EXHIBIT A
PART 1

Page 1

```
 1
 2                 IN THE UNITED STATES DISTRICT COURT
 3                   FOR THE DISTRICT OF DELAWARE
 4      BOEHRINGER INGELHEIM INTERNATIONAL,    )
        GMBH and BOEHRINGER INGELHEIM          )
 5      PHARMACEUTICALS, INC.,                 )
                                               )
 6                       Plaintiffs,           )
                                               )
 7                    vs.                      )C.A. No.
                                               )05-700
 8      BARR LABORATORIES, INC.,               ) (KAJ)
                                               )
 9                       Defendant.            )
        --------------------------------------)
10      BOEHRINGER INGELHEIM INTERNATIONAL,    )
        GMBH and BOEHRINGER INGELHEIM          )
11      PHARMACEUTICALS, INC.,                 )
                                               )
12                       Plaintiffs,           )
                                               )
13                    vs.                      ) C.A. No.
                                               ) 05-854
14                                             )  (KAJ)
        MYLAN PHARMACEUTICALS, INC.,           )
15                                             )
                         Defendant.            )
16      --------------------------------------)
17           VIDEOTAPE DEPOSITION OF ALAN STEMPEL
                     New York, New York
18             Wednesday, October 11, 2006
19      Reported by:
        ERICA L. RUGGIERI, RPR
20      Job No. 10483
21
22
23
24
25
```

Page 2

```
1
2
3                    October 11, 2006
4                     10:15 a.m.
5
6
7         Videotape deposition of ALAN STEMPEL,
8   held at the Danbury Sheraton, 18 Old Ridgebury
9   Road, Danbury, Connecticut, pursuant to notice,
10  before Erica L. Ruggieri, a Registered
11  Professional Reporter and Notary Public of the
12  State of New York.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1
2         IT IS HEREBY STIPULATED AND AGREED,
3   by and among the attorneys for the
4   respective parties herein, that filing and
5   sealing be and the same are hereby waived.
6         IT IS FURTHER STIPULATED AND AGREED
7   that all objections, except as to the form
8   of the question, shall be reserved to the
9   time of the trial.
10        IT IS FURTHER STIPULATED AND AGREED
11  that the within deposition may be sworn to
12  and signed before any officer authorized
13  to administer an oath, with the same force
14  and effect as if signed and sworn to
15  before the Court.
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1
2   A P P E A R A N C E S :
3
4   LATHAM & WATKINS LLP
5   Attorneys for Plaintiff Boehringer
6   Ingelheim
7        885 Third Avenue
8        New York, New York 10022
9   BY:   STEVEN C. CHERNY, ESQ.
10
11  WILLIAMS & CONNOLLY LLP
12  Attorneys for Defendant Barr
13  Laboratories Inc.
14       725 Twelfth Street, N.W.
15       Washington, D.C. 20005
16  BY:  GLENN J. PFADENHAUER, ESQ.
17       JESSAMYN S. BERNIKER, ESQ.
18
19  ALSO PRESENT:
20  PAULA WITTMAYER, Boehringer Ingelheim
21  MICHAEL MORRIS, Boehringer Ingelheim
22  (Afternoon session)
23  FELIX RIOS, Videographer
24
25
```

Page 5

```
1
2         THE VIDEOGRAPHER: This is tape number
3   one of the videotaped deposition of Alan
4   Stempel, in the matter of Boehringer
5   Ingelheim International, et al., versus
6   Barr Laboratories and Barr International,
7   et al., versus Mylan Pharmaceuticals Inc.
8         This deposition is being held at
9   18 Old Ridgebury Road, Danbury,
10  Connecticut, on October 11, 2006.  The time
11  is 10:16 a.m.
12        Will counsel please introduce
13  themselves.
14        MR. PFADENHAUER:  Glenn Pfadenhauer
15  with Williams & Connolly LLP, on behalf of
16  the defendant, Barr Laboratories Inc.
17        MS. BERNIKER:  Jessamyn Berniker,
18  Williams & Connolly, also on behalf of Barr
19  Laboratories.
20        MR. CHERNY:  Steve Cherny from Latham
21  & Watkins, on behalf of Boehringer
22  Ingelheim.  And with me is Paula Wittmayer
23  from Boehringer Ingelheim.
24        THE VIDEOGRAPHER:  Will the court
25  reporter please swear in the witness.
```

2 (Pages 2 to 5)

1
2  A L A N   S T E M P E L,  called as a
3  witness, having been first duly sworn by a
4  Notary Public, was examined and testified
5  as follows:
6  EXAMINATION BY
7  MR. PFADENHAUER:
8  Q.  Good morning, Mr. Stempel.
9  A.  Good morning.
10  Q.  Is it Mr. Stempel or Dr. Stempel?
11  A.  Mister.
12      MR. CHERNY:  I don't think we even
13  got the German convention of naming all our
14  lawyers doctor.
15  Q.  Would you please provide your current
16  address?
17  A.  2A Aspen Way, Brookfield,
18  Connecticut.
19  Q.  How long have you resided in
20  Brookfield, Connecticut?
21  A.  Approximately 10 years.
22  Q.  What is your current business
23  address, Mr. Stempel?
24  A.  900 Ridgebury Road, Ridgefield,
25  Connecticut.

1       Alan Stempel
2  Q.  We are sitting today in Danbury.
3  About how far away is Ridgefield from
4  Danbury?
5  A.  The border is, I don't know, might be
6  several hundred feet, actually, away from where
7  we are.
8      MR. CHERNY:  Yeah.  I don't have any
9  idea how far the town line is.
10  A.  The business, the office is about a
11  half mile from here.
12  Q.  Are you currently employed by
13  Boehringer Ingelheim?
14  A.  Yes.
15  Q.  How long have you been employed by
16  Boehringer Ingelheim?
17  A.  Since 1985.
18  Q.  What is your current position with
19  Boehringer Ingelheim?
20  A.  Senior counsel IP.
21  Q.  How long have you been in that
22  position?
23  A.  Actually, I'm not sure when my title
24  was changed.  It's been several years, but I'm
25  not sure of the exact date.

1       Alan Stempel
2  Q.  What was your title prior to being
3  senior counsel IP?
4  A.  I'm not sure of the exact title.  My
5  initial title was patent attorney, but I'm not
6  sure if there was a title in between.
7  Q.  Have you been responsible for
8  prosecution of patent applications the entire
9  time you've been working at Boehringer
10  Ingelheim?
11  A.  Yes.
12  Q.  What percentage of your work involves
13  the prosecution of patent applications?
14  A.  Well, it varies from time to time.
15      Do you have any particular time frame
16  in mind, or just sort of an average over the
17  20 years or so at the company?
18  Q.  Why don't we start on average, during
19  the period you've been with the company.
20  A.  Maybe, on average, 70, 80 percent.
21      MR. CHERNY:  I'll just caution you
22  not to speculate, if you don't know the
23  answer.
24  Q.  What occupies the other approximately
25  30 -- 20 to 30 percent of your time?

1       Alan Stempel
2      MR. CHERNY:  Objection.  Lack of
3  foundation.
4  A.  It would be a mixture of things, and
5  I think that -- I mean I, I'm not really in a
6  position to give you anything other than what
7  would amount to a guess, and I really don't want
8  to just speculate about --
9  Q.  I'm not asking you to guess,
10  Mr. Stempel.
11      What do you do besides prosecute
12  patent applications?
13      MR. CHERNY:  Currently?
14      I'm really not going to try to get in
15  the way.
16      MR. PFADENHAUER:  Mr. Cherny, please
17  don't get in the way because I'm not going
18  to tolerate that.  We will have no speaking
19  objections.
20      MR. CHERNY:  Glenn -- Glenn, I don't
21  like speaking objections either.  Please
22  don't yell at me either.  I'm really just
23  trying to be helpful.  I think that that is
24  what is causing the confusion.  I'm not a
25  big speaking objection guy.  I'm glad you're

Page 10

1    Alan Stempel
2    not. I'm really just trying to be helpful,
3    okay.
4    Q.    You can answer the question,
5    Mr. Stempel.
6    A.    I do some opinion work.  I have on
7    occasion done some agreement work.  I do
8    counseling of various sorts.  That's about it.
9    Q.    Does -- I'm sorry, I didn't mean to
10   interrupt you.
11   A.    That's -- that's it.
12   Q.    The opinion work, agreement work and
13   counseling that you've done, has it all related
14   primarily to patent issues?
15        MR. CHERNY:  Objection, compound.
16        You can answer.
17   A.    Why don't you break that down.
18   Q.    Has the opinion work that you've done
19   related primarily to patent issues?
20   A.    Yes.
21   Q.    Has the agreement work that you've
22   done related primarily to patent issues?
23   A.    What do you mean by "patent issues"?
24   Q.    Has the agreement work that you've
25   done involved agreements related to patents?

Page 11

1    Alan Stempel
2    A.    Some have.
3    Q.    What other general areas have your
4    agreement work -- has your agreement work
5    entailed, other than patents?
6    A.    Confidentiality agreements, sponsored
7    research agreements, sponsored clinical research
8    agreements, IP license agreements.
9         That's about it.
10   Q.    Have you had your deposition taken
11   before, Mr. Stempel?
12   A.    No.
13   Q.    Never?
14   A.    Never.
15   Q.    Have you attended depositions
16   previously?
17   A.    Once.
18   Q.    What deposition did you attend?
19   A.    I attended a deposition in litigation
20   having to do with a product called Flomax.
21        MR. CHERNY:  I'm just going to
22        caution you, any questions going forward,
23        in terms of the substance of that,
24        obviously there's a protective order in
25        that case as well.  Take it one by one,

Page 12

1    Alan Stempel
2    just be careful not to violate anything in
3    that case.
4    Q.    What was your role in the deposition
5    at the Flomax case that you attended?
6    A.    Observer.
7    Q.    Were you the client representative at
8    the deposition?
9    A.    I suppose I was a representative of
10   the client, yes, but it was mostly an observer.
11   Q.    Was the deposition of a Boehringer
12   Ingelheim employee?
13   A.    No.
14   Q.    Was the deposition of a
15   representative of the opposing party?
16   A.    No.
17   Q.    Was the deposition of an expert?
18   A.    Actually, he was a fact witness, not
19   an expert witness.
20   Q.    How long ago did you attend the
21   deposition?
22   A.    It was roughly a month ago, maybe a
23   little more.
24   Q.    Let me just cover some of the ground
25   rules this morning, Mr. Stempel.  Even though

Page 13

1    Alan Stempel
2    you've been to one deposition, I don't know if
3    that operated under the same rules we are going
4    to operate under today.
5         As you can see, we have a court
6    reporter today who is taking down everything
7    that is said.  She can't record nods of your
8    head or shrugs of your shoulders, so I need you
9    to verbalize your answers.
10        Will you do that for me?
11   A.    Sure.
12   Q.    Will you also let me know if at any
13   time today you don't understand my question?
14   A.    Sure.
15   Q.    It's obviously difficult for me to
16   rephrase the question if I don't know that you
17   don't understand it.  So I will rely on you to
18   let me know if you don't understand a question.
19        Will you do that?
20   A.    Uh-hum.
21   Q.    If at any time today you need to take
22   a break, Mr. Stempel, please let me know.  If
23   there's a question pending, I'll ask you to
24   answer the pending question, but then we can
25   accommodate your request for a break.

4 (Pages 10 to 13)

Page 14

Alan Stempel

1
2    A.    Okay.
3    Q.    You understand that you are under
4  oath today, and you have the same obligation to
5  tell the truth, the complete truth, as if you
6  were in a court of law?
7    A.    Yes.
8    Q.    Where did you obtain your
9  undergraduate degree, Mr. Stempel?
10    A.    Franklin Marshall College.
11    Q.    What's your undergraduate degree in?
12    A.    I have a BA degree.
13    Q.    And what was your major?
14    A.    Chemistry.
15    Q.    Did you undertake any further formal
16  education beyond your Bachelor's degree?
17    A.    In any field?
18    Q.    Yes.
19    A.    I have a degree in law.
20    Q.    Apart from your law degree, did you
21  undertake any formal education beyond your
22  Bachelor's degree?
23    A.    Yes.
24    Q.    What other education did you
25  undertake?

Page 15

Alan Stempel

1
2    A.    I took a course in polymer chemistry.
3    Q.    When did you take that course?
4    A.    Sometime during the time frame of '81
5  to '82.
6    Q.    When did you obtain your
7  undergraduate degree?
8    A.    '74.
9    Q.    Do you have any degrees other than
10  your Bachelor's degree and your law degree?
11    A.    No.
12    Q.    When did you obtain your law degree?
13    A.    '77.
14    Q.    Where did you obtain that degree?
15    A.    New England School of Law.
16    Q.    Where is the new England School of
17  Law located?
18    A.    Boston.
19    Q.    Do you have any professional
20  publications that have been published in any
21  peer review literature?
22    A.    No.
23    Q.    Are you the named inventor on any
24  patents?
25    A.    No.

Page 16

Alan Stempel

1
2    Q.    Am I correct that you went straight
3  from undergrad school to law school?
4    A.    Yes.
5    Q.    Did you work during your summers
6  while in law school?
7    A.    I don't believe I did.
8    Q.    When you graduated from law school in
9  1977, did you obtain employment?
10    A.    Yes.
11    Q.    When?
12    A.    What time frame are you asking about?
13    Q.    What was the first job you obtained
14  after you graduated from law school?
15    A.    I clerked for a brief period,
16  approximately six months, for the law firm of
17  Zwerling & Zwerling.
18    Q.    And where was the firm of Zwerling &
19  Zwerling located, at the time you clerked for
20  them?
21    A.    Lower Manhattan.
22    Q.    And what was the nature of the
23  practice of Zwerling & Zwerling, when you
24  clerked there?
25    A.    It was a general practice firm.

Page 17

Alan Stempel

1
2    Q.    What were your duties and
3  responsibilities during the time that you
4  clerked at Zwerling & Zwerling?
5    A.    Mostly in the legal research, some
6  document preparation.
7    Q.    Were you involved in any patent
8  prosecution while you were at Zwerling &
9  Zwerling?
10    A.    No.
11    Q.    Did you take any intellectual
12  property law courses while in law school?
13    A.    Yes.
14    Q.    Did you take patent law while at law
15  school?
16    A.    Yes.
17    Q.    Did you sit for the patent bar?
18    A.    Yes.
19    Q.    When did you sit for the patent bar?
20    A.    '78, I believe.
21    Q.    Did you pass the patent examination?
22    A.    Yes.
23    Q.    Became a member of the PTO bar --
24    A.    Yes.
25    Q.    -- in 1978?

5 (Pages 14 to 17)

Page 18

Alan Stempel

1  
2     A.    It was either '78 or '79.
3     Q.    You were also a member of the bar in
4  New York State; is that correct?
5     A.    Yes.
6     Q.    And you are a member of the bar in
7  Connecticut?
8     A.    Yes.
9     Q.    Did you take the Connecticut exam or
10 did you waive it?
11    A.    I recall that I had to take the
12 ethics part of the exam; otherwise, I waived it.
13    Q.    Did you obtain employment following
14 your clerkship at Zwerling & Zwerling?
15    A.    Yes.
16    Q.    Where did you obtain employment at
17 that time?
18    A.    At a company called Burndy.
19    Q.    Could you spell that for me, please?
20    A.    B-U-R-N-D-Y.
21    Q.    And where is that -- where was that
22 company located, when you joined them?
23    A.    Norwalk, Connecticut.
24    Q.    And at the time you joined Burndy,
25 what was the nature of their business?

Page 19

Alan Stempel

1  
2     A.    They made electrical connectors.
3     Q.    In what capacity did you join Burndy?
4     A.    As a patent attorney.
5     Q.    And was that in 1978?
6     A.    I believe it was '79.
7     Q.    At the time you joined Burndy in 1979
8  as a patent attorney, did you have any
9  experience as a patent attorney?
10    A.    No.
11    Q.    Had you ever prosecuted patent
12 applications prior to that time?
13    A.    No.
14    Q.    Had you ever drafted any patent
15 applications?
16    A.    No.
17    Q.    How long did you remain at Burndy?
18    A.    Approximately two years.
19    Q.    Did your position change during the
20 time you were at Burndy?
21    A.    No.
22    Q.    How many -- approximately how many
23 patent applications did you prepare during the
24 time you worked at Burndy?
25    A.    I really can't recall.

Page 20

Alan Stempel

1  
2     Q.    Did you prepare any?
3     A.    I'm sure I prepared some -- a few,
4  yes.
5     Q.    Did you prosecute any patent
6  applications while you were at Burndy?
7     A.    Yes.
8     Q.    Did Burndy do all of their patent
9  prosecution in-house?
10    A.    All their substantial law, as I
11 recall it.
12    Q.    Were you the only patent attorney
13 employed at Burndy during the time you worked
14 there?
15    A.    No.
16    Q.    How many other patent attorneys
17 worked at Burndy while you were there?
18    A.    One other.
19    Q.    Did you report to that individual?
20    A.    Yes.
21    Q.    Why did you leave Burndy?
22    A.    For a better position.
23    Q.    What was that better position?
24    A.    I went to a company called Akzona.
25    Q.    Would you spell that, please.

Page 21

Alan Stempel

1  
2     A.    A-K-Z-O-N-A.
3     Q.    Where was Akzona located, when you
4  joined them?
5     A.    Asheville, North Carolina.
6           MR. CHERNY:  Sorry for the
7  interruption.  Just for the record, Tim
8  Wikowski (ph) from Boehringer Ingelheim
9  just walked in.
10    Q.    What was your position when you
11 joined Akzona?
12    A.    I'm not sure I recall my exact title.
13    Q.    Were you hired to do patent
14 prosecution?
15    A.    Preparation and prosecution.
16    Q.    How long did you remain at Akzona?
17    A.    Approximately two years.
18    Q.    Approximately how many patent
19 applications did you prepare while you worked at
20 Akzona?
21    A.    I -- I don't recall the number.
22    Q.    More than ten?
23    A.    I don't recall the exact number.
24    Q.    So it could have been fewer than ten
25 applications that you prepared during the two

Page 22

Alan Stempel

1
2 years you worked at Akzona?
3     A.    It could have been fewer. It could
4 have been more.
5     Q.    You have no idea?
6     A.    Not without going back and -- no, I
7 really have no way of getting the number.
8     Q.    Did you prosecute applications while
9 you worked at Akzona?
10    A.    Yes.
11    Q.    What was the nature of Akzona's
12 business?
13    A.    It was a mixture of different
14 businesses. It was synthetic fibers,
15 manufacturer of synthetic fibers, nylon, rayon,
16 polyester. They had an electrical connector
17 business.
18          Are you asking what aspects of the
19 business -- what businesses they had or what
20 aspects of the business I worked on or with?
21    Q.    Well, I think my question was what
22 aspects they had, but why don't we answer the
23 next question.
24          What aspects did you work with?
25    A.    The two I just mentioned.

Page 23

Alan Stempel

1
2     Q.    Electrical connectors and synthetic
3 fibers?
4     A.    Yes.
5     Q.    Why did you leave Axo (ph)?
6     A.    Akzona.
7     Q.    Akzona, I'm sorry.
8     A.    Because Axo is a different company.
9          For a better position.
10    Q.    And where was that better position?
11    A.    With Roche.
12    Q.    How was the position at Roche better?
13    A.    The salary was better. And it was in
14 pharmaceuticals, which is a field that I wanted
15 to get into.
16    Q.    At the time you joined Roche, had you
17 done any work in the pharmaceutical field?
18    A.    No.
19    Q.    When did you join Roche?
20    A.    I think it was '83.
21    Q.    Where was the position at Roche?
22    A.    It was located in Nutley, New Jersey.
23    Q.    And were you hired to prepare and
24 prosecute patent applications for Roche?
25    A.    Yes.

Page 24

Alan Stempel

1
2     Q.    Were those patent applications
3 exclusively in the pharmaceutical field?
4     A.    I think that depends on -- no.
5     Q.    What fields were they -- were the
6 patent applications that you prepared and/or
7 prosecuted at Roche in, other than
8 pharmaceuticals?
9     A.    Diagnostics.
10    Q.    Medical diagnostics?
11    A.    Yes.
12    Q.    Were you involved in the preparation
13 or prosecution of patent applications at Roche
14 in any other fields, other than medical
15 diagnostics and pharmaceuticals?
16    A.    Not that I recall.
17    Q.    When did you leave Roche?
18    A.    At the end of '84 or possibly the
19 very -- very early '85.
20    Q.    Did you leave Roche to join
21 Boehringer Ingelheim?
22    A.    Yes.
23    Q.    Why did you leave Roche?
24    A.    The position at Boehringer was a
25 better position.

