EXHIBIT A
PART 2

Page 146

Alan Stempel
1
2    A.    I think I have answered your
3    question.
4    Q.    I'm not trying to undo or prolong
5    this. I just want to make sure we are clear on
6    this.
7         MR. CHERNY: Okay, you can talk now.
8    You are talking over each other a little
9    bit.
10        Anyway, I object as asked and
11   answered. I don't know where we are now at
12   this time.
13        MR. PFADENHAUER: I think the record
14   is not entirely clear. That's why I'm
15   trying to make sure I have the witness's
16   best recollection. I'm not asking him to
17   recall something he does not recall.
18   A.    I do not have any specific
19   recollection on which I can base an answer to
20   your question.
21   Q.    Okay. So it is a truthful statement,
22   then, as you sit here now, you don't recall that
23   having ever happened?
24        MR. CHERNY: I'm going to object to
25   this line of questioning. You are trying

Page 147

Alan Stempel
1
2    to recast it. He told you he doesn't have
3    any recollection at all.
4         MR. PFADENHAUER: If he doesn't have
5    a recollection, then it's correct to say he
6    does not recall having done it.
7         MR. CHERNY: You are clearly trying to
8    make an implication. You are saying, well,
9    you don't recollect X. He says, I don't
10   recollect anything.
11        MR. PFADENHAUER: But I want to make
12   sure I have a specific understanding of the
13   parameters of what it is he does not
14   recall. I want to make sure that the
15   record is clear that he has no recollection
16   of an instance where some claims issued
17   from something he designated as a
18   divisional that were directed to matter
19   that wasn't nonelected subject matter.
20        MR. CHERNY: I'm going to repeat my
21   objection, asked and answered. I believe
22   he's answered the question.
23   Q.    Could you answer the question,
24   Mr. Stempel?
25   A.    I have no specific recollection upon

Page 148

Alan Stempel
1
2    which I can base an answer to your question.
3    Q.    I don't think that's responsive to my
4    question, with all due respect, Mr. Stempel.
5         MR. CHERNY: I disagree.
6         MR. PFADENHAUER: I understand that,
7    Mr. Cherny.
8         What I want to know is whether the
9    witness has a recollection, yes or no, I
10   have a recollection or I don't. I'm not
11   saying that that means he did it or didn't
12   do it. I just want to know, does he recall
13   of an instance where he filed an
14   application, called it a divisional and
15   ultimately claims issued from that which
16   were directed to something other than
17   nonelected subject matter.
18        MR. CHERNY: Again, I'm going to
19   repeat my objection.
20   Q.    Can you answer that question,
21   Mr. Stempel?
22        MR. CHERNY: Asked and answered.
23   A.    I don't know how many more times I
24   can say it. I have no specific recollection
25   that that happened.

Page 149

Alan Stempel
1
2    Q.    Okay. Thank you. That answered my
3    question, Mr. Stempel. I appreciate it.
4         MR. PFADENHAUER: Let's go ahead and
5    take a break.
6         THE VIDEOGRAPHER: The time is 2:38.
7    We are going off the record.
8         (Whereupon, there is a recess in the
9    proceedings.)
10        THE VIDEOGRAPHER: The time is 2:52.
11   We are back on the record.
12   Q.    Mr. Stempel, let me show you what we
13   have previously marked as Exhibit 46.
14        (Handing.)
15        MR. CHERNY: You got a lot of
16   exhibits at the Schneider deposition.
17        MR. PFADENHAUER: Somewhere there's a
18   box of the exhibits.
19   Q.    And I'll represent to you,
20   Mr. Stempel, that this is a certified copy of a
21   file history from the United States Patent and
22   Trademark Office for the patent application
23   serial number 8,810,947 -- I'm sorry, 6 --
24   series 6, not series 8, series 6, 810,947.
25   A.    Okay.

38 (Pages 146 to 149)

Page 150

Alan Stempel

1
2    Q.   Have you seen this file history
3    before, Mr. Stempel?
4         (Witness reviews documents.)
5    A.   Yes, I believe I have.
6    Q.   Did you see the file history prior to
7    preparing for your deposition in this case?
8         MR. CHERNY:  I didn't hear the last
9    word you said.
10   Q.   Did you see the file history prior to
11   preparing for your deposition in this case?
12        MR. CHERNY:  Thank you.
13   A.   I have no specific recollection
14   whether I have or have not, prior to preparing.
15   Q.   Do you agree that this is the file
16   history for the '374 patent?
17   A.   It appears to be.
18   Q.   And if you would turn to the page
19   Bates labeled BARR 000070.
20   A.   What are last three numbers?
21        MR. CHERNY:  70.
22   Q.   070.
23   A.   The next one, right.
24   Q.   There you go.  Perfect.  All right.
25        And is this, is the document that

Page 151

Alan Stempel

1
2    starts on this page, Barr 000070, the
3    application that was filed by you that
4    ultimately led to the issuance of the '374
5    patent?
6    A.   It appears to be.
7    Q.   At the top of each page of the
8    application the word "patent" appears.
9         Do you see that?
10   A.   Yes.
11   Q.   Can you tell me what that designation
12   refers to?
13   A.   I do not recall if that was something
14   that was on the application when it was sent to
15   the patent office or not.  I don't recall that
16   it wasn't, I don't recall that it was.
17   Q.   I take it you have no recollection of
18   putting that legend on the top of each of the
19   pages?
20   A.   I have no recollection.
21   Q.   At the bottom of each page of the
22   application it indicates case 5/920, do you see
23   that?
24   A.   Yes.
25   Q.   Can you tell me what that indicates?

Page 152

Alan Stempel

1
2    A.   That, I believe it would be the
3    internal attorney's docket number for this
4    patent application.
5    Q.   And what does the 5 designate in this
6    instance?
7    A.   That the origin of the case was
8    Biberach, Germany.
9    Q.   And is 920 a sequential number?
10   A.   I believe it is.
11   Q.   Is the 5/920 case number something
12   that would have been assigned in Germany?
13   A.   Yes.
14   Q.   That was not a unique identifier that
15   the U.S. patent department put on the case?
16   A.   No.  My belief is that was assigned
17   by Germany.
18   Q.   Now, this application is one of the
19   applications that was prosecuted by you,
20   correct?
21   A.   Yes.
22   Q.   And I take it you kept yourself
23   generally apprised of the status of this
24   application, during prosecution?
25        MR. CHERNY:  Objection, vague.

Page 153

Alan Stempel

1
2    A.   I'm not sure what "generally apprised
3    of the status of the application" means.  That
4    could mean something very different to three
5    different people.
6    Q.   Were you the person who was primarily
7    responsible for this application?
8    A.   Yes.
9    Q.   And did that include substantive
10   responsibility for the application?
11        MR. CHERNY:  Objection, vague.
12   A.   What does "substantive
13   responsibility" mean?
14   Q.   Did you believe that you had any
15   responsibilities beyond serving as a conduit
16   between the patent office and the patent
17   department in Germany?
18   A.   Yes.
19   Q.   What other responsibilities did you
20   have, other than serving as a conduit between
21   the patent department in Germany and the patent
22   office --
23        MR. CHERNY:  Objection.  Lack of
24   foundation.
25   Q.   -- with respect to this application?

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212) 705-8585

Page 154

Alan Stempel

1
2    A.    Restate your question, please.
3    Q.    Yes, sir.
4          Apart from serving as a conduit
5    between the patent office and the patent
6    department in Germany, what other
7    responsibilities did you have with respect to
8    the prosecution of this patent application?
9          MR. CHERNY:  Objection.  Lack of
10   foundation.
11   A.    At a bare minimum, my
12   responsibilities, as I saw them, would have been
13   to carry out instructions from Germany, to the
14   extent that they are consistent with my ethical
15   obligations and the patent law and the rules of
16   the patent office.  To the extent that those
17   instructions were not somehow consistent, to
18   inform my German colleagues of that fact and to
19   formulate an alternative approach.
20         I'm not saying that that ever
21   happened.  I'm saying that that would have been
22   my responsibility.
23         Beyond that, my responsibility would
24   have been to analyze -- well, certainly to, upon
25   filing of the claims -- upon filing of the

Page 155

Alan Stempel

1
2    application, to reformulate the claims in U.S.
3    format, proposed claims, based upon the
4    specification that may have differed in some way
5    from what was in the foreign filing text, if
6    that was appropriate, in the context of U.S.
7    practice.
8          In response to office actions, to
9    explain the office actions to my colleagues, to
10   suggest possible responses, if I saw them.  To
11   comment upon their proposed responses.  To make
12   certain that any prior art which they brought to
13   my attention in any way, shape or form, if it
14   was material, was cited to the patent office in
15   a timely fashion.
16   Q.    Did you complete your answer?
17   A.    I think that's my answer.
18   Q.    On the front of the file history, the
19   cover page indicates that the --
20         MR. CHERNY:  Which Bates number are
21   you on?
22         MR. PFADENHAUER:  67, Mr. Cherny.
23         MR. CHERNY:  You can call me, Steve.
24   Q.    Do you see that it indicates that
25   this was assigned to Examiner Ceperley?

Page 156

Alan Stempel

1
2    A.    I can barely make out the
3    handwriting, but it does look like Examiner
4    Ceperley.
5    Q.    Do you know Examiner Ceperley?
6    A.    What do you mean by "know"?
7    Q.    Have you have occasion to prosecute a
8    number of applications examined by Examiner
9    Ceperley?
10   A.    I do not recall Examiner Ceperley.
11   Q.    I take it you didn't have sufficient
12   contact with her that you now recall Examiner
13   Ceperley?
14   A.    There are some examiners with whom I
15   have dealt, who I recall.  Examiner Ceperley is
16   not one of them.
17   Q.    The application that starts on the
18   page Bates labeled Barr 000070, who drafted that
19   application?
20   A.    I do not know who drafted that
21   application.
22   Q.    Who drafted the claims that start
23   on --
24   A.    Actually --
25   Q.    I'm sorry.

Page 157

Alan Stempel

1
2    A.    What do you mean by "drafted"?
3    Q.    Who prepared the text?
4    A.    In a mechanical sense?
5    Q.    I'm not sure I understand what you
6    mean by "in a mechanical sense."
7    A.    Do you mean typographically, who
8    prepared that?
9    Q.    Well, let's start with that.
10   A.    In a mechanical sense,
11   typographically, I assume it would have been my
12   administrative assistant at that time, and who
13   that was I don't exactly recall.
14   Q.    Was it your practice, in the period
15   1985 to 1990, to prepare an application by
16   cutting and pasting the foreign filing text that
17   you received?
18         MR. CHERNY:  Objection.  Lack of
19   foundation.  Vague.
20   A.    What do you mean by "cutting and
21   pasting"?
22         MR. CHERNY:  Are you talking about
23   from like an electronic point of view?
24   That's what I'm trying to understand.
25   Q.    I'm talking about --

40 (Pages 154 to 157)

Page 158

Alan Stempel

1
2  A.   You mean with scissors?
3  Q.   -- taking a pair of scissors and
4  Scotch tape and taking the foreign filing text
5  and creating a document that would be used to
6  either Xerox or retype, based on something you
7  had put together.
8       MR. CHERNY: Thank you for the
9  clarification, by the way.
10  A.   There was cutting and pasting
11  involved with the mechanical preparation of what
12  got sent to the patent office, yes.
13  Q.   And do you know if, in fact, that
14  sort of cutting and pasting took place with
15  respect to this application?
16  A.   I don't know it for a fact.
17  Q.   Is it your belief that that's what
18  occurred?
19  A.   It's my belief that that's what
20  happened.
21  Q.   And the document that would have
22  served as the basis for the cutting and the
23  pasting would have been the foreign filing text?
24  A.   Are you talking about in this
25  particular case?

Page 159

Alan Stempel

1
2  Q.   In this particular case.
3  A.   Twenty years later I can't know for
4  sure, but I believe that's the case.
5  Q.   Have you ever had an occasion to
6  compare this application with the corresponding
7  foreign filing text document?
8  A.   Lately?
9  Q.   After the application was filed,
10  let's say that.
11  A.   I have no specific recollection
12  whether or not I did or did not.
13  Q.   Are you aware of any text in this
14  application that did not come from the foreign
15  filing text you were provided?
16  A.   Well, while I could not tell you with
17  100 percent certainty, I believe that what you
18  see in the header and the footer on each page
19  was not exactly as present in the foreign filing
20  text.
21  Q.   What's the basis for that belief?
22  A.   Well, if nothing else, it's based
23  upon the fact that FB Dehn, in general, puts
24  their page numbers at the top of the page.
25       And since in -- the U.S. patent

Page 160

Alan Stempel

1
2  practitioners fasten their pages at the top of
3  the page, so that you can't read the page
4  numbers if you put the page numbers up there,
5  when we did our cutting and pasting, we always
6  moved the page numbers down to the bottom of the
7  page.  And since that's what's present here, I'm
8  assuming that that's what happened to this
9  particular foreign filing text.
10  Q.   Would the foreign filing text that
11  you received from Dehn typically include a case
12  designation like this document does on each
13  page?
14  A.   I can tell you what is common now.
15       I cannot necessarily tell you what
16  their practice was in this time period.
17  Q.   Do you have any recollection of the
18  foreign filing text that corresponds to this
19  U.S. application?
20  A.   Do I have any recollection of it?
21  Q.   Yes.
22  A.   I have no specific recollection of
23  it, no.
24  Q.   Have you reviewed the foreign filing
25  text that corresponds to this application any

Page 161

Alan Stempel

1
2  time in the recent past?
3  A.   No, I have not.
4       But if I could complete an answer.
5  Q.   I'm sorry, Mr. Stempel.
6  A.   You had started asking me a question
7  which, if I can paraphrase you, was, how can I
8  know that certain changes were made so that this
9  differs from the foreign filing text.
10  Q.   Okay.
11  A.   Although I cannot know for certain, I
12  do believe that the claims have been edited for
13  compliance with U.S. practice.
14  Q.   Please tell me the basis for that
15  belief.
16  A.   Well, it seems to be the convention
17  in Germany, and perhaps in European practice,
18  that, for example, claim 1 would have been
19  worded tetrahydro-benzthiazoles of the general
20  formula.  And you can see that the preamble to
21  claim 1 has been changed to "a
22  tetrahydro-benzthiazole of the formula."  That's
23  one thing that I typically would have changed in
24  the claims, the preamble, in that nature.
25       The other thing that pops out at me

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212) 705-8585

Page 162

Alan Stempel

1  is you can see that claims 9 through 13 are
2  method of treatment claims in U.S. format, and
3  in general in a foreign filing text they would
4  have been Swiss type claims.
5      So to me these are indications that
6  the claims were probably edited, too.
7      Q.   Anything else that indicates to you,
8  in reviewing the document, that it had been
9  edited by you subsequent to the receipt of the
10 foreign filing text?
11     MR. CHERNY:  Obviously, if you need
12 to read through the document.
13     A.   And I can tell you that I don't
14 think, if I read through the document, I would
15 necessarily see anything that would tell me that
16 I had -- since I have nothing to compare it to
17 -- I mean I guess maybe, if I went through it
18 and British spellings were changed to American
19 spellings, but I'm not going to do that.
20     MR. CHERNY:  Would you like him to
21 read through?
22     MR. PFADENHAUER:  No.  I think that's
23 fine.  I'm not going to suggest that there
24 might not be something else in here, since

Page 163

Alan Stempel

1  I haven't asked him to read the entire
2  thing.
3      I appreciate Mr. Stempel indicating
4  some things that he did see that suggested
5  to him that he had some input into the
6  application.
7      Q.   Mr. Stempel, let me show you what we
8  have marked as Exhibit 52.
9      MR. PFADENHAUER:  This is new.
10     (Exhibit 52, document, Bates number
11 BOE 00147021 through 147078, marked for
12 identification, as of this date.)
13     MR. CHERNY:  Do you have a copy of
14 the originals from Schneider?
15     MS. BERNIKER:  I don't have the
16 originals.  The court reporter has them.
17     MR. CHERNY:  I was just wondering for
18 next week.
19     MR. PFADENHAUER:  Hopefully they will
20 be back by then, and we can get them out of
21 customs.  These days anything that's
22 shipped in a box from one country to
23 another is not an easy project.
24     A.   Okay.  You haven't asked a question.

