IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BOEHRINGER INGELHEIM INTERNATIONAL ) 
GMBH and BOEHRINGER INGELHEIM )     C.A. No. 05-700 (***)
PHARMACEUTICALS, INC., )
                Plaintiffs, )
    v. )
                    )    **Redacted Version -**
BARR LABORATORIES, INC. )    **Publicly Filed**
               Defendant. )
                    )

**OPENING BRIEF IN SUPPORT OF DEFENDANT BARR LABORATORIES, INC.'S
MOTION FOR *IN CAMERA* INSPECTION AND TO COMPEL PRODUCTION OF
<u>DOCUMENTS PURSUANT TO THE CRIME-FRAUD EXCEPTION</u>**

YOUNG CONAWAY STARGATT &
  TAYLOR, LLP
Josy W. Ingersoll (#1088)
John W. Shaw (#3362)
Adam W. Poff (#3990)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
(302) 571-6600
*Attorneys for Defendant Barr Laboratories,
Inc.*

OF COUNSEL:
Glenn J. Pfadenhauer
Jessamyn S. Berniker
Dov P. Grossman
Brett R. Tobin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000

Dated: May 7, 2007

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................... iii

INTRODUCTION ............................................................................................................... 1

STATEMENT OF NATURE AND STAGE OF THE PROCEEDINGS ...................................... 3

SUMMARY OF ARGUMENT ............................................................................................. 3

LEGAL STANDARD FOR *IN CAMERA* REVIEW AND THE CRIME-FRAUD
      EXCEPTION ................................................................................................... 5

STATEMENT OF FACTS .................................................................................................. 6

    A.    The '812 Patent Contains New Matter that Is Not Supported by Its
        German Priority Applications. ......................................................................... 7

    B.    Dr. Fleischer Adds New Material to the U.S. Application that Is Not
        Disclosed in the German Applications. .......................................................... 10

    C.    The Eli Lilly Applications and Boehringer's Misrepresentation
        Regarding Boehringer's Effective Filing Date. ............................................. 12

    D.    Boehringer's Privilege Log Indicates that Other Individuals May Have
        Been Involved in Perpetrating the Fraud. ..................................................... 15

    E.    Relying on Boehringer's Misrepresentations, the USPTO Issues the
        '812 Patent. ................................................................................................... 18

ARGUMENT ...................................................................................................................... 20

    A.    Boehringer's Misrepresentation Concerning Its Effective Filing Date
        Was Material. ................................................................................................. 20

    B.    Dr. Fleischer Acted With Intent to Deceive. ................................................. 21

    C.    Reliance on Boehringer's Misstatement. ...................................................... 22

    D.    Numerous Attorneys and Executives Focused on the Eli Lilly
        Reference Before the IDS was Filed. ........................................................... 23

    E.    In Light of the Evidence, *In Camera* Review Is Appropriate. ...................... 24

    F.    The Documents Proposed for *In Camera* Review. ....................................... 26

CONCLUSION ................................................................................................................... 26

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Bulk Lift International, Inc. v. Flexcon & Systems, Inc.*,
122 F.R.D. 482 (W.D. La.), aff'd, 122 F.R.D. 493 (W.D. La. 1988)............................................26

*For Your Ease Only, Inc. v. Calgon Carbon Corp.*,
No. 02 C 7345, 2003 WL 22889442 (N.D. Ill. Dec. 5, 2003) ....................................................6, 25

*In re Gosteli*,
872 F.2d 1008 (Fed. Cir. 1989)..................................................................................................9, 14

*In re Grand Jury Investigation*,
445 F.3d 266 (3d Cir.), cert. denied, 127 S.Ct. 538 (2006) ..........................................................24

*In re Grand Jury Proceedings*,
417 F.3d 18 (1st Cir. 2005), cert. denied, 546 U.S. 1088 (2006) .................................................25

*Haines v. Liggett Group, Inc.*,
975 F.2d 81 (3d Cir. 1992)......................................................................................................24, 25

*Li Second Family Limited Partnership v. Toshiba Corp.*,
231 F.3d 1373 (Fed. Cir. 2000)..........................................................................................4, 6, 21

*Scott v. Koyama*,
281 F.3d 1243 (Fed. Cir. 2002)......................................................................................................19

*In re Spalding Sports Worldwide, Inc.*,
203 F.3d 800 (Fed. Cir. 2000).........................................................................................................5

*Union Carbide Corp. v. Dow Chemical Co.*,
619 F. Supp. 1036 (D. Del. 1985)............................................................................................*passim*

*United States v. Zolin*,
491 U.S. 554 (1989)..............................................................................................................5, 6, 24

*General Electric Co. v. Hoechst Celanese Corp.*,
No. 87-458-JRR, 1990 WL 154218 (D. Del. May 8, 1990) ..........................................................24

*Ralston Purina Co. v. Griffith Laboratories., Inc.*,
No. 8 1988 WL 121601 (N.D. Ill. Nov. 9, 1988)..........................................................................25

## FEDERAL STATUTES & REGULATIONS

21 U.S.C. § 355 .................................................................................................................3

35 U.S.C. § 102(g) ....................................................................................................18, 20

35 U.S.C. § 119.............................................................................................................9, 19

35 U.S.C. § 271(e) ...........................................................................................................3

37 C.F.R. § 1.55 ...............................................................................................................19

## MISCELLANEOUS

Manual of Patent Examining Procedure § 2303 (1988)) ...............................................18

## INTRODUCTION

Representatives of Plaintiffs Boehringer Ingelheim International GmbH and Boehringer Ingelheim Pharmaceuticals, Inc. (collectively "Plaintiffs" or "Boehringer") knowingly and intentionally misrepresented to the United States Patent & Trademark Office ("USPTO") that the patent application which matured into the patent-in-suit was entitled to a much earlier effective filing date than the law allowed. Their motive: to overcome an earlier-filed application by Eli Lilly & Company directed to overlapping matter.

Dr. Rolf Fleischer—a patent agent in Boehringer's German patent department and the individual responsible for overseeing worldwide prosecution of the patent family at issue— added new subject matter to Boehringer's U.S. application that was neither described in nor supported by Boehringer's foreign priority applications. As a result of that addition, the U.S. application was not entitled to "priority" to those earlier filed German counterparts. Yet despite having knowledge of the modification, Dr. Fleischer reviewed and allowed submission of an Information Disclosure Statement to the USPTO containing the materially and demonstrably false assertion that Boehringer's application was entitled to the effective filing date of its first priority application filed in Germany. That false statement was submitted only after Boehringer had spent months considering and communicating with outside counsel about how best to handle the threat of the Eli Lilly application, and was made to avoid having the examiner declare an interference with Eli Lilly. Boehringer's deception was successful. It obtained the patent-in-suit and improperly avoided an interference that would have demonstrated Eli Lilly's earlier invention of the claimed subject matter, which, in turn, would have prevented Boehringer from obtaining some, if not all, of the claims in the patent-in-suit and at issue here.

