# EXHIBIT I

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

BOEHRINGER INGELHEIM INTERNATIONAL, )
GMBH and BOEHRINGER INGELHEIM        )
PHARMACEUTICALS, INC.,               )
                                     )
        Plaintiffs,                  )
                                     )
    vs.                              ) C.A. No.
                                     ) 05-700
BARR LABORATORIES, INC.,             )  (KAJ)
                                     )
        Defendant.                   )
-------------------------------------)
BOEHRINGER INGELHEIM INTERNATIONAL,  )
GMBH and BOEHRINGER INGELHEIM        )
PHARMACEUTICALS, INC.,               )
                                     )
        Plaintiffs,                  )
                                     )
    vs.                              ) C.A. No.
                                     ) 05-854
                                     )  (KAJ)
MYLAN PHARMACEUTICALS, INC.,         )
                                     )
        Defendant.                   )
-------------------------------------)

H I G H L Y   C O N F I D E N T I A L

VIDEOTAPE DEPOSITION OF MARY-ELLEN DEVLIN
New York, New York
Tuesday, October 31, 2006

Reported by:
ERICA L. RUGGIERI, RPR



**David Feldman**
W o r l d w i d e



HIGHLY CONFIDENTIAL

From File to Trial.

805 Third Avenue, 8th Floor
New York, NY 10022
(800) 642-1099

600 Anton Boulevard, 11th Floor
Costa Mesa, CA 92626
(866) DFW-1380

30

1        **Devlin - Highly Confidential**
2        Q.   Now, you don't recall your initial
3    job title, but do you recall what your
4    responsibilities were, when you were first
5    hired?
6        A.   Yes. Actually, on thinking about it,
7    I think my title was patent attorney.
8            MS. HOLLIS: I'm just going to
9    object, vague as to responsibilities.
10           MR. TOBIN: Okay.
11       Q.   What --
12       A.   What were my responsibilities?
13       Q.   Correct.
14       A.   My responsibilities were patent
15   preparation and prosecution. I volunteered
16   trademark services, so those became part of my
17   duties, trademark preparation, prosecution and
18   opinion work. I also did patent opinion work.
19   I also did licensing.
20           And Waxman Hatch had fairly recently
21   been enacted, so I was expected to assist in any
22   Waxman Hatch litigation that occurred.
23       Q.   Do you recall then if your position
24   changed at any time? So going forward from when
25   you were a patent attorney in '87, did you get

31

1        Devlin - Highly Confidential
2    any new positions?
3        A.   I assumed management responsibility a
4    few years ago. And I don't know if it was four
5    or five years ago.
6        Q.   Okay. So would you say, then, that
7    between 1987 and the time when you assumed some
8    management responsibility, your job title was
9    essentially the same?
10       A.   My job title differed. I went from
11   patent attorney to senior patent attorney to, I
12   think they called me executive counsel.
13       Q.   Okay. Do you recall when you were
14   promoted from patent attorney to senior patent
15   attorney?
16       A.   Yes, I recall that. It was in either
17   1995 or 1996.
18       Q.   Okay. And how did the
19   responsibilities differ between a senior patent
20   attorney and a patent attorney?
21           MS. HOLLIS: Same objection.
22       A.   The job was very similar, except that
23   with a senior patent position I was expected to
24   do a bit more training of junior attorneys.
25       Q.   Okay. And then you became, I think

32

1        Devlin - Highly Confidential
2    you said executive counsel; is that correct?
3        A.   Yes.
4        Q.   And when was that, if you recall?
5        A.   1999-2000. I'm not sure of the date.
6        Q.   But that's not the management
7    position you were referring to earlier?
8        A.   No.
9        Q.   Okay. What additional
10   responsibilities did you have as executive
11   counsel?
12       A.   I assisted in the creation of the
13   patent portfolio management position, which I
14   described earlier, where this individual
15   prepares and files PCT international
16   applications for U.S. origin inventions and also
17   prepares an agenda for review of pending
18   applications for consideration by management for
19   abandonment.
20       Q.   So at that time you were helping to
21   develop that position?
22       A.   Yes.
23       Q.   It did not exist prior to that?
24       A.   Did not exist.
25       Q.   And now you are in charge of that?

33

1        Devlin - Highly Confidential
2        A.   Yes.
3        Q.   Okay. You mentioned the -- you got
4    some management responsibility.
5            What was your title at that point
6    when you attained management status?
7        A.   My title just prior to obtaining
8    management status was executive counsel.
9        Q.   Right, right. I think --
10       A.   And then I became executive director
11   group counsel.
12       Q.   Okay. And that's your current
13   position, correct?
14       A.   It's my current title. It's also
15   referred sometimes as executive group counsel --
16       Q.   Okay.
17       A.   -- always with intellectual property
18   attached.
19       Q.   Who do you report to in your position
20   now?
21       A.   Michael P. Morris.
22       Q.   Okay. What is his title, if you
23   know?
24       A.   Vice president intellectual property.
25       Q.   When you started at Boehringer in

9  (Pages 30 to 33)

70

1       **Devlin - Highly Confidential**
2       Q.   Okay.
3            THE VIDEOGRAPHER:  The time is 10:07.
4       We are going off the record.
5            (Whereupon, there is a recess in the
6       proceedings.)
7            THE VIDEOGRAPHER:  The time is 10:25.
8       We are back on the record.
9       Q.   All right, Ms. Devlin, back from the
10      excitement.
11           We were talking about the order
12      letters, and I wanted to get a better sense.
13      Can you tell me what was in these order letters?
14      **A.   Again, we are talking about an order**
15      **letter -- order letter that would have come in**
16      **in the time period from June 1987 to 1990?**
17      Q.   Right.
18      **A.   At a minimum, the order letter would**
19      **have advised of a convention date and an**
20      **identity of the priority document.**
21      Q.   What is a convention date?
22      **A.   Convention date is a date by which an**
23      **application must be filed, under the terms of**
24      **the Paris Union, in order to get the benefit of**
25      **an earlier filed patent application in a country**

71

1       **Devlin - Highly Confidential**
2       **member of the Paris Union.**
3       Q.   You said that that was at a minimum.
4            What other types of information would
5       be included?
6       **A.   They would perhaps also provide, if**
7       **they didn't in the order letter, the**
8       **identification of the inventors, the**
9       **identification also of the owner of the**
10      **application and any details about the text of**
11      **the application that was to be filed in the**
12      **United States.**
13      Q.   Okay.  Was -- did this include a
14      foreign filing text?
15           MS. HOLLIS:  Objection, vague.
16      **A.   Yeah.  By foreign filing text, you**
17      **mean the -- that's a very well-understood term**
18      **of art within Boehringer Ingelheim.**
19           **Do you mean the same thing?**
20      Q.   Well, what does that term mean to
21      you?
22      **A.   A foreign filing text is a document**
23      **that has the full text of a patent application**
24      **that will be filed outside of the -- outside of**
25      **Germany.**

72

1       **Devlin - Highly Confidential**
2       Q.   Okay.  In what language would those
3       texts be in?
4       **A.   A foreign filing text could be in**
5       **several languages.**
6       Q.   The ones that you received.
7       **A.   The ones that I received in June 1987**
8       **until January 1, 1990 would be in English.**
9       Q.   Have you ever received a foreign
10      filing text that was not in English?
11      **A.   During my entire career at Boehringer**
12      **Ingelheim?**
13      Q.   Yes.
14      **A.   Yes.**
15      Q.   What other languages did you receive
16      foreign filing texts in?
17      **A.   As best as I recall, it would be**
18      **German.**
19      Q.   But you don't read German, correct?
20      **A.   No.  I do have a working knowledge of**
21      **German.  I would not like to read a whole patent**
22      **application, but I could certainly pick up**
23      **certain details from the German text.**
24      Q.   In the instance that you received a
25      German foreign filing text, did you request a

73

1            Devlin - Highly Confidential
2       translated version into English?
3       **A.   No.  I think, if you look at my**
4       **testimony, I have no recollection of ever,**
5       **during the time period June 1987 until**
6       **January 1, 1990, receiving a German foreign**
7       **filing text.**
8       Q.   Correct.  I understand that.
9       **A.   Okay.**
10      Q.   So we are speaking more broadly here.
11      **A.   Okay.**
12           **Yes, I would ask for a translation.**
13      Q.   Okay.  Would -- was the foreign
14      filing text part of the order letter, or would
15      you see that as a separate document?
16      **A.   It depends.  It could be part of the**
17      **order letter.  It could be separate from the**
18      **order letter.  But the order letter would make**
19      **reference to it, either attached or something**
20      **coming; or perhaps already in the office, and**
21      **the order letter was to tie it all in.**
22      Q.   Okay.  You said -- but -- but you
23      wouldn't be able to file an application without
24      getting the foreign filing text at some point?
25           MS. HOLLIS:  Objection, vague.

19  (Pages 70 to 73)

206

1      Devlin - Highly Confidential
2        MS. HOLLIS: Objection, vague.
3    A.   One or two.
4    Q.   Okay. Were they both in the same
5  general time period that you described before?
6    A.   **There were probably two**
7  **conversations, and they were spaced perhaps a**
8  **month or two apart.**
9    Q.   Okay. And was anyone else present at
10 either of the conversations?
11   A.   No.
12   Q.   What was the nature of these
13 communications, in terms of were they in person,
14 was this an in-person conversation?
15   A.   **This was an in-person conversation.**
16   Q.   Okay. So it was not over the phone?
17   A.   **Not over the phone.**
18   Q.   Okay. Do you recall if anything
19 regarding the conversation was ever reduced to
20 writing?
21   A.   **No, nothing was reduced to writing.**
22   Q.   Okay. And you never received any
23 other communications regarding this issue?
24   A.   No.
25   Q.   Did it seem unusual to you for

207

1      Devlin - Highly Confidential
2  Dr. Frankhouser to be involved with an issue
3  like that?
4    A.   **No, not at all.**
5    Q.   Why not?
6    A.   **Because he was -- I think here we are**
7  **treading into the client, truly privileged**
8  **information.**
9    Q.   I'm asking just generally, if he
10 would -- I think the question was, did it seem
11 unusual to you for Dr. Frankhouser to be
12 involved in the issue, and then I asked why not?
13 So I'm speaking generally about the kinds of
14 issues he would have been involved in.
15       And is it your testimony that this is
16 something -- the kind of issue that he typically
17 would be involved in?
18       MS. HOLLIS: I'll just caution you,
19   to the extent that your answer would reveal
20   the contents of attorney-client
21   communication, I'll instruct you not to do
22   so. To the extent you can answer without
23   disclosing those conversations --
24   A.   Yeah, I don't think I can answer
25 **without disclosing, you know, why this is**

208

1      Devlin - Highly Confidential
2  **something -- why this is something that he**
3  **definitely would be involved with.**
4    Q.   Is interference something that the
5  company would be concerned about?
6        MS. HOLLIS: Objection. Lack of
7    foundation. Calls for speculation.
8    A.   **Interference has happened.**
9    Q.   Okay. And if you --
10   A.   **Patent issue, too, the company is**
11 **concerned about that as well.**
12   Q.   Right. Now, can you recall a time
13 when you discussed an issue that you thought
14 raised potential interference problems?
15       MS. HOLLIS: Objection, vague.
16   A.   **What time frame are we talking about?**
17   Q.   Any time.
18   A.   **Any time?**
19   Q.   Any time in your time at Boehringer?
20   A.   **Any time in my time at Boehringer,**
21 **did there ever come a time when I saw the**
22 **potential for an interference?**
23   Q.   Yes.
24   A.   Yes.
25   Q.   Did it happen while Dr. Frankhouser

209

1      Devlin - Highly Confidential
2  was still your supervisor, so prior to 1994 I
3  believe is what you testified to before?
4    A.   Yes. Prior and after.
5    Q.   Okay. And during the time frame that
6  Dr. Frankhouser was there, would you, or I
7  should say did you take that issue regarding
8  interference to him?
9        MS. HOLLIS: Objection, vague.
10   A.   **He would be one of several that I**
11 **would have alerted.**
12   Q.   Okay. Who else?
13   A.   **It would depend upon the application**
14 **that we are discussing. As I said, it happened**
15 **several times --**
16   Q.   Okay.
17   A.   **-- so it would depend.**
18   Q.   How many times, if you -- how many
19 times?
20   A.   **Three or four times.**
21   Q.   So you took it to Dr. Frankhouser in
22 each of those instances?
23   A.   Among others.
24   Q.   Okay. But at least Dr. Frankhouser?
25   A.   Yes.

