**RESPONSE:**

Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 32. Boehringer further objects to Interrogatory No. 32 on the grounds that it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine. Boehringer further objects to Interrogatory No. 32 on the grounds that it is overly broad, unduly burdensome, and/or would entail undue expense to answer. Boehringer further objects to Interrogatory No. 32 on the grounds that it seeks information that is not relevant to the claim or defense of any party. Boehringer further objects to Interrogatory No. 32 on the grounds that it contains discrete subparts within the meaning of FEDERAL RULE OF CIVIL PROCEDURE 33(a).

**INTERROGATORY NO. 33:**

For each of entries 63, 67, 120, 130, and 268 on Boehringer's privilege log, state whether the "other corporation's patent" concerned Eli Lilly and Company and/or U.S. Application Serial No. 747,748.

**RESPONSE:**

Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 33. Boehringer further objects to Interrogatory No. 33 on the grounds that it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine. Boehringer further objects to Interrogatory No. 33 on the grounds that it is overly broad, unduly burdensome, and/or would entail undue expense to answer. Boehringer further objects to Interrogatory No. 33 on the grounds that it seeks information that is not relevant to the claim or defense of any party. Boehringer further objects to Interrogatory No. 33 on the grounds that it contains discrete subparts within the meaning of FEDERAL RULE OF CIVIL PROCEDURE 33(a).

**INTERROGATORY NO. 34:**

State whether Boehringer or its agents or representatives ever communicated with Eli Lilly and Company or its agents or representatives regarding the possibility of a settlement agreement in connection with U.S. Application Serial No. 747,748. If so, state with particularity the dates of each communication, the content of each communication, the names of each individual involved in those communications.

**RESPONSE:**

Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 34. Boehringer further objects to Interrogatory No. 34 to the extent that it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine. Boehringer further objects to Interrogatory No. 34 on the grounds that it is overly broad, unduly burdensome, and/or would entail undue expense to answer. Boehringer further objects to Interrogatory No. 34 on the grounds that it seeks information that is not relevant to the claim or defense of any party. Boehringer further objects to Interrogatory No. 34 on the grounds that it contains discrete subparts within the meaning of FEDERAL RULE OF CIVIL PROCEDURE 33(a). Subject to and without waiving the foregoing objections, Boehringer states that the answer to Interrogatory No. 34 is no.

**INTERROGATORY NO. 35:**

Do you contend that all compounds within claims 3, 4, 5, 7, 8, 9, and 10 of the '812 patent can be used to treat at least one of the following: (1) hypertension, (2) tachycardia,(3) schizophrenia, (4) Parkinsonism, or (5) Parkinson's disease? If so, for each claim please state the basis for your contention and identify all facts, documents, and circumstances on which you rely for your contention. If your answer is anything other than an unequivocal "Yes," for each claim please identify all compounds within those claims that can be used to treat the aforementioned disorders and identify all facts, documents, and circumstances on which you rely for your answer.

**RESPONSE:**

Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 35. Boehringer further objects to Interrogatory No. 35 on the grounds that it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine. Boehringer further objects to Interrogatory No. 35 on the grounds that it is overly broad, unduly burdensome, and/or would entail undue expense to answer. Boehringer further objects to Interrogatory No. 35 on the grounds that it seeks information that is not relevant to the claim or defense of any party. Boehringer further objects to Interrogatory No. 35 on the grounds that it contains discrete subparts within the meaning of FEDERAL RULE OF CIVIL PROCEDURE 33(a).

**INTERROGATORY NO. 36:**

Identify the reasons U.S. Application Serial No. 256,671 was filed, including whether it was filed so that the issues presented by U.S. Application Serial No. 747,748 could be more easily dealt with.

**RESPONSE:**

Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 36. Boehringer further objects to Interrogatory No. 36 to the extent it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine. Boehringer further objects to Interrogatory No. 36 as overly broad, unduly burdensome, and not reasonably calculated to lead to discoverable information. Boehringer further objects to Interrogatory No. 36 as calling for information that is not relevant to the claims or defenses of any party.

Subject to and without waiving the foregoing objections, Boehringer responds as follows. Claims 1-8 of U.S. Application No. 124,197 were reinstated in another application

24

which later became U.S. Application Serial No. 256,671 to "advance the prosecution of [the '197

application] and [so] that issues presented by [the '748 application] will be more easily dealt

with." '086 patent prosecution history, *Oct. 7, 1988 Amendment,* at 22-23.

### INTERROGATORY NO. 37

Do you contend that claim 5 of the '812 patent is not invalid for failure to satisfy
the requirement of 35 U.S.C. § 112, ¶ 2? If so, please state the basis for your contention and
identify all facts, documents, and circumstances on which you rely for your contention.

### RESPONSE:

Boehringer hereby incorporates its General Objections as and for its objections to

Interrogatory No. 37. Boehringer further objects to Interrogatory No. 37 on the grounds that it

calls for information protected by the attorney-client privilege, the work product doctrine, and/or

the common interest doctrine. Boehringer further objects to Interrogatory No. 37 on the grounds

that it is overly broad, unduly burdensome, and/or would entail undue expense to answer.

Boehringer further objects to Interrogatory No. 37 on the grounds that it seeks information that is

not relevant to the claim or defense of any party. Boehringer further objects to Interrogatory No.

37 on the grounds that it contains discrete subparts within the meaning of FEDERAL RULE OF

CIVIL PROCEDURE 33(a). Boehringer further objects to Interrogatory No. 37 to the extent that it

purports to ask Boehringer to prove, or identify all "facts, documents, and circumstances" which

evidence, the nonexistence of a fact.

Subject to and without waiving the foregoing objections, Boehringer responds as

follows. The answer to Interrogatory No. 37 is yes. Claim 5, like all the claims of the '812

patent, are presumed valid pursuant to 35 U.S.C. § 282. Barr bears the burden of establishing

invalidity by clear and convincing evidence. Barr has presented no reason why claim 5 may be

invalid for failure to satisfy 35 U.S.C. §112, ¶ 2, much less clear and convincing evidence.

Therefore, it is impossible for Boehringer to "identify all facts, documents, and circumstances on which [it] rel[ies] for [its] contention."

**INTERROGATORY NO. 38:**

Identify each person who participated in or was involved with the drafting of the Second Preliminary Amendment and Information Disclosure Statement submitted in December 1988 in connection with U.S. Application Serial No. 256,671, including without limitation any individuals who discussed or reviewed any drafts before it was filed with the United States Patent and Trademark Office, and describe with particularity each person's responsibility with respect to that document, including without limitation identifying each person who was responsible for the accuracy of the representations contained in that document.

**RESPONSE:**

Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 38. Boehringer further objects to Interrogatory No. 38 to the extent it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine. Boehringer further objects to Interrogatory No. 38 as overly broad, unduly burdensome, and not reasonably calculated to lead to discoverable information. Boehringer further objects to Interrogatory No. 38 as calling for information that is not relevant to the claims or defenses of any party. Boehringer further objects to Interrogatory No. 38 as vague and ambiguous.

Subject to and without waiving the foregoing objections, Boehringer responds as follows. Persons who participated in or were involved with the drafting of the Second Preliminary Amendment and Information Disclosure Statement submitted in December 1988 in connection with U.S. Application Serial No. 256,671 included Alan Stempel. Boehringer further states that additional information that is responsive to Interrogatory No. 38 may be found in the transcripts of the depositions taken in this case of Dr. Laudien, Dr. Fleischer, Mr. Stempel, Dr. Klaes, and Dr. Milnes.

**INTERROGATORY NO. 39**

Identify each person who received copies of the Second Preliminary Amendment and Information Disclosure Statement submitted in December 1988 in connection with U.S. Application Serial No. 256,671, including without limitation any drafts and/or the version filed with the United States Patent and Trademark Office.

**RESPONSE:**

Boehringer hereby incorporates its General Objections as and for its objections to

Interrogatory No. 39. Boehringer further objects to Interrogatory No. 39 on the grounds that it

calls for information protected by the attorney-client privilege, the work product doctrine, and/or

the common interest doctrine. Boehringer further objects to Interrogatory No. 39 on the grounds

that it is overly broad, unduly burdensome, and/or would entail undue expense to answer.

Notably, the document that is the subject of Interrogatory No. 39 is a public document.

Boehringer further objects to Interrogatory No. 39 on the grounds that it seeks information that is

not relevant to the claim or defense of any party. Boehringer further objects to Interrogatory No.

39 as vague and ambiguous.


**INTERROGATORY NO. 40**

Identify each person who participated in or was involved with the drafting of the "Auslandstext" (also referred to as a foreign filing text) for Cases 5/920 and/or 1/737, including without limitation any individuals who discussed or reviewed any drafts, and describe with particularity each person's responsibility with respect to that document.

**RESPONSE:**

Boehringer hereby incorporates its General Objections as and for its objections to

Interrogatory No. 40. Boehringer further objects to Interrogatory No. 40 on the grounds that it

calls for information protected by the attorney-client privilege, the work product doctrine, and/or

the common interest doctrine. Boehringer further objects to Interrogatory No. 40 on the grounds

that it is overly broad, unduly burdensome, and/or would entail undue expense to answer.

Boehringer further objects to Interrogatory No. 40 on the grounds that it seeks information that is not relevant to the claim or defense of any party. Boehringer further objects to Interrogatory No. 40 as vague and ambiguous.

Subject to and without waiving the foregoing objections, Boehringer responds as follows. Persons who participated in the drafting of the Auslandstext for cases 5/920 and/or 1/737 included Dr. Fleischer. Boehringer further states that additional information that is responsive to Interrogatory No. 40 may be found in the transcripts of the depositions taken in this case of Dr. Laudien, Dr. Fleischer, Mr. Stempel, Dr. Klaes, and Dr. Milnes.

**INTERROGATORY NO. 41:**

Identify each person who received copies in any language of the "Auslandstext" (also referred to as a foreign filing text) for Cases 5/920 and/or 1/737, including without limitation any drafts and/or the versions filed with any patent office.

**RESPONSE:**

Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 41. Boehringer further objects to Interrogatory No. 41 on the grounds that it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine. Boehringer further objects to Interrogatory No. 41 on the grounds that it is overly broad, unduly burdensome, and/or would entail undue expense to answer. Boehringer further objects to Interrogatory No. 41 on the grounds that it seeks information that is not relevant to the claim or defense of any party. Boehringer further objects to Interrogatory No. 41 as vague and ambiguous.

**INTERROGATORY NO. 42**

Identify each person who received copies in any language of any of: U.S. Application Serial No. 747,748, European Patent Application No. 207,696, U.S. Application Serial No. 810,947, U.S. Application Serial No. 124,197, U.S. Application Serial No. 256,671, German Applications DE 3447075, and/or German Application DE 3508947 and state which of the aforementioned patent application(s) each received and when each person received it.

**RESPONSE:**

Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 42. Boehringer further objects to Interrogatory No. 42 on the grounds that it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine. Boehringer further objects to Interrogatory No. 42 on the grounds that it is overly broad, unduly burdensome, and/or would entail undue expense to answer. Notably, the documents that are the subject of Interrogatory No. 42 are public documents. Boehringer further objects to Interrogatory No. 42 on the grounds that it seeks information that is not relevant to the claim or defense of any party. Boehringer further objects to Interrogatory No. 42 as vague and ambiguous.

**INTERROGATORY NO. 43:**

State whether Boehringer had any confidentiality or secrecy agreement(s) with Professor Oleh Hornykiewicz effective at any time between 1980 and 1990 that encompassed communications regarding the alleged invention(s) claimed in the '374, '086, or '812 patents. If your answer is anything other than an unequivocal "No," state the basis for your answer and identify all facts, documents, and circumstances on which you rely for your answer, including without limitation describing with particularity the nature of the agreement(s), the effective date of the agreement(s), the scope of the agreement(s), the reasons for entering into the agreement(s), and the basis for your assertion that the agreement(s) encompassed the alleged invention(s) claimed in the '374, '086, or '812 patents, and identifying which claim(s) of the aforementioned patents you allege the agreement(s) encompassed.

29

**RESPONSE:**

Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 43. Boehringer further objects to Interrogatory No. 43 on the grounds that it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine. Boehringer further objects to Interrogatory No. 43 on the grounds that it is overly broad, unduly burdensome, and/or would entail undue expense to answer. Boehringer further objects to Interrogatory No. 43 on the grounds that it seeks information that is not relevant to the claim or defense of any party. Boehringer further objects to Interrogatory No. 43 as vague and ambiguous. Boehringer further objects to Interrogatory No. 43 on the grounds that it seeks information that is obtainable from other means that are more convenient, less burdensome, and/or less expensive. Boehringer further objects to Interrogatory No. 43 on the grounds that it contains multiple subparts within the meaning of FEDERAL RULE OF CIVIL PROCEDURE 33(a).

**INTERROGATORY NO. 44**

Identify when (R)-2-amino-6-n-propylamino-4,5,6,7-tetrahydrobenzothiazole (including any salts thereof) and (S)-2-amino-6-n-propylamino-4,5,6,7-tetrahydrobenzothiazole (including any salts thereof) were first synthesized at Boehringer, who synthesized them, and what materials and methods were used to prepare them.

**RESPONSE:**

Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 44. Boehringer further objects to Interrogatory No. 44 on the grounds that it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine. Boehringer further objects to Interrogatory No. 44 on the grounds that it is overly broad, unduly burdensome, and/or would entail undue expense to answer. Boehringer further objects to Interrogatory No. 44 on the grounds that it seeks information that is

30

not relevant to the claim or defense of any party. Boehringer further objects to Interrogatory No. 44 as vague and ambiguous. Boehringer further objects to Interrogatory No. 44 on the grounds that it contains multiple subparts within the meaning of FEDERAL RULE OF CIVIL PROCEDURE 33(a).

Subject to and without waiving the foregoing objections, Boehringer responds as follows. Pursuant to Rule 33(d), Boehringer directs Barr to BOE 0062068-BOE 0065805 and BOE 00066139-BOE 00068784 from which the answer to Interrogatory No. 44 may be derived.

**INTERROGATORY NO. 45:**

Describe with particularity all research and testing preformed [sic] by Boehringer of any compound within the scope of General Formula I of the '812 patent where the R1 is "a phenyl alkyl or phenyl alkanoyl group having 1 to 3 carbon atoms in the alkyl part, whilst the above mentioned phenyl nuclei may be substituted by 1 or 2 halogen atoms," including without limitation the compounds with internal Boehringer numbers SND1021, SND1025, and SND1035.

**RESPONSE:**

Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 45. Boehringer further objects to Interrogatory No. 45 on the grounds that it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine. Boehringer further objects to Interrogatory No. 45 on the grounds that it is overly broad, unduly burdensome, and/or would entail undue expense to answer. Boehringer further objects to Interrogatory No. 45 on the grounds that it seeks information that is not relevant to the claim or defense of any party. Boehringer further objects to Interrogatory No. 45 as vague and ambiguous. Boehringer further objects to Interrogatory No. 45 on the grounds that it contains multiple subparts within the meaning of FEDERAL RULE OF CIVIL PROCEDURE 33(a).

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

_____

Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
1201 North Market Street
P. O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
    *Attorneys for Plaintiffs*
    *Boehringer Ingelheim International GmbH*
    *and Boehringer Ingelheim Pharmaceutical,*
    *Inc.*

Of Counsel:

Steven C. Cherny
LATHAM & WATKINS LLP
885 Third Avenue, Suite 1000
New York, NY 10022-4834
(212) 906-1200

Kenneth G. Schuler
LATHAM & WATKINS LLP
Sears Tower, Suite 5800
Chicago, IL 60606
(312) 876-7700

Sandy Choi
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA  94111-2562
(415) 395-8095

Carisa S. Yee
LATHAM & WATKINS LLP
135 Commonwealth Drive
Menlo Park, California 94025-3656
(650) 328-4600

January 30, 2007

32

# EXHIBIT M

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BOEHRINGER INGELHEIM INTERNATIONAL)
GMBH and BOEHRINGER INGELHEIM        )
PHARMACEUTICALS,                     )
                                     )
        Plaintiffs,                  )
                                     )
            V.                       )    C.A. No.
                                     ) 05-700-(KAJ)
BARR LABORATORIES, INC.,             ) CONSOLIDATED
                                     )
        Defendant.                   )
_____)
                                     )
BOEHRINGER INGELHEIM INTERNATIONAL)
GMBH and BOEHRINGER INGELHEIM        )
PHARMACEUTICALS, INC.,               )
                                     )
        Plaintiffs,                  )
                                     )
            V.                       )
                                     )
MYLAN PHARMACEUTICALS, INC.,         )
                                     )
        Defendant.                   )
---------------------------------X

VIDEODEPOSITION UPON ORAL EXAMINATION OF
DR. DIETER LAUDIEN

Taken on:
Wednesday, 29 November, 2006
Commencing at 9:31 a.m.

Taken at:
LAW OFFICES OF LATHAM & WATKINS
Reuterweg 20,
60323 Frankfurt am Main Germany

REPORTED BY:  FREDERICK WEISS, CSR, CM



**David Feldman**
W o r l d w i d e

From File to Trial.

805 Third Avenue, 8th Floor          600 Anton Boulevard, 11th Floor
New York, NY 10022                   Costa Mesa, CA 92626
(800) 642 1099                       (866) DFW-1380

DR. DIETER LAUDIEN

**22**

09:47:19 1  would be okay in terms of the privilege.

09:47:21 2       But if you want to step outside and

09:47:24 3  talk about that, I can. But I am -- I am just

09:47:28 4  objecting to the form of the question right now.

09:47:30 5       THE WITNESS: Okay.

09:47:32 6  BY MS. BERNIKER:

09:47:32 7       Q.   So let me just go back to the

09:47:34 8  question. As a part of your work as a patent

09:47:37 9  engineer at Enka-Glanzstoff --

09:47:41 10      A.   Glanzstoff, yes.

09:47:43 11      Q.   Can you say that once more?

09:47:45 12      A.   Glanzstoff.

09:47:47 13      Q.   Glanzstoff. I apologize.

09:47:48 14           As part of your work as a patent

09:47:50 15  engineer at Enka-Glanzstoff when you were involved

09:47:57 16  with foreign attorneys who are handling

09:47:59 17  prosecutions of foreign applications, did you

09:48:02 18  regularly review filings or draft filings that

09:48:08 19  they were going to file in other patent offices

09:48:11 20  before they were filed?

