# EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BOEHRINGER INGELHEIM INTERNATIONAL GMBH and BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., | ) ) ) |
| Plaintiffs, | ) |
| v. | ) ) |
| BARR LABORATORIES, INC., | ) |
| Defendant. | ) |

C.A. No. 05-700 (***)

### EXPERT REPORT OF DALE H. HOSCHEIT, ESQ.

**I.    Introduction**

1.      I have been retained by the attorneys for defendant Barr Laboratories, Inc., to investigate and offer opinions on matters related to the subject litigation. I am being compensated for my work on this matter at my normal rate of $520.00/hour for consulting time and for deposition and trial testimony, plus related and necessary expenses. Beyond those payments, I will not receive any other financial compensation regardless of the outcome of this case.

2.      I am a member of the bar of the District of Columbia and have been in patent practice for over 45 years. I am a shareholder in the law firm of Banner & Witcoff, Ltd. I am an adjunct professor at George Mason University School of Law in Arlington, Virginia, where I have taught the course, Biotechnology Patent Practice, and currently teach the course, Trade Secrets. I am also the coordinator for and teach in a graduate course at the John Hopkins University entitled "The Legal Aspects of Biotechnology". Further, I am a member of the Advisory Board of BNA's Patent, Trademark and Copyright Journal. My curriculum vitae is attached as Exhibit A.

3.    In my over 45 years of patent practice, I have prepared numerous evaluations of patent validity, enforceability, and claim scope, as well as provided many freedom-to-operate opinions to various clients. A substantial portion of my practice is in the pharmaceutical and biotechnology area. In addition to over 40 years in private practice with the firm of Banner & Witcoff, Ltd., and its predecessors, I spent five years as in-house Patent Counsel for International Minerals and Chemical Corporation located in Skokie, Illinois at that time.

4.    Cited throughout this report are materials and sources I have relied on in connection with my opinions. In addition, I may use charts, graphs, or other demonstrative exhibits to support any potential testimony at trial. I also may make reference to the patent laws (35 United States Code), the Rules of Practice (37 Code of Federal Regulations), the Manual of Patent Examining Procedures ("MPEP"), and case law.

5.    In addition to the specific opinions set forth herein, I may respond to additional testimony and information that becomes available during deposition, at trial, or otherwise, including any opinions put forth by Boehringer's experts. I may also provide a further overview of the patents and file histories for Griss et al. U.S. Patents 4,731,374, 4,843,086 and 4,886,812 (respectively, "the '374 patent," "the '086 patent," and "the '812 patent") (collectively "the Griss et al. patents").

## II.    The Griss et al. Patents

6.    The '374, '086, and '812 patents, each entitled "Tetrahydro-Benzthiazoles, The Preparation Thereof and Their Use as Intermediate Products or as Pharmaceuticals", have identical disclosures and each claims the benefit of U.S. patent application Serial No. 6/810,947, filed December 19, 1985. Each also purports to claim the benefit of German patent applications DE 3447075 (filed December 22, 1984) and DE 3508947 (filed March 13, 1985).

2

7.    The Griss et al. patents contain claims to tetrahydro-benzthiazoles within the following general formula, pharmaceutical compositions containing such tetrahydro-benzthiazoles, and the use of such tetrahydro-benzthiazoles for the treatment of identified conditions:

$R_1$ represents a hydrogen atom, an alkyl group having 1 to 6 carbon atoms, an alkenyl or alkynyl group each having 3 to 6 carbon atoms, an alkanoyl group having 1 to 6 carbon atoms, a phenyl alkyl or phenyl alkanoyl group having 1 to 3 carbon atoms in the alkyl part, whilst the above mentioned phenyl nuclei may be substituted by 1 or 2 halogen atoms,

$R_2$ represents a hydrogen atom or an alkyl group with 1 to 4 carbon atoms,

$R_3$ represents a hydrogen atom, an alkyl group with 1 to 7 carbon atoms, a cycloalkyl group having 3 to 7 carbon atoms, an alkenyl or alkynyl group having 3 to 6 carbon atoms, an alkanoyl group having 1 to 7 carbon atoms, a phenyl alkyl or phenyl alkanoyl group having 1 to 3 carbon atoms in the alkyl part, whilst the phenyl nucleus may be substituted by fluorine, chlorine or bromine atoms,

$R_4$ represents a hydrogen atom, an alkyl group with 1 to 4 carbon atoms, an alkenyl or alkynyl group having 3 to 6 carbon atoms or

$R_3$ and $R_4$ together with the nitrogen atom between them represent a pyrrolidino, piperidino, hexamethyleneimino or morpholino group.

3

## III.    U.S. Patent 4,731,374

8.    Application Serial No. 6/810,947 ("the '947 application") was filed December 19, 1985. The claims as filed contained the following general subject matter (Ex. 46 at BARR114-18):

| | |
|---|---|
| Claims 1-5 | Genus and subgenus tetrahydro-benzthiazoles |
| Claim 6 | 2-Amino-6-dimethylamino-4,5,6,7-tetrahydro-benzthiazole |
| Claim 7 | 2-Amino-6-n-propylamino-4,5,6,7-tetrahydro-benzthiazole |
| Claim 8 | A pharmaceutical composition comprising a tetrahydro-benzthiazole of claim 3 |
| Claim 9 | A method of lowering the blood pressure with a compound of claims 3-7 |
| Claim 10 | A method for lowering the heart rate with a compound of claims 3-7 |
| Claim 11 | A method of treating Parkinsonism with a compound of claims 3-7 |
| Claim 12 | A method of treating Parkinson's disease with a compound of claims 3-7 |
| Claim 13 | A method of treating schizophrenia with a compound of claims 3-7 |
| Claims 14-15 | Methods for making a tetrahydro-benzthiazole of claim 1 |

9.    During prosecution of the '947 application, the examiner (Examiner Ceperley) mailed on September 11, 1986 the following restriction requirement (*Id.* at BARR274-78):[1]

I.    Claims 1-8 (at least part of each), drawn to benzothiazole compounds and a pharmaceutical composition, classified in Class 548, subclasses 161, 163 and 164.

II.    Claims 1-5 and 8-10 (at least part of each), drawn to pyrrolidinyl-substituted benzothiazole compounds and a pharmaceutical composition, classified in Class 514, subclass 367.

---

[1] The examiner used the term "benzothiazole" to refer to "tetrahydro-benzthiazole". In addition, the examiner described substituents formed by $R_3$ and $R_4$ together with the nitrogen between them as, for example, "pyrrolidinyl" instead of "pyrrolidino" as appears in the claims.

III.    Claims 1-4 and 8 (at least part of each), drawn to piperidinyl-substituted benzothiazole compounds and a pharmaceutical composition, classified in Class 546, subclass 192.

IV.    Claims 1-4 and 8 (at least part of each), drawn to hexamethylimino substituted benzothiazole compounds and a pharmaceutical composition, classified in Class 540, subclass 603.

V.    Claims 1-4 and 8, drawn (at least part of each) morpholinyl-substituted benzothiazole compounds and a pharmaceutical composition, classified in Class 544, subclass 135.

VI.    Claim 14, drawn to a method of preparing benzothiazole compounds using a thiourea reactant.

VII.    Claim 15, drawn to a method of preparing benzothiazole compounds using a disulfide reactant classified based on type of compounds formed.

VIII.    Claims 9 and 10, drawn to a method of lowering blood pressure or heart rate classified based on type of compound used.

IX.    Claims 11 and 12, drawn to a method for treating Parkinsonism, classified based on type of compound used.

X.    Claim 13, drawn to a method for treating schizophrenia, classified based on type of compound used.

10.    The examiner further required the applicants to "elect either (A) one of the compound groups I-V and one of the utility groups VIII-X (composition and utility to be limited to elected compound type for examination), or (B) one of the process groups VI and VII." *Id.* at BARR277.

11.    In response, the applicants elected Group II (pyrrolidinyl-substituted benzthiazole compounds) and Group IX (method for treating Parkinsonism). *See id.* at BARR279. This election was consistent with the examiner's restriction requirement, as the applicants elected one of the compound groups and one of the utility groups, with both composition and utility limited to pyrrolidinyl-substituted benzthiazoles.

