# EXHIBIT 6

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

Princeton Biochemicals, Inc. v. Beckman Coulter, Inc.
D.N.J.,2004.
Only the Westlaw citation is currently available.
United States District Court,D. New Jersey.
PRINCETON BIOCHEMICALS, INC., Plaintiff,
v.
BECKMAN COULTER, INC., Defendant-Counterclaimant.
**No. Civ.A. 96-5541(MLC).**

June 17, 2004.

Outline of Opinion

| | |
|---|---|
| I. Introduction | 1 |
| II. The Claim in Suit and the Accused Device | 1 |
| III. Patent Prosecution History | 4 |
| IV. Litigation History | 8 |
| V. Claim Construction at Trial | 13 |
| VI. Motion Standards under Rules 50 and 59 | 16 |
| A. Motion for Judgment as a Matter of Law | 16 |
| B. Motion for New Trial | 18 |
| VII. Defendant's Claim of Obviousnes | 19 |

Mark D. Schorr, Sterns & Weinroth, PC, Trenton, NJ, for Plaintiff and Counter Defendant.
Joseph Re, Darrell Olson, Doug Muehlhauser, Knobbe, Martens, Olson & Bear, LLP, Newport Beach, CA, Jay Samuels, Windels, Marx , Lane & Mittendorf, LLP, Princeton, NJ, for Defendant and Counter Claimant.

MEMORANDUM OPINION

COOPER, J.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**
Page 2

| | |
|---|---|
| s | |
| A. Legal Principles | 19 |
| B. Review of the Evidence | 22 |
| 1. Defendant's Evidence on Obviousness | 23 |
| a. Dr. Osborne | 23 |
| b. Mr. Harbaugh | 27 |
| c. Mr. Burolla | 28 |
| d. Mr. Jester | 36 |
| e. Dr. Jorgenson | 41 |
| 2. Plaintiff's Evidence on Obviousness | 57 |
| a. Dr. Guzman | 57 |
| b. Plaintiff's Cross-examination of Dr. Jorgenson | 61 |
| 3. Defendant's Cross-examination of Dr. Guzman | 63 |
| C. Conclusion on Issue of Obviousnes | 73 |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**
Page 3

s
1. Level of Ordinary Skill in the Art 73
2. Scope and Content of Prior Art 74
a. Scope 74
b. Content 77
3. Difference between Prior Art and Claimed Invention 80
4. Any Objective Evidence of Nonobviousness 83
5. Review of Jury Verdict on Obviousness 84
VIII. Defendant's Claim of Prior Invention 85
A. Legal Principles 85
B. Review of the Evidence 88
1. Defendant's Evidence on its Prior Invention 89
2. Plaintiff's Evidence on its Prior 97

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**
Page 4

| | |
|---|---|
| Invention | |
| | 98 |
| a. Dr. Guzman's Narrative of Events | |
| | 104 |
| b. Plaintiff's Corroboration Exhibits | |
| | 105 |
| i. "The May, 1986, materials" | |
| | 125 |
| ii. "The December, 1986, materials" | |
| | 131 |
| iii. Other corroboration materials | |
| | 134 |
| c. Plaintiff's Corroboration Witness | |
| C. Conclusion on Issue of Prior Invention | 142 |
| 1. No Independent Corroboration Evidence | 143 |
| 2. Unreliability of Uncorroborated Inventor Testimony | 147 |
| 3. Review of Jury Verdict on Prior Invention | 151 |
| 4. | 152 |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)
Page 5

| | |
|---|---|
| Alternative Ground: Motion for New Trial | |
| IX. Plaintiff's Claim of Infringement | 157 |
| A. Legal Principles | 157 |
| B. Claim Construction | 158 |
| C. Review of the Evidence | 160 |
| 1. Description of Accused Device | 161 |
| 2. Plaintiff's Evidence on Infringement | 171 |
| a. Dr. Guzman | 171 |
| b. Deposition Testimony of Dr. Osborne | 181 |
| 3. Defendant's Evidence on Infringement | 184 |
| a. Mr. Burolla | 184 |
| b. Dr. Osborne | 187 |
| D. Conclusion on Issue of Infringeme | 190 |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 6

nt
X. Conclusion 194

## I. *Introduction*

*1 This patent case was tried to a jury on plaintiff's claim of infringement and defendant's claims of invalidity on grounds of obviousness and prior invention. During trial, both parties made timely Rule 50 motions, which this Court deferred until post-verdict pursuant to Federal Rule of Civil Procedure ("Rule") 50(b). The verdict was in favor of plaintiff. Defendant timely renewed its motion for judgment as a matter of law, and moved alternatively for a new trial under Rule 59(a).

Adjudication of these motions has required a thorough analysis by the Court of the lengthy pretrial record and the voluminous trial record, applying the established standards for post-trial motions. Based upon that analysis, we will set aside the verdict and enter judgment in favor of defendant on all issues. Alternatively, the motion for new trial will also be granted.

## II. *The Claim in Suit and the Accused Device*

Plaintiff Princeton Biochemicals, Inc. ("plaintiff" or "Princeton") is the owner of U.S. Patent No. 5,045,172 ('the '172 patent) entitled Capillary Electrophoresis Apparatus. The '172 patent is directed to an apparatus for use in the process of capillary electrophoresis whereby proteins and other molecules are separated and detected within fluid samples as a result of application of an electrical charge in a capillary tube.

Electrophoresis, also known as electrophoretic separation, is a phenomenon in which electrically charged particles move at different rates in a conductive buffer medium or fluid, enabling efficient detection of biological components. Capillary electrophoresis, also called zone electrophoresis, is one of several known systems for practicing electrophoretic separation.[FN1]

FN1. The Background section of the '172 patent states in part as follows:

Capillary electrophoresis has been shown to be a technique for obtaining high separation efficiency.... In general, this technique utilizes a fused silica (quartz) capillary with an inside diameter ranging from about 25 microns to about 200 microns, and a length ranging from about 10 centimeters to about 100 centimeters.

....

In the prior art, it is generally known that a material, containing mixtures of substances to be analyzed, can be passed along a capillary tube and through a detector under the influence of an applied voltage. The applied voltage charges the substances and the charges on the substances determine their spacing and their speed of passage along the capillary tube.

('172 patent, col. 1, ll. 50-58 and col. 2, ll. 32-38.)

Plaintiff is the owner/assignee of the '172 patent, which issued on September 3, 1991 and will expire on September 2, 2008. The named inventor, Dr. Norberto Guzman, is the founder, sole employee, and controlling shareholder of the plaintiff corporation. He holds his Ph.D. in biochemistry from Rutgers University and has been continuously employed as a scientist in industry since obtaining that degree, first at Hoffman LaRoche and then at Johnson & Johnson.

Defendant Beckman Coulter, Inc. (formerly known as Beckman Instruments, Inc.) ("defendant" or "Beckman") makes and sells the accused devices, known as the P/ACE 2000 and 5000 Series capillary electrophoresis instruments. Both series contain structures that are identical for purposes of this action, and the parties refer to them generally as the "P/ACE" device or devices. It is stipulated that the accused devices have been marketed since at least 1993, and that the sales have exceeded $50,000,000.

The '172 patent contains 40 claims, but only claim 32 is in issue in this action. Plaintiff seeks damages for alleged infringement of claim 32 under 35 U.S.C. § ("Section") 271(a). Defendant denies infringement and counterclaims for a declaration of invalidity on grounds of obviousness under Section 103, and prior invention under Section 102(g). This trial addressed issues of liability and invalidity only, with damages issues bifurcated to a later trial. (9-25-00 Order at 53; 3-27-97 Mem. & Order.) [FN2]

FN2. We will cite chiefly to the trial transcripts and trial exhibits in this opinion. All trial exhibits bear designations "PX" or "DX," which we cite as P- and Dfor convenience. Additional portions of the litigation file are identified when cited. Docketed filings in this Court are identified by docket entry date and page, for

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 7

example, "9-25-00 Order at 5."
The trial testimony is contained in 17 volumes of transcripts, totaling approximately 2,000 pages. In quoting testimony we have corrected obvious clerical errors, but none affecting the meaning of the text. We have also inserted bracketed material where needed for comprehension, and deleted conversational material. The transcripts are cited by volume number and page rather than by date, for example, "Tr. 2 at 6-8," according to the following table:

| Vol. No. | Date | Vol. No. | Date |
|---|---|---|---|
| 1 | 9-5-01 a.m. | 10 | 9-13-01 a.m. |
| 2 | 9-6-01 a.m. | 11 | 9-13-01 p.m. |
| 3 | 9-6-01 p.m. | 12 | 9-14-01 a.m. |
| 4 | 9-7-01 a.m. | 13 | 9-14-01 p.m. |
| 5 | 9-7-01 p.m. | 14 | 9-17-01 a.m. |
| 6 | 9-10-01 a.m. | 15 | 9-17-01 p.m. |
| 7 | 9-10-01 p.m. | 16 | 9-18-01 a.m. |
| 8 | 9-12-01 a.m. | 17 | 9-18-01 p.m. |
| 9 | 9-12-01 p.m. | | |

The parties also submitted briefs in support of and opposition to defendant's post-trial motions, which we will refer to by the following abbreviations: Def. Inf. Br., Def. Obv. Br., Def. Pl Br., Pl. Br., Def. Inf. Rep. Br., Def. Obv. Rep. Br., and Def. Pl Rep. Br.

***2** Claim 32 is an independent claim containing eight elements:
Pre. Capillary electrophoresis apparatus comprising
(1) a capillary tube of the type which can be electrically charged,
(2) said capillary tube having first and second ends,
(3) first means at said first end of said capillary tube providing a source of buffer solution and a source of a sample substance to be analyzed,
(4) second means coupled to said apparatus for applying electrical potential across said capillary tube whereby a sample flows through said capillary tube and past said detector,
(5) said first means includes a rotatable table carrying a plurality of sample cups and
(6) a holder for holding an end of said capillary tube in operative relation with one of the said cups, said cups containing either buffer solution or a sample to be analyzed, and
(7) said capillary tube is in the form of a coil of glass tubing
(8) secured to a support member.[FN3]

FN3. The words "secured to a support member" are not present in claim 32 in the final printed version of the '172 patent. (*See* P-1, col. 23, 1. 47.) The parties stipulated at trial that this was a printing error only, and those words (element 8) are part of claim 32 as issued. (Tr. 12 at 120-22.)

(P-1, col. 23, ll. 30-47 (paragraphing added by stipulation, P-72) .)

The Federal Circuit has set some of the parameters of the dispute in its opinion reversing an earlier grant of summary judgment of noninfringement, *Princeton Biochemicals, Inc. v. Beckman Instruments, Inc.*, Federal Circuit No. 98-1525, decided August 19, 1999 ("Fed.Cir.Op."). *See* discussion *infra*, Section IV.

III. *Patent Prosecution History*

The prosecution history resulting in the issuance of the '172 patent containing claim 32 began with the filing of a patent application ("original application") on November

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**
Page 8

25, 1987. That original application was abandoned in May, 1989, in favor of a continuation-in-part ("CIP") application that had been filed on November 14, 1988.

An overview of the file history is that elements 1 through 6 of issued claim 32 stem from claim I as it appeared in both the original application and in the CIP application; element 7 stems from CIP application claim 39; and element 8 stems from CIP application claim 40. (*See* Fed. Cir. Op. at 3; 9-25-00 Order at 6.) We next summarize the portions of both application files directed to the issuance of claim 32.

