Not Reported in F.Supp.2d                                          Page 27
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)

(*Id.* at B 08569-08570 (footnotes omitted).)

Dr. Jorgenson confirmed that the Honda article described a capillary electrophoresis device with an auto-sampler consisting of a rotating carousel of samples and buffers. (Tr. 13 at 7-8.) [FN35]

> FN35. Dr. Jorgenson also described the siphonic method of capillary injection used in the Honda apparatus. (Tr. 13 at 7-8.) This led to a more general description of the problem of sample introduction into electrophoresis capillaries. (*Id.* at 8-10.) The topic of capillary injection appears again in Section IX *infra*.

Returning to the subject of coiled electrophoresis tubes secured to support members, Dr. Jorgenson also testified about such structures used in isoelectric focusing. Although those tubes were larger than capillary size and were made of plastic, they were coiled and secured to support members as illustrated in works by authors Macko and Chilla.

"Macko" is a 1970 article co-authored by V. Macko and H. Stegemann entitled "Free Electrofocusing in a Coil of Polyethylene Tubing ("the Macko article"). (D-24.) The Macko article states in pertinent part:
*26 Electrofocusing or isoelectric fractionation has been used in density gradients and in polyacrylamide gels for separation of proteins. Recently an apparatus for electrofocusing in free solution was described....
Electrofocusing in our arrangement takes place in a coil of polyetheylene tubing as shown in Figure 1. Polyetheylene tubing, (100 cm long, 4 mm i.d. [interior diameter], 1 mm was thickness) is marked every 2.5 cm and coiled around a copper tube of 20 mm diameter. The coiling is aided by double-face tape.... The coiled tubing is held in place by a piece of wire screen fastened at the ends with strings.

(*Id.* at B 07661 (footnotes omitted; emphasis added).)

This is the schematic of the coiled tubing shown in the Macko article:

TABULAR OR GRAPHIC MATERIAL SET AT THIS POINT IS NOT DISPLAYABLE
(*Id.*)

"Chilla" is an article by R. Chilla et al. published in 1973 in the Archives of Biochemistry and Biophysics ("the Chilla article"). (D-25.) It builds on the Macko work in isoelectric focusing, stating:

Isoelectric focusing of the purified enzyme was performed in a I-m polyethylene tube using a modification of the apparatus described by Macko and Stegemann.... The tube (4 mm i.d. and 6 mm o.d.) was marked every 2.5 cm and fixed in close turns around the metal pipe shown in Fig. 1.

(*Id.* at B 07334 (footnotes omitted; emphasis added).)

This is the schematic of the coiled tubing shown in the Chilla article:

TABULAR OR GRAPHIC MATERIAL SET AT THIS POINT IS NOT DISPLAYABLE
(*Id.*)

Dr. Jorgenson confirmed that both Macko and Chilla were doing isoelectric focusing in a plastic tube that was wider than capillary size. (Tr. 12 at 191.) He described the purpose of the coiled tubing structure in each of those articles as follows:
What they have here [referring to Macko], they were doing one of these forms of electrophoresis called isoelectrofocusing in a plastic tube. And they had quite a length of this plastic tube, and they wanted to be able to cool it, thermostat it if possible, in a fluid medium. Because of the great length, they wanted to wrap it around in a coil, around a form. They wanted good heat transfer, so they wrapped it around a copper rod, and then they secured it in place. So it wouldn't just unwrap itself, they held it in place with a metal screen.
....
[T]he authors of this article [referring to Chilla] admit-it's a takeoff on the Macko et al article. And what they've added to this, they wrapped around a plastic tube and they've added a sort of convenience feature, of securing it not with a metal gauze, but with little tabs that can slide along here that each end of the tube has to go through, so they can anchor it down in that manner. You anchor it at one end through one of these little sliding eyelets, wrap your tubing on, and then anchor the other end through an eyelet, and that allows you to have variable lengths that are usually held in place.

(*Id.* at 191-93)

The usefulness of small-diameter tubes in electrophoretic techniques was recognized in publications of the 1976-1983 time frame, as described by Dr. Jorgenson. He first addressed a book entitled "Isotachophoresis," published in the Journal of Chromatography Library in 1976.[FN36] (D-35; Tr. 12 at 198-202.) That text describes capillaries as "glass narrow-bore tubes," giving internal diameters from .45 mm to .1 mm. (D-35 at 395.) It states reasons why narrow capillaries are desirable in isotachophoresis,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)

including decreasing amounts of ionic species to be separated, less temperature differences between successive zones in the tube, and decreased time of analysis. It also observes that "the sharpness of the zones increase[s] by decreasing the diameter of the narrow-bore tube, partly owing to the small differences in temperature between the zones." (_Id._ at 395; Tr. 12 at 198-202.) A similar concept was expressed in the 1983 Jorgenson/Lukacs article, which was cited in Dr. Guzman's 1986 thesis. (*Compare* D-85 *with* P-11 at 67.) That article, discussing capillary zone electrophoresis, states that "[e]fficient heat transfer from small diameter capillaries permits use of unusually high voltages, resulting in both high resolution and rapid analysis." (D-85 at B 08317; Tr. 13 at 32-36.)

> FN36. This book, co-authored by F.M. Everaerts, contains background on the history and principles of electrophoretic techniques. (*See* D-35 at 1-24.) It states that the four main types of electrophoresis are zone electrophoresis, isotachophoresis, isoelectric focusing, and moving-boundary electrophoresis. (_Id._ at 7.)

*27 Dr. Jorgenson concluded that in his expert opinion, all of the elements of claim 32 would have been obvious to one of ordinary skill in the art by no later than 1983. (Tr. 13 at 43.) On that issue he testified as follows:

Q What is your opinion with regard to the obviousness of Claim 32 in view of these references [referring to Everaerts, LKB, Macko and Chilla]?

A I would say that coiling a tube or a capillary in an electrophoresis apparatus around any kind of a form or support-inside of a cartridge, you name it-is pretty well covered. And even if it weren't for these, I would say the idea is just dead obvious.

Q It's dead obvious even if you didn't have any of these references, isn't it? Is that what you're saying?

A To me it is. I mean we were working-we coiled capillaries. We didn't run out and patent them.

Q Why not?

A Because I thought it was dead obvious. That's what you do when you have a long length of something. You coil it up.

Q How about some of the other concepts in Claim 32? What about getting a patent combining all of these eight elements put together?

A Well to me, the whole thing is obvious, every last piece. And then the combination is obvious. As I said, when you would go to a trade meeting at the time in the early 1980's, every analytical instrument was being attached to an auto-sampler. Often these were carousels of samples. And you name it. In the field of analytical chemistry, if it was possible, people were attaching those

things to auto-samplers. It's just an absolutely obvious and natural thing to do.

Q Suppose I were to say to you, "Dr. Jorgenson, I can't find a single article that explains all eight elements as written by Dr. Guzman's attorney in Claim 32. How can you say it's obvious?" What would you tell me?

A I would just say that the combination is obvious. Every one of the individual ideas is obvious. And the combination is absolutely obvious. Everybody in all of the related fields in all of the related technologies is doing those kinds of things.

....

Q In view of everything you've seen in this trial, including Mr. Jester's testimony, the references you've seen, do you believe that there is anything worthwhile in Claim 32?

A What I think is that it's all very obvious. The entire package taken together is obvious.

....

Q Would it have been obvious to those with skill in the art or ordinary skill in the art, the capillary electrophoresis art?

A By 1983, that combination would be obvious.

Q Why did you pick 1983?

A I picked 1983 because the basic capillary electrophoresis instrument had been described, a simple instrument by that time. And some of the boundaries of what would provide good or bad results were defined by that time. Auto-samplers had existed in widespread use long before that time. Coiling capillaries and electrophoresis tubes-electrophoresis capillaries-had been done long before that time.

*28 (_Id._ at 39-43.)

### 2. *Plaintiff's Evidence on Obviousness*

Plaintiff presented fact testimony from Dr. Guzman on what he thought he invented in claim 32 of the '172 patent. Dr. Guzman was not offered to present expert opinion testimony on the issue of obviousness. (*See* Tr. 3 at 40-42; Tr. 8 at 204-06.) Plaintiff also cross-examined Dr. Jorgenson, defendant's expert witness on obviousness.[FN37] (Tr. 13 at 44-102.) Plaintiff presented no expert testimony at trial in opposition to defendant's claim of obviousness. (Tr. 14 at 108-09.)

> FN37. Plaintiff's cross-examination of defendant's other witnesses did not relate to the issue of obviousness, with one exception. Mr. Burolla, who led the team that developed defendant's accused device, acknowledged on cross-examination that his review of selected literature when he began that project did include

Not Reported in F.Supp.2d                                                    Page 29
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)

works by Jorgenson but did not include the Everaerts, LKB, Macko or Chilla references adduced by defendant at trial. (Tr. 14 at 91-92.) Also, on cross Mr. Burolla was called upon to explain his quoted statements in the 1990 Beckman Annual Report. (*See* n.26 *supra* and accompanying text .)

### a. *Dr. Guzman*

Norberto A. Guzman is the sole named inventor of the '172 patent. (P-1; Tr. 3 at 39-40.) He obtained degrees of B.S. in clinical biochemistry in 1971, M.S. in cell and molecular biochemistry in 1975, and Ph.D. in biochemistry in 1986. (*Id.* at 11-15.) The Ph.D. program was at Rutgers University and Rutgers Medical School.[FN38] (*Id.* at 15.) He was subsequently employed for five years as a senior scientist in protein biology by Hoffman LaRoche at its facility in New Jersey. (*Id.* at 9-10, 20-21.) He has been continuously employed as a clinical biochemist at Johnson & Johnson in New Jersey since 1992, currently holding the position of research fellow. His entire professional life has been in the field of clinical biochemistry.[FN39] (*Id.* at 9-10, 21-22.)

> FN38. He testified that his Ph.D. was awarded in a joint program between Rutgers University and Rutgers Medical School (now named University of Medicine and Dentistry of New Jersey). (Tr. 3 at 13-14; P-12.)

> FN39. Dr. Guzman was accepted by the Court to provide expert testimony on topics relating to plaintiff's claim of infringement in this case. (*See* Tr. 3 at 40-42; Tr. 8 at 204-06.) Those topics are addressed in Section IX *infra*. Also, certain facts in his professional history are relevant to defendant's claim of invalidity due to prior invention. Those facts are addressed in detail in Section VIII *infra*.

He testified that he became interested in capillary electrophoresis in the early 1980's, while he was participating in the Rutgers Ph.D. program and earning his way partly by working as a laboratory clinician at various hospitals. (*Id.* at 22-27.) He formed the plaintiff corporation, Princeton Biochemicals, Inc., in 1985. (*Id.* at 26-27.) He stated that he worked in his company basically full time during the two years between 1985 and 1987, until he went to work for Hoffman LaRoche. (*Id.*) He described his work during those two years as follows: "All of the work I did was analyzing different constituents of biological fluid using capillary electrophoresis. So it was a full-time job for me to develop the variety of

different prototypes to improve the technology to see the best separation that I could." [FN40] (*Id.*) He is the president and majority shareholder of the plaintiff corporation.[FN41] (*Id.* at 46-47; Tr. 10 at 44-45, 50.) Plaintiff is the assignee of the '172 patent. (Tr. 3 at 46.)

> FN40. English is not Dr. Guzman's first language, and the trial record reflects transcription difficulties relating to his pronunciation and usage. The trial transcript was prepared by a certified transcription service using the tape recording of the trial, pursuant to standard procedure in this Court.
> When we quote the testimony of any witness in this opinion, we have taken the liberty of correcting obvious transcription errors, and deleting irrelevant conversational features and redundancy. We have not made any corrections where the meaning of the text is unclear or correction would vary the content. Also, for simplicity in quoting text, we have replaced an unqualified affirmative answer with "[Yes.]." The parties are invited to participate with the Court in resolving any disputes concerning the official trial transcript if that becomes necessary.

> FN41. He testified that the present structure of plaintiff is as follows:
> Q Are you presently employed by Princeton Biochemicals?
> A I'm the president of the corporation.
> Q Does the corporation have any other employees?
> A One person.
> Q [W]ho is that person?
> A It is a silent partner.
> (Tr. 3 at 46-47; *see also* Tr. 10 at 44-45, 50.) Dr. Guzman stated that he is the 60% owner of the shares of the plaintiff corporation, and the silent partner owns the rest. (Tr. 5 at 31.)

Dr. Guzman stated that he is the named inventor of the patent in issue in this case, and several others that have been issued in other countries arising out of his capillary electrophoresis work. (*Id.* at 39.) He is also the named inventor of an unrelated patent issued to Johnson & Johnson in 2000. (Tr. 10 at 62.) He is an adjunct member of the Rutgers University committee overseeing graduate students doing theses in capillary electrophoresis, and is a visiting professor for the same function at the University of Buenos Aires in Argentina and the University of Barcelona in Spain. He is on the editorial board of a publication named Journal of Liquid Chromatography, has published papers in peer-reviewed journals on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)

capillary electrophoresis and other topics in medical science, and is the editor of two books, including one on capillary electrophoresis.[FN42] (Tr. 3 at 29-32.) He has also presented hundreds of seminars relating to capillary electrophoresis around the world, and founded a Latin American symposium on capillary electrophoresis that he attends every year. (Id. at 32-34.)

> FN42. Dr. Guzman also testified that he is the editor-in-chief of a publication named the Journal of Capillary Electrophoresis, launched in 1994. (Tr. 3 at 29-31.) On cross-examination he acknowledged that it had not published any new issues in approximately two years preceding trial, although he said that three issues were in press (the same three issues to which he had testified at deposition more than a year earlier). (Tr. 10 at 51-54.)

*29 He described the invention in claim 32 of the '172 patent in his own words, in two places in the trial transcript, as follows:[FN43]

> FN43. These descriptions of the claim 32 invention by Dr. Guzman are referred to later in this section.

