Not Reported in F.Supp.2d                                                    Page 55
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)

*Exhibit P-20*

Plaintiff produced two metallic capillary electrophoresis prototype devices in this action. Exhibit P-20 was the metallic prototype produced both in discovery and at trial. Exhibit P-133, described below, was produced at the direction of the Court during trial. *See* n.75 *supra.*

The condition of P-20 at trial was incomplete. It had certain features such as a rotatable table, a removable coiled capillary cartridge (described below), a high voltage power supply, and an incomplete holder for the end of the capillary. It lacked two sets of components, one containing all the electronics for the various motors, and the other being the electronic part of the detector. It was not rigged with a capillary.[FN83] (Tr. 8 at 183-88.)

> FN83. Defendant renewed a prior objection to P-20, toward the close of Dr. Guzman's testimony on that exhibit, after it had been admitted into evidence. The objection was based on Dr. Guzman's testimony that P-20 was not a complete apparatus at trial; he said it was modified after December, 1986, to add automation; and it appeared that at least one necessary component, the high voltage power supply, had been installed after December, 1986, based on its manufacturer code. (Tr. 8 at 183-188; Tr. 10 at 61-63, 161-63.) We allowed the exhibit to remain in evidence because at that point it had already been admitted and fully discussed in the testimony. (*Id.* at 162.) Therefore, exhibit P-20 remains in evidence at this writing, subject to defendant's objection.

Dr. Guzman's deposition testimony on the question of when he made P-20 is quoted *supra,* n. 68. His trial testimony regarding P-20 may be summarized as follows.

**\*58** Exhibit P-20 is the first of his four metallic prototype capillary electrophoresis devices. He made P-20 between May and December, 1986. (Tr. 8 at 165, 170-74, 180, 183; Tr. 10 at 24-26.) Dr. Guzman designed P-20, and "made the components with the contractor," and assembled it at home. (Tr. 8 at 169.)

He continued to refine each of his prototypes, including P-20, into at least 1989. (Tr. 10 at 24-26, 61-63, 161-62.) However, as of December, 1986, the P-20 prototype possessed all of the elements of claim 32, and it functioned to produce electropherograms. (Tr. 8 at 173-74, 180-83, 197-99; Tr. 10 at 23-26.)

*Exhibit P-18*

Trial exhibit P-18 is a physical object consisting mainly of two pieces of clear plastic held together with four screws, which form a housing around the coiled capillary cassette, P-17. It appears as follows:

TABULAR OR GRAPHIC MATERIAL SET AT THIS POINT IS NOT DISPLAYABLE
(Photo of P-18.)

Here we summarize Dr. Guzman's trial testimony on exhibit P-18.

He calls the P-18 assembly a cartridge cassette ("cartridge").[FN84] (Tr. 8 at 159.) He designed P-18, but it was made by a company named Genito, and then he assembled the components. (*Id.* at 159-61.)

> FN84. We note that the trial transcript contains numerous references to both P-17 and P-18 as a coiled capillary cassette or a cartridge or some combination of those terms. However, the physical exhibit P-17 is distinct from P-18. Basically, P-18 is a two-part housing into which P-17 may be inserted. Neither counsel nor the witnesses used a consistent nomenclature distinguishing P-17 and P-18 in the trial record. For purposes of this opinion, we maintain the distinction between the two exhibits by referring to P-17 as a "cassette," and P-18 as a "cartridge." However, the quoted portions of the trial record use those terms indiscriminately in referring to P-17 and P-18.

He made P-18 between May and about September, 1986. (*Id.* at 161, 164.) It was one of two prototypes of a cartridge cassette that he made. (*Id.*) P-18 is configured as follows:
A[Y]ou can see that-inside of this there is the cassette, which 1 just show it to you before that.... So this-extra sandwich, two more pieces, in front of the piece that you saw before, it has a function to be attached to the detector, and there is some system here that you screw. But also it has two inlet and outlet some holes that go all around here. And that was to put fluid into the system. So it can circulate and be able to have some kind of cooling into the system, or heating whatever was necessary. So you see four holes, and very professional made, that was made by this company called Genito, and-and then some screws to be able-and there was also a gasket that is not here to avoid the liquid to go out of the system. That's basically

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)

it.
THE COURT: This is water?
A At that time I used water, it was attached to a cooling device, eventually. It started with a hose to my just regular faucet in my home, and then eventually I bought a commercially available system, or I used one of those so it would circulate the water in one direction to another. Down here, and goes there, and in both sides, there are four holes there.

(*Id.* at 160-61.)A ... Now, in this area, you can see two protruberants and these are placed into the detector. So the capillary go inside of the detector and then you will see in the next there is a screw that we can attach this into the detector itself.

(*Id.* at 167.)

Dr. Guzman made P-18 to be used on his first metallic prototype, P-20. (*Id.* at 163.) He operated the metallic prototype device, P-20, with the P-18 cartridge attached, to produce electropherograms beginning in October, 1986, and finishing in December, 1986.[FN85] (*Id.* at 165-68, 180-88.)

> FN85. Dr. Guzman's testimony at a pretrial Rule 104 hearing was in conflict with his trial testimony regarding when he first made and used a cartridge such as P-18. He testified at the pretrial hearing that he had made P-18 by April, 1986, and that he displayed P-18 to Dr. Olsen as one of the components of the device he brought to the Olsen meeting on April 22, 1986. (5-22-01 H'g Tr. at 124-25, docket entry 109.)

*Exhibits P-13 and P-14*

**\*59** Trial exhibit P-13 is an original electropherogram containing handwritten notations in pencil. Exhibit P-14 is a photocopy of P-13 that differs from the original.

Dr. Guzman testified that P-13 is the first electropherogram that he made using his first metallic prototype device, exhibit P-20. He made that electropherogram on December 27, 1986. (*Id.* at 191-93; Tr. 10 at 23-24, 28-30, 167-68.) That date is written in pencil, in his handwriting, in the lower left corner of P-13. (Tr. 8 at 191-93.) All of the handwritten notations on P-13 are in his handwriting, but possibly not with the same pencil. (Tr. 10 at 29-30 .) The fact that he could make this electropherogram showed him that P-20 was working for its intended function as of that date. (Tr. 8 at 197-99; Tr. 10 at 167-68.)

Exhibit P-14, also produced by plaintiff in this case, is a photocopy of P-13 that differs from the original in certain respects, including the following:
• The date of December 27, 1986, in the lower left corner of P-13 is not present on P-14, although both P-13 and P-14 bear that date on the upper right corner. (*Id.* at 38-39, 167-68.)
• The phrase "(Temperature    25C through cartridge cassette)" is written at the end of the list of test conditions on the lower right of the original, P-13, but is absent from the photocopy, P-14. (*Id.* at 39-40.)

Dr. Guzman testified that to the best of his memory, he wrote all of the handwritten information on P-13 on the day of December 27, 1986, including the date and the reference to a cartridge cassette, although he added that his memory on that point was not certain. (*Id.* at 30-36.) He stated that he did not make the photocopy, P-14, and did not know any reason for the differences between the original and the photocopy. (*Id.* at 38-40.)

*Exhibit P-27*

Trial exhibit P-27 is an invoice to plaintiff from Genito company, dated May 15, 1986.[FN86] The total cost of the order is $45.00 plus tax. The quantity ordered is "1." The description states, "lot of plasztic pcs.-machined as per instr."

> FN86. The name "Genito" is misspelled "Geneto" in the trial transcripts. (*See, e.g.* Tr. 10 at 188.) The correct spelling has been used here.

Dr. Guzman's trial testimony relating to the Genito company, and P-27 in particular, may be summarized as follows.

He obtained plastic parts to build his various prototypes and components from various companies, including sources named Bio Plastic, Cadillac and Genito. He purchased many plastic parts, dating back to at least 1985. Sometimes he paid cash; sometimes he used a check. Usually when he paid cash he would not retain a receipt. (*Id.* at 165-67.)

Genito was the company that was fabricating some of the pieces Dr. Guzman used "for the cassette." (*Id.* at 188-89.) Genito also fabricated many other pieces, "especially the connection of the so-called cartridge cassette to the detectors." (*Id.*) The P-27 invoice, totaling $47.70, was for "the small little items that I bought and this is one of the so many items that I did with Genito." (*Id.* at 189.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)

**\*60** Genito machined the pieces that form the outer housing of the P-18 cartridge. Exhibit P-27 is the invoice for those specific pieces. Dr. Guzman used those pieces to fabricate the P-18 cartridge. (*Id.* at 190; Tr. 11 at 9-12.) That was "the first thing Genito ever did for me." (*Id.* at 10.)

The pieces that he purchased in the P-27 invoice were as follows:
Q Is it your testimony that the invoice ... P-27, [reflects] the purchase of that device, Exhibit P-18?
A Yes. This is the first thing-
Q So you bought that for $47.70-
A That is correct-
Q -is that your testimony?
A-at that time, in '80 something.
Q But all this document says is lot of plastic pieces machined as per instructions, $45.
A Yes because the one piece, another piece and then there was pieces that we have to insert to cool the system, which are located here, one, two, three and four, and there is another cylinder, six, seven. So there's quite a few pieces that they made-
Q All for $45?
A Yes. It's plastic.

(*Id.* at 11.)

Dr. Guzman acknowledged that invoice P-27 does not state anything about coiling a capillary. (*Id.* at 9-10.)

### iii. *Other corroboration materials*

Plaintiff also offered the following physical and documentary exhibits on the issue of Dr. Guzman's asserted date of invention in April, 1986.
• A metallic capillary electrophoresis chassis containing certain components. (P-133.)
• Photocopy of a receipt from Bio Medical Equipment company dated June 8, 1985. (P-21.)
• Photocopy of an invoice from Spellman High Voltage Electronics Corporation dated July 11, 1985. (P-22.)
• Photocopy of a quotation from Isco, Inc. dated December 23, 1985. (P-23.)

### Exhibit P-133

Trial exhibit P-133 was the metallic prototype device produced by plaintiff during trial. *See* n.75 *supra.* It was in Dr. Guzman's attic, along with other instrumentation. Dr. Guzman testified that he had forgotten about this

prototype until he was being cross-examined during a Rule 104 hearing at trial. He estimated that it had been stored in the attic since some time in the early 1990's. (Tr. 10 at 16, 57-60.)

The condition of P-133 at trial was that it had certain components pointed out by Dr. Guzman in his testimony, including a rotatable table, high voltage power supply, detector, and an incomplete holder for the end of the capillary. It was not rigged with a capillary. (*Id.* at 11-13, 17-21.)

Dr. Guzman's trial testimony regarding P-133 may be summarized as follows.

He designed and made the P-133 metallic prototype after he made his first metallic prototype, P-20. (*Id.* at 153.) He first began working to make P-133 "later in the '80's, probably 1988." (*Id.* at 15.) The P-133 device had two detectors rather than one, which made it longer than its predecessor. (*Id.* at 15-16.) He designed his various prototypes to have interchangeable parts when possible, to save cost. (*Id.* at 17-20.) He continued to refine each of his prototypes, including P-133, into at least 1989. (*Id.* at 14.)

**\*61** The P-133 device did perform chemical separations. (*Id.* at 16 .) He thinks P-133 first worked to produce an electropherogram sometime in 1988. (*Id.* at 23.) There was a time when he had a coiled capillary mounted on the P-133 device. (*Id.* at 15.)

### Exhibit P-21

Trial exhibit P-21 is a photocopy of a receipt to Dr. Guzman from Bio Medical Equipment company dated June 8, 1985. The photocopy was admitted into evidence in the absence of an original. (*Id.* at 178-85.) There are four items described on P-21, as follows (1) "vertical slab gel unit," (2) "electrophoresis chamber," (3) "cylinder-electrophoresis chamber," and (4) ring assemblies.

Dr. Guzman's trial testimony acknowledged that the first item on P-21 related to slab gel electrophoresis, rather than capillary electrophoresis. (*Id.* at 187; Tr. 11 at 13.) He did not recall whether the second item related to his capillary electrophoresis work. (Tr. 10 at 187.) He testified that the third item, "cylinder," as well as the fourth item, "ring assemblies," did relate to his capillary electrophoresis work. (*Id.* at 185-87.) His testimony describing the latter item was as follows:
The next one is called ring assembly, which is the very last one, and that work [was] some rubber tubing that Mr. Silverman [company owner] used to cut for me to put [as]

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)

a gasket for the cartridge cassette when there was the liquid when we pressed the content so in order to avoid the liquid to get out of the system where-where there's-so there was some-he call it ring assembly, but that's what it was.

(*Id.* at 186-87.)

Dr. Guzman acknowledged that nothing stated on the P-21 receipt itself indicates that any of the listed items were for use in capillary electrophoresis, or in a particular device. (Tr. 11 at 13-14.)

