# EXHIBIT 7

Westlaw.

Not Reported in F.Supp.                                                                    Page 1
Not Reported in F.Supp., 1995 WL 683769 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

**H**
Edward Lowe Industries, Inc. v. Oil-Dri Corp. of
America
N.D.Ill.,1995.
Only the Westlaw citation is currently available.
United States District Court, N.D. Illinois, Eastern
Division.
EDWARD LOWE INDUSTRIES, INC., Plaintiff,
v.
OIL-DRI CORPORATION OF AMERICA and
MARCAL PAPER MILLS, INC., Defendants.
**No. 94 C 7568.**

Nov. 16, 1995.

Brian Edward Martin, John William Rotunno, Bell,
Boyd & Lloyd, Chicago, IL, Barry Warren Sufrin,
John T. Gabrielides, Tim C. Meece, Laff, Whitesel,
Conte & Saret, Chicago, IL, for plaintiff.
Talivaldis Cepuritis, Kathryn Elizabeth Garipay,
Arne M. Olson, Olson & Hierl, Chicago, IL, Craig
M. White, Wildman, Harrold, Allen & Dixon,
Chicago, IL, Robert S. Swecker, William C.
Rowland, Allen R. Baum, Burns, Doane, Swecker &
Mathis, Alexandria, VA, for defendants.

*MEMORANDUM OPINION AND ORDER*
CONLON, District Judge.
**\*1** Edward Lowe Industries, Inc. ("ELI") sues Oil-
Dri Corporation of America ("Oil-Dri") and Marcal
Paper Mills, Inc. ("Marcal") (collectively
"defendants") for patent infringement. On August
31, 1995 [FN1] Marcal filed a motion under
Fed.R.Civ.P. Rule 37(c)(1) for an order prohibiting
ELI's experts Seymour Rothstein and Donald
Peterson from testifying at trial for failure to disclose
their opinions by August 28. ELI responds that it
advised Marcal before it filed its motion that ELI did
not intend to call Peterson as a trial witness.
Accordingly, the only dispute requiring the court's
attention concerns Rothstein.

*BACKGROUND*

On July 3, the court ordered full compliance with
Rules 26(a)(2) of the Federal Rules of Civil
Procedure by August 15 regarding disclosure of
expert witnesses and submission of their reports.
*See* Order, No. 94 C 7568 (N.D.Ill. July 3, 1995).

On August 4, ELI notified defendants that it retained
Seymour Rothstein as an expert witness to prepare
for and testify at trial. *See* Defendant's Exhibit
("Def.Ex.") A. On August 7, the court granted the
parties' agreed motion to exchange experts' opinions
and reports on August 28, exchange rebuttal reports
on September 8, and complete expert discovery by
October 1. *See* Order, No. 94 C 7568 (N.D.Ill. Aug.
7, 1995). On August 15, ELI further disclosed
Rothstein and four other witnesses as experts who
may present evidence at trial under Rules 702, 703 or
705 of the Federal Rules of Evidence. *See* Def. Ex.
A. ELI noted that it would provide further
disclosures including the experts' written reports in
accordance with Rule 26 and the court's August 7
order.

On August 28, ELI timely furnished defendants with
Rothstein's written report. *See* Def. Ex. B. The
report summarizes Rothstein's experience as an
examiner with the United States Patent and
Trademark Office and as a practicing attorney. *Id.* at
¶ 1. The report further describes Rothstein's
anticipated testimony on various patent law
principles such as presumption of validity,
infringement principles, claim interpretation, literal
infringement, the doctrine of equivalents and
prosecution history estoppel. *Id.* at ¶ ¶ 2-5. The
report omits foundational information required by
Rule 26(a)(2).

On September 2, two days after Marcal filed the
present motion, ELI supplemented Rothstein's report.
*See* Plaintiff's Exhibit ("Pl.Ex.") F. The
supplemental information provided Rothstein's
qualifications, compensation, *curriculum vitae* and a
list of the supporting documents he reviewed in
connection with his August 28 report. *Id.* The
supplemental report further clarified that he would
also serve as a rebuttal witness, furnished a summary
of his opinions which would be offered in rebuttal
and notified defendants that he would submit a
rebuttal report by September 8. *Id.* On September 8,
ELI timely served Marcal with Rothstein's expert
report rebutting the expert report of B.R. Pravel. *See*
Pl. Exs. B, D.

*DISCUSSION*

**\*2** Rule 26(a)(2) requires parties to disclose the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                 Page 2
Not Reported in F.Supp., 1995 WL 683769 (N.D.Ill.)
(Cite as: Not Reported in F.Supp.)

identity of any person who may be used at trial as an expert witness. Fed.R.Civ.P. 26(a)(2)(A). Rule 26(a)(2) further provides that disclosure shall "be accompanied by a written report prepared and signed by the witness." Fed.R.Civ.P. 26(a)(2)(B). Parties must provide a signed, written statement of all opinions to be expressed and the basis for the opinions; the data used in forming the opinion; any exhibits to be used in support of the opinions; the witness' qualifications and compensation; and any other cases in which the witness has testified as an expert in the preceding four years. See Fed.R.Civ.P. 26(a)(2)(B). The rule states that "these disclosures shall be made at the times and in the sequence directed by the court." Fed.R.Civ.P. 26(a)(2)(C).

Rule 26(e) further provides that parties are under a duty to supplement or correct disclosures. If a party learns that information disclosed under Rule 26(a)(2) is incomplete or incorrect, any additions shall be disclosed before the pretrial order is filed. Fed.R.Civ.P. 26(e)(1).

Failure to comply with Rule 26(a)(2) precludes a party from using at trial expert testimony that was not timely or fully disclosed. See Fed.R.Civ.P. 37; Harlow v. Eli Lilly & Co., No. 94 C 4840, 1995 WL 319728, at *1 (N.D.Ill. May 25, 1995). Rule 37(c)(1) provides that absent substantial justification and unless a failure to disclose is harmless, a party that fails to disclose information shall not be permitted to use the witness at trial. Fed.R.Civ.P. 37(c)(1). Rule 37's sanction is designed to provide a strong inducement for disclosure of Rule 26(a) material. See Rule 37(c), advisory committee's note (1993).

Marcal moves under Rule 37(c)(1) to preclude Rothstein from testifying at trial for two reasons. First, it contends that Rothstein's August 28 report did not contain a complete statement of his opinions, the foundational information he considered, exhibits he intended to use to support his opinions, his qualifications and compensation and a listing of other cases in which he testified. Second, Marcal asserts that Rothstein's August 28 report does not set forth an opinion; rather, it merely recites patent law principles without reference to facts of this case. Marcal claims that it cannot prepare a rebuttal to Rothstein's expected testimony.

ELI acknowledges that Rothstein's August 28 report lacked certain foundational information. ELI contends that the omission was inadvertent and was corrected on September 2, promptly after it was brought to ELI's attention. ELI asserts that

Rothstein's September 2 supplemental report addresses the foundational concerns expressed in Marcal's motion and therefore the omission was harmless under Rule 37(c)(1). ELI maintains that Marcal neither argued that it suffered any prejudice from the omission nor did it in fact suffer any prejudice. ELI notes that Marcal has informally supplemented the opening report of Dr. Kono, one of Marcal's expert witnesses. See Affidavit of Tim C. Meece ("Meece Aff.") at ¶ 5; Pl.Ex. J. Finally, ELI contends that Pravel submitted a five-page, thirteen-paragraph report rebutting Rothstein's August 28 report.

*3 As for the substance of Rothstein's expected testimony, ELI asserts that Rothstein may properly testify not only as to his opinions, but also about non-opinionated specialized knowledge from his particular field-patent law. See Fed.R.Evid. 702. ELI claims that expert testimony in non-opinion form is well-accepted.

ELI's argument that Rothstein's August 28 report's omissions were harmless and promptly addressed is convincing. Marcal prematurely filed its motion. Rothstein supplemented his August 28 report on September 2, two days after Marcal filed its August 31 motion and five days after the initial report was submitted. Rothstein's promptly-disclosed supplemental report addresses all of the foundational issues raised in Marcal's motion. Despite Marcal's claim of prejudice, Pravel apparently submitted a report rebutting Rothstein's August 28 report. Rule 37 sanctions are reserved for situations when a party's failure to disclose constitutes more than harmless error. Marcal simply fails to identify how Rothstein's initial disclosure's omissions are more than harmless error. ELI claims the omissions were inadvertent. Its prompt supplementation prior to the court-ordered September 8 deadline for rebuttal reports complies with the requirements set forth in Rule 26(e) and renders the omissions harmless.

Moreover, Marcal's argument that Rothstein should not be able to testify because he did not express any opinions in the August 28 report is unpersuasive. Marcal's argument is precluded by Fed.R.Evid. 702, which permits an expert to testify about specialized knowledge in the form of a non-opinion. Fed.R.Evid. 702; Fed.R.Evid. 702 advisory committee's note (1972); cf. Markman v. Westview Instruments, Inc., 52 F.3d 967, 991 (Fed.Cir.) (en banc ) (expert testimony from a patent lawyer proper as an interpretive aid) (Mayer, concurring), cert. granted, 116 S.Ct. 40 (U.S.1995). Rothstein may assist the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                Page 3
Not Reported in F.Supp., 1995 WL 683769 (N.D.Ill.)
**(Cite as: Not Reported in F.Supp.)**

jury to understand evidence or to determine a fact in issue by giving "a dissertation or exposition of scientific or other principles relevant to the case ... in non-opinion form." Fed.R.Evid. 702 advisory committee's note (1972).

Marcal's claim that the substance of Rothstein's August 28 report is inadequate is disingenuous. Rothstein's report is similar to the August 28 report of Pravel, Marcal's patent law expert. Pravel states that he will explain: (i) "the application of [patent] laws to the testimony and issues in this case;" (ii) "the concepts of prosecution history estoppel and claim interpretation;" and (iii) "the prior art effect under 35 U.S.C. § 102(g) of a prior invention which has not been abandoned, suppressed, or concealed." Pl.Ex. B at ¶¶ 3, 4. Accordingly, Rothstein may properly testify as to the patent law principles identified in his August 28 report.

Finally, Rothstein's supplemental report clarifies that he may testify to rebut defendants' experts' testimony. Rothstein timely submitted a report rebutting Pravel's August 28 report. There is no basis for excluding Rothstein's rebuttal testimony at trial because he fully complied with the disclosure requirements of Rule 26 and this court's August 7 order.

*CONCLUSION*

**\*4** Defendant Marcal Paper Mills, Inc.'s motion for sanctions under Rule 37 of the Federal Rules of Civil Procedure is moot as to the expert testimony of Donald Peterson and denied as to the expert testimony of Seymour Rothstein.

         FN1. All dates occur in 1995 unless otherwise noted.
N.D.Ill.,1995.
Edward Lowe Industries, Inc. v. Oil-Dri Corp. of America
Not Reported in F.Supp., 1995 WL 683769 (N.D.Ill.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 8

Westlaw.

Not Reported in F.Supp.                                                            Page 1
Not Reported in F.Supp., 1989 WL 3473 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

**H**
Otto Zollinger v. Qualitex, Inc.
E.D.Pa.,1989.
Only the Westlaw citation is currently available.
    United States District Court, E.D. Pennsylvania.
                Otto ZOLLINGER
                        v.
           QUALITEX, INC., et al.
             **CIV. A. No. 84-1630.**

                    Jan. 17, 1989.


Charles C. Hileman, III, Joyce S. Meyers, Schnader,
Harrison, Segal & Wright, Philadelphia, Pa., Floyd A.
Gibson, James D. Myers, Ronald T. Lindsay, Bell
Seltzer Park Gibson, Charlotte, N.C., for plaintiff.
Karl L. Spivak, Harvey D. Fried, Steele, Gould &
Fried, Philadelphia, Pa., for Qualitex, Inc. and
Edward J. McBride.
Edward J. McBride, pro se.
Michael C. Cesarano, Steele, Gould & Fried, Miami,
Fla., pro hac vice for defendants.


    *FINDINGS OF FACT AND CONCLUSIONS OF
                     LAW*
GILES, District Judge.

               I. *INFRINGEMENT*

*1 1. The instant action was commenced by Otto
Zollinger, Inc. (Zollinger) in April, 1984 against
Qualitex, Inc. and Edward J. McBride, Jr. (McBride)
for infringement of three Zollinger reissue patents
(Zollinger patents). Zollinger also brought an action
against a distributor of certain of Qualitex yarn
tension devices, which was defended by Qualitex and
McBride. *Otto Zollinger, Inc. v. Shepco, Inc.,* Civil
Action No. 84-1682-15 (D.S.C. May 9, 1985). In
*Shepco,* the district court held that the Zollinger
patents were valid and infringed by the Qualitex yarn
tension devices Q-387-1, Q-387-2 and Q-777,
permanently enjoined the defendants from selling
infringing devices and awarded Zollinger
$789,768.50 in damages. The decision of the district
court in *Shepco* was affirmed on appeal by the Court
of Appeals for the Federal Circuit. *Otto Zollinger,
Inc. v. Shepco, Inc.,* No. 85-2635, slip op. (Fed.Cir.
April 21, 1986).

2. By order entered September 11, 1985, this court

entered judgment in favor of Zollinger against
Qualitex and McBride, declaring the validity of the
Zollinger patents and the infringement thereof.

3. By order entered September 11, 1986, this court
held, *inter alia,* that the Qualitex yarn tension devices
Q-175, Q-176, Q-177, Q-180, Q-181, Q-181L, Q-
185, Q-675, Q-677, Q-680, Q-681 and Q-685
infringed the Zollinger patents.

4. On February 14, 1986, Zollinger filed a motion to
have Qualitex and McBride adjudged in civil
contempt of the September 11, 1985 injunction order
by reason of their manufacture and sale of the
Qualitex yarn tension device Q-390. This court held
an evidentiary hearing on August 13, 1987 and an
order was entered on November 17, 1987, denying
Zollinger's contempt motion because, in its
discretion, the court concluded it was not possible to
determine whether the Q-390 device infringed the
Zollinger patents within the context of a contempt
proceeding.

5. This court has now conducted a full trial on the
issue of infringement of the Zollinger patents by the
Q-390 and Q-190 (sometimes referred to as the
Model-390 and Model-190) yarn tension devices and
finds that both the Model-390 and Model-190 yarn
tension devices infringe the Zollinger patents.

The inventions disclosed in the Zollinger patents are
known as ball tension control devices. The devices
are comprised of a housing having a yarn passageway
extending through it, which has a large diameter
section and a small diameter section. An insert with
a round opening is fitted inside the small diameter
section of the yarn passageway. The insert consists
of a curved, circular seat which surrounds the
opening, upon which rests a ball (referred to in the
patents as a "spherical element"). When no yarn is
passing through the yarn passageway, the ball rests
on the seat of the insert away from the walls of the
passageway. In operation, yarn is threaded through
the opening in the insert between the seat of the insert
and the ball in such a way that the ball presses the
yarn against the seat of the insert. As the yarn is
pulled through the passageway, exiting from the
opening at the top of the device, the ball is rotated by
the yarn and retards the passage of the yarn, thus
creating the desired tension. The *Shepco* court noted
that "[t]he tension controller of the present inventions

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 3473 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

Page 2

is unique in that rather than merely adding tension to the yarn passing therethrough, it assists in constantly controlling tension due to the fact that the ball responds to variations in the yarn by moving vertically along the passageway and back onto the seat." *Shepco,* slip op. at 4.

