# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

----------------------------------------x
BOEHRINGER INGELHEIM INTERNATIONAL
GMBH and BOEHRINGER INGELHEIM
PHARMACEUTICALS, INC.,

                Plaintiffs,

       vs.             CA No. 05-700-(KAJ)

BARR LABORATORIES, INC.,

                Defendant.
----------------------------------------x
BOEHRINGER INGELHEIM INTERNATIONAL
GMBH and BOEHRINGER INGELHEIM
PHARMACEUTICALS, INC.,

                Plaintiffs,

       vs.             CA No. 05-854-(KAJ)

MYLAN PHARMACEUTICALS, INC.,

                Defendant.
----------------------------------------x
                January 10, 2007
                9:28 a.m.


        Videotaped Deposition of HEINZ-GERD
KLAS, held at the offices of LATHAM &
WATKINS, LLP, 885 Third Avenue, New York,
New York, before Jennifer Ocampo-Guzman,
a Notary Public of the State of New York.



**David Feldman**
W o r l d w i d e

From File to Trial.

805 Third Avenue, 8th Floor
New York, NY 10022
(800) 642-1099

600 Anton Boulevard, 11th Floor
Costa Mesa, CA 92626
(866) DFW-1380

194

Klas

1
2      Is that -- actually, let me ask you
3  a different question.
4      Could you please direct me where in
5  this file history, Exhibit 252, the
6  application that Boehringer submitted to the
7  patent office?
8      **A.  Without checking it in detail, I**
9  **think it's BARR number 27915.**
10     Q.  And who prepared this document?
11     **A.  This document was prepared by**
12 **Dr. Fleischer.**
13     Q.  Did anyone else contribute text to
14 this document?
15     **A.  To the final version?**
16     Q.  Yes.
17     **A.  I don't know, but to make it clear,**
18 **information which came from inventors is**
19 **included in -- in this text, otherwise, there**
20 **would be no invention, but --**
21     Q.  Is there any text in this document
22 that Dr. Fleischer was not aware of when he
23 filed this application?
24     MR. SCHULER:  Objection.  Goes
25     beyond the scope, lack of foundation.

195

Klas

1
2      You can answer it if you have
3  personal knowledge as to what he was
4  aware of.
5      **A.  I don't know whether there is -- my**
6  **understanding is this was written by**
7  **Dr. Fleischer, but whether another guy**
8  **contributes to this text, I don't know.**
9      Q.  You understand that you've been
10 designated to testify on behalf of Boehringer
11 regarding Topic 21, the drafting,
12 preparation, filing and prosecution of
13 European patent application 85116016.8;
14 right?
15     **A.  Yes.**
16     Q.  Can you tell me whether anyone
17 other than Dr. Fleischer drafted or prepared
18 this application, the application that begins
19 on page BARR 27915?
20     **A.  I don't think so, because it's**
21 **Dr. Fleischer's case.**
22     Q.  Okay.  If you look at the second --
23 page 2 of this application, which is BARR
24 27916 --
25     **A.  Yes.**

196

Klas

1
2      Q.  -- and you look at the definition
3  of R1, you see that it includes text that is
4  not included in Exhibits 4 and 5, the two
5  German applications; correct?
6      MR. SCHULER:  Objection, asked and
7      answered.
8      **A.  Sorry, again.**
9      Q.  You see the definition of R1 on page
10 BARR 27916 includes text that was not
11 included in Exhibits 4 and 5, the two German
12 applications that we discussed earlier;
13 right?
14     **A.  Yes.**
15     Q.  Who added that text?
16     **A.  It was added by Dr. Fleischer.**
17     Q.  Why did he add that text?
18     **A.  Sorry?**
19     Q.  Why did he add that text?
20     MR. SCHULER:  I'll object to the
21     extent that it goes beyond the scope.
22     **A.  What I know is that Dr. Schneider,**
23 **the chemist, continued to synthesize the**
24 **examples, and he submitted those examples to**
25 **Dr. Fleischer.**

197

Klas

1
2      Q.  Did Dr. Schneider synthesize
3  tetrahydrobenzthiazoles that had halogen
4  substituted phenyl rings in the R1 position?
5      **A.  Yes.**
6      Q.  Did he synthesize those after the
7  second German application, Exhibit 5, was
8  filed with the German patent office?
9      MR. SCHULER:  Objection, goes
10     beyond the scope.
11     But you can answer if you have
12     personal knowledge.
13     **A.  I don't know whether it was**
14 **synthesized before or later.**
15     Q.  And did Dr. Fleischer add this text
16 into this application in order to encompass
17 those compounds?
18     MR. SCHULER:  Objection, goes
19     beyond the scope.  Also to the extent
20     that it calls for a legal conclusion.
21     **A.  Sorry.  Again, please.**
22     Q.  Did Dr. Fleischer add this text to
23 the definition of R1 in order to encompass the
24 compounds that Dr. Schneider had been
25 synthesizing?

**50  (Pages 194 to 197)**

198

Klas

1
2    MR. SCHULER: Object, goes beyond
3  the scope. Also to the extent that it
4  calls for speculation, lack of
5  foundation.
6    **A. I think Dr. Fleischer incorporate**
7  **the text to bring it in line with the general**
8  **disclosure of the original application, the**
9  **first application.**
10   Q. You're referring to the fact that,
11 as you testified earlier, you believe that
12 the first -- the first two German
13 applications encompass these compounds; is
14 that what you are referring to?
15   A. Yes, yes.
16   Q. And given that you believe that
17 they encompass these compounds with halogen
18 substituted phenyl rings at the R1 position,
19 why did Dr. Fleischer modify the definition
20 of R1 here?
21   MR. SCHULER: Same objections, goes
22 beyond the scope, to the extent it calls
23 for speculation, and again asked and
24 answered.
25   **A. As I mentioned, it bring it in line**

199

Klas

1
2  **for the original application.**
3    Q. What do you mean "bring it in
4  line"?
5    MR. SCHULER: Same objections.
6    **A. To what we said this morning or**
7  **what's my position, that also it's a general**
8  **teaching of the first application includes**
9  **for R1 halogenated phenyl rings.**
10   Q. So let me see if I understand this
11 correctly.
12     As you testified this morning, you
13 believe that other parts of the application,
14 Exhibits 4 and 5, teach halogenated phenyl
15 rings at the R1 position?
16   A. Yes.
17   Q. But you acknowledge that the
18 general description of Formula I in Exhibits
19 4 and 5 did not teach halogenated phenyl
20 rings?
21   MR. SCHULER: Objection to the
22 characterization. Also, asked and
23 answered.
24   **A. I have to apologize, but please**
25 **repeat it.**

200

Klas

1
2    Q. Okay. I guess I'm still not clear
3  on your answer about why Dr. Fleischer added
4  this text to R1 on page BARR 27916 when you
5  stated earlier that you believed that it was
6  already disclosed in the -- in other parts of
7  the German applications and I assume other
8  parts of this application as well.
9      MR. SCHULER: Objection. That's
10 not a question.
11   A. Yeah.
12     MS. BERNIKER: Do we need to change
13 the tape? Let's change the tape.
14     THE VIDEOGRAPHER: The time is
15 2:38. We're going off the record, and
16 this marks the ending of tape number 2.
17     (A brief recess was taken.)
18     THE VIDEOGRAPHER: The time is
19 2:40. We're back on the record, and
20 this marks the beginning of tape
21 number 3.
22 BY MS. BERNIKER:
23   Q. Dr. Klas, the two places in the
24 German application, Exhibit 4 that you
25 pointed to earlier where you indicated that

201

Klas

1
2  you believed the halogenated phenyl rings
3  were disclosed, does that text also appear in
4  the application that was submitted to the
5  European Patent Office that begins on page
6  BARR 27915?
7    A. Yes, it is.
8    Q. Okay. Given that that text is also
9  in this application that begins on BARR
10 27915, please explain to me why Dr. Fleischer
11 modified the definition of R1 on page 27916.
12     MR. SCHULER: Let me object. First
13 of all, it goes beyond the scope.
14 Second, it calls for speculation.
15 Third, it's been asked and answered, and
16 fourth, it's just argumentative. He's
17 already answered it twice, and you can't
18 just say the same question over and over
19 again. He's already answered it.
20   Q. I'm just trying to understand your
21 testimony, Dr. Klas.
22     MR. SCHULER: He's explained it
23 twice.
24   **A. Yes, he amended the claim to bring**
25 **it in line with the general teaching of the**

51  (Pages 198 to 201)

202

1    Klas
2  disclosure.
3        Q.   Was it not in line with the general
4  teaching of the disclosure before he amended
5  it?
6        MR. SCHULER:  I'll object to the
7    extent it calls for a legal conclusion
8    and goes beyond the scope.
9        A.   When it would be have in line, then
10  there wouldn't be a need to amend it.
11        Q.   So you don't believe it was in line
12  before --
13        MR. SCHULER:  Same objections.  It
14    goes beyond the scope.
15        But you can answer with your
16    personal knowledge.
17        A.   Yeah, the general teaching
18  reflected things which were not mentioned in
19  the claims.
20        Q.   The general teaching in which
21  document?
22        A.   In the priority document.
23        Q.   What did it reflect that was not
24  mentioned in the claims?
25        A.   The paragraph or the lines which

203

1    Klas
2  were added in the European specification
3  compared with the priority document.
4        Q.   Was -- was that reflected --
5  that -- those lines, is it your testimony
6  that those lines were reflected in the
7  general teaching of the priority
8  applications --
9        MR. SCHULER:  Objection.  This has
10    been asked and answered about eight
11    times.
12        Q.   -- or not?
13        MR. SCHULER:  This is just
14    badgering the witness.
15        If you have anything to add, you
16    can.  It goes beyond the scope.
17        A.   I mentioned it before.
18        Q.   I'm just trying to make sure we
19  understand each other.
20        MR. SCHULER:  No, you're not trying
21    to make sure of anything.  He said it
22    like eight times.
23        MS. BERNIKER:  I don't think you
24    know what I'm trying to do or what I'm
25    not trying to do, Ken.

204

1    Klas
2        MR. SCHULER:  I'm just trying to
3    understand.  Is it your position -- is
4    it your belief that he already said X
5    five or six times.  You're badgering the
6    witness.
7        MS. BERNIKER:  I'm not badgering
8    the witness.
9        MR. SCHULER:  If you have anything
10    further to add, you can add it.
11        A.   As mentioned before, the general
12  teaching of the priority application included
13  also sub -- halogen substituted phenyl rings.
14        Q.   Okay.  Who at Boehringer saw the
15  application that begins on BARR 27915 that
16  was submitted to the European Patent Office?
17        A.   Who submitted it?
18        MR. SCHULER:  Objection.  Goes
19    beyond the scope.
20        You can answer if you know.
21        A.   At which time?
22        Q.   Before 1990.
23        MR. SCHULER:  Objection.  Goes
24    beyond the scope.
25        Again, if you have any personal

205

1    Klas
2  knowledge --
3        MS. BERNIKER:  There is nothing
4    beyond the scope on that, Ken.  Read
5    Topic Number 17.  Please only make
6    proper beyond the scope objections.
7    Thank you.
8        MR. SCHULER:  Hold on.  Give me a
9    second.
10        Correspondence to or from the
11    office.
12        MS. BERNIKER:  This was to.  He
13    just said it was filed with the European
14    Patent Office.
15        A.   Dr. Fleischer saw it.  Maybe
16  Dr. Laudien when the European Patent Office
17  sent the so-called Druckexemplar.
18        Q.   Why would Dr. Laudien see it then?
19        A.   Because we have a central inbox for
20  all letters coming from outside.  This was in
21  Ingelheim and from this central inbox at that
22  time, all correspondence went over
23  Dr. Laudien's desk and he signed it or may
24  sign it, but I don't know whether he took
25  note of this application.

52  (Pages 202 to 205)



222

Klas

1
2  copies of correspondence to or from the
3  United States patent office in connection
4  with the application that led to this patent,
5  Exhibit 2?
6      A.  I think, again, Stempel, inbox in
7  Ingelheim, Laudien, Fleischer.
8      Q.  Does that include all
9  correspondence that came from the patent
10 office or was sent to the patent office in
11 connection with this, the application that
12 led to this patent?
13     MR. SCHULER:  I object.  Asked and
14 answered.
15     A.  I didn't see it as my task to check
16 whether all correspondence went this way, but
17 as a routine, I think it was.
18     Q.  Okay.  And then with respect to
19 Exhibit 3, the '812 patent, who at Boehringer
20 received originals or copies of
21 correspondence to or from the United States
22 Patent and Trademark Office concerning the
23 application that issued -- that led to the
24 '812 patent, Exhibit 3?
25     A.  I think Stempel and the same line

223

Klas

1
2  as mentioned before, inbox Ingelheim, Laudien
3  and Fleischer.
4      Q.  Who prepared filings to the United
5  States Patent and Trademark Office, who
6  prepared filings on behalf of Boehringer that
7  were submitted to the United States Patent
8  and Trademark Office in connection with the
9  prosecution of the applications that led to
10 Exhibits 1, 2 and 3, the three patents that
11 you have before you?
12     MR. SCHULER:  Let me object.  That
13 goes beyond the scope.  There's a
14 different designee for that topic.
15     But if you have any personal
16 knowledge, you can answer.
17     A.  I assumed it was a patent attorney
18 in Ridgefield.
19     Q.  And who reviewed filings that were
20 going to be submitted to the United States
21 Patent and Trademark Office in connection
22 with these applications before they were
23 submitted?
24     MR. SCHULER:  Again, it goes beyond
25 the scope.

224

Klas

1
2      If you have personal knowledge as
3  opposed to assumptions or speculations,
4  you may answer.
5      A.  I have no personal knowledge.
6      Q.  Was it Dr. Fleischer's
7  responsibility to review documents that were
8  going to be submitted to United States Patent
9  and Trademark Office related to these
10 applications before they were submitted?
11     MR. SCHULER:  Objection.  Goes
12 beyond the scope of any topic.
13     But if you have personal knowledge,
14 you can answer.
15     A.  No, I have not.
16     Q.  Who at Boehringer saw the foreign
17 filing text for Case 5/920 plus Case 1/737?
18     MR. SCHULER:  Objection.  Goes
19 beyond the scope.
20     But if you have personal knowledge,
21 you can answer.
22     A.  It was Dr. Fleischer and the
23 inventors.
24     Q.  The inventors were provided with a
25 copy of the foreign filing text?

225

Klas

1
2      A.  At least the main inventors or
3  chemists.
4      Q.  In this case, are you referring to
5  Dr. Schneider and Dr. Hurnaus?
6      A.  I refer to Dr. Schneider.  I didn't
7  read the deposition of Dr. Hurnaus, and it
8  was a routine that the main inventors got a
9  copy before filing because of this Germany,
10 we have a so-called --
11     (Witness speaks German.)
12     THE OFFICIAL INTERPRETER:  Employee
13 inventor law.
14     A.  -- employee inventor law.
15     And the inventors has to offer to
16 the company their invention in writing, and
17 the company has to accept the rights within a
18 certain period of month also in writing and
19 the base -- the base -- and, you know,
20 inventors in Germany, they get remuneration
21 and the basic for this remuneration is not
22 the disclosure in the patent, the basic is
23 the disclosure in the information submitted
24 from the inventors to the company.  And the
25 company has to make sure that all rights

57  (Pages 222 to 225)

282

1          Klas
2          MR. SCHULER: Which one is that?
3          MS. BERNIKER: 98.
4          MR. SCHULER: I mean --
5          MS. BERNIKER: Oh, it's a -- it's a
6   second preliminary amendment and
7   information disclosure statement.
8          Q.  Do you have it in front of you, 98?
9          I can give you another copy if you
10  --
11         A.  I have it.
12         Q.  You have it.
13         Prior to today, have you seen this
14  document?
15         A.  I can't remember that I have seen
16  this document.
17         Q.  If you turn to page 3 -- or
18  actually let's just talk about what it is for
19  a moment.  This is a second preliminary
20  amendment and information disclosure
21  statement that was filed by Alan Stempel on
22  behalf of Boehringer.
23         Do you see that?
24         A.  I see a typing, Alan R. Stempel.
25         Q.  And this was filed in connection

283

1          Klas
2   with the application serial number 256651
3   which I will represent to you is the
4   application number for the patent that
5   ultimately issued as the '812 patent, which
6   is Exhibit 3.  And if you take a look at page
7   3 of this document --
8          A.  Page 3, yes.
9          Q.  Under the heading C, it says
10  "possibly interfering application of
11  another."
12         Do you see that?
13         A.  Yes.
14         Q.  And it says that "Applicants
15  particularly wish to bring to the attention
16  of the Patent and Trademark Office the
17  existence of U.S. Patent" -- or "the
18  existence U.S. Patent Application Serial No.
19  747,748 filed 24 June, 1985 and it's foreign
20  equivalent, European Patent Application No.
21  207,696 published 1 July, 1987."
22         Do you see that?
23         A.  Yes, I see it.
24         Q.  Do you recognize those as the Eli
25  Lilly applications that we've discussed

284

1          Klas
2   earlier as Exhibits 18 and 22?
3          A.  Yes.
4          Q.  And if you skip down now, or if you
5   want to read to yourself the following two
6   paragraphs, and then I will ask you about the
7   next one.
8          A.  Yes, I've read it.
9          Q.  If you look at the paragraph that
10  begins "U.S. Application Serial No. 747,748"?
11         A.  Well, that paragraph I didn't read
12  so --
13         Q.  No, that's fine.  I think I told
14  you to stop there.  So, that's fine.
15         That says U.S. Application Serial
16  No. 747,748 contains the same disclosure as
17  European '696.  It is not available as prior
18  art because its filing date is later than the
19  effective filing date of the above-captioned
20  application."
21         Then it says "The effective filing
22  date of the above-captioned application is 22
23  December, 1984, the date on which the German
24  application for which Convention priority is
25  claimed was filed."

285

1          Klas
2          Do you see that?
3          A.  Uh-huh.
4          Q.  And December 22, 1984 is the date
5   that the first German application was filed
6   with the German patent office, Exhibit 4?
7          A.  Yes.
8          Q.  Right?
9          A.  Yes.
10         Q.  And is the statement in this
11  document correct that the effective filing
12  date of this application is 22 December,
13  1984?
14         MR. SCHULER: Let me object.  It
15  goes beyond the scope.  Also, lack of
16  foundation.  He's testified that he
17  hasn't seen this document before.  He
18  also testified he hasn't seen the Lilly
19  documents until the context of this
20  litigation.  I also object to the extent
21  it calls for a legal conclusion or any
22  litigation work product with regard to
23  this litigation.
24         Do you understand my instruction?
25         But if you have personal, factual

72  (Pages 282 to 285)

# EXHIBIT F

- 1 -

19J S008-647-T

DR. KARL THOMAE GMBH
D-7950 Biberach 1

Case 5/920 +
Case 1/737
Dr.Fl./Kp.
Foreign Filing Text

## Tetrahydro-benzthiazoles, the preparation thereof and their use as intermediate products or as pharmaceuticals

This invention relates to new tetrahydro-
5   benzthiazoles of general formula

$$R_3,R_4-N-\text{(tetrahydro-benzthiazole ring)}-N-R_1,R_2 \qquad (I)$$

the enantiomers and acid addition salts thereof,
particularly the physiologically acceptable acid
addition salts thereof with inorganic or organic
10  acids, and processes for preparing them.

If in general formula I one of the groups
$R_1$ or $R_3$ or both groups $R_1$ and $R_3$ represent
an acyl group, these compounds of general formula
I are valuable intermediate products for preparing
15  the other compounds of general formula I which
have valuable pharmacological properties, particularly
an effect on the central nervous system and/or
the circulation.

In general formula I above
20  $R_1$ represents a hydrogen atom, an alkyl group
having 1 to 6 carbon atoms, an alkenyl or alkynyl


EXHIBIT
52

BOE0014702

- 2 -

group each having 3 to 6 carbon atoms, an alkanoyl
group having 1 to 6 carbon atoms, a phenyl alkyl
or phenyl alkanoyl group having 1 to 3 carbon
atoms in the alkyl part, whilst the above mentioned
5   phenyl nuclei may be substituted by 1 or 2 halogen
atoms,

$R_2$ represents a hydrogen atom or an alkyl
group with 1 to 4 carbon atoms,

$R_3$ represents a hydrogen atom, an alkyl group
10  with 1 to 7 carbon atoms, a cycloalkyl group having
3 to 7 carbon atoms, an alkenyl or alkynyl group
having 3 to 6 carbon atoms, an alkanoyl group having
1 to 7 carbon atoms, a phenyl alkyl or phenyl alkanoyl
group having 1 to 3 carbon atoms in the alkyl part,
15  whilst the phenyl nucleus may be substituted by
fluorine, chlorine or bromine atoms,

$R_4$ represents a hydrogen atom, an alkyl
group with 1 to 4 carbon atoms, an alkenyl or alkynyl
group having 3 to 6 carbon atoms or
20   $R_3$ and $R_4$ together with the nitrogen atom
between them represent a pyrrolidino, piperidino,
hexamethyleneimino or morpholino group.

Preferred compounds of general formula I
above are those wherein the group

25   

is in the 5 or 6-position.

