EXHIBIT N

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BOEHRINGER INGELHEIM INTERNATIONAL )
GMBH and BOEHRINGER INGELHEIM )
PHARMACEUTICALS, INC., )
)
      Plaintiffs, )     C.A. No. 05-700 (***)
      v. )
)     CONSOLIDATED
BARR LABORATORIES, INC., )
)
      Defendant. )

BOEHRINGER INGELHEIM INTERNATIONAL )
GMBH and BOEHRINGER INGELHEIM )
PHARMACEUTICALS, INC., )
)     C.A. No. 05-854 (***)
      Plaintiffs, )
)
      v. )
)
MYLAN PHARMACEUTICALS INC., )
)
      Defendant. )

**OBJECTIONS AND RESPONSES OF PLAINTIFFS BOEHRINGER INGELHEIM
INTERNATIONAL GMBH AND BOEHRINGER INGELHEIM PHARMACEUTICALS,
INC. TO DEFENDANT BARR LABORATORIES, INC.'S
THIRD SET OF INTERROGATORIES (NOS. 18-45)**

Pursuant to FEDERAL RULES OF CIVIL PROCEDURE 26(d) and 33, Plaintiffs

Boehringer Ingelheim International GmbH and Boehringer Pharmaceuticals, Inc. ("Boehringer")

by its attorneys, hereby object and respond to Defendant Barr Laboratories, Inc.'s ("Barr") Third

Set of Interrogatories as follows:

## GENERAL OBJECTIONS

Boehringer incorporates by reference its General Objections in Boehringer's Objections and Responses to Barr's First Set of Interrogatories.

## INTERROGATORY NO. 18

Do you contend that the '812 patent claims compounds as well as methods of treatment? If so, state the basis for your contention and identify all facts, documents, and circumstances on which you rely for your contention.

## ANSWER:

Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 18. Boehringer further objects to Interrogatory No. 18 to the extent it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine. Boehringer further objects to Interrogatory No. 18 as overly broad, unduly burdensome, and not reasonably calculated to lead to discoverable information. Boehringer further objects to Interrogatory No. 18 on the grounds that it is vague and ambiguous, especially with the respect to the term "claims." Boehringer further objects to Interrogatory No. 18 to the extent it calls for a legal conclusion. Boehringer further objects to Interrogatory No. 18 on the grounds that it contains discrete subparts within the meaning of FEDERAL RULE OF CIVIL PROCEDURE 33(a).

Subject to and without waiving the foregoing objections, Boehringer states that claims 1-7, 9 and 10 of the '812 patent claim compounds of specified formulas or (pharmaceutically acceptable) acid addition salts thereof, (*see* '812 patent, claims 1-7, 9, 10), that claim 8 of the '812 patent claims pharmaceutical compositions, (*id.*, claim 8) and that none of the claims of the '812 patent are "method of treatment" claims. *See id. at passim.*

2

**INTERROGATORY NO. 19**

Do you contend that either of German Applications DE 3447075 and DE 3508947 contains a sufficient written description pursuant to 35 U.S.C. § 112 to support compounds within the scope of claim 3 of the '812 patent containing a 2-chloro-benzyl, a 4-chloro-benzyl, or a 3,4-dichloro-benzyl at the R1 position? If so, state the basis for your contention and identify all facts, documents, and circumstances on which you rely for your contention, including the pages and line numbers in German Applications DE 3447075 and DE 3508947 that support your contention.

**RESPONSE:**

Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 19. Boehringer further objects to Interrogatory No. 19 to the extent it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine. Boehringer further objects to Interrogatory No. 19 as overly broad, unduly burdensome, and not reasonably calculated to lead to discoverable information. Boehringer further objects to Interrogatory No. 19 as vague and ambiguous. Boehringer further objects to Interrogatory No. 19 as premature and as calling for information that is not relevant to the claims of defenses of any party. Boehringer further objects to Interrogatory No. 19 on the grounds that it contains discrete subparts within the meaning of FEDERAL RULE OF CIVIL PROCEDURE 33(a).

Subject to and without waiving the foregoing objections, Boehringer responds as follows. Both German Applications DE 3447075 and DE 3508947 contain a written description that is sufficient to support the scope of claim 3 of the '812 patent pursuant to 35 U.S.C. § 112. With respect to claim 3's inclusion of compounds containing a 2-chloro-benzyl, 4-chloro-benzyl, or 3,4-dichlorobenzyl group at the $R^1$ position, support is found, *inter alia*, at the following pages of DE 3447075, DE 3508947, and DX 53:

| Page Number of DE 3447075 | Page Number of DE 3508947 | Page Number of DX 53 |
|---|---|---|
| BOE000040009 | Ex. 5, at 6. | BARR 028270-71 |
| BOE00004011 | Ex. 5, at 8. | BARR 028273 |
| BOE00004015-16 | Ex. 5, at 12-13. | BARR 028277-80 |

As set forth above, each of DE 3447075 and DE 3508947 (1) discloses tetrahydrobenzethiazole compounds of general formula I, (2) states that $R_1$ can be a phenylalkyl group with 1 to 3 carbon atoms, and (3) states that phenyl nuclei may be substituted by chlorine atoms. Each of DE 3447075 and DE 3508947 goes on to disclose two methods for making compounds of general formula I "wherein at least one of the groups $R_1$, $R_2$, $R_3$, or $R_4$ represents one of the . . . phenylalkyl groups mentioned hereinbefore," including the previously disclosed phenylalkyl groups wherein the phenyl nucleus is substituted by one or more chlorine atoms. *See DX 53, at BARR 028277-78.* One of these methods, identified as method "d" in the applications, was the same method used by named inventor Dr. Schneider to direct the production of compounds having a 2-chloro-benzyl, 4-chloro-benzyl, or 3, 4-dichlorobenzyl group at the $R_1$ position. *See* '812 patent, col. 20, ll. 23-43; DX 8 at 23; *id.* at BOE00062011.

**INTERROGATORY NO. 20**

Do you contend that either of German Applications DE 3447075 and DE 3508947 contains a sufficient written description pursuant to 35 U.S.C. § 112 to support compounds within the scope of claim 1 of the '812 patent containing "a phenyl alkyl or phenyl alkanoyl group having 1 to 3 carbon atoms in the alkyl part, wherein the above mentioned phenyl nuclei may be substituted by 1 or 2 halogen atoms" at the R1 position? If so, state the basis for your contention and identify all facts, documents, and circumstances on which you rely for your contention, including the pages and line numbers in German Applications DE 3447075 and DE 3508947 that support your contention.

**RESPONSE:**

Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 20. Boehringer further objects to Interrogatory No. 20 to the extent it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine. Boehringer further objects to Interrogatory No. 20 as overly broad, unduly burdensome, and not reasonably calculated to lead to discoverable information. Boehringer further objects to Interrogatory No. 20 on the grounds that it is vague and ambiguous. Boehringer further objects to Interrogatory No. 20 on the grounds that it contains discrete subparts within the meaning of FEDERAL RULE OF CIVIL PROCEDURE 33(a). Boehringer further objects to Interrogatory No. 20 as premature and as calling for information that is not relevant to the claims of defenses of any party.

Subject to and without waiving the foregoing objections, Boehringer incorporates by reference its response to Interrogatory No. 19 as and for its response to Interrogatory No. 20.

**INTERROGATORY NO. 21**

Do you contend that the alleged invention(s) claimed in the '812 patent possess(es) unexpected properties, including without limitation as compared to the alleged invention(s) claimed in the '086 patent? If so, for each claim-in-suit please state the basis for your contention and identify all facts, documents, and circumstances on which you rely for your contention.

**RESPONSE:**

Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 21. Boehringer further objects to Interrogatory No. 21 to the extent it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine. Boehringer further objects to Interrogatory No. 21 on the grounds that it is overly broad, unduly burdensome, and/or would entail undue expense to answer.

Boehringer further objects to Interrogatory No. 21 on the grounds that it seeks information that is not relevant to the claim or defense of any party, particularly insofar as it asks Boehringer to describe all "unexpected properties" of the claimed compounds, "*including without limitation* as compared to the alleged invention(s) claimed in the '086 patent." It is unreasonable to request Boehringer to describe all unexpected properties of the invention of the '812 patent without limiting the universe of things to which the invention's properties should be compared. Boehringer further objects to Interrogatory No. 21 on the grounds that it is vague and ambiguous. Boehringer further objects to Interrogatory No. 21 on the grounds that it contains discrete subparts within the meaning of FEDERAL RULE OF CIVIL PROCEDURE 33(a). Boehringer further objects to Interrogatory No. 21 as premature to the extent it seeks the subject of expert opinions.

Subject to and without waiving the foregoing objections, Boehringer states that the inventions claimed by the '812 patent possess unexpected properties as compared to the inventions claimed by the '086 patent. Thus, for instance, one of the compounds claimed by the '812 patent, pramipexole, has useful properties distinct from the methods of use specified in the claims of the '086 patent. For example, the compounds of the '812 patent are useful for the treatment of moderate-to-severe primary Restless Leg Syndrome ("RLS"), a sensorimotor condition that affects millions of Americans. *E.g.*, Hening W, Walters AS, Allen RP, Montplaisir J, Myers A, Ferini-Strambi L., *Impact, diagnosis, and treatment of restless legs syndrome (RLS) in a primary care population: the REST (RLS epidemiology, symptoms, and treatment) primary care study*, Sleep Med. 2004;5:237-246. The FDA has approved pramipexole for the treatment of moderate to severe primary RLS in humans. *See* BOE00881432-67, at BOE00881433.

In addition, outside observers have noted that 2-amino-6-n-propylamino-4,5,6,7-tetrahydrobenzthiazole has neuroprotective properties, *see, e.g.*, R. Danzeisen, *et al.*, *Targeted Antioxidative and Neuroprotective Properties of the Dopamine Agonist Pramipexole and Its Nondopaminergic Enantiomer SND919CL2*, 316 J. Pharmacology and Experimental Therapeutics 189-1999 (2006) (BOE 00881492-502) and is effective as an antidepressant, *see, e.g.*, J. Maj, *et al.*, *Antidepressant Effects of Pramipexole, a Novel Dopamine Receptor Agonist*, J. Neural Transmission (1997) 104:525-533 (BOE 00881477-485). The United States Patent and Trademark Office (U.S.P.T.O.) has recognized these unexpected properties in granting U.S. Pat. Nos. 6,191,153 (entitled "Use of 2-amino-6-n-propyl-amino-4,5,6,7-tetrahydrobenzothiazole as a pharmaceutical composition having an antidepressant activity"), 6,001,861 (entitled "Use of pramipexole in the treatment of restless legs syndrome"), 6,194,445 (entitled "Use of Pramipexole in the treatment of Restless Legs Syndrome"), 6,458,820 (entitled "Method for preventing or the progression of neuronal damage with pramipexole as a neuroprotective agent"), 5,650,420 (entitled "Pramipexole as a neuroprotective agent").

Moreover, independent observers have also noted that another compound claimed by the '812 patent, (R)-2-amino-6-n-propylamino-4,5,6,7-tetrahydrobenzothiazole, is useful for the treatment of ALS. *See* Patee GL, Post GR, Gerber RE, Bennett JP, Reduction of Oxidative Stress in Amyotrophic Lateral Sclerosis Following Pramipexole Treatment, Amyotroph. Lateral Scler. Other Motor Neron. Disord. 2003; 4(2); 90-95 (BOE 00881486-491).

## INTERROGATORY NO. 22:

Do you contend that the alleged invention(s) claimed in the '812 patent satisfied a long-felt but unmet need? If so, for each claim-in-suit please state the basis for your contention and identify all facts, documents, and circumstances on which you rely for your contention.

**RESPONSE:**

Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 22. Boehringer further objects to Interrogatory No. 22 to the extent it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine. Boehringer further objects to Interrogatory No. 22 on the grounds that it is overly broad, unduly burdensome, and/or would entail undue expense to answer. Boehringer further objects to Interrogatory No. 22 on the grounds that it seeks information that is not relevant to the claim or defense of any party. Boehringer further objects to Interrogatory No. 22 on the grounds that it is vague, ambiguous, and incapable of reasonable ascertainment. Boehringer further objects to Interrogatory No. 22 as premature to the extent it seeks the subject of expert opinions. Boehringer further objects to Interrogatory No. 22 to the extent that it calls for evidence rather than facts. Boehringer further objects to Interrogatory No. 22 on the grounds that it contains discrete subparts within the meaning of FEDERAL RULE OF CIVIL PROCEDURE 33(a).

Subject to and without waiving the foregoing objections, Boehringer states that the invention(s) of the '812 patent satisfied long-felt but unmet needs as compared to compounds available as of December 21, 1984. First, it satisfied the long-felt need for an effective and well-tolerated drug for Parkinson's Disease. At the time of the invention, very few treatments for Parkinson's Disease existed. The few available treatments were levadopa and ergot-based dopamine agonists such as bromocriptine and pergolide. Use of levadopa, however, generally leads to motor complications such as dyskinesias. *See, e.g.*, Tuite, Paul, M.D., *et al.*, *Dopamine Agonists*, Seminars in Neurology, vol. 21, No. 1, 2001 (BOE 00881468-473). Ergot-based dopamine agonists also had severe side effects, including the inducement of pleural, peritoneal, and pericardial fibrosis as well as erythromelalgia and Raynaud's phenomena. *Id.* Therefore,

8

there existed a need for a drug that was effective in treating Parkinson's Disease but had a lower

risk for these side effects. Pramipexole satisfied this need. Pramipexole (1) has no ergot-related

side effects, (2) is associated with reduced instances of motor complications compared to

levadopa, (3) is effective in early stage Parkinson's Disease, (4) is effective as either a

monotherapy or as an adjunct therapy with levadopa, (5) has a long half-life, (6) does not

metabolize, and (7) does not interact with other drugs. *See, e.g.*, BARR 014115 (and reference

cited therein). Thus it quickly became the "world's leading dopamine agonist and Parkinson's

treatment." IMS Health, *Neurodegenerative Disease: A Major Market in the Making, Sep. 29,*

*2005, available at: http://www.imshealth.com/web/content/0,3148,64576068_63872702_*

*70261004_75407581,00.html.* (BOE 00881474-76).

Second, the compounds of the '812 patent also satisfied a long-felt but unmet

need for an effective therapy for the treatment of moderate-to-severe primary RLS. *See*

*Response to Interrogatory No. 22.*

### INTERROGATORY NO. 23:

Do you contend that no Boehringer agent or representative knew that the
"Auslandstext" (also referred to as a foreign filing text) for Cases 5/920 and/or 1/737 included
compounds that were not sufficiently described pursuant to 35 U.S.C. § 112 in German
Applications DE 3447075 and DE 3508947? If so, please state the basis for your contention and
identify all facts, documents, and circumstances on which you rely for your contention. If your
answer is anything other than an unequivocal "Yes," please state the basis for your answer,
identify which individual(s) possessed this knowledge, and identify all facts, documents, and
circumstances on which you rely for your answer.

### RESPONSE:

Boehringer hereby incorporates its General Objections as and for its objections to

Interrogatory No. 23. Boehringer further objects to Interrogatory No. 23 to the extent it calls for

information protected by the attorney-client privilege, the work product doctrine, and/or the

common interest doctrine. Boehringer further objects to Interrogatory No. 23 on the grounds that

it is overly broad, unduly burdensome, and/or would entail undue expense to answer. Boehringer further objects to Interrogatory No. 23 on the grounds that it assumes facts not in evidence. Boehringer further objects to Interrogatory No. 23 on the grounds that it purports to ask Boehringer to prove, or identify all "facts, documents, and circumstances" which evidence, the nonexistence of a fact. Boehringer further objects to Interrogatory No. 23 on the grounds that it is vague and ambiguous. Boehringer further objects to Interrogatory No. 23 on the grounds that it contains discrete subparts within the meaning of FEDERAL RULE OF CIVIL PROCEDURE 33(a).

Subject to and without waiving the foregoing objections, Boehringer states that the compounds included in the "Auslandstext" for Cases 5/920 and/or 1/737 were sufficiently described pursuant to 35 U.S.C. § 112 in German Applications DE 3447075 and DE 3508947. *See* Boehringer's Response to Interrogatory Nos. 19 & 20 (incorporated herein). Boehringer further states that it is not aware of any Boehringer agent or representative who thought that the "Auslandstext" included compounds that were not sufficiently described pursuant to 35 U.S.C. § 112 in German Applications DE 3447075 and DE 3508947.

## INTERROGATORY NO. 24:

Do you contend that no Boehringer agent or representative knew that the "Auslandstext" (also referred to as a foreign filing text) for Cases 5/920 and/or 1/737 included text that was not contained in German Applications DE 3447075 and DE 3508947? If so, please state the basis for your contention and identify all facts, documents, and circumstances on which you rely for your contention. If your answer is anything other than an unequivocal "Yes," please state the basis for your answer, identify which individual(s) possessed this knowledge, and identify all facts, documents, and circumstances on which you rely for your answer.

**RESPONSE:**

Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 24. Boehringer further objects to Interrogatory No. 24 to the extent it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine. Boehringer further objects to Interrogatory No. 24 on the grounds that it is overly broad, unduly burdensome, and/or would entail undue expense to answer. Boehringer further objects to Interrogatory No. 24 on the grounds that it purports to ask Boehringer to prove, or identify all "facts, documents, and circumstances" which evidence, the nonexistence of a fact. Boehringer further objects to Interrogatory No. 24 as vague and ambiguous, especially to the extent it does not identify the "text" to which it refers. Boehringer further objects to Interrogatory No. 24 as calling for information that is irrelevant to the claims or defenses of either party. Boehringer further objects to Interrogatory No. 24 on the grounds that it contains discrete subparts within the meaning of FEDERAL RULE OF CIVIL PROCEDURE 33(a).

Subject to and without waiving the foregoing objections, Boehringer states that Dr. Schneider's laboratory synthesized additional compounds within the scope of the invention disclosed in DX 4 following the filing of that application with the German Patent Office and forwarded information regarding those compounds to Dr. Fleischer for inclusion in the Auslandstext. *See* Schneider Dep. at 70-77, 120-21 & 153-54. However, no Boehringer deponent recalls being aware at the time that the Auslandstext "included text that was not contained in German Applications DE 3447075 and DE 3508947." *See id.* at 154 ("I cannot tell you that I specifically have been aware of it. I was aware that additional compounds were synthesized in my laboratory . . . ."); Dep. of R. Fleischer at 201-214.

**INTERROGATORY NO. 25**

Do you contend that the statement submitted to the United States Patent and Trademark Office during the prosecution of U.S. Patent Application 256,671 that U.S. Application Serial No. 747,748 "is not available as prior art because its filing date is later than the effective filing date of the above-captioned application. (The effective filing date of the above-captioned application is 22 December 1984, the date on which the German application for which Convention priority is claimed was filed)" is correct? If so, please state the basis for your contention and identify all facts, documents, and circumstances on which you rely for your contention. If your answer is anything other than an unequivocal "Yes," please identify what is incorrect about the statement(s), identify each person at Boehringer that knew that it was incorrect, identify when and how each person learned it was incorrect, identify the basis for any contention that part of the statement is correct, and state the basis for your answer including identifying all facts, documents, and circumstances on which you rely for your answer.

**RESPONSE:**

Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 25. Boehringer further objects to Interrogatory No. 25 to the extent it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine. Boehringer further objects to Interrogatory No. 25 as overly broad, unduly burdensome, and not reasonably calculated to lead to discoverable information. Boehringer further objects to Interrogatory No. 25 as vague and ambiguous. Boehringer further objects to Interrogatory No. 25 as calling for information that is irrelevant to the claims or defenses of either party and that is not reasonably calculated to lead to the discovery of admissible evidence. Boehringer further objects to Interrogatory No. 25 to the extent that it calls for evidence rather than facts. Boehringer further objects to Interrogatory No. 25 on the grounds that it contains multiple discrete subparts within the meaning of FEDERAL RULE OF CIVIL PROCEDURE 33(a).

Subject to and without waiving the foregoing objections, Boehringer states that the statement made to the United States Patent and Trademark Office during the prosecution of U.S. Patent Application 256,671 (the "671 Application") that U.S. Application Serial No.

747,748 "is not available as prior art because its filing date is later than the effective filing date of the above-captioned application. (The effective filing date of the above-captioned application is 22 December 1984, the date on which the German application for which Convention priority is claimed was filed)" is accurate.

First, the first German application to which the '671 application claimed priority under 35 U.S.C. § 119 adequately supported the claims of the '671 Application under 35 U.S.C. § 112, *see* Boehringer's Response to Interrogatory Nos. 19 & 20 (incorporated herein), and was filed on December 22, 1984, which is earlier than the June 24, 1985 filing date of U.S. Application Serial No. 747,748. Therefore, the filing date of the '748 application was later than the effective filing date of the '671 application.

Second, regardless of whether the claims of the '671 application had the benefit of the filing dates of either DE 3508947 or DE 3447075 under 35 U.S.C. § 119, the '748 application was not prior art. Because the '748 application was never published and never issued as a patent, it did not fall within the scope of any of 35 U.S.C. § 102(a), (b), (d), or (e). The inventors named in the '671 application did not derive their invention(s) from the '748 application, so the '748 application did not constitute prior art under §102(f). Finally, the '748 application did not itself qualify as prior art under § 102(g). *See* MPEP § 2138.

At most, the '748 application may potentially have led to the information that could have qualified as prior art under § 102(g), but the applicants expressly disclosed that possibility to the Examiner, as can be seen from the entirety of, and context of, the statement quoted in Interrogatory No. 25:

C. Possibly Interfering Application of Another

Applicants particularly wish to bring to the attention of the Patent and Trademark Office the existence U.S. Patent Application Serial No. 747,748, filed 24 June 1985, and its foreign equivalent, European Patent Application No. 207,696, published 1 July, 1987.

European '696 discloses tetrahydro (thi or ox) azoles of the formula:



wherein $R^1$ and $R^2$ are individually H, methyl, ethyl or n-propyl; $R^3$ and $R^4$ are individually H, methyl, ethyl, n-propyl or allyl; and Y is O or S.

When Y is S, the compounds of European '696 represent a subgenus of the compounds disclosed and originally claimed in the above-captioned application. However, European '696 does not represent prior art because its publication date is later than the affective filing date of the above-captioned application.

U.S. Application Serial No. 747,748 contains the same disclosure as European '696. It is not available as prior art because its filing date is later than the effective filing date of the above-captioned application. (The effective filing date of the above-captioned application is 22 December 1984, the date on which the German application for which Convention priority is claimed was filed).

It is believed that Serial No. 747,748 is still pending. As filed, U.S. Application Serial No. 747,748 contained claims directed to compounds of the above formula XX.

The Examiner is urged to consider carefully the relevance of Serial No. 747,748 before allowing the above-captioned application. The possibility of interfering subject matter should be particularly considered. Copies of these two references and a Form PTO-1449 listing the same are enclosed herewith.

'812 pros., Dec. 8, 1988 Second Preliminary Amendment and Information Disclosure Statement, at 3-4.

As can be seen from the context of this statement, the applicants urged the U.S.P.T.O. "to consider carefully the relevance of Serial No. 747,748 before allowing the above-captioned application" and that "[t]he possibility of interfering subject matter should be particularly considered." *Id.* The U.S.P.T.O. never invoked the interference, however, and the '748 application ultimately was abandoned.