Page 25

Alan Stempel

1
2     Q.    In what way was it better?
3     A.    Mostly in terms of salary.
4     Q.    When you joined Boehringer Ingelheim
5 in late '84 or early '85, were they physically
6 located in the same place they are now?
7     A.    They were on the other side of town.
8     Q.    Same town, though?
9     A.    Ridgefield, yes.
10    Q.    And have you been continuously
11 employed by Boehringer Ingelheim since the end
12 of '84 or early '85?
13    A.    Yes.
14    Q.    Are you employed by the German
15 Boehringer Ingelheim company, or are you a
16 subsidiary?
17          MR. CHERNY:  Objection, vague. Lack
18 of foundation as well.
19    Q.    You can answer.
20    A.    Can you clarify your question.
21    Q.    What company gives you your paycheck?
22    A.    Boehringer Ingelheim Pharmaceuticals
23 Inc.
24    Q.    Is that a United States company?
25    A.    Yes.

7 (Pages 22 to 25)

Page 26

Alan Stempel

1
2    Q.   Is that wholly owned by a German
3  company?
4    A.   I'm not sure that it is wholly owned
5  by a German company.
6    Q.   What is your understanding of the
7  ownership of Boehringer Ingelheim
8  Pharmaceuticals Inc.?
9    MR. CHERNY:  Objection.  Lack of
10  foundation.
11    MR. PFADENHAUER:  How is there a lack
12  of foundation, when I said what is his
13  understanding?
14    MR. CHERNY:  You didn't establish
15  whether he has an understanding.
16    MR. PFADENHAUER:  I don't have to ask
17  him that first.  He can tell me he doesn't
18  have an understanding.  That's a crazy
19  objection.
20    MR. CHERNY:  Glenn, first of all, do
21  you really want to argue with me?
22    MR. PFADENHAUER:  I don't want to
23  waste time with your objections, when they
24  are frivolous.
25    MR. CHERNY:  I'm allowed to make an

Page 27

Alan Stempel

1
2  objection.  Do you really want to go to the
3  judge and argue that foundation objection?
4    MR. PFADENHAUER:  I don't want to
5  waste a bunch of time with frivolous
6  objections.
7    MR. CHERNY:  We've both done this
8  enough of times to know that I'm sitting
9  here quietly, listening to your questions.
10  I made an objection.  I didn't make a big
11  deal.
12    MR. PFADENHAUER:  Just go ahead and
13  ask your question.
14    MR. CHERNY:  No, I'm not going to
15  stop.  And you are not going to get me to
16  stop saying lack of foundation.  So go ask
17  your question and calm down.  We are all
18  friends here, seriously.
19    MR. PFADENHAUER:  Don't think I won't
20  go to Judge Stein, if you interrupt the
21  deposition.
22    MR. CHERNY:  Please, please go any
23  time you want to.
24    Q.   Go ahead, Mr. Stempel.
25    A.   I am not really sure what -- what

Page 28

Alan Stempel

1
2  legal entity owns Boehringer Ingelheim Pharm --
3  well, Boehringer Ingelheim Pharmaceuticals, Inc.
4  is a subsidiary of Boehringer Ingelheim
5  Corporation, which is an American company.
6    Q.   And what is your understanding of the
7  ownership of Boehringer Ingelheim Corporation?
8    A.   I am not a hundred percent sure of
9  the ownership of Boehringer Ingelheim
10  Corporation.
11    Q.   Do you have any understanding at all,
12  apart from something that's 100 percent sure?
13    A.   I believe it's owned by a Canadian
14  company, but I'm not sure about that.
15    Q.   Have you, during the course of your
16  work at Boehringer Ingelheim Pharmaceuticals,
17  Inc., performed work for other companies?
18    A.   Yes.
19    Q.   What other companies have you
20  performed work for?
21    A.   It's a little bit difficult for me to
22  answer your question, because first of all, we
23  are talking about a 20-year time span, and over
24  the course of that time some of these legal
25  entities that I have performed work for have

Page 29

Alan Stempel

1
2  either ceased to exist, have changed their name
3  or have been replaced by other entities; and I'm
4  not quite sure at this stage that I could
5  correctly name some of the legal entities from
6  earlier in the 20-year time span.
7    Q.   Have you prosecuted patent
8  applications where the assignee is a German
9  company?
10    A.   Yes.
11    Q.   Identify for me any of the German
12  companies for whom you have prosecuted patent
13  applications.
14    A.   Again I'm not entirely sure, because
15  of the 20-year time frame involved, that I could
16  correctly tell you the correct legal names of
17  some of these legal entities --
18    Q.   Can you tell me the name --
19    A.   -- because they have changed over
20  time.
21    Q.   Can you tell me the names of any of
22  the companies, German companies that you
23  prosecuted German applications for?
24    A.   Sure.  Dr. Karl Thomae.
25    Q.   Any others?

8 (Pages 26 to 29)

Page 30

Alan Stempel

2  A.  There was also a legal entity which
3 was essentially Boehringer Ingelheim, probably
4 GmbH, but again, I'm not quite sure.  I mean I
5 know -- I can tell you what the names of legal
6 entities are more currently, but I am a little
7 bit hazy at this point as to what their correct
8 legal names were, say, 20 years ago.
9  Q.  Has there, throughout the time that
10 you've worked for Boehringer Ingelheim
11 Pharmaceuticals USA -- Boehringer Ingelheim
12 Pharmaceuticals, Inc., is that what you said the
13 name of your employer is?
14  A.  Yes.
15  Q.  During the time that you worked for
16 that company, have you always been performing
17 work for the Boehringer Ingelheim German
18 corporation, whatever particular name it held at
19 the time?
20  A.  You mean for various German entities
21 that are part of the Boehringer family?
22  Q.  Yes.  How about that.
23  A.  That's fair to say.
24  Q.  Is there a patent department in
25 Germany that provides patent services for the

Page 31

Alan Stempel

2 Boehringer family, as you have used the term?
3  MR. CHERNY:  Objection, vague.
4  A.  A single patent department?
5  Q.  Have you dealt with a patent
6 department or more than one patent department in
7 Germany for Boehringer companies?
8  A.  Yes.
9  Q.  How many patent departments in
10 Germany have you dealt with for Boehringer
11 companies?
12  A.  There are -- there are either one
13 department or two departments.
14  There's certainly a department with
15 two physical locations in Germany.
16  Q.  What are the two physical locations?
17  A.  Ingelheim and Biberach.
18  Q.  And have, you throughout the time
19 that you've worked for Boehringer Ingelheim,
20 performed work in conjunction with both the
21 patent departments in Ingelheim and in Biberach?
22  A.  Yes.
23  Q.  Do you have any understanding as to
24 how work is segregated between Ingelheim and
25 Biberach?

Page 32

Alan Stempel

2  MR. CHERNY:  Can I have that read
3 back, please.
4  (Record read.)
5  A.  I really do not understand your
6 question.
7  First of all, I don't understand it,
8 because I don't know what time frame you are
9 talking about; and then I also don't understand
10 in general what you mean by "segregated."
11  Q.  Let me try another question.
12  A.  Okay.
13  Q.  Have you, during the time that you
14 worked at Boehringer Ingelheim, prosecuted U.S.
15 counterpart applications for patent applications
16 that were originally filed in Germany?
17  A.  Yes.
18  Q.  And have you done that working with
19 individuals from the patent office in
20 Ingelheim -- the patent department in Ingelheim?
21  A.  Yes.
22  Q.  Have you done that kind of work
23 working with individuals from the patent
24 department in Biberach?
25  A.  Yes.

Page 33

Alan Stempel

2  Q.  Are there particular types of patent
3 applications that have originated in Ingelheim
4 versus Biberach?
5  MR. CHERNY:  Objection, vague.
6  A.  I have to agree that I really don't
7 understand what you mean by "type."
8  Q.  What I'm trying to get at, are there
9 subject matters that originate out of one office
10 versus the other?  Does one office do
11 pharmaceutical compositions and the other does
12 active ingredients?  Does one do a particular
13 class of compositions?
14  Is there some distinction in your own
15 mind between the types of patent applications
16 that come to you from Ingelheim and those that
17 come to you from Biberach?
18  A.  I -- I really don't know how I
19 could -- how I would characterize -- I don't
20 know what the difference is between the cases
21 coming from one site or the other.
22  First of all, again, it depends on
23 the time frame you are talking about.  But even
24 then I'm not sure that I could characterize the
25 applications coming from one side as being --

Page 34

Alan Stempel

1
2  having some different characteristic than the
3  applications coming from another.
4      Q.    Approximately how many patents have
5  you prosecuted during your career, Mr. Stempel?
6      A.    I'm not really sure that I could,
7  without taking some time to think about it, come
8  up with a number that -- and it would, at the
9  end of the day, only be a guesstimate, an
10  approximation.
11      Q.    Well, I'm happy to have you
12  approximate for me.
13          Is it more than a hundred?
14      A.    Yes, certainly.
15      Q.    Do you think it's more than 500?
16      A.    Possibly.
17      Q.    Have you prosecuted patent
18  applications before any entity other than the
19  United States Patent and Trademark Office?
20      A.    No.
21      Q.    To your knowledge, has any patent
22  that you prosecuted been found by any court to
23  be invalid or unenforceable?
24      A.    Not to my knowledge.
25      Q.    Has any patent that was prosecuted by

Page 35

Alan Stempel

1
2  you been subjected to a reexamination by the
3  United States Patent and Trademark Office?
4      A.    Not to my knowledge.
5      Q.    In conjunction with your work at
6  Boehringer Ingelheim, have you prosecuted any
7  patent applications that were filed in the first
8  instance, that is, were original applications as
9  filed in the United States Patent and Trademark
10  Office?
11      A.    Yes.
12      Q.    Approximately what portion of the
13  patent applications that you've prosecuted are
14  applications that were filed in the first
15  instance in the United States, as opposed to
16  another country?
17      A.    I'm not really comfortable in just
18  making a guess, and it would be a guess.
19      Q.    Is it a very small percentage?
20          MR. CHERNY:  Objection, vague.
21      A.    What is small?
22      Q.    Less than 20 percent.
23      A.    Probably less than 20 percent, yes.
24      Q.    The applications that you filed that
25  were filed in the first instance in the United

Page 36

Alan Stempel

1
2  States, did that relate to work that was done in
3  the United States or work that was done in
4  another country?
5      A.    You are saying of the applications
6  that were filed first in the United States, did
7  100 percent of them relate to U.S. -- U.S.
8  origin inventions, or are you saying most --
9  what -- what do you mean?
10      Q.    Tell me, if you can, whether the
11  majority of those originate, the work was
12  originally done in the United States or in some
13  other country.
14      A.    I would say the majority of the
15  applications that were filed in the first
16  instance in the United States dealt with U.S.
17  origin inventions.
18      Q.    In what facilities has Boehringer
19  done work in the United States that led to the
20  filing of patent applications, in the first
21  instance, in the United States?
22          MR. CHERNY:  Objection.  Lack of
23      foundation.
24      A.    Would you repeat your question,
25  please.

Page 37

Alan Stempel

1
2      Q.    With respect to those applications,
3  patent applications that you filed in the first
4  instance in the United States, where the
5  underlying work was done in the United States,
6  where was that -- tell me what facilities, in
7  which facilities that work was done.
8      A.    Are you -- does your question
9  presuppose that the facilities are those of a
10  particular legal entity?
11      Q.    No.
12      A.    Is your question -- are you asking
13  for a comprehensive listing, or are you asking
14  simply in the main, what facilities did they
15  come from?
16      Q.    That's fine.
17      A.    The latter?
18      Q.    Yes, that's fine.
19      A.    From the research facilities of
20  Boehringer Ingelheim Pharmaceuticals, which are
21  located in Ridgefield, Connecticut, and, to a
22  lesser degree, the research facilities of
23  Boehringer Ingelheim Chemicals, Inc. in
24  Petersburg, Virginia.
25      Q.    Has Boehringer Ingelheim operated

10 (Pages 34 to 37)

Page 38

Alan Stempel

1
2  both of the facilities you've just described the
3  entire time that you worked at the company?
4      A.    First of all, what do you mean by
5  Boehringer Ingelheim?
6      Q.    The Boehringer family. Let's just --
7  could we use the Boehringer family? I don't
8  want to attach particular legal entities to and
9  I don't want to make you uncomfortable by
10  suggesting that a particular company, but the
11  Boehringer family of companies.
12          Has that family of companies operated
13  both of those facilities the entire time you've
14  worked at Boehringer?
15      A.    Yes.
16      Q.    And have you been involved in
17  prosecuting patent applications based on work
18  originating from those two facilities the entire
19  time that you've worked for Boehringer?
20      A.    I'm sorry, repeat that question.
21      Q.    Yes. Have you been involved in
22  prosecuting patent applications based on work
23  that originated in these two facilities the
24  entire time that you've worked at Boehringer?
25      A.    I'm not 100 percent sure that the

Page 39

Alan Stempel

1
2  Boehringer Ingelheim Chemicals facility in
3  Virginia has existed for the entire time. I'm
4  not sure that it hasn't, but I'm not sure that
5  it has existed for the entire time that I have
6  worked for Boehringer.
7      Q.    Okay. Have you prosecuted patent
8  applications arising out of work done at the
9  Boehringer Ingelheim Pharmaceuticals facility in
10  Ridgefield, Connecticut the entire time you
11  worked for the company?
12      A.    Yes.
13      Q.    In those instances in which you have
14  filed patent applications which were filed in
15  the first instance in the United States, did you
16  draft those patent applications?
17      A.    What do you mean by "draft"?
18      Q.    Did you write the text of the
19  application?
20      A.    In some instances, yes. In some
21  instances, no.
22      Q.    In those instances where you did not
23  write the text, was the text written by another
24  patent attorney or by someone else?
25      A.    I'm not entirely sure.

Page 40

Alan Stempel

1
2      Q.    Does Boehringer Ingelheim have a
3  practice of inventors submitting invention
4  disclosure forms to the patent department?
5      A.    Yes --
6      Q.    In the majority of instances in which
7  you have --
8      A.    -- but it has not always had that.
9      Q.    At what point in time did Boehringer
10  begin a practice of having invention disclosure
11  forms prepared?
12          MR. CHERNY: And I'd like to -- when
13  you say "Boehringer," I assume --
14          MR. PFADENHAUER: I'm talking about
15  the U.S. activities now.
16          MR. CHERNY: No, no. The question
17  I'm asking, before you said you would
18  define Boehringer Ingelheim. I myself am
19  getting confused between all the different
20  entities.
21          MR. PFADENHAUER: I'm fine, Steve. I
22  understand your point.
23          MR. CHERNY: You just said
24  Boehringer. I just want to know who you
25  were referring to.

Page 41

Alan Stempel

1
2          MR. PFADENHAUER: I think it's clear
3  that we are talking about the applications
4  that Mr. Stempel prepared that were
5  originally filed in the U.S. in the first
6  instance.
7          MR. CHERNY: I'm just trying to keep
8  up with the different Boehringers.
9          MR. PFADENHAUER: That's fine.
10  That's fine.
11          THE WITNESS: I think it's an
12  important distinction, because I think that
13  as you go from Boehringer company to
14  Boehringer company, and we have discussed
15  that I have done work for several
16  Boehringer companies within the United
17  States, I think that the procedures about
18  how a patent application, say, comes to be,
19  varies not only from company to company but
20  from time to time. So that makes it rather
21  difficult to answer your question.
22      Q.    All right. Why don't we focus on the
23  time period from when you joined the company
24  through 1990, so about the first five years you
25  were with the company.

11 (Pages 38 to 41)

Page 42

Alan Stempel

1
2    A.    Okay.
3    Q.    During that period of time, did you
4    draft patent applications that were filed in the
5    first instance in the United States?
6    A.    Yes.
7    Q.    Were those patent applications
8    generally based on an invention disclosure that
9    was submitted to you?
10    MR. CHERNY:  Objection, vague.
11    A.    What's an invention disclosure?
12    Q.    An invention disclosure form that had
13    been submitted to you?
14    A.    I don't think that that would
15    generally be the case.
16    Q.    During the period of time that we
17    have been talking about, '85 through '90, with
18    respect to applications that you filed in the
19    first instance in the United States, would
20    inventors provide you with draft patent
21    applications or portions of draft patent
22    applications?
23    A.    What do you mean by a portion of a
24    draft patent application?
25    Q.    Apart from providing you data or

Page 43

Alan Stempel

1
2    information that could be incorporated in an
3    application, did inventors provide you with
4    drafts of patent applications?
5    A.    I don't think you can fairly
6    characterize anything that the inventors
7    provided as being drafts of patent applications,
8    no.
9    Q.    So it was generally, during that
10    period of time, the responsibility of the patent
11    department to draft the patent applications?
12    A.    Correct.
13    Q.    During that period of time, 1985
14    through 1990, how many patent attorneys were
15    involved in drafting patent applications that
16    would be filed in the first instance in the
17    United States for the Boehringer companies?
18    A.    Well, during that time period the
19    number of patent attorneys that we had changed a
20    bit over time, so I'm not sure how to answer
21    your question.
22    Q.    All right.  Tell me the range, in
23    terms of the number of patent attorneys that you
24    had during that period of time.
25    A.    I believe that the greatest number of

Page 44

Alan Stempel

1
2    patent attorneys that we ever had during that
3    time frame was four.
4    Q.    And what was the fewest number you
5    had during that period?
6    A.    Two.
7    Q.    Besides yourself, who were the other
8    patent attorneys that were involved in
9    prosecuting patent applications filed in the
10    first instance in the United States for the
11    Boehringer family of companies?
12    A.    During that time?
13    Q.    During that time period.
14    A.    Well, there was a member of the
15    staff, who I am not sure whether he ever drafted
16    or prosecuted a patent application during that
17    time period.
18    Q.    Well, you can make that clear in your
19    answer.
20    A.    There was a member of our staff, he
21    was the head of our staff, Dr. David
22    Frankhouser.  Again, I am not sure whether or
23    not, during that time period, whether or not he
24    drafted or prosecuted any patent applications.
25    Q.    Was he one of the four?

Page 45

Alan Stempel

1
2    A.    Yes.
3    Q.    You said the maximum was four.
4    Did that include Dr. Frankhouser?
5    A.    Yes.
6    There was an attorney, Charles
7    Herring, he did draft and prosecute patent
8    applications.  And there was Maryellen Devlin,
9    she did draft and prosecute patent applications.
10    And there was another individual, and
11    I'm not quite sure if he falls within your time
12    frame or not.  I think he may, but I'm not sure.
13    Q.    Who was that?
14    A.    His last name was Reitenbach.
15    What was his first name?
16    Q.    I'm sorry, the last name was
17    Reitenbach?
18    A.    Reitenbach.
19    Q.    Reitenbach.  You can't recall his
20    first name?
21    A.    It will come to me.
22    Q.    With respect to these individuals
23    you've identified, did each of them work
24    primarily physically in the United States?
25    A.    Yes.

12 (Pages 42 to 45)

Page 46

Alan Stempel

1
2    Q.    With respect to these individuals
3    other than yourself -- well, let me strike that.
4          Maryellen Devlin that you referred
5    to --
6    A.    Yes.
7    Q.    -- is that the same person as
8    Maryellen Timbers?
9    A.    Yes.
10   Q.    Is Ms. Timbers still employed by
11   Boehringer Ingelheim?
12   A.    Yes.
13   Q.    Is Dr. Frankhouser still employed by
14   Boehringer Ingelheim?
15   A.    No, he's retired.
16   Q.    Do you know if he's living in the
17   United States?
18   A.    I believe he lives in Pennsylvania.
19   I'm not certain.
20   Q.    Mr. Herring, is he still employed by
21   Boehringer Ingelheim?
22   A.    I have no idea what became of
23   Mr. Herring.
24   Q.    And Mr. Reitenbach, is he still
25   employed by Boehringer Ingelheim?