Page 164

Alan Stempel

1      MR. CHERNY:  No, no, I think he
2  probably wants you to take a look at it.
3      Unless you'd like to ask him a
4  question first.
5      Q.   I guess the first question would be,
6  have you seen the document before?
7      MR. CHERNY:  Read it, obviously.
8      While the witness is looking at the
9  document, for the record, Exhibit 52 bears
10 Bates number BOE 00147021 through 147078.
11     MR. CHERNY:  I can't believe we gave
12 you some good stuff.
13     A.   This is interesting.
14     (Witness reviews document.)
15     A.   Well, it certainly appears to be the
16 foreign filing text upon which this U.S. filing
17 text was based.
18     Q.   When I first showed you the exhibit,
19 you made a comment about, something about "This
20 is interesting."  You had some sort of reaction
21 in looking at the two documents.
22     Is there something that triggered in
23 your mind?
24     MR. CHERNY:  I'll just state I didn't

Page 165

Alan Stempel

1  hear that, so I'll put a foundation
2  objection in there.
3      A.   You know what, regardless, I don't
4  recall if I said it or why I said it.
5      Q.   Having now looked at this document,
6  do you have any recollection of having seen the
7  foreign filing text recently?
8      A.   Not -- I do not recall having seen it
9  recently, no.
10     Q.   The number at the top of the first
11 page, 19J S008-647-T, do you know what that
12 designates?
13     A.   Do I know?  I don't know what it
14 designates.
15     Q.   Do you have some understanding as to
16 what you believe it designates?
17     A.   My guess is that it's a serial
18 number, the word processing serial number used
19 by Dehn so that they can keep track of their
20 documents.
21     MR. CHERNY:  I'll caution you not to
22 speculate.
23     Q.   This indicates it's a patent
24 application that has some connection to Karl

42 (Pages 162 to 165)

Page 166

Alan Stempel

1  Thomae GmbH, do you see that?
2
3      A.   Yes.
4      Q.   And it recites Biberach address, do
5  you see that?
6      A.   Yes.
7      Q.   Was Dr. Karl Thomae located in
8  Biberach?
9      A.   Yes.
10          Physically?
11     Q.   Yes.
12     A.   Yes.
13     Q.   And were the patent attorneys and
14 patent agents who were located in Biberach, was
15 their primary responsibility preparation and
16 prosecution of applications related to work done
17 by Dr. Karl Thomae during the 1985 to 1990 time
18 period?
19          MR. CHERNY:  Objection.  Lack of
20     foundation.  Calls for speculation.
21     A.   What's your question again?  I'm
22 sorry.
23     Q.   Is it your understanding that in the
24 1985 to 1990 time period, Dr. Karl Thomae had
25 some relationship to Boehringer Ingelheim, the

Page 167

Alan Stempel

1
2  German company?
3          MR. CHERNY: Can I have that read
4      back.
5          (Record read.)
6      A.   Well, I'm not exactly sure that I
7  know to what legal entity you are referring,
8  when you say "Boehringer Ingelheim, the German
9  company."
10     Q.   Did you understand Dr. Karl Thomae to
11 be part of the Boehringer Ingelheim family of
12 companies, in the 1985 to 1990 time period?
13     A.   Yes.
14     Q.   And were the patent attorneys and
15 patent agents who were located in Biberach
16 primarily involved in work relating to the
17 operations of Dr. Karl Thomae, as opposed to
18 another Boehringer company?
19          MR. CHERNY:  Objection.  Vague.  Lack
20     of foundation.  Calls for speculation.
21     A.   I have really no way of knowing
22 whether or not they were primarily engaged in
23 the way that you recite, or differently.
24     Q.   The top of the first page there's an
25 indication, "case 5/920," do you see that?

Page 168

Alan Stempel

1
2      A.   Yes.
3      Q.   And that matches the designation on
4  the U.S. application we were looking at,
5  correct?
6      A.   Yes.
7      Q.   It also indicates "case 1/737," do
8  you see that?
9      A.   Yes.
10     Q.   And can you tell me what the 1
11 designator indicates?
12     A.   That indicates an application or an
13 invention coming out of Ingelheim.
14     Q.   Do you recall any other instances in
15 which a single application related to an
16 invention from Biberach and an invention from
17 Ingelheim?
18     A.   Specifically?
19     Q.   Yes.
20     A.   I have no specific recollection.
21     Q.   Do you have any general recollection
22 of that happening, that is, a single application
23 reflecting an invention from Biberach and an
24 invention from Ingelheim?
25     A.   I have no recollection that it did

Page 169

Alan Stempel

1
2  happen or it didn't happen.
3      Q.   Underneath the case designator it
4  says "Dr. FL./KP."
5          Do you see that?
6      A.   Uh-hum, uh-hum.
7      Q.   Do you have an understanding as to
8  what that designation means?
9      A.   I believe FL indicates that the case
10 was assigned to Dr. Fleischer.  I actually have
11 no idea or I can't figure out what the KP means.
12     Q.   Dr. Fleischer was in Biberach; is
13 that right?
14     A.   Yes.
15     Q.   Is there some individual who was in
16 the patent department in Ingelheim that would be
17 associated with the initials KP?
18     A.   I can't -- I can't think of anyone.
19     Q.   By looking at the two case numbers,
20 5/920 and 1/737, is it possible to determine --
21 strike that.
22          Does the fact it has two case
23 numbers, 5/920 and 1/737, indicate to you that
24 there would have been more than one foreign
25 priority document?

43 (Pages 166 to 169)

Page 170

Alan Stempel

1
2     A.    That is -- I believe that's what that
3  indicates.
4     Q.    Is it possible, by looking at those
5  numbers, to determine which of those two -- in
6  which instance the foreign priority document had
7  been filed first?
8     A.    I think without more, you cannot
9  determine from that the order.
10    Q.    The fact that one number is 920
11 versus the other one being 737 doesn't tell you
12 anything about which of the foreign priorities
13 had actually been filed first; is that right?
14    A.    No, it doesn't.
15    Q.    Do you have an understanding,
16 Mr. Stempel, as to why the application that you
17 filed relating to this foreign filing text does
18 not reflect the 1/737 case number?
19       MR. CHERNY:  Objection. Lack of
20 foundation.
21       When you say "reflect," you mean it
22 just doesn't have the number on it?
23       MR. PFADENHAUER:  Right.
24       MR. CHERNY:  I just want to make sure
25 we are clear.

Page 171

Alan Stempel

1
2       MR. PFADENHAUER:  That number doesn't
3  appear on the application he filed, as far
4  as we can tell.
5       MR. CHERNY:  That's what I wanted to
6  clarify.
7     A.    So you are asking why the -- I
8  believe what you are asking, and tell me if this
9  is your question.
10    Q.    I'm not sure about that.
11    A.    Why is the attorney docket number on
12 the application that was filed not 5/920 plus
13 1/737; is that correct?
14    Q.    Correct.
15    A.    I don't know.
16    Q.    In this period of time, 1985 to 1990,
17 in those instances in which a foreign filing
18 text had been based on more than one foreign
19 priority document, was it your general practice
20 to put both of the case numbers on the U.S.
21 application?
22       MR. CHERNY:  Objection, Lack of
23 foundation and vague.
24       Answer.
25    A.    I'm not sure I remember what my

Page 172

Alan Stempel

1
2  general practice was or what our office's
3  general practice was that long ago.
4     Q.    Do you have any recollection,
5  Mr. Stempel, of instances in which you did put
6  two case numbers on the U.S. application?
7     A.    I don't recall any specific instances
8  where I have done that.  But I also do not
9  recall that I have not done that.
10    Q.    Back in the period '85 to 1990, when
11 you received the English foreign filing text and
12 then used that as a basis for preparing the U.S.
13 application, was it your general practice to
14 retain a copy of the foreign filing text in your
15 file?
16    A.    I think that they were retained more
17 often than not.
18    Q.    Were the prosecution files for patent
19 applications you were prosecuting organized by
20 case number?
21    A.    By attorney docket number, yes.
22    Q.    And by "attorney docket number," are
23 you referring, for example, to the 5/920?
24    A.    Yes.
25    Q.    If a particular foreign filing text

Page 173

Alan Stempel

1
2  reflected two different attorney docket numbers,
3  how would you determine which number to use for
4  purpose of filing the documents?
5     A.    The -- we would receive a
6  communication, usually a letter, from Germany
7  requesting us to file a U.S. application based
8  upon the foreign filing text that would be sent
9  and based upon claiming certain priorities which
10 they would spell out in the request letter; and
11 the subject line of the -- usually the subject
12 line or somewhere else in the request letter
13 would say case whatever.
14    Q.    Do you believe that the fact that the
15 application you filed reflects case number 5/920
16 is a result of the instruction letter you had
17 received, indicating that that was the case
18 number?
19       MR. CHERNY:  I'm sorry, objection.
20 Vague. Calls for speculation.
21    A.    I have no belief as to whether or not
22 1/737 has any significance at all.  Let me --
23 I'm not sure that was a complete sentence.
24       I have no -- I do not believe that
25 there is any significance to be attached to the

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212) 705-8585

Page 174

Alan Stempel

1  fact that in the docket number which appears in
2  the header of this case or in correspondence to
3  the patent office relating to this case or in
4  any other correspondence, internal or external,
5  relating to this patent application, that the
6  attorney docket number is simply 5/920 and not,
7  instead, 5/920 plus 1/737. I do not believe
8  that there's any significance to that
9  whatsoever.
10      Q.   Do I understand, then, that you
11  believe that the application that you filed and
12  this foreign filing text we have marked as
13  Exhibit 52 relate to the same case?
14          MR. CHERNY: Read it and compare.
15      I assume that's what you are asking
16  him to do.
17          MR. PFADENHAUER: I'm just -- he said
18  he doesn't attach any significance to the
19  fact that one has two numbers and one has
20  the other.
21          MR. CHERNY: I'm just trying to
22  interpret, when you say the same case, are
23  you asking him just to compare?
24      Q.   So the fact that one has one number

Page 175

Alan Stempel

1  and the other one has two numbers doesn't
2  indicate to you that these are not the same
3  case; is that right?
4      A.   It does not indicate -- I'm sorry.
5  Say that question again.
6      Q.   The fact that there is a difference
7  in the attorney docket numbers between these two
8  documents does not, by itself, indicate to you
9  that these are different cases?
10          MR. CHERNY: Objection. Lack of
11  foundation.
12      A.   No, it does not indicate to me that
13  they are different cases.
14      Q.   Now --
15      A.   As a matter of fact, quite the
16  opposite. My belief is that, the conclusion I
17  would draw is that they are the same case.
18      Q.   Because both documents share the
19  5/920 case number?
20      A.   Yes.
21      Q.   You indicated that you would normally
22  receive a letter of instruction requesting you
23  to file a U.S. application from Germany.
24      And do I understand that those

Page 176

Alan Stempel

1  normally came before you had actually received
2  the foreign filing text?
3      A.   Over the 20-some-odd years that I
4  have been at Boehringer, there's been enough
5  inconsistencies to the order of arrival of
6  various documentation that I'm not sure there is
7  something that vaguely resembles a norm.
8      Q.   Did it more frequently happen that
9  you would get the letter of instruction before
10  you received the foreign filing text?
11          MR. CHERNY: Objection, vague.
12      A.   My recollection today of what took
13  place back then, as to what usually happened as
14  opposed to what was out of the norm, is I don't
15  have a sufficient recollection to tell you what
16  was the norm.
17      Q.   Do you have a recollection that
18  during that period, '85 to '90, at least in some
19  instances it happened both ways, that is,
20  sometimes you got the instruction letter first,
21  followed by the foreign filing text, and in
22  other instances you would receive the foreign
23  filing text and then get the instruction letter?
24          MR. CHERNY: Objection. Lack of

Page 177

Alan Stempel

1  foundation.
2      A.   Ask your question again, please.
3      Q.   Yes, sir.
4      Do you have a general recollection
5  that during the period 1985 to 1990, in at least
6  some instances the instruction letter came
7  first, and other instances the foreign filing
8  text arrived first?
9      A.   I cannot rule out that both of those
10  two alternatives may have occurred.
11      Q.   If you received a foreign filing text
12  before you had received a letter of instruction
13  from Germany, would you file the application
14  prior to having an instruction letter?
15      A.   No.
16      Q.   Were there instances in which the
17  foreign filing text in English came to you
18  directly from Germany?
19          MR. CHERNY: Objection. Asked and
20  answered.
21      A.   There were times when the foreign
22  filing text was transmitted, physically
23  transmitted to us by Germany and times when it
24  came directly from Dehn in England.

45 (Pages 174 to 177)

Page 178

Alan Stempel

1
2    Q.    Was it your understanding that the
3    usual practice was that Dehn in England would
4    provide the German patent department with a copy
5    of the English version of the foreign filing
6    text?
7        MR. CHERNY: Objection. Calls for
8    speculation.
9    A.    Ask your question again, please.
10    Q.    Yes, sir.
11        In the period 1985 to 1990, was it
12    your understanding that generally the Dehn firm
13    in England would provide the German patent
14    department with a copy of the English
15    translation of the foreign filing text?
16    A.    Certainly -- do you want to limit
17    your question as to in what point of time?
18    Q.    1985 to 1990.
19    A.    No, I don't mean that. I mean -- I
20    mean before the English language foreign filing
21    text was transmitted to -- for filing by an
22    English-speaking country or after that event
23    took place?
24    Q.    Either one.
25    A.    Doesn't matter to you?

Page 179

Alan Stempel

1
2    Q.    No.
3    A.    It's my impression that yes, that the
4    German counterparts had access to, saw the
5    English language foreign filing text, yes.
6    Q.    And was it your understanding that
7    that generally was received in Germany before or
8    after the English language foreign filing text
9    had been filed in the English-speaking country?
10    A.    My impression is that generally it
11    was before.
12    Q.    Do you recall instances in which your
13    colleagues in Germany brought to your attention
14    errors or omissions with respect to a patent
15    application, based on their review of the
16    English translation of the foreign filing text?
17    A.    I recall instances in which both my
18    German colleagues and Dehn and/or Dehn, had
19    found either errors in the English language
20    foreign filing text or questions about the
21    German and how to translate the German into
22    English.
23    Q.    This patent application that we have
24    been looking at in Exhibit 46 contains on
25    several of the pages initials with dates next to

Page 180

Alan Stempel

1
2    them. For example, on page 00085.
3        MR. CHERNY: We are back on
4    Exhibit 46?
5        MR. PFADENHAUER: Yes.
6    A.    Uh-hum. You are talking about the
7    lower left-hand corner?
8    Q.    Yes, sir.
9        Do you have any understanding as to
10    what those are?
11    A.    Interesting.
12        I believe that there's an error in
13    the final line, a typographical error that was
14    stricken in the final line of that text and that
15    these are the indications that the inventors
16    have recognized that error.
17    Q.    Does this indicate to you that the
18    inventors each reviewed this application in
19    English and initialed in places where they saw
20    errors that had been corrected?
21        MR. CHERNY: I'm going to caution you
22    not to speculate. That you know.
23        THE WITNESS: Excuse me for one
24    second.
25        MR. CHERNY: Where are you going?

Page 181

Alan Stempel

1
2        THE WITNESS: I'm just taking my coat
3    off. I'm not going anywhere.
4        MR. PFADENHAUER: You made Mr. Cherny
5    very nervous.
6        MR. CHERNY: Is this a good time to
7    break for the tape? I'm not going to talk
8    to him about it.
9        THE WITNESS: I'm just warm.
10        MR. PFADENHAUER: We have got
11    two minutes. Let's see if we can just wrap
12    this up. It would just be better if we
13    can.
14        MR. CHERNY: Okay.
15        What was the question again?
16    A.    Ask your question again.
17    Q.    Does this indicate to you that the
18    inventors reviewed the application in English
19    and initialed in places where they saw errors
20    that had been corrected in the text?
21        MR. CHERNY: I think you --
22    A.    I believe that to be the case.
23        MR. PFADENHAUER: All right. We need
24    to change the tape. Let's take a break.
25        THE VIDEOGRAPHER: The time is 3:49.

46 (Pages 178 to 181)

Page 182

Alan Stempel

1
2  We are going off the record. This marks
3  the ending of Tape Number 2.
4      (Whereupon, there is a recess in the
5  proceedings.)
6      THE VIDEOGRAPHER: The time is 4:02.
7  We are back on the record, and this marks
8  the beginning on of Tape Number 3 of Alan
9  Stempel.
10     Q.   If you turn to page BARR 120,
11 Mr. Stempel.
12     Is this document a copy of the
13 inventor's declaration that was submitted to the
14 patent office as part of the '947 application?
15     A.   It appears to be, yes.
16     Q.   Was this declaration -- obviously
17 signed by the various inventors, but was it
18 otherwise prepared by you?
19     A.   Physically?
20     Q.   Yes, sir.
21     A.   I did not physically prepare the
22 declaration.
23     Q.   Did you give instructions to some
24 clerical person in your office to prepare the
25 declaration?

Page 183

Alan Stempel

1
2      A.   Let's put it this way: At this date,
3  at this amount of time after the event,
4  actually, I cannot tell you whether or not I did
5  physically prepare it or if I instructed
6  somebody else to prepare it. Typically, I would
7  not have done it myself, I would have instructed
8  somebody else, but I can't tell you how this
9  particular declaration came to be.
10     Q.   In those instances when you
11 instructed someone else to prepare the
12 declaration, would you tell the person what
13 information should be put into the form?
14     A.   The information that would go into
15 the declaration form would be derived from the
16 letter from Germany requesting the filing. Some
17 administrative assistants can do -- can prepare
18 a declaration on that basis, with no help from
19 the attorney, and some cannot.
20     What was going on in this point in
21 time, what kind of -- what the situation was, I
22 can't tell you anymore.
23     Q.   The information with respect to which
24 foreign applications should be listed under the
25 claim for priority would have come from the

Page 184

Alan Stempel

1
2  instruction letter you received from Germany?
3      A.   Yes.
4      Q.   The instruction letter would have
5  included the foreign application numbers in it?
6      A.   Yes.
7      Q.   In the normal course, then, the
8  declaration form would be prepared by your
9  office and then transmitted to Germany for
10 execution by the inventors?
11     A.   Yes.
12     Q.   Was it your understanding that the
13 inventors would be shown the declaration form
14 and requested that they read the form, before
15 they execute the declaration?
16     MR. CHERNY: Can I have that back
17 again, please.
18     (Record read.)
19     A.   Yes.
20     Q.   Did you instruct one of your
21 colleagues in Germany to take steps to make sure
22 that each of the inventors read the declaration,
23 before they signed it?
24     A.   In this particular case or as a sort
25 of general standing request?