Plaintiffs have been unable to conceal the inequitable conduct and fraud committed by Dr. Fleischer. But Plaintiffs have attempted to hide the involvement of others in

the deception.

# REDACTED

In fact, Boehringer's 30(b)(6) witness testified that one of the documents on Boehringer's privilege log is a document prepared by outside counsel prior to submission of the Information Disclosure Statement and which discusses what steps were taken to determine the accuracy of the statements in the Information Disclosure Statement that fraudulently claimed priority and avoided the interference with Eli Lilly.

In light of Boehringer's demonstrable misconduct, it cannot hide behind the privilege to protect communications that relate to how Boehringer planned to deal with the Eli Lilly reference—*i.e.*, communications in furtherance of the fraudulent Information Disclosure Statement. Defendant Barr Laboratories, Inc. ("Barr") therefore respectfully moves this Court to conduct an *in camera* review of the allegedly privileged documents on Boehringer's log that were prepared between the discovery of the Eli Lilly applications (February 2, 1987) and the issuance of U.S. Patent No. 4,886,812 ("the '812 patent") (December 12, 1989) to evaluate whether they reveal evidence demonstrating the applicability of the crime-fraud exception.[1]  If this Court determines that the crime-fraud exception applies to such documents, Barr respectfully requests that this Court compel their production.

---

[1] For the Court's convenience, the entries in Boehringer's privilege log between February 2, 1987 and December 18, 1989 are excerpted in chronological order in Exhibit A.  A complete copy of Boehringer's privilege log is attached as Exhibit 100.

2

## STATEMENT OF NATURE AND STAGE OF THE PROCEEDINGS

This is a patent infringement action under the Hatch-Waxman Act. *See* 21 U.S.C. § 355 and 35 U.S.C. § 271(e). Plaintiffs commenced this lawsuit after Barr submitted an Abbreviated New Drug Application ("ANDA") and an amendment thereto seeking approval from the FDA to market and sell generic equivalents of pramipexole dihydrochloride tablets. Plaintiffs have alleged that Barr's proposed generic products would infringe the '812 patent.[2] Fact discovery has closed and the parties are engaged in expert discovery.

Barr respectfully submits this brief in support of its Motion for *in camera* inspection and to compel production, pursuant to the crime-fraud exception, of certain documents that Plaintiffs have withheld on privilege grounds.

## SUMMARY OF ARGUMENT

1.      Barr satisfies the showing necessary for *in camera* review of these materials to determine whether they support piercing the privilege pursuant to the crime-fraud exception. In fact, Barr contends that it already satisfies the elements of the crime-fraud exception's higher standard.

2.      Boehringer's U.S. application contained claims to subject matter that was neither disclosed nor described in its earlier German priority applications. In spite of that knowledge, Boehringer misrepresented the U.S. application's effective filing date to avoid an interference[3] with the admittedly overlapping Eli Lilly patent application that had been filed in the period between the filing of Boehringer's German and U.S. applications. That misrepresentation far exceeds the materiality requirement for the crime-fraud exception that "the

---

[2] Plaintiffs sued on a second patent, but that patent has since expired.

[3] An interference is a USPTO proceeding to resolve conflicting claims to priority of invention.

3

misrepresented or withheld information relates to the subject matter of the claims." *Union Carbide Corp. v. Dow Chem. Co.*, 619 F. Supp. 1036, 1052 (D. Del. 1985). Indeed, the Federal Circuit has held that such misrepresentations concerning an applicant's priority date are "highly material." *See Li Second Family Ltd. P'ship v. Toshiba Corp.*, 231 F.3d 1373, 1380 (Fed. Cir. 2000).

3.    The record contains ample evidence demonstrating that Dr. Fleischer intended to deceive the USPTO when he reviewed and allowed submission of the fraudulent statements concerning Boehringer's effective filing date. Moreover, "[t]he existence of fraudulent intent may be presumed upon proof of a knowing misrepresentation of a material fact, but may be rebutted at trial by a showing of the applicant's good faith." *Union Carbide*, 619 F. Supp. at 1052. Dr. Fleischer added the new matter into the U.S. application and then reviewed and allowed submission of the statement that Boehringer was entitled to claim priority back to the original German Applications, knowing that the new matter actually prohibited a proper claim of priority.

4.    The USPTO examiner relied on Boehringer's representations and, based on that reliance, did not declare an interference but allowed the claims of the U.S. application to issue. Had an interference been declared, the Eli Lilly inventors would have been able to demonstrate and corroborate a conception and reduction to practice of the compounds within the scope of Boehringer's claims <u>prior</u> to the earliest date that Boehringer could have asserted, thereby preventing issuance of at least some of the '812 patent claims.

## REDACTED

As their involvement is improperly hidden

4

under the guise of privilege, Boehringer's allegedly privileged documents should be inspected by this Court to assess whether there is further documentary evidence that the crime-fraud exception has been satisfied.

6.    The current record evidence more than suffices "'to support a good faith belief by a reasonable person,' that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *United States v. Zolin*, 491 U.S. 554, 572 (1989) (citation omitted). It therefore supports conducting an *in camera* review of the documents listed on Boehringer's log dated at least between February 2, 1987 and December 12, 1989.

## LEGAL STANDARD FOR *IN CAMERA* REVIEW AND THE CRIME-FRAUD EXCEPTION

Although a party may withhold responsive documents on the basis of attorney-client privilege or work product immunity, such an assertion "will be vitiated by a showing that the documents claimed to be protected were prepared in furtherance of a crime or fraud." *Union Carbide Corp. v. Dow Chem. Co.*, 619 F. Supp. 1036, 1051 (D. Del. 1985); *see also In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800, 807 (Fed. Cir. 2000). "In a patent action, that equates to a prima facie showing of 1) a knowing, willful, and intentional act of misrepresentation or omission before the patent office; 2) that is material; and 3) that the patent office relied upon in deciding to issue the patent." *Union Carbide*, 619 F. Supp. at 1052; *see also Spalding*, 203 F.3d at 807.

"The existence of fraudulent intent may be presumed upon proof of a knowing misrepresentation of a material fact, but may be rebutted at trial by a showing of the applicant's good faith. Materiality is established where the misrepresented or withheld information relates to the subject matter of the claims." *Id.* The Federal Circuit has held that "an applicant's

5

misrepresentation that he is entitled to the benefit of an earlier filing date is highly material." *Li Second Family Ltd. P'ship v. Toshiba Corp.*, 231 F.3d 1373, 1379-80 (Fed. Cir. 2000). "Reliance is generally exhibited by satisfaction of a 'but for' test—but for the omission or misrepresentation, the claims would not have been allowed." *Union Carbide*, 619 F. Supp. at 1052.