53  (Pages 206 to 209)

210

Devlin - Highly Confidential

1
2    Q.   And was there anyone else that you --
3  that would have been included in all of those
4  times?
5       MS. HOLLIS: Objection, vague.
6    A.   Anyone else that would have been
7  included in each of those instances where I
8  went -- no.
9    Q.   Okay.  So it was a different person
10 each time, in addition to Dr. Frankhouser?
11   A.   Yes.
12   Q.   Okay.  I mean can you just list them?
13 Who were these people?
14      MS. HOLLIS: Objection, vague.
15   A.   List these people?  Well, I can
16 probably only recall a handful.
17   Q.   Okay.
18   A.   Jerry Stiles, Roger Milnes, Dieter
19 Laudien.  Those are the ones that I can think
20 of.
21   Q.   Okay.
22   A.   There were probably others.
23   Q.   What about Dr. Fleischer?
24   A.   I don't recall any instances
25 Dr. Fleischer was involved.

211

Devlin - Highly Confidential

1
2    Q.   Why did you raise it with those
3  particular people?
4    A.   Aren't we getting into
5  attorney-client?
6       MS. HOLLIS: If the answer would
7  reveal the contents of any attorney-client
8  communications --
9    Q.   I'm not asking for the content.  I'm
10 just trying to get into your thought processes
11 as to why a particular person needed to know, as
12 opposed to anyone else.
13      MS. HOLLIS: I think the, these
14 questions are unclear.  I'm going to
15 object, because they are vague.  And also,
16 to the extent your answer would reveal the
17 contents of privileged confidential
18 communications, I'll instruct you not to do
19 so.
20      If you can answer without divulging
21 the contents of those conversations, you
22 may do so.
23      MR. TOBIN: I think your instruction
24 is clear.  I think your objection is clear.
25   A.   All right, an interference is a

212

Devlin - Highly Confidential

1
2  complicated legal proceeding, involves
3  substantial costs and substantial time
4  commitments.  One does not embark upon an
5  interference lightly.
6    Q.   Okay.  So then I take it you are
7  saying that it was important to inform
8  individuals higher than yourself?
9       MS. HOLLIS: Objection to form.
10   A.   They were not necessarily higher than
11 myself.
12   Q.   Okay.  But Dr. Frankhouser was,
13 correct?
14   A.   Dr. Frankhouser was.
15   Q.   And you said he was involved in all
16 of the four, while he was still there?
17   A.   Yes.  As I said, an interference is a
18 complex legal proceeding.  It involves staffing,
19 time commitment and expense.
20   Q.   If you were to make a representation
21 to the patent office regarding potential
22 interference, would you want to discuss it with
23 these people first?
24      MS. HOLLIS: Objection.  Vague.
25      Incomplete hypothetical.  Calls for

213

Devlin - Highly Confidential

1
2  speculation.
3    A.   The set of individuals that I gave
4  you were ones that were involved in possible
5  interferences over the course of years.
6  However, their roles in each of those
7  interferences varied; so in any given instance,
8  no, I would certainly not get in touch with
9  those individuals, because the circumstances
10 would be very different.
11   Q.   Okay.  But you would have at least
12 taken it to Dr. Frankhouser?
13      MS. HOLLIS: Objection to form.
14   A.   If Dr. Frankhouser, you know, was
15 involved.
16   Q.   During the --
17   A.   During this time period, yes, I would
18 have gone to Dr. Frankhouser.
19   Q.   Now, do you remember any other
20 specific instances in which Dr. --
21   A.   Actually, I just thought of another
22 interference situation, where Dr. Raymond was
23 involved and Dr. Heinz-Gerd Klaes was involved,
24 in addition to Dr. Laudien.
25   Q.   Do you remember when that was?

54  (Pages 210 to 213)

230

1    Devlin - Highly Confidential
2  sure that that statement was correct?
3        MS. HOLLIS: Objection, incomplete
4    hypothetical. Calls for speculation. Lack
5    of foundation.
6    A.   Yeah. And this is a purely
7  hypothetical, if I were to make that statement.
8  I don't know all the facts and circumstances
9  here. As I have testified over and over again,
10 I have never seen these documents before.
11   Q.   And I understand that.
12        But based on your experience with the
13 company over 19 years and your experience
14 prosecuting patents, which I think we came out
15 to a number that was north of 500, I'm asking
16 you, when you make a statement regarding
17 priority, what sources would you look at to make
18 sure that that statement was correct?
19        MS. HOLLIS: Objection. Vague, and
20   again, incomplete hypothetical. Calls for
21   speculation.
22   A.   In my practice, I would make sure I
23 had all of the applications in front of me, so
24 that I feel comfortable making that statement.
25   Q.   So meaning you would look at the

231

1    Devlin - Highly Confidential
2  priority applications?
3    A.   Yes.
4    Q.   And if they were in a foreign
5  language, would you want to look at a translated
6  version?
7        MS. HOLLIS: Objection, incomplete
8    hypothetical. Calls for speculation.
9    A.   Yes. If I were presented with a
10 situation where I had a priority document in
11 German, I wanted to verify what was in the
12 priority document, I wasn't comfortable with my
13 rough translation, I would order a translation.
14   Q.   And then you would compare that to
15 what was filed in the United States application,
16 correct?
17        MS. HOLLIS: Same objections.
18   Incomplete hypothetical. Calls for
19   speculation.
20   A.   This is purely a hypothetical.
21   Q.   You can answer the question.
22   A.   If I was in this situation. And I
23 don't know whether or not that is, in fact -- I
24 don't know what the situation here is.
25   Q.   Right. But I'm just asking, you

232

1    Devlin - Highly Confidential
2  know, based on your experience, based on the
3  many years of doing this kind of thing, I'm --
4  and you've begun to answer, and you talked about
5  how you would want the applications in front of
6  you and you'd want to look at them, and you'd
7  want an English translation.
8        And it seems to me the final step
9  would be to compare what's in the U.S.
10 application to what's in the priority
11 application.
12        MS. HOLLIS: Objection, narrative.
13   Objection, to the extent that
14   mischaracterizes her previous testimony.
15   And again, it's a hypothetical. Asked and
16   answered, in fact.
17   Q.   You can answer.
18   A.   I would want everything in front of
19 me. But again, I need to know exactly what's in
20 these other applications, what's in the
21 application in hand and what's in all these
22 other applications.
23   Q.   Now, in the applications that you'd
24 want in front of you, would you include the
25 other company's applications, the ones that

233

1    Devlin - Highly Confidential
2  might potentially interfere?
3        MS. HOLLIS: Incomplete
4    hypothetical -- sorry. Objection,
5    incomplete hypothetical. Again, lack of
6    foundation. Calls for speculation.
7    A.   Again, if I'm making representations
8  about what's in someone else's application, I'd
9  want the entire application in front of me. If
10 that application was in another language other
11 than English, chances are I would want an
12 English translation.
13   Q.   And then you would compare the U.S.
14 application to the foreign applications?
15        MS. HOLLIS: Objection. First of
16   all, is that a question?
17        Same objections.
18   A.   If this were before me, I would do my
19 best to get every piece of information that I
20 felt necessary in front of me. If I was not
21 comfortable with the foreign language, I would
22 see to it that I had a translation. Then I
23 would make my comparisons and then report
24 appropriately to the patent and trademark
25 office.

59   (Pages 230 to 233)

# EXHIBIT J

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| BOEHRINGER INGELHEIM INTERNATIONAL GMBH and BOEHRINGER INGELHEIM PHARMACEUTICAL, INC. | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 05-0700 (KAJ) |
| v. | ) ) ) | |
| BARR LABORATORIES, INC., | ) ) ) | |
| Defendant, | ) ) | |
| BOEHRINGER INGELHEIM INTERNATIONAL GMBH and BOEHRINGER INGELHEIM PHARMACEUTICAL, INC. | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 05-0854 (KAJ) |
| v. | ) ) ) | |
| MYLAN PHARMACEUTICALS, INC., | ) ) ) | |
| Defendant. | ) | |

**OBJECTIONS AND RESPONSES OF PLAINTIFFS BOEHRINGER INGELHEIM INTERNATIONAL GMBH AND BOEHRINGER INGELHEIM PHARMACEUTICALS, INC. TO DEFENDANT BARR LABORATORIES, INC.'S SECOND SET OF INTERROGATORIES (NOS. 10-17)**

Pursuant to FEDERAL RULES OF CIVIL PROCEDURE 26(d) and 33, Plaintiff Boehringer Ingelheim International GMBH and Boehringer Pharmaceuticals, Inc. ("Boehringer") by its attorneys, hereby objects and responds to Defendant Barr Laboratories, Inc.'s ("Barr") Second Set of Interrogatories as follows:

### GENERAL OBJECTIONS

Boehringer incorporates by reference its General Objections in Boehringer's

Objections and Responses to Barr's First Set of Interrogatories.

### INTERROGATORY NO. 10

Identify each person involved with or responsible for the drafting, preparation, and/or prosecution of European Patent Application 85116016.8 and state with particularity what each person's role was.

### ANSWER:

Boehringer incorporates its General Objections as and for its objections to

Interrogatory No. 10. Boehringer further objects to Interrogatory No. 10 to the extent that it

seeks information protected from disclosure by the attorney-client privilege and/or the work-

product doctrine. Boehringer further objects to Interrogatory No. 10 on the grounds that it is

vague and ambiguous. Boehringer further objects to Interrogatory No. 10 on the grounds that it

is overly broad, unduly burdensome, and/or would require undue expense to answer.