09:48:12 21      MR. SCHULER: Object to the form.

09:48:18 22  BY MS. BERNIKER:

**23**

09:48:19 1       Q.   You can answer.

09:48:21 2       A.   Yes. I mean, it was the usual work

09:48:27 3  Patent Agents are doing.

09:48:30 4       Q.   Okay.

09:48:31 5       A.   They are corresponding with the

09:48:32 6  foreign patent attorney who is responsible for the

09:48:35 7  handling of the cases.

09:48:36 8       Q.   In addition to drafting patent

09:48:45 9  applications for submission and prosecuting patent

09:48:49 10  applications before the German Patent Office and

09:48:51 11  overseeing foreign patent prosecutions --

09:48:56 12      A.   Mm-Hmm.

09:48:57 13      Q.   -- did you have other

09:48:58 14  responsibilities in your role as a patent engineer

09:49:00 15  at Enka-Glanzstoff?

09:49:02 16      A.   No. That was only projects which

09:49:09 17  are related to invention patents.

09:49:14 18      Q.   Okay.

09:49:15 19      A.   Nothing else.

09:49:15 20      Q.   Did you supervise anyone while you

09:49:18 21  were working there?

09:49:19 22      A.   No, I did not.

**24**

09:49:21 1       Q.   Approximately how many patents did

09:49:26 2  you personally prosecute while you were at

09:49:29 3  Enka-Glanzstoff?

09:49:30 4       A.   I don't recall the number.

09:49:31 5       Q.   Would it be more than 100, do you

09:49:35 6  think?

09:49:35 7       A.   Certainly, yes.

09:49:36 8       Q.   More than 500?

09:49:37 9       A.   You mean including the foreign

09:49:45 10  filing programs, or only the priority -- the basic

09:49:50 11  applications?

09:49:51 12      Q.   Let's start with the basic

09:49:53 13  application.

09:49:53 14      A.   Yes.

09:49:54 15      Q.   Yes. It would be more than 500, do

09:49:59 16  you think?

09:49:59 17      A.   I can't answer that question. So I

09:50:02 18  have no idea --

09:50:03 19      Q.   Okay.

09:50:04 20      A.   -- whether it was 500 or more or

09:50:05 21  less or...

09:50:07 22      Q.   Okay.

**25**

09:50:07 1       A.   Yes.

09:50:08 2       Q.   If you included the foreign

09:50:10 3  applications, would you say it would be more than

09:50:12 4  100 as well then?

09:50:13 5       A.   Yes.

09:50:14 6       Q.   And do you think it would be more

09:50:15 7  than 500?

09:50:16 8       A.   Including the foreign patent

09:50:18 9  applications, yes.

09:50:18 10      Q.   I believe you testified that in

09:50:28 11  approximately 1980, you moved to Boehringer

09:50:31 12  Ingelheim to be the Director of the Patent

09:50:35 13  Department?

09:50:35 14      A.   Yes.

09:50:35 15      Q.   Why did you decide to move

09:50:36 16  Boehringer Ingelheim?

09:50:37 17      A.   Why? Yes. That was a chance for

09:50:41 18  me to get promoted.

09:50:46 19      Q.   And how long did you serve as

09:50:47 20  Director of the Patent Department at Boehringer?

09:50:50 21      A.   Until 2002. Then my successor came

09:51:00 22  on board, and I trained him until I left the

7 (Pages 22 to 25)

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212) 705-8585

company.
Q. And who is your successor, sir?
A. Dr. Hammann is his name.
Q. And when did you leave Boehringer?
A. My -- the date of retirement was August 2004. But I left the company already in September 2003, because I had spared holidays.
And they also have a pension program at that time where you could leave the company a few months earlier --
Q. Okay.
A. -- being fully paid. So that's one of the social service benefits they gave at that time.
Q. Did you have other employment as of September 2003, or did you retire at that time?
A. I took over responsibility for a TACIS project of the European Union. That was a program run by the Germans; the name is GTZ. This is a body of the German Ministry of Development and Technical Aid.
And that was related to improve the

intellectual property in Russia in order to help the Russians to become a member of the WTO and to fulfill their obligations as regards the European Union in the IP field.
Q. And, approximately how long did you work on that project?
A. One and-a-half years.
Q. And what was your -- did you have a title in that role?
A. I was the team leader.
Q. And what were your responsibilities with respect to that project?
A. I organized the office there. I hired the people, the Russian people. I invited the and selected the international experts to help in this project, and I was supervising the whole project, contacts with the EU delegation in Moscow.
Q. Can you tell me, generally, what was required for Russia in terms of its patent system in order to be able to become a member of the WTO?

MR. SCHULER: I will object to the extent it calls for a legal conclusion. But you can certainly answer with your understanding.
BY MS. BERNIKER:
Q. You can answer the question.
A. I can answer that very shortly. This is to become a member of the WTO, you have to fulfill the obligations of the members of that organization, mainly to apply the TRIPS agreement. It's an international agreement with WTO.
Q. Did you -- after -- was that a full-time position that you held?
MR. SCHULER: Object to the form.
THE WITNESS: What do you mean by full-time?
BY MS. BERNIKER:
Q. Let me just ask you a different question: Did you have any other employment during the same time period --
A. No.
Q. -- starting in September of 2003?
A. No.

Q. And so when this role, your role as team leader of this project, was completed you said approximately a year and-a-half later, so that would be sometime in early 2005?
A. Mm-Hmm. Mm-Hmm.
Q. Did you have -- seek other employment at that point or obtain other employment at that point?
A. No employment, no.
Q. And since then, you have been fully retired, I understand?
A. Yes. I am doing some consultant work, a few things.
Q. Is it for Boehringer Ingelheim?
A. Yes. One was for Boehringer, others for other companies.
Q. Do you still do consulting work for Boehringer, presently?
A. There is one project. It's not yet terminated, yes. Yes.
Q. Have you ever worked at a law firm?
A. I am a partner in a law firm, in a

DR. DIETER LAUDIEN

74

10:51:25 1 communicate with each other. It's the same thing
10:51:28 2 like if a foreign external patent attorney is
10:51:33 3 handling a company case, that it's a must that he
10:51:37 4 corresponds with the German company for whom they
10:51:41 5 are working.
10:51:42 6        I mean, you don't give away your
10:51:44 7 case and say, "Do it. I am not any longer
10:51:48 8 interested. Do it and then give me back the
10:51:50 9 patent."
10:51:51 10       There is always correspondence,
10:51:52 11 questions, and so on.
10:51:54 12    Q.   And was David Frankhouser the
10:51:57 13 senior person in the United States' office in the
10:52:02 14 time period 1980 to 1990?
10:52:04 15    A.   I --
10:52:06 16       MR. SCHULER: Object to the form.
10:52:09 17 You said the United States' office.
10:52:11 18       Do you want to clarify what office?
10:52:13 19 BY MS. BERNIKER:
10:52:13 20    Q.   The office that I was talking
10:52:15 21 about, the patent -- the Boehringer patent office
10:52:19 22 in the United States?

75

10:52:20 1    A.   David Frankhouser was the first
10:52:22 2 head of the U.S. patent Department, and then he
10:52:25 3 retired. I don't recall the date of his
10:52:29 4 retirement.
10:52:30 5        And then we have got Bob Raymond.
10:52:33 6 He was his successor. But then again, I don't
10:52:37 7 retire -- I don't recall the exact date when this
10:52:40 8 change took place.
10:52:41 9    Q.   And if I refer to that office as
10:52:43 10 the U.S. patent Department, you will understand
10:52:46 11 that I am talking about the office in Ridgefield
10:52:49 12 Connecticut --
10:52:49 13    A.   Yes.
10:52:52 14    Q.   -- of Boehringer Ingelheim that
10:52:50 15 handled --
10:52:52 16    A.   Yes.
10:52:52 17    Q.   When you communicated with
10:52:57 18 individuals in the U.S. patent Department, you
10:53:01 19 would communicate with them in English?
10:53:03 20    A.   In English, yes.
10:53:04 21    Q.   And also when you communicated with
10:53:11 22 -- at your meetings where in the industry

76

10:53:14 1 associations, those meetings would be held in
10:53:17 2 English?
10:53:17 3    A.   Yes. With the exception of the
10:53:19 4 German associations, yes.
10:53:27 5    Q.   Was it Boehringer's general
10:53:30 6 practice to file applications first with the
10:53:31 7 German Patent Office and then subsequently abroad?
10:53:34 8       MR. SCHULER: Object to the form.
10:53:40 9       THE WITNESS:
10:53:41 10    A.   Yes. Normally, yes. Yes. Because
10:53:44 11 it's in German, that is easier for our German
10:53:47 12 patent people to write it in German, the patent
10:53:50 13 application.
10:53:50 14       It's easier in the communication
10:53:53 15 with the inventors. Most of them are German, and
10:53:58 16 you have to file a first patent application
10:54:03 17 anyway. And so we did it normally with the German
10:54:08 18 Patent Office, and it was cheap.
10:54:10 19    Q.   Why was it cheap?
10:54:11 20    A.   It was cheap. The fee was cheap --
10:54:13 21    Q.   Okay.
10:54:15 22    A.   -- low in the German Patent Office.

77

10:54:17 1    Q.   That's a good reason?
10:54:19 2    A.   Yes. That's a good reason, yes.
10:54:21 3    Q.   And after you filed the patent
10:54:23 4 applications typically in the German office, did
10:54:29 5 you usually file other applications abroad? Or
10:54:32 6 was that only in certain circumstances?
10:54:34 7       MR. SCHULER: I object. It
10:54:36 8 misstates his prior testimony when you said you
10:54:39 9 filed patent applications.
10:54:40 10 BY MS. BERNIKER:
10:54:41 11    Q.   The Boehringer Patent Department
10:54:42 12 when it filed patent applications?
10:54:43 13    A.   You may know that, that in the
10:54:50 14 pharmaceutical field, you file foreign patent
10:54:53 15 application very broadly, because you never know
10:54:55 16 whether you would need the patent later on once
10:55:02 17 the compound is successful, and went successfully
10:55:05 18 through the registration and ultimately gets
10:55:10 19 marketed.
10:55:10 20       Therefore, you have to file very
10:55:12 21 broadly. So most of the applications were filed
10:55:17 22 very broadly.

20  (Pages 74 to 77)

DAVID FELDMAN WORLDWIDE, INC.
805 Third Avenue, New York, New York 10022 (212) 705-8585

**86**

| | |
|---|---|
| 11:03:55 1 | there are new products, but they are listed. |
| 11:03:57 2 | It's publicly available and you can |
| 11:03:59 3 | get it also from the internet, this Red List and |
| 11:04:02 4 | the same thing you have the -- is it the orange |
| 11:04:05 5 | book in the states? It's publicly available. |
| 11:04:09 6 | Everybody can check it. |
| 11:04:11 7 | Q. Was the development of a central |
| 11:04:21 8 | nervous system drug important to Boehringer in the |
| 11:04:26 9 | 1980s? |
| 11:04:27 10 | MR. SCHULER: Objection. Lack of |
| 11:04:28 11 | foundation, but answer if you know. |
| 11:04:30 12 | THE WITNESS: |
| 11:04:34 13 | A. Yes. You should better ask one of |
| 11:04:37 14 | the scientists these questions. |
| 11:04:39 15 | BY MS. BERNIKER: |
| 11:04:40 16 | Q. You don't know the answer? |
| 11:04:40 17 | A. No, I don't know. |
| 11:04:42 18 | Q. At what point did you first -- and |
| 11:04:51 19 | I am not asking you for specific communications |
| 11:04:54 20 | that you had with anyone, but when did you first |
| 11:04:57 21 | learn about -- when did you first learn that |
| 11:04:59 22 | Boehringer was developing Pramipexole? |

**87**

| | |
|---|---|
| 11:05:07 1 | A. I can't recall that date. |
| 11:05:08 2 | Q. It was some time in the 1980s? |
| 11:05:13 3 | A. I told you I can't recall that |
| 11:05:16 4 | date. |
| 11:05:19 5 | Q. In terms -- going back for a minute |
| 11:05:39 6 | to talk about the United States Patent Department, |
| 11:05:45 7 | I think you referred to it -- right, the United |
| 11:05:48 8 | States Patent Department. |
| 11:05:51 9 | Did you and Dr. Frankhouser, when |
| 11:05:53 10 | he was the head of that department, have any kind |
| 11:05:55 11 | of reporting relationship? |
| 11:05:56 12 | A. Yes. We did, yes. |
| 11:05:58 13 | Q. And what was that relationship? |
| 11:05:59 14 | A. We tried to meet maybe once or |
| 11:06:05 15 | twice a year, and to have an exchange of views and |
| 11:06:13 16 | information. And we met also the Patent Agents |
| 11:06:18 17 | from the US department. |
| 11:06:22 18 | It was a kind of discussion, |
| 11:06:29 19 | information between colleagues. |
| 11:06:30 20 | Q. So that was a meeting that would be |
| 11:06:32 21 | held in Germany or in the United States? |
| 11:06:36 22 | A. In the early 90s, it was in the |

**88**

| | |
|---|---|
| 11:06:39 1 | States. And later on, it was in Germany or |
| 11:06:46 2 | somewhere else. |
| 11:06:46 3 | Q. And in the 1980s, do you remember |
| 11:06:49 4 | where it was? |
| 11:06:50 5 | A. In Ridgefield. I had a meeting in |
| 11:06:53 6 | Ridgefield. |
| 11:06:54 7 | Q. And would the Patent Agents from |
| 11:06:56 8 | Germany also come to that meeting? |
| 11:06:58 9 | A. That happened only later. Because |
| 11:07:03 10 | of cost reasons, they wanted to cut back the |
| 11:07:07 11 | costs. They wanted to save the travel expenses |
| 11:07:11 12 | and, therefore, there was no general meeting |
| 11:07:13 13 | between all patent people. |
| 11:07:15 14 | But this has now been established. |
| 11:07:18 15 | There are frequent meetings with all patent |
| 11:07:21 16 | people. |
| 11:07:22 17 | Q. Do you know when that was |
| 11:07:23 18 | established, approximately? |
| 11:07:24 19 | A. I can't give you the exact figure. |
| 11:07:29 20 | But it was -- no. I mean, I can only guess. |
| 11:07:34 21 | Q. Do you know if it was in the 1980s? |
| 11:07:36 22 | A. I think it was later, but I can't |

**89**

| | |
|---|---|
| 11:07:41 1 | give you the exact date. |
| 11:07:43 2 | Q. I understand. Dr. Laudien, do you |
| 11:08:01 3 | know Dr. -- I am sorry. Do you know Rolf |
| 11:08:03 4 | Fleischer? |
| 11:08:04 5 | A. Yes. |
| 11:08:04 6 | Q. And he was a Patent Agent at |
| 11:08:07 7 | Boehringer? |
| 11:08:07 8 | A. In Biberach, yes. |
| 11:08:09 9 | Q. And he reported to you? |
| 11:08:09 10 | A. Yes. |
| 11:08:10 11 | Q. He also reported to Dr. Milnes? |
| 11:08:13 12 | A. Yes. He directly reported to |
| 11:08:17 13 | Milnes, and Milnes was reporting to me. |
| 11:08:22 14 | But of course, he was a colleague |
| 11:08:25 15 | since a long time. He was already there when I |
| 11:08:29 16 | arrived, so we had some discussions also. |
| 11:08:34 17 | Q. Okay. |
| 11:08:34 18 | A. Yes. |
| 11:08:35 19 | Q. And so they were both Patent Agents |
| 11:08:40 20 | in the 1980s at Boehringer? |
| 11:08:43 21 | A. Yes. |
| 11:08:43 22 | Q. And Dr. Klaes was also a Patent |

23 (Pages 86 to 89)

DR. DIETER LAUDIEN

90

11:08:46 1  Agent at Boehringer during that time?
11:08:48 2  A.  Yes.
11:08:48 3  Q.  Was he in the Ingelheim office?
11:08:50 4  A.  Yes.
11:08:51 5  Q.  And did he report directly to you?
11:08:52 6  A.  Yes.
11:08:53 7  Q.  And Dr. Sommer was also in the
11:08:57 8  Ingelheim office at that time?
11:08:59 9  A.  No. He was in Biberach. He was --
11:09:07 10  before Milnes came, was he the group leader in
11:09:11 11  Biberach.
11:09:11 12  Q.  So --
11:09:12 13  A.  And after his retirement, Milnes
11:09:14 14  became his successor.
11:09:15 15  Q.  So that was -- so Dr. Sommer worked
11:09:19 16  for the company before you came to Boehringer?
11:09:24 17  A.  Yes. He was there already.
11:09:27 18  Q.  So you didn't work with him.
11:09:29 19  Is that right?
11:09:31 20  A.  Yes. I mean, he was reporting to
11:09:32 21  me.
11:09:33 22  Q.  Oh, I see.

91

11:09:36 1  A.  Yes. He was reporting to me.
11:09:37 2  Q.  Okay. He reported to you.
11:09:39 3  And then Dr. Bubeck was also in the
11:09:43 4  Biberach office?
11:09:44 5  A.  Yes. He was a colleague of
11:09:45 6  Fleischer.
11:09:46 7  Q.  And he also reported to Dr. Milnes
11:09:48 8  and to you?
11:09:49 9  A.  Yes. I mean, they directly
11:09:54 10  reported to Sommer. Bubeck was also a colleague
11:09:57 11  who was already there when I came.
11:09:59 12  Q.  Okay.
11:10:00 13  A.  They reported to Sommer, and Sommer
11:10:01 14  to me. But since that was a small group, of
11:10:05 15  course we had also contact.
11:10:06 16  Q.  When was the last time you have
11:10:12 17  spoke with Dr. Fleischer? And I am not asking you
11:10:17 18  to disclose the communication.
11:10:18 19  I just want to know when the last
11:10:21 20  time was that you had communication with him?
11:10:22 21  A.  Well, we exchange Christmas
11:10:28 22  greetings. We call each other when some of us has

92

11:10:32 1  a birthday.
11:10:33 2  Q.  Okay.
11:10:33 3  A.  Yes. So that was my last contact,
11:10:36 4  maybe three months or maybe four months ago. But
11:10:39 5  only on private issues of course.
11:10:41 6  Q.  Nothing related to Boehringer or
11:10:43 7  patents?
11:10:44 8  A.  No. No. Because he is retired
11:10:46 9  since a long time and I am now retired. There is
11:10:48 10  no reason why we should discuss company matters.
11:10:52 11  Q.  Sure.
11:10:52 12  A.  Besides the fact that you know the
11:10:54 13  retired people said, "When we were in charge it
11:10:57 14  was much better."
11:10:58 15  (Laughter in the room)
11:11:04 16  Q.  And with respect to Roger Milnes,
11:11:08 17  when was the last time you had a communication
11:11:09 18  with him?
11:11:09 19  A.  I don't recall when he left the
11:11:14 20  company, but thereafter maybe we had one telephone
11:11:19 21  call. And again, we were exchanging Christmas
11:11:23 22  cards, yes.