12.    The '374 patent issued from the '947 application on March 15, 1988 with the
following general categories of claims (Ex. 1 at BOE34, 46-47):

Claims 1-6      Tetrahydro-benzthiazole compounds where $R_3$ and $R_4$ together with the
                nitrogen atom between them form a pyrrolidino group

Claim 7         A pharmaceutical composition for treating parkinsonism or Parkinson's
                Disease comprising a tetrahydo-benzthiazole of claims 3-6

Claims 8-9      Methods of treating parkinsonism or Parkinson's disease with a tetrahydo-
                benzthiazole of claims 3-6

## IV.    U.S. Patent 4,843,086

13.    Application Serial No. 7/124,197 ("the '197 application") was filed November
23, 1987 and was denominated as a divisional application of the '947 application. *See* Ex. 286 at
BARR500. There was no preliminary amendment to the claims, meaning that the claims of the
application as filed were the same claims as the claims originally filed in the '947 application.
*See id.* at BARR501, BARR491-95.

14.    In an Office Action mailed April 7, 1988, the examiner (Examiner Gerstl) stated
that originally-filed claims 6, 7, 9, 10 and 13 of the '197 application were allowed. *Id.* at
BARR503-05. Claims 1-5, 8, 11, and 12, however, were rejected for double patenting over the
'374 patent, apparently because those claims still encompassed tetrahydro-benzthiazoles claimed
in the '374 patent. *Id.* As the examiner stated, "Although the conflicting claims are not
identical, they are not patentably distinct from each other because they overlap." *Id.* at
BARR504.[2] Claim 8 was also rejected under 35 U.S.C. § 112 and claims 14 and 15 under 35
U.S.C. § 103. *Id.* at BARR503-05.

---

[2] Alan Stempel, the attorney prosecuting this application, wrote in a response to the April 7, 1988
Office Action that claims 11 and 12, as filed, "are directed, in part, to the same subject matter
covered by claims 8 and 9 of the '374 patent". Ex. 286 at BARR595-96.

15.    The applicants mailed a response and information disclosure statement on October 7, 1988, in which they voluntarily cancelled the originally filed claims (claims 1-15), even though the examiner had indicated his intention to allow 5 of them, and added new claims 16-56. *Id.* at BARR578-600. Despite the fact that two of the original claims – claims 6 and 7 – which had been noted as "allowed" by the examiner, were compound claims, the new claims were exclusively method claims. The amendment acknowledged that cancelled claims 6 and 7 had been allowed (*Id.* at BARR592-93):

> Claims 1-5, 8 and 15, which are rejected, have been cancelled in the interest of advancing the prosecution of this application and for reasons which are given below.

> Claims 6 and 7, which had been allowed, have been cancelled for reasons which are given below.

> None of the new claims are directed to the subject matter of former claims 1-8. Applicants reserve the right to present claims directed to the subject matter of these cancelled claims in a divisional application, under 37 CFR 1.60.

16.    The "reasons . . . given below" related to a possibly interfering application of Eli Lilly, Serial No. 747,748 ("the Eli Lilly '748 application"), which was called to the examiner's attention in the same filing. *Id.* at BARR598-600. The Eli Lilly '748 application was said to have been filed June 24, 1985 and to disclose a subgenus of the compounds disclosed and originally claimed in the '197 application. *Id.* at BARR599. It was asserted, however, that the Eli Lilly third-party application did not claim any of the methods encompassed by the pending method claims and would not support the making of such claims. *Id.* at BARR599-600. The applicants further stated (*Id.* at BARR600):

> In view of the particular pertinence of U.S. Patent Application Serial No. 747,748 to claims 1-8, these claims have been cancelled and will be reinstated in a divisional application under 37 CFR 1.60. It is believed that so doing will advance the prosecution of

7

the above-captioned application and that issues presented by this reference will be more easily dealt with in said divisional application.

17. The method claims introduced by the amendment, claims 16-55, were allowed, and the '086 patent issued June 27, 1989 with 40 claims.[3] *Id.* at BARR601-02; Ex. 2. These method of treatment claims included methods of using compounds of Groups I-V of the restriction requirement imposed during prosecution of the '947 application (which had already issued as the '374 patent) for the treatment of the disorders of Groups VIII-X of that restriction requirement.[4] Ex. 2 at BOE29-32. The claim pattern is as follows:

| | |
|---|---|
| Claims 1-10 | Methods for lowering blood pressure (claim 9 is specific to the use of 2-Amino-6-n-propylamino-4,5,6,7-tetrahydrobenzthiazole) |
| Claims 11-20 | Methods for lowering heart rate (claim 19 is specific to the use of 2-Amino-6-n-propylamino-4,5,6,7-tetrahydro-benzthiazole) |
| Claims 21-30 | Methods for treating Parkinsonism or Parkinson's disease (claim 29 is specific to the use of 2-Amino-6-n-propylamino-4,5,6,7-tetrahydro-benzthiazole) |
| Claims 31-40 | Methods for treating schizophrenia (claim 39 is specific to the use of 2-Amino-6-n-propylamino-4,5,6,7-tetrahydro-benzthiazole) |

*Id.*

18. The prosecution history of the '197 application indicates that the restriction requirement imposed during prosecution of the '947 application did not carry over during examination of the '197 application. The examiner in the '197 application (Examiner Gerstl)

---

[3] Process claim 56, which corresponded to rejected original claim 14, was cancelled. Ex. 286 at BARR602.

[4] No claims covered the use of compounds of Group II for the method of Group IX (if categorized according to the restriction requirement imposed during prosecution of the '947 application).

made no reference to the restriction requirement imposed in the '947 application, but rather examined all the claims and allowed claims in a pattern that was inconsistent with the earlier restriction requirement – *i.e.*, he allowed claims from Groups I, VIII, and X (if categorized according to the '947 restriction requirement). Accordingly, the examiner for the '197 application, by his actions, withdrew the restriction requirement. No new restriction requirement was imposed during prosecution of the '197 application.

19.    The applicants appeared to acknowledge that the '947 restriction requirement no longer applied when, for example, they voluntarily withdrew the allowed claims in the '197 application and re-submitted claims for multiple methods of treatment (*i.e.*, Groups VIII-X (if categorized according to the '947 restriction requirement)) employing compounds from multiple restriction groups. These claims – which issued in the '086 patent – were not consistent with the restriction requirement imposed during prosecution of the '947 application, which required the applicants to "elect either (A) one of the compound groups I-V and one of the utility groups VIII-X (composition and utility to be limited to elected compound type for examination), or (B) one of the process groups VI and VII."

20.    The '086 patent expired 17 years after issuance on June 27, 2006.

## V.    U.S. Patent 4,886,812

### A.    Overview of the Prosecution History

21.    Application Serial No. 7/256,671 ("the '671 application") was filed October 12, 1988, approximately seven months after the '374 patent issued. The '671 application was denominated as a divisional application of the '197 application, which had been denominated as a divisional application of the '947 application. Ex. 99 at BARR674.

22.    The prosecution histories indicate that the '671 application was filed voluntarily by the applicants, not as a result of a restriction requirement or any administrative action by the Patent and Trademark Office. As discussed above, during prosecution of the '197 application, the examiner allowed claims 6 and 7, but the applicants voluntarily cancelled those allowed claims and deferred pursuing them until they could file a separate application (the '671 application). The applicants stated that they took these actions in order to address issues presented by the Eli Lilly '748 application.

23.    Original claims 1-8 of the '671 application corresponded to original claims 1-8 presented in the '947 and '197 applications, except that "pyrrolidino", the subject of the '374 patent claims, was deleted by preliminary amendment filed with the application. *See id.* at BARR662-66, BARR677. Claims 1-7 issued substantially unchanged as claims 1-7 of the '812 patent. Ex. 3 at BOE14-15. Composition claim 8 was later amended to overcome a rejection under 35 U.S.C. § 112. Ex. 99 at BARR784-85. A second preliminary amendment and information disclosure statement (discussed further below) added two compound claims that correspond to issued claims 9 and 10 of the '812 patent. *Id.* at BARR779-80.

24.    In the only Office Action in the prosecution, mailed December 28, 1988, the examiner (Examiner Gerstl) indicated that claims 6 and 7 were allowed but rejected the remaining broader compound claims (claims 1-5) and the pharmaceutical composition claim (claim 8) under the doctrine of double patenting over claims 1-7 of the '374 patent. *Id.* at BARR776-77. The applicants' response, mailed on May 9, 1989, argued, among other things, that "there is no 'anticipation-type' double patenting" by the claims of the '374 patent because "pyrrolidino" had been deleted in the preliminary amendment. *Id.* at BARR784-87.