The original application contained 28 claims, including claim 1 in the form quoted in the margin.[FN4] (D-2 at 29-50.) [FN5] All original claims were rejected as obvious under Section 103, in a first office action on June 2, 1988. (*Id.* at 84-87.) That office action rejected claims 1 to 28 as unpatentable over "Jorgenson [FN6] in view of Stevenson [FN7] and Arlinger." [FN8] (*Id.* at 85.) An amendment containing changes not here relevant resulted in a final rejection on October 31, 1988, again rejecting claims 1 to 28 as obvious. (*Id.* at 92-96.) A telephone interview and two more amendments, filed on January 6, 1989 and March 2, 1989, did not overcome the prior rejection. (*Id.* at 97-102 and 105-08.) The application terminated with a Notice of Abandonment on May 31, 1989. (*Id.* at 109.)

FN4. Claim 1 in the original application, filed on November 25, 1987, stated as follows:

1. Capillary electrophoresis apparatus comprising

a capillary tube of the type which can be electrically charged, said capillary tube having first and second ends,

a detector adjacent to said capillary tube,

first means at said first end of said capillary tube providing a source of buffer solution and a source of a sample substance to be analyzed,

second means coupled to said apparatus for applying electrical potential across said capillary tube whereby a sample flows through said capillary tube and past said detector, and

said first means includes a rotatable table carrying a plurality of sample cups and a holder for holding an end of said capillary in operative relation with one of the said cups, said cups containing either buffer solution or a sample to be analyzed.

(D-2 at 28.)

FN5. Exhibits D-2 and D-3 are the file histories of the original patent application and the CIP application, respectively. At trial, they were also admitted into evidence as plaintiff's exhibits P-2 and P-3. (Tr. 3 at 6-7.) For purposes of this opinion, we will refer solely to D-2 and D-3.

FN6. The Jorgenson reference (P-93) is an article by James W. Jorgenson entitled "Capillary Zone Electrophoresis," in a book edited by Jorgenson entitled *New Directions in Electrophoretic Methods* (1987) ( "Jorgenson article"). (*See* P-1 at 1.) There is also an article by Rose and Jorgenson cited in the '172 file history entitled "Characterization and Automation of Sample Introduction Methods for Capillary Zone Electrophoresis," in Analytical Chemistry, vol. 60, no. 7, Apr. 1, 1988 at 642-48 ("Rose/Jorgenson article"). (*See* P-1 at 1.) This latter article is discussed *infra,* n.28.

FN7. The Stevenson reference (D-4) is U.S. Patent No. 3,918,913 ("Stevenson"). (*See* P-1 at 1.)

FN8. The Arlinger reference (P-96) is U.S. Patent No. 3,948,753 ("Arlinger"). (*See* P-1 at 1.)

*3 The CIP application had meanwhile been filed on November 14, 1988, approximately one year after the filing of the original application. (D-3 at 5.) That application contained a total of 49 claims. Claim 1 of the CIP application was identical to claim 1 of the original application insofar as relevant to this case. (*See* Fed. Cir. Op. at 9.) Claim 39 of the CIP application was "[t]he apparatus defined in claim 1 wherein said capillary tube is in the form of a coil of glass tubing." (D-3 at 60.) Claim 40 of that application was "[t]he apparatus defined in claim 39 wherein said coil of glass tubing is secured to a support member." (*Id.*)

The first office action in response to the CIP application was a rejection of many of the claims including claims 1 and 39. (*Id.* at 69.) As before, claim 1 was rejected on the grounds of obviousness due to "Jorgenson in view of Stevenson et al and Arlinger." (*Id.* at 70.) Claim 39 was rejected for obviousness reasons as well, with that claim found "unpatentable over Jorgenson in view of Stevenson et al and Arlinger as applied to claims 1-28 and 48 above, and further in view of Akiyama." [FN9] (*Id.* at 72.) The examiner objected to, but did not reject, claim 40, on the ground that it depended upon rejected claims. But the examiner stated that claim 40 "would be allowable if rewritten in independent form including all of the limitations of the base claim and any intervening claims." (*Id.* at 73.) Here it may be noted that the examiner did not object to claim 40 on grounds of obviousness.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**
Page 9

FN9. The Akiyama reference (D-5) is U.S. Patent No. 3,941,678 ("Akiyama") (*See* P-1 at 1.)

The applicant responded to the first office action on the CIP application by filing an amended application making a series of changes. (*Id.* at 75-88.) Those changes included moving most of the text of former claim 1 into claim 39, thus combining claim 1 with the coiled glass capillary element of former claim 39. That amended claim 39 thus read:

39. (Amended) Capillary electrophoresis apparatus comprising a capillary tube of the type which can be electrically charged, said capillary tube having first and second ends,

first means at said first end of said capillary tube providing a source of buffer solution and a source of a sample substance to be analyzed,

second means coupled to said apparatus for applying electrical potential across said capillary tube whereby a sample flows through said capillary tube and past said detector,

said first means includes a rotatable table carrying a plurality of sample cups and a holder for holding an end of said capillary tube in operative relation with one of the said cups, said cups containing either buffer solution or a sample to be analyzed, and

said capillary tube is in the form of a coil of glass tubing.

(*Id.* at 88.)

The Patent Office issued a final rejection of the CIP application on September 5, 1990. (*Id.* at 96.) That notice allowed certain claims but continued to reject amended claim 39 and several other claims, and continued to object to claim 40. (*Id.*) This time the examiner cited the Jorgenson, Stevenson, and Akiyama references in rejecting as obvious certain claims, including amended claim 39. (*Id.* at 98.) The objection to claim 40 remained the same, the examiner again indicating that he would allow claim 40 if it were combined with the elements of claims 1 and 39. (*Id.* at 99-100.) The applicant adopted the examiner's suggestion in its October 11, 1990 amendment, combining the language of CIP claims 1, 39 and 40 into amended claim 39. (*Id.* at 103.) Thus, for the first time in the prosecution history, element 8, consisting of the words "secured to a support member," were added at the end of the language of combined claims 1 and 39.

*4 The second amended CIP application received a Notice of Allowability on October 26, 1990, and the '172 patent was issued on September 3, 1991. (*Id.* at 107; P-1 at 1.) In the process, amended claim 39 was renumbered to be claim 32. (D-3 at 88.) The result of this prosecution history is that claim 32, as issued, contains elements 1 through 6 of original application claim 1 (which were carried forward unamended into CIP application claim 1), combined with elements 7 and 8 stemming from CIP claims 39 and 40.[FN10] (*See* Fed. Cir. Op. at 9-10.)

FN10. A more detailed review of the file history pertaining to claim 32 is in Section VII, *infra.*

IV. *Litigation History*

Plaintiff commenced this action against defendant on November 21, 1996, alleging that defendant's P/ACE devices infringe the '172 patent. Defendant denied infringement and counterclaimed for a declaration of invalidity. There was no injunctive phase. A bifurcation order was entered providing that adjudication of issues of willful infringement and damages would follow adjudication of liability and invalidity issues, and discovery ensued. (3-27-97 Mem. & Order.)

Defendant moved for summary judgment of noninfringement, and plaintiff cross-moved for partial summary judgment of infringement. This Court held a Markman hearing directed to construing only the "holder limitation" of element 6 of claim 32, as requested by defendant in its motion. (10-27-97 Tr., filed 12-5-97.) We issued an opinion granting defendant summary judgment of noninfringement on grounds of both literal infringement and doctrine of equivalents. (6-25-98 Memo. & Order.) Plaintiff appealed only the literal infringement ruling. (Fed. Cir. Op. at 5, n.2.) The Federal Circuit reversed, holding that this Court had erred in its claim construction of that limitation and therefore its infringement analysis of the accused device could not stand. (*Id.* at 11-12.)

The Federal Circuit appeal concerned only the construction of the "holder" limitation of element 6 of claim 32, namely the words "a holder for holding an end of said capillary tube in operative relation with one of the said cups." (*Id.* at 2.) That Court described the dispute as follows:

The P/ACE devices consist of an apparatus in which a vertically moving table and sample cup is "in operative relation" with a stationary capillary. The parties disputed whether the claim covers only the embodiment where the holder and the capillary tube move vertically toward a stationary sample cup and table, or also the alternative embodiment in which the sample cup and table move vertically toward a stationary holder and capillary tube as in the accused devices.[FN11]

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

FN11. Plaintiff has argued that this and other language in the Federal Circuit Opinion constitutes a ruling that the accused device does in fact contain a "holder" within the meaning of element 6. (Tr. 6 at 14-19.) We rejected that notion because the same opinion ruled that the issue of infringement based on the "holder" limitation was not decided by the Circuit on appeal. (*Id.*) *See* n.12 *infra* and accompanying text.

(*Id.* at 3 (emphasis added).)

This Court had construed the language "in operative relation" to require vertical movement of the structure that holds the capillary toward sample cups, and not to encompass the opposite action, vertical movement of the sample cups or the table holding the sample cups toward a stationary structure holding the capillary. (*Id.* at 3-4.) Based upon that claim construction, we had concluded that the accused device did not infringe claim 32 for two reasons, stating that "[t]he capillary in the alleged infringing device is stationary; it does not move vertically. Moreover, the alleged infringing device has no holder for the capillary at all." (*Id.* at 4-5, quoting 6-25-98 Mem. & Order at 18.)

*5 The appeals court opinion relied upon its reading of both the claim language and the written description. (Fed. Cir. Op. at 6-7.) It also pointed out that a close reading of the prosecution history reveals that although there were some narrowing amendments submitted during the course of the original application, those amendments did not result in the issuance of claim 32. (*Id.* at 8-9.) Finally, it made reference to the prior art, specifically Jorgenson and Stevenson, stating that "the prior art discloses embodiments in which capillary tubes, individual sample cups, and rotatable sample tables are raised and lowered." (*Id.* at 11.) For those reasons, the Court held that "the proper interpretation of the holder limitation is that "in operative relation" encompasses both vertical movement of the holder as well as vertical movement of the sample cups and table." (*Id.* at 3-4.)

The final point addressed in the Federal Circuit opinion was plaintiff's contention that having reversed the district court's claim interpretation, that court should grant plaintiff's motion for summary judgment of infringement as to the holder limitation. The Court declined to so rule, stating that the issue was not before it in that appeal.[FN12]

FN12. This was the Circuit ruling on this point, in its entirety:

Finally, Princeton urges that if we are to reverse the district court's claim interpretation, as we have done, we should also grant summary judgment of literal infringement as the P/ACE devices contain a "holder" in the form of either the cartridge which houses the coiled capillary tube itself or the plugs which seal the capillary tube ends to the cartridge wall at the inlet and outlet openings. Beckman asserts that this is inappropriate as the district court dismissed Princeton's motion for summary judgment of infringement as moot and thus is not before us on appeal. We agree with Beckman. In this case, the proper disposition is for us to remand the case to the district court to determine the issue of literal infringement in light of the correct claim interpretation. Although the district court determined that "the alleged infringing device has no holder for the capillary at all," Slip op. at 18, this finding was based on an incorrect claim interpretation and thus cannot stand.

(Fed. Cir. Op. at 11-12.)

Discovery and motion practice continued upon remand. Plaintiff moved to amend the complaint to include in its infringement claim a later series of defendant's instruments, called the P/ACE MDQ series. That motion was denied by the Magistrate Judge and not appealed to the District Judge. (3-6-00 Order.) Defendant moved again for summary judgment, this time seeking a declaration of invalidity on grounds of obviousness. We issued an opinion denying that summary judgment motion, ruling that plaintiff's opposition papers had sufficed to establish the existence of factual issues. (12-29-00 Mem. & Order.)