I have a small box that has the two containers basically-two different beakers which connect the capillary from one side to another. And it has a high-voltage power supply. So the capillary, you can see, has a first end and a second end which is the inlet and the outlet. But it's also in a support system that is coil the capillary [sic] for a number of reasons. The capillary coil will make the instrument more compact. That was one of the main reasons why I started doing this. The first instrument that I did, I had no idea that I could coil the capillary. So it was a very long instrument. So now we have a small little instrument that could be portable in the luggage for traveling. And it has a detectable optical system. Everything can be detached. So it's like a mobile unit....
(Id. at 54-55.)
Basically I built or manufactured a capillary electrophoresis device containing certain elements and some of those elements-at the heart of the instrumentation itself, has a fused silica capillary....
And one of those elements was a capillary tube, which is basically a transport tube that is able to separate certain constituents of various different samples. And this particular capillary has an inlet and an outlet. And there's a rotatory table or a sampler of a way of a source, of providing a source for the sample and source of the buffer. In order to have some motion of these elements in

the capillary, within the capillary, we need something called a high voltage power supply that provided potential of moving its across the capillary. And once after a certain period of time we needed a detector which is going to provide the signal of passing through that particular detector and also give some quantification of the quantity of the material that we're analyzing.
The capillary was kind of embedded into something called an-in a cartridge cassette. And the two ends of the capillary were in operative relationship with some of the vials in the rotatory table. And there was a support member, which is the cartridge cassette, there's a support in this particular device. Those are in the sample's way general scope of what I call invention. The critical part of this is that all of these elements in combination were able to function what we call the claim 32.

(Tr. 8 at 14-15.)

b. *Plaintiff's Cross-examination of Dr. Jorgenson*

Plaintiff established on cross-examination of Dr. Jorgenson that not one of the prior art references identified at trial teaches all of the limitations of claim 32. (Tr. 13 at 58-59.) Plaintiff also highlighted the following differences between some of those references and claim 32:
• Stevenson (D-4) relates to liquid chromatography, which is a different separation method than capillary electrophoresis. (Id. at 79-80.)
• Akiyama (D-5) relates to a capillary electrophoresis device identified in Mr. Jester's testimony about the '172 patent file history.[FN44] (Id. at 80-83.)

> FN44. This portion of the Jorgenson cross-examination appears to be a reference to the examiner's citation of Akiyama against element 7 but not against element 8 in the '172 file history. (Tr. 12 at 103-104.) Dr. Jorgenson testified on direct examination that the Akiyama reference does not show any obvious support member for its coiled capillary. (Tr. 12 at 187-188.)

*30 • Everaerts (D-29) relates to an isotachophoresis device that did not have a rotatable table, sample cups or holder as in claim 32, and it refers to a plastic rather than a glass capillary tube.[FN45] It also describes leading and trailing electrolytes and a sample undergoing analysis, which are not part of the language of claim 32. (Id. at 71-72.)

Not Reported in F.Supp.2d                                    Page 31
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)

FN45. The Everaerts reference actually describes a coiled and supported capillary made of either Teflon, glass, or a common plastic material, with a narrow interior dimension of .04-.06 mm. (D-29 at B 07388.)

• LKB (D-30) relates to an isotachophoresis device that did not have a rotatable table. It includes a cooling function using kerosene, unlike the language of claim 32, which does not mention temperature control. (*Id.* at 74-76.)
• Honda (D-77) relates to a capillary electrophoresis device that did have a rotatable table, but the capillary was not coiled. It describes a siphoning method of sample injection, unlike the language of claim 32, which does not mention any sample injection method. (*Id.* at 88-91.)
• Macko (D-24) relates to an isoelectric focusing device that did not have a rotatable table and used low voltage. It describes a coiled tube made of plastic that is wider than capillary size. Its separation technique involves freezing and cutting the coiled tubing to complete the analysis, and requires approximately 60 hours. In contrast, claim 32 has a glass capillary, a rotatable table, and a high voltage power supply. Also, capillary electrophoresis does not destroy the capillary and takes only 5 to 30 minutes. (*Id.* at 61-66.)
• Chilla (D-25) relates to a modification of the Macko device that also did isoelectric focusing using similar equipment, technique, and timing as Macko. [FN46] (*Id.* at 66-70.)

FN46. Plaintiff's counsel pointed out during cross-examination of Dr. Jorgenson that his expert report and deposition testimony did not refer to certain prior art references in evidence at trial. (Tr. 13 at 53.) Cross-examination also showed that at deposition Dr. Jorgenson stated that he was "not prepared to say right now" what combination of prior art references he would need to get all of the limitations of claim 32. (*Id.* at 77-79.)

Plaintiff also elicited from Dr. Jorgenson that the word "automation" is not found in claim 32, nor does claim 32 describe any motors. However, on this point Dr. Jorgenson stated, "I believe that what's meant by automation is the ability to have multiple samples on a carousel. That's what is the automation in this patent. So, in fact, although the word automation does not appear there, claim 32 is containing a key part of the proposed automation." (*Id.* at 83-84.)

It was emphasized on cross-examination that although Dr.

Jorgenson testified that he has studied isotachophoresis and isoelectric focusing, he has never actually run any chemical separations using those techniques.[FN47] (*Id.* at 64-65; *see* Tr. 12 at 175-76.)

FN47. Dr. Jorgenson was also shown five of his own patents in the same Patent Office class as the '172 patent (204/299), which were all approved by the same primary examiner who approved the '172 patent. He acknowledged that he had not cited any of the references discussed during this trial in any of those five patent applications. However, the subject matter of those patents was not described in the record. (Tr. 13 at 91-102.)

### 3. Defendant's Cross-examination of Dr. Guzman on Obviousness

Dr. Guzman did not testify as an expert on the issue of obviousness. (*See* Tr. 3 at 40-42; Tr. 8 at 204-06; Tr. 14 at 108-09.) Thus, he provided no testimony on the knowledge of one of ordinary skill in the art at the relevant time. However, he did state in his direct examination what he considered was the invention in claim 32, as quoted above. (*See* n.43 *supra* and accompanying text.) Dr. Guzman stated the following in cross-examination on that topic: [FN48]

FN48. The entire cross-examination, and redirect examination, of Dr. Guzman on this specific topic is contained in Volume 10 of the trial transcript at pages 63-94, 124-126, and 175. The excerpts quoted here are an accurate summary of the entire line of questioning.

Q You're not contending that you invented capillary electrophoresis?
\*31 A Absolutely not.
Q There were instruments performing capillary electrophoresis predating you by many years?
A Many years before. That's correct.
Q To do capillary electrophoresis, you have to have a capillary tube, right? [Yes.]
Q And you have to have electrical charging? [Yes.]
Q So you didn't invent anything with regard to limitation number 1?
A No.

(Tr. 10 at 63-64.)Q Now, if there's a capillary electrophoresis device, wouldn't it always have to have first and second ends? [Yes.]
Q So you didn't invent the idea of having a capillary tube

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)

with a first and second end?

A Not at all.

Q So we just have a first and second ends, and you take no credit for inventing anything that I've shown on the board so far, that is the preamble, limitation 1 and limitation 2, right?

A Absolutely, yes.

(*Id.* at 64-65.)Q Limitation 3, a first means at the first end of the capillary tube providing a source of buffer solution and a source of a sample substance to be analyzed. Did you see capillary electrophoresis not performed with buffer or sample?

A No.

....

Q So you have to have a capillary and a first and second ends-and a source of buffer and a source of sample, right? [Yes.]

Q So you take no credit whatsoever for inventing anything that I've shown so far up to limitation 3?

A Not at all.

(*Id.* at 65-66.)Q [L]et's look at limitation 4. Second means coupled to said apparatus for applying electrical potential across said capillary tube whereby a sample flows through said capillary tube and past said detector, see that? [Yes.]

Q Wouldn't every single capillary electrophoresis device have to perform what's shown as the second means?

A I agree with you.

Q You have to have a voltage supply?

A Absolutely.

Q And the flow has to go past the detector? [Yes.]

Q And you have to look through the detector to see the separation? [Yes.]

Q So isn't it clear that you could not have invented anything through this claim up to limitation 4?

A Absolutely, yes, I agree with you.

(*Id.* at 64-65.)Q There seems to be a lot of discussion about the rotatable table carrying a plurality of sample cups, you see that? [Yes.]

Q You're well aware of the fact that you didn't invent limitation 5?

A No.

Q That's an old technique in chemical separation?

A Yes. There are different names for the rotatable table, the trays, the autosamplers, and the fraction collectors are also called. So it was in the literature prior to that as-

Q Well known, right?

A Well known.

....

Q So when I see it in the literature and it says autosampler, that's what they're referring to, rotatable tables?

A Yes. It's a general terminology, mean how can you

supply that into the buffer and once again, it's not just round, it can be in different shapes.

Q But it's well known well before ... you began your research in capillary electrophoresis, to have rotatable tables for carrying plurality of sample cups so that any automated equipment would be able to test and diagnose multiple samples?

*32 A That is correct.

Q That's the purpose of automated devices with rotatable tables, isn't it?

A Yes, and exactly they providing the plurality of samples, vials.

Q So is it safe to say as we dissect this claim, you invented nothing up through limitation 5?

A That is correct.

(*Id.* at 67-69.)Q Limitation 6: A holder for holding an end of said capillary tube in operative relation with one of said cups, said cups containing either buffer solution or sample to be analyzed.

Now we know the cups have to contain buffer or sample because you already said that earlier, right? [Yes.]

Q I think everybody realizes that said cups containing either buffer solution or a sample to be analyzed, that can't lend any inventiveness or patentability to the claim, isn't that right?

A No.

....

Q So do you believe you were the inventor of the holder for holding the end of the capillary?

A No, because the holder is a very general terminology. So there are many different holders and so I'm not inventor of those holders.

Q So you're not inventor of anything in Limitation 6, right?

A No.

....

Q So we can now agree that you could not have invented anything from the preamble all the way through Limitation 6, right?

A That is correct.

(*Id.* at 69-71.)Q At the time you filed for this Claim 32, you thought you were the first ever to coil the capillary in a capillary electrophoresis device?

A Capillary electrophoresis device, yes.

Q Since that time, do you still believe that you were the first one to invent the idea of coiling the tubing in a capillary electrophoresis device?

A I[had] never seen literature prior to that date.

Q You didn't look at the literature that's been submitted in this case?

A Right, after '89.

....

Q I'm referring to literature that existed before you ever

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)

Page 33

filed your second application in November of 1988. Have you seen literature in this case, which shows that you in fact were not the first to publish, think of, build, use, test, a coil of glass tubing in a capillary electrophoresis device, yes or no?

A[If] you're comparing conventional and traditional electrophoresis versus modern capillary electrophoresis, the answer is yes. If you are comparing the back of-what happens in the past if you-and something like that, of course they existed, but those-are different kind of electrophoresis.

....

Q Where is "modern" in your claim 32?
A There's no modern, but that's-everybody knows today that capillary electrophoresis is a different way of doing things from the past.
Q I'm not asking you what people know today. When you filed this claim in 1988, did you ever have the word "modern" anywhere in it?
A No.

....

Q Before the break, we were talking about limitation 7. Have you reviewed the exhibits which are on each of the parties' exhibit books? ... [Yes.]
Q Did you see any references discussing coiling the capillary in a capillary electrophoresis device?
*33 A I saw reference coiling a capillary in traditional and conventional capillary.
Q So what year did it go from traditional to-what did you call it-modern?
A Modern capillary electrophoresis.
Q And when did that transition occur in the field of chemical separation in your view?
A I would say 1981 was probably the most classical year, to define modern capillary electrophoresis with some of the first papers from Dr. Jorgenson.
Q So by 1981 your view of modern capillary electrophoresis was now well known due to the papers written by Dr. Jorgenson, who is sitting in the front of the courtroom? [Yes.]

....

Q Have you read papers by Dr. Jorgenson and a student of his named Lukacs? [Yes.]

....

Q Did you ever read a thesis dated 1983, by Krynn DeArman Lukacs, at the University of North Carolina at Chapel Hill?
A Never.
Q You never saw it?
A No, I never saw that.
Q You never saw it even though it's been in defendant's exhibit book, and designated as an exhibit since the pretrial order in September of 2000?
A Yes, I don't think I have the whole copy.
Q I'm going to give you a whole copy.... Let's go back to

[claim 32], before we have the lunch break, and I'll come back. [Regarding] limitation 7, is it your testimony that at the time you filed your application in November of 1988, you thought that you were the first to ever coil the capillary in a "modern" capillary electrophoresis device?
A Yes, I never saw it before, yes.
Q As you sit here today, do you still believe that you were the first ever to coil the capillary in a modern capillary electrophoresis device?
A Well, it was-
Q Yes or no?
A I will say yes.
Q Do you know, are you guessing, speculating, just picking and choosing, or do you have any knowledge whatsoever as to when those of skill in the art, like Dr. Jorgenson in his lab, began coiling capillaries?
A I never saw those references-that you're referring to.

....

Q So you know that there were coils in gas chromatography?
A Oh, I admitted that the capillary coil has been coiled for many many years. What I'm saying in-capillary electrophoresis I mean-there are two different things. So, capillary coil existed before in isotachophoresis and gas chromatography, and many other forms of electrophoresis. But like I said, to my knowledge in this particular thing, in combination with the rest of the claim, this is the first time.
Q You refer to other forms of capillary electrophoresis. Isotachophoresis-is that one form?
A No, I have conventional and traditional electrophoresis, yes.
Q Is it your testimony that isotachophoresis is not a form of electrophoresis?
A It is.

....

Q You do concede that coiled capillaries have been used for years before you?
A Yes.
Q And before you began doing any work in capillary electrophoresis you recognize that coiled capillaries were used in isotachophoresis? [Yes.]
*34 Q And were used in gas chromatography? [Yes.]
Q And were used in other chemical separation techniques?
A Yes, quite possible.

(Id. at 74-85.)Q Let's go to the last limitation and we'll save limitation 7 for after the lunch break. This one-secured to a support member. Is it your testimony that securing to a support member was your idea?
A No.

....

Q In Claim 32, what is being secured to the support member?