*Exhibit P-22*

Trial exhibit P-22 is a photocopy of a two-page invoice to plaintiff from Spellman High Voltage Corp. dated July 11, 1985. The photocopy was admitted into evidence in the absence of an original. (Tr. 10 at 192-93.) Exhibit P-22 shows the purchase of power supply components with an instruction manual for $2,020.00 cash.

Dr. Guzman testified that the equipment purchased in P-22 was a large, heavy, external high voltage power supply that would not fit inside his capillary electrophoresis devices. (Tr. 11 at 14-15.) He stated that it was used in connection with his capillary electrophoresis work, but he could not relate it specifically to any of the prototypes described in the record. (Tr. 10 at 190-195.)

He said that the P-22 power supply unit, purchased in 1985, predated all of the prototype devices shown at trial.[FN87] (Tr. 11 at 15-16.) Each of those prototypes, exhibits, P-20A, P-20 and P-133, has an internal high voltage unit. (Tr. 8 at 142; Tr. 10 at 11-15, 20-21, 162-63.)

> FN87. Dr. Guzman also testified, on cross-examination, that he identified the P-22 Spellman external high voltage power unit in his thesis, when describing the capillary electrophoresis equipment used for the thesis. (Tr. 11 at 16; *see* P-11 at 85 (quoted *supra,* in text accompanying n.76).)

*Exhibit P-23*

Trial exhibit P-23 is a photocopy of a one-page quotation to plaintiff from Isco, Inc. dated December 23, 1985. The photocopy was admitted into evidence in the absence of an original. (Tr. 11 at 3-5 .) It lists an absorbance detector with built-in recorder and other components. The prices for the listed items are quoted but not totaled. (P-23.)

*62 Dr. Guzman testified that he did purchase a detector from Isco, as described in P-23. He stated that it was made to be used in high performance liquid chromatography, but he purchased it to use in his capillary electrophoresis work and had it modified for that purpose. He then used it in the plastic prototype that he brought to the Olsen meeting, P-20A. It was that detector that he described in his thesis. (Tr. 11 at 4-8, 17-18.)

*Guzman testimony pertaining to P-21, P-22 and P-23*

Dr. Guzman testified that exhibits P-21, 22 and 23 are probative of his having made a capillary electrophoresis device in the time frame of those documents. He acknowledged that none of them shows anything about coiling a capillary. (*Id.* at 9-10.)

c. *Plaintiff's Corroboration Witness*

Dr. Bjorn Olsen was one of the members of the thesis committee for Dr. Guzman's Ph.D. degree that was awarded in May, 1986. He currently holds endowed professorships at Harvard Medical School and Harvard Dental School. As of April, 1986, he had left his position at Rutgers and commenced working at Harvard, but he remained on the thesis committee for graduate student Guzman. Also, his family and his residence were still in New Jersey so that the children could finish the school year. (Tr. 6 at 59-72, 77.) He was called as a fact witness in this case. His testimony may be summarized as follows.

He recalls that he did meet with Dr. Guzman in April, 1986. (*Id* . at 75-76.) At that time, Guzman was in danger of not receiving his Ph.D. because he had been in the program for ten years without finishing his thesis. (*Id.* at 76-77; Tr. 7 at 67-68.) He has no independent recollection of the exact date of the Olsen meeting. (*Id.* at 59-61.) During this litigation, plaintiff's counsel showed him the handwritten sketches dated April 22, 1986, P-6 and P-8. (*Id.* at 16-23, 68-69.) As to the timing of the meeting, he notes that April 22 is his birthday; Guzman was under a thesis deadline of Spring, 1986, at the time and the thesis was approved in May, 1986; and he recalls that the meeting with Guzman took place in his dining room while he went in and out of the room to join his family.[FN88] (Tr. 6 at 77-79, 87-88; Tr. 7 at 6-7, 72-73.)

> FN88. The April, 1986 meeting described in Dr. Olsen's trial testimony is referred to in this opinion as "the Olsen meeting." However, it

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)

should be noted that Dr. Olsen also testified that he met several times thereafter with Dr. Guzman and/or his counsel. Those meetings, as he recalled, were as follows: (1) Meetings with Dr. Guzman at Rutgers after he received his Ph.D. (Tr. 7 at 11.) (2) Meeting with Guzman and a lawyer in New York City in the late 1980's; Olsen does not recall the purpose of that meeting. (*Id.* at 57-58, 64-66.) (3) Approximately two meetings with Guzman "when he worked in Princeton," in or around 1989 or 1990. At that time Olsen actually saw Guzman perform capillary electrophoresis, but does not know whether that apparatus was one of Guzman's devices or from other sources. (*Id.* at 37-39, 49-50, 74-76.) (4) Meetings with Guzman and/or plaintiff's litigation counsel in this case, beginning in approximately 1996. (*Id.* at 16-35, 64-66.) He does not recall whether he ever met with lawyers regarding Dr. Guzman's patent application or any attempt by Dr. Guzman to obtain funding for his company. (*Id.* at 64-66.)

Dr. Olsen knew nothing about capillary electrophoresis before Dr. Guzman began to tell him about it during the time immediately prior to 1986. He had never seen a capillary electrophoresis device of any kind before that time. (*Id.* at 9-10)

During the period leading up to the Olsen meeting, Guzman had told Dr. Olsen about the type of device he was using to do capillary electrophoresis:
Q Did Dr. Guzman describe to you the type of device he was using to employ capillary electrophoresis?
A Yes. He was trying to build a prototype of a machine that could do this, this prototype evolved over time, so his goal was to be able to clearly show that hydroxylase from chicken embryos was different, has different properties, somehow by separation technique, from the same enzyme activity that he could isolate from-placenta. And as he was doing this, he improved on the machine, and components from one prototype went into the formation of the second version, or generation of a machine.

**\*63** (Tr. 6 at 74-75.)

Dr. Guzman brought several items to the Olsen meeting, and drew sketches to show to Dr. Olsen during the meeting. (*Id.* at 78-82.) The items that Dr. Olsen recalls having seen at the meeting were:
• A device that was made of reddish-orange and clear plexiglas ("the Olsen meeting prototype").[FN89]

FN89. Dr. Olsen could not state from his recollection whether the Olsen meeting prototype was the same device as P-20A. He stated that the device that he saw at the meeting could have been P-20A, or it could have been an earlier version. (Tr. 6 at 84-86; Tr. 7 at 45-48, 54-57.)

• A two-part clear plexiglas unit with internal grooves into which could fit a coiled capillary, which he recognized as exhibit P-17.
• Electropherograms.
• Sketches made by Dr. Guzman at the meeting.

The Olsen meeting prototype "was not an operating machine" during the Olsen meeting. (*Id.* at 82.) It was not equipped with a capillary or fully assembled, and Dr. Guzman did not demonstrate it in operation. (*Id.* at 82, 86.) Dr. Guzman did not bring a capillary to the meeting, as he recalls. "The purpose of his visit was not to demonstrate a running machine, because he had the results with him, he had the results that he wanted to include in this thesis." (*Id.* at 83.)

Dr. Olsen recalls that the instrumentation Guzman showed him at the meeting included the following:
Q Can you describe the device as best you can recall that you saw at that time?
A[W]hat was striking and what I remember distinctly, because it was typical of Norberto-something, but make it beautiful. And it had red-red orange color, plexiglas with clear plexiglas and-and it was a neat piece of plexiglas work.
And it had a couple of features that I thought was very, very important. He had been talking to me about capillary electrophoresis before, but there had-was a way of [coiling] the capillary tube, but very simple device actually, two plates of plexiglas, with a groove sort of-in one of them, and it could-the tube along these screws and it could put the whole thing like a little cartridge, into the machine and I thought that it was a major conceptual advance, actually because it would allow one to have longer capillaries in a smaller physical setup.

(*Id.* at 79.)

He saw the two-part cassette, P-17, or a unit like that, at the meeting:
Q Did you discuss the capillary and the cartridge as you're describing it, on April 22nd?
A He described it yes.
Q Did you see it at that time?
A Well I certainly saw it in-on the drawing. But I remember that the two plates of plexiglas, so I must have seen it.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)

Q Can you describe P-17?
A Well this is a-a square piece of plexiglas, which has-of two squares the same size, and one on top of the other. And on the one side of that two squares, was spiral sort of groove, that is carved into-with a drill or something, into the surface of the plexiglas. And when you put the two plates together you've got a tunnel that runs in this spiral like fashion, between the two plates, and the two plates are clamped together with the screws at the four comers.
Q Have you seen P-17 before? [Yes.]
Q When did you see it?
A This was the one I saw in April 1986.

*64 (*Id.* at 79-81 (direct examination).)Q You're also positive that Dr. Guzman, in fact, showed you a cartridge on the prototype, is that what you're-
A Right.
Q Yes. And he did so with Exhibit P-17?
A I believe so. I've seen this before.
Q So, do you believe you were one of the first people ever to see Dr. Guzman's prototype with the cartridge, like Exhibit P-17?
A Among the members of the Thesis Committee, I was perhaps the first or the second because I know that he tried to show these things and talk about this to Dr. Prokop. But Prokop wasn't interested. I was interested in listening to Norberto and I saw that this might be very useful.
Q And so you're positive, right, that he showed you this prototype with the cartridge?
A A prototype like that.
Q I understand.
A It's a different thing.

(Tr. 7 at 48-49 (cross examination).)

He also recalls having seen a rotatable table at the meeting:
Q Do you recall anything else about the device you saw, on your dining room table, on April 22nd, of 1986?
A Well there were two things that I thought was-I remember otherwise I'm not sure I would have remembered this, one was-what was-this way of taking longer capillary and making it physically more compact. The second thing-to me that you would have almost like a round-collector you would have a plate-with holes in it, for tubes that could contain the different samples that we wanted to analyze, and putting that on a rotating machine, and then-present each tube in succession to one of a capillary, so that you can in principle, automate this machine.
And this was not an operating machine at the time, he didn't run it on my table. But clearly the concepts were there for having multiple samples, could load it, and then you could have a long-sort of long capillary in a small

machine, I thought that was very important.

(Tr. 6 at 82.)

Dr. Olsen understood that an electropherogram was "the product of running this type of machine." (*Id.* at 83.) Guzman showed Dr. Olsen electropherograms during the meeting. (*Id.*) The electropherograms shown at the Olsen meeting were ultimately approved for inclusion in Dr. Guzman's thesis, P-11 at page 173, Figure 19, items A, B and C. (Tr. 7 at 7-8.)

Based on the discussion he had with Guzman during that meeting, Dr. Olsen understood that those electropherograms were generated on the prototype that he saw at the Olsen meeting. (Tr. 7 at 8-9.) "He showed me electropherograms, and obviously I assumed-but that's an assumption-that he had produced it with this machine. As far as I know he had no other machine, so." (Tr. 6 at 83.) In his opinion, Guzman was absolutely a trustworthy person. (*Id.* at 83-84.; Tr. 7 at 73-74.)

During the Olsen meeting, Guzman explained to Dr. Olsen where the capillary would run, not by running the machine but by making a sketch, "sort of explaining the principle of how this worked." (Tr. 7 at 86.) As Dr. Olsen recalled, the sketch that he saw was actually about the "what the potential would be." (*Id.* at 87.) That potential, as he recalled Dr. Guzman describing through a sketch, was as follows:
*65 Q Why was it necessary for Dr. Guzman to prepare a sketch when you had the device in front of you?
A Well, he could then explain it on how it worked but what the potential would be. So again Norberto was an unusual student, because he was always thinking about the next step and next generation of things that it would do, or in the next few experiments. So he had all these ideas, about what it might do with this, and where to take it, and one of those things he explained together with this well cartridge, or whatever, of plexiglas with a spiralized capillary, was that of course you could run-put it in a-or you could have circling water around it, or some other fluid, could keep it cold, you could keep it hot, you could-do things with this, that-couldn't do. And-he says you could clear it-you could run it at a high voltage. And get rid of more heat that you would generate if you do the separation at high voltage, so you could decrease time for separation-one of the goals was to do-separations, a very clean separations-get beautiful peaks, in a very short period of time, and that it did.

(*Id.* at 87.)

Dr. Olsen was partially occupied with his family in another room while Dr. Guzman was making his sketches

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)

during the meeting, so Olsen did not observe all of the sketching process. (*Id.* at 87-88.) He has no recollection of seeing a sketch resembling P-6 at that meeting. That sketch does not show a coiled capillary or rotatable table. (Tr. 7 at 39-40, 69-72.) He does recall seeing "this kind of document," referring to P-8, at the Olsen meeting. (Tr. 6 at 96.) He remembers that at that meeting, he saw "a drawing like this explaining how these different components would work." (*Id.* at 97-98.) Dr. Olsen has no contemporaneous documents from that meeting in his current files. (Tr. 7 at 42-43.)

The sketch be recalls having seen during the meeting showed the following:

Q Do you recall what specific portions of the document [referring to the photocopy, P-9] Dr. Guzman prepared in your presence?
A I cannot ... say that I remember every detail of this. But I do remember his exploration of the cartridge, what he calls cartridge here, that it could be heated or cooled, and he was drawing that. And then he indicated where he would have detector, to detect what was electrophoresis. And then he indicated that he had different samples in the sample compartment.