**\*2** 6. Defendants contend that the scope of the claims of the Zollinger patents should be restricted to a large diameter section, a medium diameter section and a small diameter section by purportedly newly discovered prior art in the form of a Hamel 2 for 1 twister spindle. The defendants in the *Shepco* case attempted to qualify that same Hamel spindle as prior art, but the *Shepco* court ruled that the defendants had failed in that effort and excluded it from evidence. That evidentiary ruling was not preserved on appeal. Therefore, defendants here are collaterally estopped from offering the Hamel spindle as prior art in an effort to challenge the validity of, or restrict the scope of, the Zollinger patents. Those issues were fully and finally determined by the *Shepco* court. *Id.,* slip op. at 8-12. They are not now open to relitigation by the same parties. *See, Overhead Door Corp. v. Whiting Rolleys Door Mfg. Corp.,* 215 U.S.P.Q. 428, 433 (W.D.N.Y.1981).

7. If an accused device contains every element of at least one claim of a patent, the device literally infringes the patent. *See Teledyne McCormick Selph v. United States,* 192 U.S.P.Q. 55, 61 (Ct.Cl.1976), *modified,* 558 F.2d 1000 (Ct.Cl.1977); *Great Plains Chemical Company, Inc. v. Micro Chemical, Inc.,* 652 F.Supp. 1, 11 (D.Col.1985), *citing Radio Steel Manufacturing Co. v. MTD Products, Inc.,* 731 F.2d 840, 847 (Fed.Cir.), *cert. denied,* 456 U.S. 1007, 102 S.Ct. 2298, 73 L.Ed.2d 1302 (1982).

8. The accused devices in the present action infringe every element of Claim 1 of Reissue Patent 30,920. Therefore, the devices infringe the patent.

9. The Qualitex devices are tension devices. Each is comprised of a housing, which has a yarn passageway extending therethrough. Plaintiff's Ex. 100, Reissue Patent 30,920, Claim 1(a), Col. 5.

10. The yarn passageways of the alleged infringing devices have large diameter sections and small diameter sections. *Id.,* Claim 1(a), Col. 5. Defendants' claim that the accused devices do not have small diameter sections is without merit.

11. David Garrison, Esquire, defendants' patent practice expert, interpreted the language of Claim 1

as providing that the seat is in the large diameter section but is on an insert which is, at least in part, in the small diameter section. Accepting this interpretation, the court concludes that reasonably the small diameter section means the area immediately surrounding the insert below the top of the seat. Such a small diameter section is present in each of the accused Qualitex devices.

12. Claim 1 specifies "an insert received in said small diameter section of said passageway and having an opening therethrough, said insert defining an uninterrupted seat around said opening in said large diameter section of said passageway...." *Id.,* Claim 1(b), Col. 5.

13. Defendants have asserted that the seat of the Qualitex device is not within the large diameter section and, thus, literal infringement cannot be found.

**\*3** 14. The court finds that the accused devices have a seat which is located in the large diameter section but which is received in the small diameter section. That the housing walls do not extend down past or touch the small diameter section is not relevant. The top of the seat of the accused devices is positioned below the bottom of the plastic housing a distance less than one-half the diameter of the smallest of the balls sold by defendants for use with the accused devices.

15. In use, the center-line of each ball is above the bottom of the plastic housing. Any lateral movement of the ball from the seat's center will cause it to strike the interior surface of the plastic housing of the accused devices at the same place where it would strike if the housing were continued down to the small diameter section. At the point of striking the housing, lateral movement is prohibited. Therefore, eliminating a portion of the plastic housing in the accused devices makes no practical difference in the action of the tensioning control ball.

16. There is no requirement in the Zollinger patents that the housing be comprised of one piece.

17. Defendants have also asserted that devices such as the Q-390 and Q-190 are excluded from coverage under the Zollinger patents because Zollinger abandoned any claim in which the seat is secured to the large diameter section on the housing.

18. Defendants contended through Mr. Garrison that Claim 13 of the original patent application was abandoned when it was not reiterated in the original

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 3473 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

patent.   He concluded that this aspect of the claim was thereby made available for public use.   Claim 13 provided:

13. A yarn tension device as defined in Claim 12 wherein said small diameter section and said seat means are provided on an insert secured to said housing.

Defendants' Ex. 11 at 35.

19. Mr. Garrison concluded that, where the seat is not in the large diameter section, but is secured to, and not part of, a continuous housing, the device does not infringe.

20. Dalbert Shefte, Esquire, plaintiff's patent practice expert, disagreed with Mr. Garrison's conclusion pointing out that Claim 13 was dependent on Claim 12, which was not abandoned, and which is a broad, independent claim.   The court agrees.

21. Claim 12 provides, in part:

(b) seat means located along said passageway to receive a spherical element and to hold said element out of contact with walls defining said passageway when no yarn is passing therethrough....

Defendants' Ex. 11 at 34.

22. The provision, "seat means [is] located along said passageway", does not conflict with the provision that the "seat mean [is] provided on an insert secured to said housing."   Therefore, although the narrow provisions of Claim 13 were not specifically reiterated in the patent, the broader provisions of Claim 12 cover such a situation and literal infringement may be found.

23. Defendants maintain that the accused devices have an open space between the bottom of the plastic portion of the accused devices and the top of the insert containing the seat which defendants contend does not provide "said large diameter section of said passageway having a diameter adjacent said seat to prohibit substantial lateral movement of a spherical element received thereat whereby said spherical element continuously controls tension of a yarn passing thereby."

*4 24. The gravamen of the defendants' position is that "adjacent the seat" means "at or contiguous to the seat."   The touchstone of patent construction is reason and fairness, not scholastic literalism.   See

*Georgia-Pacific Corp. v. United States Plywood Corp.*, 258 F.2d 124, 136 (2d Cir.), *cert. denied*, 358 U.S. 884 (1958); *Dennison Manufacturing Co. v. Ben Clements and Sons, Inc.*, 467 F.Supp. 391, 401 (S.D.N.Y.1979); *accord, Heltra, Inc. v. Richen-Gemco, Inc.*, 494 F.Supp. 12, 16 (D.S.C.1979), *aff'd*, 631 F.2d 728 (4th Cir.1980).   The language of the claims and the specification and prosecution histories of the plaintiff's patents, along with the testimony of the witnesses, cause this court to find that the recitation of "adjacent the seat" means, in the context of the claims of these patents, "sufficiently near or close to the seat to prohibit substantial lateral movement of the ball."   Accordingly, the court finds that the accused devices do have a large diameter section of a yarn passageway having a diameter adjacent said seat to prohibit substantial lateral movement of a spherical element received thereat whereby said spherical element continuously controls tension of a yarn passing thereby.

25. Substantial lateral movement necessarily means that degree of movement which allows the tensioning ball to leave the seat laterally at the point of contacting the housing of the larger diameter section.

26. Despite defendants' argument to the contrary, the court finds that the balls in the Qualitex devices continuously tension the yarn.   Defendants argue that the yarn is not continuously tensioned when the ball is knocked from the seat by a knot or slub in the yarn.   However, the device is designed to have the ball knocked from the seat when a variation in the yarn passes through.   Thereby, it maintains even and continuous tension, rather than an increase in tension, upon such an occurrence.   Continuous tensioning does not mean continuous contact with the yarn.

27. The court also finds that defendants' Q-390 device is smooth surfaced as required under Claim 1.   Defendants' claim that the Q-390 is not smooth surfaced because of its octagonal shape is without merit.   The term "smooth surfaced" is defined in the specification where it states that "no surfaces are available for abrasion of yarn or for collection of lint and slubs."   Reissue Patent 30,920, Plaintiff's Ex. 100 at Col. 1, l. 33.   The term "smooth surfaced" was added to overcome prior art that had screw threads in the walls.

28. In addition, the octagonal shape of the housing functions in the same way as a cylindrical housing.   A ball bounces off a cylindrical housing surface by hitting the side of the housing at one point and returning back into the seat.   A ball striking an

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 3473 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

Page 4

octagonal housing surface might hit two sides at once, one point a side, but would be similarly returned into the seat as though it had struck only one. Therefore, both the cylindrical and octagonal shapes prevent substantial lateral movement of the ball in substantially the same way, while allowing substantially unrestricted upward movement as claimed.

*5 29. For the reasons stated above, the court finds that the Q-390 and Q-190 devices literally infringe Claim 1 of reissue patent 30,920 and thus infringe reissue patent 30,920.

30. The court also finds literal infringement of Claim 1 of reissue patent 31,024. Claim 1 of patent 31,024 is infringed for the reasons stated above regarding Claim 1 of patent 30,920.

31. In addition, patent 31,024 specifies that the seat is located in the large diameter section at the junction of the large and small diameter sections. The court finds infringement of this requirement by the Qualitex devices. The seat in the Qualitex devices is located where the planes of the small and large diameter sections of the device would meet if the large diameter section were not truncated. As previously discussed, the court does not find the truncation of the walls of the large diameter section sufficient to avoid infringement of the patents. *See* Findings 14, 15, *supra.*

32. Claim 1 of patent 31,024 also specifies that the seat has an annular opening passing through it and presents a "smooth arcuate surface extending from said opening outwardly therefrom, the curvature of said arcuate surface being in a direction opposite the curvature of (the ball)." Plaintiff's Ex. 101 at Col. 5, 1. 56. The seat of the Qualitex devices descends at an angle. However, the top portion of the seat-that is, where the seat is at its widest-arcs outwardly away from the ball. Therefore, Qualitex' devices infringe Claim 1 of patent 31,024.

33. Based upon its finding of literal infringement of Claim 1 of patent 31,024, the court finds infringement of patent 31,024 by the accused devices.

34. Based upon the finding of infringement of Claim 1 of both patents 30,920 and 31,024, this court finds infringement of Claim 1 of patent 31,041.

35. Therefore, this court finds infringement of patent 31,041 by the accused devices.

36. The Hamel spindles were offered in evidence as prior art should this court reach the issue of equivalency. Because this court has found literal infringement of the patents by the accused devices, it will not reach the issue of equivalency or consider the evidence offered as prior art. However, it should be noted that this court has doubts as to whether the Hamel devices constitute prior art. The large diameter section of the Hamel 1 device is constructed in such a way that it does not continuously tension yarn and therefore does not fall within the specifications of the patents. Documentary evidence suggests that the Hamel 2 device was not in existence one year prior to the original Zollinger patent application, as required in order to be considered as prior art. *See* Leksa Deposition, Defendant's Ex. 2, drawing dated August 16, 1972.

## II. *ALTER EGO*

1. Defendant McBride is an individual citizen of Pennsylvania, who resides at Route 115, Long Pond, Pennsylvania.

2. Defendant Qualitex is a New Jersey corporation with its principal place of business at Route 115, Long Pond, Pennsylvania.

*6 3. Defendant Tamarack Sales Corporation (Tamarack) is a Pennsylvania corporation with its principal place of business at Route 115, Long Pond, Pennsylvania.

4. Defendant Regina M. McBride (Mrs. McBride) is an individual citizen of Pennsylvania, who resides at Route 115, Long Pond, Pennsylvania, and is the wife of McBride.

5. Mrs. McBride is the sole shareholder of Tamarack and was president of Tamarack until April, 1988. (Exhibits P-204, P-205, P-206, P-207; Mock Dep., pp. 6-7).

6. Shortly after the judgment in the *Shepco* case and the filing of the motions in this court, McBride transferred to Mrs. McBride a mold owned by Qualitex and used to manufacture Qualitex yarn tension devices, six patents that he owned individually but which were paid for by Qualitex, and other assets previously used by Qualitex in making and selling the infringing yarn tension, without requiring adequate consideration to be paid by Mrs. McBride to Qualitex or to himself. (Exhibit P-201; Exhibit P-232, pp. 51-52).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 3473 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

7. McBride transferred all his patents and the mold to his wife for the purported consideration of one dollar.

8. On July 11, 1985, Tamarack Sales Corporation was incorporated in Pennsylvania. (Exhibit P-203).

9. The Articles of Incorporation state that the registered office of Tamarack is Route 115, Long Pond, Pennsylvania 18334, which is the address of McBride, Mrs. McBride and Qualitex. (Exhibit P-203).

10. Mrs. McBride possesses Tamarack Stock Certificate No. 1, which recites that she is the owner of 300 shares of fully paid stock in the company.

11. The record of certificates issued and transferred shows 300 shares of stock issued to Regina M. McBride on July 10, 1985, but does not record any amount paid for such shares.

12. Tamarack's tax returns for 1985-86 and 1986-87 show $50 in capital stock, but there is no record of payment for any stock issued by the company. (Exhibits P-205, P-224, P-225).

13. Tamarack's tax returns for 1985-86 and 1986-87 show that the company had no inventory or tangible assets. (Exhibits P-224, P-225).

14. Based on the evidence, the court finds that Tamarack is inadequately capitalized.

15. McBride and Mrs. McBride mortgaged their property in Long Pond, Pennsylvania to pay the legal expenses of McBride and Qualitex in connection with the patent infringement litigation involving Qualitex. (Exhibits P-231, 236, 237).

16. McBride and Mrs. McBride assigned the $30,000 debt in the mortgage to Qualitex. (Exhibit D-110).

17. McBride and Mrs. McBride then refinanced their mortgage in order to obtain more money to pay the legal expenses of McBride and Qualitex.

18. Tamarack's check register shows that the Tamarack account has been regularly used to make payments on mortgages taken by the McBrides on their property in Long Pond, Pennsylvania. (Exhibits P-239, P-240).

19. At trial, Mrs. McBride asserted that Tamarack was making these mortgage payments instead of paying rent, which Tamarack had never paid to the McBrides for use of their property. She also claimed that Tamarack had a pecuniary interest in the success of Qualitex and McBride in their past patent infringement battles. Finally, she asserted that Tamarack had been paying to cover future legal fees that might be incurred in its offensive suit filed in the United States District Court for the Middle District of Pennsylvania.

*7 20. None of the above-stated rationales was put in writing by Tamarack.

21. The McBrides did not report the "rent" payments by Tamarack as ordinary income on their federal income tax return, filed with the Internal Revenue Service. (Exhibits P-226, 227).

22. In light of this evidence, the court does not find credible the McBrides' stated reasons for paying the legal fees of Qualitex and McBride out of the funds of Tamarack.

23. Tamarack also paid sums directly to the law firm of Steele, Gould and Fried for legal fees incurred by Qualitex and McBride in patent infringement litigation. (Exhibits P-239, 240).

24. The Tamarack account has also been used to pay the law firm that represents Qualitex and McBride in their bankruptcy cases. (Exhibit P-239).

25. The Tamarack bank account has also been used to pay personal expenses of Mr. and Mrs. McBride. (Exhibits P-239, 240).

26. The court finds that McBride and Mrs. McBride have freely commingled their personal and marital assets with those of Qualitex and Tamarack. It further finds that the assets of Tamarack and Qualitex have been commingled.

27. After this court entered orders in August and September, 1985, enjoining Qualitex from infringing the Zollinger patents, Qualitex introduced and began selling the Model 390 yarn tension device. (Exhibit P-222).