As examples of the definitions of the groups

30

- 3 -

the 

group represents an amino, methylamino, ethylamino,
5  n-propylamino, isopropylamino, n-butylamino, isobutylamino,
tert.butylamino, n-pentylamino, isoamylamino, n-
hexylamino, dimethylamino, diethylamino, di-n-propylamino,
di-n-butylamino, methyl-ethylamino, methyl-n-propylamino,
methyl-isopropylamino, ethyl-isopropylamino, allylamino,
10  buten-2-ylamino, hexen-2-ylamino, N-methyl-allylamino,
N-ethyl-allylamino, N-n-propyl-allylamino, N-n-butyl-
allylamino, propargylamino, N-methyl-propargylamino,
N-n-propyl-propargylamino, formylamino, acetylamino,
propionylamino, butanoylamino, hexanoylamino, N-
15  methyl-acetylamino, N-allyl-acetylamino, N-propargyl-
acetylamino, benzylamino, N-methyl-benzylamino,
2-chloro-benzylamino, 4-chloro-benzylamino, 4-fluoro-
benzylamino, 3,4-dichloro-benzylamino, 1-phenylethylamino,
2-phenylethylamino, 3-phenyl-n-propylamino, benzoylamino
20  phenacetylamino or 2-phenylpropionylamino group and

the group 

may represent an amino, methylamino, ethylamino,
25  n-propylamino, isopropylamino, n-butylamino, isobutylamino,
tert.butylamino, n-pentylamino, isoamylamino, n-
hexylamino, n-heptylamino, dimethylamino, diethylamino,
di-n-propylamino, Di-n-butylamino, methyl-ethylamino,
methyl-n-propylamino, methyl-isopropylamino, ethyl-
30  isopropylamino, allylamino, buten-2-ylamino, hexen-
2-ylamino, diallylamino, N-methyl-allylamino, N-
ethyl-allylamino, N-n-propyl-allylamino, N-n-butyl-
allylamino, propargylamino, butin-2-ylamino, hexin-
2-ylamino, dipropargylamino, N-methyl-propargylamino,

BOE00147023

- 4 -

N-ethyl-propargylamino, cyclopropylamino, cyclobutylamino, cyclopentylamino, cyclohexylamino, cycloheptylamino, N-methyl cyclohexylamino, N-ethyl-cyclohexylamino, formylamino, acetylamino, propionylamino, butanoylamino,
5    pentanoylamino, hexanoylamino, heptanoylamino, N-methyl-acetylamino, N-ethyl-acetylamino, N-n-propyl-acetylamino, N-allyl-acetylamino, benzoylamino, fluorobenzoylamino, chlorobenzoylamino, bromobenzoylamino, phenylacetamino, 2-phenylpropionylamino, N-methyl-
10   benzoylamino, N-ethyl-chlorobenzoylamino, Dichlorobenzoyl-amino, N-cyclohexyl-acetylamino, benzylamino, chloro-benzylamino, bromobenzylamino, l-phenylethylamino, 2-phenylethylamino, 2-phenyl-n-propylamino, 3-phenyl-n-propylamino, N-methyl-benzylamino, N-ethyl-benzylamino,
15   N-ethyl-chlorobenzylamino, N-ethyl-2-phenylethylamino, N-acetyl-benzylamino, N-acetyl-chlorobenzylamino, N-allyl-benzylamino, N-allyl-chlorobenzylamino, pyrrolidino, piperidino, hexamethyleneimino or morpholino group.

20       Particularly preferred compounds of general formula I are, however, the compounds of general formula Ia



(Ia)

    wherein
25       $R_1$ represents a hydrogen atom, an alkyl group having 1 to 3 carbon atoms, an allyl, benzyl, 2-chloro-benzyl, 4-chloro-benzyl, 3,4-dichloro-benzyl or phenylethyl group,
        $R_2$ represents a hydrogen atom, a methyl or

- 5 -

ethyl group,

$R_3$ represents a hydrogen atom, an alkyl group with 1 to 6 carbon atoms, an allyl, propargyl, benzyl, chlorobenzyl, phenylethyl, cyclopentyl or cyclohexyl group,

$R_4$ represents a hydrogen atom, an alkyl group having 1 to 3 carbon atoms or an allyl group or

$R_3$ and $R_4$ together with the nitrogen atom between them represent a pyrrolidino, piperidino, hexamethyleneimino or morpholino group, but particularly the compounds wherein the group



is in the 6-position, and the acid addition salts thereof, particularly the physiologically acceptable acid addition salts.

According to the invention the new compounds are obtained by the following methods:

20  a)    Reacting a cyclohexanone of general formula

(II)

wherein

$R_3$ and $R_4$ are as hereinbefore defined and

X represents a nucleophilically exchangeable group such as a halogen atom, e.g. a chlorine or bromine atom,

- 6 -

with a thiourea of general formula

$$H_2N - \overset{\overset{\textstyle S}{\|}}{C} - N\overset{\displaystyle R_1}{\underset{\displaystyle R_2}{}} \qquad \text{(III)}$$

wherein

$R_1$ and $R_2$ are as hereinbefore defined.

5    The reaction is carried out in a melt or
in a solvent or mixture of solvents such as water,
ethanol, water/ethanol, pyridine, dioxan, dioxan/water,
glacial acetic acid, tetrahydrofuran or dimethylformamide,
conveniently at temperatures of between 0 and 150°C,
10   preferably at temperatures of between 20 and 100°C
and optionally in the presence of a base, e.g.
sodium hydroxide solution, sodium acetate, pyridine,
triethylamine or N-ethyl-diisopropylamine.  The
compounds of general formula II used as starting
15   materials need not be isolated.

b)    Reacting a compound of general formula

$$\overset{\displaystyle R_3}{\underset{\displaystyle R_4}{}}N - \text{(cyclohexanone)} = O \qquad \text{(IV)}$$

wherein

$R_3$ and $R_4$ are as hereinbefore defined, with
20   a formamidine disulfide of general formula

BOE00147026

- 7 -

$$R_2-\overset{\overset{R_1}{|}}{N}-C-S-S-C-\overset{\overset{R_1}{|}}{N}-R_2 \qquad 2\ Y^-$$

(V)

wherein

$R_1$ and $R_2$ are as hereinbefore defined and
$Y^-$ represents an anion of an inorganic or organic acid.

The reaction is preferably carried out in a melt or in a high-boiling solvent such as glycol, dimethylformamide, diphenylether or dichlorobenzene, conveniently at temperatures of between 25 and 200°C, preferably at temperatures of between 70 and 150°C,

c)    In order to prepare compounds of general formula I wherein at least one of the groups $R_1$, $R_2$, $R_3$ or $R_4$ represents a hydrogen atom;
splitting off a protecting group from a compound of general formula



(VI)

wherein

at least one of the groups $R_1'$, $R_2'$, $R_3'$

BOE00147027

- 8 -

or $R_4'$ represents a protecting group for an amino
group such as an acyl or alkoxycarbonyl group,
e.g. an acetyl, propionyl, methoxycarbonyl or ethoxycarbonyl
group, or $R_1'$ and $R_2'$ or $R_3'$ and $R_4'$ together with
5  the nitrogen atom between them represent an imido
group, e.g. the phthalimido group, and

the other groups $R_1$, $R_2$, $R_3$ or $R_4$ have the
meanings given for $R_1$ to $R_4$ hereinbefore, with
the exception of the acyl groups mentioned hereinbefore.

10    The splitting off of a protecting group is
preferably carried out by hydrolysis in the presence
of a base such as sodium hydroxide solution or
potassium hydroxide solution or in the presence
of an acid such as hydrochloric or sulphuric acid
15  in an aqueous solvent such as water/ethanol, water/dioxan
or water/tetrahydrofuran at temperatures of between
50 and 150°C, preferably at the boiling temperature
of the reaction mixture. An imido group such as
the phthalimido group used as a protecting group
20  is preferably split off with hydrazine in a solvent
such as water, water/ethanol or water/dioxan at
the boiling temperature of the solvent used.

d)    In order to prepare compounds of general
formula I wherein at least one of the groups $R_1$,
25  $R_2$, $R_3$ or $R_4$ represents one of the above-mentioned
alkyl, cycloalkyl, alkenyl or phenylalkyl group:

Reduction of a compound of general formula



VII

- 9 -

wherein

at least one of the groups $R_1"$, $R_2"$, $R_3"$
or $R_4"$ represents one of the acyl or phenylacyl
groups mentioned hereinbefore and

5      the other groups have the meanings given
for $R_1$, $R_2$, $R_3$ and $R_4$ hereinbefore,

with a metal hydride in a solvent.

The reduction is carried out in a suitable
solvent such as diethylether, tetrahydrofuran,
10 glycoldimethylether or dioxan with a metal hydride,
e.g. with a complex metal hydride such as lithium
aluminium hydride, at temperatures of between 0
and 100°C, but preferably at temperatures of between
20 and 80°C.

15      In order to prepare compounds of general
formula I wherein one of the groups $R_3$ or $R_4$ represents
one of the acyl groups mentioned hereinbefore,
it is particularly advantageous to carry out the
reaction with lithium aluminium hydride at temperatures
20 of between 0 and 30°C, preferably at ambient temperature.


e)      In order to prepare compounds of general
formula I wherein at least one of the groups $R_1$,
$R_2$, $R_3$ or $R_4$ represents one of the alkyl, cycloalkyl,
alkenyl, alkynyl or phenylalkyl groups mentioned
25 hereinbefore:

Reacting a compound of general formula



(VIII)

wherein

BOE00147029

- 10 -

at least one of the groups $R_1{}^{\prime\prime\prime}$, $R_2{}^{\prime\prime\prime}$, $R_3{}^{\prime\prime\prime}$
or $R_4{}^{\prime\prime\prime}$ represents a hydrogen atom and the other
groups $R_1{}^{\prime\prime\prime}$, $R_2{}^{\prime\prime\prime}$, $R_3{}^{\prime\prime\prime}$ or $R_4{}^{\prime\prime\prime}$ have the meanings
given for $R_1$ to $R_4$ hereinbefore,
5      with a compound of general formula

$$R_5 - Z \qquad\qquad (IX)$$

wherein
$R_5$ represents one of the alkyl, cycloalkyl,
alkenyl, alkinyl or phenylalkyl groups mentioned
10   for $R_1$ to $R_4$ hereinbefore and Z represents a nucleophili-
cally exchangeable group such as a halogen atom
or a sulfonic acid group, e.g. a chlorine, bromine
or iodine atom, a methoxysulfonyloxy or p-toluene-
sulfonyloxy group, or Z together with an adjacent
15   hydrogen of the group $R_5$ represents an oxygen.

The reaction is carried out in a solvent
such as water, methanol, ethanol, tetrahydrofuran,
dioxan, acetone, acetonitrile or dimethylsulfoxide
with an alkylating agent such as methyliodide,
20   dimethylsulfate, ethylbromide, diethylsulfate, allyliodide,
benzylbromide, 2-phenylethylbromide or methyl-p-
toluenesulfonate, optionally in the presence of
a base such as sodium hydroxide solution, potassium
carbonate, sodium hydride, potassium-tert.butoxide
25   or triethylamine, conveniently at temperatures
of between −10 and 50°C, but preferably at temperatures
of between 0 and 30°C. However, the reaction may
also be carried out without a solvent.
Alkylation of the nitrogen atom may also
30   be effected using formaldehyde/formic acid at elevated
temperatures, e.g. at the boiling temperature of
the reaction mixture, or with a corresponding carbonyl
compound and a complex metal hydride such as sodium-
borohydride or sodiumcyanoborohydride in a solvent

BOE00147030

- 11 -

such as water/methanol, ethanol, ethanol/water,
dimethylformamide or tetrahydrofuran at temperatures
of between 0 and 50°C, but preferably at ambient
temperature.

5  If according to the invention a compound
of general formula I is obtained wherein at least
one of the groups $R_1$, $R_2$, $R_3$ or $R_4$ represents a
hydrogen atom, this may be converted by corresponding
acylation into a corresponding compound of general
10 formula I wherein at least one of the groups $R_1$,
$R_2$, $R_3$ or $R_4$ represents one of the acyl groups
mentioned herein before.

  The subsequent acylation is appropriately
carried out in a solvent such as methylene chloride,
15 chloroform, carbontetrachloride, ether, tetrahydrofuran,
dioxan, glacial acetic acid, benzene, toluene,
acetonitrile or dimethylformamide, optionally in
the presence of an acid-activating agent or a dehydrating
agent, e.g. in the presence of ethyl chloroformate,
20 thionylchloride, N,N-dicyclohexylcarbodiimide,
N,N'-dicyclohexylcarbodiimide/N-hydroxysuccinimide,
N,N'-carbonyldiimidazole or N,N'-thionyldiimidazole
or triphenylphosphine/carbontetrachloride, or an
agent which activates the amino group, e.g. phosphorus
25 trichloride, and optionally in the presence of
an inorganic base such as sodium carbonate or a
tertiary organic base such as triethylamine or
pyridine, which may simultaneously be used as solvent,
at temperatures of between -25°C and 250°C, but
30 preferably at temperature of between -10°C and
the boiling temperature of the solvent used. The
reaction may also be carried out without a solvent
and furthermore any water formed during the reaction
may be removed by azeotropic distillation, e.g.
35 by heating with toluene using a water separator,
or by adding a drying agent such as magnesium sulphate
or molecular sieve.

BOE00147031

- 12 -

The compounds of general formula I which
have at least one chiral centre can be resolved
into their enantiomers by conventional methods,
e.g. by column chromatography on a chiral phase,
5   by fractional distillation of the diastereomeric
salts or by column chromatography of their conjugates
with optically active auxiliary acids such as tartaric
acid, O,O-dibenzoyl-tartaric acid, camphor acid,
camphorsulfonic acid or α-methoxy-phenylacetic
10   acid.

The compounds may also be converted into
the acid addition salts thereof, particularly the
physiologically acceptable acid addition salts
with inorganic or organic acids.  Suitable acids
15   for this include, for example, hydrochloric, hydrobromic,
sulfuric, phosphoric, lactic, citric, tartaric,
succinic, maleic or fumaric acid.

The compounds of general formulae II to IX
used as starting materials are known from the literature
20   in some cases or may be obtained using methods
known from the literature.

Thus, for example, a compound of general
formula II is obtained by halogenation of the corresponding
cyclohexanone, which is in turn prepared by oxidation
25   of the corresponding cyclohexanol and optional
subsequent alkylation and/or acylation.

The compounds of general formulae VI, VII
and VIII used as starting materials are obtained
by condensation of a corresponding α-bromo-cyclohexanone
30   with a correponding thiourea.

As already mentioned hereinbefore, the compounds
of general formula I wherein at least one of the
groups $R_1$ to $R_4$ represents one of the acyl groups
mentioned above are valuable intermediate products
35   for preparing the compounds of general formula
I wherein $R_1$ to $R_4$ have the meanings given to $R_1$
to $R_4$ hereinbefore, with the exception of the acyl

BOE00147032

- 13 -

groups referred to hereinbefore.  These compounds
and the physiologically acceptable acid addition
salts thereof have valuable pharmacological properties,
particularly an effect on blood pressure, a heart
5    rate-lowering effect and an effect on the central
nervous system, particularly a stimulant effect
on the dopamine receptors.

For example, therefore, in order to investigate
the effect on presynaptic dopamine receptors, the
10   following compounds

A =    2-amino-6-dimethylamino-4,5,6,7-tetrahydro-
       benzthiazol-dihydrochloride,

B =    2-amino-6-pyrrolidino-4,5,6,7-tetrahydro-
       benzthiazol-dihydrochloride,

15   C =    2-amino-6-n-propylamino-4,5,6,7-tetrahydro-
       benzthiazol-dihydrochloride,

D =    2-allylamino-6-dimethylamino-4,5,6,7-tetrahydro-
       benzthiazol-dihydrochloride,

E =    6-[N-allyl-N-(4-chloro-benzyl)-amino]-2-amino-
20      4,5,6,7-tetrahydro-benzthiazol-dihydrochloride
       and

F =    2-amino-6-diallylamino-4,5,6,7-tetrahydro-
       benzthiazol-dihydrochloride

were tested first for their effect on the exploratory
25   activity of mice and then, after any effect on
postsynaptic dopamine receptors had been clarified
(motility in animals pretreated with reserpine),
the effect on dopamine turnover and dopamine synthesis
was determined as follows:

BOE00147033

- 14 -

1.    Inhibition of the exploratory activity

The activity was measured in observation
cages fitted with an infra-red light barrier.
The frequency of interruption of the light beam
5   by a group of 5 mice within 5 minutes.  Groups
of 5 animals are given the test substance, unless
otherwise specified, in a dosage of 10 mg/kg by
subcutaneous injection.  One hour later the animals
are moved into the observation cages where their
10  exploratory activity over a period of 5 minutes
is immediately measured.  In parallel or alternately
with groups treated with test substance, control
groups treated with common salt are investigated
(0.9% solution; 0.1 ml/10 g of body weight by subcutaneous
15  route).

The results are assembled in the following
table:

| | Substance | Dosage (mg/kg s.c.) | Inhibition of activity in percent compared with controls treated with common salt |
|---|---|---|---|
| 20 | A | $2.7^1$ | 50 |
| 25 | B | 10.0 | 94 |
| | C | 10.0 | $20^2$ |
| | D | 10.0 | $76^2$ |
| | E | 10.0 | $56^2$ |
| | F | 10.0 | $60^2$ |

1)   read off from the dosage/activity curve in
the range from 1-10 mg/kg subcutaneously
2)   measurement of exploration: 75 minutes after
35  administration of the substance

BOE00147034

- 15 -

2.    Determining the inhibition of dopamine turnover

The inhibition of dopamine turnover was measured
in mice.  In animals treated with α-methylparatyrosine
(AMPT) (250 mg/kg by intraperitoneal route) 15
5   minutes into the experiment, the dopamine concentration
throughout the brain decreases as the test progresses.
By administering substances which act on autoreceptors,
the dopamine reduction (compared with control animals
treated with common salt solution) can be prevented.
10        Test substances are administered at time
0 of the experiment in a dosage of 5 mg/kg s.c.,
unless otherwise stated.  Four hours and 15 minutes
into the experiment the animals are killed and
the brains are subjected to dopamine determination
15   using high pressure liquid chromatography with
electrochemical detection.  This determines the
percentage inhibition, caused by the test substance,
of the dopamine reduction induced by AMPT.

| | Substance | Dosage (mg/kg s.c.) | % inhibition of AMPT effect |
|---|---|---|---|
| 20 | | | |
| | A | 0.95[1] | 50 |
| | B | 5 | 67 |
| 25 | D | 5 | 52 |
| | E | 5 | 32 |

1)    read off from the dosage/activity curve in
the range from 0.5-3 mg/kg s.c.

30  3.    Determining the inhibiton of dopamine synthesis

For this purpose, 5 animals are given the
test substance in a dosage of 10 mg/kg s.c., unless

BOE00147035

- 16 -

otherwise stated.  After 5 minutes, 750 mg/kg of
 -butyrolactone are administered by intraperitoneal
route in order to rule out the effect of postsynaptic
feed back loops on the rate of dopamine synthesis
5 by blocking the presynaptic impulse line.  This
results in a considerable increase in the synthesis
of DOPA or dopamine.  In order to inhibit the decarboxylation
of DOPA, 200 mg/kg of 3-hydroxybenzyl-hydrazin-hydrochloride
are administered by intraperitoneal route after
10 a further 5 minutes.  Forty minutes after administration
of the substance the animals are killed and the
corpus striatum is prepared.  The DOPA content
is measured by HPLC with electrochemical detection
(standard:  dihydroxybenzylamine).

15      The percentage inhibition, produced by the
test substance, of the DOPA accumulation stimulated
by  -butyrolactone compared with the controlled
animals treated  with 0.9% common salt solution
is determined.

20      The results of this experiment are shown
in the following table:

| Substance | Dosage (mg/kg s.c.) | Inhibition of DOPA accumulation in percent compared with controls treated with common salt |
|-----------|---------------------|--------------------------------------------------------------------------------------------|
| A | 0.55[1] | 50 |
| C | 10 | 60 |

1)    read off from the dosage/activity curve in
      the range from 0.1-1.0 mg/kg but subcutaneous
      route.

BOE00147036

- 17 -

4.    <u>Determining the anti-Parkinsonism activity</u>
      <u>or the activity against Parkinson's disease</u>

       The discovery of the neurotoxin 1-methyl-
4-phenyl-1,2,3,6-tetrahydropyridine (MPTP) (Langston
5   et al., Science <u>219</u>, 979 (1983)) provided an animal
model for Parkinson's disease.
       The irreversible neurological syndrome triggered
by MPTP in man and in monkeys largely resembles
the idiopathic Parkinson's disease in its clinical,
10   pathological, biochemical and pharmacological characteristics
(Markey et al., Nature <u>311</u>, 464 (1984)).  The reason
for this convincing similarity is the fact that
MPTP selectively destroys the small group of dopaminergic
nerve cells in the substantia nigra of the brain
15   which are also destroyed by degenerative processes
in naturally occurring Parkinson's disease.  There
is even some talk that the cause of idiopathic
Parkinson's disease is MPTP or a similar compound
forming in the organism (Snyder, S.H., Nature <u>311</u>,
20   514 (1984)).  Possibly as a result of the specific
metabolism of MPTP, the clinical impression of
the MPTP-Parkinson picture has hitherto been demonstrated
only in monkeys and man.
       The MPTP model realised in Rhesus monkeys
25   is therefore exceptionally suitable for testing
the activity of anti-Parkinson's disease drugs.
Seven Rhesus monkeys were given MPTP (for 3 days,
1 x 0.15 mg/kg i.m. daily, 3 days' break, then
3 days 1 x 0.30-0.40 mg/kg daily) and showed the
30   following symptoms; the animals were akinetic and
not capable of taking water or food.  They showed
a typical bowed posture; occasionally, cataleptic
states occured.  The extremities showed a rigor
which was interspersed by clonic convulsions on
35   passive movement.  As a rule, voluntary movements
of the rump and the extremities could not be triggered

BOE00147037

- 18 -

even by very powerful and painful stimulation.