**INTERROGATORY NO. 26:**

Do you contend that the statement submitted to the United States Patent and Trademark Office during the prosecution of U.S. Patent Application 256,671 that U.S. Application Serial No. 747,748 "is not available as prior art because its filing date is later than the effective filing date of the above-captioned application. (The effective filing date of the above-captioned application is 22 December 1984, the date on which the German application for which Convention priority is claimed was filed)" was not a material representation? If so, please state the basis for your contention and identify all facts, documents, and circumstances on which you rely for your contention. If your answer is anything other than an unequivocal "Yes," please describe with particularity why the representation was material and identify all facts, documents, and circumstances on which you rely for your answer.

**RESPONSE:**

Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 26. Boehringer further objects to Interrogatory No. 26 to the extent it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine. Boehringer further objects to Interrogatory No. 26 as overly broad, unduly burdensome, and not reasonably calculated to lead to discoverable information. Boehringer further objects to Interrogatory No. 26 as vague and ambiguous, especially with respect to the term "material representation." Boehringer further objects to Interrogatory No. 26 as calling for information that is irrelevant to the claims or defenses of either party and that is not reasonably calculated to lead to the discovery of admissible evidence. Boehringer further objects to Interrogatory No. 26 as overly broad, unduly burdensome, and not reasonably calculated to lead to discoverable information, especially to the extent that it purports to ask Boehringer to

15

prove, or identify all "facts, documents, and circumstances" which evidence, the nonexistence of a fact. Boehringer further objects to Interrogatory No. 26 on the grounds that it contains multiple discrete subparts within the meaning of FEDERAL RULE OF CIVIL PROCEDURE 33(a).

Subject to and without waiving the foregoing objections, Boehringer states that, given their context, the words quoted in Interrogatory No. 26 were not material.

First, the words quoted are accurate, because the '748 application was not available as prior art to the '671 application, regardless of whether the '671 application could claim the benefit of the filing date of the German priority applications. *See* Boehringer's Resp. to Interrog. No. 25 (incorporated herein). Second, the words quoted are accurate because the filing date of the '748 application was later than the earliest effective filing date of the '671 application. *See id.* Third, even if the '748 application suggested prior art might exist to the '671 application under § 102(g), the applicants disclosed that possibility to the Examiner in the portions of the document at issue (which portions were omitted by Barr from Interrogatory No. 26). *See id.*

Fourth, even if was true that the '748 application had an earlier effective filing date than the '671 application, the statement that the '748 application "is not available as prior art *because* its filing date is later than the effective filing date of the above-captioned application" (emphasis added) would not be material because the '748 application was not available as prior art to the '671 application regardless of whether or not the '671 application could claim the benefit of the filing date of the German priority applications. *See id.*

**INTERROGATORY NO. 27:**

Do you contend that practicing a method of treating Parkinsonism or Parkinson's disease which comprises administering a therapeutically effective amount of 2-amino-6-n-propyl-4,5,6,7-tetrahydro-benzthiazole, or a pharmaceutically acceptable acid addition salt thereof is within the scope of any claim of the '812 patent? If so, please state the basis for your

contention, identify which claim(s), and identify all facts, documents, and circumstances on which you rely for your contention. If not, please state the basis for your answer and identify all facts, documents, and circumstances on which you rely for your answer.

**RESPONSE**:

Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 27. Boehringer further objects to Interrogatory No. 27 to the extent it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine. Boehringer further objects to Interrogatory No. 27 as overly broad, unduly burdensome, and not reasonably calculated to lead to discoverable information. Boehringer further objects to Interrogatory No. 27 as vague and ambiguous, especially with respect to its use of the phrase "within the scope of any claim." Boehringer further objects to Interrogatory No. 27 to the extent it calls for a legal conclusion. Boehringer further objects to Interrogatory No. 27 on the grounds that it contains discrete subparts within the meaning of FEDERAL RULE OF CIVIL PROCEDURE 33(a).

Subject to and without waiving the foregoing objections, Boehringer states claims 1-7, 9 and 10 of the '812 patent claim compounds of specified formulas or (pharmaceutically acceptable) acid addition salts thereof, (*see* '812 patent, claims 1-7, 9, 10), that claim 8 of the '812 patent claims pharmaceutical compositions, (*id.*, claim 8). Boehringer further states that the unauthorized manufacture, use, offer to sell, or sale within the United States or importation into the United States of any of those claimed compounds, acid addition salts, or compositions by a person or entity other than Boehringer before the expiration of the '812 patent – or the filing of an ANDA seeking approval from the FDA to do so – constitutes infringement of the '812 patent pursuant to 35 U.S.C. § 271(a), (b), and/or (e)(2). Boehringer further states that no claims in the '812 patent claim a "method of treating Parkinsonism or Parkinson's disease which comprises

administering a therapeutically effective amount of 2-amino-6-n-propyl-4,5,6,7-tetrahydro-benzthiazole, or a pharmaceutically acceptable acid addition salt thereof."

## INTERROGATORY NO. 28

Do you contend that practicing a method of treating the signs and symptoms of idiopathic Parkinson's disease which comprises administering 0.125 mg, 0.25 mg, 0.5 mg, 1.0mg, or 1.5 mg of (S)-2-amino-4,5,6,7-tetrahydro-6-(propylamino) benzothiazole dihydrochloride monohydrate is within the scope of any claim of the '812 patent? If so, please state the basis for your contention, identify which claim(s), and identify all facts, documents, and circumstances on which you rely for your contention. If not, please state the basis for your answer and identify all facts, documents, and circumstances on which you rely for your answer.

## RESPONSE:

Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 28. Boehringer further objects to Interrogatory No. 28 to the extent it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine. Boehringer further objects to Interrogatory No. 28 as overly broad, unduly burdensome, and not reasonably calculated to lead to discoverable information. Boehringer further objects to Interrogatory No. 28 as vague and ambiguous, especially with respect to its use of the phrase "within the scope of any claim." Boehringer further objects to Interrogatory No. 28 to the extent it calls for a legal conclusion. Boehringer further objects to Interrogatory No. 28 on the grounds that it contains discrete subparts within the meaning of FEDERAL RULE OF CIVIL PROCEDURE 33(a).

Subject to and without waiving the foregoing objections, Boehringer states claims 1-7, 9 and 10 of the '812 patent claim compounds of specified formulas or (pharmaceutically acceptable) acid addition salts thereof, (*see* '812 patent, claims 1-7, 9, 10), that claim 8 of the '812 patent claims pharmaceutical compositions, (*id.*, claim 8). Boehringer further states that the unauthorized manufacture, use, offer to sell, or sale within the United States or importation into

the United States of any of those claimed compounds, acid addition salts, or compositions by a person or entity other than Boehringer before the expiration of the '812 patent – or the filing of an ANDA seeking approval from the FDA to do so – constitutes infringement of the '812 patent pursuant to 35 U.S.C. § 271(a), (b), and/or (e)(2). Boehringer further states that no claims in the '812 patent claim a "method of treating the signs and symptoms of idiopathic Parkinson's disease which comprises administering 0.125 mg, 0.25 mg, 0.5 mg, 1.0 mg, or 1.5 mg of (*S*)-2-amino-4,5,6,7-tetrahydro-6-(propylamino) benzothiazole dihydrochloride monohydrate."

**INTERROGATORY NO. 29:**

For each of entries 1, 5, 8, 16, 17, 19, 22, 28, 30, 31, 39, 42, 43, 44, 45, 46, 47, 48, 49, 51, 52, 56, 57, 58, 59, 60, 61, 62, 63, 67, 68, 70, 71, 74, 183, 184, 186, 188, 190, 192, 193, 196, 205, 208, 209, 211, 213, 214, 216, 218, 219, 223, 225, 227, 237, 244, 246, 251, 254, 260, 262, 266, 268, 279, 281, 282, 283, 288, 297, 298, 304, 306, 307, 309, 311, 312, 315, 316, 318, 319, 321, 389, 390, 392, 394, 397, 398, 416, 418, 420, 421, 423, 425, 431, 432, 433, 435, 436, and 440 on Boehringer's privilege log, state which communications were partially or wholly in English.

**RESPONSE:**

Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 29. Boehringer further objects to Interrogatory No. 29 to the extent it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine. Boehringer further objects to Interrogatory No. 29 on the grounds that it is overly broad, unduly burdensome, and/or would entail undue expense to answer. Boehringer further objects to Interrogatory No. 29 on the grounds that it seeks information that is not relevant to the claim or defense of any party.

**INTERROGATORY NO. 30:**

State whether Boehringer or its agents or representatives were making any preparations at anytime between 1987 and 1990 for a potential interference proceeding between U.S. Application Serial Nos. 810,947, 124,197, and/or 256,671 and U.S. Application Serial

19

No. 747,748. If your answer is anything other than an unequivocal "No," identify which of the aforementioned patent applications were the subject of those preparations, and identify all individuals involved with the preparations (including without limitation outside counsel) and all individuals who were aware of the preparations.

**RESPONSE:**

Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 30. Boehringer further objects to Interrogatory No. 30 to the extent it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine, especially to the extent it requests information about "preparations . . . for a potential interference proceeding." Boehringer further objects to Interrogatory No. 30 as overly broad, unduly burdensome, and not reasonably calculated to lead to discoverable information. Boehringer further objects to Interrogatory No. 30 as vague and ambiguous. Boehringer further objects to Interrogatory No. 30 as calling for information that is not relevant to the claims or defenses of any party. Boehringer further objects to Interrogatory No. 30 on the grounds that it contains discrete subparts within the meaning of FEDERAL RULE OF CIVIL PROCEDURE 33(a).

Subject to and without waiving the foregoing objections, Boehringer responds as follows. Boehringer acknowledged "[t]he possibility" that the '748 application contained "interfering subject matter" in its correspondence with the U.S.P.T.O. in connection with the prosecution of U.S. Application Nos. 256,671 (*Dec. 8, 1988 Second Preliminary Amendment*, at 3-4), 124,197 (*Oct. 7, 1988 Amendment*, at 22-23), and 810,947 (*March 1, 1988 Supplemental Information Disclosure Statement Under Rule 99*, at 1-2). Individuals aware of the possibility of "interfering subject matter" with respect to the '748 application included Alan Stempel.

**INTERROGATORY NO. 31:**

State whether Boehringer or its agents or representatives were making any preparations at anytime between 1987 and 1990 for a potential interference proceeding between U.S. Application Serial Nos. 810,947, 124,197, and/or 256,671 and any patent application other than U.S. Application Serial No. 747,748. If your answer is anything other than an unequivocal "No," identify which of the aforementioned patent applications were the subject of those preparations and identify all individuals involved with the preparations (including without limitation outside counsel) and all individuals who were aware of the preparations.

**RESPONSE:**

Boehringer hereby incorporates its General Objections as and for its objections to

Interrogatory No. 31. Boehringer further objects to Interrogatory No. 31 on the grounds that it

calls for information protected by the attorney-client privilege, the work product doctrine, and/or

the common interest doctrine, especially to the extent it requests information about "preparations

. . . for a potential interference proceeding." Boehringer further objects to Interrogatory No. 31

on the grounds that it is overly broad, unduly burdensome, and/or would entail undue expense to

answer. Boehringer further objects to Interrogatory No. 31 on the grounds that it seeks

information that is not relevant to the claim or defense of any party. Boehringer further objects

to Interrogatory No. 31 on the grounds that it contains discrete subparts within the meaning of

FEDERAL RULE OF CIVIL PROCEDURE 33(a).

**INTERROGATORY NO. 32:**

For each of entries 5, 20, 21, 26, 35, 39, 54, 57, 68, 69, 72, 73, 74, 75, 76, 77, 79, 82, 83, 84, 85, 86, 94, 95, 96, 97, 100, 101, 102, 104, 106, 107, 172, 173, 174, 175, 176, 438, 439 on Boehringer's privilege log, state whether the "potential interference proceeding" concerned U.S. Application Serial No. 747,748.

**RESPONSE:**

Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 32. Boehringer further objects to Interrogatory No. 32 on the grounds that it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine. Boehringer further objects to Interrogatory No. 32 on the grounds that it is overly broad, unduly burdensome, and/or would entail undue expense to answer. Boehringer further objects to Interrogatory No. 32 on the grounds that it seeks information that is not relevant to the claim or defense of any party. Boehringer further objects to Interrogatory No. 32 on the grounds that it contains discrete subparts within the meaning of FEDERAL RULE OF CIVIL PROCEDURE 33(a).

**INTERROGATORY NO. 33:**

For each of entries 63, 67, 120, 130, and 268 on Boehringer's privilege log, state whether the "other corporation's patent" concerned Eli Lilly and Company and/or U.S. Application Serial No. 747,748.

**RESPONSE:**

Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 33. Boehringer further objects to Interrogatory No. 33 on the grounds that it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine. Boehringer further objects to Interrogatory No. 33 on the grounds that it is overly broad, unduly burdensome, and/or would entail undue expense to answer. Boehringer further objects to Interrogatory No. 33 on the grounds that it seeks information that is not relevant to the claim or defense of any party. Boehringer further objects to Interrogatory No. 33 on the grounds that it contains discrete subparts within the meaning of FEDERAL RULE OF CIVIL PROCEDURE 33(a).

**INTERROGATORY NO. 34:**

State whether Boehringer or its agents or representatives ever communicated with Eli Lilly and Company or its agents or representatives regarding the possibility of a settlement agreement in connection with U.S. Application Serial No. 747,748. If so, state with particularity the dates of each communication, the content of each communication, the names of each individual involved in those communications.

**RESPONSE:**

Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 34. Boehringer further objects to Interrogatory No. 34 to the extent that it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine. Boehringer further objects to Interrogatory No. 34 on the grounds that it is overly broad, unduly burdensome, and/or would entail undue expense to answer. Boehringer further objects to Interrogatory No. 34 on the grounds that it seeks information that is not relevant to the claim or defense of any party. Boehringer further objects to Interrogatory No. 34 on the grounds that it contains discrete subparts within the meaning of FEDERAL RULE OF CIVIL PROCEDURE 33(a). Subject to and without waiving the foregoing objections, Boehringer states that the answer to Interrogatory No. 34 is no.

**INTERROGATORY NO. 35:**

Do you contend that all compounds within claims 3, 4, 5, 7, 8, 9, and 10 of the '812 patent can be used to treat at least one of the following: (1) hypertension, (2) tachycardia,(3) schizophrenia, (4) Parkinsonism, or (5) Parkinson's disease? If so, for each claim please state the basis for your contention and identify all facts, documents, and circumstances on which you rely for your contention. If your answer is anything other than an unequivocal "Yes," for each claim please identify all compounds within those claims that can be used to treat the aforementioned disorders and identify all facts, documents, and circumstances on which you rely for your answer.

**RESPONSE:**

Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 35. Boehringer further objects to Interrogatory No. 35 on the grounds that it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine. Boehringer further objects to Interrogatory No. 35 on the grounds that it is overly broad, unduly burdensome, and/or would entail undue expense to answer. Boehringer further objects to Interrogatory No. 35 on the grounds that it seeks information that is not relevant to the claim or defense of any party. Boehringer further objects to Interrogatory No. 35 on the grounds that it contains discrete subparts within the meaning of FEDERAL RULE OF CIVIL PROCEDURE 33(a).

**INTERROGATORY NO. 36:**

Identify the reasons U.S. Application Serial No. 256,671 was filed, including whether it was filed so that the issues presented by U.S. Application Serial No. 747,748 could be more easily dealt with.

**RESPONSE:**

Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 36. Boehringer further objects to Interrogatory No. 36 to the extent it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine. Boehringer further objects to Interrogatory No. 36 as overly broad, unduly burdensome, and not reasonably calculated to lead to discoverable information. Boehringer further objects to Interrogatory No. 36 as calling for information that is not relevant to the claims or defenses of any party.

Subject to and without waiving the foregoing objections, Boehringer responds as follows. Claims 1-8 of U.S. Application No. 124,197 were reinstated in another application

which later became U.S. Application Serial No. 256,671 to "advance the prosecution of [the '197 application] and [so] that issues presented by [the '748 application] will be more easily dealt with." '086 patent prosecution history, *Oct. 7, 1988 Amendment,* at 22-23.

**INTERROGATORY NO. 37**

       Do you contend that claim 5 of the '812 patent is not invalid for failure to satisfy the requirement of 35 U.S.C. § 112, ¶ 2? If so, please state the basis for your contention and identify all facts, documents, and circumstances on which you rely for your contention.

**RESPONSE:**

       Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 37. Boehringer further objects to Interrogatory No. 37 on the grounds that it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine. Boehringer further objects to Interrogatory No. 37 on the grounds that it is overly broad, unduly burdensome, and/or would entail undue expense to answer. Boehringer further objects to Interrogatory No. 37 on the grounds that it seeks information that is not relevant to the claim or defense of any party. Boehringer further objects to Interrogatory No. 37 on the grounds that it contains discrete subparts within the meaning of FEDERAL RULE OF CIVIL PROCEDURE 33(a). Boehringer further objects to Interrogatory No. 37 to the extent that it purports to ask Boehringer to prove, or identify all "facts, documents, and circumstances" which evidence, the nonexistence of a fact.

       Subject to and without waiving the foregoing objections, Boehringer responds as follows. The answer to Interrogatory No. 37 is yes. Claim 5, like all the claims of the '812 patent, are presumed valid pursuant to 35 U.S.C. § 282. Barr bears the burden of establishing invalidity by clear and convincing evidence. Barr has presented no reason why claim 5 may be invalid for failure to satisfy 35 U.S.C. §112, ¶ 2, much less clear and convincing evidence.

Therefore, it is impossible for Boehringer to "identify all facts, documents, and circumstances on which [it] rel[ies] for [its] contention."

## INTERROGATORY NO. 38:

Identify each person who participated in or was involved with the drafting of the Second Preliminary Amendment and Information Disclosure Statement submitted in December 1988 in connection with U.S. Application Serial No. 256,671, including without limitation any individuals who discussed or reviewed any drafts before it was filed with the United States Patent and Trademark Office, and describe with particularity each person's responsibility with respect to that document, including without limitation identifying each person who was responsible for the accuracy of the representations contained in that document.

## RESPONSE:

Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 38. Boehringer further objects to Interrogatory No. 38 to the extent it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine. Boehringer further objects to Interrogatory No. 38 as overly broad, unduly burdensome, and not reasonably calculated to lead to discoverable information. Boehringer further objects to Interrogatory No. 38 as calling for information that is not relevant to the claims or defenses of any party. Boehringer further objects to Interrogatory No. 38 as vague and ambiguous.

Subject to and without waiving the foregoing objections, Boehringer responds as follows. Persons who participated in or were involved with the drafting of the Second Preliminary Amendment and Information Disclosure Statement submitted in December 1988 in connection with U.S. Application Serial No. 256,671 included Alan Stempel. Boehringer further states that additional information that is responsive to Interrogatory No. 38 may be found in the transcripts of the depositions taken in this case of Dr. Laudien, Dr. Fleischer, Mr. Stempel, Dr. Klaes, and Dr. Milnes.

## INTERROGATORY NO. 39

Identify each person who received copies of the Second Preliminary Amendment and Information Disclosure Statement submitted in December 1988 in connection with U.S. Application Serial No. 256,671, including without limitation any drafts and/or the version filed with the United States Patent and Trademark Office.

## RESPONSE:

Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 39. Boehringer further objects to Interrogatory No. 39 on the grounds that it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine. Boehringer further objects to Interrogatory No. 39 on the grounds that it is overly broad, unduly burdensome, and/or would entail undue expense to answer. Notably, the document that is the subject of Interrogatory No. 39 is a public document. Boehringer further objects to Interrogatory No. 39 on the grounds that it seeks information that is not relevant to the claim or defense of any party. Boehringer further objects to Interrogatory No. 39 as vague and ambiguous.

## INTERROGATORY NO. 40

Identify each person who participated in or was involved with the drafting of the "Auslandstext" (also referred to as a foreign filing text) for Cases 5/920 and/or 1/737, including without limitation any individuals who discussed or reviewed any drafts, and describe with particularity each person's responsibility with respect to that document.

## RESPONSE:

Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 40. Boehringer further objects to Interrogatory No. 40 on the grounds that it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine. Boehringer further objects to Interrogatory No. 40 on the grounds that it is overly broad, unduly burdensome, and/or would entail undue expense to answer.

Boehringer further objects to Interrogatory No. 40 on the grounds that it seeks information that is not relevant to the claim or defense of any party. Boehringer further objects to Interrogatory No. 40 as vague and ambiguous.

Subject to and without waiving the foregoing objections, Boehringer responds as follows. Persons who participated in the drafting of the Auslandstext for cases 5/920 and/or 1/737 included Dr. Fleischer. Boehringer further states that additional information that is responsive to Interrogatory No. 40 may be found in the transcripts of the depositions taken in this case of Dr. Laudien, Dr. Fleischer, Mr. Stempel, Dr. Klaes, and Dr. Milnes.

**INTERROGATORY NO. 41:**

Identify each person who received copies in any language of the "Auslandstext" (also referred to as a foreign filing text) for Cases 5/920 and/or 1/737, including without limitation any drafts and/or the versions filed with any patent office.

**RESPONSE:**

Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 41. Boehringer further objects to Interrogatory No. 41 on the grounds that it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine. Boehringer further objects to Interrogatory No. 41 on the grounds that it is overly broad, unduly burdensome, and/or would entail undue expense to answer. Boehringer further objects to Interrogatory No. 41 on the grounds that it seeks information that is not relevant to the claim or defense of any party. Boehringer further objects to Interrogatory No. 41 as vague and ambiguous.

**INTERROGATORY NO. 42**

Identify each person who received copies in any language of any of: U.S. Application Serial No. 747,748, European Patent Application No. 207,696, U.S. Application Serial No. 810,947, U.S. Application Serial No. 124,197, U.S. Application Serial No. 256,671, German Applications DE 3447075, and/or German Application DE 3508947 and state which of the aforementioned patent application(s) each received and when each person received it.

**RESPONSE:**

Boehringer hereby incorporates its General Objections as and for its objections to

Interrogatory No. 42. Boehringer further objects to Interrogatory No. 42 on the grounds that it

calls for information protected by the attorney-client privilege, the work product doctrine, and/or

the common interest doctrine. Boehringer further objects to Interrogatory No. 42 on the grounds

that it is overly broad, unduly burdensome, and/or would entail undue expense to answer.

Notably, the documents that are the subject of Interrogatory No. 42 are public documents.

Boehringer further objects to Interrogatory No. 42 on the grounds that it seeks information that is

not relevant to the claim or defense of any party. Boehringer further objects to Interrogatory No.

42 as vague and ambiguous.

**INTERROGATORY NO. 43:**

State whether Boehringer had any confidentiality or secrecy agreement(s) with Professor Oleh Hornykiewicz effective at any time between 1980 and 1990 that encompassed communications regarding the alleged invention(s) claimed in the '374, '086, or '812 patents. If your answer is anything other than an unequivocal "No," state the basis for your answer and identify all facts, documents, and circumstances on which you rely for your answer, including without limitation describing with particularity the nature of the agreement(s), the effective date of the agreement(s), the scope of the agreement(s), the reasons for entering into the agreement(s), and the basis for your assertion that the agreement(s) encompassed the alleged invention(s) claimed in the '374, '086, or '812 patents, and identifying which claim(s) of the aforementioned patents you allege the agreement(s) encompassed.