Page 47

Alan Stempel

1
2    A.    No.
3    Q.    With respect to these individuals
4    that you've identified -- let's put
5    Dr. Frankhouser off to the side for a second.
6          With respect to the other
7    individuals, were each of them also involved in
8    the prosecution of patent applications in the
9    United States that had been originally filed in
10   a foreign country?
11   A.    Yes.
12   Q.    And do you know if Dr. Frankhouser
13   was involved in the prosecution in the United
14   States of patent applications that had
15   originally been filed in a foreign country?
16   MR. CHERNY:  Objection, vague.
17   A.    What do you mean by "involved"?
18         That was your word, right, involved?
19   Q.    My computer is not --
20   MR. CHERNY:  That was the word.
21   Q.    If that was the word.
22   A.    What do you mean by "involved"?
23   Q.    Did he personally prepare or
24   prosecute patent applications in the United
25   States that were originally filed in another

Page 48

Alan Stempel

1
2    country?
3    A.    I can't say with certainty that he
4    did not.
5    Q.    In this period of time, 1985 through
6    1990, did you file any patent applications in
7    the United States that were counterparts of
8    applications that had originally been filed in
9    any country other than Germany?
10   A.    Yes.
11   Q.    What other countries?
12   A.    I believe there were some
13   applications that originally were out of Italy.
14   Q.    And -- I'm sorry.
15   A.    I am not sure that there were any
16   applications originating from -- your question
17   was aside from Germany, correct?
18   Q.    Correct.
19   A.    I do not believe that I recall any
20   that came from places, in that time frame, other
21   than Germany and Italy.
22   Q.    During that time frame, '85 through
23   1990, did you prosecute any patent applications
24   in the United States that had originally been
25   filed in the European patent office?

Page 49

Alan Stempel

1
2    A.    I don't recall if any of the
3    applications I prosecuted in the United States
4    had originally been filed in the EPO.
5    Q.    Did many of the patent applications
6    that you prosecuted in the United States during
7    this period, '85 through '90, have counterparts
8    that had been filed or were pending in the
9    European patent application -- Patent Office?
10   MR. CHERNY:  Objection, vague.
11   A.    Are you saying that the European --
12   the EPO filings was the basis -- that the U.S.
13   filing was the counterpart of the EPO filing or
14   simply that there was, in addition to the U.S.
15   filing, an EPO filing?
16   Q.    I don't intend to limit my question
17   to those cases in which the United States filing
18   relies on the EPO filing for priority.  I'm
19   trying to understand whether there were
20   counterpart applications pending in the EPO,
21   generally, with respect to the applications that
22   you were prosecuting in the United States during
23   this time, which had originally been filed in
24   some country other than the United States.
25   MR. CHERNY:  Objection, vague.

13 (Pages 46 to 49)

Alan Stempel

1
2     A.   I'm not sure that I feel comfortable,
3  since I did not carry out any of these EPO
4  filings, I'm not sure that I feel comfortable in
5  saying that across the board there were
6  corresponding EPO filings.  So -- I mean I
7  don't -- I don't feel comfortable answering your
8  question, because your question calls for a
9  generalization that I'm not sure I'm prepared to
10 make.
11    Q.   Were there numerous instances in
12 which you became aware that there were
13 counterpart applications pending in the EPO
14 while you were prosecuting an application in the
15 United States?
16         MR. CHERNY:  Objection, vague.
17    A.   I am aware that there was some.
18    Q.   During the period of time 1985
19 through 1990, who did you report to?
20    A.   Dr. Frankhouser.
21    Q.   Was Dr. Frankhouser your supervisor
22 for all of your activities during the time
23 period?
24    A.   Yes.
25    Q.   What was your understanding, if you

Alan Stempel

1
2  had one, as to whom Dr. Frankhouser reported
3  during that time?
4     A.   He reported to Philip Franks.
5     Q.   Franks, F-R-A-N-K-S?
6     A.   Yes.
7     Q.   And where was Mr. Franks located
8  during that time?
9     A.   Ridgefield, Connecticut, same
10 facility as we were.
11    Q.   What was Dr. Frankhouser's position
12 during this period of time, 1985 through 1990?
13    A.   Chief patent counsel.
14    Q.   And what was Mr. Franks' position
15 during that time?
16    A.   General counsel.
17    Q.   During this period of time, 1985 to
18 1990, did either you or Dr. Frankhouser, to your
19 knowledge, have any reporting requirements to
20 patent agents or patent attorneys working in
21 Germany?
22    A.   What do you mean by "reporting
23 requirements"?
24    Q.   Did you have any obligation to report
25 information to patent attorneys or patent agents

Alan Stempel

1
2  in Germany?
3     A.   Yes.
4     Q.   Were you obligated, during this
5  period of time, to take certain instructions
6  from patent attorneys or patent agents in
7  Germany?
8     A.   Yes.
9     Q.   What instructions were you obligated
10 to take, during this period of time, from such
11 individuals?
12    A.   I think -- I think that covers a lot
13 of ground, and it's -- it's a little bit too
14 vague for me to answer, the way it's posed.
15         Can you narrow that?
16    Q.   I'm trying to understand, when you
17 said yes to my question that you were obligated
18 to take some instructions, if you can identify
19 for me what you were thinking about.
20    A.   Fair enough.
21         We would be, from time to time,
22 requested to file U.S. counterpart applications
23 to applications that had been filed in another
24 jurisdiction under the Paris -- usually under
25 the Paris convention.

Alan Stempel

1
2     Q.   Any other instructions that you can
3  recall being obligated to comply with during
4  this period of time, from patent attorneys or
5  patent agents in Germany?
6          MR. CHERNY:  Objection.  Lack of
7  foundation.
8     A.   Do you have any other particular
9  activities in mind?
10    Q.   Were there any other activities that
11 you can think of, in connection with the
12 preparation or prosecution of patent
13 applications, where you would have been
14 obligated to honor instructions from patent
15 attorneys or patent agents in Germany?
16         MR. CHERNY:  Objection.  Lack of
17 foundation.
18    A.   We would -- if we were to receive an
19 office action regarding a case we had filed on
20 behalf of these people in Germany, as they were
21 our clients, we would seek their advice and
22 instructions regarding responding to those
23 office actions.
24    Q.   Can you identify for me, please, the
25 individuals from whom you received instructions

14 (Pages 50 to 53)

Page 54

1          Alan Stempel
2    regarding the filing of U.S. counterpart
3    applications during the '85 through '90 period?
4          A.    Repeat the question, please.
5          Q.    Sure.  Please identify for me the
6    individuals, those patent agents or patent
7    attorneys in Germany from whom you received
8    requests to file U.S. counterpart applications
9    during the period 1985 through 1990.
10         A.    I'm not certain it's correct to say
11   that the request to file the applications came
12   from attorneys or agents.
13         Q.    Was it typical that requests to file
14   U.S. counterpart applications would come from
15   clerical staff working for patent attorneys or
16   patent agents in Germany?
17         A.    In the sense that they generated the
18   actual correspondence?
19         Q.    I'm just trying to understand, when
20   you said that you would on occasion receive
21   requests to file U.S. counterpart applications,
22   I'm trying to understand from whom those
23   requests came.
24         A.    They came from various people, and
25   I'm not sure that I can recall with any

Page 55

1          Alan Stempel
2    precision precisely who they came from.
3          Dr. Dieter Laudien.
4          Q.    I'm sorry, what was the name?
5          A.    Dr. Dieter Laudien.
6          Q.    Anyone else that you can recall?
7          A.    I think that actually, in a formal
8    sense, the requests came from him.
9          Q.    Anyone else that you can recall that
10   transmitted requests to you, in a formal sense,
11   to file U.S. counterpart applications during
12   this time?
13         A.    I don't recall whether or not, in a
14   formal sense, any requests came from other than
15   Dr. Laudien.
16         Q.    Other than in a formal sense, were
17   those requests transmitted to you or to your
18   office by someone other than Dr. Laudien?
19         A.    I'm not sure I understand your
20   question.
21         Q.    Well, you said in a formal sense the
22   requests came from Dr. Laudien.  I'm trying to
23   understand what you mean by "in a formal sense."
24         A.    My recollection is that most of the
25   requests were signed by him or in his name.

Page 56

1          Alan Stempel
2          Q.    Did you ever receive requests, during
3    this period of time, directly from inventors
4    located in Germany, asking --
5          A.    No.
6          Q.    -- that you file --
7          MR. CHERNY:  Just as a courtesy, let
8    Glenn finish his question, and then he'll
9    let you finish your answer.
10         THE WITNESS:  I thought he was.
11         MR. PFADENHAUER:  I apologize, I
12   paused for a second.
13         Q.    Is it correct, then, that during the
14   period 1985 through 1990, all of the requests
15   that you received to file U.S. counterpart
16   patent applications came from either Dr. Laudien
17   or someone on Dr. Laudien's staff, to the best
18   of your knowledge?
19         MR. CHERNY:  Objection.  Lack of
20   foundation.
21         A.    Can you repeat the question, please.
22         Q.    Yes.  To the best of your current
23   recollection, did the requests that you received
24   in the period '85 through '90 to file U.S.
25   counterpart patent applications come from

Page 57

1          Alan Stempel
2    Dr. Laudien or someone on Dr. Laudien's staff in
3    Germany?
4          MR. CHERNY:  Same objection.
5          A.    I think the answer is yes.
6          Q.    What was your understanding,
7    Mr. Stempel, in the period '85 through 1990,
8    with respect to what discretion you had
9    regarding whether or not to file a U.S.
10   counterpart application, where you had been
11   requested to do so by Dr. Laudien or someone on
12   his staff?
13         MR. CHERNY:  Can I have that read
14   back, please.
15         (Record read.)
16         MR. CHERNY:  Objection, vague.
17         A.    Could you repeat your question,
18   please.
19         Q.    Let me try a different question.
20   Maybe we will come back to that one.
21         During the period 1985 through 1990,
22   when you received requests from Dr. Laudien or
23   his staff to file a U.S. counterpart patent
24   application, were you typically provided with a
25   draft application to be filed?

15 (Pages 54 to 57)

Page 58

Alan Stempel

1
2    A.   We were provided with a text, yes.
3    Q.   Was that text in English?
4    A.   Not in every instance.
5    Q.   In the vast majority of instances,
6    would you receive the text in English?
7         MR. CHERNY:  Objection, vague.
8    A.   What does the vast -- what do you
9    mean by "vast"?
10   Q.   What I'm trying to understand,
11   Mr. Stempel, although there may have been
12   exceptions, was the general practice that you
13   would receive the draft text in English?
14   A.   I would say that most were received
15   in English --
16   Q.   Did most of these --
17   A.   -- but, but.  I mean -- but sometimes
18   they were received in another language first.
19   Eventually they were received in English.
20        I think the problem is, are you
21   saying initially in English?
22   Q.   Prior to the time that the
23   application was filed in the U.S., would you
24   normally have received from Germany an English
25   draft of the text?

Page 59

Alan Stempel

1
2    A.   In most cases there was an English
3    text to work from, yes.
4    Q.   So in most instances your office was
5    not involved in preparing an English translation
6    from a German text?
7    A.   Correct.
8         MR. CHERNY:  We've been going for a
9    little more than an hour.  Is this a good
10   time to break?
11        MR. PFADENHAUER:  Whatever is fine
12   for the witness; and if you are requesting
13   a break, I'm fine with that, too.  I could
14   keep going, but I'm happy to break whenever
15   you'd like.
16        MR. CHERNY:  I understand you can
17   keep going.  He's never done this before,
18   so I want to pace it a little bit.
19   Q.   If you'd like a break, Mr. Stempel.
20   If Mr. Cherny wants -- looks like he wants to
21   take a little break.
22        MR. CHERNY:  Let's take a break.
23        MR. PFADENHAUER:  Why don't we take a
24   little break.
25        THE VIDEOGRAPHER:  The time is

Page 60

Alan Stempel

1
2    11:25 a.m., and we are going off the
3    record.
4         (Whereupon, there is a recess in the
5    proceedings.)
6         THE VIDEOGRAPHER:  The time is 11:32.
7    We are back on the record.
8    Q.   Mr. Stempel, we have just returned
9    from a break in the deposition.
10        During the break, did you talk with
11   Mr. Cherny?
12   A.   Just very briefly.
13   Q.   In your discussions with Mr. Cherny,
14   did you discuss your testimony?
15   A.   No.
16   Q.   Did you discuss any of my questions,
17   in your conversation with Mr. Cherny?
18   A.   We didn't discuss your questions.
19   Q.   And did you discuss any anticipated
20   testimony by you, in your conversations with
21   Mr. Cherny?
22   A.   No.
23        MR. CHERNY:  Do I get a gold star?
24        MR. PFADENHAUER:  So far, so good.
25   Q.   Other than Dr. Laudien, who else did

Page 61

Alan Stempel

1
2    you have communications with in the patent
3    departments in Germany?
4         MR. CHERNY:  Objection, vague.
5    Q.   In the 1985 through 1990 time period.
6    Let's keep it focused.
7         MR. CHERNY:  Thank you.
8    A.   I'm going to limit my answer to those
9    people who I am sure or nearly sure were present
10   at the time.  There was a turnover in personnel,
11   and while there may have been other people with
12   whom I dealt, I'm going to limit my answer to
13   only those people who I'm sure or virtually sure
14   I dealt with during that time frame.
15        Heinz Gerd Klaes, Rolf Fleischer,
16   Roger Milnes, Ehrmtrate Kalsner, don't ask me to
17   spell Ehrmtrate.
18        MR. CHERNY:  That was a tough one.
19   Q.   How about the last name?
20   A.   Kalsner?
21   Q.   Yes.  K --
22   A.   K-A-L-S-N-E-R.
23   Q.   Was it Dr. Kalsner?
24   A.   I don't know.
25   Q.   Not sure, okay.

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212) 705-8585

Page 62

| 1 | Alan Stempel |
| 2 | Anyone else? |
| 3 | A. Volker Kuhn. |
| 4 | Q. K-U -- |
| 5 | A. K-U-H-N. There's probably an umlaut |
| 6 | over the U. |
| 7 | MR. CHERNY: I'll caution you not to |
| 8 | speculate about German spelling. |
| 9 | A. That's -- there was a gentleman, |
| 10 | Hoffman. I don't remember his first name. |
| 11 | Q. How about Dr. Weilman, Weilman or |
| 12 | Weilman? |
| 13 | A. I don't know if it's because of the |
| 14 | pronunciation or because that person wasn't |
| 15 | there, but that's not ringing any bells for me. |
| 16 | Q. How about Dr. Weilman? |
| 17 | A. Weilman. That's also -- |
| 18 | MR. CHERNY: I assume it's the same |
| 19 | spelling as you just did. |
| 20 | Q. How about a Dr. Sommer or Sommer? |
| 21 | A. Yeah. |
| 22 | Q. You did interact with him during that |
| 23 | time period? |
| 24 | A. He was there, and I believe I did |
| 25 | interact with him. |

Page 63

| 1 | Alan Stempel |
| 2 | Q. The individuals that you've just |
| 3 | identified, were some of these individuals |
| 4 | located in the Biberach office? |
| 5 | A. Some were in Biberach, yes. |
| 6 | Q. And were some in Ingelheim? |
| 7 | A. Yes. |
| 8 | Q. Can you tell me which individuals |
| 9 | were in which office, during this period of time |
| 10 | '85 through '90? |
| 11 | A. I'll tell you the ones that were in |
| 12 | Biberach and, by exclusion, the others were in |
| 13 | Ingelheim. |
| 14 | Q. Fair enough. |
| 15 | A. Biberach was Milnes, Fleischer. |
| 16 | There was another person in Biberach, I'm not |
| 17 | sure I mentioned him, and I think he was there |
| 18 | during this time frame, I think. Bubeck. |
| 19 | Q. B-U-B -- |
| 20 | A. B-U-B-E-C-K. |
| 21 | Q. Anyone else in Biberach? |
| 22 | A. I think in that time frame, those |
| 23 | were the only people I am more or less sure of |
| 24 | were there in that time frame. |
| 25 | Q. So Dr. Laudien was in Ingelheim? |

Page 64

| 1 | Alan Stempel |
| 2 | A. (Witness nods.) |
| 3 | Q. And Rolf Fleischer was in Ingelheim? |
| 4 | A. No, he was -- |
| 5 | Q. I'm sorry? |
| 6 | A. I'm sorry -- yeah. |
| 7 | Q. That's my fault. You had it right. |
| 8 | Dr. Kalsner was in Ingelheim? |
| 9 | A. Yes. |
| 10 | Q. Mr. Hoffman was in Ingelheim? |
| 11 | A. Yes. |
| 12 | Q. Mr. Kuhn was in Ingelheim? |
| 13 | A. Yes. |
| 14 | Q. And Mr. Volker was in Ingelheim? |
| 15 | A. Volker was Kuhn's first name. |
| 16 | MR. CHERNY: So both halves. |
| 17 | Q. Both of them were in Ingelheim. |
| 18 | Dr. Klaes was in Ingelheim? |
| 19 | A. Yes. |
| 20 | Q. And Dr. Sommer? |
| 21 | A. Ingelheim. I -- actually, yeah, |
| 22 | Ingelheim. |
| 23 | Q. Did the individuals you've identified |
| 24 | who were working in Biberach, did they report to |
| 25 | someone in Ingelheim? |

Page 65

| 1 | Alan Stempel |
| 2 | A. My understanding is that I believe, |
| 3 | but I am not certain, that there was a reporting |
| 4 | relationship of the people in -- repeat your |
| 5 | question. I'm sorry. |
| 6 | Q. Did the individuals who worked in |
| 7 | Biberach that you've identified as having |
| 8 | interacted with, was it your understanding that |
| 9 | those individuals reported to someone in |
| 10 | Ingelheim? |
| 11 | MR. CHERNY: Objection, compound. |
| 12 | Q. Let me try another question. |
| 13 | Did you have an understanding that |
| 14 | one of the individuals you've identified as |
| 15 | being in Biberach was in charge of that office? |
| 16 | A. I was wondering if that was your |
| 17 | question. |
| 18 | I had the impression that Roger |
| 19 | Milnes was in charge of that office. |
| 20 | Q. And so was it your understanding that |
| 21 | Mr. Fleischer and Mr. Bubeck reported to |
| 22 | Mr. Milnes? |
| 23 | A. That was my impression. |
| 24 | Q. And was it your impression that |
| 25 | Mr. Milnes reported to somebody in Ingelheim? |

17 (Pages 62 to 65)

Page 66

Alan Stempel

1  A.  That's my impression, yes.
2
3  Q.  And what was your impression as to
4  who in Ingelheim Mr. Milnes reported to?
5  A.  Dr. Laudien.
6  Q.  To your recollection, Mr. Stempel,
7  during the '85-'90 time period, did you receive
8  any requests to file patent applications from
9  anyone in the Biberach office?
10  A.  I actually did not receive directly
11  any requests to file patent applications from
12  anyone in the Biberach office or the Ingelheim
13  office, directly.
14  Q.  The requests that you received
15  indirectly from Germany to file patent
16  applications, did they all originate, to your
17  knowledge, with someone in the Ingelheim office?
18  A.  I believe that requests, whether or
19  not they got to me directly or indirectly, did
20  originate from Ingelheim, yes.
21  Q.  We were discussing earlier that
22  during this 1985 through 1990 time period, that
23  when you were requested to file a US counterpart
24  application, generally you would receive from
25  Germany an English text.

Page 67

Alan Stempel

1
2  Do you recall that?
3  MR. CHERNY:  Objection, lack of
4  foundation.
5  Q.  Do you recall that testimony, Dr. --
6  Mr. Stempel?
7  A.  In most cases there was an English
8  text.
9  Q.  In most cases did you receive draft
10  claims to be included in the patent application?
11  A.  Yes.
12  Q.  Was it correct, then, that in the
13  1985 to 1990 time period, when you were
14  requested to file a U.S. counterpart
15  application, in most instances you received a
16  complete application that was sufficient to
17  enable a filing in the U.S. patent office?
18  A.  What do you mean by "sufficient to
19  enable a filing"?
20  Q.  Did the document you received from
21  Germany in English generally contain all of the
22  requisite components of a patent application to
23  be filed in the United States?
24  A.  Yes.
25  Q.  Did it generally include an abstract?