Page 185

Alan Stempel

1
2      Q.   I'd actually like to know the answer
3  to both of those questions, so you can pick --
4      A.   I have no specific recollection at
5  this point as to whether or not there was a
6  specific request or instruction, with respect to
7  this application, that that be done.
8      Q.   Was it your understanding, in the
9  period 1985 to 1990, that you had generally
10 instructed your counterparts in Germany to
11 ensure that the inventors read the declaration,
12 before they signed it?
13     A.   If there was that general request,
14 yes.
15     Q.   With respect to this application, did
16 you take any steps to ensure that the inventors
17 understood the significance of their request for
18 foreign priority in this declaration?
19     A.   Could you repeat your question,
20 please.
21     Q.   Yes, sir.
22     With respect to this application, did
23 you take any steps to ensure that the inventors
24 understood the significance of their request in
25 the declaration that they be afforded priority,

47 (Pages 182 to 185)

Page 186

Alan Stempel

1  under 35 U.S.C. section 119?
2      MR. CHERNY: Objection. Lack of
3  foundation.
4      A.   I don't recall if I did or if I did
5  not.
6      Q.   In the 1985-1990 period, were you
7  familiar with your obligation of, your
8  obligation to disclose material information to
9  the patent office, with respect to prosecution
10  of a patent application?
11      MR. CHERNY: Objection. Lack of
12  foundation.
13      You can answer.
14      A.   Yes.
15      Q.   And you understood, in the 1985 to
16  1990 period, that you did have an affirmative
17  obligation to disclose material information to
18  the patent office, correct?
19      MR. CHERNY: Objection. Lack of
20  foundation. Calls for a legal conclusion
21  as well.
22      A.   Yes.
23      Q.   Did you understand that in the 1985
24  to 1990 period you had a duty of candor to the

Page 187

Alan Stempel

1  patent office, with respect to patent
2  applications you were prosecuting?
3      A.   Yes.
4      Q.   Did you understand that you had both
5  a duty of candor and an obligation to disclose
6  material information, with respect to patent
7  applications that you had filed at the request
8  of your colleagues in Germany?
9      A.   Yes.
10      Q.   Was it your understanding that your
11  colleagues in Germany understood that there was
12  both a duty to disclose material information and
13  a duty of candor to the patent office, in
14  connection with applications filed with the
15  United States Patent and Trademark Office?
16      A.   I can't know -- I do not know with
17  any certainty whether or not all of the
18  individuals that you are speaking of, my German
19  colleagues, had that understanding. I don't
20  know what they -- what they thought.
21      Q.   Did you have discussions with your
22  German colleagues about the fact that there was
23  a duty of candor, in connection with the
24  prosecution of U.S. patent applications?

Page 188

Alan Stempel

1      A.   I do not have any specific
2  recollections -- recollection that that kind of
3  a discussion, either in writing or verbally,
4  took place or did not take place.
5      Q.   Did you have any discussions with
6  your colleagues in Germany about the fact that
7  there is a duty to disclose material information
8  to the U.S. Patent and Trademark Office, in
9  connection with the prosecution of a patent
10  application?
11      MR. CHERNY: Objection. Lack of
12  foundation.
13      A.   Repeat your question, please.
14      Q.   Yes, sir.
15      In the 1985 to 1990 time period, did
16  you have any discussions with your colleagues in
17  Germany about the fact that there is a duty --
18  that there was a duty to disclose material
19  information to the United States Patent and
20  Trademark Office, in connection with the
21  prosecution of patent applications?
22      MR. CHERNY: Same objection.
23      A.   I do not have any specific
24  recollection that such a discussion did take

Page 189

Alan Stempel

1  place or did not take place.
2      Q.   Did you understand, in the 1985 to
3  1990 period, that there was not a similar duty
4  of disclosure, with respect to the German patent
5  office?
6      A.   I don't recall whether or not I
7  understood that in that time frame.
8      Q.   Did you understand -- strike that.
9      Do you now understand that there is
10  not a similar duty of disclosure, with respect
11  to the German patent office?
12      A.   I currently believe that to be the
13  case.
14      Q.   And currently do you understand that
15  there is not a similar duty of disclosure with
16  respect to the European patent office?
17      A.   That is my current understanding.
18      Q.   And do I understand you correctly
19  that you cannot now identify when it was you
20  came to that understanding, with respect to
21  either the European patent office or the German
22  patent office?
23      A.   I can't tell you at what point in
24  time I knew that or thought I knew that.

48 (Pages 186 to 189)

Alan Stempel

1
2    Q.    Did you understand that your duty of
3  candor required that you bring to the attention
4  of the patent office material information that
5  you learned after the patent application had
6  already been filed?
7        MR. CHERNY:  Objection.  Lack of
8  foundation.
9    A.    Yes.
10    Q.    And did you understand that your duty
11  of candor required that you bring to the
12  attention of the patent office material
13  information that you learned at any time prior
14  to the issuance of the patent?
15        MR. CHERNY:  Same objection.
16    A.    Yes.
17    Q.    Did you understand your duty of
18  candor, in the 1985 to 1990 time period, to
19  require that if you learned that a misstatement
20  had been made in connection with a patent
21  application you had filed, that you were
22  required to bring that misstatement to the
23  attention of the patent office?
24        MR. CHERNY:  Objection.  Lack of
25  foundation.  Vague as well.

Alan Stempel

1
2    A.    What do you mean -- what do you mean
3  by "misstatement"?
4    Q.    If you had made any assertion in
5  connection with a patent application that you
6  later determined was incorrect.
7    A.    Any assertion?
8    Q.    Any assertion.
9    A.    Now, ask your full question again.
10    Q.    Did you understand that if you
11  determined, while a patent application was
12  pending, that a false statement had been made to
13  the patent office in connection with that
14  application, that you had an obligation to bring
15  that to the attention of the patent office?
16        MR. CHERNY:  Objection.  Vague.
17    A.    Are you asking any misstatement, no
18  matter how trivial?
19    Q.    Do you believe that there are
20  misstatements that can be made to the patent
21  office that you are not required to correct, if
22  you learn of them?
23        MR. CHERNY:  Objection.  Calls for a
24  conclusion of law.
25    A.    I believe that a trivial, nonmaterial

Alan Stempel

1
2  misstatement does not necessarily -- there's no
3  obligation, necessarily, to correct a trivial,
4  nonmaterial misstatement.
5    Q.    Can you identify for me an example of
6  a trivial, nonmaterial misstatement that you
7  believe would not have to be corrected?
8        MR. CHERNY:  Objection.  Incomplete
9  hypothetical.  Calls for speculation.
10    A.    I'm not going to make up a
11  hypothetical.
12    Q.    Are you aware of any situation where
13  a trivial, nonmaterial misrepresentation was
14  made, and you determined that you didn't need to
15  correct it?
16    A.    I can't think of one.
17    Q.    And can you think of any particular
18  type of mistake that could be made that you
19  think would be trivial, nonmaterial, not
20  requiring correction?
21        MR. CHERNY:  Same objection.
22  Incomplete hypothetical, calls for
23  speculation.
24    A.    I think if I were on the phone to an
25  examiner and I looked out the window and said to

Alan Stempel

1
2  the examiner, well, you know, it's raining
3  outside, and I was mistaken, actually it wasn't
4  raining outside, I don't think I'd have any
5  obligation to call the examiner the next day and
6  say, you know what, it really wasn't raining
7  yesterday.
8    Q.    Do you think that there are
9  misstatements that can be made that relate to
10  the substance of a patent application that you
11  are not required to correct?
12        MR. CHERNY:  Objection.  Calls for a
13  legal conclusion.  Incomplete hypothetical.
14    A.    That type of thing would have to be
15  addressed on a fact specific basis.
16    Q.    Do you believe that a claim for
17  priority under 35 U.S.C. section 119 is a
18  material representation?
19        MR. CHERNY:  Objection.  Calls for a
20  legal conclusion.  Incomplete hypothetical.
21    A.    I'm not even sure I understand your
22  question.
23    Q.    Let me ask you another one, then.
24        Do you believe that if you learned,
25  during the course of a prosecution of a patent

49 (Pages 190 to 193)

Page 194

Alan Stempel

1  application for which you've claimed priority to
2  a foreign filing under 35 U.S.C. section 119,
3  that the U.S. application does not qualify for
4  foreign priority, that you have an obligation to
5  bring that attention -- that fact to the
6  attention of the examiner?
7      A.    In what way does it not qualify for a
8  foreign priority?
9      Q.    Let's assume it was not filed within
10 a year of the foreign filing.
11     A.    I think if a claim to priority of an
12 application that was filed outside of the
13 convention year was made, that yes, if I
14 appreciated that fact, I would bring that to the
15 attention of the examiner.
16     Q.    If a claim for foreign priority was
17 made, and during prosecution you appreciate the
18 fact that the foreign priority document does not
19 have support for the claims in the application,
20 do you believe you have an obligation to bring
21 that to the attention of the examiner?
22          MR. CHERNY:  Objection.  Incomplete
23     hypothetical.
24     A.    I don't think that's a material fact.

*Numbering note: lines above are 1–25.*

Page 195

Alan Stempel

1      Q.    Whether or not the foreign priority
2  document satisfies the requirement of section
3  112, you do not believe to be a material fact,
4  with respect to a claim for priority?
5          MR. CHERNY:  Objection.  Lack of
6     foundation.
7      A.    State your question again, please.
8      Q.    Do you believe that if during the
9  course of a prosecution of an application for
10 which you've previously made a claim of priority
11 under section 119 to a foreign filing, and you
12 learned that the foreign filing does not
13 support, under section 112, any of the claims in
14 the U.S. application, that you would have an
15 obligation to bring that fact to the attention
16 of the examiner?
17          MR. CHERNY:  Objection.  Calls for a
18     legal conclusion.
19     A.    In a vacuum, without more facts, my
20 answer is that does not -- there are no facts in
21 your hypothetical that would require a
22 communication to the patent office one way or
23 the other.
24     Q.    Is it your understanding that you

Page 196

Alan Stempel

1  have to have in an indication that the examiner
2  is in some way relying on your claim of foreign
3  priority, before you have an obligation to
4  advise him that you've determined you no longer
5  are entitled to it?
6      A.    Certainly, if I thought that the
7  examiner was relying on my claim for priority
8  and I believed I was not entitled to it, I would
9  immediately tell the examiner that, that that
10 was my belief.
11     Q.    If the examiner rejects claims in
12 your application --
13     A.    Or let me --
14     Q.    Sorry.
15     A.    Yeah, yeah.  My answer stands.
16     Q.    Okay.  If an examiner rejects claims
17 in your application based on prior art, and you
18 advise him that the art doesn't qualify as prior
19 art, because your priority date is earlier than
20 that, and you subsequently learn that all of the
21 claims which had been rejected are not
22 supported, pursuant to section 112, by the
23 foreign priority document, do you believe you
24 have an obligation to bring that to the

Page 197

Alan Stempel

1  attention of the examiner?
2      A.    Yes, I do.
3      Q.    Have you ever had an instance in
4  which you advised an examiner that a foreign
5  priority document you had previously relied on
6  did not support all of your pending claims,
7  pursuant to section 112?
8      A.    I don't know that that's ever
9  happened, and I don't know that it's never
10 happened.
11     Q.    Would you turn to page BARR 124,
12 please, Mr. Stempel.
13     A.    Uh-hum.
14     Q.    This document was signed by you; is
15 that correct?
16     A.    Yes.
17     Q.    And it authorizes two individuals to
18 make copies of documents in this file history;
19 is that right?
20     A.    Yes.
21     Q.    Who are those two individuals?
22     A.    I don't know how to describe their
23 business.
24          In Crystal City, near the patent

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212) 705-8585

Alan Stempel

1
2 office, there are a number of companies that
3 provide services which, patent-related services,
4 going to the patent office to hand documents --
5 hand-deliver documents, to retrieve documents;
6 and Ms. Bonderoff at one time was the
7 owner/operator of one of these firms, and
8 Annette Masiello, who worked with her.
9     Q.    And was it your practice, during the
10 '85-1990 time period, to retain such a firm to
11 have access to your pending patent files at the
12 patent office?
13     A.    If we needed one of the services,
14 such as I described, say, for example, to obtain
15 a copy of a patent application file, we would
16 have retained these individuals, this company,
17 yes.
18     Q.    Does the fact that this document is
19 in the file history indicate to you that you had
20 a particular need for a document in this
21 instance, or did you prophylactically provide --
22 file such a request?
23         MR. CHERNY:    Objection.  Lack of
24 foundation.  Compound.
25     A.    I have no specific recollection as to

Alan Stempel

1
2 why this power to inspect was issued in this
3 particular instance.
4     Q.    Okay.  If you'd look at the next page
5 that ends in Bates number 125, that document is
6 also signed by you?
7     A.    Uh-hum.
8     Q.    Caused to be filed by you; is that
9 right?
10     A.    Yes.
11     Q.    And the document that ends in 126 on
12 the next page was also signed by you and caused
13 to be filed by you, right?
14     A.    Yes.
15     Q.    The next document that ends in 127 is
16 entitled Claim of Foreign Priority Under 35
17 U.S.C. Section 119, correct?
18     A.    Yes.
19     Q.    And that is also signed by you and
20 was caused to be filed by you, correct?
21     A.    Yes.
22     Q.    At the time this document was filed
23 by the patent office --
24     A.    Which is this?
25     Q.    Paper number 5, which is the one

Alan Stempel

1
2 Bates numbered 127.
3     A.    Okay.
4     Q.    -- the patent application had, with
5 the inventor's declaration claiming priority,
6 had already been filed, correct?
7     A.    Uh-hum.
8     Q.    Did you understand that you had an
9 obligation to file a separate request for
10 priority, as you've done in paper 5?
11         MR. CHERNY:    Objection.  Lack of
12 foundation.
13     A.    Well, as the paper says, it's
14 confirming and reiterating the claim of
15 priority.
16     Q.    In the 19 -- I'm sorry.
17     A.    By the way, it also goes on to say
18 that the certified copies of the prior
19 applications are an enclosure which, as of
20 filing of those certified copies, is a
21 requirement for making the claim.  So this is
22 perfecting the claim to foreign priority.
23     Q.    Apart from filing the certified
24 copies of the priority documents, is the
25 attorney prosecuting the case required to make a

Alan Stempel

1
2 claim of priority in the form of paper 5, in
3 order to perfect the claim for priority under 35
4 U.S.C. section 119?
5     A.    I have -- I do not believe that it's
6 necessarily required.
7     Q.    Following that document prepared by
8 you are copies of two German patent
9 applications, correct?
10     A.    Why don't you give me a page number
11 of the beginnings of the two documents, so that
12 way I can know that we are talking about the
13 same thing.
14     Q.    The first one, I believe the
15 application itself starts on 129, although the
16 document indicating that it's a certified copy
17 starts on page 128.  And then I believe that
18 runs through page 184; isn't that correct?
19     A.    Okay.
20     Q.    Is that correct that the document
21 that goes from page 128 to 184 is a copy -- is a
22 certified copy of a German patent application?
23     A.    On its face, that's what it says it
24 is, yes.
25     Q.    And then starting on page 185 is

Alan Stempel

1
2  another certified copy of a German patent
3  application that runs through, looks like page
4  236?
5      A.    Your question is?
6      Q.    Is that correct, that that's another
7  copy -- it's a copy of a second German patent
8  application?
9      A.    On its face, that's what it appears
10 to be.
11     Q.    And your transmittal letter that we
12 looked at previously on page 127 recites that
13 you are providing certified copies of the two
14 foreign applications, correct?
15     A.    Yes.
16     Q.    You did not provide the patent office
17 with English translations of either of those
18 documents, correct?
19     A.    Not at this time I didn't.
20     Q.    Did you ever provide the patent
21 app -- the patent office with English
22 translations of either of those German priority
23 documents?
24     A.    I have no recollection whether or not
25 that happened.