"[W]hile a prima facie showing need not be such as to actually prove the disputed facts, it must be such as to subject the opposing party to the risk of non-persuasion if the evidence as to the disputed fact is left unrebutted." *Id.* (quotations omitted). "Unless the party accused of fraud comes forward with a satisfactory explanation, the privilege is defeated." *For Your Ease Only, Inc. v. Calgon Carbon Corp.*, No. 02 C 7345, 2003 WL 22889442, at *1 (N.D. Ill. Dec. 5, 2003). The protection of the attorney-client privilege or work product immunity "will be vitiated by a showing that the documents claimed to be protected were prepared in furtherance of a crime or fraud." *Union Carbide*, 619 F. Supp. at 1051.

The Supreme Court has held that courts may conduct an *in camera* review of allegedly privileged documents in order to evaluate whether the crime-fraud exception applies. *United States v. Zolin*, 491 U.S. 554, 572 (1989). Before engaging in such a review, "'the judge should require a showing of a factual basis adequate to support a good faith belief by a reasonable person,' that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *Id.* (emphasis added). Notwithstanding that burden, "a lesser evidentiary showing is needed to trigger *in camera* review than is required ultimately to overcome the privilege . . . ." *Id.*

## STATEMENT OF FACTS

The '812 patent claims chemical compounds known as tetrahydrobenzothiazoles and pharmaceutical compositions thereof. The '812 patent matured from application 256,671

6

("the '671 U.S. application") and on its face claims priority to two German applications, filed on December 22, 1984 ("First German") and on March 13, 1985 ("Second German") (collectively "German Applications").[4] *See* Ex. 3 ('812 patent) at BOE2.[5] In fact, the '812 patent and '671 U.S. application contained new matter that was <u>not disclosed</u> in the original German Applications, rendering utterly false Boehringer's December 8, 1988 representation to the USPTO that the earlier-filed Eli Lilly U.S. application "is not available as prior art because its filing date is later than the effective filing date of the above-captioned application. (The effective filing date of the above-captioned application is 22 December 1984, the date on which the German application for which Convention priority is claimed was filed)." *See* Ex. 99 ('812 File History) at BARR680.

A.     **The '812 Patent Contains New Matter that Is Not Supported by Its German Priority Applications.**

Boehringer's claim of priority to the German Applications was unfounded. Although the '812 patent claims priority back to the two German Applications, the '812 patent has a broader disclosure than those foreign applications: unlike the German Applications, the '812 patent discloses and claims compounds with halogen-substituted phenyl groups at the $R_1$ position of a general chemical formula set forth in the patent. While the '812 patent and the German Applications all describe compounds within a "General Formula I," the "General Formula I" of the '812 patent is <u>broader</u> than the "General Formula I" of the German Applications at the $R_1$ position:

---

[4] The patent also claims priority back to an original U.S. application filed on December 19, 1985.

[5] Since the parties used a single, consecutively numbered set of exhibits throughout the depositions, this Motion preserves that numbering. Exhibits not previously marked are designated herein by letter.

<table>
<tr><td>

**German Applications**

This invention relates to new
tetrahydrobenzothiazoles of general formula

</td><td>

**'671 U.S. Application and '812 Patent**

This invention relates to new
tetrahydrobenzothiazoles of general formula

</td></tr>
</table>

| German Applications | '671 U.S. Application and '812 Patent |
|---|---|
| This invention relates to new tetrahydrobenzothiazoles of general formula (I) | This invention relates to new tetrahydrobenzothiazoles of general formula (I) |
| ... In general formula I above $R_1$ represents a hydrogen atom, an alkyl group having 1 to 6 carbon atoms, an alkenyl or alkynyl group each having 3 to 6 carbon atoms, an alkanoyl group having 1 to 6 carbon atoms, a phenyl alkyl or phenyl alkanoyl group having 1 to 3 carbon atoms in the alkyl part, .... | ... In general formula I above $R_1$ represents a hydrogen atom, an alkyl group having 1 to 6 carbon atoms, an alkenyl or alkynyl group each having 3 to 6 carbon atoms, an alkanoyl group having 1 to 6 carbon atoms, a phenyl alkyl or phenyl alkanoyl group having 1 to 3 carbon atoms in the alkyl part, whilst the above mentioned phenyl nuclei may be substituted by 1 or 2 halogen atoms, .... |
| Ex. 53 (First German Transl.) at BARR28270-71; *see also* Ex. B (Second German Transl.) at BARR209357-58.[6] | (emphasis added). Ex. 3 ('812 Patent), Col. 1; Ex. 99 ('812 File History) at BARR618-19. |

*See also* Ex. C (Schneider Tr.) at 152:22-154:8; Ex. D (Fleischer Tr.) at 201:22-206:7; Ex. E

(Klaes 30(b)(6) Tr.) at 196:9-14; Ex. F (Anslyn Rep.) at ¶¶ 45-47.

Similarly, while the '812 patent and '671 U.S. application explain that

"particularly preferred compounds of general formula I" include those where $R_1$ can be halogen-

substituted phenyl groups "2-chloro-benzyl," "4-chloro-benzyl" or "3,4-dichloro-benzyl," the

German Applications do not. *Compare* Ex. 3 ('812 Patent) Col. 3 (describing preferred

---

[6] Exhibit 53 is a certified translation of the First German application submitted by Boehringer to
the Australian Patent Office in 1986. No such translation was ever submitted to the USPTO.
Exhibit B, is a certified translation of the Second German application produced by Barr in this
litigation and is often identical in substance to Exhibit 53, since portions of the First and Second
German applications are identical.

compounds) *with* Ex. 53 (First German Transl.) at BARR28273 and Ex. B (Second German Transl.) at BARR209360 (not disclosing those compounds). *See also* Ex. F (Anslyn Rep.) at ¶¶ 43-46, 47; Ex. D (Fleischer Tr.) at 251:7-253:10.

Likewise, the '812 patent describes preparative examples of tetrahydrobenzothiazoles in which $R_1$ represents "2-chloro-benzyl," "4-chloro-benzyl" or "3,4-dichloro-benzyl," but the German Applications lack such a disclosure. *Compare* Ex. 3 ('812 Patent) Col. 20 (describing 2-chlorobenzyl, 4-chlorobenzyl, and 3-4-dichloro-benzyl compounds in Example 10) *with* Ex. 53 (First German Transl.) at BARR28306-08 and Ex. B (Second German Transl.) at BARR209396-97 (not disclosing those compounds). *See also* Ex. F (Anslyn Rep.) at ¶¶ 43-46; Ex. D (Fleischer Tr.) at 211:2-213:7, 213:15-214:2.