Boehringer further objects to Interrogatory No. 10 to the extent that it seeks information already

in Barr's possession, custody or control, or available to Barr from public sources. Boehringer

further objects to the terms "drafting, preparation, and/or prosecution" because they are vague,

overly broad, and unduly burdensome.

Subject to and without waiving the foregoing objections and based on the

information currently available to Boehringer, Boehringer states that Dr. Rolf Fleischer, a Patent

Agent for Boehringer-Ingelheim International was involved with and responsible for the

drafting, preparation, and/or prosecution of European Patent Application 85116016.8.

CH\876904.1

2

## INTERROGATORY NO. 11

State with particularity all facts concerning when and how Plaintiffs first came into possession of European Patent Application No. 207,656 and U.S. Application Serial No. 747,748, and identify each person with knowledge of those facts.

## ANSWER:

Boehringer incorporates its General Objections as and for its objections to Interrogatory No. 11. Boehringer further objects to Interrogatory No. 11 to the extent that it seeks information protected from disclosure by the attorney-client privilege and/or the work-product doctrine. Boehringer further objects to Interrogatory No. 11 on the grounds that it is vague and ambiguous. Boehringer further objects to Interrogatory No. 11 on the grounds that it is overly broad, unduly burdensome, and/or would require undue expense to answer.

Subject to and without waiving the foregoing objections and based on the information currently available to Boehringer, Boehringer states that it became aware of a published European patent application with the designation No. 207,696 no later than February 2, 1987. *See* BOE00848983.

## INTERROGATORY NO. 12

State with particularity all facts concerning Plaintiffs' decision to submit the European Patent Application No. 207,656 and U.S. Application Serial No. 747,748 to the United States Patent and Trademark Office during prosecution of the applications that led to the '374, '086, and '812 patents, and identify each person with knowledge of those facts.

## ANSWER:

Boehringer incorporates its General Objections as and for its objections to Interrogatory No. 12. Boehringer further objects to Interrogatory No. 12 to the extent that it seeks information protected from disclosure by the attorney-client privilege and/or the work-product doctrine. Boehringer further objects to Interrogatory No. 12 on the grounds that it is

3

CH\876904.1

vague and ambiguous. Boehringer further objects to Interrogatory No. 12 on the grounds that it is overly broad, unduly burdensome, and/or would require undue expense to answer. Boehringer further objects to Interrogatory No. 12 to the extent it seeks information already in Barr's possession, custody or control, or available to Barr from public sources.

Subject to and without waiving the foregoing objections and based on the information currently available to Boehringer, Boehringer states that it submitted European Patent Application No. 207,656 and U.S. Application Serial No. 747,748 to the United States Patent and Trademark Office during the prosecution of the application that led to the '374 patent merely in an abundance of caution. It was evident that those applications were not available as prior art due to Boehringer's senior filing date and that, in light of the amendment necessitated by the issuance of the restriction requirement dated September, 11, 1986 neither of the applications contained any potentially interfering subject matter. Boehringer submitted European Patent Application No. 207,656 and U.S. Application Serial No. 747,748 to the United States Patent and Trademark Office during the prosecution of the applications that led to the '086 and '812 patents because, although they were not available as prior art, they were determined to contain potentially interfering subject matter. Alan R. Stempel of Boehringer is most knowledgeable of the facts leading to Boehringer's disclosure of European Patent Application No. 207,656 and U.S. Application Serial No. 747,748 to the examiners of the applications that lead to the '374, '086 and '812 patents.

## INTERROGATORY NO. 13

For each claim of the '812 patent you contend is infringed by Barr's proposed ANDA Product(s), do you contend that the claim is entitled to an earlier priority date than the filing date of the application that led to the '812 patent (October 12, 1988)? If so, state the

4

earliest date to which you contend you are entitled to priority and the basis for your contention, and identify all facts, documents, and circumstances on which you rely for your contention.

**ANSWER:**

Boehringer incorporates its General Objections as and for its objections to Interrogatory No. 13. Boehringer further objects to Interrogatory No. 13 to the extent that it seeks information protected from disclosure by the attorney-client privilege and/or the work-product doctrine. Boehringer further objects to Interrogatory No. 13 on the grounds that it is vague and ambiguous. Boehringer further objects to Interrogatory No. 13 on the grounds that it is overly broad, unduly burdensome, and/or would require undue expense to answer. Boehringer further objects to Interrogatory No. 13 on the to the extent that it seeks information already in Barr's possession, custody or control, or available to Barr from public sources. Boehringer further objects to Interrogatory No. 13 on the grounds that it is premature as Barr has not made a *prima facie* showing that Boehringer is not entitled to priority based on its foreign-filed parent applications as set forth during the prosecution of the '812 patent.

Subject to and without waiving the foregoing objections and based on the information currently available to Boehringer, Boehringer states that for each claim of the '812 patent it is entitled to a priority date of December 22, 1984, the filing date of German Patent No. 34,470,751, pursuant to 35 U.S.C. §§ 119 & 121. The following are the responsive documents relating to Boehringer's entitlement of a December 22, 1984 priority date: BOE00000073 to 334, BOE00000335 to 476, and BOE00000477 to 709, BOE00003998 to 4052, and BOE00000194 to 245.

CH\876904.1

Subject to and without waiving the foregoing objections and based on the information currently available to Boehringer, Boehringer states that claims 3, 4, 5, and 8 of the '812 patent are valid. First, by asking whether Boehringer contends that claims of the '812 patent "are not invalid," Interrogatory No. 16 erroneously presumes that Boehringer bears the burden of establishing validity. Instead, the claims of the '812 patent are presumed valid pursuant to 35 U.S.C. § 282, and Barr bears the burden of establishing invalidity by clear and convincing evidence. Barr has made no *prima facie* case of invalidity under § 102(g) with respect to any of claims 3, 4, 5, or 8 of the '812 patent, let alone a showing by clear and convincing evidence.

Second, Boehringer states that claims 3, 4, and 5 of the '812 patent are valid regardless of any work done by Drs. Laguzza and Turner because Drs. Laguzza and Turner never conceived of (a) a "tetrahydro-benzthiazole of the formula:



(Ia)

wherein, $R_1$ is a hydrogen atom, an alkyl group having 1 to 3 carbon atoms, an allyl, benzyl, 2-chloro-benzyl, 4-chloro-benzyl, 3,4-dichloro-benzyl or phenyl-ethyl group; $R_2$ is a hydrogen atom, a methyl or ethyl group; $R_3$ is a hydrogen atom, an alkyl group with 1 to 6 carbon atoms, an allyl, propargyl, benzyl, chlorobenzyl, pheylethyl, cyclopentyl or cyclohexyl group; and $R_4$ is a hydrogen atom, an alkyl group having 1 to 3 carbon atoms or an allyl group; or $R_3$ and $R_4$ together with the nitrogen atom between them form a piperidino, hexamethyleneimino or

9

Parkinsonism and schizophrenia, comprising a therapeutically effective amount of a compound according to claim 3 and a pharmaceutically acceptable carrier diluent" (claim 8) prior to the earliest effective filing date of the '812 patent. There is no evidence that either Drs. Turner or Laguzza synthesized or conceived of any such pharmaceutical compositions and/or their utility for the treatment of high blood pressure, tachycardia, Parkinson's disease, Parkinsonism, or schizophrenia. Indeed, there is no evidence that neither Dr. Laguzza or Dr. Turner received or understood the results of any biological tests performed on any compounds of claim 3 before the earliest effective filing date of the '812 patent. Moreover, even if Drs. Laguzza and Turner had conceived of or reduced to practice a pharmaceutical composition within the scope of claim 8 of the '812 patent prior to the earliest effective filing date of the '812 patent, they abandoned such inventions.     *See, e.g., Prosecution Histories of European Patent Application No. 207,656 and U.S. Application Serial No. 747,748.*

### INTERROGATORY NO. 17

Identify the author of the handwriting on the top of the page with Bates number BOE00004259, state what the handwritten portion of the document says, and, if the handwriting refers to a person's name, identify who that person is.

### ANSWER:

Boehringer incorporates its General Objections as and for its objections to Interrogatory No. 16. Boehringer further objects to Interrogatory No. 16 to the extent that it seeks information protected from disclosure by the attorney-client privilege and/or the work-product doctrine. Boehringer further objects to Interrogatory No. 17 on the grounds that it is unduly burdensome and/or would require undue expense to answer.

11

CH\876904.1

Carisa S. Yee
LATHAM & WATKINS LLP
135 Commonwealth Drive
Menlo Park, California 94025-3656
(650) 328-4600

13

## CERTIFICATE OF SERVICE

I, Maryellen Noreika, hereby certify that copies of the foregoing were caused to

be served this 10th day of October, 2006 upon the following in the manner indicated:

### BY HAND

Mary B. Matterer
Morris, James, Hitchens & Williams
222 Delaware Avenue
P.O. Box 2306
Wilmington, DE 19899

Adam Wyatt Poff
Young, Conaway, Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391

### BY FEDERAL EXPRESS

Glenn J. Pfadenhauer
Dov P. Grossman
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005-5901

David J. Harth
David L. Anstaett
Melody K. Glazer
Heller Ehrman LLP
One East Main Street, Suite 201
Madison, Wisconsin 53703

Shannon M. Bloodworth
Heller Ehrman LLP
1717 Rhode Island Ave., NW
Washington, DC 20036

Maryellen Noreika

# EXHIBIT K

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE
------------------------------------x
BOEHRINGER INGELHEIM INTERNATIONAL
GMBH and BOEHRINGER INGELHEIM
PHARMACEUTICALS, INC.,

        Plaintiffs,

     vs.          CA No.
                  05-700-(KAJ)

BARR LABORATORIES, INC.,

        Defendant.
------------------------------------x
BOEHRINGER INGELHEIM INTERNATIONAL
GMBH and BOEHRINGER INGELHEIM
PHARMACEUTICALS, INC.,

        Plaintiffs,

     vs.          CA No.
                  05-854-(KAJ)

MYLAN PHARMACEUTICALS, INC.,

        Defendant.
------------------------------------x
               January 31, 2007
               9:11 a.m.


     Videotaped Deposition of TIMOTHY X.

WITKOWSKI, held at the Sheraton Hotel, 18

Old Ridgebury Road, Danbury, Connecticut,

before Jennifer Ocampo-Guzman, a Notary

lic of the State of Connecticut.



**David Feldman**
W o r l d w i d e

                                               From File to Trial.

805 Third Avenue, 8th Floor          600 Anton Boulevard, 11th Floor
New York, NY 10022              Costa Mesa, CA 92626
(800) 642-1099                     (866) DFW-1380

114

Witkowski

1    Witkowski
2    A.  I believe Alan Stempel has
3    testified that he does not personally or now
4    recall what happened at the time, but he
5    feels confident that he had a good faith
6    belief in the accuracy of all the statements
7    that he made during the prosecution of this
8    application.
9    Q.  Apart from anything that Mr.
10   Stempel may have testified to in his
11   deposition, does the company have any other
12   information that would indicate whether or
13   not Mr. Stempel had a good faith belief in
14   the accuracy of the information contained in
15   the supplemental IDS?
16       MR. SCHULER:  Objection, goes
17       beyond the scope.  If you have personal
18       knowledge you can answer.
19   A.  Not to my knowledge.
20   Q.  Does the company have any
21   information as to whether or not Mr. Stempel
22   took any steps to determine whether or not
23   the statements made in the supplemental
24   information disclosure were correct?
25       MR. SCHULER:  Same objection.