93

11:11:23 1  Q.  Nothing about patents or the
11:11:25 2  company?
11:11:25 3  A.  No. No.
11:11:26 4  Q.  Okay.
11:11:27 5  A.  No, because he moved to another
11:11:30 6  company, to a British company.
11:11:31 7  Q.  And Dr. Sommer, have you spoken
11:11:33 8  with him about anything other than personal issues
11:11:36 9  since he left the company?
11:11:37 10  A.  No. No. Only personal things.
11:11:40 11  Q.  And Dr. Bubeck, have you spoken to
11:11:43 12  him?
11:11:43 13  A.  He died meanwhile, unfortunately.
11:11:46 14  Q.  I am sorry.
11:11:47 15  A.  Yes. He died.
11:11:48 16  Q.  Was that recent?
11:11:51 17  A.  A couple of years ago.
11:11:52 18  Q.  Okay.
11:11:54 19  And then Dr. Klaes, when was the
11:11:56 20  last time you had communication with him?
11:12:00 21  MR. SCHULER:  You can just say the
11:12:03 22  date.

24 (Pages 90 to 93)

DR. DIETER LAUDIEN

**122**

11:34:56 1  countries.

11:34:58 2      For instance, we can't give a

11:35:00 3  German text to a Korean attorney and ask him to

11:35:04 4  file a Korean patent application, because he would

11:35:08 5  charge us with a much higher fee to make the

11:35:12 6  Korean translation from the German text

11:35:16 7  application, rather than from an English text

11:35:20 8  which you can send all over the world to every

11:35:23 9  foreign patent attorney.

11:35:25 10      So it's -- and we would need an

11:35:28 11  English translation anyway for the filing in the

11:35:31 12  United States and in Great Britain. So that is

11:35:40 13  the main reason why we prepared this translation.

11:35:45 14      So in the first instance, it was a

11:35:47 15  translation of the priority application, and then

11:35:54 16  in cases where they have another example, that

11:35:56 17  could be added there.

11:35:59 18      But you have clearly to

11:36:01 19  differentiate between working examples which are

11:36:06 20  submitted in the foreign applications to support

11:36:10 21  that what you have claimed in the first

11:36:13 22  application from any other matter, new matter

**123**

11:36:18 1  which you would not file in this patent

11:36:22 2  application.

11:36:22 3      In this instance, if you have

11:36:24 4  additional findings which are not already

11:36:27 5  disclosed in the first application, you have to

11:36:30 6  file the second application to be on the safe

11:36:34 7  side. Everybody would do that.

11:36:40 8  BY MS. BERNIKER:

11:36:43 9      Q.   So I just want to understand kind

11:36:45 10  of how this works.

11:36:46 11      The Patent Agents would prepare the

11:36:48 12  Foreign Filing Text?

11:36:49 13      A.   Yes.

11:36:51 14      Q.   The Patent Agent responsible for

11:36:54 15  the original application with the German patent?

11:36:55 16      A.   Yes, when they get the translation

11:36:57 17  from a translator. I mean, the Patent Agent is

11:37:00 18  not translating by himself the German text.

11:37:02 19      Q.   Sure. Okay.

11:37:03 20      A.   So.

11:37:04 21      Q.   Would they often prepare the German

11:37:06 22  -- the Foreign Filing Text in German and have the

**124**

11:37:08 1  Foreign Filing Text translated?

11:37:11 2      MR. SCHULER: Object to the form

11:37:11 3  and lack of foundation.

11:37:13 4      But answer if you have personal

11:37:14 5  knowledge.

11:37:18 6      THE WITNESS:

11:37:28 7      A.   No. I can't say that for sure.

11:37:30 8  BY MS. BERNIKER:

11:37:45 9      Q.   And then after the Foreign Filing

11:37:47 10  Text was prepared, how did that get transmitted

11:37:50 11  around the world for the foreign filings?

11:37:54 12      MR. SCHULER: Objection. Lack of

11:37:56 13  foundation.

11:37:57 14  BY MS. BERNIKER:

11:37:57 15      Q.   In the 1980s?

11:37:58 16      MR. SCHULER: I am sorry.

11:37:59 17  Objection. Lack of foundation. But answer if you

11:38:02 18  have personal knowledge.

11:38:03 19      THE WITNESS:

11:38:03 20      A.   Yes. It is being sent then to the

11:38:05 21  foreign patent attorneys with the order to file a

11:38:08 22  local patent application. That's how it works.

**125**

11:38:13 1  BY MS. BERNIKER:

11:38:13 2      Q.   Was there an order that you would

11:38:15 3  refer to as an order letter that was sent with it?

11:38:17 4      A.   Yes. Yes. Yes.

11:38:18 5      Q.   And the order letter included the

11:38:20 6  names of the inventors as well?

11:38:23 7      MR. SCHULER: Object to the form

11:38:24 8  and foundation. But answer if you have personal

11:38:26 9  knowledge.

11:38:26 10      THE WITNESS:

11:38:31 11      A.   I don't recall whether the first

11:38:33 12  order letter contained all this information.

11:38:36 13      I mean, there is a time limit, and

11:38:39 14  the crucial point is to get this stuff out on time

11:38:44 15  so that the local attorneys can make the

11:38:48 16  translation.

11:38:52 17  BY MS. BERNIKER:

11:38:53 18      Q.   But at some point, obviously, the

11:38:57 19  inventors had to be conveyed?

11:38:58 20      A.   If required by that country, yes.

11:39:00 21      Q.   And the order letter, it also

11:39:03 22  included information about the original

32  (Pages 122 to 125)

DR. DIETER LAUDIEN

| | 126 |
|---|---|
| 11:39:06 1 | application or applications that were filed with |
| 11:39:08 2 | the German Patent Office? |
| 11:39:09 3 | MR. SCHULER: Same objection. Lack |
| 11:39:12 4 | of foundation. But answer if you know. |
| 11:39:14 5 | THE WITNESS: |
| 11:39:15 6 | A.   The order letter contained the |
| 11:39:16 7 | information that a priority has to be claimed, |
| 11:39:21 8 | yes. |
| 11:39:21 9 | BY MS. BERNIKER: |
| 11:39:22 10 | Q.   And it would indicate what the |
| 11:39:23 11 | application number was for that priority claim? |
| 11:39:25 12 | A.   Yes. Yes. You have to send the |
| 11:39:28 13 | document where it is testified that this patent |
| 11:39:33 14 | application has been filed in the German Patent |
| 11:39:36 15 | Office, has got this number, serial number, and |
| 11:39:40 16 | has got the application date, and so on. This is |
| 11:39:42 17 | necessary for claiming of priority. |
| 11:39:45 18 | BY MS. BERNIKER: |
| 11:39:46 19 | Q.   And was it also general practice to |
| 11:39:52 20 | forward a copy of the priority application itself, |
| 11:39:56 21 | rather than the Foreign Filing Text, but also a |
| 11:39:58 22 | copy of the priority application? |

| | 127 |
|---|---|
| 11:39:59 1 | MR. SCHULER: Objection. Lack of |
| 11:40:00 2 | foundation. But answer if you know. |
| 11:40:02 3 | THE WITNESS: |
| 11:40:03 4 | A.   I think so, yes, because it is |
| 11:40:04 5 | required to submit the priority document when |
| 11:40:08 6 | claiming a priority. |
| 11:40:10 7 | BY MS. BERNIKER: |
| 11:40:12 8 | Q.   Would the Patent Agents also |
| 11:40:15 9 | forward with the order document, or in that time |
| 11:40:19 10 | period, a translated copy of the priority document |
| 11:40:23 11 | so that the United States or other foreign |
| 11:40:26 12 | attorney can view? |
| 11:40:27 13 | A.   I can't recall -- I can't answer |
| 11:40:29 14 | that question. The only thing I can tell you is |
| 11:40:31 15 | that for each and every country, there is a list |
| 11:40:36 16 | of the requirements, which document you have to |
| 11:40:40 17 | submit, which information you have to give, at |
| 11:40:43 18 | what point in time, and so on. |
| 11:40:44 19 | And the patent attorney or the |
| 11:40:49 20 | administration office then follows these |
| 11:40:53 21 | guidelines. And they make sure that all necessary |
| 11:40:57 22 | documents or information are given in due time. |

| | 128 |
|---|---|
| 11:41:03 1 | BY MS. BERNIKER: |
| 11:41:04 2 | Q.   So just to be clear, it was the |
| 11:41:06 3 | Patent Agents or their assistants? |
| 11:41:08 4 | A.   Yes. |
| 11:41:09 5 | Q.   Who are responsible for providing |
| 11:41:12 6 | the order document with the Foreign Filing Text, |
| 11:41:16 7 | the priority information that we discussed, to the |
| 11:41:18 8 | attorneys around the world? |
| 11:41:19 9 | A.   Yes. |
| 11:41:19 10 | Q.   And they were the Patent Agents |
| 11:41:23 11 | were the ones who decided which patent |
| 11:41:26 12 | applications to claim priority to, which patent |
| 11:41:29 13 | applications would be listed as the priority |
| 11:41:31 14 | documents on the order letter? |
| 11:41:33 15 | MR. SCHULER: Object to the form. |
| 11:41:39 16 | THE WITNESS: |
| 11:41:40 17 | A.   Yes. Normally, we could claim |
| 11:41:43 18 | priority, so we did of course. Because otherwise, |
| 11:41:47 19 | you lose a year respectively. You run the risk |
| 11:41:52 20 | that there is an interim application of a third |
| 11:41:54 21 | party. So it is, I mean, best practice to claim |
| 11:41:58 22 | priority wherever you can. |

| | 129 |
|---|---|
| 11:42:01 1 | BY MS. BERNIKER: |
| 11:42:01 2 | Q.   And you can claim priority in a |
| 11:42:03 3 | situation where you haven't added anything to the |
| 11:42:07 4 | original application that was beyond the scope of |
| 11:42:10 5 | the original application? |
| 11:42:10 6 | MR. SCHULER: Object to the form. |
| 11:42:11 7 | Also to the extent that it's an incomplete |
| 11:42:14 8 | hypothetical and also to the extent that it calls |
| 11:42:18 9 | for a legal conclusion. |
| 11:42:19 10 | THE WITNESS: |
| 11:42:21 11 | A.   I told you one wouldn't do that. I |
| 11:42:23 12 | mean, why run the risk, I mean, to get -- to lose |
| 11:42:27 13 | that additional findings? It is not reasonable to |
| 11:42:33 14 | try to get that in an old patent application with |
| 11:42:36 15 | the consequence that you could lose that. |
| 11:42:38 16 | You would file a new patent |
| 11:42:40 17 | application. |
| 11:42:40 18 | BY MS. BERNIKER: |
| 11:42:40 19 | Q.   If there were a situation where new |
| 11:42:45 20 | matter had been added? |
| 11:42:46 21 | A.   Yes. |
| 11:42:46 22 | Q.   Subsequent to the original |

33  (Pages 126 to 129)

DR. DIETER LAUDIEN

170

01:34:12 1    Q.   And when a Patent Agent had a
01:34:32 2    problem and didn't know how to address it, who
01:34:38 3    would you expect that Patent Agent to consult
01:34:41 4    regarding how to address it?
01:34:43 5            MR. SCHULER: Object to the form.
01:34:44 6            THE WITNESS:
01:34:51 7    A.   I think you have to precise your
01:34:53 8    question, because it depends upon the
01:34:57 9    circumstances.
01:34:58 10           Problems with whom?  With the
01:35:00 11   external patent attorney, with the inventors?  In
01:35:04 12   which stage of the prosecution?
01:35:06 13   BY MS. BERNIKER:
01:35:08 14   Q.   If the Patent Agent had a concern
01:35:12 15   about their ability to overcome a particular prior
01:35:16 16   art reference, who would you expect that
01:35:20 17   individual to consult in deciding how to handle
01:35:26 18   that?
01:35:26 19           MR. SCHULER: Object to the form.
01:35:27 20   Incomplete hypothetical.
01:35:39 21           THE WITNESS:
01:35:40 22   A.   I would say this again depends on

171

01:35:41 1    the circumstances.  I mean, certainly, he is the
01:35:46 2    one who knows his case best.  He has the
01:35:53 3    possibility to consult the scientists who know the
01:35:56 4    technology best, so he can go to the scientists
01:35:59 5    and can say, "What does that mean, this
01:36:01 6    publication?  Or this sentence, or this
01:36:06 7    statement?"
01:36:07 8            So, certainly, that is the first
01:36:09 9    step and the most important step, that if he
01:36:12 10   himself doesn't understand the disclosure of this
01:36:19 11   publication, he goes to the scientist who knows
01:36:22 12   better the technology and discusses that with him.
01:36:26 13   BY MS. BERNIKER:
01:36:27 14   Q.   And if the concern regarding the
01:36:29 15   prior art is about -- is more legal in nature, you
01:36:33 16   would also expect the Patent Agent to consult his
01:36:36 17   or her colleagues in the Patent Department?
01:36:39 18           MR. SCHULER: Object to the form.
01:36:40 19   Incomplete hypothetical.
01:36:45 20           THE WITNESS:
01:36:45 21   A.   Legal issues are addressed then by
01:36:48 22   the external attorney, and it depends also from

172

01:36:52 1    the country.  There are various different legal
01:36:55 2    systems.
01:36:56 3            So this is on a country by country
01:36:59 4    basis, case by case basis.  And it has to be
01:37:05 5    discussed with the external attorneys if it's a
01:37:09 6    legal question, because then it's a local legal
01:37:13 7    question.
01:37:14 8    BY MS. BERNIKER:
01:37:29 9    Q.   Going back to the discussion we've
01:37:31 10   been talking about, potential interferences.
01:37:34 11           Is a potential interference the
01:37:36 12   kind of issue that you would bring -- that you
01:37:42 13   would report to the board?
01:37:44 14           MR. SCHULER: Object to the form.
01:37:45 15   It assumes facts not in evidence.
01:37:53 16           THE WITNESS:
01:37:55 17   A.   Yes, because money is involved.
01:37:57 18   And it's not only the possibility that your own
01:38:06 19   invention is being involved, but it can be the
01:38:09 20   invention of other people.
01:38:10 21           You can be drawn into an
01:38:12 22   interference without becoming active because

173

01:38:15 1    another side starts, initiates the interference.
01:38:22 2    BY MS. BERNIKER:
01:38:24 3    Q.   And if there was a potential
01:38:27 4    interference in the United States, you would also
01:38:30 5    consult with Mr. Frankhouser about it?
01:38:33 6    A.   It will come first to the US
01:38:36 7    department anyway.
01:38:38 8            I mean, they are the first -- they
01:38:40 9    receive, they are the recipients of the Office
01:38:45 10   Action; and then they report from the States, then
01:38:49 11   to Europe, not the other way around.  Because they
01:38:52 12   are the first to get knowledge about proceedings.
01:38:56 13   Q.   But then in your capacity as head
01:38:59 14   of the Patent Department in Germany, when you are
01:39:03 15   considering how to handle a potential
01:39:06 16   interference, would you have discussions with Mr.
01:39:08 17   Frankhouser about that?
01:39:09 18           MR. SCHULER: Objection.
01:39:10 19   Incomplete hypothetical.
01:39:17 20           THE WITNESS:
01:39:18 21   A.   Yes.  Hypothetically, yes.
01:39:20 22   BY MS. BERNIKER:

44  (Pages 170 to 173)

**194**

02:00:10 1 having one look at these two documents.

02:00:13 2 Q. Have you seen Exhibit 5 before or

02:00:16 3 an unpublished version of Exhibit 5?

02:00:20 4 A. No, I don't remember.

02:00:32 5 MR. SCHULER: Is this a good time

02:00:33 6 for a break?

02:00:33 7 MS. BERNIKER: Yes.

02:00:35 8 THE VIDEOGRAPHER: We are going off

02:00:36 9 the record. The time is 2:00 o'clock p.m.

02:00:39 10 (Short recess taken)

02:12:02 11 THE VIDEOGRAPHER: We are going on

02:12:05 12 the record. The time is 2:11 p.m.

02:12:07 13 BY MS. BERNIKER:

02:12:08 14 Q. Dr. Laudien, you remember that the

02:12:12 15 patents related to Pramipexole were prosecuted

02:12:16 16 during the time you were head of the Patent

02:12:20 17 Department?

02:12:20 18 A. Yes.

02:12:20 19 Q. And you were aware that they were

02:12:25 20 getting prosecuted in the 1980s?

02:12:27 21 A. Yes.

02:12:29 22 Q. And what do you remember about

**195**

02:12:36 1 those patent applications?

02:12:37 2 A. Nothing. You know, for me, they

02:12:43 3 look all alike. It's a general formula with

02:12:48 4 substituents, and a definition what it means, and

02:12:52 5 an indication. And this is an early stage. I

02:12:57 6 mean, nothing happened with that document since

02:13:00 7 filing.

02:13:02 8 And I am not aware about the first

02:13:04 9 filings of this application.

02:13:07 10 Q. You were aware that Dr. Fleischer

02:13:12 11 was responsible for handling the case of those

02:13:15 12 applications?

02:13:16 13 A. Yes.

02:13:18 14 Q. And you are aware that Dr. Milnes

02:13:21 15 supervised him?

02:13:21 16 A. Yes.

02:13:22 17 Q. And you were aware that patent

02:13:24 18 applications were being filed around the world

02:13:30 19 covering -- I am sorry. Let me rephrase.

02:13:33 20 And you are aware that patent

02:13:35 21 applications were being filed around the world

02:13:38 22 relating to Pramipexole?