10

25.    The '812 patent issued December 12, 1989, with an original expiration date of December 12, 2006, approximately 5½ months after the expiration date of the '086 patent.  Ex. 3 at BOE2.

26.    The claims submitted by the applicants in the '671 application and which issued in the '812 patent are from Groups I and III-V (if categorized according to the '947 restriction requirement).  That is inconsistent with the election framework set forth in the '947 restriction requirement.  That further indicates that the restriction requirement imposed during prosecution of the '947 application did not carry over during examination of the '197 and '671 applications.

27.    The '812 patent was nominated for a patent term extension under 35 U.S.C. § 156.  Ex. 99 at BARR810.  No terminal disclaimer has been filed for the '812 patent.

**B.    The December 8, 1988 Second Preliminary Amendment and Information Disclosure Statement**

28.    In a second preliminary amendment and information disclosure statement mailed December 8, 1988, the applicants called the examiner's attention to the Eli Lilly '748 application and a foreign equivalent, European Patent Application No. 207,696, published July 1, 1987 (the "European '696 application"), each assigned to Eli Lilly & Co.  *See* Ex. 99 at BARR680.  A copy of the Eli Lilly '748 application was simultaneously provided to the U.S. Patent and Trademark Office.  Ex. 99 at BARR693-718.

29.    In this submission, in a section entitled "Possibly Interfering Application of Another", the applicants admitted that the Eli Lilly applications disclosed and claimed a subgenus of compounds that were disclosed and claimed in the subject '671 application.  It was represented, however, that the Eli Lilly applications were not "prior art" because the publication and filing dates were "later than the effective filing date of the above-captioned application":

11

European '696 discloses tetrahydro (thi or ox) azoles of the formula:



wherein $R^1$ and $R^2$ are individually H, methyl, ethyl or n-propyl; $R^3$ and $R^4$ are individually H, methyl, ethyl, n-propyl or allyl; and Y is O or S.

When Y is S, the compounds of European '696 represent a subgenus of the compounds disclosed and originally claimed in the above-captioned application. However, European '696 does not represent prior art because its publication date is later than the effective filing date of the above-captioned application.

U.S. Application Serial No. 747,748 contains the same disclosure as European '696. It is not available as prior art because its filing date is later than the effective filing date of the above-captioned application. (The effective filing date of the above-captioned application is 22 December 1984, the date on which the German application for which Convention priority is claimed was filed).

It is believed that Serial No. 747,748 is still pending. As filed, U.S. Application Serial No. 747,748 contained claims directed to compounds of the above formula XX.

Ex. 99 at BARR 680.[5]

30.    In my opinion, statements in this submission regarding the effective filing date of the '671 application were inaccurate, and were material to the examination of the '671 application. In particular, the applicants' misrepresentations concerning their effective filing date pertained directly to the question of whether there would be an interference with the "still pending" Eli Lilly '748 application prior to issuance of any claims of the '671 application.

---

[5] Similar representations concerning the Eli Lilly applications were made during prosecution of the '947 and '197 applications. Ex. 46 at BARR349-50; Ex. 286 at BARR598-600.

31.    Reference to "effective filing date" in the amendment and disclosure statement was a representation that the German application filed December 22, 1984 – DE 3447075 – supported the full scope of the claims of the pending application under 35 U.S.C. § 119 (37 C.F.R. § 1.601(g)).[6]  In order to obtain the benefit of an earlier application, it is necessary that the earlier application comply with requirements of 35 U.S.C. § 112, including the presence of a sufficient written description of the later claimed subject matter.  A comparison of the specification of the '812 patent and the December 22, 1984 and March 13, 1985 German priority documents[7] demonstrates that additional disclosure was added after the filing of the German priority applications.  For example, at column 1 lines 33 et. seq. of the '812 patent, $R_1$ includes the statement "whilst the above mentioned phenyl nuclei may be substituted by 1 or 2 halogen atoms".  Ex. 3 at BOE3.  At column 3 lines 5 et seq. of the '812 patent, particularly preferred compounds are said to include those in which $R_1$ represents 2-chloro-benzyl, 4-chloro-benzyl, or 3,4-dichloro-benzyl.  Ex. 3 at BOE4.  No such disclosure appears in the December 22, 1984 German priority application or the March 13, 1985 German priority application.

32.    It is my understanding that the disclosure of $R_1$ substituents whereby the "phenyl nuclei may be substituted by 1 or 2 halogen atoms," or whereby $R_1$ could represent a 2-chloro-benzyl, 4-chloro-benzyl, or 3,4-dichloro-benzyl, was not added until the filing of the '947 application on December 19, 1985, and is not supported elsewhere by either of the German applications – *i.e.*, it is new matter.  As such, the applicants' representations that December 22, 1984 was the effective filing date of their application were inaccurate.

---

[6] 37 C.F.R. § 1.601(g) (1988) defines the "effective filing date" of an application or patent as "the filing date of an earlier application accorded to the application or patent under 35 U.S.C. 119, 120, or 365".

[7] I have reviewed English translations of the German priority documents (Exhibit 53 and BARR209351-403).

13

33.     Claims 1-4 and 8 of the '671 application pending as of December 8, 1988, as well

as claims 1-4 and 8 of the '812 patent, included this new matter – *i.e.*, they encompassed

permutations in which $R_1$ includes a phenyl nuclei substituted by 1 or 2 halogen atoms (claims 1

and 2) or in which $R_1$ is a 2-chloro-benzyl, 4-chloro-benzyl, or 3,4-dichloro-benzyl (claims 3, 4,

and 8) – and therefore were not entitled to an effective filing date before December 19, 1985.  As

such, the Eli Lilly '748 application reflected a prior invention of another with respect to those

claims of '671 application that could have precluded issuance of the claims of the '671

application had the examiner declared an interference.

34.     Section 2303 of the Patent and Trademark Office Manual of Patent Examining

Procedure in effect as of December 1988[8] included directions to examiners that an interference

normally will *not* be declared if the difference in the "effective filing dates" of two co-pending

applications is more than six months.  The applicants' representation concerning the effective

filing date of the '671 application stated that the effective filing date was 6 months and 2 days

earlier than the Eli Lilly '748 application (December 22, 1984 versus June 24, 1985).  However,

as discussed above, the "effective filing date" for at least a portion of the '671 application (and

for five of the pending claims) was December 19, 1985, well after the June 24, 1985 Eli Lilly

U.S. filing date.  The '812 patent ultimately issued without ever having to meet a 35 U.S.C.

---

[8] Section 2303 in relevant part read:

> Interferences will not be declared between pending applications if there is a
> difference of more than 3 months in the effective filing dates of the oldest and the
> next oldest applications, in the case of inventions of a simple character, or a
> difference or more than 6 months in the effective filing dates of the applications in
> other cases, except in exceptional situations, as determined and approved by the
> group director.  One such exceptional situation would be where one application as
> the earliest effective filing date based on foreign priority and the other application
> has the earliest effective United States filing date.  If an interference is declared,
> all applications having the interfering subject matter should be included.

14

§ 102(g) priority challenge with Eli Lilly, a challenge in which Eli Lilly would have been able to rely on work conducted in the United States to support a priority date earlier than June 24, 1985.

35.    The materiality of the applicants' misrepresentation concerning the effective filing date of their application is reinforced by the fact that they did not submit copies of the German applications during prosecution of the '671 application, let alone a translation of those documents. The provisions of 37 C.F.R. § 1.55 require an applicant to file a sworn translation of a foreign language application if it was relied on to overcome the date of a reference relied on by the examiner.[9] Here, in order to overcome any reliance on the Eli Lilly '748 application by the examiner, the applicants represented that they were entitled to claim priority back to their original German application. However, no English translation, sworn or otherwise, was filed by the applicants, nor was either of the German applications. And while the German applications (but not their English translations) were made part of the '947 application prosecution history, Ex. 46 at BARR127-236 – an application reviewed by a different examiner – the '947 application had previously issued as the '374 patent on March 15, 1988, approximately seven months before the '671 application was filed. By the time the '671 application was filed, the

---

[9] 37 C.F.R. § 1.55(a) (1988) reads in relevant part:

> The claim for priority and the certified copy of the foreign application specified in the second paragraph of 35 U.S.C. § 119 must be filed in the case of interference (§ 1.630); when necessary to overcome the date of a reference relied upon by the examiner; or when specifically required by the examiner; and in all other cases they must be filed not later than the date the issue fee is paid. If the papers filed are not in the English language, a translation need not be filed except in the three particular instances specified in the preceding sentence, in which event a sworn translation or a translation certified as accurate by a sworn or official translator must be filed.

application file for the '374 patent would not have been maintained in the Examining Group.