Following entry of the Pretrial Order, the parties engaged in extensive *in limine* motion practice. (*See generally* docket entries 74-112.) The resolution of those motions included two evidentiary hearings, one on a document authenticity issue and the other a Daubert hearing on one of defendant's expert witnesses. (4-4-01 H'g Tr., docket entry 107; 5-22-01 H'g Tr., docket entry 109 .) Certain evidentiary rulings were made in the course of the in *limine* motions, and others were made during the ensuing trial. Also during the trial, this Court conducted (out of the presence of the jury) a Daubert hearing regarding the scope of Dr. Guzman's proposed expert testimony, and a Markman hearing to construe claim 32 in its entirety. (Tr. 4 at 104-48; Tr. 5 at 3-60; Tr. 6 at 3-57.) To the extent that the evidentiary and claim construction rulings made during the pretrial and trial proceedings are pertinent to this opinion, they are addressed in the discussion sections *infra.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**
Page 11

The jury trial was conducted in nine days of trial sessions. (*See* n.2 supra.) Plaintiff presented Dr. Guzman as both fact and expert witness, and also a fact witness named Dr. Olsen. (Tr. 3 at 9-55; Tr. 4 at 44-80; Tr. 5 at 59-101; Tr. 7 at 4-76; Tr. 8 at 14-230; Tr. 9 at 15-57; Tr. 10 at 3-195; Tr. 11 at 3-23.) Defendant presented fact witnesses named Dr. Osborne and Messrs. Burolla and Harbaugh, and expert witnesses named Dr. Jorgenson and Mr. Jester. (Tr. 11 at 57-84; Tr. 12 at 3-204; Tr. 13 at 3-102; Tr. 14 at 11-108 .) Each side used deposition excerpts of party witnesses as testimonial evidence. Plaintiff used portions of Dr. Osborne's deposition (Tr. 11 at 25-53), and defendant used portions of Dr. Guzman's depositions. (Tr. 14 at 3-5; Tr. 16 at 45; Defendant's Submission of Citations to Deposition Videoclips Presented During Trial, dated 9-18-01, docket entry 171.) Stipulations were also made part of the record at various points in the trial. (*See, e.g.,* Tr. 9 at 59-61; Tr. 14 at 109.)

***6** Both parties moved for judgment as a matter of law before the case was submitted to the jury, and we reserved judgment until appropriate motions could be filed post-verdict. (Tr. 16 at 45-46.) During deliberations the jury asked one question, which was discussed at length with counsel and was responded to as shown in the record. (*Id.* at 15-38; docket entry 168.) The verdict sheet, reproduced in the margin, was answered by the jury in favor of plaintiff on all issues.FN13

FN13. The verdict sheet asked and was answered as follows:

1. Do you find that Princeton has proven by a preponderance of the evidence that Beckman's P/ACE devices infringe Claim 32 of the patent?

Yes *X* No _____

2. Do you find that Beckman has proven by clear and convincing evidence that Claim 32 of the patent is invalid because the subject matter of that claim would have been obvious in view of the prior art?

Yes _____ No *X*

3. Do you find that Beckman has proven by clear and convincing evidence that Claim 32 of the patent is invalid because the invention described in that claim was made by Beckman before it was made by Princeton?

Yes _____ No *X*

(Docket entry 169.)

V. *Claim Construction at Trial*

Certain basic legal principles guided our approach to claim construction for the trial. Patent claims must be interpreted to determine the scope of the invention and the meaning of the words used in the claim. Construction of a patent claim is a matter of law exclusively for the court. *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 979 (Fed.Cir.1995), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996). Claims are construed the same way for purposes of validity and infringement. *Id.,* 52 F.3d at 1025 n. 7. In general, words in a claim must be given their ordinary and customary meaning. *Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.,* 214 F.3d 1302, 1307 (Fed.Cir.2000); *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996). To interpret an asserted claim, the court should look first to the intrinsic evidence, which is the patent itself, including the claims, the specification and the prosecution history. *Id.*

The parties during trial provided the Court with undisputed recommended claim construction language for a few of the limitations of claim 32. They did agree, based upon the outcome of the prior appeal, that the phrase "in operative relation" in element 6 means "that the end of the capillary can move toward the cups or the cups can move upward toward the end of the capillary." They also agreed that most of the words in claim 32 could have their ordinary English meaning. They further agreed that the entirety of element 4, which is a "means plus function" limitation, would properly be construed to mean "a high voltage power supply which causes sample components to migrate through the capillary."

The rest of the claim construction process was the subject of much debate, both in briefing materials and in oral argument.FN14 The result of the Court's rulings on those issues is reflected in the claim construction set forth in the jury charge.FN15 Here we will highlight only the most

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 12

contentious of those rulings.

FN14. The oral arguments of the parties concerning the claim construction to be used at trial are found in the trial transcripts. (*See* Tr. 6 at 3-54; Tr. 16 at 43-44.) Those were supported in a series of issue briefs submitted during trial ("claim construction trial briefs"). Those briefs, maintained only in chambers under the local rules of this Court at the time, have been filed on the docket under a separate filing order, for convenience on appeal. (Docket entry 170.)

FN15. The construction of claim 32 provided in the jury charge stated in full as follows:

We have something called claim construction in a patent case. To decide the questions of infringement and invalidity, you must first understand what the claims of the patent cover, that is what they prevent anyone else from making or selling. You must use the same claim meaning for both your decision on infringement and your decision on invalidity. In this case it is my duty under the law to define any words or phrases in Claim 32 whose meaning is not plainly apparent. Therefore I must provide you with the definitions of those words or phrases. They are as follows.

If you look at Element 3, the phrase "first means at said first end of said capillary tube providing a source of buffer solution and a source of sample substance to be analyzed," that phrase is defined as a rotatable table carrying a plurality of sample cups and a holder for holding an end of the capillary tube in operative relation with one of the sample cups. That's how I am defining for you Element 3 there.

Then we have Element 4, the phrase, "second means coupled to said apparatus for applying electrical potential across said capillary tube whereby a sample flows through said capillary tube and past said detector," that phrase I am defining for you as a high voltage power supply which causes sample components to migrate through the capillary.

Lastly, down in Element 6, the phrase, "in operative relation" means that the end of the capillary can move toward the cups or the cups can move upward toward the end of the capillary.

You should give all of the remaining words in Claim 32 their ordinary meaning consistent with these instructions, ordinary English word meaning.

(Tr. 15 at 33-34.)

The parties sharply disagreed on the meaning of the "means plus function" language of element 3. Defendant argued that the proper construction of that limitation, under Section 112 ¶ 6, would refer to the function of introducing the fluid into the capillary tube. Based on this premise, defendant contended that since the only structure identified in the patent specification for introducing both a buffer solution and a sample substance into the capillary was a suction, vacuum or peristaltic pump manually connected to the capillary using a tube connector for the application of mild suction, element 3 should be limited to that structure or its structural equivalent. [FN16] Plaintiff argued for an interpretation that a capillary loading feature is not part of claim 32, and that the stated function of element 3 is simply to provide a source of buffer and sample solutions. Plaintiff urged that under that view, a proper construction of element 3 under Section 112 ¶ 6 would refer only to the structures for performing that function explicitly identified in elements 5 and 6, namely the rotatable table and holder limitations of elements 5 and 6.

FN16. A ruling favorable to defendant on this point would enable it to argue that element 3 is not infringed by the accused P/ACE device, which normally uses a pressure injection system to introduce the fluid into the capillary rather than a suction pump. (*See, e.g* . Tr. 12 at 7-10 and 26-27.) Details concerning the capillary injection capabilities of the P/ACE device, and the development of those features in the design phase, are found throughout the trial evidence. (*See, e.g., id.;* Tr. 14 at 41-47.) Despite our ruling on the claim construction of element 3, the details concerning the capillary injection system of the P/ACE device remain relevant to an understanding of the accused device itself, on the issue of infringement. (*See* Section IX *infra.*)

*7 This Court ultimately construed element 3 consistent with the view advanced by plaintiff. (Tr. 6 at 19-54; *see also* n.14 *supra.*) We thus explicitly included the rotatable table and holder limitations of elements 5 and 6 in the construction of element 3.[FN17] Although the parties preserved each of their claim construction objections on the record, defendant does not revisit any claim construction issues in the present motion.

FN17. *See* n.15 *supra,* quoting claim construction in jury charge.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 13

VI. *Motion Standards under Rules 50 and 59*

A. *Motion for Judgment as a Matter of Law*

Rule 50(a)(1) states:
If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue.

A motion for judgment as a matter of law must be made before the submission of the case to the jury. *Id.* at (a)(2). The Court, however, may reserve ruling on the motion for JMOL, and submit the action to the jury "subject to the court's later deciding the legal questions raised by the motion." *Id.* at (b). That was the procedure followed by the Court and the parties in this case. (Tr. 16 at 45-46.)

Rule 50 provides one of many procedural safeguards insuring litigants and the system against an improper outcome in a civil case. Connell v. Sears, Roebuck & Co., 722 F.2d 1542, 1546 (Fed.Cir.1983). A motion for judgment as a matter of law should be granted "only if, viewing all the evidence in favor of the nonmoving party, no reasonable jury could find liability on a particular point." Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 613 (3d Cir.1995). Conversely, judgment as a matter of law is required when "a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find" for the nonmoving party. Rule 50(a); *see* Goodman v. Pa. Tpk. Comm'n, 293 F.3d 655, 665 (3d Cir.2002); Texas Instruments Inc. v. Cypress Semiconductor Corp., 90 F.3d 1558, 1563 (Fed.Cir.1996).

On a motion for judgment as a matter of law, the court's task is to determine "whether there is substantial evidence to support" the jury's verdict. Dawn Equip. Co. v. Ky. Farms, Inc., 140 F.3d 1009, 1014 (Fed.Cir.1998); *see also* Glenn Distribs. Corp. v. Carlisle Plastics, Inc., 297 F.3d 294, 299 (3d Cir.2002). Substantial evidence "is such relevant evidence from the record taken as a whole as a reasonable mind might accept as adequate to support the finding under review." Verdegaal Bros., Inc. v. Union Oil Co., 814 F.2d 628, 631 (Fed.Cir.1987); *see also* Sibia Neurosciences, Inc. v. Cadus Pharm. Corp., 225 F.3d 1349, 1354 (Fed.Cir.2000). To make that legal analysis, a "court must: (1) consider all of the evidence; (2) in a light most favorable to the non-moving party; (3) drawing all reasonable inferences favorable to that party; (4) without determining credibility of witnesses; and (5) without substituting its choice for that of the jury's in deciding between conflicting elements of the evidence." Verdegaal Bros., 814 F.2d at 631; *see also* Sibia, 225 F.3d at 1354-55; *Lightning Lube, Inc. v. Witco Corp.,* 5 F.3d 1153, 1166 (3d Cir.1993).

*8 The court must view the trial record as a whole, Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150-51, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000), and must consider evidence that "both justifies and detracts from the decision of the fact-finder." Sibia, 225 F.3d at 1354-55. In considering evidence that detracts from the jury verdict, the court must accept as true the evidence that is "uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." Reeves, 530 U.S. at 151 (resolving circuit conflict concerning evidence on a Rule 50 motion). "The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury could properly find for that party." Walter v. Holiday Inns, Inc., 985 F.2d 1232, 1238 (3d Cir.1993) (citation omitted). *See* Goodman, 293 F.3d at 665 (observing that "a scintilla of evidence will not enable the non-movant to survive a Rule 50 motion").