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)

A This is the support itself.

Q I'll ask the question again, what is being secured to the support member?

A The capillary is secured to the cartridge cassette.

Q Is the cartridge cassette anywhere in this claim?

A No.

Q So cartridge cassette, let's get that out of the way. We're just talking support members, right?

A Well it could be any support members, it's a general term.

Q In your view, looking at claim 32, what is secured to the support member?

A I did explain that before to you, secured is the coiled capillary that is secured to a support member. The coiled glass tubing.

....

Q Is it your testimony that the "coil of glass tubing" is secured to the support member?

A[It] is the capillary tubing, [in] the form of a coil of a glass tube, [that] is secured to a support member.

....

Q Other than what we're going to cover after lunch, you concede you did not invent securing capillary tubes or any portion thereof to support members?

A No.

Q That's old, right?

A You mean ... limitation 8, is that right?

Q Yes.

A Yes, sir. I didn't.

Q You did not invent-okay. Limitation 8 doesn't add.

A Right.

(*Id.* at 89-94.)Q [After lunch recess, and referring to D-86, Lukacs 1983 thesis, at B 08358.] Do you see that in 1983, it was public information that you could coil the capillary in capillary electrophoresis devices?

A I can see that.

Q Particularly I'd like to read in the sentence, where it says, "Occasionally, very long columns (two meters or more) were coiled, but this resulted in the coils being electrostatically attracted to one another when voltage was applied." See that? [Yes.]

Q The thesis continues and shows how they resolved the problem of the coiled segments touching each other by electricity, see that? [Yes.]

Q Then it talks about putting insulation between each of the loops or rings, or coils, of the capillary, right?

A Yes, ... they don't say that they solved all the problems, they say they solved that problem.

Q But you do concede now that coils were known in the art, particularly as published by the students of Dr. Jorgenson?

A No, what I didn't see there in that paragraph, is ... all the elements in combination together.

Q I was just discussing limitation 7, just to show to you

that limitation 7 was not a contribution made by you to the field of capillary electrophoresis. Isn't that correct?

A I can see that now.

**\*35** (*Id.* at 124-26.)

Dr. Guzman was also cross-examined on a topic relating to objective indicia of nonobviousness (commercial success of the patented invention), in the following exchange:

Q You said your company was created for the purpose of selling capillary electrophoresis instrumentation, do you remember that?

A For the design and manufacture of capillary electrophoresis.

Q Do you remember testifying out of the presence of the jury that the purpose of you creating this company was to sell capillary electrophoresis instrumentation?

A There was probably another word that I used. But I also said design and manufacture.

Q Did you ever sell a single capillary electrophoresis device ever?

A Commercially, no, but I manufacture it internally, yes.

Q I'm just asking about selling to someone else that may actually use this. Did you ever sell a single one?

A No.

(*Id.* at 46-47.)

### C. Conclusion on Issue of Obviousness

We find that on the issue of obviousness pursuant to Section 103, the underlying historical facts are not in dispute. We further find that the only reasonable factual conclusion supported by the trial record is that all of the elements of claim 32, in combination, were obvious to a person of ordinary skill in the art of capillary electrophoresis apparatus as of the relevant date of November 14, 1987. Accordingly, we hold as a matter of law that defendant has met its burden of proving, by clear and convincing evidence, that claim 32 of the '172 patent is invalid as obvious.

The following discussion is structured under the four *Graham* factors: (1) the level of ordinary skill in the art; (2) the scope and content of the prior art; (3) the differences, if any, between the prior art and the claims at issue; and (4) any objective evidence of nonobviousness. *Graham,* 383 U.S. at 17. This analysis incorporates by reference all of the trial evidence pertaining to the issue of obviousness. That evidence is cited and summarized *supra,* Section VII.B. We will highlight that evidence as we apply the legal standards under Section 103.[FN49] The general legal standards are set forth *supra* Section VII.A,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

and discussed here.

> FN49. The "Conclusion" subsections of this opinion generally do not contain citations to the evidence except after quoted language. The trial record citations are set forth in the "Review of the Evidence" portion of each section.

### 1. *Level of Ordinary Skill in the Art*

"There are six factors a court should consider in determining the level of ordinary skill in the art: (1) the educational level of the inventor; (2) the type of problems encountered in the art; (3) the prior art solutions; (4) the rapidity of innovation; (5) the sophistication of the technology at issue; and (6) the educational level of active workers in the field." *Ajinomoto Co. v. Archer-Daniels-Midland Co.,* No. 95-218, 1998 WL 151411, at *40 (D.Del. Mar.13, 1998) (citing *Bausch & Lomb,* 796 F.2d at 449-50). Neither of the parties made any issue of the level of ordinary skill in this case at trial.

The evidence showed that the chemical separations field, and specifically the field of electrophoresis, was an active research area with numerous published materials during the early and mid-1980's. The publications in the field of electrophoresis techniques were by Ph.D. level researchers and their Ph.D. candidate postgraduate students. Dr. Guzman was a Ph.D. candidate in biochemistry when he developed the designs leading to his '172 patent application. Beckman developed its P/ACE device based on research by a leading academic chemist (Dr. Zare), initial research authorization by a manager with an M.S. in chemistry (Mr. Harbaugh), project approval for commercialization by a vice president with a Ph .D. in biochemistry (Dr. Osborne), and research and development work by a team comprised of an M.S. level chemical engineer (Mr. Burolla) and other technical engineers, computer specialists, and precision instrument makers.

**\*36** We find that the level of ordinary skill in the art would require at least an M.S. or its equivalent in biochemistry or chemical engineering, with some practical knowledge of electrophoresis instrumentation and its operation.

### 2. *Scope and Content of Prior Art*

#### a. *Scope*

A reference is within the scope of prior art if it is within the field of the inventor's endeavor. *Bausch & Lomb,* 796 F.2d at 449. If it is not, a reference is included in the scope of prior art if it "is reasonably pertinent to the particular problem with which the inventor was involved." *Id.* "A reference is reasonably pertinent if, even though it may be in a different field of endeavor, it is one which, because of the matter with which it deals, logically would have commended itself to an inventor's attention in considering his problem." *In re GPAC Inc.,* 57 F.3d 1573, 1578 (Fed.Cir.1995) (quotations and citations omitted). If a reference disclosure relates to the same problem as that addressed by the claimed invention, "that fact supports use of that reference in an obviousness rejection." *In re Clay,* 966 F.2d 656, 659 (Fed.Cir.1992).

The title of the '172 patent is "Capillary Electrophoresis Apparatus." [FN50] Certainly the scope of relevant prior art includes all references in the field of capillary electrophoresis. However, the inquiry does not end there.

> FN50. We note that defendant's witness Mr. Jester testified that the title of the '172 patent is actually a printing error, and should have read "Automated Capillary Electrophoresis Apparatus." (Tr. 12 at 120.) Plaintiff did not stipulate to such a fact. (*Id.* at 156 .) We need not rule on the point since it does not appear to affect the outcome of the case.

The '172 file history itself demonstrates that the scope of relevant prior art may include other electrophoretic techniques, and even other chemical separation techniques not limited to electrophoresis, if such art was reasonably pertinent to the particular problem with which the inventor was involved. The examiner in this case consistently rejected elements 1 through 6 of claim 32 as obvious, citing references ranging from capillary electrophoresis (Jorgenson) to liquid chromatography (Stevenson), stating "liquid chromatography and capillary electrophoresis are closely related techniques." (D-2 at 86.) The examiner expressly found that it would be obvious to one skilled in the art to combine the capillary electrophoresis apparatus of Jorgenson with automating elements found, for example, in Stevenson. (*Id.*) The examiner's citation of the Arlinger patent at various points of the '172 file history also shows that references in isotachophoresis may be prior art relevant to a capillary zone electrophoresis device.[FN51] Both the examiner and the applicant referred to the Arlinger device as an "electrophoretic apparatus." (*Id.* at 86, 92.)

> FN51. The Arlinger patent was cited numerous times by the examiner in rejecting various claims

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)

in both the original and the CIP application for the '172 patent. For example, Arlinger was cited against claims 1 through 28, 29, 30, 34, 35, 39, 47 and 48 in the examiner's initial rejection of the CIP application. (*See* D-3 at 70-72.) The examiner characterized the Arlinger patent as an electrophoretic apparatus disclosing a sample recovery means. (*See, e.g., id.* at 71.) Mr. Jester saw no apparent reason why Arlinger was not named among the references ultimately cited against only amended claims 39 and 50. (*See* n.30 *supra* and accompanying text.) We can discern no evidence relevant to obviousness from this aspect of the file history, except for the examiner's citation of Arlinger, which disclosed an isotachophoresis device, as a reference against many claims in the '172 patent application for a capillary zone electrophoresis device.

The evidence revealed that the scope of peer publications in the chemical separations field during the relevant period would typically address many of these related techniques. Examples include the following:
• The Honda article entitled "Evaluation of an Automatic Siphonic Sampler for Capillary Zone Electrophoresis" appeared in a publication named the International Journal on Chromatography, Electrophoresis and Related Methods. (D-77.)
**\*37** • The book edited by Everaerts entitled "Isotachophoresis" appeared in a publication named the Journal of Chromatography. (D-35 .) It states that the four main types of electrophoresis are zone electrophoresis, isotachophoresis, isoelectric focusing, and moving-boundary electrophoresis.
• The Stover article describing automation of the LKB Tachophor device was published in the same Journal of Chromatography. (D-36.)
• The Everaerts article entitled "Some Theoretical and Practical Aspects of Isotachophoretical Analysis" expressly compares isotachophoresis (called a closed capillary tube system) with zone capillary electrophoresis. (D-29.)
• The Jorgenson reference on capillary electrophoresis cited by the examiner in the '172 file history is a chapter in a book entitled *New Directions in Electrophoretic Methods*. (P-93.)
• Dr. Jorgenson testified that it was not unusual to combine teaching from techniques such as capillary electrophoresis and liquid chromatography, as the '172 examiner did, because "anyone working in the analytical field, in the separations field, is apt to be using or certainly be aware of these different separation methods ." (Tr. 12 at 183-84.)

We find that based upon this unrebutted evidence, the scope of analogous prior art must include prior art references in any electrophoretic method, as well as liquid chromatography, if the content of the reference is reasonably pertinent to the particular problems with which the inventor of claim 32 was involved. This scope would potentially include all of the prior art references in evidence at trial.

### b. *Content*

The next inquiry considers what problems the inventor of claim 32 was involved in solving, and whether the content of the identified prior art references is reasonably pertinent to those problems. *Bausch & Lomb*, 796 F.2d at 449.

Claim 32 is one of 40 claims in the '172 patent as issued. Like many of the other claims in that patent, claim 32 has numerous limitations. The parties have by stipulation divided claim 32 into eight listed elements. (P-72.) Within those eight elements are various limitations, depending upon how one would subdivide the claim language. It is understood that the obviousness inquiry is not directed to the so-called point of novelty of claim 32. Rather, the inquiry focuses upon the claimed subject matter as a whole.[FN52] The content of the collective teachings of the prior art must also be viewed as a whole, through the eyes of one of ordinary skill in the art. *See* Section VII.A. *supra.*

> FN52. Defendant argued at the summary judgment stage that plaintiff acquiesced in the examiner's rejection of elements 1 through 7 as obvious, and that by accepting the added limitation of element 8, plaintiff allowed the subject matter of claim 32 to reduce to that single point of novelty. We left that issue open for further factual development at trial. (*See* 12-29-00 Mem. and Order, nn. 1 and 4.) Based upon the full trial record we reach the conclusion that the entirety of claim 32 was obvious, in light of the entirety of the relevant prior art. Therefore it is not necessary to reach the issue of acquiescence, although both parties have preserved their positions on this issue for appeal. (*See* Tr. 12 at 125-126, 149-150, 155-156.)

The patent examiner in this case reviewed certain prior art references pertinent to elements 1 through 7 of claim 32, and rejected the combination of all those elements as obvious. The Patent Office's final rejection of elements 1 through 7 relied upon "Jorgenson in view of Stevenson et

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)

al and Akiyana [sic]." (D-3 at 98.) Plaintiff could not, and did not, rebut those conclusions or the underlying references at trial. The relevant content of those references, cited by the examiner, may be summarized as follows:

*38  • Jorgenson describes the basic structure and operation of Jorgenson's capillary electrophoresis system at the time. (P-93.) Jorgenson does not have a coiled and supported capillary nor a rotatable table.

• Stevenson describes a rotatable table carrying a plurality of sample cups in a liquid chromatography device. (D-4.) Stevenson is not a capillary electrophoresis device, so it lacks several other features of claim 32. [FN53]

> FN53. The Honda article in evidence confirms that the prior art specifically in capillary electrophoresis did show an automated device with a rotatable table carrying a plurality of sample cups, corresponding to elements 1 through 6 of claim 32. (D-77.) Honda does not describe a coiled capillary secured to a support member.

• Akiyama describes a capillary electrophoresis device containing elements 1 through 7 of claim 32, excluding the rotatable table. It features a coiled capillary tube made of "an insulating material such as Teflon," with an internal diameter of, "for example, .05 mm." (D-5, col.3, l.41-45.) It does not show a support member for the coiled portion of the capillary.

It is well established that the source of a suggestion or motivation to modify prior art teachings can be the content of the public prior art, the knowledge of one of ordinary skill in the art, or the nature of the problem to be solved. *Sibia,* 225 F.3d at 1356. The question of what is relevant content in the prior art for the coiled capillary "secured to a support member," element 8, therefore may depend upon the needs the inventor would have been addressing at the time of adding that feature to his capillary electrophoresis device. Here we have the testimony of the inventor himself, identifying the needs he was addressing in adding that feature:

So the capillary, you can see, has a first end and a second end which is the inlet and the outlet. But it's also in a support system that is coil the capillary [sic] for a number of reasons. The capillary coil will make the instrument more compact. That was one of the main reasons why I started doing this. The first instrument that I did, I had no idea that I could coil the capillary. So it was a very long instrument. So now we have a small little instrument that could be portable in the luggage for traveling.