(Tr. 6 at 89.)Q Describe for the jury what elements if any you do recall seeing on April 22, 1986?
A[W]hat I do remember is what I thought was important. And that is again that the way that multiple samples could be loaded in the machine, with the device flat, that the capillary was [coiled], so it could-you could have a long capillary, with significant separating power, in a small setup. And that perhaps in the future, one could then run the machine at high voltage, and cool the samples as it was running through the capillary.[FN90]

> FN90. Dr. Olsen could not be more specific about whether he had seen P-8 or a similar sketch at the Olsen meeting, or what other features the sketch that he saw contained at the time. (Tr. 6 at 88-91, 92-98; Tr. 7 at 3-5, 69-72.)

*66 (*Id.* at 91.)

Looking just at the electropherogram readout shown in Dr. Guzman's thesis, Dr. Olsen can identify it as an optical density readout on a recorder, but cannot say whether it was made by electrophoresis or by other separation methods using a similar readout machine. (Tr. 7 at 53.) He knows the readout was made by capillary electrophoresis because at that time, "only that kind of instrumentation could produce that very sharp, separation study obtained." (*Id.* at 52.)

Dr. Olsen acknowledges that nothing in the thesis electropherogram or what he has read in the thesis, P-11, shows that the electropherogram was produced by a certain capillary electrophoresis machine, with or without a coiled capillary or coiled capillary cartridge. (*Id.* at 53-54.) He concludes:

Q From looking at the thesis, can you tell whether or not Dr. Guzman ever used a coiled capillary of any kind to perform any capillary electrophoresis to perform any chart or electropherogram in this thesis?
A No.
Q Is any cartridge mentioned? Any cartridge cassette in the thesis?
A Not in the legend. And I have not looked at the materials or methods.
Q But you can't tell from looking at the graph, or anything in that thesis as you sit here today, that shows anything whatsoever to do with a coil.
A No.
Q Anything to do with a cartridge cassette?
A No.
Q Anything to do with thermal couple cooling?
A No.
Q So, this data could have been obtained using a regular old system with two beakers and a straight capillary, as far as you know?
A Correct.

(*Id.* at 63-64.)

C. *Conclusion on Issue of Prior Invention*

This Court finds that the trial evidence established that defendant had a claim 32 invention reduced to practice by no later than February 1, 1987. Plaintiff does not dispute this fact. (Pl. Br. at 22, 27.) That date is more than 21 months prior to the filing date of the CIP application for the '172 patent, November 14, 1988. There, for the first time in the patent history, the applicant disclosed elements 7 and 8 of claim 32.

Plaintiff challenges defendant's claim of prior invention by asserting that Dr. Guzman actually had his claim 32 invention reduced to practice prior to February 1, 1987, despite his failure to disclose it to the Patent Office until November 14, 1988. The dispute on the issue of prior invention therefore concerns the date of Dr. Guzman's reduction to practice.

The question of when a party reduced an invention to practice is a legal question, and submitting it to the jury does not relieve a court of the duty to ensure that the law is correctly applied. The primary focus of that inquiry

Not Reported in F.Supp.2d                                                                                          Page 62
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

must be on the corroborating evidence of the prior invention date. *See* authorities cited *supra,* Section VII.A.

Only evidence "independent of information received from the inventor" can legally corroborate an inventor's asserted invention date. *See, e.g., Hahn,* 892 F.2d at 1032-33. The court applies a rule of reason analysis to ensure that the record contains proper corroboration. It must then determine for itself, on the basis of the independent corroboration evidence, whether the "inventor's story" is credible. *See Finnigan Corp.,* 180 F.3d at 1369 n. 11.

### 1. *No Independent Corroboration Evidence*

**\*67** This Court has searched the record in vain for any evidence, independent of Dr. Guzman's own statements, to support his trial testimony that he had a working claim 32 device prior to February 1, 1987.[FN91] We will briefly review each of the physical and documentary exhibits offered by plaintiff on this issue, along with the testimony of corroboration witness Dr. Olsen.

> FN91. We find that the testimony of the inventor, Dr. Guzman, is testimony of the plaintiff in this case for purposes of imposing the corroboration requirement. *See* n.41 *supra.*

### *"The May, 1986, materials"*

• P-20A is an orange and black plastic chassis with various components. It was excluded from evidence but was the subject of extensive trial testimony. As presented at trial, it had no capillary or any support member for a coiled capillary, and was missing other components needed to make it operational. There were no dates shown on P-20A, or any dated photographs or engineering drawings accompanying P-20A, to establish an assembly date prior to February 1, 1987. Dr. Olsen could not say whether the plastic prototype that he saw during the Olsen meeting, in April, 1986, was P-20A or some earlier prototype. Nor was the prototype that Dr. Olsen saw at that meeting complete or operational.
• P-17 is a "cassette" consisting of two flat pieces of clear plastic held together by four screws, with grooves cut into its internal surface to secure a coiled capillary. Dr. Olsen testified that he saw this unit, or a similar unit, during the Olsen meeting. However, the cassette was not assembled, with capillary, onto the plastic prototype device at that meeting. Nor was the prototype device operated during that meeting.
• P-6 is an altered original pencil sketch dated April 22, 1986. It depicts three components called external high voltage power supply, recorder and motor controller.

Those components would be common to various types of instrumentation, not just a claim 32 instrument. (P-7 is a photocopy of P-6 that differs from the original.)
• P-8 is an altered original pencil sketch dated April 22, 1986. It depicts a <u>capillary electrophoresis</u> chassis with various components including a rotatable table and units called "cartridge-cassette coiled capillary" and "liquid cooler-heater." The cartridge shown in the sketch is inserted at the wrong location. *See* n.81 *supra.* Dr. Olsen testified that be recalls seeing P-8, or a sketch resembling P-8, at the Olsen meeting, and he understood that sketch to depict "what the potential would be." (Tr. 6 at 87.) He did not report seeing any physical object at that meeting that would correspond to the temperature-controlled "cartridge-cassette" depicted in the P-8 sketch. He only testified that he saw the simple two-piece cassette unit, P-17. (P-9 is a photocopy of P-8 that differs from the original.)
• P-11 is Dr. Guzman's thesis, bearing approval date "May, 1986." Figure 19 of the thesis consists of three related electropherograms, with text attributing those readings to a "homemade system consisting of a capillary column, two buffer reservoirs, an in-column detector, and a power supply." (P-11 at 85 .) The thesis does not disclose any coiled capillary secured to a support member. Nor does it disclose any component corresponding to the "holder" or "rotatable table" limitations of claim 32. Dr. Olsen testified that based only on the information contained in the thesis, the electropherogram data shown in Figure 19 could have been obtained using a regular old <u>capillary electrophoresis</u> system with two beakers and a straight capillary.

### *"The December, 1986, materials"*

**\*68** • P-20 is a metallic chassis with various components. As presented at trial, it had no capillary, and was missing other components needed to make it operational. There were no dates shown on P-20, or any dated photographs or engineering drawings accompanying P-20, to establish an assembly date prior to February 1, 1987.
• P-18 is a "cartridge cassette" consisting mainly of two pieces of clear plastic held together with four screws, which form a housing for a unit such as the P-17 cassette. It also has inlet and outlet holes for temperature control liquid, and two protruberants to be placed into the detector and screwed in place, to attachthe cartridge to an electrophoresis device. There were no dates shown on P-18, or any dated photographs or engineering drawings accompanying P-18.
• P-13 is an altered original electropherogram containing handwritten pencil notations, including the date "December 27, 1987 ." At the bottom of the list of test

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                 Page 63
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

conditions written in pencil, the following appears: "(Temperature-25C through cartridge cassette)."
• P-14 is a photocopy of P-13 that has one conspicuous difference from the original: the quoted language at the bottom of P-13 (being the only reference to a cartridge cassette on the document) is not present in the photocopy, P-14.
• P-27 is an invoice from Genito company dated May 15, 1986, totaling $47.70. The quantity ordered is 1. The description states, "lot of plastic pcs.-machined as per instr."

There was no corroboration testimony about any of the materials described in this group.

*"Other corroboration materials"*

• P-133 is a metallic chassis with various components. It was produced for the first time at trial, at the direction of the Court. Plaintiff does not contend that this prototype was made prior to February 1, 1987.
• P-21 is copy of a receipt from Bio Medical Equipment company dated June 8, 1985, listing four items: (1) "vertical slab gel unit," (2) "electrophoresis chamber," (3) "cylinder-electrophoresis chamber," and (4) ring assemblies.
• P-22 is a copy of an invoice from Spellman High Voltage Corp. dated July 11, 1985, showing purchase of an external power supply unit and related items for $2,020.00. Plaintiff does not contend that this power supply unit was used with any of the prototype devices shown at trial.
• P-23 is a copy of a quotation from Isco, Inc. dated December 23, 1985. It lists an absorbance detector with built-in recorder and other components. The prices for the listed items are quoted but not totaled.

There was no corroboration testimony about any of the materials described in this group.

*Summary of corroboration evidence*

Dr. Olsen, the sole corroboration witness, testified to a meeting in April 1986, at which the inventor showed him an incomplete, non-operational plastic capillary electrophoresis prototype device, and a two-piece plastic "cassette" (such as P-17) that could hold a coiled capillary. Dr. Olsen did not see the device in operation, with or without a cassette attached, during the meeting. The sketch Dr. Olsen recalls seeing at that meeting did not depict the P-17 cassette. He understood that sketch to depict a "potential" future development of a temperature-controlled cartridge.

*69 There is no corroboration witness for the time period between the Olsen meeting (April, 1986) and defendant's invention date (February 1, 1987). Neither the P-20 metallic prototype, nor the P-18 temperature-controlled "cartridge cassette," were the subject of any corroborating testimony on when they were made and when, if ever, they functioned.

The independent documents submitted as corroboration for plaintiff's claimed invention date contain no reference to any kind of coiled capillary assembly. The only documents that make such a reference are the handwritten pencil statements in P-8 (and its photocopy, P-9) and P-13 (but not its photocopy, P-14), attributed to Dr. Guzman.

We conclude that the trial record contains no evidence, independent of the statements of the inventor Dr. Guzman, to corroborate a finding that he had an operational capillary electrophoresis device containing each of the elements of claim 32, at any time before February 1, 1987.

*2. Unreliability of Uncorroborated Inventor Testimony*

This tribunal must keep in mind the purpose of corroboration, which is to prevent fraud, by providing independent confirmation of the inventor's testimony. *Kridl,* 105 F.3d at 1450. Having found no independent corroboration of the date of Dr. Guzman's reduction to practice of his claim 32 invention, the Court is not required to proceed to the next step and determine whether, in our view, the "inventor's story" is credible. Nevertheless, the numerous conflicts and discrepancies in the sworn testimony of Dr. Guzman in this case do lead us firmly to the conclusion that the prior inventorship story projected by Dr. Guzman at trial is unworthy of belief.

The most significant of the conflicts in Dr. Guzman's testimony was the abrupt change in his claimed dates of having made the two prototypes produced in discovery, the plastic P-20A and the metallic P-20. When asked in deposition when he constructed P-20A, he testified: "It could have been ... in the middle of '87, 1987, that is correct." *See* n.67 *supra.* Defense counsel was clearly surprised when, for the first time at trial, the inventor testified that P-20A was the exact prototype that he brought to the Olsen meeting in April, 1986, that it featured a coiled capillary, and that he had operated it (albeit not in the presence of Dr. Olsen) in that configuration by that time. (*See* Tr. 8 at 117-124, 140-142, 148-153; Tr. 10 at 23, 177.) Likewise at deposition Dr. Guzman testified that he constructed P-20 "start[ing] probably late in '87, part of '88." *See* n.68 *supra.* At trial

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

Page 64

he swore that P-20, and its P-18 coiled capillary cartridge, were operational by December, 1986. (Tr. 8 at 165-174, 180-187.) [FN92]

> FN92. Related surprise developments at trial included Dr. Guzman's testimony that he had made a later plastic prototype after making his metallic prototypes, and gave that plastic device to a professor in Argentina in 2000, during the pendency of this case. Also, the P-133 metallic device emerged from Dr. Guzman's attic only as the result of a lengthy Rule 104 hearing during the trial.