28. Qualitex sold Model 390 devices from October, 1985 through April, 1986. (Exhibit P-222).

29. In February, 1986, Zollinger filed a motion for contempt on the ground that the sale of Model 390 devices by Qualitex violated the injunction against infringing the Zollinger patents.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 3473 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

30. Shortly after Zollinger filed the motion for contempt, Qualitex stopped selling yarn tension devices.

31. Tamarack's first sale of the Model 390 device was in March, 1986, after Zollinger filed its motion for contempt against Qualitex and Mr. McBride. (Exhibit P-221).

32. Tamarack's second sale was in May, 1986 to John A. Eberly Company, which was a distributor for Qualitex products. (Exhibit P-221).

33. On August 13, 1987, at the hearing on Zollinger's motion for contempt, McBride testified that he had not sold the Qualitex Model 390 yarn tension device through Qualitex, but sold it through Tamarack, which he described as a company that he had had for a number of years. (N.T. 8/13/87, p. 7).

34. Mr. McBride explained this testimony at trial as resulting from a reflexive desire to shield his wife. This court does not find this testimony to be credible.

35. Based on the above sequence of events, the court finds that Qualitex transferred its assets to Regina McBride and Tamarack in June, 1985 in order to escape liability for the *Shepco* judgment but continued to advertise and sell its products until Zollinger's motion for contempt.

36. Qualitex purchased components for its products from ABC Tool and Design Company, Howell Manufacturing Company, Hi-Tech Products, Mitchell Bissel, Eagle Ball and Hoover Ball. (Exhibit P-232, p. 20).

*8 37. Tamarack buys ceramic components from Hi-Tech Products, Inc., Greenville, South Carolina, which bills Qualitex and Tamarack interchangeably. Tamarack pays invoices directed to both companies from Hi-Tech Products, Inc. (R. McBride Dep., confidential excerpt, pp. 12-13).

38. Tamarack purchases its components from the same suppliers used by Qualitex and has been billed by these suppliers as Qualitex, although the bills have been paid by Tamarack, on checks prepared and signed by McBride. (Exhibit P-232, pp. 21, 24).

39. Throughout the existence of Tamarack, McBride served as technical advisor to the company, communicating with suppliers and customers concerning technical matters, advising Mrs. McBride

as to the technical content of advertisements, arranging for advertising, and designing new products for Tamarack to manufacture and sell. There is no evidence that McBride received any compensation from Tamarack for these services.

40. The court finds that Tamarack took advantage of Qualitex' goodwill, using its customers, suppliers and credit lines without compensation to Qualitex.

41. For a period of time at least from its incorporation through September, 1987, Tamarack did not advertise under its own name but advertised in *Southern Textile News* as Qualitex, Inc. and paid invoices from *Southern Textile News* addressed to Qualitex, Inc.

42. The Qualitex ads in *Southern Textile News* showed a telephone number of 717-646-0550, which was the Qualitex telephone number. (Exhibit P-209).

43. When telephone orders were received at that phone number, the orders would be filled by either Qualitex or Tamarack, without regard to which company the customer intended to call.

44. After April, 1986, when Qualitex made its last sale, all orders resulting from Qualitex advertisements were filled by Tamarack.

45. After Tamarack began to advertise under the name of Tamarack in *Southern Textile News,* it continued to use the Qualitex telephone number in its advertisements. (Exhibit P-212).

46. Tamarack did not have a telephone number separate from that of Qualitex until April, 1988, after Zollinger announced in court its intention to add Tamarack as a defendant in this action. (Exhibit P-212).

47. Similarly, in April, 1988, after Zollinger announced its intention to join Tamarack as a party to this action, Tamarack hired Deborah L. Mock as its president and designated chief operating officer. (Mock Dep., pp. 6-7).

48. Before being hired as chief operating officer and president of Tamarack, Mrs. Mock's total experience in the yarn tension industry consisted of working for Tamarack from June to December, 1987, in a clerical capacity, with duties that included shipping and receiving, assembly work, answering the phones, filling and taking inventory. (Mock Dep., pp. 14-15).

49. Mrs. Mock is paid $50.00 a week by Tamarack,

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 7
Not Reported in F.Supp., 1989 WL 3473 (E.D.Pa.)
(Cite as: Not Reported in F.Supp.)

although she has no specific hours and no assigned duties other than to meet Mrs. McBride at a restaurant several times a month. (Mock Dep., pp. 8, 30-31).

**\*9** 50. Mrs. Mock testified that her duties and responsibilities consist of giving "input on problems and issues" at meetings with Mrs. McBride, but Mrs. Mock has no knowledge of Tamarack's products or of the textile industry other than what Mrs. McBride tells her. (Mock Dep., pp. 8, 34-37).

51. Mrs. Mock has no knowledge of the financial affairs of Tamarack, nor does she have authority to sign checks for Tamarack. (Mock Dep., p. 36).

52. Based on the evidence, the court finds that Tamarack was incorporated to carry on the business of Qualitex, and actually did so by manufacturing and selling Qualitex products, using Qualitex suppliers, advertising under the name of Qualitex, using the Qualitex telephone number, selling to Qualitex customers, and using the assets of Qualitex without adequate consideration being paid to Qualitex.

53. The court finds that the transfer of assets to Mrs. McBride and the incorporation of Tamarack were carried out with the intent of defeating the claims of judgment creditors of McBride and Qualitex.

## III. *CONCLUSIONS OF LAW*

1. The determination of an alter ego situation rests on the specific facts and circumstances in the case. *Carpenters Health and Welfare Fund v. Kenneth R. Ambrose, Inc., 727 F.2d 279, 283 (3d Cir.1973); Publicker Industries, Inc. v. Roman Ceramics Corp., 603 F.2d 1065, 1069 (3d Cir.1979).*

2. The application of the alter ego theory is a tool of equity that is appropriately utilized to "prevent fraud, illegality or injustice, or when recognition of the corporate entity would defeat public policy or shield someone from liability for a crime." *Carpenters Health and Welfare Fund, 727 F.2d at 284; Publicker Industries, Inc., 603 F.2d at 1069.*

3. Relevant factors in determining whether the alter ego theory is applicable include:  the failure to observe corporate formalities;  nonpayment of dividends;  the insolvency of the corporation; siphoning of funds of the corporation by the dominant stockholder;  nonfunctioning of other officers or directors;  absence of corporate records;

and the fact that the corporation is merely a facade for the dominant stockholder. *Solomon v. Klein, 770 F.2d 352, 353-4 (3d Cir.1985); Carpenters Health and Welfare Fund, 727 F.2d at 284.*

4. The evidence establishes that Tamarack has failed to observe corporate formalities in that Regina McBride paid nothing for the stock of Tamarack, the company does not have a functioning board of directors or officers, and no dividends have ever been paid.

5. The court finds that Tamarack is a sham corporation that was never adequately capitalized, does not observe corporate formalities, has a figurehead as president and chief operating officer, and has held itself out to the public as Qualitex through its advertising and its dealings with suppliers and customers.

6. The court finds that McBride transferred his patents and the assets and goodwill of Qualitex to his wife without adequate consideration for use in establishing and operating Tamarack for the purpose of avoiding the adverse consequences of litigation against himself and Qualitex.

**\*10** 7. Tamarack was incorporated by Mrs. McBride, as agent for McBride, for the purpose of carrying on the business of Qualitex while avoiding the adverse effects of litigation against Qualitex and McBride with the intent of protecting the assets of Qualitex and McBride from judgment creditors.

8. The personal and marital assets of McBride and Mrs. McBride have been commingled with the assets of Qualitex and Tamarack, and assets for the two corporation have been commingled throughout the existence of Tamarack.

9. The court concludes that the corporate entity has been used to perpetrate fraud and injustice and that recognition of the corporate entity in this case would defeat public policy by permitting the avoidance of just debts by means of fraudulent transfers of assets to a sham corporation.

10. The court therefore concludes that the application of the alter ego theory to pierce the corporate veil of Tamarack is appropriate in this case.

11. As the alter ego of Qualitex and McBride, Tamarack and Mrs. McBride are subject to the jurisdiction of this court.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1989 WL 3473 (E.D.Pa.)
**(Cite as: Not Reported in F.Supp.)**

Page 8

12. The court holds that Tamarack Sales Corporation and its dominant stockholder Regina M. McBride, who operates the company as her alter ego, are jointly the alter egos of Qualitex and Edward J. McBride, Jr. and are equally liable with Qualitex and McBride for the infringement of the Zollinger patents.

13. The court further finds that the assets of Tamarack and the personal assets of Regina McBride are subject to execution on the judgments entered against Qualitex and McBride.

An appropriate order follows.

*ORDER*

AND NOW, this 17th day of January, 1989, it is hereby ORDERED that:

1. The court finds infringement of the patents-in-suit;

2. Regina M. McBride and Tamarack Sales Corporation are both the alter egos of both Edward J. McBride, Jr. and Qualitex, Inc.

3. A hearing to determine damages and attorneys' fees in conjunction with the Q-390 and Q-190 devices, and attorneys' fees in conjunction with the devices previously found to infringe, will be held on March 2, 1989, at 10:00 a.m., in Courtroom 8B.

4. Plaintiff shall file findings of fact and conclusions of law by February 13, 1989. Defendant shall file findings of fact and conclusions of law by February 27, 1989.

BY THE COURT:

E.D.Pa.,1989.
Otto Zollinger v. Qualitex, Inc.
Not Reported in F.Supp., 1989 WL 3473 (E.D.Pa.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 9

Westlaw.

Not Reported in F.Supp.                                      Page 1
Not Reported in F.Supp., 1981 WL 2025 (D.D.C.), 209 U.S.P.Q. 809, 1980-81 Trade Cases P 63,835
**(Cite as: Not Reported in F.Supp.)**


**H**
Oetiker v. Jurid Werke GmbH

United States District Court; District of Columbia.
**Hans Oetiker**
**v.**
**Jurid Werke GmbH.**
**Civil Action No. 74-1670**
74-1670
Filed February 17, 1981

FLANNERY, D. J.
*1 [*Editor's Note: In full text except for omissions as indicated by asterisks.*]


### Findings of Fact

*Background*


1. On November 15, 1974, plaintiff Hans Oetiker ("Oetiker"), a Swiss citizen, filed a complaint against defendant Jurid Werke GmbH ("Jurid"), a German company, seeking a declaratory judgment that Jurid's United States Patent No. 3,321,811 (the "'811 patent") was invalid and noninfringed (Count I), that the '811 patent was procured by fraud (Count II), and that the '811 patent was misused (Count III).

2. Following the filing of the original complaint, defendant filed a disclaimer of the '811 patent in the U. S. Patent and Trademark Office. Thereafter defendant moved to dismiss the complaint on the grounds that Counts I and II were moot in view of the disclaimer, that Count III should be dismissed for lack of subject matter jurisdiction, and that because of the disclaimer, personal jurisdiction under 35 U. S. C. § 293 did not exist. The motion to dismiss was granted and plaintiff appealed.

3. On appeal, the court of appeals remanded the case to give the plaintiff an opportunity to plead a section 2 of the Sherman Act cause of action based upon alleged fraudulent procurement of the '811 patent.

In remanding the court of appeals stated "We remand for consideration of whether plaintiff has a viable federal antitrust claim. This does not necessarily require a trial. We express no opinion on the point

beyond noting that it remains open to the district court after further pleading and discovery to conclude that defendant is entitled to summary judgment for inability of plaintiff to establish even a disputable claim of attempted monopolization." *Oetiker v. Jurid Werke GmbH* [1977-1 TRADE CASES P 61,308], 556 F. 2d 1 (D. C. Cir. 1977).

Pursuant to the remand, the parties engaged in discovery under the supervision of the court. Upon completion of discovery both parties moved for summary judgment. Both motions were denied.

4. On December 5, 1979, this court ordered that a separate trial should be conducted devoted solely to the issue of whether the '811 patent was procured by fraud sufficient to predicate an antitrust violation under section 2 of the Sherman Act, 15 U. S. C. § 2.

On May 5, 1980, the trial began on the issue of fraudulent procurement. The trial took six days to complete. Testifying for plaintiff were Hans Oetiker, plaintiff, and Irving Marcus, an expert in patent law and practice. Testifying for defendant were Douglas G. Noiles, a technical expert, and Frank Neuhauser, an expert in patent law and practice. A number of depositions were read at trial and numerous exhibits were received and considered by this court.

*The Issues*

5. Plaintiff has alleged during the course of this litigation that the defendant committed fraud in the procurement of the '811 patent on a number of grounds. These alleged grounds are as follows:
a. Defendant incorrectly and fraudulently named Karl Thomas as the inventor of the subject matter disclosed and claimed in the '811 patent.
b. Defendant failed to inform the Patent Office of the date of grant of a German Gebrauchsmuster No. 1,800,846 ("Gbm '846") which corresponds to the '811 patent;
*2 c. The invention disclosed and claimed in the '811 patent was inoperable and that alleged false statements were made to the Patent Office concerning the operability of the '811 patent invention;
d. Defendant fraudulently failed to disclose the best mode contemplated by the inventor of carrying out his invention;
e. Defendant made misrepresentations and

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 2
Not Reported in F.Supp., 1981 WL 2025 (D.D.C.), 209 U.S.P.Q. 809, 1980-81 Trade Cases P 63,835
(Cite as: Not Reported in F.Supp.)

nondisclosures concerning two prior art French patents cited by the Examiner;

f. Defendant failed to record an interview conducted with the Patent Office Examiner;

g. Defendant failed to cite to the Patent Office prior art relied upon by the German Patent Office and failed to inform the Patent Office that the German Patent Office had rejected a German patent application corresponding to the '811 patent; and

h. Defendant failed to cite the Tinnerman U. S. Patent No. 2,335,464 to the Patent Office.

During the trial, plaintiff's patent law expert, Mr. Marcus, after reviewing all of the exhibits, discovered only three alleged fraudulent activities, corresponding to subparagraphs e., f., and h. above. (Tr. 336-337.)

* * *

*Conclusions of Law Fraudulent Procurement Standards, In General*

The doctrine of fraudulent procurement of a patent has many different legal consequences. "Broadly seated, the civil penalties available to courts for fraud or inequitable conduct in procurement of a patent are three: loss of the patent right; award of attorneys' fees against the patentee under 35 U. S. C. § 285; and antitrust treble damages if a violation of Sections 1 or 2 of the Sherman Act is found". Kayton et al., *Fraud in Patent Procurement; Gemuine and Sham Charges*, 43 Geo. Wash. L. Rev. 1, 16 (1974) (footnote omitted). The "loss of patent right" consequence can involve the patent being held invalid as a result of the fraud, or the patent being held unenforceable under the equitable "unclean hands" maxim.

The issue in this case is whether the '811 patent was procured by fraud of sufficient magnitude to predicate an antitrust violation. Reliance on cases that find "fraud" sufficient to render a patent merely invalid or unenforceable are not dispositive. In *Corning Glass Works v. Anchor Hocking Glass Corp.* [1966 TRADE CASES P 71,834], 253 F. Supp. 461 (D. Del. 1966), modified on other grounds, 374 F. 2d 473 (3rd Cir.), cert. denied, 389 U. S. 826 (1967), the court stated that significant misrepresentations made to the Patent Office would justify the patent being held unenforceable. However, such misrepresentations could be insufficient to justify a

finding of fraud as a basis for an antitrust violation. To find an antitrust violation, the court held that the alleger not only must "establish that an intentional misrepresentation was made to the patent examiner, but also [the alleger] must show that the misrepresentation was material, i. e., that the patent would not have issued but for the fraud." 253 F. Supp. at 469. In full accordance with this view is *United States Movidyn Corp. v. Hercules, Inc.* [1975-2 TRADE CASES P 60,517], 388 F. Supp. 1146, 1155 (D. Minn. 1975); *SCM Corp. v. Radio Corporation of America* [1970 TRADE CASES P 73,343], 318 F. Supp. 433, 449 (S. D. N. Y. 1970). No court has recognized "inequitable conduct" falling short of actual "fraud" as a basis for an action under Section 2 of the Sherman Act. See, *E. I. duPont de Nemours & Co. v. Berkley & Co., Inc.* [1980-1 TRADE CASES P 63,214], [620] F. 2d [1247], 205 U. C. P. Q. 1, 21-22 (8th Cir. 1980).