After intramuscular administration of compound
C (10-100 µg/kg) voluntary movements first occured
after a time interval of 5 to 10 minutes, which
5  were followed in the subsequent 10 to 30 minutes
by a gradual, extensive normalisation of the motor
function. The animals were capable of taking food.
They stayed perfectly upright and straight inside
their cages and were also satisfactory in terms
10  of their vigilance and species-specific behaviour.
The only residual symptoms recorded were an occasional
transient and slight resting tremor and a reduction
in rough strength. There was no sedation. Circulation
in the skin appeared to be greater than before
15  the compound C was administered.

The effect of compound C diminished after
about 5 to 7 hours and the animals reverted to
the Parkinson symptoms described above; a fresh
administration of this compound again leads to
20  an improvement or substantial removal of the clinically
pathological manifestations. The advantageous
effects of the compounds were thus reproduced several
times in each individual animal.

No side effects were detected at the dosages
25  used hitherto.

Moreover, the compounds prepared according
to the invention are largely non-toxic. Thus,
when the substances were tested in mice at dosages
of between 27 and 50 mg/kg s.c., no deaths were
30  recorded.

In view of their pharmacological properties,
the compounds of general formula I prepared according
to the invention and the physiologically acceptable
acid addition salts thereof are suitable for the
35  treatment of central nervous, neuropsychiatric
diseases, particularly schizophrenia, for the treatment
of Parkinsonism or Parkinson's disease and/or for

BOE00147038

- 19 -

treating circulatory disorders, particularly hypertension.

    For pharmaceutical use, the new compounds and the physiologically acceptable acid addition salts thereof, optionally combined with other active
5 substances, may be incorporated in the conventional galenic preparations such as plain or coated tablets, powders, suppositories, suspensions, drops or ampoules. The individual dose is from 0.01 to 0.5 mg/kg of body weight, preferably 0.1 to 0.3 mg/kg of body
10 weight, 1 to 4 times a day.

    The examples which follow are intended to illustrate the invention:

- 20 -

Example A
4-[N-(4-Chloro-benzyl)-amino]-cyclohexanol

75.8 g (0.5 Mol) of 4-amino-cyclohexanol-
hydrochloride are dissolved in 60 ml of water and,
5   after the addition of 36 g (0.26 Mol) of potassium
carbonate and 500 ml of toluene, boiled with a
water separator until the separation of water has
ended.  Then 71.7 g (0.5 Mol) of 4-chlorobenzaldehyde
are slowly added with further boiling using the
10  water separator.  After the calculated quantity
of water has been separated, the residue is added
to water and the toluene phase is separated off
and concentrated.  The concentration residue is
dissolved in 500 ml of ethanol and 19 g (0.5 Mol)
15  of sodium borohydride are added in batches with
stirring.  After standing overnight, the mixture
is concentrated, mixed with water and extracted
with chloroform.  After drying and concentrating
the extracts, the residue is recrystallised from
20  ethyl acetate.
Yield:  93.4 g (78% of theory),
M.p.: 103-104°C
Calculated:   C  65.12   H 7.57   N 5.84   Cl 14.79
Found:            65.21     7.68     5.93      14.65

The following compound was prepared analogously
to Example A using propionaldehyde:
25  4-n-propylamino-cyclohexanol
Yield:  12.4% of theory,
M.p.:  < 20°C
Calculated:  m/e = 157
Found:       m/e = 157
30

Example B
4-[N-(4-Chloro-benzyl)-methylamino]-cyclohexanol

7.2 g (30 mMol) of 4-[N-(4-chloro-benzyl)-
amino]-cyclohexanol are dissolved in 30 ml of dimethyl-
35  formamide, and after the addition of 2.2 g (16 mMol)

BOE00147040

- 21 -

of potassium carbonate, 4.26 g (30 mMol) of methyliodide
are added dropwise.  When the slightly exothermic
reaction has ended, the mixture is concentrated
by evaporation, mixed with water and extracted with
5    chloroform.  The concentrated extracts are chromatographed
on silica gel to purify them (eluant; methylene
chloride/methanol = 20/1).
Yield: 3.3 g (43.4% of theory),
M.p.: 74-75°C
10   Calculated:  C 66.26  H 7.94  N 5.52  Cl 13.97
Found:           66.36    7.95    5.46     13.81


     The following compounds were prepared analogously
to Example B:

15   4-Hexamethyleneimino-cyclohexanol
     Prepared from 4-amino-cyclohexanol and 1,6-
dibromohexane.
Yield:  47.3% of theory,
M.p.: < 20°C
20   Calculated:  m/e = 197
Found:       m/e = 197.


     4-Diallylamino-cyclohexanol

     Prepared from 4-amino-cyclohexanol and allylbromide.
25   Yield:  51% of theory,
M.p.: < 20°C
Calculated:  m/e = 195
Found:       m/e = 195.


30   4-Piperidino-cyclohexanol

     Prepared from 4-amino-cyclohexanol and 1,5-
dibromopentane.
Yield: 65.8% of theory,
M.p.: < 20°C

- 22 -

Calculated:   m/e = 183
Found:        m/e = 183.


4-Pyrrolidino-cyclohexanol

5      Prepared from 4-amino-cyclohexanol and 1,4-
dibromo-butane.
Yield:  35.8% of theory,
M.p.: < 20°C
Calculated:  m/e = 169
10  Found:       m/e = 169.


Example C
4-Diethylamino-cyclohexanol

       28.75 g (0.25 Mol) of 4-amino-cyclohexanol
15  are dissolved in 150 ml of water, with the addition
of 20 g (0.5 Mol) of sodium hydroxide and then 65.6 ml
(0.5 Mol) of diethylsulfate are added dropwise.
The mixture then heats up to 65°C.  It is stirred
for an hour at 70°C, then poured onto ice and extracted
20  with chloroform.
Yield:  18.2 g (42.5% of theory,
M.p.: < 20°C
Calculated:  m/e = 171
Found:       m/e = 171.

25

Example D
4-[N-(4-Chloro-benzyl)-amino]-cyclohexanone

       23.9 g (0.1 Mol) of 4-[N-(4-chlorobenzyl)-
amino]-cyclohexanol are suspended in 125 ml of
30  ice water and 32 ml of concentrated sulphuric acid
are added.  Then 29.4 g (0.1 Mol) of potassium
dichromate are added in 2 batches and the mixture
is heated for 5 hours at 50°C.  It is then cooled,
made alkaline with sodium hydroxide solution and

BOE00147042

- 23 -

extracted with chloroform.  After concentration,
a yellowish oily liquid is obtained.
Yield:  8.2 g (34% of theory,
M.p.:  < 20°C
5  Calculated:  m/e = 237/239
Found:        m/e = 237/239.


        The following compounds were prepared analogously
to Example D:

4-[N-(4-Chloro-benzyl)-methylamino]-cyclohexanone

10  Yield:  38% of theory,
M.p.:  < 20°C
Calculated:  m/e = 251/253
Found:        m/e = 251/253.


    4-Diallylamino-cyclohexanone

15  Yield:  21% of theory,
M.p.:  < 20°C
Calculated:  m/e = 193
Found:        m/e = 193.


    4-Piperidino-cyclohexanone

20  Yield:  22.2% of theory,
M.p.:  < 20°C
Calculated:  m/e = 181
Found:        m/e = 181.


    4-Pyrrolidino-cyclohexanone

25  Yield:  45.1% of theory,
M.p.:  < 20°C
Calculated:  m/e = 167
Found:        m/e = 167.


BOE00147043

- 24 -

4-Diethylamino-cyclohexanone

Yield:  49.7% of theory,
M.p.:  < 20°C
Calculated:  m/e = 169
5   Found:      m/e = 169.


4-n-Propylamino-cyclohexanone

Yield:  33% of theory,
M.p.:  < 20°C
Calculated:  m/e = 155
10  Found:      m/e = 155.


Example E
4-[N-(4-Chloro-benzyl)-methylamino]-cyclohexanone

       8.4 g (35 mMol) of 4-[N-(4-chloro-benzyl)-
15  amino]-cyclohexanone are dissolved in 50 ml of
absolute dimethylformamide and, after the addition
of 2.6 g (18.7 mMol) of potassium carbonate, 5.0 g
(35 mMol) of methyliodide are added dropwise at
25-30°C.  After standing overnight the mixture
20  is concentrated, mixed with water and extracted
with chloroform.   The extracts are dried and concentrated.
Yield:  8.1 g (93% of theory,
M.p.:  < 20°C
Calculated:  m/e = 251/253
25  Found:      m/e = 251/253.


       The following compounds were prepared analogously
to Example E:

4-[N--Allyl-N-(4-chloro-benzyl)-amino]-cyclohexanone

Yield:  70.7% of theory,
30  M.p.:  < 20°C

- 25 -

Calculated:  m/e = 277/279
Found:       m/e = 277/279.


4-[N-(4-Chloro-benzyl)-ethylamino]-cyclohexanone

Yield:  30% of theory,
5  M.p.:  < 20°C
Calculated:  m/e = 265/267
Found:       m/e = 265/267.


Example F
10  4-Hexamethyleneimino-cyclohexanone

At 20 to 25°C, a solution of 47 g (0.5 Mol)
of 4-hexamethyleneimino-cyclohexanol in 300 ml
of methylenechloride is added dropwise to a suspension
of 107.5 g (0.5 Mol) of pyridiniumchlorochromate
15  and 40 g (0.5 Mol) of sodium acetate in 700 ml
of methylenechloride. After stirring for one hour
at 20°C the mixture is poured onto ice water and
sodium hydroxide solution and extracted with methylene
chloride. After drying and concentration of the
20  extracts a coloured oily liquid is left.
Yield:  16.8 g (35.8% of theory),
M.p.:  < 20°C
Calculated:  m/e = 195
Found:       m/e = 195.

BOE00147045

- 26 -

Example 1
2-Amino-6-dimethylamino-4,5,6,7-tetrahydro-benzthiazole-
dihydrochloride

     2.82 g (0.02 Mol of 4-dimethylamino-cyclohexanone
5  are dissolved in 20 ml of glacial acetic acid,
mixed with 4.7 ml of 36% of hydrobromic acid in
glacial acetic acid and then a solution of 1.0 ml
(0.02 Mol) of bromine in 12 ml of glacial acetic
acid is added dropwise with cooling. The mixture
10  is then concentrated by evaporation in vacuo and
the residue is triturated several times with diethylether
The ether extracts are discarded and the residue
is dissolved in 50 ml of ethanol. After 3.04 g
(40 mMol) of thiourea have been added the mixture
15  is refluxed for 5 hours. It is then concentrated
by evaporation, made alkaline with sodium hydroxide
solution and extracted with chloroform. After
drying and concentration of the extracts, the residue
is purified by column chromatography on silica
20  gel (eluant: chloroform/methanol = 1/1). Then
the base (mp: 191°C) is dissolved in acetone and
converted into the dihydrochloride with isopropanolic
hydrochloric acid.
Yield: 1.09 g (20% of theory),
25  M.p.: 272°C

| | | | | | |
|---|---|---|---|---|---|
| Calculated: | C 40.00 | H 6.34 | N 15.55 | Cl | 26.24 |
| Found: | 39.63 | 6.55 | 15.31 | | 26.29 |

     The following tetrahydrobenzthiazoles were
prepared analogously to Example 1 from the corresponding
30  ketones:

2-Amino-6-diethylamino-4,5,6,7-tetrahydro-benzthiazole
Yield: 25% of theory,
M.p.: 182-183°C
Calculated:   C 58.62   H 8.49   N 18.64

- 27 -

Found:          58.65      8.72      18.50.


2-Amino-6-piperidino-4,5,6,7-tetrahydro-benzthiazole-
dihydrochloride
Yield: 13% of theory,
5   M.p.: 280°C
Calculated:    C 46.45    H 6.82    N 13.55    Cl 22.85
Found:          46.37      6.75      13.41              22.95.


2-Amino-6-pyrrolidino-4,5,6,7-tetrahydro-benzthiazole
Yield: 24.4% of theory,
10  M.p.: 204-206°C
Calculated:    C 59.15    H 7.67    N 18.81
Found:          59.50      7.74      18.95.


2-Amino-6-diallylamino-4,5,6,7-tetrahydro-benzthiazole-
dihydrochloride
15  Yield: 19% of theory,
M.p.: 242°C
Calculated:    C 48.44    H 6.56    N 13.03    Cl 22.00
Found:          47.90      6.49      12.95              22.21.


2-Amino-6-[N-(4-chloro-benzyl)-amino]-4,5,6,7-tetrahydro-
20  benzthiazole
Yield: 35% of theory,
M.p.: 146°C
Calculated:    C 57.23    H 5.49    N 14.30    Cl 12.06
Found:          56.93      5.56      13.86              12.04.


25  2-Amino-6-[N-(4-chloro-benzyl)-methylamino]-4,5,6,7-
tetrahydro-benzthiazole
Yield: 36% of theory,
M.p.: 163°C
Calculated:    C 58.69    H 5.89    N 13.64    Cl 11.51
30  Found:          58.50      5.94      13.49              11.55.

BOE00147047

– 28 –

2-Amino-6-[N-(4-chloro-benzyl)-ethylamino]-4,5,6,7-
tetrahydro-benzthiazole
Yield: 49% of theory,
M.p.: 258°C (decomposition)

5  Calculated:    C 48.67   H 5.61   N 10.64   Cl 26.94
   Found:           48.30     5.85     10.57        26.97.


2-Amino-6-[N-allyl-N-(4-chloro-benzyl)-amino]-4,5,6,7-
tetrahydro-benzthiazole-dihydrochloride
Yield: 46.5% of theory,
10  M.p.: 240°C (decomposition)
   Calculated:    C 50.19   H 5.45   N 10.33   Cl 26.14
   Found:           49.84     5.68     9.97         26.04.


2-Amino-6-hexamethyleneimino-4,5,6,7-tetrahydro-
benzthiazole-dihydrochloride
15  Yield: 15.4% of theory,
   M.p.: 295°C (decomposition)
   Calculated:    C 48.17   H 7.14   N 12.95   Cl 21.86
   Found:           47.90     7.34     12.44        21.64.


2-Allylamino-6-dimethylamino-4,5,6,7-tetrahydro-
20  benzthiazole-dihydrochloride
       Prepared from 4-dimethylamino-cyclohexanone
by bromination and subsequent reaction with allylthiourea.
Yield: 64% of theory,
M.p.: 248°C
25  Calculated:    C 46.45   H 6.82   N 13.54   Cl 22.85
   Found:           46.30     7.00     13.29        22.99.


2-Amino-5-dimethylamino-4,5,6,7-tetrahydro-benzthiazole-
dihydrochloride
       Prepared from 3-dimethylamino-cyclohexanone.
30  Yield: 33% of theory,
   M.p.: 194°C
   Calculated:    C 40.00   H 6.34   N 15.55   Cl 26.24
   Found:           39.74     6.37     15.15        25.96.


BOE00147048

- 29 -

2-Amino-5-morpholino-4,5,6,7-tetrahydro-benzthiazole-
dihydrochloride
          Prepared from 3-morpholino-cyclohexanone.
          Yield: 7.4 g (20% of theory),
5   M.p.: 237-238°C
          Calculated:    C 42.31    H 6.13    N 13.46
          Found:           42.00       6.29       13.13.


        Example 2
10  2,6-Diamino-4,5,6,7-tetrahydro-benzthiazole-dihydrochloride


        a)      (4-(Phthalimido)-cyclohexanol


        75.5 g (0.5 Mol) of 4-aminocyclohexanol-hydrochloride
and 74.0 g (0.5 Mol) of phthalic acid anhydride
are mixed with 65 g (0.5 Mol) of ethyl-diisopropyl-
15  amine and 1000 ml of toluene and boiled for 36
hours with a water separator.  Then water is added,
the toluene phase is separated off and the aqueous
phase is extracted several times with chloroform.
The organic phases are combined, dried and concentrated.
20  The concentration residue is recrystallised from isopropanol.
Yield: 95 g (77.8% of theory),
M.p.: 175-176°C.


        b)      4-(Phthalimido)-cyclohexanone


25      95 g (0.388 Mol) of 4-(phthalimido)-cyclohexanol
are dissolved in 600 ml of chloroform and, after
the addition of 450 ml of water and 120 ml of sulfuric
acid, 90 g (0.3 Mol) of potassium dichromate are
added in batches.  The internal temperature of
30  the mixture is maintained at between 25 and 30°C
by slight cooling.  The mixture is stirred for
a further 3 hours, then the chloroform phase is
separated off and the mixture extracted twice more with
chloroform. After drying and concentration of the extracts

- 30 -

82 g (86.9% of theory) are obtained.

c)   2-Amino-6-phthalimido-4,5,6,7-tetrahydro-
     benzthiazol

       48.6 g (0.2 Mol) of 4-(phthalimido)cyclohexanone
5  are brominated analogously to Example 1 with 32 g
   (0.2 Mol) of bromine and then converted with thiourea
   into the 2-amino-6-phthalimido-4,5,6,7-tetrahydro-
   benzthiazol.
   Yield:  30 g (50% of theory),
10 M.p.:  244-246°C (decomposition)
   Calculated:  C 60.18   H 4.38   N 14.04
   Found:          60.05      4.25     13.95.

d)   2,6-Diamino-4,5,6,7-tetrahydro-benzthiazole-
     dihydrochloride

15       9.5 g (31.7 mMol) of 2-amino-6-phthalmido-
   4,5,6,7-tetrahydro-benzthiazole are suspended in
   100 ml of ethanol and, after the addition of 1.8 g
   (36 mMol) of hydrazine hydrate, refluxed for 2
   hours.  The mixture is then concentrated and purified
20 by column chromatography on silica gel using methanol
   as eluant.  Then the dihydrochloride is precipitated
   in ethanol with ethanolic hydrochloric acid.
   Yield:  2.0 g (26% of theory),
   M.p.:  > 315°C (decomposition)
25 Calculated:  C 34.72   H 5.41   N 17.35   Cl 29.25
   Found:          35.00      5.26     16.95        29.10.

Example 3
6-Acetylamino-2-amino-4,5,6,7-tetrahydro-benzthiazole-
30 hydrobromide

       160 g (1.0 Mol) of bromine are added dropwise
   to a solution of 155 g (1.0 Mol) of 4-acetylamino-

BOE00147050

- 31 -

cyclohexanone in 1.5 l of glacial acetic acid.
The mixture is stirred for 3 hours at ambient temperature.
152.0 g (2.0 Mol) of thiourea are added to the
reaction mixture and the resulting mixture is refluxed
5   for 30 minutes.  After cooling, the crystals precipitated
are suction filtered and washed with water and acetone.
Yield:  73 g (37% of theory),
M.p.:   292-293°C (decomposition)
10  Calculated:  C 36.99   H 4.83   N 14.38
Found:         36.82     4.76     14.18.


        By stirring the hydrobromide in aqueous potassium
carbonate solution and subsequently suction filtering,
the free base is obtained, m.p. 194-196°C (methanol).

15        The following compounds were prepared analogously
to Example 3:


6-Acetylamino-2-allylamino-4,5,6,7-tetrahydro-benzthiazole
Yield:  46% of theory,
M.p.:   194-196°C
Calculated:  m/e = 251
20  Found:       m/e = 251.


6-Acetylamino-2-methylamino-4,5,6,7-tetrahydro-
benzthiazole
Yield:  64% of theory,
M.p.:   238-240°C
25  Calculated:   C 53.30   H 6.71   N 18.65
Found:          53.18     6.78     18.41.


6-Acetylamino-2-dimethylamino-4,5,6,7-tetrahydro-
benzthiazole
Yield:  51% of theory,
30  M.p.:  170-171°C
Calculated:   C 55.20   H 7.16   N 17.56
Found:          55.15     7.17     17.58.

- 32 -

## Example 4
## 2,6-Diamino-4,5,6,7-tetrahydro-benzthiazole-dihydrobromide

3 g (0.01 Mol) of 6-acetylamino-2-amino-4,5,6,7-
tetrahydro-benzthiazole-hydrobromide are dissolved
5 in 20 ml of semi-concentrated hydrobromic acid
and refluxed for 6 hours.  The solution is then
concentrated by evaporation and the residue recrystallised
from methanol.
Yield:  2.8 g (82% of theory),
10 M.p.: $>$ 315°C,
Melting point of the base: 233-236°C
Calculated:  C 25.39   H 3.96   N 12.69
Found:        25.34     3.93     12.51.