**RESPONSE:**

Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 43. Boehringer further objects to Interrogatory No. 43 on the grounds that it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine. Boehringer further objects to Interrogatory No. 43 on the grounds that it is overly broad, unduly burdensome, and/or would entail undue expense to answer. Boehringer further objects to Interrogatory No. 43 on the grounds that it seeks information that is not relevant to the claim or defense of any party. Boehringer further objects to Interrogatory No. 43 as vague and ambiguous. Boehringer further objects to Interrogatory No. 43 on the grounds that it seeks information that is obtainable from other means that are more convenient, less burdensome, and/or less expensive. Boehringer further objects to Interrogatory No. 43 on the grounds that it contains multiple subparts within the meaning of FEDERAL RULE OF CIVIL PROCEDURE 33(a).

**INTERROGATORY NO. 44**

Identify when (R)-2-amino-6-n-propylamino-4,5,6,7-tetrahydrobenzothiazole (including any salts thereof) and (S)-2-amino-6-n-propylamino-4,5,6,7-tetrahydrobenzothiazole (including any salts thereof) were first synthesized at Boehringer, who synthesized them, and what materials and methods were used to prepare them.

**RESPONSE:**

Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 44. Boehringer further objects to Interrogatory No. 44 on the grounds that it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine. Boehringer further objects to Interrogatory No. 44 on the grounds that it is overly broad, unduly burdensome, and/or would entail undue expense to answer. Boehringer further objects to Interrogatory No. 44 on the grounds that it seeks information that is

not relevant to the claim or defense of any party. Boehringer further objects to Interrogatory No. 44 as vague and ambiguous. Boehringer further objects to Interrogatory No. 44 on the grounds that it contains multiple subparts within the meaning of FEDERAL RULE OF CIVIL PROCEDURE 33(a).

Subject to and without waiving the foregoing objections, Boehringer responds as follows. Pursuant to Rule 33(d), Boehringer directs Barr to BOE 0062068-BOE 0065805 and BOE 00066139-BOE 00068784 from which the answer to Interrogatory No. 44 may be derived.

**INTERROGATORY NO. 45:**

Describe with particularity all research and testing preformed [sic] by Boehringer of any compound within the scope of General Formula I of the '812 patent where the R1 is "a phenyl alkyl or phenyl alkanoyl group having 1 to 3 carbon atoms in the alkyl part, whilst the above mentioned phenyl nuclei may be substituted by 1 or 2 halogen atoms," including without limitation the compounds with internal Boehringer numbers SND1021, SND1025, and SND1035.

**RESPONSE:**

Boehringer hereby incorporates its General Objections as and for its objections to Interrogatory No. 45. Boehringer further objects to Interrogatory No. 45 on the grounds that it calls for information protected by the attorney-client privilege, the work product doctrine, and/or the common interest doctrine. Boehringer further objects to Interrogatory No. 45 on the grounds that it is overly broad, unduly burdensome, and/or would entail undue expense to answer. Boehringer further objects to Interrogatory No. 45 on the grounds that it seeks information that is not relevant to the claim or defense of any party. Boehringer further objects to Interrogatory No. 45 as vague and ambiguous. Boehringer further objects to Interrogatory No. 45 on the grounds that it contains multiple subparts within the meaning of FEDERAL RULE OF CIVIL PROCEDURE 33(a).

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

_Maryellen Noreika_ (signature)
_____
Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
1201 North Market Street
P. O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
*Attorneys for Plaintiffs*
*Boehringer Ingelheim International GmbH*
*and Boehringer Ingelheim Pharmaceutical,*
*Inc.*

Of Counsel:

Steven C. Cherny
LATHAM & WATKINS LLP
885 Third Avenue, Suite 1000
New York, NY 10022-4834
(212) 906-1200

Kenneth G. Schuler
LATHAM & WATKINS LLP
Sears Tower, Suite 5800
Chicago, IL 60606
(312) 876-7700

Sandy Choi
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA  94111-2562
(415) 395-8095

Carisa S. Yee
LATHAM & WATKINS LLP
135 Commonwealth Drive
Menlo Park, California 94025-3656
(650) 328-4600

January 30, 2007

## CERTIFICATE OF SERVICE

I, Maryellen Noreika, hereby certify that copies of the foregoing were caused to

be served this 30th day of January, 2007, upon the following in the manner indicated

### BY HAND DELIVERY and EMAIL

Mary B. Matterer
Morris James LLP
500 Delaware Avenue
P.O. Box 2306
Wilmington, DE 19899

Adam Wyatt Poff
Young, Conaway, Stargatt & Taylor
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391

### BY EMAIL

Glenn J. Pfadenhauer
Jessamyn S. Berniker
Dov P. Grossman
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005-5901

David J. Harth
David L. Anstaett
Melody K. Glazer
Heller Ehrman LLP
One East Main Street, Suite 201
Madison, Wisconsin 53703

Shannon M. Bloodworth
Heller Ehrman LLP
1717 Rhode Island Ave., NW
Washington, DC 20036

_____
Maryellen Noreika (#3208)

EXHIBIT O

# Manual of
# PATENT
# EXAMINING
# PROCEDURE

Original Fifth Edition, August 1983
Latest Revision January 1989

 

## U.S. DEPARTMENT OF COMMERCE
Patent and Trademark Office

Rev. 10 January 1989

# Chapter 900    Prior Art, Classification, Search

901    Prior Art
901.01    Canceled Matter in U.S. Patent Files
901.02    Abandoned Applications
901.03    Pending Applications
901.04    U.S. Patents
901.05    Foreign Patent Documents
901.05(a)    Citation Data
901.05(b)    Other Significant Data
901.05(c)    Obtaining Copies
901.05(d)    Translation
901.06    Non-patent Publications
901.06(a)    Scientific Library
901.06(b)    Borrowed Publications
901.06(c)    Alien Property Custodian Publications
901.06(d)    Abstracts, Abbreviatures and Defensive Publications
901.07    Arrangement of Art in Examining Groups
901.08    Borrowing References
90′ ·    Missing Copies—Replacement
9.·    ʹfficial Publications and Indices of U.S. Patents
902 ·    Manual of Classification
902.01(a)    Index to the U.S. Patent Classification
902.02    Definitions
902.02(a)    Search Notes
902.02(b)    Search Cards
902.03    U.S. Patent Classification Indices
902.03(a)    Master Classification File (MCF) on Microfilm
902.03(b)    Patent Index
902.03(c)    Subclass Lists
902.03(d)    Classification and Search System Information System (CASSIS)
902.04    Classification Orders and Bulletins
903    Classification
903.01    Statutory Authority
903.02    Basis and Principles of Clas··.ation
903.02(a)    New and Revised Classes
903.02(b)    Scope of a Class
903.02(c)    Establishing Subclasses and Cross Reference Art Collections
903.03    Classification of Foreign Patents
903.05    Transfer of U.S. Patents
903.06    Practice to be Used in Ordering Official Cross References
903.06    Ordering Official Cross-References
903.06(a)    Discovery of New Cross-References
903.07    Classifying and Cross-Referencing at Allowance
903.07(a)    Cross-References—Keep Systematic Notes during Prosecution
903.07(b)    Issuing in Another Examining Group Without Transfer
903.08    Applications—Assignment and Transfer
903.08(a)    New Applications
903.08(b)    Classification and Assignment to Examiner
903.08(c)    Immediate Inspection of Amendments
903.08(d)    Transfer Procedure
903.08(e)    General Regulations Governing the Assignment of Applications for Examination
903.08(f)    Post Classifier's Decision
903.08(g)    Transfer to Another Examining Group after Decision
903.09    International Classification of Patents for Inventions
903.10    Duties o.′ tl·e Post Classifier
904    How to Search
904.01    Analysis of Claims
904.01(a)    Variant Embodiments within Scope of Claim
904.01(b)    Equivalents
904.01(c)    Analogous Arts
904.01(d)    Outlining Field of Search
904.02    Conducting the Search
905    Miscellaneous
905.01    Photocopy Orders
905.02    Soft Copy Orders
905.03    Ordering of Patented and Abandoned Files
905.04    Marking Examiners' Copies of Patents
905.05    Application File Location

## 901    Prior Art

Note 37 CFR 1.104(a) in § 707.

## 901.01    Canceled Matter in U.S. Patent Files

Canceled matter in the application file of a U.S. patent is not a proper reference as of the filing date under 35 U.S.C. 102(e), see Ex parte Stalego, 154 USPQ 52. However, matter canceled from the application file wrapper of a U.S. patent may be used as prior art as of the patent date in that it then constitutes prior public knowledge under 35 U.S. C. 102(a), In re Lund et al, 153 USPQ 625 (CCPA 1967).

## 901.02    Abandoned Applications

*37 CFR 1.108. Abandoned applications not cited. Abandoned applications as such will not be cited as references except those which have become abandoned as a result of the filing and acceptance of a request under § 1.139.*

Where an abandoned application is referred to in an issued U.S. patent, the disclosure of the application is incorporated by reference into the disclosure of the patent and is available to the public. See § 1.14(b).

In re Heritage, 1950 CD. 419, 86 USPQ 160, holds that where a patent refers to and relies upon the disclosure of a copending abandoned application, such disclosure is available as a reference. See also In re Lund, 153 USPQ 625, 54 CCPA 1361.

It has also been held that where the reference patent refers to a copending but abandoned application which discloses subject matter in common with the patent, the effective date of the reference as to the common subject matter is the filing date of the abandoned application. Ex parte Clifford, 49 USPQ 152; Ex parte Peterson, 63 USPQ 99; and In re Switzer et al., 612 O.G. 11; 77 USPQ 156.

Published abstracts, abbreviatures and defensive publications are references (§ 901.06(d)).

## § 901.03    Pending Applications

Except as provided in 37 CFR 1.11(b) pending U.S. applications are preserved in secrecy (37 CFR 1.14(a)) and are not available as references. However, claims in one application may be rejected on the claimed subject matter of a copending application of the same inventive entity. For applications having a common assignee and different inventive entities claiming a single inventive concept see § 804.03.

Applications abandoned under § 1.139 are treated as pending applications for limited time periods regarding interferences and the filing of a continuing application. (See § 711.06.)

## § 901.04    U.S. Patents

The following different series of U.S. patents are being, or in the past have been issued. The date of patenting given on the face of each copy is the publication date and is the one usually cited. The filing date, in most instances also given on the face of the patent, is ordinarily the effective date as a reference (35 U.S.C. 102(e)).

*X-Series* These are the approximately 10,000 patents issued between 1790 and July 4, 1863. They were not

EXHIBIT P

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BOEHRINGER INGELHEIM INTERNATIONAL GMBH and BOEHRINGER INHELHEIM PHARMACEUTICAL, INC. | ) ) ) ) | |
| Plaintiffs, | ) | Civil Action No. 05-0700 (KAJ) |
| v. | ) ) | |
| BARR LABORATORIES, INC., | ) ) | |
| Defendant. | ) ) | |

**EXPERT REPORT OF PROFESSOR PAUL A. BARTLETT, Ph.D.**

## A.    INTRODUCTION

1.    I am a Professor of Chemistry, Emeritus, at the University of California, Berkeley. I began teaching at Berkeley in 1973 and was Chair of the Department of Chemistry from 1996 to 2000.

2.    I obtained my A.B. in Chemistry from Harvard University in 1969 and my Ph.D. in Organic Chemistry from Stanford University in 1972. From 1972 through 1973 I was a postdoctoral fellow at the University of California, San Diego. I have attached my curriculum vitae and a list of my publications as Exhibit A.

3.    In addition to fulfilling my teaching duties as a Professor at Berkeley, I led a research group in the field of bioorganic chemistry and synthetic organic chemistry. Under my direction, 63 students have received their Ph.D. degrees, more than 75 postdoctoral fellows and visiting scientists have carried out advanced research, and countless undergraduate students have had their first exposure to original research. Some of my coworkers went into academe, while

most have gone on to successful industrial careers in research and development in the
pharmaceutical, biotech, and agrochemical fields.

4.     I have served as the director of the Center for New Directions in Organic
Synthesis since I founded the Center in 1999, while I was department Chair.  The role of this
Center is to improve the interactions between industry and academe in this field, thus improving
the training our students receive and facilitating industrial support for laboratory renovation for
junior faculty.

5.     As a consequence of my research interests and accomplishments, I have had the
opportunity to consult broadly with industry across many of my fields of interest and I lecture
extensively on drug design.  I first began working as a consultant in 1979, for the Bristol-Myers
Company, consulting for both its research and development divisions.  The former group was
concerned with the discovery of new medicinal agents, and the latter was charged with finding
efficient and workable methods for their manufacture.  I had similar interactions with the
corresponding divisions at Schering-Plough when I consulted for it from 1984-1996.  I have
consulted for companies engaged in medicinal chemistry, in agrochemistry, in biotechnology,
and chemical software development.  I also co-founded a successful start-up company engaged
in drug discovery.  Through these interactions, which are detailed in my curriculum vitae, I have
had extensive opportunity to participate in the drug discovery and development processes in the
industrial context.

6.     I have co-authored more than 180 articles and abstracts in the field of organic
chemistry, bioorganic chemistry, and drug design, and I am named as co-inventor on several
United States patents.  The list of publications that I have written or to which I have contributed
is attached to my curriculum vitae.

7.    I am a member of a number of technical societies, serve on the editorial advisory boards of several technical journals, and have chaired a number of technical conferences. Many of these professional positions have been in the field of drug discovery. I have also received several awards in my field, including, for example, the Cope Scholar Award from the American Chemical Society in 1990. I was also elected a Fellow in the American Academy of Arts and Sciences in 1994. Early in my career I received the Stuart Pharmaceuticals Award and an Eli Lilly Young Scientist Award, in recognition of my accomplishments in research and its relevance to the pharmaceutical industry.

8.    I am very familiar with the field of organic synthesis, namely that branch of organic chemistry that involves the preparation of more complex molecules from less complex molecules. I received my Ph.D. training in this field, it has been an important component of my own research throughout my career, and it has been an area in which I have consulted extensively for industry. I have an understanding not only of synthetic operations on the laboratory scale, but also of how these operations are carried out as large-scale manufacturing processes.

9.    On the basis of my education and the experience described above, I believe I am qualified to give the opinions set out herein.

## B.    MANDATE

10.    I have been asked to provide a tutorial on drug development and a discussion of the Boehringer inventors' research that led to the invention claimed in the U.S. Patent No. 4,886,812 (" the '812 Patent), particularly the compound called pramipexole.

3

11.    In addition, I have been asked to respond to the opinions offered by Dr. Eric Anslyn, an expert retained by Defendant Barr Laboratories ("Barr") in this matter. In particular, I have been asked to provide an opinion as to whether the German priority applications adequately describe and enable one of ordinary skill in the art to synthesize certain compounds encompassed by the '812 Patent.

12.    I have further been asked to provide an opinion as to whether the work performed at Eli Lilly & Company ("Lilly") by Dr. Bennett Laguzza and Mr. William Turner, Jr. constitutes invention of 2-amino-6-dipropylamino-4,5,6,7-tetrahydrobenzthiazole, 2-amino-6-di-methylamino-4,5,6,7-tetrahydrobenzthiazole, and 2-methylamino-6-di-methylamino-4,5,6,7-tetrahydrobenzthiazole prior to June 19, 1985, the date that Dr. Laguzza and Mr. Turner signed the declaration for Lilly's U.S. patent application in which it is claimed.

13.    In preparing this expert report, I have reviewed the materials set forth in Exhibit B. I have also reviewed the expert report of Dr. Anslyn. In addition to those documents, the opinions I express in this report are based on my own personal knowledge of, and experience in, the areas of drug design and development.

## C.    **SUMMARY OF OPINIONS**

14.    The discovery of a new drug is a difficult process that involves the intersection of many scientific disciplines. Enormous experimental effort is undertaken to identify biologically active lead compounds and optimize them for evaluation as drug candidates, lengthy and expensive testing is required to determine if these candidates are suitable for administration to man, and extensive clinical trials are carried out to determine if they are efficacious and safe. In short, drug discovery is a challenging process in which there is no guarantee of success. The

4

discovery and development of pramipexole as an effective pharmaceutical agent was no exception.

15.    My analysis of the evidence concerning the work performed at Lilly by Dr. Bennett Laguzza and Mr. William Turner, Jr. shows that it does not constitute invention of 2-amino-6-dipropylamino-4,5,6,7-tetrahydrobenzthiazole, 2-amino-6-di-methylamino-4,5,6,7-tetrahydrobenzthiazole, and 2-methylamino-6-di-methylamino-4,5,6,7-tetrahydrobenzthiazole prior to June 19, 1985.

16.    As I explain in detail below, I disagree with Dr. Anslyn's opinion that "that there is nothing in either of the German applications that discloses implicitly or explicitly to the skilled artisan, any starting material, intermediate, or final product in which $R_1$ contains or optionally contains a halogenated phenyl group." Anslyn Report ¶ 46. In my opinion, the first German priority application adequately discloses to one of skill in the art the halogenated phenyl alkyl $R_1$ derivatives to meet the written description requirement of the U.S. patent law.

## D.    PERSON OF ORDINARY SKILL IN THE ART

17.    I understand that patent claims must be construed, and the specification of a patent read, as a person of ordinary skill in the art would have understood them at the time of the filing of the patent.

18.    In my opinion, a person of ordinary skill in this art at the time of the invention would have been an individual with an advanced degree (M.S. or Ph.D.) in organic chemistry or pharmacology and having two or three years of laboratory experience in medicinal chemistry in an academic or industry setting. A person without a graduate degree, but having more laboratory

5

experience in this field, could also be considered a person of ordinary skill at the time of the invention.[1]

## E.    UNDERSTANDING OF RELEVANT PATENT LAW REQUIREMENTS

19.    I understand that when a patent is issued after examination by the U.S. Patent and Trademark Office, the patent is presumed to be valid. This presumption can only be overcome by clear and convincing evidence of facts to the contrary. I further understand that "clear and convincing evidence" is a much higher standard than a suggestion or a presumption or one possible interpretation out of many; it is evidence that produces in one's mind a firm belief or conviction that the allegations sought to be proved by the evidence are true.

20.    I understand that Section 112 of the patent law provides that the "specification shall contain a written description of the invention...." It is my further understanding that the subject matter of a later filed claim does not need to be described literally or *in haec verba* in an earlier filed priority application in order for the description requirement to be satisfied. I have been advised that the appearance of a claim element that is not expressly delineated in the specification of a patent does not violate the written description requirement if the specification makes it clear to one skilled in the art that the claim element has been invented. Thus, a priority application provides sufficient description of an invention if, taken as a whole, it reasonably conveys to those skilled in the art that the inventors were in possession of the subject matter they later claim.

---

[1]    I note that Barr Laboratories' expert Dr. Anslyn suggests that the skilled artisan has a lower level of training and less experience in the field of drug discovery. While I believe his definition underestimates the capabilities of one of ordinary skill, I note that the opinions I offer in this report would not change in the event that Barr's definition is accepted by the Court.

21.     It is also my understanding that a parent application satisfies the written description requirement if it provides adequate direction to those skilled in the art that reasonably leads them to the claimed compounds, in other words, that an adequate description of a process for synthesizing a compound may be considered an adequate description of the compound itself.

22.     In this case, I understand that in order to constitute prior invention by another in this country who had not abandoned, suppressed, or concealed it under Section 102(g) of the patent law, Barr must show both conception and reduction to practice of the alleged invention.  I also understand that to achieve actual reduction to practice, an inventor must not only construct an embodiment of the invention but must also test the product or process so as to establish its capacity to perform the intended purpose successfully.  In the context of a new chemical compound or composition, I understand that utility of the new chemical compound or composition must be established by testing and that the inventor must recognize and appreciate that the tests were successful.  In other words, there is no invention until the alleged inventor interprets or evaluates the results and understands them to demonstrate the invention.  I thus understand that prior invention cannot be established without evidence for this timely testing, evaluation, and demonstration of the invention.

## F.     TUTORIAL ON DRUG DISCOVERY

23.     The discovery of a new pharmaceutical agent begins with the consideration of a disease area, such as cancer, heart disease, diabetes, a neurological disorder, etc.  In some cases, a researcher may be able to focus his attention on a specific biological mechanism of action, often referred to as a *target*, that is known to play a role in the disease.  In particularly favorable circumstances, it may be possible to probe the function of the biological target in a simple *in*

7

*vitro* system (i.e., in a test tube – or the modern equivalent), which facilitates the evaluation of drug candidates that may show promise in treating the disease.

24.    However, in other cases, a specific biological target for treating the disease may not have been identified, in which case a researcher must rely on animal testing (*i.e.*, an *in vivo* model) to evaluate the promise of potential lead compounds phenomenologically.  The researcher may thus be able to identify the biological target only after compounds effective in modulating the disease have been found and their mechanism of action elucidated.  Even in instances in which a target may have been identified biologically, the complexity of the system in which it functions may be such that the effect of increasing or decreasing its activity cannot be evaluated in a simple *in vitro* experiment.  Indeed, the complexity of every biological system is such that any drug must be evaluated in extensive animal and, eventually, human clinical trials before its efficacy and potential toxicity can be fully understood.

25.    From the standpoint of a medicinal chemist, the starting point in the search for a new drug is a "lead compound," a molecule that shows some of the desired biological activity. There are a number of ways in which such starting points can be identified.  One strategy is to screen collections of compounds, such as those archived from past pharmaceutical research or being synthesized in other programs, or collections of extracts from natural sources.  While not completely random, the screening approach is very much like searching for the needle in the haystack, since the likelihood of finding a useful lead is very small.  This method is also impractical unless the screen is a very straightforward *in vitro* test.

26.    Another approach to the identification of a lead compound is to build on what is known in the art by considering what compounds have been described in the scientific literature or in patents as showing the desired activity.  There are often many such avenues to consider,

based on what others have reported or claimed, and the task is to select a starting point that appears to offer the most promise. One skilled in the art may consider a number of characteristics in selecting a starting compound, such as the potency of its effect on the desired target, or its selectivity for the desired target as opposed to an undesired target, or the least toxicity, or the most favorable pharmacodynamic profile. He also considers what may be known about *structure-activity relationships* or *SAR*; that is, what has been reported in the prior art regarding the effect of structural differences on a particular biological property (I address this issue in greater detail below). Information from the prior art is important, since it may direct one skilled in the art toward particularly promising molecular structures or scaffolds, and may teach away from structural features that result in unfavorable properties.

27.     It is extremely unlikely that a medicinal chemist is able to identify a lead compound, either from screening or from the prior art, that has all the properties required of a new drug. Invariably, modifications to the structure are undertaken to change the properties so that it has the desired potency and selectivity for the biological target, so that it has an acceptably low toxicity when tested in animals, so that it can be adequately absorbed from its site of administration (optimally by oral dosage), and so that it is distributed throughout the body and not metabolized or excreted too slowly or too quickly.

28.     These requirements are addressed in a hierarchical approach: typically, the medicinal chemist first tries to improve the potency of the lead compounds against the desired target. He then looks for compounds that do not hit related or undesired targets, while trying to preserve the primary activity. Potent and selective compounds are evaluated for toxicity, and modifications are made to try to identify non-toxic compounds that are still potent and selective. Compounds that are potent, selective, and that appear to be reasonably safe may not be well-

absorbed, they may be rapidly metabolized, or the mechanism by which they are excreted from the body may be such that they are cleared rapidly from the bloodstream or, conversely, may persist too long and build up over time.  In the development of compounds that must act in the central nervous system, the "blood-brain barrier" is another hurdle that the drug must cross. Similarly, in the development of compounds that act in the peripheral nervous system, compounds that also elicit central behavioral effects may not be suitable as drugs.  While there is some temporal overlap in the sequence in which these properties of a drug candidate are addressed, it is clear that the problem faced by the medicinal chemist involves balancing many independent variables, all of which are important and difficult to predict.