Page 68

Alan Stempel

1
2  A.  Yes.
3  Q.  During this period of time, 1985
4  through 1990, what did you understand your role
5  to be, with respect to those instances in which
6  you were requested by Germany to file a U.S.
7  counterpart of a patent application that had
8  originally been filed elsewhere?
9  A.  I believe that there was an
10  attorney-client relationship brought into being
11  between myself and both the inventors and the
12  owner of the application.
13  Q.  And what did you understand,
14  generally, was your responsibility with respect
15  to those applications?
16  A.  Well, all of the responsibilities
17  that we normally attach to an attorney
18  representing a client who wishes to have a
19  patent application filed.
20  Q.  Did you understand that it was your
21  responsibility, during that time period, to
22  ensure that any patent applications you caused
23  to be filed complied with all of the requisite
24  statutory requirements?
25  A.  Yes.

Page 69

Alan Stempel

1
2  Q.  And was it your practice, during the
3  period of '85 through 1990, to take steps to
4  ensure yourself that the applications that you
5  filed that you had received from Germany
6  complied with all the requisite statutory
7  requirements?
8  A.  I dealt with every application that I
9  was asked to file on a case-by-case basis.
10  Q.  Were there instances in which you
11  filed U.S. counterpart patent applications,
12  without having first read the entire
13  application?
14  A.  I don't recall if there was ever an
15  instance in that time frame when I did not read
16  the application.  But also I don't understand
17  what you mean by "read the application."
18  Q.  What don't you understand about read
19  the application?
20  A.  Well, one can read the application
21  word by word, one can skim it.  One can focus in
22  on certain parts of the application.
23  Q.  Were there instances in which you did
24  not read the entire U.S. application word for
25  word, before you caused it to be filed?

18 (Pages 66 to 69)

Page 70

Alan Stempel

1
2      A.    I don't recall 20 years later whether
3   or not there was ever an instance where I didn't
4   read the application.
5      Q.    To the best of your knowledge, was it
6   your general practice to read the entire
7   application word for word, before you caused it
8   to be filed?
9      A.    Again, I dealt with every application
10  on a case-by-case basis.
11     Q.    So you did not have a general
12  practice of reading the entire application word
13  for word, before you caused it to be filed?
14     A.    I'm not sure that I read every
15  application word for word.
16     Q.    How did you decide which applications
17  you would read word for word and which
18  applications you would skim, before they were
19  filed?
20         MR. CHERNY:  Objection, lack of
21  foundation.  Lack of foundation.
22     A.    To some degree it was based upon
23  availability of time.  And to some degree was
24  based upon whether or not, when I began to read
25  the application, I saw that it was well-written

Page 71

Alan Stempel

1
2   and I saw that perhaps there were things that
3   looked like they needed more attention than
4   others might have.
5      Q.    So if you were busy and had a number
6   of other things occupying your time, you would
7   have been less likely to read the entire
8   application word for word than in those
9   instances where you were less occupied?
10         MR. CHERNY:  Objection.  Lack of
11  foundation.
12     A.    I think I was interested in making
13  certain that what I was filing apparently met
14  the statutory requirements for patent
15  application.
16     Q.    Was it your practice to review
17  anything other than the draft U.S. patent
18  application, in order to satisfy yourself that
19  that application met the statutory requirements
20  for filing?
21     A.    Other things such as what?
22     Q.    Prior art.
23     A.    Not at the time of filing.
24     Q.    Foreign priority document?
25     A.    Not necessarily at the time of the

Page 72

Alan Stempel

1
2   filing.
3      Q.    European search report?
4      A.    At the time of filing, a main
5   European search report did not yet exist.
6      Q.    So generally speaking, do I
7   understand at the time of filing your
8   determination that an application met the
9   statutory requirements for filing was based upon
10  your review of the draft application that had
11  been provided to you?
12     A.    That's correct.
13     Q.    Was it your understanding,
14  Mr. Stempel, in this period 1985 to 1990, that
15  there were patent agents or patent attorneys in
16  Germany who were familiar with the requirements
17  for patentability under U.S. law?
18     A.    Ask your question again, please.
19     Q.    Yes, sir.
20         In this period of time, 1985 through
21  1990, was it your understanding that there was
22  one or more individuals, patent attorneys or
23  patent agents, in Germany working for Boehringer
24  who had an understanding of the United States
25  requirements for patentability?

Page 73

Alan Stempel

1
2      A.    I think my counterparts in Germany,
3   my colleagues in Germany were generally familiar
4   with the requirements under U.S. law.
5      Q.    Did you, in fact, on occasion advise
6   your German counterparts about U.S. requirements
7   for patentability?
8      A.    On occasion.  Surely there were
9   occasions when I did, yes.
10     Q.    Did you ever travel to Germany to
11  meet with patent attorneys or patent agents, for
12  the purpose of providing them information about
13  the requirements for patentability under United
14  States law?
15     A.    Within what time frame?
16     Q.    Well, let's start with '85 to '90.
17     A.    I did travel to Germany to meet with
18  my -- with patent colleagues during that time
19  frame; and although the -- it was not the entire
20  purpose of my trip, I think we did discuss U.S.
21  patent law, yes.
22         MR. CHERNY:  I'm just going to
23  caution you, before Mr. Pfadenhauer goes
24  on, to be very careful about any
25  conversations which may be privileged that

19 (Pages 70 to 73)

Page 74

Alan Stempel

1  occurred during that time frame.
2  Q.  Was it your impression, Mr. Stempel,
3  based on your meetings and conversations with
4  your patent colleagues in Germany, that they
5  were generally familiar with the requirements
6  for patentability under U.S. law?
7  MR. CHERNY:  Objection, asked and
8  answered.
9  A.  I think -- you know, in the context
10  of your question generally has a certain
11  ambiguity to it, so I'm not entirely sure how to
12  answer your question.
13  I think they had some knowledge of
14  U.S. patent law.
15  Q.  Were you aware, in the period 1985
16  through 1990, Mr. Stempel, that there were
17  differences in the requirements for
18  patentability under U.S. law and German law?
19  A.  Yes.
20  Q.  Were you aware, for example, that
21  Germany did not have a best mode requirement at
22  that point in time?
23  A.  I believe I was aware of that, yes.
24  Q.  Was it your understanding that your

Page 75

Alan Stempel

1  patent colleagues in Germany understood that the
2  United States had a best mode requirement?
3  A.  I don't really have any specific
4  knowledge on which to form a belief as to what
5  they knew or didn't know, particularly with
6  respect to best mode.
7  Q.  Did you have an understanding during
8  this period of time, 1985 through 1990, that the
9  requirements for a sufficient disclosure of an
10  invention under German law were different than
11  that under U.S. law?
12  A.  State your question again, please.
13  Q.  Did you have an understanding, in the
14  period 1985 through 1990, that the requirements
15  for a sufficient disclosure of an invention to
16  satisfy the requirements for patentability were
17  different in Germany and in the United States?
18  A.  In any particular respect?
19  Q.  In any respect, did you understand
20  them to be different?
21  A.  Well, the U.S. has a best mode
22  requirement.  I believe most other
23  jurisdictions, including Germany, do not.
24  Q.  Did you understand there to be any

Page 76

Alan Stempel

1  difference, with respect to the written
2  description requirement, between German law and
3  the United States?
4  A.  I'm not sure that I did have that
5  understanding in that time period.
6  Q.  Do you now have an understanding that
7  there is a difference in the written description
8  requirement?
9  A.  Apart from best mode?
10  Q.  Apart from best mode.
11  A.  I am not sure that I do have that
12  understanding.
13  Q.  With respect to, specifically to
14  pharmaceutical matters, did you have an
15  understanding that there were differences, with
16  respect to patentable subject matter, between
17  the law in Germany and the law in the United
18  States, in this period '85 through 90?
19  MR. CHERNY:  Objection.  Vague and
20  lack of foundation.
21  A.  Are you -- do you have in mind a
22  particular standard for patentability where
23  there might be a difference?
24  Q.  Were you aware, during this period of

Page 77

Alan Stempel

1  time, that Germany did not permit claims to
2  second medical uses?
3  A.  Yes.
4  Q.  And did you know, during this time,
5  that the United States did permit claims to
6  second medical uses?
7  A.  Yes.
8  Q.  Were there other differences that you
9  were aware of in patentable subject matter,
10  between German law and U.S. law, as it would be
11  relevant to pharmaceutical inventions?
12  A.  I don't recall whether or not, within
13  that time period, I had this understanding.
14  Q.  When you say "this understanding,"
15  are you referring to the second medical use
16  issue?
17  A.  To perhaps another difference.
18  Q.  What's the other difference that you
19  aren't sure you knew about back then?
20  A.  That inventive step and lack of
21  obviousness are not precisely the same thing and
22  that the tests for one are not precisely the
23  tests for the other; and consequently, what's
24  prior art in one jurisdiction is not necessarily

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212) 705-8585

Page 78

1          Alan Stempel
2    the prior art in another.
3        Q.   Is it your testimony, Mr. Stempel,
4    that to the best of your recollection, in the
5    period '85 to 1990, you did not appreciate that
6    there was any difference, in terms of what was
7    relevant prior art, between Germany and the
8    United States?
9          MR. CHERNY:  Objection, lack of
10    foundation.
11        A.   I know that now.  I don't know
12    precisely at what point I came to have that
13    understanding.
14        Q.   At what point in time are you sure
15    you knew of that difference?
16        A.   I'm not sure exactly when I first
17    certainly understood that difference.
18        Q.   Did you understand that difference
19    before this litigation was filed?
20        A.   Yes.
21        Q.   Did you understand that difference as
22    of 1985?
23        A.   Most probably.
24        Q.   Is there a particular matter or event
25    that you have in your mind that clearly puts you

Page 79

1          Alan Stempel
2    on notice of the difference, in terms of patent
3    art, between -- prior art, between Germany and
4    the United States?
5        A.   I don't know that there was any
6    particular event that took place.  I do know
7    that there has been a, during my 20-some-odd
8    years with the company, there's been a constant
9    mentoring of patent colleagues, one of the
10    other, where we have learned from each other.
11    And it's a very slow, incremental process.
12        Q.   Did you learn of this difference from
13    one of your colleagues?
14        A.   I think I have learned of that
15    difference and the nuances of that difference
16    from more than one of my colleagues.
17        Q.   Were those colleagues colleagues in
18    the United States or colleagues in Germany or
19    both?
20        A.   Of -- the difference?
21        Q.   Yes.
22        A.   I would say that the Germans have
23    taught me and my U.S. colleagues about their
24    law, and we have taught them about ours.
25        Q.   Were you aware, in the period '85

Page 80

1          Alan Stempel
2    through '90, that certain types of claims that
3    were allowable in Germany were not allowable in
4    the United States?
5          MR. CHERNY:  Objection, vague.  Lack
6    of foundation.
7        A.   What kind of claims are you talking
8    about?
9        Q.   Any particular type -- in terms of a
10    structure of a claim, whether it be a product by
11    process claim or a method of use claim or any
12    sort of category of claim you can think of, were
13    you aware of categories of claims that were
14    allowable under one jurisdiction's law and not
15    under the other's?
16          MR. CHERNY:  Can I have that read
17    back.  Sorry, I don't have the whole thing
18    in my head.
19          MR. PFADENHAUER:  As it turns out,
20    you are not answering the question, so you
21    can say "objection."
22          MR. CHERNY:  I still have to hear the
23    question so that I can object.
24          MR. PFADENHAUER:  You can put the
25    objection on the record now.

Page 81

1          Alan Stempel
2          MR. CHERNY:  I can't object, if I
3    don't know what the question was.  That was
4    a long question, so I need her to read it
5    back; and when you take depositions you'll
6    have questions read back so that you can
7    hear them.
8        (Record read.)
9          MR. CHERNY:  Objection, vague, lacks
10    foundation.
11        Q.   Under the law of one jurisdiction and
12    not the other.
13          MR. CHERNY:  See, aren't you glad I
14    had it read back?
15        A.   I think the United States you can
16    have method of treatment claims.  In Germany and
17    a lot of other jurisdictions you cannot, but you
18    can have Swiss type claims.  So there's a
19    difference in form for what, the end of the day,
20    amounts to a method of treatment, right.
21        Q.   Were you aware of that difference in
22    form required for such claims in the period '85
23    through '90?
24          MR. CHERNY:  Objection.  Lack of
25    foundation.

21 (Pages 78 to 81)

Page 82

```
1              Alan Stempel
2      A.   I believe I was aware in that time
3  frame that a claim written as a Swiss type claim
4  was not appropriate in the United States.
5          Is that --
6      Q.   Were you aware during that time that
7  a method of treatment claim was permissible
8  under U.S. law?
9      A.   Yes.
10     Q.   And were you aware during that time
11 that a method of treatment claim as such was not
12 permissible under German law?
13     A.   Yes.
14     Q.   Was it your understanding in the
15 period '85 to '90 that your colleagues in
16 Germany were familiar with those differences?
17     A.   I believe I understood that.
18     Q.   In those instances when you received
19 patent applications containing claims to be
20 filed in the United States Patent Office that
21 had been prepared in Germany, did those
22 applications, on occasion, include method of
23 treatment claims?
24     A.   Method of treatment?
25     Q.   Yes.
```

Page 83

```
1              Alan Stempel
2      A.   I can't recall -- repeat your
3  question.
4      Q.   During the period 1985 through 1990,
5  when you received patent applications from
6  Germany to be filed in the United States Patent
7  and Trademark Office that included claims that
8  had been drafted in Germany, did such
9  applications on occasion include method of
10 treatment claims?
11     A.   You are talking about translations of
12 those applications, or are you talking about the
13 applications from Germany in their native
14 German?
15     Q.   No, I'm talking about the
16 applications in English text that you received
17 to be filed in the U.S. patent office.
18     A.   Because those did not come directly
19 from Germany.
20     Q.   Which did not come directly from
21 Germany?
22     A.   The translations. Your question says
23 that you received from Germany. Well, the
24 English didn't come from Germany.
25     Q.   Okay. Let me make sure I clarify.
```

Page 84

```
1              Alan Stempel
2      When you would receive an application
3  that was a counterpart to an application that
4  had been first filed in another country and
5  requested to file that application in the United
6  States, you indicated that often those were
7  received in English; is that correct?
8          MR. CHERNY: Objection. Lack of
9  foundation.
10     A.   They were often received for filing
11 in English translation.
12     Q.   When you would receive such an
13 English translation, would you receive two
14 versions, an English version and a version in
15 another language, or did you just receive the
16 English version?
17     A.   If the filing was based upon claim
18 priority from a German language text or a text
19 in some non-English, not in English, typically,
20 but not always, in addition to the -- well, at
21 some point, to claim priority, for the purposes
22 of claiming priority, we received a copy of the
23 priority application in whatever language it had
24 been written.
25     Q.   I take it from your answer you didn't
```

Page 85

```
1              Alan Stempel
2  always receive the priority document at the same
3  time you received the English language document
4  for filing in the U.S.?
5      A.   It is possible that -- I have no
6  particular recollection of an instance where it
7  wasn't, but it is possible that in some
8  instances the priority text, which was filed for
9  the purposes of claiming priority, may have
10 arrived at some other, different point in time.
11     Q.   Do I understand, then, with respect
12 to what you can recall, in every instance that
13 you can recall, the priority document arrived
14 with the English language document to be filed?
15     A.   In most instances it did -- I think
16 it did.
17         Well, in most instances it had
18 arrived, if not with the translation, at least
19 before the time of U.S. filing.
20     Q.   And as I understand it, although you
21 haven't excluded the possibility, you don't have
22 any recollection of any instance in which, at
23 the time you made the U.S. filing, you did not
24 yet have possession of the priority document in
25 the foreign language in which it had been filed?
```

22 (Pages 82 to 85)

Page 86

Alan Stempel

1
2    A.   I can't recall any specific instance
3    where I did not have it.
4    Q.   Now, you made a reference to the fact
5    earlier that the translations did not come from
6    Germany.
7         Did I understand that correctly?
8    A.   Although there may have been
9    deviations from this, for the most part, they
10   physically did not reach us directly from
11   Germany.
12   Q.   Where did the translations come from
13   when they were provided to you directly?
14   A.   They came from a British law firm
15   called Frank B. Dehn.
16   Q.   I'm sorry Frank B. --
17   A.   Frank B. Dehn, D-E-H-N.
18   Q.   And what was your understanding of
19   the role, if any, of this British law firm, with
20   respect to the preparation of these English
21   documents?
22   A.   Dehn's role was to produce a -- which
23   documents, first of all?
24   Q.   You indicated that applications in
25   the English language were received by you to be

Page 87

Alan Stempel

1
2    filed in the U.S. patent office that were
3    foreign counterparts of an application that had
4    originally been filed elsewhere.
5    A.   In most instances the German
6    colleagues would produce, on the basis of the
7    priority texts, what they would call a foreign
8    filing text. Dehn would translate the foreign
9    filing text into English. That foreign filing
10   text would then be used as the basis to carry
11   out corresponding filings in English-speaking
12   countries, including the United States.
13   Q.   Was it your understanding that the
14   foreign filing text in the first instance was
15   usually prepared in German?
16   A.   Yes.
17   Q.   So do I understand correctly that
18   during the period '85 to '90, the normal
19   practice, with respect to patent applications
20   that you received to be filed in the United
21   States from Germany, was that a foreign filing
22   text would be prepared in Germany based on the
23   priority document, that form filing text would
24   be sent to the English firm for translation, and
25   the translation would then be sent to your

Page 88

Alan Stempel

1
2    office?
3    A.   Correct.
4    Q.   Was it your understanding that Dehn's
5    role was limited to the administerial function
6    of translating the German words into English
7    words?
8         MR. CHERNY:  Objection, vague.
9    A.   It's my understanding that Dehn's
10   role was to produce, to the extent that that was
11   possible, a faithful translation of the foreign
12   filing text into English.
13   Q.   Was it your understanding that the
14   work at the Dehn firm was performed by
15   translators rather than patent attorneys or
16   patent agents?
17   A.   I actually do not know what the
18   background of the translator -- the person who
19   was doing the translations is, or are.
20   Q.   Do you recall any instance in which
21   you received a copy of the foreign filing text
22   in German?
23   A.   There have been limited instances
24   where, if the translation was not ready by the
25   end of the convention year, we had filed U.S.

Page 89

Alan Stempel

1
2    filings on the basis of the German language
3    foreign filing text, later to be supplemented by
4    translation.
5    Q.   Did that happen during the period
6    1985 to 1990?
7    A.   I can't recall if it happened within
8    that time period.
9         I know that in the 20-odd years I
10   have been at Boehringer, it has happened on rare
11   occasions.
12   Q.   Do you have any reason to think that
13   that happened in connection with the patents at
14   issue in this litigation?
15        MR. CHERNY:  Objection. Lack of
16   foundation.
17   A.   First of all, what patents are the
18   subject of this litigation? And second of all,
19   I don't recall.
20   Q.   Well, the second answer probably
21   takes care of the first one.
22        Do I understand correctly, then, that
23   in the period 1985 to 1990, it was not the usual
24   practice for the Dehn firm to send you a copy of
25   the foreign filing text in German, when they

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212) 705-8585

Page 90

Alan Stempel

1  sent you the English translation?
2      A.   You know, I really don't recall if
3  they also sent us the foreign filing text in
4  German, too.
5      Q.   In the course of doing your work in
6  preparing an application for filing with the
7  U.S. Patent and Trademark Office, was it your
8  general practice to review the German language
9  foreign filing text?
10     A.   I speak so little German that that
11 would have been utterly pointless, and so I
12 didn't do it.
13     Q.   So --
14     A.   The only time I would have done that
15 is if, for some odd reason, I thought that there
16 was something wrong with the English text, and I
17 wanted to see if I could possibly find out from
18 the German text.
19     Q.   In those instances where you wanted
20 to refer to the German text, would you look at
21 the foreign filing text or would you go back and
22 look at the German priority document?
23     A.   Generally speaking, I was much more
24 concerned with what the priority documents said.