Alan Stempel

1
2      Q.    Did you have a practice, in the
3  period 1985 through 1990, of providing English
4  translations of foreign priority documents to
5  the patent office?
6      A.    I have no recollection whether -- if
7  there was a standard practice for doing that one
8  way or the other.
9      Q.    Do you have any recollection of
10 having ever submitted an English translation of
11 a certified copy of a foreign priority document?
12     A.    Certainly I have done that.
13     Q.    In the period of 1985 through 1990,
14 in what instances did you submit an English
15 translation of a certified copy of a foreign
16 priority document?
17     A.    I can't tell you, 20 years later, a
18 specific instance.
19     Q.    Can you remember any instance in
20 which you did that?
21     A.    In that time frame?
22     Q.    In that time frame.
23     A.    I can't recall any specific instance.
24     Q.    In any time frame, can you recall an
25 instance in which you specifically submitted an

Alan Stempel

1
2  English translation of a certified copy of a
3  foreign priority document?
4      A.    I cannot recall any specific
5  instances. I have done it frequently.
6      Q.    How do you know that you've done it
7  frequently, if you can't recall any instances of
8  having done that?
9      A.    I can recall doing many things in
10 general, but not specifically when.
11     Q.    To the extent that you can recall in
12 general doing it, can you recall in general the
13 types of situations where you would have
14 submitted to the patent office an English
15 translation of a certified copy of a foreign
16 priority document?
17     A.    Certainly there have been instances
18 that I can recall in general where an examiner
19 has said, look, we are relying upon -- whether
20 or not you are entitled to priority has become
21 an issue in this case. I want an English
22 translation of the priority document that you
23 are relying upon. And I have responded by
24 giving it to the examiner.
25     Q.    Can you recall any instance in which

Alan Stempel

1
2  you've provided an examiner with an English
3  translation of a certified copy of a foreign
4  priority document, where that had not been
5  requested by the examiner in the first instance?
6      A.    I cannot recall specific instances of
7  it.
8      Q.    Do you --
9      A.    But I also cannot recall that it did
10 not happen.
11     Q.    So let me make sure I understand it.
12        You can recall that there have been
13 instances when an examiner has specifically
14 requested the English translation of the
15 certified priority document, and you've provided
16 that; is that right?
17     A.    Uh-hum.
18     Q.    There may have also been instances in
19 which you did it without being asked by the
20 examiner, but you can't recall any particular
21 instances when that actually happened; is that
22 right?
23     A.    That's correct.
24     Q.    At the time that you filed the
25 certified copies of the priority documents and

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212) 705-8585

Page 206

Alan Stempel

1  Alan Stempel
2  confirmed and reiterated the inventor's claim
3  for priority, did you believe that you had any
4  obligation to do any investigation other than to
5  make sure that the dates of filing of the
6  priority applications fell within 12 months of
7  the filing of the U.S. application?
8      A.  Could you repeat your question.
9      MR. CHERNY:  That's exactly what I
10  was going to ask.  You did it before I did.
11      (Record read.)
12      A.  I have no specific recollection of
13  what I believed 20 years ago.
14      Q.  Did you undertake any investigation
15  at that time, beyond looking at the dates of the
16  foreign filings?
17      A.  I have no specific recollection of
18  what action of that nature I may have done
19  20 years ago.
20      Q.  Did you have a general practice, in
21  the period 1985 through 1990, of doing any
22  investigation, with respect to reiterating and
23  confirming the claim of priority, beyond looking
24  at the dates of filing of the foreign priority
25  documents?

Page 207

1  Alan Stempel
2      A.  I would have approached that issue on
3  a case-by-case basis.
4      Q.  And is it correct that in this
5  particular case, you have no recollection what,
6  if anything -- what, if anything, you did in
7  that regard?
8      MR. CHERNY:  Objection.  Asked and
9  answered.
10      A.  I have no particular or specific
11  recollection of what I did or what I thought
12  about that 20 years later.
13      Q.  Do you have any recollection of ever
14  having a conversation with anyone about whether
15  or not this application that we have been
16  looking at that led to the '374 patent was
17  entitled to priority of the two foreign priority
18  documents to which you had claimed for it?
19      MR. CHERNY:  I'm just going to -- I
20  don't know if there is any such
21  conversation, but if there is, just be
22  careful not to reveal any privileged
23  information.
24      But it sounds like you are about to
25  answer the question.

Page 208

1  Alan Stempel
2      A.  I don't recall any conversation,
3  communication, relating to this matter.
4      Q.  Is it correct that you have no
5  recollection of any question ever having been
6  raised about whether or not this application
7  that led to the '374 patent was entitled to the
8  benefit of the foreign priority -- to the
9  benefit of priority to the foreign documents
10  that were listed in the application?
11      MR. CHERNY:  I'm putting my hand out
12  for two reasons:  A, to let him finish, and
13  B, to let me object.
14      Objection, asked and answered.
15      Now you can answer.
16      A.  I have no recollection one way or the
17  other.
18      MR. CHERNY:  I'm sure that
19  Mr. Pfadenhauer appreciates your
20  enthusiasm, but you've got to give me a
21  second to answer, and let him finish the
22  question.
23      Q.  In the 1985-1990 time period, you've
24  indicated that it was your practice to provide
25  copies of office actions that you received to at

Page 209

1  Alan Stempel
2  least one of your counterparts in Germany; is
3  that right?
4      MR. CHERNY:  Objection.  Lack of
5  foundation.
6      Q.  You can answer the question.
7      A.  When you say "counterparts in
8  Germany," are you saying a patent professional
9  or perhaps just that it was sent to an office
10  and with the knowledge that it would work its
11  way to the appropriate person?
12      Q.  Either one of those things.
13      A.  It was my practice to send copies of
14  office actions to Germany, but I don't recall
15  specific -- with any specificity, with regard to
16  this case, exactly to whom copies of office
17  actions would have been addressed.
18      Q.  But it was your understanding that
19  the office actions would have been reviewed by
20  some patent professional in Germany?
21      MR. CHERNY:  Objection.  Calls for
22  speculation.
23      A.  I would have conferred with my
24  counterpart before filing my response;
25  therefore, necessarily, or almost necessarily,

53 (Pages 206 to 209)

Page 210

Alan Stempel

1   there would have been discussion of the office
2   action.
3       Q.   And with respect to this particular
4   application we have been looking at that led to
5   the '374 patent, the counterpart that you
6   conferred with would have been Mr. Schneider?
7       MR. CHERNY:  Objection.
8       Q.   I'm sorry, Mr. Fleischer?
9       MR. CHERNY:  I think it's actually
10  Dr. Fleischer.
11      Q.   Dr. Fleischer.
12      THE WITNESS:  Yes.
13      A.   My recollection is that it would have
14  been Dr. Fleischer.
15      Q.   In addition to providing the
16  individuals in the patent departments in Germany
17  with copies of the office actions, was it your
18  general practice, during this 1985 to 1990
19  period, to provide the German patent department
20  with a copy of your responses to the office
21  action?
22      A.   Yes.
23      Q.   And was it your understanding that
24  generally one of your colleagues in the German

Page 211

Alan Stempel

1   patent department would review the responses
2   that you filed to office actions?
3       MR. CHERNEY:  Objection.  Calls for
4   speculation.
5       A.   Well, certainly, if I received a
6   communication from them which evidenced
7   knowledge of the office action, I would have at
8   that point known if they had looked at it.  But
9   whether or not you are asking -- if you are
10  asking whether or not I have knowledge that a
11  specific office action was reviewed by a
12  specific individual 20 years later, I have no
13  way of recalling that one way or the other.
14      Q.   Was it your general impression at the
15  time that one of your counterparts in the German
16  patent department would be keeping him or
17  herself apprised of the prosecution of the
18  applications that you were handling?
19      MR. CHERNY:  Objection.  Lack of
20  foundation.
21      A.   Repeat your question, please.
22      Q.   Yes, sir.
23      Was it your general understanding, in
24  the 1985 through 1990 time period, that with

Page 212

Alan Stempel

1   respect to U.S. patent applications that you had
2   filed based on a request you had received from
3   Germany, that one of your colleagues in the
4   German patent department would have been kept
5   apprised of the progress of that prosecution?
6       A.   Yes.
7       Q.   And in the case of this particular
8   application that led to the '374 patent, was it
9   your understanding that the colleague who you
10  believed kept himself generally apprised would
11  have been Dr. Fleischer?
12      A.   That's my recollection.
13      Q.   Turning back to the application that
14  starts on page Barr 070, Mr. Stempel.
15      A.   Uh-hum.
16      Q.   Do you have an understanding as to
17  whether there is anything that is described in
18  this application that is not described in either
19  of the two German priority documents to which
20  you have filed a claim of priority?
21      A.   At this date and quite apart from
22  whatever understanding I may or may not have had
23  20 years ago, I have no understanding about that
24  that could help me to respond to your question.

Page 213

Alan Stempel

1       (Brief pause.)
2       Q.   Mr. Stempel, I want to show you what
3   we marked as deposition Exhibit 53.
4       (Exhibit 53, English translation of
5   German priority document, marked for
6   identification, as of this date.)
7       Q.   And I'll represent to you that this
8   is an English translation of one of the German
9   priority documents that was submitted by
10  Boehringer, during the prosecution of an
11  Australian patent application.
12      MR. CHERNY:  I'm sorry, what was that
13  representation again?
14      MR. PFADENHAUER:  That this
15  translation was submitted by Boehringer in
16  the prosecution of an Australian patent
17  application and represented to be, by
18  Boehringer, to be an accurate English
19  translation, so.
20      MR. CHERNY:  I was just trying to
21  understand what you were representing.  I
22  mean apart from what it says on its face,
23  you don't have any basis to make any
24  personal representations.

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212) 705-8585

Page 214

1      Alan Stempel
2      MR. PFADENHAUER: I'm relying on what
3   Boehringer told the Australian patent
4   office.
5      MR. CHERNY: That's what I was trying
6   to understand. When you said you were
7   representing, I was trying to figure out
8   where that was coming from.
9      MR. PFADENHAUER: I was just
10  representing where it came from. I'm not
11  making any other representations beyond
12  that.
13     MR. CHERNY: Cool. Perfect.
14     Would you like him to read it?
15     Q.   My first question to you is whether
16  or not you have any recollection of having ever
17  seen an English translation of this German
18  priority document.
19     MR. CHERNY: I'm going to object to
20  that, when you say "English translation of
21  this German priority document."
22     Are you just asking him if he's ever
23  seen this document?
24     MR. PFADENHAUER: This document or
25  any other English translation of the German

Page 215

1      Alan Stempel
2   application 34 47 075.1, which is the first
3   German --
4      MR. CHERNY: That's fair.
5      Are you clear on the question?
6      THE WITNESS: I think so.
7      MR. CHERNY: Cool.
8      A.   I have no recollection whether or not
9   I saw an English translation of this priority
10  document. I have no recollection that I didn't.
11     Q.   Can we take a look at general
12  formula 1?
13     A.   Mm-hmm.
14     MR. CHERNY: Which page number?
15     Q.   Let's direct you first to the U.S.
16  application we were looking at earlier, the page
17  070, BARR 070, from the file history. Keep that
18  one open, because we are going to do a little
19  comparison here.
20     MR. CHERNY: So you want to turn to
21  page 70 over here.
22     Q.   And do you see that on the first page
23  of the application, BARR 070, there is a general
24  formula denoted as formula 1?
25     A.   In 070?

Page 216

1      Alan Stempel
2      Q.   In 070. And do you see that as the
3   application continues, it specifies that R1 in
4   formula 1 can have certain meanings?
5      A.   So --
6      MR. CHERNY: Can you point to where
7   you are reading from?
8      A.   Is that the second, penultimate line
9   of the page?
10     Q.   That's correct. And that bridges
11  over to the page that is BARR 071, do you see
12  that?
13     A.   Okay, yeah.
14     Q.   And do you see that at the end of the
15  description of possible substituents in the R1
16  position, the U.S. application indicates,
17  "Whilst the above-mentioned phenyl nuclei may be
18  substituted by 1 or 2 halogen atoms."
19     A.   Uh-hum.
20     Q.   Would you take a look at the German
21  translation priority document. And there is, at
22  the bottom of the page that ends in 270 bridging
23  onto page 271, a description of possible
24  substituents for R1.
25     Do you see that?

Page 217

1      Alan Stempel
2      A.   On the bottom of page 1, yeah, and
3   bridging over to page 2?
4      Q.   Yes, that's correct.
5      A.   Okay, uh-hum.
6      Q.   And do you see that that entry in the
7   German priority document does not make any
8   reference to R1 possibly being phenyl nuclei
9   substituted by 1 or 2 halogen atoms?
10     MR. CHERNY: I'm going to object to
11  your characterizing Exhibit 53 as the
12  German priority document. I mean it's an
13  Australian document. A lot of the same
14  documents out there. I want to be clear as
15  to what we are talking about.
16     MR. PFADENHAUER: I'm going to -- you
17  know, I'm just representing to you that
18  this has been represented by Boehringer to
19  be an accurate translation of the German
20  priority document, so we will work on that
21  assumption. If that representation is not
22  correct, then obviously that's what it is.
23     MR. CHERNY: No, no, the only reason
24  I was cautioning is that there's a number
25  of documents that we are referring to that

55 (Pages 214 to 217)

Page 218

Alan Stempel

1  were given to different patent offices, and
2  I don't want there to be any mixup.
3      This is the Australian document that
4  you made a representation about?
5      MR. PFADENHAUER: That's correct.
6  A.  Okay.  What was your question?  I'm
7  sorry.
8  Q.  Do you see, in comparing these two
9  documents --
10 A.  That on page 071 --
11     MR. CHERNY: Of Exhibit 53.
12 A.  -- there's a "Whilst the above," and
13 on 271 that phrase doesn't appear, is that your
14 question?
15 Q.  That's correct.
16 A.  I see that, yes.
17 Q.  You see that, okay.
18     Are you aware that in the U.S.
19 application there is a reference to a possible
20 phenyl nuclei substituted with 1 or 2 halogen
21 atoms that, for R1 in formula 1, that does not
22 appear in the German priority document?
23     MR. CHERNY: Again, I object to the
24     characterization, but.

Page 219

Alan Stempel

1  A.  I think that's what we just said a
2  second ago, but all right, yeah.
3  Q.  Do you know whether or not, in the
4  German priority document, there is any
5  description of the possibility of the R1
6  substituent having a phenyl nuclei substituted
7  by 1 or 2 halogen atoms?
8  A.  When you say "the German priority" --
9  Q.  The English translation of the German
10 priority document that we have provided.
11     MR. CHERNY: Just to be clear, you
12 are asking him, in Exhibit 53, if he's
13 aware of something being in the document or
14 not?
15     MR. PFADENHAUER: Correct.
16     MR. CHERNY: I just want to make sure
17 I understand, because it is getting
18 confusing.
19 A.  I have no knowledge -- I haven't read
20 them today, and I have no recollection from
21 20 years ago what they said back then, so no.
22 Q.  Did you ever come to learn that there
23 was text in the U.S. application that you filed
24 that did not appear in either of the German

Page 220

Alan Stempel

1  priority documents to which you had claimed
2  priority?
3      MR. CHERNY: Objection.  I think
4  that's a mischaracterization.  He didn't
5  claim priority to this Australian
6  translation.
7      MR. PFADENHAUER: I didn't ask him
8  about the priority.  That's not the
9  question, Mr. Cherny.
10     MR. CHERNY: Okay, then, lack of
11 foundation.  I'm sorry.
12 Q.  Did you ever come to learn that there
13 was text in the U.S. application that you filed
14 that did not appear in either of the German
15 priority documents to which you had claimed
16 priority?
17     MR. CHERNY: And I apologize, there
18 was really confusion relating to the
19 nomenclature for Exhibit 53.
20     Do you have the question?  I
21 apologize.
22 A.  Okay.  I have no recollection if I
23 knew that 20 years ago or if I didn't know that
24 20 years ago.