Finally—and critical to Boehringer's misconduct—the '812 patent and '671 U.S. application <u>claim</u> compounds containing halogenated phenyl moieties at the $R_1$ position (Claims 1, 2, 3, 4, and 8), while the German Applications do not. *Compare* Ex. 3 ('812 Patent) at Cols. 24-26 and Ex. 99 ('812 File History) at BARR662-66, 677, *with* Ex. 53 (First German Transl.) at BARR28314-22 and Ex. B (Second German Transl.) at BARR209353-55. *See also* Ex. F (Anslyn Rep.) at ¶¶ 45-47.[7]  Given that the German applications do not support the full scope of those claims, Boehringer's effective priority date is no earlier than the original U.S. filing date of December 19, 1985. *See, e.g., In re Gosteli*, 872 F.2d 1008, 1010 (Fed. Cir. 1989) ("Under section 119, the claims set forth in a United States application are entitled to the benefit of a

---

[7] Boehringer's communications on this topic to date suggest that it will contend that halogen-substituted phenyl rings at the $R_1$ position were disclosed in the German Applications because General Formula I of those applications discloses phenyl moieties "substituted by fluorine, chlorine or bromine atoms" at the $R_3$ position. There can be little doubt that the disclosure of certain substituents at one position of the molecule does not provide any disclosure of substituents at a different position of the molecule.

9

foreign priority date if the corresponding foreign application supports the claims in the manner required by section 112, ¶ 1.").

There can be no sincere dispute that the compounds with halogenated phenyl moieties at the $R_1$ position are new matter. Indeed, Dr. Fleischer put it best when he explained, with respect to these particularly preferred halogen-substituted phenyl compounds, that "[t]hese three compounds are not part of the scope of the German patent application. They are not part of the substance." Ex. D (Fleischer Tr.) at 213:15-214:2. *See also, id.* at 258:20-259:12.

**B.    Dr. Fleischer Adds New Material to the U.S. Application that Is Not Disclosed in the German Applications.**

Dr. Fleischer drafted the First German application for filing in Germany. Ex. D (Fleischer Tr.) at 167:10-168:13. After that application was filed, one of the named inventors (Dr. Schneider) synthesized tetrahydrobenzothiazoles containing halogenated phenyl moieties at the $R_1$ position and recognized their desirability.    **REDACTED**    Dr. Schneider then provided information about these compounds to Dr. Fleischer because he knew that it was the usual practice of the Boehringer patent department to add new examples to applications during the Paris Convention[8] year between the German priority filing and the filing of applications abroad. Ex. C (Schneider Tr.) at 153:2-155:4.

Dr Fleischer, the individual responsible for overseeing the tetrahydrobenzothiazole patent family, subsequently prepared a "Foreign Filing Text" by combining the two German applications[9] into a single application for translation and filing

---

[8] The Paris Convention is an international treaty that allows a one-year period after the filing of an initial patent application for an applicant to file counterpart applications in other countries, so long as certain requirements are satisfied.

[9] The Second German application contained additional biological data on compounds disclosed in the First German application. Those changes are not pertinent to the instant Motion.

around the world. Ex. D (Fleischer Tr.) at 75:2-18, 104:8-14, 153:3-9, 158:17-159:5, 167:10-168:13, 195:15-200:7; 243:3-5; Ex. E (Klaes 30(b)(6) Tr.) at 215:16-21; Ex. H (Stempel Tr.) at 133:3-19; Ex. M (Laudien Tr.) at 194:14-195:13; Ex. 52 (Foreign Filing Text in English). In preparing that text, Dr. Fleischer broadened General Formula I, added a specific disclosure of the new compounds prepared by Dr. Schneider into the list of preferred compounds and Example 10, and broadened the claims. *See* Ex. E (Klaes 30(b)(6) Tr.) at 196:9-25; Ex. 52 (Foreign Filing Text in English) at 1-2, 4, 39-41, 48-56. Dr. Fleischer did so notwithstanding the fact that he was well aware of the rule that a foreign application filed within the Paris Convention year is not entitled to the priority date of the earlier application if it contains new matter. Ex. D (Fleischer Tr.) at 114:12-21, 117:14-119:8, 344:15-346:20.

The Foreign Filing Text, as was the standard practice, was then translated into English and sent to Boehringer's U.S. Patent Department for filing in the USPTO.[10] Ex. D (Fleischer Tr.) at 124:15-126:16, 196:5-198:6; Ex. H (Stempel Tr.) at 86:24-88:12; Ex. I (Devlin Tr.) at 71:13-73:7; Ex. E (Klaes 30(b)(6) Tr.) at 128:5-24. Dr. Fleischer was then responsible for forwarding the Foreign Filing Text to the U.S. Patent Department with an "order letter" that he prepared indicating to which patent applications Boehringer would claim priority. *See* Ex. D (Fleischer Tr.) at 135:7-136:16, 235:6-236:11; Ex. E (Klaes 30(b)(6) Tr.) at 289:22-295:6; Ex. M (Laudien Tr.) at 124:9-128:22. Dr. Fleischer remained responsible for overseeing the prosecution of the tetrahydrobenzothiazole patents around the world. Ex. D (Fleischer Tr.) at 75:2-18, 153:3-9, 158:17-159:5, 167:10-168:13, 243:3-5; Ex. E (Klaes 30(b)(6) Tr.) at 215:16-21; Ex. H (Stempel Tr.) at 133:3-19; Ex. M (Laudien Tr.) at 194:14-195:13. As part of those responsibilities, Dr. Fleischer was regularly consulted about and reviewed all substantive filings

---

[10] The U.S. application was subsequently re-filed twice as a "divisional" application, and the last of these filings was the '671 U.S. application that eventually matured into the '812 patent.

with the USPTO in connection with the patent family that included the '812 patent. Ex. D
(Fleischer Tr.) at 151:22-153:9, 236:14-237:8; Ex. H (Stempel Tr.) at 136:17-137:8.

It is noteworthy that while Dr. Fleischer originally had no problem admitting that
he drafted the Foreign Filing Text (on the first day of his deposition) (Ex. D (Fleischer Tr.) at
196:5-197:15), and although that document bears the marking "Dr. Fl." at the top to indicate that
he prepared it (*id.* at 313:5-13; Ex. 52 (Foreign Filing Text in English)), Dr. Fleischer's
testimony suddenly changed (on the second day of his deposition) after Barr's evidence of
inequitable conduct became clear. At that time, he began testifying that he was not aware that
there were new compounds in the Foreign Filing Text, although he could not identify any other
individual who might have added them. Ex. D (Fleischer Tr.) at 348:5-352:22. No other witness
or document provides any support for Dr. Fleischer's tardy denials. Indeed, Boehringer's own
30(b)(6) witness contradicted Dr. Fleischer's statements and testified that Dr. Fleischer was the
person who prepared this document and added the new text. *See, e.g.*, Ex. E (Klaes 30(b)(6) Tr.)
at 181:1-4 (Q. Did Fleischer prepare the foreign filing text for case 5/920? A. Yes, he did.),
189:17-20, 196:9-16 (Q. You see the definition of R1 on page BARR 27916 includes text that
was not included in [the German Applications] . . . , right? A. Yes. Q. Who added that text? A.
It was added by Dr. Fleischer.").