115

1    Witkowski
2    A.  I believe Alan Stempel's testimony
3    in his deposition was that he does not recall
4    what steps, if any, were taken to determine
5    the correctness of the statements given the
6    fact that this is in excess of, you know,
7    18 years old, I guess, so Boehringer's
8    understanding is we have no knowledge about
9    what was done to determine whether the
10   statement is correct or not.
11   Q.  And the company has no knowledge as
12   to whether anything was done to determine
13   whether the statements were correct; is that
14   right?
15   A.  Well, my knowledge --
16       MR. SCHULER:  And I'll object, it
17       goes beyond the scope but you can answer
18       with your personal knowledge.
19   A.  My personal knowledge is I don't
20   have any information with respect to what, if
21   anything, was done to determine the
22   correctness of this statement in this
23   document.
24   Q.  And the company has no knowledge as
25   to what, if anything, was done to determine

116

1    Witkowski
2    the correctness of the statements in the
3    document; correct?
4        MR. SCHULER:  Objection, goes
5        beyond the scope, but if you have
6        personal knowledge, you can testify to
7        it.
8    A.  I don't know if -- I would have no
9    nonprivileged information about what was done
10   or not done with respect to determining the
11   correctness of the statements.
12   Q.  Do you have privileged information,
13   Mr. Witkowski, as to what was or was not done
14   with respect to determining the correctness
15   of information contained in the supplemental
16   IDS?
17       MR. SCHULER:  You can answer yes or
18       no.
19   A.  Yes.
20   Q.  And is that privileged information
21   that you learned from Mr. Stempel?
22       MR. SCHULER:  You can answer yes or
23       no.
24   A.  No.
25   Q.  Is that privileged information that

117

1    Witkowski
2    you learned from the review of documents?
3        MR. SCHULER:  You can answer yes or
4        no.
5    A.  Not for this deposition, no.
6    Q.  Are you aware of the existence of
7    documents that contain information bearing on
8    whether any steps were taken to determine the
9    accuracy of the information contained in the
10   supplemental IDS?
11       MR. SCHULER:  Can I have that
12       question back.
13       (A portion of the record was read.)
14       MR. SCHULER:  I don't think he's
15       calling for the content of any
16       communication, would you agree?
17       MR. PFADENHAUER:  I'm just asking
18       whether he knows of any such documents.
19       I'm not asking him to disclose what the
20       documents say.
21       MR. SCHULER:  I understand, and I'm
22       just saying even if he says, yes, I want
23       to make sure you're not going to claim
24       that's a waiver.
25       MR. PFADENHAUER:  Yes.

30  (Pages 114 to 117)

118

Witkowski
1
2    Q.  You are aware of such documents?
3    A.  Yes.
4    Q.  And you have seen the documents but
5  you didn't review them in preparation for
6  this deposition; is that correct?
7    A.  That's correct.
8    Q.  And are those documents documents
9  that are contained on Boehringer's privilege
10  log produced in this litigation?
11    MR. SCHULER:  Objection, goes
12    beyond the scope, but if you have any
13    personal knowledge, you can answer.
14    A.  Yes.
15    Q.  How many documents are you aware
16  of?
17    A.  One.
18    Q.  Do you know the date of the
19  document?
20    A.  I do not.
21    Q.  Do you know who the document was
22  authored by?
23    MR. SCHULER:  You can answer yes or
24    no.
25    A.  I don't recollect.

119

Witkowski
1
2    Q.  Do you know who the document was
3  sent to?
4    A.  Yes.
5    Q.  Who was the document sent to?
6    A.  I believe this is -- I'm trying to
7  remember.  I believe it is David Frankhouser.
8    Q.  But you don't recall who sent it to
9  Mr. Frankhouser?
10    A.  No, I don't.
11    Q.  And do you remember the year the
12  document was transmitted?
13    A.  I do not know.
14    Q.  How many pages long is the
15  document?
16    A.  I don't recall.
17    Q.  If I give you Boehringer's
18  privilege log, would you be able to identify
19  the entry on the log?
20    A.  It's possible but I very much doubt
21  it.
22    Q.  Apart from that one document, are
23  you aware of any other information in the
24  possession of Boehringer that bears on the
25  question of what, if anything, was done to

120

Witkowski
1
2  determine the accuracy of the statements
3  contained in the supplemental IDS?
4    MR. SCHULER:  Objection, goes
5    beyond the scope, but you can answer
6    with your personal knowledge.
7    A.  My personal knowledge, no.
8    Q.  To your personal knowledge, the
9  company doesn't have any other such
10  knowledge, any other such knowledge?
11    A.  That's correct.
12    Q.  You have reviewed the Eli Lilly
13  U.S. and European applications that were
14  ultimately submitted to the patent office in
15  the United States; correct?
16    A.  I have skimmed them, yes.
17    Q.  In preparing for the deposition you
18  reviewed the portions of the file history
19  that contained copies of those two Lilly
20  applications; correct?
21    A.  The file history here, yes.  Of
22  course, the one is -- okay.  Yeah, I think
23  they're both -- yes, they seem to be both
24  here, yes.
25    Q.  While I'm thinking about it, let me

121

Witkowski
1
2  ask you one more question about the documents
3  to Mr. Frankhouser that you testified about
4  earlier, was that document a letter?
5    A.  I don't know what it was designated
6  as, but it was, my recollection is it was a
7  letter, yes.
8    Q.  And do you know if it was
9  transmitted by fax or by mail?
10    A.  I don't know.
11    Q.  Turning now to the two Lilly
12  applications, there's a copy of a portion of
13  the Lilly U.S. file history, including the
14  application and the European published Lilly
15  application in the file history for the '374
16  patent; correct?
17    A.  Correct.
18    Q.  And you had a chance to at least
19  skim those applications in preparation for
20  the deposition; correct?
21    A.  Correct.
22    Q.  How did Boehringer come into
23  possession of a certified copy of the Lilly
24  U.S. application?
25    MR. SCHULER:  Objection, goes

31  (Pages 118 to 121)

214

1          Witkowski
2  be at 598 and 599 states that applicants
3  particularly wish to bring to the attention
4  of the Patent and Trademark Office the
5  existence of U.S. Patent Application 747,748
6  filed 24 June 1985, and its foreign
7  equivalent European patent application number
8  207,696 published 1 July 1987. So it was
9  brought to the attention of the examiners,
10  those are the Lilly applications.
11          It says -- it says here on page
12  BARR 600, the examiner is nevertheless urged
13  to consider carefully the relevance of serial
14  number 747,748 before allowing the
15  above-captioned application. So it's from
16  this document it is clear that the -- Alan
17  Stempel has brought these two applications to
18  the attention of the examiner to be
19  considered before passing on the
20  patentability of the claims that are pending.
21          Q.  Apart from the portions of the IDS
22  you just referenced, does the company have
23  any other information bearing on the question
24  of why the Lilly applications were included
25  in this IDS?

215

1          Witkowski
2          MR. SCHULER:  You can answer that
3  yes or no.
4          A.  Yes.
5          Q.  What other information does the
6  company have bearing on the question?
7          MR. SCHULER:  Object, and instruct
8  you not to answer to the extent that it
9  would call for the content of any
10  attorney-client communication or mental
11  impression of any Boehringer attorney.
12          A.  All the other documents that I'm
13  aware of that relate to this issue are
14  attorney-client privileged documents.
15          Q.  Are you aware of privileged
16  documents that bear on the question of why
17  the Lilly applications were included in this
18  IDS?
19          MR. SCHULER:  I'm sorry.  Can I
20  have that question back?
21          THE WITNESS:  Yeah, read it back.
22          Q.  Are you aware of privileged
23  documents that bear on the question of why
24  the Lilly applications were included in this
25  IDS?

216

1          Witkowski
2          A.  Yes.
3          Q.  How many such documents are you
4  aware of?
5          A.  One.
6          Q.  Who was the document prepared by?
7          A.  I don't know.
8          Q.  Who was the document addressed to?
9          A.  I believe it was David Frankhouser.
10          Q.  Is it the same privileged document
11  that you mentioned earlier in your testimony?
12          A.  Yes.
13          Q.  Was the document prepared before or
14  after this IDS on October 7, 1988?
15          A.  Before, according to my
16  recollection, before, yes.
17          Q.  Okay.  Other than that one
18  privileged document and the information in
19  the IDS that you've identified, does the
20  company have any other information bearing on
21  the question of why the Lilly applications
22  were included in this IDS?
23          A.  Not to my knowledge.
24          Q.  This IDS includes a heading,
25  "Possibly Interfering Application of

217

1          Witkowski
2  Another," on page BARR 598; do you see that,
3  Mr. Witkowski?
4          A.  Yes, I do.
5          Q.  Do you know who drafted that
6  heading?
7          A.  No, I do not.
8          MR. SCHULER:  Objection, goes
9  beyond the scope.  Go ahead.
10          A.  No, I do not.
11          Q.  In what way did Boehringer believe
12  that the Lilly applications were possibly
13  interfering applications of another?
14          MR. SCHULER:  I'll object,
15  misstates the document, goes beyond the
16  scope.  And to the extent that it would
17  call for privileged information, I
18  instruct you not to reveal it, but if
19  you can answer the question with your
20  personal knowledge, you can do so,
21  nonprivileged information.
22          A.  As I said before, there may be
23  privileged information that bears on this
24  question, but to the extent that I can talk
25  about this question without revealing the

55  (Pages 214 to 217)

226

Witkowski

1
2    application in the 197 application and to
3    determine whether it was proper to initiate
4    an interference.
5        Q.  At the time this document was filed
6    by Mr. Stempel in October 1988, did anyone at
7    Boehringer have a concern that the Lilly
8    applications might interfere with the
9    Boehringer application?
10        MR. SCHULER:  Objection, goes
11    beyond the scope.  Also to the extent
12    that you have any personal knowledge
13    that would implicate attorney-client
14    communications or mental impressions of
15    any attorney, I instruct you not to
16    reveal them.
17        THE WITNESS:  Could you read that
18    back?
19        (A portion of the record was read.)
20        MR. SCHULER:  Did you say
21    Boehringer twice?
22        MR. PFADENHAUER:  She said Lilly
23    and then Boehringer.
24        MR. SCHULER:  Okay.
25        A.  Well, I believe that this shows

227

Witkowski

1
2    that there is some concern that there's a
3    potential for interference with the Lilly
4    application.
5        Q.  Did you know who at Boehringer had
6    that concern?
7        MR. SCHULER:  Again, it goes beyond
8    the scope, but again, if you have
9    personal knowledge you can answer.
10        A.  Yes.
11        Q.  Who had that concern?
12        MR. SCHULER:  Same objection, goes
13    beyond the scope but you can answer if
14    you have personal knowledge.
15        A.  David Frankhouser?
16        Q.  Did anyone at Boehringer besides
17    Mr. Frankhouser have concern that the Lilly
18    applications might interfere with the
19    Boehringer application?
20        MR. SCHULER:  Objection, misstates
21    the document, also goes beyond the
22    scope, but if you have personal
23    knowledge you can do so as long as you
24    don't reveal privileged communications.
25        A.  I don't know.