**196**

02:13:39 1 A. Yes. Because we have a system in

02:13:42 2 the administration where we have to ask other --

02:13:47 3 or we ask other, we consulted other departments

02:13:50 4 about the foreign filing program. There was a

02:13:53 5 certain, you know, process, how the decision has

02:13:56 6 been made, and has to be made.

02:13:59 7 So the information from the

02:14:03 8 research departments is important for making the

02:14:07 9 decision in which country patents are foreign

02:14:10 10 filed.

02:14:10 11 But normally, most of them are

02:14:15 12 broadly filed in foreign countries.

02:14:18 13 Q. So you remember that you -- that

02:14:22 14 Boehringer filed patent applications around the

02:14:24 15 world relating to Pramipexole because of

02:14:28 16 information from the research department relating

02:14:31 17 to the import of the compounds?

02:14:34 18 MR. SCHULER: Object to the form.

02:14:37 19 THE WITNESS:

02:14:38 20 A. No. I don't remember that, because

02:14:39 21 the decision on the foreign filing program has to

02:14:45 22 be made one year before the priority has been

**197**

02:14:49 1 made, during this one year priority term. And

02:14:55 2 this is a very early stage.

02:14:59 3 And then this is a routine with all

02:15:02 4 the patent application to get this decision, to

02:15:05 5 ask the formal approval from the research

02:15:09 6 department, in which countries or how broadly that

02:15:14 7 should be filed.

02:15:15 8 Q. Were you involved in the decision

02:15:16 9 of which countries to file patent applications

02:15:19 10 relating to Pramipexole?

02:15:21 11 A. No.

02:15:21 12 Q. But Dr. Fleischer was involved in

02:15:24 13 that decision?

02:15:25 14 A. Yes, because he was handling the

02:15:26 15 case.

02:15:26 16 Q. And Dr. Milnes was also involved in

02:15:29 17 that decision?

02:15:29 18 A. As his supervisor, I guess. Yes.

02:15:32 19 Q. And Dr. Fleischer was involved in

02:15:36 20 filing the original application in Germany?

02:15:41 21 MR. SCHULER: Are you --

02:15:43 22 THE WITNESS:

50 (Pages 194 to 197)

DR. DIETER LAUDIEN

**242**

| | |
|---|---|
| 02:58:58 1 | A. Yes. |
| 02:58:58 2 | Q. And -- |
| 02:59:03 3 | A. Hoffmann and Fleischer. |
| 02:59:05 4 | Q. It's from -- right. Actually, I am |
| 02:59:07 5 | sorry. I didn't mean to confuse you. |
| 02:59:08 6 | Let me ask you about a different |
| 02:59:11 7 | one. I apologize, I didn't mean to confuse you, |
| 02:59:13 8 | sir. |
| 02:59:13 9 | Let me -- I meant to discuss entry |
| 02:59:16 10 | number 65 on that page. I am sorry. |
| 02:59:18 11 | A. Mm-Hmm. |
| 02:59:18 12 | Q. And that's a letter dated February |
| 02:59:20 13 | 2nd, 1988. |
| 02:59:23 14 | Do you see that? |
| 02:59:25 15 | A. 65. |
| 02:59:26 16 | Q. 65? |
| 02:59:27 17 | A. 88. Yes? |
| 02:59:28 18 | Q. Yes. |
| 02:59:29 19 | A. Okay. |
| 02:59:29 20 | Q. And it's from you? |
| 02:59:30 21 | A. Yes. |
| 02:59:31 22 | .Q. To Mr. Dehio and Mr. Teague? |

**243**

| | |
|---|---|
| 02:59:35 1 | A. Yes. |
| 02:59:35 2 | Q. Who is Mr. Dehio? |
| 02:59:37 3 | A. I don't recall whether he was in |
| 02:59:46 4 | Biberach or whether he was in Ingelheim at that |
| 02:59:56 5 | time, and what function he had at that time. |
| 02:59:59 6 | Q. Was he a scientist? |
| 03:00:03 7 | A. As I can clearly answer who was Mr. |
| 03:00:06 8 | Teague, he was the head of the Licensing |
| 03:00:08 9 | Department at that time. |
| 03:00:08 10 | Q. Were they both in the -- the |
| 03:00:10 11 | Licensing Department, was that part of the Legal |
| 03:00:13 12 | Department? |
| 03:00:13 13 | A. No. That was separate. |
| 03:00:14 14 | Q. I see. |
| 03:00:15 15 | A. Yes. |
| 03:00:15 16 | Q. And then the person copied on it is |
| 03:00:18 17 | Professor Waldeck? |
| 03:00:20 18 | A. Yes. He was my boss. He was at |
| 03:00:22 19 | the board responsible for research and |
| 03:00:24 20 | development. |
| 03:00:24 21 | Q. I see. And the description of the |
| 03:00:28 22 | subject matter here is "Attorney-client |

**244**

| | |
|---|---|
| 03:00:31 1 | communication (including attorney's mental |
| 03:00:33 2 | impressions) regarding a potential interference |
| 03:00:36 3 | proceeding." |
| 03:00:36 4 | Do you see that text? |
| 03:00:37 5 | A. Yes. |
| 03:00:37 6 | Q. Does this refresh your |
| 03:00:39 7 | recollection, Dr. Laudien, that there was concern |
| 03:00:41 8 | about a potential interference proceeding |
| 03:00:44 9 | regarding the Pramipexole application? |
| 03:00:46 10 | A. No. I really don't recall that. |
| 03:00:49 11 | It's, you see, '88. I don't recall. Sorry. |
| 03:00:52 12 | Q. Can you -- I am sorry. |
| 03:00:57 13 | And does this entry number 65, was |
| 03:01:00 14 | this communication relating to the Eli Lilly |
| 03:01:04 15 | patent application? |
| 03:01:04 16 | MR. SCHULER: Let me object on the |
| 03:01:07 17 | grounds of attorney/client privilege. |
| 03:01:09 18 | Can you ask him does he know which |
| 03:01:11 19 | -- whether there was any -- just ask him whether |
| 03:01:14 20 | he knows the identity of -- one way or the other |
| 03:01:19 21 | as to -- because if you can ask him a foundational |
| 03:01:22 22 | question and he says no, then I don't need to |

**245**

| | |
|---|---|
| 03:01:25 1 | instruct him. |
| 03:01:34 2 | BY MS. BERNIKER: |
| 03:01:35 3 | Q. Dr. Laudien, my question to you is, |
| 03:01:37 4 | and please answer just yes or no, did this |
| 03:01:40 5 | communication relate to the Eli Lilly patent |
| 03:01:43 6 | application? |
| 03:01:43 7 | MR. SCHULER: I object and instruct |
| 03:01:44 8 | you not to answer. |
| 03:01:45 9 | Again, I will allow him to answer |
| 03:01:47 10 | the foundational question with I is: Does he know |
| 03:01:50 11 | the identity of any -- |
| 03:01:53 12 | THE WITNESS: Yes. |
| 03:01:53 13 | MR. SCHULER: -- potential -- |
| 03:01:54 14 | THE WITNESS: Yes. |
| 03:01:54 15 | BY MS. BERNIKER: |
| 03:01:55 16 | Q. Are you going to follow your |
| 03:01:56 17 | counsel's instruction not to answer my question? |
| 03:01:58 18 | A. Yes. Because I really don't recall |
| 03:02:01 19 | the content of that letter. |
| 03:02:03 20 | So how should I know whether it was |
| 03:02:04 21 | related to a specific case? |
| 03:02:08 22 | Q. If you would look at the next entry |

62 (Pages 242 to 245)

DR. DIETER LAUDIEN

254

| | | |
|---|---|---|
| 03:08:27 1 | A. | Same question? |
| 03:08:31 2 | Q. | Same question. |
| 03:08:31 3 | A. | The answer is no. |
| 03:08:32 4 | Q. | If you would turn to page 12 and |
| 03:08:38 5 | look at entry number 85, and I am flipping around | |
| 03:08:45 6 | because I am doing this in chronological order. | |
| 03:08:48 7 | A. | Number 85, no, same thing. |
| 03:08:51 8 | Q. | And if you -- can you tell me, sir, |
| 03:08:55 9 | who Dr. Rosenthal is? | |
| 03:09:00 10 | A. | He was at that time the head of the |
| 03:09:04 11 | American research. | |
| 03:09:08 12 | Q. | R & D Department? |
| 03:09:09 13 | A. | Yes. R & D. |
| 03:09:11 14 | Q. | In the United States? |
| 03:09:11 15 | A. | Yes. |
| 03:09:12 16 | Q. | And who is Dr. Cutter or Kutter? |
| 03:09:15 17 | A. | Kutter, he was the head of the |
| 03:09:18 18 | Ingelheim Research Department. | |
| 03:09:21 19 | Q. | And if you would please turn back |
| 03:09:30 20 | to page 25 and look at entry number 174. | |
| 03:09:38 21 | A. | Yes. |
| 03:09:39 22 | Q. | Does that refresh your recollection |

255

| | | |
|---|---|---|
| 03:09:41 1 | that Boehringer was concerned about a potential | |
| 03:09:43 2 | interference proceeding in connection with the | |
| 03:09:47 3 | applications relating to Pramipexole? | |
| 03:09:49 4 | A. | No. |
| 03:09:49 5 | Q. | Can you tell me sir who Dr. |
| 03:09:51 6 | Kauffmann is? | |
| 03:09:52 7 | A. | No. I don't remember that either. |
| 03:09:58 8 | Q. | And I believe you testified earlier |
| 03:10:00 9 | that you didn't remember who Dr. Herschel is. | |
| 03:10:02 10 | | Is that still correct? |
| 03:10:03 11 | A. | That's right, yes. |
| 03:10:04 12 | Q. | And who is Dr. Merz? |
| 03:10:06 13 | | MR. SCHULER: Do you want to phrase |
| 03:10:08 14 | that as who was? I mean, do you care who it is | |
| 03:10:11 15 | now? | |
| 03:10:11 16 | | I assume you care about 1988, what |
| 03:10:14 17 | role they had in 1988. | |
| 03:10:15 18 | BY MS. BERNIKER: | |
| 03:10:15 19 | Q. | Do you know who Dr. Merz was? |
| 03:10:17 20 | A. | Yes. He was one of the scientists |
| 03:10:19 21 | in the Research Department. | |
| 03:10:20 22 | Q. | In Ingelheim? |

256

| | | |
|---|---|---|
| 03:10:21 1 | A. | In Ingelheim, yes. |
| 03:10:23 2 | Q. | And do you see how it says, "Ap. |
| 03:10:26 3 | Kauffmann?" Do you know who that refers to? | |
| 03:10:28 4 | A. | "Ap." means physician. |
| 03:10:33 5 | Q. | Okay. |
| 03:10:34 6 | A. | So it's an abbreviation, Apotheke. |
| 03:10:37 7 | Q. | And who is doctor -- I am sorry. |
| 03:10:42 8 | Who is Professor Daniel? | |
| 03:10:45 9 | | THE INTERPRETER: Which would be a |
| 03:10:45 10 | pharmacist. | |
| 03:10:47 11 | BY MS. BERNIKER: | |
| 03:10:47 12 | Q. | And who is Professor Daniel? |
| 03:10:50 13 | A. | He was in R & D. He was the head |
| 03:10:57 14 | of the chemical research of the R & D. | |
| 03:11:00 15 | Q. | In Ingelheim? |
| 03:11:01 16 | A. | In Ingelheim, and Kutter was the |
| 03:11:04 17 | head of the overall line. | |
| 03:11:07 18 | Q. | And Dr. Hoppe, who was that? |
| 03:11:11 19 | A. | This is the research |
| 03:11:14 20 | administration, the head of the Research | |
| 03:11:15 21 | Administration. | |
| 03:11:16 22 | Q. | Is that separate from the R & D |

257

| | | |
|---|---|---|
| 03:11:18 1 | group? | |
| 03:11:18 2 | A. | Within the R & D group. |
| 03:11:19 3 | Q. | Can you tell me, sir, who P.J. |
| 03:11:30 4 | Franks is? | |
| 03:11:30 5 | | MR. SCHULER: Can I have a standing |
| 03:11:31 6 | request that he can interpret your question as | |
| 03:11:34 7 | meaning at the time of a certain communication as | |
| 03:11:37 8 | opposed to today? | |
| 03:11:39 9 | | MS. BERNIKER: Yes. That's fine, |
| 03:11:40 10 | if you want me to direct him to each | |
| 03:11:43 11 | communication. | |
| 03:11:44 12 | BY MS. BERNIKER: | |
| 03:11:44 13 | Q. | Can you tell me in the late 1980? |
| 03:11:47 14 | | MR. SCHULER: That's fine. |
| 03:11:49 15 | | MS. BERNIKER: I just don't want to |
| 03:11:51 16 | waste time. | |
| 03:11:52 17 | BY MS. BERNIKER: | |
| 03:11:52 18 | Q. | Can you tell me, in the late 1980s, |
| 03:11:55 19 | what P.J. Franks' role was? | |
| 03:11:56 20 | A. | P.J. Franks, what was his name? |
| 03:11:59 21 | Q. | You can see on page 10, entry 76. |
| 03:12:10 22 | A. | 10, 76. Oh, yes. He was the head |

65 (Pages 254 to 257)

DR. DIETER LAUDIEN

258

03:12:13 1 of the Legal Department.

03:12:18 2     Q.   And who is John Sweeney?

03:12:21 3     A.   An attorney, an external attorney.

03:12:25 4     Q.   Outside counsel?

03:12:26 5     A.   Yes.

03:12:26 6     Q.   Do you know what country he is

03:12:29 7 located in?

03:12:30 8     A.   He is American.

03:12:30 9     Q.   And do you know what law firm he is

03:12:38 10 with?

03:12:38 11     A.   Pardon?

03:12:39 12     Q.   Do you know what law firm he was

03:12:41 13 with at the time?

03:12:41 14     A.   No, I don't remember.

03:12:44 15     Q.   Does this entry number 10 -- I am

03:12:48 16 sorry, number 76 on page 10 refresh your

03:12:50 17 recollection that there was discussion -- I am

03:12:52 18 sorry, that there was concern at Boehringer

03:12:55 19 regarding a potential interference related to

03:12:58 20 applications related to Pramipexole?

03:13:00 21     A.   No. No. No.

03:13:01 22     Q.   And if you would just turn for a

259

03:13:05 1 moment to, please, to page 11, entry number 83.

03:13:12 2     (Witness complying)

03:13:13 3     And entry number 83 is described as

03:13:16 4 a letter dated April 21st, 1988, from Dr.

03:13:20 5 Frankhouser to John Sweeney?

03:13:23 6     A.   Mm-Hmm.

03:13:24 7     Q.   And copied on it are yourself --

03:13:26 8     A.   Yes.

03:13:26 9     Q.   -- P. Franks, and Alan Stempel.

03:13:29 10     Do you see that?

03:13:29 11     A.   Yes.

03:13:29 12     Q.   And it describes in the subject

03:13:31 13 matter, "Attorney-client communication reflecting

03:13:33 14 an attorney's mental impressions?"

03:13:35 15     MR. SCHULER: I will represent that

03:13:37 16 that is just a repeat of entry 76.

03:13:39 17     MS. BERNIKER: It's not, though.

03:13:40 18     MR. SCHULER: It is. It's the same

03:13:42 19 document, same date.

03:13:44 20     MS. BERNIKER: Oh, in any event,

03:13:46 21 let me just ask you about the description of

03:13:49 22 the --

260

03:13:49 1 BY MS. BERNIKER:

03:13:49 2     Q.   It says in the subject matter,

03:13:51 3 "Attorney-client communication reflecting an

03:13:52 4 attorney's mental impressions regarding a

03:14:03 5 potential interference proceeding and in

03:14:05 6 anticipation of litigation."

03:14:06 7     Do you see that, sir?

03:14:07 8     A.   Mm-Hmm.

03:14:07 9     Q.   Sir, in 1988, were you anticipating

03:14:15 10 litigation regarding the applications related to

03:14:19 11 Pramipexole?

03:14:19 12     A.   No. I mean, this is the truth. I

03:14:23 13 don't remember anything about this case. I am

03:14:27 14 sorry. I am sorry for me, but that was in '88.

03:14:31 15     Q.   Okay.

03:14:31 16     A.   I don't --

03:14:34 17     Q.   Please.

03:14:34 18     A.   I don't recall.

03:14:35 19     Q.   So you don't remember whether or

03:14:37 20 not you were anticipating litigation at that time?

03:14:38 21     A.   No. I don't remember.

03:14:39 22     Q.   Does this entry number 11 refresh

261

03:14:49 1 your recollection about whether you were

03:14:50 2 anticipating litigation at the time?

03:14:52 3     MR. SCHULER: Objection.

03:14:54 4     THE WITNESS: You mean 83?

03:14:56 5 BY MS. BERNIKER:

03:14:57 6     Q.   I mean 83. Sorry.

03:14:59 7     A.   No.

03:14:59 8     Q.   And can you tell me yes or no

03:15:02 9 whether actually -- do you know what entity you

03:15:13 10 would be anticipating litigation with as described

03:15:17 11 in entry number 83?

03:15:19 12     MR. SCHULER: And you can answer

03:15:20 13 yes or no.

03:15:20 14     THE WITNESS:

03:15:21 15     A.   No.

03:15:21 16 BY MS. BERNIKER:

03:15:22 17     Q.   No, you don't know?

03:15:23 18     A.   No. I don't know.

03:15:25 19     Q.   Do you know whether that was with

03:15:30 20 Eli Lilly?

03:15:31 21     MR. SCHULER: And I will object and

03:15:33 22 instruct you not to -- first of all, there was no

66 (Pages 258 to 261)

## 262

03:15:35 1 foundation for that. He just said no, he doesn't
03:15:38 2 know, and secondly, I instruct you not to answer
03:15:41 3 anyway.
03:15:41 4 BY MS. BERNIKER:
03:15:41 5 Q. And you are going to follow your
03:15:43 6 counsel's instruction?
03:15:43 7 A. Yes.
03:15:44 8 Q. I would just like to go few a more
03:15:47 9 of these?
03:15:47 10 MR. SCHULER: Can we take a break
03:15:48 11 in the next 5 minutes or go? You can keep going
03:15:52 12 if you want.
03:15:52 13 MS. BERNIKER: We can take a break
03:15:54 14 now if you like.
03:15:55 15 THE WITNESS: Okay.
03:15:56 16 THE VIDEOGRAPHER: This is the end
03:15:57 17 of tape number 2 of Dieter Laudien. The time is
03:16:00 18 3:15 p.m.
03:16:01 19 (Short recess taken)
03:29:11 20 THE VIDEOGRAPHER: This is tape
03:29:15 21 number 3 of the videodeposition of Dieter Laudien.
03:29:18 22 The time is 3:28 p.m.