Dated:  March 28, 2007

Dale H. Hoscheit, Esq.

# TAB A

# DALE H. HOSCHEIT

Dale Hoscheit, a long time shareholder in Banner & Witcoff, concentrates in federal and United States International Trade Commission litigation, licensing, counseling on patent matters, and protection of intellectual property rights. He was one of the lawyers representing Chakrabarty in the landmark Supreme Court decision, <u>Diamond v. Chakrabarty</u>, which held that life forms could be patented. He has practiced patent law for over 40 years.

He received a Bachelor of Science in Chemical Engineering with *high honors* from the University of Illinois in 1951 and a Juris Doctor from the same institution in 1956. His honors include Phi Lambda Upsilon and Sigma Tau. Mr. Hoscheit worked as a chemical engineer for Standard Oil of California and later, after beginning the practice of law, as patent counsel for the International Minerals and Chemical Corporation.

A speaker and panelist, Mr. Hoscheit has addressed numerous panels on biotechnology and United States patent law. Among these are the Annual Biotechnology Patent Conferences of the American Type Culture Collection, 1983-1994; the 14th Miami Winter Symposium, the 82nd Annual Meeting of the American Society of Microbiologists; the 1983 U.S. Tissue Culture Conference; the Vth International Congress of Culture Collection in Bangkok; the 1987 American Bar Association Annual Meeting; BioFair Tokyo 1988; and the 1989 and 1990 Patent and Trademark Office Day.

Mr. Hoscheit is an Adjunct Professor at George Mason Law School, has taught a course in Biotechnology Patent Law and teaches a course in Trade Secrets. He has also been a lecturer in Legal Aspects of Biotechnology, a graduate course at The Johns Hopkins University. He is a member of the Advisory Board of BNA's Patent, Trademark & Copyright Journal.

Mr. Hoscheit's professional memberships include The American Bar Association, The Bar of the Federal Circuit and of the United States Supreme Court, The Bar Association of the District of Columbia, and The American Intellectual Property Law Association. He is admitted to the bar in the District of Columbia.

He is a member of the board of directors of Sibley Memorial Hospital, Washington, D.C.

Publications:

Patent Protection for Cell Lines, Hybridomas, and Processes Utilizing Cultured Cells, *In Vitro*, Monograph No. 5, pp. 236-239 (1984).

Enforcement of Biotechnology Patents in the United States, BioSymposium Tokyo, pp. 529-533 (1988).

Papers entitled "Biotechnology Patent Law - An Overview" which summarize current developments in patent law are included in the ATCC Conference workbook for each of the years 1983-1994, 1996 and 1997.

Cases in which Expert deposition testimony has been given within the last four years

Lek Pharma v. GlaxoSmithKline, CA 203 CV 909 (E.D. Va.)

Teva Pharmaceuticals USA, Inc. v. Pfizer Inc. 03 CV-7423 and 03 CV-4979 (LAP) (S.D.N.Y.)

Dey v. Eon Labs, SACV-04-00079; SACV-04-00243 (C.D. Cal.)

Genetech v. Insmed, 04-CV-05429 (N.D. Cal.)

Novartis Corp., et al. v. Teva Pharmaceuticals USA, Inc., 2:04-CV-04473 (HAA-MF) (D.N.J.)

Tyco Healthcare, et al. v. Daniels Sharpsmart, et al., 2:04-CV-00229-RAJ-TEM (E.D. Va.)

# EXHIBIT B

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

CHAMBERS OF
SUE L. ROBINSON
CHIEF JUDGE

LOCKBOX 31
844 KING STREET
U.S.COURTHOUSE
WILMINGTON, DELAWARE 19801

Guidelines: Legal Expert Testimony in Patent Cases

   In all patent jury trials, the court shows the video "An Introduction to the Patent System" to the jurors in connection with its preliminary jury instructions.  The 18 minute video is distributed by the Federal Judicial Center and provides jurors with an overview of patent rights in the United States, patent office procedure and the contents of a patent.  Thus, expert testimony from attorneys regarding patent practice and procedure is not required and will not be permitted except in the case of extraordinary circumstances.

   "Expert" legal testimony (as opposed to technical testimony) on such substantive issues as invalidity (by anticipation, obviousness, on-sale bar, prior conception, etc.) and claim construction and infringement, generally is not admitted, as descriptions of the law and instructions on the law are matters for the court.

# EXHIBIT C

# UNITED STATES DISTRICT COURT
# DISTRICT OF DELAWARE

CHAMBERS OF
KENT A. JORDAN
DISTRICT JUDGE

LOCKBOX 10
844 KING STREET
U.S. COURTHOUSE
WILMINGTON, DELAWARE 19801

Guidelines:    Legal Expert Testimony in Patent Cases

In patent jury trials, the court will either provide a brief description of the procedure for obtaining patents or show the video "An Introduction to the Patent System" to the jurors in connection with the preliminary jury instructions.  The 18 minute video is distributed by the Federal Judicial Center and provides jurors with an overview of patent rights in the United States, patent office procedure and the contents of a patent.  Expert testimony from attorneys regarding patent practice and procedure is not required and will not be permitted, except, perhaps, in the case of truly extraordinary circumstances.

"Expert" legal testimony (as opposed to technical testimony) on such substantive issues as invalidity (by anticipation, obviousness, on-sale bar, prior conception, etc.) and claim construction and infringement will also not be permitted, as descriptions of the law and instructions on the law are matters for the court.  This principle also holds for issues tried to the court, such as inequitable conduct.

August 2005

# EXHIBIT D

238

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

CORNING INCORPORATED,                :
ARTIFICIAL SENSING INSTRUMENTS       :
ASI AG,                              :
                                     :
          Plaintiffs,                :
                                     :
     v.                              :      Civil Action No. 03-633 JJF
                                     :
SRU BIOSYSTEMS, et al.,              :
                                     :
          Defendants.                :
                                     :

## MEMORANDUM AND ORDER

Pending before the Court is Defendants' Motion To Exclude

The Expert Report And Testimony Of Corning And ASI's Patent Law

Expert, Gerald J. Mossinghoff (D.I. 129).  For the reasons

discussed, Defendants' Motion  will be granted.

### PARTIES' CONTENTIONS

By their motion, Defendants contend that Mr. Mossinghoff's

report and proposed testimony, while couched as explanations of

Patent and Trademark Office ("PTO") practices and procedures,

consist primarily of legal opinions on various patent issues,

including ultimate issues of law.

Plaintiffs contend that Mr. Mossinghoff's opinions on PTO

procedures are relevant and within the proper scope of expert

testimony on patent matters.

1

## DISCUSSION

Because Mr. Mossinghoff's report and proposed testimony deal primarily with internal patent office procedures, the Court will grant Defendants' Motion To Exclude The Expert Report And Testimony Of Corning And ASI's Patent Law Expert, Gerald J. Mossinghoff (D.I. 129).

NOW THEREFORE, IT IS HEREBY ORDERED this _5_ day of November 2004, that Defendants' Motion To Exclude The Expert Report And Testimony Of Corning And ASI's Patent Law Expert, Gerald J. Mossinghoff (D.I. 129) is **GRANTED**.


UNITED STATES DISTRICT JUDGE

2

# EXHIBIT E

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

REVLON CONSUMER PRODUCTS )
CORPORATION, )
                               )
          Plaintiff, )
                               )
        v. )        Civil Action No. 96-192 MMS
                               )
L'ORÉAL S.A., COSMAIR, INC., )
MAYBELLINE, INC., and )
MAYBELLINE SALES, INC. )
                               )
         Defendants. )

---

Jack Blumenfeld, Esq., and Jon E. Abramczyk, Esq., of Morris, Nichols, Arsht & Tunnell, Wilmington, Delaware; Of Counsel: Daniel J. Leffell, Esq., Elizabeth J. Holland, Esq., and Douglas A. Berman, Esq., of Paul, Weiss, Rifkind, Wharton & Garrison, New York, New York; and John W. Behringer, Esq., of Fitzpatrick, Cella, Harper & Scinto; attorneys for plaintiff.