B. *Motion for New Trial*

Rule 59(a) states:
A new trial may be granted to all or any of the parties on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States.

The decision to grant or deny a new trial is within the Court's "sound discretion," and "unlike the standard for determining judgment as a matter of law, the court need not view the evidence in the light most favorable to the verdict winner." Eaton Corp. v. Parker Hannifin Corp., 292 F.Supp.2d 555, 566 (D.Del.2003) (citing Allied Chem. Co. v. Daiflon, Inc., 449 U.S. 33, 36, 101 S.Ct. 188, 66 L.Ed.2d 193 (1980)).

New trials may be granted where "the verdict is contrary to the great weight of the evidence." Roebuck v. Drexel Univ., 852 F.2d 715, 735 (3d Cir.1988). A new trial may be granted on this basis, however, "only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks the conscience." Klein v. Hollings, 992 F.2d 1285, 1290 (3d Cir.1993) (citation omitted). Discovery abuses by the nonmovant that prejudice the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 14

movant may also be grounds for a new trial. *Seaboldt v. Pa. R.R. Co.*, 290 F.2d 296, 299-300 (3d Cir.1961).

VII. *Defendant's Claim of Obviousness*

A. *Legal Principles*

A patent shall be presumed valid, and each claim shall be presumed valid independently of the validity of other claims. 35 U.S .C. § 282. The party asserting the invalidity of a patent has the burden of establishing the invalidity of a patent or any claim thereof, which is satisfied only by clear and convincing evidence. *Id.; Bausch & Lomb, Inc. v. Barnes-Hind/Hydrocurve, Inc.*, 796 F.2d 443, 446 (Fed.Cir.1986). Clear and convincing evidence is evidence that proves in the mind of the trier of fact an abiding conviction that the truth of the factual contentions is highly probable. *Intel Corp. v. U.S. Int'l Trade Comm'n*, 946 F.2d 821, 830 (Fed.Cir.1991).

*9 Defendant claims that claim 32 of the '172 patent is invalid on grounds of obviousness and prior invention. If it is invalid on either ground, the patent cannot support an infringement claim by the patent owner. This section will discuss the issues pertaining to obviousness.

An invention cannot be patented if "the difference between the new thing and what was known before is not considered sufficiently great to warrant a patent." *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966) (quoting H.R.1923, 82d Cong., 2d Sess., at 7 (1952)). The standard for determining obviousness is found at Section 103. It states in relevant part:

A patent may not be obtained if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.

35 U.S.C. § 103.

"It is black letter law that the ultimate question of obviousness is a question of law." *Richardson-Vicks v. Upjohn Co.*, 122 F.3d 1476, 1478 (Fed.Cir.1997). To determine whether a claimed invention would have been obvious, a court must consider: (1) the scope and content of the prior art; (2) the differences, if any, between the prior art and the claims at issue; (3) the level of ordinary skill in the art; and (4) any objective evidence of nonobviousness ("the *Graham* factors"). *Graham v. John Deere Co.*, 383 U.S. at 17. *See also* Bausch & Lomb, 796 F.2d at 447. The law presumes that all the prior art references are directly in front of the hypothetical person of ordinary skill. *In re Winslow*, 53 C.C.P.A. 1574, 365 F.2d 1017, 1020 (C.C.P.A.1966); *see Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 454 (Fed.Cir.1985).

An obviousness inquiry is not directed to the so-called point of novelty for a patent claim. The issue turns on whether the claimed subject matter, as a whole, would have been obvious to a person of ordinary skill at the time the invention was made. *Panduit Corp. v.. Dennison Mfg. Co.*, 810 F.2d 1561, 1566 (Fed.Cir.1987); *Union Carbide Corp. v. Am. Can Co.*, 724 F.2d 1567, 1575 (Fed.Cir.1984). The correct legal standard requires also that the collective teachings of the prior art be viewed "as a whole" through the eyes of one skilled in the art. *See, e.g., In re Gorman*, 933 F.2d 982, 986 (Fed.Cir.1991).

The "prior art" is the collection of everything in a particular art or science that pre-dates the patent-in-suit. *In re Yale*, 52 C.C.P.A. 1668, 347 F.2d 995, 1000 (C.C.P.A.1965). The prior art also encompasses the general knowledge of those of ordinary skill in that art. *Para-Ordnance Mfg., Inc. v. SGS Imps. Int'l, Inc.*, 73 F.3d 1085, 1090 (Fed.Cir.1995). In this case it was undisputed that the measuring date for the prior art included at least all patents, publications and devices that were published or offered for sale before November 14, 1987, which was one year before the filing date of the CIP application. 35 U.S.C. § 102(b). (Tr. 15 at 38-39.)

***10** A claimed invention would have been obvious if "there is something in the prior art as a whole to suggest the desirability, and thus the obviousness, of making the [claimed] combination." *In re Beattie*, 974 F.2d 1309, 1311 (Fed.Cir.1992). A suggestion or motivation to modify prior art teachings may be derived from the prior art itself, from the knowledge of one of ordinary skill in the art, or from the nature of the problem to be solved. *Sibia*, 225 F.3d at 1356. Indeed, the suggestion to make the claimed invention may be based upon "the common knowledge and common sense of the person of ordinary skill in the art without any specific hint or suggestion in a particular reference." *In re Bozek*, 57 C.C.P.A. 713, 416 F.2d 1385, 1390 (C.C.P.A.1969). That motivation cannot come from the claimed invention itself; thus it cannot be based on hindsight. *See, e.g., In re Dembiczak*, 175 F.3d 994, 999 (Fed.Cir.1999); *In re Rouffet*, 149 F.3d 1350, 1358 (Fed.Cir.1998); *In re Geiger*, 815 F.2d 686, 688 (Fed.Cir.1987).

The threshold question for the court with respect to obviousness, on a motion for judgment as a matter of law, is "whether the factual findings of the jury, expressed or implied in the verdict, are supported by substantial

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Page 15
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

evidence in the record." Richardson-Vicks, Inc., 122 F.3d at 1478. After determining which, if any, factual findings may be supported by substantial evidence, the court must apply its judgment to the ultimate legal question of whether claim 32 would have been obvious. *Id.*

B. *Review of the Evidence*

The jury in this case was instructed to use the date of November 14, 1987 (one year before the filing date of the CIP application) as the undisputed date on which to identify prior art relevant to the '172 patent. (Tr. 15 at 38-39.) *See* 35 U.S.C. § 102(b). All other underlying facts pertinent to the *Graham* factors were submitted to the jury for its determination, with accompanying jury instructions. (Tr. 15 at 38-39.) We will identify the findings of fact necessarily implicit in the jury's finding of nonobviousness after the following summary of the evidence.[FN18]

FN18. To the degree that the evidence summarized in this section also bears upon the issues of infringement and invalidity due to prior invention, we will refer back and amplify it as necessary in the discussion portions on those issues, Sections VIII and IX, *infra.*

As previously stated, plaintiff's case was presented chiefly through the testimony of its principal, Dr. Guzman. Plaintiff also called a fact witness, Dr. Olsen, whose testimony related only to the issue of prior invention. Defendant called five witnesses at trial, described below. Each party cross-examined each other's witnesses to elicit certain undisputed facts and to challenge other asserted facts. Each party also presented deposition excerpts of the other as trial evidence pursuant to Rule 32(a)(2). Throughout the trial, during the examination of both plaintiff's and defendant's witnesses, trial exhibits were under discussion as identified in the record.[FN19] (*See* n.2 *supra.*)

FN19. Due to the volume of the trial record, we have of necessity selected the segments to summarize and discuss in this opinion. The summary of evidence set forth in this section and in Sections VIII and IX *infra* is based upon the Rule 50 standards reviewed in Section VI.A *supra.*

1. *Defendant's Evidence on Obviousness*

Defendant presented fact testimony from Dr. Osborne and Messrs. Burolla and Harbaugh (current and former Beckman employees). There was expert testimony from an independent patent attorney, Mr. Jester, limited to an explanation of the '172 file history and Patent Office procedure. (*See* 11-4-01 Tr.; 6-28-01 Order.) Finally, defendant offered expert opinion testimony from Dr. Jorgenson (not affiliated with Beckman), himself one of those cited for prior art in the prosecution history. (*See* n.6 *supra* and accompanying text.) Defendant also elicited certain points relevant to obviousness from plaintiff's witness, Dr. Guzman. (*See* Section VII.B.3 *infra.*)

a. *Dr. Osborne*

***11** James C. Osborne is vice-president of technology for Beckman. He holds degrees of B.S. in chemistry, M.S. in physical chemistry, and Ph.D. in biochemistry. He has worked at Beckman since September, 1985. (Tr. 11 at 57-58.) A summary of his testimony is as follows.

Beckman makes and sells diagnostic tests and analytical instruments for use in academic research labs, biotech research companies, and medical laboratories. Its products include systems for separation and analysis of compounds and for drug development. Examples include the "ultracentrifuge" equipment used by Dr. Salk to isolate the polio vaccine, systems used in the sequencing of the human genome, and automated robots used in processing samples in large labs such as pharmaceutical companies. (*Id.* at 58-60.)

Beckman has long been the leading manufacturer of ultra-centrifuges. A centrifuge separates samples by spinning a rotor at a very high RPM, causing the samples to separate at different rates. As of the mid-1980's it also had an HPLC (high pressure liquid chromatography) product line. When Osborne arrived at Beckman in 1985 as manager of centrifuge applications and research, Beckman felt its business was sample separation. It was looking at other ways to separate compounds, and capillary electrophoresis was viewed as a natural extension of its product lines. Essentially, capillary electrophoresis devices use only a small volume of sample, and separate compounds in the capillary. (*Id.* at 60-62.)

The status of capillary electrophoresis product development research at Beckman as of September, 1985 was that Beckman had, since 1984, an existing exclusive research contract for capillary electrophoresis with the laboratory of Dr. Richard Zare on the campus of Stanford University at Palo Alto, California. Dr. Zare holds an endowed professorship in chemistry at Stanford University and is a worldwide celebrated scientist in laser

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**
Page 16

manipulation of molecules and capillary electrophoresis. The purpose of the contract was to have the high-risk capillary electrophoresis done in a senior scientist's lab outside the company, and if that research demonstrated feasibility, Beckman would move the research in-house and address making a product out of it. (*Id.* at 62-65.)

Dr. Zare had developed in his lab a capillary electrophoresis system consisting of components arranged on an "optical bench," like a lab table. As of September, 1985, Dr. Zare's system had a detector and a gas laser aimed at a block through a series of mirrors and lenses. There was a long capillary inserted through the block. At each end of the capillary would be an inlet or outlet reservoir or cup. The end of the capillary was manually inserted into the lid (septum) of the cup during the run. The system also included electrodes going into the cups, and a high voltage power supply. Beckman's response, according to Dr. Osborne, was:

We were excited about his device because he was able to show the separation in a reasonable amount of time. He was showing that you could use the high voltage in a fairly safe way. But there were some drawbacks of his work. One was that he did not have temperature control. The second was that he was manipulating the ends of the capillary. And these capillaries are very fragile and they break. And when they break or become fractured, it affects the separation. The third thing we found out with Dr. Zare's device is that when the capillary swayed during the run, it affected the separation. So we wanted to address in our program temperature control, and we were convinced that we did not want to manipulate the tips of the capillary. And we did not want the capillary moving during the separation.