(Tr. 3 at 54-55; *see also* Tr. 8 at 14-15.)

The two needs apparently identified in that statement are: (1) to make the capillary electrophoresis apparatus more compact, and (2) to immobilize the coiled capillary. It will be recalled that Beckman identified those same two needs among its objectives for the OTEP automated capillary electrophoresis product development.[FN54]

> FN54. In the real world, an additional need can be addressed while coiling and supporting an electrophoretic tube of any sort, whether capillary size or larger. The trial record contains many references to (1) a coiled and supported electrophoretic tube being combined with other features to achieve temperature control inside the coiled portion of the tubing, and (2) temperature control inside the tubing being important in all types of electrophoresis, whether or not a coiled capillary is used. However, because temperature control is not expressly addressed in the language of claim 32 of the '172 patent, we do not address that aspect in this section. We do address it in the following section, because it becomes relevant to the chronology of Dr. Guzman's inventorship based upon the patent prosecution history and the testimony of plaintiff's witnesses.

The examiner, as we know, found that coiling the capillary in an automated capillary electrophoresis device, regardless of the reason, was obvious. However, as a practical matter, the "secured to a support member" element (8) cannot be divorced from the "coil of glass tubing" element (7), because the coiled tubing is secured to the support member according to the claim language. Therefore, the prior art must be analyzed for content addressing either or both of those needs.

Searching the trial evidence, we find the following references pertinent to those specific needs:

*39  • The Lukacs thesis stated that during capillary electrophoresis work in Dr. Jorgenson's laboratory, very long coils were coiled. This resulted in the problem that the coils were electrostatically attracted to each other when voltage was applied. (D-86.)

• Beckman witness Dr. Osborne testified that even in Dr. Zare's apparatus without coiling, the capillary, swayed during the electrophoresis run, which affected the separation results, so "we did not want the capillary to move during the separation." (Tr. 11 at 67.)

• Dr. Jorgenson identified the coiled electrophoresis tubes used in prior art references Everaerts, LKB Tachophor, Macko and Chilla, discussed below. He stated that those

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)

were prior art specifically showing coiled electrophoresis tubes, including underlined capillary tubes, secured in place in a variety of ways.

• Dr. Jorgenson testified that from the late 1960's forward, those of ordinary skill were using coiled tubes to conserve space, in electrophoretic techniques including capillary electrophoresis, isotachophoresis and isoelectric focusing. He said, "any time you would have a long electrophoresis tube of some kind, then you'd be natural to want to use a coil." (Tr. 12 at 186.)

• Dr. Jorgenson further testified that at the relevant time it was known by persons of ordinary skill in the art that it was obvious to secure a coiled electrophoresis tube to a support member, for the reason that "you don't want a coil floating around without some kind of support." (*Id.* at 189.)

### 3. *Difference between Prior Art and the Claimed Invention*

Dr. Jorgenson, in the course of his testimony, discussed the five prior art references in evidence that specifically used coiled electrophoretic tubes secured to a support member. Those were Everaerts, LKB Tachophor and Stover using the isotachophoresis technique, and Macko and Chilla using the isoelectric focusing technique. For each of those references he pointed out the coiled portion of the tube and the structures that supported it. Briefly, to recap:

• Everaerts describes an isotachophoresis device with an electrophoresis capillary (0.4 to 0.6 mm) made of Teflon, glass or plastic, would around an aluminum block and pressed into a groove made in the block. (D-29.)

• The LKB Tachophor reference describes an isotachophoresis device with an electrophoresis capillary described as made of Teflon, coiled around a spool or mandrel inside a cartridge, and anchored in place at various points by tabs. (D-30.)

• Stover describes a "simple system for total automation" of isotachophoresis using an LKB Tachophor. (D-36.) It would use the LKB Tachophor cartridge containing the coiled and secured capillary tube.

• Macko describes an isoelectric focusing device using polyethylene tubing (4 mm) coiled around a copper tube aided by double-face tape, and held in place by a piece of wire screen fastened at the ends with strings. (D-24.)

**\*40** • Chilla describes an isoelectric focusing device based on the Macko design, using the same size and type of polyethylene tubing but fixed in close turns around a metal pipe and secured at each and through eyelets using sliding tabs. (D-25.)

Dr. Jorgenson admitted that no single prior art reference had been found showing all eight elements of claim 32 in combination. However, his testimony established that each of those five references showed that it was public information that lengths of electrophoretic tubing were being accommodated by coiling, and that the coiled tubing was being secured in place, within electrophoresis devices at the relevant time. Dr. Jorgenson also pointed out contemporaneous publications from his lab and another authoritative source that stated the desirability of small-diameter capillaries in electrophoresis generally, thus providing the suggestion or motivation to reduce the diameter of the tube to capillary size. Indeed, Dr. Guzman paraphrased that information in his thesis. Nor is there anything special about a glass capillary over a Teflon or plastic capillary as an electrophoretic medium, as demonstrated by Everaerts and LKB.[FN55]

FN55. It will also be recalled that the Akiyama patent in capillary electrophoresis stated that its capillary was made of Teflon, and that patent was cited against element 7 by the examiner.

Those five references are found in the same field of technology as claim 32, namely electrophoresis, and they each relate to the same problems addressed in elements 7 and 8 of claim 32. Considered in light of the surrounding evidence presented through Dr. Jorgenson, those references provide the suggestion that an inventor using a glass capillary in an apparatus for capillary zone electrophoresis could successfully solve the dual problems of accommodating length and immobilizing the capillary by coiling it and securing it to some kind of support member. We find that the only reasonable conclusion from this evidence is that those five references are reasonably pertinent to the particular problems addressed in elements 7 and 8 of claim 32. Therefore, they must be included within the scope of analogous prior art, along with references pertaining to the other elements of claim 32 such as Jorgenson, Stevenson and Akiyama.

Dr. Guzman admitted that he does not consider himself the inventor of any of the eight elements of claim 32; only the combination. However, he did not offer expert testimony from the standpoint of one of ordinary skill in the art. That hypothetical person is presumed by law to have (1) all of the prior art references before him or her and (2) the knowledge and common sense of one of ordinary skill in the art. Only Dr. Jorgenson presented testimony under that standard.[FN56]

FN56. Mr. Burolla did not purport to know all that the hypothetical person of ordinary skill in

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)

the art would know. However, his practical experience in leading the Beckman design team is relevant to the issue of the obviousness of claim 32. He had no prior experience in electrophoresis when assigned to Beckman's OTEP project. He learned how to make a basic capillary electrophoresis device by studying Dr. Zare's work and some of the pertinent literature, not including the above-cited five references. He was aware of the need to have a compact machine and to immobilize the capillary. His team designed its very first prototype to be a capillary electrophoresis device containing each of the elements of claim 32, including elements 7 and 8, even without knowledge of those five references. It is also relevant that as described by Mr. Harbaugh, Beckman sold a chemical separation instrument called an amino acid analyzer since the mid-1960's that featured a capillary tube wound around and secured to a mandrel.

Dr. Jorgenson testified that at the relevant time, (1) the published prior art references made all elements of claim 32 obvious, and (2) even in the absence of such references:

[T]he combination is obvious. Every one of the individual ideas is obvious. And the combination is absolutely obvious. Everybody in all of the related fields in all of the related technologies is doing those kinds of things.... The entire package taken together is obvious.

**\*41** (Tr. 13 at 41.)

We have considered the unrebutted opinion testimony of Dr. Jorgenson on obviousness and all of the evidence on this issue presented by both parties at trial. We find that defendant has presented clear and convincing evidence establishing that claim 32 of the '172 patent was obvious to one of ordinary skill in the art as of the benchmark date of November 14, 1987. The jury verdict to the contrary is not sustained by the evidence.

### 4. *Any Objective Evidence of Nonobviousness*

The consideration of objective evidence of nonobviousness, such as commercial success and long-felt need, is "a necessary part of the obviousness determination." *WMS Gaming, Inc. v. Int'l Game Tech., 184 F.3d 1339, 1359 (Fed.Cir.1999); see also In re Rouffet, 149 F.3d 1350, 1355 (Fed.Cir.1998).* Such evidence may also rebut a *prima facie* case of obviousness. *Id.* Commercial success of a patented invention is relevant to obviousness, but only if the

success of a product is related to the merits of the patented claim. *Sibia, 225 F.3d at 1358-59* (attempted reliance on commercial success failed when there was no evidence of a nexus between the alleged success and the claimed invention); *In re Huang, 100 F.3d 135, 140 (Fed.Cir.1996).*

There is no objective evidence of nonobviousness in the trial record. It was undisputed that the accused Beckman P/ACE devices were the first commercial instruments capable of performing capillary zone electrophoresis, and that gross sales have exceeded $50 million. However, even assuming *arguendo* that the P/ACE device infringes claim 32 of the '172 patent, plaintiff made no showing that its commercial success was attributable to the features of claim 32 rather than the myriad other factors that could account for that success.

Claim 32, for example, does not address temperature control, removable capillary cartridge, sample injection, automation motors, or computer hardware and software for inputting, collecting and analyzing data. All of these features are among the attributes of the Beckman product. (*See* Section IX *infra.*) Also, the P/ACE devices are equipped to perform several varieties of electrophoresis, not limited to capillary zone electrophoresis, including isotachophoresis and isoelectric focusing. (*See* Section VII.B.1.a *supra.*) Finally, it is undisputed that plaintiff itself solely controls the rights to the '172 patent, and it has never marketed or sold one single device. For these reasons, we find that plaintiff has presented no objective evidence tending to rebut defendant's showing that claim 32 was obvious.[FN57]

> FN57. An independent invention of the patented claim that is contemporaneous with the patentee's invention also constitutes some objective evidence of obviousness. *See Monarch Knitting Mach., Corp. v. Sulver Morat GMBH, 139 F.3d 877, 883 (Fed.Cir.1998); Matsushita Elec. Indus. Co. v. Cinram Int'l, Inc., 299 F.Supp.2d 348, 363 (D.Del.2004).* Defendant has shown that its product development effort produced a working prototype within the same 12-month period that plaintiff claims to have made its invention. (*See* nn.26 & 56 *supra* and accompanying text.) Plaintiff does not contend that defendant had any knowledge of Dr. Guzman or his work at that time. (Tr. 10 at 132.)

### 5. *Review of Jury Verdict on Obviousness*

The jury found that defendant had not proven by clear and convincing evidence that claim 32 was obvious. (*See* n.13

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)

Page 40

*supra*.) The jury instructions on this issue were consistent with the law as set forth in this opinion. (*See* Tr. 2 at 72; Tr. 15 at 24-44.) All factual issues pertinent to obviousness were submitted to the jury, subject to the parties' Rule 50 motions upon which this Court reserved decision.

**\*42** In order to reach the verdict rendered, the jury would have had to make underlying factual findings that the prior art references in evidence were not analogous, or that those references did not supply the required suggestion or motivation to make all elements of claim 32. The jury would also have had to reject Dr. Jorgenson's unrebutted expert testimony that even without those publicly-available references, all elements of claim 32 were obvious to those of ordinary skill in the art.[FN58]

> FN58. The jury could also have reached its verdict by incorrectly holding defendant to a burden of proving anticipation rather than obviousness, *i.e.,* by requiring that one single prior art reference should contain all of the elements of claim 32. (*See* 35 U.S.C. § 102(a); Tr. 13 at 58-59.) This would be a failure to adhere to the jury instructions, and at a minimum require a new trial.

This Court now concludes under Rule 50, viewing the trial evidence as a whole in the light most favorable to the plaintiff, that no reasonable fact-finder could make factual findings supporting the verdict in favor of plaintiff on the issue of obviousness. We therefore hold as a matter of law that claim 32 of the '172 patent is invalid as obvious, pursuant to Section 103. In the alternative, we will exercise the discretion of the Court and grant defendant's motion for new trial under Rule 59(a), holding that this verdict is so contrary to the great weight of the evidence that to allow it to stand would result in a miscarriage of justice.

VIII. *Defendant's Claim of Prior Invention*

A. *Legal Principles*

Defendant also asserts that claim 32 of the '172 patent is invalid on grounds of prior invention by Beckman. 35 U.S.C. § 102(g). Section 102(g) provides that a person is not entitled to a patent if "before such person's invention thereof, the invention was made in this country by another inventor who had not abandoned, suppressed, or concealed it."

An inventor can establish that she was the first to invent under § 102(g) by demonstrating either that she was the first to reduce the invention to practice or that she was the first to conceive of the invention and then, prior to the other party's conception, exercised reasonable diligence in reducing the invention to practice.

*Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co.,* 308 F.3d 1167, 1189 (Fed.Cir.2002). The issue of prior invention at trial focused upon who first reduced to practice a device containing each element of claim 32: plaintiff or defendant.[FN59] "To prove actual reduction to practice, an inventor must establish that he actually prepared the composition and knew it would work." *Estee Lauder Inc. v. L'Oreal, S.A.,* 129 F.3d 588, 592 (Fed.Cir.1997) (quotations and citations omitted).

> FN59. Plaintiff has preserved for appeal its argument that the prior invention inquiry in this case should focus on conception, rather than reduction to practice. This Court determined that the latter standard applies here, and so instructed the jury. (*See* Tr. 15 at 43-44; Tr. 16 at 6-16, 43-44; Pl. Br. at 22, n.20.)

When the inventor seeking to establish his or her own prior invention is also a party to the litigation, that inventor's own testimony, alone, is insufficient to establish actual reduction to practice. Rather, such interested testimony must be accompanied by evidence corroborating its veracity. *Sandt Tech., Ltd. v. Resco Metal & Plastics Corp.,* 264 F.3d 1344, 1350 (Fed.Cir.2001) ("It is well-established in our case law that a party claiming his own prior inventorship must proffer evidence corroborating his testimony ."). "This rule addresses the concern that a party claiming inventorship might be tempted to describe his actions in an unjustifiably self-serving manner in order to obtain a patent or to maintain an existing patent." *Id.* (quoting *Singh v. Brake,* 222 F.3d 1362, 1367 (Fed.Cir.2000)); *see also Kridl v. McCormick,* 105 F.3d 1446, 1450 (Fed.Cir.1997) ("The tribunal must also bear in mind the purpose of corroboration, which is to prevent fraud, by providing independent confirmation of the inventor's testimony."). Only evidence "independent of information received from the inventor" can legally corroborate an inventor's invention date. *See, e.g., Hahn v. Wong,* 892 F.2d 1028, 1032-33 (Fed.Cir.1989).