Equally serious is the conflict between Dr. Guzman's deposition and trial testimony in answer to the point-blank question of when he first placed a coiled capillary inside a cassette. That question was based, of course, on element 8 of claim 32, "secured to a support member." (P-72). "In December of '86," was his answer at deposition. *See* n.65 *supra.* At trial, he pointed to the P-17 cassette and testified that he had that cassette, and used it to produce electropherograms on his plastic prototype device, prior to his April, 1986, meeting with Dr. Olsen. (*But see* n.85 *supra.*) The obvious significance of his misleading answer to that deposition question was that defense counsel prepared for trial knowing that Dr. Guzman could produce no corroboration, in the form of documents or witnesses, covering the period between the Olsen meeting in April, 1986, and defendant's date of invention in February, 1987. *See* n.69 *supra.* So whatever Dr. Guzman claimed he had as of December, 1986, would be uncorroborated, unless Dr. Olsen could corroborate it from the April, 1986, meeting. As it turned out, Dr. Olsen at trial could not corroborate any actual operation of the Olsen meeting prototype (whatever generation prototype it was) with the P-17 cassette, to produce the electropherogram shown in Dr. Guzman's thesis. Dr. Guzman's testimony to that effect at trial was in conflict with his sworn deposition testimony.

**\*70** The inventor's trial testimony itself is riddled with obvious inconsistencies, some of which are quoted at length above, including the following:

*Compare:*

Q So are you telling us that you performed a separation using the Princeton Tiger and the cassette of PX-17?
A Yes.
Q And you did that before May of 1986?
A Yes.
Q And we know that, because it's in the thesis right?

A Yes.
Q Explain exactly what it is in the thesis that confirms the testimony you just offered.
A Well, is the electropherogram-I believe it's Page 173....
(Tr. 8 at 149.)

*With:*

Q Is there anything in your thesis that explains how you got the data on Figure 19 that uses a coiled capillary?
A I explained every detail, how I did it, and all the conditions, and I said this is the best buffer that I used, I also used the-the sample, I injected into the column. The time that I injected, amount of voltage that I injected. The 30 microamps, there's a lot of detail here, what I did. I also-
Q In all those details, is there anything explaining a coiled capillary?
A I'm still looking for that. And-then-
Q Rather than keep talking, could you please find to me any reference where you believe your thesis indicates that there's a coiled capillary?
A I was-tell you-under the advice of an attorney I was told not to put the details in the thesis.
Q [So] you don't need to look; you know it's not in there?
A Right.
(Tr. 10 at 138.)

*Compare:*

Q [Describe P-8.]
A This is actually the drawing that I was making to Dr. Olsen to explain about what is what I invented, and how my electropherogram that eventually appeared in my thesis was made. So I tried to do as much as I could, once again, this is a sketch of what I call the capillary electrophoresis apparatus that I used at the time.
(Tr. 8 at 82.)

*With:*

Q Is it your testimony that P-8 is simply to show the general principles and it's not intended to be an accurate depiction of any device whatsoever?
A That is correct. Not a device of this.
(*Id.* at 134.)

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                    Page 65
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

*Compare:*

Q Is there anything else in this thesis in any way, suggests how you were able to obtain the data which formed Figure 19 [of the thesis]?
....
A.... So the Thesis Committee, especially Dr. Olsen, saw the instrument, and under the next page, the only thing I'm telling you is some of the components that I used here for the instrumentation which is Page 109. So basically it said that several buffers were used but the one which gave the most consistent results was with 50-buffer-8.2, at room temperature....
Q Room temperature, is that what you said?
A. Yes.
Q So you didn't control the temperature of the capillary?
A Oh, no I was-it was with water. I was telling you I was cooling the whole thing and it was measured at 25-centigrade. So that's what I called room temperature....
(Tr. 10 at 134-36; *see* n.77 *supra*.)

*With:*

**\*71** Q Describe the next iteration of cassette [after the P-17 cassette].
A The next concept was not only to be able to coil the capillary, those grooves that I show, but also be able to cool the system, with some kind of a cooling device.... So I developed a few prototypes for my so-called cassette cartridge device.
(Tr. 8 at 158; *see* n.71 *supra*.)

Last but not least is the fact that the originals of all three of the purportedly contemporaneous handwritten documents produced by plaintiff are obviously altered. Dr. Guzman's explanation of how P-6 and P-8 may have come to be altered is plausible at best. However, there is no excuse for the augmentation of the original of P-13 to insert a reference to a "cartridge cassette" at some time after the photocopy, P-14, was made. Dr. Guzman had no explanation for that obvious tampering with the original, written in pencil in his own handwriting.

### 3. *Review of Jury Verdict on Prior Invention*

The jury found that defendant had not proven by clear and convincing evidence that claim 32 was invalid due to prior invention by defendant. (*See* n.13 *supra*.) All factual issues pertinent to prior invention were submitted to the jury, subject to the parties' Rule 50 motions upon which this Court reserved decision. However, the Court was and

is mindful that the question of when a party reduced an invention to practice is a legal question, and that the legal sufficiency of the evidence on the issue of prior invention must be determined by the Court.

It will be recalled that all of plaintiff's proffered corroboration materials were admitted into evidence at trial, with the exception of P-20A. The testimony of plaintiff's corroboration witness, Dr. Olsen, was also presented at trial. The admissibility of that evidence at trial does not relieve this Court of its obligation to make a determination, as a matter of law, as to whether such evidence provides independent corroboration of the inventor's claimed invention date.

Based upon the analysis set forth above, we hold that none of plaintiff's purported corroboration evidence provides any support, independent of the statements of the inventor, for a finding that Dr. Guzman had a claim 32 invention reduced to practice prior to defendant's undisputed invention date. We further conclude that in view of this failure of corroboration, the statements and testimony of the inventor are not competent to establish his own invention date. Finally, we conclude that the statements and testimony of Dr. Guzman in evidence, viewed as a whole, demonstrate on their face that the testimony of this inventor about his invention date is unreliable in the extreme. Accordingly, the jury verdict in favor of plaintiff on this issue cannot stand.

It has been established by defendant, and this Court has found, that defendant's claim 32 invention date was February 1, 1987. That date is more than 21 months prior to November 14, 1988, which was plaintiff's patent application filing date for claim 32. Based upon this trial record, we therefore hold as a matter of law that claim 32 of the '172 patent is invalid due to prior invention by defendant, puruant to Section 102(g).

### 4. *Alternative Ground; Motion for New Trial*

**\*72** This Court is firmly of the view that it would be inappropriate to require another trial on the issue of prior invention in this case, rather than entering judgment for defendant as a matter of law. However, as a technical matter we hereby grant, in the alternative, defendant's motion for new trial on the issue of prior invention, to prevent manifest injustice under all the circumstances described above.

In the event of a remand requiring a new trial on this issue, we wish to call to the attention of the parties and the Court of Appeals an unsettled question of law that was not fully addressed during the trial phase in this case. The

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)

question was uncovered in our further research on the pending motions, and in our view would need to be resolved (by us or the appeals court) before we could retry the prior inventorship claims in this case. That question is as follows:

Where, as here, a patentee seeks to rely upon an asserted invention date prior to its patent application filing date to defeat a claim of prior inventorship by another party, what burden of proof is assigned to each party thus claiming a prior invention date?

The jury instructions in the trial of this case followed the usual course of assigning the burden of proof, by clear and convincing evidence, to the defendant to prove that it had an invention date prior to the patentee's date. (*See* Tr. 15 at 32, 43-44.) Our research, described below, leads us to believe that this was an inappropriate assignment of the burdens when each party is actually claiming an invention date prior to the presumptive invention date of the patent application filing.

Patents are presumed valid. 35 U.S.C. § 282. Accordingly, "a party asserting invalidity under § 102(g) must prove facts by clear and convincing evidence establishing a prior invention that was not abandoned, suppressed, or concealed." *Apotex USA, Inc. v. Merck & Co., 254 F.3d 1031, 1036 (Fed.Cir.2001)*. If the party asserting prior invention satisfies this standard, a limited burden of production shifts to the patentee: "Because the patentee ... has the benefit of the presumption of validity, that party should only be held to bear a burden of producing evidence indicating that the prior inventor may have suppressed or concealed the invention." *Id. at 1037.*

The patentee, however, must necessarily have an additional burden where, as in this case, it seeks to stave off a claim of prior invention by asserting a date of invention prior to the date it filed its patent application. Though neither the Court nor the parties have identified any Federal Circuit cases directly addressing this issue, review of lower court caselaw on this and related points suggests that a patentee asserting that it invented the subject matter of the patent in question prior to the date of its application must bear *some* burden of proving the date of its own prior invention.

Courts have found in various invalidity contexts that a patentee seeking to establish a date of invention prior to the application date must do so by clear and convincing evidence. In *American Standard Inc. v. Pfizer Inc., 722 F.Supp. 86 (D.Del.1989)*, the court addressed the defendant's claim that a patent was invalid under Section 102(a)'s doctrine of anticipation. *Id.* at 108-09. The court observed that the issue turned on the date the patentee had

invented the subject matter of the patent, and further stated: "In order to receive an effective date earlier than the filing date of the '123 Patent ... a patentee has the burden of proving by clear and unequivocal evidence, that the invention was both conceived and reduced to practice before the application date." *Id.* at 109 (quotations and citations omitted). The court in *All States Plastic Mfg. Co. v. Weckesser Co., 362 F.Supp. 94 (N.D.Ill.1973), aff'd, 506 F.2d 465 (7th Cir.1974)*, addressed the date of a patentee's invention in the Section 103 obviousness context. *Id.* at 97. The court observed: "The burden of carrying an invention back of the date of filing of the patent application thereon is heavy, and the evidence tending to establish such earlier date must be so clear and unequivocal as to leave no reasonable doubt." *Id.* In the Section 102(e) context, the court in *Rohm & Hass Co. v. Dawson Chemical Co., 557 F.Supp. 739 (S.D.Tex.1983), rev'd on other grounds, 722 F.2d 1556 (Fed.Cir.1983)*, observed:

**\*73** Generally, the date of an invention is deemed to be the date of the filing of an application adequately disclosing the subject matter of the invention with the Patent Office. The date of a claimed invention can be established also by proving an actual reduction to practice of the invention, or by proving a conception of the invention coupled with diligence to achieve a reduction to practice. The burden of establishing the date of an invention or reduction to practice prior to the time of filing rests with the inventor. The burden of the inventor in this regard has been described as a heavy one when compared to the burden of an infringer to establish prior use.

*Id.* at 802 (citations omitted). Finally, in the interference context, the Third Circuit stated in *Standard Oil Co. (Ind.) v. Montedison, S.p.A., 664 F.2d 356 (3d Cir.1981)*, that a party seeking to establish priority of invention may rely either "on the filing date of its [patent] application, which constitutes constructive reduction to practice, or by proof of actual reduction to practice on an earlier date." *Id.* at 362-63.

The district court in *Diasonics, Inc. v. Acuson Corp., No. 91-3118, 1993 WL 248654 (N.D.Cal. June 24, 1993)*, confronted the same issue implicated in this case: the burden of proof on a patentee who seeks to avoid a finding of prior invention by relying on an invention date earlier than the filing date. *Id.* at \*15-\*17. The court concluded that the patentee could only rely on an earlier date if it could establish an invention on that date by clear and convincing evidence. The court's reasoning, with which we concur, was as follows:

As is apparent, the Court assigned the burden of proof on this issue to Diasonics. Diasonics vigorously disputed this assignment, arguing that the burden of proof should be on

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:05-cv-00700-JJF    Document 158-5    Filed 06/13/2007    Page 13 of 26

Not Reported in F.Supp.2d                                                      Page 67
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)

Acuson to show prior invention. Diasonics relied on the fundamental statement of patent law that a lawfully issued patent is presumed to be valid. In contrast, Acuson relies on the proposition in patent law that the date of invention is presumed to be the date of the patent application. There is no precedent directly on point for the Court's decision to assign the burden of proof to Diasonics on this issue.

The Court is convinced, however, that the only sensible resolution of these conflicting presumptions is that the inventor must bear the burden of proof when it is the inventor who seeks to establish a date of invention before the application date. Generally, burdens are assigned to the party who seeks to prove the truth of the fact asserted, and reality would seem to dictate such an assignment in patent priority of invention contests. If the burden is on Acuson to establish Diasonics' date of invention, Acuson's only incentive is to produce no evidence to meet this burden. The situation remains essentially the same if the burden of proof remains with Acuson and the burden of going forward with evidence is assigned to Diasonics. In the absence of precedent, the Court looks to common sense solutions and it is apparent to this Court that this assigns the burden of proof to Diasonics in this case.

*74 *Id.* at *15.

We find the reasoning of the *Diasonics* court compelling. We also find that the imposition of the burden of proof on the patentee in other invalidity contexts supports applying the burden here, too. Therefore, were we to conduct a new trial, to establish an invention date earlier than the filing date for purposes of defeating a claim of prior invention we would require plaintiff to prove (by some standard) "either (1) conception plus diligence or (2) conception plus reduction to practice," *Id.* at *16, as of plaintiff's asserted invention date.

The need for this legal standard to be determined before any retrial is especially highlighted in this case, where the inventor has admitted under oath at trial that he knowingly failed to disclose the best mode of practicing his invention when he certified his original patent application. (*See* Section VIII.B.1 *supra.*) In that connection, we note that in the event of a retrial of this case on the issue of prior inventorship, we anticipate a motion by defendant to reopen the pleadings and discovery to the extent necessary to conform the pleadings to the new revelations by Dr. Guzman at trial. *See* Fed.R.Civ.P. 15(b).