*3 To establish fraudulent procurement of a patent, clear, unequivocal, and convincing evidence must be established. *DeLong Corp. v. Raymond International, Inc.*, - F. 2d -, 206 U. S. P. Q. 97, 105 (3rd Cir. 1980); *Nelson v. Bowler, et al.*, 626 F. 2d 853, 858 (C. C. P. A. 1980); *Schnadig Corp. v. Gaines Mfg. Co., Inc.*, 494 F. 2d 383, 392 (6th Cir. 1974); *Colt Industries Operating Corp. v. Index-Werke KG*, 205 U. S. P. Q. 990, 1004 (D. D. C. 1979) (Flannery, J.). A "heavy burden of proof" must be carried. *Becton, Dickinson & Co. v. Sherwood Medical Ind., Inc.* [1975-2 TRADE CASES P 60,432], 516 F. 2d 514, 522 (5th Cir. 1975). Moreover, "bad faith" must be proven. *Pfizer, Inc. v. International Rectifier Corp.*, 538 F. 2d 180, 186 (8th Cir. 1976), cert. denied, 429 U. S. 1040 (1977).

In order to establish fraud sufficient to predicate an antitrust violation, the alleged misrepresentations or nondisclosures to the Patent Office must be such that the patent would not have issued "but for" such alleged misrepresentations or nondisclosures. That is, the misrepresentations or nondisclosed facts must be material in the strictest sense of the word. *Walker Process Equipment Co., Inc. v. Food Machinery and Chemical Corp.* [1965 TRADE CASES P 71,625], 382 U. S. 172 (1965); *E. I. duPont de Nemours & Co. v. Berkley & Co., Inc., supra*, at 22; *Reynolds Metals Co. v. Aluminum Co. of America*, 457 F. Supp. 482, 500-501, 510-511 (N. D. Ind. 1978), rev'd on other grounds, 609 F. 2d 1218 (7th Cir. 1979); *Rohm and Haas Co. v. Owens-Corning Fiberglas Corp.*, 196 U. S. P. Q. 726, 743 (N. D. Ala. 1977); *Mueller Brass Co. v. Reading Industries, Inc.*, 352 F. Supp. 1357, 1371 (E. D. Pa. 1972), aff'd, 487 F. 2d

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                              Page 3
Not Reported in F.Supp., 1981 WL 2025 (D.D.C.), 209 U.S.P.Q. 809, 1980-81 Trade Cases P 63,835
**(Cite as: Not Reported in F.Supp.)**

1395 (3rd Cir. 1973); *SCM Corp. v. Radio Corporation of America* [1970 TRADE CASES P 73,343], 318 F. Supp. 433, 472-73 (S. D. N. Y. 1970); *Corning Glass Works v. Anchor Hocking Glass Corp., supra* at 469-70.

As the Court of Appeals stated in this very case, it is necessary that there be clear evidence of "specific intent" and that defendant "knowingly and willfully" misrepresented facts to the Patent Office. *Oetiker v. Jurid Werke GmbH* [1977-1 TRADE CASES P 61,308], 556 F. 2d 1, 8 (D. C. Cir. 1977). Even to support the lesser offense of invalidity or unenforceability, the alleged misconduct must be accompanied by some element of wrongfulness, willfulness, or bad faith. *Carpet Seaming Tape Licensing Corp. v. Best Seam, Inc.* [1980-2 TRADE CASES P 63,290], 616 F. 2d 1133, 1138 (9th Cir. 1980); *DeLong Corp. v. Raymond International, Inc., supra* at 105; *Skil Corp. v. Lucerne Products, Inc.,* 489 F. Supp. 1129, 1160 (N. D. Ohio 1980). "This requirement of proof has been uniformly applied in infringement actions by a majority of the circuits to claims of both fraud and lesser inequitable conduct." *Pfizer, Inc. v. International Rectifier Corp.,* 538 F. 2d 180, 186 (8th Cir. 1976), cert. denied, 429 U. S. 1040 (1977). See also *Colt Industries Operating Corp. v. Index-Werke KG,* 205 U. S. P. Q. 990, 1004 (D. D. C. 1979).

*\*4* The above legal principles are applicable, generally, to contentions of fraud in patent procurement. The following legal authority relates to each specific allegation of fraud.

### Inventorship Issue

In *Brown v. Myerberg* [1970 TRADE CASES P 73,054], 314 F. Supp. 939, 945 (S. D. N. Y. 1970), the court refused to find fraud for incorrect naming of the inventor, since the named inventor believed that he was the first and sole inventor and thus there was no intentional or willful defrauding of the Patent and Trademark Office. At most, any fraud was "technical fraud" that did not give rise to an antitrust violation. For examples of other cases in which courts have refused to find fraud, see *Becton, Dickinson & Co. v. Sherwood Medical Industries, Inc.,* 516 F. 2d 514 (5th Cir. 1975) and *Cataphote Corp. v. DeSoto Chemical Coatings, Inc.* [1971 TRADE CASES P 73,750], 450 F. 2d 769, 773 (9th Cir.) cert. denied, 408 U. S. 929 (1972).

"A good faith belief on the part of the named

inventor that the claimed subject matter was his origination will be sufficient to refute an allegation of fraud or misconduct." Kayton et al., *Fraud in Patent Procurement: Genuine and Sham Charges,* 43 Geo. Wash. L. Rev. 1, 56 (1974).

Courts have been reluctant to hold a patent merely invalid for incorrect inventorship. An allegation of invalidity, much less fraud, for incorrect inventorship has always been regarded as "technical". *Mueller Brass Co. v. Reading Industries, Inc., supra* at 1372. Although the patent laws require the naming of the correct inventor, the misjoinder or nonjoinder of inventors is not fatal and can be corrected by a court provided that the error was without deceptive intention. *A. F. Stoddard & Co. Ltd. v. Dann,* 564 F. 2d 556, 565, 566 (D. C. Cir. 1977).

The burden of showing incorrect inventorship is a heavy one and must be proven by clear and convincing evidence. *Garrett Corp. v. United States,* 422 F. 2d 874, 880 (Ct. Cl.), cert. denied, 400 U. S. 951 (1970).

The evidence presented by plaintiff Oetiker is insufficient to conclude, as a matter of law, that Thomas was incorrectly named as the inventor, much less that any fraud was committed.

*Failure to Cite the Date of Grant of Gbm '846.*

Based upon the legal authority cited hereinbelow, and the testimony of defendant's patent law expert, Mr. Neuhauser, the court concludes that the Gbm '846 was not, under U. S. patent law, a bar to the issuance of the '811 patent. All facts material to the matter were disclosed to the Patent Office and no fraud was committed.

Plaintiff's theory is based, in part, upon 35 U. S. C. § 102(a) which reads, in pertinent part, as follows:
A person shall be entitled to a patent unless-(a) the invention was . . . patented or described in a printed publication in . . . a foreign country, before the invention thereof by the applicant for patent.

Under Section 102(a), it is clear that the Gbm '846, even if deemed a patent in a foreign country, could not invalidate, as a matter of law, the '811 patent. The facts are uncontroverted that both the Gbm '846 and the U. S. '811 patent are identical counterparts disclosing the identical invention of the same inventor, Mr. Thomas. Thus, it is logically impossible that the Gbm '846 could have issued, or

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                    Page 4
Not Reported in F.Supp., 1981 WL 2025 (D.D.C.), 209 U.S.P.Q. 809, 1980-81 Trade Cases P 63,835
(Cite as: Not Reported in F.Supp.)

been patented, before the invention had occurred. Stated alternatively, Thomas must have invented the invention before such invention was patented in a foreign country.

**\*5** Logic dictates that <u>35 U. S. C. § 102(a)</u> applies only between different inventors; that is, when considering the validity of a U. S. patent, the subject matter alleged to constitute the prior art, such as a foreign patent, must have been invented by someone other than the U. S. applicant. See <u>Illinois Tool Works, Inc. v. Solo Cup Co., 461 F. 2d 265, 271 (7th Cir.)</u>, cert. denied, <u>407 U. S. 916 (1972)</u>; <u>Kistler Instrumente AG v. United States, 203 U. S. P. Q. 511, 520 (Ct. Cl. 1979)</u>. *"[O]ne's own invention,* whatever the form of disclosure to the public, may not be prior art against oneself, *absent a statutory bar"* under <u>section 102(b)</u>. <u>In re Facius, 408 F. 2d 1396, 1406 (C. C. P. A. 1969)</u>. (Emphasis in original). (<u>Section 102(b)</u> bars the issuance of a patent if the invention is *patented* in a foreign country *more than one year before* the U. S. application is filed. <u>Section 102(b)</u> is applicable even if the foreign patent issues to the same inventor as named in the U. S. application. Neither condition is satisfied in the present case.)

Plaintiff contends that under <u>35 U. S. C. § 104</u>, defendant cannot establish a "date of invention" by reference to activity outside the United States, unless priority is claimed under <u>35 U. S. C. § 119</u>, which plaintiff contends, was not claimed due to defendant's oversight in not filing a certified copy of the Gbm '846 in the U. S. Patent Office. For some unexplained reason, defendant never "perfected" his claim for priority under <u>35 U. S. C. § 119</u> by filing, in the U. S. Patent Office, a certified copy of the Gbm '846 application. Had defendant done this relatively simple act, it would have been entitled to priority and plaintiff's fraud, or invalidity, contention could not have been raised. Where the failure to file a certified copy results from inadvertence, rather than from deceptive intention, the error may be corrected by a reissue patent. <u>Brenner v. State of Israel, 400 F. 2d 789 (D. C. Cir. 1968)</u>. Where, as here, there is no indication that the failure to file was other than inadvertent, this court is reluctant to penalize defendant with an antitrust violation for such a trivial oversight. According to plaintiff's theory, the earliest date of invention that defendant can rely upon would be the filing date of the U. S. <u>'811 patent</u> application.

Plaintiff's reliance on <u>35 U. S. C. § 104</u> is misplaced. Such section is applicable only when an applicant is trying to establish a "date of invention"

in order to, for example, antedate a date of invention *"of another"*. See <u>Hedgewick v. Akers, 497 F. 2d 905, 907 (C. C. P. A. 1974)</u>. In the present case, defendant is not seeking to establish any "date of invention" in a foreign country. Defendant seeks only to establish that Mr. Thomas is the originator of the invention described in the Gbm '846. Establishing *origin* of invention is completely different from *"date* of invention" and is not precluded by <u>35 U. S. C. § 104</u>. <u>Hedgewick v. Akers, supra</u> at 907, *Ex parte Lemieux,* 115 U. S. P. Q. 148 (P. O. Bd. App. 1957).

*Operability Issue*

**\*6** Plaintiff contends that the Thomas invention, disclosed and claimed in <u>the '811 patent</u>, was inoperable, since the final commercial clamp was modified somewhat from the clamp disclosed in <u>the '811 patent</u>.

"It is well settled that the apparatus disclosed in an application need not necessarily be operative in the exact form in which it is shown and described. It is sufficient if it can be rendered operative by adjustments and corrections which would naturally occur to a skilled worker in the art attempting to construct the apparatus on the basis of the application disclosure." <u>Bennett v. Halahan,</u> 285 F. 2d 807, 811 (C. C. P. A. 1961).

The fact that the invention has some drawbacks, or that under certain circumstances it may not work, or that a better device has been invented, does not detract from the operability of the invention. "Quite clearly, inoperativeness is not established merely by showing that the particular disclosed embodiment for carrying out the principles of the invention is lacking in perfection." <u>Decca Ltd. v. United States,</u> 544 F. 2d 1070, 1077 (Ct. Cl. 1976). "Perfection under all conditions is not required". *E. I. duPont de Nemours & Co. v. Berkley & Co., Inc., supra* at 10.

The mere fact that problems may be encountered in adapting the device to a particular environment having particular characteristics "or that in one mode of its operation some additional [features] would be required does not detract from the overall operativeness of the device." <u>Douglas v. United States,</u> 510 F. 2d 364, 366 (Ct. Cl. 1975), cert. denied, <u>423 U. S. 825 (1975)</u>.

As a matter of law, the court concludes the invention disclosed and claimed in <u>the '811 patent</u> is operable

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                   Page 5
Not Reported in F.Supp., 1981 WL 2025 (D.D.C.), 209 U.S.P.Q. 809, 1980-81 Trade Cases P 63,835
**(Cite as: Not Reported in F.Supp.)**

and no fraud occurred.

### Best Mode Issue

An applicant for patent is required to set forth only the "best mode contemplated by the inventor of carrying out his invention." 35 U. S. C. § 112.

In the present case, both the tongue and groove embodiment and the additional supporting tooth embodiment were invented by persons other than Mr. Thomas. Moreover, the tongue and groove embodiment was discarded by defendant before the filing of the U. S. application. In addition, there is no evidence to suggest that Mr. Thomas knew of the additional supporting tooth embodiment prior to the U. S. filing date. Indeed, such embodiment was not commercially adopted by defendant until after the U. S. filing date. Upon such facts, the court concludes as a matter of law that plaintiff has not established that Mr. Thomas contemplated either of these embodiments to be his best mode at the time of filing the U. S. application.

The best mode that is required to be set forth is only that mode that relates to the essence of the invention. In re Sichert, 566 F. 2d 1154 (C. C. P. A. 1977); In re Bosy, 360 F. 2d 972 (C. C. P. A. 1966).

The issue in this case is not whether the best mode was set forth in the '811 patent; rather plaintiff must further establish that the failure to set forth the best mode was fraudulent. See Dale Electronics. Inc. v. R. C. L. Electronics, Inc., 488 F. 2d 382, 389 (1st Cir. 1973). Mere failure to set forth the best mode does not necessarily lead to a finding of inequitable conduct or fraud. See Union Carbide Corp. v. Borg-Warner Corp., 550 F. 2d 355, 363 (6th Cir. 1977).

### False Statements Concerning the French Patents

**\*7** If prior art references are before the Examiner for his consideration, as were the two French patents in suit, mere advocacy arguments by the attorney concerning the references do not rise to the level of fraud. "The exhibits were there for the Examiner's independent scrutiny. They spoke for themselves, and if plaintiff's attorney puffed up their significance in his own argument, the court still does not see that this rises to the level of a fraudulent misstatement of material fact." Mueller Brass Co. v. Reading Industries, Inc., 352 F. Supp. 1357, 1380 (E. D. Pa. 1972), aff'd, 487 F. 2d 1395 (3rd Cir. 1973). See

also, Reynolds Metals Co. v. Aluminum Co. of America, supra, 457 F. Supp. at 502.

Defendant's attorney-client comments made in connection with the prosecution of the German patent application, and made well after the issuance of the '811 patent, are not probative of defendant's state of mind concerning the French patents at an earlier date.