The following compounds were prepared analogously
15 to Example 4:

6-Amino-2-methylamino-4,5,6,7-tetrahydro-benzthiazole-
hydrobromide
Yield:  57% of theory,
M.p.:  262-263°C
20 Calculated:   C 36.37   H 5.34   N 15.90
Found:         36.30     5.45     15.82.

2-Allylamino-6-amino-4,5,6,7-tetrahydro-benzthiazole-
oxalate
Yield:  52% of theory,
25 M.p.:  164-165°C (decomp.)
Calculated:    m/e = 209
Found:         m/e = 209.

6-Amino-2-diethylamino-4,5,6,7-tetrahydro-benzthiazole
30 Yield: 45% of theory,
M.p.: $>$ 270°C (decomp.)
Calculated:    C 30.10    H 4.77    N 11.70

BOE00147052

- 33 -

Found:          30.13      4.84      11.68

Example 5
2-Amino-6-[N-(2-phenyl-ethyl)-amino]-4,5,6,7-tetrahydro-
5  benzthiazole-dihydrochloride

        To a solution of 3.4 g (0.02 Mol) of 2,6-
diamino-tetrahydro-benzthiazole in 34 ml of dimethylformamide
are added 5 g (0.022 Mol) of 2-phenyl-ethylbromide
and 2.6 g of potassium carbonate and the reaction
10  mixture is stirred at 100°C for 3 hours.  The potassium
bromate precipitated is then suctioned off and the solvent
is distilled off.  The residue is chromatographed
on silica gel (ethyl acetate/methanol = 80/20 +
3% ammonia.  The desired compound crystallises
15  out from ethereal hydrochloric acid.
Yield:  2.1 g (30% of theory),
M.p.:  289-291°C
Calculated:  C 52.02    H 6.11    N 12.13
Found:          51.82      6.13      12.16

20      The following compounds were prepared analgously
to Example 5:

2-Amino-6-isopropylamino-4,5,6,7-tetrahydro-benzthiazole-
dihydrochloride
Yield:  28% of theory,
25  M.p.:  295-296°C (decomp.)
Calculated:  C 42.25    H 6.74    N 14.78
Found:          41.95      7.09      14.50

2-Amino-6-isobutylamino-4,5,6,7-tetrahydro-benzthiazole-
dihydrochloride
30  Yield:  35% of theory,
M.p.:  268°C (decomp.)
Calculated:  C 44.29    H 7.10    N 14.09
Found:          43.97      7.17      13.97

BOE00147053

- 34 -

6-Allylamino-2-amino-4,5,6,7-tetrahydro-benzthiazole-
dihydrochloride
Yield: 38% of theory,
M.p.: 282-283°C (decomp.)
5  Calculated:    C 42.56   H 6.07   N 14.89
Found:           42.17      6.07     14.71


2-Amino-6-[N-(2-chloro-benzyl)-amino]-4,5,6,7-tetrahydro-
benzthiazole-dihydrochloride
Yield: 40% of theory,
10  M.p.: > 280°C (decomp.)
Calculated:    C 45.85   H 4.95   N 11.45
Found:           45.50      4.86     11.08


2-Amino-6-propargylamino-4,5,6,7-tetrahydro-benzthiazole-
dihydrochloride
15  Yield: 35% of theory,
M.p.: 268-270°C (decomp.)
Calculated:    C 42.86   H 5.40   N 15.00
Found:           42.78      5.59     14.79


2-Amino-6-methylamino-4,5,6,7-tetrahydro-benzthiazole-
20  dihydrobromide
Yield: 25% of theory,
M.p.: 312-313°C (decomp.)
Calculated:    C 27.84   H 4.38   N 12.18
Found:           27.78      4.46     12.21

25

Example 6
2-Amino-6-di-n-propylamino-4,5,6,7-tetrahydro-benzthiazole-
dihydrochloride-monohydrate


To a solution of 3.4 g (0.02 Mol) of 2,6-
30  diamino-4,5,6,7-tetrahydro-benzthiazole in 50 ml
of methanol are added 10 g (0.08 Mol) of n-propylbromide
and 11.1 g of potassium carbonate and the mixture
is refluxed for 3 days.  Then 100 ml of water are

BOE00147054

- 35 -

added and the mixture is extracted with ethylacetate.
The solvent is distilled off and the residue is
chromatographed on silica gel (eluant: methylenechloride/
methanol = 80/20).  The corresponding fraction
5 is concentrated by evaporation and the desired
compound is precipitated in the form of the hydrochloride.
Yield:  1.9 g (28% of theory),
M.p.:  271-273°C
Calculated:    C 45.34    H 7.90    N 12.20
10 Found:             45.00      7.98      12.00

Example 7
2-Amino-6-n-butylamino-4,5,6,7-tetrahydro-benzthiazole-
dihydrochloride

15        To a solution of 3.4 g (0.02 Mol) of 2,6-
diamino-4,5,6,7-tetrahydro-benzthiazole in 34 ml
of dimethylformamide are added 1.8 g (0.022 Mol)
of n-butanal and the mixture is heated to 50°C
for 1 hour.  After cooling, the reaction solution
20 is mixed with 0.8 g (0.02 Mol) of sodium borohydride
and heated to 50°C for 30 minutes.  The solvent
is largely eliminated in vacuo.  Whilst cooling
with ice, the residue is mixed with 20 ml of water
and 2N hydrochloric acid until a pH of 1 is obtained.
25 The aqueous solution is extracted with ethylacetate
and the organic phase discarded.  The aqueous phase
is mixed with potassium carbonate until an alkaline
reaction is obtained and then extracted with ethyl
acetate.  The organic phase is dried and concentrated.
30 The compound crystallizes out when ethereal hydrochloric
acid is added.
Yield:  2.3 g (39% of theory),
M.p.:  254-256°C
Calculated:    C 44.29    H 7.10    N 14.09
35 Found:             44.44      7.31      14.07.

BOE00147055

- 36 -

The following compounds were prepared analogously
to Example 7:

2-Amino-6-ethylamino-4,5,6,7-tetrahydro-benzthiazole-
dihydrochloride
5  Yield:  38% of theory,
M.p.:  296-297°C
Calculated:  C 40.00   H 6.34   N 15.55
Found:       39.97      6.41     15.35

2-Amino-6-n-pentylamino-4,5,6,7-tetrahydro-benzthiazole-
10  semifumarate
Yield:  42% of theory,
M.p.: ⟩270°C
Calculated:  C 56.54   H 7.79   N 14.13
Found:       56.13      7.80     13.97

15  2-Amino-6-n-hexylamino-4,5,6,7-tetrahydro-benzthiazole-
dihydrochloride
Yield:  49% of theory,
M.p.:  272-274°C
Calculated:  C 47.85   H 7.72   N 12.88
20  Found:       47.96      7.65     12.71

2-Amino-6-n-propylamino-4,5,6,7-tetrahydro-benzthiazole-
dihydrochloride
Yield:  42% of theory,
M.p.:  286-288°C
25  Calculated:  C 42.25   H 6.74   N 14.78
Found:       42.05      6.77     14.57

(-)2-Amino-6-n-propylamino-4,5,6,7-tetrahydro-benzthiazole
dihydrochloride
M.p.: 270-272°C
$\alpha_D^{20}$ = -56° (c = 1, methanol)

- 37 -

(+)2-Amino-6-n-propylamino-4,5,6,7-tetrahydro-benzthiazole
dihydrochloride
M.p.: 270-272°C
$\alpha_D^{20}$ = +56° (c = 1, methanol)

5   2-Amino-6-cyclopentylamino-4,5,6,7-tetrahydro-benzthiazole-
dioxalate
Yield:  36% of theory,
M.p.:  212-213°C
Calculated:   C 46.04    H 5.55    N 10.07
10  Found:         45.95     5.28     10.08

2-Amino-6-cyclohexylamino-4,5,6,7-tetrahydro-benzthiazole-
dihydrochloride
Yield:  38% of theory,
M.p.:  288-290°C
15  Calculated:   C 48.14    H 7.15    N 12.96
Found:         47.88     7.16     12.74

Example 8
6-Ethylamino-2-methylamino-4,5,6,7-tetrahydro-benzthiazole-
20  dihydrochloride
A solution of 1 g (0.0044 Mol) of 6-acetylamino-
2-methylamino-4,5,6,7-tetrahydro-benzthiazole in
20 ml of absolute tetrahydrofuran is mixed with
0.4 g (0.01 Mol) of lithiumaluminium hydride and
25  refluxed for 2 hours.  After cooling, 50 g of a
40% diammonium tartrate solution are added dropwise.
The organic phase is separated off and concentrated
by evaporation.  The residue is chromatographed
on silica gel (eluant:  methylene chloride/methanol =
30  80/20).  The corresponding fraction is concentrated
by evaporation.  The compound crystallizes out
when ethereal hydrochloric acid is added.
Yield:  0.3 g (33% of theory),
M.p.:  260°C
35  Calculated:   m/e = 211

- 38 -

Found:         m/e = 211.

The following compounds were prepared analogously
to Example 8:

2-Allylamino-6-ethylamino-4,5,6,7-tetrahydro-benzthiazole-
5   dihydrochloride
Yield:  37% of theory,
M.p.:  218-220°C (decomp.)
Calculated:   C 46.45    H 6.82    N 13.54
Found:         46.60     7.03     13.66

10  2-Dimethylamino-6-ethylamino-4,5,6,7-tetrahydro-
benzthiazole-oxalate hydrate
Yield:  20% of theory,
M.p.:  189-190°C
Calculated:   C 46.83    H 6.95    N 12.60
15  Found:         47.03     6.89     12.49.

## Example 9
## 6-Acetylamino-2-benzoylamino-4,5,6,7-tetrahydro-benzthiazole

20      To a solution of 4.2 g (0.02 Mol) of 6-acetylamino-
2-amino-4,5,6,7-tetrahydro-benzthiazole in 100 ml
of absolute tetrahydrofuran are added 2.2 g (0,022 Mol)of
triethylamine and 3.1 g (0.022 Mol) of benzoylchloride
and the mixture is refluxed for 3 hours.  The reaction
25  mixture is mixed with water and extracted with
ethyl acetate.  The organic phase is concentrated
by evaporation.  The residue is recrystallized
from methanol.
Yield:  3 g (48% of theory),
30  M.p.: ＞260°C
Calculated:   m/e = 315
Found:        m/e = 315

BOE00147058

- 39 -

The following compounds were prepared analogously
to Example 9:

2,6-Diacetylamino-4,5,6,7-tetrahydro-benzthiazole
Yield:  50% of theory,
5  M.p.:  258-259°C
Calculated:   m/e = 252
Found:        m/e = 252.

6-Acetylamino-2-propionylamino-4,5,6,7-tetrahydro-
benzthiazole
10  Yield:  44% of theory,
M.p.: ⟩260°C
Calculated:   m/e = 266
Found:        m/e = 266.

6-Acetylamino-2-phenylamino-4,5,6,7-tetrahydro-
15  benzthiazole
Yield:  78% of theory,
M.p.:  112°C
Calculated:   m/e = 329
Found:        m/e = 329.

20

Example 10
2-Benzylamino-6-ethylamino-4,5,6,7-tetrahydro-benzthiazole-
dihydrochloride

To a solution of 1.2 g (3.2 mMol) of 6-acetylamino-
25  2-benzoylamino-4,5,6,7-tetrahydro-benzthiazole
in 50 ml of absolute tetrahydrofuran are added
0.24 g (64 mMol) of lithiumaluminiumhydride and
the mixture is refluxed for 1 hour.  It is then
worked up as in Example 8.
30  Yield:  0.4 g (34% of theory),
M.p.:  242-245°C
Calculated:   C 53.33   H 6.43   N 19.68
Found:        53.59      6.37      19.42

- 40 -

The following compounds were prepared analogously
to Example 10:

2,6-Diethylamino-4,5,6,7-tetrahydro-benzthiazole-
dihydrochloride
5 Yield: 38% of theory,
M.p.: 241-243°C
Calculated:  C 44.29   H 7.10   N 14.09
Found:          44.06      7.27     13.85

6-Ethylamino-2-n-propylamino-4,5,6,7-tetrahydro-
10 benzthiazole-dihydrochloride
Yield: 32% of theory,
M.p.: 267-268°C
Calculated:  C 46.15   H 7.42   N 13.46
Found:          45.95      7.53     13.33

15 6-Ethylamino-2-[N-(2-phenyl-ethyl)-amino]-4,5,6,7-
tetrahydro-benzthiazole-dihydrochloride-hemihydrate
Yield: 26% of theory,
M.p.: 248-251°C
Calculated:  C 53.25   H 6.84   N 10.96
20 Found:          53.31      6.64     10.89

2-(4-Chloro-benzylamino)-6-ethylamino-4,5,6,7-tetrahydro-
benzthiazole-dihydrochloride
Yield: 65% of theory,
M.p.: >260°C
25 Calculated:  C 48.67   H 5.62   N 10.64
Found:          48.79      5.80     10.60

2-(2-Chloro-benzylamino)-6-ethylamino-4,5,6,7-tetrahydro-
benzthiazole-dihydrochloride-
Yield: 36% of theory,
30 M.p.: 251-253°C
Calculated:  C 48.67   H 5.62   N 10.64
Found:          48.57      5.78     10.57

BOE00147060

- 41 -

2-(3,4-Dichloro-benzylamino)-6-ethylamino-4,5,6,7-
tetrahydro-benzthiazole-dihydrochloride
Yield:  62.5% of theory,
M.p.: > 260°C
5  Calculated:   C 44.77   H 4.93   N 9.79
   Found:            44.85     4.82     9.96


   6-Acetylamino-2-ethylamino-4,5,6,7-tetrahydro-benzthiazole
        Prepared from 2,6-diacetylamino-4,5,6,7-tetrahydro-
   benzthiazole at ambient temperature.
10 Yield:  33% of theory,
   M.p.:  234-235°C
   Calculated:   m/e = 238
   Found:        m/e = 238.


        6-Acetylamino-2-benzylamino-4,5,6,7-tetrahydro-
15 benzthiazole prepared from 6-acetylamino-2-benzoylamino-
   4,5,6,7-tetrahydro-benzthiazole at ambient temperature.


        6-Acetylamino-2-n-propylamino-4,5,6,7-tetrahydro-
   benzthiazole prepared from 6-acetylamino-2-propionylamino-
   4,5,6,7,-tetrahydro-benzthiazole at ambient temperature.


20      6-Acetylamino-2-[N-(2-phenyl-ethyl)-amino]-
   4,5,6,7-tetrahydrobenzthiazole.


   Example 11
   6-Amino-2-ethylamino-4,5,6,7-tetrahydro-benzthiazole-
25 dihydrochloride


        Prepared from 6-acetylamino-2-ethylamino,4,5,6,7-
   tetrahydro-benzthiazole analogously to Example 4.
   Yield:  45% of theory,
   M.p.:  155-158°C
30 Calculated:   C 40.00   H 6.34   N 15.55
   Found:          39.86      6.31      15.26


BOE00147061

- 42 -

The following compounds were prepared analogously to Example 11:

6-Amino-2-benzylamino-4,5,6,7-tetrahydro-benzthiazole-dihydrobromide

5          6-Amino-2-n-propylamino-4,5,6,7-tetrahydro-benzthiazole-dihydrobromide

6-Amino-2-[N-(2-phenyl-ethyl)amino]-4,5,6,7-tetrahydro-benzthiazole-dihydrobromide.

10  Example 12

2-Benzoylamino-6-dimethylamino-4,5,6,7-tetrahydro-benzthiazole-dihydrochloride

3.0 g (15 mMol) of 2-amino-6-dimethylamino-4,5,6,7-tetrahydro-benzthiazole are dissolved in

15  15 ml of pyridine and 2.1 g (15 mMol) of benzoylchloride are added dropwise. After standing overnight the mixture is concentrated, mixed with soda solution and extracted with chloroform. The chloroform extract is concentrated and then chromatographed

20  on silica gel (eluant: methylenechloride/methanol = 9/1). The isolated base (melting point 174°C) is dissolved in acetone and the dihydrochloride is precipitated with isopropanolic hydrochloric acid.

25  Yield: 2.8 g (49% of theory),
M.p.: 284°C (decomp.)

| Calculated: | C 51.33 | H 5.65 | N 11.23 | Cl 18.94 |
|---|---|---|---|---|
| Found: | 51.51 | 5.76 | 11.32 | 18.75 |

30  Example 13

6-Acetylamino-2-amino-4,5,6,7-tetrohydro-benzthiazole

3.1 g (20 mMol) of 4-acetylamino-cyclohexanone and 6.2 g (20 mMol) of formamidine-disulfide-dihydrobromide are intimately mixed and heated in a heating bath

- 43 -

at a temperature of 120 – 130°C for 2 hours with
stirring.  The mixture is then taken up in water,
made alkaline with ammonia and extracted with chloroform.
After the extracts have been dried they are concentrated
5   by evaporation, triturated with acetone and suction
filtered.
Yield:  1.8 g (42.6% of theory),
M.p.:  230°C
Calculated:    C 51.17    H 6.20    N 19.89
10   Found:              51.09      6.22      19.75


Starting from 4-dimethylamino-cyclohexanone
the following compound was prepared analogously
to Example 13:

2-Amino-6-dimethylamino-4,5,6,7-tetrahydro-benzthiazole
15   Yield:  21% of theory,
M.p.:  189-190°C
Calculated:    C 54.80    H 7.66    N 21.29
Found:              54.71      7.53      21.12

BOE00147063

- 44 -

Example I

Tablet core containing 5 mg of 2-amino-6-dimethylamino-
4,5,6,7-tetrahydro-benzthiazole-dihydrochloride

Composition:

5   1 tablet core contains:

| | |
|---|---|
| Active substance | 5.0 mg |
| Lactose | 33.5 mg |
| Corn starch | 10.0 mg |
| Gelatine | 1,0 mg |
10   Magnesium stearate | 0.5 mg |
| | 50.0 mg |

Preparation

        A mixture of the active substance with lactose
15  and corn starch is granulated with a·10% aqueous
    gelatine solution through a screen with a mesh
    size of 1 mm, dried at 40°C and again rubbed through
    this screen.  The granulate thus obtained is mixed
    with magnesium stearate and compressed to form
20  tablet cores.  The tablets must be prepared in
    darkened rooms.


    Weight of core:  50 mg
    Punch:           4 mm, convex.
                   .

        The tablet cores thus obtained are coated
25  by the usual method with a coating consisting essentially
    of sugar and talc.  The finished coated tablets
    are polished with bees wax.

    Weight of coated tablet:  100 mg.

BOE00147064

- 45 -

Example II
Drops containing 5 mg of 2-amino-6-dimethylamino-
4,5,6,7-tetrahydro-benzthiazole-dihydrochloride

Composition:
5 100 ml of drops substance:

| | |
|---|---|
| Methylester-p-hydroxybenzoate | 0.035 g |
| n-Propylester-p-hydroxybenzoate | 0.015 g |
| Anisol | 0.05 g |
| Menthol | 0.06 g |
| 10 Pure ethanol | 10.0 g |
| Active substance | 0.5 g |
| Citric acid | 0.7 g |
| Sec. sodiumphosphate x 2 $H_2O$ | 0.3 g |
| Sodium cyclamate | 1.0 g |
| 15 Glycerol | 15.0 g |
| Distilled water ad | 100.0 ml |

Preparation

        The p-hydroxybenzoates, anisol and menthol
20 are dissolved in ethanol (Solution I).
        The buffer substances, active substance and
sodium cyclamate are dissolved in distilled water
and glycerol is added (Solution II).  Solution
I is stirred into Solution II and the mixture is
25 topped up to the volume specified with distilled
water.  The finished drops solution is filtered
through a suitable filter.  The preparation and
bottling of the drops solution must be carried
out away from the light and under a protective
30 gas.

BOE00147065

- 46 -

Example III

Suppositories containing 10 mg of 2-amino-6-dimethylamino-
4,5,6,7-tetrahydro-benzthiazole-dihydrochloride

5   1 suppository contains:
Active substance                        10.0 mg
Suppository mass
(e.g. Witepsol W 45)                  1 690.0 mg
                                        1 700.0 mg

10  Preparation

        The finely powdered substance is stirred
into the molten suppository mass, cooled to 40°C,
with an immersion homogeniser.  At 35°C the mass
is poured into slightly chilled moulds.
15  Weight of suppository:  1.7 g

    Example IV
    Ampoules containing 5 mg of 2-amino-6-dimethylamino-
    4,5,6,7-tetrahydro-benzthiazole-dihydrochloride

20  1 Ampoule contains:
Active substance                 5.0 mg
Citric acid                      7.0 mg
Sec. sodium phosphate x $2H_2O$          3.0 mg
Sodium pyrosulphite              1.0 mg
25  Distilled water          ad.   1.0 ml

    Preparation

        The buffer substances, active substance and
sodium pyrosulphite are successively dissolved in
30  deionised water which has been cooled under $CO_2$
gas.  The solution is made up to the volume specified
with boiled water and filtered free from pyrogens.