### Structure-Activity Relationships (SAR)

29.    It is the nature of scientists to discern patterns from their data and to attempt to extrapolate from their experience in designing further experiments.  In the search for novel and improved drugs, this conceptual approach is embodied in what has become known as "structure-activity relationships" or "SAR."  In an SAR analysis, a medicinal chemist looks for a trend in a property of interest, for example, a biological effect in an *in vitro* or *in vivo* model system, as the structures of the molecules are modified.  To appreciate the role of SAR analysis, it helps to understand what insights or intuition a medicinal chemist gains from observing the effects that changes in molecular structure have on the biological or other properties of a lead compound; in particular, it is important to understand their limitations.  To the extent a researcher tries to glean from SAR analyses some indication of which compounds to make and which compounds to avoid, hypotheses of this sort may be of potential use in guiding his decision.  However, such hypotheses are by definition derived from a retrospective analysis, and their utility is critically

dependent on the type of data from which they are derived and on the nature of the extrapolation that the researcher makes in applying them to an unknown structure.

30.    As an example of a typical SAR hypothesis, if a researcher observes that replacement of a particular hydrogen atom with a hydroxyl group (OH) leads to an improvement in certain activity between one pair of molecules, he might hope to see a similar difference in that activity if the same substitution is made in a closely related pair of molecules. For there to be any validity to this inference, all other elements of the experiment must be the same; *i.e.*, the activity must be measured under similar conditions and against the same target. As one would expect, the more that the comparison compounds differ from each other, the less confidence the researcher can have in his hypothesis.

31.    An SAR hypothesis derived from one kind of data provides no insight into properties that depend on different types of data. For example, if one just determines the *in vitro* activity of two related compounds, one containing a hydroxyl substituent and the other a hydrogen, this information is not useful for inferring what the difference between the compounds would be in terms of other *in vitro* activity or their absorption, tissue distribution, metabolism, excretion, toxicity - in short, their efficacy as drugs *in vivo*.

32.    It is intuitively apparent why one can have little confidence in the generality of an SAR analysis derived from a multivariate system. For instance, if the biological test involves an *in vivo* animal model system that depends on a CNS effect, the molecular interaction between the lead compound and the biological target will be only one factor out of many in determining the observed activity. For one series of compounds, the limiting factor may be the potency of this interaction, whereas for another series, penetration of the blood-brain barrier may restrict the observed effect. Since these various biological properties are not affected by structural

11

alterations in the same way, the SAR observed for one series of compounds may be completely irrelevant for another.

### *Advancement of a Lead Compound to a Clinical Candidate*

33.     As noted above, there is far more involved in the invention of a drug than simply obtaining a compound that manifests activity against a particular biological target.  One cannot file a New Drug Application with the Food and Drug Administration for approval to market a drug simply on the strength of the observation that "this molecule showed potent dopaminergic activity in the rat."  Nor can one even submit an Investigational New Drug application for permission to administer the compound to humans in a clinical trial at this point.  A clinical candidate must satisfy a multitude of biological, pharmacological, and physicochemical characteristics before it reaches this stage of human testing or commercial use.  All of these characteristics depend on the molecular structure, none of them can be predicted with any degree of confidence, and they can be obtained only through extensive experimentation.

### G.     **BOEHRINGER INVENTORS' WORK**

34.     To put into context the invention of pramipexole, I outline the state of the art in the field of dopamine agonists as of that time.  An enormous number of chemical structures were known to have dopaminergic activity, as shown in the chart below, which was derived from a comprehensive review article published in 1985 (J. G. Cannon, *Prog. Drug. Res.* **1985**, *29*, 303-414 "Dopamine agonists: Structure-activity relationships"):



35.    In addition to the enormous diversity of structures from the prior art, Dr. Claus

Schneider, one of the inventors of the '812 Patent and a medicinal chemist working at

13

Boehringer's Ingelheim research facility, and his colleagues considered and investigated many

other structural classes that were not known from the prior art to have dopaminergic activity. Dr.

Schneider's "Tätigkeitsbericht IV/1984" records the following ring systems as "Bearbeitete

Strukturklassen bei der Suche von Dopaminagonisten" (Structural classes worked on in the

search for dopamine agonists) (Exh. 40 at BOE00849215):



14

36.    The Cannon 1985 review of the prior art, as well as Dr. Schneider's 1984 report of his efforts, show that the 2,6-diamino-4,5,6,7-tetrahydrobenzthiazole framework was not a clear-cut starting point in a search for compounds with dopaminergic agonist activity.  However, from the broad search that Dr. Schneider's lab undertook, testing revealed promising activity for some derivatives in this class, in particular the 6-monopropylamino compound, prompting the further investigation of this chemical series that ultimately led to the selection of pramipexole as a candidate for development of an anti-Parkinson's agent.

37.    Dr. Schneider began his investigation of diaminotetrahydrobenzthiazoles in late 1983 as part of his effort to find compounds that could be useful in the treatment of schizophrenia.  *See* Schneider Dep. 25:4-5; 45:3-22.  In this June 1984 quarterly activity report, Dr. Schneider recorded the synthesis and physical characterization (by melting point) of some 11 diaminotetrahydrobenzthiazoles with different amino substituents at the 2- and 5- or 6-positions.  Exh. 9, BOE00849177-78.

38.    In his September 1984 quarterly activity report, Dr. Schneider indicated that in the intervening reporting period, his lab had synthesized two aminotetrahydrobenzthiazole derivatives that he considered "wichtigen Varianten" (important variants), which were identified by the codes "SND 919" and "SND 920."  Exh. 35, BOE00849198.  SND 919 was the Boehringer designation for the 2-amino-6-propylamino derivative and SND 920 was the 2-amino-6-dipropylamino derivative.  Dr. Schneider noted that the initial biological evaluation of these compounds showed an interesting profile.  In particular, he reported that SND 919 exhibited presynaptic dopaminergic activity, as manifested by pronounced inhibition of the synthesis of DOPA; moreover, this compound appeared to have favorable tolerance in animal experiments.  *Id.* at BOE 00849199.

15

39.    After his internal report of the synthesis and initial testing of some diaminotetra-hydrobenzthiazoles, Dr. Schneider learned that Drs. Gerhart Griss and Rudolf Hurnaus, scientists at Boehringer's Biberach research facility, had independently synthesized and tested some compounds from this chemical series. *See* Schneider Dep. 34:25-35:22; 93:25-94:21. After consultation between Dr. Schneider and Dr. Hurnaus (Dr. Griss died in 1983), it was decided that continued research on diaminotetrahydrobenzthiazoles would be the responsibility of Dr. Schneider's laboratory. *See* Hurnaus Dep. 49:1-52:8.

40.    In his December 1984 quarterly activity report, Dr. Schneider reported that during 1984, his lab had synthesized 200 compounds from 18 different structure classes in their search for antipsychotics/dopamine agonists; compounds from three classes had thus far demonstrated activity as inhibitors of dopamine synthesis. Increased dopamine synthesis, which still needed to be verified, was observed in a fourth class. Exh. 40 at BOE00849214. He also reported that the emphasis of his laboratory during the quarter was on the continued synthesis of diamino-tetrahydrobenzthiazoles and that additional compounds within the class had been prepared using the newly developed synthesis routes. *Id.* By that time, his lab was concentrating on the 6-monoalkylamino derivatives because they had found that 6-dialkylamino derivatives were not as well tolerated. *Id.* at BOE00849216. Dr. Schneider singled out SND 919 as a diaminotetrahydrobenzthiazole that was being investigated more broadly, reflecting the encouraging results emerging from biological testing of this compound. *Id.* at BOE00849217. He further noted that work on the diaminotetrahydrobenzthiazoles had, for the time being, largely been wound down, with attention directed toward a different ring system, the diaminothiazolocyclopentanes. *Id.*

16

41.     In his March 1985 quarterly activity report, Dr. Schneider characterized SND 919 as an "Entwicklungssubstanz" (development substance), meaning that it had been approved for further investigation in anticipation of carrying it forward into preclinical development. *See* Schneider Dep. 121:10-122:8; Exh. 41 at BOE00849166. Dr. Schneider reported that the potential neuroleptic and anti-Parkinsonian properties of SND 919 were better than those of other compounds due to reduced adrenergic effects combined with the highest activity so far measured as an inhibitor of dopamine synthesis. Exh. 41 at BOE00849166. In addition, SND 919 appeared to improve the symptoms of MPTP monkeys (those with induced symptoms akin to Parkinson's disease) for a distinctly longer period of time. *Id.* As a consequence of the focus on SND 919, the emphasis of his laboratory work for the quarter was to develop a manufacturing protocol for SND 919 and prepare 30 g of this compound for additional testing. *Id.*

42.     In his May 1985 quarterly activity report, Dr. Schneider described a new synthetic route for SND 919 that was superior to those employed previously. Exh. 42 at BOE00849180. He also described in more detail the method for preparing the individual enantiomers of SND 919, designated SND 919 Y (–) and SND 919 X (+). The individual enantiomers and the racemic form were compared with respect to their biological activity and Boehringer determined that the (–)-enantiomer ("SND CL 2 Y (–)") had the highest activity as a dopaminergic agent. *Id.* at BOE00849182-83. Finally, Dr. Schneider provided a retrospective overview of the structure-activity relationships for a dozen of the variously substituted 2,6-diaminotetrahydrobenzthiazoles that had been investigated. *Id.* at BOE00849187.

43.     On June 14, 1985, Boehringer decided to pursue development of the more active SND 919 Y enantiomer. *See* BOE00132270-71. Preliminary pharmacological and biochemical tests showed SND 919 CL 2 Y (pramipexole) to be more effective than the racemate, and that the

17

X form is substantially weaker. *Id.* Boehringer also reported internally that the Y enantiomer

and the racemate did not differ in the preliminary acute toxicity tests in the mouse. *Id.* In his

October 1985 quarterly activity report, Dr. Schneider reported that, because SND 919 Y had

been selected for further development, his lab had concentrated their activities during the report

period on developing a procedure for the kilogram-scale preparation of SND 919 CL 2 Y. Exh.

50 at BOE00849205. The report also recorded additional biological test results for the

enantiomers of SND 919 and the racemate, which confirmed that the Y enantiomer was the best

candidate for development as a dopaminergic agent. *Id.* at BOE00849209.

     44.     Between July and September 1985, various pharmacological tests were carried

out to compare SND 919 (racemate) with B-HT 920 and BX-OX 280, the other compounds that

were under investigation in Boehringer's search for dopamine autoreceptor agonists. *See*

BOE00004167-77. In a pharmacological model for Parkinson's disease, SND 919 proved to be

equivalent or superior to the comparison compounds in their action on the hypersensitive

postsynaptic dopamine receptors, and definitely superior with regard to the duration of this

effect. *Id.* at BOE00004172. The results led the Boehringer investigators to designate SND 919

as the leader and most favorable among the three comparison compounds because it showed

most favorable ratio of desired dopamine activity to undesired $\alpha$-adreno receptor activity. *Id.*

Further pharmacological tests continued to show that SND 919 CL 2 Y was superior to the SND

919 racemate and other potential dopaminergic compounds that had been selected for further

testing. *See* BOE00004178-97.

     45.     By August 1988, numerous biological tests with SND 919 CL 2 Y (pramipexole)

had been carried out, leading to the conclusion that SND 919 CL 2 Y "shares many of the

characteristics of B-HT 920 but is much less active on $\alpha2$ receptors so that [it is expected to

have] less pronounced effects on the cardiovascular system and lower incidence of nausea and vomiting and perhaps sedation." *See* BOE00037825-61 at BOE00037828. In particular, in studies in animals whose dopaminergic system had been damaged irreversibly using MPTP, SND 919 CL 2 Y was shown to antagonize motor deficit and other Parkinson-like symptoms, including tremor, dyskinesia and dorsi-flexion, in a dose-dependent way. *Id.* at BOE00037833. Notably, SND 919 CL 2 Y, in contrast to B-HT 920, did not produce sedation. *Id.* at BOE00037834. Moreover, in both *in vitro* and *in vivo* pharmacological tests, pramipexole was shown to be a highly potent, presynaptic dopamine receptor agonist with a marked inhibitory effect both on the rate of dopamine synthesis and on dopamine release. *Id.* at BOE00037835-36.

46.    Pramipexole eventually was tested on humans in Phase III clinical trials. Those trials showed that as initial therapy in early Parkinson's disease, pramipexole (1) significantly reduces the risk of developing dyskinesias; (2) enhances patient functioning; and (3) may slow the loss of dopaminergic neurons. The clinical trials also demonstrated that as adjunct therapy in advanced Parkinson's disease, pramipexole (1) reduces tremor; (2) reduces the daily levodopa dosage without deterioration of motor response; (3) increase "on" time and decreases "off" time; and (4) enhances patient functioning. *See* BOE00754889-929 at BOE00754899. Based upon such trials, pramipexole was commercialized as Mirapex® in the United States. The United States Food and Drug Administration approved various dosage strengths of Mirapex® for the treatment of the signs and symptoms of idiopathic Parkinson's disease on July 1, 1997. *See* July 1, 1997 FDA Approval Letter; BOE00116352.

## H.    THE GERMAN PRIORITY APPLICATIONS

47.    The German patent applications DE 3 447 075  filed December 22, 1984 ("the German '075 application") and DE 3 508 947 filed March 13, 1985 ("the German '947

19

application") were cited as priority disclosures in the U.S. application that matured into the '812

Patent. The German '075 application defines and claims a genus of compounds described as

follows (Exh. 53 at BARR028314):

Tetrahydro-benzthiazoles of general formula



(I)

wherein

$R_1$ represents a hydrogen atom, an alkyl group having 1 to 6 carbon atoms, an alkenyl or alkynyl group each having 3 to 6 carbon atoms, an alkanoyl group having 1 to 6 carbon atoms, a phenyl alkyl group or phenyl alkanoyl group having 1 to 3 carbon atoms in the alkyl part,

$R_2$ represents a hydrogen atom or an alkyl group with 1 to 4 carbon atoms,

$R_3$ represents a hydrogen atom, an alkyl group with 1 to 7 carbon atoms, a cycloalkyl group having 3 to 7 carbon atoms, an alkenyl or alkynyl group having 3 to 6 carbon atoms, an alkanoyl group having 1 to 7 carbon atoms, a phenyl alkyl group or phenyl alkanoyl group having 1 to 3 carbon atoms in the alkyl part, whilst the phenyl nucleus may be substituted by fluorine, chlorine, or bromine atoms,

$R_4$ represents a hydrogen atom, an alkyl group with 1 to 4 carbon atoms, an alkenyl or alkynyl group having 3 to 6 carbon atoms or

$R_3$ and $R_4$ together with the nitrogen atom between them represent a pyrrolidino, piperidino, hexamethyleneimino or morpholino group, [] and the acid addition salts thereof.

48.    The German '075 application discloses several conventional methods for

preparing the compounds described in the application. One, designated as method "d)", involves

reduction of an acyl or phenylacyl derivative; this method is illustrated by Examples 8 and 10 of

the German priority applications:

d)    In order to prepare compounds of general formula I wherein at least one of the groups $R_1$, $R_2$, $R_3$ or $R_4$ represents one of the above-mentioned alkyl, cycloalkyl, alkenyl or phenylalkyl groups:

Reduction of a compound of general formula



VII

20

wherein

at least one of the acyl groups $R_1"$, $R_2"$, $R_3"$ or $R_4"$ represents one of the acyl or phenylacyl groups mentioned hereinbefore and the other groups have the meanings given for $R_1$, $R_2$, $R_3$ and $R_4$ hereinbefore, with a metal hydride in a solvent.

[Additional details regarding suitable solvents, advantageous reagents, and conditions for the reduction reaction are given.]

(Exh. 53 at BARR028277-78.)

49.    Another method disclosed, method "e)", describes the introduction of nitrogen substituents by alkylation and acylation; method "e)" is illustrated by Examples 5, 6, 7, 9, and 12 of the German priority applications:

e)    In order to prepare compounds of general formula I wherein at least one of the groups $R_1$, $R_2$, $R_3$ or $R_4$ represents one of the above-mentioned alkyl, cycloalkyl, alkenyl, alkynyl or phenylalkyl groups mentioned hereinbefore:

Reacting a compound of general formula



(VIII)

wherein

at least one of the groups $R_1'''$, $R_2'''$, $R_3'''$ or $R_4'''$ represents a hydrogen atom and the other groups $R_1'''$, $R_2'''$, $R_3'''$ or $R_4'''$ have the meanings given for $R_1$ to $R_4$ hereinbefore, with a compound of general formula

$R_5 - Z$    (IX)

wherein

$R_5$ represents one of the alkyl, cycloalkyl, alkenyl, alkynyl or phenylalkyl groups mentioned for $R_1$ to $R_4$ hereinbefore and Z represents a nucleophilically exchangeable group such as a halogen atom or a sulfonic acid, e.g., a chlorine, bromine or iodine atom,  methoxysulfonyloxy or p-toluenesulfonyloxy group, or Z together with an adjacent hydrogen of the group $R_5$ represents an oxygen.

[Additional details regarding suitable solvents, advantageous reagents, and conditions for the alkylation reaction are given.]

If according to the invention a compound of general formula I is obtained wherein at least one of the groups $R_1$, $R_2$, $R_3$ or $R_4$ represents a hydrogen atom, this may be converted by corresponding acylation into a

21

corresponding compound of general formula I wherein at least one of the
groups $R_1$, $R_2$, $R_3$ or $R_4$ represents one of the acyl groups mentioned
hereinbefore.

[Additional details regarding suitable solvents, advantageous reagents, and
conditions for the acylation reaction are given.]

(Exh. 53 at BARR028278-80.)

50.    These methods involve very general synthetic reactions that were well known in

the art of organic synthesis.  One of ordinary skill would understand that, either singly or in

combination, they enable the preparation of a vast range of substituted diamino-4,5,6,7-tetra-

hydrobenzthiazoles.

## I.    THE '812 PATENT

51.    The '812 Patent defines and claims a genus of compounds similar to those of the

German '075 application:

A tetrahydro-benzthiazole of the formula:

$$\begin{array}{c} R_3 \\ N \\ R_4 \end{array} \underset{S}{\overset{N}{\boxed{\phantom{xx}}}} N \overset{R_1}{\underset{R_2}{N}} \quad (I)$$

wherein

$R_1$ is a hydrogen atom, an alkyl group having 1 to 6 carbon atoms, an
alkenyl or alkynyl group each having 3 to 6 carbon atoms, an
alkanoyl group having 1 o 6 carbon atoms, a phenyl alkyl group or
phenyl alkanoyl group having 1 to 3 carbon atoms in the alkyl part,
wherein the above mentioned phenyl nuclei may be substituted by
1 or 2 halogen atoms;

$R_2$ is a hydrogen atom or an alkyl group with 1 to 4 carbon atoms;

$R_3$ is a hydrogen atom, an alkyl group with 1 to 7 carbon atoms, a
cycloalkyl group having 3 to 7 carbon atoms, an alkenyl or alkynyl
group having 3 to 6 carbon atoms, an alkanoyl group having 1 to 7
carbon atoms, a phenyl alkyl group or phenyl alkanoyl group
having 1 to 3 carbon atoms in the alkyl part, whilst the phenyl
nucleus may be substituted by fluorine, chlorine, or bromine
atoms; and,

22

$R_4$ is a hydrogen atom, an alkyl group with 1 to 4 carbon atoms, an alkenyl or alkynyl group having 3 to 6 carbon atoms; or,

$R_3$ and $R_4$ together with the nitrogen atom between them form a piperidino, hexamethyleneimino or morpholino group; or, an acid addition salt thereof.

(Exh. 3, BOE00000014.)

52.    The only difference with respect to phenyl substitution between the genus of Claim 1 of the '812 Patent and that of Claim 1 of the German '075 application is the explicit inclusion of halogen substituents on the phenyl alkyl and phenyl alkanoyl groups within the definitions of both $R_1$ and $R_3$; such substituents are only enumerated explicitly for $R_3$ in the genus of Claim 1 of the German '075 application.

53.    The '812 Patent discloses the identical synthetic methods for preparation of the compounds of the invention as described in the earlier German applications, and includes all of the specific examples those documents disclosed.  Also included within Example 10 of the '812 Patent are three compounds with chlorinated benzyl substituents on the 2-amino group, as examples in which $R_1$ is a halogenated phenyl alkyl group.  Exh. 3, BOE00000012, column 20, lines 23-44.

## J.    THE INVENTORS' SYNTHESES OF HALOGENATED PHENYLALKYL DERIVATIVES

54.    I have reviewed the laboratory notebooks of Michael Lavall, a technical assistant in Dr. Schneider's laboratory, and I note that syntheses of a number of diaminotetrahydrobenz-thiazoles with chlorinated benzyl groups as $R_1$ substituents are recorded therein.  These syntheses, which were carried out in January 1985, are illustrated below:

23

$R_1$ = 2-chlorobenzyl    Bates #'s BOE00061984, BOE00061989



$R_1$ = 4-chlorobenzyl    Bates #'s BOE00061987, BOE00061992



$R_1$ = 3-chlorobenzyl    Bates #'s BOE00061997, BOE00062003



$R_1$ = 2,4-dichlorobenzyl    Bates #'s BOE00061995, BOE00062000



$R_1$ = 3,4-dichlorobenzyl    Bates #'s BOE00062007, BOE00062011

## K.    THE OPINIONS OFFERED BY DR. ANSLYN

55.    Barr's expert, Dr. Anslyn, notes the expanded definition for the $R_1$ groups in Claim 1 of the '812 Patent, as well as the inclusion of chlorinated phenyl alkyl groups as $R_1$ groups in the enumerated examples of the $R_1R_2N$ fragment (column 2 of the Patent), in the description of particularly preferred compounds (column 3), and within Example 10. *See* Anslyn Report, ¶¶ 40-44.

56.    In Dr. Anslyn's opinion, "there is nothing in either of the German applications that discloses implicitly or explicitly to the skilled artisan, any starting material, intermediate, or final product in which $R_1$ contains or optionally contains a halogenated phenyl group." *Id.* at ¶ 46.

24

**L.    THE TEACHINGS OF THE GERMAN PRIORITY APPLICATIONS**

57.    In light of my understanding of the legal requirements of 35 U.S.C. Section 112, as summarized above, I disagree with Dr. Anslyn's opinion set forth in the previous paragraph. One of ordinary skill in the art of organic chemistry would have understood that the methods used to introduce halogenated phenylalkyl substituents, such as the 2-chlorobenzyl, 4-chlorobenzyl, or 3,4-dichlorobenzyl groups, are the same as those used to introduce unsubstituted benzyl or other phenylalkyl substituents into a molecule. Thus, inherently, the synthetic routes disclosed in the German priority applications would reasonably enable one of ordinary skill to make diaminotetrahydrobenzthiazoles with halogenated benzyl or other phenylalkyl groups as $R_1$ substituents.