Page 91

Alan Stempel

1      Q.   Do you recall instances in which you
2  went back and looked at a German language
3  priority document to try to ascertain whether
4  the English translation you were preparing to
5  file was correct?
6      A.   I know that it has happened.  I can't
7  recall any specific instances.
8      Q.   As you sit here today, you cannot
9  recall any specific instances in which you did
10 that?
11         MR. CHERNY:  Objection.  Asked and
12 answered.
13     Q.   Is that correct?
14     A.   That's correct.
15     Q.   Although you don't recall any
16 specific instances, you seem pretty confident
17 that that did happen on occasion; is that right?
18     A.   Yes.
19     Q.   And in those instances when it did
20 happen, you would be looking at the priority
21 document in German to see if you could glean
22 enough information to ascertain whether the
23 English document was correct; is that right?
24         MR. CHERNY:  Objection, vague, lack

Page 92

Alan Stempel

1  of foundation.
2      A.   Correct in what way?
3      Q.   Is that what you did, when you went
4  back and looked at the priority document?
5      A.   Sometimes it was not a matter of
6  necessarily the English language document being
7  correct or not correct; sometimes it was simply
8  a matter of the English language document may
9  not have been fully legible.
10     Q.   But in instances where either the
11 English document wasn't fully legible or you had
12 some question about whether it was correct, you,
13 on occasion, would look back at the German
14 language priority document to see if that
15 enabled you to answer the question that you had?
16     A.   I know that through -- during the
17 course of 20 years, there had been occasions
18 when I have done that.  Specific instances I
19 cannot recall.
20         MR. PFADENHAUER:  Let's go a few more
21 minutes.  We are just about at the end of
22 the tape, but it's almost the lunch break
23 we agreed on, so let's try and do a little
24 more before we stop.

Page 93

Alan Stempel

1      MR. CHERNY:  Sure.
2      Q.   Do you recall instances, Mr. Stempel,
3  where you received from the Dehn firm an English
4  language document for filing in the United
5  States that did not include claims?
6          MR. CHERNY:  Objection.  Lack of
7  foundation.
8      A.   I have no specific recollection that
9  a translation was ever received without claims.
10 Which is also not to say that it never happened.
11 I don't recall it happening.
12     Q.   Your recollection is that usually, if
13 not always, there were claims in the document
14 that you received?
15         MR. CHERNY:  Objection.  Asked and
16 answered.  Lack of foundation.
17     A.   Yes.
18     Q.   Do you have any understanding as to
19 whether those claims that were contained in the
20 English language documents you received had been
21 drafted with the U.S. requirements for
22 patentability in mind?
23     A.   Given that there were often Swiss
24 type claims, I think the impression was usually

24 (Pages 90 to 93)

Page 94

Alan Stempel

1  that they were rather a generic set of claims
2  and that the local practitioner was expected to
3  put them into a form which would be acceptable
4  for local practice.
5      Q.   Did you understand that one of your
6  responsibilities, with respect to filing these
7  U.S. counterpart applications, was specifically
8  to look at the claims to ensure that they were
9  appropriate for filing in the United States?
10     A.   Yes, although I will add that in some
11  instances, for one reason or another, it may
12  have been necessary to file the case with the
13  generic claims set, if you will, and amend them
14  at some point post filing.
15     Q.   United States applications require
16  the submission of declarations signed by each of
17  the inventors; is that correct?
18     A.   Correct.
19     Q.   And that has been true throughout the
20  time that you have been prosecuting in the
21  United States patent office?
22     A.   That's correct.
23     Q.   And that, in fact, differs from the
24  requirement in many other countries of the
25

Page 95

Alan Stempel

1  world, correct?
2      MR. CHERNY:  Objection.  Lack of
3  foundation.
4      A.   You know, I'm trained in the practice
5  of U.S. patent law, and I am not an expert in
6  the practice of patent law in other
7  jurisdictions.  Plus the patent practice in
8  other jurisdictions varies from jurisdiction to
9  jurisdiction.
10     I'm not really sure how to answer
11  your question.
12     Q.   Do you have an understanding whether
13  such declarations are required under German law?
14     A.   First of all, I don't know whether or
15  not a declaration is required under German law.
16  And I don't know the substance of it, if there
17  is one.
18     Q.   And do you know if an inventor's
19  declaration is required under the European
20  patent practice?
21     A.   Again, I don't know.
22     Q.   Did you ever hear from any of your
23  colleagues that this requirement of the United
24  States for an inventor's declaration was
25

Page 96

Alan Stempel

1  different than what they dealt with in Germany
2  or in the EPO?
3      A.   Are you alluding to the fact that in
4  most jurisdictions outside the United States the
5  application is made not in the name of the
6  inventors, but usually the assignee?
7      Q.   Are you aware of that fact?
8      A.   Yes.
9      Q.   And were you aware of that fact in
10  the period '85 through '90?
11     A.   Yes.
12     Q.   When you received the English
13  language document from the Dehn firm for filing,
14  did it typically have inventor's declarations
15  with it?
16     A.   The Dehn translation?
17     Q.   Yes.
18     A.   No.
19     Q.   Would you usually file the United
20  States patent application prior to receiving
21  signed inventor's declarations?
22     A.   Typically, yes.
23     Q.   And was it your general practice,
24  then, to request from Germany inventor's
25

Page 97

Alan Stempel

1  declarations to be submitted in conjunction with
2  the patent application that was already on file?
3      A.   It was our practice to send to
4  Germany a copy of the application that was
5  actually filed, with blank inventor's
6  declarations, with a request that the inventors
7  read the application that was actually filed and
8  then, assuming they accepted what had been filed
9  in their names, to sign the inventor's
10  declaration.
11     MR. PFADENHAUER:  Let's go ahead and
12  go off the record for lunch.
13     THE VIDEOGRAPHER:  The time is 12:22.
14  We are going off the record, and this marks
15  the ending of tape number one.
16     (Luncheon recess taken at 12:23 p.m.)

25 (Pages 94 to 97)

Page 98

Alan Stempel

1
2      A F T E R N O O N   S E S S I O N
3          (Time noted:  1:34 p.m.)
4      A L A N   S T E M P E L ,  resumed and
5    testified as follows:
6    EXAMINATION BY (Cont'd.)
7    MR. PFADENHAUER:
8          THE VIDEOGRAPHER: The time is 1:34.
9      We are back on the record, and this marks
10     the beginning of Tape Number 2 of Alan
11     Stempel.
12         Q.    Mr. Stempel, before the lunch break
13   we talked a little bit about foreign filing
14   texts.
15         Do you recall that?
16         A.   Yes.
17         Q.   And you indicated that a German
18   language version of a form filing text would be
19   sent to the firm in London to prepare an English
20   translation.
21         Do you recall that?
22         A.   London or somewhere in England, yeah.
23         Q.    What was your understanding, back in
24   the 1985 to 1990 time period, about why a
25   foreign filing text was prepared to serve as the

Page 99

Alan Stempel

1
2    basis for the English translations?
3         A.    Well, the various foreign filings
4    have to rely upon one common text.
5          I'm not really sure -- I'm not really
6    understanding your question.  I mean they have
7    to be based upon something.
8         Q.    Why didn't Boehringer use the foreign
9    priority document as the basis for creating the
10   English translation?
11         MR. CHERNY:  Objection.  Lack of
12     foundation.
13         A.    Your question, first of all,
14   presupposes that there was one foreign priority
15   document.  And your question also presupposes
16   that the foreign filing text was not based upon
17   the foreign priority document or documents.
18         Q.    Well, I didn't intend to presuppose
19   either of those things in my question.
20         As I understand your testimony, there
21   were at least some instances in which the
22   document that was sent to England for
23   translation was a document called the foreign
24   filing text, not the actual foreign priority
25   document; is that right?

Page 100

Alan Stempel

1
2         A.   I do not know whether or not in any
3    particular case the foreign filing text was
4    different than, let's say, the last of the
5    priority text.  I don't know that in all cases
6    it corresponded to it, I don't know that it
7    differed from it.  All I know is I received a
8    foreign filing text in English to be used as the
9    basis of my U.S. filing.
10         Q.    And it was your understanding that
11   the foreign filing text was based on a foreign
12   filing text document that was originally
13   prepared in German; is that right?
14         MR. CHERNY:  Objection.  Lack of
15     foundation.
16         A.    It was my understanding that there
17   was a foreign filing text prepared in, usually
18   in German, and that when that was prepared in a
19   language other than English, it was translated
20   into English by Dehn.
21         Q.    Do you recall any instances that the
22   English application that you were asked to file
23   in the United States had been prepared from
24   something other than a document that was
25   entitled Foreign Filing Text?

Page 101

Alan Stempel

1
2         MR. CHERNY: Objection.  Lack of
3     foundation.
4         A.    I don't recall if there was ever an
5    instance when a U.S. filing was to be based upon
6    a document other than something called a foreign
7    filing text.
8         Q.    The normal practice was there would
9    be a document that was entitled or had a legend
10   on it that said "Foreign Filing Text"; is that
11   right?
12         A.    That was a -- a normal thing.
13         Q.    And it was your understanding that
14   although the content could be identical to the
15   priority document, there was actually a separate
16   document created, usually, that was entitled
17   Foreign Filing Text?
18         MR. CHERNY:  Objection.  Lack of
19     foundation.
20         A.    It was the usual practice to base the
21   U.S. filing upon an English language document,
22   which was a translation of a German language
23   document called a foreign filing text.
24         Q.    And that German language document
25   called a foreign filing text was often a

26 (Pages 98 to 101)

Page 102

Alan Stempel

1  different document than the priority -- form
2  priority filing?
3      A.   I don't know if it -- if it ever was
4  or often was -- differed from the last priority
5  application.  I accept that that may have been a
6  possibility, but I don't know that even in a
7  single instance that that might have been the
8  case.
9      Q.   Do you have any understanding, then,
10 as to why Boehringer didn't just take the
11 foreign priority document and send it to England
12 to be translated into English?
13          MR. CHERNY:  Objection.  Lack of
14 foundation.
15     A.   I have no basis for forming any
16 belief as to why they did that.
17     Q.   What was your understanding,
18 Mr. Stempel, in the 1985 through 1990 time
19 period, as to how long after a foreign priority
20 document had been filed that a foreign filing
21 text would be prepared?
22     A.   The -- first of all, I think that the
23 time varied from case to case.  And second of
24 all, I'm not sure that I know or would have any
25

Page 103

Alan Stempel

1  way of knowing when the German language foreign
2  filing text was prepared in any particular case
3  vis-a-vis when the last priority application was
4  filed.
5      Q.   Was it usual, during the 1985 through
6  1990 period, for a foreign filing text to be
7  based on more than one priority document?
8          MR. CHERNY:  Objection.  Vague.  Lack
9  of foundation.
10     A.   Repeat your question, please.
11     Q.   Yes.  Was it usual, during the period
12 of 1985 through 1990, for a foreign filing text
13 to be based on more than one priority document?
14         MR. CHERNY:  Same objections.
15     A.   I don't know that it was usual.  It
16 happened.
17     Q.   Were there instances in which a
18 foreign filing text was based on a single
19 priority document?
20     A.   I don't know that it was usual, but
21 I'm sure it happened.
22     Q.   Do you have any understanding as to
23 whether it was more frequent for the foreign
24 filing text to be based on a single priority

Page 104

Alan Stempel

1  document or upon multiple priority documents?
2      A.   I have no recollection or any other
3  basis to answer that question.
4      Q.   During the period 1985 to 1990, did
5  you concern yourself at all with whether a
6  foreign filing text had been based upon a single
7  priority document or multiple priority
8  documents?
9          MR. CHERNY:  Objection.  Vague.
10     A.   Concern myself in what way, at what
11 point in time and what context?
12     Q.   Prior to filing an application that
13 had been based upon a foreign filing text, did
14 you consider the issue of whether that foreign
15 filing text had been based upon more than one
16 foreign priority document?
17     A.   At the time of filing, I concern
18 myself with claiming the priorities that my
19 client informed me should be asserted under the
20 Paris convention.
21     Q.   What do you mean by your "client"?
22     A.   My client would have been the owner
23 of the application and/or the inventors.
24     Q.   Were there instances in which the
25

Page 105

Alan Stempel

1  inventors would advise you what priority you
2  should claim under the convention?
3      A.   That sort of information would have
4  come from representatives of the patent owner
5  or -- yes.
6      Q.   When you say "representatives of the
7  patent owner," do you mean patent attorneys or
8  patent agents in the patent department at
9  Boehringer in Germany?
10     A.   Yes.
11     Q.   Did you make any independent
12 determination, prior to filing U.S. patent
13 applications, as to whether that application met
14 the statutory requirements for claiming priority
15 under 35 U.S.C. section 119?
16     A.   As to whether or not the U.S. filing
17 was taking place within the convention year that
18 began with the filing of the first application
19 for which priority was to be claimed?  Yes.
20     Q.   So it was your general practice to
21 look at the dates to make sure, if you were
22 claiming priority to a foreign filing, that the
23 earliest foreign filing had not occurred more
24 than a year prior to your U.S. filing; is that

27 (Pages 102 to 105)

Page 106

Alan Stempel

1 right?
2
3      A.   Yes.
4      Q.   Apart from looking at those dates to
5 make sure that more than a year had not elapsed,
6 did you take -- undertake any other
7 investigation to ascertain whether an
8 application that you filed was entitled to
9 priority to a foreign filing, under 35 U.S.C.
10 section 119?
11      A.   At that point in time during the
12 prosecution of the application, no.  Later,
13 different.
14      Q.   What do you mean by at that point in
15 time in prosecution?
16      A.   At that point in time I checked
17 whether or not, on its face, a given foreign
18 application could qualify, because of its filing
19 date, as a priority document for that U.S.
20 application.
21      Q.   So at the time of filing, your
22 investigation was limited to a comparison of the
23 dates of filing of the foreign priority document
24 and the proposed U.S. application; is that
25 right?

Page 107

Alan Stempel

1
2      A.   Correct.
3      Q.   Did you ever, during the period 1985
4 through 1990, make a determination on your own
5 that you should make a request for priority,
6 pursuant to 35 U.S.C. section 119?
7      A.   I don't recall that I ever did that.
8      Q.   Was it your practice, and did you in
9 every instance, to the best of your knowledge,
10 rely on a representation from someone in the
11 patent department in Germany in making a claim
12 for priority under 35 U.S.C. section 119?
13      A.   Aside from verifying that a given
14 application, in terms of its date, met the --
15 satisfied the Paris convention, I relied upon
16 representations from colleagues in the German
17 patent department, yes.
18      Q.   So if you filed a patent application
19 with the United States patent office in the
20 period 1985 through 1990 and asserted in that
21 application a claim for priority to a foreign
22 filing, pursuant to 35 U.S.C. section 119, it
23 was because someone in the patent department in
24 Germany had expressly represented to you that
25 the application was entitled to the priority; is

Page 108

Alan Stempel

1 that right?
2
3      A.   That's correct.
4      Q.   Did you ever have an instance, in the
5 period 1985 through 1990, Mr. Stempel, in which
6 it became apparent to you, for any reason, that
7 a U.S. application was not entitled, under 35
8 U.S.C. section 119, to priority to a foreign
9 filing that had been asserted at the time the
10 U.S. application was filed?
11      A.   When you say "entitled to priority,"
12 do you mean in whole or in part?
13      Q.   Were there instances in which you
14 learned that a pending application did not have
15 any claims that were entitled to priority to the
16 foreign priority document to which priority had
17 been claimed?
18      A.   Sir, are you asking that it became
19 apparent that there was no support in the
20 priority document for any claim that
21 eventually --
22      Q.   Let's start with that question.
23      A.   I don't recall -- I don't recall any
24 specific application where that would have
25 happened or that would have been the case.

Page 109

Alan Stempel

1
2      Q.   Do you recall any instance when you
3 became aware that there was a claim in a pending
4 U.S. application that had been filed by you
5 which was directed to new matter that was not
6 present in the foreign priority document?
7      A.   I don't recall any specific instance
8 where that would have happened, and at the same
9 time I do not recall anything that would lead me
10 to believe that it never happened.
11      Q.   Were you aware, in the period 1985
12 through 1990, that new matter was on occasion
13 added to foreign filing texts, when they were
14 prepared following the filing of the foreign
15 priority document?
16      MR. CHERNY:  Objection.  Lack of
17 foundation.
18      A.   I do not recall any specific
19 instances where new matter not appearing in the
20 priority texts was added to the foreign filing
21 texts.  And -- I'm not aware of any specific --
22 I don't recall any specific instances where new
23 matter was added, but I also don't have any
24 recollections that are specific enough to
25 exclude that that did happen.

28 (Pages 106 to 109)

Page 110

Alan Stempel

1
2    Q.    Did you have conversations with your
3  colleagues in the patent department in Germany
4  about the issue of whether or not new matter
5  should be added to foreign filing texts?
6      A.    I don't recall whether or not there
7  were specific conversations with colleagues in
8  Germany about this particular topic.
9      Q.    Were you aware, in the period 1985
10  through 1990, that additional examples were
11  frequently added to foreign filing texts, after
12  the foreign priority document had been filed?
13          MR. CHERNY:  Objection.  Lack of
14  foundation.
15      A.    I do not have any specific
16  recollection that specific examples were in any
17  particular instance added -- added in any
18  particular case.  I have no recollection that
19  they were not ever added to a foreign filing
20  text.
21      Q.    Was it your general understanding, in
22  the period 1985 through 1990, that the foreign
23  filing texts did not include matter that had not
24  been in the form priority documents?
25          MR. CHERNY:  Can I have that read

Page 111

Alan Stempel

1
2  back, please.
3      A.    Yeah, I need that, too.  That's a
4  complicated question.
5          (Record read.)
6          MR. CHERNY:  Objection, Lack of
7  foundation. And vague.
8      A.    I'm also struggling with -- I sense a
9  double negative in there somewhere.
10      Q.    Let me strike the question, and let's
11  try it again.
12          You were aware, in the period 1985
13  through 1990, that some of the foreign filing
14  texts you received were seeking priority to more
15  than one foreign filing, correct?
16      A.    I know that there were instances
17  where multiple priorities were claimed for a
18  given case, yes.
19      Q.    And you were aware, then, in
20  instances that some of the material in the
21  foreign filing text may not have been supported
22  by the first foreign priority; is that right?
23          MR. CHERNY:  Objection.  Lack of
24  foundation.
25      A.    I don't have any recollections which

Page 112

Alan Stempel

1
2  are specific enough to say that happened in a
3  particular case.  I have no recollection that's
4  specific enough to say that it never happened.
5      Q.    Well, the fact that priority was
6  based on more one document suggests that not
7  everything in the application was supported by
8  the first priority document, or there would be
9  no reason to assert the second priority
10  document, right?
11          MR. CHERNY:  Objection.  Lack of
12  foundation.
13      A.    I think that you'd have to look at
14  the reason for multiple priorities on a
15  case-by-case basis.  And I just don't see any
16  way to answer in a generalized fashion or
17  respond to a question that seeks to look at, in
18  a generalized fashion, why multiple priorities,
19  why they ever existed.  I think you can do it on
20  a case-by-case basis, but I have no way of
21  addressing that in general.
22      Q.    Well, tell me generally the types of
23  situations in which priority was claimed in more
24  than one priority document.
25          MR. CHERNY:  Objection.  Vague.  Lack

Page 113

Alan Stempel

1
2  of foundation.
3      A.    Could you restate -- either could the
4  reporter --
5      Q.    I'll restate it.
6      A.    All right.
7      Q.    Tell me examples of types of
8  instances where a patent application claimed
9  priority to more than one foreign filing, how
10  would that come about?
11      A.    Since I don't have any particular
12  recollections about any particular case,
13  especially within that time frame that we are
14  talking about, which is the first five years of
15  my career, essentially, at Boehringer, to me an
16  example is specific from a given case, and I do
17  not recall specifics now, 15 years later.  So
18  I'm not sure how to answer your question.
19      Q.    Well, Mr. Stempel, in the 1985-1990
20  period, when you were aware that these foreign
21  priority texts -- foreign filing texts were
22  claiming priority to more than one foreign
23  application, didn't it ever occur to you that
24  that could create an issue about whether or not
25  the foreign filing text was entitled to priority

29 (Pages 110 to 113)

Page 114

Alan Stempel

1  under section 119?
2  MR. CHERNY: Objection. Lack of
3  foundation.
4  A.   If you are asking me if I was aware
5  of the fact that during prosecution, where the
6  priority date to which that application was
7  entitled might depend upon the subject, the
8  subject matter disclosed by the -- if there were
9  more than one priority text, might depend upon
10 what was actually disclosed in each application
11 from which priority was claimed, yes, I was
12 aware of that.
13 Q.   But you didn't think you had any
14 obligation, at the time you filed U.S. patent
15 applications, to do any investigation to see
16 whether or not there were claims in your U.S.
17 application that were actually entitled to the
18 benefit of the earliest filing date; is that
19 right?
20 MR. CHERNY: Objection. Lack of
21 foundation.
22 A.   My objection -- my obligation to do
23 that kind of investigation arose when it was
24 necessary to assert priority to overcome, either

Page 115

Alan Stempel

1  to include or exclude prior art to be cited to
2  the office or to respond to a rejection, but not
3  at that point of time of filing.
4  Q.   So it was your understanding at the
5  time of filing you had no obligation, when you
6  asserted that an application was entitled to
7  foreign priority, to investigate whether it
8  really was?
9  A.   I had an obligation, but it did not
10 arise at that time in that context.
11 Q.   So you didn't have an obligation at
12 the time of filing?
13 A.   I had an obligation, but not at that
14 time, in that context.
15 MR. CHERNY: I'm just going to remind
16 everybody, too much cross-talk, in terms of
17 you both going at the same time.
18 Q.   So it's your understanding that at
19 the time of filing you had no such obligation;
20 is that right?
21 MR. CHERNY: Objection. Asked and
22 answered.
23 A.   I had an obligation at a different
24 time, in a different context.