Page 221

Alan Stempel

1  Q.  Do you see, Mr. Stempel, in the page
2  in the U.S. application that ends 114 --
3  A.  Page 114, okay -- first page of the
4  claims?
5  Q.  Correct.  And that claim was the --
6  what we see on the top of page 114 is claim 1 in
7  the application as originally filed by you,
8  correct?
9  A.  I'm sorry, say that again.
10 Q.  Yes.  On the page that ends in 114,
11 we see claim 1 of this application as it had
12 been originally filed by you in the U.S. patent
13 office?
14 A.  Yes.
15 Q.  Do you see that this claim, as filed
16 by you, includes in the description of the R1
17 substituent in formula 1 the possibility that
18 the above-mentioned phenyl nuclei may be
19 substituted by 1 or 2 halogen atoms?
20 A.  I see that, yes.
21 Q.  I'll represent to you, Mr. Stempel,
22 that in this English translation that we just
23 looked at that was filed in the Australian
24 application --

56 (Pages 218 to 221)

Page 222

Alan Stempel

1
2   A.  You are talking about 53?
3   Q.  Correct.
4       -- that there is no description in
5 here where formula 1 R1 is described as having
6 an above-mentioned phenyl nuclei substituted by
7 1 or 2 halogen atoms, all right?
8       That's my representation to you.
9   A.  I'll take your word.
10   Q.  That's the premise for the question.
11      MR. CHERNY: Of course, that's
12 subject to agreement, but for purposes of
13 the question.
14      MR. PFADENHAUER: For purposes of the
15 question, rather than take Mr. Stempel's
16 time to go through every line of the
17 application.
18      MR. CHERNY: Understood. You've made
19 a representation. That doesn't mean anyone
20 is accepting it, but it's for the purpose
21 of the question.
22   Q.  Assuming that that is correct, do you
23 agree that claim 1 in the application that you
24 filed, which led to the '374 patent, would not
25 be entitled to priority to the first German

Page 223

Alan Stempel

1
2 application?
3      MR. CHERNY: Objection. Calls for a
4 legal conclusion.
5   A.  Restate your question, please.
6   Q.  Yes, sir.
7   A.  I remember the premise, but state
8 your question.
9   Q.  If that premise is correct, and there
10 is no description of this phenyl nuclei
11 substituted by 1 or 2 halogen atoms in the
12 English translation of the German priority
13 document --
14   A.  In 53?
15   Q.  Right.
16       -- do you agree that claim 1, as
17 filed by you in the application that led to the
18 '374 patent, would not be entitled to the
19 benefit of priority to the first German
20 application?
21      MR. CHERNY: And same objection.
22 Calls for a legal conclusion.
23      And I understand that Mr. Pfadenhauer
24 has made a representation regarding what
25 isn't there, but if you need to read the

Page 224

Alan Stempel

1
2 specification to see what is there, please
3 do so.
4   A.  I think I'd be uncomfortable
5 without -- without -- in reaching that
6 conclusion. I would be uncomfortable reaching
7 that conclusion without considering it at
8 length.
9   Q.  Well, based on your 20-plus years
10 experience prosecuting pharmaceutical and
11 chemical patent applications, do you believe
12 that the addition of the phrase that we have
13 been discussing as an additional descriptor of
14 R1 in general formula 1 would qualify as new
15 matter, as you understand that term?
16      MR. CHERNY: Objection. Lack of --
17 I'm sorry, are you finished?
18      MR. PFADENHAUER: Uh-hum.
19      MR. CHERNY: Objection. Lack of
20 foundation. Calls for a legal conclusion.
21   A.  After 20 something years of patent
22 practice, I would be very uncomfortable reaching
23 a conclusion of law, without considering it at
24 length.
25   Q.  Are you comfortable, then, without

Page 225

Alan Stempel

1
2 considering it at length, in asserting that that
3 claim is entitled to priority on the first
4 German application?
5   A.  I'm not comfortable reaching any
6 conclusion of, law without considering the
7 matter at length.
8   Q.  And did there ever come a point in
9 time in which you considered that matter at some
10 length, during the prosecution of this
11 application?
12   A.  I do not recall whether I did or did
13 not.
14   Q.  If you had considered that matter at
15 some length, do you think you would have
16 remembered it?
17      MR. CHERNY: Objection. Incomplete
18 hypothetical.
19   A.  Either I do recall it or I don't. I
20 don't.
21   Q.  During the 1985-1990 time period,
22 were there instances when you became aware that
23 there was text in a U.S. application you had
24 filed that did not appear in a formal priority
25 document to which you had claimed priority?

57 (Pages 222 to 225)

Page 226

Alan Stempel
1
2      MR. CHERNY: Objection. Lack of
3  foundation.
4      A.    Restate your question, please.
5      Q.    Yes, sir.
6          During the 1985 to 1990 time period,
7  were there any instances that you recall where
8  you became aware that there was text in a U.S.
9  application you had filed that did not appear in
10  the German priority document to which you had
11  claimed priority?
12          MR. CHERNY: Objection, Lack of
13      foundation.
14      A.    When you say German priority
15  application, you mean the English translation?
16      Q.    Either one, the English translation
17  or the German words for that same thing, as
18  appeared in the German document.
19      A.    Well, certainly in that it was my
20  habit to edit the claims to put them in U.S.
21  format, at least in that regard there would have
22  been words that could not be found verbatim in
23  the German priority application.
24      Q.    Was it your practice to review the
25  German priority application, to see if it had a

Page 227

Alan Stempel
1
2  sufficient disclosure, in your view, to support
3  the new claims that you had drafted?
4      A.    As I believe I said before, it was my
5  habit to -- my practice to take the claims that
6  I saw in the foreign filing text and to, if
7  necessary, recast them into U.S. claim format.
8  That necessarily would have required minor
9  language changes, which I do not believe would
10  rise to the -- would present a need to do which
11  you just suggested.
12      Q.    Was it your practice, during the
13  period 1985 to 1990, to make any changes to the
14  definition of formulas, chemical formulas set
15  forth in claims of patents that you received for
16  filing in the patent office?
17      A.    Definitions of?
18      Q.    Of chemical formulas.
19      A.    Of chemical, okay. I'm sorry,
20  restate your question.
21      Q.    Yes, sir.
22          In the period 1985 to 1990, you've
23  indicated that you would from time to time make
24  changes to the language of the claims, based on
25  what you had received in the foreign filing

Page 228

Alan Stempel
1
2  text, in what you ultimately filed in the U.S.
3  patent office; is that right?
4      A.    That's correct.
5      Q.    And you indicated that one example of
6  that would be to change the form of a claim to
7  comport with U.S. practice, for example, with
8  respect to method claims; is that right?
9      A.    Uh-hum. Yes.
10      Q.    My question to you is, during that
11  period, 1985 to 1990, did you have a practice
12  of, when you edited the claims, making any
13  changes to the definition of chemical formulas
14  or chemical structures shown in the claim?
15      A.    A substantive change?
16      Q.    Correct.
17      A.    I have no specific recollection of
18  having made such a substantive change, but I
19  cannot rule out that a substantive change from
20  the foreign filing text was never made.
21      Q.    Was it your practice to add
22  additional substituents to a description of a
23  chemical formula in a claim that you were
24  filing?
25      A.    Was it my habit?

Page 229

Alan Stempel
1
2      Q.    Yes.
3      A.    It was not my habit.
4      Q.    Was it a general practice that you
5  had to add substituents to a chemical formula?
6      A.    It was not my practice.
7          MR. CHERNY: I don't know what the
8      difference is.
9      Q.    Can you recall any instances in
10  which, in filing a U.S. application based on a
11  foreign filing text, you made changes to the
12  definition of any substituents in a chemical
13  formula?
14      A.    Can I recall any specific occurrence?
15      Q.    Right. Can you recall ever doing
16  that?
17      A.    I have no specific recollection.
18      Q.    Do you have any general recollection
19  of having made that type of a change to a patent
20  application?
21          MR. CHERNY: Objection. Asked and
22      answered.
23      A.    Actually, if I had no habit or
24  practice of having doing it, how could I have
25  had -- well, I don't know.

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212) 705-8585

Page 230

1        Alan Stempel
2        No, I have no general recollection.
3    Q.    Would you have, during the 1985 to
4    1990 period, taken it upon yourself to add or
5    remove substituents from a chemical formula in a
6    patent application that you had received from
7    Germany for filing in the U.S.?
8    A.    If I had taken it upon myself?
9    Q.    Yes.
10   A.    No.
11   Q.    Would you ever have done such a
12   change or made such a change to a patent
13   application, without consulting with one of your
14   colleagues in the German patent department?
15   A.    No.
16       MR. CHERNY:  Whenever you get a
17   chance, I need to make a call; so if you
18   get to a good place to take a break, I'd
19   appreciate it.
20       MR. PFADENHAUER:  Let's go ahead and
21   do it now.
22       MR. CHERNY:  Thank you.
23       THE VIDEOGRAPHER:  The time is 5:08.
24   We are going off the record.
25       (Whereupon, there is a recess in the

Page 231

1        Alan Stempel
2    proceedings.)
3        THE VIDEOGRAPHER:  The time is 5:20.
4    We are back on the record.
5    Q.    Mr. Stempel, would you look back at
6    the U.S. application we have been reviewing.
7    A.    Uh-hum, okay.
8    Q.    And turn to the page that ends in
9    BARR 73, please.
10   A.    I'm there.
11   Q.    Do you see that there's a general
12   formula on that page that is denominated 1A?
13   A.    Yes.
14   Q.    And do you see that there are certain
15   substituents listed as possibilities for R1?
16   A.    I see that, yes.
17   Q.    Do you see that in the third line of
18   R1 there are two substituents?
19   A.    I see that.
20   Q.    Looking back at the description for
21   general formula 1 we had looked at a few minutes
22   earlier on page 71.
23   A.    Okay.
24   Q.    Do you understand that the three
25   substituents that are added -- strike that.

Page 232

1        Alan Stempel
2        Do you see that the three
3    substituents that we just referenced on page 73
4    for R1 are, in fact, instances where the R1
5    substituent has a phenyl nuclei substituted by 1
6    or 2 halogen atoms?
7        MR. CHERNY:  You are asking his
8    understanding of that?
9        MR. PFADENHAUER:  Yes, if that's his
10   understanding.
11       MR. CHERNY:  Obviously, read as much
12   of the document as you need to answer his
13   question.
14       THE WITNESS:  Uh-hum.
15   A.    Okay.  Ask your question again,
16   please.
17   Q.    Do you understand that the three
18   specific substituents we have been discussing on
19   the third line from the bottom of page 73 are
20   examples of substituents where a phenyl nuclei
21   is substituted with 1 or 2 halogen atoms?
22   A.    I think that's correct.
23   Q.    So the three compounds we have been
24   discussing on page 73 would be particular
25   species of the genus of phenyl compounds wherein

Page 233

1        Alan Stempel
2    the phenyl nuclei is substituted with 1 or 2
3    halogen atoms, correct?
4        MR. CHERNY:  Objection, calls for a
5    legal conclusion.
6    A.    I think they would represent specific
7    subgenera, but maybe that's just semantics.
8    Q.    If you'd look at the English
9    translation of the German priority document that
10   we previously marked as Exhibit 53 and turn to
11   the page that ends in 273.
12   A.    Okay.
13   Q.    And do you see that the particularly
14   preferred compounds of general formula 1 are
15   denominated as compounds of general formula 1A?
16   A.    Uh-hum.
17   Q.    And do you see that included in
18   compounds of general formula 1A are compounds
19   where R1 has a certain definition?
20   A.    Yes.
21   Q.    And do you see --
22   A.    You are talking about line 25, 26,
23   27?
24   Q.    Exactly, correct.
25       And do you see that in that

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212) 705-8585

Page 234

Alan Stempel

1    definition for R1 in the English translation of
2    the German priority document, there is no
3    description of the 2-chloro-benzyl,
4    4-chloro-benzyl or 3,4-dichloro-benzyl
5    compounds or substituents that are shown on
6    page 73 of the German translation?
7        A.    I don't see that at lines 26 and 27.
8    If that's your question, that's correct.
9        Q.    You do not understand R1, as shown on
10   lines 25 through 26 of the English translation
11   of the German priority document, to encompass
12   substituents 2-chloro-benzyl, 4-chloro-benzyl or
13   3,4-dichloro-benzyl?
14       MR. CHERNY:  Can I have that read
15   back, please.
16       (Record read.)
17       MR. CHERNY:  Objection, vague.  Calls
18   for a legal conclusion.
19       You could answer.
20       A.    I do not literally see that, see a
21   recitation of halogenated -- a halogenated
22   phenyl moiety.
23       Q.    Do you understand, in reading lines
24   20 through 27 of the English translation of the

Page 235

Alan Stempel

1    German priority document --
2        A.    Was that a question?
3        Q.    I wasn't finished.
4        Let me rephrase it, maybe make it
5    easier for you.
6        A.    Okay.
7        Q.    In reading lines 20 through 27 of the
8    English translation of the German priority
9    document, do you understand R1 of formula 1A to
10   include halogenated phenyl moieties?
11       MR. CHERNY:  I'm sorry.  Objection,
12   asked and answered.
13       A.    If I limit my consideration to those
14   lines, I do not see any indication that R1 can
15   be a halogenated phenyl moiety there, in those
16   lines.
17       Q.    I'll represent to you that in the
18   remaining portion of the English translation of
19   the German priority document, there is no
20   description of a halogenated phenyl moiety as a
21   possibility for R1 in formula 1A.
22       If that representation is correct, do
23   you agree that the three substituents shown on
24   the third line from the bottom in the U.S.

Page 236

Alan Stempel

1    application, page 73, would constitute new
2    matter?
3        MR. CHERNY:  Objection.  Calls for a
4    legal conclusion.
5        And again, I understand
6    Mr. Pfadenhauer's representation.  You can
7    read whatever you'd like of the application
8    but you can answer the question subject to
9    his representation, even though we are not
10   necessarily accepting it.
11       But again, calls for a legal
12   conclusion.
13       A.    What do you mean by the term "new
14   matter?"
15       Q.    Do you have an understanding of the
16   term "new matter," as that is used for purposes
17   of claiming priority under the U.S. patent law?
18       A.    I believe that I do.
19       Q.    Using that understanding, do you
20   believe that that would constitute new matter?
21       MR. CHERNY:  Again, objection.  Calls
22   for a legal conclusion.
23       A.    I believe I would be uncomfortable
24   reaching a legal conclusion, without taking a

Page 237

Alan Stempel

1    substantial amount of time to consider it.
2        Q.    Is it correct, then, that you would
3    be uncomfortable reaching the conclusion that a
4    claim directed to that matter would be entitled
5    to priority to the first German application,
6    without taking substantial time to consider it?
7        A.    I would want to take time to consider
8    that, yes.
9        Q.    Would you want to take substantial
10   time to consider that?
11       MR. CHERNY:  Objection.  Lack of
12   foundation.  And again, vague.
13       A.    I would want to take substantial time
14   and perhaps have access, before I reach such a
15   conclusion, to resources which I do not have
16   here.
17       Q.    Would you be comfortable reaching a
18   conclusion, with respect to whether or not that
19   information would be entitled to priority,
20   without reading the German priority document in
21   English?
22       A.    I'm sorry?
23       Q.    Would you be comfortable reaching a
24   determination as to whether that information was

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212) 705-8585

Page 238

Alan Stempel

1   entitled to priority to the German application,
2   without reading the German application's
3   disclosure in English?
4   A.   I would not be able to do that -- I
5   would have difficulty doing that, in that I
6   don't read German that well.
7   Q.   So in order to make a determination
8   as to whether or not the U.S. application is
9   entitled to the priority of the German document,
10  where you learned that information had been
11  added to the U.S. application, you would want to
12  have the priority document available to you in
13  English; is that right?
14      MR. CHERNY: Objection.  Incomplete
15      hypothetical.
16  A.   Re -- repeat your question, please.
17  Q.   In order to make a determination as
18  to whether or not the U.S. application is
19  entitled to the priority of the German document,
20  where you learned that information such as
21  additional substituents had been added to the
22  U.S. application, you would want to have the
23  priority document available to you in English?
24  A.   Yes.

Page 239

Alan Stempel

1   Q.   If you would turn to the pages that
2   end in -- that ends in 107.
3   A.   This is in the spiral bound?
4   Q.   Yes, correct.  In the U.S.
5   application.
6   A.   Okay, 107 did you say?
7   Q.   Yes, correct, 107.
8   A.   Okay.
9   Q.   I want to direct your attention to
10  the example that starts at the bottom of that
11  page, the 2-(4-chloro-benzylamino)-6-ethylamino,
12  and the name goes on.
13      Do you see that?
14  A.   Uh-hum, uh-hum, yeah.
15  Q.   And then the next two examples on the
16  next page, the 2-(2-chloro-benzylamino) and the
17  2-(3,4-chloro-benzylamino), do you see those
18  three examples?
19  A.   So the next page,
20  2-(2-chloro-benzylamino)-6 ethylamino, et
21  cetera?
22  Q.   Correct.
23  A.   And then
24  2-(3,4 dichloro-benzylamino), et cetera?

Page 240

Alan Stempel

1   Q.   Correct.
2   A.   Okay, yes.
3   Q.   Are those three compounds shown on
4   pages 107 to 108 of the application examples of
5   compounds of formula 1A from page 73, using the
6   three substituents for R1 shown on the third
7   line from the bottom of the page?
8   A.   You totally lost me.
9   Q.   Hold your place there on page 107 and
10  108, those three examples.
11  A.   Okay.  Part of my confusion is you
12  got 107 in your BARR, and then you've also got
13  page numbers in the application.
14  Q.   I'm sorry, I'm sorry.
15  A.   But restate your question, and I'll
16  try to follow along.
17  Q.   Is it correct that the three
18  compounds that we have just read --
19  A.   Bottom of -- for the moment, bear
20  with me, the -- I'm going to use your BARR
21  numbers.
22  Q.   Okay.
23  A.   107 and 108.
24  Q.   Correct.