**C.    The Eli Lilly Applications and Boehringer's Misrepresentation Regarding
Boehringer's Effective Filing Date.**

By February 2, 1987, Boehringer had become aware that on June 24, 1985—
nearly 6 months <u>before</u> the filing date of Boehringer's first U.S. application—Eli Lilly filed a
U.S. patent application disclosing and claiming tetrahydrobenzothiazoles. *See* Ex. J (Objections
and Responses of Plaintiffs to Barr's Second Set of Interrogatories) at 3; Ex. 18 (Eli Lilly U.S.
Application). Eli Lilly's filing date preceded Boehringer's U.S. filing date but it was <u>after</u> the

filing of Boehringer's First German application.  Dr. Fleischer and other Boehringer attorneys immediately recognized that the Eli Lilly application and its European counterpart disclosed and claimed subject matter that overlapped with Boehringer's applications, including its U.S. Application.  *See* Ex. D (Fleischer Tr.) at 285:5-286:14; Ex. 99 ('812 File History) at BARR680; Ex. 18 (Eli Lilly U.S. Application); Ex. 22 (Eli Lilly European Application).  In fact, Dr. Fleischer immediately took action in Europe to inform the European Patent Office ("EPO") examiner handling the Eli Lilly European application that Boehringer had earlier filed an application with overlapping subject matter and which they asserted would preclude issuance of an Eli Lilly patent.

## REDACTED

Ex. D (Fleischer Tr.) at 283:10-284:2, 285:5-286:14, 291:21-293:22 (testifying that he submitted Exhibit 92 to the EPO on February 2, 1987 representing that the Boehringer application anticipates the Eli Lilly application in order to speed up the examiner's rejection of the Eli Lilly application).

In the United States, the fact that the Eli Lilly U.S. application had an earlier U.S. filing date raised the possibility that Boehringer could become entrenched in an interference battle over priority to the tetrahydrobenzothiazole compounds.  That fight could result in Boehringer losing not only its particularly preferred compounds with halogenated phenyl moieties at $R_1$, but also its prized development compound pramipexole dihydrochloride—the active ingredient in the FDA-approved product at issue in this litigation.  After thoroughly considering the issue, as demonstrated by the countless privilege log entries and Rule 30(b)(6)

testimony from Boehringer regarding the retention of outside counsel,[11] Boehringer brought the Eli Lilly applications to the attention of the USPTO in a document entitled "Second Preliminary Amendment and Information Disclosure Statement" and dated December 8, 1988 (hereinafter "the IDS"). Boehringer admitted that Eli Lilly disclosed and claimed "a subgenus of the compounds disclosed and originally claimed in the above-captioned application," and acknowledged the possibility of an interference. Ex. 99 ('812 File History) at BARR680. However, Boehringer then falsely represented in the IDS:

> [The Eli Lilly U.S. Application] is not available as prior art because its filing date is later than the effective filing date of the above-captioned application. (The effective filing date of the above-captioned application is 22 December 1984, the date on which the German application for which Convention priority is claimed was filed).

See Ex. 99 ('812 File History) at BARR680 (emphasis added).[12]

Of course, all of the claims of the '812 patent were not entitled to the benefit of the filing date of the First German application because the addition of the new compounds with halogenated phenyl moieties at the $R_1$ position was new matter. See, e.g., Gosteli, 872 F.2d at 1010. In fact, half of the pending claims covered compounds (with halogenated phenyl moieties at $R_1$) that were not supported by the German Applications and hence were not entitled to an "effective filing date" of 22 December 1984, but rather to an "effective filing date" no earlier

---

[11] See Ex. K (Witkowski 30(b)(6) Tr.) at 117:6-119:7, 214:21-216:16, 226:5-230:17.

[12] Boehringer submitted similar Information Disclosure Statements in the originally filed U.S. application as well as the other "divisional" application.

than December 19, 1985—a date _after_ Eli Lilly's filing date.  Boehringer simply misrepresented that all of its pending claims were entitled to an effective filing date _earlier than_ Eli Lilly's.[13]

**D.    Boehringer's Privilege Log Indicates that Other Individuals May Have Been Involved in Perpetrating the Fraud.**

It is abundantly clear that Dr. Fleischer knowingly reviewed and allowed submission of this false IDS.  For example, Dr. Fleischer not only testified that he was involved in all substantive submissions to the USPTO (Ex. D (Fleischer Tr.) at 151:22-153:9, 236:14-237:8)—which certainly includes the IDS—but he further admitted that Exhibit 98 was his copy of the IDS and bore his "Fl" symbol on the upper right hand corner indicating that he received and took notice of the document. _See id._ at 241:14-242:1, 320:22-321:9; _see also_ Ex. 98 (Fleischer's Copy of the IDS).  Given that Dr. Fleischer (1) was himself responsible for adding the new matter to the U.S. application, and (2) knew such a modification would cause Boehringer to lose its German priority date, there is no question that Dr. Fleischer committed fraud on the USPTO based on his role in the submission of the IDS.  Ex. D (Fleischer Tr.) at 114:12-21, 117:14-119:8, 196:5-197:15, 344:15-346:20;  Ex. E (Klaes 30(b)(6) Tr.) at 181:1-4, 189:17-20, 196:9-16.

The record, however, documents that individuals other than Dr. Fleischer may have been involved in preparing or advising about the preparation of the IDS and, consequentially, perpetrating the fraud.

# REDACTED

---

[13] Dr. Fleischer agreed that if only part of an application was disclosed in an earlier priority application, it would be inaccurate to say that the entire application is entitled to priority. Ex. D (Fleischer Tr.) at 344:15-346:20.

**REDACTED** [14] The privilege log reveals that, in addition to Dr. Fleischer, at least the following other

individuals communicated about the potential interference:[15]

- 
- 
- 
- 
- 
- 
- 
- 
- 

**REDACTED**

- 
- 
- 
- 
- 
- 
- 

---

[14] While it was publicly known that Boehringer was worried about a potential interference with Eli Lilly, Boehringer has improperly refused to admit the non-privileged fact that these communications on its privilege log relate specifically to the potential interference with the Eli Lilly U.S. application. *See* Ex. L (Objections & Responses of Plaintiffs to Barr's Third Set of Interrogatories) at 21-22. **REDACTED**

*See* Ex. K (Witkowski 30(b)(6) Tr.) at 292:4-14.