228

Witkowski

1
2        Q.  Does the company know?
3        MR. SCHULER:  Same objection, goes
4    beyond the scope.
5        A.  Not to my knowledge.
6        Q.  What's the basis for your
7    understanding that Mr. Frankhouser had a
8    concern that the Lilly applications might
9    interfere with the Boehringer application?
10        MR. SCHULER:  To the extent that
11    answering that question would in your
12    personal capacity cause you to divulge
13    attorney-client communications or mental
14    impressions of an attorney, I instruct
15    you not to reveal them.  But if you can
16    otherwise answer the question, you may.
17        A.  Based on the attorney-client
18    privileged documents.
19        Q.  Is that the same document you
20    testified about earlier that was directed to
21    Mr. Frankhouser?
22        A.  Yes.
23        Q.  Is it your understanding, Mr.
24    Witkowski, that the document directed to Mr.
25    Frankhouser that you've discussed was

229

Witkowski

1
2    prepared by outside counsel for the company?
3        MR. SCHULER:  You can answer yes or
4    no.
5        A.  Yes.
6        Q.  Which outside attorney prepared the
7    document?
8        A.  I don't recall.
9        Q.  What firm was the attorney with?
10        A.  I don't recall.
11        Q.  Had the document been prepared at
12    Mr. Frankhouser's request?
13        MR. SCHULER:  Well, let me object.
14    It goes beyond the scope, obviously, but
15    to the extent that that would cause you
16    to divulge the contents of the memo in
17    any respect, don't do so.  But,
18    obviously, if you have personal
19    knowledge, you can answer, as long as
20    it's not privileged.
21        A.  I don't recall.
22        Q.  Was Mr. Stempel provided a copy of
23    that document?
24        MR. SCHULER:  Objection, goes
25    beyond the scope, but if you have

58  (Pages 226 to 229)

230

```
1           Witkowski
2    personal knowledge you can answer.
3       A.  I don't know.
4       Q.  Does the company know if anyone
5    other than Mr. Frankhouser received a copy of
6    the document?
7           MR. SCHULER:  Same objection, goes
8       beyond the scope but if you have
9       personal knowledge you can answer.
10      A.  I don't know.
11      Q.  Do you know, Mr. Witkowski, if a
12   document to Mr. Frankhouser was prepared by
13   John Sweeney?
14      A.  Yes.
15      Q.  Yes, it was prepared by Mr.
16   Sweeney?
17      A.  Yes, it was.
18      Q.  In the back on page BARR 599 in the
19   paragraph that starts U.S. application serial
20   number, do you see that, Mr. Witkowski?
21      A.  Yes.
22      Q.  The second sentence refers to the
23   effective filing date of the above-captioned
24   application; do you see that?
25      A.  Yes.
```

231

```
1           Witkowski
2       Q.  Is that referring to the effective
3    filing date of December 22, 1984?
4           MR. SCHULER:  Objection, the
5       document speaks for itself.
6       A.  The document says that the
7    effective filing date of the above-captioned
8    application is 22, December 1984.
9       Q.  And in the paragraph above that
10   there's a reference to, in the last sentence,
11   the effective filing date of the
12   above-captioned application, do you see that?
13          MR. SCHULER:  I'm sorry, I
14      missed --
15      Q.  The paragraph that starts when Y is
16   S?
17          MR. SCHULER:  Okay.
18      Q.  Are you with me, Mr. Witkowski?
19      A.  Yes.  Okay.
20      Q.  Okay.  The end -- the last sentence
21   of that paragraph has a reference to the
22   effective filing date of the above-captioned
23   application; do you see that?
24      A.  Yes.
25      Q.  And is that also referring to 22
```

232

```
1           Witkowski
2    December 1984?
3           MR. SCHULER:  Objection, the
4       document speaks for itself.
5       A.  It seems to be.
6       Q.  What did Boehringer do prior to the
7    time Mr. Stempel filed this document with the
8    patent office to determine whether or not
9    this document correctly asserted the
10   effective filing date of the pending
11   application?
12          MR. SCHULER:  Objection, goes
13      beyond the scope.  But if you have
14      personal knowledge, you can answer.
15      A.  I have no personal knowledge about
16   how or if Boehringer did anything to
17   determine that that was the effective filing
18   date.
19      Q.  Does the company have any knowledge
20   about whether anything was done to determine
21   whether that was the effective filing date of
22   the application?
23          MR. SCHULER:  Same objection.
24      A.  Not to my knowledge.
25          THE WITNESS:  I would just clarify,
```

233

```
1           Witkowski
2    just to the extent that priority was
3    claimed, I mean something was apparently
4    done, so priority was claimed, so that
5    the company did do something to
6    determine that priority should be
7    claimed.
8       Q.  At the time the application was
9    filed you're referring to?
10      A.  Yeah, because at the beginning of
11   the application there's a claim to priority,
12   so that's the only indication that I know of
13   that something was done.
14      Q.  And the claims in this application
15   were amended after that claim for priority
16   had originally been made; correct?
17      A.  Yes.
18      Q.  And the company doesn't have any
19   information as to whether anyone did anything
20   to determine whether those newly presented
21   claims had an effective filing date of the
22   date of December 22, 1984; is that correct?
23          MR. SCHULER:  Objection, goes
24      beyond the scope, but you can answer if
25      you have personal knowledge.
```

59  (Pages 230 to 233)

290

Witkowski

1
2    Q.  And are you the person in the legal
3    department at Boehringer Ingelheim in the
4    United States who has primary responsibility
5    for supervising those outside counsel?
6        A.  I wouldn't say primary
7    responsibility.
8        Q.  Who would you identify as the
9    person in the legal department at Boehringer
10   Ingelheim in the U.S. who has the primary
11   responsibility for them?
12       A.  The person who has, who is in
13   charge of the prosecution section of the IP
14   group is Mary-Ellen Devlin.  The person in
15   charge of litigation is Mike Morris.
16       Q.  Do you report then to both of those
17   individuals in performing your function for
18   the company?
19       A.  No.
20       Q.  You only report to Mr. Morris?
21       A.  Yes.
22       Q.  So in conjunction with supervising
23   lawyers, outside lawyers who are involved in
24   prosecution for the company, you do that
25   apart from Ms. Devlin?

291

1        Witkowski
2        A.  Well, I wouldn't say apart but I
3    don't report formally to her.  She has
4    overall responsibility and she facilitates
5    the, I guess you would say the structure of
6    the internal and external functions of the
7    prosecution group, but I don't report to her
8    in the sense of getting work from her or
9    having her direct my work.
10       Q.  Do you have any supervisory
11   authority over anyone in Germany affiliated
12   with Boehringer Ingelheim?
13       A.  I do not.
14       Q.  Was the company aware at any time
15   prior to the issuance of the '812 patent of
16   any potential interferences relating to
17   tetrahydrobenzthiazole compounds other than
18   the potential interference involving Lilly?
19       MR. SCHULER:  Objection, goes
20   beyond the scope and to the extent it
21   calls for privilege information or the
22   mental opinions of any attorney from
23   Boehringer, I instruct you not to
24   divulge those, but if you have personal
25   knowledge, nonprivileged knowledge you

292

1        Witkowski
2    can answer.
3        A.  Not to my knowledge.
4        Q.  So based on all information
5    available to you both privileged and
6    nonprivileged, you are unaware of the company
7    having knowledge of any potential
8    interference involving tetrahydrobenzthiazole
9    compounds prior to the issuance of the '812
10   other than the potential interference with
11   Lilly?
12       A.  That's --
13       MR. SCHULER:  Same objections.
14       A.  That's correct.
15       Q.  Did Boehringer at any point in time
16   have discussions with anyone affiliated with
17   Eli Lilly regarding either the U.S. or
18   European Lilly applications relating to
19   tetrahydrobenzthiazoles?
20       MR. SCHULER:  Objection, goes
21   beyond the scope.  If you have personal
22   knowledge you can answer as long as it's
23   not privileged.
24       A.  Not to my knowledge.
25       (Discussion off the record.)

293

1        Witkowski
2        Q.  Who is John Foley?
3        MR. SCHULER:  Objection, goes
4    beyond the scope, lack of foundation.
5        A.  I don't know.
6        Q.  Who is Dr. James Oliver?
7        MR. SCHULER:  Same objections.
8        A.  I don't know.
9        Q.  Who is Warren Lackstrom?
10       MR. SCHULER:  Same objection.
11       A.  I don't know.
12       Q.  Who is Heidi Reidies,
13   R-E-I-D-I-E-S?
14       MR. SCHULER:  Same objections.
15       A.  She is, my understanding is she's
16   an employee of Boehringer Ingelheim
17   Pharmaceuticals, who is in the drug
18   regulatory affairs group, but I don't know
19   what her title is.
20       Q.  Is she an employee of Boehringer
21   Ingelheim located in the United States?
22       A.  My understanding is yes.
23       Q.  And what is your understanding as
24   to how long she's been associated with the
25   company?

74  (Pages 290 to 293)

# EXHIBIT L

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BOEHRINGER INGELHEIM INTERNATIONAL GMBH and BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 05-700 (***) |
| v. | ) ) | CONSOLIDATED |
| BARR LABORATORIES, INC., | ) ) | |
| Defendant. | ) ) | |

| | | |
|---|---|---|
| BOEHRINGER INGELHEIM INTERNATIONAL GMBH and BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 05-854 (***) |
| v. | ) ) ) | |
| MYLAN PHARMACEUTICALS INC., | ) ) | |
| Defendant. | ) | |

**OBJECTIONS AND RESPONSES OF PLAINTIFFS BOEHRINGER INGELHEIM
INTERNATIONAL GMBH AND BOEHRINGER INGELHEIM PHARMACEUTICALS,
INC. TO DEFENDANT BARR LABORATORIES, INC.'S
THIRD SET OF INTERROGATORIES (NOS. 18-45)**

Pursuant to FEDERAL RULES OF CIVIL PROCEDURE 26(d) and 33, Plaintiffs

Boehringer Ingelheim International GmbH and Boehringer Pharmaceuticals, Inc. ("Boehringer")

by its attorneys, hereby object and respond to Defendant Barr Laboratories, Inc.'s ("Barr") Third

Set of Interrogatories as follows:

## GENERAL OBJECTIONS

Boehringer incorporates by reference its General Objections in Boehringer's Objections and Responses to Barr's First Set of Interrogatories.

### INTERROGATORY NO. 18

Do you contend that the '812 patent claims compounds as well as methods of treatment? If so, state the basis for your contention and identify all facts, documents, and circumstances on which you rely for your contention.