## 263

03:29:20 1 BY MS. BERNIKER:
03:29:21 2 Q. Dr. Laudien, in 1988, what was the
03:29:25 3 position of Mr. D. Barrios? And if you want to
03:29:30 4 see the spelling, it's on page 12, entry number 84
03:29:33 5 of Exhibit 100.
03:29:58 6 A. Which line you are referring to?
03:30:02 7 Q. Line 84 of page 12?
03:30:05 8 A. Line 184.
03:30:07 9 Q. No. 84?
03:30:09 10 A. I am not sure, but I think he was
03:30:23 11 the president of the company. But I am not sure.
03:30:27 12 Q. The president of which company?
03:30:30 13 A. Of the US company. But I am not
03:30:33 14 sure.
03:30:33 15 Q. The US Boehringer entity?
03:30:36 16 A. Yes.
03:30:36 17 Q. And who is Dr. Wardell at that
03:30:43 18 time?
03:30:43 19 MR. SCHULER: Object to the form.
03:30:47 20 THE WITNESS:
03:30:47 21 A. I don't remember.
03:30:48 22 BY MS. BERNIKER:

## 264

03:30:48 1 Q. What was Dr. Wardell's role at that
03:30:52 2 time? You don't remember?
03:30:52 3 A. No.
03:30:53 4 Q. And what was Dr. Rosenthal's
03:30:56 5 position as of 1988?
03:30:57 6 A. Head of research, I think chemical
03:30:59 7 research.
03:31:01 8 Q. In the United States or in --
03:31:02 9 A. In the United States, yes.
03:31:05 10 Q. And does entry number 84 on page 12
03:31:12 11 refresh your recollection?
03:31:14 12 I am not going to read it all into
03:31:16 13 the record, but please take a look at it.
03:31:18 14 A. No.
03:31:18 15 Q. Does that refresh your
03:31:19 16 recollection --
03:31:19 17 A. No. No.
03:31:20 18 Q. -- that there were concerns about
03:31:21 19 potential interference?
03:31:22 20 A. No. No.
03:31:22 21 Q. And if you would turn to page 11
03:31:25 22 and look at entry number 82, does that entry

## 265

03:31:31 1 refresh your recollection that there were
03:31:32 2 concerns?
03:31:33 3 A. No.
03:31:33 4 Q. And if you turn to page 14 at entry
03:31:41 5 98, can you tell me, sir, who doctor -- Dr.
03:31:48 6 William is?
03:31:54 7 MR. SCHULER: Who?
03:31:55 8 THE WITNESS:
03:31:55 9 A. You mean Wardell?
03:31:56 10 BY MS. BERNIKER:
03:31:57 11 Q. Wardell. I am sorry. Wardell.
03:32:00 12 Sorry, I apologize.
03:32:01 13 A. No.
03:32:01 14 Q. And we just talked about him?
03:32:03 15 A. Yes. Hmm-Mmm.
03:32:04 16 Q. And Dr. Hertkorn, who is he?
03:32:11 17 A. I don't remember his position at
03:32:15 18 that time, but I think he was in Ingelheim at that
03:32:19 19 time.
03:32:19 20 Q. Do you know if he is a scientist?
03:32:21 21 A. Yes. He is a scientist. He might
03:32:29 22 be a medical doctor, but I don't know it exactly.

67 (Pages 262 to 265)

DR. DIETER LAUDIEN

| | 266 |
|---|---|
| 03:32:35 1 | Q.    And in the subject matter of that |
| 03:32:36 2 | entry, "Attorney-client communication concerning |
| 03:32:39 3 | patent application and patent rights and |
| 03:32:40 4 | discussing legal advice from Dr. Laudien." |
| 03:32:43 5 | Do you see that, sir? |
| 03:32:44 6 | A.    Which number?  Which line? |
| 03:32:46 7 | Q.    Line 98. |
| 03:32:47 8 | A.    98.  No.  That might be |
| 03:33:01 9 | correspondence which is just being provided to one |
| 03:33:03 10 | guy to some other guys. |
| 03:33:05 11 | Q.    Okay.  Does this entry on 98 |
| 03:33:08 12 | refresh your recollection -- |
| 03:33:08 13 | A.    No.  It does not. |
| 03:33:09 14 | Q.    -- about any -- okay.  Well, |
| 03:33:12 15 | actually, let me finish the question. |
| 03:33:14 16 | MR. SCHULER:  Yes.  Let her finish. |
| 03:33:16 17 | BY MS. BERNIKER: |
| 03:33:17 18 | Q.    Sir, do you know which patent |
| 03:33:21 19 | application this communication related to? |
| 03:33:24 20 | A.    No, I don't know. |
| 03:33:25 21 | Q.    Do you know which patent rights |
| 03:33:29 22 | this communication related to? |

| | 267 |
|---|---|
| 03:33:30 1 | A.    No. |
| 03:33:36 2 | Q.    Do you know whether the legal |
| 03:33:38 3 | advice that you provided that was incorporated |
| 03:33:41 4 | into this communication related to the patent |
| 03:33:46 5 | applications related to Pramipexole? |
| 03:33:49 6 | A.    No.  I don't know. |
| 03:33:49 7 | Q.    If you would please look at entry |
| 03:33:58 8 | number 97 on the same page. |
| 03:34:02 9 | A.    Mm-Hmm. |
| 03:34:06 10 | Q.    Actually, let me ask you one more |
| 03:34:08 11 | question about entry 98:  Did this communication |
| 03:34:12 12 | relate to the Eli Lilly patent application? |
| 03:34:16 13 | MR. SCHULER:  Objection. |
| 03:34:18 14 | THE WITNESS:  88? |
| 03:34:19 15 | MR. SCHULER:  Let me just object. |
| 03:34:20 16 | MS. BERNIKER:  98. |
| 03:34:21 17 | THE WITNESS:  98? |
| 03:34:21 18 | MR. SCHULER:  Hold on.  Objection. |
| 03:34:23 19 | That clearly calls for attorney/client privileged |
| 03:34:25 20 | communication, some of the communication, |
| 03:34:26 21 | so I instruct you not to answer. |
| 03:34:28 22 | Except that he already said that he |

| | 268 |
|---|---|
| 03:34:29 1 | doesn't know what it was about, so there would be |
| 03:34:31 2 | no foundation for that question, in any event. |
| 03:34:34 3 | BY MS. BERNIKER: |
| 03:34:35 4 | Q.    Are you going to follow your |
| 03:34:36 5 | counsel's instruction? |
| 03:34:37 6 | A.    Yes. |
| 03:34:37 7 | MS. BERNIKER:  I am understanding |
| 03:34:38 8 | your objection as you were actually instructing |
| 03:34:41 9 | him not to answer, among your other objections? |
| 03:34:43 10 | MR. SCHULER:  Yes.  But I don't |
| 03:34:45 11 | know that he needs the instruction, because he |
| 03:34:46 12 | said he doesn't know what it's about.  So -- |
| 03:34:48 13 | MS. BERNIKER:  I understand that. |
| 03:34:49 14 | I have asked him a question you think that there |
| 03:34:51 15 | is no foundation for. |
| 03:34:53 16 | I am still entitled to an answer if |
| 03:34:55 17 | that's the only question.  So are you instructing |
| 03:34:56 18 | him not to answer? |
| 03:34:58 19 | MR. SCHULER:  There is two |
| 03:34:59 20 | objections.  And for the purposes of the dispute |
| 03:35:01 21 | you initially raised a couple of weeks ago, my |
| 03:35:04 22 | point is that there is no real dispute because he |

| | 269 |
|---|---|
| 03:35:08 1 | has already said he doesn't know what that relates |
| 03:35:09 2 | to. |
| 03:35:10 3 | MS. BERNIKER:  But for the purposes |
| 03:35:12 4 | of this question today, you are instructing him |
| 03:35:13 5 | not to answer? |
| 03:35:14 6 | MR. SCHULER:  Yes. |
| 03:35:15 7 | BY MS. BERNIKER: |
| 03:35:15 8 | Q.    And you are going to follow your |
| 03:35:17 9 | counsel's instruction? |
| 03:35:17 10 | A.    Yes. |
| 03:35:19 11 | Q.    Now, I am sorry, let's go back to |
| 03:35:20 12 | entry 97 on the same page. |
| 03:35:23 13 | And would you please tell me who |
| 03:35:25 14 | Alex Dehio is -- was as of 1988, what his position |
| 03:35:31 15 | was? |
| 03:35:31 16 | MR. SCHULER:  Objection.  Asked and |
| 03:35:32 17 | answered. |
| 03:35:51 18 | BY MS. BERNIKER: |
| 03:35:51 19 | Q.    I apologize if I have already asked |
| 03:35:54 20 | you that, sir. |
| 03:35:55 21 | Can you tell me who Dr. Huber is? |
| 03:35:57 22 | A.    He was the head of the Legal |

68  (Pages 266 to 269)

DR. DIETER LAUDIEN

<table>
<tr><td colspan="2">270</td></tr>
<tr><td>03:35:59 1</td><td>Department at that time in Ingelheim.</td></tr>
<tr><td>03:36:00 2</td><td>Q.    And can you tell me who Mr.</td></tr>
<tr><td>03:36:05 3</td><td>Lackstrom is -- was at that time?  Again, entry</td></tr>
<tr><td>03:36:12 4</td><td>97?</td></tr>
<tr><td>03:36:12 5</td><td>MR. SCHULER:  Oh, I am sorry.  I</td></tr>
<tr><td>03:36:13 6</td><td>thought you were talking about 96.  I am sorry.</td></tr>
<tr><td>03:36:20 7</td><td>THE WITNESS:</td></tr>
<tr><td>03:36:20 8</td><td>A.    He belonged to the US organization.</td></tr>
<tr><td>03:36:23 9</td><td>I do not know to which department he belonged, but</td></tr>
<tr><td>03:36:26 10</td><td>I think it was Licensing.  But I am not sure.</td></tr>
<tr><td>03:36:27 11</td><td>BY MS. BERNIKER:</td></tr>
<tr><td>03:36:28 12</td><td>Q.    And if you look at both entries 97</td></tr>
<tr><td>03:36:33 13</td><td>and 96, their descriptions are "Attorney-client</td></tr>
<tr><td>03:36:37 14</td><td>communication reflecting the mental impressions of</td></tr>
<tr><td>03:36:39 15</td><td>an attorney regarding a potential interference</td></tr>
<tr><td>03:36:41 16</td><td>proceeding and in anticipation of litigation."</td></tr>
<tr><td>03:36:44 17</td><td>Do you see that text, sir?</td></tr>
<tr><td>03:36:45 18</td><td>A.    Yes.</td></tr>
<tr><td>03:36:45 19</td><td>Q.    And do those entries refresh your</td></tr>
<tr><td>03:36:48 20</td><td>recollection that there was discussion about a</td></tr>
<tr><td>03:36:52 21</td><td>potential interference proceeding in connection</td></tr>
<tr><td>03:36:53 22</td><td>with the applications relating to Pramipexole?</td></tr>
</table>

<table>
<tr><td colspan="2">271</td></tr>
<tr><td>03:36:56 1</td><td>A.    No, they don't.</td></tr>
<tr><td>03:36:57 2</td><td>Q.    Do these entries refresh your</td></tr>
<tr><td>03:36:58 3</td><td>recollection that there was consideration of</td></tr>
<tr><td>03:37:01 4</td><td>potential litigation in connection with the</td></tr>
<tr><td>03:37:04 5</td><td>applications related to Pramipexole?</td></tr>
<tr><td>03:37:06 6</td><td>A.    Same line, 96?</td></tr>
<tr><td>03:37:09 7</td><td>Q.    96 and 97?</td></tr>
<tr><td>03:37:11 8</td><td>A.    No, they don't.</td></tr>
<tr><td>03:37:12 9</td><td>Q.    And if you would just turn to entry</td></tr>
<tr><td>03:37:24 10</td><td>95 on the same page, can you tell me whether that</td></tr>
<tr><td>03:37:29 11</td><td>entry refreshes your recollection that there was</td></tr>
<tr><td>03:37:31 12</td><td>discussions -- I am sorry, that there was concern</td></tr>
<tr><td>03:37:33 13</td><td>at Boehringer regarding a potential interference</td></tr>
<tr><td>03:37:36 14</td><td>proceeding?</td></tr>
<tr><td>03:37:37 15</td><td>A.    No.</td></tr>
<tr><td>03:37:37 16</td><td>Q.    In connection -- and does it</td></tr>
<tr><td>03:37:40 17</td><td>refresh your recollection that there was</td></tr>
<tr><td>03:37:43 18</td><td>consideration at Boehringer regarding potential</td></tr>
<tr><td>03:37:46 19</td><td>litigation in connection with the applications</td></tr>
<tr><td>03:37:48 20</td><td>relating to the Pramipexole?</td></tr>
<tr><td>03:37:50 21</td><td>A.    No.</td></tr>
<tr><td>03:37:50 22</td><td>Q.    And if you would please -- I don't</td></tr>
</table>

<table>
<tr><td colspan="2">272</td></tr>
<tr><td>03:37:56 1</td><td>have that many of these left, so I am trying to</td></tr>
<tr><td>03:37:58 2</td><td>whip through them.  But if you would please turn</td></tr>
<tr><td>03:38:01 3</td><td>to page 9 and look at entry 63.</td></tr>
<tr><td>03:38:11 4</td><td>And could you tell me please if</td></tr>
<tr><td>03:38:13 5</td><td>that refreshes your recollection regarding whether</td></tr>
<tr><td>03:38:18 6</td><td>there was concern about another corporation's</td></tr>
<tr><td>03:38:20 7</td><td>patent in connection with the applications related</td></tr>
<tr><td>03:38:23 8</td><td>to Pramipexole?</td></tr>
<tr><td>03:38:24 9</td><td>A.    No.</td></tr>
<tr><td>03:38:24 10</td><td>Q.    And do you know which other</td></tr>
<tr><td>03:38:32 11</td><td>corporation's patent is referenced in this entry?</td></tr>
<tr><td>03:38:35 12</td><td>MR. SCHULER:  You can answer yes or</td></tr>
<tr><td>03:38:35 13</td><td>no.</td></tr>
<tr><td>03:38:36 14</td><td>THE WITNESS:</td></tr>
<tr><td>03:38:36 15</td><td>A.    No.</td></tr>
<tr><td>03:38:37 16</td><td>BY MS. BERNIKER:</td></tr>
<tr><td>03:38:39 17</td><td>Q.    Do you know whether that</td></tr>
<tr><td>03:38:40 18</td><td>corporation was Eli Lilly?</td></tr>
<tr><td>03:38:42 19</td><td>MR. SCHULER:  Since he doesn't</td></tr>
<tr><td>03:38:44 20</td><td>know, then he can't know the answer to the</td></tr>
<tr><td>03:38:46 21</td><td>question.</td></tr>
<tr><td>03:38:46 22</td><td>There is no foundation.</td></tr>
</table>

<table>
<tr><td colspan="2">273</td></tr>
<tr><td>03:38:49 1</td><td>MS. BERNIKER:  And you are going to</td></tr>
<tr><td>03:38:50 2</td><td>instruct him not to answer?</td></tr>
<tr><td>03:38:51 3</td><td>MR. SCHULER:  I think he said no.</td></tr>
<tr><td>03:38:52 4</td><td>MS. BERNIKER:  It's up to you.</td></tr>
<tr><td>03:38:53 5</td><td>MR. SCHULER:  Look, he doesn't know</td></tr>
<tr><td>03:38:55 6</td><td>who the company is, so you could go through 30</td></tr>
<tr><td>03:38:57 7</td><td>different companies and say:  Is it this one?  Is</td></tr>
<tr><td>03:38:59 8</td><td>it that one?  The answer would still be he doesn't</td></tr>
<tr><td>03:39:03 9</td><td>know.</td></tr>
<tr><td>03:39:03 10</td><td>So there is no foundation.  That's</td></tr>
<tr><td>03:39:04 11</td><td>my position with regard to the fight you have</td></tr>
<tr><td>03:39:07 12</td><td>begun.  But to the extent that you are going to</td></tr>
<tr><td>03:39:09 13</td><td>insist, I will instruct him not to answer that</td></tr>
<tr><td>03:39:10 14</td><td>question.</td></tr>
<tr><td>03:39:11 15</td><td>BY MS. BERNIKER:</td></tr>
<tr><td>03:39:11 16</td><td>Q.    And you are going to follow his</td></tr>
<tr><td>03:39:13 17</td><td>instruction?</td></tr>
<tr><td>03:39:13 18</td><td>A.    Yes.</td></tr>
<tr><td>03:39:14 19</td><td>Q.    And now, if you would please look</td></tr>
<tr><td>03:39:16 20</td><td>at entry number 108, and I believe that is on page</td></tr>
<tr><td>03:39:21 21</td><td>16?</td></tr>
<tr><td>03:39:33 22</td><td>MR. SCHULER:  I am sorry.  Which</td></tr>
</table>

**69  (Pages 270 to 273)**

DR. DIETER LAUDIEN

**282**

03:45:58 1  BY MS. BERNIKER:
03:46:00 2      Q.   Who would be the one to contact the
03:46:01 3  other company?
03:46:02 4          MR. SCHULER: Same objections.
03:46:08 5          THE WITNESS:
03:46:08 6      A.   I mean, you see all from this cited
03:46:11 7  letters; and so on that, I obviously was involved.
03:46:14 8          But I don't recall. So that's the
03:46:18 9  answer to your question.
03:46:20 10  BY MS. BERNIKER:
03:46:21 11     Q.   So you would have been the one to
03:46:22 12  contact another company if that contact took
03:46:24 13  place?
03:46:25 14         MR. SCHULER: Objection. Misstates
03:46:26 15  his prior testimony and assumes facts. It's an
03:46:28 16  incomplete hypothetical.
03:46:32 17  BY MS. BERNIKER:
03:46:32 18     Q.   You can still answer if you can,
03:46:35 19  sir.
03:46:42 20         MR. SCHULER: Let me just say also,
03:46:44 21  this is asked and answered. I mean, you asked him
03:46:46 22  directly whether he did any contact and he said.