Rudolph E. Hutz, Esq., and Stanley C. Macel, III, Esq., of Connolly, Bove, Lodge & Hutz, Wilmington, Delaware; Of Counsel: Norman H. Stepno, Esq., Frederick G. Michaud, Jr., David M. Schlitz, Esq., and Ronni S. Jillions, Esq., of Burns, Doane, Swecker & Mathis, L.L.P., Alexandria, Virginia; and Norman F. Oblon, Esq., Richard D. Kelly, Esq., Jean-Paul Lavalleye, Esq., and Frank J. West, Esq., of Oblon, Spivak, McClelland, Maier & Neustadt, P.C., Arlington, Virginia; attorneys for defendants.

---

## **MEMORANDUM OPINION**

Submitted on Briefs
Dated: March 26, 1997
Wilmington, Delaware

*Schwartz, Senior District Judge*

## INTRODUCTION

Revlon Consumer Products Corp. ("Revlon") filed this lawsuit against L'Oréal

S.A., Cosmair Inc., Cosmair Canada, Inc.,[1] Maybelline, Inc. and Maybelline Sales,

Inc. (collectively "defendants") alleging infringement of Revlon's patented composition

for transfer resistant lipstick.  See Docket Item ("D.I.") 61 (Amended Complaint).

Three defendants, Cosmair Inc., Maybelline Inc., and Maybelline Sales Inc., asserted a

counterclaim seeking a declaratory judgment that Revlon's patent is invalid and they

have not infringed nor induced infringement.

Before the Court is Revlon's motion to preclude the testimony of defendants'

patent law expert, John Witherspoon.  D.I. 147.   According to his report, Mr.

Witherspoon proposes to offer opinions on a wide range of issues, including Patent and

Trademark Office ("PTO") practice and procedure as well as many substantive areas of

patent law.[2]  Id., Exh. A at 2.  The parties agree Mr. Witherspoon may testify as to

---

[1]   Cosmair Canada, Inc. has since been dismissed as a defendant.  D.I. 24.

[2]   Specifically, these areas are: "patent infringement, both literal and under the doctrine of equivalents; principles of claim construction and interpretation; prosecution history estoppel; conditions for patentability, including novelty, utility and nonobviousness under 35 U.S.C. §§ 101, 102 and 103; requirements for and purposes of patent specifications and claims under 35 U.S.C. § 112; the prohibition regarding the addition of new matter under 35 U.S.C. § 132; duties and responsibilities of an inventor, his or her attorney or agent, and others substantively involved in the preparation and prosecution of a patent application in the PTO; and the prosecution history of the patent in suit."  D.I. 147, Exh. A, at 2.

1

PTO practice and procedure.  D.I. 154, at 1; D.I. 157 at 2.  Revlon asserts, however, the remainder of Mr. Witherspoon's proposed testimony goes to topics inappropriate for expert testimony in a patent case.  D.I. 157, at 2.  In their answer to Revlon's motion, defendants indicate other than PTO practice and procedure, they wish only to introduce Mr. Witherspoon's testimony on the issue of inequitable conduct.  D.I. 154, at 1.  Thus, to resolve Revlon's motion, the Court must decide whether to admit testimony by a proffered patent law expert on the topic of inequitable conduct.

## DISCUSSION

### I.  Inequitable Conduct

Inequitable conduct has been defined by the Federal Circuit Court of Appeals as "an 'affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive.'" Micro Chemical, Inc. v. Great Plains Chemical Co., Inc., 103 F.3d 1538, 1549 (Fed Cir. 1997) (citation omitted); accord Refac International, Ltd. v. Lotus Development Corp., 81 F.3d 1576 (Fed Cir. 1996).  "Information is 'material' when there is a substantial likelihood that a reasonable examiner would have considered the information important in deciding whether to allow the application to issue as a patent." Refac International, 81 F.3d at 1581.

The proponent of a claim of inequitable conduct must prove "the threshold elements of materiality and intent by clear and convincing evidence." Micro Chemical,

2

Inc., 103 F.3d at 1549. "The district court must then weigh the threshold findings of materiality and intent in light of all the circumstances to determine whether they warrant a conclusion that inequitable conduct occurred." Id. "A determination of inequitable conduct is committed to a district court's discretion." Id.

## II. Expert Testimony

Defendants assert Mr. Witherspoon's testimony as to inequitable conduct may assist the trier of fact and thus is admissible under Federal Rule of Evidence 702. That rule states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Fed. R. Evid. 702.

Because the admission of expert testimony is a "procedural matter" not unique to patent issues, the law of the Third Circuit Court of Appeals governs this motion, as opposed to the law of the Federal Circuit. Panduit Corp. v. All States Plastic Manufacturing Co., 744 F.2d 1564, 1574-75 (Fed. Cir. 1984); accord National Presto Industries, Inc. v. The West Bend Co., 76 F.3d 1185, 1188 n.2 (Fed. Cir. 1996).

The decision whether to admit expert testimony is committed to the discretion of the district court. United States v. Velasquez, 64 F.3d 844, 847-48 (3d Cir. 1995). As might be gleaned from the rule, several bases exist for excluding expert testimony.

They are: "(1) if the testimony will not assist the trier of fact; (2) if scientific [or technical or other specialized] evidence is not sufficiently reliable; and (3) if the particular expert does not have sufficient specialized knowledge to assist the jurors." Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1238 (3d Cir. 1993); see also Holbrook v. Lykes Bros. Steamship Co., Inc., 80 F.3d 777, 781 (3d Cir. 1996).

The Third Circuit Court of Appeals has adopted a broad interpretation of Rule 702; close calls on the admission of expert testimony are to be resolved in favor of admissibility. Dunn v. Hovic, 1 F.3d 1362, 1367 (3d Cir. 1993). However, "it is not permissible for a witness to testify as to the governing law since it is the district court's duty to explain the law to the jury . . . ." United States v. Leo, 941 F.2d 181, 196 (3d Cir. 1991). As relevant to Revlon's motion, Mr. Witherspoon's testimony will be inadmissible either if it is not helpful to the trier of fact, or if it constitutes impermissible testimony before the jury as to the governing law.

Defendants have not provided the details of Mr. Witherspoon's proposed testimony on inequitable conduct, beyond the sentence: "Defendants request that Mr. Witherspoon be allowed to testify as to the inequitable conduct issue if the Court determines that Mr. Witherspoon's testimony as a legal expert would assist in its determination." D.I. 154, at 2. Defendants' answer to Revlon's motion places into

4

issue the currently unsettled question of whether, in this case, the judge or the jury will

act as fact-finder on the issue of inequitable conduct.

      With respect to that question, the Federal Circuit recently explained:

> There are a variety of ways in which the district court may choose to
> handle the issue of inequitable conduct during a jury trial . . . . . Some
> courts have reserved the entire issue of inequitable conduct unto
> themselves; some have submitted special interrogatories to the jury on the
> facts of materiality and intent; and some have instructed the jury to find
> and weigh the facts of materiality and intent and decide the ultimate
> question of inequitable conduct . . . .  Absent a clear showing of
> prejudice, or failure to achieve a fair trial, the district court's choice of
> procedure will not be disturbed.

Hebert v. Lisle Corp., 99 F.3d 1109, 1114 (Fed. Cir. 1996).   The court noted in the

last instance the parties agreed to submit the entire issue of inequitable conduct to the

jury.  Id.

      Failing to achieve similar agreement of the parties in the present case, the Court

will opt to submit to the jury special interrogatories on the facts of materiality and

intent.  The Court will then weigh the findings on these two elements "in light of all the

circumstances," and decide the ultimate question of inequitable conduct.  See Micro

Chemical, Inc., 103 F.3d at 1549; see also Akzo N.V. v. U.S. International Trade

Commission, 808 F.2d 1471, 1481-82 (Fed. Cir. 1986) ("Materiality and intent must

. . . be considered together:  the more material the omission or misrepresentation, the

less intent that must be shown to reach a conclusion of inequitable conduct.")