***12** (*Id.* at 65-67.)

Dr. Osborne and other scientists at Beckman observed the structure and operation of that system at Dr. Zare's lab. Next, Beckman set up a small replica in its own lab, just to show that it could reproduce Dr. Zare's work in-house. Dr. Osborne's responsibility focused on the science of the project, and at that point it was ready to turn over to the engineering department. The engineering team would be responsible to design a capillary electrophoresis product, in collaboration with the scientists and the applications area. The project was dubbed the OTEP project, and chief engineer Victor Burolla was assigned as team leader. (*Id.* at 67-68.)

The OTEP project was initially funded at approximately $250,000, beginning in about April, 1986. (*Id.* at 68.) Dr. Osborne testified that Beckman also had as a resource its own vast experience in designing and making analytical instrumentation, including auto-sampling (i.e., rotatable tables), temperature control, optical design, and computer control providing "walk-away automation." (*Id.* at 69-70.) He cited Beckman's existing HPLC product line and the 6300 amino acid separation product line in terms of auto-sampling, and the latter product as having a coiled capillary since the late 1960's. (*Id.* at 70-71.)

Dr. Osborne was one of the supervisors who received periodic reports on the progress of the OTEP project. He identified the Beckman file materials entered into evidence as the regularly maintained business records pertaining to the OTEP project, and gave an overview of its chronology and results. He confirmed that the OTEP project led to commercialization in the form of the P/ACE device. (*Id.* at 70-84.) That testimony led to the detailed description of the project provided in the ensuing trial testimony by Mr. Burolla, the project leader. Dr. Osborne added that the field of capillary electrophoresis research was very active during the 1984 through 1986 time frame, led by Dr. Zare, Dr. Jorgenson, a researcher named Everaerts, and a few others whose names he recalled from that period. (*Id.* at 84.)

The accused P/ACE device was described in some detail by Dr. Osborne. Since that part of his testimony pertains to the infringement issue, it is summarized *infra,* Section IX. Relevant to the topic of obviousness, however, he listed the several of types of electrophoresis that the P/ACE device can perform, describing them as follows:

• Isotachophoresis-The components in the sample are separated by additives to the buffer and then the separated bands move at the same speed through the capillary.

• Capillary gel electrophoresis-Gel is inserted into the capillary and the components are separated based on their interaction with the gel. This is distinguished from "gel slab electrophoresis," which is electrophoresis, but without a capillary.

• Isoelectric focusing-The components in the sample are separated based on their isoelectric point.

***13** • Open tube capillary electrophoresis-[Explaining that] there are a great variety of different buffers that can be used in open tube capillary electrophoresis.

(Tr. 12 at 3-5.) Dr. Osborne stated that the latter mode is also called "capillary zone electrophoresis," which is the mode in the P/ACE device that plaintiff contends infringes claim 32. (*Id.* at 23-24.) He further explained that in each of the above modes, the P/ACE device permits the operator to decide whether the inside wall of the capillary will be charged or neutral, stating that in the first three modes the capillary wall should be uncharged. (Tr. 11 at 5.) He confirmed that there is a separate portion of the P/ACE device Operating Manual for the latter mode, and that the name of the entire device gets its last two letters, CE, from the words capillary electrophoresis.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**
Page 17

(Tr. 12 at 22-24.)

b. *Mr. Harbaugh*

Jon Harbaugh is a former Beckman employee, having worked there from 1969 until he retired in 1993 and became a college professor in business administration. He holds degrees of B.S. and M.S. in chemistry, and an M.B.A. in business. (Tr. 12 at 34-35.) He worked as an applications research chemist at Beckman for his first five years, then moved into marketing management positions. (*Id.* at 36-39.)

Mr. Harbaugh testified that during his research years, 1969 to 1974, he used instruments called gas chromatographs and amino acid analyzers. Both are separation devices. The gas chromatograph is used to separate, identify and quantify volatile components of a mixture. The amino acid analyzer uses a form of liquid chromatography to separate, identify and quantify amino acids in protein and peptide samples. (*Id.*)

He stated that during the approximately 30 years from the mid 1960's to the mid 1990's, Beckman made and sold an amino acid analyzer product. He described that device as having been equipped with a rotatable table driven by a small electric motor, into which up to 48 samples could be placed for automated operation. Those samples would then be injected into the system in sequence and analyzed by the system. It also had a requirement for maintaining the capillary tube at a certain temperature, which was accomplished by winding the capillary around a mandrel and securing it, then immersing the capillary/mandrel assembly into a temperature-controlled hot water bath. (*Id.*)

Mr. Harbaugh was director of molecular structure research and development at Beckman in 1984, when it first began funding the capillary electrophoresis research in Dr. Zare's lab at Stanford. He stated that he made the initial recommendation to fund that work. He also personally observed Dr. Zare and his graduate students in the project, and was permitted to operate the equipment that they developed there. (*Id.* at 39-42.)

Beckman records show that as of April 10, 1986, Mr. Harbaugh recommended that it launch a product development effort based on Zare's work, and that by April 24, 1986, Beckman had received from Dr. Zare the "protocol" for constructing Zare's lab device in-house as a starting point for that effort. (*Id.* at 43-51.) Mr. Harbaugh stated that he based that recommendation in part on the following awareness:

***14** [T]he capillary tube is not nearly as fragile as I had expected. You can take it and actually wind it around your hand. So that ... what was [a] one meter long, fairly ungainly piece of equipment, is now going to be something that the engineers will be able to package and make it a very user friendly kind of device.

(*Id.* at 43.)

c. *Mr. Burolla*

Victor Burolla is a former Beckman employee. He holds degrees of B.S. in chemical engineering and M.S. in engineering. Prior to joining Beckman in September 1985, he had worked for approximately 14 years in the military and in a laboratory company. (Tr. 14 at 11-12.) In September, 1986, he was assigned as project leader of the OTEP development project, in the engineering department of the division that designed and made centrifuges and other molecular structure products. He explained that the original name of the project, OTEP, meant open tube electrophoresis; later the project was also called HVEC or HIVEC, meaning high voltage electro chromatography. (*Id.* at 12-15 and 61.) His testimony relevant to obviousness may be summarized as follows.

The role of the engineering department in Burolla's division at Beckman was to create engineering designs and the necessary supporting documentation, with reference to industry standards, and convey their results to the manufacturing group to make a commercial product. (*Id.* at 13-14.) As of September, 1986, the OTEP project was managed by Burolla and consisted of a small group including an engineer technician and a computer software engineer. (*Id.* at 31-33.) The team reported to upper management, and it could draw upon internal and external resources by following authorized procedures. (*Id.* at 15-18, 24, 45-46.) Its charter was to determine the feasibility of turning capillary electrophoresis technology into a commercial product for Beckman. (*Id.* at 15.)

Burolla himself had absolutely no experience in capillary electrophoresis when he was assigned to the OTEP project. (*Id.*) He began with an awareness that capillary electrophoresis technology itself had existed since 1930, and that Beckman had been working with Dr. Zare for several years. But Beckman itself had not to date offered a product that could do open tube capillary electrophoresis, nor did it have an existing product that it could modify for that purpose, so in that sense it was a new commercial technology for Beckman. (*Id.* at 18-24, 73-74.)

The plan of action for the OTEP project was established in a Project Authorization document prepared by Burolla

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Page 18
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

and approved by the company on or about October 1, 1986. (D-109, D-111.) The first step was to verify that a replica of the Zare apparatus, which had no autosampler and was not automated, would function in Beckman's lab as it did at Stanford. That meant that the replica apparatus would have to produce the same chemical separations, using the same instructions, as those obtained in Dr. Zare's lab. The next step was to design a first prototype having certain features and capabilities. Those included that the first prototype would be fully automated and computer-controlled; it would allow sample injection using either high voltage electricity or air pressure; and it would perform data collection. It was also anticipated that their device could be compact in size. The target date to design and build the first functioning prototype was the first week of January, 1987, but the desired date was the first week of December, 1986. (*Id.;* Tr. 14 at 15-26, 89-90.)

***15** As he embarked upon the OTEP project, Mr. Burolla first read published articles by a number of researchers, Dr. Jorgenson and his graduate students (including Lukacs and Green) primary among them.[FN20] (*Id.* at 27-29.) He prepared a memo summarizing some of the data and knowledge set forth in those articles, for the use of the team. (*Id.;* D-103.) That memo noted that researchers at the time were seeking the best reproducibility of results and were looking at factors that could affect that, including the electric current in the capillary. (*Id.* at 29.) Another issue for researchers was resolution, meaning that the resulting electropherograms should have sharp, tall peaks to distinguish the components being sampled. It was known that temperature control was required to obtain good resolution, so any device must include components to control and measure the temperature. (*Id.* at 29-31, 33-34.)

FN20. Burolla's literature review did not list the references to Chilla, Macko, Everaerts or an LKB device discussed *infra* in this section. (Tr. 14 at 91-92.)

The first Beckman capillary electrophoresis prototype was called OTEP I. (*Id.* at 38.) Mr. Burolla testified that it was completed ahead of schedule on the day before Thanksgiving, November 26, 1986, and it successfully produced its first electropherogram the following week, on December 2, 1986.[FN21] (*Id.* at 23, 45-48.) Beckman documented that OTEP I was delivered from the engineering department to the research and applications group on December 15, 1986. (D-100 at 1.) The following month, on January 28, 1987, it was deactivated and refurbished into OTEP II. (Tr. 14 at 88, 97-98; D-112 at 2.) [FN22]

FN21. The documentation for the OTEP I and OTEP II phase was maintained by Mr. Burolla as team leader during the project. It was received in evidence without objection as the regularly maintained business records of Beckman. (*See, e.g.,* Tr. 11 at 75-77; Tr. 14 at 16, 23-24, 26-27, 31-32, 48-50, 54-55, 57-58, 61-66, 96-97.) Those documents included task allocations and timetables, hardware and software specifications, sequentially numbered engineering specifications, purchase requisitions, periodic team progress reports and management reports, and electropherograms. (*Id.*) Of those, the only documents noted on the record to be undated were some of the sequentially numbered engineering drawings, surrounded by others in the series that were dated. (*Id.* at 51-52, 92-93.) During the OTEP II phase there was also an engineering log maintained, to record the progress of development of the capillary cartridge. (*Id.* at 48-49.) Finally, the OTEP II device itself was shown in photographic slides and prints from the slides. Those slides were date-stamped in March, 1987. (*Id.* at 65-69; D-122.)

FN22. Plaintiff has suggested, in the context of the prior inventorship issue, that if Beckman had the claim 32 invention in the OTEP I design, it abandoned that design in January, 1987 when OTEP I was deactivated. Beckman replies that the design of OTEP II built upon the work done to create OTEP I. We need not reach an issue of abandonment in the present motion, because Beckman relies on OTEP II and its undisputed invention date of February 1, 1987, for purposes of its motion on prior inventorship. *See* Section VIII *infra.*

Mr. Burolla described the features of the OTEP I device, summarizing the relevant documentation in evidence, *see* n.21 *supra.* (Tr. 14 at 33-45, 50-54.) He also drew a rough sketch of OTEP I at trial and used it as a visual aid to explain his testimony to the jury. (*Id.;* D-310.) He described OTEP I as a capillary electrophoresis device equipped with a rotatable table with openings for a number of vials. "We could load up five different samples, for example, program the device, walk away from it, and sometime later we could get results from five different separations...." (Tr. 14 at 35.) "It gave us an electropherogram as a result. But basically what it did was it applied an electric potential to a capillary where the ends of the capillary were immersed in a solution that was

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**
Page 19

electrically conductive. We could also automate the process of injecting sample into the capillary either by pressure or voltage." (*Id.* at 37.) His description of the components that surrounded the capillary in OTEP I was as follows:

Q [Referring to D-310, trial sketch.] If you could describe how it works?