**\*43** A "rule of reason" test governs whether an inventor's testimony of prior inventorship has been sufficiently corroborated. *Sandt,* 264 F.3d at 1350. The court has the obligation under the rule of reason analysis to insure proper corroboration. *See Finnigan Corp. v. Int'l Trade Comm'n,* 180 F.3d 1354, 1369 n. 11 (Fed.Cir.1999). In

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

applying the rule of reason test, the court must examine all pertinent evidence in order to determine for itself whether the "inventor's story" is credible. "Each corroboration case must be decided on its own facts with a view to deciding whether the evidence as a whole is persuasive." _Berges v. Gottstein_, 618 F.2d 771, 776 (Fed.Cir.1980).

Documentary or physical evidence that is made contemporaneously with the inventive process provides the most reliable source of corroboration. _Sandt_, 264 F.3d at 1350-51 (citing _Woodland Trust v. Flowertree Nursery, Inc._, 148 F.3d 1368, 1373 (Fed.Cir.1998)). Such evidence guards against "the risk of litigation-inspired fabrication or exaggeration." _Sandt_, 264 F.3d at 1351.

Oral testimony of someone other than the inventor may also corroborate an inventor's testimony. _Id._ However, the Federal Circuit has cautioned that "post-invention oral testimony is more suspect, as there is more of a risk that the witness may have a litigation-inspired motive to corroborate the inventor's testimony, and that the testimony may be inaccurate." _Id._ (citing _Woodland Trust_, 148 F.3d at 1373). _See also Sandt_, 264 F.3d at 1351 (testimony from witnesses often reflects "their proneness to recollect things as the party calling them would have them recollect") (citing _Barbed Wire Patent Case_, 143 U.S. 275, 284, 12 S.Ct. 443, 36 L.Ed. 154 (1892)).

The only issues at trial with regard to prior invention were the parties' respective dates of reduction to practice. The question of when a party reduced an invention to practice is a legal question. _See, e.g., Sliptrack Sys., Inc. v. Metal-Lite, Inc._, 304 F.3d 1256, 1262 (Fed.Cir.2002). That a jury has answered a legal question does not relieve the court "of the judicial duty to insure that the law is correctly applied." _Senmed, Inc. v. Richard-Allan Med. Indus._, 888 F.2d 815, 818 (Fed.Cir.1989), _disapproved of on other grounds by Cardinal Chem., Co. v. Morton Int'l, Inc._, 508 U.S. 83, 113 S.Ct. 1967, 124 L.Ed.2d 1 (1993); _see also Newell Co., Inc. v. Kenney Mfg. Co._, 864 F.2d 757, 761-66 (Fed.Cir.1988). Accordingly, a court will grant judgment as a matter of law to defendant on the issue of prior invention if (1) defendant has established that it reduced to practice before plaintiff did, "by evidence that the jury would not be at liberty to disbelieve"; and (2) "the only reasonable conclusion is in [defendant's] favor." _Nobelpharma AB v. Implant Innovations, Inc._, 141 F.3d 1059, 1065 (Fed.Cir.1998) (stating standard for judgment as a matter of law with respect to invalidity generally).

### B. Review of the Evidence

**\*44** Defendant selects the date of February 1, 1987 as the completion date of its claim 32 invention, for purposes of this post-trial motion.[FN60] (Def. Pl Br. at 7.) Plaintiff does not dispute that date. (_See_ Pl. Br. at 22, 27.)

> FN60. Plaintiff asserts, and defendant denies, that the accused P/ACE device contains all eight elements of claim 32. For purposes of this section dealing with the prior invention counterclaim, we will assume _arguendo_ that plaintiff can establish infringement. The issue of infringement is addressed _infra_, Section IX.

The dispute concerns the date of plaintiff's reduction to practice. Plaintiff asserts that Dr. Guzman had a fully functioning capillary electrophoresis device, containing all elements of claim 32, no later than April of 1986. (Pl. Br. at 23.) Defendant contends that plaintiff's evidence is legally insufficient to create a material issue of fact as to whether claim 32 was reduced to practice by Dr. Guzman before February 1, 1987.

Defendant presented uncontroverted evidence to establish its own date of invention as of February 1, 1987. We have summarized that evidence in the preceding section, describing the chronology of the P/ACE development process. (_See_ Section VII.B.I _supra_.)

The parties each offered evidence concerning Dr. Guzman's invention date. Defendant presented evidence drawn from the '172 patent file history and from the testimony of several witnesses including the inventor, Dr. Guzman, in support of its contention that Dr. Guzman could not show a date of invention earlier than February 1, 1987. Plaintiff presented the trial testimony of Dr. Guzman, along with physical and documentary evidence, to support his asserted earlier invention date. Plaintiff also presented a corroboration witness named Dr. Bjorn Olsen, who was a former colleague of Dr. Guzman.

### 1. Defendant's Evidence on its Prior Invention

Defendant established its invention date to be no later than February 1, 1987, as noted above. The balance of the evidence of both parties on prior inventorship was devoted to the question of Dr. Guzman's invention date for claim 32. Defendant presented the following evidence relevant to its contention that Dr. Guzman could not establish a date of reduction to practice earlier than February 1, 1987.

Dr. Guzman signed the inventorship declaration for the original '172 patent application on November 17, 1987.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)

(D-2 at 62.) It included the inventor's acknowledgment of the duty to disclose material information. (*Id.*) Mr. Jester testified that when an apparatus is the subject of a patent application, the duty to disclose material information encompasses the duty to disclose the best mode to build the apparatus, including all features and advantages known to the inventor at the time the patent application was filed. (Tr. 12 at 61-63.) He stated that the penalty for violating the best mode requirement would generally be to render the patent invalid. (*Id. at 64.*) Dr. Guzman acknowledged at trial that same sanction for failure to disclose the best mode. (Tr. 3 at 50-51.)

The original application for the '172 patent was filed on November 25, 1987, more than nine months after February 1, 1987. That application contained no claim language, specifications, or drawings disclosing a coiled capillary secured to a support member (elements 7 and 8 of claim 32 as issued). Those features were wholly absent from the prosecution of the original application for the '172 patent. (D-2; Tr. 12 at 77-91.)

**\*45** An overview drawing of the capillary electrophoresis device claimed in the original application was depicted in Figure 1 of that application, and remains Figure 1 of the '172 patent as issued. That drawing is as follows:

TABULAR OR GRAPHIC MATERIAL SET AT THIS POINT IS NOT DISPLAYABLE
(D-2 at 52; P-1, Sheet 1.)

The CIP application was filed on November 14, 1988, more than 21 months after February 1, 1987. (D-3 at 4; Tr. 12 at 92.) There, for the first time in the patent prosecution, elements 7 and 8 were disclosed to the Patent Office. Element 7 was disclosed in added claim 39, and element 8 was disclosed in added claim 40. (D-3 at 60; Tr. 12 at 97-99.) Figures 16 and 17, each depicting elements 7 and 8, made their first appearance in the CIP application. (D-3 at 125; Tr. 12 at 95-97.) Those Figures were accompanied by the new specification language quoted in the margin, referring to a coiled capillary contained in a cassette/cartridge assembly.[FN61]

> FN61. The pertinent specification language corresponding to Figures 16 and 17 in the CIP application, which is repeated verbatim in the '172 patent specification, states:
> The apparatus of the invention may also use a modified capillary which, as shown in Fig. 16, comprises a capillary cartridge 711. The cartridge includes a capillary cassette which comprises a coiled capillary tube 713 embedded in a body of metal, glass, plastic or the like. In

coiled form, the capillary tube may be of any suitable length and it may contain various chemistries. The capillary cassette is held in a housing 721 made up of two plates of metal, glass, plastic or the like coupled by screws or the like. A temperature control fluid, which can be heated or cooled, can be circulated through the housing by way of inlet and outlet tubes 723 and 725. It is noted that the capillary cassette can be easily removed from the housing 721 and replaced by another cassette of different size or other characteristics.
The utility of the capillary assembly 711 as a readily replaceable cartridge which can provide capillaries of different lengths and chemistries will be clear to those skilled in the art. A mounting arrangement for the capillary assembly or cartridge 711 is illustrated in Fig. 17.
(D-3 at 31; P-1, col. 11, ll. 36-56.)

An overview drawing of the modified capillary electrophoresis device corresponding to the coiled capillary specification in the CIP application is Figure 17 in both the CIP application and the '172 patent. That drawing is as follows:

TABULAR OR GRAPHIC MATERIAL SET AT THIS POINT IS NOT DISPLAYABLE
(D-3 at 125, Fig. 17; P-1, Sheet 11, Fig. 17.)

A closeup drawing of the capillary cartridge corresponding to the coiled capillary specification in the CIP application is Figure 16 in both the CIP application and the '172 patent. That drawing is as follows:

TABULAR OR GRAPHIC MATERIAL SET AT THIS POINT IS NOT DISPLAYABLE
(D-3 at 125, Fig. 16; P-1, Sheet 11, Fig. 16.)

Dr. Guzman acknowledged at trial that CIP claims 39 and 40 disclosed an improved mode for accommodating capillary length, which was unquestionably superior to the two modes for that same purpose disclosed in the original patent application. (Tr. 10 at 145-48, 156-60.) It was thus undisputed that this better mode was not disclosed to the Patent Office on November 25, 1987, when the original application was filed, or at any time during the succeeding year until the CIP application was filed on November 14, 1988.[FN62]

> FN62. *See* Section VIII.C.4 *infra.*

Defendant at trial presented deposition testimony of Dr. Guzman in support of its contention regarding Dr.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 43

Guzman's date of inventorship of claim 32, as follows.[FN63] Dr. Guzman testified at deposition that he first coiled a capillary in approximately September, 1986, but did not initially place the coiled capillary into a cassette.[FN64] He stated at deposition that he first made a prototype equipped with a cartridge cassette in December, 1986. [FN65] However, during discovery there were only two prototype electrophoresis devices produced by plaintiff: (1) an orange and black plastic device, and (2) a stainless steel device.[FN66] Dr. Guzman testified at deposition that he made that orange and black plastic prototype around the middle of 1987,[FN67] and he made that stainless steel prototype in late 1987 and into 1988.[FN68] He further testified at deposition that the first time he ever showed anyone a prototype device that had a cartridge cassette was when he showed that stainless steel prototype to a Merck representative named Dr. Majors in late 1987 or early 1988.[FN69]

FN63. Deposition testimony of an officer of a party is admissible as evidence at trial when offered by the adverse party. *See* Fed.R.Civ.P. 32(a)(2). Defendant displayed videotaped deposition excerpts of Dr. Guzman at trial, pursuant to this rule. (Tr. 14 at 6-8; Tr. 16 at 45.) Those deposition excerpts were also filed in printed form in Defendant's Submission of Citations to Deposition Videoclips Presented During Trial. (Docket entry 171.) Plaintiff's counsel incorrectly suggested that such evidence is "hearsay" during closing arguments, and the Court was obliged to provide the jury with a corrective instruction. (Tr. 15 at 122, 124.)

FN64. Deposition text:
Q [W]e were talking about your coiled capillary ... when you first coiled it, ... was it always inside a cartridge?
A The intent-yes, without a cartridge cassette. No, was without.
Q When did you first coil the capillary?
A It could have been sometime in maybe September of 1986.
(Guzman 3-26-97 dep. at 134.)

FN65. Deposition text:
Q When do you recall placing the coil inside a cassette?
A In December of '86.
Q December of '86?
A Yes.
Q How do you recall first putting the coil in the cassette in December of '86?
A With electropherograms like I showed to you,

it was done sometime during the Christmastime of 1986.
(Guzman 3-26-97 dep. at 134.)

FN66. Those two prototypes, produced by plaintiff during pretrial discovery, were marked for identification at trial as follows. The orange and black prototype produced in discovery was marked P-20A at trial. The stainless steel prototype produced in discovery was marked P-20 at trial. This Court made evidentiary rulings and provided jury instructions pertaining to those two exhibits in the course of the trial, as described *infra.*

FN67. Deposition text:
Q When did you construct the actual prototype that's plastic in the library [of the law firm]?
A It could have been ... in the middle of '87, 1987, that is correct.
(Guzman 3-27-97 dep. at 263.)

FN68. Deposition text:
Q When did you make the stainless steel prototype?
A That was make-started probably late in '87, part of '88. That was one of the prototype that was show[n] to Dr. Ronald Majors.
(Guzman 3-27-97 dep. at 261.)

FN69. Deposition text:
Q Do you recall meeting Mr. Weinberger [of an unidentified corporation] in the spring of 1987?
A Yes. I think so.
Q Do you recall showing Mr. Weinberger your prototype?
A There was an early prototype at the time, but not with the cartridge cassette. It was one of the very elementary prototype.
Q When did you first make a prototype with the cartridge cassette?
A In December of 1986.
Q But you didn't show that prototype-
A No.
Q -to Mr. Weinberger?
A Not to him or to anybody in that corporation.
Q When did you first show somebody a prototype with a cartridge cassette?
A Was probably late '87, early '88.
Q And to whom did you show it?
A Dr. Ronald Majors from I think E.M. Science, the people from Merck at Germany.
(Guzman 3-27-97 dep. at 215-16; *see also* text quoted *supra,* n. 68.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)

Page 44

### 2. *Plaintiff's Evidence on its Prior Inventorship*

**\*46** Plaintiff presented evidence at trial in support of its contentions on the issue of the timing of Dr. Guzman's invention. That evidence, including direct and cross-examination of witnesses and voir dire on various exhibits, occupies a substantial portion of the trial transcripts. We have organized this subsection in three parts: first, a summary of Dr. Guzman's narrative of events; second, a description of the corroborative exhibits

presented through Dr. Guzman's trial testimony; and third, a summary of the testimony of plaintiff's corroboration witness, Dr. Olsen.