The attorney upon whose advice Dr. Guzman says he acted in withholding information in the original patent application is currently listed as a practicing attorney in this state. It appears that by presenting that testimony at trial, plaintiff has waived any attorney-client privilege that

Dr. Guzman may have had during the prosecution of the '172 patent. The crime/fraud exception to the privilege may also apply. Therefore, the files and recollection of that attorney and any others with relevant knowledge on the subject of the patent prosecution will likely be subject to discovery by defendant prior to any retrial on this issue. Discovery may also be necessary to explore other areas opened up by Dr. Guzman's self-contradictory testimony on the issue of his invention date.

IX. *Plaintiff's Claim of Infringement*

A. *Legal Principles*

Infringement is governed by Section 271, which states in pertinent part:
[W]hoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States ... during the term of the patent therefor, infringes the patent.

35 U.S.C. § 271(a).

Infringement is a two-part analysis. First, the court must construe the patent claims. Second, the factfinder must determine whether the accused device reads on the claims as construed. *Prima Tek II, L.L.C. v. Polypap S.A.R.L.,* 318 F.3d 1143, 1148 (Fed.Cir.2003); *Hybritech Inc. v. Abbott Labs.,* 849 F.2d 1446, 1455 (Fed.Cir.1988). Claims are construed the same way for purposes of validity and infringement. *Markman,* 52 F.3d at 996 n. 7 (Mayer, J ., concurring).

Plaintiff claims literal infringement in this case.[FN93] Specifically, plaintiff claims that defendant's P/ACE devices infringe claim 32 of the '172 patent. Defendant stipulates that all models of its P/ACE 2000 and 5000 series are identical for purposes of this analysis. (Final Pretrial Order at 7, docket entry 71.)

> FN93. Defendant was granted summary judgment of noninfringement under the doctrine of equivalents early in the case. (Docket entry 28.) The Federal Circuit ruled that because that determination was not contested in the prior appeal, plaintiff was foreclosed from relying upon the doctrine of equivalents at trial. (Fed. Cir. Op. at 5, n.2.)

*75 "Literal infringement ... requires that the accused device contain each of the claim elements and their recited limitations." *Signtech USA, Ltd. v. Vutek, Inc.,* 174 F.3d 1352, 1358 (Fed.Cir.1999). A patentee claiming

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

infringement must prove that claim by a preponderance of the evidence. *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1578 (Fed.Cir.1993).

The jury found that plaintiff met its burden of proving by a preponderance of the evidence that the P/ACR devices infringe claim 32. (*See* n.13 *supra.*) The Court should grant defendant judgment as a matter of law only if, viewing the evidence in the light most favorable to plaintiff, there is no legally sufficient evidentiary basis for a reasonable jury to have reached that verdict. Alternatively, a new trial may be granted only where the verdict is contrary to the great weight of the evidence. (*See* Section VII *supra.*)

### B. *Claim Construction*

The only limitations of claim 32 at issue in defendant's post-trial motions are the "holder" language of element 6, and the "secured to a support member" language of element 8. (Def. Inf. Br. at 8-11; Pl. Br. at 5-10; Def. Inf. Rep. Br. at 1-5.) Here we again quote just those portions of claim 32, in context:
(6) a holder for holding an end of said capillary tube in operative relation with one of the said cups, ..., and
(7) said capillary tube is in the form of a coil of glass tubing
(8) secured to a support member.

(P-72; P-1, col. 23, ll.42-47; *see* n.3 *supra.*)

This Court performed the claim construction step of the infringement analysis at trial. We instructed the jury to give the words of claim 32 their ordinary English word meaning, with certain stated exceptions. (*See* nn.14 & 15 *supra* and accompanying text.) All of the words quoted above were subject to that "ordinary meaning" construction, except that the phrase "in operative relation" was construed to mean "that the end of the capillary can move toward the cups or the cups can move upward toward the end of the capillary." (*See* n.15 *supra.*)

Here we note that the word "holder" is part of the phrase in element 6 that is quoted above. In the following discussion we will refer to the word "holder," read in the context of that phrase, as the "holder limitation," or the "element 6 holder." [FN94]

> FN94. The claim construction performed by this Court during trial construed the "means plus function" language of element 3 as incorporating by reference the "holder limitation" found in element 6. (*See* nn. 16 & 17 *supra* and

accompanying text.) For convenience in this opinion, we will refer to the "holder limitation" as if it is found in element 6 only.

We likewise observe that the words "support member" are part of the entire clause constituting elements 7 and 8: "said capillary tube is in the form of a coil of glass tubing secured to a support member." We will refer to the words "secured to a support member," read in the context of that clause, as the "support member element," or "element 8." [FN95]

> FN95. We use the term "clause" to describe a portion of a sentence that contains a subject and a verb, and thus could stand as a separate sentence. We use the term "phrase" to describe a portion of a sentence that has a subject, but no verb. By those definitions, the word "holder" is part of a phrase in element 6; and the words "support member" are part of a clause that spans elements 7 and 8.

### C. *Review of the Evidence*

Defendant did not dispute at trial that its accused device is a capillary electrophoresis apparatus containing the features described in elements 1 through 5 of claim 32. Those features include a capillary tube that can be electrically charged, having first and second ends, a high voltage power supply to cause the sample in the capillary to flow past a detector, and a rotatable table carrying a plurality of sample cups. Defendant also agreed that the cups in its device move upward toward the end of the capillary (element 6 "in operative relation" limitation), and that its device includes glass capillary tubing that may be in the form of a coil (element 7 "in the form of a coil of glass tubing" limitation).

**\*76** The issue on infringement, based on the evidence at trial, reduces to this: Does the accused device have both an element 6 "holder," *and* a feature as claimed in element 8? Plaintiff has taken the position, both during the prior appeal and at trial, that the "holder" in the accused device is "either the cartridge which houses the coiled capillary tube itself or the plugs which seal the capillary tube ends to the cartridge wall at the inlet and outlet openings." (*See, e.g.,* Fed. Cir. Op. at 11-12, quoted *supra* n. 12.) Plaintiff contends that the mandrel located inside the P/ACE cartridge satisfies element 8. (Tr. 9 at 32-34.)

Defendant argues that the configuration of its accused device does not feature any "holder" that can be distinguished from the support member that secures the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)

coiled capillary. Therefore, defendant contends, its device does not have both a "holder for holding an end of the capillary tube in operative relation with one of [the] cups" (element 6), *and* (also element 6) a "support member" to which the capillary tube in the form of a coil of glass tubing is "secured" (element 8).

The parties do not dispute the physical features of the accused device, or the contents of the accompanying product literature. Actually, both parties rely heavily upon that body of evidence in support of their respective positions on the infringement issue. Here we will summarize that evidence. Next we will summarize the testimony presented by each party on the issue of infringement.

### 1. Description of Accused Device [FN96]

> FN96. This description of the accused device is derived from the text and drawings contained in defendant's P/ACE product documents, placed in evidence by plaintiff, including: P/ACE Operating Manual (P-49) and Beckman Capillary Replacement Procedure (P-50). Also admitted into evidence at trial was an actual P/ACE capillary electrophoresis instrument (D-88), with an accompanying P/ACE UV capillary cartridge (P-46).

The main component of the P/ACE capillary electrophoresis device is called a "UV capillary cartridge." [FN97] (P-49, pg.3-6, Fig.3-4.) The parties do not dispute that the entire length of the capillary is contained within the P/ACE cartridge, except a portion at both the inlet end and the outlet end of the capillary that protrudes from the cartridge. The capillary is a continuous, unbroken tube from inlet end to outlet end.

> FN97. In this section we refer to the cartridge in the accused device as the "P/ACE cartridge", or simply "cartridge" where the context makes it clear that the reference is to the P/ACE cartridge.

The detection point along the capillary is located inside the P/ACE cartridge. (P-49, pp. 3-7.) The location where the capillary can be coiled is also located inside the cartridge. (*Id.*) Looking at the capillary beginning at its inlet end, the location for coiling the capillary inside the cartridge is found before the contents inside the capillary flow past the detection window. After the capillary contents flow past the detection window, the contents exit the capillary through the outlet end of the capillary. (*See*

P-50 at 7, 15.) Coolant fluid flows through the cartridge to maintain constant temperature around the capillary within the cartridge. (P-49, pg.3-7.)

The P/ACE cartridge is manually inserted into the P/ACE instrument. (*Id.*) When the cartridge is in that position, the bottom of the cartridge is the exterior surface of the cartridge through which the inlet and outlet ends of the capillary protrude. The bottom of the cartridge contacts an interface mechanism. The two ends of the capillary, protruding through the bottom of the cartridge, each fit through a hole in the interface and extend downward, "protected within four plastic fingers." [FN98] (*Id.,* pg. 3-8.)

> FN98. The P/ACE Operating Manual describes the functions of the interface mechanism as follows:
> The interface mechanism performs several functions: it aids in coupling the capillary to two of the vials in the autosampler, creating a bridge between two electrolyte solutions; it houses the electrodes connected to the high-voltage power supply; it opens the flaps on each vial cap, allowing the capillary and electrode access to the fluid in the vial; and it provides a sealing mechanism for the openings surrounding the capillary ends and the inlet and exit openings for the coolant in the bottom of the capillary cartridge, preventing leakage.
> (P-49, pg.3-8.)

\*77 Each capillary end is immersed in a fluid vial during a run. (*Id.*) The vials are located on two concentric autosampler trays. (*Id.,* pg. 3-2.) One tray is used to hold inlet vials; the other is used to hold outlet vials. "One vial in the larger tray and one vial in the smaller tray are always in position beneath the ends of the capillary located within the cartridge interface.... When these two vials are pneumatically raised from the autosampler, the ends of the capillary (and the electrodes) are immersed in the fluid in the vials." (*Id.*)

The configuration and parts of the P/ACE cartridge are described in detail in the product booklet entitled "Capillary Replacement Procedure," exhibit P-50. The following drawings, with accompanying text, are included in that booklet.

This is an overview of the P/ACE cartridge with its lid in place. The detection aperture is shown as the round opening near the lower right corner of the cartridge. The other five round features shown on the lid are occupied by Phillips-head screws.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)

TABULAR OR GRAPHIC MATERIAL SET AT THIS
POINT IS NOT DISPLAYABLE
(P-50 at 22.)

This is an overview of the P/ACE cartridge with its lid
removed. This drawing labels the inlet and outlet ends of
the capillary, and the mandrel location where the capillary
is coiled. The detection location, although not labeled in
this drawing, can be seen in the same position as in the
above drawing.

TABULAR OR GRAPHIC MATERIAL SET AT THIS
POINT IS NOT DISPLAYABLE
(*Id.* at 7.)

The Capillary Replacement Procedure booklet sets forth a
5-step method for removing an existing capillary from the
cartridge, followed by an 11-step method to install a new
capillary. One can observe at close range the
configuration inside the cartridge by reviewing those
steps, as illustrated by the drawings. We can summarize
and illustrate that configuration as follows.

The housing of the cartridge consists of a lid and a
base.[FN99] The lid contains the aperture for use with the
detector optics. (P-49, pg.3-7.) It also contains five screw
holes, and its surface is molded in a certain shape. (*See* P-
50 at 22, drawing shown above.) The base receives the
rest of the cartridge components. We will describe those
components from the floor of the base upward, moving
generally from the inlet to the outlet side of the cartridge.

> FN99. The base half of the cartridge body is
> referred to in P-50 as the "cartridge bottom."
> (*See* P-50 at 17.) However, we will refer to that
> structure as the "cartridge base" here for clarity,
> because we will be looking at the cartridge from
> an overview perspective with the lid removed
> during this description. In actual operation, the
> completely assembled cartridge is inserted into
> the capillary electrophoresis instrument in such a
> position that the external surface of the cartridge
> through which the capillary ends protrude
> becomes the "bottom" of the cartridge, as
> described *supra.*

The capillary enters the cartridge on the inlet side through
the cartridge inlet hole. (*Id.* at 17.) There is a rubber plug
inside the cartridge inlet hole. That part is shown as
follows:

TABULAR OR GRAPHIC MATERIAL SET AT THIS
POINT IS NOT DISPLAYABLE
(*Id.* at 2; *see also id.* at 19, *infra.*)

There is an oblong sealant strip on the cartridge base
immediately inside the inlet hole. That part is shown as
follows:

TABULAR OR GRAPHIC MATERIAL SET AT THIS
POINT IS NOT DISPLAYABLE
(*Id.* at 2.)