The court concludes that, as a matter of law, the statements made to the Examiner were true and were not calculated to mislead the Examiner, and that the evidence is insufficient to conclude that fraud was practiced or attempted on the Patent Office.

### Failure to Record Interview

Plaintiff contends that the alleged failure of defendant's U. S. attorney to record an interview with the Examiner was fraud.

The alleged interview apparently took place in August-September, 1966. During that time period, the Patent Office Manual of Patent Examining Procedure ("MPEPP") § 713.04 did not require any written memoranda of interviews to remain in the application file. Rather, MPEP § 713.04 stated that memoranda of an interview "are ont an official part of the record, and should be removed from the file if and when the case is passed to issue or abandoned." Thus, plaintiff cannot establish that the defendant, or the Examiner, failed to record the substance of any interview, since the Examiner may well have removed such memoranda from the file wrapper, in accordance with the MPEP § 713.04, when the application was issued as a patent. Further, since the memoranda are not an official part of the file wrapper, it is clear that such memoranda cannot be very material to the grant of a patent.

In Pfizer, Inc. v. International Rectifier Corp., 538 F. 2d 180, 193 n. 27 (8th Cir. 1976), cert. denied, 429 U. S. 1040 (1977) the court stated the following:
Although the defendants contend that under Patent Office Rules 2 and 133, 37 C. F. R. § § 1.2, 1.133 (1961), all information must be submitted to the Patent Office in writing, it appears that the practice is not so restrictive and that many items are discussed with the patent examiners orally rather than in writing.

In Pfizer, the court distinguished those situations in which an agreement is reached with the Examiner from those in which an interview is had but no

Not Reported in F.Supp.                                                                                    Page 6
Not Reported in F.Supp., 1981 WL 2025 (D.D.C.), 209 U.S.P.Q. 809, 1980-81 Trade Cases P 63,835
(Cite as: Not Reported in F.Supp.)

agreement reached.   In the former situation, the court stated that a formal memorandum, signed by both the attorney and the Examiner, should be filed.   In those situations where no agreement is reached, as in the present case, the *Examiner* is expected to place a memorandum in the file that is later to be removed when the application issues.

**\*8** The court concludes as a matter of law that no fraud was practiced or attempted by defendant for failure to record an interview.

*Failure to Cite the Decision of the German*

*Patent Office, and Prior Art Cited*

*Therein, to the U. S. Patent*

*Office*

Once a patent issues, the U. S. Patent Office loses all jurisdiction over the patent application. *McCormick Harvesting Machine Co. v. C. Aultman,* 169 U. S. 606, 612 (1899).   Thus, there can be no fraud on the Patent Office for failure to cite prior art, or other information, that was discovered only after the issuance of the patent.

Since the references cited by the German Federal Patent Court were identical counterparts of the references cited by the U. S. Examiner, there would be no duty to cite such cumulative counterparts, even if the U. S. application were still pending.

*Failure to Cite the Tinnerman*

*Patent*

In order to find fraud as a predicate for an antitrust violation based upon the nondisclosure of prior art, the nondisclosed prior art must be of such a character that the patent would not have issued.   *E. I. duPont de Nemours & Co. v. Berkley & Co., Inc., supra* at 22;   *Reynolds Metals Co. v. Aluminum Co. of America, supra,* at 500-501.   Although the willful failure to disclose mere "relevant" prior art, i. e., prior art falling short of anticipatory prior art, may be the basis for denying a patent the presumption of validity or rendering a patent unenforceable for

inequitable conduct, *Turzillo v. P&Z Mergentime,* 532 F. 2d 1393, 1399 (D. C. Cir.) cert. denied, 429 U. S. 897 (1976), mere inequitable conduct is not sufficient to predicate an antitrust violation.   *E. I. duPont de Nemours & Co. v. Berkley & Co., Inc., supra,* at 21-23.

The Tinnerman patent is not anticipatory prior art that would have invalidated the '811 patent, nor is it prior art that could be combined with the references cited by the Examiner to render the patent invalid for obviousness.   Indeed, defendant's technical expert, Mr. Noiles, testified that Tinnerman was not as relevant as the prior art cited by the Examiner.   No evidence to the contrary was offered by plaintiff.   No fraud can be found without evidence that the Examiner would have rejected the application had he considered the nondisclosed Tinnerman patent. *Magnavox Co. v. Chicago Dynamic Industries,* 201 U. S. P. Q. 25, 28 (N. D. Ill. 1977);   *International Telephone & Telegraph Corp. v. Raychem Corp.,* 188 U. S. P. Q. 214 (D. Mass. 1975), aff'd, 538 F. 2d 453 (1st Cir.) cert. denied, 429 U. S. 886 (1976).

In addition to requiring that the nondisclosed prior art reference be material in a strict "but for" sense, the failure to cite the prior art must be done with a "specific intent" to defraud.   *Oetiker v. Jurid Werke GmbH, supra,* at 8.   Without a showing of willful and intentional fraud, no antitrust liability can be sustained.   *Forbro Design Corp. v. Raytheon Co.,* 390 F. Supp. 794, 805 (D. Mass. 1975), aff'd [1976-1 TRADE CASES P 60,782], 532 F. 2d 758 (1st Cir. 1976).   A good faith judgment not to cite the prior art to the Patent Office, even if erroneous, cannot be fraud.   *Deere & Co. v. Hesston Corp.,* 593 F. 2d 956, 960 (10th Cir.), cert. denied, 444 U. S. 838 (1977).

**\*9** The evidence is insufficient to support a conclusion that defendant withheld the Tinnerman patent with the specific intent to defraud or deceive the Examiner.   No bad faith has been established.

The court concludes as a matter of law that the nondisclosure of the Tinnerman patent does not constitute fraud sufficient to predicate an antitrust violation.

*Conclusion*

The court has carefully considered the sworn testimony of all the witnesses who testified at the trial, the deposition testimony which was read into the record, and the numerous exhibits received as

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1981 WL 2025 (D.D.C.), 209 U.S.P.Q. 809, 1980-81 Trade Cases  P 63,835
**(Cite as: Not Reported in F.Supp.)**

evidence.   The court was particularly impressed by the testimony of Frank Neuhauser, Esquire, the defendant's patent law expert, and Mr. Douglas Noiles, the defendant's technical expert, and credits their testimony over the testimony of the plaintiff's witnesses.   The court has also reviewed the relevant law as set forth in the court's conclusions of law.

The plaintiff has failed to carry the burden of proof and prove by a preponderance of the evidence that the defendant fraudulently procured the patent in issue.   Therefore, judgment must be issued in favor of the defendant on the issue of whether the '811 patent was secured by fraud sufficient to predicate an antitrust violation under section 2 of the Sherman Act, 15 U. S. C. § 2.

Counsel for the defendant shall submit a proposed Judgment to the court within 5 days of the receipt of the court's Findings of Fact and Conclusions of Law, and send a copy thereof to counsel for plaintiff. Counsel for plaintiff may file any comments on the proposed judgment within 7 days thereafter.

Oetiker v. Jurid Werke GmbH
Not Reported in F.Supp., 1981 WL 2025 (D.D.C.), 209 U.S.P.Q. 809, 1980-81 Trade Cases  P 63,835

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 10

Westlaw.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 34082555 (S.D.Cal.)

**(Cite as: Not Reported in F.Supp.2d)**

Page 1

▷
Abbott Laboratories v. Syntron Bioresearch Inc.
S.D.Cal.,2001.
Only the Westlaw citation is currently available.
United States District Court,S.D. California.
ABBOTT LABORATORIES, an Illinois corporation,
Plaintiff,
v.
SYNTRON BIORESEARCH, INC., a California
corporation, Defendant.
No. 98-CV-2359 H(POR).

Aug. 24, 2001.

Order Adopting Report and Recommendation;
Granting in Part, Denying in Part Abbott's Motion to
Exclude Evidence: Excluding Nine Newly Disclosed
Prior Art References; Not Excluding Five Other Prior
Art References; Not Excluding Issues of Inequitable
Conduct and Inventorship
HUFF, Chief J.
*1 AND RELATED CROSS-ACTIONS.

On July 2, 2001, Plaintiff Abbott Laboratories filed a
motion to exclude Defendant Syntron Bioresearch,
Inc.'s untimely prior art references of validity and
untimely issues of inequitable conduct and
inventorship. The Court referred the motion to
Magistrate Judge Louisa S. Porter on a report and
recommendation basis. Syntron filed its opposition
on July 11, 2001. On July 16, 2001, Abbott filed a
reply. Judge Porter held telephonic oral arguments on
July 20, 2001.

On August 3, 2001, Judge Porter issued a Report and
Recommendation, recommending that the motion to
exclude evidence be granted in part and denied in
part. On August 10, 2001, both parties submitted
objections to the Report and Recommendation and on
August 17, 2001, the parties both submitted replies to
the objections.

I. Procedural Background

On December 30, 1998, Abbott filed a Complaint
alleging patent infringement. On February 22, 1999,
Syntron filed an Answer with Counterclaims seeking
declaratory judgment that it did not infringe Abbott's
patents and that Abbott's patents are invalid and

unenforceable. After a case management conference,
the Court issued a scheduling order on May 13, 1999.
Pursuant to the scheduling order, all fact discovery
was to be completed by February 28, 2000, and the
final date to conduct depositions of experts was to be
April 14, 2000. On March 21, 2000, this Court
extended the final date to conduct expert discovery to
April 28, 2000.

Summary judgment motions, *Markman* hearings on
the construction of claims and motions for
reconsideration were heard between Spring 2000
through Spring 2001. On July 31, 2000, the parties
filed their Memoranda of Contentions of Facts and
Law. A proposed Pretrial Order was submitted on
August 28, 2000.

On May 24, 2001, Syntron filed a Notice of Prior Art
pursuant to 35 U.S.C. § 282. On June 7, 2001, the
parties submitted a revised Memoranda of
Contentions of Facts and Law. A pretrial conference
was held on June 22, 2001 and a Pretrial Order was
filed on the same day. On June 27, 2001, the Court
issued a scheduling order setting trial to begin on
September 11, 2001.

On June 25, 2001, the Court issued an Order
Referring Issues in Pretrial Order to Magistrate Judge
for Report and Recommendation.[FN1] Specifically, the
Court asked Magistrate Judge Porter to address 1) the
requirements of whether the prior art should have
been disclosed in discovery or expert reports; 2)
whether the inventorship issue should have been
disclosed in discovery or expert reports; 3) if there
was any violation of proper discovery procedures; 4)
and if Abbott was prejudiced by the lack of
disclosure.

> FN1. The items in dispute are indicated by
> asterisks next to the paragraph number in the
> Pretrial Order.

II. Analysis

A. Prior Art References (paragraphs 36-44 of the
Pretrial Order)

Paragraphs 36-44 of the Pretrial Order set forth nine
prior art references (Weiss, Schuurs, Guire, Renn,
Maggio, Litman I, Neuhäusser) that were not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 34082555 (S.D.Cal.)

(Cite as: Not Reported in F.Supp.2d)

Page 2

disclosed by Syntron until May 24, 2001, more than a year after discovery had closed.

*2 Between April 28, 2000 (the close of expert discovery) and May 24, 2001, Syntron never filed a supplemental disclosure or response. *See* Fed.R.Civ.P. 26(e)(1) & (2). Syntron argues that Abbott is not prejudiced by the new disclosures because it knew about these references based on previous litigation or prosecution of the patents-in-suit. However, Abbott did not have knowledge that these prior arts would be an issue in this particular case. In addition, there has been no expert discovery conducted on these references.

" The purpose of a discovery cutoff date is to protect the parties from a continuing burden of producing evidence and to assure them adequate time to prepare immediately before trial." *Whittaker Corp. v. Execuair Corp.,* 736 F.2d 1341, 1347 (9th Cir.1984) (citations omitted). Federal Rules of Civil Procedure 26(e)(1) and (2) establish a duty to supplement or correct discovery. If a party fails to supplement disclosures or responses, the court may issue sanctions pursuant to Fed.R.Civ.P. 37(c)(1):
A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed ...

In cases involving patent invalidity or infringement notice of prior art references is also governed by 35 U.S.C. § 282, which provides:In actions involving the validity or infringement of a patent the party asserting invalidity or noninfringement shall give notice in the pleadings or otherwise in writing to the adverse party at least thirty days before the trial, of the country, number, date, and name of the patentee of any patent, the title, date, and page numbers of any publication to be relied upon as anticipation of the patent in suit ...

35 U.S.C.A. § 282 (West Supp.2000). The Federal Rules of Civil Procedure and § 282 co-exist. *ATD Corp. v. Lydall, Inc.,* 159 F.3d 534, 551 (Fed.Cir.1998); *Eaton Corp. v. Appliance Valves Corp.,* 190 F.2d 874, 879 (Fed.Cir.1986). Section 282 sets a minimum period for identification of prior art; however, " when the court has set and the parties have agreed to a discovery period, that procedure necessarily governs that trial." *ATD Corp.,* 159 F.3d

at 551 (excluding prior art because defendant presented no reason to justify inclusion of prior art that was presented four months after extended discovery ended and one month before a first rescheduled pretrial conference). The purpose of both the Federal Rules and § 282 is to prevent unfair and prejudicial surprise. *Id.*

Magistrate Judge Porter found that Syntron failed to present any " substantial justification" for its delay in presenting the prior art references. *See* Fed.R.Civ.P. 37(c)(1); Scheduling Regulating Discovery and Other Pretrial Proceedings, May 13, 1999. Based on the prejudice suffered by Abbott, Judge Porter recommended that the Court exclude all reference to the nine prior art references in paragraphs 36-44 of the Pretrial Order.

*3 Syntron objects to this portion of the Report and Recommendation. Syntron disagrees with the exclusion of any of the nine references, but focuses its Objection to three prior art references: the Takeda article; the Alfa Laval AB patent; and the Litman I patent.[FN2] Syntron argues that Abbott is not prejudiced by having to respond to the Takeda and Alfa Laval AB references because it has know about them since 1999 and 1986, respectively, when they were cited against Abbott in its foreign prosecution of these patents. Syntron also argues that Abbott is not prejudiced by having to respond to Litman I because the relevant portions of Litman I are identical to Litman III, which was discussed in the report by Attorney Hoscheit, Syntron's patent law expert. However, Litman III is not disclosed in the Pretrial Order and thus not within scope of trial.

> FN2. In Syntron's Reply to Abbott's Objections to the Report and Recommendation, Syntron stated that it was willing to forego all the disputed prior art references, including those allowed by Judge Porter, in favor of the introduction of the Takeda, Alfa Laval AB, and Litman I references.

Syntron fails to offer any reason why these prior art references were not disclosed earlier. Syntron states that it disclosed the references as soon as it discovered them in May, 2001, however, all of the references were available to Syntron two years ago, during the discovery phase of this case. In March 2000, Dr. David, Syntron's expert, opined that the '484 and '162 patents are invalid on various grounds and cited five prior art references. Dr. David did not

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 34082555 (S.D.Cal.)

(Cite as: Not Reported in F.Supp.2d)

identify Takeda, Litman, or Alfa Laval.