BOE00147066

- 47 -

Bottling:  in brown ampoules under protective gas
Sterilisation:  20 minutes at 120°C.

The preparation and transferring of the ampoule
solution must be carried out in darkened rooms.

5

Example V

Coated tablets containing 1 mg of 2-amino-6-dimethylamino-
4,5,6,7-tetrahydro-benzthiazole-dihydrochloride

1 tablet core contains:

10  Active substance              1.0 mg
Lactose                      35.5 mg
Corn starch                  12.0 mg
Gelatine                      1,0 mg
Magnesium stearate            0.5 mg
15                              50.0 mg


Preparation

Analogous to Example I


Weight of core:          50 mg
20  Punch:          :        5 mm, convex
Weight of coated tablet:  100 mg


Obviously, instead of the compound mentioned,
all the other compounds of general formula I may
be incorporated as active substance in the Pharmaceutical
25  Examples I to V, such as 2-amino-6-n-propylamino-
4,5,6,7-tetrahydro-benzthiazole-dihydrochloride.

BOE00147067

- 48 -

Patent Claims

1.    Tetrahydro-benzthiazoles of general formula



(I)

wherein

5        $R_1$ represents a hydrogen atom, an alkyl group
having 1 to 6 carbon atoms, an alkenyl or alkynyl
group each having 3 to 6 carbon atoms, an alkanoyl
group having 1 to 6 carbon atoms, a phenyl alkyl
or phenyl alkanoyl group having 1 to 3 carbon atoms

10   in the alkyl part, whilst the above mentioned phenyl
nuclei may be substituted by 1 or 2 halogen atoms,
        $R_2$ represents a hydrogen atom or an alkyl
group with 1 to 4 carbon atoms,
        $R_3$ represents a hydrogen atom, an alkyl group

15   with 1 to 7 carbon atoms, a cycloalkyl group having
3 to 7 carbon atoms, an alkenyl or alkynyl group
having 3 to 6 carbon atoms, an alkanoyl group having
1 to 7 carbon atoms, a phenyl alkyl or phenyl alkanoyl
group having 1 to 3 carbon atoms in the alkyl part,

20   whilst the phenyl nucleus may be substituted by
fluorine, chlorine or bromine atoms,
        $R_4$ represents a hydrogen atom, an alkyl group
with 1 to 4 carbon atoms, an alkenyl or alkynyl group
having 3 to 6 carbon atoms or

25        $R_3$ and $R_4$ together with the nitrogen atom
between them represent a pyrrolidino, piperidino,
hexamethyleneimino or morpholino group, the enantiomers
thereof, and the acid addition salts thereof.

BOE00147069

- 49 -

2.    Tetrahydro-benzthiazoles of general formula I as claimed in claim 1 wherein the

$$
\begin{array}{c}
R_3 \\
\quad \diagdown \\
\quad \quad N- \\
\quad \diagup \\
R_4
\end{array}
$$

5

group is in the 5 or 6-position, the enantiomers thereof, and the acid addition salts thereof.

3.    Tetrahydro-benzthiazoles of general formula

$$
\begin{array}{c}
R_3 \diagdown \\
\quad \quad N - \{ \quad \text{(ring)} \quad N \diagup R_1 \\
R_4 \diagup \quad \quad \quad \quad \quad \quad \quad \diagdown R_2
\end{array}
\qquad (Ia)
$$

10  wherein

$R_1$ represents a hydrogen atom, an alkyl group having 1 to 3 carbon atoms, an allyl, benzyl, 2-chloro-benzyl, 4-chloro-benzyl, 3,4-dichloro-benzyl or phenylethyl group,

15       $R_2$ represents a hydrogen atom, a methyl or ethyl group,

$R_3$ represents a hydrogen atom, an alkyl group with 1 to 6 carbon atoms, an allyl, propargyl, benzyl, chlorobenzyl, phenylethyl, cyclopentyl

20  or cyclohexyl group,

$R_4$ represents a hydrogen atom, an alkyl group having 1 to 3 carbon atoms or an allyl group or

$R_3$ and $R_4$ together with the nitrogen atom between them represent a pyrrolidino, piperidino,

25  hexamethyleneimino or morpholino group, the enantiomers thereof and the acid addition salts thereof.

4.    Tetrahydro-benzthiazoles of general formula

- 50 -

Ia as claimed in claim 3, wherein the



5

group is in the 6-position, the enantiomers thereof,
and the acid addition salts thereof.

5.    Tetrahydro-benzthiazoles of general formula
Ia as claimed in claim 3, wherein

10       $R_1$ and $R_2$ together with the nitrogen atom
between them represent an amino or allylamino group and
        $R_3$ and $R_4$ together with the nitrogen atom
between them represent a diethylamino, diethylamino,
N-allyl-N-(4-chloro-benzyl)-amino, n-propylamino

15  or pyrrolidono group, the enantiomers thereof and
the acid addition salts thereof.

6.    2-Amino-6-dimethylamino-4,5,6,7-tetrahydro-
benzthiazole, the enantiomers thereof, and the acid
addition salts thereof.

20  7.    2-Amino-6-n-propylamino-4,5,6,7-tetrahydro-
benzthiazole, the enantiomers thereof, and the acid
addition salts thereof.

8.    Physiologically acceptable acid addition
salts with inorganic or organic acids of the compounds
25  as claimed in claims 1 to 7.

9.    Pharmaceutical compositions containing as
active substance a compound as claimed in claims
3 to 7 or a physiologically acceptable acid addition
salt as claimed in claim 8 optionally together

30  with one or more inert carriers and/or diluents.

10.    Use of a compound as claimed in claims 3
to 7 or a physiologically acid addition salt as
claimed in claim 8 for treating central nervous
neuro-psychiatric diseases and/or for treating

35  circulatory disorders.

11.    Use of a compound as claimed in claims 3 to 7
or a physiologically acceptable acid addition salt as

BOE00147070

– 51 –

claimed in claim 8 for the treatment of Parkinson's
disease or Parkinsonism.

12.    Process for preparing a pharmaceutical composition,
characterised in that a compound as claimed in
5  claims 3 to 7 or a physiologically acceptable acid
addition salt as claimed in claim 8 is incorporated
in one or more inert carriers and/or diluents
by a non-chemical method.

13.    Process for preparing the tetrahydro-benzthiazoles
10 as claimed in claims 1 to 8, characterised in that

a)    a cyclohexanone of general formula

$$
\begin{array}{c}
R_3 \\
\diagdown \\
N \\
\diagup \\
R_4
\end{array}
\quad
\overset{O}{\underset{X}{\bigcirc}}
\qquad (II)
$$

wherein

$R_3$ and $R_4$ are defined as in claims 1 to 7
15 and

X represents a nucleophilically exchangeable
group such as a halogen atom, e.g. a chlorine or
bromine atom,
with a thiourea of general formula

$$
\begin{array}{c}
S \\
\| \\
H_2N - C - N
\end{array}
\begin{array}{c}
R_1 \\
\diagup \\
\diagdown \\
R_2
\end{array}
\qquad (III)
$$

20

wherein

BOE00147071

– 52 –

$R_1$ and $R_2$ are defined as in claims 1 to 7,
or
b)    a compound of general formula



(IV)

5    wherein

$R_3$ and $R_4$ are defined as in claims 1 to 7,
in reacting with a formamidine disulphide of general
formula



(V)

10    wherein

$R_1$ and $R_2$ are defined as in claims 1 to 7
and
$Y^-$ represents an anion of an inorganic or
organic acid, or

15    c)    in order to prepare compounds of general
formula I wherein at least one of the groups $R_1$,
$R_2$, $R_3$ or $R_4$ represents a hydrogen atom, a protecting
group is split off from a compound of general formula

BOE00147072

– 53 –



(VI)

wherein at least one of the groups $R_1'$, $R_2'$, $R_3'$
or $R_4'$ represents a protecting group for an amino
5  group such as an acyl or alkoxycarbonyl group,
e.g. an acetyl, propionyl, methoxycarbonyl or ethoxycarbonyl
group, or $R_1'$ and $R_2'$ or $R_3'$ and $R_4'$ together with
the nitrogen atom between them represent an imido
group, e.g. the phthalimido group, and
10      the remaining groups $R_1$, $R_2$, $R_3$ or $R_4$ have
the meanings given for $R_1$ to $R_4$ in claims 1 to
7, with the exception of the acyl groups mentioned
in claims 1 and 2, or
d)      in order to prepare compounds of general
15  formula I wherein at least one of the groups $R_1$,
$R_2$, $R_3$ or $R_4$ represents one of the alkyl, cycloalkyl,
alkenyl or phenylalkyl groups mentioned in claims
1 to 7,
      a compound of general formula



VII

20

wherein at least one of the groups $R_1''$, $R_2''$, $R_3''$

BOE00147073

- 54 -

or $R_4$" represents one of the acyl or phenylacyl
groups mentioned in claims 1 and 2 and
     the other groups have the meanings given
for $R_1$, $R_2$, $R_3$ and $R_4$ in claims 1 to 7,

5     is reduced with a metal hydride in a solvent
or
e)    in order to prepare compounds of general
formula I wherein at least one of the groups $R_1$,
$R_2$, $R_3$ or $R_4$ represents one of the alkyl, cycloalkyl,

10  alkenyl, alkynyl or phenylalkyl groups mentioned
in claims 1 to 7,
     a compound of general formula



(VIII)

wherein

15     at least one of the groups $R_1$"', $R_2$"', $R_3$"'
or $R_4$"' represents a hydrogen atom and the other
groups $R_1$"', $R_2$"', $R_3$"' or $R_4$"' have the meanings
given for $R_1$ to $R_4$ in claims 1 to 7 is reacted
with a compound of general formula

20               $R_5 - Z$        (IX)

wherein $R_5$ represents one of the alkyl, cycloalkyl,
alkenyl, alkynyl or phenylalkyl groups mentioned
for $R_1$ to $R_4$ in claims 1 to 7 and
     Z represents a nucleophilically exchangeable

25  group such as a halogen atom or a sulphonic acid
group, e.g. a chlorine, bromine or iodine atom,
a methoxysulphonyloxy or p-toluenesulphonyloxy group,

BOE00147074

- 55 -

or Z together with an adjacent hydrogen of the
group $R_5$ represents an oxygen,
        and subsequently if desired, a compound of
general formula I thus obtained wherein at least
5  one of the groups $R_1$, $R_2$, $R_3$ or $R_4$ represents a
hydrogen atom, is converted by a suitable acylation
into a corresponding compound of general formula
I wherein at least one of the groups $R_1$, $R_2$, $R_3$
or $R_4$ represents one of the acyl groups mentioned
10  in claims 1 and 2, or
        a compound of general formula I thus obtained
which contains at least one chiral centre is resolved
into its enantiomers or
        a compound of general formula I thus obtained
15  is converted into the acid addition salts thereof,
particularly the physiologically acceptable acid
addition salts with organic or inorganic acids.
14.    Process as claimed in claim 13, characterised
in that the reaction is carried out in a solvent.
20  15.    Process as claimed in claims 13a and 14,
characterised in that the reaction is carried out
at temperatures of between 0 and 150°C, preferably
at temperatures of between 20 and 100°C.
16.    Process as claimed in claims 13b and 14,
25  characterised in that the reaction is carried out
at temperatures of between 50 and 200°C, preferably
at temperatures of between 70 and 150°C.
17.    Process as claimed in claims 13c and 14,
characterised in that the splitting off of a protecting
30  group is carried out by hydrolysis in the presence
of a base or acid.
18.    Process as claimed in claims 13c, 14 and
17, characterised in that the reaction is carried
out at temperatures of between 50 and 150°C.
35  19.    Process as claimed in claims 13d and 14,
characterised in that the reduction is carried
out with lithium aluminium hydride.

BOE00147075

- 56 -

20.    Process as claimed in claims 13d, 14 and
19, characterised in that the reduction is carried
out at temperatures of between 0 and 100°C, preferably
at temperatures of between 20 and 80°C.

5   21.    Process as claimed in claims 13e and 14,
characterised in that, if X represents a nucleophilically
exchangeable group, the reaction is carried out
at temperatures of between -10 and 50°C, preferably
at temperatures of between 0 and 30°C.

10  22.    Process as claimed in claim 21, characterised
in that the reaction is carried out in the presence
of a base.

23.    Process as claimed in claims 13e and 14,
characterised in that, if the reaction is carried

15  out with a carbonyl compound of general formula
IX, it is carried out in the presence of a complex
metal hydride at temperature of between 0 and 50°C,
preferably at ambient temperature.

24.    Process as claimed in claim 23, characterised

20  in that sodiumborohydride or sodiumcyanoborohydride
is used as the complex metal hydride.

BOE00147076

- 57 -

## Abstract

This invention relates to new tetrahydro-benzthiazoles of general formula

$$R_3 \overset{\displaystyle |}{\underset{\displaystyle R_4}{N}} - \boxed{\phantom{ring}} - N \overset{\displaystyle R_1}{\underset{\displaystyle R_2}{}} \qquad (I)$$

wherein

$R_1$ represents a hydrogen atom, an alkyl group, an alkenyl or alkynyl group, an alkanoyl group, a phenyl alkyl or phenyl alkanoyl group, whilst the above mentioned phenyl nuclei may each be substituted by 1 or 2 halogen atoms,

$R_2$ represents a hydrogen atom or an alkyl group,

$R_3$ represents a hydrogen atom, an alkyl group a cycloalkyl group, an alkenyl or alkynyl group, an alkanoyl group, a phenyl alkyl or phenyl alkanoyl group, whilst the phenyl nucleus may be substituted by fluorine, chlorine or bromine atoms,

$R_4$ represents a hydrogen atom, an alkyl group, an alkyl or alkenyl group, or

$R_3$ and $R_4$ together with the nitrogen atom between them represent a pyrrolidino, piperidino, hexamethyleneimino or morpholino group, the enantiomers and the acid addition salts thereof.

The compounds of general formula I above in which one of the groups $R_1$ or $R_3$ or both groups $R_1$ and $R_3$ represent an acyl group are valuable intermediate products for preparing the other compounds of general formula I which have valuable pharmacological properties,

BOE00147077

- 58 -

particularly an effect on the central nervous system
and/or the circulation.

The new compounds may be prepared using methods
known per se.

ROE00147078

EXHIBIT G

CONFIDENTIAL EXHIBIT

EXHIBIT H

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

BOEHRINGER INGELHEIM INTERNATIONAL,   )
GMBH and BOEHRINGER INGELHEIM         )
PHARMACEUTICALS, INC.,                )
                                      )
              Plaintiffs,             )
                                      )
         vs.                          ) C.A. No.
                                      ) 05-700
BARR LABORATORIES, INC.,              )  (KAJ)
                                      )
              Defendant.              )
---------------------------------------)
BOEHRINGER INGELHEIM INTERNATIONAL,   )
GMBH and BOEHRINGER INGELHEIM         )
PHARMACEUTICALS, INC.,                )
                                      )
              Plaintiffs,             )
                                      )
         vs.                          ) C.A. No.
                                      ) 05-854
                                      )  (KAJ)
MYLAN PHARMACEUTICALS, INC.,          )
                                      )
              Defendant.              )
---------------------------------------)

VIDEOTAPE DEPOSITION OF ALAN STEMPEL
New York, New York
Wednesday, October 11, 2006

Reported by:
ERICA L. RUGGIERI, RPR
Job No. 10483





## David Feldman
### W o r l d w i d e

From File to Trial.

805 Third Avenue, 8th Floor
New York, NY 10022
(800) 642-1099

600 Anton Boulevard, 11th Floor
Costa Mesa, CA 92626
(866) DFW-1380



150

Alan Stempel

1
2    Q.    Have you seen this file history
3    before, Mr. Stempel?
4        (Witness reviews documents.)
5    A.    Yes, I believe I have.
6    Q.    Did you see the file history prior to
7    preparing for your deposition in this case?
8        MR. CHERNY:  I didn't hear the last
9    word you said.
10    Q.    Did you see the file history prior to
11    preparing for your deposition in this case?
12        MR. CHERNY:  Thank you.
13    A.    I have no specific recollection
14    whether I have or have not, prior to preparing.
15    Q.    Do you agree that this is the file
16    history for the '374 patent?
17    A.    It appears to be.
18    Q.    And if you would turn to the page
19    Bates labeled BARR 000070.
20    A.    What are last three numbers?
21        MR. CHERNY:  70.
22    Q.    070.
23    A.    The next one, right.
24    Q.    There you go.  Perfect.  All right.
25        And is this, is the document that

151

Alan Stempel

1
2    starts on this page, Barr 000070, the
3    application that was filed by you that
4    ultimately led to the issuance of the '374
5    patent?
6    A.    It appears to be.
7    Q.    At the top of each page of the
8    application the word "patent" appears.
9        Do you see that?
10    A.    Yes.
11    Q.    Can you tell me what that designation
12    refers to?
13    A.    I do not recall if that was something
14    that was on the application when it was sent to
15    the patent office or not.  I don't recall that
16    it wasn't, I don't recall that it was.
17    Q.    I take it you have no recollection of
18    putting that legend on the top of each of the
19    pages?
20    A.    I have no recollection.
21    Q.    At the bottom of each page of the
22    application it indicates case 5/920, do you see
23    that?
24    A.    Yes.
25    Q.    Can you tell me what that indicates?

152

Alan Stempel

1
2    A.    That, I believe it would be the
3    internal attorney's docket number for this
4    patent application.
5    Q.    And what does the 5 designate in this
6    instance?
7    A.    That the origin of the case was
8    Biberach, Germany.
9    Q.    And is 920 a sequential number?
10    A.    I believe it is.
11    Q.    Is the 5/920 case number something
12    that would have been assigned in Germany?
13    A.    Yes.
14    Q.    That was not a unique identifier that
15    the U.S. patent department put on the case?
16    A.    No.  My belief is that was assigned
17    by Germany.
18    Q.    Now, this application is one of the
19    applications that was prosecuted by you,
20    correct?
21    A.    Yes.
22    Q.    And I take it you kept yourself
23    generally apprised of the status of this
24    application, during prosecution?
25        MR. CHERNY:  Objection, vague.

153

Alan Stempel

1
2    A.    I'm not sure what "generally apprised
3    of the status of the application" means.  That
4    could mean something very different to three
5    different people.
6    Q.    Were you the person who was primarily
7    responsible for this application?
8    A.    Yes.
9    Q.    And did that include substantive
10    responsibility for the application?
11        MR. CHERNY:  Objection, vague.
12    A.    What does "substantive
13    responsibility" mean?
14    Q.    Did you believe that you had any
15    responsibilities beyond serving as a conduit
16    between the patent office and the patent
17    department in Germany?
18    A.    Yes.
19    Q.    What other responsibilities did you
20    have, other than serving as a conduit between
21    the patent department in Germany and the patent
22    office --
23        MR. CHERNY:  Objection.  Lack of
24    foundation.
25    Q.    -- with respect to this application?

39 (Pages 150 to 153)

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BOEHRINGER INGELHEIM INTERNATIONAL,  )
GMBH and BOEHRINGER INGELHEIM        )
PHARMACEUTICALS, INC.,               )
                                     )
            Plaintiffs,              )
                                     )
       vs.                           ) C.A. No.
                                     ) 05-700
BARR LABORATORIES, INC.,             ) (KAJ)
                                     )
            Defendant.               )
-------------------------------------)
BOEHRINGER INGELHEIM INTERNATIONAL,  )
GMBH and BOEHRINGER INGELHEIM        )
PHARMACEUTICALS, INC.,               )
                                     )
            Plaintiffs,              )
                                     )
       vs.                           ) C.A. No.
                                     ) 05-854
MYLAN PHARMACEUTICALS, INC.,         ) (KAJ)
                                     )
            Defendant.               )
-------------------------------------)


CONTINUED VIDEOTAPED DEPOSITION OF ALAN STEMPEL
            Danbury, Connecticut
         Friday, January 19, 2007


Reported by:
ERICA L. RUGGIERI, RPR
Job No: 11505




**David Feldman**
W o r l d w i d e

From File to Trial.