58.    I note also that neither method "d)" nor method "e)" of the German priority applications distinguish the $R_1$ and $R_2$ substituents on the 2-amino group from the $R_3$ and $R_4$ substituents on the amino group of the 6-membered ring. *See* Exh. 53, BARR028277-80. That is, the German priority applications describe identical reactions for introducing these substituents. One of ordinary skill in the art would have known that these reactions enable the introduction of a halogenated phenylalkyl or phenylalkanoyl groups as either $R_1$ or $R_3$ substituents as straightforwardly as they would the non-halogenated groups.

59.    The generality of this chemistry, and the ease with which one of ordinary skill could apply it to the synthesis of halogenated $R_1$ groups, is further illustrated by the following sequence, which falls squarely within the boundaries of method "e)" of the German priority applications:

("a compound of general formula VIII wherein at least one of the groups $R_1'''$, $R_2'''$, $R_3'''$ or $R_4'''$ represents a hydrogen atom ...")

("$R_5$ represents one of the ... phenylalkyl groups mentioned for $R_1$ to $R_4$ hereinbefore...")

60.     The definition for $R_5$ includes all of the phenylalkyl group variations disclosed for $R_1$ to $R_4$ "hereinbefore". *See Id.* at BARR028279. Because the description of the $R_3$ group in the specification includes those "having 1 to 3 carbon atoms in the alkyl part, whilst the phenyl nucleus may be substituted by fluorine, chlorine, or bromine atoms," one of skill in the art would have understood the definition of $R_5$ to include halogenated phenylalkyl and phenylalkanoyl groups. Thus, method "e)" clearly embraces the synthesis of diaminotetrahydrobenzthiazoles with halogenated phenylalkyl and phenylalkanoyl groups at the $R_1$ position.

61.     The variation of method "e)" in which the R substituents are introduced by reductive amination instead of alkylation is similarly applicable to the synthesis of diaminotetrahydrobenzthiazoles with halogenated phenylalkyl and phenylalkanoyl groups at the $R_1$ position:



("... or Z together with an adjacent hydrogen of the group $R_5$ represents an oxygen.")

62.     I note that method "d)" may also be employed for the preparation of diaminotetra-hydrobenzthiazoles with halogenated phenylalkyl substituents at the $R_1$ position:

("a compound of general formula VII
wherein at least one of the groups $R_1$", $R_2$",
$R_3$" or $R_4$" represents one of the ... phenyl-
acyl groups mentioned hereinbefore")

63.     The definition of "the phenylacyl groups mentioned hereinbefore" in compounds

of general formula VII encompasses those defined for both $R_1$ and $R_3$ and thus includes groups in

which the phenyl nucleus may be substituted by fluorine, chlorine, or bromine atoms. *See Id.* at

BARR028278.

64.     As I noted above, these interpretations are fully in accord with what one of

ordinary skill in organic chemistry would understand are possible synthetic methods. Indeed, the

applicability of method "d)" to the synthesis of derivatives containing a chlorobenzyl or

dichlorobenzyl group as the $R_1$ substituent is confirmed by the fact that Dr. Schneider's assistant

Michael Lavall used the method to prepare five such analogs. I also note that the compounds of

Example 10 of the '812 Patent that contain chlorinated benzyl groups as the $R_1$ substituent were

prepared by method "d)."

65.     Furthermore, a clear reading of the synthetic methods disclosed in the German

priority applications contradicts Dr. Anslyn's statement that these documents do not disclose

"any starting material, intermediate, or final product in which $R_1$ contains or optionally contains

a halogenated phenyl group." Anslyn Report ¶¶ 18, 46. The definition of a compound of

general formula VII in method "d)" includes all phenylacyl groups, halogenated or non-

halogenated, within the definition of $R_1$". *See Id.* at BARR028277-78. Compound VII would be

considered by one of ordinary skill as either a starting material or intermediate.

66.    Similarly, the definition of the $R_5$ group in formula IX, which would be considered a starting material in method "e)," encompasses all the variations "mentioned for $R_1$ to $R_4$ hereinbefore"; this definition includes the halogenated phenylalkyl groups of the $R_3$ moiety. *Id.* at BARR028279.

## M.    RESEARCH WORK BY LILLY SCIENTISTS

67.    It is my understanding that Barr, and only Barr, alleges that the work by Lilly scientists, Dr. Bennett Laguzza and Mr. William Turner, constitutes prior invention of diaminotetrahydro-benzthiazole dopaminergic agents under Section 102(g). Neither the purported inventors nor Lilly has made such an assertion or otherwise endorsed Barr's position.

68.    Lilly's patent application Ser. No. 747,748 informs one skilled in the art that the compounds that Dr. Laguzza and Mr. Turner believed to have invented were tetrahydrobenzthiazoles (Y = S) and -benzoxazoles (Y = O) of formula XX:



XX

wherein Y is S or O, $R^1$ and $R^2$ are independently H, methyl, ethyl, or n-propyl, and $R^3$ and $R^4$ are independently H, methyl, ethyl, n-propyl or allyl; and pharmaceutically-acceptable acid addition salts thereof formed with non-toxic acids.

Exh. 18, BARR027394.

69.    The specification of this application makes it clear that the only compounds predicted to have dopamine agonist activity are those in which the nitrogen on the 6-membered ring is disubstituted (that is, both $R^3$ and $R^4$ are alkyl or allyl groups):

The compounds of this invention wherein neither $R^3$ nor $R^4$ is H have receptor agonist activity; i.e., they can increase the amounts centrally or peripherally or both of certain neurohormones.

*Id.*

28

70.    Although compounds in which the nitrogen on the 6-membered ring is monosubstituted are claimed in this application, the specification makes it clear that they were understood to have utility only as intermediates for the synthesis of the active disubstituted derivatives:

> Compounds according to XX wherein one or both of $R^3$ and $R^4$ is H are intermediates in that they can be allylated or alkylated to yield compounds of this invention wherein $R^3$ and $R^4$ are individually methyl, ethyl, n-propyl or allyl.

*Id.*

71.    It is clear that the Lilly scientists did not expect diaminotetrahydrobenzthiazoles with a monoalkylamino substituent at the 6- position to have receptor agonist activity. This conclusion is not only supported by the explicit teaching of their patent application, but also by the fact that they never even made such a compound to test for activity. I understand that Mr. Turner testified that he had never synthesized a compound that fit that description or even thought about doing so. *See* Turner Dep 89:17-91:2. I also understand that there is no evidence that Dr. Laguzza ever made such a compound either.

72.    I note that Dr. Anslyn in his report does not address any issue relating to obviousness for any claims of the '812 Patent. Although he addresses the structural relationship between the 6-dialkylamino compounds synthesized by the Lilly scientists and the compounds encompassed by claims 1-6 and dependent claim 8 of the '812 Patent, he specifically excludes claims 7, 9, and 10 from his discussion. Claims 7, 9 and 10 of the '812 Patent are directed to 6-monoalkylamino derivatives, which were never synthesized by the Lilly scientists and which they did not expect to have receptor agonist activity.

73.    Dr. Anslyn offers no opinion whether the compounds encompassed by claims 7, 9 and 10 of the '812 Patent would have been obvious to one skilled in the art, nor does he cite any

factual support for such an opinion, were it to be found that the three dialkylaminotetrahydro-benzthiazole compounds that the Lilly scientists synthesized were to constitute a prior invention. Of course, the fact that the Lilly scientists' own patent application taught that the monoalkyl derivatives, like those in claims 7, 9 and 10 of the '812 Patent, would not be useful as receptor agonists leads to the opposite conclusion – that is, that the dopaminergic activity of monoalkyl derivatives, such as pramipexole, was unexpected and nonobvious.

### 2-Amino-6-di-n-propylamino-4,5,6,7-tetrahydrobenzthiazole (Lilly Compound 188305)

74.    In light of the legal requirements for an invention to be considered "reduced to practice", I see no evidence from the documents or deposition testimony from Lilly scientists that Dr. Laguzza actually reduced to practice the invention of 2-amino-6-di-n-propylamino-4,5,6,7-tetrahydrobenzthiazole prior to June 19, 1985, the date that Dr. Laguzza signed the declaration for U.S. patent application Ser. No. 747,748. See BARR027413-14.

75.    I note that Dr. Laguzza purportedly made this compound as the HBr salt ("Compound 188305") on or about December 6, 1983 and that it was tested for activity as a dopaminergic agent and as a hypotensive agent in December 1983 and January 1984 by Dr. Richard Hahn and Mr. Edward Smalstig. See Exs. 11, 14-16; Hahn Dep. 26:1-15; Smalstig Dep.16:8-17:14.

76.    Although Dr. Laguzza submitted Compound 188305 for testing, there is no indication what expectations he may have had regarding its biological activity. Moreover, I have seen no testimony from Dr. Laguzza that he was informed of the results of that testing, nor testimony from Dr. Hahn or Mr. Smalstig that they provided him this information. A handwritten note from Dr. Hahn to Dr. Laguzza (Exh. 14 at LLY 9) is undated, and there is no indication when it was prepared or if it was actually received by Dr. Laguzza.

77.     The fact that Dr. Laguzza did not make any additional tetrahydrobenzthiazoles or pursued any further evaluation of Compound 188305 itself suggests that, regardless of his expectations or understanding of its biological activity, he did not consider the tetrahydrobenzthiazoles to be a fruitful series for further investigation.

78.     I note that neither Dr. Laguzza nor Lilly is asserting that Dr. Laguzza "invented" 2-amino-6-di-n-propylamino-4,5,6,7-tetrahydrobenzthiazole before December 22, 1984.  In my opinion, there is insufficient evidence to conclude that Dr. Laguzza actually reduced to practice the invention of that compound prior to June 19, 1985, the date that he signed the declaration for Lilly's U.S. patent application in which it is claimed.  *See* BARR027413-14.

## *2-Amino-6-di-methylamino-4,5,6,7-tetrahydrobenzthiazole(Lilly Compound 197511) and  2-Methylamino-6-di-methylamino-4,5,6,7-tetrahydrobenzthiazole (Lilly Compound 178694)*

79.     Similarly, I see no evidence from the documents or deposition testimony from Lilly scientists that Mr. William Turner reduced to practice the invention of 2-amino-6-di-methylamino-4,5,6,7-tetrahydrobenzthiazole or 2-methylamino-6-dimethylamino-4,5,6,7-tetrahydrobenzthiazole prior to the date that Mr. Turner signed the declaration for U.S. patent application Ser. No. 747,748.  *See* BARR027413-14.

80.     On or about May 10, 1984, Mr. Turner synthesized 2-amino-6-dimethylamino-tetrahydrobenzthiazole·2HBr (Compound 197511) and on or about July 14, 1984, he synthesized 2-methylamino-6-dimethylamino-tetrahydrobenzthiazole (Compound 178694).  *See* Exh. 30 at LLY 47-48.  Although he was not part of the research group that was interested in "partial ergoline" structures as dopaminergic agents, he testified that he offered to make these compounds since he was working with similar chemical intermediates.  *See* Turner Dep. 81:2-22. His testimony makes clear that he did not synthesize these compounds to follow up any

31

hypothesis or expectation on his part as to their biological activity. Moreover, there is no indication that Mr. Turner ever learned of any results from the testing of these compounds prior to his involvement in the submission of the U.S. patent application in which they were claimed. *See* Turner Dep. 109:17-111:16.

81.    According to Lilly's internal database of test results, Compound 197511 was sent to an outside contractor, PanLabs, Inc., for a broad panel of biological tests. Exh. 19, LLY 19; Turner Dep. 100:24-101:18. The data record shows that Compound 197511 was reported to be "active" in PanLabs, Inc. Test No. 1057; however, the identity of that test is not indicated. The data record also shows that the results were not obtained until January 30, 1985. In other words, the earliest that the invention of Compound 197511 could have been reduced to practice is January 30, 1985, even if Turner had received that information and understood its significance.

82.    The same data record indicates that Compound 178694 did not show any activity in a battery of biological tests, the earliest record for which was October 9, 1985. Exh. 19, LLY 39; Turner Dep. 103:12-109:10. Thus, the invention of this compound could not have been reduced to practice prior to this date, if then.

83.    In summary, the evidence shows that the earliest date at which Mr. Turner could be said to have reduced to practice the invention of 2-amino- and 2-methylamino-6-di-methyl-amino-4,5,6,7-tetrahydrobenzthiazole is June 19, 1985, the date that he signed the declaration for Lilly's U.S. patent application claiming these compounds. *See* BARR027413-14.

## N.    CONCLUSIONS

84.    In my opinion, Barr and its expert Dr. Anslyn have not made valid arguments with regard to the disputed claims in the '812 Patent regarding adequate description in the German priority document or prior invention by Lilly. I believe that Dr. Anslyn's opinion on

32

adequate description is based on an inappropriate analysis of the disclosure of the priority document. Moreover, the evidence that I have reviewed does not provide any support for the premise that the Lilly scientists were in possession of the invention relating to the disputed claims prior to June 19, 1985. Barr's arguments are unconvincing and fall short of the standards of clear and convincing evidence that I understand must apply.

85.    In forming his opinion that the German '075 priority application did not disclose halogenated phenyl groups as part of the $R_1$ substituents, Dr. Anslyn has focused narrowly on the definition of the genus of compounds in Claim 1. He has not, as I understand the law requires, properly analyzed the application as a whole, which not only discloses synthetic methods that produce those compounds but also describes starting materials and synthetic intermediates that would reasonably lead one of skill in the art to them.

86.    The synthetic methods disclosed in the German '075 application are more than adequate to lead one of ordinary skill without difficulty to diaminotetrahydrobenzthiazoles containing halogenated phenyl groups as part of the $R_1$ substituents. No new methods or synthetic chemistry was required to obtain the additional compounds embraced in the genus of the '812 Patent. This opinion is confirmed by the fact that Lavall applied, without any difficulty at all, the methods outlined in the German priority applications to make five such compounds. The specification of the German priority applications thus provided satisfactory written description to support the genus claims of the '812 Patent.

87.    In conclusion, I disagree with Dr. Anslyn's opinion that "that there is nothing in either of the German applications that discloses implicitly or explicitly to the skilled artisan, any starting material, intermediate, or final product in which $R_1$ contains or optionally contains a halogenated phenyl group." In my opinion, the German priority applications adequately disclose

33

to one of skill in the art the halogenated phenyl alkyl $R_1$ derivatives to meet the written description requirement.

88.     In addition to Barr's failure to show actual reduction to practice by clear and convincing evidence, my analysis of the evidence concerning the work performed at Lilly by Dr. Laguzza and Mr. Turner shows that it does not constitute invention of 2-amino-6-dipropylamino-4,5,6,7-tetrahydrobenzthiazole, 2-amino-6-di-methylamino-4,5,6,7-tetrahydrobenzthiazole, and 2-methylamino-6-di-methylamino-4,5,6,7-tetrahydrobenzthiazole prior to June 19, 1985, the date that Dr. Laguzza and Mr. Turner signed the declaration for Lilly's U.S. patent application in which it is claimed.

## O.    OTHER MATTERS

89.     I may rely on visual aids and demonstrative exhibits that illustrate the basis for my opinion. Examples of these visual aids and demonstrative exhibits may include, for example, diagrams of one or more of the compounds claimed, and blow-ups of documents considered or excerpts from this report.

90.     My opinions are based upon the information that I have considered to date. I reserve the right to supplement or amend my opinions in response to opinions (including any rebuttal opinions) expressed by Barr's experts or in light of any additional evidence, testimony, or other information that may be provided to me after the date of this report, including at trial.

91.     I am being compensated for my time in this matter at my standard hourly consulting rate of $700 per hour, or $7,000 per day for travel outside California. No part of my compensation is dependent on the outcome of this litigation.

92.     In the last four years, I have testified as an expert by affidavit in Aventis Pharma, Inc., Aventis Pharma Deutschland GmbH, and Schering Corp. v. Novopharm, Ltd. (Canadian

Federal Court File No. T-1965-05), in Warner-Lambert v. Ranbaxy (U.S. District of NJ, 00-CV-2931), in Sanofi-Aventis Canada, Inc. v. Cobalt Pharmaceuticals, Inc. (Canadian Federal Court File No. T-1710-06), in Sanofi-Aventis Canada, Inc. v. Pharmascience, Inc. (Canadian Federal Court File No. T-2300-06), in Monsanto Technology LLC v. Cargill International SA (United Kingdom High Court of Justice file HC 2006 C00585), in Greta Murphy et al. v. Merck & Co., Inc. (U.S. Southern Dist. NY No. 1:06-md-1789 JFK), and in Novartis Pharmaceuticals Corp. et al. v. Teva Pharmaceuticals USA, Inc. (U.S. District of NJ: 05-1887 DMC); by affidavit and deposition in Novartis Pharmaceuticals Corp. et al. v. Dr. Reddy's Laboratories (U.S. Southern District of NY, 02 Civ. 5560), in Bristol-Myers Squibb Canada Co. and Kyorin Pharmaceutical co., Ltd. v. Novopharm, Ltd. (Canadian Federal Court File No. T-1070-04), in Aventis Pharma, Inc., Aventis Pharma Deutschland GmbH, and Schering Corp. v. Laboratoire Riva, Inc. (Canadian Federal Court File No. T-1384-04), in Astra-Zeneca v. KV Pharmaceuticals et al. (U.S. Eastern District of MO, 04-CV-0800); and in Eli Lilly Canada v. Novopharm, Ltd. (Canadian Federal Court File No. T-1770-05); and by affidavit and at trial in Merck, Merck-Frosst Canada & Astra-Zeneca v. Apotex-Canada (Canadian Federal Court File No. T-2972-96), in Synthon IP, Inc. v. Pfizer, Inc. (U.S. District Court, Eastern District of VA, 1:05cv01267), in Janssen-Ortho Inc. and Daiichi Pharmaceutical Co., Ltd. v. Novopharm Ltd. (Canadian Federal Court File No. T-2175-04), and in GlaxoSmithKline v. Teva Pharmaceuticals USA, Inc. (U.S. District Court, Delaware, No. 05-197-GMS)

Dated: ___May 17, 2007___    _____

Paul A. Bartlett

# EXHIBIT A

**Paul A. BARTLETT**

*address* Department of Chemistry
University of California
Berkeley, California 94720-1460
(510) 642-1259
e-mail: paul_bartlett@berkeley.edu
http://www.cchem.berkeley.edu/~pabgrp/

*birthdate* January 5, 1948

*education* Harvard University:  A.B. and A.M. (Chemistry), 1969
[with Prof. David Dolphin]
Stanford University:  Ph.D. (Chemistry), 1972
[with Prof. William S. Johnson]
University of California, San Diego:  Postdoctoral Fellow, 1972-73 [with Prof. S. Jonathan Singer]
Max-Planck-Institut für exp. Medizin, Göttingen:  Sabbatical, 1981 [with Prof. Fritz Eckstein]
Max-Planck-Institut für Biochemie, Martinsried:  Sabbatical, 1988 [with Prof. Robert Huber]

*academic* University of California, Berkeley
*positions* Assistant Professor, 1973-79, Associate Professor, 1979-82, Professor, 1982-2003, Emeritus
Department of Chemistry, Vice-Chair 1980-84, Chair, 1996-2000
Committee on Budget & Interdepartmental Relations: Member, 1985-87; Chair 1989-90
Academic Planning Board Advisory Panel for Biosciences, Chair 1993
Executive Vice Chancellor Search Committee, Chair 1999
Center for New Directions in Organic Synthesis, Director 1999-2005

*professional* National Institutes of Health: Bioorganic and Natural Products Study Section (1984-87);
*positions* National Advisory General Medical Sciences Council (*ad hoc* member 1989); Proteomics, Protein
Expression & Protein Therapeutics Special Study Section (*ad hoc* member, 2003)
Editorial Advisory Boards:  J. Org. Chem. (1985-90), Bull. Soc. Chim. Fr. (1985-92), Drug Discovery
Today (1996-98), Molecular Medicine (1994-98), Molecules (1995-2000), J. Comb. Chem. (1998-2001), Chemistry & Biology (1993-2003), Organic Letters (1999-), ChemMedChem (2005-)
1987 American Chemical Society, National Organic Symposium Executive Officer
1987 Gordon Conference on Enzymes, Coenzymes, and Metabolic Pathways, Co-Chair
1989 Enzyme Mechanisms Conference, Chair
1993 Gordon Conference on Bioorganic Chemistry, Co-Chair
XVth International Symposium on Medicinal Chemistry Advisory Committee (1998)
2001 Keystone Symposium: "Impact of Genomics on Drug Discovery & Development", Co-Chair
2004 Keystone Symposium: "New Advances in Drug Discovery & Development", Co-Chair
2006 Keystone Symposium: "Structure-Based Drug Design", Co-Chair

*honors and* National Science Foundation Predoctoral Fellow, 1969-72
*awards* National Institutes of Health Postdoctoral Fellow, 1972-73
Alfred P. Sloan Research Fellow, 1979-81
Alexander von Humboldt Foundation, Fellow, 1981, Senior Scientist Award, 1988
Miller Professor, 1984-85, 1996
Stuart Pharmaceuticals Award, 1987
NIH MERIT Award, 1988
Buck Whitney Medal, Eastern New York ACS, 1989
Cope Scholar Award, American Chemical Society, 1990
American Academy of Arts and Sciences, Fellow, 1994
American Association for the Advancement of Science, Fellow, 1999
The Berkeley Citation, 2003

*research* Bioorganic chemistry: Design, synthesis, and evaluation of biologically active compounds

*industrial* Pharmacopeia, Co-Founder; Chair, Scientific Advisory Board 1993-; Board of Directors 1998-
*positions* Novartis Science Board, 2000-
*-current* SGX Pharmaceuticals, Scientific Advisory Board, 2003-
MannKind Corporation, Scientific Advisory Board, 2006-

*industrial*
*positions*
*-past*

Sterling-Winthrop Research Institute, Rensselaer, New York, chemist 1971
Bristol-Myers Company, consultant 1979-83
DuPont Central Research & Development, consultant 1980-87
FMC Corporation, consultant 1981-84
Schering-Plough Corporation, consultant 1984-96
Chevron Chemical Company - Ortho Division, consultant 1985-89
IGEN, Scientific Advisory Board, 1986-95
Celgene, Scientific Advisory Board, Member, 1987-91; Chair, 1991-96
Agouron Pharmaceuticals → Pfizer-La Jolla, Scientific Associate & consultant, 1987-88, 1992-2004
Chiron Corporation, Scientific Associate, 1988-93; consultant 2004-2005
SmithKline Beecham, Chemical Technologies Advisory Board, 1989-92
Sandoz Research Institute, Scientific Advisory Board, 1991-93; Chair, 1993
Molecular Simulations, Inc., Scientific Advisory Board, 1991-1999
Tularik → Amgen,  Scientific Advisory Board, 1992-2006
Monsanto Company, consultant and Ceregen Scientific Advisory Board, 1994-97
Bristol-Myers Squibb, consultant 1997-99
Rosetta Inpharmatics, Scientific Advisory Board, 1997-2001
Argonaut, Scientific Advisory Board, 2000-2005

*selected*
*lectureships*

G.D. Searle Symposium, Chemistry of Bioactive Substances, 1990
10th Annual Graduate Student Symposium for the Pharmacological Sciences, University of
     Michigan, keynote speaker, 1990
Merck-Frosst Lecturer, University of British Columbia, 1990
18th Peter A. Leermakers Symposium, Wesleyan University, 1990
Italian Advanced School of Organic Chemistry, Ischia, 1990
IVth Nagoya Conference on Frontiers of Organic Synthesis, 1990
Burroughs-Wellcome Lecturer, University of North Carolina, 1991
Robert A. Welch Foundation Lectureship, 1991
XXXIV Robert A. Welch Foundation Conference on Chemical Research Lecturer, 1991
Proctor & Gamble Lecturer, Massachusetts Institute of Technology, 1991
Frontiers in Chemistry Lecturer, Case Western Reserve, 1991
Fifth Annual Eli Lilly Grantee Symposium in Organic Chemistry, 1992
Chemistry as a Life Science Symposium Lecturer, Rutgers, 1992
Bio-Méga Lecturer, Université de Montréal, 1992
8th Conference of the Nozaki School, Yokohama, 1992
Interfaces Between Chemistry and Biology Symposium, Marion-Merrell-Dow Research Inst., 1993
W. S. Johnson Symposium, Harvard University, 1993
Frontiers in Chemistry, International Roche Pharma Meeting, Wildhaus, Switzerland, 1994
H. C. Brown Symposium, Purdue University, 1994
Rhône-Poulenc Rorer International Round Table, Turnberry, Scotland 1994
NATO Advanced Study Institute on Chemical Synthesis, Ravello, Italy, 1994
3ème Cycle en Chemie 'Synthesis - Methods and Goals', Champéry, Switzerland, 1994
Plenary Lecture, Gesell. deutsche Chem. Medicinal Chemistry meeting, Schliersee, 1994
Wyeth-Ayerst Lecturer, Columbia University, 1995
Syntex Lecturer, University of Colorado, Boulder, 1996
Contemporary Challenges in Molecular Medicine symp., Univ. of Michigan/Parke-Davis, 1996
Syntex Distinguished Lectureship, Colorado State University, 1997
2nd Lausanne Bioorganic Chemistry Symposium, Switzerland, 1997
Karcher Lecturer, University of Oklahoma, 1998
Pfizer Lecturer, SUNY Stony Brook, 1998
Plenary Lecture, XVth International Medicinal Chemistry Symposium, Edinburgh, 1998
Bio-Méga Lecturer, University of Alberta, 1999
Humphrey Memorial Symposium, University of Vermont, 1999
Plenary Lecture, Royal Society of Chemistry Symposium "Protease 2000"
Haverford College Distinguished Philip's Visitor, 2001
7th Symposium of the Bijvoet Graduate School for Biomolecular Chemistry, 2001
North Jersey ACS Organic Topical Group Symposium, 2003
Ernst Schering Research Foundation Lecturer, Berlin, 2003
Keystone Symposium on New Advances in Drug Discovery, Closing Address, 2004
Drug Design Symposium, Center for Cancer Experimental Therapeutics, Kansas University, 2006

*recent*
*publications*

187. Hammond, M.C.; Harris, B.Z.; Lim, W.A.; Bartlett, P.A. β-Strand Peptidomimetics as Potent PDZ Domain Ligands" *Chem. Biol.* **2006**, *13*, 1247-1251.