Page 116

Alan Stempel

1  Q.   And I understand that part,
2  Mr. Stempel. I'd like you to answer my
3  question.
4  Was it your understand that you had
5  any obligation at the time you filed the
6  application?
7  MR. CHERNY: Objection. Asked and
8  answered.
9  MR. PFADENHAUER: It's been asked
10 several times; not answered yet, Steve.
11 MR. CHERNY: I'm making my objection.
12 I'm not trying -- I mean you are looking
13 for sound bites. I'm just making my
14 objections.
15 MR. PFADENHAUER: Sound bites I'm not
16 looking for. Answers to my questions I'm
17 looking for.
18 MR. CHERNY: He gave you the answer.
19 MR. PFADENHAUER: He hasn't answered
20 it.
21 Q.   Go ahead.
22 A.   My obligation at that time was to
23 determine whether or not, a priori, that it was
24 a basis for determining priority under the Paris

Page 117

Alan Stempel

1  convention; and since under the Paris convention
2  there only has to be one little iota of subject
3  matter in that application, and it has to be
4  within the convention year, I determined whether
5  or not, a priori, there was any colorable basis
6  for claiming priority, which basically amounts
7  to do it -- was it filed within the convention
8  year, and that's my answer.
9  Q.   And so as I understand it, at the
10 time of filing you made no investigation to
11 determine whether the claims, as filed in the
12 U.S., had any support in the first foreign
13 priority document; is that right?
14 MR. CHERNY: Objection. Sorry,
15 objection. Asked and answered. Lack of
16 foundation.
17 A.   That inquiry was made at a later
18 date, in a different context.
19 Q.   So the answer to my question is yes,
20 at the time of filing you did not undertake to
21 compare the claims in the U.S. application with
22 the first foreign priority texts?
23 MR. CHERNY: Objection. Asked and
24 answered. Lack of foundation.

30 (Pages 114 to 117)

Page 118

Alan Stempel

1
2  Q.  Is that right?
3  A.  Are you asking with regard to a
4  particular case?
5  Q.  Do you remember doing that in any
6  case?
7  A.  I do not recall that it was done in
8  any case, and I don't recall that it was never
9  done.
10  Q.  What you recall -- you don't recall
11  any specifics, but you recall that generally
12  your practice was not to compare the claims in
13  the U.S. application that you had filed with the
14  first foreign priority document at the time of
15  the filing?
16  MR. CHERNY:  Objection.  Asked and
17  answered.  Lack of foundation.
18  A.  The first or any priority document?
19  Q.  The first priority document.
20  A.  That's correct.
21  Q.  While we are waiting for the
22  exhibits, Mr. Stempel, you've never been subject
23  to any discipline by any bar, correct?
24  A.  No, I have not.
25  Q.  You've never been subject to

Page 119

Alan Stempel

1
2  discipline by the Patent and Trademark Office?
3  A.  No, I haven't.
4  Q.  You've never had your license
5  suspended or revoked; is that right?
6  A.  No, I have not.
7  Q.  Mr. Stempel, I'm going to show you
8  what's previously been marked as -- previously,
9  but not currently, apparently, copies of --
10  MR. PFADENHAUER:  Which is which?
11  I'm just going to write on the front.
12  MR. CHERNY:  You want to just put
13  another exhibit sticker on it or something?
14  MR. PFADENHAUER:  I really would
15  rather not do that, so we don't have
16  multiple copies of the same exhibit
17  floating around.
18  MR. CHERNY:  Fine.
19  MR. PFADENHAUER:  Okay.  So here's,
20  for the record, here's what we are doing.
21  We are going to show the witness copies of
22  three patents which were previously marked
23  as Exhibits 1, 2 and 3.
24  Exhibit 1 is the '374 patent,
25  Exhibit 2 is the '086 patent and Exhibit 3

Page 120

Alan Stempel

1
2  is the '812 patent.
3  MR. CHERNY:  And when you say
4  "previously marked," I assume you mean at
5  the Schneider deposition?
6  MS. BERNIKER:  Yes.
7  MR. CHERNY:  That way I can see where
8  a marked copy came from.
9  Thanks.
10  I'm sorry, that was chronological, in
11  terms of '374 is 1, '086 is 2 and '812 is
12  3?
13  MS. BERNIKER:  Yes.
14  Q.  All right.  Mr. Stempel, have you
15  seen these patents before?
16  (Witness reviews documents.)
17  A.  I believe that I have.
18  Q.  Did you meet with Mr. Cherny to
19  prepare for your deposition today, Mr. Stempel?
20  A.  Yes, I did.
21  Q.  When did you meet with him?
22  A.  Yesterday.
23  Q.  And how long was your meeting with
24  Mr. Cherny?
25  A.  Several hours.

Page 121

Alan Stempel

1
2  Q.  And during the course of that
3  meeting, did you look at what we marked as
4  Exhibit 1, the '374 patent?
5  MR. CHERNY:  Objection.
6  DIR  Instruction not to answer.
7  MR. PFADENHAUER:  You are instructing
8  him not to answer whether he looked at the
9  specific document that he has in front of
10  him?
11  MR. CHERNY:  Yeah.  I'm going to
12  instruct him not to answer as to any
13  question that would have him disclose any
14  specific document that I put in front of
15  him or that we discussed as work product.
16  MR. PFADENHAUER:  I agree with you
17  I'm not entitled to ask him to just list
18  generally documents he looked at, but when
19  I show him a specific document that I have
20  identified, I'm entitled to know if he
21  looked at it yesterday.
22  MR. CHERNY:  I'm maintaining the
23  objection.  Seems to me all you are trying
24  to do is sample -- let me complete my
25  statement and then I'll let you go.  Seems

31 (Pages 118 to 121)

Page 122

Alan Stempel

1
2    to me all you are trying to do is sample
3    away the work product immunity. You can
4    either say what did he show you, which we
5    agreed was objectionable, or you can sit
6    there and show him documents, did he show
7    you this, did he show you this; and it
8    seems to me that you would end up with the
9    same result, which would be finding out
10   what we discussed specifically yesterday.
11         MR. PFADENHAUER: I think under the
12   third circuit law it's abundantly clear I'm
13   entitled to ask him as to a particular
14   document in front of him, whether he saw it
15   in preparation for the deposition. I
16   understand your position. We can --
17         MR. CHERNY: I'm happy --
18         MR. PFADENHAUER: Fight with it --
19         MR. CHERNY: If you have some third
20   circuit law in mind, I'd be happy to
21   consider it at one of the breaks, you know,
22   I'm happy to consider that.
23         MR. PFADENHAUER: It's not my job to
24   educate you about the law. If you want to
25   instruct him, instruct him. That's fine.

Page 123

Alan Stempel

1
2          MR. CHERNY: He's been instructed.
3    What I'm trying to do at this point,
4    now, is that to the extent there's a
5    difference of opinion, if we can work it
6    out, I'm happy to work it out. It's not a
7    matter of instructing me about the law,
8    it's a matter of coming to some conclusion
9    that attempts to work out a difference of
10   opinion.
11         Q.   Mr. Stempel, did you see Exhibit 2
12   yesterday, the '086 patent, in connection with
13   preparing for your deposition?
14   DIR       MR. CHERNY: Same instruction.
15         MR. PFADENHAUER: What's your
16   instruction?
17         MR. CHERNY: I'll say the same,
18   assuming you are going to do it for
19   Exhibit 3, to the extent that
20   Mr. Pfadenhauer asks you whether any
21   specific document was the subject of our
22   meeting yesterday in preparation for this
23   deposition, I instruct you not to answer.
24         Q.   Mr. Stempel, in your preparation
25   yesterday, did you look at Exhibit 3, the '812

Page 124

Alan Stempel

1
2    patent?
3          MR. CHERNY: I already instructed him
4    on that.
5          MR. PFADENHAUER: Instruct him again.
6    DIR       MR. CHERNY: I'm sorry, I was trying
7    to cut through this. I instruct him on
8    Exhibit 3 as well.
9          Q.   Are you going to follow your
10   attorney's instruction?
11         A.   Yes, I will.
12         Q.   Are you going to follow your
13   attorney's instruction with respect to not
14   answering whether you looked at the '086 patent
15   yesterday?
16         MR. CHERNY: I object. That's
17   Exhibit 2.
18         A.   When you say the '086 patent, you
19   mean Exhibit 2?
20         Q.   I mean the '086 patent, U.S. patent
21   4,843,086.
22         A.   Do you mean Exhibit 2?
23         Q.   No. I mean United States patent
24   4,843,086, did you look at that document
25   yesterday?

Page 125

Alan Stempel

1
2          MR. CHERNY: I don't think there's
3    any issue here. I think Exhibit 2 is the
4    number you just raised.
5    DIR       So the answer is I instruct you not
6    to answer either the patent number or
7    Exhibit 2 number.
8          MR. PFADENHAUER: Let me make sure
9    the witness is not being cute here.
10         Q.   Do you, distinguish, Mr. Stempel,
11   between Exhibit 2 and United States patent
12   4,843,086?
13         MR. CHERNY: I object to the
14   characterization of the witness being cute.
15         Q.   Is there any difference in those two
16   things, in your mind, Mr. Stempel?
17         A.   Ask your question again.
18         Q.   Is there any difference between
19   what's in front of you as Exhibit 2 and United
20   States patent 4,843,086?
21         A.   Yes.
22         Q.   Okay. So what's the difference
23   between those two things?
24         THE WITNESS: Do you want me to --
25         MR. CHERNY: I mean do you believe

32 (Pages 122 to 125)

Page 126

1        Alan Stempel
2     this would somehow implicate the privilege
3     of work product, identifying the difference
4     that you are alluding to?
5        THE WITNESS:  I don't think so.
6        MR. CHERNY:  Okay.  Well then, then
7     tell him.
8     A.    This appears to be a certified copy
9  of that patent, and I don't regard a certified
10 copy of the patent to be necessarily synonymous
11 with the patent.
12    Q.    So let me make sure I understand,
13 Mr. Stempel.  If I show you Exhibit 2 and I ask
14 you whether you've ever seen U.S. patent
15 4,843,086, and you've seen the patent, but you
16 don't think you've seen the certified copy, you
17 can truthfully answer no to that question; is
18 that right?
19    A.    State your question again.
20    Q.    Yes.  If I ask you if you've seen
21 Exhibit 2, which is in front of you, and the
22 facts are that you've seen United States patent
23 4,843,086, but you've never seen this certified
24 copy of it, that you can say no, I have never
25 seen Exhibit 2; is that right?

Page 127

1        Alan Stempel
2        MR. CHERNY:  Objection.  Lack of
3     foundation.
4     A.    I'm not sure that I have ever seen
5  the certified copy of the '086 patent.
6     Q.    Do you understand, Mr. Stempel, that
7  you have an obligation to tell the complete
8  truth in this deposition?
9        MR. CHERNY:  He is doing that.
10    A.    Yes.
11    Q.    Do you understand that you --
12       MR. CHERNY:  Okay, at this point we
13    are going to stop, because at this point
14    you are starting to harass.
15       He's answered your questions
16    truthfully.  You don't lecture him about
17    the oath, which you already asked him
18    about.  We are going to step out and take a
19    break for a second.
20       He answered your question.
21       MR. PFADENHAUER:  I want to
22    understand the extent to which the witness
23    is playing games here.
24       MR. CHERNY:  He is not playing any
25    games.  I didn't even know what the answer

Page 128

1        Alan Stempel
2     to that question was.
3        MR. PFADENHAUER:  I know you didn't,
4     because it's crazy.
5        MR. CHERNY:  It's not crazy.  He
6     answered your question.
7     A.    I am answering your question.
8        MR. CHERNY:  So if you want to argue
9     with him, we are going to take a break.  If
10    you want to just ask him questions about
11    the exhibit, then go ahead.
12    Q.    Let's go back through this, Mr.
13 Stempel, and make sure we have a record.
14    A.    And I do not like being insulted and
15 my integrity impugned.
16    Q.    I'm not insulting you, Mr. Stempel.
17       MR. CHERNY:  That's exactly what
18    happened.
19    Q.    Now, let me ask you again.
20       Prior to today, have you seen the
21    '374 patent?
22       MR. CHERNY:  Asked and answered.
23    A.    Yes, I have.
24    Q.    Okay.  And prior to today have you
25 seen the '086 patent?

Page 129

1        Alan Stempel
2        MR. CHERNY:  Objection, asked and
3     answered.
4     A.    Yes, I have.
5     Q.    And prior to today, have you seen the
6  '812 patent?
7     A.    Yes, I have.
8        MR. CHERNY:  Asked and answered.
9     Q.    Now, in your preparation yesterday
10 for the deposition, did you look at the '374
11 patent?
12 DIR       MR. CHERNY:  Instruction not to
13    answer.
14    Q.    Are you going to follow your
15 attorney's instructions?
16    A.    Yes, I will.
17    Q.    In your preparation for your
18 deposition yesterday, did you look at the '086
19 pavement?
20 DIR       MR. CHERNY:  Instruction not to
21    answer.
22    Q.    Are you going to follow your
23 attorney's instruction?
24    A.    Yes, I will.
25    Q.    In preparation for the deposition

33 (Pages 126 to 129)

Page 130

Alan Stempel

1  Alan Stempel
2  yesterday, did you look at the '812 patent?
3  DIR     MR. CHERNY:  Instruction not to
4      answer.
5      Q.   Are you going to follow your
6  attorney's instruction?
7      A.   Yes, I will.
8      Q.   Prior to your preparation yesterday
9  for your deposition, when was the last time you
10 looked at the '812 patent?
11     MR. CHERNY:  And again, you are
12     assuming the answer that he did see it one
13     way or the other, but --
14     MR. PFADENHAUER:  I'm not making any
15     assumption.  I'm saying, let's forget about
16     whatever happened yesterday, whether he did
17     or didn't.
18     Q.   Prior to yesterday, when was the last
19 time you looked at the '812 patent?
20     A.   I cannot recall with any specificity
21 when the last time was.
22     Q.   Do you know whether you looked at the
23 '812 patent -- apart from whether you did
24 yesterday, do you know whether you looked at the
25 '812 patent in the last six months?

Page 131

Alan Stempel

1  Alan Stempel
2      A.   Aside from yesterday?
3      Q.   Aside from yesterday.
4      A.   I don't believe that I have.
5      Q.   Okay.  Apart from whatever may or may
6  not have happened yesterday, have you looked at
7  the '086 patent in the last six months?
8      A.   I don't believe that I have.
9      Q.   Okay.  And prior to whatever may or
10 may not have happened yesterday, have you looked
11 at the '374 patent in the past six months?
12     A.   I don't believe that I have.
13     Q.   Just so our record is clear, when I
14 have been referring to the '374 patent, you
15 understand that to mean U.S. patent 4,731,374,
16 correct?
17     A.   Yes.
18     Q.   And when I said the '086 patent,
19 you've understood that to mean U.S. patent
20 4,843,086, correct?
21     A.   Yes.
22     Q.   When I have said the '812 patent,
23 you've understood that to mean U.S. patent
24 4,886,812?
25     A.   Yes.

Page 132

Alan Stempel

1  Alan Stempel
2      Q.   If I refer to these three patents
3  collectively, Mr. Stempel, as the
4  tetrahydro-benzthiazole patents, will you
5  understand what I'm talking about?
6      A.   Sure.
7      Q.   Okay.  I think it will just make
8  things easier, if I can generally refer to these
9  three patents in that way.
10     MR. CHERNY:  But of course subject to
11     objections regarding compound.
12     Q.   All right.  Now, were you the person,
13 Mr. Stempel, who was primarily responsible for
14 the prosecution of these tetrahydro-benzthiazole
15 patents in the United States?
16     MR. CHERNY:  Objection, compound.
17     Vague.
18     A.   Ask your question again, please.
19     Q.   Yes, sir.
20     Were you the person primarily
21 responsible for the prosecution, before the
22 United States Patent and Trademark Office, of
23 these three patents that I'm referring to as the
24 tetrahydro-benzthiazole patents?
25     MR. CHERNY:  Same objections.

Page 133

Alan Stempel

1  Alan Stempel
2      A.   My recollection is that I was.
3      Q.   Was there a particular individual in
4  the patent department in Germany who was your
5  primary contact, with respect to the prosecution
6  of these three tetrahydro-benzthiazole patents?
7      MR. CHERNY:  Objection, vague and
8  compound.
9      A.   State your question again, please.
10     Q.   Yes, sir.
11     Was there a particular individual in
12 the patent department in Germany who was your
13 primary contact, with respect to prosecution of
14 these three tetrahydro-benzthiazole patents in
15 the United States?
16     A.   My recollection is that there was
17 such a person, yes.
18     Q.   And who was that individual?
19     A.   Dr. Rolf Fleischer.
20     Q.   Apart from Dr. Fleischer, did you
21 communicate, Mr. Stempel with anyone else in the
22 Boehringer patent department in Germany, with
23 respect to the prosecution of these three
24 tetrahydro-benzthiazole U.S. patents?
25     A.   I don't have a recollection that's

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212) 705-8585

Page 134

Alan Stempel

1    specific enough to say whether or not I did or
2    did not.
3        Q.    I take it, as you sit here now, you
4    don't recall any conversations with anyone else
5    in the German patent department regarding the
6    prosecution of these three patents; is that
7    right?
8        A.    That's correct.
9        Q.    Did you, Mr. Stempel, ever
10   communicate with any of the named inventors
11   directly, regarding the prosecution of these
12   three patents to tetrahydro-benzthiazole?
13           MR. CHERNY: Objection, vague.
14       A.    Ask your question again, please.
15       Q.    Yes sir.
16           Did you ever communicate directly
17   with any of the named inventors on these three
18   tetrahydro-benzthiazole U.S. patents, regarding
19   the prosecution of these three patents?
20       A.    I do not recall that I did.
21       Q.    Did you communicate with
22   Dr. Fleischer regarding the prosecution of these
23   three tetrahydro-benzthiazole patents, both in
24   writing and orally?

Page 135

Alan Stempel

1        A.    I believe that I communicated with
2    him in writing and orally.
3        Q.    Were all of your written and oral
4    communications with Dr. Fleischer, regarding the
5    prosecution of these three
6    tetrahydro-benzthiazole patents, conducted in
7    English?
8        A.    I believe that they were conducted in
9    English.
10       Q.    Did you, to the best of your
11   knowledge, provide Dr. Fleischer with copies of
12   all of the office actions that you received,
13   during the course of the prosecution of these
14   three tetrahydro-benzthiazole patents?
15       A.    When you say "provide Dr. Fleischer,"
16   do you mean directly?
17       Q.    Did you provide to Dr. Fleischer's
18   office and request that it be provided to his
19   attention?
20       A.    Yes.
21       Q.    And was it your understanding that
22   Dr. Fleischer was aware of all of the office
23   actions that were received regarding these three
24   tetrahydro-benzthiazole patents?