Page 241

Alan Stempel

1   A.   So the one on the bottom of the --
2   the last one on 107 and the top two on 108,
3   those are the three you have in mind?
4   Q.   That's correct.
5   A.   Okay.  Now what about them.
6   Q.   Are those three compounds examples of
7   compounds of formula 1A shown on page BARR 73 of
8   the same application.
9   A.   BARR 73.  I marked that.  No, of
10  course not.
11      Okay.  Are they examples of 1A on
12  BARR 73?
13  Q.   Wherein R1 is the three compounds
14  shown on the third line from the bottom of the
15  page?
16      MR. CHERNY:  Obviously, read as much
17      of the document as you need.
18  A.   What was the last part of your
19  question again, wherein --
20  Q.   Wherein R1 is defined as one of the
21  three compounds shown on the third line from the
22  bottom -- three substituents shown on the third
23  line from the bottom of BARR 73.
24  A.   So you mean 2-chloro-benzyl,

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212) 705-8585

Page 242

Alan Stempel

1  4-chloro-benzyl, 3,4 dichloro-benzyl?
2
3      Q.   Correct.
4          MR. PFADENHAUER:  Excuse me, I have
5  to take a break.
6          MR. CHERNY:  Please go off the
7  record.
8          THE VIDEOGRAPHER:  The time is 5:38.
9  We are going off the record.
10         (Whereupon, there is a recess in the
11  proceedings.)
12         THE VIDEOGRAPHER:  The time is 5:49.
13  We are back on the record.
14         MS. BERNIKER:  This is Jessamyn
15  Berniker from Williams & Connolly.  During
16  the break, Mr. Pfadenhauer notified us that
17  he was ill.
18         I understand that Mr. Cherny has no
19  objection to my taking over the
20  examination, at least temporarily.
21         MR. CHERNY:  Take it over for the
22  rest of the day.  Just take it over and
23  let's get done with it.
24         And I hope Glenn feels better.
25         MS. BERNIKER:  So do I.

Page 243

Alan Stempel

1
2  EXAMINATION BY
3  MS. BERNIKER:
4      Q.   I guess we should go back to the
5  question that was pending.
6      A.   Yes.
7      Q.   Do you have an answer to that, at the
8  moment?
9          MR. CHERNY:  Why don't you just have
10  it read back for everybody.  It's been
11  about 10 minutes, 15 minutes.
12     A.   Please, it was complicated the first
13  time.
14     Q.   Are the three compounds that we
15  discussed earlier at BARR 107, BARR 108 -- and
16  you remember those three compounds, the
17  4chloro-benzylamino compound, the
18  2chloro-benzylamino compound and the 3,4
19  dichloro-benzylamino compound?
20     A.   Uh-hum.
21     Q.   Are those compounds that are
22  described on BARR 73 in the definition of R1 as
23  it pertains to general formula 1A in the third
24  line from the bottom of the page?
25         MR. CHERNY:  Objection.  Incomplete

Page 244

Alan Stempel

1  hypothetical.
2
3          You can answer, if you can.
4      A.   On BARR 73, I believe that the
5  definition of R1 embraces the last compound on
6  BARR 107 and the first two compounds on
7  BARR 108.
8      Q.   All right.  Now, if you would turn
9  back to the English translation of the first
10  German application that we have designated
11  Exhibit 53.  And if you would turn to the page
12  with Bates number BARR 028307?
13     A.   307?
14         MR. CHERNY:  Correct.
15     A.   Okay.
16     Q.   Actually, I'm sorry, why don't you
17  flip to the page right before that for context,
18  306.
19     A.   So 306?
20     Q.   You see on page 306 at about line 20
21  begins example 10?
22     A.   Yes.
23     Q.   Okay.  And you see now, comparing
24  that to Exhibit 46, the file history?
25     A.   Okay.  So this is 46.

Page 245

Alan Stempel

1
2      Q.   Yes, the spiral bound file history of
3  the '374 patent.
4          If you compare that to page BARR 107,
5  you see that's where example 10 begins in that
6  document; is that right?
7      A.   Okay.  What page am I going to in the
8  file history?
9      Q.   Page 107.
10         MR. CHERNY:  And example 10 starts on
11  page BARR 107, is that the question?
12     A.   Oh, okay, fine.
13         MR. CHERNY:  So far I think the only
14  question, was do you see where example 10
15  starts at 107.
16     Q.   Essentially, do you have before you
17  both documents where example 10 begins?
18     A.   I have two example 10s, one in each
19  document, yes, okay.
20     Q.   If you would flip through the next
21  two pages in the German, in the translation of
22  the German priority application, and can you
23  tell me whether the examples that we just
24  discussed that are listed on pages BARR 107 and
25  108 of Exhibit 46, the United States

62 (Pages 242 to 245)

Alan Stempel

1  application, if those three examples, the
2  4-chloro-benzylamino, the 2-chloro-benzylamino
3  and the 3,4-dichloro-benzylamino, appear in any
4  way in the German -- in the English translation
5  of the German priority application.
6      MR. CHERNY:  Again, I'm going to
7  object to the characterization.
8      A.   Wow.
9      Q.   Let me try to simplify that for you,
10 in case it's not clear.  I'm asking you whether
11 the three examples we just talked about in the
12 U.S. application, the chloro-benzyl example --
13 the 2-chloro-benzyl examples and the
14 dichloro-benzyl example, the ones we just
15 discussed, whether they are included in the
16 German priority application for which you have a
17 translation.
18     MR. CHERNY:  Exhibit 53?
19     MS. BERNIKER:  Exhibit 53.
20     MR. CHERNY:  And are you asking him
21 to read the entire document, or just look
22 at --
23     Q.   If you just look at example -- the
24 section designated example 10, which begins on

Alan Stempel

1  page Bates range 306 of this document.
2      A.   So your question is restricted to
3  example 10 --
4      Q.   Yes.
5      A.   -- of the translation of the priority
6  document.
7      Q.   Exactly.
8      A.   And the question is, those three
9  compounds, do they appear there?
10     Q.   Exactly.
11     A.   Okay.  And those three compounds, I
12 can go back to -- if I want to see their names,
13 where do I go back?
14     Q.   At the bottom of BARR 107.
15     MR. CHERNY:  May I for a second.
16     MS. BERNIKER:  Please.
17     THE WITNESS:  This last one and the
18 next two, is that it?
19     MR. CHERNY:  Yes.
20     A.   So you're saying the compound, the
21 last compound on BARR 107 and the next two on
22 BARR 108, are they in example 10 anywhere?
23     Q.   Exactly.
24     MR. CHERNY:  Of Exhibit 53.

Alan Stempel

1      Q.   Of Exhibit 53.
2      A.   I don't see them there.
3      Q.   Okay.  Mr. Stempel, can you tell me
4  who provided you -- I'm sorry, let me start that
5  question again.
6          Can you tell me who in the German
7  patent department in Germany drafted the
8  application -- the foreign filing text document
9  that we looked at earlier?
10     MR. CHERNY:  Which exhibit number?
11     Q.   The foreign filing text document that
12 you used to create your application to the
13 patent office?
14     A.   So 52?
15     Q.   I believe that's correct.
16     A.   So we are talking about Document 52.
17 Now, what's the question?
18     Q.   Can you tell me who drafted that
19 document?
20     A.   Who drafted it?  I don't know who
21 drafted it.
22     Q.   You testified earlier that on the top
23 right corner it says "Dr. FL" and that you
24 understand that to mean Dr. Fleischer?

Alan Stempel

1      A.   Yes.
2      Q.   And you testified earlier that you
3  understand that Dr. Fleischer was -- well, I'm
4  not sure you said that.  Let me try it again.
5          You testified earlier that
6  Dr. Fleischer was your key contact in Germany
7  with respect to the tetrahydro-benzthiazole
8  patents that we identified earlier?
9      A.   I'm not sure if I did or did not.
10     MR. CHERNY:  Give me time to object.
11 Objection, vague.
12     Q.   You can answer.
13     MR. CHERNY:  I think he actually did,
14 as I was objecting.
15     MS. BERNIKER:  I must have missed it.
16     A.   I'm not sure whether -- you are
17 either quoting or paraphrasing testimony I may
18 or may not have given before, and I'm not sure
19 if your quoting or paraphrasing is accurate.
20 That's all I'm saying.
21     Q.   Was Dr. Fleischer your key contact in
22 the German patent office, with respect to --
23     A.   German patent department?
24     Q.   Excuse me, German patent department.

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212) 705-8585

Page 250

Alan Stempel

1
2   -- with respect to the application
3  that we are discussing, Exhibit 46?
4       MR. CHERNY: Objection, vague.
5       A.   What do you mean by "key contact"?
6       Q.   You communicated with him regularly
7  regarding filings for this patent, Exhibit 46,
8  correct?
9       MR. CHERNY: Objection, vague. Lacks
10  foundation.
11      A.   What do you mean by communicated
12  frequently regarding filings?
13      Q.   You sent him copies of office actions
14  that you received in this case, correct?
15      A.   Perhaps not directly.
16      Q.   When you were deciding how to respond
17  to office actions, you consulted with
18  Dr. Fleischer; is that correct?
19      A.   Correct.
20      Q.   Do you have an understanding as to
21  who drafted the document entitled Foreign Filing
22  Text that is marked Exhibit 52?
23      MR. CHERNY: Objection. Asked and
24  answered.
25      A.   You are talking about in German?

Page 251

Alan Stempel

1
2       Q.   Who drafted the text in German that
3  was later translated to English by the British
4  law firm?
5       A.   I have no firsthand knowledge as to
6  who drafted it in German.
7       Q.   If information was added in the
8  foreign filing text document that was not in the
9  original German applications, do you have an
10  understanding --
11      A.   Meaning essentially 53?
12      MR. CHERNY: I don't think -- don't
13  put words --
14      A.   Well, there were two German
15  priorities, and you really haven't --
16      Q.   Right. 53 is the first German
17  priority. Let's start with that.
18       If information has been added to
19  Exhibit 52, the foreign filing text, that was
20  not present in the first German priority
21  application, do you have an understanding of who
22  added that information?
23      A.   I have no --
24      MR. CHERNY: Please go.
25      THE WITNESS: I'm sorry.

Page 252

Alan Stempel

1
2       A.   I have no firsthand knowledge or
3  information respecting who may have added that
4  information.
5       MR. CHERNY: Again, objection,
6  foundation.
7       Q.   Do you have an understanding as to
8  who would have been involved in a decision to
9  add new text, if such new text was added?
10      A.   I --
11      MR. CHERNY: Objection. Please let
12  me have a chance.
13      THE WITNESS: I'm sorry, I'm sorry.
14      MR. CHERNY: I'm going to get even
15  angrier at you than she is.
16       Objection. Lack of foundation, and
17  asked and answered.
18      A.   I have no firsthand information about
19  who may have been involved with or responsible
20  for the additions.
21      Q.   Why are you limiting your answer to
22  firsthand information?
23      MR. CHERNY: Objection. Vague.
24       Are you asking him for secondhand
25  information?

Page 253

Alan Stempel

1
2       MS. BERNIKER: I'm asking him if he
3  has any information whatsoever.
4       A.   I have no specific information,
5  whether or not firsthand or secondhand, about
6  who added the information, the text.
7       Q.   If at some point during the
8  prosecution of the '947 application you had
9  become aware that the text we just discussed
10  regarding the definition of R1 and substituted
11  phenyl nuclei with halogen atoms, if you had
12  become aware that that text had been added and
13  that that text was not in either of the German
14  priority applications, would you have disclosed
15  that to the United States patent office?
16      MR. CHERNY: Objection. Incomplete
17  hypothetical, calls for speculation.
18       And Lack of foundation as well.
19      A.   With those as the facts and nothing
20  more, which I do not believe are necessarily the
21  facts in reality, I do not believe that I would
22  necessarily have done that; but that is
23  hypothetical, because those are not the facts.
24      Q.   Is it that those are not the facts,
25  or you don't know one way or the other, sitting

64 (Pages 250 to 253)

Page 254

Alan Stempel

1
2 here today, whether there was new matter added?
3    A.    You are posing facts that were not
4 the facts.
5        I would have dealt with the facts
6 that existed, and how I dealt with the facts
7 that existed 20 years ago, I do not recall.
8    Q.    Okay.  If you had learned that there
9 was new matter added regarding these halogenated
10 phenyl substituents while you were prosecuting
11 the '947 application, would you have discussed
12 this with anybody in Germany?
13        MR. CHERNY:  Objection, Lack of
14    foundation.  Objection to the
15    characterization and the legal conclusion.
16    Also incomplete hypothetical.
17    A.    You are discussing -- you are posing
18 a fact situation which I do not recall
19 corresponds to the fact situation that existed.
20        I do not recall precisely how I
21 responded at the time to the fact situation that
22 existed.
23    Q.    Was there ever a time during your
24 prosecution of patent applications in the 1985
25 to 1990 period where you began to have concerns

Page 255

Alan Stempel

1
2 about your ability to claim priority back to an
3 original application?
4    A.    I do not, 20 years, approximately
5 20 years later, have a specific recollection
6 whether or not I did or did not.
7    Q.    Was it your general practice, before
8 making representations to the United States
9 patent office in cases where you are dealing
10 with a foreign priority application -- a
11 counterpart to a foreign priority application,
12 was it your general practice in that time period
13 to discuss the substance of your representations
14 to the United States patent office with somebody
15 in Germany, before you made those
16 representations?
17        MR. CHERNY:  Can I have that read
18    back, please.
19        (Record read.)
20        MR. CHERNY:  Objection, vague.  Lack
21    of foundation.
22    A.    It would have been my practice to
23 discuss with my German counterpart or allow him
24 to review a draft response, before its filing.
25        Whether or not there was any specific

Page 256

Alan Stempel

1
2 discussion of the claim of priority here, I do
3 not recall.  I do not recall if there was or
4 there was not.
5    Q.    And just to be clear, with respect to
6 the '947 application, which is designated
7 Exhibit 46, the person you are referring to,
8 when you say "German counterpart," is that
9 Dr. Fleischer?
10    A.    Dr. Fleischer.
11    Q.    Is there anyone else at the German
12 patent office --
13    A.    But there -- if there was someone
14 else in the office with whom I was dealing about
15 this case, that statement would apply to them,
16 too, if I'm forgetting someone.
17    Q.    Do you have an understanding as to
18 whether Dr. Fleischer consulted with anyone else
19 in Germany, any of his colleagues in Germany,
20 regarding substantive filings with the United
21 States patent office that you were making, in
22 connection with the '947 application?
23        MR. CHERNY:  Objection, calls for
24    speculation.
25    A.    That's also a very long and complex

Page 257

Alan Stempel

1
2 sentence.  Read it back to me, please.
3    Q.    Do you have an understanding as to
4 whether Dr. Fleischer in Germany consulted with
5 anyone else in Germany, regarding substantive
6 filings with the United States patent office
7 that you were making, in connection with the
8 '947 application?
9        MR. CHERNY:  Objection, vague.
10    A.    I do not recall whether or not I was
11 informed if he consulted with anybody else or
12 not.
13    Q.    Do you know under what circumstances
14 he would generally consult with somebody else,
15 for example, one of his supervisors?
16        MR. CHERNY:  Objection.  Calls for
17    speculation.
18        Lack of foundation as well.
19    A.    I have no knowledge today, and I'm
20 not sure that I ever had any knowledge about
21 what would have caused Dr. Fleischer to consult
22 with another individual about this matter or
23 not.
24    Q.    Did you ever consult with
25 Mr. Frankhouser regarding this application, the

65 (Pages 254 to 257)

Page 258

Alan Stempel

1    '947 application?
2
3    A.   I have no specific recollection
4    whether I did or not.
5    Q.   Do you have a recollection about
6    whether you consulted with Dr. Fleischer or
7    Mr. Frankhouser regarding the applications
8    leading to either the '812 patent or the '086
9    patent?
10   A.   I have no recollection whether or not
11   I did.
12   Q.   Do you recall having conversations or
13   consultation with Ms. Devlin?
14        We are all clear, when I say Devlin,
15   I mean --
16   A.   Timbers, yes.
17        MR. CHERNY:  Timbers or Devlin,
18   that's fine.
19   Q.   Do you know whether you had any
20   conversations with Ms. Timbers regarding the
21   applications that either led to the '374 patent,
22   the '086 patent or '812 patent?
23        MR. CHERNY:  Objection, compound.
24   A.   I have no recollection whether or not
25   I consulted with Mrs. Devlin/Timbers about any

Page 259

Alan Stempel

1    of these three applications.
2
3    Q.   Do you recall discussing any of these
4    three applications with Mr. Herring?
5    A.   I have no recollection whether or not
6    I discussed any of these three with him as well.
7    Q.   So is it your recollection -- I just,
8    I want to make sure I have your testimony
9    correct -- that the only person you recall --
10   the only Boehringer Ingelheim family employee
11   that you recall discussing any of these
12   applications with is Dr. Fleischer?
13        MR. CHERNY:  Objection, lacks
14   foundation.  Mischaracterization.
15   Q.   And your clerical staff.
16        MR. CHERNY:  Same objections.
17   A.   I have no recollection about -- of
18   having discussed this case with persons -- I
19   have no specific recollection of having
20   discussed these three cases with persons other
21   than Dr. Fleischer, which is not to say that I
22   did not discuss the cases with somebody else.
23   Q.   Is Dr. Milnes still --
24   A.   Milnes, yes.
25   Q.   I'm sorry.