[15] For the positions of these individuals *see* Ex. M (Laudien Tr.) at 25:10-26:1, 74:12-75:4, 89:22-90:6, 242:22-243:20, 254:8-18, 256:12-21, 257:18-258:8, 263:2-16, 269:21-270:1; Ex. I (Devlin Tr.) at 31:6-33:18; Ex. H (Stempel Tr.) at 7:18-8:6, 50:25-51:16; Ex. E (Klaes 30(b)(6) Tr.) at 11:14-12:19; Ex. D (Fleischer Tr.) at 70:6-71:19; Ex. N (Kauffmann Tr.) 30:17-19, 40:19-21, 116:7-117:13.

•

**REDACTED**

Dr. Laudien, then the head of

Boehringer's German patent department, testified that a potential interference was the kind of

issue he would report to the Board of Directors.  Ex. M (Laudien Tr.) at 172:11-173:1.

Boehringer witnesses also testified that a potential interference was a very significant occurrence

and that they would involve their superiors and other team members in decisions relating to it.

*See, e.g.*, Ex. M (Laudien Tr.) at 285:6-286:4;     **REDACTED**

**REDACTED**

Most important, however, is the fact that at least some of the allegedly privileged

communications at issue concern the accuracy of Boehringer's representations to the USPTO

regarding the Lilly application—*i.e.*, the fraudulent statement itself.  Mr. Timothy Witkowski,

Boehringer's 30(b)(6) witness and in-house U.S. counsel, testified that one communication

authored by outside U.S. counsel John Sweeney (1) was prepared before the filing of the IDS,

and (2) contains information bearing on whether any steps were taken to determine the accuracy

of the information contained in the IDS and why the Eli Lilly applications were disclosed

therein.  Ex. K (Witkowski 30(b)(6) Tr.) at 117:6-118:14, 214:21-216:16, 226:5-230:17.  That

17

strongly suggests that Dr. Fleischer was not the only person at Boehringer who was aware of the falsity of the IDS's claim to priority.

**E.    Relying on Boehringer's Misrepresentations, the USPTO Issues the '812 Patent.**

Following the misrepresentation about Boehringer's effective filing date, the examiner accorded Boehringer's U.S. application the benefit of the First German application's filing date (to which it was not entitled), did not apply the Eli Lilly application as prior art (as Boehringer urged in the IDS), and allowed the claims of the '812 patent, including the claims that encompassed tetrahydrobenzothiazoles with halogenated phenyl moieties at $R_1$. Had Boehringer been truthful about its effective filing date, the examiner would have taken an alternative course of action. If the examiner had been properly informed that at least five of Boehringer's pending claims had an effective filing date <u>after</u> Eli Lilly's, that fact would have weighed heavily in favor of declaring an interference to determine which party had priority (if not issuing an outright rejection for those claims under 35 U.S.C. § 102(g)). But Boehringer's conduct prevented an interference. Under Section 2303 of the Manual of Patent Examining Procedure ("MPEP") in effect at that time, an examiner was directed that an interference will normally <u>not</u> be declared if the difference in effective filing dates between the two pending applications is more than six months. *See* Ex. O (MPEP § 2303 (1988)).[16] Thus, by

---

[16] Section 2303 in relevant part read:

> Interferences will not be declared between pending applications if there is a difference of more than 3 months in the effective filing dates of the oldest and the next oldest applications, in the case of inventions of a simple character, or a difference of more than 6 months in the effective filing dates of the applications in other cases, except in exceptional situations, as determined and approved by the group director. One such exceptional situation would be where one application as the earliest effective filing date based on foreign priority and the other application has the earliest effective United States filing date. If an interference is declared, all applications having the interfering subject matter should be included.

misrepresenting that Boehringer's application was entitled to a filing date more than six months earlier than the Eli Lilly U.S. filing date, Boehringer avoided an interference between the two.[17]

The significance of Boehringer's misstatement is underscored further by the fact that, had an interference been declared, Boehringer would not have obtained some, if not all, of the claims pending in the '671 U.S. application. Third-party discovery taken from Eli Lilly conclusively demonstrates that Lilly scientists synthesized and tested tetrahydrobenzothiazoles several months before the filing date of Boehringer's first German application, and that such work was disclosed and claimed in Eli Lilly's U.S. patent application. See, e.g., Ex. F (Anslyn Rep.) at ¶¶ 48-51;

**REDACTED**

That work was within the scope of several claims of the '812 patent. See, e.g., Ex. F (Anslyn Rep.) at ¶¶ 48-54.[18]

---

[17] It is noteworthy that while Boehringer submitted English translations of its German applications to the Australian Patent Office in 1986—two years before the false IDS, see, e.g., Ex. 53 (First German Transl.)—it never submitted those translations to the U.S. examiner, thereby depriving him of the opportunity to assess whether the German language documents actually supported Boehringer's assertion of a 1984 priority date (before Eli Lilly's U.S. filing date), which they did not. That violated the requirement in 37 C.F.R. § 1.55 that translations be provided if a foreign language application is relied upon to overcome a reference. See 37 C.F.R. § 1.55(a) (1988).

37 C.F.R. § 1.55(a) (1988) read in relevant part:

The claim for priority and the certified copy of the foreign application specified in the second paragraph of 35 U.S.C. § 119 must be filed in the case of interference (§ 1.630); when necessary to overcome the date of a reference relied upon by the examiner; or when specifically required by the examiner; and in all other cases they must be filed not later than the date the issue fee is paid. If the papers filed are not in the English language, a translation need not be filed except in the three particular instances specified in the preceding sentence, in which event a sworn translation or a translation certified as accurate by a sworn or official translator must be filed.

[18] Eli Lilly would have been able to rely on this earlier research in an interference, but Boehringer, as a foreign entity, would only be able to rely on its filing dates. See, e.g., Scott v. Koyama, 281 F.3d 1243, 1245-46 (Fed. Cir. 2002).

<u>**ARGUMENT**</u>

The foregoing description of the evidence leaves no doubt that Barr satisfies the showing necessary for *in camera* review of these materials to determine whether they support piercing the privilege pursuant to the crime-fraud exception. Indeed, while Barr asserts that it already satisfies the elements of the crime-fraud exception, Barr submits that *in camera* review of these materials in the first instance may be the appropriate course, as it temporarily preserves Boehringer's assertion that the privilege applies while allowing inquiry into the extent of the fraudulent conduct.

A.    **Boehringer's Misrepresentation Concerning Its Effective Filing Date Was Material.**

The evidence here far exceeds the materiality requirement for the crime-fraud exception that "the misrepresented or withheld information relates to the subject matter of the claims." *Union Carbide Corp. v. Dow Chem. Co.*, 619 F. Supp. 1036, 1052 (D. Del. 1985). Boehringer admitted in the very IDS at issue that the Eli Lilly application had an earlier U.S. filing date, and described it as disclosing and claiming "a subgenus of the compounds disclosed and originally claimed in the above-captioned application." Ex. 99 ('812 File History) at BARR680. As a result, the Eli Lilly research would have been a bar to pending claims of the Boehringer application under 35 U.S.C. § 102(g) unless Boehringer were able to overcome it. So Boehringer made a false statement to the USPTO, representing that "[t]he effective filing date of the above-captioned application is 22 December 1984, the date on which the German application for which Convention priority is claimed was filed." *Id.* But a simple review of the applications reveals that, as Dr. Fleischer himself admitted, the German Applications did not disclose compounds with halogenated phenyl moieties at the $R_1$ position, while the pending '671

20

U.S. application claims did, vitiating any argument that the '671 U.S. application was entitled to the filing date of <u>either</u> German Application, much less the first one.