### ANSWER:

Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 18. Boehringer further objects to Interrogatory No. 18 to the extent it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine. Boehringer further objects to Interrogatory No. 18 as overly broad, unduly burdensome, and not reasonably calculated to lead to discoverable information. Boehringer further objects to Interrogatory No. 18 on the grounds that it is vague and ambiguous, especially with the respect to the term "claims." Boehringer further objects to Interrogatory No. 18 to the extent it calls for a legal conclusion. Boehringer further objects to Interrogatory No. 18 on the grounds that it contains discrete subparts within the meaning of FEDERAL RULE OF CIVIL PROCEDURE 33(a).

Subject to and without waiving the foregoing objections, Boehringer states that claims 1-7, 9 and 10 of the '812 patent claim compounds of specified formulas or (pharmaceutically acceptable) acid addition salts thereof, (*see* '812 patent, claims 1-7, 9, 10), that claim 8 of the '812 patent claims pharmaceutical compositions, (*id.*, claim 8) and that none of the claims of the '812 patent are "method of treatment" claims. *See id. at passim.*

## INTERROGATORY NO. 19

Do you contend that either of German Applications DE 3447075 and DE 3508947 contains a sufficient written description pursuant to 35 U.S.C. § 112 to support compounds within the scope of claim 3 of the '812 patent containing a 2-chloro-benzyl, a 4-chloro-benzyl, or a 3,4-dichloro-benzyl at the R1 position? If so, state the basis for your contention and identify all facts, documents, and circumstances on which you rely for your contention, including the pages and line numbers in German Applications DE 3447075 and DE 3508947 that support your contention.

## RESPONSE:

Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 19. Boehringer further objects to Interrogatory No. 19 to the extent it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine. Boehringer further objects to Interrogatory No. 19 as overly broad, unduly burdensome, and not reasonably calculated to lead to discoverable information. Boehringer further objects to Interrogatory No. 19 as vague and ambiguous. Boehringer further objects to Interrogatory No. 19 as premature and as calling for information that is not relevant to the claims of defenses of any party. Boehringer further objects to Interrogatory No. 19 on the grounds that it contains discrete subparts within the meaning of FEDERAL RULE OF CIVIL PROCEDURE 33(a).

Subject to and without waiving the foregoing objections, Boehringer responds as follows. Both German Applications DE 3447075 and DE 3508947 contain a written description that is sufficient to support the scope of claim 3 of the '812 patent pursuant to 35 U.S.C. § 112. With respect to claim 3's inclusion of compounds containing a 2-chloro-benzyl, 4-chloro-benzyl, or 3,4-dichlorobenzyl group at the $R^1$ position, support is found, *inter alia*, at the following pages of DE 3447075, DE 3508947, and DX 53:

3

| Page Number of DE 3447075 | Page Number of DE 3508947 | Page Number of DX 53 |
|---|---|---|
| BOE000040009 | Ex. 5, at 6. | BARR 028270-71 |
| BOE00004011 | Ex. 5, at 8. | BARR 028273 |
| BOE00004015-16 | Ex. 5, at 12-13. | BARR 028277-80 |

As set forth above, each of DE 3447075 and DE 3508947 (1) discloses tetrahydrobenzethiazole compounds of general formula I, (2) states that $R_1$ can be a phenylalkyl group with 1 to 3 carbon atoms, and (3) states that phenyl nuclei may be substituted by chlorine atoms. Each of DE 3447075 and DE 3508947 goes on to disclose two methods for making compounds of general formula I "wherein at least one of the groups $R_1$, $R_2$, $R_3$, or $R_4$ represents one of the . . . phenylalkyl groups mentioned hereinbefore," including the previously disclosed phenylalkyl groups wherein the phenyl nucleus is substituted by one or more chlorine atoms. *See DX 53, at BARR 028277-78.* One of these methods, identified as method "d" in the applications, was the same method used by named inventor Dr. Schneider to direct the production of compounds having a 2-chloro-benzyl, 4-chloro-benzyl, or 3, 4-dichlorobenzyl group at the $R_1$ position. *See* '812 patent, col. 20, ll. 23-43; DX 8 at 23; *id.* at BOE00062011.

## INTERROGATORY NO. 20

Do you contend that either of German Applications DE 3447075 and DE 3508947 contains a sufficient written description pursuant to 35 U.S.C. § 112 to support compounds within the scope of claim 1 of the '812 patent containing "a phenyl alkyl or phenyl alkanoyl group having 1 to 3 carbon atoms in the alkyl part, wherein the above mentioned phenyl nuclei may be substituted by 1 or 2 halogen atoms" at the R1 position? If so, state the basis for your contention and identify all facts, documents, and circumstances on which you rely for your contention, including the pages and line numbers in German Applications DE 3447075 and DE 3508947 that support your contention.

4

**RESPONSE:**

Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 20. Boehringer further objects to Interrogatory No. 20 to the extent it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine. Boehringer further objects to Interrogatory No. 20 as overly broad, unduly burdensome, and not reasonably calculated to lead to discoverable information. Boehringer further objects to Interrogatory No. 20 on the grounds that it is vague and ambiguous. Boehringer further objects to Interrogatory No. 20 on the grounds that it contains discrete subparts within the meaning of FEDERAL RULE OF CIVIL PROCEDURE 33(a). Boehringer further objects to Interrogatory No. 20 as premature and as calling for information that is not relevant to the claims of defenses of any party.

Subject to and without waiving the foregoing objections, Boehringer incorporates by reference its response to Interrogatory No. 19 as and for its response to Interrogatory No. 20.

**INTERROGATORY NO. 21**

Do you contend that the alleged invention(s) claimed in the '812 patent possess(es) unexpected properties, including without limitation as compared to the alleged invention(s) claimed in the '086 patent? If so, for each claim-in-suit please state the basis for your contention and identify all facts, documents, and circumstances on which you rely for your contention.

**RESPONSE:**

Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 21. Boehringer further objects to Interrogatory No. 21 to the extent it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine. Boehringer further objects to Interrogatory No. 21 on the grounds that it is overly broad, unduly burdensome, and/or would entail undue expense to answer.

5

Boehringer further objects to Interrogatory No. 21 on the grounds that it seeks information that is not relevant to the claim or defense of any party, particularly insofar as it asks Boehringer to describe all "unexpected properties" of the claimed compounds, *"including without limitation as compared to the alleged invention(s) claimed in the '086 patent."* It is unreasonable to request Boehringer to describe all unexpected properties of the invention of the '812 patent without limiting the universe of things to which the invention's properties should be compared. Boehringer further objects to Interrogatory No. 21 on the grounds that it is vague and ambiguous. Boehringer further objects to Interrogatory No. 21 on the grounds that it contains discrete subparts within the meaning of FEDERAL RULE OF CIVIL PROCEDURE 33(a). Boehringer further objects to Interrogatory No. 21 as premature to the extent it seeks the subject of expert opinions.

Subject to and without waiving the foregoing objections, Boehringer states that the inventions claimed by the '812 patent possess unexpected properties as compared to the inventions claimed by the '086 patent. Thus, for instance, one of the compounds claimed by the '812 patent, pramipexole, has useful properties distinct from the methods of use specified in the claims of the '086 patent. For example, the compounds of the '812 patent are useful for the treatment of moderate-to-severe primary Restless Leg Syndrome ("RLS"), a sensorimotor condition that affects millions of Americans. *E.g.,* Hening W, Walters AS, Allen RP, Montplaisir J, Myers A, Ferini-Strambi L., *Impact, diagnosis, and treatment of restless legs syndrome (RLS) in a primary care population: the REST (RLS epidemiology, symptoms, and treatment) primary care study,* Sleep Med. 2004;5:237-246. The FDA has approved pramipexole for the treatment of moderate to severe primary RLS in humans. *See* BOE00881432-67, at BOE00881433.

6

In addition, outside observers have noted that 2-amino-6-n-propylamino-4,5,6,7-tetrahydrobenzthiazole has neuroprotective properties, *see, e.g.*, R. Danzeisen, *et al.*, *Targeted Antioxidative and Neuroprotective Properties of the Dopamine Agonist Pramipexole and Its Nondopaminergic Enantiomer SND919CL2*, 316 J. Pharmacology and Experimental Therapeutics 189-1999 (2006) (BOE 00881492-502) and is effective as an antidepressant, *see, e.g.*, J. Maj, *et al.*, *Antidepressant Effects of Pramipexole, a Novel Dopamine Receptor Agonist*, J. Neural Transmission (1997) 104:525-533 (BOE 00881477-485). The United States Patent and Trademark Office (U.S.P.T.O.) has recognized these unexpected properties in granting U.S. Pat. Nos. 6,191,153 (entitled "Use of 2-amino-6-n-propyl-amino-4,5,6,7-tetrahydrobenzothiazole as a pharmaceutical composition having an antidepressant activity"), 6,001,861 (entitled "Use of pramipexole in the treatment of restless legs syndrome"), 6,194,445 (entitled "Use of Pramipexole in the treatment of Restless Legs Syndrome"), 6,458,820 (entitled "Method for preventing or the progression of neuronal damage with pramipexole as a neuroprotective agent"), 5,650,420 (entitled "Pramipexole as a neuroprotective agent").

Moreover, independent observers have also noted that another compound claimed by the '812 patent, (R)-2-amino-6-n-propylamino-4,5,6,7-tetrahydrobenzothiazole, is useful for the treatment of ALS. *See* Patee GL, Post GR, Gerber RE, Bennett JP, *Reduction of Oxidative Stress in Amyotrophic Lateral Sclerosis Following Pramipexole Treatment*, Amyotroph. Lateral Scler. Other Motor Neron. Disord. 2003; 4(2); 90-95 (BOE 00881486-491).

**INTERROGATORY NO. 22:**

Do you contend that the alleged invention(s) claimed in the '812 patent satisfied a long-felt but unmet need? If so, for each claim-in-suit please state the basis for your contention and identify all facts, documents, and circumstances on which you rely for your contention.

7

**RESPONSE:**

Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 22. Boehringer further objects to Interrogatory No. 22 to the extent it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine. Boehringer further objects to Interrogatory No. 22 on the grounds that it is overly broad, unduly burdensome, and/or would entail undue expense to answer. Boehringer further objects to Interrogatory No. 22 on the grounds that it seeks information that is not relevant to the claim or defense of any party. Boehringer further objects to Interrogatory No. 22 on the grounds that it is vague, ambiguous, and incapable of reasonable ascertainment. Boehringer further objects to Interrogatory No. 22 as premature to the extent it seeks the subject of expert opinions. Boehringer further objects to Interrogatory No. 22 to the extent that it calls for evidence rather than facts. Boehringer further objects to Interrogatory No. 22 on the grounds that it contains discrete subparts within the meaning of FEDERAL RULE OF CIVIL PROCEDURE 33(a).