**283**

03:46:48 1  no, he doesn't remember. Just asking him
03:46:51 2  hypothetically whether that was -- he would have
03:46:53 3  been the person to do it --
03:46:54 4          MS. BERNIKER: You can say
03:46:55 5  objection, Ken. We have been through this.
03:46:57 6          The rules of evidence require you
03:46:59 7  to just say objection and your basis. You can do
03:47:01 8  that.
03:47:01 9          MR. SCHULER: My basis is you have
03:47:03 10  asked him a whole line of questions.
03:47:04 11         MS. BERNIKER: Asked and answered.
03:47:06 12  That's a basis.
03:47:07 13         MR. SCHULER: And it's an
03:47:08 14  incomplete hypothetical and it assumes facts not
03:47:10 15  in evidence.
03:47:10 16  BY MS. BERNIKER:
03:47:11 17     Q.   I am asking you if you would have
03:47:12 18  been the person that would have contacted them. I
03:47:15 19  understand that you don't remember in this
03:47:16 20  particular instance.
03:47:16 21         But would you have been that person
03:47:18 22  who would have contacted another corporation if

**284**

03:47:20 1  you were considering settling a potential
03:47:23 2  interference?
03:47:23 3      A.   No.
03:47:23 4      Q.   Who would have been that person?
03:47:25 5          MR. SCHULER: Objection.
03:47:25 6  Incomplete hypothetical. Assumes facts not in
03:47:28 7  evidence.
03:47:28 8  BY MS. BERNIKER:
03:47:28 9      Q.   You don't know?
03:47:28 10     A.   No. It's not my -- that was not my
03:47:31 11  responsibility.
03:47:32 12     Q.   Whose responsibility was it?
03:47:33 13     A.   I do not know who would have been
03:47:37 14  this person. I mean, in complicated cases, there
03:47:41 15  is always a teamwork.
03:47:42 16     Q.   Okay.
03:47:43 17     A.   There is somebody from the Legal
03:47:46 18  Department and a scientist, and it has to be
03:47:49 19  coordinated with the board and whatever.
03:47:51 20         So it -- it is much more
03:47:54 21  complicated.
03:47:55 22     Q.   And a potential interference is a

**285**

03:47:57 1  complicated case where you would involve other
03:47:59 2  people?
03:48:01 3          MR. SCHULER: Object to the form.
03:48:02 4  And --
03:48:03 5          THE WITNESS:
03:48:04 6      A.   What do you mean by "involved"?
03:48:05 7  BY MS. BERNIKER:
03:48:05 8      Q.   A situation of a potential
03:48:06 9  interference is a complicated case, and,
03:48:08 10  therefore, a team would be --
03:48:09 11     A.   Yes.
03:48:10 12     Q.   -- assembled to decide? Yes?
03:48:13 13     A.   Yes.
03:48:14 14     Q.   Okay.
03:48:15 15     A.   There are different stages of
03:48:17 16  preparing this final decision then, and the people
03:48:25 17  involved had their specific responsibilities, or
03:48:32 18  our responsibility from the Patent Department was
03:48:34 19  to clarify the patent situation. I mean, I am
03:48:39 20  talking in general now.
03:48:42 21         And the Legal Department was
03:48:43 22  responsible for drafting possible agreements, and

72 (Pages 282 to 285)

DR. DIETER LAUDIEN

286

03:48:48 1  the Marketing Department was responsible for
03:48:51 2  thinking about licensing fees.
03:48:54 3          And you see, that stuff. A lot of
03:48:56 4  people are always involved in these decision.
03:49:14 5      Q.  Dr. Fleischer, we've reviewed --
03:49:16 6      MR. SCHULER:  This is Dr. Laudien.
03:49:19 7  BY MS. BERNIKER:
03:49:19 8      Q.  Dr. Laudien, I am sorry.  I
03:49:21 9  apologize.
03:49:22 10         Dr. Laudien, we've reviewed about
03:49:26 11  20 entries in this exhibit, Exhibit 100?
03:49:30 12     A.  Yes.
03:49:30 13     Q.  And about that many referred to a
03:49:35 14  potential interference proceeding and named you as
03:49:39 15  either an author or a recipient or a.
03:49:45 16         I just want to be clear, is it your
03:49:47 17  testimony here today that you don't remember --
03:49:49 18     A.  Yes.
03:49:49 19     Q.  -- a potential interference
03:49:51 20  proceeding in connection with the patent
03:49:52 21  applications relating to Pramipexole?
03:49:54 22     A.  Yes.

287

03:49:55 1      Q.  And that reviewing these entries
03:49:57 2  did not refresh your recollection about that?
03:49:59 3      A.  No.
03:49:59 4      Q.  And your testimony is that you also
03:50:03 5  don't remember a potential interference proceeding
03:50:06 6  relating to Eli Lilly?
03:50:09 7      A.  Yes.  That's right.
03:50:13 8      Q.  Dr. Laudien, did Dr. Klaes have a
03:50:31 9  role in the prosecution of the patents related to
03:50:34 10  Pramipexole?
03:50:39 11     MR. SCHULER:  Objection.  Lack of
03:50:39 12  foundation.  But answer if you have personal
03:50:41 13  knowledge.
03:50:42 14     THE WITNESS:
03:50:46 15     A.  I don't recall.
03:51:23 16     (Mr. Schuler exits the room)
03:51:49 17     MR. GROSSMAN:  Can we go off the
03:51:50 18  record and hold in place?
03:51:54 19     MS. BERNIKER:  We want to go off
03:51:55 20  the record because Ken is out of the room.
03:51:58 21     THE VIDEOGRAPHER:  We are going off
03:51:59 22  the record.  The time is 3:51 p.m.

288

03:52:03 1          (Off the record)
03:53:37 2          THE VIDEOGRAPHER:  We are going on
03:53:40 3  the record.  The time is 3:53 p.m.
03:53:49 4          (Whereupon, Exhibit No. 116 was
03:53:43 5  marked for identification)
03:53:43 6  BY MS. BERNIKER:
03:53:44 7      Q.  Dr. Laudien, I am handing you
03:53:45 8  what's been marked Exhibit 116.  It's a new
03:53:48 9  Exhibit.
03:53:49 10         (Handing)
03:53:53 11         If you would take a quick look,
03:53:55 12  please.
03:54:20 13         (Witness reading document)
03:54:27 14     A.  Yes.
03:54:28 15     Q.  And this, if you look at the first
03:54:30 16  page, it's a letter from Boehringer Ingelheim
03:54:34 17  office in Ridgefield, Connecticut signed by Miriam
03:54:39 18  Phillips and sent to your attention?
03:54:41 19     A.  Yes.
03:54:41 20     Q.  And it's dated January 4th, 1989?
03:54:44 21     A.  Mm-Hmm.
03:54:45 22     Q.  And this letter encloses a copy of

289

03:54:50 1  an Office Action received from the United States
03:54:52 2  Patent and Trademark Office in case 5/920?
03:54:55 3      A.  Yes.
03:54:55 4      Q.  And if you look at the top toward
03:55:02 5  the left, there is what looks like a stamp; and in
03:55:07 6  the middle, it says, "10 Jan, 1989."
03:55:13 7          Do you see that?
03:55:13 8      A.  On the first page?
03:55:15 9      Q.  Yes.  On the first page?
03:55:16 10     A.  Yes. Here.
03:55:16 11         (Indicating)
03:55:17 12     Q.  Yes.
03:55:18 13     A.  Yes.
03:55:18 14     Q.  Can you tell me what that is?
03:55:22 15     A.  This is whenever we get any
03:55:25 16  correspondence, it gets this stamp.  And it's
03:55:38 17  indicated to whom it will be forwarded.  This is
03:55:41 18  the abbreviation of the patent attorneys, and it's
03:55:45 19  indicated administration group, or whatever.
03:55:49 20     Q.  And who indicates that on the
03:55:51 21  stamp?
03:55:51 22     A.  The administrator.  And he sees it

73  (Pages 286 to 289)

DR. DIETER LAUDIEN

**310**

04:15:21 1     So if somebody sees that there is a
04:15:23 2 mistake, and mistakes can happen all the time, it
04:15:26 3 can be a small thing, an administrative thing, it
04:15:29 4 can be a printing error in the general formula, he
04:15:33 5 would make his colleagues aware of this situation.
04:16:25 6     Q.   Sir, can you tell me whether the
04:16:28 7 representations on page 3 of Exhibit 98 in the
04:16:34 8 paragraph that begins U.S. Application number
04:16:40 9 747,778?
04:16:40 10     A.   Yes.
04:16:41 11     Q.   Can you tell me whether those
04:16:42 12 applications were correct -- I am sorry, whether
04:16:46 13 those representations were correct?
04:16:47 14     A.   No, I don't know. I mean, I
04:16:52 15 haven't studied that case and these documents.
04:16:53 16     Q.   What would you need to do to
04:16:55 17 determine whether those statements were correct?
04:16:57 18     A.   To compare the content of the U.S.
04:17:03 19 application with the serial number with the
04:17:06 20 disclosure in the European patent application.
04:17:10 21     That is what he is saying, and that
04:17:12 22 means, I mean, to take the whole content of these

**311**

04:17:15 1 documents and to compare it.
04:17:17 2     Q.   I just want to understand what you
04:17:20 3 would compare. You would compare the Boehringer
04:17:23 4 United States application, and you would compare
04:17:25 5 the original priority applications filed by
04:17:29 6 Boehringer?
04:17:29 7     A.   No. He is talking about this
04:17:32 8 serial number, this one here.
04:17:33 9     (Indicating)
04:17:34 10     18? Exhibit 18?
04:17:37 11     Q.   Yes.
04:17:38 12     A.   And the 696, this one, Exhibit 22.
04:17:44 13     (Indicating)
04:17:45 14     Q.   Yes.
04:17:46 15     A.   And he says the U.S. patent
04:17:50 16 application contains the same disclosure as the
04:17:54 17 European 696.
04:17:56 18     Q.   Okay.
04:17:56 19     A.   So it's a question of fact. One
04:17:59 20 has to compare the content --
04:18:00 21     Q.   Okay.
04:18:01 22     A.   -- to come to that conclusion.

**312**

04:18:02 1     Q.   And then if you look at the next
04:18:05 2 two sentences where it says, "It is not available
04:18:09 3 as prior art because its filing date is later than
04:18:12 4 the effective filing date of the above-captioned
04:18:14 5 application," and the next sentence, "(The
04:18:16 6 effective filing date of the above-captioned
04:18:18 7 application is 22 December, 1984, the date on
04:18:21 8 which the German application for which convention
04:18:23 9 priority is claimed was filed)."
04:18:25 10     Can you tell me whether those two
04:18:27 11 sentences are accurate?
04:18:32 12     MR. SCHULER: Objection. Lack of
04:18:33 13 foundation.
04:18:48 14     THE WITNESS:
04:18:50 15     A.   This is a very bad copy. I can't
04:18:53 16 see the filing date.
04:19:21 17     (Pause)
04:19:28 18     I mean, this obviously is a
04:19:30 19 different filing date. That's what I can see.
04:19:35 20     BY MS. BERNIKER:
04:19:36 21     Q.   Let me ask a more specific
04:19:39 22 question. This statement on page 3 that says,

**313**

04:19:42 1 "The effective filing date of the above-captioned
04:19:44 2 application is 22 December, 1984?
04:19:49 3     A.   Oh, excuse me. This is not this
04:19:51 4 one.
04:19:51 5     (Indicating)
04:19:52 6     This is our own patent application.
04:19:54 7 Right?
04:19:54 8     Q.   Right. It's asking whether the
04:19:56 9 effective filing date of the United States
04:19:59 10 application in which this was submitted?
04:20:01 11     A.   Yes. I can't see it here. I mean,
04:20:04 12 one has to go into the file.
04:20:22 13     Q.   Well, can you tell me, sir, what
04:20:25 14 you would need to do to determine whether this
04:20:26 15 statement in the parenthetical, "the effective
04:20:29 16 filing date" -- I am not going to read it again.
04:20:31 17     Can you tell me what you would need
04:20:33 18 to do to determine whether that statement was
04:20:36 19 accurate?
04:20:36 20     A.   To look into the docket.
04:20:38 21     Q.   What would you look at in the
04:20:39 22 docket?

79 (Pages 310 to 313)

DR. DIETER LAUDIEN

314

04:20:40 1      A.   In the application in the date
04:20:45 2   where the application date is fixed by the patent
04:20:48 3   office when they received the application.
04:20:51 4      So you have to look into the docket
04:20:53 5   whether this is correct.
04:20:54 6      Q.   You would look at the docket and
04:20:57 7   you would look at the date in which the United
04:21:00 8   States application was filed.
04:21:01 9      Right?
04:21:01 10     A.   Yes.
04:21:01 11     Q.   Would you also look at the priority
04:21:03 12  applications if it claimed priority to other
04:21:06 13  applications?
04:21:06 14     MR. SCHULER:   Object to the form.
04:21:11 15  That's what the statement refers to.
04:21:14 16     I think he already answered that
04:21:16 17  question.
04:21:21 18     THE WITNESS:
04:21:21 19     A.   Yes. One has to go into the file
04:21:23 20  and see whether this is correct or not.
04:21:27 21  BY MS. BERNIKER:
04:21:28 22     Q.   I guess my question, though, is you

315

04:21:30 1   have to go into the file.
04:21:32 2      You have to look and see whether
04:21:34 3   it's appropriate to claim priority to an earlier
04:21:37 4   application --
04:21:37 5      MR. SCHULER:   Object to the form.
04:21:37 6   BY MS. BERNIKER:
04:21:38 7      Q.   -- if that's what was happening?
04:21:39 8      A.   No. I was referring to the date of
04:21:41 9   the application. He says this is the application
04:21:43 10  date. So you have to go into the file and see
04:21:49 11  whether this is the correct application date.
04:21:55 12     Q.   Sir, if you look at the first page
04:21:56 13  of the document of Exhibit 98?
04:22:00 14     A.   Yes.
04:22:01 15     Q.   At the top, it says, "Filed:
04:22:02 16  October 12, 1988."
04:22:05 17     Do you see that?
04:22:05 18     A.   Yes.
04:22:06 19     Q.   Is that enough information to
04:22:17 20  determine whether or not this statement is
04:22:19 21  accurate, this statement on page 3 about the
04:22:22 22  effective filing date?

316

04:22:23 1      MR. SCHULER:   Object to the form.
04:22:25 2   Also to the extent that it calls for a legal
04:22:27 3   conclusion.
04:22:32 4      THE WITNESS:
04:22:32 5      A.   I don't know. I mean, typing
04:22:34 6   errors can be on every document. You know, it
04:22:38 7   could be a typing error here in this document.
04:22:41 8   So, therefore I said, to be on the safe side, you
04:22:44 9   go into the docket and you see the official
04:22:46 10  document where you get the filing date awarded.
04:22:50 11     And this is the date which is the
04:22:53 12  true date.
04:23:14 13     Q.   I just want to be clear. I just
04:23:16 14  want to make sure I understand your testimony.
04:23:18 15     Do you know one way or the other
04:23:20 16  whether this statement on page 3 about the
04:23:22 17  effective filing date is correct?
04:23:24 18     A.   No, I don't know that.
04:23:25 19     Q.   You don't know?
04:23:26 20     A.   No.
04:23:26 21     Q.   Okay.
04:24:00 22     ...(Pause)

317

04:24:08 1      Sir, I am handing you what's been
04:24:10 2   marked as Exhibit 99.
04:24:12 3      (Handing)
04:24:19 4      This is a certified copy of the
04:24:23 5   file history of the 812 patent in the United
04:24:39 6   States.
04:24:39 7      And if you would please --
04:24:44 8   actually, let me before I ask you about this
04:24:46 9   document, do you understand that there were three
04:24:49 10  patent applications filed in the United States
04:24:52 11  relating to tetrahydro-benzthiazoles?
04:24:58 12     A.   No. I don't know.
04:24:58 13     Q.   You don't know.
04:25:02 14     Do you understand that three
04:25:04 15  patents issued in the United States relate to
04:25:09 16  tetrahydro-benzthiazoles?
04:25:10 17     A.   No. I don't know.
04:25:10 18     Q.   Do you understand that the
04:25:12 19  litigation that has caused us to be here today
04:25:17 20  relates to two Boehringer patents?
04:25:23 21     A.   Yes.
04:25:23 22     MR. SCHULER:   Two what?

80  (Pages 314 to 317)

# EXHIBIT N

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

---

BOEHRINGER INGELHEIM INTERNATIONAL)
GMBH and BOEHRINGER INGELHEIM      )
PHARMACEUTICALS,                   )
      Plaintiffs,                  )
                       )
            V.                   )  C.A. No.
                       )  05-700-(KAJ)
BARR LABORATORIES, INC.,           )  CONSOLIDATED
      Defendant.                   )
                       )

---

BOEHRINGER INGELHEIM INTERNATIONAL)
GMBH and BOEHRINGER INGELHEIM      )
PHARMACEUTICALS, INC.,             )
      Plaintiffs,                  )
                       )
            V.                   )
                       )
MYLAN PHARMACEUTICALS, INC.,       )
      Defendant.                   )

---

VIDEO DEPOSITION UPON ORAL EXAMINATION OF
JUERGEN KAUFFMANN
Taken on:
Thursday, 30 November, 2006
Commencing at 9:11 a.m.
Taken at:
LAW OFFICES OF LATHAM & WATKINS
Reuterweg 20,
60323 Frankfurt am Main Germany

Job No. 10886



**David Feldman**
W o r l d w i d e

From File to Trial.