As the determination of the Court consists of a 'weighing' of the factual findings on materiality and intent, and then a determination in light of all the circumstances whether inequitable conduct occurred, see Micro Chemical, Inc., 103 F.3d at 1549, it follows that the jury will act as the sole fact-finder on the issue of inequitable conduct. The Court therefore cannot permit Mr. Witherspoon to testify as an expert on inequitable conduct; to do otherwise would usurp the respective functions of the jury and the Court.[3]

In accordance with the other cases in this District, the Court holds defendants' expert John Witherspoon may testify only as to matters of PTO practice and procedure. See Lucas Aerospace, Ltd. v. Unison Industries, L.P., No. 93-525 (D. Del. March, 9, 1995); General Battery Corp. v. Gould, Inc., 545 F. Supp. 731, 758 n.30 (D. Del. 1982); see also Thorn EMI North America Inc. v. Micron Technology, Inc. No. 92-673 (D. Del. Nov. 23, 1993) (McKelvie, J.) (hearing transcript); The Read Corporation v. Portec, Inc., No. 88-29 (D. Del. March 9, 1990) (Roth, J.) (hearing transcript); RCA Corp. v. Data General Corp., No. 84-270 (D. Del. Dec. 17, 1986)

---

[3]   The Federal Circuit recently noted one of the hazards of permitting expert testimony on patent law:

> We take note of the extent to which . . . incorrect law was announced by a patent law expert witness.  We encourage exercise of the trial court's gatekeeper authority when parties proffer, through purported experts . . . markedly incorrect law.

Hebert, 99 F.3d at 1117.

6

(Farnan, J.) (hearing transcript); Guidelines: Legal Expert Testimony in Patent Cases

(Robinson, J.).[4]  Mr. Witherspoon may not testify as to substantive issues of patent

law, including inequitable conduct.  For purposes of clarity, it is noted this holding

precludes, among other things, Mr. Witherspoon's proposed testimony regarding the

"duties and responsibilities of an inventor, his or her attorney or agent, and others

substantively involved in the preparation and prosecution of a patent application in the

PTO . . . ."  D.I. 147, Exh. A, at 2.

        An order will issue consistent with this opinion.

---

    [4]  While this rule regarding patent experts is followed in this District, it is not
uniform throughout the country.  Several Federal Circuit cases refer, in passing, to
expert testimony that was permitted on the topic of inequitable conduct, see Hebert, 99
F.3d at 1115; Kingsdown Medical Consultants Ltd. v. Hollister, Inc., 863 F.2d 867,
872 (Fed. Cir. 1988).

7

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

REVLON CONSUMER PRODUCTS )
CORPORATION, )
                             )
            Plaintiff, )
                             )
         v. )       Civil Action No. 96-192 MMS
                             )
L'ORÉAL S.A., COSMAIR, INC., )
MAYBELLINE, INC., and )
MAYBELLINE SALES, INC. )
                             )
           Defendants. )

## O R D E R

At Wilmington this ⟨2 6th⟩ day of March, 1997, in accordance with the

Opinion issued on this date,

IT IS ORDERED Revlon's motion to preclude the testimony of Defendants'

patent law expert John Witherspoon is GRANTED.

United States District Judge

# EXHIBIT F

```
1                        - VOLUME D -

2              IN THE UNITED STATES DISTRICT COURT

3              IN AND FOR THE DISTRICT OF DELAWARE

4                        - - -

5    BERG ELECTRONICS, INC.,        :    CIVIL ACTION
                                    :
6              Plaintiff            :
                                    :
7              v.                   :
                                    :
8    MOLEX, INCORPORATED,           :
                                    :
9              Defendant            :    NO. 94-470 (RRM)

10                       - - -

11                                  Wilmington, Delaware
                                    Tuesday, September 26, 1995
12                                  9:00 o'clock, a.m.

13                       - - -

14   BEFORE:  HONORABLE RODERICK R. McKELVIE, U.S.D.C.J., and a
                                                          jury
15                       - - -

16
     APPEARANCES:
17

18              MORRIS, NICHOLS, ARSHT & TUNNELL
                BY:  DONALD F. PARSONS, JR., ESQ.
19                      -and-
                WOODCOCK, WASHBURN, KURTZ, MACKIEWICZ &
20              NORRIS
                BY:  NORMAN L. NORRIS, ESQ.,
21                   JOHN P. DONOHUE, JR.,
                     KEVIN M. FLANNERY, ESQ. and
22                   REBECCA L. RALPH, ESQ.
                     (Philadelphia, Pennsylvania)
23
                        -and-
24

25              Official Court Reporters
```

Krieger - direct                872

1    examiner.

2    Q.    Mr. Kreiger, I have handed you Exhibit No. 847.

3          Can you identify that document?

4    A.    Okay.

5          That looks like a, the front page is Manual

6    of Patent Examining Procedure, Fifth Edition, Revision 3,

7    May 1986, and a number of pages, from what appears to be

8    that volume, including Section 2001 that I mentioned -- I

9    am sorry, 2004.  It starts with Section 2001.  2004, here

10   it is.

11         MR. DONOHUE:  Your Honor, for the next portion

12   of Mr. Kreiger's testimony, could we have him come down

13   and utilize the Elmo.

14         THE COURT:  All right.

15         (At this point the witness stepped down from the

16   stand and approached the Elmo.)

17         MR. DONOHUE:  Your Honor, we are going to be

18   placing a portion of Exhibit 847 on the Elmo.  To assist

19   the jury in following along, I have made photocopies of

20   that portion.

21         May I distribute those copies to the jury?

22         THE COURT:  Is he going to be testifying on

23   issues of law?  Is he going to be describing the duty of

24   disclosure?

25         MR. DONOHUE:  No, your Honor.

1        I believe he is only going to be describing

2    guidelines that are set out by the Patent Office on

3    procedures that should be followed in the preparation and

4    prosecution of the patent application.

5             THE COURT:  All right.

6             Your Honor, may I distribute these?

7             THE COURT:  All right.

8             Document distributed amongst the jurors.)

9    BY MR. DONOHUE:

10   Q.   Mr. Kreiger, referring to this portion of the Manual

11   of Patent Examining Procedure that we have placed up on

12   the monitor, and specifically to -- first of all, can you

13   tell us generally what this section is about?

14   A.   Okay.

15            The Section 2004, you can see, is the title

16   Aids to Compliance with the Duty of Disclosure.

17            These are a series of guidelines that are

18   issued by the Patent Office for patent attorneys

19   primarily and the applicants to look at, and then help

20   stimulate their thinking as to various things to ask

21   their clients about, and various things the Patent

22   Office might consider during the examination of the

23   patent application.

24   Q.   All right.

25            Focusing your attention first on numbered

1    Paragraph 1, what is the significance, if any, of that

2    paragraph?

3    A.    This paragraph suggests that attorneys might use

4    letters and questionnaires in obtaining information from

5    the inventors.  And it even talks about this being a

6    checklist, so that they make sure they don't skip

7    anything when they ask the inventors what it is that

8    they might know as relevant background to the invention.

9              THE COURT:  I think we will stop for the day and

10   start tomorrow at 9:00.

11             (At this point the jury then left the courtroom,

12   and the following occurred without the presence of the

13   jury.)

14             THE COURT:  I am happy to let you create a

15   record outside of the hearing of the jury of whatever you

16   would like.

17             But I tell you and I tell them, I tell people

18   repeatedly, I am the law, and I turn to the jury and tell

19   them what the law is.  And I don't care for witnesses who

20   come into court and describe duties to the jury.

21             In this situation, the relevance of what he

22   is talking about it seems to me is that if you are going

23   to argue to the jury that a lawyer breached a standard of

24   care described on that sheet that is up on the Elmo, I am

25   the one who defines to the jury what the standard is.

Krieger - direct          875

1          I have told lawyers repeatedly, if you want

2     to bring a lawyer in -- and I have lawyers, patent

3     lawyers seem to be willing to testify about almost

4     anything.  If you want to bring a patent lawyer in, my

5     thought is that it's an aid to assist the jury to

6     understand the file wrapper.

7          We can't call an examiner to come in and say

8     here's what I did and why I did it.  And as a courtesy to

9     the Patent Office, we don't do that.  Just as a mechanic

10    to get the information across to the jury, I allow parties

11    to call lawyers to do it.

12          But when you qualified him, I didn't hear

13    much about the Patent Office.  I didn't hear much that

14    says that he is a person qualified to offer an opinion

15    about what goes on in the Patent Office.  And when I

16    sustained the objection that I made, it was he was

17    offering an opinion on a matter that there was no

18    foundation for.

19          I am happy to stay here right after I take

20    the guilty plea in a minute from this other person and

21    have you put on the record whatever you would like to put

22    on the record about it.

23          But to me, the jury looks to you to present

24    facts.  They will be the judges of the facts.  And they

25    look to me to describe the duties that they are to

Krieger - direct                    876

1    evaluate those facts from.

2          I don't understand why a party should be

3    entitled to bring a lawyer in, turn to the jury and say,

4    let me tell you what the obligations were, let me tell you

5    what the duties were, unless we are in some kind of a

6    malpractice case. All right?