A Sure. These are the fundamental elements of it. I'll start from one end and work my way through. We would have a sample table which is basically a rotating disk, the box with holes in it. Each hole would hold a vial ..., just a plastic vial that would hold liquid. And underneath the vial there'd be a pneumatic cylinder that would push the vial up and down so that we didn't have to move the capillary. We could just lift the vial up and down and get into the capillary.

***16** Immediately above that there was an acrylic block that held both the electrode, the end of the capillary and a-actually there's one part missing [in the sketch]-there is also a feed to a cylinder to provide pressure. So that when this vial came up in contact with this acrylic block, there was an O ring in here that we could-if we pressurized the space inside this block, then we'd be pressurizing that entire air space and forcing liquid up into the capillary.... And at the top here, the capillary was sealed against this block. So was the electrode. So was this pressure tube.

The capillary went from there to this aluminum bath that I described earlier, this aluminum box that held water.FN23 It was coiled inside, came out this end, went to another aluminum block that ... we'll call the detector. It had some fiber optics that would bring in a laser signal and export a laser signal to the [detector]....

FN23. The reference to an aluminum bath, also referred to as a temperature chamber, is to the following Burolla testimony about the OTEP I device:

Q You mentioned water surrounding the column. How did the water surround the column?

THE COURT: When you say column, you're talking about the capillary tube?

A Yes. We created basically a metal box that we could thread the capillary into and out of, and put a lid on this box. And it had an inlet and outlet where we pumped water of a known temperature into and out of it. So that the capillary inside this box was completely immersed in this water solution.

Q How was the capillary configured inside the metal box?

A We tried to cram as much capillary as we could inside there. So what we did was we took a plastic cylinder and cut grooves in it-we actually cut a tread in it, but it's the effect of cutting grooves-and we wound the capillary around that cylinder in those grooves, and made sure it exited the box at the two locations through fittings that would prevent it from leaking around the capillary.

Q You're now referring to the prototype that was built in phase one of OTEP by November 26th?

A. Yes.

(Tr. 14 at 36-37.)

Then the capillary would go from there to a block, an acrylic block, that was identical to the one at this [inlet] end and fed in the same way and it also contained an electrode and a pressure fitting. And there was another vial at this end also moved up and down by a pneumatic cylinder. I think that's about it.

Q Can you tell us what the capillary was made of?

A The capillary's made of fused [silica] which is basically very pure glass....

Q And the sample table, did it provide both the buffer and sample?

A It could provide anything that we needed to provide it.

Q Describe how the fluids got into the capillary.

A Basically we would just pressurize the air space in these acrylic holders and then-it's sort of like the reverse of a straw, you use a straw to suck liquid up into your mouth. If you pressurize the air space above, you're forcing liquid into the capillary and it goes to the other side. So we'd either pressurize this end or this end, not both, and liquid would flow through it.

Q You were able to lift a vial up out of the table up against that acrylic holder?

A We have [an] acrylic holder, right. This was an acrylic block so that we could see ... what's going on inside.... But we had cylinders down here [below the vials], pneumatic cylinders that we would pressurize and would force this vial and provide actually significant force against this acrylic holder so that we had an O ring that would seal it. And so we could pressurize this to 20, 30, ... 40 PST to get the liquid moving through there [the capillary] pretty quickly.

(*Id.* at 39-43.)Q [Referring to engineering drawing D-125, page 19.] Use your pointer and describe the features of the temperature chamber.

A.... [I]f you look [at] this side view-this is as if you were looking at the side and you had sliced this box ... right about in the middle-what would you see?

The hatched area in general indicates solid material. The non-hatched area indicates open space. So this would be the space filled with water and holding the capillary and the cylinder that the capillary was wound around.

***17** In addition to that, you need to have the capillary go into and out of this box. That's shown by this threaded

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 20

hole and this threaded hole. We had a special fitting that we insert here and that we thread the capillary through it and then tighten that fitting around the capillary.
In addition to that, you'd have to have some fittings for the water to enter and exit. That's what this is.

(*Id.* at 52-53.) FN24

FN24. We observe that Mr. Burolla's description of the OTEP I device encompasses all of the elements of claim 32 of the patent in suit, and Beckman does not dispute that for purposes of this case. This point is discussed *infra* in this section and in Section IX.

OTEP I met the design criteria of being completely computer-controlled and had several other advantages, according to Mr. Burolla. Those included the fact that the capillary was coiled and secured and temperature-controlled; fluid could be injected into the capillary by air pressure rather than voltage; and the flexible but fragile glass capillary remained stationary above a vertically moving vial. One of the disadvantages of OTEP I was that the capillary was threaded through a series of blocks or boxes, with fittings tightened around the capillary at each capillary hole, and was prone to breakage. The replacement process was then very tedious. (*Id.* at 23, 37-38, 42-44, 52-53, 60-62.)

Phase Two of the project was development of the OTEP II prototype. Mr. Burolla stated that the disadvantage referred to above was overcome in the design of the OTEP II prototype. (*Id.* at 60-61.) His discussion of the relevant components of OTEP II and the commercial P/ACE device pertains primarily to the infringement issue, and is set forth in Section IX *infra.*

Mr. Burolla stated that OTEP II was completed in January, 1987. (*Id.* at 61, 69.) Beckman documented, and Burolla testified, that on February 1, 1987, the operational OTEP II was delivered from the engineering department to the research and applications group for further commercial development. FN25 (*Id.* at 61-62, 97-98; D-100 at 1; D-112 at 2.)

FN25. The documentary evidence pertaining to OTEP II is described *supra* n. 21.

The project was called HiVEC by April, 1987. Mr. Burolla remained with it for the further steps that led to the commercial release of the first P/ACE models in 1989. (Tr. 14 at 70-71.) He confirmed that the P/ACE device resulted from the OTEP project. (*Id.* at 14-15.) The Beckman 1990 Annual Report referred to the P/ACE launch, stating that it took just three months to completely automate the capillary electrophoresis process. Mr. Burolla testified that this was a reference to the period from September to December, 1986, during which the design, assembly and testing of OTEP I was accomplished by his project team. FN26 (*Id.* at 73-74; P-67.)

FN26. The 1990 Beckman Annual Report also contains the following statements: "According to Senior Engineer Vic Burolla, ... capillary electrophoresis is a fundamentally different way to separate samples; as with any new technology, there is a lot to be learned.... We were starting from ground zero on this one." (P-67 at 7.) Mr. Burolla testified he did not believe that the "ground zero" language was his wording, but what he meant by that was "there was not any experience within Beckman in capillary electrophoresis that we could draw on." (Tr. 14 at 73-74.) On cross-examination he agreed that capillary electrophoresis was a fundamentally different way to separate samples in view of what Beckman had done in the past. (*Id.* at 95-96.)

d. *Mr. Jester*

Michael H. Jester is a registered patent attorney with 25 years of patent practice experience. The evidence showed no affiliation of Mr. Jester with defendant other than his retention to serve as an expert witness in this case. (Tr. 12 at 54-57, 157-158.) The Court ruled prior to trial that his expert testimony would be limited to providing the jury with a review of the '172 patent file history and an explanation of relevant patent laws and Patent Office procedures. (4-4-01 H'g Tr.; 6-28-01 Order.) His testimony described the filings and the dialogue between the applicant and the Patent Office that resulted in the issuance of claim 32, summarized *supra,* Section III. (Tr. 12 at 55-167.) Here we set forth that dialogue in the file history, as described during the testimony of Mr. Jester. (D-2; D-3.)

***18** It will be recalled that claim 1 of the original application was identical to claim 1 of the CIP application, in all respects pertinent to this case. (*See* Fed. Cir. Op. at 9.) Claim 1 in each of those applications is the source of elements 1 through 6 of claim 32 as issued. (*Id.* at 3; *compare* text, n.4 *supra, with* P-72.) Claims 39 and 40 made their first appearance in the CIP application, and are the source of elements 7 and 8, respectively, of claim 32 as issued. (*See* Fed. Cir. Op. at 3; P-72.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d Page 21
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

The applicant filed a List of Prior Art form with the original application. (D-2 at 68.) There the applicant listed U.S. patents including Akiyama and Arlinger. (*Id.; see* nn.8 & 9 *supra.*) In its first office action rejecting that application, the Patent Office filed a Notice of References Cited. (D-2 at 90.) That notice listed Arlinger, but added the Stevenson patent, the Jorgenson article, and the Rose/Jorgenson article. (*Id.; see* nn.6 & 7 *supra.*)

The examiner rejected claim 1 in the original application as obvious. FN27 (*See* Section III *supra.*) The examiner never changed that position as to the language of claim 1, throughout the prosecution of both the original application and the CIP application. (D-2 at 93-96; D-3 at 69-72.) The examiner's statement accompanying the original rejection of claim 1 is quoted here as follows:

FN27. There were two examiners who participated in the '172 application process at various times. (*See* Tr. 12 at 87-88, 129-130.) We will refer to them in the singular for purposes of this opinion.

Claims 1 to 28 are rejected under 35 U.S.C. 103 as being unpatentable over Jorgenson in view of Stevenson and Arlinger.
Jorgenson discloses an electrophoretic apparatus. Jorgenson also discloses using the electromigration technique to introduce sample into capillary. Specifically on page 185, Jorgenson recites "The buffer reservoir at the high voltage end is replaced with a reservoir containing sample. High voltage is applied for a specific amount of time (usually a few seconds) and then turned off. The brief application of voltage migrates a narrow band of sample into the capillary. Now the sample reservoir is removed, and the buffer reservoir is replaced. High voltage is again applied, and the electrophoresis run begins."
Applicant's apparatus is considered to be an obvious automation of the manual process described by Jorgenson. For example, Stevenson et al discloses a sample introduction system of a liquid chromatographic system (liquid chromatography and capillary electrophoresis are closely related techniques). This sample introduction system contains all of the critical elements recited in the claims: a rotating turntable, a vertically moving sample probe, etc. Hence, it would be obvious to one skilled in the art to automate apparatus and process of Jorgenson using notoriously well-known automating elements. It has been well-established that the obvious automation of a known manual process is not patentable. See In re Vener and Bowser, 46 C.C.P.A. 754, 262 F.2d 91, 120 USPQ 192 and In re Rundell, 18 C.C.P.A. 1290, 48 F.2d 958, 9 USPQ 220.
Arlinger teaches that it is sometimes desirable to recover the sample after the electrophoretic separation is completed. Arlinger discloses an electrophoretic apparatus with sample recovery means. It would be obvious to one skilled in the art to provide the apparatus with sample recovery means. It would be obvious to one skilled in the art to provide the apparatus and process of Jorgenson with sample recovery means employing automation elements similar to the sample introduction means. Any automation elements not specifically recited in Stevenson et al or differences between the claimed automation element and those of Stevenson et al would be obvious, i.e. dictated by the apparatus and the manual process of Jorgenson. Moreover, some of the claimed automation recited appear to be optional. For example,....
***19** The prior art made of record and not relied upon is considered pertinent to applicant's disclosure.
The article of Rose and Jorgenson shows a sample introduction system which is identical to the applicant's in all essential structure. Although this article cannot be used as a reference to reject claims because of the requirements of 35 U.S.C. 102, the examiner believes this reference supports the examiner's rejection of the claims under 35 U.S.C. 103.