### a. *Dr. Guzman's Narrative of Events*

The undisputed benchmark dates in the history of Dr. Guzman, in relation to the chronology of the claim 32 invention, are as follows:

| | |
|---|---|
| 1975 | He received M.S. degree at Medical College of Georgia; then moved to New Jersey and enrolled in Ph.D. program at Rutgers. (Tr. 3 at 13-15.) |
| 1985 | He formed the plaintiff corporation, Princeton Biochemicals, Inc. (*Id.* at 26.) |
| May, 1986 | His thesis was approved and he was awarded the Ph.D. (P-11; P-12.) |
| July, 1987 | He commenced working for Hoffman-LaRoche ("Hoffman"). (Tr. 3 at 20-21; |

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)

| | |
|---|---|
| | Tr. 8 at 32; Tr. 10 at 143.) |
| 11-17-87 | He signed inventorship declaration for original '172 patent application. (D-2 at 62.) |
| 11-25-87 | Filing date of original '172 application. (*Id.* at 3; P-1.) |
| 11-14-88 | Filing date of CIP application. (D-3 at 4; P-1.) |

Dr. Guzman's trial testimony describing the process and timing of the claim 32 invention may be summarized as follows.[FN70] Some of plaintiff's physical and documentary corroborative evidence is referred to in this part, and all of that category of evidence is described in detail in the following part.

> FN70. In this subsection we merely summarize the trial testimony of Dr. Guzman on the issue of prior inventorship. Defendant disputes the truth of the key facts in this testimony. We address that issue in the conclusion subsection, *infra.*

Guzman's thesis concerned a type of enzyme used in collagen, comparing it in chick embryo and human placenta. He was interested in differentiating those two enzymes. (Tr. 3 at 13-18; P-11.) In the course of his thesis work, he used separation techniques including HPLC, slab gel electrophoresis, and capillary electrophoresis. (Tr. 8 at 20-21; Tr. 10 at 134-138; Tr. 11 at 12-13, 16; Tr. 13 at 32-36; P-11 at 67, 108, 172-174.)

He started his invention efforts that eventually led to the '172 patent in approximately 1980, while enrolled in the Ph.D. program. (Tr. 3 at 15-16.) He described his invention process in general as follows:
The first part of my time was a very frustrating time. It was a trial and error and I develop improvement from the very simple element to offer this particular capillary electrophoresis system all the way to improve. So I make

sketches. I did significant amount of prototypes. And then finally I tested. I ran samples so I knew that the final proto was a functional operationable machine and for use in electropherogram.

(*Id.* at 15.)

He founded the plaintiff corporation in 1985, while still enrolled in the Ph.D. program. (Tr. 3 at 26, 48.) He then worked for his corporation "full time basically," from 1985 until he started at Hoffman in July, 1987. (*Id.;* Tr. 10 at 143.) "So I worked in PBI during those years.... [I]t was a full-time job for me to develop the variety of different prototypes to improve the technology to see the best separation that I could." (Tr. 3 at 27.)

**\*47** His prototype devices began as a simple arrangement of a straight capillary between two beakers. (Tr. 8 at 115-17.) Gradually he added and modified components, creating successive prototypes based on preceding models. (*Id.* at 85-87, 115-17.) He would re-use components from earlier models wherever possible, to save money. (*Id.* at 124-26, 145-46; Tr. 10 at 153-55.)

One of the problems he encountered in his design efforts was how to accommodate varying lengths of capillary. He wanted a prototype that was compact and could fit into luggage for travel. (Tr. 8 at 115-16, 140; Tr. 10 at 153-55.) His first two approaches to that problem were a bellows/accordion type arrangement, and a modular arrangement similar to table leaves. (Tr. 10 at 145, 155-60; P-1, Figs. 1, 15.) Eventually he thought of the idea of

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)

Page 46

coiling the capillary and securing it to a support member. (Tr. 8 at 14-15, 89-91, 142-43; Tr. 10 at 9-11, 145.) That was a better mode for accommodating capillary length than his earlier methods. (Tr. 10 at 145-48, 156-60.)

There were six members on Guzman's thesis committee at Rutgers. The committee was chaired by Dr. Darwin Prockop, the department head. (Tr. 3 at 18-19.) Another committee member was Dr. Olsen. (*Id.*) By April of 1985, Guzman had been in the Ph.D. program for almost ten years but had not finished his thesis. (Tr. 8 at 20.) The committee sent him a letter dated April 30, 1985, advising that if he did not finish it within the next two months his Ph.D. degree would be in jeopardy. (P-10.) The committee later extended the thesis deadline to April 30, 1986. (Tr. 8 at 113-115.)

As the deadline for his thesis approached, Guzman wanted to include in his thesis an electropherogram that he had made in his capillary electrophoresis experiments. (*Id.* at 20-21, 149-53; Tr. 10 at 141-43.) He would need the approval of the committee for this, and Dr. Olsen agreed to meet with him. (*Id.* at 153.) Dr. Olsen knew nothing about capillary electrophoresis. (*Id.* at 92.)

That meeting took place at the dining room table in the home of Dr. Olsen on April 22, 1986 ("Olsen meeting"). (*Id.* at 17-19, 25-28, 80-82.) Dr. Guman brought to the Olsen meeting some instrumentation and an electropherogram. (*Id.* at 82, 85, 117-19, 140-43, 149-53; Tr. 10 at 23, 177.) The instrumentation consisted of a plastic prototype capillary electrophoresis device, and a separate plastic cassette for a capillary to be coiled into grooves in the cassette. (Tr. 8 at 140-43, 146-49; Tr. 10 at 9-11.)

The prototype that Guzman took to the Olsen meeting was not complete. It was missing several necessary components and was not operational at that meeting. (Tr. 8 at 25-27, 89-93, 142-43.) The instrumentation that he brought to the Olsen meeting, although incomplete, did contain all of the elements of claim 7. (Tr. 8 at 142-43; Tr. 10 at 9-11.) During that meeting, Dr. Guzman also drew sketches and used them in his explanation to Dr. Olsen. (P-6; P-8; *see, e.g.,* Tr. 8 at 17-22, 80-84, 92.) Dr. Guzman had used that same prototype, fully assembled and operational, to make the electropherogram that he brought to the Olsen meeting. (*Id.* at 148-53.) That electropherogram was then incorporated into his thesis. (*Id.* at 153.)

**\*48** The thesis was approved in May, 1986. (Tr. 3 at 15-16; P-11.) He received his Ph.D. as of May 22, 1986. (P-12.) The thesis contains a capillary electrophoresis electropherogram, with some descriptive text. (P-11 at 67,

85, 108-09, 172-73.) It makes no reference to a coiled capillary apparatus. (Tr. 8 at 156; Tr. 10 at 134-38.)

When Dr. Guzman had formed the plaintiff corporation in 1985, the attorney who handled the incorporation suggested that he consult with the law firm that eventually became his patent counsel. (Tr. 3 at 48-49.) The attorneys named in the original '172 application were Messrs. Wilson and Green, and attorney Green prosecuted the patent to its approval. (D-2 at 4; D-3 at 4, 136.) Dr. Guzman signed the retainer agreement with Mr. Green's firm in March, 1987. (Tr. 10 at 132.) However, he consulted with Mr. Green initially in 1985 and several times in 1986. (*Id.* at 132-34.) He kept all reference to a coiled capillary device out of his May, 1986, thesis based on free advice from that attorney. (Tr. 8 at 156-57; Tr. 10 at 132-38.)

The next step in his inventorship took place as soon as he obtained his Ph.D. in May, 1986. He commenced developing the first of four metallic prototype devices. (Tr. 8 at 165, 168-70, 180.) Before making any metallic prototypes, he had created approximately 31 plastic prototype devices. (Tr. 8 at 119-26.) The version he displayed at the Olsen meeting was approximately version 28 or 29 of those approximately 31 plastic prototypes. (*Id.* at 123-24.) Later, in approximately 1989, after making several of his metallic prototypes, he made one more plastic prototype and sent it to a professor in Argentina in 2000. (Tr. 8 at 174-77; Tr. 10 at 60-61.) He was constantly evolving capillary electrophoresis devices from 1980 through at least 1989. (Tr. 3 at 15; Tr. 8 at 145-46; Tr. 10 at 54-63.)

As he commenced developing his first metallic prototype in May, 1986, he also started to develop a cartridge housing to surround the coiled capillary cassette.[FN71] Within the cartridge housing, fluid could be circulated around the coiled capillary for temperature control. (Tr. 8 at 159-61.) He had a working metallic prototype, equipped with such a cartridge and all the other elements of claim 32, as of December, 1986. (*Id.* at 165-74, 180-87.) He knew it worked because he made electropherograms on it. (*Id.* at 181.) One of those electropherograms is an original document bearing his handwritten notations including the date of December 27, 1986. (*Id.* , at 191-93; P-13.) A photocopy of that same document differs from the original.[FN72] (*Id.* at 201-02; Tr. 10 at 28-40, 167-68; P-14.) He made electropherograms using every one of the prototypes that he completed. (Tr. 10 at 15-16.)

FN71. Dr. Guzman described development of the capillary cartridge cassette as follows:

Case 1:05-cv-00700-JJF     Document 158-4     Filed 06/13/2007     Page 21 of 28

Not Reported in F.Supp.2d                                                    Page 47
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)

Q [Did] you design any other capillaries or cartridges, or cartridge cassettes, in 1986?

A Yes, I was doing several cartridge cassettes.

Q Describe the next iteration of cassette [after the P-17 cassette].

A The next concept was not only to be able to coil the capillary, those grooves that I show, but also be able to cool the system, with some kind of a cooling device. In fact the first time I did this device, was in my home, so I used to use hot water, and cold water and a combination of those to maintain a certain temperature with a simple hose. So I developed a few prototypes for my so-called cassette cartridge device.

Q This is a cartridge cassette you're now describing? [Yes.]

Q What was the the cartridge made out of?

A It was also plastic, it was a heavy plastic, but ... it required more sophistication so I went to some professional company to do that.

Q Are you describing the cartridge now, or the cassette? My question I think was directed to the cassette.

A Well the cassette was a simple issue, I have many cassette done prior to my thesis. What I didn't have then was the cartridge, which is another sandwich after the cassette.

Q And so the cartridge was used to hold the cassette? [Yes.]

Q And in turn the cartridge was used to hold the capillary? [Yes .]

(Tr. 8 at 158-59.)

FN72. The differences between the various original documents and corresponding photocopies produced by plaintiff are addressed in the next subsection, *infra.*

Guzman's employment at Hoffman commenced in July, 1987. (*Id. at 143.*) When Hoffman became aware that he was working with attorneys to file patent applications, it demanded documentation that he had made his inventions prior to July, 1987. (Tr. 8 at 31-33 .) In response to that demand, he provided Hoffman with documentation that included two original handwritten pencil sketches dated April 22, 1986. (*Id. at 31-33, 80-82, 99-107.*) One of those sketches is a schematic of a capillary electrophoresis device including a "cartridge cassette coiled capillary" with an inlet and outlet for liquid to be circulated from a "liquid cooler-heater unit." (P-8.) He made photocopies of those two sketches in approximately late 1988, before he delivered the originals to Hoffman. (Tr. 8 at 33, 37, 99.) He received the originals back from Hoffman in 1991. (*Id. at 37-39;* Tr. 10 at 143-44.) There are differences between those originals and the

photocopies. (*See* discussion *infra.*)

**\*49** When he retained his patent counsel in March, 1987, he provided the attorney with full information about his claim 32 invention, including the coiled and secured capillary. (Tr. 10 at 132-34, 145-48.) The information he provided his attorney included six prototypes with cartridges and cassettes. (*Id. at 145-48.*) However, the original application for the '172 patent, filed in November, 1987, contained no disclosure of a coiled capillary secured to a support member. He was aware that the original patent application contained no such disclosure when he signed the inventorship declaration on November 17, 1987. (*Id.*)

### b. *Plaintiff's Corroboration Exhibits*

This subsection will summarize in detail the trial testimony of Dr. Guzman directed to plaintiff's corroboration exhibits.[FN73] We have grouped those exhibits, for purposes of this narrative, into the following three categories based upon his trial testimony: (1) "the May, 1986, materials," (2) "the December, 1986, materials," and (3) other corroboration materials.

> FN73. The following summary, which describes Dr. Guzman's trial testimony addressing the corroboration exhibits for his claimed date of invention, cites both his direct and cross-examination on those points.

#### i. *"The May, 1986, materials"*

Plaintiff offered the following physical and documentary exhibits in support of Dr. Guzman's trial testimony concerning the status of his invention efforts as of May, 1986:

• An orange and black plastic capillary electrophoresis chassis containing certain components. (P-20A.)
• A plastic coiled capillary cassette. (P-17.)
• Dr. Guzman's thesis dated May, 1986. (P-11.)
• The original of a handwritten pencil sketch dated April 22, 1986, showing various components including a coiled capillary, with related photocopy. (P-8; P-9.)
• The original of another handwritten pencil sketch dated April 22, 1986, showing various components, with related photocopy. (P-6; P-7.)

Each of those materials was admitted into evidence at trial, with the exception of P-20A. Exhibit P-20A was the subject of extensive trial testimony, both on voir dire and during the direct and cross-examination of Dr. Guzman.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)

However, the physical exhibit itself ultimately was not admitted into evidence, and the jury was instructed accordingly as described below. We will now describe Dr. Guzman's trial testimony about each of the exhibits in this group.

### Exhibit P-20A

Plaintiff produced one plastic prototype capillary electrophoresis device in this case. That same plastic prototype was produced during discovery and at trial. (Tr. 8 at 175.) It bore exhibit number P-20A for identification at trial. (*Id.* at 117.)