The capillary lies flat as it crosses over the inlet sealant
strip, then remains flat on the cartridge base as it travels
between three pairs of small posts molded into the base.
(*Id.* at 17, 18.) We will refer to the small posts in the
cartridge as "guideposts." An inlet clamp is positioned
over the capillary between the second and third pair of
those guideposts, and screwed into place. The locations of
the sealant strip, guideposts and clamp on the inlet side of
the cartridge are shown as follows:

TABULAR OR GRAPHIC MATERIAL SET AT THIS
POINT IS NOT DISPLAYABLE
*78 (*Id.* at 18.)

The next location in the cartridge base is the mandrel
location. There, a large post is molded into a well in the
base. (*Id.* at 17.) We will refer to that post as the "mandrel
base post." The mandrel base post has a keyed opening to
receive a protruding guide on the bottom of the mandrel.
In this manner the mandrel and the mandrel base post are
keyed to ensure proper positioning, allowing the mandrel
to seat completely, as shown:

TABULAR OR GRAPHIC MATERIAL SET AT THIS
POINT IS NOT DISPLAYABLE
(*Id.* at 17.)

The capillary enters the mandrel area along the inner side
of a post molded into the mandrel, called a mandrel post.
(*Id.* at 14.) A short length of tubing called "capillary
retainer tubing" is positioned over the capillary on that
mandrel post, as shown:

TABULAR OR GRAPHIC MATERIAL SET AT THIS
POINT IS NOT DISPLAYABLE
(*Id.* at 12.)

The capillary retainer tubing is shown here:

TABULAR OR GRAPHIC MATERIAL SET AT THIS
POINT IS NOT DISPLAYABLE
(*Id.* at 2.)

The mandrel itself is grooved. (*Id.* at 14.) The capillary is
next wound around the mandrel the prescribed number of
turns depending on the total length of capillary, as

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)

follows:

TABULAR OR GRAPHIC MATERIAL SET AT THIS
POINT IS NOT DISPLAYABLE
(*Id.* at 13.)

The capillary leaves the mandrel at the outlet end of the
mandrel, on the inner side of another mandrel post
covered by another capillary retainer tube. (*Id.* at 12.)
Next, the capillary travels along the cartridge base in the
direction of the aperture plate. (*Id.* at 17.) Another pair of
guideposts stands just before the capillary reaches the
detection aperture area. The capillary passes between
those guideposts and over another sealant strip, then
arrives at the aperture area.

TABULAR OR GRAPHIC MATERIAL SET AT THIS
POINT IS NOT DISPLAYABLE
(*Id.* at 10.)

The aperture area consists of two semi-circular posts
surrounding just that area. Within those aperture posts, on
the floor of the cartridge base, is an oblong "aperture
plate" positioned perpendicular to the path of the
capillary, with an "aperture plate groove" running across
the center of the aperture plate in the direction of travel of
the capillary. The capillary travels across the aperture
plate centered into the aperture plate groove, and the
capillary window is centered on that groove. Then a large
clamp, also known as the outlet clamp, is positioned over
the capillary and screwed in place, so that small grooves
in the underside of the clamp are holding the capillary in
place over the aperture plate. (*Id.* at 2, 16.) The aperture
area is shown below.

The next portion of capillary, beyond the outlet clamp,
travels over another sealant strip, between two more sets
of guideposts, and over one more sealant strip. (*Id.* at 10.)
It then travels out of the cartridge through the cartridge
outlet hole. The aperture area and the adjacent outlet area
are shown here:

TABULAR OR GRAPHIC MATERIAL SET AT THIS
POINT IS NOT DISPLAYABLE
(*Id.* at 16.)

The cartridge outlet hole is equipped with the same type
of rubber plug found in the cartridge inlet hole, shown as
follows:

TABULAR OR GRAPHIC MATERIAL SET AT THIS
POINT IS NOT DISPLAYABLE
(*Id.* at 19.)

The capillary ends ·protruding from both the inlet and

outlet sides of the cartridge are trimmed to equal length
using a cleaving stone and alignment guide plate. (*Id.* at
20.) The cartridge is completed by installing a large and
small gasket on the base at specified locations, and
attaching the cartridge lid to the base with five screws.
(*Id.* at 21.)

*79 The base of the cartridge also has holes for coolant
fluid to circulate in and out of the cartridge during use.
Those coolant openings are located in the base of the
cartridge between the capillary inlet and outlet holes. (P-
49, pg.3-7.)

### 2. *Plaintiff's Evidence on Infringement*

Plaintiff presented Dr. Guzman as an expert to provide his
opinion testimony comparing the elements of claim 32
with the accused device. (Tr. 8 at 204-06.) Plaintiff also
presented deposition testimony of defendant's employee
Dr. Osborne in support of its infringement claim. (Tr. 11
at 25-53.) The areas of that evidence pertaining
specifically to the disputed elements of claim 32
(elements 6 and 8) are summarized in this subsection.[FN100]

> FN100. Plaintiff's counsel also cross-examined
> defendant's witnesses Osborne and Burolla at
> trial. That testimony is included with the direct
> testimony of those witnesses in the next
> subsection. Likewise, defendant's cross-
> examination of Dr. Guzman on the disputed
> infringement points is included in this
> subsection.

#### a. *Dr. Guzman*

Dr. Guzman testified that in his opinion the accused
device has all elements of claim 32, including an element
6 holder and a feature corresponding to element 8. (Tr. 9
at 15, 32-35.) The following is a representative sampling
of his testimony directed to those two elements:[FN101]

> FN101. We have found it necessary to quote Dr.
> Guzman's testimony at length in this subsection
> rather than try to summarize it, so that his exact
> words may be shown. In this subsection, as
> before, we continue to correct obvious
> transcription errors and delete irrelevant material
> that does not affect the meaning of the quoted
> text. (*See* n.40 *supra.*) We also include necessary
> explanatory references in brackets. We note that
> some of the testimony quoted in this subsection
> has transcription errors in key testimony. Where

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)

that occurs, we have reviewed the trial recording and have substituted the erroneous text with the corrected text in brackets. Again, the parties are invited to participate with the Court in resolving any disputes concerning the official trial transcript if that becomes necessary. (*Id.*)

Q Limitation 6, do you have any evidence from PX-49 [the P/ACE Operating Manual] with respect to that element?
A Yes. Here we have-the holder is there. The whole cartridge cassette.
Q For instance, take a look at Page 3-3 of PX-49.
A The figure 3-2?
Q Yes. Do you find evidence relating to Limitation 6 on that page?
A Yes. I think I mentioned-we have an auto-sampler with two vials, which are always positioned beneath the cartridge interface. So these two vials have to be in such a way that they will be-every one of the ends of the capillary, which is the inlet and the outlet submerged in the liquid.
Q During operation of a PACE instrument, the ends of the capillary are stationary, correct? [Yes.]
Q They don't move at all, right? [Yes.]
Q So what happens? How do they cooperate or relate to, the sample cups which you've described in connection with the rotatable table?
A Well if they are in a stated position, there has to be something that holds two ends of the capillary. If not, the capillary will drop. And they have to be in a relationship with the two cups that we have beneath the inlet and the outlet. So the capillary itself has to be holded in one way or another.
Q [C]an you describe the movement of the cups as it relates to the stationary <u>capillary tube</u>?
A There are two tables, the inner and-table-sample and the outer. So they move in a position drive either by the computer until you find two individual holes which contain the two vials. And they will be pneumatically pushed up in such a-
Q What's pushed up?
A The two vials. And so they will be in a relationship in a coordination with each one of the two ends of the capillary.
Q In other words, the rotatable table positions the cups in the right place-
A Positions the cups in the right place until they find which one of the two cups are related to the separation or the additional buffers or sample.
*80 Q So one of the cups is under the inlet end and one of the cups is under the outlet end of the capillary, right? [Yes.]
Q Then there's a device in the machine that pneumatically pushes the cups up-

A That is correct. And then-
Q -so the cup is in operative relation with the end of the capillary, correct?
A Is in operative relation with the end of the capillary. And in any particular time when you only need two vials to be in this operative relationship.

(Tr. 9 at 16-19.)Q Turn to Page 3-5 of PX-49. And do you see any information on that page that relates to Limitation 6?
A Yes, this one sentence here say, "When the vials are in position pressing keys to manually raise or lower the vials or running a process -"-I presume through the computer- "cause pneumatic cylinder to raise the vial holders so that the ends of the capillary are immersed in fluid."
Q So that passage there on Page 3-5 confirms what we just talked about?
A Yes.

(*Id.* at 19-20.)Q Turn the page to 3-6 [of P-49]. And is there any evidence on Page 3-6 that relates to the presence of Limitation 6 in the PACE instrumentation?
A Yes. Here is a sentence that say, "The ends of the capillary protrude through two sealed openings in the bottom of the housing."
Q How does that relate to the holder limitation of Element 6?
A Well here "protrude through two sealed openings," there are some blue plug in the cartridge cassette that would be also holding the capillaries and one of the end of the capillary-and an end of the capillary.
Q What is the holding structure utilized by PACE for the purposes of Limitation 6?
A Well my opinion is the whole cartridge as a whole, with some of the components within, and the plug in which the capillary will protrude and pass through those little blue plugs.
THE COURT: So repeat that. The whole cartridge?
....
Q Do you have the question, Dr. Guzman?
A Yes. The holder in the PACE device is the whole cartridge with some of the components that keep the capillary in a holding position, including the two blue plugs which the capillary protrude at that particular end.

(*Id.* at 20-22.)Q Turn to Page 3-8 [of P-49], specifically Figure 3-6, and tell us if you have anything to say about Limitation 6.
A Well here in Figure 3-6, the cartridge interface, both ends-
....
Q I believe you were reading from the caption which appears in connection with Figure 3-6? [Yes.] Okay. Please do so-so you have a complete thought on the record.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)

A The cartridge interface, both ends of the capillary extend through the interface and are immersed in fluid vials during a run.
Q So the ends of the capillary tube are in operative relation with the cups, correct?
A That is correct.

(Id. at 22-23.)Q Page 17 [of P/ACE Capillary Replacement Procedure booklet, P-50] is the view with the pair of hands inserting the mandrel into the cartridge, correct? [Yes.]
*81 Q In fact, Page 17 tells us quite a lot with respect to Claim 32? [Yes.]
Q It shows the capillary tube?
A Yes. This is the capillary in a coil position in the mandrel, so-
Q It also shows the first and second ends of the capillary protruding through the wall of the housing?
A Yes-that was the prior claim that we just focused on-in the coil.
Q No, I understand-we're focusing on [element] seven, but I'm broadening my question-to extend to certain of the other limitations. And page 18 shows us some of the same information again, doesn't it?
A The same information but now they have some of the components within the cartridge cassette, the clamps, for instance, that they will screw to the capillary to make it in a secure position there as a holder.
Q So the word clamp appears in two places on Page 18? [Yes.]
Q The drawings on Page 18 also illustrate where those blue plugs would be placed that you described earlier?
A That is correct....

(Id. at 25-26.)Q That brings us to the last limitation of the claim, Number 8. And the question becomes whether the PACE instruments have the coiled capillary secured to a support member. Where do you find evidence of that?
A In ... [P-50].... On Page 13 is-a mandrel.
Q Now we're back to the little boy with the capillary. The word mandrel doesn't appear in connection with the illustration, but of course it does appear in the right heading of the table? [Yes.]
Q So is it your understanding that the mandrel described in PX-50 satisfies Limitation 8 of Claim 32?
A Support member, yes.
Q [Refer to P-50, page 14 the language under the second heading which includes the word note.] The last entry on the page, although it's really only in the middle of the page.
A There are two "note." One is at the end.
Q I want to direct you to the second "note" [P-50, page 14]. What does that say?
A ... "If the capillary is loose, carefully pull the end of the capillary until it is tight around the mandrel."

Q That's an instruction in the Beckman document to secure the capillary to the support member?
A That is correct.

(Id. at 32-34.)Q [Compare the claim language to the actual device, referring to P/ACE instrument (P-88) and P/ACE cartridge (P-46).]
A ... This is the end of a capillary. It's not a tip of a capillary, just the end because the capillary could be as long as one meter in length. And in going operation because as you can see here, the only time that this can function is when one of the two vials, one at the inlet and one at the outlet, are in operative relationship. So that will satisfy Limitation number 6, which is the holder for holding an end of the capillary. And then again, I'm not sure if I can open this or not, but the holder is the overall cartridge with some of the components that you saw internally, to be the clamps, but also there is a blue plug there which may have more than one function, but here also holds the capillary.... So that is what we have for Limitation 6. Once again I repeat, the overall cartridge with a component inside and the blue plug which will hold an end of the capillary.
*82 ....
Q [W]ould you relate the schematic, which appears on Page 17 of PX-50, to the cartridge cassette that you have in your hand [P-46]? Would you explain to the jury how we would get to here if we were to take that apart?
A Basically, if we have a capillary in the air, it's going to basically drop to the floor. We have to have some system to hold it. So here we have (inaudible) which is holding it and also have the blue plugs at the end of the system there of the two capillary which protrude through that aperture-
....
Q [Remove the lid of the P-46 cartridge and continue with this answer.]
A Here you have the inside part of the cartridge. And this is the mandrel here. But I cannot get it out of mandrel because of the support here with a little clamp. But if you remove the clamp, you can see. So the first of that is to maintain in a steady position. If not, this will go out. Then there is a second plug in this position here which is also holding the capillary in a very steady position because this is the area in which the window has been removed.... So it's very fragile, this area. And this you see, it break. The one with the (inaudible)-you can bring it around and nothing happens. So then we have some new putty as the children play with. It's like little rubber. And that basically helps that the liquid will be maintained in this area. And finally we have-
THE COURT: You mean a cooling liquid?
THE WITNESS: Yes, the cooling liquid.
A And finally we have those blue plugs that maintain the capillary in a position that is going to be very straight. And this will be, like I mentioned to you before-there will

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                    Page 74
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)

be a cup here, another here, so it will be in operative relation to that.