Abbott has not conducted expert discovery on the nine newly disclosed references. Syntron states that Dr. David is available for a deposition at Abbott's convenience. However, leave of court is required to conduct additional depositions at this stage in the litigation. Fed.R.Civ.P. 30(a)(2)(C); Fed.R.Civ.P. 29. The Magistrate Judge concluded that Abbott is prejudiced by the lack of expert discovery and recommended that the nine reference be excluded. The Court ADOPTS the Report and Recommendation and excludes the nine prior art references listed in paragraphs 36-44 of the Pretrial Order.

### B. New Applications (paragraphs 45-56 of the Pretrial Order)

Paragraphs 45-56 of the Pretrial Order list sixteen different prior art references, alone or in combination, as invalidating the patents-in-suit. As discussed above, the nine new prior art references are excluded from trial. Abbott argues that five other prior art references (Deutsche II, Brown, Litman II, Bauman, Kelton) mentioned in paragraphs 45-56 should also be excluded. Abbott contends that these references were not properly identified in discovery and that it will be prejudiced if Syntron is allowed to raise these reference at trial. In opposition, Syntron contends that these issues are not new applications but were included in Syntron's original Memorandum of Contentions of Facts and Law filed on July 31, 2000 and in the previous Pretrial Order filed in August 2000. It further argues that prior art reference, like any other piece of evidence, once admitted, is admissible for any purpose for which it is relevant.

Judge Porter recommended that the five prior art references not be excluded. Judge Porter found that the Brown and Deutsche II patents were listed as prior art references in Syntron's responses to interrogatories and the Deutsche II, Brown, and Kelton patents were stipulated to as prior art in the Pretrial Order filed June 22, 2001. Judge Porter concluded that " [a]lthough the patents were not specifically mentioned as ' invalidating prior art,' Abbott had notice that these prior art references may be used to invalidate the patents-in-issue." Report and Recommendation at 7. Judge Porter also found that the combinations of Tom, Deutsche (I or II), Bauman, Grubb, Giegel and Glad were in the proposed Pretrial Order dated August 21, 2000. Judge Porter concluded that although Abbott may suffer

prejudice by allowing these references, the prejudice was created by Abbott's failure to file a motion either to exclude or re-open discovery a year ago.

*4 Abbott objects to this recommendation. Abbott argues that the five references and new uses of previously identified prior art should be excluded because Syntron did not identify them as invalidating prior art during the scheduled discovery period. Specifically, Abbott argues that Dr. David never opined that any of the five references (Deutsche II, Litman II, Kelton, Bauman, Brown) invalidated the asserted claims of the patents-in-suit. Abbott further contends that: (1) Syntron failed to identify three of the references in response to its interrogatory requesting identification of prior art; (2) Mr. Hoscheit, Syntron's patent law expert, stated that Syntron was not relying on Bauman as an invalidating reference; and (3) neither Dr. David nor Mr. Hoscheit ever opined on the Brown reference.

Abbott contends that the Report and Recommendation allowing the five references is based on three misconceptions of the facts. Abbott first asserts that just because it stipulated that the references are prior art does not mean that it admits they can be asserted at trial. Abbott specifically reserved this objection in the Pretrial Order. See Pretrial Order at p. 7, ¶ 2 (" [b]y admitting [the references] are prior art to the patents-in-suit, Abbott does not admit that Syntron may assert them at trial because it has not previously identified them as invalidating art" ). Second, Abbott contends that although Rule 26 is not incorporated by name in the Scheduling Order, its substance is incorporated. See Scheduling Order (" Opinions and reasons for opinions not disclosed during depositions or in reports are subject to exclusion absent substantial justification" ). Finally, Abbott asserts that it was improper for Syntron to raise the new applications and combinations or prior art in the July 31, 2000 Memorandum of Contentions of Fact and Law. Abbott contends that it preserved its objection to the new applications and combinations in the original proposed Pretrial Order. See Pretrial Order, August 2000, p. 13, ¶ 35.

Syntron replies that the five references Abbott contests were not referred to the Magistrate Judge for a report and recommendation. Syntron points out that these five references were listed in the Pretrial Order as stipulated facts. Syntron contends that Abbott has known about these references for a year and has failed to object or cite authority for its position that

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                Page 4

Not Reported in F.Supp.2d, 2001 WL 34082555 (S.D.Cal.)

(Cite as: Not Reported in F.Supp.2d)

previously disclosed references can not be used in new combinations. Syntron claims that any alleged prejudice suffered by Abbott could be cured with a supplemental deposition of Dr. David. Syntron states that it is not seeking to depose Abbott's expert, Dr. Harlow, about these references.

The Court ADOPTS the Report and Recommendation and will not exclude the five references from trial. Abbott had notice that these references were prior art to the patents-in-suit and will not be prejudiced having to defend against them to an extent which would require excluding them from trial. However, the Court reserves the right to limit testimony about the five references in accordance with the Federal Rules of Evidence during the course of the trial.

C. Inequitable Conduct Defense (paragraphs 60, 62-65, & 66 of the Pretrial Order)

1. Paragraphs 60 and 62

*5 Paragraphs 60 and 62 of the Pretrial Order make general allegations of inequitable conduct by Abbott. Abbott argues that the inequitable conduct issue was never raised in pleadings or discovery. Furthermore, it claims that the inequitable conduct claim was not based on Abbott's conduct but that of the " applicants." Abbott states that although it assisted in the prosecution of the patents, the inventors took primary responsibility in the prosecution. Lastly, Abbott contends that it will be prejudiced because this issue was not raised in expert reports.

Magistrate Judge Porter determined that Syntron raised the " inequitable conduct" issue when it filed its answer with counterclaims. Syntron's Sixth Affirmative Defense states " Abbott is estopped from asserting that Syntron has infringed the 484 patent or the 162 patent by reason of actions taken and statements made by the applicant to the Patent Office during prosecution of the application which led to the 484 and 162 patents." This statement is broad as it relates to Abbott's conduct. In the Seventh Affirmative Defense, Syntron alleges inequitable conduct by the " applicant." Therefore, inequitable conduct, in paragraphs 60 and 62 with regards to both patents-in-issue, was alleged early in the litigation. Inequitable conduct was also raised in interrogatories.

The Court also notes that the inequitable conduct issue was raised in the prior pretrial order filed August 21, 2000. Abbott had notice of these issues

since last year and at no time contacted the Court to re-open discovery on these issues. By virtue of the answer with affirmative defenses and reference to same in interrogatory answers, Abbott had notice and full opportunity to explore the issue during the scheduled discovery time. Judge Porter concluded that the inequitable conduct issue was raised in discovery and recommended that the issue not be excluded. The Court ADOPTS the Recommendation with respect to the general allegations of inequitable conduct found in paragraphs 60 and 62 of the Pretrial Order.

However, Judge Porter also recommended if expert testimony is required on this issue of inequitable conduct, then the issue should be excluded based on prejudice against Abbott.[FN3] It appears from Syntron's papers that the only specific inequitable conduct issues are those listed in paragraphs 63-66.

> FN3. At oral argument, Syntron stated that expert testimony would be helpful, but it would not be required, while Abbott asserted that expert testimony is needed. At no time did Syntron's expert, in reports or during deposition testimony, raise the specific issue of inequitable conduct.

2. Paragraphs 63-65

Paragraphs 63-65 set forth inequitable conduct allegations for failure to disclose certain reference to the patent examiner and or the PTO during prosecution of the '484 or '162 patents. Paragraph 63 discusses inequitable conduct as it relates to the newly disclosed prior art. As set forth above, these references are excluded from trial. Consequently, the allegations in paragraph 63 are excluded from trial.

In paragraphs 64 and 65, Syntron alleges an inequitable conduct defense based on Abbott's failure to point out the asserted patentable novelty over Deutsche I, Bauman, Grubb, Giegel, Litman II, Tom, or Hochstrasser.

*6 Abbott argues that Syntron will need to support its inequitable conduce defenses with expert testimony. Abbott relies on *Life Technologies, Inc. v. Clontech Lab., Inc.,* 224 F.3d 1320, 1325 (Fed.Cir.2000), for its assertion that expert testimony is required on the issue of materiality in the inequitable conduct inquiry. In *Life Technologies,* the Federal Circuit explained what " material" means in the context of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 5
Not Reported in F.Supp.2d, 2001 WL 34082555 (S.D.Cal.)
(Cite as: Not Reported in F.Supp.2d)

an inequitable conduct challenge:

Information is material when there is a substantial likelihood that a reasonable Examiner would have considered the information important in deciding whether to allow the application to issue as a patent. Because patentability is assessed from the perspective of the hypothetical person of ordinary skill in the art, information regarding the subjective motivations of inventors is not material.

_Life Technologies._ 224 F.3d at 1325 (citations omitted). The _Life Technologies_ Court did not state that expert testimony was needed to prove materiality. However, an expert is needed to voice the understanding of a hypothetical person of ordinary skill in the art.

Syntron's expert, Dr. David, has opined that Grubb, Deutsche I, Tom, Hochstrasser, and Giegel patents, and Glad article invalidate the patents-in-suit. In addition, Mr. Hoscheit has opined that the patentee breached its duty of candor to the Patent Office by failing to submit Hochstrasser and Litman III to the Patent Office. While they didn't render an opinion specifically addressing inequitable conduct, the testimony of Dr. David and Mr. Hoscheit establishes the materiality of most of these references relevant to Syntron's inequitable conduct defense. Potentially invalidating references are material and there is a substantial likelihood that a reasonable Examiner would have considered the information important in decided whether to allow the application to issue as a patent. However, it does not appear that any showing of materiality has been made with respect to the Bauman and Litman II references.

At this time, the Court ADOPTS the Report and Recommendation. The Court will not exclude Syntron's inequitable conduce defense from trial, however, Syntron must make a proper showing of materiality before the evidence can be admitted. Based on the scope of the expert reports, the Court does not see how Syntron can raise the Bauman or Litman II references. Nevertheless, the Court reserves final judgment for trial when the Court is in a better position to evaluate the issue.

3. Paragraph 66

Paragraph 66 alleges inequitable conduct based on concealing the correct inventorship from the PTO with deceptive intent. For the reasons set forth in Section D below, the Court will not exclude this defense from trial but the necessary evidentiary proof

must be made before evidence of inequitable conduct based on inventorship will be presented to the jury.

D. Inventorship (paragraph 69 of the Pretrial Order)

Abbott contends that Syntron failed to properly raise the inventorship issue as an affirmative defense, failed to disclose any evidence of alleged incorrect inventorship during discovery and failed to identify the allegedly correct inventors or facts supporting that contention. Abbott also argues that it will be prejudiced since there was no expert testimony about inventorship. In opposition, Syntron argues that it has continually preserved the inventorship issue in its pleadings and in discovery. Moreover, Syntron argues that Abbott has known about the inventorship issue for at least six years when it was brought up as a defense in another lawsuit. Also, Syntron learned about the inventorship issue through Abbott when Abbott produced a memorandum by Dr. Brian Lee about why he should have been named as a co-inventor during deposition in another lawsuit. However, both parties stated that expert testimony was not conducted on this issue.

*7 The Report and Recommendation concludes that the inventorship issue was adequately disclosed during discovery and recommended that it not be excluded. However, Judge Porter did note that if expert testimony was required on the issue then the Court recommends that the issue be excluded based upon prejudice against Abbott.

Abbott argues that expert testimony is required for Syntron to meet its burden to prove inventorship issues by clear and convincing evidence. _See Environ Prods. v. Furon Co._, 215 F.3d 1261, 1265 (Fed.Cir.2000) (a party challenging patent validity for omission of an inventor must present clear and convincing evidence that the omitted individual actually invented the claimed invention). Abbott relies on _Acromed Corp. V. Sofamor Danek Group, Inc._, 253 F.3d 1371, 1378-1381 (Fed.Cir.2001) to support its contention that expert testimony is required. While the _Acromed_ Court makes clear that Syntron has the burden of proving that the omitted co-inventor's contribution was more than just the normal contributions of one of ordinary skill in the art, the case does not hold that this evidence must be presented through expert testimony. The _Acromed_ Court noted that the defendant " could have countered this by producing testimony at trial concerning what would or would not be obvious to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                      Page 6
Not Reported in F.Supp.2d, 2001 WL 34082555 (S.D.Cal.)

**(Cite as: Not Reported in F.Supp.2d)**

one ordinarily skilled in the art ... [the defendant] never did." *Acromed,* 253 F.3d at 1380.

Syntron has not offered expert testimony on the inventorship issue. However, Abbott has failed to present any case law that establishes that expert testimony is required. The Court is unclear how Syntron will meet its burden to prove the inventorship issues it raises by clear and convincing evidence, however, the Court will not exclude the issue at this time. The Court ADOPTS the Report and Recommendation. However, the Court reserves final judgment on the inventorship issue until trial.

                    III. Conclusion

For the reasons set forth above, the Court ADOPTS the Report and Recommendation RE: Plaintiff's Motion to Exclude Evidence. The recently disclosed prior art references found in paragraphs 56 of the pretrial order are excluded without prejudice. The remaining prior art references are not excluded. Inequitable conduct and inventorship issues are not excluded at this time but will be limited at trial if Syntron fails to meet its evidentiary burden.

IT IS SO ORDERED.

            REPORT AND RECOMMENDATION RE
             PLAINTIFF'S MOTION TO EXCLUDE
                       EVIDENCE
PORTER, Magistrate J.

                 [Document No. 241]

And related cross-claims

On July 2, 2001, Plaintiff Abbott Laboratories filed a motion to exclude Defendant Syntron Bioresearch, Inc.'s untimely prior art references of validity and untimely issues of inequitable conduct and inventorship. Syntron filed its opposition on July 11, 2001. On July 16, 2001, Abbott filed a reply. Oral arguments were heard telephonically on July 20, 2001.

This matter has been referred to Magistrate Judge Louisa S. Porter on a report and recommendation basis from District Judge Marilyn L. Huff. Based on the foregoing, this Court recommends that Plaintiff's motion be GRANTED in part and DENIED in part.

               *I. Procedural Background*

*8 On December 30, 1998, Abbott filed a Complaint alleging patent infringement. On February 22, 1999, Syntron filed an Answer with Counterclaims seeking declaratory judgment that it did not infringe Abbott's patents and that Abbott's patents are invalid and unenforceable. After a case management conference, this Court issued a scheduling order on May 13, 1999. Pursuant to the scheduling order, all fact discovery was to be completed by February 28, 2000, and the final date to conduct depositions of experts was to be April 14, 2000. On March 21, 2000, this Court extended the final date to conduct expert discovery to April 28, 2000.

Summary judgment motions, *Markman* hearings on the construction of claims and motions for reconsideration were heard between Spring 2000 through Spring 2001. On July 31, 2000, the parties filed their Memoranda of Contentions of Facts and Law. A Pretrial Order was filed on August 28, 2000.

On May 24, 2001, Syntron filed a Notice of Prior Art pursuant to 35 U.S.C. § 282. On June 7, 2001, the parties submitted a revised Memoranda of Contentions of Facts and Law. A pretrial conference was held on June 22, 2001 and a Pretrial Order was filed on the same day. On June 27, 2001, Judge Huff issued a scheduling order setting trial to begin on September 11, 2001.

On June 25, 2001, Judge Huff issued an Order Referring Issues in Pretrial Order to Magistrate Judge for Report and Recommendation.[FN1] Specifically, Judge Huff wanted this Court to address 1) the requirements of whether the prior art should have been disclosed in discovery or expert reports; 2) whether the inventorship issue should have been disclosed in discovery or expert reports; 3) if there was any violation of proper discovery procedures; 4) and if Abbott was prejudiced by the lack of disclosure.