805 Third Avenue, 8th Floor
New York, NY 10022
(800) 642-1099

600 Anton Boulevard, 11th Floor
Costa Mesa, CA 92626
(866) DFW-1380

346

STEMPEL

1   preclinical experiments and going through the
2   FDA and whatnot, but I don't have any particular
3   understanding or knowledge of what happened to
4   pramipexole or Mirapex.
5
6       Q.   Did you ever have conversations with
7   anyone regarding anyone who was involved in
8   overseeing or actually conducting the
9   preclinical or clinical tests?
10      A.   I don't have any recollection that I
11  did.
12           MR. CHERNEY:  Give me time to object,
13      especially when she's asking you about
14      conversations, because I have to assess the
15      privilege issues.  Please.
16      Q.   I'm going to hand you now a document
17  that we began at the first day of
18  your deposition, Exhibit 46.
19           And I believe you'll see that this is
20  a certified copy of the file history of the 947
21  application.  If you just refer to the last
22  three digits.
23      A.   Okay.
24      Q.   Do you see that?
25      A.   I see 947 up at the top, yeah,

347

STEMPEL

1   uh-hum.
2       Q.   And this is the file history for the
3   patent that ultimately issued as the '374
4   patent, Exhibit 1?
5       A.   Okay, yup.
6       Q.   Do you see that?
7       A.   Yup, uh-hum.
8       Q.   And you were responsible for filing
9   and prosecuting this application?
10      A.   That's my recollection.
11      Q.   And Dr. Fleischer was your primary
12  contact in Germany, regarding this application?
13      A.   Uh-hum, yes.
14      Q.   And if you turn to page with the
15  number, the BARR number, I'm going to refer to
16  the BARR numbers, BARR70.
17      A.   Okay.
18      Q.   That is the first page of the text of
19  the patent application that was submitted --
20      A.   Okay.
21      Q.   -- is that right?
22      A.   Looks right.
23      Q.   Okay.  Who drafted this document?
24      A.   I'm not sure I know who drafted this

348

STEMPEL

1   document.
2           Actually, what do you mean by this
3   document, too?
4       Q.   Okay, well, let's talk about the
5   application that begins on page BARR70.  If you
6   flip through, I think you'll find that it
7   ends -- I'm not talking about the attendant
8   paperwork, I'm just talking about the actual
9   application ends on page BARR119; is that right?
10      A.   Okay.
11      Q.   You now understand what I'm talking
12  about?
13      A.   No, actually, I don't.
14      Q.   What I'm asking is, do you -- you do
15  agree with me, that document that starts on
16  BARR70 and goes through BARR119 is the original
17  patent application that you filed with the
18  United States Patent Office in this case, right?
19      A.   It would appear to be.
20      Q.   Okay.  And who drafted this document,
21  the one that starts on page BARR70 and goes
22  through page BARR119?
23      A.   Again, I'm not really sure what your
24  questions means.

349

STEMPEL

1       Q.   What is unclear about my question?
2       A.   What does it mean to draft a
3   document?
4           And what if more than one person was
5   involved in the preparation of a document, who,
6   then, is the drafter of the document?
7       Q.   I didn't ask you -- my question did
8   not intend to exclude multiple people drafting.
9   So if you believe that more than one person
10  drafted it, why don't you tell me, then.
11      A.   Okay.  Well, I believe that I had a
12  hand in the -- in making certain editorial
13  changes to put the claims into U.S. format.
14      Q.   Aside from that, did you have
15  other -- did you have any other hand in the
16  drafting of this document?
17      A.   I don't recall that I did.
18           It's likely that my involvement in
19  editing of this document was restricted to that,
20  but I can't exclude that there -- there might
21  have been other editorial changes.
22      Q.   When you say you edited the document,
23  are you referring to the fact that you received
24  a foreign filing text in English, and you edited

10  (Pages 346 to 349)

466

STEMPEL

1    STEMPEL
2    certified copy of the file wrapper, or at least
3    this particular certified copy.
4    Q.    Have you seen a copy of the file
5    wrapper that wasn't certified?
6    A.    Actually, at this point I'm not --
7    I'm not sure one way or the other, actually,
8    whether or not I have seen it, a copy of the
9    file wrapper.
10    Go on.  Certified or otherwise.
11    Q.    This document, Exhibit 286, you
12    understand this is the file history for the
13    '0 -- for the application that issued as the
14    '086 patent?
15    A.    For the middle exhibit?
16    Q.    Right, Exhibit 2.
17    A.    Right, uh-hum.
18    Q.    Were you responsible for prosecuting
19    this application in front of the United States
20    Patent and Trademark Office?
21    Please take your time, if you need to
22    look through it.
23    MR. CHERNEY:  Just one clarification.
24    When you say "responsible," are you asking
25    him if he's solely responsible or in any

467

STEMPEL

1    STEMPEL
2    way responsible?
3    MS. BERNIKER:  If he wants to
4    clarify, he can clarify in his answer.  I
5    was just asking if he was responsible.
6    MR. CHERNEY:  I was asking for a
7    clarification.  Apparently --
8    MS. BERNIKER:  I thought the question
9    was clear.
10    MR. CHERNEY:  Okay.
11    A.    I see submissions in here with my
12    name on them, which means that I was involved
13    with the prosecution of this application.
14    Q.    Were you responsible for prosecuting
15    this patent before the United States Patent and
16    Trademark Office, this patent application?
17    A.    Yes.
18    Q.    Was anybody else also responsible for
19    prosecuting this patent application in front of
20    the United States Patent and Trademark Office?
21    A.    I don't know whether or not anybody
22    else was.
23    Again, I come back to the question
24    with the word "responsible."  I'm going to say I
25    don't know whether or not anybody else was

468

STEMPEL

1    STEMPEL
2    involved with the prosecution of this
3    application.
4    Q.    Can you think of any individual that
5    filed papers on behalf of Boehringer, in
6    connection with this application, aside from
7    yourself?
8    A.    Well, I can look through all the
9    papers in here and see if I can find anybody
10    else's signature.
11    Q.    Is it your recollection that anyone
12    else was involved in the prosecution of this
13    application?
14    A.    I have no recollection -- I mean
15    actually, I have no recollection of myself
16    prosecuting this application.  I can tell that I
17    prosecuted it, because my name is on it.
18    Q.    Sitting here today, can you name
19    anybody else who you remember being involved in
20    the prosecution of this application?
21    A.    No.
22    Q.    Just for clarity purposes, will you
23    understand, if I refer to it as the 197
24    application, which is the last three digits of
25    the application number?

469

STEMPEL

1    STEMPEL
2    A.    Sure, okay.
3    Q.    This patent application was filed on
4    November 23, 1987; is that right?
5    A.    Yes.
6    Q.    And Robert Gerstl was the primary
7    examiner at the patent office?
8    A.    When I look through these various
9    papers and the file history, I haven't seen all
10    of them, but of the papers I have seen since
11    you've handed me this exhibit, I did see his
12    name on at least one or more of them as the
13    examiner.
14    Q.    Do you recall that he was the
15    examiner?
16    A.    I don't recall, no.
17    Q.    Do you remember Mr. Gerstl,
18    generally?
19    A.    I remember having dealt with him.
20    Q.    Do you remember dealing with him, in
21    the context of patent applications relating to
22    tetrahydro-benzthiazoles?
23    A.    I don't have any recollections of him
24    that are specific to this case, or these cases.
25    Q.    Do you have an opinion as to the

554

STEMPEL

1 mean -- why don't you ask what your question is.
2
3    Q.   Given that you --
4    A.   Because you are asking your question
5 in subtly different ways; and my answer is
6 coming back subtly different, because you are
7 asking the question in subtly different ways.
8    Q.   Okay, well, let me try to be as clear
9 as possible.
10        Given that, as you've already
11 testified, in the 947 restriction requirement
12 the examiner required an election of no more
13 than one utility group.
14    A.   Correct.
15    Q.   And given, as you previously
16 testified, that the '086 patent issued with more
17 than one utility group, as defined by the
18 restriction requirement utility groups, doesn't
19 that mean that if this -- the restriction
20 requirement had been renewed and issued -- and
21 renewed in the '086 prosecution, the prosecution
22 of the patent that led to the '086 patent, that
23 you wouldn't have been able to end up with a
24 patent that included all of these claims, unless
25 the examiner changed his or her mind about the

555

STEMPEL

1
2 restriction requirement?
3    A.   I think that's correct.  I'm not
4 certain.
5    Q.   Okay.  And when you look at the
6 '086 patent claims, for example, in claim 1, and
7 you look at R3 and R4 in claim 1 in column 24?
8    A.   Where am I now?
9    Q.   Column 24, claim 1 of the
10 '086 patent?
11    A.   '086 patent, okay.
12    Q.   Too many documents.
13    A.   And column 24?
14    Q.   Yes.  And if you look at claim 1, it
15 says that R3 and R4 together with a nitrogen
16 atom between them, form a pyrrolidino piperidino
17 hexamethyleneimino or morpholino group or a
18 pharmaceutically acceptable acid addition salt
19 thereof, do you see that?
20    A.   Yes.
21    Q.   That's a possibility for R3 and R4 in
22 claim 1, right?
23    A.   Yes.
24    Q.   Okay.  And if we look again to the
25 examiner's restriction requirement in the '374

556

STEMPEL

1
2 application, she had compound groups -- I'm
3 sorry --
4    A.   The '374, that's the same as the 947?
5    Q.   I'm sorry, the 947.  I'm not trying
6 to confuse you.  You know what, we will move on.
7 Let's move on.
8        To your knowledge, Mr. Stempel, you
9 did not provide the patent office with English
10 translations of the German priority documents,
11 in connection with the prosecution of the 197
12 application, Exhibit 286?
13    A.   I don't have a recollection of having
14 done that.
15    Q.   And you haven't seen any evidence
16 that you had done that today, in your review of
17 documents?
18    A.   I'm not saying it's not there, but
19 not in anything I have seen today.
20    Q.   Okay.  All right, let's move on.
21        I'm now going to hand you yet another
22 document, Mr. Stempel.  This is a document
23 previously marked as Exhibit 99.  This is a
24 certified copy of the -- I'm sorry.  This is the
25 certified copy of the file history of the 671

557

STEMPEL

1
2 application, do you see that?
3    A.   Okay, yes.
4    Q.   And that is the application that
5 ultimately issued as the '812 patent.  Do you
6 see that?
7    A.   Correct.
8    Q.   And the '812 patent is Exhibit 3
9 before you.
10    A.   Okay.
11    Q.   And you understand that this is the
12 third in a series of United States applications
13 that was filed relating to
14 tetrahydro-benzthiazoles by Boehringer?
15    A.   Yes.
16    Q.   And you handled the filing and
17 prosecution of this application, right?
18    A.   Let's find out.
19        There are certainly prosecution
20 papers in the file history with my name on them,
21 signed by me.
22    Q.   And you were responsible for handling
23 the prosecution and filing of this application
24 in the United States, right?
25    A.   Correct.

62   (Pages 554 to 557)

570

1            STEMPEL
2     **A.  Correct.**
3     Q.  So essentially what you were doing,
4 when you filed this application, the 671
5 application, is refiling claims 1 through 8 and
6 removing from them the pyrrolidino group --
7     **A.  Okay.**
8     Q.  -- is that right?
9     **A.  I think that's correct.**
10     Q.  Okay.  Then if you turn to the next
11 page, BARR678 --
12     **A.  Give me one second, okay?**
13     Q.  Please.
14     **A.  Okay.  678?**
15     Q.  Yes.  There is a second preliminary
16 amendment and information disclosure statement
17 at the beginning of that document, right?
18     **A.  Correct.**
19     Q.  And if you turn to the last page of
20 that document, which I believe is at BARR681,
21 that's your signature?
22     **A.  Correct.**
23     Q.  Okay.  And that's dated December 8th,
24 1988?
25     **A.  Correct.**

571

1            **STEMPEL**
2     Q.  And in this amendment, now turning
3 back to the beginning of the amendment that
4 begins on 678 --
5     **A.  Yes.**
6     Q.  -- the first thing you did was add
7 new claims, 16 and 17, right?
8     **A.  Uh-hum, yes.**
9     Q.  And they have the same general
10 formula that we discussed regarding new claims
11 that you added in the 197 application, do you
12 recollect that?
13     **A.  Our discussion?**
14     Q.  Yes.  Do you recollect our
15 discussion?
16     **A.  Vaguely, yes.**
17     Q.  The structure that you see under
18 claim 16, which is crossed out and then says 9,
19 on page 678?
20     **A.  Yes.**
21     Q.  There's a structure, and that's the
22 structure that we discussed earlier, where there
23 are two hydrogens on the nitrogen on the right
24 of the structure and one hydrogen and one R on
25 the left side?

572

1            STEMPEL
2     **A.  The R1 and two and three and the four**
3 **disappeared and got replaced by hydrogens or**
4 **that single R?**
5     Q.  Right, exactly.
6     **A.  Okay.**
7     Q.  And do you know who proposed that
8 this claim be drafted, who came up with this?
9     **A.  I have no recollection how this claim**
10 **came to be.**
11     Q.  Do you have any recollection as to
12 how this structure came to be?
13     **A.  I don't.**
14     Q.  And then in this document beginning
15 on page BARR680, there is the heading C,
16 Possibly Interfering Application of Another.
17        Do you see that?
18     **A.  Yes.**
19     Q.  Then you bring to the examiner's
20 attention the Eli Lilly United States
21 application and the Eli Lilly European
22 application, right?
23     **A.  Yes.**
24     Q.  Can you tell me who drafted this
25 document that begins to page 678?

573

1            STEMPEL
2     **A.  What do you mean by "drafted" it?**
3     Q.  Who came up with the text?
4     **A.  Your question is assuming that one**
5 **person came up with all the text.**
6     Q.  I'm not assuming that.  If there's
7 more than one person, please feel free to
8 include that in your answer.
9     **A.  I don't have any recollection, but in**
10 **that I signed it, I'm going to go out on a limb**
11 **to say that I came up with least some of that**
12 **text.**
13     Q.  Do you know which part of the text
14 you came up with?
15     **A.  I don't.**
16     Q.  Do you know whether you did come up
17 with part of the text?
18     **A.  I don't know that I did or did not.**
19     Q.  Do you know who else came up with at
20 least part of the text?
21     **A.  I have no recollection about the**
22 **creation of this document.**
23     Q.  Do you remember having discussions
24 with anybody about this document?
25     **A.  I have no recollection about having a**

**66  (Pages 570 to 573)**

574

STEMPEL

discussion about this document.

Q. Do you know whether you consulted with Dr. Fleischer, regarding this document, before it was submitted to the United States patent office?

A. Are you asking if I recall a conversation or communication with Dr. Fleischer?

Q. Yes.

A. No, I do not.

Q. But this is the kind of document that you would generally discuss with a German counterpart before submitting to the United States patent office, right?

A. Generally speaking, yes.

Q. Why did you disclose the Eli Lilly European and United States applications to the United States patent office in this document?

A. Are you asking me if I have a recollection that goes back to when this document was actually created and submitted?

Q. I'm asking you if you know why, sitting here today, can you tell me why?

A. In the file history that we were

575

STEMPEL

reading a few minutes ago there was some discussion of Lilly, and I think there was a discussion saying that the division was going to be filed so that the claims could be better considered in the context of this reference.

Q. Okay.

A. Didn't we just go through that a few minutes ago?

Q. We did. But what I want to know now is why, in this application, you brought these -- the Eli Lilly applications to the examiner's attention.

A. And I'm saying to you that beyond what I read a few minutes ago, I do not have any recollection of events back in -- what was it now, '88?

Q. Right.

A. -- that would help me answer your question.

Q. Okay. And did you believe, at the time that you submitted this application -- I'm sorry, that you submitted this document, did you believe that the Eli Lilly United States application was a material -- was material to

576

STEMPEL

the examination of this application?

MR. CHERNEY: Objection, calls for a legal conclusion.

A. First of all, I don't recall what I believed when this paper was submitted.

Does that answer your question?

Q. It does, unless there was a second of all.

A. Okay. I think you asked me what I believed, past tense, and I just told you that I don't recall what I believed, past tense.

Q. Do you have a belief, present tense, regarding whether the Eli Lilly United States application was material to the examination of this application?

A. Well, if I understand what I was saying here back in 1988 correctly, I'm saying that this Lilly reference may be available under 102 G, at least to the extent that maybe it represents interfering subject matter -- that it presents interfering subject matter. So at least for that reason, it would be material.

Q. Are you aware of other reasons why it might be material?

577

STEMPEL

A. Are you saying --

Q. Do you have any understanding regarding any other reasons why it would be material?

A. No.

Q. And in making the representation on page 680 that the effective filing date of the above-captioned application is 22 December 1984, when you say "above-captioned application," does that refer to the 671 application?

A. I believe so.

Q. Okay. In making that representation, what, if anything, did you do to determine that that statement was accurate?

A. I don't have any recollection of the origin of that statement.

Q. Is it fair to say that the testimony that you provided about that statement, when we discussed it in the context of the other two patent applications, is equally true in this case?

A. Actually, since I don't really recall what I testified to with great precision, I'm not even willing to say that.

67 (Pages 574 to 577)

# EXHIBIT I

CONFIDENTIAL EXHIBIT

# EXHIBIT J

→ Acct Boultes



⑲ Europäisches Patentamt
European Patent Office
Office européen des brevets

⑪ Publication number: **0 207 696 A1**

## EUROPEAN PATENT APPLICATION

㉑ Application number: 86304754.4

㉒ Date of filing: 20.06.86

�51 Int. Cl.⁴: C 07 D 277/82
C 07 D 263/58, A 61 K 31/425
A 61 K 31/42

㉚ Priority: 24.06.85 US 747748

㊸ Date of publication of application:
07.01.87 Bulletin 87/2

㊴ Designated Contracting States:
AT BE CH DE FR GB IT LI NL SE

⑪ Applicant: ELI LILLY AND COMPANY
Lilly Corporate Center
Indianapolis Indiana 46285(US)

㉒ Inventor: Laguzza, Bennett Coleman
7340 North Grand Avenue
Indianapolis Indiana, 46250(US)

㉒ Inventor: TUrner, William Wilson, Jr.
321 East 14th Street Apt. A2
Bloomington Indiana 47401(US)

㉔ Representative: Tapping, Kenneth George  et  al,
Erl Wood Manor
Windlesham Surrey, GU20 6PH(GB)

㉔ Dialkylaminotetrahydrobenzothiazoles and oxazoles.

㉗ ±-2-Amino-6-dialkylaminotetrahydrobenzothiazoles  or
oxazoles as receptor agonists.

EP 0 207 696 A1

Croydon Printing Company Ltd



EXHIBIT
81

BOE00004259

(R=NH$_2$) and ergonovine (ergometrine) (I, -R=N-CHCH$_2$OH),
as well as the peptide alkaloids (R=a complex amide
derived from a polypeptide by cyclization) including
ergotamine, ergosine, ergocornine, ergocryptine,
ergocristine, etc. The corresponding alkaloids based on
isolysergic acid (9-ergolene-8α-carboxylic acid) have
also been isolated.

The ergot alkaloids as a group have several
interesting pharmacologic activities; uterine contrac-
tion (oxytocic action), peripheral vasoconstriction,
adrenergic blockade, and serotonin antagonism plus
varied CNS activities including the production of
hallucinations. Certain of the alkaloids individually
are used to produce post-partum uterine contractions and
in the sympomatic treatment of migraine. Pharmacologic
activity, toxicity and central effects vary from
alkaloid to alkaloid. In general, hydrogenation of the
delta-9 double bond results in compounds of lowered
activity as regards peripheral action but adrenolytic
and central inhibition of vasomotor centers may be
enhanced.

Derivatives of lysergic acid and dihydro-
lysergic acid are too numerous to mention, but include,
generically, substitution on the indole nitrogen, at
C-2 (α-bromocryptine is a 2-bromo derivative), replace-
ment of N-6 methyl by other alkyl groups or by allyl and
replacement of the carboxamide function at C-8 by
various groups, particularly cyanomethyl, carboxamido-
methyl, methylthiomethyl, and methoxymethyl. In

BOE00004261

0207696

degree of specificity as regards the dopamine D-2
agonist activity (prolactin inhibition etc) of ergo-
cornine, dihydroergocornine, lergotrile or pergolide
(United States patents 3,920,664, 4,054,660 and

5    4,166,182 for example). Recently, however, Kornfeld and
Bach have found that the A ring of an ergoline is not
required for D-2 agonist activity.  These new part
structures are named as hexahydropyrrolo[4,3-g]quino-
lines- see United States patent 4,235,909.  A related

10   structure, a hexahydropyrazolo[4,3-g]quinoline, United
States patent 4,198,415, also has excellent D-2 agonist
action.  The corresponding 2-ring compounds, in which
the D ring of the ergoline is opened, are also active
D-2 agonists -- see United States patent 4,235,226 for

15   the amino-substituted isoindoles, and United States
patent 4,276,300 for the amino substituted indazoles
(like the three-ring pyrazoles).  It has now been found
that other hetero ring systems than pyrrole and pyrazole
can be attached to the perhydroquinoline ring (rings B +

20   C of an ergoline) to complete a three-ring analogue.
One of these is a pyrimidine - see Nichols and Kornfeld,
United States patent 4,501,890.

2-Amino-6-dialkylaminotetrahydrobenzothiozoles
and oxazoles are not known.

25

This invention provides tetrahydrobenzothia-
zoles and oxazoles of the formula

0207696

X-6708                           -4-

degree of specificity as regards the dopamine D-2
agonist activity (prolactin inhibition etc) of ergo-
cornine, dihydroergocornine, lergotrile or pergolide
(United States patents 3,920,664, 4,054,660 and
5  4,166,182 for example).  Recently, however, Kornfeld and
Bach have found that the A ring of an ergoline is
not required for D-2 agonist activity.  These new part
structures are named as hexahydropyrrolo[4,3-g]quino-
lines- see United States patent 4,235,909.  A related
10  structure, a hexahydropyrazolo[4,3-g]quinoline, United
States patent 4,198,415, also has excellent D-2 agonist
action.  The corresponding 2-ring compounds, in which
the D ring of the ergoline is opened, are also active
D-2 agonists -- see United States patent 4,235,226 for
15  the amino-substituted isoindoles, and United States
patent 4,276,300 for the amino substituted indazoles
(like the three-ring pyrazoles).  It has now been found
that other hetero ring systems than pyrrole and pyrazole
can be attached to the perhydroquinoline ring (rings B +
20  C of an ergoline) to complete a three-ring analogue.
One of these is a pyrimidine - see Nichols and Kornfeld,
United States patent 4,501,890.