184. Phillips, S.T.; Piersanti, G.; Bartlett, P.A. "Quantifying amino acid conformational preferences and side chain-side chain interactions in β-hairpins" *Proc. Natl. Acad. Sci. USA* **2005**, *102*, 13737-13742.

173. An, M.; Maitra, U.; Neidlein, U.; Bartlett, P.A."5-Enolpyruvylshikimate-3-Phosphate Synthase: Chemical Synthesis of the Tetrahedral Intermediate and Assignment of the Stereochemical Course of the Enzymatic Reaction" *J. Am. Chem. Soc.* **2003**, *125*, 12759-12767.

170. Spaller, M.R.; Thielemann, W.; Brennan, P.E.; Bartlett, P.A. "Combinatorial Synthetic Design. Solution and Polymer-Supported Synthesis of Heterocycles *via* Intramolecular Aza-Diels-Alder and Iminoalcohol Cyclizations" *J. Comb. Chem.* **2002**, *4*, 516-522.

167. Bartlett, P.A.; Yusuff, N.; Rico, A.C.; Lindvall, M.K. "Anti-Hydrophobic Solvent Effects: An Experimental Probe for the Hydrophobic Contribution to Enzyme-Inhibitor Binding", *J. Am. Chem. Soc.* **2002**, *124*, 3853-3857.

166. Phillips, S.T.; Rezac, M.; Abel, U.; Kossenjans, M.; Bartlett, P.A. "'@-Tides': The 1,2-Dihydro-3(6*H*)-pyridinone Unit as a ß-Strand Mimic", *J. Am. Chem. Soc.* **2002**, *124*, 58-66.

158. Khan, A.R.; Parish, J.C.; Fraser, M.E.; Smith, W.W.; Bartlett, P.A.; James, M.N.G. "Lowering the Entropic Barrier for Binding Conformationally Flexible Inhibitors to Enzymes" *Biochemistry*, **1998**, *37*, 16839-16845.

156. Smith, W.W.; Bartlett, P.A. "Macrocyclic Inhibitors of Penicillopepsin. 3. Design, Synthesis, and Evaluation of an Inhibitor Bridged Between P2 and P1'", *J. Am. Chem. Soc.* **1998**, *120*, 4622-4628.

150. Austin, R.E.; Maplestone, R.A.; Sefler, A.M.; Liu, K.; Hruzewicz, W.N.; Liu, C.W.; Cho, H.S.; Wemmer, D.E.; Bartlett, P.A. "A Template for Stabilization of a Peptide α-Helix: Synthesis and Evaluation of Conformational Effects by Circular Dichroism and NMR", *J. Am. Chem. Soc.* **1997**, *119*, 6461-6472.

149. Marx, M.A.; Grillot, A.-L.; Louer, C.T.; Beaver, K.A.; Bartlett, P.A. "Synthetic Design for Combinatorial Chemistry. Solution and Polymer-Supported Synthesis of Polycyclic Lactams by Intramolecular Cyclization of Azomethine Ylides", *J. Am. Chem. Soc.* **1997**, *119*, 6153-6167.

135. Kozlowski, M. C.; Tom, N. J.; Seto, C. T.; Sefler, A. M.; Bartlett, P. A., "Chorismate-Utilizing Enzymes Isochorismate Synthase, Anthranilate Synthase and *p*-Aminobenzoate Synthase: Mechanistic Insight Through Inhibitor Design", *J. Am. Chem. Soc.* **1995**, *117*, 2128-2140.

*seminal*
*publications*
*(100-600+*
*citations)*

130. Nestler, H. P.; Bartlett, P. A.; Still, W. C. "A General Method for Molecular Tagging of Encoded Combinatorial Chemistry Libraries" *J. Org. Chem.* **1994**, *59*, 4723-4724.

126. Lauri, G.; Bartlett, P.A., "CAVEAT: A Program to Facilitate the Design of Organic Molecules", *J. Comp. Aided Mol. Design* **1994**, *8*, 51-66.

123. Simon, R. J.; Kania, R. S.; Zuckerman, R. N.; Huebner, V. D.; Jewell, D. A.; Banville, S.; Ng, S.; Wang, L.; Rosenberg, S.; Marlowe, C. K.; Spellmeyer, D.; Tan, R.; Frankel, A. D.; Santi, D. V.; Cohen, F. E.; Bartlett, P. A., "Peptoids: A Modular Approach to Drug Discovery", *Proc. Natl. Acad. Sci., USA* **1992**, *89*, 9367-9371.

110. Morgan, B.P.; Scholtz, J.M., Ballinger, M., Zipkin, I.; Bartlett, P.A., "Differential Binding Energy: A Detailed Evaluation of the Influence of Hydrogen-Bonding and Hydrophobic Groups on the Inhibition of Thermolysin by Phosphorus-Containing Inhibitors", *J. Am. Chem. Soc.* **1991**, *113*, 297-307.

90. Jackson, D.Y.; Jacobs, J.W.; Sugasawara, R.; Reich, S.H.; Bartlett, P.A.; Schultz, P.G., "An Antibody-Catalyzed Claisen Rearrangement", *J. Am. Chem. Soc.* **1988**, *110*, 4841-4842.

88. Bartlett, P.A.; McLaren, K.L.; Ting, P.C., "Radical Cyclization of Oxime Ethers", *J. Am. Chem. Soc.* **1988**, *110*, 1633-1634.

85. Bartlett, P.A.; Marlowe, C.K., "A Possible Role for Water Dissociation in the Slow Binding of Phosphorus-Containing Transition State Analog Inhibitors of Thermolysin", *Biochemistry* **1987**, *26*, 8553-8561.

82. Giannousis, P.P.; Bartlett, P.A., "Phosphorus Amino Acid Analogs as Inhibitors of Leucine Aminopeptidase", *J. Med. Chem.* **1987**, *30*, 1603-1609.

77. Bartlett, P.A.; Marlowe, C.K., "Evaluation of the Intrinsic Binding Energy from a Hydrogen Bonding Group in an Enzyme Inhibitor", *Science* **1987**, *235*, 569-571.

47. Bartlett, P.A.; Marlowe, C.K., "Phosphonamidates as Transition State Analog Inhibitors of Thermolysin", *Biochemistry* **1983**, *22*, 4618-4624.

21. Bartlett, P.A., "Stereocontrol in the Synthesis of Acyclic Systems: Application to Natural Product Synthesis", Tetrahedron Report #71, *Tetrahedron*, **1980**, *36*, 2-72.

# BIBLIOGRAPHY
Paul A. Bartlett
Department of Chemistry, University of California
Berkeley, California 94720

1. Bartlett, P.A.; Johnson, W.S., "An Improved Reagent for the O-Alkyl Cleavage of Methyl Esters by Nucleophilic Displacement", *Tetrahedron Lett.* 1970, 4459-62.
2. Wick, A.E.; Bartlett, P.A.; Dolphin, D., "The Total Synthesis of Ipalbidine and Ipalbine", *Helv. Chim. Acta* 1971, 54, 513-522.
3. Bartlett, P.A.; Johnson, W.S., "A Stereospecific Total Synthesis of Estrone via a Cationic Olefinic Cyclization", *J. Am. Chem. Soc.* 1973, 95, 7501-02.
4. Bartlett, P.A.; Brauman, J.I.; Johnson, W.S.; Volkmann, R.A., "Concerning the Mechanism of a Nonenzymic Biogenetic-like Olefinic Cyclization", *J. Am. Chem. Soc.* 1973, 95, 7502-04.
5. Ruoho, A.; Bartlett, P.A.; Dutton, A.; Singer, S.J., "A Disulfide-Bridge Bifunctional Imidoester as a Reversible Cross-Linking Reagent", *Biochem. Biophys. Res. Commun.* 1975, 63, 417.
6. Bartlett, P.A., "Synthesis of β-Acyl-Acrylic Esters and α,β-Butenolides via β-Ketosulfoxide Alkylation", *J. Am. Chem. Soc.* 1976, 98, 3305-3312.
7. Bartlett, P.A.; Long, K.P., "A New Class of Potential Photoaffinity Labels. α-Diazophosphonic Acids: Synthesis and Stability", *J. Am. Chem. Soc.* 1977, 99, 1267-1268.
8. Bartlett, P.A.; Green, F.R. III; Webb, T.R., "A Mild, Oxidative Nitro-to-Carbonyl Conversion and a New Prostaglandin Synthon", *Tetrahedron Lett.* 1977, 331-334.
9. Bartlett, P.A.; Jernstedt, K.K., "'Phosphate Extension'. A Strategem for the Stereoselective Functionalization of Acyclic Homoallylic Alcohols", *J. Am. Chem. Soc.* 1977, 99, 4829-4830.
10. Bartlett, P.A.; Myerson, J., "Stereoselective Epoxidation of Acyclic Olefinic Carboxylic Acids via Iodolactonization", *J. Am. Chem. Soc.* 1978, 100, 3950-3952.
11. Bartlett, P.A.; Green, F.R. III; Rose, E.H., "The Synthesis of Acetylenes from Carboxylic Acid Derivatives via β-Ketosulfones", *J. Am. Chem. Soc.* 1978, 100, 4852-4858.
12. Bartlett, P.A.; Green, F.R. III, "Total Synthesis of Brefeldin A", *J. Am. Chem. Soc.* 1978, 100, 4858-4865.
13. Bartlett, P.A.; Bauer, B.; Singer, S.J., "Synthesis of Water-Soluble Undecagold Cluster Compounds of Potential Importance in Electron Microscopic and other Studies of Biological Systems", *J. Am. Chem. Soc.* 1978, 100, 5085-5089.
14. Johnson, W.S.; Bartlett, P.A., "Intermediate in the Synthesis of Estrone", U.S. Patent 4,117,234 (September 26, 1978).
15. Summerton, J.E.; Bartlett, P.A., "Affinity Crosslinking Agents for Nucleic Acids: Use of 6-Bromo-5,5-dimethoxyhexanohydrazide for Crosslinking Cytidine to Guanosine and Crosslinking RNA to Complementary Sequences of DNA", *J. Mol. Biol.* 1978, 122, 145-162.
16. Summerton, J.E.; Bartlett, P.A., "Nucleic Acid Crosslinking Agent and Affinity Inactivation of Nucleic Acids Therewith", U.S. Patent 4,123,610 (October 31, 1978).
17. Hunt, J.T.; Bartlett, P.A., "Regioselective Synthesis of 5-Amino-4-imidazolecarboxylates via Isonitrile Cycloaddition", *Synthesis* 1978, 741-742.
18. Bartlett, P.A.; Hunt, J.T.; Adams, J.L.; Gehret, J.-C., "Phosphorus-Containing Purines and Pyrimidines: A New Class of Transition State Analogs", *Bioorganic Chem.* 1978, 7, 421-436.
19. Bartlett, P.A.; Hahne, W.F., "Stereochemical Control of the Ynamine-Claisen Rearrangement", *J. Org. Chem.* 1979, 44, 882-883.
20. Bartlett, P.A.; Myerson, J., "A Highly Stereoselective Synthesis of (±)-α-Multistriatin", *J. Org. Chem.* 1979, 44, 1625-1627.
21. Bartlett, P.A., "Stereocontrol in the Synthesis of Acyclic Systems: Application to Natural Product Synthesis", Tetrahedron Report #71, *Tetrahedron*, 1980, 36, 2-72.
22. Bartlett, P.A.; Adams, J.L., "A Stereoselective Total Synthesis of the Prelog-Djerassi Lactone", *J. Am. Chem. Soc.* 1980, 102, 337-342.
23. Bartlett, P.A.; Jernstedt, K.K., "A Stereocontrolled Synthesis of the Methyl Ester of (±)-Nonactic Acid", *Tetrahedron Lett.* 1980, 1607-1610.
24. Jacobsen, N.E.; Bartlett, P.A., "A Phosphorus-Containing Dipeptide Analog as an Inhibitor of Carboxypeptidase A", *J. Am. Chem. Soc.* 1981, 103, 654-657.

1

25. Rychnovsky, S.D.; Bartlett, P.A., "Stereocontrolled Synthesis of cis-2,5-Disubstituted Tetrahydrofurans; and of the cis- and trans-Linalyl Oxides", *J. Am. Chem. Soc.* **1981**, *103*, 3963-64.

26. Bartlett, P.A.; Pizzo, C.F., "Evaluation of the Claisen Rearrangement of 2-Cyclohexenols for the Stereoselective Construction of a Terpene Synthon", *J. Org. Chem.* **1981**, *46*, 3896-3900.

27. Voll, R.J.; Koerner, T.A.W., Jr.; Bartlett, P.A.; Bhacca, N.S.; Lankin, D.C.; Younathan, E.S., "Purification of 2,5-Anhydro-D-hexitol Bis(phosphates) and Identification of a Major 1,4,6-Tris(phosphate) Contaminant by 31P-, 13C-, and ¹H-NMR Spectroscopy", *Carbohydr. Res.* **1981**, 95, 145.

28. Jacobsen, N.E.; Bartlett, P.A., "Phosphonate Inhibitors of Carboxypeptidase A", in "Phosphorus Chemistry, ACS Symposium Series No. 171", L.D. Quin and J. Verkade, editors, 1981; pg. 221-224.

29. Bartlett, P.A.; "Solutions Manual and Study Guide", for Streitwieser and Heathcock's *Introduction to Organic Chemistry*, 2nd edition, Macmillan Publishing Company, New York, 1981.

30. Bartlett, P.A.; Spear, K.L.; Jacobsen, N.E., "A Thioamide Substrate of Carboxypeptidase A", *Biochemistry* **1982**, *21*, 1608-1611.

31. Bartlett, P.A.; Tanzella, D.J.; Barstow, J.F., "Stereoselective Synthesis of the Dihydroxyisoleucine Constituent of the Amanita Mushroom Toxins", *Tetrahedron Lett.* **1982**, *23*, 619-622.

32. Bartlett, P.A.; Barstow, J.F., "Stereoselective Synthesis of 2-(2'-Cycloalkenyl)glycinates via Ester-Enolate Claisen Rearrangement", *Tetrahedron Lett.* **1982**, *23*, 623-626.

33. Bartlett, P.A.; Carruthers, N.I.; Winter, B.M.; Long, K.P., "α-Diazophosphonic Acids as Potential Photoaffinity Labeling Reagents: Synthesis, Stability, and Photochemistry", *J. Org. Chem.* **1982**, *47*, 1284-1291.

34. Bartlett, P.A.; Carruthers, N.I., "An α-Diazophosphonic Acid Monoester: Synthesis, Stability, and Unexpected Photochemical Behavior", *J.C.S. Chem. Commun.* **1982**, 536-537.

35. Wall, J.S.; Hainfeld, J.F.; Bartlett, P.A.; Singer, S.J., "Observation of an Undecagold Cluster Compound in the Scanning Transmission Electron Microscope", *Ultramicroscopy* **1982**, *8*, 397-402.

36. Bartlett, P.A.; Barstow, J.F., "Ester-Enolate Claisen Rearrangement of α-Amino Acid Derivatives", *J. Org. Chem.* **1982**, *47*, 3933-3941.

37. Bartlett, P.A.; Tanzella, D.J.; Barstow, J.F., "Ester-Enolate Claisen Rearrangement of Lactic Acid Derivatives", *J. Org. Chem.* **1982**, *47*, 3941-3945.

38. Bartlett, P.A.; Meadows, J.D.; Brown, E.G.; Morimoto, A.; Jernstedt, K.K., "'Carbonate Extension'. A Versatile Procedure for Functionalization of Acyclic Homoallylic Alcohols with Moderate Stereocontrol", *J. Org. Chem.* **1982**, *47*, 4013-4018.

39. Bartlett, P.A.; Eckstein, F., "Stereochemical Course of Polymerisation Catalyzed by Avian Myeloblastosis Virus Reverse Transcriptase", *J. Biol. Chem.*, **1982**, *257*, 8879-8884.

40. Ashley, G.W.; Bartlett, P.A., "A Phosphorus-Containing Pyrimidine Analog as a Potent Inhibitor of Cytidine Deaminase", *Biochem. Biophys. Res. Commun.* **1982**, 108, 1467-1474.

41. Jacobsen, N.E.; Bartlett, P.A., "Cyclic Phosphonic-Carboxylic Imides and Anhydrides as Reactive Intermediates. 1. Rearrangement and Solvolysis of N-(Amino(methyl)phosphinyl)-L-phenylalanine Derivatives", *J. Am. Chem. Soc.* **1983**, *105*, 1613-1619.

42. Jacobsen, N.E.; Bartlett, P.A., "Cyclic Phosphonic-Carboxylic Imides and Anhydrides as Reactive Intermediates. 2. Solvolysis of N-(Hydroxy(methyl)phosphinothioyl)-L-phenylalanine Derivatives", *J. Am. Chem. Soc.* **1983**, *105*, 1619-1626.

43. Bartlett, P.A., "Stereocontrol via Cyclization Reactions", in Current Trends in Organic Synthesis, H. Nozaki, editor, Pergamon Press, 1983.

44. Bartlett, P.A.; Holmes, C.P., "A Highly Stereoselective Synthesis of Davanone", *Tetrahedron Lett.* **1983**, *24*, 1365-1368.

45. Bartlett, P.A.; Johnson, W.S.; Elliott, J.E., "Asymmetric Synthesis via Acetal Templates III. On the Stereochemistry Observed in the Cyclization of Chiral Acetals of Polyolefinic Aldehydes; Formation of Optically Active Homoallylic Alcohols", *J. Am. Chem. Soc.* **1983**, *105*, 2088-2089.

46. Lamden, L.A.; Bartlett, P.A., "Aminoalkylphosphonofluoridate Derivatives: Rapid and Potentially Selective Inactivators of Serine Peptidases", *Biochem. Biophys. Res. Commun.* **1983**, *112*, 1085-1090.

47. Bartlett, P.A.; Marlowe, C.K., "Phosphonamidates as Transition State Analog Inhibitors of Thermolysin", *Biochemistry* **1983**, *22*, 4618-4624.

2

48.  Bartlett, P.A.; Chouinard, P.M., "Stereocontrolled Synthesis of E and Z 3-Deuteriophosphoenolpyruvate", *J. Org. Chem.* **1983**, *48*, 3854-3855.

49.  Stark, G.R.; Bartlett, P.A., "Design and Use of Potent, Specific Enzyme Inhibitors", *Pharmacol. Therap.* **1983**, *23*, 45-78.

50.  Bartlett, P.A., "Stereoselectivity in the Synthesis of Cyclic Ethers", Proceedings of the Reisensburg Symposium, September 1983; W. Bartmann, editor, Verlag-Chemie, 1984.

51.  Bartlett, P.A., "Olefin Cyclization Processes that Form Carbon-Carbon Bonds", in *Asymmetric Synthesis*, Volume 3, J.D. Morrison, editor, Academic Press, Inc., New York, 1984; pp. 342-410.

52.  Bartlett, P.A., "Olefin Cyclization Processes that Form Carbon-Heteroatom Bonds", in *Asymmetric Synthesis*, Volume 3, J.D. Morrison, editor, Academic Press, Inc., New York, 1984; pp. 411-454.

53.  Bartlett, P.A.; Richardson, D.P.; Myerson, J., "Electrophilic Lactonization as a Tool in Acyclic Stereocontrol: Synthesis of Serricornin", *Tetrahedron* **1984**, *40*, 2317-2327.

54.  Ting, P.C.; Bartlett, P.A., "Stereocontrolled Synthesis of *trans*-2,5-Disubstituted Tetrahydrofurans", *J. Am. Chem. Soc.* **1984**, *106*, 2668-2671.

55.  Bartlett, P.A.; Marlowe, C.K.; Connolly, P.J.; Banks, K.M.; et al., "Synthesis of Frontalin, the Aggregation Pheromone of the Southern Pine Beetle", *J. Chem. Ed.* **1984**, *61*, 816-817.

56.  Bartlett, P.A.; Kezer, W.B., "Phosphinic Acid Dipeptide Analogs:  Potent, Slow-Binding Inhibitors of Aspartic Peptidases", *J. Am. Chem. Soc.* **1984**, *106*, 4282-4283.

57.  Bartlett, P.A.; Meadows, J.D.; Ottow, E., "Enantiodivergent Syntheses of (+)- and (-)-Nonactic Acid and the Total Synthesis of Nonactin", *J. Am. Chem. Soc.* **1984**, *106*, 5304-5311.

58.  Bartlett, P.A.; McQuaid, L.A., "Total Synthesis of (±)-Methyl Shikimate and (±)-3-Phosphoshikimic Acid", *J. Am. Chem. Soc.* **1984**, *106*, 7854-7860.