Page 136

Alan Stempel

1           MR. CHERNY: Objection. Lack of
2    foundation. Calls for speculation.
3        A.    At this late date, what is it, nearly
4    20 years later, I don't have any recollections
5    which are specific enough to know whether or not
6    Dr. Fleischer was unaware of any particular
7    office action.
8        Q.    Did you receive direction from
9    Dr. Fleischer, with respect to how to respond to
10   office actions that were received during
11   prosecution of these three
12   tetrahydro-benzthiazole patents?
13           MR. CHERNY: Objection, vague.
14   Objection, compound.
15       A.    Would you restate the question.
16       Q.    Sure. Did you receive from
17   Dr. Fleischer, either directly or indirectly,
18   instructions with respect to how to respond to
19   office actions that were received from the
20   patent office, during the prosecution of these
21   three tetrahydro-benzthiazole patents?
22       A.    I believe that there were
23   communications between myself and Dr. Fleischer
24   where we --

Page 137

Alan Stempel

1           MR. CHERNY: I'm going to caution
2    you. Be careful not to disclose any
3    privileged communications between you and
4    Dr. Fleischer.
5        A.    -- where we decided, on the basis of
6    those communications, how to respond to office
7    actions.
8        Q.    Did you ever utilize a translator, in
9    conjunction with your communications with
10   Dr. Fleischer?
11           MR. CHERNY: Objection, vague.
12       A.    Well, regardless of the vagueness, I
13   have no specific recollection about whether or
14   not there was ever a language problem requiring
15   a translator to be brought in.
16       Q.    Do you have any recollection of ever
17   having any language problem, in connection with
18   your communications with Dr. Fleischer?
19           MR. CHERNY: Objection, asked and
20   answered.
21       A.    I don't recall any particular
22   difficulty -- I do not speak German. Dr. -- my
23   communications with Dr. -- I do not speak German
24   to any particular degree. My communications

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212) 705-8585

Page 138

1        Alan Stempel
2   were in English with Dr. Fleischer. I do not
3   recall any instance where his grasp of English
4   or my limited grasp of German were not
5   sufficient for us to communicate, without
6   bringing in a translator.
7        Q.   Mr. Stempel, what is a divisional
8   patent application?
9            MR. CHERNY: Objection. Calls for a
10  legal conclusion.
11           Unless I instruct you not to answer,
12  you can answer his questions to the best of
13  your ability.
14       A.   My understanding is that, strictly
15  speaking, a divisional application is one filed
16  in response to a -- maybe not in response to, as
17  a result of there having been a restriction
18  requirement and an election having been made
19  such that, in the parent application, nonelected
20  subject matter has been withdrawn from
21  consideration and will not be granted a patent.
22       Q.   Is it your understanding that
23  divisional patent applications are limited to
24  patent applications directed to nonelected
25  subject matter?

Page 139

1        Alan Stempel
2            MR. CHERNY: I'm going to make an
3   objection again as to a legal conclusion.
4   May I ask for a clarification, Glenn?
5            MR. PFADENHAUER: Okay.
6            MR. CHERNY: Before we were talking
7   about specific time frames. I just want to
8   make sure you are asking him his current
9   understanding.
10           MR. PFADENHAUER: Let me get an
11  answer to this question, and then we'll see
12  if we can clarify that.
13           MR. CHERNY: I'm just trying to
14  figure out when you are asking.
15       A.   It's my understanding the objective,
16  ultimate objective of a divisional application
17  is to prosecute claims to subject matter that
18  was not elected in the parent. The ultimate
19  objective.
20       Q.   Do I understand that you are
21  highlighting the fact that that's the ultimate
22  objective, because you can file an application
23  with all of the original claims and then file a
24  preliminary amendment to narrow that
25  prosecution; is that the distinction?

Page 140

1        Alan Stempel
2       A.   My understanding of practice at that
3   point in time is in fact it may have been -- my
4   recollection is that it was the only way to file
5   a divisional application, that it had to be a
6   photocopy of the parent, and that one had but no
7   choice but to start out with a photocopy of the
8   parent, which necessarily would have had all of
9   the original claims.
10       Q.   When you say "at that time," are you
11  referring to 1985 to 1990?
12       A.   Yes.
13           MR. CHERNY: Hence why I was asking
14  for the clarification.
15           MR. PFADENHAUER: That's fine.
16       Q.   So is it your understanding, then,
17  that although you would, with respect to a
18  divisional application, file a photocopy of the
19  parent application, you would typically then
20  file a preliminary amendment to limit the claims
21  to those that related to the nonelected subject
22  matter in the parent case?
23       A.   It's my understanding that the claims
24  ultimately would be limited to nonelected
25  subject matter, but not necessarily by

Page 141

1        Alan Stempel
2   preliminary amendment; that that was but one
3   means for accomplishing that end.
4       Q.   In the period 1985 to 1990, when you
5   filed a patent application, would you have the
6   opportunity to designate that application as a
7   divisional?
8            MR. CHERNY: Objection. Lack of
9   foundation. Vague.
10           You can answer.
11           Calls for a legal conclusion as well.
12       A.   I believe that -- my recollection is
13  is that during that time period the usual
14  procedure or usual method for filing a
15  divisional application was to essentially submit
16  a photocopy of the parent with a cover sheet,
17  which, among other things, said this is a
18  divisional or this is a division of, and then
19  you would give the serial number and filing date
20  of the parent.
21       Q.   And how would that differ from the
22  practice for filing a continuation application
23  at that point in time?
24           MR. CHERNY: Objection, calls for a
25  legal conclusion.

36 (Pages 138 to 141)

Page 142

Alan Stempel

1
2    A.    The procedure at the time was more or
3    less the same, as I recall, except that one
4    would say this is a continuation of and give the
5    serial number and filing date of the parent.
6    Q.    So in those instances where you
7    indicated that this was intended to be a
8    divisional, does that indicate that, at least at
9    the time of the filing, it was your intention
10    that the claims resulting from that application
11    would be limited to nonelected subject matter?
12    A.    Are we talking about a particular
13    patent application or a particular context?
14    Q.    I'm trying to understand if, in '85
15    to '90, you had a general practice.
16          If you indicated, when you filed an
17    application, that you intended it to be a
18    divisional, does that reflect that at the time
19    you filed it, you intended for the claims that
20    resulted from that application to be limited to
21    nonelected subject matter?
22          MR. CHERNY:  Objection.  Lack of
23          foundation.
24    A.    I do not recall whether or not I ever
25    filed something characterized as a divisional,

Page 143

Alan Stempel

1
2    which had -- or the intention was not to pursue
3    claims -- was to pursue something other than
4    claims to nonelected subject matter.
5    Q.    Was there any advantage, in the
6    period 1985 to 1990, to designate an application
7    as a divisional rather than as a continuation?
8          MR. CHERNY:  Objection, vague.
9    A.    It's my belief that following a
10    restriction requirement where there was
11    nonelected subject matter, the appropriate --
12    the appropriate path, in view of the statute at
13    the time, as it was written at the time, would
14    have been to file a divisional.
15    Q.    So it was your understanding, in the
16    period of 1985 to 1990, that it would be
17    improper to file an application and designate it
18    as a continuation, if you intended for the
19    claims resulting from that application to
20    encompass any nonelected subject matter?
21          MR. CHERNY:  Objection.  Lack of
22          foundation.  Calls for a legal conclusion.
23          Vague as well.
24    A.    I'm not sure that it would have been
25    improper.  I'm not even sure that it would

Page 144

Alan Stempel

1
2    necessarily have been disadvantageous.
3    Q.    Are you aware, as you sit here today,
4    Mr. Stempel, of any instances in which you filed
5    an application, during the period 1985 to 1990,
6    and initially designated that application as a
7    divisional, but ultimately claims were issued
8    from the application which were not directed to
9    nonelected subject matter?
10          MR. CHERNY:  Can I have that back,
11          please.
12          (Record read.)
13          MR. CHERNY:  Objection.  Lack of
14          foundation.  Vague.
15    A.    Restate your question.  There's
16    something about it that is not working for me
17    yet.  I'm sorry.
18    Q.    Tell me what you don't understand
19    about the question, and I'll try and fix it for
20    you.
21    A.    Either the reporter can read it back
22    to me or you can restate it.
23    Q.    I can just read it to you.  It's in
24    front of me.
25          Are you aware of any instances, as

Page 145

Alan Stempel

1
2    you sit here now, in which you filed a patent
3    application, during the period 1985 to 1990, you
4    designated that patent application filing as a
5    divisional, and ultimately claims issued from
6    the application which were not directed to
7    nonelected subject matter?
8    A.    Your question calls for me to
9    remember specifics, and I really do not recall
10    that long ago specifics.
11    Q.    So --
12    A.    I'm not going to speculate as to
13    whether I might or might not have done that.  I
14    can't answer to specifics.
15    Q.    All I'm trying to understand, is it
16    correct that as you sit here today, you don't
17    have in your mind any instance in which that
18    happened, which you originally designated
19    something as a divisional, and ultimately what
20    happened was claims issued that were directed to
21    non -- that were not directed to nonelected
22    subject matter?
23          MR. CHERNY:  I'm going to object as
24          to asked and answered.  He just answered
25          the question.

37 (Pages 142 to 145)

Page 146

Alan Stempel

1
2    A.   I think I have answered your
3    question.
4    Q.   I'm not trying to undo or prolong
5    this. I just want to make sure we are clear on
6    this.
7         MR. CHERNY: Okay, you can talk now.
8    You are talking over each other a little
9    bit.
10        Anyway, I object as asked and
11   answered. I don't know where we are now at
12   this time.
13        MR. PFADENHAUER: I think the record
14   is not entirely clear. That's why I'm
15   trying to make sure I have the witness's
16   best recollection. I'm not asking him to
17   recall something he does not recall.
18   A.   I do not have any specific
19   recollection on which I can base an answer to
20   your question.
21   Q.   Okay. So it is a truthful statement,
22   then, as you sit here now, you don't recall that
23   having ever happened?
24        MR. CHERNY: I'm going to object to
25   this line of questioning. You are trying

Page 147

Alan Stempel

1
2    to recast it. He told you he doesn't have
3    any recollection at all.
4         MR. PFADENHAUER: If he doesn't have
5    a recollection, then it's correct to say he
6    does not recall having done it.
7         MR. CHERNY: You are clearly trying to
8    make an implication. You are saying, well,
9    you don't recollect X. He says, I don't
10   recollect anything.
11        MR. PFADENHAUER: But I want to make
12   sure I have a specific understanding of the
13   parameters of what it is he does not
14   recall. I want to make sure that the
15   record is clear that he has no recollection
16   of an instance where some claims issued
17   from something he designated as a
18   divisional that were directed to matter
19   that wasn't nonelected subject matter.
20        MR. CHERNY: I'm going to repeat my
21   objection, asked and answered. I believe
22   he's answered the question.
23   Q.   Could you answer the question,
24   Mr. Stempel?
25   A.   I have no specific recollection upon

Page 148

Alan Stempel

1
2    which I can base an answer to your question.
3    Q.   I don't think that's responsive to my
4    question, with all due respect, Mr. Stempel.
5         MR. CHERNY: I disagree.
6         MR. PFADENHAUER: I understand that,
7    Mr. Cherny.
8         What I want to know is whether the
9    witness has a recollection, yes or no, I
10   have a recollection or I don't. I'm not
11   saying that that means he did it or didn't
12   do it. I just want to know, does he recall
13   of an instance where he filed an
14   application, called it a divisional and
15   ultimately claims issued from that which
16   were directed to something other than
17   nonelected subject matter.
18        MR. CHERNY: Again, I'm going to
19   repeat my objection.
20   Q.   Can you answer that question,
21   Mr. Stempel?
22        MR. CHERNY: Asked and answered.
23   A.   I don't know how many more times I
24   can say it. I have no specific recollection
25   that that happened.

Page 149

Alan Stempel

1
2    Q.   Okay. Thank you. That answered my
3    question, Mr. Stempel. I appreciate it.
4         MR. PFADENHAUER: Let's go ahead and
5    take a break.
6         THE VIDEOGRAPHER: The time is 2:38.
7    We are going off the record.
8         (Whereupon, there is a recess in the
9    proceedings.)
10        THE VIDEOGRAPHER: The time is 2:52.
11   We are back on the record.
12   Q.   Mr. Stempel, let me show you what we
13   have previously marked as Exhibit 46.
14        (Handing.)
15        MR. CHERNY: You got a lot of
16   exhibits at the Schneider deposition.
17        MR. PFADENHAUER: Somewhere there's a
18   box of the exhibits.
19   Q.   And I'll represent to you,
20   Mr. Stempel, that this is a certified copy of a
21   file history from the United States Patent and
22   Trademark Office for the patent application
23   serial number 8,810,947 -- I'm sorry, 6 --
24   series 6, not series 8, series 6, 810,947.
25   A.   Okay.

38 (Pages 146 to 149)

Page 150

Alan Stempel

1
2    Q.    Have you seen this file history
3    before, Mr. Stempel?
4         (Witness reviews documents.)
5    A.    Yes, I believe I have.
6    Q.    Did you see the file history prior to
7    preparing for your deposition in this case?
8         MR. CHERNY: I didn't hear the last
9    word you said.
10   Q.    Did you see the file history prior to
11   preparing for your deposition in this case?
12        MR. CHERNY: Thank you.
13   A.    I have no specific recollection
14   whether I have or have not, prior to preparing.
15   Q.    Do you agree that this is the file
16   history for the '374 patent?
17   A.    It appears to be.
18   Q.    And if you would turn to the page
19   Bates labeled BARR 000070.
20   A.    What are last three numbers?
21        MR. CHERNY: 70.
22   Q.    070.
23   A.    The next one, right.
24   Q.    There you go. Perfect. All right.
25        And is this, is the document that

Page 151

Alan Stempel

1
2    starts on this page, Barr 000070, the
3    application that was filed by you that
4    ultimately led to the issuance of the '374
5    patent?
6    A.    It appears to be.
7    Q.    At the top of each page of the
8    application the word "patent" appears.
9         Do you see that?
10   A.    Yes.
11   Q.    Can you tell me what that designation
12   refers to?
13   A.    I do not recall if that was something
14   that was on the application when it was sent to
15   the patent office or not. I don't recall that
16   it wasn't, I don't recall that it was.
17   Q.    I take it you have no recollection of
18   putting that legend on the top of each of the
19   pages?
20   A.    I have no recollection.
21   Q.    At the bottom of each page of the
22   application it indicates case 5/920, do you see
23   that?
24   A.    Yes.
25   Q.    Can you tell me what that indicates?

Page 152

Alan Stempel

1
2    A.    That, I believe it would be the
3    internal attorney's docket number for this
4    patent application.
5    Q.    And what does the 5 designate in this
6    instance?
7    A.    That the origin of the case was
8    Biberach, Germany.
9    Q.    And is 920 a sequential number?
10   A.    I believe it is.
11   Q.    Is the 5/920 case number something
12   that would have been assigned in Germany?
13   A.    Yes.
14   Q.    That was not a unique identifier that
15   the U.S. patent department put on the case?
16   A.    No. My belief is that was assigned
17   by Germany.
18   Q.    Now, this application is one of the
19   applications that was prosecuted by you,
20   correct?
21   A.    Yes.
22   Q.    And I take it you kept yourself
23   generally apprised of the status of this
24   application, during prosecution?
25        MR. CHERNY: Objection, vague.

Page 153

Alan Stempel

1
2    A.    I'm not sure what "generally apprised
3    of the status of the application" means. That
4    could mean something very different to three
5    different people.
6    Q.    Were you the person who was primarily
7    responsible for this application?
8    A.    Yes.
9    Q.    And did that include substantive
10   responsibility for the application?
11        MR. CHERNY: Objection, vague.
12   A.    What does "substantive
13   responsibility" mean?
14   Q.    Did you believe that you had any
15   responsibilities beyond serving as a conduit
16   between the patent office and the patent
17   department in Germany?
18   A.    Yes.
19   Q.    What other responsibilities did you
20   have, other than serving as a conduit between
21   the patent department in Germany and the patent
22   office --
23        MR. CHERNY: Objection. Lack of
24   foundation.
25   Q.    -- with respect to this application?

39 (Pages 150 to 153)

Page 154

Alan Stempel

1
2    A.    Restate your question, please.
3    Q.    Yes, sir.
4          Apart from serving as a conduit
5    between the patent office and the patent
6    department in Germany, what other
7    responsibilities did you have with respect to
8    the prosecution of this patent application?
9          MR. CHERNY:  Objection.  Lack of
10   foundation.
11   A.    At a bare minimum, my
12   responsibilities, as I saw them, would have been
13   to carry out instructions from Germany, to the
14   extent that they are consistent with my ethical
15   obligations and the patent law and the rules of
16   the patent office.  To the extent that those
17   instructions were not somehow consistent, to
18   inform my German colleagues of that fact and to
19   formulate an alternative approach.
20         I'm not saying that that ever
21   happened.  I'm saying that that would have been
22   my responsibility.
23         Beyond that, my responsibility would
24   have been to analyze -- well, certainly to, upon
25   filing of the claims -- upon filing of the

Page 155

Alan Stempel

1
2    application, to reformulate the claims in U.S.
3    format, proposed claims, based upon the
4    specification that may have differed in some way
5    from what was in the foreign filing text, if
6    that was appropriate, in the context of U.S.
7    practice.
8          In response to office actions, to
9    explain the office actions to my colleagues, to
10   suggest possible responses, if I saw them.  To
11   comment upon their proposed responses.  To make
12   certain that any prior art which they brought to
13   my attention in any way, shape or form, if it
14   was material, was cited to the patent office in
15   a timely fashion.
16   Q.    Did you complete your answer?
17   A.    I think that's my answer.
18   Q.    On the front of the file history, the
19   cover page indicates that the --
20         MR. CHERNY:  Which Bates number are
21   you on?
22         MR. PFADENHAUER:  67, Mr. Cherny.
23         MR. CHERNY:  You can call me, Steve.
24   Q.    Do you see that it indicates that
25   this was assigned to Examiner Ceperley?

Page 156

Alan Stempel

1
2    A.    I can barely make out the
3    handwriting, but it does look like Examiner
4    Ceperley.
5    Q.    Do you know Examiner Ceperley?
6    A.    What do you mean by "know"?
7    Q.    Have you have occasion to prosecute a
8    number of applications examined by Examiner
9    Ceperley?
10   A.    I do not recall Examiner Ceperley.
11   Q.    I take it you didn't have sufficient
12   contact with her that you now recall Examiner
13   Ceperley?
14   A.    There are some examiners with whom I
15   have dealt, who I recall.  Examiner Ceperley is
16   not one of them.
17   Q.    The application that starts on the
18   page Bates labeled Barr 000070, who drafted that
19   application?
20   A.    I do not know who drafted that
21   application.
22   Q.    Who drafted the claims that start
23   on --
24   A.    Actually --
25   Q.    I'm sorry.

Page 157

Alan Stempel

1
2    A.    What do you mean by "drafted"?
3    Q.    Who prepared the text?
4    A.    In a mechanical sense?
5    Q.    I'm not sure I understand what you
6    mean by "in a mechanical sense."
7    A.    Do you mean typographically, who
8    prepared that?
9    Q.    Well, let's start with that.
10   A.    In a mechanical sense,
11   typographically, I assume it would have been my
12   administrative assistant at that time, and who
13   that was I don't exactly recall.
14   Q.    Was it your practice, in the period
15   1985 to 1990, to prepare an application by
16   cutting and pasting the foreign filing text that
17   you received?
18         MR. CHERNY:  Objection.  Lack of
19   foundation.  Vague.
20   A.    What do you mean by "cutting and
21   pasting"?
22         MR. CHERNY:  Are you talking about
23   from like an electronic point of view?
24   That's what I'm trying to understand.
25   Q.    I'm talking about --

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212) 705-8585

Page 158

Alan Stempel

1
2    A.    You mean with scissors?
3    Q.    -- taking a pair of scissors and
4    Scotch tape and taking the foreign filing text
5    and creating a document that would be used to
6    either Xerox or retype, based on something you
7    had put together.
8        MR. CHERNY: Thank you for the
9    clarification, by the way.
10    A.    There was cutting and pasting
11    involved with the mechanical preparation of what
12    got sent to the patent office, yes.
13    Q.    And do you know if, in fact, that
14    sort of cutting and pasting took place with
15    respect to this application?
16    A.    I don't know it for a fact.
17    Q.    Is it your belief that that's what
18    occurred?
19    A.    It's my belief that that's what
20    happened.
21    Q.    And the document that would have
22    served as the basis for the cutting and the
23    pasting would have been the foreign filing text?
24    A.    Are you talking about in this
25    particular case?