Page 260

Alan Stempel

1
2    A.   It's spelled Milnes, yes.
3    Q.   Is Dr. Milnes still with the
4    Boehringer Ingelheim companies?
5    A.   No.
6    Q.   Do you know his present location?
7    A.   No.
8        MR. CHERNY:  He answered your
9    question.
10   Q.   Do you know whether he's alive?
11   A.   Actually, no.
12        MS. BERNIKER:  I was just trying to
13   find a tactful of asking that.
14        MR. CHERNY:  Just ask it.
15   Q.   All right.  Turning back to
16   Exhibit 46, which is the United States file
17   history.
18        You can put the other exhibits aside
19   for a moment, to make your life easier.
20   A.   46, this sucker, okay.
21        MR. CHERNY:  Yes, sir.
22   A.   Okay.
23   Q.   If you would turn to the page
24   BARR 000274.
25        MR. CHERNY:  I'm sorry, what page are

Page 261

Alan Stempel

1
2    we at?
3        THE WITNESS:  274.  Should be the
4    beginning of --
5        MR. CHERNY:  I got it.
6    Q.   Can you identify this document for
7    me?
8        MR. CHERNY:  Read the document and I
9    guess say what it is.
10       And I assume, by "this document," you
11   mean going through 278?
12       MS. BERNIKER:  Yes.
13   A.   Okay.  Your question is, what is this
14   document?
15   Q.   Yes.
16   A.   It's an office action that was issued
17   by the U.S. PTO for the '947 application, on
18   September 11, '86.
19   Q.   And it was issued by Examiner
20   Ceperley?
21   A.   Ceperley, yes.
22   Q.   What was she telling you in this
23   office action?
24   A.   She was issuing what's called a
25   restriction requirement.

66 (Pages 258 to 261)

Page 262

Alan Stempel

1
2    Q.    And what is a restriction
3    requirement?
4    A.    I suppose the simplest way to put it
5    is that the examiner is saying, okay, look at --
6    by law, you are allowed to have one invention
7    that is the subject of your patent application.
8    You've got more than one invention.  She has
9    laid out, in Roman numerals I through X, what
10   the different inventions are, and she's saying,
11   pick one that is to be the subject of this
12   application that I'm going to examine.
13   Q.    What is your understanding of what
14   happens to the ones that you don't pick?
15          MR. CHERNY:  Objection.  Are you
16   talking about what happened here or what
17   happens on restriction requirements?
18          MS. BERNIKER:  Generally, with
19   restriction requirements.
20          MR. CHERNY:  Objection, calls for a
21   legal conclusion.  It's an incomplete
22   hypothetical as well.
23   A.    Well, an election is made.  That's
24   the "pick one."  And then you have the right,
25   though not the obligation, to pursue the

Page 263

Alan Stempel

1
2    non-elected subject matter in divisional
3    applications.
4    Q.    And directing you to the page that is
5    BARR 277.
6    A.    Okay.
7    Q.    At the second paragraph from the
8    bottom, is that where Examiner Ceperley tells
9    you, essentially, what your options are for your
10   election?
11          MR. CHERNY:  Which paragraph are you
12   talking about?
13          MS. BERNIKER:  The paragraph that's
14   second from the bottom on BARR 277.  It
15   begins "Applicants must elect."
16          MR. CHERNY:  You just want him to
17   read it?
18          MS. BERNIKER:  No, I'm asking him if
19   that's where she indicates to him what his
20   options are for electing subject matter.
21   A.    I think the paragraph speaks for
22   itself.
23   Q.    All right.  Well, let's look at what
24   the paragraph says.
25   A.    Okay.

Page 264

Alan Stempel

1
2    Q.    "Applicants must elect either A, one
3    of the compound groups, Roman numeral I through
4    V, and one of the utility groups, Roman numeral
5    VIII through X, composition and utility to be
6    limited to elected compound type for
7    examination; or B, one of the process groups,
8    Roman numeral VI and VII."
9           Did I read that correctly?
10   A.    Yes.
11   Q.    And looking back to pages BARR 275
12   and BARR 276 --
13          MR. CHERNY:  Yes.
14   A.    Okay.
15   Q.    -- is that where Examiner Ceperley
16   defined the various groups by Roman numerals?
17   A.    Yes.
18   Q.    Can you tell me what you understand
19   her to be instructing you, then, in that
20   paragraph that we just read on BARR 277?
21          MR. CHERNY:  Are you asking him what
22   he understood then or what he understands
23   now?
24   Q.    Let's start with what you understand
25   now.

Page 265

Alan Stempel

1
2    A.    Okay.  She's saying take one of the
3    groups 1 through 5, which are directed to or
4    define a subgenera of compounds; so elect one of
5    those.  In addition to electing one of those,
6    you can also elect one of the utilities or
7    methods of treatments from groups that are delineated by
8    groups 8 through 10 -- is that right?  Yeah.
9           So that's basically your first
10   choice.  And if you don't want to do that, you
11   can, instead, elect one of the processes of
12   groups, what do you call it, 9 or 11.
13   Q.    I'm sorry, did you mean 6 or 7?
14   A.    6 or 7, I'm sorry.
15   Q.    Is it your understanding that
16   Examiner Ceperley was telling you that you could
17   not proceed with a patent application that
18   included claims covering both compounds
19   described by formula 1 and compounds, for
20   example, compounds described -- I'm sorry, by
21   Roman numeral I and compounds described by Roman
22   numeral II, as an example?
23   A.    That's my present understanding of
24   what she's saying.
25   Q.    And just as another example, to be

67 (Pages 262 to 265)

Page 266

Alan Stempel

1
2    clear, that also means that you couldn't have --
3    essentially, you couldn't have more than one of
4    categories 1 through 5 in the same application,
5    correct?
6            MR. CHERNY: Objection, vague.
7        A.   Yeah, either restate it or rephrase
8    it. I'm not understanding what you are asking.
9        Q.   All right.
10           MS. BERNIKER: Actually, we should
11   probably stop for a minute so he could
12   change the tape.
13           THE VIDEOGRAPHER: The time is 6:20.
14   We are going off the record. And this
15   marks the end of Tape Number 3.
16           (Whereupon, there is a recess in the
17   proceedings.)
18           THE VIDEOGRAPHER: The time is 6:24.
19   We are back on the record, and this marks
20   the beginning of Tape Number 4.
21       Q.   All right, Mr. Stempel. Going back
22   to page BARR 275, is it your understanding that
23   an application containing claims -- and now I'm
24   going to read, summarize Roman numerals I
25   through V, so containing claims drawn to benzyl

Page 267

Alan Stempel

1
2    tetrahydro-benzthiazole compounds and a
3    pharmaceutical composition, that also contains
4    claims to pyrrolidinyl-substituted benzothiazole
5    compounds and a pharmaceutical composition, and
6    that also contains claims to
7    piperodinyl-substituted benzothiazole compounds
8    and pharmaceutical composition; and that also
9    contains claims to hexamethylamino-substituted
10   benzothiazole compounds and pharmaceutical
11   compositions; and that also contains claims to
12   morpholinyl-substituted benzothiazole compounds
13   and pharmaceutical compositions; that a patent
14   that contains claims to all of those would not
15   be consistent with Examiner Ceperley's
16   instruction for you to -- of a restriction that
17   is described in this document?
18           MR. CHERNY: Are you saying any
19   application or this application?
20           I'm really lost, when you say all
21   patents.
22       Q.   I'm saying that if you filed -- if
23   you proceeded with claims that met that
24   description, that had all five of those
25   compounds in them, that you would not be

Page 268

Alan Stempel

1
2    proceeding consistent with her instruction in
3    this office action.
4        A.   You know, I don't know how to
5    interpret that question.
6        Q.   What's unclear about the question?
7        A.   Well, at the very least, are we
8    talking about in this application, subsequent to
9    this restriction requirement?
10       Q.   Yes. Let's say that. Let's say that
11   if, in response to this restriction requirement,
12   you submitted claims that included all five of
13   those categories, that you would not be acting
14   consistent with her restriction requirement.
15       A.   And the claims that are not
16   consistent with the election are not withdrawn?
17       Q.   No, they are maintained.
18       A.   In this application, that would have
19   been inconsistent with her restriction -- with
20   the election --
21       Q.   Okay.
22       A.   -- if maintaining those claims.
23       Q.   And if you maintained claims to any
24   combination of more than one of those
25   categories, that would not be consistent with

Page 269

Alan Stempel

1
2    her requirement in this restriction requirement,
3    correct?
4        A.   In this application?
5        Q.   In this application.
6        A.   Yes.
7        Q.   And similarly, if we turn to the next
8    page, if you proceeded in this application with
9    claims drawn to methods of lowering blood
10   pressure or heart rate and claims to methods of
11   treating Parkinsonism and claims to methods of
12   treating schizophrenia, if you proceeded with
13   all three of those claims in this application,
14   and you didn't withdraw them, that that action
15   would not be consistent with her instruction on
16   the following page and her restriction
17   requirement?
18       A.   I believe that's correct.
19       Q.   And in fact, if you proceeded with
20   any more than one of those three categories,
21   lowering blood pressure or heart rate being one
22   category, Parkinsonism being another category
23   and schizophrenia being a third category, if you
24   proceeded with any more than one of those in the
25   same application --

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212) 705-8585

Page 270

Alan Stempel

1      MR. CHERNY: In this application?
2      Q.   In this application, with any more
3  than one of those categories of claims, you
4  would not be acting consistent with her
5  restriction requirement; is that correct?
6      A.   This is hypothetically?
7      Q.   Yes.
8      A.   I believe that's correct.
9      MR. CHERNY: Of course, if you feel
10     like you want to read the application, feel
11     free to do so.
12     A.   Give me a few seconds, please.
13     Q.   Let me be clear. I'm not
14  representing to you that you did that in this
15  application. I'm just asking you to be clear
16  about your interpretation of her restriction
17  requirement.
18     A.   Okay.
19     Q.   And one more question about that,
20  which is: Is this consistent with your
21  understanding of the restriction requirement,
22  when you first read it approximately in 1986?
23     MR. CHERNY: So you are asking for
24     his '86 recollection?

Page 271

Alan Stempel

1      MS. BERNIKER: Yes.
2      A.   I'm not going to guess -- I have no
3  remembrance of what I thought in 1986. I'm not
4  going to guess at what I thought in 1986.
5      Q.   You understand this to be the plain
6  meaning of the restriction requirement?
7      MR. CHERNY: Objection, vague.
8      Do you have the question in mind?
9      THE WITNESS: Give me a second,
10     please.
11     Q.   The restriction requirement is on
12  page 275, if that's what you are looking for.
13     MR. CHERNY: He understands. He's
14     obviously looking at the rest of the
15     application.
16     A.   I notice that the claims in this case
17  were limited to the election, so --
18     MR. CHERNY: What was the question
19     again?
20     A.   What is your question?
21     Q.   I believe my question is whether your
22  testimony regarding what you understand this
23  restriction requirement to require --
24     A.   My present understanding?

Page 272

Alan Stempel

1      Q.   My question -- originally we talked
2  about your present understanding, and then I
3  asked you whether there is -- what your
4  understanding was in 1986.
5      A.   I do not recall what my understanding
6  was, and I'm not going to guess at what my
7  understanding was 20 years ago.
8      Q.   Do you have any reason to believe
9  that your understanding would have been
10  different at that time?
11     MR. CHERNY: Objection, calls for
12     speculation.
13     A.   I have no reason for believing it
14  would have been different.
15     Q.   Sitting here today, is there anything
16  about this restriction requirement that you find
17  unclear?
18     A.   No.
19     Q.   Is there anything about this
20  restriction requirement that you find ambiguous?
21     A.   What was your question?
22     Q.   Whether there was anything about this
23  restriction requirement that you find ambiguous,
24  sitting here today.

Page 273

Alan Stempel

1      A.   No.
2      Q.   Turning to the next page --
3      A.   Of?
4      Q.   -- of this document, BARR --
5      MR. CHERNY: 278?
6      Q.   Page 279, actually, if you could turn
7  to that.
8      A.   Okay.
9      Q.   If you could just describe that
10  document for me.
11     MR. CHERNY: Just the document on
12     page 279?
13     MS. BERNIKER: Just the document on
14     279.
15     MR. CHERNY: Okay.
16     A.   This appears to be my response to the
17  office action that appears on page -- on
18  BARR 274.
19     Q.   And you responded by making an
20  election; is that correct?
21     A.   Yes.
22     Q.   And you elected invention -- I'm
23  sorry, you elected to prosecute claims directed
24  to the invention of group 2, the

69 (Pages 270 to 273)

Page 274

Alan Stempel

1
2  pyrrolidinyl-substituted benzylthiazole, and to
3  the invention group 9, a method of treating
4  Parkinsonism; is that correct?
5      A.   That's what the document says.
6      Q.   And as I believe you just testified a
7  minute ago, you believe that that election is
8  consistent with the restriction requirement that
9  the examiner required, correct?
10     MR. CHERNY:  Are you saying that he
11 testified to that?
12     MS. BERNIKER:  I think he did.
13     Q.   Please correct me, if I'm wrong.
14     A.   I believe that it was a possible
15 election, as the restriction requirement was
16 laid out in the office action of September 11th,
17 '86.
18     Q.   Why did you make that election?
19         Why did you select those --
20     A.   Are you asking why if I know today
21 why, 20 years ago, I made that particular
22 election?
23     Q.   Yes.
24     A.   I don't know today.  I don't recall
25 today, why that election, as opposed to other

Page 275

Alan Stempel

1
2  possible elections, why that particular election
3  was the election made.
4      Q.   Do you know whether, at the time, you
5  and your colleagues believed that
6  pyrrolidino-substituted benzylthiazoles were
7  better than some of the other compounds
8  included?
9      MR. CHERNY:  Objection, vague.  Lack
10 of foundation.  Calls for speculation.
11     And to the extent that Ms. Berniker's
12 question requires you to disclose any
13 privileged communications between you and
14 your colleagues, as phrased, please don't
15 do so.
16     A.   Today, 20 years later, I have no
17 recollection which would allow me to understand
18 why this election was made, as opposed to any
19 other possible election.
20     Q.   With whom would you have discussed
21 the election, before you submitted it to the
22 patent office?
23     A.   Are you saying who -- with whom did I
24 discuss the election or with whom was I most
25 likely to have discussed the election?

Page 276

Alan Stempel

1
2      Q.   Let's start with with whom did you
3  discuss the election.
4      A.   I have no recollection as to with
5  whom I did discuss the election.
6      Q.   With whom were you likely to have
7  discussed the election?
8      MR. CHERNY:  Objection, vague.  Calls
9  for speculation.
10     A.   I may have discussed the election
11 with Dr. Fleischer, but I cannot rule out,
12 20 years later, that it was discussed with some
13 other patent colleague.
14     Q.   Okay.  Turning to page BARR 280, the
15 next page.
16     Is that the subsequent office action
17 that describes that you withdrew certain claims,
18 particularly claims 6, 7, 9, 10, 13 through 15,
19 that claims 4 and 5 had been allowed and that
20 claims 1 through 3, 8, 11 and 12 had been
21 rejected?
22     MR. CHERNY:  I'm not sure what the
23 question is.  Are you just asking him if
24 that's what it says?
25     MS. BERNIKER:  I'm asking him if

Page 277

Alan Stempel

1
2  that's what it says, if that's what it is,
3  an office action that describes what I just
4  indicated.
5      A.   It's an office action.  I think it
6  speaks for itself as to what is allowed and what
7  is withdrawn, yes.
8      Q.   Do you believe that my
9  characterization was inaccurate?
10     A.   I think your characterization is
11 accurate.
12     Q.   Okay.  And this office action was
13 mailed on December 12, 1986; is that correct?
14     A.   That's what the document says.
15     Q.   Okay.  Turning to page that begins
16 BARR 304, do you see that document?
17     It's dated April 16, 1987; is that
18 right?
19     A.   Uh-hum.
20     Q.   And it bears your signature at the
21 bottom right?
22     A.   Uh-hum.
23     Q.   And in that document you are
24 transmitting an amendment to this application?
25     A.   Uh-hum.

70 (Pages 274 to 277)

Page 278

Alan Stempel

1
2  Q.   And then on the next page, the
3  amendment begins?
4  A.   Yup.
5  Q.   And it continues from BARR 305
6  through BARR 310?
7  A.   Yes.
8  Q.   And in these amendments, what you are
9  doing, essentially, is excluding the
10  restricted-out subject matter that you had not
11  elected, i.e., the piperodino,
12  hexamethyleneimino and morpholino-substituted
13  benzthiazoles?
14  MR. CHERNY:  Read the document.
15  Objection, vague as well.
16  While he's reading that, is it
17  possible to have the question read back?
18  (Record read.)
19  A.   Read your question again, please.
20  Q.   In these amendments what you were
21  doing, essentially, is excluding the
22  restricted-out subject matter that you had not
23  elected, i.e. the piperodino, hexamethyleneimino
24  and morpholino-substituted benzthiazoles,
25  correct?