The Federal Circuit has held that misrepresentations concerning an applicant's priority date are material. In *Li Second Family Limited Partnership v. Toshiba Corp.*, 231 F.3d 1373 (Fed. Cir. 2000), the Federal Circuit affirmed a finding of inequitable conduct on similar facts, explaining that:

> Because the effective filing date of each claim in a patent application determines which references are available as prior art for purposes of §§ 102 and 103, information regarding the effective filing date is of the utmost importance to an examiner. Consequently, an applicant's misrepresentation that he is entitled to the benefit of an earlier filing date is highly material.

*Id.* at 1379-80. The court further explained, "[p]articularly in a case such as this, in which an applicant's misrepresentation and nondisclosure of priority date information eliminates a reference specifically cited by the examiner and previously found by the Board to disclose an important feature of the claimed invention, there is no doubt that such information is highly material." *Id.* at 1380. Here, the Eli Lilly application did not merely disclose an "important feature of the claimed invention"—by Boehringer's own admission to the USPTO and the European Patent Office, <u>it disclosed the invention itself</u>.

### B.    Dr. Fleischer Acted With Intent to Deceive.

"The existence of fraudulent intent may be presumed upon proof of a knowing misrepresentation of a material fact, but may be rebutted at trial by a showing of the applicant's good faith." *Union Carbide*, 619 F. Supp. at 1052. The evidence demonstrating Dr. Fleischer's fraudulent intent is overwhelming:

- Dr. Fleischer drafted the First German application and he combined the First and Second German Application into the Foreign Filing Text. *See* Ex. D (Fleischer Tr.) at 104:8-14, 167:10-168:13, 195:15-198:6; Ex. E (Klaes 30(b)(6) Tr.) at 181:1-4, 189:17-20; Ex. 52 (Foreign Filing Text in English).

- As the sole person responsible for drafting the foreign filing text, Dr. Fleischer was the individual who added the halogen-substituted phenyl moieties at the $R_1$-position. *See* Ex. D (Fleischer Tr.) at 104:8-14; Ex. E (Klaes 30(b)(6) Tr.) at 181:1-4, 189:17-20, 196:9-16.

- Dr. Fleischer knew that the Foreign Filing Text he prepared would be translated and filed in the United States, Europe and elsewhere, and he received a copy of the United States application. *See* Ex. D. (Fleischer Tr.) at 140:16-19, 195:15-198:6.

- Dr. Fleischer knew that the addition of new matter to the foreign filing text would prevent Boehringer from claiming priority to the German applications. *See* Ex. D (Fleischer Tr.) at 114:12-21, 117:14-119:8, 344:15-346:20.

- Dr. Fleischer knew about the overlap between the Eli Lilly and Boehringer applications, telling the European Patent Office on multiple occasions that the Eli Lilly European Application overlapped with the Boehringer European application (*i.e.* the Foreign Filing Text). *See id.* at 285:21-286:14; Ex. 92 (Feb. 2, 1987 Letter to EPO); Ex. 95 (May 10, 1988 Letter to EPO); Ex. 98 (Fleischer's Copy of the IDS).

- Dr. Fleischer was involved in substantive filings for Boehringer's '671 U.S. application, and he reviewed and initialed the IDS, while knowing the concern about the ability to overcome the Eli Lilly reference. *See* Ex. D (Fleischer Tr.) at 151:22-153:9, 236:14-237:8, 241:14-242:1, 320:22-321:9; Ex. H (Stempel Tr.) at 136:17-137:8.; Ex. 98 (Fleischer's Copy of the IDS).

- Dr. Fleischer did all this while acknowledging his obligation to be truthful and candid with the USPTO. *See* Ex. D (Fleischer Tr.) at 143:20-144:17, 146:11-147:19.

**C.    Reliance on Boehringer's Misstatement.**

Finally, the examiner's reliance on the false statements in the IDS is easily demonstrated. Following submission of the IDS, the examiner, consistent with MPEP section 2303, did not declare an interference but allowed the claims of the '671 U.S. application to issue. As discussed above, the record evidence demonstrates that, had an interference been declared, the Eli Lilly inventors would have been able to demonstrate a corroborated conception and reduction to practice of compounds within the scope of the '671 U.S. application claims prior to the earliest date that Boehringer could have asserted. The claims of the '812 patent simply would not have issued in their current form if Boehringer had not misrepresented that its

22

application was entitled to an effective filing date six months before the Eli Lilly application
date.

    **D.**    **Numerous Attorneys and Executives Focused on the Eli Lilly Reference
Before the IDS was Filed.**


# REDACTED

    . Ex. K (Witkowski 30(b)(6) Tr.) at 117:6-118:14, 214:21-216:16, 226:5-230:17; *see also*
footnote 15 *supra*, for the positions of individuals named on the privilege log.  Plaintiffs cannot
legitimately argue without belying credulity that, in the course of these thorough efforts, <u>no</u>
individual performed the simple act of comparing the U.S. Application to the priority
documents—an act that more than one Boehringer witness testified would be necessary to assure
the accuracy of the representations in the IDS (*see, e.g.,*    **REDACTED**    and
Ex. M (Laudien Tr.) at 312:21-314:20).  This single act would have immediately revealed the
falsity of the IDS.  Indeed, as Mr. Witkowski testified, the allegedly privileged documents
include a memorandum from outside counsel dated before the filing of the IDS and discussing
whether steps were taken to assure the accuracy of the contents of the IDS.  Ex. K (Witkowski
30(b)(6) Tr.) at 116:12-118:14, 214:21-216:16, 228:6-230:17.