Subject to and without waiving the foregoing objections, Boehringer states that the invention(s) of the '812 patent satisfied long-felt but unmet needs as compared to compounds available as of December 21, 1984. First, it satisfied the long-felt need for an effective and well-tolerated drug for Parkinson's Disease. At the time of the invention, very few treatments for Parkinson's Disease existed. The few available treatments were levadopa and ergot-based dopamine agonists such as bromocriptine and pergolide. Use of levadopa, however, generally leads to motor complications such as dyskinesias. *See, e.g.*, Tuite, Paul, M.D., *et al.*, *Dopamine Agonists*, Seminars in Neurology, vol. 21, No. 1, 2001 (BOE 00881468-473). Ergot-based dopamine agonists also had severe side effects, including the inducement of pleural, peritoneal, and pericardial fibrosis as well as erythromelalgia and Raynaud's phenomena. *Id.* Therefore,

8

there existed a need for a drug that was effective in treating Parkinson's Disease but had a lower risk for these side effects. Pramipexole satisfied this need. Pramipexole (1) has no ergot-related side effects, (2) is associated with reduced instances of motor complications compared to levadopa, (3) is effective in early stage Parkinson's Disease, (4) is effective as either a monotherapy or as an adjunct therapy with levadopa, (5) has a long half-life, (6) does not metabolize, and (7) does not interact with other drugs. *See, e.g.,* BARR 014115 (and reference cited therein). Thus it quickly became the "world's leading dopamine agonist and Parkinson's treatment." IMS Health, *Neurodegenerative Disease: A Major Market in the Making, Sep. 29, 2005, available at: http://www.imshealth.com/web/content/0,3148,64576068_63872702_70261004_75407581,00.html.* (BOE 00881474-76).

Second, the compounds of the '812 patent also satisfied a long-felt but unmet need for an effective therapy for the treatment of moderate-to-severe primary RLS. *See Response to Interrogatory No. 22.*

**INTERROGATORY NO. 23:**

Do you contend that no Boehringer agent or representative knew that the "Auslandstext" (also referred to as a foreign filing text) for Cases 5/920 and/or 1/737 included compounds that were not sufficiently described pursuant to 35 U.S.C. § 112 in German Applications DE 3447075 and DE 3508947? If so, please state the basis for your contention and identify all facts, documents, and circumstances on which you rely for your contention. If your answer is anything other than an unequivocal "Yes," please state the basis for your answer, identify which individual(s) possessed this knowledge, and identify all facts, documents, and circumstances on which you rely for your answer.

**RESPONSE:**

Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 23. Boehringer further objects to Interrogatory No. 23 to the extent it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine. Boehringer further objects to Interrogatory No. 23 on the grounds that

it is overly broad, unduly burdensome, and/or would entail undue expense to answer. Boehringer further objects to Interrogatory No. 23 on the grounds that it assumes facts not in evidence. Boehringer further objects to Interrogatory No. 23 on the grounds that it purports to ask Boehringer to prove, or identify all "facts, documents, and circumstances" which evidence, the nonexistence of a fact. Boehringer further objects to Interrogatory No. 23 on the grounds that it is vague and ambiguous. Boehringer further objects to Interrogatory No. 23 on the grounds that it contains discrete subparts within the meaning of FEDERAL RULE OF CIVIL PROCEDURE 33(a).

Subject to and without waiving the foregoing objections, Boehringer states that the compounds included in the "Auslandstext" for Cases 5/920 and/or 1/737 were sufficiently described pursuant to 35 U.S.C. § 112 in German Applications DE 3447075 and DE 3508947. *See* Boehringer's Response to Interrogatory Nos. 19 & 20 (incorporated herein). Boehringer further states that it is not aware of any Boehringer agent or representative who thought that the "Auslandstext" included compounds that were not sufficiently described pursuant to 35 U.S.C. § 112 in German Applications DE 3447075 and DE 3508947.

## INTERROGATORY NO. 24:

Do you contend that no Boehringer agent or representative knew that the "Auslandstext" (also referred to as a foreign filing text) for Cases 5/920 and/or 1/737 included text that was not contained in German Applications DE 3447075 and DE 3508947? If so, please state the basis for your contention and identify all facts, documents, and circumstances on which you rely for your contention. If your answer is anything other than an unequivocal "Yes," please state the basis for your answer, identify which individual(s) possessed this knowledge, and identify all facts, documents, and circumstances on which you rely for your answer.

**RESPONSE:**

   Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 24. Boehringer further objects to Interrogatory No. 24 to the extent it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine. Boehringer further objects to Interrogatory No. 24 on the grounds that it is overly broad, unduly burdensome, and/or would entail undue expense to answer. Boehringer further objects to Interrogatory No. 24 on the grounds that it purports to ask Boehringer to prove, or identify all "facts, documents, and circumstances" which evidence, the nonexistence of a fact. Boehringer further objects to Interrogatory No. 24 as vague and ambiguous, especially to the extent it does not identify the "text" to which it refers. Boehringer further objects to Interrogatory No. 24 as calling for information that is irrelevant to the claims or defenses of either party. Boehringer further objects to Interrogatory No. 24 on the grounds that it contains discrete subparts within the meaning of FEDERAL RULE OF CIVIL PROCEDURE 33(a).

   Subject to and without waiving the foregoing objections, Boehringer states that Dr. Schneider's laboratory synthesized additional compounds within the scope of the invention disclosed in DX 4 following the filing of that application with the German Patent Office and forwarded information regarding those compounds to Dr. Fleischer for inclusion in the Auslandstext. *See* Schneider Dep. at 70-77, 120-21 & 153-54. However, no Boehringer deponent recalls being aware at the time that the Auslandstext "included text that was not contained in German Applications DE 3447075 and DE 3508947." *See id.* at 154 ("I cannot tell you that I specifically have been aware of it. I was aware that additional compounds were synthesized in my laboratory . . . ."); Dep. of R. Fleischer at 201-214.

**INTERROGATORY NO. 25**

Do you contend that the statement submitted to the United States Patent and Trademark Office during the prosecution of U.S. Patent Application 256,671 that U.S. Application Serial No. 747,748 "is not available as prior art because its filing date is later than the effective filing date of the above-captioned application. (The effective filing date of the above-captioned application is 22 December 1984, the date on which the German application for which Convention priority is claimed was filed)" is correct? If so, please state the basis for your contention and identify all facts, documents, and circumstances on which you rely for your contention. If your answer is anything other than an unequivocal "Yes," please identify what is incorrect about the statement(s), identify each person at Boehringer that knew that it was incorrect, identify when and how each person learned it was incorrect, identify the basis for any contention that part of the statement is correct, and state the basis for your answer including identifying all facts, documents, and circumstances on which you rely for your answer.

**RESPONSE:**

Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 25. Boehringer further objects to Interrogatory No. 25 to the extent it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine. Boehringer further objects to Interrogatory No. 25 as overly broad, unduly burdensome, and not reasonably calculated to lead to discoverable information. Boehringer further objects to Interrogatory No. 25 as vague and ambiguous. Boehringer further objects to Interrogatory No. 25 as calling for information that is irrelevant to the claims or defenses of either party and that is not reasonably calculated to lead to the discovery of admissible evidence. Boehringer further objects to Interrogatory No. 25 to the extent that it calls for evidence rather than facts. Boehringer further objects to Interrogatory No. 25 on the grounds that it contains multiple discrete subparts within the meaning of FEDERAL RULE OF CIVIL PROCEDURE 33(a).

Subject to and without waiving the foregoing objections, Boehringer states that the statement made to the United States Patent and Trademark Office during the prosecution of U.S. Patent Application 256,671 (the "671 Application") that U.S. Application Serial No.

747,748 "is not available as prior art because its filing date is later than the effective filing date of the above-captioned application. (The effective filing date of the above-captioned application is 22 December 1984, the date on which the German application for which Convention priority is claimed was filed)" is accurate.

First, the first German application to which the '671 application claimed priority under 35 U.S.C. § 119 adequately supported the claims of the '671 Application under 35 U.S.C. § 112, *see* Boehringer's Response to Interrogatory Nos. 19 & 20 (incorporated herein), and was filed on December 22, 1984, which is earlier than the June 24, 1985 filing date of U.S. Application Serial No. 747,748. Therefore, the filing date of the '748 application was later than the effective filing date of the '671 application.

Second, regardless of whether the claims of the '671 application had the benefit of the filing dates of either DE 3508947 or DE 3447075 under 35 U.S.C. § 119, the '748 application was not prior art. Because the '748 application was never published and never issued as a patent, it did not fall within the scope of any of 35 U.S.C. § 102(a), (b), (d), or (e). The inventors named in the '671 application did not derive their invention(s) from the '748 application, so the '748 application did not constitute prior art under §102(f). Finally, the '748 application did not itself qualify as prior art under § 102(g). *See* MPEP § 2138.

At most, the '748 application may potentially have led to the information that could have qualified as prior art under § 102(g), but the applicants expressly disclosed that possibility to the Examiner, as can be seen from the entirety of, and context of, the statement quoted in Interrogatory No. 25:

C.  Possibly Interfering Application of Another

Applicants particularly wish to bring to the attention of the Patent and Trademark Office the existence U.S. Patent Application Serial No. 747,748, filed 24 June 1985, and its foreign equivalent, European Patent Application No. 207,696, published 1 July, 1987.

European '696 discloses tetrahydro (thi or ox) azoles of the formula:



wherein $R^1$ and $R^2$ are individually H, methyl, ethyl or n-propyl; $R^3$ and $R^4$ are individually H, methyl, ethyl, n-propyl or allyl; and Y is O or S.

When Y is S, the compounds of European '696 represent a subgenus of the compounds disclosed and originally claimed in the above-captioned application.  However, European '696 does not represent prior art because its publication date is later than the affective filing date of the above-captioned application.

U.S. Application Serial No. 747,748 contains the same disclosure as European '696. It is not available as prior art because its filing date is later than the effective filing date of the above-captioned application.  (The effective filing date of the above-captioned application is 22 December 1984, the date on which the German application for which Convention priority is claimed was filed).

It is believed that Serial No. 747,748 is still pending.  As filed, U.S. Application Serial No. 747,748 contained claims directed to compounds of the above formula XX.

The Examiner is urged to consider carefully the relevance of Serial No. 747,748 before allowing the above-captioned application. The possibility of interfering subject matter should be particularly considered.  Copies of these two references and a Form PTO-1449 listing the same are enclosed herewith.

*'812 pros., Dec. 8, 1988 Second Preliminary Amendment and Information Disclosure Statement,*

at 3-4.

14

As can be seen from the context of this statement, the applicants urged the U.S.P.T.O. "to consider carefully the relevance of Serial No. 747,748 before allowing the above-captioned application" and that "[t]he possibility of interfering subject matter should be particularly considered." *Id.* The U.S.P.T.O. never invoked the interference, however, and the '748 application ultimately was abandoned.

### INTERROGATORY NO. 26:

Do you contend that the statement submitted to the United States Patent and Trademark Office during the prosecution of U.S. Patent Application 256,671 that U.S. Application Serial No. 747,748 "is not available as prior art because its filing date is later than the effective filing date of the above-captioned application. (The effective filing date of the above-captioned application is 22 December 1984, the date on which the German application for which Convention priority is claimed was filed)" was not a material representation? If so, please state the basis for your contention and identify all facts, documents, and circumstances on which you rely for your contention. If your answer is anything other than an unequivocal "Yes," please describe with particularity why the representation was material and identify all facts, documents, and circumstances on which you rely for your answer.