805 Third Avenue, 8th Floor       600 Anton Boulevard, 11th Floor
New York, NY 10022                Costa Mesa, CA 92626
(800) 642-1099                    (866) DFW-1380

**30**

| | | |
|---|---|---|
| 1 | With one exception. We prefer you do not identify specific compounds in developments. Those are too secret for this meeting, and I assume Barr's attorneys agree. | 09:51:25 |

1    With one exception. We   09:51:25
2    prefer you do not identify specific compounds in   09:51:28
3    developments. Those are too secret for this   09:51:33
4    meeting, and I assume Barr's attorneys agree.   09:51:38
5    MS. BERNIKER: Yes. And just so   09:51:40
6    it's clear, I was only intentionally asking him   09:51:41
7    about public for that reason.   09:51:43
8    Obviously he can testify about SND   09:51:44
9    919 development.   09:51:47
10    THE WITNESS:   09:51:53
11    A.   Dr. Hoppe was the successor.   09:51:53
12    BY MS. BERNIKER:   09:52:06
13    Q.   And how long was he the head of the   09:52:06
14    R & D department?   09:52:11
15    A.   For the whole time while I was   09:52:15
16    still at Boehringer.   09:52:17
17    Q.   With respect to the SND 919   09:52:17
18    project, Dr. Herschel was the team leader?   09:52:27
19    A.   Yes.   09:52:32
20    INTERPRETER MUELLER-GRANT:   09:52:39
21    (Interpreting) Yes.   09:52:40
22    Q.   Was he the team leader during the   09:52:41

**31**

1    whole project?   09:52:42
2    A.   Well, he left the company. But   09:52:57
3    that was after my time. I think it was then after   09:53:13
4    1995, so he couldn't possibly have been over the   09:53:16
5    whole period the team leader. But I wasn't with   09:53:19
6    the company then anymore, so I don't know for   09:53:22
7    sure.   09:53:24
8    Q.   While you were with the company, he   09:53:24
9    was the team leader?   09:53:27
10    A.   As far as I know. But I have to   09:53:28
11    give an explanation.   09:53:37
12    In August of 1992, I had a serious   09:54:46
13    almost fatal motor bike accident and I -- for six   09:54:49
14    months I couldn't go to work. I wasn't in the   09:54:50
15    company.   09:54:58
16    And another colleague then took   09:54:58
17    over my work at SND. And since it was not sure   09:55:01
18    whether I would survive, the colleague took over   09:55:04
19    my work.   09:55:06
20    So really I can only testify until   09:55:07
21    1992.   09:55:10
22    INTERPRETER ROOSE-STAEHLE: And   09:55:11

**32**

1    then the witness, he originally said 1962, but I   09:55:13
2    asked for clarification.   09:55:17
3    Q.   Until 1992, was Dr. Herschel the   09:55:21
4    team leader on the SND 919 project?   09:55:25
5    A.   As far as I remember, yes.   09:55:30
6    Q.   Do you currently do any work for   09:55:31
7    Boehringer?   09:55:40
8    A.   Except for my presence here, none.   09:55:47
9    Q.   Have you done any work for   09:55:50
10    Boehringer, except your presence here, since you   09:55:52
11    retired?   09:55:55
12    A.   No.   09:55:55
13    Q.   Do you have any consulting   09:55:58
14    agreements with Boehringer?   09:56:02
15    A.   I refuse to do that, because I   09:56:02
16    wanted to start a new phase of life and I wanted   09:56:19
17    to do it properly and thoroughly.   09:56:22
18    Q.   Enjoying retirement?   09:56:24
19    A.   Enjoying my motorbike, and I am,   09:56:25
20    filming and some other. (Through the interpreter)   09:56:28
21    And I make films and I edit films, (English) and   09:56:35
22    so I am busy.   09:56:41

**33**

1    Q.   Good for you.   09:56:42
2    A.   Yes.   09:56:43
3    INTERPRETER ROOSE-STAEHLE: But you   09:56:45
4    got back on the motor bike.   09:56:47
5    THE WITNESS: I sold it.   09:56:48
6    Q.   Mr. Kauffmann, you mentioned -- did   09:56:58
7    you -- and please just answer yes or no.   09:57:06
8    Did you have any meetings with the   09:57:11
9    attorneys for Boehringer in preparation for the   09:57:13
10    deposition today?   09:57:15
11    MS. HOLLIS: And I will instruct   09:57:26
12    you to answer yes or no.   09:57:27
13    THE WITNESS:   09:57:39
14    A.   Yes. Yesterday.   09:57:40
15    BY MS. BERNIKER:   09:57:41
16    Q.   You had a meeting yesterday?   09:57:42
17    A.   Nothing else.   09:57:43
18    Q.   Just yesterday.   09:57:44
19    Did you review any documents at   09:57:48
20    that meeting?   09:57:50
21    A.   No.   09:57:55
22    Q.   That meeting was with Ms. Hollis?   09:57:55

9 (Pages 30 to 33)

**38**

| | | |
|---|---|---|
| 1 | foundation. | 10:03:41 |
| 2 | THE WITNESS: | 10:03:43 |
| 3 | A.   Well, that was a firm procedure at | 10:03:45 |
| 4 | Boehringer, that upper committee or a body | 10:04:21 |
| 5 | consisting of the representatives of the science | 10:04:26 |
| 6 | department, of research, of commercial and board | 10:04:29 |
| 7 | members. | 10:04:32 |
| 8 | And they discussed the situation | 10:04:34 |
| 9 | and then they came to the decision.  So this was a | 10:04:35 |
| 10 | top decision of a higher echelon. | 10:04:38 |
| 11 | But I must add that it was the case | 10:04:49 |
| 12 | at the time when I was with Boehringer.  I don't | 10:04:51 |
| 13 | know what the procedure is today, because after | 10:04:54 |
| 14 | all, I left the company in 1995. | 10:04:55 |
| 15 | Q.   And just so that you understand in | 10:04:58 |
| 16 | this set of questions, I am just asking you about | 10:05:03 |
| 17 | the time that you were at Boehringer. | 10:05:06 |
| 18 | A.   Mm-Hmm. | 10:05:08 |
| 19 | Q.   Were you involved in the decision | 10:05:08 |
| 20 | to develop SND 919? | 10:05:10 |
| 21 | A.   No. | 10:05:13 |
| 22 | Q.   Was Dr. Herschel involved in that | 10:05:13 |

**39**

| | | |
|---|---|---|
| 1 | decision? | 10:05:17 |
| 2 | A.   No. | 10:05:17 |
| 3 | Q.   You mentioned various groups or | 10:05:17 |
| 4 | departments that would be represented in making | 10:05:26 |
| 5 | that decision, I believe.  And one of them you | 10:05:31 |
| 6 | said was commercial. | 10:05:34 |
| 7 | Is that right? | 10:05:35 |
| 8 | A.   Well, yes.  And I think that's the | 10:05:35 |
| 9 | case in any pharmaceutical company, that the | 10:06:02 |
| 10 | commercial departments, marketing people say that | 10:06:06 |
| 11 | there is a market for that.  Because that's, after | 10:06:09 |
| 12 | all, important. | 10:06:12 |
| 13 | Q.   The commercial department at | 10:06:13 |
| 14 | Boehringer, was that also known as the marketing | 10:06:14 |
| 15 | department? | 10:06:16 |
| 16 | A.   Marketing is a separate unit which | 10:06:17 |
| 17 | is part of the commercial department.  But these | 10:06:34 |
| 18 | are internal matters.  I don't think that that's | 10:06:42 |
| 19 | really very important. | 10:06:45 |
| 20 | Q.   I just want to understand a little | 10:06:46 |
| 21 | bit about this. | 10:06:48 |
| 22 | What else does the commercial | 10:06:51 |

**40**

| | | |
|---|---|---|
| 1 | department do? | 10:06:53 |
| 2 | MS. HOLLIS:  Objection.  Vague. | 10:06:57 |
| 3 | THE WITNESS: | 10:07:05 |
| 4 | A.   I don't know.  I wasn't a member of | 10:07:06 |
| 5 | the commercial department. (English) I never was | 10:07:08 |
| 6 | a member of this department. | 10:07:11 |
| 7 | BY MS. BERNIKER: | 10:07:15 |
| 8 | Q.   After the company made a decision | 10:07:15 |
| 9 | to develop a compound generally, while you were at | 10:07:21 |
| 10 | the company, what would happen next? | 10:07:27 |
| 11 | MS. HOLLIS:  Objection.  Lack of | 10:07:28 |
| 12 | foundation, and vague. | 10:07:31 |
| 13 | THE WITNESS: | 10:07:47 |
| 14 | A.   Then a project leader and a project | 10:07:48 |
| 15 | Coordinator were named, they had to outline the | 10:08:07 |
| 16 | next steps, and they had to report from time to | 10:08:11 |
| 17 | time. | 10:08:14 |
| 18 | BY MS. BERNIKER: | 10:08:14 |
| 19 | Q.   Were you the project Coordinator | 10:08:14 |
| 20 | for the SND 919 project? | 10:08:16 |
| 21 | A.   Yes. | 10:08:18 |
| 22 | Q.   And were you involved in preparing | 10:08:21 |

**41**

| | | |
|---|---|---|
| 1 | the plan for the development of SND 919? | 10:08:35 |
| 2 | MS. HOLLIS:  Objection.  Vague. | 10:08:38 |
| 3 | THE WITNESS: | 10:08:55 |
| 4 | A.   Yes. | 10:08:56 |
| 5 | INTERPRETER ROOSE-STAEHLE: I am | 10:09:00 |
| 6 | sorry.  Could we change? | 10:09:01 |
| 7 | INTERPRETER MUELLER-GRANT: Yes. | 10:09:02 |
| 8 | Okay. | 10:09:07 |
| 9 | MS. BERNIKER:  So she can take a | 10:09:07 |
| 10 | break. | 10:09:08 |
| 11 | INTERPRETER ROOSE-STAEHLE: Can I | 10:09:11 |
| 12 | leave the room briefly? | 10:09:11 |
| 13 | MS. BERNIKER:  Why don't we just | 10:09:14 |
| 14 | take a quick break. | 10:09:16 |
| 15 | INTERPRETER ROOSE-STAEHLE:  Sure. | 10:09:17 |
| 16 | THE VIDEOGRAPHER:  We are going off | 10:09:17 |
| 17 | the record.  The time is 10:08 p.m. | 10:09:18 |
| 18 | (Short recess taken) | 10:09:21 |
| 19 | THE VIDEOGRAPHER:  We are going on | 10:11:57 |
| 20 | the record.  The time is 10:23 a.m. | 10:23:57 |
| 21 | BY MS. BERNIKER: | 10:24:04 |
| 22 | Q.   Mr. Kauffmann, before the break, we | 10:24:05 |

11 (Pages 38 to 41)

114

| | | |
|---|---|---|
| 1 | MS. HOLLIS: Objection. Lacks | 02:11:44 |
| 2 | foundation. I don't see what the relevance of | 02:11:45 |
| 3 | these questions are. | 02:11:48 |
| 4 | If you are looking for sound bytes, | 02:11:49 |
| 5 | this is an inappropriate place to get them. You | 02:11:51 |
| 6 | can argue if you like, but I don't understand the | 02:11:55 |
| 7 | relevance of these questions. | 02:11:58 |
| 8 | THE WITNESS: | 02:12:20 |
| 9 | A. Well, I can't answer the questions | 02:12:22 |
| 10 | the way they have been asked anyway. | 02:12:25 |
| 11 | BY MS. BERNIKER: | 02:12:29 |
| 12 | Q. Do you know whether more people | 02:12:30 |
| 13 | were involved in the SND 919 project as it | 02:12:31 |
| 14 | progressed through the phases, whether the number | 02:12:36 |
| 15 | of people who were involved increased? | 02:12:38 |
| 16 | MS. HOLLIS: Same objection. And | 02:12:40 |
| 17 | objection to form. | 02:12:44 |
| 18 | THE WITNESS: | 02:12:48 |
| 19 | A. No. You couldn't put it like that, | 02:13:20 |
| 20 | because it fluctuated all the time. Some of the | 02:13:23 |
| 21 | people who were no longer needed in the project, | 02:13:26 |
| 22 | like the lab technicians when the toxicology | 02:13:28 |

115

| | | |
|---|---|---|
| 1 | studies were terminated, they did not contribute | 02:13:33 |
| 2 | to the project any longer. | 02:13:35 |
| 3 | No. It's not correct to say that | 02:13:37 |
| 4 | more and more people were involved in the project. | 02:13:39 |
| 5 | BY MS. BERNIKER: | 02:13:43 |
| 6 | Q. Aside from the meetings that you | 02:13:44 |
| 7 | had attended regarding the Pramipexole project -- | 02:13:46 |
| 8 | I am sorry, the SND 919 project, and aside from | 02:13:49 |
| 9 | meetings that you attended regarding other | 02:13:54 |
| 10 | products that you were working on developing, were | 02:13:56 |
| 11 | there other meetings that you generally attended | 02:13:59 |
| 12 | during your work at Boehringer? | 02:14:03 |
| 13 | MS. HOLLIS: Objection to form. | 02:14:04 |
| 14 | Very unclear. | 02:14:06 |
| 15 | THE WITNESS: | 02:14:28 |
| 16 | A. Yes. Of course. | 02:14:28 |
| 17 | BY MS. BERNIKER: | 02:14:30 |
| 18 | Q. And what meetings were those? | 02:14:31 |
| 19 | A. This concerned organizational | 02:14:32 |
| 20 | matters or interdepartmental matters; and also | 02:14:55 |
| 21 | certain issues with HR, and things like that. | 02:14:59 |
| 22 | Q. Did members of the board attend any | 02:15:05 |

116

| | | |
|---|---|---|
| 1 | of those meetings? | 02:15:07 |
| 2 | A. No. | 02:15:08 |
| 3 | Q. Did members of the legal department | 02:15:12 |
| 4 | attend any of those meetings? | 02:15:14 |
| 5 | A. It was not necessary, no. These | 02:15:16 |
| 6 | were internal matters of the department. | 02:15:26 |
| 7 | Q. Do you know who Mr. Alex Debio is? | 02:15:29 |
| 8 | A. Yes. | 02:15:39 |
| 9 | Q. And -- | 02:15:39 |
| 10 | A. In private, he was riding, horse | 02:15:41 |
| 11 | riding. | 02:15:43 |
| 12 | Q. Aside from his horse riding, was he | 02:15:44 |
| 13 | -- did he work for Boehringer? | 02:15:48 |
| 14 | A. He worked for Boehringer, and he -- | 02:15:48 |
| 15 | is later on he switched over to Thomae Biberach, | 02:15:53 |
| 16 | (through the interpreter) he became practically | 02:16:01 |
| 17 | the general manager, the CEO in Thomae. | 02:16:04 |
| 18 | Q. Of Karl Thomae, the institute? | 02:16:07 |
| 19 | A. At Biberach Thomae. | 02:16:10 |
| 20 | Q. And in the late 1980s, was he a | 02:16:11 |
| 21 | member of the board of Boehringer? | 02:16:18 |
| 22 | A. I don't know exactly when he became | 02:16:20 |

117

| | | |
|---|---|---|
| 1 | a board member. | 02:16:35 |
| 2 | Q. At some point, he was a board | 02:16:36 |
| 3 | member? | 02:16:38 |
| 4 | MS. HOLLIS: Objection. Lack of | 02:16:39 |
| 5 | foundation. | 02:16:42 |
| 6 | THE WITNESS: | 02:16:47 |
| 7 | A. It depends on what you mean by | 02:16:48 |
| 8 | board. He was certainly in the group of the board | 02:17:26 |
| 9 | members for the Boehringer KG. | 02:17:30 |
| 10 | But for the umbrella association of | 02:17:34 |
| 11 | Boehringer, he was not on the board. But he was | 02:17:37 |
| 12 | on the board then later on of Thomae again. | 02:17:39 |
| 13 | (English) As far as I know. | 02:17:45 |
| 14 | Q. Of course. And to be clear, we are | 02:17:48 |
| 15 | only asking you about what you know today. | 02:17:50 |
| 16 | Was he involved at all in the SND | 02:17:52 |
| 17 | 919 development? | 02:17:56 |
| 18 | MS. HOLLIS: Objection. Calls for | 02:17:57 |
| 19 | speculation. | 02:17:59 |
| 20 | THE WITNESS: | 02:18:13 |
| 21 | A. I don't remember. | 02:18:13 |
| 22 | BY MS. BERNIKER: | 02:18:14 |

30 (Pages 114 to 117)

# EXHIBIT O

# Manual of
# PATENT
# EXAMINING
# PROCEDURE

Original Fifth Edition, August 1983
Latest Revision October 1989

 

## U.S. DEPARTMENT OF COMMERCE
Patent and Trademark Office

Rev. 13, Nov. 1989

1

The Patent and Trademark Office does not handle the sale of the Manual, distribution of notices and revisions or change of address of those on the subscription list.

Correspondence relating to any of the above items should be sent to the Superintendent of Documents at the following address:

> Superintendent of Documents
> Mail List Section
> Washington, D.C. 20402

Inquiries relating to subscriptions should be directed to:

> Superintendent of Documents
> United States Government Printing Office
> Washington, D.C. 20402

Orders for reproduced copies of individual replacement pages not amounting to a complete revision of the Manual should be sent to the following address:

> Commissioner of Patents and Trademarks
> Attention: Customer Services Division
> Washington, D.C. 20231

The cost for each 30 pages or a fraction thereof is $10.00 (See 37 CFR 1.13(a) and 1.19(a)(3)).

Charges may be made to Deposit Accounts if the requester is an account holder in good standing at the time the request is received. Checks or money orders should be payable to the Commissioner of Patents and Trademarks. Requests must identify the specific pages required and the number of copies of each page.

Employees of the Patent and Trademark Office should direct their requests for the Manual, replacement pages, notices, and revisions to the Patent Academy.