7          I try to avoid this moment in every patent

8    trial by warning people about the bus driver at the first

9    status conference, at the second status conference, at

10   the pretrial conference. And I understand that Molex may

11   not be objecting because they may have a similar view as

12   you do about how lawyers should be entitled to testify

13   during trial.

14         But to me, we are here to resolve facts.

15   This is the only area of law that I am aware of other than

16   legal malpractice where lawyers -- parties think they can

17   put lawyers on who can turn to the jury and tell them how

18   they should be deciding the case.

19         To me, it is not relevant. It is not

20   admissible. And I have given fair warning to both parties

21   that I just don't think it is productive.

22         I know that you can back into a lot of this

23   by saying what is going on here and what are the resources

24   the examiner has, you can back into it. Here, you are

25   just coming right at it. You haven't talked about the

1    file wrapper.  You haven't helped the jury understand what

2    is going on and why it's going on.  You are going right to

3    the legal duties.

4             I just don't think it is appropriate.  You can

5    make whatever offer you want and we will do it later

6    tonight.

7             MR. DONOHUE:  Your Honor, could I just have a

8    point of clarification?  And perhaps we should address this

9    in the morning.

10            I believe it is our understanding that Mr.

11   Kreiger is not permitted to go through the file wrapper

12   because of either a motion in limine or some other type

13   of motion that has been made.

14            Is that Your Honor's understanding?

15            THE COURT:  That he is not allowed to go --

16            MR. DONOHUE:  Yes, sir.

17            THE COURT:  Because he didn't disclose it in

18   the prior report.

19            MR. KOZAK:  That's right.

20            THE COURT:  Okay.  There is not much left,

21   huh?

22            MR. NORRIS:  Except to ask for reconsideration

23   of that.  I think that your Honor has not seen the expert

24   report.  Perhaps we would ask that you look at that, where

25   it is described very generally that he was going to

Krieger - direct                    878

1   describe procedures of moving a patent application

2   through the Patent Office.

3           THE COURT:  Well, I am not going to reconsider

4   the decision I made about the disclosure, because that has

5   to do with my Rule 16 obligations.

6           I don't like this moment in the trial any more

7   than anybody else does.  I certainly don't want to say

8   these things or do things that bring a guest into

9   Delaware from Texas to have him hear me say these things.

10          Anybody that wants to sit down can sit down.

11          But I really do feel I have given people fair

12  warning about where we are going.  I don't mind you saying

13  we know you feel strongly about this, but we think the

14  Federal Circuit disagrees with you.  So we would like to

15  create a record, and let's not have heat about it.  Just

16  go and create a record.

17          But to come in and in light of what I said

18  in the past to do this to me, you are just inviting me to

19  do stuff in front of the jury I don't want to do.  I

20  don't want to embarrass people in front of the jury.

21          I want the jury to know that everybody is

22  working hard and doing a good job and the Judge doesn't

23  think they are making mistakes.  You have to figure out a

24  way to do this to preserve the record and take it up,

25  unless I haven't been clear in the past, and I think I

Krieger - direct                    879

1    have been pretty clear.

2              MR. NORRIS:  No, you have been clear, your

3    Honor.  You indicated be a bus driver through the Patent

4    Office.

5              THE COURT:  And you can't get that in because

6    of the problem -- you can't get in the file wrapper

7    because of the ruling.

8              MR. NORRIS:  Yes.  So we were making Mr.

9    Krieger the bus driver of a hypothetical patent application

10   through the Patent Office.  That is supported by his

11   expert report.

12             That is all that we are asking, is for him to

13   be allowed to drive this hypothetical bus through the

14   Patent Office.

15             THE COURT:  Look at this sheet on the Elmo.

16             What are you going to do with that in closing

17   argument?  Are you going to say that these establish a

18   standard of care as to what the duty of disclosure is and

19   what obligations a lawyer had?  And, look, they should have

20   sent a questionnaire to the client and they didn't do it

21   and the Patent Office told them to do it?

22             If you are going to be doing that, do we do

23   that through this witness or do I do it through the

24   instructions?  If I find that isn't the standard of care,

25   that the law doesn't require that a lawyer do that, what

Krieger - direct                880

1    is the relevance of this testimony?

2              Is it in the jury instructions?  Because if it

3    is not in the jury instructions, you may not be able to

4    argue that in closing argument.

5              MR. NORRIS:  I think the relevance is that

6    there are all kinds of prior art that an applicant needs

7    to be concerned about and they have to watch out for this

8    and they have to watch out for that and they have to watch

9    out for the other thing.

10             It is all of those things that you have to do

11   when you are driving that bus through the Patent Office.

12             THE COURT:  Right.  So who is going to tell

13   them about that?  What is any different between you and

14   him both standing up at the microphone and saying, Let me

15   tell you about patent law, ladies and gentlemen.  Here's

16   what they had to do and here's how they had to do it.

17             As you go home tonight, think about it.

18   Think about other trials that you have seen, how many

19   other trials have you seen where any one of the lawyers

20   at counsel table could get up on the witness stand and

21   say, let me tell you what is going on here.  Let me tell

22   you what the duties are and here's what you should be

23   doing.

24             Because that's what is happening.  And it is

25   no different than buying a witness to sit on the stand

Krieger - direct                881

1    and say, Look, jury, here's the right and wrong of this.

2    It is argument.

3            As a courtesy to litigants, we let people put

4    facts in front of the jury as factual background, as to

5    what went on in the Patent Office, because you can't

6    depose the examiner, because you can't give them a

7    factual setting as to what goes on.

8            But this type of discussion, I just don't

9    understand the legal significance of this.  I understand

10   that people may say and there may be opinions out there

11   that say this creates a duty of law, and you turn to the

12   jury at the end of the case and say Judge McKelvie will

13   instruct you that to understand what a lawyer's obligation

14   is in this context, you can look to what the Patent Office

15   tells them as to what they do.

16           And I will tell them that that is a duty that

17   the lawyer has.  And I will describe that to the jury and

18   you can argue to the jury whether they find as a matter of

19   fact that the lawyer has complied with that duty or didn't

20   comply with that duty.

21           But I don't want witnesses telling the jury

22   what the duty is outside of the context of me telling

23   them what the Law is.

24           I am happy to have you do a written summary

25   and take it up and let the Federal Circuit look at it and

1    see whether they think it is a good idea.  But to me, it

2    is not -- I want witnesses on the stand who talk about

3    what they saw, what they heard, what they felt, what they

4    touched, and what they said to somebody.  I don't want

5    somebody coming in and saying, Let me tell you what it's

6    all about, folks.

7            MR. NORRIS:  The other thing we would like

8    your Honor to consider is how we got stuck in this whole

9    situation.

10           You may recall, your Honor, that you said,

11   look at what you have, did you really disclose it to

12   them?  There is an exchange of correspondence.  Mr.

13   Tegtmeyer's report was way too broad -- way too specific,

14   and he had willful infringement, he had all sorts of

15   things.

16           We said, that's too broad.  And we came in

17   with this and we had correspondence.  We said, obviously,

18   there is a difference in view in interpreting what Judge

19   McKelvie will permit.  We need to talk about this.  There

20   is correspondence.  They will have a view on that, but I

21   would like your Honor to see that correspondence before

22   you irrevocably conclude that we are stuck.

23           THE COURT:  You may be able to bring him

24   back after I hear their witness.  My thought about this

25   is, really, one, I have been pretty clear about my Rule

1    16 requirements about disclosure.

2         Two, they are going to put somebody on.  You

3    will get through him on cross and direct pretty much what

4    we want.  It is basically background information that we

5    are talking about.  We are not talking about core issues

6    that are in dispute.  You will be able to turn to that

7    jury and argue to them pretty much everything that this

8    person is saying, if it is consistent with what I tell

9    them the law is.

10        There is just not that much damage from this.

11   That is why I don't think it is a good idea to put it in

12   in the first place.  The fact I have cut him out from the

13   file wrapper doesn't mean that we should go ahead and

14   bring all the bad baggage that I don't care for in any

15   event.

16        Again, let's -- assume I will come in

17   tomorrow morning.  I will be relaxed about it.  I will be

18   calm about it.  We will go back to where you want to go

19   with it.  But I feel real strongly about this topic, as

20   you can tell.  I feel real strongly about it.

21        MR. NORRIS:  That is, why, your Honor, we

22   thought we should be very nonspecific in his expert

23   report.  We didn't know how much you would let him do.