(D-2 at 86-88.) FN28

FN28. In quoting the above text we have corrected obvious clerical errors by observing the retyped versions of most of the above text in later rejections. (*See* D-2 at 94-96; D-3 at 70-72.) Here we also note the last paragraph of the quoted text, which cites and comments upon the Rose/Jorgenson article while stating that it cannot be used as a prior art reference. That comment apparently refers to the fact that the Rose/Jorgenson article is dated April 1, 1988, which is later than November 14, 1987, the one-year cutoff date prior to the filing date of the CIP application. (D-2 at 90.) *See* 35 U.S.C. § 102.

It will also be recalled that in response to the first rejection of the original application, including claim 1, the applicant filed a minor amendment not here relevant and presented argument of nonobviousness, all of which the Patent Office rejected. (*See* Section III *supra.*) That argument from the applicant asserted in pertinent part as follows:
Even though Jorgenson and Arlinger show electrophoresis apparatus and Stevenson shows a rotary apertured table holding sample cups, these references do not provide such teaching as to anticipate the claimed apparatus. The claimed apparatus is considerably more complex than

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 22

apparatus in the prior art and is in commercial form.

(D-2 at 92.)

The examiner rejected those arguments in the following statement:

Applicant's arguments ... have been fully considered but they are not deemed to be persuasive.

The applicant fails to specifically point out how *the language of claims* patentably distinguishes them from the reference. In particular, the applicant fails to show how the amendments avoid such references. Statements such as "The claimed apparatus is considerably more complex than apparatus in the prior art and is in commercial form" ... are considered to be mere allegations of patentability.

(*Id.* at 96 (emphasis in original).)

The CIP application, which contained independent claim 1 and dependent claims 39 and 40 as relevant to this case, was initially met with rejection of claims 1 and 39 as obvious. (*See* Section III *supra;* D-3 at 69.) As before, the examiner cited Jorgenson, Stevenson and Arlinger against numerous claims including claim 1, with the same explanation as during the original application. (*Id.* at 70-72; *see* n.28 *supra* and accompanying text.) The basis for rejection of claim 39 was stated as follows:

Claims 29, 34, 35, 39 and 47 are rejected under 35 U.S.C. 103 as being unpatentable over Jorgenson in view of Stevenson et al and Arlinger as applied to claims 1-28 and 48 above, and further in view of Akiyama.

Akiyama teaches that the two features recited in the above claims are known in the art. Akiyama discloses a capillary electrophoresis apparatus in which the capillary is coiled. Akiyama also discloses means for supplying inert gas to the sample chambers. It would be obvious to one skill [sic] in the art that these features are desirable for any capillary electrophoresis apparatus, manual or automated.

(D-3 at 72.) As for claim 40, the examiner stated:***20**

Claims 31 to 33, 36, 40 to 43, and 49 objected to as being dependent upon a rejected base claim, but would be allowable if rewritten in independent form including all of the limitations of the base claim and any intervening claims.

(*Id.* at 73.)

The applicant responded to the first office action on the CIP application by combining the language of claims 1 and 39 and arguing:

Claim 39 is in independent form and includes the elements of claim 1. This claim calls for the capillary tubing being in the form of a coil of glass tubing and should be allowable like claim 40.

(*Id.* at 90.)

The examiner rejected amended claim 39, stating as follows:

Claims 39 and 50 are rejected under 35 U.S.C. 103 as being unpatentable over Jorgenson in view of Stevenson et al and Akiyana [sic]. See rejection of claim 39 in previous Office action for details. Applicant's arguments ... have been fully considered but they are not deemed to be persuasive.

(*Id.* at 98.)

Ultimately, the applicant did combine the language of claims 1, 39 and 40 into amended claim 39, as the examiner had suggested. (*Id.* at 101-04.) The '172 patent was then granted, with amended claim 39 renumbered as claim 32. (*Id.* at 101-04; Tr. 12 at 106-09.) The face sheet of the '172 patent lists all of the references considered by the examiner during the prosecution history of the entire patent, as follows: Flower et al.,[FN29] Stevenson, Akiyama, Arlinger,[FN30] Jorgenson and Rose/Jorgenson. (P-1 at 1; Tr. 12 at 111-20.)

FN29. The Flower reference is U.S. Patent No. 3,793,180. Neither party has directed the attention of the Court to it as a possible prior art reference relating to claim 32. (Tr. 12 at 111-20, 128-58, 162-67.)

FN30. Mr. Jester testified that in his view, the Arlinger patent was not particularly relevant to claim 32 as issued. (Tr. 12 at 84, 130-34, 137-42.)) The Arlinger patent is entitled Apparatus for Isotachophoretical Separation. (*Id.* at 146-48; P-96.) Mr. Jester pointed out that when the examiner characterized Arlinger in earlier rejections of various claims including claim 1, the examiner described Arlinger as pertaining to a sample recovery means. He stated that he did not see any words in claim 32 talking about sample recovery, but acknowledged that claim 32 does provide for the capillary to have "first and second ends." (Tr. 12 at 158-59, 165-67.) He agreed that when claim 39 was amended in the CIP application process to include the language of claim 1, the examiner's rejection of amended claim 39 as obvious no longer cited Arlinger. He did not venture to surmise what that omission meant in the mind of the examiner. (*Id.* at 162-65.) This portion of the evidence is discussed *infra,* nn.34 & 51.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**
Page 23

Mr. Jester stated his conclusion from reviewing the patent prosecution as follows:

After reviewing these file wrappers in great detail, it is my opinion that after repeated obviousness rejections, Dr. Guzman was only able to get Claim 32 allowed by limiting that claim to a coiled capillary tube secured to a support member. Unless he put "secured to a support member," that claim would not have been allowed.

(*Id.* at 127.) He agreed, however, that the scope of claim 32 contains not just the words of element 8, but all the words in the claim. (*Id.* at 153-55.)

.e. *Dr. Jorgenson*

James W. Jorgenson is chairman of the Chemistry Department at the University of North Carolina. He earned his Ph.D. in chemistry at Indiana University in 1979, and began his teaching and research career at U.N.C. that same year. His career has focused upon the subject of chemical separation, with particular emphasis on capillary electrophoresis. He is co-editor of a 1987 text published by the American Chemical Society entitled "New Directions in Electrophoretic Methods," and is the author or co-author of numerous published works based upon his research in capillary electrophoresis, including the Jorgenson and Rose/Jorgenson references cited in the '172 patent history. (*See* n. 6 *supra:* Tr. 12 at 168-73.) In the course of his work he has studied, but never performed, other chemical separation techniques such as isotachophoresis, isoelectric focusing, and gas chromatography. (*Id.* at 175-76; Tr. 13 at 64-65.) His professional activities have included supervising graduate level research in his university lab, and conducting numerous peer scientific symposia on capillary electrophoresis. (Tr. 12 at 169, 175-76.) He is also the named inventor in several patents. (Tr. 13 at 46-47.)

***21** Dr. Jorgenson has no affiliation with Beckman other than serving as an expert witness in this case, and he has never testified as an expert prior to this case. (Tr. 12 at 175-76; Tr. 13 at 47.) The Court accepted him as an expert witness in the area of chemical separation, particularly capillary electrophoresis. (Tr. 12 at 176-77.)

He was asked what he was doing in his university laboratory regarding capillary electrophoresis during the period 1979 to 1988, and responded as follows:

Basically essentially getting the field started. We got curious-I had done a little bit of work with the technique called paper electrophoresis in my graduate research at Indiana and was struck by how primitive that technique was-very useful, but kind of primitive-and so I set out to see if I couldn't develop a form of electrophoresis that would be more instrumental in nature, more automated, would generate data that could be fed directly into computers, for instance. And that led to a whole line of research in this area that's come to be called capillary electrophoresis.

(*Id.* at 168-69.) He was actively running capillary electrophoresis samples himself during the early 1980's, working with a graduate student named Krynn Lukacs. Since that time he has supervised thousands of capillary electrophoresis tests in directing research performed by his graduate students. (*Id.*)

Dr. Jorgenson's testimony began with a basic description of electrophoresis and some of its recognized techniques. He stated that electrophoresis is any separation done in a fluid medium, where the separation is caused by application of an electric field. The substances then move at different rates and separate from each other. The basic purpose of electrophoresis is to separate different substances, determining the identity and quantity of the substances in the sample. (*Id.* at 177-79.)

He explained that there are many ways of setting up an electrophoresis experiment. Those techniques all share the common property that they use an electric field to cause the separation process. He stated that among the numerous varieties of electrophoretic techniques are zone electrophoresis, isotachophoresis, and isoelectric focusing. They vary in the types of buffers (ionic solutions) used, and how they are used. (*Id.* at 178-79.) His overview of those techniques is quoted in the margin .[FN31] He also stated that various containers or media can be used in electrophoretic techniques. Those modes include paper, gel slab, and capillary-the latter two being the most common formats in current use. (*Id.* at 179-82.) He confirmed that the technique called zone electrophoresis is done in a capillary. (Tr. 13 at 32-33 .) Describing a capillary, as distinguished from larger sizes of chemical separation tubes or columns, he put an approximate internal diameter of one millimeter or smaller. (Tr. 12 at 191.) He added that isotachophoresis is a subset of capillary electrophoresis if it is practiced in a capillary. (Tr. 13 at 64.)

FN31. Dr. Jorgenson stated:

In isotachophoresis, for instance, you sandwich your sample between a very fast moving ion and an extremely slow moving ion. And that's the way that game is played. In isoelectric focusing, you do this electrophoretic separation in the presence of a PH ingredient, going from very acidic PH to very basic PH.So by setting up the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 24

initial experiment in different ways you can get different kinds of separations to occur. And one of the simplest actually is zone electrophoresis. It's just done in the presence-you just put your sample, sandwich it between two identical buffers, apply a field, do a separation. That's the one that I've spent most of my time working on.
(Tr. 12 at 178-79.)

***22** The topic of Dr. Jorgenson's testimony next turned to a review of the prior art listed in the '172 patent history. He stated that in his opinion, the examiner was correct in concluding that elements 1 through 6 of claim 32 were obvious in light of his own cited 1987 article and the 1975 Stevenson patent. He said it would not be unusual for one skilled in the art to combine teachings from references in chemical separation techniques such as capillary electrophoresis (Jorgenson) and liquid chromatography (Stevenson).FN32 (*Id.* at 183-84.)

FN32. His testimony on this point included the following:

Q Is there anything unusual in your mind about combining an auto sampler of the Stevenson reference with the technology discussed on capillary zone electrophoresis in your 1987 book?

...

A No. I mean-Stevenson was one example of an auto-sampler in use, a carousel type of auto-sampler that Stevenson happened to apply to liquid chromatography. But other samplers of a variety of types-including a carousel of samples-were in widespread use by 1980 in all forms of chemical analysis, whether it be gas chromatography, liquid chromatography, atomic absorption spectroscopy, you name it.