The physical exhibit displayed at trial consisted of a plastic chassis in several modules, constructed out of plastic in a black and orange color scheme. (*Id.* at 140-42; Tr. 10 at 156-57.) As presented at trial, the P-20A chassis did not include certain components including the following:
• a capillary
• a complete holder for holding an end of a capillary
• a coiled capillary
• a support member for a coiled capillary
**\*50** • a detector.

(Tr. 8 at 123-126.)

The color scheme of black and orange for P-20A was chosen by Dr. Guzman as a reference to the school colors of Princeton University, because he had named his company Princeton Biochemicals. He called his black and orange prototype "the Princeton Tiger." (Tr. 8 at 140-42; *see also* Tr. 10 at 41-43.) The trial transcript refers to exhibit P-20A alternately by that nickname. (*See, e.g.,* Tr. 8 at 148, 174.)

He testified that as he made each successive prototype, he would typically transfer components to the next generation prototype, to reduce expense. (*Id.* at 124-26, 143-46; Tr. 10 at 155.) At the conclusion of voir dire on the admissibility of P-20A at trial, this Court sustained defendant's objection to admitting it into evidence in its current condition. (Tr. 8 at 139-40.) However, we instructed the jury that it could consider Dr. Guzman's testimony concerning P-20A as the device had existed in the past. (*Id.* at 142-43.)

Dr. Guzman's deposition testimony on the question of when he made P-20A is quoted *supra,* n. 67. His trial testimony regarding P-20A may be summarized as follows.

Exhibit P-20A was one of the more advanced versions of

the various prototypes that he made, beginning from a very simple concept with two beakers in 1982. (Tr. 8 at 117-18.) His process of making P-20A was as follows:
Q How did you make the prototype of 20A?
A By buying components and going to different show machines and doing the sketches and-putting together with the help of different plastic people, or electronic people.

(*Id.* at 119.)

His inventive steps evolved as he built a series of prototype capillary electrophoresis devices during the period 1982 through at least 1989. (*Id.* at 117, 145-46; Tr. 10 at 24-27, 61-63.) He made approximately 31 plastic prototypes and four metallic prototypes during that period. (Tr. 8 at 119-20.) Exhibit P-20A represented approximately number 28 or 29 in the evolution of the 31 plastic prototypes.[FN74] All but one of the plastic prototypes, including P-20A, were made before he made his four metallic prototypes. (*Id.* at 174-80; Tr. 10 at 11-13.) However, as of 1989 he was still refining his various prototypes, including P-20A and the later metallic versions, to add automation.[FN75] (*Id.* at 24-26, 61-63, 161-62.)

> FN74. Trial text:
> Q What version are we looking at, one or 31? Pretend we're at Baskin and Robbins, and we've got 31 flavors, and they're numbered one to 31. Which version do we have here, in P-20A?
> A I don't know. It could have been 28, 29, but one of the very latest versions.
> (Tr. 8 at 124.)

> FN75. Dr. Guzman produced three partial capillary electrophoresis prototypes in this case. None was complete and operational during this litigation. Two were produced in discovery: trial exhibits P-20A (plastic) and P-20 (metallic). During the trial this Court conducted a Rule 104 hearing out of the presence of the jury, and Dr. Guzman revealed that he had another metallic prototype at home in his attic that had not been produced. (Tr. 5 at 16-17.) This Court directed plaintiff to produce that prototype, and it was admitted into evidence as P-133, discussed *infra.*

Dr. Guzman showed the P-20A plastic prototype to Dr. Olsen during the Olsen meeting on April 22, 1986. (Tr. 8 at 117-19, 122-24, 140-43; Tr. 10 at 24-25.) At that meeting, the P-20A plastic prototype possessed all the elements of claim 32, including a coiled capillary secured to a support member. (Tr. 8 at 124-26, 142-43; Tr. 10 at

9-11, 163.) That prototype was not operational at the Olsen meeting because it lacked several necessary components. (Tr. 8 at 25-27, 89-93, 142-43.) However, Dr. Guzman had operated the P-20A plastic prototype to produce the electropherogram that he showed Dr. Olsen at that meeting. (*Id.* at 148-53; Tr. 10 at 23-24.)

*Exhibit P-17*

**\*51** Trial exhibit P-17 is a physical object consisting of two flat pieces of clear plastic held together by four screws. One of the two plastic pieces has grooves cut into its internal surface in a coil-like pattern. There are broken pieces of capillary inside the grooves, held in place by patches of tape. (Tr. 8 at 146-47.) It appears as follows:

TABULAR OR GRAPHIC MATERIAL SET AT THIS POINT IS NOT DISPLAYABLE
(Photo of P-17.)

Here we summarize Dr. Guzman's trial testimony on exhibit P-17.

He calls this assembly a cassette ("cassette"). *See* n.84 *infra.* The grooves inside the cassette are there "to guide the capillary to go around." (Tr. 8 at 147.) He made P-17 as follows:
[T]his is a very simple thing to do. You go to a place, they cut it ... and ... you can do [these] grooves, and then ... . they put ... the screws here.

*(Id.)*

Dr. Guzman showed P-17 to Dr. Olsen during the Olsen meeting on April 22, 1986. *(Id.* at 148.) The electropherogram that Dr. Guzman brought to the Olsen meeting had been made by him using the P-20A plastic prototype device, equipped with the P-17 coiled capillary cassette. That cassette had been attached to the P-20A device adjacent to the detector during operation of the device. *(Id.* at 122-23, 146-49.)

*Exhibit P-11*

Trial exhibit P-11 is Dr. Guzman's thesis, bearing the approval date "May, 1986." (P-11 at Bates no. 341.) Figure 19 of the thesis is a comparison of three electropherograms, shown as follows:

TABULAR OR GRAPHIC MATERIAL SET AT THIS POINT IS NOT DISPLAYABLE
*(Id.* at 173.) The text accompanying Figure 19 states in its entirety:

FIGURE 19. High-resolution electrophoresis of purified prolyl 4-hydroxylase from chick embryo and human placenta. Capillary free zone electrophoresis was performed using native conditions as described in the text. Approximately 1 to 5 ul of protein was applied to the column. Optical density at 280 nm measured. A: Chick embryo prolyl 4-hydroxylase. B: Human placenta prolyl 4-hydroxylase. C: Mixture of both enzymes.

*(Id.* at 172.) The thesis also states the following, in a section bearing the heading MATERIALS AND METHODS:Capillary free zone electrophoresis (high performance or high resolution electrophoresis) was performed with a homemade system consisting of a capillary column, two buffer reservoirs, an in-column detector, and a power supply. Fused silica capillaries (I.D. 50 and 75u) were purchased from Scientific Glass Engineering, Austin, TX. The electrophoresis power supply (high voltage) was obtained from Spellman High Voltage Electronics Corp., Plainview, N.Y.

*(Id.* at 85.) The thesis also refers to capillary electrophoresis in another section, quoted in full in the margin.[FN76]

FN76. The further text of the thesis on the subject of capillary electrophoresis states as follows:
Capillary Zone Electrophoresis of Prolyl 4-Hydroxylase
Buffer-filled open-tubular capillaries are an alternative to gels as a medium in which to conduct zone electrophoresis. Using fused silica capillaries with typical dimensions of 50 or 75 micron inside diameter and 50 to 100 cm length, it has been possible to apply potentials from 1,000 to as high as 30,000 volts to drive separations (Jorgenson and Lukacs, 1983; Green et al., 1985.) Such high voltages can be applied due to the efficient heat dissipation of small diameter capillaries. The advantages of very high voltages (and very low current) for driving electrophoresis are increased resolution and speed of analysis.
During the course of this thesis, capillary zone electrophoresis was used as an alternative method to compare charge differences between the avian and mammalian prolyl 4-hydroxylase. Fifty and 75 micron inside diameter and 60 cm length untreated fused silica capillaries were used. A variety of buffers were used during the performance of these experiments, but the one which gave the most consistent results was 0.050 M sodium borate, pH 8.2 at room temperature

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)

(Hjerten and Zhu, 1985). The detection system used was ultraviolet absorbance, usually 214 and 229 nm, on-column. For this purpose a UA-5 detector (ISCO, Lincoln, NE) was used, containing a Type-9 optical unit system with Hg and Zn lamps (214, 254, and 280 nm filters) or Type-6 optical unit system with Hg and Cd lamps (229, 254, and 280 nm filters). About 1-5 ug per 1-5 ul of protein sample was injected into the column by applying a short-term, high-voltage pulse. Routinely, 5,000 volts for about 4-7 see were used for the initial injection and then a potential gradient of about 300 volts per em, 30 microamps, were kept during the rest of the experiment.

Several considerations were always kept in mind during the use of capillary zone electrophoresis as a powerful separation technique. Of major concern was the fact that proteins tend to adsorb onto the capillary wall, and in so doing, tend to migrate as broadened zones. Although it has been suggested (Green et al., 1985) that the phenomenon of adsorption of proteins to capillary walls can be minimized by a number of different capillary surface treatments, during the course of this thesis only one "blocking" substance was used. Commercially available untreated fused capillaries were treated with a solution of 0.2% (w/v) methylcellulose before use (Hjerten and Zhu, 1985). Methylcellulose suppresses electroendosmosis and minimizes adsorption of solutes, in general, on the capillary walls. Without the methylcellulose treatment of the capillaries (blocking of active groups), the resolution of the protein bands was not accomplished.

(P-11 at 108-11.)

Here we quote Dr. Guzman's trial testimony on direct examination concerning the relationship between his thesis, P-11, and the elements of the claim 32 invention:

Q What is it in the thesis that was derived from the use of PX-17 on the Princeton Tiger?

A That was the [result] of separation, which is called electropherograms, of the two different enzymes, one derived from chicken embryos, and one derived from human placenta.

*52 Q So are you telling us that you performed a separation using the Princeton Tiger and the cassette of PX-17? [Yes.]

Q And you did that before May of 1986? [Yes.]

Q And we know that, because it's in the thesis right? [Yes.]

Q Explain exactly what it is in the thesis [P-11] that confirms the testimony you just offered.

A Well, is the electropherogram-I believe it's Page 173, and-

Q What is on Page 173, which would be of interest to these jurors?

A It's basically what I call electropherogram, that I-

THE COURT: Your question was would be please explain how the drawing there demonstrates that it was made using the Princeton Tiger which has loosely been referred to as such here-an apparatus made of plastic with some black and orange-which included this cassette, P-17, that he's holding.

A I made it to prove to my advisor Dr. Darwin Prokap that this particular piece of information in my thesis, was very important. He was a very conservative person and he rejected the fact that it was put in the thesis something he didn't understand. So after a lot of discussion we settled that someone in the Committee has to see and understand the electropherograms, and be able to see if there was any instrument at all in which I have such a thing.

Well, this was the final product, and you can notice that there is [an] A ... for one particular enzyme, which I presume was chicken embryos, then there is a B, that it was the next enzyme was human placenta hydroxylase and there are minor differences because they were very similar in physical chemical characteristic. But when you mix them, you notice that there are two species, without any question.

And this is what I used the other day that were this same-my thesis, because even though without this I could have still received my Ph.D. degree, was the most scientific evidence to prove when compared to all the tradition of-they-that I did in the past.

So final when Dr. Olsen noticed that this was an important issue, he convinced my boss that it should be in the thesis, and the final was accepted by the rest of the Committee.

Q What do the two peaks [in] panel C demonstrate?

A This [is] the combination of the two enzymes simultaneous, which mix and you add it into the system. If there was no separation it would be a single peak.

Q So the two peaks demonstrate that the Princeton Tiger [and] PX-17 had performed the intended separation?

A Absolutely, it was complete operational instrument.

Q Again directing your attention to the thesis, PX-11, does the thesis make any reference to a coiled capillary as represented by PX-17?

A No.

Q Why not?

A There was two explanations to that. First of all I mentioned to you that I never ever applied for a patent before, so even though that my final agreement with my attorney was in 1987, in 1985 when I filed the corporation, there was a lady Ms. Lydia Kuhn, who was the attorney that opened the corporation, and she mentioned to me that her husband Mr. Kuhn was another

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)

attorney,-for the firm of Mr. Wilson that eventually introduced me to Mr. Green, so when I did that for the first time in 1985, the attorney advised me that I have to be very careful to disclosure, anything that was in the invention, because I was-

**\*53** THE COURT: To not disclose?

THE WITNESS: Not to disclose to the public what I was doing.

Q Go ahead.

A My invention and the reason is because I was planning to apply for a European patent, that eventually was issued, I have a European patent and this was called PCT, Patent Corporate Treaties. And the moment you disclosure this to the people you no longer have a patent in Europe.

Q What did you say? The moment you disclose what?

A Your invention to the public, you have no possibility of having a European patent. Was a different in the United States, I think from the moment you showed to someone your invention, you have one year to apply to the patent office. So that was basically the main reason of keeping most of this information away from the public.

Q You thought if you described the coiled capillary in your thesis, you would lose your opportunity to obtain a patent in Europe? [Yes.]

(Tr. 8 at 149-57.)Q I think [defense counsel on cross examination] was asking you questions about whether or not there was any discussion in your thesis about the capillary cartridge. [Yes.]

Q And we've previously established that Page 173 was the electropherogram of your thesis? [Yes.]

Q And that electropherogram was produced on the Princeton Tiger, if I have it right?

A That is correct.

Q And in that configuration the Princeton Tiger had the coiled capillary?

A That is correct.

(Tr. 10 at 177.)

On cross examination regarding his thesis, Dr. Guzman again acknowledged that nothing in the thesis disclosed any <u>capillary electrophoresis</u> instrumentation featuring a coiled capillary:

Q Did you or did you not testify on your direct examination that you consulted with an attorney to keep information out of your thesis?

A That is correct. That was in '86.

Q So in '86 you were consulting an attorney?

A That is correct, I didn't pay, and we didn't have a signed agreement.

Q So you kept information outside of your thesis, based on free advice from an attorney?

A That is correct.

....

Q Is there any reference here, whatsoever, to any of the components on the Princeton Tiger, which you tried to get admitted as P-20A?