....

THE WITNESS: [Element] Number 8 was secured to a support member. And this is the support member, the mandrel. And here is something really interesting. There are some little sleeves there-one at every end. And this maintain it in a very steady position. If I do this and you remove this, it separates. It no longer will be-so there are many different ways of considering something that is holding the capillary. But this whole thing, the mandrel, is the support member, is to secure the capillary.

(*Id.* at 35-45.)Q The white cylinder that we've called 303D [part of Guzman metallic prototype P-20], that's a bolder of the type described in Limitation 6 of Claim 32? [Yes.]
A Where is the holder placed in relation to the end of the capillary, not only in PX-20 but in terms of the language of the patent?
A Well the holder has to be in relation, in operative relationship with the cups. So when this goes up, this move, another one come, goes down. And so there is an end. It's not a tip of the capillary-a certain-
Q What's not a tip?
A Well I'm not holding the tip of the capillary here. If I hold it here, it would never work.
THE COURT: Here meaning what?
*83 THE WITNESS: The tip of the-
Q At the very end, in other words?
A At the very tip, yes, that's what I call the tip, the very end of the capillary. So-but an end of the capillary is all this portion that goes after that.
Q In other words, the end of the capillary is that portion of the capillary which extends beyond the holder, is that what you-
A That is correct.
Q And it extends beyond the holder so it can be immersed into the sample cup or the buffer cup, correct? [Yes.]
Q The holder is not at the very tip of the capillary?
A No. The holder is here. I'm holding it here. Okay. You can see that. I can adjust it also different dimension depending on the tube.
Q Look at PX-46 [the P/ACE cartridge], and explain what you just said in connection with the holder and the end of the capillary? I'm just asking [you] to explain the spatial relationship between the holder and the end of the capillary tube.
A This is basically the same. In order to be in operative relationship you can see that you need a distance from-this called a holder which in this case is the blue plug which is holding that, but you need a space, a certain distance and length of capillary.
Q How much of the capillary stands beyond the holder in connection with PX-46?

A It will vary from instrument to instrument. But in this particular case, it's probably an inch and a half, two inches.

(Tr. 10 at 7-9.)Q What touches the end of the capillary, that is the portion beyond the blue plug, in the Pace device?
A I give you two answer, in the air, nothing touches the capillary. In the tube, the liquid touches the capillary. When-immersed in the tube, it touch the liquid.
Q It touches the liquid, okay.
A Is that correct?
Q Yes, it has to touch the liquid to work. Doesn't it? [Yes.]
Q Doesn't every capillary electrophoresis device have to touch the liquid in order for the liquid to get into the capillary?
A Yes.

(*Id.* at 128.)Q You stated that in the Pace device [P-46], that it is your position that the end is held in that device, in order to read your Claim onto it? Is that your position?
A By the blue plug.
Q No, how about the portion which you have defined as the end, which is the portion beyond the blue plug?
A Yes.
Q That's held, in your opinion, right?
A Yes.

(*Id.* at 128-29.)Q On Friday you held a screwdriver, remember that? And I read it into the record, when you were holding a screwdriver and you held it in your hand, like this, and you said, this is holding the end of the screwdriver, correct?
A An end.
Q An end, yes.
A Yes, I didn't say the end.

....

Q [S]uppose I did this. Am I holding two ends in operative relation if they're both-the vials? Let the record reflect I'm holding a tape measure, I have the 40 inch mark, and I've got approximately 40 inches on each side, dangling in a U. Am I holding the ends in operative relation?
*84 A Doesn't say in the Claim.

(*Id.* at 129-32.)Q That limitation, Number 6, does not describe a holder system, does it?
A No.
Q It describes a holder and uses the word holder? [Yes.]
Q In unqualified fashion, correct?
A Yes.

(*Id.* at 169.)Q Does Limitation 6 of Claim 32 require the holder to be in the absolute tip of the capillary?

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)

A No.

(*Id.* at 177.)

Dr. Guzman also compared the claim language of claim 32 to the features of his own metallic prototype, exhibit P-20, and one or more versions of his cartridge cassette. (Tr. 9 at 47-52; Tr. 10 at 3-8.) Extensive cross and redirect examination ensued, pertaining to the specification language and drawings of the '172 patent. (*Id.* at 94-122, 169-75; ·Tr. 11 at 18-23.) Throughout that testimony, Dr. Guzman identified distinctly separate structures as corresponding to the element 6 holder and the element 8 support member of his claim 32 invention. (*See also* Tr. 8 at 89-91.)

b. *Deposition Testimony of Dr. Osborne*

Plaintiff introduced deposition testimony of Dr. Osborne, vice-president of chemistry development for Beckman, as part of plaintiff's evidence on the issue of infringement. (Tr. 11 at 25-54.) Representative portions of that testimony pertinent to disputed elements 6 and 8 arc as follows:
Q [T]he ends of the capillary tube are always in operative relation to an inlet cup and an outlet cup?
A During operation, that's correct.

(*Id.* at 33.)Q Do all of the cartridges presently sold by Beckman have a mandrel? [Yes.]
Q If the cartridge is equipped with a capillary tube, is ·the capillary tube coiled around the mandrel?
A It depends upon the length of the capillary tube that's in there. If it is required to be coiled around the mandrel to fit the system, yes.

(*Id.* at 36-37.)Q [P-51, page 8] has additional instructions for securing the tube to the mandrel? [Yes.]
Q It says that after the capillary has been coiled around the mandrel the appropriate number of times, the capillary should be held firmly so that it is tight around the mandrel? [Yes.]
Q In fact, the document includes an additional instruction that if the capillary is loose, it should be tightened so it is secured to the mandrel?
A Yes. You said secured to the mandrel. The capillary is to be pulled until it is tight around the mandrel.
Q That's what the document says?
A Yes.

(*Id.* at 43.)Q [Ref. to P-49, page 3-6, top heading.] That refers specifically to the UV capillary cartridge? [Yes.]
Q Thereafter, it describes the cartridge and indicates that the ends of the capillary protrude through two sealed

openings in the bottom of the housing?
A Yes.

(*Id.* at 46.)Q When the machine is in operation, namely any one of the P/ACE 2000 instruments, is the cartridge cassette moving?
A No. We do not want the cartridge cassette to move in any of our systems.
**85** Q Nor do you want the tube to be moving?
A No. We do not want the capillary to be moving either.
Q The capillary is intended to be in proximity to the inlet and the outlet cups?
A The inlet and the outlet cups are designed to be under the inlet and outlet capillary tips.
....
Q The way I understand, the way the instrument works is that in order to get the end of the capillary tube to cooperate with the cup, the cup is lifted by a pneumatic piston from the auto-sampler table, right?
A That's correct. We do not move the capillary or the cartridge. We move the inlet and outlet reservoirs.
Q So you bring the cups to the end of the tube, is what you're saying?
A We position the cups under the ends of the tubes and then the pneumatic system lifts them to the capillary.

(*Id.* at 48-49.)Q What holds the end of the capillary tube above the cup when the electrophoresis analysis is being conducted?
A I didn't quite understand that. The cup is positioned under the inlet and outlet tubes during separation.
Q Right. And what I'm asking you is what is holding the inlet and outlet ends of the tube in relation to the cups during the separation analysis?
A The pneumatic piston-that raises the buffer reservoirs.
Q The pneumatic piston is raising the cup, right? [Yes.]
Q But the pneumatic piston doesn't hold the capillary tube, right?
A We don't hold the capillary tube.
Q Then how does it stay stationary during the operation of the instrument?
A That's why we have a cartridge.
Q And what you are telling me then is it's the ends of the capillary tube are protruding through the openings in the cartridge as reflected by Figure 3-4, correct? [Yes.]
Q In fact, the ends of the capillary tube are protruding through two sealed openings, correct?
A Yes.
Q Those two sealed openings are mounted on the cartridge housing as reflected by Figure 3-4, right?
A Yes.

(*Id.* at 49-51.)Q [Ref. to P-49, page 3-7, first sentence.] It says that within the cartridge, the capillary tube is wound around a mandrel a number of times depending on its

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)

Page 76

length? [Yes.]
Q The capillary tube is coiled around the mandrel?
A Yes.

(*Id.* at 51-52.)

### 3. Defendant's Evidence on Infringement

It will be recalled that Dr. Osborne was the senior executive at Beckman in charge of the P/ACE development project, and Mr. Burolla was the team leader on the project. (*See* Section VII *supra.*) Defendant presented their trial testimony on the issue of infringement. (Tr. 11 at 57-84; Tr. 12 at 3-33; Tr. 14 at 11-108.) The areas of that evidence pertaining specifically to the disputed elements of claim 32 (elements 6 and 8) are summarized in this subsection.

### a. Mr. Burolla

Mr. Burolla's testimony concerning the development of Beckman's first capillary electrophoresis prototype, called OTEP I, is described *supra,* Section VII. His further testimony, directed to the OTEP II prototype and the P/ACE commercial product, may be summarized as follows.

*86 One of the disadvantages of OTEP I was that the capillary was threaded through a series of blocks or boxes, with fittings tightened around the capillary at each capillary hole, and was prone to breakage. (Tr. 14 at 23, 37-38, 42-44, 52-53, 60-62.) That disadvantage was overcome in the design of the OTEP II prototype by introducing two differences:
Q Describe how the OTEP II prototype differed from OTEP I.
A Basically there were, well, at least two differences. OTEP II used a capillary cartridge instead of the scheme that I showed earlier about threading the capillary through several boxes. In addition to that, the acrylic holders that I described on either end were changed so that the capillary did not have to be threaded through any fitting. When the capillary simply passed through that block. When the cartridge was placed on top of those holders it had an O-ring. So the O-ring created the necessary gas seal and the capillary didn't have to be touched, it just simply passed through the block.
Q Why was OTEP II designed to avoid threading the capillary down into a block?
A Because I got tired of replacing capillaries that I broke, and it was a very tedious process. It could take as long as a half an hour, primarily because when you're threading the capillary you also, prior to threading the capillary you

have to burn off the protective coating of the capillary in the detection area, and that made the capillary there very, very delicate. It's this coating, this plastic coating, that allows you to wrap it around things and become very flexible. So if you have to do that before you thread it through everything there-it greatly increases the chance that you're going to break it in the process of threading it through everything. With the capillary cartridge we avoided that.

(*Id.* at 60-61.)

Mr. Burolla was involved in developing the P/ACE commercial product, which resulted from further steps in the development process after OTEP II. (*Id.* at 70-71.) As such, he is familiar with the features of that product, including the P/ACE capillary cartridge.

The main difference between the OTEP I design and the P/ACE instrument is the way the capillary is introduced into the vial on the sample table. "In the P/ACE instrument, there's no disturbance of the capillary from the cartridge into the vial." (*Id.* at 84.) In contrast, the capillary in OTEP I had to go through an acrylic block near the inlet and outlet end, "that had the ferrule in it that we had to tighten to hold the capillary in place." (*Id.*)
Q [Contrast OTEP I and the P/ACE device.]
A ... So the difference between OTEP I and P/ACE would be that the capillary, as it exists in the [P/ACE] cartridge, simply hangs down from the cartridge, and there is no attachment of the capillary to anything on the instrument prior to going into the vial.
Q And there's no structure for it?
A There's no structure, no.
Q Holding it?
*87 A Basically there are holes in the interface block that the capillary goes through, and that's it.

(*Id.* at 85-86.)

The P/ACE cartridge includes the blue plugs from which the capillary protrudes from the cartridge on the inlet and outlet sides of the cartridge. (*Id.* at 78.) The function of those plugs is to prevent gas pressure from escaping during pressure injection of the capillary.[FN102] The blue plugs do not hold the capillary. (*Id.* at 78-79.)