              FN1. The items in dispute are indicated by
              asterisks next to the paragraph number.

                     *II. Analysis*

      A. Prior Art References (paragraphs 36-44 of the
                   Pretrial Order)[FN2]

              FN2. Abbott claims that there are fourteen
              prior art references at issue. Syntron argues
              that only nine are at issue and the additional

Not Reported in F.Supp.2d                                                                Page 7

Not Reported in F.Supp.2d, 2001 WL 34082555 (S.D.Cal.)

**(Cite as: Not Reported in F.Supp.2d)**

five are stipulated facts in the Pretrial Order. District Judge Huff referred certain disputed issues in the pretrial order, specifically, paragraphs 36-44. Therefore, this Court will only address the nine prior art references contained in paragraphs 36-44.

The federal rules of discovery are designed to give parties knowledge of all relevant facts before going to trial in order to prevent surprise. *Shelak v. White Motor Co.,* 581 F.2d 1155, 1159 (5th Cir.1978) (*citing Hickman v. Taylor,* 329 U.S. 495 (1947)). " The purpose of a discovery cutoff date is to protect the parties from a continuing burden of producing evidence and to assure them adequate time to prepare immediately before trial." *Whittaker Corp. v. Execuair Corp.,* 736 F.2d 1341, 1347 (9th Cir.1984) (citations omitted). Notwithstanding the discovery cut-off date, Fed.R.Civ.P. 26(e)(1) and (2) establishes a duty to supplement or correct discovery and provides:

(e) Supplementation of Disclosures and Responses. A party who has made a disclosure under subdivision (a) or responded to a request for discovery with a disclosure or response is under a duty to supplement or correct the disclosure or response to include information thereafter acquired ... in the following circumstances:

(1) A party is under a duty to supplement *at appropriate intervals* its disclosures under subdivision (a) if the party learns that in some material respect the information disclosed is incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing. With respect to testimony of an expert from whom a report is required under subdivision (a)(2)(B) the duty extends both to information contained in the report and to information provided through a deposition of the expert, and any additions or other changes to this information shall be disclosed by the time the party's disclosures under Rule 26(a)(3) are due.

*\*9* (2) A party is under a duty *seasonably* to amend a prior response to an interrogatory, request for production, or request for admission if the party learns that the response is in some material respect incomplete or incorrect and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing. (emphasis added).

Fed.R.Civ.P. 26(e)(1) & (2). The duty to supplement does not have to occur each time new information is

learned but " should be made at appropriate intervals during the discovery period, and with special promptness as the trial date approaches." Fed.R.Civ.P. 26(e) (Committee Notes on Amendments (1993)).

If a party fails to supplement disclosures or responses, the court may issue sanctions pursuant to Fed.R.Civ.P. 37(c)(1):

A party that without *substantial justification* fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is *harmless,* permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed ... (emphasis added).

Fed.R.Civ.P. 37(c)(1). " A failure to disclose in a timely manner is equivalent to a failure to disclose." *Transclean Corp. v. Bridgewood Servs., Inc.,* 101 F.Supp.2d 788, 795 (D.Minn.2000). Since exclusion of evidence is a harsh sanction, the court must look to whether there was substantial justification for nondisclosure or whether the failure was harmless. *Id.*

Notice of prior art pursuant to 35 U.S.C. § 282 provides:

In actions involving the validity or infringement of a patent the party asserting invalidity or noninfringement shall give notice in the pleadings or otherwise in writing to the adverse party at least thirty days before the trial, of the country, number, date, and name of the patentee of any patent, the title, date, and page numbers of any publication to be relied upon as anticipation of the patent in suit ...

35 U.S.C.A. § 282 (West Supp.2000). The Federal Rules of Civil Procedure and § 282 co-exist. *ATD Corp. v. Lydall, Inc.,* 159 F.3d 534, 551 (Fed.Cir.1998); *Eaton Corp. v. Appliance Valves Corp.,* 190 F.2d 874, 879 (Fed.Cir.1986). Section 282 sets a minimum period for identification of prior art; however, " when the court has set and the parties have agreed to a discovery period, that procedure necessarily governs that trial." *ATD Corp.,* 159 F.3d at 551 (excluding prior art because defendant presented no reason to justify inclusion of prior art that was presented four months after extended discovery ended and one month before a first rescheduled pretrial conference). The purpose of both the Federal Rules and § 282 is to prevent unfair and prejudicial surprise. *Id.* In *Eaton Corp.,* the Federal Circuit admitted prior art references that were

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 34082555 (S.D.Cal.)

(Cite as: Not Reported in F.Supp.2d)

Page 8

submitted less than thirty days before trial began. *Eaton Corp.,* 190 F.2d at 879. The court explained that plaintiff was not prejudiced or surprised because the prior art references were provided to plaintiff in depositions, the plaintiff should have known about the prior art because it had been a competitor in the market for over 10 years, and the alleged inventor was familiar with the prior art. *Id.* at 880. As a result, plaintiff was able to adequately respond to the prior art. *Id.*

*10 Abbott contends that the nine prior art references were never revealed until May 24, 2001, on the " eve of trial." It argues that expert discovery ended on April 28, 2000 and that it will be severely prejudiced since it was unable to conduct expert discovery. In opposition, Syntron argues that it disclosed the references right after discovering them in April/May 2001. Syntron contends that Abbott will not be prejudiced since it was fully aware of all these prior art references through other litigation. Further, it asserts that prejudice to Abbott can be cured by giving it the opportunity to depose the experts on the prior art.[FN5]

> FN3. Syntron assumes that additional expert discovery can readily be conducted. However, leave of court will be required to conduct additional depositions. Fed.R.Civ.P. 30(a)(2)(C) & Fed.R.Civ.P. 29.

Fact discovery ended on February 28, 2000 and expert discovery was extended to April 28, 2000. Syntron filed its Notice of Prior Art on May 24, 2001, revealing nine new prior art references, over one year after discovery ended. Between April 28, 2000 and May 24, 2001, Syntron never filed a supplemental disclosure or response. Most of the nine prior art references were issued in the 1970's and 1980's and Syntron does not explain why these references were not revealed earlier. No expert discovery was conducted on these references. [FN4] Syntron only argues that Abbott will not be prejudiced because it knew about the references based on previous litigation or prosecution. However, Abbott did not have knowledge that these prior arts would be an issue in this particular case. Although Syntron argues that it complied with section 282 and promptly disclosed the prior arts after discovering them, Syntron does not present any " substantial justification" for its delay in presenting the prior art references.

FN4. On July 23, 2001, a day after the motion hearing, Syntron submitted a Post-Hearing Submission of Supplemental Expert Report that was served upon Abbott. On July 24, 2001, Abbott filed a response to Syntron's Post-Hearing Submission. Since the Post-Hearing Submission of Supplemental Expert Report was not provided for in the scheduling order, it was not considered by this Court in this report and recommendation.

The patents-in-issue are complex. Expert discovery was conducted. There will be expert testimony on prior art references at trial. (*See* Pretrial Order at 17-19.) The newly revealed prior art references were not mentioned in discovery and Abbott had no opportunity to conduct expert discovery on these prior arts. Since no expert discovery has been conducted, Abbott will be prejudiced if these prior art references are admitted at trial. Based upon the prejudice suffered by Abbott, it is recommended that the Court exclude, at time of trial, all reference to these nine prior arts listed in the Pretrial Order in paragraphs 36-44. The only way to avoid this prejudice to Abbott is to continue the trial and re-open discovery to allow expert discovery on these limited issues.

B. New Applications (paragraphs 45-56 of the Pretrial Order)

Abbott argues that Syntron attempts to assert previously disclosed prior art references in new combinations and new ways that were never disclosed before in expert reports. It also argues that Syntron improperly raised the nine prior art references in these new combinations. In opposition, Syntron contends that these issues are not new applications but were included in Syntron's original Memorandum of Contentions of Facts and Law filed on July 31, 2000 and in the previous Pretrial Order filed in August 2000. It further argues that prior art reference, like any other piece of evidence, once admitted, is admissible for any purpose for which it is relevant.

*11 Expert disclosure under Rule 26 does not apply in this case because the Scheduling Order dated May 13, 1999, did not provide for it. Therefore, merely failing to disclose expert opinion on certain issues would not preclude testimony at trial. This Court focuses on the prejudice issue. Here, many of the new applications under paragraphs 45-56 were previously

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 9

Not Reported in F.Supp.2d, 2001 WL 34082555 (S.D.Cal.)

(Cite as: Not Reported in F.Supp.2d)

mentioned either in the prior Pretrial Order or Syntron's previous Memorandum of Contentions of Fact and Law. Therefore, Abbott was aware of these issues in August 2000 and had an opportunity to affirmatively act and failed to do so. For example, Abbott could have moved for leave to re-open discovery, or could have brought a motion before the Court regarding exclusion of disputed issues. Certain applications were disclosed in the previous Pretrial Order and/or Syntron's prior Memorandum of Contentions of Facts and Law while others were not. This Court will analyze the notice issue as relates to each of the applications at issue:

1. Paragraph 45-Whether Claims 22, 23 and/or 26 of the '484 patent are invalid as anticipated by the Weiss, Guire, Renn, Deutsch I, Grubb, Deutsch II, Litman I, Brown, Tom, Bauman, Giegel, Kelton, Neuhausser and Alfa Laval AB patents and patent applications, the Glad and Takeda articles, and/or the remaining references listed in the attached Exhibit List.

As discussed above, the Court recommends that the recently disclosed prior art references of Weiss, Guire, Renn, Litman I, Neuhausser, Alfa Laval AB patents and the Takeda article be excluded. Based upon prior notice, it is recommended that the Deutsch I, Grubb, Tom, Bauman, Giegel patents and the Glad article not be excluded.[FN5] Based upon the Court's review of the presented documents, the Brown and Deutsch II patents were listed as prior art references in Syntron's revised responses to interrogatories, (Abbott's Second Lodgment, Ex. 1 at 5), and the Deutsch II, Brown and Kelton patents are listed as Stipulated Facts in the Pretrial Order filed June 22, 2001, (Pretrial Order ¶¶ 16, 17 & 22). Although the patents were not specifically mentioned as " invalidating prior art," Abbott had notice that these prior art references may be used to invalidate the patents-in-issue. Accordingly, this Court recommends that the Brown, Deutsch II and Kelton patents not be excluded.

> FN5. The Grubb, Deutsch I and Tom patents are mentioned in the expert report of Dr. Gary S. David. (Abbott's Second Lodgment, Ex. 2 ¶¶ 60, 63, & 64.) The Bauman and Giegel patents and the Glad article are discussed in Syntron's previous Memorandum of Contentions of Fact and Law, dated August 1, 2000. (Syntron's Lodgment, Ex. 11 ¶¶ 109, 114, & 117). The Deutsch I, Bauman, Grubb, Giegel patents and the Glad article are also mentioned in

the previous Pretrial Order, dated August 21, 2000. (Abbott's Lodgment, Ex. J ¶ 26.)

2. Paragraph 46. Whether Claims 22, 23, and/or 26 of the '484 patent are invalid as rendered obvious by the Weiss, Guire, Renn, Deutsch I, Grubb, Deutsch II, Litman I, Brown, Tom, Bauman, Giegel, Kelton, Neuhausser and Alfa Laval AB patents and patent applications, the Glad and Takeda articles, and/or the remaining references listed in the attached Exhibit List, whether alone or in combination.

As discussed above, this Court recommends that the newly disclosed prior arts of Weiss, Guire, Renn, Litman I, Neuhausser, Alfa Laval AB patents and the Takeda article be excluded. Based upon prior notice, Deutsch I, Grubb, Tom, Bauman, Giegel, and the Glad article should not be excluded.[FN6] As discussed previously, the Brown and Deutsch II patents were listed as prior art references in Syntron's revised responses to interrogatories. (Abbott's Second Lodgment, Ex. 1 at 5.) Moreover, the Deutsch II, Brown and Kelton patents are listed as Stipulated Facts of the Pretrial Order filed June 22, 2001. (Pretrial Order ¶¶ 16, 17 & 22.) Therefore, based upon prior knowledge, the Deutsch II, Brown and Kelton patents should not be excluded.

> FN6. The Tom, Grubb, Bauman, Deutsch I, Giegal patents and the Glad article are mentioned in Syntron's prior Memorandum of Contentions of Fact and Law filed August 1, 2000. (Syntron's Lodgments, Ex. 11 ¶¶ 108, 112, 113, 115, 116 & 118.)

*12 3. Paragraph 47. Whether, to one of ordinary skill in the art, Claims 22, 23 and 26 of the '484 patent were rendered obvious by the following combinations of references: (a) Deutsch (I or II) in view of Tom; (b) Grubb in view of Deutsch (I or II) and/or Bauman; (c) the Glad article in view of Deutsch (I or II) or Bauman; or (d) Giegel in view of Deutsch (I or II) or Bauman.

Paragraph 48. Whether Claim 1 of the '162 patent was anticipated by the Deutsch (I or II), Bauman, Grubb, Giegel, Litman I, Tom, Neuhausser and Alfa Laval AB patents and patent applications, the Glad article, and/or remaining references listed in the attached Exhibit List.

Paragraph 50. Whether, to one of ordinary skill in the art, Claim 1 of the '162 patent was rendered obvious by the following combination of references: (a) Deutsch (I or II) in view of Tom; (b) Deutsch (I or II) in view of Tom and/or Bauman; (c) Grubb in view of

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 34082555 (S.D.Cal.)

(Cite as: Not Reported in F.Supp.2d)

Bauman and/or Deutsch (I or II); or (d) Glad in view of Bauman.

Paragraph 51. Whether, to one of ordinary skill in the art, Claim 1 of the '162 patent was made obvious by Giegel in view of Grubb.

Paragraph 52.[FN7] Whether Claims 22, 29 and 30 of the '162 patent are anticipated by the Deutsch (I or II), Litman I, Giegel patents and/or the remaining references listed in the attached Exhibit List.

> FN7. The Court notes that Claim 22 of patent '162 in paragraphs 52 and 54 is not mentioned in the prior pretrial order. It appears that the omission is the result of a typographical error since this claim was stated in Syntron's prior Memorandum of Contentions of Fact and Law.

Paragraph 54. Whether, to one of ordinary skill in the art, Claims 22, 29 and 30 of the '162 patent were rendered obvious by Deutsch I in view of Tom and/or Bauman.

Except for the new prior art references (Litman I, Neuhausser, Alfa Laval AB) in paragraph 48 that should be excluded, these applications were in the Pretrial Order dated August 21, 2000. (Abbott's Lodgments, Ex. J at 72-73.) At the time, Abbott objected to these paragraphs, (id. at 73); however, for almost one year, Abbott never made an attempt to file a motion, either to re-open discovery or to exclude. This Court finds that Abbott had notice of these issues as of August 21, 2000 and failed to act upon them even though a Magistrate Judge was assigned for purposes of pretrial discovery and scheduling. Therefore, although Abbott may suffer prejudice, that state was contributed to by Abbott's failure to act. It is recommended that the issues set forth in these paragraphs, except for the Litman I, Neuhausser and Alfa Laval AB patents, not be excluded. The Court further recommends that the Litman I, Neuhausser and Alfa Laval AB patents be excluded.