        2-Amino-6-dialkylaminotetrahydrobenzothiozoles
and oxazoles are not known.

25

        This invention provides tetrahydrobenzothia-
zoles and oxazoles of the formula

BOE00004265

0207696

X-6708                        –6–

erally or both of certain neurohormones. For example, compounds according to XX in which both $R^3$ and $R^4$ are allyl or n-propyl, are dopamine agonists, particularly dopamine D-2 agonists, capable of increasing the effec-tive concentration of dopamine in the brain. Compounds
5   wherein $R^3$ and $R^4$ are both methyl have σ-agonist action.
          Also included within the scope of this inven-tion are acid addition salts of the nitrogenous bases represented by XX. The above compounds contain at least
10  three basic nitrogens; first, the amine group at C-6; secondly, the ring nitrogen in the fused heterocyclic ring; and thirdly, the $NR^1R^2$ group. The nitrogen of the C-6 amino group is generally the most basic of the amine functions and readily forms acid addition salts. Strong
15  inorganic acids such as the mineral acids or strong organic acids, such as p-toluenesulfonic acid, can when employed in excess form di salts with one of the other amine functions in the compounds of this invention.
          Pharmaceutically-acceptable acid addition
20  salts of the compounds of this invention thus include mono or di salts derived from inorganic acids such as: hydrochloric acid, nitric acid, phosphoric acid, sulfuric acid, hydrobromic acid, hydriodic acid, phos-phorous acid and the like, as well as salts derived from
25  organic acids such as aliphatic mono and dicarboxylic acids, phenyl-substituted alkanoic acids, hydroxy-alkanoic and alkandioic acids, aromatic acids, aliphatic and aromatic sulfonic acids, etc. Such pharmaceutically-acceptable salts thus include sulfate, pyrosulfate,
30  bisulfate, sulfite, bisulfite, nitrate, phosphate,

BOE00004267

0207696

X-6708                    -8-

## Reaction Scheme I



XXI

NaCNBH₃    HNR⁵R⁶

XXII

acid

XXIII    Br₂
HBr

XIV

NH₂–C–NR¹R²

R²R¹N          NR⁵R⁶

XXa

BOE00004269

0207696

X-6708                    -10-

allylbromide in the presence of a base.  If desired, a
primary amine group at C-2 can be protected as by
acylation, and the acyl group removed by hydrolysis
after the allylation at the C-6 amine is completed.

5          Compounds according to XX above have an
asymmetric carbon, the C-6 carbon, to which the amino
group ($NR^3R^4$) is attached.  Thus, compounds represented
by XX above include two optical isomers occurring as a
(±) or dl pair or racemate.  Resolution of a (±) pair of
10   this invention into its optical antipodes can be accom-
plished by the usual empirical procedures used by those
skilled in the art.  Such separated optical isomers
are included within the scope of this invention.

          Compounds preparable by the above procedures
15   which illustrate the scope of this invention include:
          (-)-2,6-bis(dimethylamino)-5,6,7,8-tetrahydro-
benzothiazole methanesulfonate,
          (+)-2,6-bis(methyl-n-propylamino)-5,6,7,8-
tetrahydrobenzoxazole hydrobromide,
20          (±)-2-dimethylamino-6-ethyl-n-propylamino-
5,6,7,8-tetrahydrobenzoxazole sulfate,
          (±)-2-diethylamino-6-di-n-propylamino-5,6,7,8-
tetrahydrobenzothiazole hydrobromide,
          (±)-2-methylethylamino-6-diallylamino-5,6,7,8-
25   tetrahydrobenzothiazole maleate,
          (-)-2-dimethylamino-6-allylmethylamino-5,6,7,8-
tetrahydrobenzoxazole succinate,
          (±)-2-diethylamino-6-allyl-n-propyl-5,6,7,8-
tetrahydrobenzothiazole tartrate,

BOE00004271

X-6708                    -12-

starting material.  The reaction mixture was therefore
filtered and the filter cake washed with methanol.  The
filtrate and wash were combined, and the solvent evap-
orated therefrom to yield a thick, white slurry.  The
5    slurry was cooled to about 0°C and 100 ml of 1N hydro-
chloric acid were added with stirring.  The resulting
solution was extracted twice with equal volumes of
ether.  The ether extracts were separated and discarded.
The aqueous layer was cooled and then made basic by the
10   addition of 5N aqueous sodium hydroxide (pH ~12).  The
basic layer was extracted three times with 50 ml
portions of methylene dichloride.  The methylene di-
chloride extracts were combined, the combined extracts
were washed once with saturated aqueous sodium bicar-
15   bonate and were then dried.  Evaporation of the solvent
in vacuo yielded a yellow oil containing some solid;
weight = 6.26 g.  The residue was flash chromatographed
over silica using a 100:1 ether/triethylamine solvent as
eluant.  [The term "flash chromatography" refers to a
20   procedure developed by Still et al., J. Org. Chem., 43,
2923 (1978)].  Fifty ml fraction were taken.  Fractions
10-15 were shown by TLC to contain the desired material.
These fractions were combined and concentrated in vacuo
to yield 5.40 g of a nearly colorless oil comprising
25   4-di-n-propylamino-1-cyclohexanone 2,2-dimethyltri-
methylene ketal.

        The ketal group was removed by dissolving
4.4 g of the above ketal in 110 ml of 6N hydrochloric
acid with stirring under a nitrogen atmosphere for
30   48 hours at room temperature.  The colorless solution

0207696

4,5,6,7-benzothiazole dihydrobromide formed in the above
reaction weighed 1.05 g.  The dihydrobromide salt was
recrystallized from a methanol/ether solvent mixture to
yield 589 mg of purified dihydrobromide salt.

5          Analysis calculated:  C, 37.60; H, 6.07; N, 10.12;
                    Found:  C, 37.63; H, 5.72; N, 10.00.

Mass spectrum, molecular ion (-2HBr) at 253.

10          The corresponding 2-aminotetrahydrobenzoxazole
can be prepared in a similar fashion by substituting
urea for thiourea in the above reaction.

### Example 2

15          Preparation of (±)-2-Amino-6-dimethylamino-
5,6,7,8-tetrahydrobenzothiazole

          Ten grams of 1,4-cyclohexanedione-mono-2,2-
20  dimethyltrimethylene ketal were mixed with 50 g of
anhydrous dimethylamine in benzene solution at about
5°C.  4.75 g of TiCl$_4$ in benzene was added thereto in
dropwise fashion.  A precipitate formed.  The reaction
mixture was allowed to warm to room temperature at which
25  temperature it was stirred for about 1 hour.  A solid
which formed was separated by filtration.  Evaporation
of the solvent from the filtrate yielded about 9.88 g of
an oil which was hydrogenated at 60 psi at room tem-
perature overnight in anhydrous ethanol with 0.5 g of
30  Pd/C as the catalyst.  The catalyst was removed by

BOE00004275

hydrobenzothiazole, was isolated as the dihydrobromide
salt.

    Mass spectrum: molecular ion at 197

    Infrared spectrum: peak at $1626.11 cm^{-1}$

5    Analysis: Calcd.: C, 30.10; H, 4.77; N, 11.70;
Br, 44.50;

            Found: C, 29.95; H, 4.51; N, 11.72;
Br, 44.58.

10    As previously stated, the compounds of this
invention (wherein neither $R^3$ nor $R^4$ is H) are receptor
agonists; ie, they are capable of increasing the quan-
tities of various neurohormones--dopamine and norepi-
nephrine in particular--available for interaction with
15 specific receptors.  For example, the compound according
to XX wherein $R^1$ and $R^2$ are H and $R^3$ and $R^4$ are both
n-propyl, is a specific dopamine D-2 agonist.  One of
such dopamine agonist activities is the inhibition of
prolactin secretion, as demonstrated according to the
20 following protocol.

    Adult male rats of the Sprague-Dawley strain
weighing about 200 g were housed in an air-conditioned
room with controlled lighting (lights on 6 a.m. - 8 p.m.)
and fed lab chow and water ad libitum.  Each rat
25 received an intraperitoneal injection of 2.0 mg of
reserpine in aqueous suspension 18 hours before admin-
istration of the test drug.  The purpose of the
reserpine was to keep the rat prolactin levels uniformly
elevated.  The compound was dissolved in 10 percent
30 ethanol, and injected intraperitoneally to groups of ten

BOE00004277

0207696

X-6708                           -18-

which varies from compound to compound, the number of
turns is counted over a 15-minute period.

  Results obtained from such testing for (±)-2-
amino-6-di-n-propylamino-5,6,7,8-tetrahydrobenzothiazole
5 dihydrobromide are set forth in Table 2 below.  In the
table, column 1 gives the dose and column 2 the average
number of turns observed in first 15 minutes after the
end of the latency period.


10        Table 2


   Dose    Average number of Turns
   1000 mcg/kg      51


15   Compounds according to XX, particularly those
wherein both $R^3$ and $R^4$ are methyl, reduce the blood
pressure of anesthetized spontaneously hypertensive
rats, as illustrated by the following experiment:
   Adult male spontaneously hypertensive rats
20 (SHR) (Taconic Farms, Germantown, New York), weighing
approximately 300 g. were anesthetized with pentobarbital
sodium (60 mg./kg., i.p.).  The trachea was cannulated
and the SHR respired room air.  Pulsatile arterial blood
pressure was measured from a cannulated carotid artery
25 using a Statham transducer (P23 ID).  Mean arterial
blood pressure was calculated as diastolic blood pres-
sure plus 1/3 pulse pressure.  Cardiac rate was moni-
tored by a cardiotachometer which was triggered by the
systolic pressure pulse.  Drug solutions were adminis-
30 tered i.v. through a catheter placed in a femoral vein.

BOE00004279

−20−                        0207696

### Table 4

| Time after injection in minutes | PERCENT CHANGE FROM CONTROL | |
|---|---|---|
| | Blood Pressure | Heart Rate |
| 5 | −3.6 | −12.3 |
| 15 | −17.1 | −17.7 |
| 30 | −18.6 | −15.5 |
| 45 | −16.9 | −8.3 |
| 60 | −17.2 | −5.2 |
| 90 | −16.9 | −0.7 |
| 120 | −15.8 | −4.1 |
| 180 | −14.7 | −4.1 |

The compounds of this invention are adminis-
tered for therapeutic purposes in a variety of formula-
tions including hard gelatin capsules prepared by mixing
the drug with these ingredients: dried starch, dried
magnesium stearate. The drug plus ingredients are mixed
and filled into hard gelatin capsules each containing
an effective dose of the drug.

Tablets are prepared by blending the drug
Cellulose, microcrystalline; fumed Silicon dioxide, and
Stearic acid. The components are blended and compressed
to form tablets.

Suspensions are made by passing the drug
through a No. 45 mesh U.S. sieve and mixing the sieved
drug with sodium carboxymethylcellulose and syrup to
form a smooth paste. A preservative, flavor and color
are diluted with water and added with stirring. Suf-
ficient water is then added to produce the required
volume.

0207696

X-6708 (EPO)                    -22-

9.  (±)-2-Amino-6-dimethylamino-5,6,7,8-
tetrahydrobenzothiazole.

10.  A process for preparing a compound of
Formula XX, as claimed in any one of claims 1 to 9,
which comprises:

reacting a compound of Formula A

$$R^5R^6N \text{—} \bigcirc \text{—} Br$$

$$O$$

A

with a compound of Formula B,

$$Y$$
$$\|$$
$$NH_2\text{-}C\text{-}NR^1R^2 \quad B \ ,$$

optionally dealkylating the 6 amino group and
realkylating to yield different $R^5$ and $R^6$ substituted
amines, and/or optionally salifying.

11.  A compound of Formula XX as claimed in any
one of claims 1 to 9 for use as a dopamine receptor
agonist.

12.  A pharmaceutical formulation comprising as
an active ingredient a compound of Formula XX or a
pharmaceutically acceptable salt thereof, as claimed in
any one of claims 1 to 9, associated with one or more
pharmaceutically-acceptable carriers therefor.

BOE00004283

 European Patent Office

**EUROPEAN SEARCH REPORT**

0207696

EP  86 30 4754

## DOCUMENTS CONSIDERED TO BE RELEVANT

| Category | Citation of document with indication, where appropriate, of relevant passages | Relevant to claim | CLASSIFICATION OF THE APPLICATION (Int Cl 4) |
|---|---|---|---|
| A | DE-A-2 136 233 (RIEDEL-DE HAEN AG) <br> * page 14, lines 10-23 * | 1,10 | C 07 D 277/82 <br> C 07 D 263/58 <br> A 61 K 31/425 <br> A 61 K 31/42 |
| A | FR-A-1 566 157 (LABORATOIRES DAUSSE/B.M.C.) <br> * claims 1, 2; example 1 * | 1,10 | |
| | | | **TECHNICAL FIELDS SEARCHED (Int Cl 4)** <br> C 07 D 263/00 <br> C 07 D 277/00 |

The present search report has been drawn up for all claims

| Place of search <br> BERLIN | Date of completion of the search <br> 18-09-1986 | Examiner <br> HASS C V F |
|---|---|---|

CATEGORY OF CITED DOCUMENTS

X : particularly relevant if taken alone
Y : particularly relevant if combined with another document of the same category
A : technological background
O : non-written disclosure
P : intermediate document

T : theory or principle underlying the invention
E : earlier patent document, but published on, or after the filing date
D : document cited in the application
L : document cited for other reasons

& : member of the same patent family, corresponding document

BOE00004285

EXHIBIT K

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re application of: G. Griss et at.

Serial No. : 256,671                          ) Art Unit: 125

         : October 12, 1988                    ) Examiner:

         : TETRA HYDRO-BENZTHIAZOLES, THE      )
           THE PREPARATION THEREOF AND         )
           THEIR USE                           )

Honorable Commissioner of
Patents and Trademarks
Washington, D.C.  20231

SECOND PRELIMINARY AMENDMENT
AND
INFORMATION DISCLOSURE STATEMENT

Sir:

Entry of the following amendments in addition to those
contained idn the Preliminary Amendment filed on 12 October
1988, and review of the following information disclosure
statement are required prior to commencing examination of
the above captioned application.

AMENDMENTS

Please add the following new claims 16 and 17.

16. A tetrahydrobenzthiazole of the formula



wherein R is an alkyl group with 1 to 7 carbon atoms, a
cycloalkyl group having 3 to 7 carbon atoms, an alkenyl or
alkynyl group having 3 to 6 carbon atoms, an alkanoyl group
having 1 to 7 carbon atoms or a phenyl alkyl or phenyl
alkanoyl group having 1 to 3 carbon atoms in the alkyl
moiets, wherein the phenyl nucleus may be substituted by
fluorine, chlorine or bromine atoms.

17. The compound of claim 16 wherein R is an alkyl group
having 1 to 7 carbon atoms.

BOE00000539

<u>REMARKS</u>

New claims 16 and 17 are directed to a subgeneric aspect of
the invention not previously claimed.  Support for these new
claims is found throughout the specification, particularly
at pages 2 through 4 thereof.

<u>INFORMATION DISCLOSURE STATEMENT</u>

Pursuant to 37 CFR 1.56, 1.97 and 1.98, Applicants wish to
bring the following information to the attention of the
Examiner in connection with this application.

A.  <u>European Search Report</u>

Applicants provide herewith a copy of the search report of
the European Patent Office for EP85116016.8, which corre-
sponds to the above-captioned application.  This cites EP-
A1-0-044 443 and US 4,337,343 as references which are indic-
ative of the state of the art.  It should be noted that US
4,337,343 corresponds to EP 21 940.

Neither of the cited references are believed to affect the
patentability of the claims since neither discloses or
suggests the claimed compounds or pharmaceutical
compositions.  Both references were made of record in Serial
No. 810,947, the parent of the above captioned application,
now Patent 4,731,374.

A copy of the search report, the two cited referenced and a
PTO 1449 form listing these references are enclosed.

B.  <u>Other References made of Record In Parent</u>

British Patent 812,512 was made or record by the Examiner in
Serial No. 810,947, the parent of the above captioned
application, now Patent 4,731,374.

This reference generically discloses compounds which would
be structurally related to those claimed herein but for the
fact that these compounds are benzothiazoles, and not
tetrahydrobenzothiazoles as in the above-captioned applica-
tion.  The claimed compounds and compositions are therefore
considered to be patentable over this reference.

- 2 -

BOE00000540

A copy of this reference and a PTO-1449 for listing the same is enclosed herewith.

C.  Possibly Interfering Application of Another

Applicants particularly wish to bring to the attention of the Patent and Trademark Office the existence U.S. Patent Application Serial No. 747,748, filed 24 June 1985, and its foreign equivalent, European Patent Application No. 207,696, published 1 July, 1987.

European '696 discloses tetrahydro (thi or ox) azoles of the formula:



wherein $R^1$ and $R^2$ are individually H, methyl, ethyl or n-propyl; $R^3$ and $R^4$ are individually H, methyl, ethyl, n-propyl or allyl; and Y is O or S.

When Y is S, the compounds of European '696 represent a subgenus of the compounds disclosed and originally claimed in the above-captioned application.  However, European '696 does not represent prior art because its publication date is later than the effective filing date of the above-captioned application.

U.S. Application Serial No. 747,748 contains the same disclosure as European '696.  It is not available as prior art because its filing date is later than the effective filing date of the above-captioned application.  (The effective filing date of the above-captioned application is 22 December 1984, the date on which the German application for which Convention priority is claimed was filed).

It is believed that Serial No. 747,748 is still pending.  As filed, U.S. Application Serial No. 747,748 contained claims directed to compounds of the above formula XX.

- 3 -

BOE00000541

The Examiner is urged to consider carefully the relevance of
Serial No. 747,748 before allowing the above-captioned
application. The possibility of interfering subject matter
should be particularly considered.

Copies of these two references and a Form PTO-1449 listing
the same are enclosed herewith.

Respectfully submitted,

Alan R. Stempel
Registration No. 28,991

Boehringer Ingelheim Corp.
90 East Ridge
Ridgefield, CT 06877
(203) 431-5873

Case No. 5/920-2-D2

I hereby certify that this correspondence is
being deposited with the U. S. Postal Service
as first class mail in an envelope addressed
to:    Commissioner of Patents & Trademarks,
Washington, D.C. 20231 on Dec. 8, 1988

BOE00000542

# EXHIBIT L

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE
--------------------------------------x
BOEHRINGER INGELHEIM INTERNATIONAL
GMBH and BOEHRINGER INGELHEIM
PHARMACEUTICALS, INC.,

            Plaintiffs,

      vs.             CA No.
                    05-700-(KAJ)
BARR LABORATORIES, INC.,

           Defendant.
--------------------------------------x
BOEHRINGER INGELHEIM INTERNATIONAL
GMBH and BOEHRINGER INGELHEIM
PHARMACEUTICALS, INC.,

            Plaintiffs,

      vs.             CA No.
                    05-854-(KAJ)
MYLAN PHARMACEUTICALS, INC.,

           Defendant.
--------------------------------------x
               January 31, 2007
               9:11 a.m.


      Videotaped Deposition of TIMOTHY X.

WITKOWSKI, held at the Sheraton Hotel, 18

Old Ridgebury Road, Danbury, Connecticut,

before Jennifer Ocampo-Guzman, a Notary

     lic of the State of Connecticut.

## David Feldman
### W o r l d w i d e

From File to Trial.