59.  Ashley, G.W.; Bartlett, P.A., "Purification and Properties of Cytidine Deaminase from Echerichia coli", *J. Biol. Chem.* **1984**, *259*, 13615-13620.

60.  Ashley, G.W.; Bartlett, P.A., "Inhibition of *Escherichia coli* Cytidine Deaminase by a Phosphapyrimidine Nucleoside", *J. Biol. Chem.* **1984**, *259*, 13621-13627.

61.  Michael, J.P.; Ting, P.C.; Bartlett, P.A., "Stereocontrolled Synthesis of Tetrahydrofurans and Tetrahydropyrans using Thallium(III)-Induced Cyclizations", *J. Org. Chem.* **1985**, *50*, 2416-2423.

62.  Bartlett, P.A., "Transition State Analogs to Probe Enzyme Mechanisms", *Stud. Org. Chem.* **1985**, *20*, 439-450.

63.  Bartlett, P.A., "Solutions Manual and Study Guide", for Streitwieser and Heathcock's *Introduction to Organic Chemistry*, 3rd Edition, Macmillan Publishing Company, New York, 1985.

64.  Bartlett, P.A.; Johnson, C.R., "An Inhibitor of Chorismate Mutase Resembling the Transition State Conformation", *J. Am. Chem. Soc.* **1985**, *107*, 7792-7793.

65.  Gonzalez, F.B.; Bartlett, P.A., "Stereocontrolled Iodolactonization of Acyclic Olefinic Acids:  The trans- and cis-Isomers of 4,5-Dihydro-5-iodomethyl-4-phenyl-2(3H)-furanone", *Organic Syntheses* **1985**, *64*, 175-181.

66.  Bartlett, P.A.; Holm, K.H.; Morimoto, A., "Stereocontrolled Synthesis of a Polyether Fragment", *J. Org. Chem.* **1985**, *50*, 5179-5183.

67.  Chouinard, P.M.; Bartlett, P.A., "Conversion of Shikimic Acid to 5-Enolpyruvylshikimate-3-phosphate", *J. Org. Chem.* **1986**, *51*, 75-78.

68.  Bartlett, P.A., "Synthetic Organic Chemistry and the Shikimate Pathway: Inhibitors and Intermediates", in *Recent Advances in Phytochemistry*, Volume 20, Conn, E.C., Ed., Plenum, New York, **1986**, 119-146.

69.  Bartlett, P.A.; Ting, P.C., "Construction of *trans*-Fused Polycyclic Ethers:  Methodology for the Brevetoxins", *J. Org. Chem.* **1986**, *51*, 2230-2240.

70.  Bartlett, P.A.; Chapuis, C., "Synthesis of Polyether-Type Tetrahydrofurans via Peroxide Cyclization", *J. Org. Chem.* **1986**, *51*, 2799-2806.

71.  Neukom, C.; Richardson, D.P.; Myerson, J.H.; Bartlett, P.A., "A Stereocontrolled Total Synthesis of (±)-Tirandamycin A", *J. Am. Chem. Soc.* **1986**, *108*, 5559-5568.

72.  Bartlett, P.A.; Acher, F., "Synthesis of Phosphonamides and Phosphinamides Related to Pepstatin", *Bull. Soc. Chim. France* **1986**, 771-775.

73.  Bartlett, P.A.; Vanmaele, L.J.; Kezer, W.B., "Phosphonic Acid Lactones as Potential Analogs of D-Ala-D-Ala", *Bull. Soc. Chim. France* **1986**, 776-780.

74.  Bartlett, P.A.; Lamden, L.A., "Inhibition of Chymotrypsin by Phosphonate and Phosphonamidate Peptide Analogs", *Bioorg. Chem.* **1986**, *14*, 356-377.

3

75. Bartlett, P.A.; Maitra, U.; Chouinard, P.M., "Synthesis of 'iso-EPSP' and Evaluation of Its Interaction with Chorismate Synthase", *J. Am Chem. Soc.* **1986**, 108, 8068-8071.

76. Akerfeldt, K.; Bartlett, P.A., "Specific Synthesis and *Stereochemical* Assignment of the Diastereomeric 1,2-O-Isopropylidene-3,5-O-benzylidene-α-D-glucofuranose Isomers", *Carbohydrate Res.* **1986**, 158, 137-145.

77. Bartlett, P.A.; Marlowe, C.K., "Evaluation of the Intrinsic Binding Energy from a Hydrogen Bonding Group in an Enzyme Inhibitor", *Science* **1987**, 235, 569-571.

78. Bartlett, P.A.; Hanson, J.E.; Acher, F.; Giannousis, P.P., "Phosphorus Analogs as Peptidase Inhibitors: Aspartic Peptidases and Leucine Aminopeptidase", in **Phosphorus Chemistry of Biomolecules**, *Proc. Intl. Symp. Phos. Chem. Directed Towards Biol.*, Bruzik, K.S. and Stec, W.J., eds. (Elsevier, Amsterdam), **1987**, pp. 429-440.

79. Bartlett, P.A.; Marlowe, C.K., "An Analysis of the Enzyme-Inhibitor Binding Interactions for Phosphonic Acid Transition State Analogs of Thermolysin", *Phosphorus and Sulfur* **1987**, 30, 537-543 (*Proc. Xth Intl. Conf. Phosphorus Chem.*).

80. Mookthiar, K.A.; Marlowe, C.K.; Bartlett, P.A.; Van Wart, H.E., "Phosphonamidate Inhibitors of Human Neutrophil Collagenase", *Biochemistry* **1987**, 26, 1962-1965.

81. Hansen, M.M.; Bartlett, P.A.; Heathcock, C.H., "Preparation and Reactions of an Alkylzinc Enolate", *Organometallics* **1987**, 6, 2069-2074.

82. Giannousis, P.P.; Bartlett, P.A., "Phosphorus Amino Acid Analogs as Inhibitors of Leucine Aminopeptidase", *J. Med. Chem.* **1987**, 30, 1603-1609.

83. Bartlett, P.A.; McLaren, K.L., "Diastereoselectivity in the Alkylation of Chiral 2-Aminomethyl-1,3,2-dioxaphosphorinane-2-oxides", *Phosphorus and Sulfur* **1987**, 33, 1-14.

84. Mori, I.; Bartlett, P.A.; Heathcock, C.H., "High Diastereofacial Selectivity in Nucleophilic Additions to Chiral Thionium Ions", *J. Am. Chem. Soc.* **1987**, 109, 7199-7200.

85. Bartlett, P.A.; Marlowe, C.K., "A Possible Role for Water Dissociation in the Slow Binding of Phosphorus-Containing Transition State Analog Inhibitors of Thermolysin", *Biochemistry* **1987**, 26, 8553-8561.

86. Bartlett, P.A.; Marlowe, C.K.; Giannousis, P.P.; Hanson, J.E., "Phosphorus-Containing Peptide Analogs as Peptidase Inhibitors", in **Cold Spring Harbor Symposia on Quantitative Biology**, Volume LII, Cold Spring Harbor Laboratory, **1987**, pp. 83-90.

87. Bartlett, P.A.; Satake, K., "Does Dehydroquinate Synthase Synthesize Dehydroquinate?", *J. Am. Chem. Soc.* **1988**, 110, 1628-1630.

88. Bartlett, P.A.; McLaren, K.L.; Ting, P.C., "Radical Cyclization of Oxime Ethers", *J. Am. Chem. Soc.* **1988**, 110, 1633-1634.

89. Bartlett, P.A.; Drewry, D.H.; Hanson, J.E.; Marlowe, C.K., "Details of the Interaction of Phosphorus-Containing Peptide Inhibitors with Thermolysin", in **Peptides: Chemistry and Biology** (*Proc. Tenth Amer. Pept. Symposium*), G.A. Marshall, editor (ESCOM/Leiden, The Netherlands), **1988**, pp.427-432.

90. Jackson, D.Y.; Jacobs, J.W.; Sugasawara, R.; Reich, S.H.; Bartlett, P.A.; Schultz, P.G., "An Antibody-Catalyzed Claisen Rearrangement", *J. Am. Chem. Soc.* **1988**, 110, 4841-4842.

91. Bartlett, P.A.; Nakagawa, Y.; Johnson, C.R.; Reich, S.; Luis, A., "Chorismate Mutase Inhibitors: Synthesis and Evaluation of Some Potential Transition State Analogs", *J. Org. Chem.* **1988**, 53, 3195-3210.

92. Sampson, N.S.; Bartlett, P.A., "Synthesis of Phosphonic Acid Derivatives by Oxidative Activation of Phosphinate Esters", *J. Org. Chem.* **1988**, 53, 4500-4503.

93. Hoeffken, H.W.; Knof, S.H.; Bartlett, P.A.; Huber, R.; Moellering, H.; Schumacher, G., "Crystal Structure Determination, Refinement and Molecular Model of Creatine Amidinohydrolase from *Pseudomonas putida*", *J. Mol. Biol.* **1988**, 204, 417-433.

94. Bartlett, P.A., "The Interplay between Enzyme Mechanism, Protein Structure, and Inhibitor and Catalyst Design", *Colloq. Ges. Biol. Chem.* **1988**, 39th(Protein Struct. Protein Eng.), 86-95; Winnacker and Huber, eds.

95. Holmes, C.P.; Bartlett, P.A., "Approaches to the Tetrahydropyran Subunit of the Polyether Nigericin", *J. Org. Chem.* **1989**, 54, 98-108.

96. Alberg, D.G.; Bartlett, P.A., "Potent Inhibition of 5-Enolpyruvylshikimate-3-phosphate Synthase by a Reaction Intermediate Analog", *J. Am. Chem. Soc.* **1989**, 111, 2337-2338.

97. Bushweller, J.H.; Bartlett, P.A., "Sulfoxide Analogs of Dihydro- and Tetrahydroprephenate as Inhibitors of Prephenate Dehydratase", *J. Org. Chem.* **1989**, 54, 2404-2409.

4

98. Bartlett, P.A.; Mori, I.; Bose, J.A., "A Subtotal Synthesis of Methynolide via an Electrophilic Spirocyclization", *J. Org. Chem.* **1989**, 54, 3236-3239.

99. Hanson, J.E.; Kaplan, A.P.; Bartlett, P.A., "Phosphonate Analogs of Carboxypeptidase A are Potent Transition State Analog Inhibitors", *Biochemistry* **1989**, 28, 6294-6305.

100. Scholtz, J.M.; Bartlett, P.A., "A Convenient Differential Protection Strategy for Functional Group Manipulation of Aspartic and Glutamic Acids", *Synthesis* **1989**, 542-544.

101. Bartlett, P.A.; McLaren, K.L.; Alberg, D.G.; Fässler, A.; Nyfeler, R.; Lauhon, C.T., Grissom, C.B., "Exploration of the Shikimic Acid Pathway: Opportunities for the Study of Enzyme Mechanisms Through the Synthesis of Intermediates and Inhibitors", in *Prospects for Amino Acid Biosynthesis Inhibitors in Crop Protection and Pharmaceutical Chemistry*, Copping, L.G., Ed., Society of Chemical Industry, **1989**, pp. 155-170.

102. Bartlett, P.A.; Shea, G.T.; Telfer, S.J.; Waterman, S., "*CAVEAT*: A Program to Facilitate the Structure-Derived Design of Biologically Active Molecules", in *Molecular Recognition: Chemical and Biological Problems*, Roberts, S.M., Editor, Royal Society of Chemistry, **1989**, 182-196.

103. Scholtz, J.M.; Bartlett, P.A., "Synthesis and Evaluation of Inhibitors for *E. coli* Carbamyl Phosphate Synthetase", *Bioorg. Chem.* **1989**, 17, 422-433.

104. Morgan, B.P.; Bartlett, P.A., "Phosphinates as transition-state analog inhibitors of thermolysin: The importance of hydrophobic and hydrogen bonding effects", in *Peptides: Chemistry Structure and Biology* (Proceedings of the 11th American Peptide Symposium), Rivier, J.E.; Marshall, G.R., eds., ESCOM (Leiden), **1990**, 371-372.

105. Bartlett, P.A.; Sampson, N.S.; Reich, S.H.; Drewry, D.H.; Lamden, L.A., "The Interplay Between Enzyme Mechanism, Protein Structure, and the Design of Serine Protease Inhibitors", in *Use of X-Ray Crystallography in the Design of Antiviral Agents*, Laver, G., Air, G., Eds., Academic Press, **1989**, 247-259.

106. Copié, V.; Kolbert, A.C.; Drewry, D.H.; Bartlett, P.A.; Oas, T.G.; Griffin, R.G., "Inhibition of Thermolysin by Phosphonamidate Transition-State Analogs: Measurement of $^{31}$P-$^{15}$N Bond Lengths and Chemical Shifts in Two Enzyme-Inhibitor Complexes by Solid-State Nuclear Magnetic Resonance", *Biochemistry* **1990**, 29, 9176-9184.

107. Mori, I.; Bartlett, P.A.; Heathcock, C.H., "Stereoselective Additions of Nucleophilic Alkenes to Chiral Thionium Ions", *J. Org. Chem.* **1990**, 55, 5966-5977.

108. Mori, I.; Ishihara, K.; Flippin, L.A.; Nozaki, K.; Yamamoto, H.; Bartlett, P.A.; Heathcock, C.H., "On the Mechanism of Lewis Acid Mediated Nucleophilic Substitution Reactions of Acetals", *J. Org. Chem.* **1990**, 55, 6107-6115.

109. Bartlett, P.A.; Hanson, J.E.; Giannousis, P.P., "Potent Inhibition of Pepsin and Penicillopepsin by Phosphorus-Containing Peptide Analogs", *J. Org. Chem.* **1990**, 55, 6268-6274.

110. Morgan, B.P.; Scholtz, J.M.; Ballinger, M., Zipkin, I.; Bartlett, P.A., "Differential Binding Energy: A Detailed Evaluation of the Influence of Hydrogen-Bonding and Hydrophobic Groups on the Inhibition of Thermolysin by Phosphorus-Containing Inhibitors", *J. Am. Chem. Soc.* **1991**, 113, 297-307.

111. Sampson, N.S.; Bartlett, P.A., "Peptidic Phosphonylating Agents as Irreversible Inhibitors of Serine Proteases and Models of the Tetrahedral Intermediates", *Biochemistry* **1991**, 30, 2255-2263.

112. Bone, R.; Sampson, N.S.; Bartlett, P.A.; Agard, D.A. "Crystal Structures of α-Lytic Protease Complexes with Irreversibly Bound Phosphonate Esters", *Biochemistry* **1991**, 30, 2263-2272.

113. Mullen, D.G.; Bartlett, P.A. "The Design of a Peptide Turn Mimic Modelled from the Crystal Structure of the Helix-Turn-Helix DNA Binding Motif of the Bacteriophage 434 Repressor-DNA Complex", in *Peptides 1990, Proceedings of the 21st European Peptide Symposium*, Giralt, E.; Andreu, D., Eds. ESCOM Science Publishers BV, **1991**, 364-365.

114. Kozlowski, M.C.; Bartlett, P.A. "Synthesis of a Potential Transition State Analog Inhibitor of Isochorismate Synthase", *J. Am Chem. Soc.* **1991**, 113, 5897-5898.

115. Bushweller, J.H.; Bartlett, P.A., "Investigation of an Octapeptide Inhibitor of E. coli Ribonucleotide Reductase by Transferred Nuclear Overhauser Effect Spectroscopy", *Biochemistry* **1991**, 30, 8144-8151.

116. Kaplan, A.P.; Bartlett, P.A., "An Inhibitor of Carboxypeptidase A with a $K_i$ Value in the Femtomolar Range", *Biochemistry* **1991**, 30, 8165-8170.

117. Åkerfeldt, K.S.; Bartlett, P.A., "Synthesis and Evaluation of Potential Multisubstrate Analog Inhibitors of Hexokinase", *J. Org. Chem.* **1991**, 56, 7133-7144.

118. Sampson, N. S.; Bartlett, P. A., "Attempted De Novo Design, Synthesis, and Evaluation of a Ligand for the Allosteric Site of Phosphofructokinase", *J. Org. Chem.* **1991**, *56*, 7179-7183.

119. Phillips, M.A.; Kaplan, A.P.; Rutter, W.J.; Bartlett, P.A., "Transition State Characterization: A New Approach Combining Inhibitor Analogs and Variation in Enzyme Structure", *Biochemistry* **1992**, *31*, 959-962.

120. Alberg, D. G.; Lauhon, C. T.; Nyfeler, R.; Fässler, A.; Bartlett, P. A., "Inhibition of EPSP Synthase by Analogs of the Tetrahedral Intermediate and of EPSP", *J. Am Chem. Soc.* **1992**, *114*, 3535-3546.

121. Fraser, M. E.; Strynadka, N. C. J.; Bartlett, P. A.; Hanson, J. E.; James, M. N. G., "Crystallographic Analysis of Transition State Mimics Bound to Penicillopepsin: Phosphorus-Containing Peptide Analogues", *Biochemistry* **1992**, *31*, 5201-5214.

122. Bartlett, P.A.; Etzkorn, F.A.; Guo, T.; Lauri, G.; Liu, K.; Lipton, M.; Morgan, B.P.; Shea, G.T.; Shrader, W.D.; Waterman, S. "Intuitive- and Computer-Assisted Approaches to the Design of Conformationally Restrained Peptides and Their Mimics", in *Chemistry at the Frontiers of Medicine* (Proceedings of the Robert A. Welch Foundation Conference on Chemical Research XXXV), **1992**, 45-68.

123. Simon, R. J.; Kania, R. S.; Zuckerman, R. N.; Huebner, V. D.; Jewell, D. A.; Banville, S.; Ng, S.; Wang, L.; Rosenberg, S.; Marlowe, C. K.; Spellmeyer, D.; Tan, R.; Frankel, A. D.; Santi, D. V.; Cohen, F. E.; Bartlett, P. A., "Peptoids: A Modular Approach to Drug Discovery", *Proc. Natl. Acad. Sci., USA* **1992**, *89*, 9367-9371.

124. Smith, W.W.; Bartlett, P.A., "An Improved Synthesis of the Transition State Analog Inhibitor of Chorismate Mutase", *J. Org. Chem.* **1993**, *58*, 7308-7309.

125. Rich, R. H.; Lawrence, B. M.; Bartlett, P. A., "Synthesis of 2-Chloroshikimic Acid", *J. Org. Chem.* **1994**, *59*, 693-694

126. Lauri, G.; Bartlett, P.A., "CAVEAT: A Program to Facilitate the Design of Organic Molecules", *J. Comp. Aided Mol. Design* **1994**, *8*, 51-66.

127. Morgan, B.P.; Bartlett, P.A.; Holland, D.R.; Matthews, B.W. "Structure-Based Design of an Inhibitor of the Zinc Peptidase Thermolysin", *J. Am. Chem. Soc.* **1994**, *116*, 3251-3260.

128. Bartlett, P. A.; McLaren, K. L.; Marx, M. A., "A Divergence Between the Enzyme-Catalyzed and Non-Catalyzed Synthesis of 3-Dehydroquinate", *J. Org. Chem.* **1994**, *59*, 2082-2085.

129. Bartlett, P. A.; Mader, M. M. "Cysteine Proteinase Inhibitors and Inhibitor Precursors", U.S. Patent No. 5,317,086, May 31, 1994

130. Nestler, H. P.; Bartlett, P. A.; Still, W. C. "A General Method for Molecular Tagging of Encoded Combinatorial Chemistry Libraries" *J. Org. Chem.* **1994**, *59*, 4723-4724.

131. Seto, C. T.; Bartlett, P. A. "(Z)-9-Fluoro-EPSP is Not a Substrate for EPSP Synthase: Implications for the Enzyme Mechanism", *J. Org. Chem.* **1994**, *59*, 7130-7132.

132. Etzkorn, F. A.; Guo, T.; Lipton M. A.; Goldberg, S. D.; Bartlett, P. A. "Cyclic Hexapeptides and Chimeric Peptides as Mimics of Tendamistat", *J. Am. Chem. Soc.* **1994**, *116*, 10412-10425.

133. Lauhon, C. T.; Bartlett, P. A. "Substrate Analogs as Mechanistic Probes for the Bifunctional Chorismate Synthase from *Neurospora crassa*", *Biochemistry* **1994**, *33*, 14100-14108.

134. a) Bartlett, P. A.; Santi, D. V.; Simon, R. J., "Libraries of modified peptides with protease resistance" WO Patent 91/19,735 (December 26, 1991);
b) Simon, R. J.; Bartlett, P.A.; Santi, D.V. "Peptoid Mixtures", U.S. Patent 5,811,387 (September 22, 1998);
c) Simon, R. J.; Bartlett, P.A.; Santi, D.V. "Modified Peptide and Peptide Libraries with Protease Resistance, Derivatives Thereof and Methods of Producing and Screening Such", U.S. Patent 5,965,695 (October 12, 1999);
d) Simon, R. J.; Bartlett, P.A.; Santi, D.V. "Modified peptide and peptide libraries with protease resistance, derivatives thereof and methods of producing and screening such", U.S. Patent 6,075,121 (June 13, 2000).

135. Kozlowski, M. C.; Tom, N. J.; Seto, C. T.; Sefler, A. M.; Bartlett, P. A., "Chorismate-Utilizing Enzymes Isochorismate Synthase, Anthranilate Synthase and *p*-Aminobenzoate Synthase: Mechanistic Insight Through Inhibitor Design", *J. Am Chem. Soc.* **1995**, *117*, 2128-2140.

136. Bartlett, P.A.; Pyun, H.-J.; Lauri, G.; Morgan, B.P. "The Interplay Between Intuition and Computer Assistance in the Design of Enzyme Inhibitors: Macrocyclic Phosphonamidates as Inhibitors of Thermolysin" in *New Perspectives in Drug Design*, Dean, P. M.; Jolles, G.; Newton, C. G.; Taylor, J. B., eds., Academic Press, Ltd. **1995**, 51-67.