Page 159

Alan Stempel

1
2    Q.    In this particular case.
3    A.    Twenty years later I can't know for
4    sure, but I believe that's the case.
5    Q.    Have you ever had an occasion to
6    compare this application with the corresponding
7    foreign filing text document?
8    A.    Lately?
9    Q.    After the application was filed,
10    let's say that.
11    A.    I have no specific recollection
12    whether or not I did or did not.
13    Q.    Are you aware of any text in this
14    application that did not come from the foreign
15    filing text you were provided?
16    A.    Well, while I could not tell you with
17    100 percent certainty, I believe that what you
18    see in the header and the footer on each page
19    was not exactly as present in the foreign filing
20    text.
21    Q.    What's the basis for that belief?
22    A.    Well, if nothing else, it's based
23    upon the fact that FB Dehn, in general, puts
24    their page numbers at the top of the page.
25        And since in -- the U.S. patent

Page 160

Alan Stempel

1
2    practitioners fasten their pages at the top of
3    the page, so that you can't read the page
4    numbers if you put the page numbers up there,
5    when we did our cutting and pasting, we always
6    moved the page numbers down to the bottom of the
7    page. And since that's what's present here, I'm
8    assuming that that's what happened to this
9    particular foreign filing text.
10    Q.    Would the foreign filing text that
11    you received from Dehn typically include a case
12    designation like this document does on each
13    page?
14    A.    I can tell you what is common now.
15        I cannot necessarily tell you what
16    their practice was in this time period.
17    Q.    Do you have any recollection of the
18    foreign filing text that corresponds to this
19    U.S. application?
20    A.    Do I have any recollection of it?
21    Q.    Yes.
22    A.    I have no specific recollection of
23    it, no.
24    Q.    Have you reviewed the foreign filing
25    text that corresponds to this application any

Page 161

Alan Stempel

1
2    time in the recent past?
3    A.    No, I have not.
4        But if I could complete an answer.
5    Q.    I'm sorry, Mr. Stempel.
6    A.    You had started asking me a question
7    which, if I can paraphrase you, was, how can I
8    know that certain changes were made so that this
9    differs from the foreign filing text.
10    Q.    Okay.
11    A.    Although I cannot know for certain, I
12    do believe that the claims have been edited for
13    compliance with U.S. practice.
14    Q.    Please tell me the basis for that
15    belief.
16    A.    Well, it seems to be the convention
17    in Germany, and perhaps in European practice,
18    that, for example, claim 1 would have been
19    worded tetrahydro-benzthiazoles of the general
20    formula. And you can see that the preamble to
21    claim 1 has been changed to "a
22    tetrahydro-benzthiazole of the formula." That's
23    one thing that I typically would have changed in
24    the claims, the preamble, in that nature.
25        The other thing that pops out at me

41 (Pages 158 to 161)

Page 162

Alan Stempel

1
2  is you can see that claims 9 through 13 are
3  method of treatment claims in U.S. format, and
4  in general in a foreign filing text they would
5  have been Swiss type claims.
6        So to me these are indications that
7  the claims were probably edited, too.
8        Q.   Anything else that indicates to you,
9  in reviewing the document, that it had been
10  edited by you subsequent to the receipt of the
11  foreign filing text?
12        MR. CHERNY:  Obviously, if you need
13     to read through the document.
14        A.   And I can tell you that I don't
15  think, if I read through the document, I would
16  necessarily see anything that would tell me that
17  I had -- since I have nothing to compare it to
18  -- I mean I guess maybe, if I went through it
19  and British spellings were changed to American
20  spellings, but I'm not going to do that.
21        MR. CHERNY:  Would you like him to
22     read through?
23        MR. PFADENHAUER:  No.  I think that's
24     fine.  I'm not going to suggest that there
25     might not be something else in here, since

Page 163

Alan Stempel

1
2  I haven't asked him to read the entire
3  thing.
4        I appreciate Mr. Stempel indicating
5  some things that he did see that suggested
6  to him that he had some input into the
7  application.
8        Q.   Mr. Stempel, let me show you what we
9  have marked as Exhibit 52.
10        MR. PFADENHAUER:  This is new.
11        (Exhibit 52, document, Bates number
12     BOE 00147021 through 147078, marked for
13     identification, as of this date.)
14        MR. CHERNY:  Do you have a copy of
15     the originals from Schneider?
16        MS. BERNIKER:  I don't have the
17     originals.  The court reporter has them.
18        MR. CHERNY:  I was just wondering for
19     next week.
20        MR. PFADENHAUER:  Hopefully they will
21     be back by then, and we can get them out of
22     customs.  These days anything that's
23     shipped in a box from one country to
24     another is not an easy project.
25        A.   Okay.  You haven't asked a question.

Page 164

Alan Stempel

1
2        MR. CHERNY:  No, no, I think he
3  probably wants you to take a look at it.
4        Unless you'd like to ask him a
5  question first.
6        Q.   I guess the first question would be,
7  have you seen the document before?
8        MR. CHERNY:  Read it, obviously.
9        While the witness is looking at the
10  document, for the record, Exhibit 52 bears
11  Bates number BOE 00147021 through 147078.
12        MR. CHERNY:  I can't believe we gave
13     you some good stuff.
14        A.   This is interesting.
15        (Witness reviews document.)
16        A.   Well, it certainly appears to be the
17  foreign filing text upon which this U.S. filing
18  text was based.
19        Q.   When I first showed you the exhibit,
20  you made a comment about, something about "This
21  is interesting."  You had some sort of reaction
22  in looking at the two documents.
23        Is there something that triggered in
24  your mind?
25        MR. CHERNY:  I'll just state I didn't

Page 165

Alan Stempel

1
2  hear that, so I'll put a foundation
3  objection in there.
4        A.   You know what, regardless, I don't
5  recall if I said it or why I said it.
6        Q.   Having now looked at this document,
7  do you have any recollection of having seen the
8  foreign filing text recently?
9        A.   Not -- I do not recall having seen it
10  recently, no.
11        Q.   The number at the top of the first
12  page, 19J S008-647-T, do you know what that
13  designates?
14        A.   Do I know?  I don't know what it
15  designates.
16        Q.   Do you have some understanding as to
17  what you believe it designates?
18        A.   My guess is that it's a serial
19  number, the word processing serial number used
20  by Dehn so that they can keep track of their
21  documents.
22        MR. CHERNY:  I'll caution you not to
23     speculate.
24        Q.   This indicates it's a patent
25  application that has some connection to Karl

42 (Pages 162 to 165)

1        Alan Stempel
2  Thomae GmbH, do you see that?
3      A.   Yes.
4      Q.   And it recites Biberach address, do
5  you see that?
6      A.   Yes.
7      Q.   Was Dr. Karl Thomae located in
8  Biberach?
9      A.   Yes.
10         Physically?
11     Q.   Yes.
12     A.   Yes.
13     Q.   And were the patent attorneys and
14  patent agents who were located in Biberach, was
15  their primary responsibility preparation and
16  prosecution of applications related to work done
17  by Dr. Karl Thomae during the 1985 to 1990 time
18  period?
19         MR. CHERNY:  Objection.  Lack of
20  foundation.  Calls for speculation.
21     A.   What's your question again?  I'm
22  sorry.
23     Q.   Is it your understanding that in the
24  1985 to 1990 time period, Dr. Karl Thomae had
25  some relationship to Boehringer Ingelheim, the

1        Alan Stempel
2  German company?
3         MR. CHERNY: Can I have that read
4  back.
5         (Record read.)
6      A.   Well, I'm not exactly sure that I
7  know to what legal entity you are referring,
8  when you say "Boehringer Ingelheim, the German
9  company."
10     Q.   Did you understand Dr. Karl Thomae to
11  be part of the Boehringer Ingelheim family of
12  companies, in the 1985 to 1990 time period?
13     A.   Yes.
14     Q.   And were the patent attorneys and
15  patent agents who were located in Biberach
16  primarily involved in work relating to the
17  operations of Dr. Karl Thomae, as opposed to
18  another Boehringer company?
19         MR. CHERNY: Objection. Vague. Lack
20  of foundation. Calls for speculation.
21     A.   I have really no way of knowing
22  whether or not they were primarily engaged in
23  the way that you recite, or differently.
24     Q.   The top of the first page there's an
25  indication, "case 5/920," do you see that?

1        Alan Stempel
2      A.   Yes.
3      Q.   And that matches the designation on
4  the U.S. application we were looking at,
5  correct?
6      A.   Yes.
7      Q.   It also indicates "case 1/737," do
8  you see that?
9      A.   Yes.
10     Q.   And can you tell me what the 1
11  designator indicates?
12     A.   That indicates an application or an
13  invention coming out of Ingelheim.
14     Q.   Do you recall any other instances in
15  which a single application related to an
16  invention from Biberach and an invention from
17  Ingelheim?
18     A.   Specifically?
19     Q.   Yes.
20     A.   I have no specific recollection.
21     Q.   Do you have any general recollection
22  of that happening, that is, a single application
23  reflecting an invention from Biberach and an
24  invention from Ingelheim?
25     A.   I have no recollection that it did

1        Alan Stempel
2  happen or it didn't happen.
3      Q.   Underneath the case designator it
4  says "Dr. FL./KP."
5         Do you see that?
6      A.   Uh-hum, uh-hum.
7      Q.   Do you have an understanding as to
8  what that designation means?
9      A.   I believe FL indicates that the case
10  was assigned to Dr. Fleischer.  I actually have
11  no idea or I can't figure out what the KP means.
12     Q.   Dr. Fleischer was in Biberach; is
13  that right?
14     A.   Yes.
15     Q.   Is there some individual who was in
16  the patent department in Ingelheim that would be
17  associated with the initials KP?
18     A.   I can't -- I can't think of anyone.
19     Q.   By looking at the two case numbers,
20  5/920 and 1/737, is it possible to determine --
21  strike that.
22         Does the fact it has two case
23  numbers, 5/920 and 1/737, indicate to you that
24  there would have been more than one foreign
25  priority document?

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212) 705-8585

Page 170

Alan Stempel

1
2    A.    That is -- I believe that's what that
3    indicates.
4    Q.    Is it possible, by looking at those
5    numbers, to determine which of those two -- in
6    which instance the foreign priority document had
7    been filed first?
8    A.    I think without more, you cannot
9    determine from that the order.
10    Q.    The fact that one number is 920
11    versus the other one being 737 doesn't tell you
12    anything about which of the foreign priorities
13    had actually been filed first; is that right?
14    A.    No, it doesn't.
15    Q.    Do you have an understanding,
16    Mr. Stempel, as to why the application that you
17    filed relating to this foreign filing text does
18    not reflect the 1/737 case number?
19    MR. CHERNY:  Objection.  Lack of
20    foundation.
21    When you say "reflect," you mean it
22    just doesn't have the number on it?
23    MR. PFADENHAUER:  Right.
24    MR. CHERNY:  I just want to make sure
25    we are clear.

Page 171

Alan Stempel

1
2    MR. PFADENHAUER:  That number doesn't
3    appear on the application he filed, as far
4    as we can tell.
5    MR. CHERNY:  That's what I wanted to
6    clarify.
7    A.    So you are asking why the -- I
8    believe what you are asking, and tell me if this
9    is your question.
10    Q.    I'm not sure about that.
11    A.    Why is the attorney docket number on
12    the application that was filed not 5/920 plus
13    1/737; is that correct?
14    Q.    Correct.
15    A.    I don't know.
16    Q.    In this period of time, 1985 to 1990,
17    in those instances in which a foreign filing
18    text had been based on more than one foreign
19    priority document, was it your general practice
20    to put both of the case numbers on the U.S.
21    application?
22    MR. CHERNY:  Objection, Lack of
23    foundation and vague.
24    Answer.
25    A.    I'm not sure I remember what my

Page 172

Alan Stempel

1
2    general practice was or what our office's
3    general practice was that long ago.
4    Q.    Do you have any recollection,
5    Mr. Stempel, of instances in which you did put
6    two case numbers on the U.S. application?
7    A.    I don't recall any specific instances
8    where I have done that.  But I also do not
9    recall that I have not done that.
10    Q.    Back in the period '85 to 1990, when
11    you received the English foreign filing text and
12    then used that as a basis for preparing the U.S.
13    application, was it your general practice to
14    retain a copy of the foreign filing text in your
15    file?
16    A.    I think that they were retained more
17    often than not.
18    Q.    Were the prosecution files for patent
19    applications you were prosecuting organized by
20    case number?
21    A.    By attorney docket number, yes.
22    Q.    And by "attorney docket number," are
23    you referring, for example, to the 5/920?
24    A.    Yes.
25    Q.    If a particular foreign filing text

Page 173

Alan Stempel

1
2    reflected two different attorney docket numbers,
3    how would you determine which number to use for
4    purpose of filing the documents?
5    A.    The -- we would receive a
6    communication, usually a letter, from Germany
7    requesting us to file a U.S. application based
8    upon the foreign filing text that would be sent
9    and based upon claiming certain priorities which
10    they would spell out in the request letter; and
11    the subject line of the -- usually the subject
12    line or somewhere else in the request letter
13    would say case whatever.
14    Q.    Do you believe that the fact that the
15    application you filed reflects case number 5/920
16    is a result of the instruction letter you had
17    received, indicating that that was the case
18    number?
19    MR. CHERNY:  I'm sorry, objection.
20    Vague.  Calls for speculation.
21    A.    I have no belief as to whether or not
22    1/737 has any significance at all.  Let me --
23    I'm not sure that was a complete sentence.
24    I have no -- I do not believe that
25    there is any significance to be attached to the

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212) 705-8585

Page 174

Alan Stempel

1 fact that in the docket number which appears in
2 the header of this case or in correspondence to
3 the patent office relating to this case or in
4 any other correspondence, internal or external,
5 relating to this patent application, that the
6 attorney docket number is simply 5/920 and not,
7 instead, 5/920 plus 1/737. I do not believe
8 that there's any significance to that
9 whatsoever.
10    Q.   Do I understand, then, that you
11 believe that the application that you filed and
12 this foreign filing text we have marked as
13 Exhibit 52 relate to the same case?
14        MR. CHERNY:  Read it and compare.
15    I assume that's what you are asking
16 him to do.
17        MR. PFADENHAUER:  I'm just -- he said
18    he doesn't attach any significance to the
19    fact that one has two numbers and one has
20    the other.
21        MR. CHERNY:  I'm just trying to
22    interpret, when you say the same case, are
23    you asking him just to compare?
24    Q.   So the fact that one has one number
25

Page 175

Alan Stempel

1 and the other one has two numbers doesn't
2 indicate to you that these are not the same
3 case; is that right?
4    A.   It does not indicate -- I'm sorry.
5 Say that question again.
6    Q.   The fact that there is a difference
7 in the attorney docket numbers between these two
8 documents does not, by itself, indicate to you
9 that these are different cases?
10        MR. CHERNY:  Objection.  Lack of
11    foundation.
12    A.   No, it does not indicate to me that
13 they are different cases.
14    Q.   Now --
15    A.   As a matter of fact, quite the
16 opposite.  My belief is that, the conclusion I
17 would draw is that they are the same case.
18    Q.   Because both documents share the
19 5/920 case number?
20    A.   Yes.
21    Q.   You indicated that you would normally
22 receive a letter of instruction requesting you
23 to file a U.S. application from Germany.
24        And do I understand that those
25

Page 176

Alan Stempel

1 normally came before you had actually received
2 the foreign filing text?
3    A.   Over the 20-some-odd years that I
4 have been at Boehringer, there's been enough
5 inconsistencies to the order of arrival of
6 various documentation that I'm not sure there is
7 something that vaguely resembles a norm.
8    Q.   Did it more frequently happen that
9 you would get the letter of instruction before
10 you received the foreign filing text?
11        MR. CHERNY:  Objection, vague.
12    A.   My recollection today of what took
13 place back then, as to what usually happened as
14 opposed to what was out of the norm, is I don't
15 have a sufficient recollection to tell you what
16 was the norm.
17    Q.   Do you have a recollection that
18 during that period, '85 to '90, at least in some
19 instances it happened both ways, that is,
20 sometimes you got the instruction letter first,
21 followed by the foreign filing text, and in
22 other instances you would receive the foreign
23 filing text and then get the instruction letter?
24        MR. CHERNY:  Objection.  Lack of
25

Page 177

Alan Stempel

1 foundation.
2    A.   Ask your question again, please.
3    Q.   Yes, sir.
4        Do you have a general recollection
5 that during the period 1985 to 1990, in at least
6 some instances the instruction letter came
7 first, and other instances the foreign filing
8 text arrived first?
9    A.   I cannot rule out that both of those
10 two alternatives may have occurred.
11    Q.   If you received a foreign filing text
12 before you had received a letter of instruction
13 from Germany, would you file the application
14 prior to having an instruction letter?
15    A.   No.
16    Q.   Were there instances in which the
17 foreign filing text in English came to you
18 directly from Germany?
19        MR. CHERNY:  Objection.  Asked and
20    answered.
21    A.   There were times when the foreign
22 filing text was transmitted, physically
23 transmitted to us by Germany and times when it
24 came directly from Dehn in England.

45 (Pages 174 to 177)

Page 178

Alan Stempel

1
2    Q.   Was it your understanding that the
3  usual practice was that Dehn in England would
4  provide the German patent department with a copy
5  of the English version of the foreign filing
6  text?
7        MR. CHERNY:  Objection.  Calls for
8  speculation.
9    A.   Ask your question again, please.
10   Q.   Yes, sir.
11       In the period 1985 to 1990, was it
12  your understanding that generally the Dehn firm
13  in England would provide the German patent
14  department with a copy of the English
15  translation of the foreign filing text?
16   A.   Certainly -- do you want to limit
17  your question as to in what point of time?
18   Q.   1985 to 1990.
19   A.   No, I don't mean that.  I mean -- I
20  mean before the English language foreign filing
21  text was transmitted to -- for filing by an
22  English-speaking country or after that event
23  took place?
24   Q.   Either one.
25   A.   Doesn't matter to you?

Page 179

Alan Stempel

1
2    Q.   No.
3    A.   It's my impression that yes, that the
4  German counterparts had access to, saw the
5  English language foreign filing text, yes.
6    Q.   And was it your understanding that
7  that generally was received in Germany before or
8  after the English language foreign filing text
9  had been filed in the English-speaking country?
10   A.   My impression is that generally it
11  was before.
12   Q.   Do you recall instances in which your
13  colleagues in Germany brought to your attention
14  errors or omissions with respect to a patent
15  application, based on their review of the
16  English translation of the foreign filing text?
17   A.   I recall instances in which both my
18  German colleagues and Dehn and/or Dehn, had
19  found either errors in the English language
20  foreign filing text or questions about the
21  German and how to translate the German into
22  English.
23   Q.   This patent application that we have
24  been looking at in Exhibit 46 contains on
25  several of the pages initials with dates next to

Page 180

Alan Stempel

1
2  them.  For example, on page 00085.
3        MR. CHERNY:  We are back on
4  Exhibit 46?
5        MR. PFADENHAUER:  Yes.
6    A.   Uh-hum.  You are talking about the
7  lower left-hand corner?
8    Q.   Yes, sir.
9        Do you have any understanding as to
10  what those are?
11   A.   Interesting.
12       I believe that there's an error in
13  the final line, a typographical error that was
14  stricken in the final line of that text and that
15  these are the indications that the inventors
16  have recognized that error.
17   Q.   Does this indicate to you that the
18  inventors each reviewed this application in
19  English and initialed in places where they saw
20  errors that had been corrected?
21       MR. CHERNY:  I'm going to caution you
22  not to speculate.  That you know.
23       THE WITNESS:  Excuse me for one
24  second.
25       MR. CHERNY:  Where are you going?

Page 181

Alan Stempel

1
2        THE WITNESS:  I'm just taking my coat
3  off.  I'm not going anywhere.
4        MR. PFADENHAUER:  You made Mr. Cherny
5  very nervous.
6        MR. CHERNY:  Is this a good time to
7  break for the tape?  I'm not going to talk
8  to him about it.
9        THE WITNESS:  I'm just warm.
10       MR. PFADENHAUER:  We have got
11  two minutes.  Let's see if we can just wrap
12  this up.  It would just be better if we
13  can.
14       MR. CHERNY:  Okay.
15       What was the question again?
16   A.   Ask your question again.
17   Q.   Does this indicate to you that the
18  inventors reviewed the application in English
19  and initialed in places where they saw errors
20  that had been corrected in the text?
21       MR. CHERNY:  I think you --
22   A.   I believe that to be the case.
23       MR. PFADENHAUER:  All right.  We need
24  to change the tape.  Let's take a break.
25       THE VIDEOGRAPHER:  The time is 3:49.

46 (Pages 178 to 181)