Page 279

Alan Stempel

1
2  A.   Are you using the word "essentially"
3  the way patent attorneys use the word
4  essentially?
5  MR. CHERNY:  I'm not sure I know what
6  that means.
7  Q.   I wanted to make it not the exclusion
8  of other amendments, but let's just be clear.
9  In these amendments, at least one of
10  the things you were doing is excluding the
11  restricted subject matter that you have not
12  elected, meaning where R3 and R4 are defined
13  together with a nitrogen atom to form something
14  other than a pyrrolidino group.  Previously you
15  had had claims that included piperodino,
16  hexamethyleneimino and morpholino-substituted
17  benzthiazoles groups, and those three you have
18  excluded from the claims in this amendment; is
19  that correct?
20  A.   I think that's correct.
21  Q.   Okay.  I'd like to hand you what's
22  been previously marked Barr Exhibit 18, and this
23  time it actually has a sticker on it.
24  MR. CHERNY:  That's actually kind of
25  interesting.  This is from Schneider as

Page 280

Alan Stempel

1
2  well?
3  MS. BERNIKER:  What was that?
4  MR. CHERNY:  This is from Schneider
5  as well?
6  MS. BERNIKER:  We had depositions
7  before Schneider as well.
8  MR. CHERNY:  That's what I was
9  asking.
10  Q.   Exhibit 18, which I have just handed
11  you, you've seen this document before, sir?
12  MR. CHERNY:  Obviously, take a look
13  at it, before you answer the question.
14  (Witness reviews document.)
15  MR. CHERNY:  I think she just wants
16  to know if you recognize this document.
17  THE WITNESS:  Well, that really
18  wasn't her question.
19  MR. CHERNY:  Okay.
20  THE WITNESS:  The question is have I
21  seen it before.
22  MR. CHERNY:  I apologize.
23  A.   I can tell you I don't recognize it,
24  but that's not the same thing as have I seen it
25  before.

Page 281

Alan Stempel

1
2  Q.   You don't recognize it, is that what
3  you just said?
4  A.   Do I recognize it, no.  But that
5  doesn't -- but your question was, have I seen it
6  before.
7  MR. CHERNY:  I apologize.  I was
8  trying to short-circuit it.
9  MS. BERNIKER:  No, that's fine.
10  Q.   Let me hand you another exhibit, and
11  then we can talk about them at the same time.
12  A.   Okay, go ahead.
13  Q.   This is Barr 22, also previously
14  marked.
15  Do you recognize that document?
16  A.   Okay, what was your question again?
17  Q.   Do you recognize Barr 22, the second
18  exhibit that I handed you?
19  A.   What do you mean by "recognize"?
20  Q.   Do you recall having seen that
21  document before?
22  A.   I do not recall having seen it
23  before.
24  Q.   Both of those documents are patent
25  applications filed on behalf of Eli Lilly; is

71 (Pages 278 to 281)

Page 282

Alan Stempel

1    that your understanding?
2        A.    That's my understanding.
3        Q.    And the first one marked BARR 18 was
4    filed in the United States --
5        A.    Yes.
6        Q.    -- on June 24th, 1985?
7            MR. CHERNY:  Objection.  I mean I
8        don't know what he can add.  I mean you are
9        asking him just to read it?
10           MS. BERNIKER:  I'm asking him to
11       confirm this information.
12       A.    To the extent that I can read what's
13   on the face of this, that's what looks to be,
14   the date, but I can barely read the date.
15       Q.    All right.  Well, let's make this
16   easier.  Why don't you turn to page -- in
17   Exhibit 46 --
18           MR. CHERNY:  The application?
19           MS. BERNIKER:  The application.
20       A.    Okay.
21       Q.    Why don't you turn to page BARR 349.
22       A.    Okay.
23       Q.    Do you see that?
24       A.    Yup.

Page 283

Alan Stempel

1        Q.    That's a supplemental information
2    disclosure statement that you filed; and if you
3    turn to the next page, it has your signature and
4    it's dated March 1st, 1988 --
5        A.    Uh-hum.
6        Q.    -- is that right?
7        A.    Uh-hum.
8        Q.    In this information disclosure
9    statement you disclose to the patent office the
10   existence of U.S. patent application serial
11   number 747748 filed on June 24th, 1985?
12       A.    Yes.
13       Q.    And it's for an equivalent European
14   application number 207696, which published on
15   July 1, 1987; is that right?
16           That's what the document says?
17       A.    That's what the first paragraph of
18   the document says, yes.
19       Q.    Okay.  And then following the two
20   pages of your information disclosure statement
21   there's another document on page 351.  And then
22   after that you see what I believe is the
23   equivalent of what I've handed you, which is
24   Barr 18.

Page 284

Alan Stempel

1        A.    Okay.
2        Q.    Does that --
3            MR. CHERNY:  I mean we will take your
4        word for it.  If you are saying it's the
5        same document, we will take your word for
6        it.
7        Q.    The same document.  In fact we can
8    consider it from the file history, and we'll
9    just talk about it.
10           MR. CHERNY:  If you say it's the same
11       I'm happy to allow it.
12       Q.    Does that refresh your recollection,
13   sir, that you have seen this document before?
14       A.    Well, clearly I have.
15       Q.    Because you wrote about it to the
16   patent office.
17       A.    Right.
18       Q.    And --
19       A.    Are you asking if I recall having
20   seen this document?
21       Q.    Yes, that's what I'm asking.
22       A.    Before you showed me this?  No.
23       Q.    Right, but now --
24       A.    But I know I saw it 20 years ago,

Page 285

Alan Stempel

1    don't I?
2        Q.    Okay.  And before you filed a
3    disclosure of it to the patent office, you would
4    have read it, correct?
5        A.    Would I have read it?  I would
6    have -- I would have -- if I'm citing it to the
7    patent office, I would have considered why I'm
8    citing it to the patent office.  20 years later
9    I don't know what I did or did not do to reach
10   the conclusion that I should cite it to the
11   patent office.  I don't know that I read it, I
12   don't know that I didn't read it.
13       Q.    Okay.  Well, let's look at what you
14   said on page BARR 349.
15           Do you want to take a minute to look
16   at it?
17       A.    Sure.
18       Q.    Okay.
19           MR. CHERNY:  I certainly don't
20       object.
21           Do you want to pose a question to him
22       to consider while he's reading it, if that
23       will speed things up?
24       Q.    My first question for you is, why did

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212) 705-8585

Page 286

Alan Stempel

1  you disclose these two documents to the patent
2  office?
3
4        MR. CHERNY:  The "two documents"
5  being the American and the European?
6        Q.    And just for clarification, European
7  is also in the file history, starting at page
8  BARR 379.
9        A.    I think I have explained the reason,
10 or reasons, on BARR 349 and 350.
11       Q.    Did you believe this to be material
12 information for the patent examiner to know?
13       A.    Are you asking me what I believed
14 20 years ago?
15       Q.    Yeah, I'm asking what you believed
16 20 years ago.
17       A.    I don't know what I believed 20 years
18 ago.
19       Q.    Is it your -- was it generally your
20 practice, between 19 --
21       A.    Certainly I don't recall what I
22 believed 20 years ago.
23       Q.    Was it generally your practice,
24 between 1985 and 1990, to disclose references to
25 the patent office that you did not believe were

Page 287

Alan Stempel

1
2  material?
3        MR. CHERNY:  Objection, vague.  Lack
4  of foundation.
5        A.    It is my practice to disclose to the
6  patent office any information, references or any
7  other information which I either believed were
8  or are material or, in an overabundance of
9  caution, which anyone might colorably believe
10 are, even though I don't.
11       Q.    Sitting here --
12       A.    In other words, I resolved that if
13 there was any doubt as to the materiality, I
14 resolved it in favor of citing it.
15       Q.    Do you know when you first became
16 aware of these patent applications, which, for
17 convenience, I'd like to refer to as the Lilly
18 applications, if that's fine.
19       A.    That's fine.
20       Do I know when?
21       Q.    Uh-hum.
22       A.    I do not today recall when I became
23 aware of them.
24       Q.    Do you know how you became aware of
25 them?

Page 288

Alan Stempel

1        A.    I do not today recall how I became
2  aware of them.
3
4        Q.    Do you know how you acquired a copy
5  of the United States application?
6        MR. CHERNY:  Exhibit 18.
7        Q.    Exhibit 18, that's also -- right,
8  Exhibit 18.
9        A.    I don't recall today how I came to
10 have a copy of that U.S. application.
11       Q.    Do you remember having discussions
12 with Rolf Fleischer about these applications?
13       A.    I do not today recall having had a
14 specific discussion with him about the Lilly
15 references.
16       MR. CHERNY:  Obviously, I caution
17 you, to the extent that Ms. Berniker asks
18 you a question that would require you to
19 disclose a privileged communication, please
20 don't do so.
21       Q.    Do you recall having discussions with
22 anyone else about the Lilly applications?
23       A.    I do not today recall any discussions
24 with anybody, taking place 20 years ago, about
25 the Lilly references.

Page 289

Alan Stempel

1
2        Q.    Let me just do one other thing, for
3  purposes of the record.
4        On BARR 316, which is earlier in the
5  file history --
6        MR. CHERNY:  That's -- didn't sound
7  like you were asking a question, sounded
8  like you were just making a statement.
9        MS. BERNIKER:  I was just waiting
10 until he got to the right page.
11       Q.    That's a notice of allowability,
12 correct, issued by the patent office?
13       A.    That's correct.
14       Q.    And there the examiner is telling you
15 that the claims that were currently pending were
16 allowed?
17       A.    Uh-hum.
18       Q.    And that -- you received that
19 document from the patent office before you
20 submitted the supplemental information
21 disclosure, disclosing Lilly that we just
22 discussed?
23       A.    Uh-hum.
24       Q.    Okay.
25       MS. BERNIKER:  Just one second.  How

73 (Pages 286 to 289)

Page 290

Alan Stempel

1    much time is there?
2        THE VIDEOGRAPHER:  There's about
3    20 minutes left.
4        MR. CHERNY:  I'm sorry, I didn't
5    hear.
6        THE VIDEOGRAPHER:  20 minutes.
7    Q.    I'd like to turn back for a moment to
8    the '812 patent, which is Exhibit 3.
9        MR. CHERNY:  That's the '374, the
10    '086 -- I just don't know if we have a copy
11    of it handy.
12    A.    Got it.
13    Q.    In case there's any doubt, the
14    Exhibit 3 that you are looking at is a certified
15    copy of the '812 patent that you prosecuted.
16    A.    Okay.
17    Q.    And you were the main attorney
18    responsible for prosecuting this application in
19    the United States?
20    A.    Is that a question or a statement?
21    Q.    That's a question.
22    A.    Yes.
23    Q.    I'd like you to turn to the claims,
24    starting in column 23.
25

Page 291

Alan Stempel

1    A.    Oh, column 23, okay.
2    Q.    Yes.
3    A.    Okay, yes.
4    Q.    Looking at claim 1.  In claim 1, R1
5    is defined so that it could include, and I'm
6    just going to read a part of it, so that we
7    don't -- so that it could include a phenyl alkyl
8    or a phenyl alkyl group having one to three
9    carbon atoms in the alkyl part, wherein the
10    above-mentioned phenyl nuclei may be substituted
11    by 1 or 2 halogen atoms; is that right?
12    A.    Okay.
13    Q.    And if you look for a moment to R3
14    and R4.  "R3 and R4," it says, "together with a
15    nitrogen atom between them, form a piperodino,
16    hexamethyleneimino or morpholino group; or, an
17    acid addition salt thereof."
18        Is that correct, did I read that
19    properly?
20    A.    Okay.
21    Q.    And claim 2 is dependent from
22    claim 1?
23    A.    Yes.
24    Q.    And it just defines where the amine
25

Page 292

Alan Stempel

1    that attaches to the benzene portion of the
2    ring, that it needs to be located at the 5 or 6
3    position; is that correct?
4    A.    Okay.
5    Q.    So otherwise, R1 has the same
6    definition as included in claim 1?
7    A.    Yes.
8        MR. CHERNY:  Okay.  I just want to
9    make sure -- you answered the question
10    already.
11    Q.    I didn't mean to suggest, by
12    otherwise, that that modified R1.
13        And then with respect to R3 and 4,
14    they are both still defined in the same way as
15    they are defined in claim 1?
16        MR. CHERNY:  You are talking about
17    dependent claim --
18    Q.    In dependent claim 2, is that right?
19    There's no modification to the definition, where
20    it says R3 and R4 together; is that correct?
21    A.    Correct.
22    Q.    And if you look at claim 3, it
23    provides formula 1A.  Do you see that?
24    A.    Yes.
25

Page 293

Alan Stempel

1    Q.    And in formula 1A in claim 3, R1 can
2    be, among other things, 2-chloro-benzyl,
3    4-chloro-benzyl or 3,4 dichloro-benzyl.
4        Do you see that?
5    A.    Uh-hum, uh-hum.
6    Q.    And R3 and R4 in that claim, together
7    with a nitrogen atom between them, form a
8    piperodino, hexamethylamino or a morpholino
9    group; or a pharmaceutically acceptable acid
10    addition salt thereof.
11        Do you see that?
12    A.    I see that, okay.
13    Q.    And then claim 4, again, independent
14    of claim 3, but please confirm that the
15    definition of R1 is not modified, it's the same
16    as in claim 3.
17    A.    Okay.
18    Q.    And that R3 and R4 can also be the
19    same as in claim 3?
20    A.    Okay.
21    Q.    Turning back to Exhibit 46 that we
22    just discussed.
23        MR. CHERNY:  That's it, there are no
24    other questions?
25

74 (Pages 290 to 293)

Page 294

Alan Stempel

1
2     MS. BERNIKER: What do you mean, "no
3  other questions"?
4     MR. CHERNY: I just want to make sure
5  we are done with '812.
6     MS. BERNIKER: We are not.
7     MR. CHERNY: Okay, I'm sorry.
8     Q.   Turning back to Exhibit 46. Can you
9  turn back to the restriction requirement that
10  begins on page BARR 274?
11     A.   Okay.
12     Q.   Are claims 1, 2, 3 and 4 that we just
13  discussed consistent with what the examiner told
14  you to do? Recognizing it's in a different
15  patent application, but is it consistent with
16  what the examiner told you in this restriction
17  requirement?
18     MR. CHERNY: Objection. Vague. Lack
19  of foundation. Calls for a legal
20  conclusion.
21     You might as well just read back the
22  question, so we have it fresh in our minds.
23     MS. BERNIKER: Do you mind reading
24  it.
25     (Record read.)

Page 295

Alan Stempel

1
2     A.   I'm not sure I know how to interpret
3  that question.
4     Q.   Can you tell me what's unclear about
5  the question?
6     Let me try again.
7     A.   Okay, go ahead.
8     Q.   Looking at claim 1 of the '812
9  patent.
10     A.   Okay.
11     Q.   You have that in front of you?
12     A.   Yeah.
13     Q.   Okay. Now -- actually, let me start
14  with page 275 -- I'm sorry -- of the
15  application. It's probably helpful to have them
16  side by side.
17     A.   Okay, uh-hum.
18     Q.   In the restriction requirement, the
19  examiner told you that you needed to select one
20  of the compound groups 1 through 5, Roman
21  numeral I through V, that are shown on page 275,
22  right?
23     A.   Uh-hum, uh-hum.
24     Q.   And she said that you can't have more
25  than one in the same application, correct?

Page 296

Alan Stempel

1
2     MR. CHERNY: She said that you can't
3  have one in the same application or in that
4  application?
5     A.   She didn't say that. She said you
6  had to elect.
7     Q.   You have to pick one.
8     A.   Okay.
9     Q.   And that if you have more than one in
10  the same application, that's not consistent with
11  her statement that you have to elect one,
12  correct?
13     MR. CHERNY: Objection,
14  mischaracterizes.
15     A.   Did she say that? I don't think she
16  said that.
17     Q.   Well, what do you read the sentence
18  to mean, "Applicants must elect either A, one of
19  the compound group, 1 through 5, and one of the
20  utility groups, 8 through 10; or B, one of the
21  process groups, 6 and 7"?
22     A.   It means that you have to make an
23  election as she's delineated, which was done in
24  that application.
25     Q.   And all I'm asking you, and I

Page 297

Alan Stempel

1
2  understand that this is a different application,
3  is that if you were -- well, actually let me --
4  hang on a second.
5     Okay, let's simplify.
6     Claim 1 of the '812 patent. If you
7  had filed that in this application, in response to this election
8  application, in response to this election
9  requirement, in response to the restriction
10  requirement, if you had amended your claims and
11  provided claim 1, as written in the '812 patent,
12  would have that been consistent with the
13  restriction requirement that the examiner
14  issued?
15     MR. CHERNY: Objection, incomplete
16  hypothetical.
17     A.   Are you saying that the examiner in
18  the '974 application, are you asking if I
19  believe the examiner in the '974 application was
20  asking me to make an election in the --
21     MR. CHERNY: Well, it's '947, just
22  for accuracy.
23     A.   -- in the '671 application, is that
24  what you are asking?
25     Q.   No, I'm not asking that, but let's

75 (Pages 294 to 297)