E.    **In Light of the Evidence,** *In Camera* **Review Is Appropriate.**

The foregoing evidence more than suffices "'to support a good faith belief by a reasonable person,' that *in camera* review of the materials may reveal evidence to establish the claim that the crime-fraud exception applies." *United States v. Zolin*, 491 U.S. 554, 572 (1989). "'May' is a very relaxed test and, as only the judge gets this initial access, properly so." *In re Grand Jury Proceedings*, 417 F.3d 18, 22 (1st Cir. 2005), *cert. denied*, 546 U.S. 1088 (2006). As a result, "the decision to engage in *in camera* review implicates a much more lenient standard of proof than the determination to apply the crime/fraud exception, as the intrusion on the asserted privilege is minimal." *Haines v. Liggett Group, Inc.*, 975 F.2d 81, 96 (3d Cir. 1992) (quoting district court and affirming *in camera* review); *see also General Electric Co. v. Hoechst Celanese Corp.*, No. 87-458-JRR, 1990 WL 154218, at *5 (D. Del. May 8, 1990) (granting *in camera* review where a patentee submitted an affidavit but excluded relevant experimental data, explaining that "[t]he showing necessary to trigger *in camera* review is considerably less demanding than that required to show *prima facie* common law fraud"). "[U]pon this showing whether to conduct *in camera* review is within the trial court's discretion." *In re Grand Jury Proceedings*, 417 F.3d at 22. In fact, in *Haines v. Liggett Group, Inc.*, the Third Circuit concluded that "[f]or *in camera* inspection, it would be sufficient for the district court, in its discretion, to consider only the presentation made by the party challenging the privilege. The court may decide on this submission alone whether a factual basis is present to support a good faith belief by a reasonable person that the materials may reveal evidence of a crime or fraud." 975 F.2d at 96.

"Despite the importance of the attorney-client privilege in the administration of justice, the Supreme Court in *Zolin* commented on the costs of the privilege in that it 'has the effect of withholding relevant information from the factfinder.'" *In re Grand Jury Investigation*,

24

445 F.3d 266, 273-74 (3d Cir.), *cert. denied*, 127 S.Ct. 538 (2006) (internal citations omitted).
"Precisely because of the initial barrier of the privilege, it is very hard for an adversary unaided
to show that the privileged communications were themselves corrupt, so the requirements for
access cannot be set too high. And, if the communications were innocent, the initial look may
often not damage the client." *In re Grand Jury Proceedings*, 417 F.3d at 23.

The propriety of *in camera* review is underscored by the fact even the *prima facie*
showing for applying the crime-fraud exception and immediately piercing the privilege has been
met in the instant case. The Third Circuit has interpreted the relevant standard as requiring that
"the party seeking discovery must present evidence which, if believed by the fact-finder, would
be sufficient to support a finding that the elements of the crime-fraud exception were met."
*Haines*, 975 F.2d at 95-96. The First Circuit has explained that "[a]s we read the consensus of
precedent in the circuits, it is enough to overcome the privilege that there is a reasonable basis to
believe that the lawyer's services were used by the client to foster a crime or fraud. The
circuits—although divided on articulation and on some important practical details—all
effectively allow piercing of the privilege on something less than a mathematical (more likely
than not) probability that the client intended to use the attorney in furtherance of a crime or
fraud. This is a compromise based on policy but so is the existence and measure of the privilege
itself." *In re Grand Jury Proceedings*, 417 F.3d at 23.

Indeed, courts routinely go beyond *in camera* review and grant motions to pierce
the privilege in similar circumstances. For example, in *Union Carbide*, the court pierced the
privilege under the crime-fraud exception where the patentee knowingly misrepresented the
inventor of the patent. 619 F. Supp. at 1036. In *For Your Ease Only, Inc. v. Calgon Carbon
Corp.*, 2003 WL 22889442, at *1 (N.D. Ill. Dec. 5, 2003), and *Ralston Purina Co. v. Griffith*

*Laboratories., Inc.*, No. 85C9304, 1988 WL 121601, at *2 (N.D. Ill. Nov. 9, 1988), the court

granted such motions where the patentee intentionally concealed relevant prior art. In *Bulk Lift*

*International, Inc. v. Flexcon & Systems, Inc.*, 122 F.R.D. 482 (W.D. La.), *aff'd*, 122 F.R.D. 493

(W.D. La. 1988), the court granted a motion to pierce where the patentee withheld material

information that may have demonstrated an on-sale bar.

      **F.**    **The Documents Proposed for *In Camera* Review.**

      In this Motion, Barr seeks the *in camera* inspection (and/or production) of the

documents listed on Boehringer's log dated at least between February 2, 1987 and December 12,

1989. Consistent with the analysis in *Union Carbide*, that timeframe represents the period

between which Boehringer admits to having first discovered the Eli Lilly application[19]—the date

when evidence of the fraud first appeared—and the date the '812 patent issued—when the

fraudulent scheme was complete. *See Union Carbide*, 619 F. Supp. at 1055. There is reason to

believe that the documents in between—particularly those specifically referencing an

interference—were prepared in furtherance of the fraud and should be produced in this case.

**CONCLUSION**

      For the foregoing reasons, Barr respectfully requests that this Court conduct an *in*

*camera* inspection of the above-referenced documents and compel their production.

---

[19] Barr is currently relying on Boehringer's representation in its interrogatories that no one was aware of the Lilly applications prior to February 2, 1987. However, given that Boehringer has apparently refused to review its privileged documents in responding to interrogatories, and given that by February 2, 1987, Boehringer was already communicating with the EPO regarding these applications, there is reason to believe that Boehringer may have learned of the Eli Lilly applications earlier. Barr respectfully requests that this Court require Boehringer to review its privileged documents to identify the actual first reference to the Eli Lilly applications and set the period for commencing inspection on that date.

Respectfully Submitted:

Josy W. Ingersoll (#1088)
John W. Shaw (#3362)
Adam W. Poff (#3990)
YOUNG CONAWAY STARGATT &
    TAYLOR, LLP
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
(302) 571-6600
*Attorneys for Defendant Barr Laboratories,
Inc.*

OF COUNSEL:

Glenn J. Pfadenhauer
Jessamyn S. Berniker
Dov P. Grossman
Brett R. Tobin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000

Dated: May 7, 2007

27

**CERTIFICATE OF SERVICE**

I, Adam W. Poff, Esquire hereby certify that on May 14, 2007, I caused a copy of the foregoing document to be served by CM/ECF, e-mail, and hand-delivery on the following counsel of record:

Jack B. Blumenfeld, Esquire
Morris Nichols Arsht & Tunnell
1201 North Market Street
PO Box 1347
Wilmington, DE 19899-1347

Mary B. Matterer, Esquire
Morris, James, Hitchens & Williams LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE 19801

I further certify that on May 14, 2007, I caused a copy of the foregoing document to be served on the following non-registered participants in the manner indicated:

**BY E-MAIL**

Steven C. Cherny, Esquire
Latham & Watkins LLP
885 Third Avenue, Suite 1000
New York, NY 10022-4834

Kenneth G. Schuler, Esquire
Latham & Watkins LLP
Sears Tower, Suite 5800
Chicago, IL 60606

Shannon M. Bloodworth, Esquire
Heller Ehrman LLP
1717 Rhode Island Ave., N.W.
Washington, DC 20036

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Adam W. Poff (No. 3990)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600
apoff@ycst.com

*Attorneys for Barr Laboratories, Inc.*