### RESPONSE:

Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 26. Boehringer further objects to Interrogatory No. 26 to the extent it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine. Boehringer further objects to Interrogatory No. 26 as overly broad, unduly burdensome, and not reasonably calculated to lead to discoverable information. Boehringer further objects to Interrogatory No. 26 as vague and ambiguous, especially with respect to the term "material representation." Boehringer further objects to Interrogatory No. 26 as calling for information that is irrelevant to the claims or defenses of either party and that is not reasonably calculated to lead to the discovery of admissible evidence. Boehringer further objects to Interrogatory No. 26 as overly broad, unduly burdensome, and not reasonably calculated to lead to discoverable information, especially to the extent that it purports to ask Boehringer to

15

prove, or identify all "facts, documents, and circumstances" which evidence, the nonexistence of a fact. Boehringer further objects to Interrogatory No. 26 on the grounds that it contains multiple discrete subparts within the meaning of FEDERAL RULE OF CIVIL PROCEDURE 33(a).

Subject to and without waiving the foregoing objections, Boehringer states that, given their context, the words quoted in Interrogatory No. 26 were not material.

First, the words quoted are accurate, because the '748 application was not available as prior art to the '671 application, regardless of whether the '671 application could claim the benefit of the filing date of the German priority applications. *See* Boehringer's Resp. to Interrog. No. 25 (incorporated herein). Second, the words quoted are accurate because the filing date of the '748 application was later than the earliest effective filing date of the '671 application. *See id.* Third, even if the '748 application suggested prior art might exist to the '671 application under § 102(g), the applicants disclosed that possibility to the Examiner in the portions of the document at issue (which portions were omitted by Barr from Interrogatory No. 26). *See id.*

Fourth, even if was true that the '748 application had an earlier effective filing date than the '671 application, the statement that the '748 application "is not available as prior art *because* its filing date is later than the effective filing date of the above-captioned application" (emphasis added) would not be material because the '748 application was not available as prior art to the '671 application regardless of whether or not the '671 application could claim the benefit of the filing date of the German priority applications. *See id.*

## INTERROGATORY NO. 27:

Do you contend that practicing a method of treating Parkinsonism or Parkinson's disease which comprises administering a therapeutically effective amount of 2-amino-6-n-propyl-4,5,6,7-tetrahydro-benzthiazole, or a pharmaceutically acceptable acid addition salt thereof is within the scope of any claim of the '812 patent? If so, please state the basis for your

16

contention, identify which claim(s), and identify all facts, documents, and circumstances on which you rely for your contention. If not, please state the basis for your answer and identify all facts, documents, and circumstances on which you rely for your answer.

**RESPONSE:**

Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 27. Boehringer further objects to Interrogatory No. 27 to the extent it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine. Boehringer further objects to Interrogatory No. 27 as overly broad, unduly burdensome, and not reasonably calculated to lead to discoverable information. Boehringer further objects to Interrogatory No. 27 as vague and ambiguous, especially with respect to its use of the phrase "within the scope of any claim." Boehringer further objects to Interrogatory No. 27 to the extent it calls for a legal conclusion. Boehringer further objects to Interrogatory No. 27 on the grounds that it contains discrete subparts within the meaning of FEDERAL RULE OF CIVIL PROCEDURE 33(a).

Subject to and without waiving the foregoing objections, Boehringer states claims 1-7, 9 and 10 of the '812 patent claim compounds of specified formulas or (pharmaceutically acceptable) acid addition salts thereof, (*see* '812 patent, claims 1-7, 9, 10), that claim 8 of the '812 patent claims pharmaceutical compositions, (*id.*, claim 8). Boehringer further states that the unauthorized manufacture, use, offer to sell, or sale within the United States or importation into the United States of any of those claimed compounds, acid addition salts, or compositions by a person or entity other than Boehringer before the expiration of the '812 patent – or the filing of an ANDA seeking approval from the FDA to do so – constitutes infringement of the '812 patent pursuant to 35 U.S.C. § 271(a), (b), and/or (e)(2). Boehringer further states that no claims in the '812 patent claim a "method of treating Parkinsonism or Parkinson's disease which comprises

17

administering a therapeutically effective amount of 2-amino-6-n-propyl-4,5,6,7-tetrahydro-
benzthiazole, or a pharmaceutically acceptable acid addition salt thereof."

## INTERROGATORY NO. 28

Do you contend that practicing a method of treating the signs and symptoms of idiopathic Parkinson's disease which comprises administering 0.125 mg, 0.25 mg, 0.5 mg, 1.0mg, or 1.5 mg of (S)-2-amino-4,5,6,7-tetrahydro-6-(propylamino) benzothiazole dihydrochloride monohydrate is within the scope of any claim of the '812 patent? If so, please state the basis for your contention, identify which claim(s), and identify all facts, documents, and circumstances on which you rely for your contention. If not, please state the basis for your answer and identify all facts, documents, and circumstances on which you rely for your answer.

## RESPONSE:

Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 28. Boehringer further objects to Interrogatory No. 28 to the extent it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine. Boehringer further objects to Interrogatory No. 28 as overly broad, unduly burdensome, and not reasonably calculated to lead to discoverable information. Boehringer further objects to Interrogatory No. 28 as vague and ambiguous, especially with respect to its use of the phrase "within the scope of any claim." Boehringer further objects to Interrogatory No. 28 to the extent it calls for a legal conclusion. Boehringer further objects to Interrogatory No. 28 on the grounds that it contains discrete subparts within the meaning of FEDERAL RULE OF CIVIL PROCEDURE 33(a).

Subject to and without waiving the foregoing objections, Boehringer states claims 1-7, 9 and 10 of the '812 patent claim compounds of specified formulas or (pharmaceutically acceptable) acid addition salts thereof, (see '812 patent, claims 1-7, 9, 10), that claim 8 of the '812 patent claims pharmaceutical compositions, (id., claim 8). Boehringer further states that the unauthorized manufacture, use, offer to sell, or sale within the United States or importation into

18

the United States of any of those claimed compounds, acid addition salts, or compositions by a person or entity other than Boehringer before the expiration of the '812 patent – or the filing of an ANDA seeking approval from the FDA to do so – constitutes infringement of the '812 patent pursuant to 35 U.S.C. § 271(a), (b), and/or (e)(2). Boehringer further states that no claims in the '812 patent claim a "method of treating the signs and symptoms of idiopathic Parkinson's disease which comprises administering 0.125 mg, 0.25 mg, 0.5 mg, 1.0 mg, or 1.5 mg of (S)-2-amino-4,5,6,7-tetrahydro-6-(propylamino) benzothiazole dihydrochloride monohydrate."

**INTERROGATORY NO. 29:**

For each of entries 1, 5, 8, 16, 17, 19, 22, 28, 30, 31, 39, 42, 43, 44, 45, 46, 47,48, 49, 51, 52, 56, 57, 58, 59, 60, 61, 62, 63, 67, 68, 70, 71, 74, 183, 184, 186, 188, 190, 192,193, 196, 205, 208, 209, 211, 213, 214, 216, 218, 219, 223, 225, 227, 237, 244, 246, 251, 254,260, 262, 266, 268, 279, 281, 282, 283, 288, 297, 298, 304, 306, 307, 309, 311, 312, 315, 316,318, 319, 321, 389, 390, 392, 394, 397, 398, 416, 418, 420, 421, 423, 425, 431, 432, 433, 435,436, and 440 on Boehringer's privilege log, state which communications were partially or wholly in English.

**RESPONSE:**

Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 29. Boehringer further objects to Interrogatory No. 29 to the extent it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine. Boehringer further objects to Interrogatory No. 29 on the grounds that it is overly broad, unduly burdensome, and/or would entail undue expense to answer. Boehringer further objects to Interrogatory No. 29 on the grounds that it seeks information that is not relevant to the claim or defense of any party.

**INTERROGATORY NO. 30:**

State whether Boehringer or its agents or representatives were making any preparations at anytime between 1987 and 1990 for a potential interference proceeding between U.S. Application Serial Nos. 810,947, 124,197, and/or 256,671 and U.S. Application Serial

No. 747,748. If your answer is anything other than an unequivocal "No," identify which of the aforementioned patent applications were the subject of those preparations, and identify all individuals involved with the preparations (including without limitation outside counsel) and all individuals who were aware of the preparations.

**RESPONSE:**

   Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 30. Boehringer further objects to Interrogatory No. 30 to the extent it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine, especially to the extent it requests information about "preparations . . . for a potential interference proceeding." Boehringer further objects to Interrogatory No. 30 as overly broad, unduly burdensome, and not reasonably calculated to lead to discoverable information. Boehringer further objects to Interrogatory No. 30 as vague and ambiguous. Boehringer further objects to Interrogatory No. 30 as calling for information that is not relevant to the claims or defenses of any party. Boehringer further objects to Interrogatory No. 30 on the grounds that it contains discrete subparts within the meaning of FEDERAL RULE OF CIVIL PROCEDURE 33(a).

   Subject to and without waiving the foregoing objections, Boehringer responds as follows. Boehringer acknowledged "[t]he possibility" that the '748 application contained "interfering subject matter" in its correspondence with the U.S.P.T.O. in connection with the prosecution of U.S. Application Nos. 256,671 (*Dec. 8, 1988 Second Preliminary Amendment*, at 3-4), 124,197 (*Oct. 7, 1988 Amendment*, at 22-23), and 810,947 (*March 1, 1988 Supplemental Information Disclosure Statement Under Rule 99*, at 1-2). Individuals aware of the possibility of "interfering subject matter" with respect to the '748 application included Alan Stempel.

20

**INTERROGATORY NO. 31:**

State whether Boehringer or its agents or representatives were making any preparations at anytime between 1987 and 1990 for a potential interference proceeding between U.S. Application Serial Nos. 810,947, 124,197, and/or 256,671 and any patent application other than U.S. Application Serial No. 747,748. If your answer is anything other than an unequivocal "No," identify which of the aforementioned patent applications were the subject of those preparations and identify all individuals involved with the preparations (including without limitation outside counsel) and all individuals who were aware of the preparations.

**RESPONSE:**

Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 31. Boehringer further objects to Interrogatory No. 31 on the grounds that it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine, especially to the extent it requests information about "preparations . . . for a potential interference proceeding." Boehringer further objects to Interrogatory No. 31 on the grounds that it is overly broad, unduly burdensome, and/or would entail undue expense to answer. Boehringer further objects to Interrogatory No. 31 on the grounds that it seeks information that is not relevant to the claim or defense of any party. Boehringer further objects to Interrogatory No. 31 on the grounds that it contains discrete subparts within the meaning of FEDERAL RULE OF CIVIL PROCEDURE 33(a).

**INTERROGATORY NO. 32:**

For each of entries 5, 20, 21, 26, 35, 39, 54, 57, 68, 69, 72, 73, 74, 75, 76, 77, 79, 82, 83, 84, 85, 86, 94, 95, 96, 97, 100, 101, 102, 104, 106, 107, 172, 173, 174, 175, 176, 438, 439 on Boehringer's privilege log, state whether the "potential interference proceeding" concerned U.S. Application Serial No. 747,748.

21