> First Edition, November 1949
> Second Edition, November 1953
> Third Edition, November 1961
> Fourth Edition, June 1979
> Fifth Edition, August 1983
> > Revision 1, October 1985
> > Revision 2, December 1985
> > Revision 3, May 1986
> > Revision 4, October 1986
> > Revision 5, July 1987
> > Revision 6, October, 1987
> > Revision 7, December, 1987
> > Revision 8, May 1988
> > Revision 9, September 1988
> > Revision 10, January 1989
> > Revision 11, April 1989
> > Revision 12, July 1989
> > Revision 13, November 1989

Rev. 13, Nov. 1989

2

# Chapter 2300  Interference Proceedings under Public Law 98-622

2300.01   Introduction
2300.02   Outline of Interference Procedure
2301.01   Preliminaries to an Interference
2301.01(a)  In Different Groups
2301.01(b)  The Interference Search
2301.02   Definitions
2302   Ownership of Applications and Patents Involved in an Interference
2303   Interference Between Applications
2304   Applicant Requests Interference Between Applications
2305   Examiner Suggests Claim to Applicant
2305.01   Action To Be Made at Time of Suggesting Claims
2305.02   Time Limit Set for Presenting Suggested Claims
2305.03   Suggested Claims Presented After Period for Response Running Against Case
2305.04   Suggestion of Claims, Application in Issue or in Interference
2306   Interference Between an Application and a Patent
2307   Applicant Requests Interference With a Patent
2307.01   Presentation of Claims Corresponding to Patent Claims Not a Response to Last Office Action
2307.02   Rejection of Claims Corresponding to Patent Claims
2307.03   Presentation of Claims for Interference With a Patent, After Prosecution of Application is Closed
2307.04   Presentation of Claims For Interference With a Patent Involved in a Reexamination Proceeding
2307.05   Corresponding Patent Claims Not Identified
2307.06   Presentation of Claims for Interference With a Patent, Patentee Must be Notified
2308   Interference between an Application and a Patent; Prima Facie Showing by Applicant
2308.01   Patent Has Filing Date Earlier than Application
2308.02   Showing Under 37 CFR 1.608(b)
2308.03   Patent has Filing Date Later Than Application
2309   Preparation of Interference Papers by Examiner
2309.01   Formulation of Counts
2309.02   Preparation of Papers - Initial Memorandum
2309.03   Affidavits and Declarations Retained in File
2309.04   Record in Each Interference Complete
2309.05   Consultation With Examiner-in-Chief
2309.06   Interfering Subject Matter in "Secrecy Order" Cases
2310   Handling by Examiner-In-Chief
2311   Declaration of Interference
2312   Access to Applications in Interference
2313   Lead Attorney or Agent
2314   Jurisdiction Over Interference
2315   Suspension of Ex Parte Prosecution
2315.01   Suspension - Overlapping Applications
2316   Sanctions For Failure to Comply With Rules or Order
2317   Summary Judgment Against Applicant
2318   Return of Unauthorized Papers
2321   Preliminary Statement, Time for Filing
2322   Preliminary Statement, Invention Made by Who and Where
2323   Preliminary Statement; Invention Made in United States
2324   Preliminary Statement, Invention Made Abroad
2325   Preliminary Statement, Derivation by an Opponent
2326   Preliminary Statement, Earlier Application
2327   Preliminary Statement, Sealing and Opening
2328   Preliminary Statement, Correction of Error
2329   Preliminary Statement, Effect of
2330   Reliance on Earlier Application
2331   Preliminary Statement Access
2332   Abandonment, Suppression or Concealment to be Argued
2333   Preliminary Motions
2333.01   Preliminary Motions - Related to Application Not Involved in Interference
2333.02   Preliminary Motions - Benefit of Foreign Filing Date
2334   Motions to Correct Inventorship
2335   Miscellaneous Motions
2336   Time for Filing Motions
2337   Motion Content
2338   Opposition and Reply
2339   Evidence in Support of Motion, Opposition, or Reply
2340   Motions, Hearing and Decision
2341   Unpatentability Discovered
2342   Addition to Interference
2343   Prosecution by Assignee
2344   Petitions
2345   Extension of Time
2346   Service of Papers
2347   Translations
2351   Times for Discovery and Testimony
2352   Judgment for Failure To Take Testimony or File Record
2353   Records and Exhibits
2354   Final Hearing
2355   Final Decision, Matters Considered
2356   Briefs for Final Hearing
2357   Burden of Proof
2358   Final Decision
2359   Board Recommendation
2360   Notice of Reexamination, Reissue, Protest, or Litigation
2361   Termination of Interference After Judgment
2362   Request for Entry of Adverse Judgement
2363   Action After Interference
2363.01   No Interference In Fact
2363.02   The Winning Party
2363.03   The Losing Party
2364   Entry of Amendments
2364.01   Amendments Filed During Interference
2365   Second Interference
2366   Interference Settlement Agreement
2371   Evidence
2372   Manner of Taking Testimony
2373   Notice of Examination of Witness
2374   Persons Depositions Taken Before
2375   Examination of Witness
2376   Filing Transcript of Deposition
2377   Form of Transcript of Deposition
2378   Time for Filing Transcript of Deposition
2379   Inspection of Transcript
2382   Official Records and Printed Publications
2383   Testimony From Another Interference or Proceeding
2384   Testimony in a Foreign Country
2385   Errors in Deposition
2387   Additional Discovery
2388   Use of Discovery
2390   Arbitration of Interferences

## 2300.01 Introduction [R-9]

Title II of the Patent Law Amendments Act of 1984 (Public

Rev. 9, Sept. 1988

MANUAL OF PATENT EXAMINING PROCEDURE

1746. The definition "United States" is the same as the definition of United States in 35 U.S.C. 100(c).

The definition of "interference" permits an interference between one or more applications and one or more patents. Thus, the revised rules follow the policy of *Wilson v. Yakel*, 1876 C.D. 245 (Comm'r. Pat. 1876) and, to the extent inconsistent therewith, do not follow the policy announced in *Touval v. Newcombe*, 194 USPQ 509 (Comm'r. Pat. 1976). However, in view of the statutory requirement for the presence of at least one application in an interference, if an applicant were to concede priority or otherwise be terminated from an interference involving only one application and more than one patent, the interference would have to be terminated for lack of subject matter jurisdiction unless one or more of the patentees filed an application for reissue which could be added to the interference under >37 CFR< 1.633(h).

A "count" defines interfering subject matter. An interference may have two counts only if the second count defines a "separate patentable invention" from the first count. The reason the second count must define a separate patentable invention is to permit the PTO to lawfully issue separate patents to different parties in an interference when a single party does not prevail as to all counts. A "separate patentable invention" is defined in >37 CFR< 1.601(n):

Invention (A) is a "separate patentable invention" with respect to invention (B) when invention (A) is new (35 U.S.C. 102) and unobvious (35 U.S.C. 103) in view of invention (B) assuming invention (B) is prior art with respect to invention (A).

## 2302 Ownership of Applications and Patents Involved in an Interference [R-9]

*37 CFR 1.602  Interest in applications and patents involved in an interference.*

(a)  Unless good cause is shown, an interference shall not be declared or continued between (1) applications owned by a single party or (2) applications and an unexpired patent owned by a single party.

(b)  The parties, within 20 days after an interference is declared, shall notify the Board of any and all right, title, and interest in any application or patent involved or relied upon in the interference unless the right, title, and interest is set forth in the notice declaring the interference.

(c)  If a change of any right, title, and interest in any application or patent involved or relied upon in the interference occurs after notice is given declaring the interference and before the time expires for seeking judicial review of a final decision of the Board, the parties shall notify the Board of the change within 20 days of the change.

[49 FR 48416, Dec. 12, 1984, added effective Feb. 11, 1985]

>37 CFR< 1.602 continues the previous PTO practice (37 CFR 1.201(c)) of not declaring or continuing an interference between (1) two or more applications owned by the same party or (2) an application and a patent owned by a single party unless good cause is shown. A corporation and its wholly-owned subsidiary are considered a "single party" within the meaning of >37 CFR< 1.602(a). Under prior rules, when a patent and an application involved in an interference became commonly owned, the interference was not "dissolved." Rather, the PTO

required that the interference be terminated with a judgment. *Chillas v. Weisberg*, 1928 C.D. 24 (Comm'r. Pat. 1928); *Malone v. Toth*, 202 USPQ 397 (Comm'r. Pat. 1978); and *Morehouse v. Arnbuster*, 209 USPQ 514 (Comm'r. Pat. 1980). Under the revised rules, all interferences, including those involving only applications, will be terminated with a judgment. As noted in *Chillas v. Weisberg, supra* at 25 "the common owner can allow a judgment against the junior party to be rendered by default or it can file a concession of priority from one party to the other." Paragraphs (b) and (c) of >37 CFR< 1.602 continue the previous PTO practice (37 CFR 1.201(c)) of requiring a party to notify the PTO of any real party in interest not apparent on the face of the notice declaring the interference (see >37 CFR< 1.611) or of any change in the real party in interest after the interference is declared. The PTO needs to know the identity of any real party in interest to properly enforce >37 CFR< 1.602(a) and to enable an examiner-in-chief to determine whether refusal is necessary or appropriate. A new requirement in paragraph (b) and (c), of >37 CFR< 1.602, not present in 37 CFR 1.201(c), is a 20-day time period for advising the PTO of the identity of, or any change in, the real party in interest.

### COMMON OWNERSHIP

Where applications by different inventive entities but of common ownership claim the same subject matter or subject matter that is not patentably different:

I. Interference therebetween is normally not instituted since there is no conflict of interest. Elimination of conflicting claims from all except one case should usually be required, 37 CFR 1.78(c). The common assignee must determine the application in which the conflicting claims are properly placed. Treatment by rejection is set forth in >MPEP< § 804.03.

II. Where an interference with a third party is found to exist, the commonly-owned application having the earliest effective filing date will be placed in interference with the third party. The common assignee may move during the interference under 37 CFR 1.633(d) to substitute the other commonly-owned application, if desired.

## 2303 Interference Between Applications [R-2]

*37 CFR 1.603  Interference between applications: subject matter of the interference.*

Before an interference is declared between two or more applications, the examiner must be of the opinion that there is interfering subject matter claimed in the applications which is patentable to each applicant subject to a judgment in the interference. The interfering subject matter shall be defined by one or more counts. Each count shall define a separate patentable invention. Each application must contain, or be amended to contain, at least one claim which corresponds to each count. All claims in the applications which define the same patentable invention as a count shall be designated to correspond to that count.

[49 FR 48416, Dec. 12, 1984, added effective Feb. 11, 1985]

Where two or more applications are found to be claiming the same patentable invention they may may be put in interference, dependent on the status of the respective applications and the

difference between their filing dates. One of the applications should be in condition for allowance. Unusual circumstances may justify an exception to this if the approval of the group director is obtained.

Interferences will not be declared between pending applications if there is a difference of more than 3 months in the effective filing dates of the oldest and the next oldest applications, in the case of inventions of a simple character, or a difference of more than 6 months in the effective filing dates of the applications in other cases, except in exceptional situations, as determined and approved by the group director. One such exceptional situation would be where one application has the earliest effective filing date based on foreign priority and the other application has the earliest effective United States filing date. If an interference is declared, all applications having the interfering subject matter should be included.

Before taking any steps looking to the formation of an interference, it is essential that the examiner make certain that each of the prospective parties is claiming the same patentable invention (as defined in 37 CFR 1.601(n)) and that at least one claim of each party corresponds to each count of the interference and is clearly readable upon the disclosure of that party and allowable in its application.

It is to be noted that while the claims of two or more applicants may not be identical, yet if directed to the same patentable invention, an interference exists. But mere disclosure by an applicant of an invention which he or she is not claiming does not afford a ground for suggesting to that applicant a claim for the said invention based upon claims from another application that is claiming the invention. The intention of the parties to claim the same patentable invention, as expressed in the summary of the invention or elsewhere in the disclosure or in the claims, is an essential in every instance.

Where the subject matter found to be allowable in one application is disclosed and claimed in another application, but the claims therein to such subject matter are either nonelected or subject to election, the question of interference should be considered. The requirement of 37 CFR 1.601(i) that the conflicting applications shall contain claims for the same patentable invention should be interpreted as meaning generally that the conflicting claimed subject matter is sufficiently supported in each application and is patentable to each applicant over the prior art. The statutory requirement of first inventorship is of transcendent importance and every effort should be made to avoid the improvident issuance of a patent where there is an adverse claimant.

Following are illustrative situations where the examiner should take action toward instituting interference:

A. Application filed with claims to divisible inventions I and II. Before action requiring restriction is made, examiner discovers another case having claims to invention I.

The situation is not altered by the fact that a requirement for restriction had actually been made but had not been responded to. Nor is the situation materially different if an election of noninterfering subject matter had been made without traverse, but no action given on the merits of the elected invention.

B. Application filed with claims to divisible inventions I and

II and in response to a requirement for restriction, applicant traverses the same and elects invention I. Examiner gives an action on the merits of I. Examiner subsequently finds an application to another containing allowed claims to invention II and which is ready for issue.

The situation is not altered by the fact that the election is made without traverse, and the nonelected claims possibly cancelled.

C. Application filed with generic claims and claimed species a, b, c, d, and e. Generic claims rejected and election of a single species required. Applicant elects species a, but continues to urge allowability of generic claims. Examiner finds another application claiming species b which is ready for issue.

The allowability of generic claims in the first case is not a condition precedent to setting up interference.

D. Application filed with generic claims and claims to five species and other species disclosed but not specifically claimed. Examiner finds another application the disclosure and claims of which are restricted to one of the unclaimed species and have been found allowable.

The prosecution of generic claims is taken as indication of an intention to cover all species disclosed which come under the generic claim.

In all the above situations, the applicant has shown an intention to claim the subject matter which is actually being claimed in another application. These are to be distinguished from situations where a distinct invention is claimed in one application but merely disclosed in another application without evidence of an intent to claim the same. The question of interference should not be considered in the latter instance. However, if the application disclosing but not claiming the invention is senior, and the junior application is ready for issue, the matter should be discussed with the group director to determine the action to be taken.

## 2304 Applicant Requests Interference Between Applications [R-9]

*37 CFR 1.604. Request for interference between applications by an applicant.*

(a) An applicant may seek to have an interference declared with an application of another by (1) suggesting a proposed count and presenting **>**at least one**<** claim corresponding to the proposed count **>**or identifying at least one claim in his or her application that corresponds to the proposed count**<**, (2) identifying the other application and, if known, a claim in the other application which corresponds to the proposed count, and (3) explaining why an interference should be declared.

(b) When an applicant presents a claim known to the applicant to define the same patentable invention claimed in a pending application of another, the applicant shall identify that pending application, unless the claim is presented in response to a suggestion by the examiner. The examiner shall notify the Commissioner of any instance where it appears an applicant may have failed to comply with the provisions of this paragraph.

[49 FR 48416, Dec. 12, 1984, added effective Feb. 11, 1985; paragraph (a) amended 53 FR 23735, June 23, 1988, effective Sept. 12, 1988]

2300 - 9                                                    Rev. 9, Sept. 1988

737

## CERTIFICATE OF SERVICE

I, Adam W. Poff, Esquire hereby certify that on May 7, 2007, I caused a copy of the foregoing document to be served by CM/ECF, e-mail, and hand-delivery on the following counsel of record:

Jack B. Blumenfeld, Esquire
Morris Nichols Arsht & Tunnell
1201 North Market Street
PO Box 1347
Wilmington, DE 19899-1347

Mary B. Matterer, Esquire
Morris, James, Hitchens & Williams LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE 19801

I further certify that on May 7, 2007, I caused a copy of the foregoing document to be served on the following non-registered participants in the manner indicated:

### BY E-MAIL

Steven C. Cherny, Esquire
Latham & Watkins LLP
885 Third Avenue, Suite 1000
New York, NY 10022-4834

Kenneth G. Schuler, Esquire
Latham & Watkins LLP
Sears Tower, Suite 5800
Chicago, IL 60606

Shannon M. Bloodworth, Esquire
Heller Ehrman LLP
1717 Rhode Island Ave., N.W.
Washington, DC 20036

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ Adam W. Poff
Adam W. Poff (No. 3990)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600
apoff@ycst.com

*Attorneys for Barr Laboratories, Inc.*

## Other Documents

1:05-cv-00700-*** Boehringer Ingelheim International GMBH et al v. Barr Laboratories, Inc. et al

LEAD, MEDIATION, PATENT, PaperDocuments

### U.S. District Court

### District of Delaware

#### Notice of Electronic Filing

The following transaction was entered by Poff, Adam on 5/7/2007 at 11:31 PM EDT and filed on 5/7/2007

**Case Name:**    Boehringer Ingelheim International GMBH et al v. Barr Laboratories, Inc. et al
**Case Number:**  1:05-cv-700
**Filer:**        Barr Laboratories, Inc.
**Document Number:** 146

**Docket Text:**
SEALED APPENDIX re [145] Opening Brief in Support, *VOLUME I* by Barr Laboratories, Inc.. (Poff, Adam)

**1:05-cv-700 Notice has been electronically mailed to:**

Jack B. Blumenfeld    jbbefiling@mnat.com

Steven C. Cherny    steven.cherny@lw.com, chefiling@lw.com

Sandy Choi    sandy.choi@lw.com

Amanda J. Hollis    amanda.hollis@lw.com, chefiling@lw.com

Mary Matterer    mmatterer@morrisjames.com, shadley@morrisjames.com, tpullan@morrisjames.com

Joel S. Neckers    joel.neckers@lw.com

Maryellen Noreika    menefiling@mnat.com

Adam Wyatt Poff    apoff@ycst.com, corpcal@ycst.com, corporate@ycst.com

Kenneth G. Schuler    kenneth.schuler@lw.com, chefiling@lw.com

Carisa S. Yee    carisa.yee@lw.com

**1:05-cv-700 Notice has been delivered by other means to:**

## CERTIFICATE OF SERVICE

I, Adam W. Poff, Esquire hereby certify that on May 14, 2007, I caused a copy of the foregoing document to be served by CM/ECF, e-mail, and hand-delivery on the following counsel of record:

Jack B. Blumenfeld, Esquire
Morris Nichols Arsht & Tunnell
1201 North Market Street
PO Box 1347
Wilmington, DE 19899-1347

Mary B. Matterer, Esquire
Morris, James, Hitchens & Williams LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE 19801

I further certify that on May 14, 2007, I caused a copy of the foregoing document to be served on the following non-registered participants in the manner indicated:

### BY E-MAIL

Steven C. Cherny, Esquire
Latham & Watkins LLP
885 Third Avenue, Suite 1000
New York, NY 10022-4834

Kenneth G. Schuler, Esquire
Latham & Watkins LLP
Sears Tower, Suite 5800
Chicago, IL 60606

Shannon M. Bloodworth, Esquire
Heller Ehrman LLP
1717 Rhode Island Ave., N.W.
Washington, DC 20036

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Adam W. Poff (No. 3990)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600
apoff@ycst.com

*Attorneys for Barr Laboratories, Inc.*