24   We worked with Mr. Parsons in that regard.

25        Obviously, we misconstrued that you would

Krieger - direct                    884

1    allow him to do more than we thought.  So we are stuck.

2              THE COURT:  I am afraid you are stuck.

3              But, in fact, to me, it's not, it really isn't

4    going to be all that significant.  The jury is not going

5    to make decisions based on what the lawyers testify to

6    from the witness stand.

7              You will have the file wrapper.  In fact, you

8    will find that you can walk through with the jury in

9    closing argument pretty much everything that this witness

10   would say.  There is just not that much damage to it.

11             MR. NORRIS:  The bottom line is, we do not

12   wish to usurp your legal function, your Honor.

13             THE COURT:  And you don't want to irritate me,

14   I know that.  I won't be irritated tomorrow.  It will be

15   a fresh day.

16             I don't want to insult anybody.  I feel real

17   strongly about this topic.  It happens in every case I

18   have got.  I warn people way ahead of time.  I try to be

19   as clear as I can.  I try to sit down early on in cases

20   say, Here's what I think is allowable, here's what's not

21   allowable, make an offer of proof on the balance, maybe

22   the Federal Circuit will tell me I am wrong.

23             I think the Judges are pretty uniform in this

24   Court about Patent Office practice and procedure, what is

25   allowable.  I know Judge Robinson has done some written

Krieger - direct                885

1   guidelines on it.  I am generally in agreement with what is

2   in those guidelines.

3              I want to be fair to people.  One of the.

4              Problems with this situation is, sometimes both

5   sides come in and want to sneak it in and sometimes I.

6              Have to be a little more active about it, even

7   though somebody doesn't object.

8              MR. NORRIS:  One of the concerns we have is

9   that, while we have your comments from before, you have

10  been rather explicit, we still have this big report of

11  Mr. Tegtmeyer that has him getting into all these

12  nitty-gritty things and we are not sure what the

13  ultimate result of that will be.

14             THE COURT:  You know, in some ways it is too

15  bad you go first on the topic, because you would have had

16  fun standing up and just remain standing, saying, Object.

17  Sustained.  Object.  Sustained.

18             MR. NORRIS:  I just don't have a chance to

19  do that.

20             THE COURT:  I imagine they will go back and

21  think, Boy, he really means it.  They will have it all

22  figured out and it will look nice and smooth.

23             Fresh day tomorrow.  I know people go back

24  and think, boy, this is awful, we have been blown away

25  on the remainder of a significant issue.  But trust me,

Krieger - direct                886

1   in two weeks the jury will have all of these issues in

2   mind.

3            In fact, unless people are missing the point,

4   there has been a lot of -- there aren't that many issues

5   for the jury to decide here.  They are sort of on the

6   table.  I know there will be more issues put on the table

7   by the other side.  We will get a fair decision on the

8   merits from the jury without anybody getting knocked out

9   based on lawyers testifying.

10           Besides, lawyers can make more money not

11  testifying.  They can make more money billing.

12           In any event, that is what I am going to do.

13  I will handle this criminal matter.  I look forward to

14  seeing people tomorrow morning.

15           No harm, no foul.  You can re-think what you

16  would like me to do.  I have a conference call at 8:15,

17  8:30. I will come to court a couple minutes early, you

18  can try the trial balloon on me, and say, Judge, we are

19  thinking about doing this.

20           MR. NORRIS:  Maybe we will.

21           THE COURT:  See you tomorrow morning.

22           (Court recessed at 4:38 p.m., to reconvene on

23  Wednesday, September 27, 1995, at 9:00 a.m.)

24                    - - -

25

# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE



LUCAS AEROSPACE, LTD.,              :
                                   :
          Plaintiff and            :
          Counter Defendant,       :
                                   :
     v.                            :    Civil Action No. 93-525-JJF
                                   :
UNISON INDUSTRIES, L.P.,           :
                                   :
          Defendant and            :
          Counter Claimant.        :

O R D E R

WHEREAS, Defendant Unison Industries, L.P. ("Unison") filed Motion in Limine No. 2 to Limit the Testimony by Plaintiff's Patent Law Expert A. Donald Messenheimer (D.I. 269);

WHEREAS, Unison contends that Mr. Messenheimer as a patent law expert should not be permitted to give opinions on the issues of law or the legal significance of the facts;

WHEREAS, Lucas Aerospace, Ltd. ("Lucas"), by way of response contends that Mr. Messenheimer's testimony will provide the jury and the Court with the benefit of his specialized knowledge regarding the practice of obtaining a patent and the procedures followed in the application which resulted in the patents at issue;

WHEREAS, Lucas further contends that any objections to particular questions are more appropriately raised during the course of trial at the time Mr. Messenheimer's testimony is elicited before the jury;

WHEREAS, the Court finds that Mr. Messenheimer is offered as a witness on practice and procedure in the Patent and Trademark Office as indicated by Lucas in their briefing;

WHEREAS, the Court finds that "patent law experts" are permitted to testify about Patent Office practice and procedure but not to draw inferences or make statements or conclusions about the patent law of the case;

NOW THEREFORE, IT IS HEREBY ORDERED this ___7___ day of March, 1995, that Unison's Motion in Limine No. 2 to Limit the Testimony by Plaintiff's Patent Law Expert A. Donald Messenheimer is GRANTED, and Mr. Messenheimer is limited to factual recitations concerning practice and procedure in the Patent and Trademark Office.

_____
UNITED STATES DISTRICT JUDGE

# EXHIBIT H

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

THORN EMI NORTH AMERICA, INC.,    )
                                  )
          Plaintiff,              )    Civil Action No.
                                  )    92-673 (RRM)
v.                                )
                                  )
MICRON TECHNOLOGY, INC., and      )
                                  )
          Defendants.             )
MICRON SEMICONDUCTOR, INC.,       )
                                  )
          Counterclaimant,        )
                                  )
v.                                )
                                  )
THORN EMI NORTH AMERICA, INC.,    )
                                  )
          Counterdefendant.       )

                        Federal Courtroom
                        No. 4 - 2nd Floor
                        U.S. Courthouse
                        844 King Street
                        Wilmington, Delaware


                        Tuesday, November 23, 1993
                        1:15 p.m.


BEFORE: HONORABLE RODERICK R. McKELVIE
        United States District Court Judge

Pretrial Conference

                WILCOX & FETZER
    1330 King Street - Wilmington, Delaware 19801
                (302) 655-0477
                        Wilcox & Fetzer
                    Registered Professional Reporters



1    The other day Judge Niece had to walk through with

2    me some of the other mistakes that she thought were

3    in there, most of them had to do with issues of law

4    versus issues of fact.  And I'm going to look

5    through them.

6                And there may never be a solution in

7    life about this, but I do think what ends up

8    happening is people compromise by building a camel

9    in the instructions and nobody pays much attention

10    to it.  And I spend an hour up here reading to the

11    jury stuff that just doesn't make a whole lot of

12    sense, but we will keep working on it and we'll see

13    if we can improve it.

14                Okay.  Expert witness.  Let me talk

15    for a minute about patent office practice and

16    procedure on expert witnesses on law.  As people

17    know, the other judges in this district and I have

18    adopted a general practice of stating that we don't

19    allow opinions on issues of law, that we do allow

20    parties to call expert witnesses to testify on

21    patent office practice and procedure.  And while I

22    know that certain lawyers think that's an exception

23    you can drive a truck through and you can offer all

24    kinds of opinion on law, in any event I try to stop

*Wilcox & Fetzer*
Registered Professional Reporters

1  that truck from passing through this courtroom.

2  And I like to try to be as clear as I can be about

3  what my limitations are so there is no

4  embarrassment during the trial.

5       And if you put a witness on and he's

6  on and off in three minutes because you don't want

7  to here it, I won't let him talk to the jury about

8  it.  I believe witnesses, expert witnesses on

9  patent office practice and procedure tend to be

10  helpful in the sense that you can put them on the

11  stand, they can take the file and they can walk the

12  jury through the file to explain to them what has

13  happened in the patent office and what the context

14  is for what's happening.

15       And maybe that's helpful in part

16  because the Court's limit discovery and testimony

17  on patent office practice and procedure.  For

18  example, we can't have a patent examiner here.  So

19  to me it's almost an evidentiary aid to bring an

20  expert in, hand him a document and use a witness on

21  the stand to walk the jury through a paper that's

22  otherwise admitted into evidence, but they may not

23  understand it other than through argument by

24  counsel.