Everyone, if you had an established technique, if possible, people wanted to add onto the instrument the capability for an operator to bring up a whole host of samples, load them in a carousel, or a tray of some kind, and let them all be run automatically unattended, while you could be off doing some other work. It's a great labor saver.

So to make a combination with capillary electrophoresis I thought was very obvious. We were working on the same thing starting in 1985, actually ourselves.

Q So it doesn't look unusual to you that these two references were combined to show the obviousness of the first six elements of Claim 32, does it?

A Right.

Q And the fact that the Stevenson reference was specifically dealing with liquid chromatography chemical separation, in no way changes your view about combining Stevenson with your own article?

A No, I mean anyone working in the analytical field, in the separations field, is apt to be using or certainly be aware of these different separation methods.

(Tr. 12 at 183-84.)

Dr. Jorgenson also agreed that the examiner correctly combined the Jorgenson, Stevenson and Akiyama references to reject elements I through 7 of claim 32 as obvious. (*Id.* at 186-87.) The 1976 Akiyama patent described a capillary electrophoresis device where the capillary was shown coiled inside a chamber. (D-5; Tr. 12 at 186-87.) Dr. Jorgenson confirmed that it was known, since long before 1976, to coil capillaries in chemical separation techniques. He recalled that by the early 1960's people were using coiled capillaries in gas chromatography, where the columns they used reached to as long as 150 feet, "and you are certainly going to coil those up because you don't want that kind of thing running all around your lab." (*Id.* at 185-86.) He added that between the late 1960's and mid-1970's, coiled tubes were used in electrophoretic techniques including capillary electrophoresis, isotachophoresis, and isoelectric focusing. He said, "any time you would have a long electrophoresis tube of some kind, then you'd be natural to want to use a coil." (*Id.* at 186.)

The stated opinion of Dr. Jorgenson was that at the relevant time it also would have been obvious to make the entire device of claim 32, including limitation 8, wherein the coiled electrophoresis capillary was "secured to a support member." (*Id.* at 188-89. Tr. 13 at 39-43.) He said, "you don't want a coil floating around without some kind of support. It wouldn't be a good idea, so it would be very natural to do that." (Tr. 12 at 189.) He based this conclusion upon public information not considered by the examiner, and upon his own stated familiarity with what was known by persons of ordinary skill in the art, as described below.

It was Dr. Jorgenson's testimony that at the relevant time there was prior art specifically showing electrophoresis capillaries, and larger electrophoresis tubes, secured in place in a variety of ways. (*Id.* at 188-89.) He discussed examples of that teaching in the published prior art. Those examples were materials by Everaerts, LKB, Lukacs and Stover in the capillary electrophoresis format, and Chilla and Macko in an electrophoretic technique using larger plastic tubing. It was undisputed that each publication appeared prior to the obviousness date of November 14,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Page 25
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

1987. (*See, e.g.,* Tr. 14 at 4-6.) Those sources, and Dr. Jorgenson's accompanying testimony, may be summarized as follows.

***23** "Everaerts" is an article by F.M. Everaerts et al. entitled "Some Theoretical and Practical Aspects of Isotachophoretical Analysis," published in the Annals of the New York Academy of Sciences in 1973. (D-29.) It expressly compares isotachophoresis (called a closed capillary tube system) with zone electrophoresis. (*Id.* at B 07388.) The authors describe their apparatus for isotachophoresis in pertinent part as follows:

Basically the analytical electrophoretical equipment (figure 3) consists of a thin-walled narrow-hole tube, made of PTFE (Teflon), glass, or a common plastic material. The experimentally determined optimum diameter is 0.4-0.6 mm (i.d.) [interior diametor] and 0.65-0 .85 (o.d.). This diameter is defined by the electrolyte chosen, the electric driving current used, the temperature of the environment of the capillary tube, the possible addition of a polymer to the electrolyte for stabilizing the zones, etc.... [T]he length of the capillary tube is determined by the pair of ions most difficult to separate. Although 10 cm is adequate for the separation of proteins, a length of 50-100 cm is needed for the separation of weak acids without the use of counterflow equipment.... The capillary is wound around an aluminum block in the form of a helix and pressed into a groove made in the block. A heat-sink component is used for good thermal contact.

(*Id.* at B 07388-07389 (emphasis added).)

This is the schematic of the coiled capillary shown in the Everaerts article:

TABULAR OR GRAPHIC MATERIAL SET AT THIS POINT IS NOT DISPLAYABLE
(*Id.* at B 07389.)

Dr. Jorgenson pointed out that in the Everaerts apparatus, the capillary was wound around an aluminum block. He observed that "clearly they're winding the capillary onto a mandrel or spool or what have you." (Tr. 12 at 193-94.)

"LKB" refers to an isotachophoresis device called LKB Tachophor, which was made by a Swedish company named LKB and was sold as a commercial instrument. It is described in LKB public seminar notes in 1978 entitled "Isotachophoresis" ("the LKB document").[FN33] (D-30.) The LKB document shows a coiled capillary secured inside a cartridge called a "capillary plate." (*Id.*) The Tachophor capillary plate is described in pertinent part as follows:

FN33. Other brochures for the LKB device are in evidence as exhibits D-32 and D-33. (Tr. 12 at 196-98.)

Each capillary plate contains a Teflon capillary tube surrounded by the thermostatting fluid, kerosene. Four different plates are available, containing capillaries of lengths 230, 430, 610 or 800 mm.

(*Id.* at B 07944 (emphasis added).) This is the schematic of the coiled capillary shown in the LKB Tachophor document:

TABULAR OR GRAPHIC MATERIAL SET AT THIS POINT IS NOT DISPLAYABLE
(*Id.* at B 07943.)

Dr. Jorgenson explained that the capillary cartridge in the LKB device was designed to be removable, so that pre-assembled cartridges containing various lengths of capillary could be installed. (Tr. 12 at 194-96, 198.) He showed that the coiled capillary inside an LKB cartridge was anchored and held in place inside the cartridge at various points by tabs. (*Id.* at 194.) He recalled that he saw the LKB devices at trade shows in the United States in the early 1980's.[FN34] (*Id.* at 195.)

FN34. There was a connection between the LKB company and the named inventor of the Arlinger patent cited in the '172 patent history. (*See* n.30 *supra* and accompanying text.) Dr. Jorgenson stated that Mr. Arlinger, whom Dr. Jorgenson met several times, was an employee of LKB. However, Dr. Jorgenson testified that the technology described in the Arlinger patent was not used in the LKB Tachophor device, and indeed that Arlinger patent was not in any way related to LKB Tachophor. (Tr. 12 at 196-97.)

***24** "Stover" is an article by F.S. Stover et al. of the Monsanto corporate research laboratories published in 1987 in the Journal of Chromatography. The topic, as described in its title, is "Simple System for Total Automation of Isotachophoresis Using an LKB 2127 Tachophor." (D-36.) It describes "the total automation of isotachophoresis (ITP)" using "minor modifications to an LKB Tachophor." Those modifications included adding computer systems for data acquisition and analysis and instrument control, as well as an automatic sampling system that could be obtained commercially. (*Id.* at B 07856, 07861.) It concluded:

Demonstration of totally automated ITP has been accomplished using the above system for several 8-12 [hour] periods of unattended operation. This development

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**
Page 26

raises the overall capabilities of ITP to the level of other modern analytical instruments.

(*Id.* at B 07862.)

Again it will be recalled that the LKB Tachophor featured an electrophoresis capillary coiled and held in place inside a capillary cartridge. Dr. Jorgenson testified that the Stover article demonstrates that by 1987 there was a publication showing specifically that the LKB commercial isotachophoresis device had been automated to "act like other modern analytical instruments-like modern HPLC columns, like modern gas chromatography instruments-which were already routinely coupled to autosamplers." (Tr. 12 at 202-04; Tr. 13 at 3.)

"Lukacs" is a Ph.D. thesis published in 1983 by Dr. Jorgenson's graduate student Krynn Lukacs, who worked under his supervision at the University of North Carolina ("Lukacs thesis"). (D-86.) It describes their experiments in capillary zone electrophoresis at that time, stating in part as follows:

Straight lengths of tubing were used almost exclusively. Occasionally, very long columns (2 meters or more) were coiled, but this resulted in the coils being electrostatically attracted to each other when voltage was applied. Insulation between the loops solved that problem.

(*Id.* at B 08358.)

Dr. Jorgenson testified that the Lukacs thesis describes work during the early 1980's in which he personally participated with student Lukacs. (Tr. 13 at 22.) Part of the work was to use capillaries of various lengths, to investigate the effect of capillary length on the capillary electrophoresis separation process. (*Id.* at 19-20.) Some of those capillaries would be as long as three meters, equivalent to ten feet, which was longer than a laboratory bench. For that reason, "we used a coiled capillary to conserve some space." (*Id.* at 20.) Dr. Jorgenson testified that once the capillary was coiled, there arose a need to separate the coils due to electrical attraction during operation:

She [Lukacs] had a very simple setup of a beaker, a second beaker, a high-voltage power supply-... 20, 30,000 volts-to an electrode at one end, ground potential applied through an electrode to the other end, a detector.... And again, this was two, three meters of capillary tubing. So to conserve space, we simply arranged it as a coil right out on the desktop. And when we first turned it on, it turns out that the coils almost violently attract to each other when you turn the electricity on because as you go from 30,000 volts down to zero volts, each point of the capillary is at a progressively lower and lower potential. And since they're at different potentials, they're attracted to each other. So ... what she did is she put an insulated [sic] in between there. I believe we tried at first something akin to wax paper called parafilm. And I believe later on it was a little more effective to use some plastic plates. But it was just to try and separate them from each other so they weren't quite so violently attracted to each other. And then she was able to complete her experiments on the effect of capillary length on separation process.

***25** (*Id.* at 20-21.)

The notion of automating a capillary electrophoresis device was also addressed in an article published in 1983, co-authored by Jorgenson and Lukacs ("Jorgenson/Lukacs article"). (D-85.) Dr. Jorgenson confirmed that in that article, the authors made the following suggestion:

Capillaries also seem well-suited for automation. Our present electromigration injection technique is relatively straightforward and should be simple to automate.... Automated versions would be useful in routine analyses such as separation of serum proteins in a clinical laboratory. Capillary systems offer higher resolution, greater speed and better accuracy than conventional methods.

(D-85; Tr. 13 at 34.)

Automation of sample introduction in a capillary electrophoresis device was described in a September, 1987, article published in the International Journal on Chromatography, Electrophoresis and Related Methods. The article was by authors Susumu Honda et al., and entitled "Evaluation of an Automatic Siphonic Sampler for Capillary Zone Electrophoresis" ("Honda article"). (D-77.) The Honda article stated in pertinent part:

Capillary zone electrophoresis (CZE) is a recently developed method for the separation of ions, based on a combination of the effects of electrophoresis and electroosmosis in a capillary tube. It was introduced by Mikkers et al., and developed by Jorgenson and Lukacs. Its applicability is very wide.... However, all these studies on CZE were performed by manual sample introduction, because no automatic apparatus was commercially available. This has hampered the popularization of CZE.

The most difficult problem in sample introduction in CZE is that an extremely small volume ... of a sample solution has to be introduced into a capillary tube which is strictly insulated so as to withstand high voltages....

As compared to the above techniques, the one based on siphoning is important. Since it can be performed manually, many studies on CZE were done by this technique, though on a qualitative basis. We propose here an automatic sampler for both qualitative and quantitative studies, based on this principle.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.