A My attorney told me not to put the components that I'm going to patent, so no.

....

Q This was a homemade device, wasn't it?

A This is all was homemade device.

Q Right, and that's what you referred to it as, right? [Yes.]

Q Didn't you also refer to it in your thesis as a homemade in-column device, didn't you?

A I don't know if I see that.

Q Does "in-column" suggest that it was not coiled?

A Not necessarily.

Q Is there anything in your thesis that explains how you got the data on Figure 19 that uses a coiled capillary?

A I explained every detail, how I did it, and all the conditions, and I said this is the best buffer that I used, I also used the-the sample, I injected into the column. The time that I injected, amount of voltage that I injected. The 30 microamps, there's a lot of detail here, what I did. I also-

**\*54** Q In all those details, is there anything explaining a coiled capillary?

A I'm still looking for that. And-then-

Q Rather than keep talking, could you please find to me any reference where you believe your thesis indicates that there's a coiled capillary?

A I was-tell you-under the advice of an attorney I was told not to put the details in the thesis.

Q [So] you don't need to look; you know it's not in there?

A Right.

....

Q The reference to Page 85 of the thesis. The first full paragraph on the left column, where it begins "capillary free zone electrophoresis." Did I correctly characterize your thesis here where it calls [it] a homemade system? [Yes.]

Q What device are you referring to when you say a homemade system?

A That's the only device that I have at the time, was the-the-the plastic device.

Q The Princeton Tiger? [Yes.]

Q When you say "capillary column" and when you say "in-column detector," you are purposely leaving out any mention of the coil, correct?

A That's correct, sir.

<u>(Id.</u> at 133-39.)

The subject of controlling capillary temperature also came up during Dr. Guzman's trial testimony regarding his thesis. He referred to the statement in his thesis concerning room temperature, quoted *supra*, n. 76. He testified that in performing his <u>capillary electrophoresis</u>

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)

separations for the thesis, he controlled the temperature of the capillary at room temperature by using water at 25 degrees centigrade, the equivalent of room temperature. That segment of his trial testimony is quoted here in the margin.[FN77]

> FN77. Dr. Guzman testified at trial that that he controlled capillary temperature in performing the capillary electrophoresis for his thesis in May, 1986. That testimony was as follows:
> Q Is there anything else in this thesis in any way, suggests how you were able to obtain the data which formed Figure 19?
> A Well there's a sentence....
> ....
> A See it said [quoting P-11 at 108], "during the course of this thesis, capillary electrophoresis was used as an alternative method to compare charge differences between the avian and mammalian prolyl 4-hydroxylase." So the Thesis Committee, especially Dr. Olsen, saw the instrument, and under the next page, the only thing I'm telling you is some of the components that I used here for the instrumentation which is Page 109. So basically it said that several buffers were used but the one which gave the most consistent results was with 50-buffer-8.2, at room temperature....
> Q Room temperature, is that what you said? [Yes.]
> Q So you didn't control the temperature of the capillary?
> A Oh, no I was-it was with water. I was telling you I was cooling the whole thing and it was measured at 25-centigrade. So that's what I called room temperature....
> (Tr. 10 at 135-36.)

*Series of sketches, Exhibits P-6 through P-9*

Trial exhibit P-6 is a one-page sketch in pencil that has obviously been altered. Exhibit P-7 is a photocopy of P-6, but it differs from P-6 in certain respects. There is a second set of similar documents marked P-8 and P-9, consisting of another altered pencil sketch and its related but different photocopy.

Each of the four documents bears the date of April 22, 1986, but the handwriting of the dates has been altered in the originals. Also, the handwriting of the dates does not match when comparing the originals and the photocopies, and the P-6 original has an added notation not present on its photocopy, P-7.

Plaintiff produced copies of the originals, P-6 and P-8, in an early stage of discovery in this case. Defense counsel observed that there appeared to be obvious erasures and superimposed handwriting on the produced copies of the originals, and questioned Dr. Guzman about those alterations during a deposition. Thereafter, plaintiff produced the related photocopies, P-7 and P-9. This Court held a pretrial hearing on defendant's motion to exclude the whole series from evidence, resulting in the motion being withdrawn. (5-22-01 H'g Tr.; docket entries 108-13.) All four documents were admitted into evidence at trial, without objection.[FN78]

> FN78. Any authenticity issue regarding exhibits P-6 through P-9 was for the jury, pursuant to Federal Rules of Evidence 1003 and 1008. Defendant did not raise any other objections to admissibility of the series, and the Court agreed that they were admissible because they are alleged prior statements by Dr. Guzman. *See* Fed.R.Ev. 801(c)(1)(B) (prior consistent statements by a witness, offered to rebut an express or implied charge against the declarant of recent fabrication, are not hearsay).

Dr. Guzman's trial testimony concerning this series of documents may be summarized as follows.

*55 When Dr. Guzman met with Dr. Olsen at the Olsen residence in April, 1986, Guzman made sketches and used them to explain certain concepts to him. (Tr. 8 at 17-19.) Dr. Guzman later went to work for Hoffman, in July, 1987. (Tr. 3 at 20-21.) At that time he was working with his patent counsel to file patent applications on his own behalf. Hoffman learned of his patenting activities, and in 1988 it demanded documentation to establish that the inventions he was seeking to patent had not been created during his employment at Hoffman. He had saved in his attic a few documents, including two sketches. He delivered the originals of those two sketches to Hoffman for its inspection in or about late 1988. Before conveying the originals to Hoffman, he made and retained a photocopy of each sketch. He received the two originals back from Hoffman in 1991. He put the originals back in his attic without noticing any changes. (Tr. 8 at 31-38, 99, 104-07.)

When he began working with plaintiff's litigation counsel to file this action, he gave that counsel the two originals, P-6 and P-8, copies of which were initially produced in discovery. (*Id.* at 35-36.) He does not recall when he gave plaintiff's counsel the two related photocopies, P-7 and P-9. (*Id.* at 69-73.) He himself made no alterations to the originals since they were created in April, 1986, nor did

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)

Page 53

he alter the photocopies. (*Id.* at 79-80, 111-13.)

Looking at the originals, P-6 and P-8, he agrees that someone has written over the dates in pencil, and that the underlying original handwritten dates are not legible. (*Id.* at 44-45.) The overwritten portions of the originals, including the dates, are not in his handwriting. (*Id.* at 30, 97-99, 100-04.) There is also a notation on one of the originals, P-6, that is not in his handwriting. (*Id.* at 36.) [We will refer to both the overwritten and the added notations in the originals as "the added writing."] He does not know when or how the added writing was placed on the originals. He can only surmise that it was placed there by persons within Hoffman during the period from late 1988 until 1991, when the originals were in the possession of Hoffman. (*Id.* at 37-39, 97-99, 104-07.)

Looking at the photocopies, P-7 and P-9, he believes that those photocopies accurately depict what the originals looked like in late 1988, when he gave the originals to Hoffman for inspection. (*Id.* at 39, 99-100.)

He created those two sketches at the home of Dr. Olsen during the Olsen meeting on April 22, 1986.[FN79] He used the sketches at that meeting to explain to Dr. Olsen certain concepts concerning <u>capillary electrophoresis</u> in general, and specifically his instrument. (*Id.* at 20-21, 27, 82-83, 85-89.) They are conceptual sketches only, and are not accurate drawings of the instrumentation that Dr. Guzman brought with him to the Olsen meeting. (*Id.* at 25-26, 126-34.)

> FN79. There is a legend on the bottom of each document in this series that states: "Shown to Dr. Bjorn Olsen (Thesis Committee) April 1986." Leaving aside the fact that the "April 1986" date is overwritten in the originals (P-6 and P-8), it is apparent from observing P-6 and P-7 that the letter "n" in the word "shown" has been wedged into the line as an afterthought. Dr. Guzman was questioned on voir dire as to whether he wrote that legend on April 22, 1986, rather than on some other date, and he could not swear to that, stating only it was "possible." (Tr. 8 at 25-28.) But he asserted that the sketch portions of both documents, except for the added writing contents, were all placed by him on P-6 and P-8 during the Olsen meeting. (*Id.* at 17-19, 21-22, 82-84.)

P-6 is a sketch of three boxes with various features. The first box is marked "external high voltage power supply," the second is marked "recorder," and the third is marked "motor controller." The "recorder" box is shown printing

out a document resembling an electropherogram. (P-6.) Those units were not on the prototype device that Dr. Guzman brought to the Olsen meeting, and he made this sketch to show Dr. Olsen "what are the elements that I needed to make this device functional and operational." (*Id.* at 25-26.)

**\*56** P-8 is a sketch of a <u>capillary electrophoresis</u> chassis with various feature, reproduced here in its entirety:

TABULAR OR GRAPHIC MATERIAL SET AT THIS POINT IS NOT DISPLAYABLE
(P-8.)

Dr. Guzman's testimony about what is depicted in P-8 changed between direct and voir dire examination, as follows:
Q [Describe P-8.]
A This is actually the drawing that I was making to Dr. Olsen to explain about what is what I invented, and how my electropherogram that eventually appeared in my thesis was made. So I tried to do as much as I could, once again, this is a sketch of what I call the <u>capillary electrophoresis</u> apparatus that I used at the time.

(Tr. 8 at 82 (direct testimony).)Q Let's take a look at some of the dates here [P-8]. Is it your testimony that you had a device like this at the time of April 22nd, 1986?
A Yes. Plastic device, let's make a difference.
Q So it was plastic, but it looked like this? [Yes.]
Q And everything is in the right location?
A Everything is in the right location? [FN80] You have to remember that what I brought to Dr. Olsen is not what is there, what I brought to Dr. Olsen is what I wanted to explain, how the whole mechanism of <u>capillary electrophoresis</u> worked.

> FN80. See further development of this topic, n.81 *infra* and accompanying text.

Q And you used this to explain to Dr. Olsen how <u>capillary electrophoresis</u> works?
A In base of some of the things that I brought to his home, yes [sic].

(*Id.* at 89-90 (voir dire on P-8).)Q You're not suggesting that P-20A, that orange and black thing, you're not suggesting that's in the drawing of P-8, are you?
A Not at all.
Q They're two separate things, what's in the drawing?
A This-absolutely.

(*Id.* at 119-20 (voir dire on P-20A).)Q Do you have any

documents whatsoever, that show any of the versions of P-20A as it existed at any time, with any date, ... yes or no?

A I have a-sketch, of what I presented to Dr. Olsen, of what I think is going to be the next generation of 20A, or 29 version.

Q But we established, I thought, that P-8 ... that's not a picture of P-20A?

A That's not a picture of 20A, but it contained all the components of 20A.

Q It shows all the components?.... Show me in P-8, where it shows this component?

A The components are-the package, the whole thing.
.... [Further voir dire examination.]

Q Now, explain to me how this ... P-8 is an accurate depiction of Exhibit 20A?

A It's not an accurate depiction. What I'm trying to say that-I explained to Dr. Olsen this first, that I have a system, was two boxes, was one cover-with one ground-and capillary-some meters and-so on and so forth. Once 1 finished that I said look, this is the one instrument and component, in fact it's in the reverse order. Right here it's in the reverse order, the components.[FN81]

> FN81. Dr. Guzman acknowledged in the above-quoted testimony that his P-8 sketch shows the cartridge containing the coiled capillary in the wrong location. (Tr. 8 at 131.) The sketch depicts the cartridge on the outlet side of the detector. (P-8.) Dr. Guzman agreed that this is incorrect because the length of capillary relates to the time necessary for the sample to undergo chemical separation between the inlet point and the detector window, and the temperature control must occur on the inlet side of the detector, so there would be no reason to coil and cool the capillary on the outlet side of the detector. (Tr. 8 at 89-97.) Defendant's expert witness on capillary electrophoresis, Dr. Jorgenson, stated in reference to P-8 that if one of his graduate students had made such a sketch, "I would point out the problems and say go back to the drawing board." (Tr. 13 at 38.)

....

Q [W]as there any reason why you were unable to draw P-8 with any degree of accuracy of P-20A?

A Because this was not a drawing of that, I explained the principles first. The principle capillary electrophoresis, how it was going to be in operation. What do I need.

*57 Q So this is a future device, P-8?

A Yes.

Q So P-8 is not P-20A? Can we establish that?

A P-8 is a model of what I call P-20A, I mean you have to remember there are two different things here, this is a schematic, how the work capillary electrophoresis and then I bring to the table, and say look this is a physical evidence which I did in my thesis.

Q I didn't ask you about the thesis. I just want to ask you one more time, do you concede that P-8 is not a drawing of P-20A?

A Is not an accurate drawing.

Q Did you intend [P-8] to be an accurate drawing of P-20A?

A That's what I have in the next instrumentation.

Q Pointing to the left side of the courtroom, it's in the next instrumentation. Is it your testimony that P-8 is a depiction of your next instrument?

A Once again, this is the general principles.

Q Is it your testimony that P-8 is simply to show the general principles and it's not intended to be an accurate depiction of any device whatsoever?

A That is correct. Not a device of this.

Q Now that's consistent with Dr. Olsen-just shows principle, right?

A Right.

(*Id.* at 126-34 (continued voir dire on P-20A).)

Each of "the May, 1986, materials" described above, as well as the exhibits described in the following two subsections, are discussed in Section VIII.C *infra*.

ii. *"The December, 1986, materials"*

Plaintiff offered the following physical and documentary exhibits in support of Dr. Guzman's trial testimony concerning the status of his invention efforts as of December, 1986:
• A metallic capillary electrophoresis chassis containing certain components. (P-20.)
• A plastic coiled capillary cassette cartridge. (P-18.)
• The original of an electropherogram containing handwritten pencil notations including the date "12/27/86." (P-13.)[FN82]

> FN82. Exhibit P-13 also has a related photocopy, exhibit P-14 moved into evidence by defendant, described in this subsection.

• An invoice from Genito company dated May 15, 1986. (P-27.)
Each of those exhibits was admitted into evidence. We will now describe Dr. Guzman's trial testimony about each of the exhibits in this group.