> FN102. The pressure injection feature of the P/ACE device is described in Dr. Osborne's testimony summarized *infra.*

When the blue plugs are pushed out of their normal position in the capillary inlet and outlet openings of the cartridge, Mr. Burolla observes no change in the

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)

alignment of the capillary protruding from the cartridge as a result of removing the plugs from their normal position. (*Id.* at 77-78.) He acknowledges that in that demonstration position, the blue plugs pushed down on the exposed portion of capillary remain "in frictional contact" with the capillary. (*Id.* at 102-04.) He further agrees that to prevent escape of gas during pressure injection, the blue plugs as installed in the cartridge must have a tight fit with the capillary and the cartridge body. (*Id.*)

Q [I]t is your testimony that the cartridge of the P/ACE 2000 instrument holds the capillary, correct?

A Yes.

(*Id.* at 106.)

### b. Dr. Osborne

Dr. Osborne's testimony concerning the development process for the P/ACE device is summarized *supra*, Section VII. Excerpts of his trial testimony describing the P/ACE device, as relevant to disputed elements 6 and 8, are as follows:

Q [Using a demonstrative, describe certain components of the P/ACE device.]

A This is a diagram of some of the components that we have in the P/ACE device. The cartridge is here. You see the capillary ends below the cartridge. The cartridge is inserted into this cartridge interface. You see four holes in that interface. Two holes are for the capillaries and the other two holes are an inlet and outlet for the cooling liquid that we use to cool the capillary....

Q [E]xplain how the cartridge is inserted into the machine and what happens.

A We place the cartridge into the machine. The capillaries go into these two outer holes. We then latch it in place. You program the computer to turn these autosampler wheels to the vials that you want to interrogate. And then a pneumatic piston raises those [pneumatic] tubes up so that the ends of the capillary are inside the inlet and outlet tube.

Q You mentioned the cartridge interface, could you describe ... what the function of that is?

A That interface has the electrode connections in it. It has the fluid for cooling the capillary inlet and outlet. And these devices are running sometimes at 30 kilovolts and so you really want to make sure that you don't get arcing and things like that. That's why we actually latch that cartridge in place with this latch on top.

Q [E]xplain how the buffer and then the capillary fluid gets into the capillary in the P/ACE system.

**\*88** A Here's the coil and the cartridge. And ... if you have a capillary that is 27 centimeters, you would not put it around that mandrel. It would just go straight over to the side. If it's 37 or higher centimeters, then you would coil

it the appropriate amount of times around that mandrel. The cartridge bottom sits on the interface that we saw before.

Q Now could you show what of the interface is shown in this graphic, if at all?

A In this graphic, there are shown two holes that the capillary fits through the interface. So the capillaries extend through the interface into the inlet and outlet vials when the pneumatic piston has raised them up.

Q Does this graphic show the entire interface structure or is it cut away?

A This is a cut away. It's not the entire interface structure. It's just the part of it that the cartridge sits on. This particular diagram does not show the cooling fluid inlet and outlet either. In order for capillary electrophoresis to work, the capillaries on the inlet and outlet have to be in the buffer. And there is a cap on each of our inlet and outlet vials and you can see it diagramed here. And if the fluid in the inlet and outlet vials is higher than the cap, then it'll leak out and you'll get arcing. And so the operational ends of the capillary is really that part of the capillary that extends below these caps. So we have the-when the pneumatic pistons lift the tubes up, we now have the capillary operative ends in the buffer. This is a diagram of our positive pressure injection system. The caps on these vials actually make a seal on the bottom of the interface. We then pump gas in, and on the cartridge there's a seal so that we can maintain that positive pressure and we actually pressurize the buffer all the way through to the other side. Now you can also inject the sample and you would just have the pressure on for a smaller amount of time.

....

Q Looking at those structures on the left [in the demonstrative], it's identified as gas sealing plug. Can you explain ... what their function is?

A You want to maintain a positive pressure, and if you didn't have a gas sealing plug in the cartridge then you would not be able to reproducibly use positive pressure to get the buffer in or inject the sample.

Q Are these plugs the so-called blue plugs that we've been hearing about?

A Yes.

Q So the function of the blue plugs is to do what?

A It's [to] enable the positive pressure gas injection. Those blue plugs really don't have anything to do with the capillary electrophoresis run itself.

Q And what if one were to move the blue plugs, what effect if any does that have?

A You would not be able to have the positive pressure injection, but you would still be able to perform capillary electrophoresis. You would have to inject the sample and the buffer in a different way.

Q So if you remove the blue plugs entirely, what if any effect does that have on the capillary ends as you've been

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)

describing it?

**\*89** A It would have no effect on that.

Q To sum up, what structure, if any, does the P/ACE system have for holding the ends of the capillary?

A As I said in my deposition, we don't hold the ends of the capillary.

Q [E]xplain one more time why that's the case?

A We found with Dr. Zare's device that if you manipulate the ends of the capillary, they're very fragile, they break, they'll split. There's a polyamide coating and if it cracks you can get arcing across the capillary ends. And so in the design that Vic Burolla and his team came up with, we did not want the capillary to move. If you remember Dr. Zare's device, the capillary moved. And so that's why we wrap it tightly around this mandrel. And we did not want to have the ends held by any other device.

(Tr. 12 at 6-11.)Q [Refer to P-46, disassembled cartridge.] [T]hat's the part used on the P/ACE instruments, right?

A Once it's assembled, yes.

Q And it shows a mandrel sort of structured to the coiled capillary, right?

A Yes, it does.

Q And then there are the blue plugs that you identified in your testimony?

A Yes.

Q And that there's a portion or an end of the capillary protruding from the plugs, is that right?

A Yes.

(*Id.* at 32-33.)Q In the actual P/ACE device as you described it ..., what holds the ends of the capillary in operative relation ... during the operation of a P/ACE device?

A We don't hold the ends of the capillary tubes.

Q Well, you hold the capillary with the cartridge cassette, do you not?

A The capillary is tightly wound or tightly supported by the cartridge, yes.

Q Right. And the ends of the capillary tube protrude through the cartridge housing?

A They protrude through the cartridge house, yes.

(*Id.* at 29-30.)

### C. Conclusion on Issue of Infringement

There is no dispute in this case as to the configuration of the P/ACE cartridge, or the way that it is inserted and functions within the P/ACE capillary electrophoresis device. What is at issue is the nomenclature to be assigned to that apparatus, and thus whether the apparatus fits the language of elements 6 and 8 of claim 32.

Plaintiff points to the mandrel in the P/ACE cartridge as the element 8 feature. Plaintiff's position on what constitutes the element 6 feature is difficult to discern. Dr. Guzman in his trial testimony variously identified the element 6 "holder for holding an end of said capillary tube in operative relation with one of the said cups" as the entire cartridge, or the cartridge and the interface into which it is inserted, or the cartridge with some of its components including the clamps and blue plugs, or the blue plugs alone.

Defendant's witnesses Burolla and Osborne agreed that the capillary itself can be coiled inside the cartridge, and that the coiled capillary is both wound around the mandrel within the cartridge and "tightly supported by the cartridge," to quote Dr. Osborne. (Tr. 12 at 29-30.) However, they would not agree that "an end" of the capillary is "held." Rather, those witnesses pointed to the fact that the portions of each capillary that protrude from the cartridge do not touch anything until they are immersed in the fluid in the vials.

**\*90** The jury found in favor of plaintiff on the issue of infringement, as on the other issues submitted for its determination at trial. In our view, a reasonable jury could agree with plaintiff that the "end" portion of the capillary that protrudes from the ́cartridge is "held" in operative relation to the liquid in the cups by the cartridge, even though no structure touches the portion of the capillary that protrudes from the cartridge. The screwdriver analogy is helpful here: a screwdriver has a handle and a shank, with a point at the tip of the shank that must contact a screw for the screwdriver to function. Even though the handle does not touch the portion of the shank that extends out from the handle, the handle nevertheless serves as a "holder for holding an end" of the shank "in operative relation" with the screw. So too the P/ACE cartridge can be viewed as a "holder" that holds the ungrasped portion of capillary that extends down beyond the cartridge and into the vials in operation.

The problem with that concept, however, is that when the cartridge as a whole is deemed to be the element 6 "holder," then it becomes impossible to distinguish that "holder" from the element 8 "support member" for the coiled capillary. We reject as a matter of law that any reasonable reading of claim 32 could permit elements 6 and 8 to be the same structure. They are clearly separated by the conjunction "and" in element 6. Dr. Guzman acknowledged that his claim 32 invention contemplates that elements 6 and 8 refer to separate items.

Looking at the actual configuration of the P/ACE cartridge, the capillary is in fact tightly secured so that it cannot move at any location in its continuous travel

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
(Cite as: Not Reported in F.Supp.2d)

through the cartridge. It is not just "secured to a support member" at the location where it may be coiled. It is secured to the cartridge housing throughout its travel through the cartridge by all the features put there for that purpose, including the capillary inlet holes (with or without their blue rubber plugs); the cartridge base itself with its numerous sealant strips and guideposts; the screwed-in capillary clamps in the inlet and aperture/outlet areas; the grooved mandrel keyed into the mandrel base post and the retaining tubes on the mandrel posts; the grooved aperture plate; and the gasket-sealed lid that completes the cartridge assembly.

We must also reject as a matter of law the notion that given the configuration of the P/ACE cartridge, the mandrel alone can qualify as the element 8 "support member" to which the coiled capillary is "secured." The relevant clause of claim 32, containing both elements 7 and 8, reads, "said capillary tube is in the form of a coil of glass tubing secured to a support member." It does not read "the coiled portion of said capillary tubing is secured to a support member." [FN103] Comparing the literal claim language of element 8 to the P/ACE cartridge, the only reasonable factual conclusion is that the capillary inside the cartridge, which may be coiled at a certain location within the cartridge to accommodate varying lengths, is "secured" at every point in its travel through that cartridge, not just at the mandrel, and that the complete cartridge is the "support member" for the coiled capillary.

> FN103. The patent file history reveals that during prosecution of the CIP application, when claims 1 and 39 had been combined into an amended claim 39 ending with the words "said capillary tube is in the form of a coil of glass tubing," the applicant added a new proposed dependent claim 50 that read as follows:
> 50. The apparatus defined in claim 39 wherein said capillary tube includes a portion in the form of a coil of glass tubing.
> (D-3 at 88.) Claim 50 was rejected as both indefinite and obvious. (Id. at 96-98.) The applicant cancelled claim 50, in the same Amendment After Final Rejection that combined former claims 1, 39 and 40 into claim 32 as issued. (Id. at 101-04.)

*91 We conclude that a reasonable jury could not find that the mandrel inside the P/ACE cartridge constitutes the element 8 "support member" for the coiled capillary, while also finding that all other parts of the cartridge constitute the element 6 "holder" for holding an end of the capillary. Nor could a finder of fact reasonably conclude that the "holder" limitation is satisfied in the accused

device by the "blue plugs" alone, or some other assortment of cartridge parts except the mandrel. Similarly, no reasonable jury could find that the entire P/ACE cartridge embodies both the "holder" requirement of element 6 and the "support member" requirement of element 8, although in actual operation the P/ACE cartridge does perform both of those functions. The inescapable fact is that the P/ACE cartridge is a unitary design. Call the P/ACE cartridge what you will, but it is not two structures, as required by claim 32.

This Court holds that claim 32 demands that elements 6 and 8 be two distinguishable structures, and no such distinguishable structures exist in the configuration of the accused device. For these reasons, we will enter judgment as a matter of law denying plaintiff's claim that the accused device infringes claim 32 of the patent. Alternatively, we conclude that the substantial weight of the evidence does not support the verdict on infringement, and the motion for a new trial on this claim should be granted.

## X. Conclusion

Plaintiff Princeton Biochemicals, Inc., the owner of U.S. Patent No. 5,045,172, sues defendant Beckman Coulter, Inc., claiming infringement of claim 32 of the patent. Defendant denies infringement, and counterclaims for declaratory judgment of invalidity on grounds of obviousness and prior invention. The case was tried to a jury on issues of liability and invalidity only, resulting in a verdict for plaintiff on all three claims.

Defendant filed timely motions for judgment as a matter of law and, alternatively, for a new trial. For the reasons stated herein, the motion for judgment as a matter of law is granted. Accordingly, final judgment will be entered in favor of defendant, declaring claim 32 of the patent invalid on grounds of both obviousness and prior invention, and plaintiff's claim of infringement will be dismissed with prejudice. Alternatively, the motion for new trial is also granted.

A post-trial motion seeking to intervene in this action was filed by Rutgers University. Defendant joined in that motion, and sought to stay trial on any damages phase until the claim by Rutgers to ownership of the '172 patent was adjudicated. We have granted the motion to intervene, in a separate Memorandum Opinion and Order. (Docket entries 172 & 173.) Based upon the disposition of defendant's motions for judgment as a matter of law and for new trial set forth herein, we will dismiss the motion for stay as moot.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)
**(Cite as: Not Reported in F.Supp.2d)**

An appropriate Order and Judgment accompanies this Memorandum Opinion.

D.N.J.,2004.
Princeton Biochemicals, Inc. v. Beckman Coulter, Inc.
Not Reported in F.Supp.2d, 2004 WL 1398227 (D.N.J.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.