4. Paragraph 49. Whether Claim 1 of the '162 patent is invalid as rendered obvious by the Deutsch (I or II), Bauman, Grubb, Glad, Giegel, Litman I, Tom, Neuhausser and Alfa Laval AB patents and patent applications, the Glad article, and/or the remaining references listed in the attached Exhibit list, whether alone or in combination.

As discussed above, the recently disclosed prior art references of Litman I, Neuhausser and Alfa Laval AB patents should be excluded. The Bauman, Grubb,

Glad, Giegel, and Tom patents are not cited as invalidating the patents-in-issue based on obviousness in the previous pretrial order, Syntron's previous Memorandum of Contentions of Fact and Law or the expert report as it relates to the '162 patent. However, they were listed as prior art references that may be used to invalidate the patents-in suit in Syntron's revised responses to interrogatories. (Abbott's Second Lodgment, Ex. 1 at 5.) Even though Syntron did not specify under which theory it would proceed to use the prior art references, Abbott had notice that Syntron might rely on these prior arts to demonstrate invalidity, whether it be based on anticipation or obviousness. Consequently, this Court recommends that these references not be excluded. Lastly, it appears that Deutsch (I or II) was mentioned in the expert report, (Abbott's Second Lodgment, Ex. 2 ¶ 83), and this Court recommends that it also not be excluded.

*13 5. Paragraph 53. Whether Claims 22, 29 and 30 of the '162 patent are rendered obvious by Deutsch (I or II), Litman I, Giegel, Neuhausser and Alfa Laval AB patents and patent applications and/or the remaining references listed in the attached Exhibit List, whether alone or in combination.

As discussed above, the recently disclosed prior art references of Litman I, Neuhausser and Alfa Laval AB patents should be excluded. In addition, as explained above, although the Giegel patent is not referenced as rendering obvious the patents-in-suit in the prior pretrial order, Syntron's previous Memorandum of Contentions of Fact and Law or the expert report, it was cited as prior art that might be used to invalidate the patents-in-issue. (Abbott's Second Lodgment, Ex. 1 at 5.) Therefore, the Giegel patent should not be excluded. Lastly, it appears that Deutsch (I or II) was mentioned in the expert report, (Abbott's Second Lodgment, Ex. 2 ¶ 83), and this Court recommends that it not be excluded.

6. Paragraph 55. Whether, to one of ordinary skill in the art, Claims 22, 29 and 30 of the '162 patent were rendered obvious by Litman I alone, or Litman I in view of Neuhausser and/or Alfa Laval AB patents and patent applications.

This paragraph contains the new prior art references which should have been disclosed during discovery. Therefore, in accordance with the reasoning set forth in Section A above, this Court recommends that the issue set forth in this paragraph be excluded.

7. Paragraph 56. Whether, to one of ordinary skill in the art, Claims 22, 29 and 30 of the '162 patent were rendered obvious by Giegel alone, or Giegel in view

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

Not Reported in F.Supp.2d, 2001 WL 34082555 (S.D.Cal.)

(Cite as: Not Reported in F.Supp.2d)

of Neuhausser and/or Alfa Laval AB patents and patent applications.

As discussed above, the recently disclosed prior art references of Neuhausser and Alfa Laval AB patents should be excluded. The Giegel prior art reference as stated in paragraph 56 is not in the previous pretrial order, Syntron's prior Memorandum of Contentions of Fact and Law, or in the expert report. However, Abbott had notice, during discovery, that it may be used to invalidate the patents-in-issue. (Abbott's Second Lodgment, Ex. 1 at 5.) Therefore, the Giegel patent should not be excluded.

### C. Inequitable Conduct Defense (paragraphs 60, 62-65, & 66 of the Pretrial Order)

#### 1. Paragraphs 60, 62 & 66

Abbott argues that Syntron raises for the first time certain inequitable conduct defenses as set forth in paragraphs 60, 62 and 66 of the pretrial order. It argues that the inequitable conduct issue was never raised in pleadings or discovery. Furthermore, it claims that the inequitable conduct claim was not based on Abbott's conduct but that of the " applicants." Abbott states that although it assisted in the prosecution of the patents, the inventors took primary responsibility in the prosecution. Lastly, Abbott contends that it will be prejudiced because this issue was not raised in expert reports.

In opposition, Syntron contends that it has been raising the " inequitable conduct" defense based on Abbott's conduct since the beginning of the lawsuit. Syntron further argues that its claim against the " applicant" is against Abbott because Abbott became the exclusive licensee of the patents in 1988 which gave Abbott significant control over prosecution of the applications. (Syntron's Lodgment, Ex. 12.) In further support, Syntron states that Abbott's in-house counsel, Gregory Steele was added as attorney of record in the application for the '162 patent on January 3, 1995. (Syntron's Lodgment, Ex. 13.) Syntron also argues that expert reports are not needed to address this issue.

**\*14** Syntron raised the " inequitable conduct" issue when it filed its answer with counterclaims. Syntron's Sixth Affirmative Defense states " Abbott is estopped from asserting that Syntron has infringed the 484 patent or the 162 patent by reason of actions taken and statements made by the applicant to the Patent Office during prosecution of the application which

led to the 484 and 162 patents." This statement is broad as it relates to Abbott's conduct. In the Seventh Affirmative Defense, Syntron alleges inequitable conduct by the " applicant." Therefore, inequitable conduct, in paragraphs 60, 62, and 66 with regards to both patents-in-issue, was alleged early in the litigation.

Inequitable conduct was also raised in interrogatories. In the revised response interrogatory no. 13, when Abbott asked Syntron to state the basis for its allegation that the patents-in-suit are " unenforceable or barred for any reason relating to the conduct of the inventors or the licensee." (Abbott's Second Lodgment, Ex. 1 at 13-15.) Syntron responded by reciting the Seventh Affirmative Defense which alleges inequitable conduct by the " applicant." (*Id.*) The response also included inequitable conduct based on concealing correct inventorship of the 484 patent from the patent office. (*Id.* at 14.)

On December 29, 1988, Abbott became the exclusive licensee to patents '220 and '459 that eventually issued as the '484 and '162 patents. (Syntron's Lodgment, Ex. 12.) The '484 patent was issued on December 17, 1991 and the '162 patent was issued on August 5, 1997. As part of the license agreement, Abbott had the duty to prosecute any application related to the 220 and 459 patents which would include the 484 and 162 patents. (*Id.* at 73.) As Syntron points out, Gregory Steele was named attorney of record for the 162 patent application. (*Id.,* Ex. 13.) Abbott states that it " assisted" in the prosecution of the patents. However, it appears that Abbott was significantly more involved in the prosecution of the patents-in-issue than mere " assistance."

The inequitable conduct issue was brought up in the pleadings and in interrogatories, contrary to what Abbott claims. The Court also notes that the inequitable conduct issue was raised in the prior pretrial order filed August 21, 2000. (Abbott's Lodgments, Ex. J at 74.) Abbott had notice of these issues since last year and at no time contacted the Court to re-open discovery on these issues. By virtue of the answer with affirmative defenses and reference to same in interrogatory answers, Abbott had notice and full opportunity to explore the issue during the scheduled discovery time. This Court finds that the inequitable conduct issue was raised in discovery and recommends that the issue not be excluded.

During oral argument, both counsel stated that no

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 12

Not Reported in F.Supp.2d, 2001 WL 34082555 (S.D.Cal.)

**(Cite as: Not Reported in F.Supp.2d)**

expert discovery was conducted on this issue. There is a dispute whether expert testimony is needed on this issue. At oral argument, Syntron stated that expert testimony would be helpful, but it would not be required, while Abbott asserted that expert testimony is needed. At no time did Syntron's expert, in reports or during deposition testimony, raise the issue.[FN8] The trial court will determine whether expert testimony should be presented on this issue. If the Court finds that expert testimony is required on this issue, this Court recommends that the issue be excluded based on prejudice against Abbott, or in the alternative, that the trial be continued and expert discovery re-opened.

> FN8. Dale H. Hoscheit, Esq. issued an " expert report" on March 22, 2000 and raised the inequitable conduct issue regarding prosecution of the patents-in-issue. (Abbott's Second Lodgment, Ex. 3.) There are significant issues whether attorneys may serve as experts on these issues.

### 2. Paragraphs 63-65

**\*15** Abbott also argues that paragraph 63 is based upon the new prior art and should be excluded. In addition, Abbott asserts that since expert reports do not address the issues in paragraphs 63-65, it will be prejudiced. Syntron argues that expert reports are not needed to address this issue.

Paragraph 63 contains an inequitable conduct issue as it relates to the newly disclosed prior art. As discussed above, these new references should have been disclosed in discovery and this Court recommends that the issue set forth in paragraph 63 be excluded. However, since inequitable conduct was raised in pleadings and discovery, this Court recommends that the issues set forth in paragraphs 64 and 65 not be excluded. As noted above, both parties disagree whether expert reports are needed on these issues. Based upon the submitted documents, it appears that Syntron's expert, Dr. Gary S. David, did not raise these issues in his report or during his deposition testimony. The trial court will determine whether expert testimony should be presented on this issue. If the Court determines that expert reports will be required on paragraphs 64-65, this Court recommends that the paragraphs be excluded based on prejudice against Abbott, or in the alternative, that the trial be continued and expert discovery re-opened.

### D. Inventorship (paragraph 69 of the Pretrial Order)

Abbott contends that Syntron failed to properly raise the inventorship issue as an affirmative defense, failed to disclose any evidence of alleged incorrect inventorship during discovery and failed to identify the allegedly correct inventors or facts supporting that contention. Abbott also argues that it will be prejudiced since there was no expert testimony about inventorship. In opposition, Syntron argues that it has continually preserved the inventorship issue in its pleadings and in discovery. Moreover, Syntron argues that Abbott has known about the inventorship issue for at least six years when it was brought up as a defense in another lawsuit. Also, Syntron learned about the inventorship issue through Abbott when Abbott produced a memorandum by Dr. Brian Lee about why he should have been named as a co-inventor during deposition in another lawsuit. (Syntron's Lodgment, Ex. 5.)

Under the Federal Rules, pleadings " shall contain a short and plain statement of the claim showing that the pleader is entitled to relief ..." Fed. Rule Civ. P. 8(a). The Rules do not require a " claimant to set out in detail the facts upon which he bases his claim ... [this] is made possible by the liberal opportunity for discovery and the other pretrial procedures established by the Rules to disclose more precisely the basis of both claim and defense and to define more narrowly the disputed facts and issues." Vivid Techs., Inc. v. American Science & Eng'g, Inc., 200 F.3d 795, 802 (Fed.Cir.1999) (quoting Conley v. Gibson, 355 U.S. 41, 47-48 (1957)). " The Federal Rules reject the approach that pleading is a game of skill in which one misstep by counsel may be decisive to the outcome and accept the principle that the purpose of pleading is to facilitate a proper decision on the merits." Id.

**\*16** Syntron filed an answer with counterclaim seeking declaratory judgment that the patents-in-suit are invalid and unenforceable. (Answer with Counterclaims at 7.) Although inventorship was not specifically pled, the counterclaim of invalidity encompasses the claim of inventorship. Syntron's counterclaim satisfied the " short and plain statement of the claim" of the Federal Rules.

In written interrogatories, the issue of inventorship of the '484 patent was explicitly brought up. (Abbott's Lodgments, Ex. 1 at 12-15). It also appears inventorship was brought up in Dr. Swanson's

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 13

Not Reported in F.Supp.2d, 2001 WL 34082555 (S.D.Cal.)

**(Cite as: Not Reported in F.Supp.2d)**

depositions and in the memorandum by Dr. Brian Lee. (Syntron Lodgments, Ex. 5 & 6.) Both parties stated that expert testimony was not conducted on this issue.

Although Abbott argues that expert testimony is required, it has presented no case law and this Court has not found any case law to support that proposition. In proving inventorship by clear and convincing evidence, the court must look to the evidence as a whole which includes the testimony of the alleged inventor and corroborative evidence that he presents. *See Marketel Int'l, Inc. v. Priceline.com,* 139 F.Supp.2d 1210, 1213 (N.D.Cal.2001); *Vivus, Inc. v. Kercso,* 977 F.Supp.1004, 1011 (N.D.Cal.1997).

The Court finds that the inventorship issue was disclosed during discovery and recommends that the issue not be excluded. Both parties dispute whether expert testimony is needed on inventorship. Syntron argues that it is not needed while Abbott contends that expert testimony is needed. It appears that Syntron's expert, Dr. Gary S. David, did not raise the issue in his report or during his deposition testimony. The trial court will determine whether expert testimony should be presented on this issue. If the Court finds that expert testimony is required on this issue, this Court recommends that the issue be excluded based upon prejudice against Abbott, or in the alternative, that the trial be continued and expert discovery re-opened.

### III. *Conclusion*

Based on the reasons set forth above, this Court recommends that Abbott's Motion to Exclude Evidence be GRANTED in part and DENIED in part. This Court makes the following recommendations:
1. Paragraphs 36-44. The recently disclosed nine prior art references in these paragraphs should be excluded.
2. Paragraph 45. The recently revealed prior art references of the Weiss, Guire, Renn, Litman I, Neuhausser, Alfa Laval AB patents and the Takeda article should be excluded. The Deutsch I, Grubb, Tom, Bauman, Giegel, Deutsch II, Brown and Kelton patents and the Glad article should not be excluded.
3. Paragraph 46. The recently revealed prior art references of the Weiss, Guire, Renn, Litman I, Neuhausser, Alfa Laval AB patents and the Takeda article should be excluded. The Deutsch I, Grubb, Tom, Bauman, Giegel, Deutsch II, Brown and Kelton patents and the Glad article should not be excluded.

4. Paragraphs 47, 48, 50, 51, 52 and 54. Except for the new prior art references of the Litman I, Neuhausser, Alfa Laval AB patents, which should be excluded, all the applications in these paragraphs should not be excluded.
**\*17** 5. Paragraph 49. The Deutsch (I or II), Bauman, Grubb, Glad, Giegel, and Tom patents should not be excluded and the Litman I, Neuhausser and Alfa Laval AB patents should be excluded.
6. Paragraph 53. The Deutsch (I or II) and Giegel patents should not be excluded and the Litman I, Neuhausser and Alfa Laval AB patents should be excluded.
7. Paragraph 55. The applications in this paragraph should be excluded.
8. Paragraph 56. The Giegel patent should not be excluded and the Neuhausser and Alfa Laval AB patents should be excluded.
9. Paragraphs 60, 62, and 66. The issue of inequitable conduct in these paragraphs should not be excluded.
10. Paragraph 63. The issue of inequitable conduct as it relates to the newly disclosed prior art references in this paragraph should be excluded.
11. Paragraphs 64-65. The issue of inequitable conduct should not be excluded in these paragraphs.
12. Paragraph 69. The issue of inventorship in this paragraph should not be excluded.

This report and recommendation is submitted to the United States District Judge assigned to this case pursuant to 28 U.S.C. § 636(b)(1). Any party may file written objections with the Court and serve a copy on all parties on or before August 10, 2001. The document should be captioned "Objections to Report and Recommendation." Any reply to the objections shall be filed and served on or before August 17, 2001.

IT IS SO ORDERED.

S.D.Cal.,2001.
Abbott Laboratories v. Syntron Bioresearch Inc.
Not Reported in F.Supp.2d, 2001 WL 34082555 (S.D.Cal.)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.