805 Third Avenue, 8th Floor
New York, NY 10022
(800) 642-1099

600 Anton Boulevard, 11th Floor
Costa Mesa, CA 92626
(866) DFW-1380



278

1          Witkowski
2      Q.  Have you seen stamps like that that
3   have various boxes with letters in them
4   around the circumference of the stamp?
5      A.  I have a vague recollection, but I
6   don't specifically recall seeing these
7   stamps.
8      Q.  I take it, you have no
9   understanding as to what any of the writing
10  in the stamp represents?
11     A.  No, I don't.
12         MR. PFADENHAUER:  We need to take a
13  break to change the tape.
14         THE VIDEOGRAPHER:  The time is
15  4:47.  We're going off the record.  And
16  this marks the ending of tape number 3.
17         (A brief recess was taken.)
18         THE VIDEOGRAPHER:  The time is
19  4:59.  We're back on record.  And this
20  marks the beginning of tape number 4.
21     Q.  Mr. Witkowski, if we can direct
22  your attention back to BARR 678, which is in
23  the 678 file history?
24     A.  Yes.
25     Q.  And I had asked you some questions

279

1          Witkowski
2   about who prepared the formula shown on page
3   678, and I asked you some questions about who
4   drafted two of the paragraphs on 680, but my
5   question to you now really is, does the
6   company know who prepared the second
7   preliminary amendment and IDS, the document
8   in its entirety?
9      A.  Other than Alan Stempel, who signed
10  the paper, I don't know.  I have no
11  information about anybody else being involved
12  in the preparation of this paper.
13     Q.  And other than the fact that Mr.
14  Stempel signed the document, does the company
15  have any other basis to believe that he
16  prepared it?
17     A.  Not that I know of.
18     Q.  And does the company have any basis
19  to know who, if anyone, other than Mr.
20  Stempel participated in the preparation of
21  the document?
22         MR. SCHULER:  Objection, asked and
23  answered.
24     A.  No, the only basis, I guess, would
25  be the fact that Alan Stempel, it's known

280

1          Witkowski
2   that Alan Stempel was assigned to this
3   application.
4      Q.  But Dr. Fleischer also had
5   responsibility with respect to this case,
6   right?
7      A.  Yes.
8      Q.  And the company doesn't know the
9   extent to which Dr. Fleischer participated in
10  the drafting of this particular document; is
11  that right?
12     A.  That's correct.
13     Q.  And does the company know whether
14  Mr. Frankhouser had anything to do with the
15  preparation of this document?
16     A.  Not to my knowledge.
17     Q.  Does the company know whether
18  outside counsel was involved in the
19  preparation of this document?
20     A.  Not to my knowledge.
21     Q.  Are you aware of any privileged
22  communications in the possession of the
23  company that relate to this document?
24         MR. SCHULER:  Object to the form.
25  It goes beyond the scope, but if you

281

1          Witkowski
2   have personal knowledge you can answer
3   yes or no.
4      A.  No.
5         (Discussion off the record.)
6      Q.  If we can turn to BARR 776, please.
7   This is an office action issued by the
8   examiner on December 28, 1988; is that right?
9      A.  Yes, that's the date mailed, yes.
10     Q.  And the examiner rejects claims 1
11  through 5 and claim 8; is that right?
12     A.  That's what it indicates, yes.
13     Q.  And the examiner indicates that the
14  reason he's rejecting claim 8 is because it
15  fails to recite a utility or effective
16  amount; is that right?
17         MR. SCHULER:  Objection, the
18  document speaks for itself.
19     A.  That's the statement on BARR 777
20  with respect to claim 8, the examiner says
21  the claim fails to recite a utility or
22  effective amount, yes.
23     Q.  Does Boehringer have any other
24  information as to why the examiner rejected
25  claim 8 at this point in time?

71  (Pages 278 to 281)

# EXHIBIT M

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BOEHRINGER INGELHEIM INTERNATIONAL GMBH and BOEHRINGER INGELHEIM PHARMACEUTICAL, INC. | ) ) ) ) |
| Plaintiffs, | ) Civil Action No. 05-0700 (KAJ) ) |
| v. | ) ) |
| BARR LABORATORIES, INC., | ) ) |
| Defendant, | ) ) |
| BOEHRINGER INGELHEIM INTERNATIONAL GMBH and BOEHRINGER INGELHEIM PHARMACEUTICAL, INC. | ) ) ) ) |
| Plaintiffs, | ) Civil Action No. 05-0854 (KAJ) ) |
| v. | ) ) |
| MYLAN PHARMACEUTICALS, INC., | ) ) |
| Defendant. | ) |

## OBJECTIONS AND RESPONSES OF PLAINTIFFS BOEHRINGER INGELHEIM INTERNATIONAL GMBH AND BOEHRINGER INGELHEIM PHARMACEUTICALS, INC. TO DEFENDANT BARR LABORATORIES, INC.'S SECOND SET OF INTERROGATORIES (NOS. 10-17)

Pursuant to FEDERAL RULES OF CIVIL PROCEDURE 26(d) and 33, Plaintiff Boehringer Ingelheim International GMBH and Boehringer Pharmaceuticals, Inc. ("Boehringer") by its attorneys, hereby objects and responds to Defendant Barr Laboratories, Inc.'s ("Barr") Second Set of Interrogatories as follows:

## GENERAL OBJECTIONS

Boehringer incorporates by reference its General Objections in Boehringer's Objections and Responses to Barr's First Set of Interrogatories.

## INTERROGATORY NO. 10

Identify each person involved with or responsible for the drafting, preparation, and/or prosecution of European Patent Application 85116016.8 and state with particularity what each person's role was.

## ANSWER:

Boehringer incorporates its General Objections as and for its objections to Interrogatory No. 10. Boehringer further objects to Interrogatory No. 10 to the extent that it seeks information protected from disclosure by the attorney-client privilege and/or the work-product doctrine. Boehringer further objects to Interrogatory No. 10 on the grounds that it is vague and ambiguous. Boehringer further objects to Interrogatory No. 10 on the grounds that it is overly broad, unduly burdensome, and/or would require undue expense to answer. Boehringer further objects to Interrogatory No. 10 to the extent that it seeks information already in Barr's possession, custody or control, or available to Barr from public sources. Boehringer further objects to the terms "drafting, preparation, and/or prosecution" because they are vague, overly broad, and unduly burdensome.

Subject to and without waiving the foregoing objections and based on the information currently available to Boehringer, Boehringer states that Dr. Rolf Fleischer, a Patent Agent for Boehringer-Ingelheim International was involved with and responsible for the drafting, preparation, and/or prosecution of European Patent Application 85116016.8.

2

## INTERROGATORY NO. 11

State with particularity all facts concerning when and how Plaintiffs first came into possession of European Patent Application No. 207,656 and U.S. Application Serial No. 747,748, and identify each person with knowledge of those facts.

## ANSWER:

Boehringer incorporates its General Objections as and for its objections to Interrogatory No. 11. Boehringer further objects to Interrogatory No. 11 to the extent that it seeks information protected from disclosure by the attorney-client privilege and/or the work-product doctrine. Boehringer further objects to Interrogatory No. 11 on the grounds that it is vague and ambiguous. Boehringer further objects to Interrogatory No. 11 on the grounds that it is overly broad, unduly burdensome, and/or would require undue expense to answer.

Subject to and without waiving the foregoing objections and based on the information currently available to Boehringer, Boehringer states that it became aware of a published European patent application with the designation No. 207,696 no later than February 2, 1987. *See* BOE00848983.

## INTERROGATORY NO. 12

State with particularity all facts concerning Plaintiffs' decision to submit the European Patent Application No. 207,656 and U.S. Application Serial No. 747,748 to the United States Patent and Trademark Office during prosecution of the applications that led to the '374, '086, and '812 patents, and identify each person with knowledge of those facts.

## ANSWER:

Boehringer incorporates its General Objections as and for its objections to Interrogatory No. 12. Boehringer further objects to Interrogatory No. 12 to the extent that it seeks information protected from disclosure by the attorney-client privilege and/or the work-product doctrine. Boehringer further objects to Interrogatory No. 12 on the grounds that it is

3

vague and ambiguous. Boehringer further objects to Interrogatory No. 12 on the grounds that it is overly broad, unduly burdensome, and/or would require undue expense to answer. Boehringer further objects to Interrogatory No. 12 to the extent it seeks information already in Barr's possession, custody or control, or available to Barr from public sources.

Subject to and without waiving the foregoing objections and based on the information currently available to Boehringer, Boehringer states that it submitted European Patent Application No. 207,656 and U.S. Application Serial No. 747,748 to the United States Patent and Trademark Office during the prosecution of the application that led to the '374 patent merely in an abundance of caution. It was evident that those applications were not available as prior art due to Boehringer's senior filing date and that, in light of the amendment necessitated by the issuance of the restriction requirement dated September, 11, 1986 neither of the applications contained any potentially interfering subject matter. Boehringer submitted European Patent Application No. 207,656 and U.S. Application Serial No. 747,748 to the United States Patent and Trademark Office during the prosecution of the applications that led to the '086 and '812 patents because, although they were not available as prior art, they were determined to contain potentially interfering subject matter. Alan R. Stempel of Boehringer is most knowledgeable of the facts leading to Boehringer's disclosure of European Patent Application No. 207,656 and U.S. Application Serial No. 747,748 to the examiners of the applications that lead to the '374, '086 and '812 patents.

## INTERROGATORY NO. 13

For each claim of the '812 patent you contend is infringed by Barr's proposed ANDA Product(s), do you contend that the claim is entitled to an earlier priority date than the filing date of the application that led to the '812 patent (October 12, 1988)? If so, state the

4

CH\876904.1

earliest date to which you contend you are entitled to priority and the basis for your contention, and identify all facts, documents, and circumstances on which you rely for your contention.

**ANSWER:**

Boehringer incorporates its General Objections as and for its objections to Interrogatory No. 13. Boehringer further objects to Interrogatory No. 13 to the extent that it seeks information protected from disclosure by the attorney-client privilege and/or the work-product doctrine. Boehringer further objects to Interrogatory No. 13 on the grounds that it is vague and ambiguous. Boehringer further objects to Interrogatory No. 13 on the grounds that it is overly broad, unduly burdensome, and/or would require undue expense to answer. Boehringer further objects to Interrogatory No. 13 on the to the extent that it seeks information already in Barr's possession, custody or control, or available to Barr from public sources. Boehringer further objects to Interrogatory No. 13 on the grounds that it is premature as Barr has not made a *prima facie* showing that Boehringer is not entitled to priority based on its foreign-filed parent applications as set forth during the prosecution of the '812 patent.

Subject to and without waiving the foregoing objections and based on the information currently available to Boehringer, Boehringer states that for each claim of the '812 patent it is entitled to a priority date of December 22, 1984, the filing date of German Patent No. 34,470,751, pursuant to 35 U.S.C. §§ 119 & 121. The following are the responsive documents relating to Boehringer's entitlement of a December 22, 1984 priority date: BOE00000073 to 334, BOE00000335 to 476, and BOE00000477 to 709, BOE00003998 to 4052, and BOE00000194 to 245.

5

**INTERROGATORY NO. 14**

    For each claim of the '812 patent you contend is infringed by Barr's proposed ANDA Product(s), please state the date(s) of the conception and reduction to practice for the alleged invention(s) claimed in each claim, identify the location of said conception and reduction to practice, and identify all facts, documents, and persons with knowledge concerning said conception and reduction to practice.

**ANSWER:**

    Boehringer incorporates its General Objections as and for its objections to Interrogatory No. 14. Boehringer further objects to Interrogatory No. 14 to the extent that it seeks information protected from disclosure by the attorney-client privilege and/or the work-product doctrine. Boehringer further objects to Interrogatory No. 14 on the grounds that it is vague and ambiguous. Boehringer further objects to Interrogatory No. 14 on the grounds that it is overly broad, unduly burdensome, and/or would require undue expense to answer. Boehringer further objects to Interrogatory No. 14 to the extent that it seeks information already in Barr's possession, custody or control, or available to Barr from public sources.

    Subject to and without waiving the foregoing objections and based on the information currently available to Boehringer, Boehringer states that based on presently available information, the invention(s) claimed in the patent-in-suit were made outside of the United States, and Plaintiff relies at present on their effective filing date and the application filed on that date for conception and reduction to practice.

**INTERROGATORY NO. 15**

    Do you contend that claims 3, 4, 5, 7, 8, 9, and 10 of the '812 patent are not invalid under the judicially-created doctrine of obviousness-type double patenting as set forth in Eli Lilly and Co. v. Barr Laboratories, Inc., 251 F.3d 955 (Fed. Cir. 2001)? If so, state the basis for your contention and identify all facts, documents, and circumstances on which you rely for your contention.

CH\876904.1

**ANSWER:**

Boehringer incorporates its General Objections as and for its objections to Interrogatory No. 15. Boehringer further objects to Interrogatory No. 15 to the extent that it seeks information protected from disclosure by the attorney-client privilege and/or the work-product doctrine. Boehringer further objects to Interrogatory No. 15 on the grounds that it is vague and ambiguous. Boehringer further objects to Interrogatory No. 15 on the grounds that it is overly broad, unduly burdensome, and/or would require undue expense to answer. Boehringer further objects to Interrogatory No. 15 on the grounds that it purports to obligate Boehringer to perform a legal or other analysis to determine whether a document supports or refutes any defense or claim asserted by Barr.

Subject to and without waiving the foregoing objections and based on the information currently available to Boehringer, Boehringer states that claims 3, 4, 5, 7, 8, 9 or 10 of the '812 patent are valid. First, by asking whether Boehringer contends that claims of the '812 patent "are not invalid," Interrogatory No. 15 erroneously presumes that Boehringer bears the burden of establishing validity. Instead, the claims of the '812 patent are presumed valid pursuant to 35 U.S.C. § 282, and Barr bears the burden of establishing invalidity by clear and convincing evidence. Barr has made no *prima facie* case of invalidity due to double patenting with respect to any of claims 3, 4, 5, 7, 8, 9 or 10 of the '812 patent, let alone a showing by clear and convincing evidence. Second, an obviousness-type double patenting analysis requires that one construe the claims at issue and determine the differences in subject matter between the subject claims. Barr has neither offered a construction of any claims of any allegedly pertinent patents nor analyzed the differences in subject matter between said claims. Third, assuming that

7

Barr is referring to the claims of the '086 patent and the '812 patent, Boehringer affirmatively states that patentable differences exist between said claims, and that the PTO recognized such patentable differences during prosecution. Fourth, the claims of the '086 patent "shall not be used as a reference . . . in the courts against" the claims of the '812 patent pursuant to 35 U.S.C. § 121. *See, e.g.,* Boehringer's Response to Interrogatory No. 8 (incorporated herein); *see also,* BOE00000073 to 334, BOE00000335 to 476, and BOE00000477 to 709.

## INTERROGATORY NO. 16

Do you contend that claims 3, 4, 5, and 8 of the '812 patent are not invalid under 35 U.S.C. § 102(g) in light of the prior invention(s) of Bennett C. Laguzza and William W. Turner, Jr.? If so, state the basis for your contention and identify all facts, documents, and circumstances on which you rely for your contention.

## ANSWER:

Boehringer incorporates its General Objections as and for its objections to Interrogatory No. 16. Boehringer further objects to Interrogatory No. 16 to the extent that it seeks information protected from disclosure by the attorney-client privilege and/or the work-product doctrine. Boehringer further objects to Interrogatory No. 16 on the grounds that it is vague and ambiguous. Boehringer further objects to Interrogatory No. 16 on the grounds that it is overly broad, unduly burdensome, and/or would require undue expense to answer. Boehringer further objects to Interrogatory No. 16 to the extent that it seeks information already in Barr's possession, custody or control, or available to Barr from public sources. Boehringer further objects to Interrogatory No. 16 on the grounds that it purports to obligate Boehringer to perform a legal or other analysis to determine whether a document supports or refutes any defense or claim asserted by Barr.

8

Subject to and without waiving the foregoing objections and based on the information currently available to Boehringer, Boehringer states that claims 3, 4, 5, and 8 of the '812 patent are valid. First, by asking whether Boehringer contends that claims of the '812 patent "are not invalid," Interrogatory No. 16 erroneously presumes that Boehringer bears the burden of establishing validity. Instead, the claims of the '812 patent are presumed valid pursuant to 35 U.S.C. § 282, and Barr bears the burden of establishing invalidity by clear and convincing evidence. Barr has made no *prima facie* case of invalidity under § 102(g) with respect to any of claims 3, 4, 5, or 8 of the '812 patent, let alone a showing by clear and convincing evidence.

Second, Boehringer states that claims 3, 4, and 5 of the '812 patent are valid regardless of any work done by Drs. Laguzza and Turner because Drs. Laguzza and Turner never conceived of (a) a "tetrahydro-benzthiazole of the formula:



(Ia)

wherein, $R_1$ is a hydrogen atom, an alkyl group having 1 to 3 carbon atoms, an allyl, benzyl, 2-chloro-benzyl, 4-chloro-benzyl, 3,4-dichloro-benzyl or phenyl-ethyl group; $R_2$ is a hydrogen atom, a methyl or ethyl group; $R_3$ is a hydrogen atom, an alkyl group with 1 to 6 carbon atoms, an allyl, propargyl, benzyl, chlorobenzyl, pheylethyl, cyclopentyl or cyclohexyl group; and $R_4$ is a hydrogen atom, an alkyl group having 1 to 3 carbon atoms or an allyl group; or $R_3$ and $R_4$ together with the nitrogen atom between them form a piperidino, hexamethyleneimino or

9

morpholino group; or, a pharmaceutically acceptable addition salt thereof" (claim 3), (b) a "tetrahydro-benzthiazole of formula Ia, as claimed in claim 3 wherein the



group is in the 6-position" (claim 4), nor (c) a "tetrahydro-benzthiazole of formula Ia, as claimed in claim 3, wherein $R_1$ and $R_2$ together form an amino or allylamino group; and, $R_3$ and $R_4$ together with the nitrogen atom between them form a dimethylamino, diethylamino, N-allyl-N-(4-chloro-benzyl)-amino, n- propylamino or group" (claim 5) before the earliest effective filing date of the '812 patent. Even if Drs. Laguzza or Turner had synthesized or thought of the structure for a compound falling within the scope of claims 3, 4, or 5, there is no evidence that either Dr. Laguzza or Turner conceived of or appreciated any use for such compound before the earliest effective filing date of the '812 patent. Indeed, there is no evidence (let alone clear and convincing evidence) that either Drs. Laguzza or Turner reviewed and understood results of any biological tests performed on any such  compounds prior to Boehringer's filing date of December 22, 1984. Finally, even if Drs. Laguzza or Turner had conceived of or reduced to practice a compound falling within the scope of claims 3, 4, or 5 prior to the earliest effective filing date of the '812 patent, they abandoned such invention. *See, e.g., Prosecution Histories of European Patent Application No. 207,656 and U.S. Application Serial No. 747,748.*

Third, Boehringer states that neither Dr. Laguzza nor Dr. Turner conceived of or reduced to practice a "pharmaceutical composition, suitable for the treatment of a disorder selected from the group consisting of high blood pressure, tachycardia, Parkinson's disease,

10

Parkinsonism and schizophrenia, comprising a therapeutically effective amount of a compound according to claim 3 and a pharmaceutically acceptable carrier diluent" (claim 8) prior to the earliest effective filing date of the '812 patent. There is no evidence that either Drs. Turner or Laguzza synthesized or conceived of any such pharmaceutical compositions and/or their utility for the treatment of high blood pressure, tachycardia, Parkinson's disease, Parkinsonism, or schizophrenia. Indeed, there is no evidence that neither Dr. Laguzza or Dr. Turner received or understood the results of any biological tests performed on any compounds of claim 3 before the earliest effective filing date of the '812 patent. Moreover, even if Drs. Laguzza and Turner had conceived of or reduced to practice a pharmaceutical composition within the scope of claim 8 of the '812 patent prior to the earliest effective filing date of the '812 patent, they abandoned such inventions. *See, e.g., Prosecution Histories of European Patent Application No. 207,656 and U.S. Application Serial No. 747,748.*

## INTERROGATORY NO. 17

Identify the author of the handwriting on the top of the page with Bates number BOE00004259, state what the handwritten portion of the document says, and, if the handwriting refers to a person's name, identify who that person is.

## ANSWER:

Boehringer incorporates its General Objections as and for its objections to Interrogatory No. 16. Boehringer further objects to Interrogatory No. 16 to the extent that it seeks information protected from disclosure by the attorney-client privilege and/or the work-product doctrine. Boehringer further objects to Interrogatory No. 17 on the grounds that it is unduly burdensome and/or would require undue expense to answer.

11

CH\876904.1

Subject to and without waiving the foregoing objections and based on the information currently available to Boehringer, Boehringer states that the handwritten portion of the document bearing Bates number BOE00004259 says "Herr Baltes."

Dated:  October 10, 2006

                        MORRIS, NICHOLS, ARSHT & TUNNELL LLP

                        /s/ Jack Blumenfeld
                            Jack B. Blumenfeld (#1014)
                            1201 North Market Street
                            P. O. Box 1347
                            Wilmington, DE  19899-1347
                            (302) 658-9200
                            Attorneys for Plaintiffs
                            Boehringer Ingelheim International GmbH
                            and Boehringer Ingelheim Pharmaceutical, Inc.

Of Counsel:

Steven C. Cherny
LATHAM & WATKINS LLP
885 Third Avenue, Suite 1000
New York, NY 10022-4834
(212) 906-1200 (phone)
(212) 751-4864 (fax)

Kenneth G. Schuler
LATHAM & WATKINS LLP
Sears Tower, Suite 5800
Chicago, IL 60606
(312) 876-7700 (phone)
(312) 993-9767 (fax)

Sandy Choi
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA  94111-2562
(415) 395-8095

12

CH\876904.1

Carisa S. Yee
LATHAM & WATKINS LLP
135 Commonwealth Drive
Menlo Park, California 94025-3656
(650) 328-4600

13

## CERTIFICATE OF SERVICE

I, Maryellen Noreika, hereby certify that copies of the foregoing were caused to be served this 10th day of October, 2006 upon the following in the manner indicated:

### BY HAND

Mary B. Matterer
Morris, James, Hitchens & Williams
222 Delaware Avenue
P.O. Box 2306
Wilmington, DE 19899

Adam Wyatt Poff
Young, Conaway, Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391

### BY FEDERAL EXPRESS

Glenn J. Pfadenhauer
Dov P. Grossman
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005-5901

David J. Harth
David L. Anstaett
Melody K. Glazer
Heller Ehrman LLP
One East Main Street, Suite 201
Madison, Wisconsin 53703

Shannon M. Bloodworth
Heller Ehrman LLP
1717 Rhode Island Ave., NW
Washington, DC 20036

Maryellen Noreika