137. Bartlett, P. A.; Otake, A. "Fluoroalkenes as a Peptide Isosteres: Ground State Analog Inhibitors of Thermolysin", *J. Org. Chem.* **1995**, *60*, 3107-3111.
138. Schultz, P. G.; Bartlett, P. A. "Antibody-Mediated Juxtaposition of Reactive Moieties" U.S. Patent No. 5,429,936 (July 4, 1995).
139. Ellsworth, B. A.; Tom, N. J.; Bartlett, P. A. "Synthesis and Evaluation of Inhibitors of Bacterial D-Alanyl-D-Alanine Ligases", *Chemistry & Biology* **1996**, *3*, 37-44.
140. Tian, Z.-Q.; Bartlett, P. A. "Metal Coordination as a Method for Templating Peptide Conformation", *J. Am Chem. Soc.* **1996**, *118*, 943-949.
141. Bartlett, P. A.; Giangiordano, M. A. "Transition State Analogy of Phosphonic Acid Peptide Inhibitors of Pepsin", *J. Org. Chem.* **1996**, *61*, 3433-3438.
142. Rich, R. H.; Bartlett, P. A. "Synthesis of (–)-2-Fluoroshikimic Acid", *J. Org. Chem.* **1996**, *61*, 3916-3919.
143. Bartlett, P. A. "Design of Enzyme Inhibitors: Answering Biological Questions Through Organic Synthesis" in *Organic Synthesis, From Gnosis to Prognosis* (NATO Advanced Study Institute), Chatgilialoglu, C. and Snieckus, V., Eds., Kluwer Academic Publishers (Dordrecht) **1996**, 137-173.
144. Sefler, A. M.; Lauri, G.; Bartlett, P. A. "A Convenient Method for Determining Cyclic Peptide Conformation from 1D ¹H-NMR Information", *Int. J. Pept. Prot. Res.* **1996**, *48*, 129-138.
145. Kozlowski, M.C.; Bartlett, P.A. "Formation of the 7-Oxa-1,4,10-triazatricyclo[8.2.2⁵,¹²]tetradecane-2,14-dione Ring System: Misrouted Synthesis of a Peptidomimetic", *J. Org. Chem.* **1996**, *61*, 7681-7696.
146. Sefler, A.M.; Kozlowski, M.C.; Guo, T.; Bartlett, P.A. "Design, Synthesis, and Evaluation of a Depsipeptide Mimic of Tendamistat", *J. Org. Chem.* **1997**, *62*, 93-102.
147. Tian, Z.-Q.; Brown, B.B.; Hutton, C.; Mack, D.P.; Bartlett, P.A. "Potentially Macrocyclic Peptidyl Boronic Acids as Chymotrypsin Inhibitors", *J. Org. Chem.* **1997**, *62*, 514-522.
148. Spaller, M.R.; Burger, M.T., Fardis, M.; Bartlett, P.A. "Synthetic Strategies in Combinatorial Chemistry", *Curr. Opin. Chem. Biol.* **1997**, *1*, 47-53.
149. Marx, M.A.; Grillot, A.-L.; Louer, C.T.; Beaver, K.A.; Bartlett, P.A. "Synthetic Design for Combinatorial Chemistry. Solution and Polymer-Supported Synthesis of Polycyclic Lactams by-Intramolecular Cyclization of Azomethine Ylides", *J. Am. Chem. Soc.* **1997**, *119*, 6153-6167.
150. Austin, R.E.; Maplestone, R.A.; Sefler, A.M.; Liu, K.; Hruzewicz, W.N.; Liu, C.W.; Cho, H.S.; Wemmer, D.E.; Bartlett, P.A. "A Template for Stabilization of a Peptide α-Helix: Synthesis and Evaluation of Conformational Effects by Circular Dichroism and NMR", *J. Am Chem. Soc.* **1997**, *119*, 6461-6472.
151. Mader, M.M.; Bartlett, P.A. "Binding Energy and Catalysis: The Implications for Transition State Analogs and Catalytic Antibodies", *Chem. Rev.* **1997**, *97*, 1281-1301.
152. Burger, M. T.; Bartlett, P.A. "Enzymatic, Polymer-Supported Synthesis of an Analog of the Trypsin Inhibitor A90720A: A Screening Strategy for Macrocyclic Peptidase Inhibitors" *J. Am. Chem. Soc.* **1997**, *119*, 12697-12698.
153. Smith, L.R.; Bartlett, P.A. "Novel, Amino Acid-Derived Heterobicycles: Scaffolds for β-Turn Mimics and Targets for Combinatorial Synthesis" *Molecules Online* **1998**, *2*, 58-62.
154. Meyer, J.H.; Bartlett, P.A. "Macrocyclic Inhibitors of Penicillopepsin. 1. Design, Synthesis, and Evaluation of an Inhibitor Bridged Between P1 and P3", *J. Am. Chem. Soc.* **1998**, *120*, 4600-4609.
155. Ding, J.; Fraser, M.E.; Meyer, J.H.; Bartlett, P.A.; James, M.N.G. "Macrocyclic Inhibitors of Penicillopepsin. 2. X-ray Crystallographic Analyses of Penicillopepsin Complexed with a P3-P1 Macrocyclic Peptidyl Inhibitor and with its Two Acyclic Analogs", *J. Am. Chem. Soc.* **1998**, *120*, 4610-4621.
156. Smith, W.W.; Bartlett, P.A. "Macrocyclic Inhibitors of Penicillopepsin. 3. Design, Synthesis, and Evaluation of an Inhibitor Bridged Between P2 and P1'", *J. Am. Chem. Soc.* **1998**, *120*, 4622-4628.
157. Fraser, M.E.; Meyer, J.H.; Bartlett, P.A.; James, M.N.G. "Overcoming the Unfavorable Entropic Contribution of Ligand Binding with a Macrocyclic Inhibitor Bound to Penicillopepsin" In *Aspartic Proteinases: Retroviral and Cellular Enzymes* (James, M.N.G., Ed.) pp. 355-359. Plenum Press, New York (1998).
158. Khan, A.R.; Parish, J.C.; Fraser, M.E.; Smith, W.W.; Bartlett, P.A.; James, M.N.G. "Lowering the Entropic Barrier for Binding Conformationally Flexible Inhibitors to Enzymes" *Biochemistry* **1998**, *37*, 16839-16845.

7

159. Bartlett, P.A.: Joyce, G.F. "Combinatorial Chemistry: The Search Continues (Editorial Overview)" *Curr. Opin. Chem. Biol.* **1999**, *3*, 253-255.

160. Stigers, K.D.; Mar-Tang, R.; Bartlett, P.A. "Synthesis of Two Potential Inhibitors of *para*-Aminobenzoic Acid Synthase", *J. Org. Chem.* **1999**, *64*, 8409-8410.

161. Fujinaga, M.; Cherney, M.M.; Tarasova, N.I.; Bartlett, P.A.; Hanson, J.E., James, M.N.G. "Structural study of the complex between human pepsin and a phosphorus-containing transition-state analog", *Acta Crystallogr., Sect. D: Biol. Crystallogr.* **2000**, *D56*, 272-279.

162. An, M.; Toochinda, T.; Bartlett, P.A. "5-Membered Ring Analogs of Shikimic Acid", *J. Org. Chem.***2001**, *66*, 1326-1333 (DOI: 10.1021/jo001121k).

163. Bartlett, P.A.; Burger, M.T. "Method for Detecting Enzyme-Catalyzed Cyclization", U.S. Patent 6,190,920 (February 20, 2001).

164. Bartlett, P.A.; Hanson, J.E.; Morgan, B.P.; Ellsworth, B.E. "Synthesis of Peptides with a Phosphorus-Containing Amide Bond Replacement" in *Synthesis of Peptides and Peptidomimetics* (Goodman, M., Moroder, L., Toniolo, C., Eds.), Houben-Weyl, Stuttgart (2002).

165. Bartlett, P.A.; Yusuff, N.; Pyun, H.-J.; Rico, A.C.; Meyer, J.H.; Smith, W.W.; Burger, M.T. "Design of Macrocyclic Peptidase Inhibitors: The Related Roles of Structure-based Approaches and Library Chemistry", in "Medicinal Chemistry into the Millenium", Campbell, M.M., Blagbrough, I.S., Eds., Royal Society of Chemistry, Cambridge (UK), 2001.

166. Phillips, S.T.; Rezac, M.; Abel, U.; Kossenjans, M.; Bartlett, P.A. "'@-Tides': The 1,2-Dihydro-3(6*H*)-pyridinone Unit as a β-Strand Mimic", *J. Am. Chem. Soc.* **2002**, *124*, 58-66 (DOI: 10.1021/ja0168460).

167. Bartlett, P.A.; Yusuff, N.; Rico, A.C.; Lindvall, M.K. "Anti-Hydrophobic Solvent Effects: An Experimental Probe for the Hydrophobic Contribution to Enzyme-Inhibitor Binding", *J. Am. Chem. Soc.* **2002**, *124*, 3853-3857 (DOI: 10.1021/ja012483).

168. Todd, M.H.; Ndubaku, C.; Bartlett, P.A. "Amino Acid-Derived Heterocycles: Lewis Acid-Catalyzed and Radical Cyclizations from Peptide Acetals", *J. Org. Chem.* **2002**, *67*, 3985-88 (DOI: 10.1021/jo010990m).

169. Bartlett, P.A.; Rezac, M.; Olson, S.H.; Phillips; S. "The 1,2-dihydro-3(6H)-pyridinone Unit as a Peptide Beta-Strand Mimic", U.S. provisional patent application filed 6/5/01; "Peptide Beta-Strand Mimics Based on 1,2-Dihydro-3(6H)-pyridinone", U.S. patent applied for 5/28/02.

170. Spaller, M.R.; Thielemann, W.; Brennan, P.E.; Bartlett, P.A. "Combinatorial Synthetic Design. Solution and Polymer-Supported Synthesis of Heterocycles *via* Intramolecular Aza-Diels-Alder and Iminoalcohol Cyclizations" *J. Comb. Chem.* **2002**, *4*, 516-522 (DOI: 10.1021/cc020027+).

171. Lewis, J.G.; Bartlett, P.A. "Amino Acid-Derived Heterocycles as Combinatorial Library Targets: Bicyclic Aminal Lactones" *J. Comb. Chem.* **2003**, *5*, 278-284 (DOI: 10.1021/cc020082i).

172. Trump, R.P.; Bartlett, P.A. "Amino Acid-Derived Heterocycles as Combinatorial Library Targets. Spirocyclic Ketal Lactones" *J. Comb. Chem.* **2003**, *5*, 285-291 (DOI: 10.1021/cc020081q).

173. An, M.; Maitra, U.; Neidlein, U.; Bartlett, P.A."5-Enolpyruvylshikimate-3-Phosphate Synthase: Chemical Synthesis of the Tetrahedral Intermediate and Assignment of the Stereochemical Course of the Enzymatic Reaction" *J. Am Chem. Soc.* **2003**, *125*, 12759-12767 (DOI: 10.1021/ja036627+).

174. Hansen, K.K.; Hansen, H.C.; Clark, R.C.; Bartlett, P.A. "Identification of Novel Macrocyclic Peptidase Inhibitors via On-bead Enzymatic Cyclization" *J. Org. Chem.* **2003**, *68*, 8459-8464 (DOI: 10.1021/jo0348367).

175. Hansen, K.K.; Grosch, B.; Greiveldinger-Poenaru, S.; Bartlett, P.A. "Synthesis and Evaluation of Macrocyclic Transition State Analog Inhibitors for α-Chymotrypsin" *J. Org. Chem.* **2003**, *68*, 8465-8470 (DOI: 10.1021/jo034837z).

176. Jackson, D.Y.; Liang, M.N.; Bartlett, P.A.; Schultz, P.G. "Activation Parameters and Stereochemistry of an Antibody-Catalyzed Claisen Rearrangement" *Angew. Chem. Intl. Ed. Engl.* **1992**, *31*, 182-183.

177. He, Z.; Stigers Lavoie, K.D.; Bartlett, P.A.; Toney, M.D. "Conservation of Mechanism in Three Chorismate-Utilizing Enzymes" *J. Am Chem. Soc.* **2003**, *126*, 2378-2385 (DOI: 10.1021/ja0389927).

178. Bartlett, P.A.; Hammond, M.C. "Peptide Beta-Strand Mimics Based on Pyridinones, Pyrazinones, Pyridazinones, and Triazinones" U.S. Patent Application filed February 24, 2004.

179. An, M; Bartlett, P.A. "Enzymatic Synthesis of a Ring-Contracted Analogue of 5-Enolpyruvylshikimate-3-Phosphate" *Org. Lett.* **2004**, *6*, 4065-4067 (DOI: 10.1021/ol048260z).

8

180. Phillips, S.T.; Piersanti, G.; Rüth, M.; Gubernator, N.; van Lengerich, B.; Bartlett, P.A. "Facile Synthesis of @-Tide β-Strand Peptidomimetics: Improved Assembly in Solution and on Solid Phase" *Org. Lett.* **2004**, *6*, 4483-4485 (DOI: 10.1021/ol048262j).

181. Phillips, S.T.; Blasdel, L.K.; Bartlett, P.A. "@-Tide-Stabilized β-Hairpins" *J. Org. Chem.* **2005**, *70*, 1865-1871 (DOI: 10.1021/jo047782p).

182. Priestman, M.A.; Healy, M.L.; Becker, A.; Alberg, D.G.; Bartlett, P.A.; Lushington, G.H.; Schönbrunn, E. "The Interaction of Phosphonate Analogs of the Tetrahedral Reaction Intermediate with 5-Enolpyruvylshikimate-3-phosphate Synthase (EPSPS) in Atomic Detail" *Biochemistry* **2005**, *44*, 3241-3248 (DOI: 10.1021/bi048198d).

183. Phillips, S.T.; Blasdel, L.K.; Bartlett, P.A. "@-Tides as Reporters for Molecular Associations" *J. Am Chem. Soc.* **2005**, *127*, 4193-4198 (DOI: 10.1021/ja045122w).

184. Phillips, S.T.; Piersanti, G.; Bartlett, P.A. "Quantifying amino acid conformational preferences and side chain-side chain interactions in β-hairpins" *Proc. Natl. Acad. Sci. USA* **2005**, *102*, 13737-13742 (DOI: 10.1073/pnas.0506646102).

185. Yang, Y; Nesterenko, D.; Trump, R.P.; Yamaguchi, K.; Bartlett, P.A. Drueckhammer, D.G. "Virtual Hydrocarbon and Combinatorial Databases for Use with CAVEAT" *J. Chem. Inf. Modeling* **2005**, *45*, 1820-1823 (DOI: 10.1021/ci050277o).

186. Bartlett, P.A.; Entzeroth, M., editors "Exploiting Chemical Diversity for Drug Discovery", Royal Society of Chemistry Biomolecular Sciences series, **2006**, 420 pages, RSC Publishing (Cambridge, UK).

187. Hammond, M.C.; Harris, B.Z.; Lim, W.A.; Bartlett, P.A. β-Strand Peptidomimetics as Potent PDZ Domain Ligands" *Chem. Biol.* **2006**, *13*, 1247-1251 (DOI: 10.1016/j.chembiol.2006.11.010).

188. Hammond, M.C.; Bartlett, P.A. "Synthesis of Amino Acid-Derived Cyclic Acyl Amidines for Use in β-Strand Peptidomimetics" *J. Org. Chem.* **2007**, *72*, 3104-3107 (DOI: 10.1021/jo062664i).

**Independent publications from the group:**

Hediger, M.E. "Design, synthesis, and evaluation of aza inhibitors of chorismate mutase" *Bioorg. Med. Chem.* **2004**, *12*, 4995-5010 (DOI: 10.1016/j.bmc.2004.06.037)

# EXHIBIT B

## MATERIALS REVIEWED

### Patent Prosecution Files

U.S. Patent No. 4,731,374
U.S. Patent No. 4,843,086
U.S. Patent No. 4,886,812

### Deposition Transcripts

July 5, 2006 Bennett Laguzza deposition
July 6, 2006 William Turner deposition
July 7, 2006 Richard Hahn deposition
July 27, 2006 Barry Smalstig deposition
October 9, 2006 Joachim Mierau deposition and exhibits
October 19, 2006 Walter Kobinger deposition and exhibits
October 24, 2006 Rudolph Hurnaus deposition and exhibits
November 28, 2006 Dieter Hinzen deposition and exhibits
December 12, 2006 Gunter Schingnitz deposition and exhibits

### Deposition Exhibits

Exhibit 1-51, 53

### Production Documents

BARR 000662-666
BARR 027413-27414
BARR 209351-209403
BOE 00000712-746
BOE 00004078-4083
BOE 00004157-4166
BOE 00004167-4177
BOE 00004178-4197
BOE 00004121-4133
BOE 00004134-4139
BOE 00004315-4350
BOE 00009695-9738
BOE 00015624-15637
BOE 00033521-33527
BOE 00034671
BOE 00037825-37861
BOE 00062414-62425
BOE 00103069-103072
BOE 00116352
BOE 00131455-131493
BOE 00131034-131099
BOE 00132060-132241
BOE 00132098-132105

BOE 00132270-132271
BOE 00754889-754929
BOE 00843204-843212
BOE 00848943-848944
BOE 00849191-849203
BOE 00849213-849224
BOE 00849164-849170
BOE 00849179-849190
BOE 00849225-849236
LLY 1-52


## Articles

J. G. Cannon, *Prog. Drug. Res.* 1985, *29*, 303-414 "Dopamine agonists: Structure-activity relationships"

J. G. Cannon, Ann. Rev. Pharmacol. Toxicol. 1983, 23, 103-30 "Structure Activity Relationships of Dopamine Agonists"

## Miscellaneous

July 1, 1997 FDA approval letter for Mirapex®

EXHIBIT Q



515a



IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re application of: G. Griss et at.

Serial No. : 256,671                    )   Art Unit: 125

Filed     : October 12, 1988           )   Examiner:

For       : TETRA HYDRO-BENZTHIAZOLES, THE   )
            THE PREPARATION THEREOF AND       )
            THEIR USE                         )

Honorable Commissioner of
Patents and Trademarks
Washington, D.C. 20231

SECOND PRELIMINARY AMENDMENT
AND
INFORMATION DISCLOSURE STATEMENT

Sir:

Entry of the following amendments in addition to those
contained idn the Preliminary Amendment filed on 12 October
1988, and review of the following information disclosure
statement are required prior to commencing examination of
the above captioned application.

AMENDMENTS

Please add the following new claims 16 and 17.

16. A tetrahydrobenzthiazole of the formula



wherein R is an alkyl group with 1 to 7 carbon atoms, a
cycloalkyl group having 3 to 7 carbon atoms, an alkenyl or
alkynyl group having 3 to 6 carbon atoms, an alkanoyl group
having 1 to 7 carbon atoms or a phenyl alkyl or phenyl
alkanoyl group having 1 to 3 carbon atoms in the alkyl
moiety, wherein the phynyl nucleus may be substituted by
fluorine, chlorine or bromine atoms.

17. The compound of claim 16 wherein R is an alkyl group
having 1 to 7 carbon atoms.

EXHIBIT
98

<u>REMARKS</u>

New claims 16 and 17 are directed to a subgeneric aspect of
the invention not previously claimed.  Support for these new
claims is found throughout the specification, particularly
at pages 2 through 4 thereof.

<u>INFORMATION DISCLOSURE STATEMENT</u>

Pursuant to 37 CFR 1.56, 1.97 and 1.98, Applicants wish to
bring the following information to the attention of the
Examiner in connection with this application.

A.  <u>European Search Report</u>

Applicants provide herewith a copy of the search report of
the European Patent Office for EP85116016.9, which corre-
sponds to the above-captioned application.  This cites EP-
A1-0-044 443 and US 4,337,343 as references which are indic-
ative of the state of the art.  It should be noted that US
4,337,343 corresponds to EP 21 940.

Neither of the cited references are believed to affect the
patentability of the claims since neither discloses or
suggests the claimed compounds or pharmaceutical
compositions.  Both references were made of record in Serial
No. 910,947, the parent of the above captioned application,
now Patent 4,731,374.

A copy of the search report, the two cited referenced and a
PTO 1449 form listing these references are enclosed.

B.  <u>Other References made of Record In Parent</u>

British Patent 812,512 was made or record by the Examiner in
Serial No. 810,947, the parent of the above captioned
application, now Patent 4,731,374.

This reference generically discloses compounds which would
be structurally related to those claimed herein but for the
fact that these compounds are benzothiazoles, and not
tetrahydrobenzothiazoles as in the above-captioned applica-
tion.  The claimed compounds and compositions are therefore
considered to be patentable over this reference.

- 2 -

A copy of this reference and a PTO-1449 for listing the
same is enclosed herewith.

C.  Possibly Interfering Application of Another

Applicants particularly wish to bring to the attention of
the Patent and Trademark Office the existence U.S. Patent
Application Serial No. 747,748, filed 24 June 1985, and its
foreign equivalent, European Patent Application No. 207,696,
published 1 July, 1987.

European '696 discloses tetrahydro (thi or ox) azoles of the
formula:



wherein $R^1$ and $R^2$ are individually H, methyl, ethyl or n-
propyl; $R^3$ and $R^4$ are individually H, methyl, ethyl, n-
propyl or allyl; and Y is O or S.

When Y is S, the compounds of European '696 represent a
subgenus of the compounds disclosed and originally claimed
in the above-captioned application.  However, European '696
does not represent prior art because its publication date is
later than the effective filing date of the above-captioned
application.

U.S. Application Serial No. 747,748 contains the same dis-
closure as European '696.  It is not available as prior art
because its filing date is later than the effective filing
date of the above-captioned application.  (The effective
filing date of the above-captioned application is 22 Decem-
ber 1984, the date on which the German application for which
Convention priority is claimed was filed).

It is believed that Serial No. 747,748 is still pending.  As
filed, U.S. Application Serial No. 747,748 contained claims
directed to compounds of the above formula XX.

- 3 -

BOE00003876

The Examiner is urged to consider carefully the relevance of Serial No. 747,748 before allowing the above-captioned application. The possibility of interfering subject matter should be particularly considered.

Copies of these two references and a Form PTO-1449 listing the same are enclosed herewith.

Respectfully submitted,

Alan R. Stempel
Registration No. 28,991

Boehringer Ingelheim Corp.
90 East Ridge
Ridgefield, CT  06877
(203) 431-5873

Case No. 5/920-2-D2

I hereby certify that this correspondence is being deposited with the U. S. Postal Service as first class mail in an envelope addressed to:    Commissioner of Patents & Trademarks, Washington, D.C. 20231 on Dec. 8, 198_

FORM PTO-1449
(REV. 7-80)

**U.S. DEPARTMENT OF COMMERCE**
**PATENT AND TRADEMARK OFFICE**

## LIST OF INFORMATION CITED BY APPLICANT(S)
*(Use several sheets if necessary)*

| | |
|---|---|
| ATTY. DOCKET NO. | SERIAL NO. |
| 5/920-2-02 | 256,671 |
| APPLICANT | |
| Gerhart Griss, et al. | |
| FILING DATE | GROUP |
| October 12, 1988 | 125 |

Sheet ___ of ___

### U.S. PATENT DOCUMENTS

| EXAMINER INITIAL | | DOCUMENT NUMBER | DATE | NAME | CLASS | SUBCLASS | FILING DATE IF APPROPRIATE |
|---|---|---|---|---|---|---|---|
| | AA | 4 3 3 7 3 4 3 | 6/29/82 | J. Maillard et al. | | | June 16, 19 |
| | AB | SN 2 4 7 7 4 8 | NONE | B.C. Laguzzo, et al. | | | |
| | AC | | | | | | |
| | AD | | | | | | |
| | AE | | | | | | |
| | AF | | | | | | |
| | AG | | | | | | |
| | AH | | | | | | |
| | AI | | | | | | |
| | AJ | | | | | | |
| | AK | | | | | | |

### FOREIGN PATENT DOCUMENTS

| | | DOCUMENT NUMBER | DATE | COUNTRY | CLASS | SUBCLASS | TRANSLATION YES | NO |
|---|---|---|---|---|---|---|---|---|
| | AL | 0 0 4 4 4 4 3 | 01/27/82 | European | | | | |
| | AM | 2 0 7 6 9 6 | 06/ /86 | European | | | | |
| | AN | 2 1 9 4 0 | 01/07/81 | European | | | | |
| | AO | 8 1 2 5 1 2 | 04/29/59 | Great Britain | | | | |
| | AP | | | | | | | |

### OTHER PRIOR ART (Including Author, Title, Date, Pertinent Pages, Etc.)

| | |
|---|---|
| AU | |
| AV | |
| AW | |

| EXAMINER | DATE CONSIDERED |
|---|---|
| | |

*EXAMINER: Initial if reference considered, whether or not citation is in conformance with MPEP 609; Draw line through citation if not in conformance and not considered. Include copy of this form with next communication to applicant.

BOE00003878