# EXHIBIT P

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BOEHRINGER INGELHEIM INTERNATIONAL GMBH and BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 05-700 (KAJ) |
| v. | ) ) | CONSOLIDATED |
| BARR LABORATORIES, INC., | ) ) | |
| Defendant. | ) | |

| | | |
|---|---|---|
| BOEHRINGER INGELHEIM INTERNATIONAL GMBH and BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | C.A. No. 05-854 (KAJ) |
| v. | ) ) ) | |
| MYLAN PHARMACEUTICALS INC., | ) ) | |
| Defendant. | ) | |

**PLAINTIFFS' OBJECTIONS AND RESPONSES TO DEFENDANT BARR
LABORATORIES, INC.'S FIRST SET OF REQUESTS
FOR THE PRODUCTION OF DOCUMENTS AND THINGS**

Pursuant to Rules 34 and 26 of the FEDERAL RULES OF CIVIL PROCEDURE,

Plaintiffs Boehringer Ingelheim International GmbH and Boehringer Ingelheim Pharmaceutical,

Inc. ("Plaintiffs" or "Boehringer") hereby respond to the First Set of Requests for the Production

of Documents and Things of Defendant Barr Laboratories, Inc. ("Defendant" or "Barr") as

follows:

documents protected from disclosure by the attorney-client privilege, the work-product doctrine, the common interest privilege, FEDERAL RULE OF CIVIL PROCEDURE 26(b)(4)(B), and/or otherwise protected from disclosure. Subject to and without waiving the foregoing objections, Boehringer states that it will produce non-privileged, non-work product documents responsive to Request No. 79, if any, after a reasonable search.

80.     All business plans relating to any drug administered for the treatment of Parkinson's disease, Parkinsonism, or the symptoms of Parkinson's disease or Parkinsonism, from 1996 to the present.

**RESPONSE:**

Boehringer hereby incorporates its General Objections as and for its objections to Request No. 80. Boehringer further objects to Request No. 80 to the extent that it seeks information not relevant to the claims or defenses of any party. Boehringer further objects to Request No. 80 on the grounds that it is vague and ambiguous. Boehringer further objects to Request No. 80 on the grounds that it is overly broad, unduly burdensome, and/or would entail undue expense. Boehringer further objects to Request No. 80 to the extent it seeks documents protected from disclosure by the attorney-client privilege, the work-product doctrine, the common interest privilege, FEDERAL RULE OF CIVIL PROCEDURE 26(b)(4)(B), and/or otherwise protected from disclosure. Subject to and without waiving the foregoing objections, Boehringer states that it will produce non-privileged, non-work product documents responsive to Request No. 80 to the extent they can be found after a reasonable search.

81.     All documents relating to United States Patent Application No. 747,748, including but not limited to all copies of that patent application.

**RESPONSE:**

Boehringer hereby incorporates its General Objections as and for its objections to Request No. 81. Boehringer further objects to Request No. 81 on the grounds that it is overly

46

broad, unduly burdensome, and/or would entail undue expense. Boehringer further objects to Request No. 81 to the extent that it seeks documents protected from disclosure by the attorney-client privilege, the work-product doctrine, the common interest privilege, FEDERAL RULE OF CIVIL PROCEDURE 26(b)(4)(B), and/or otherwise protected from disclosure. Subject to and without waiving the foregoing objections, Boehringer states that it will produce non-privileged documents responsive to Request No. 81, if any, following a reasonable search.

82.    All documents relating to European Patent Application No. 207,696, including but not limited to all copies of that patent application.

**RESPONSE:**

Boehringer hereby incorporates its General Objections as and for its objections to Request No. 82. Boehringer further objects to Request No. 82 on the grounds that it is overly broad, unduly burdensome, and/or would entail undue expense. Boehringer further objects to Request No. 82 to the extent that it seeks documents protected from disclosure by the attorney-client privilege, the work-product doctrine, the common interest privilege, FEDERAL RULE OF CIVIL PROCEDURE 26(b)(4)(B), and/or otherwise protected from disclosure. Subject to and without waiving the foregoing objections, Boehringer states that it will produce non-privileged documents responsive to Request No. 82, if any, following a reasonable search.

83.    All documents relating to Bennett C. Laguzza or William W. Turner.

**RESPONSE:**

Boehringer hereby incorporates its General Objections as and for its objections to Request No. 83. Boehringer further objects to Request No. 83 on the grounds that it is overly broad, unduly burdensome, and/or would entail undue expense. Boehringer further objects to Request No. 83 on the grounds that it seeks information not relevant to the claims or defenses of any party. Boehringer further objects to Request No. 83 to the extent it seeks documents

protected from disclosure by the attorney-client privilege, the work-product doctrine, the common interest privilege, FEDERAL RULE OF CIVIL PROCEDURE 26(b)(4)(B), and/or otherwise protected from disclosure. Subject to and without waiving the foregoing objections, Boehringer states that it will produce non-privileged, non-work product documents responsive to Request No. 83, if any, a reasonable search.

84.    All documents relating to any research, development or testing of pramipexole, any tetrahydrobenzathiazole, or any drug for the treatment of Parkinson's disease, Parkinsonism, or the symptoms of Parkinson's disease or Parkinsonism, performed by any person or entity not employed by Plaintiffs, including but not limited to Bennett C. Laguzza, William W. Turner, or Eli Lilly.

**RESPONSE:**

Boehringer hereby incorporates its General Objections as and for its objections to Request No. 84. Boehringer further objects to Request No. 84 on the grounds that it is vague and ambiguous. Boehringer further objects to Request No. 84 to the extent that it is overly broad, unduly burdensome, and/or would entail undue expense. Boehringer further objects to Request No. 84 to the extent that it seeks information not relevant to the claims or defenses of any party. Boehringer further objects to Request No. 84 as calling for documents that are not within the possession, custody, or control of Boehringer. Boehringer further objects to Request No. 84 to the extent it seeks documents protected from disclosure by the attorney-client privilege, the work-product doctrine, the common interest privilege, FEDERAL RULE OF CIVIL PROCEDURE 26(b)(4)(B), and/or otherwise protected from disclosure. Subject to and without waiving the foregoing objections, Boehringer states that it will produce non-privileged, non-work product documents responsive to Request No. 84 to the extent they can be found after a reasonable search.

85.    All documents relating to any communication between and among Plaintiffs and Bennett C. Laguzza, William W. Turner, or Eli Lilly, relating to United States Patent Application No. 747,748, European Patent Application No. 207,696, tetrahydrobenzathiazoles,

# EXHIBIT Q

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BOEHRINGER INGELHEIM | ) | |
| INTERNATIONAL GMBH and BOEHRINGER | ) | C.A. No. 05-700 (***) |
| INGELHEIM PHARMACEUTICALS, INC., | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BARR LABORATORIES, INC. | ) | |
| Defendant. | ) | |

**SUPPLEMENTAL EXPERT REPORT OF ERIC V. ANSLYN, Ph.D.**

**A.    Dr. Bartlett's Report**

1.      I have reviewed the expert report of Paul A. Bartlett and been asked to respond to some of the opinions therein.

2.      While I disagree that, in order to be a person of ordinary skill in the art, an individual must have the level of education and/or experience that Dr. Bartlett describes, the opinions expressed in my reports would not change if I applied his definition instead of the definition contained in my initial report.

3.      Nothing in Dr. Bartlett's report changes my opinions set forth in my March 28, 2007 report.

**1.    The German Applications Do Not Disclose Halogen-Substituted Phenyl Moities at the $R_1$ Position.**

4.      Dr. Bartlett incorrectly suggests several times that my March 28 report focused on the fact that claim 1 in the first German application does not include halogen-substituted phenyl rings at the $R_1$ position while claim 1 of the '812 patent does.  While it is correct that the skilled artisan would understand that claim 1 of the first German application does not include such substituents, but claim 1 of the '812 patent does, my analysis was broader.  I pointed out that the skilled artisan would understand that General Formula I of both German Applications

does not include halogen-substituted phenyl rings at the $R_1$ position while General Formula I of the '812 patent does. *See, e.g.*, Anslyn March 28 Rep. ¶ 45.

      5.      General Formula I is set forth at the very beginning of the German Applications, and both defines the scope of the invention of the German Applications and establishes the context for reading the entire disclosure of those applications. A skilled artisan would possess this understanding because, among other things, the very first sentence of the disclosure of the first German application reads:

> This invention relates to new tetrahydro-benzthiazoles of general formula



(I)

> the enantiomers and acid addition salts thereof, particularly the physiologically acceptable acid addition salts thereof with inorganic or organic acids, and processes for preparing them.

Exh. 53 at BARR28270. The second German application refers back to the first German application, stating "German Patent Application No. 34 47 075.1 describes tetrahydro-benzthiazoles of general formula [structure] (I)" and then completes the sentence in identical fashion. BARR209357. Explicit definitions of the $R_1$, $R_2$, $R_3$, and $R_4$ substituents of General Formula I follow in both applications. *See* Ex. 53 at BARR028270-71; BARR209358.

      6.      Dr. Bartlett agrees that claim 1 of the first German application does not disclose halogen-substituted phenyl rings at the $R_1$ position. *See* Bartlett ¶ 52. However, the definitions of $R_1$-$R_4$ of claim 1 of the first German application are identical to the definitions of $R_1$-$R_4$ of General Formula I of both German applications. Ex. 53 at BARR028270-71, BARR028314; BARR209357-58. Accordingly, under Dr. Bartlett's analysis, General Formula I of the German applications does not disclose halogen-substituted phenyl rings at the $R_1$ position.

2

7.      I disagree with Dr. Bartlett's opinion to the extent he asserts that the skilled artisan reading the methods of synthesis (d) and (e) of the German applications would understand them to disclose the <u>synthesis</u> of compounds with halogen-substituted phenyl moieties at the $R_1$ position.  In addition, I disagree with Dr. Bartlett's opinion to the extent he asserts that the skilled artisan reading the synthetic methods (d) and (e) of the German applications would understand them to disclose <u>compounds</u> which have a halogen-substituted phenyl group at the $R_1$ position as starting materials, intermediates, or final products.

8.      As I explained in my original report and above, the skilled artisan would understand that General Formula I of the German applications does not include halogen-substituted phenyl rings in the definition of the possible substituents at the $R_1$ position.

9.      A skilled artisan would understand synthetic method (d) to describe the synthesis of compounds within General Formula I.  Synthetic method (d) begins with the phrase "In order to prepare compounds of general formula I . . . ", and a skilled artisan would read the description that follows in (d) in the context of that language.  A skilled artisan therefore would not understand synthetic method (d) to disclose compounds or the synthesis of compounds with a halogen-substituted phenyl ring at the $R_1$ position, because those compounds are not encompassed by the group of compounds in General Formula I.  The "wherein at least one of the groups $R_1$, $R_2$, $R_3$ or $R_4$ . . ." clause in the first sentence would be understood by a skilled artisan to indicate that the method is directed to making compounds defined by General Formula I, not a broad group of compounds unlimited by the bounds of General Formula I.

10.     The same is true with respect to section (e).  A skilled artisan would understand synthetic method (e) to describe the synthesis of compounds within General Formula I.  Synthetic method (e) begins with the phrase "In order to prepare compounds of general formula I

3

. . . ", and a skilled artisan would read the description that follows in (e) in the context of that language. A skilled artisan therefore would not understand synthetic method (e) to disclose compounds or the synthesis of compounds with a halogen-substituted phenyl ring at the $R_1$ position, because those compounds are not encompassed by the group of compounds in General Formula I. The "wherein at least one of the groups $R_1$, $R_2$, $R_3$ or $R_4$ . . ." clause in the first sentence would be understood by a skilled artisan to indicate that the method is directed to making compounds defined by General Formula I, not a broad group of compounds unlimited by the bounds of General Formula I.

      11.      Dr. Bartlett relies on the German applications' use of the term "hereinbefore" for his opinions regarding the disclosures of synthetic methods (d) and (e) in the German applications. *See* Bartlett ¶¶ 59-66. I do not believe the skilled artisan would interpret the word "hereinbefore" in those synthetic methods to change the fact that the methods are defined as making compounds of General Formula I.

      12.      Dr. Bartlett states that "inherently, the synthetic routes disclosed in the German priority applications would reasonably enable one of ordinary skill to make diaminotetrahydrobenzthiazoles with halogenated benzyl or other phenylalkyl groups as $R_1$ substituents." Bartlett ¶ 57. Regardless of the accuracy of Dr. Bartlett's assertion, as discussed above, the skilled artisan would not understand synthetic methods (d) or (e) to disclose either compounds, or the synthesis of compounds, with a halogenated phenyl group at the $R_1$ position. The skilled artisan would also not understand from either synthetic method (d) or (e)—or anything else in the German applications—that the inventors had made, or had contemplated making, compounds with a halogenated phenyl group at the $R_1$ position.

13.    The skilled artisan would understand that the phrase "wherein the above mentioned phenyl nuclei may be substituted by 1 or 2 halogen atoms" of $R_1$ of claim 1 of the '812 patent is broader than the phrase "whilst the phenyl nucleus may be substituted by fluorine, chlorine or bromine atoms" of $R_3$ of General Formula I of the German applications. The skilled artisan would have that understanding because there are halogen atoms other than fluorine, chlorine and bromine: for example, iodine. Therefore, Dr. Bartlett's opinion does not explain how all of the compounds encompassed by claims 1 and 2 of the '812 patent as understood by the skilled artisan are disclosed in the German applications.

**B.    The '086 and '812 Patents**

14.    The skilled artisan would understand that each of claims 3-5 and 9-10 of the '812 patent encompasses multiple different compounds—from dozens to thousands of compounds. The skilled artisan would also understand that the phrase "2-Amino-6-n-propylamino-4,5,6,7-tetrahydro-benzthiazole" has the same meaning in claim 7 of the '812 patent and claims 9, 19, 29, and 39 of the '086 patent.

15.    Because claim 8 of the '812 patent is dependent upon claim 3 of the '812 patent, the skilled artisan would understand that claim 8 encompasses at least thousands of pharmaceutical compositions.

16.    The skilled artisan would understand that a natural result flowing from practicing the methods of at least claims 8, 9, 18, 19, 28, 29, 38, and 39 of the '086 patent would be the formation of the claimed compounds in both protonated (acidic) and unprotonated (free base) form. He/she would hold that understanding based on, among other things, the principle that weakly acidic and basic forms of amines are in equilibrium in the body. That principle is reflected in the Henderson-Hasselbalch equation and analogous equations for diprotic acids,

which can be utilized to calculate the respective amounts of protonated and free base forms

based on the dissociation constants ($pK_a$s)[1] for the compounds and the pH.

_7/9/07_

Date

_Eric V. Anslyn_

Eric V. Anslyn, Ph.D.

---

[1] See page BOE00075146 of BOE00075129-62 for information about the dissociation constants for the protonated forms of pramipexole.

# EXHIBIT R

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

BOEHRINGER INGELHEIM            )
INTERNATIONAL GMBH and BOEHRINGER    )    C.A. No. 05-700 (***)
INGELHEIM PHARMACEUTICALS, INC.,      )
                      Plaintiffs,    )
     v.                        )
                              )
BARR LABORATORIES, INC.          )
                   Defendant.    )

## EXPERT REPORT OF GÜNTER ISENBRUCK

### I.      Background

1.     I am both a European and a German Patent Attorney, and have been a patent and licensing practitioner for over 30 years. I qualified to become a European Patent Attorney in 1983 and a German Patent Attorney in 1985.

2.     From 1975 to 1996, I worked at Hoechst Aktiengesellschaft. I started out drafting patent applications, and was eventually promoted to the position of unit manager and then head manager. In 1992, I became General Intellectual Property Counsel for Hoechst.

3.     Throughout my employment at Hoechst, I was involved in the preparation of patent applications for filing as priority applications in the German patent office, as well as preparing foreign filing texts for filing outside Germany based on these German priority applications. I also coordinated with attorneys in the United States regarding the prosecution of U.S. counterpart applications.

4.     In 1996, I became a partner at Bardehle et al., and since January 2003 I have been the senior partner at the patent law firm of Isenbruck - Boesl - Hoerschler - Wichmann - Huhn. In private practice, my work has focused on advising clients on IP-related issues, procuring patents for clients, and representing clients in litigation.

5.      I graduated in 1969 from the Johann Wolfgang Goethe University in Frankfurt with a Diploma in Organic Chemistry, and received a PhD in Organic Chemistry from the same university in 1972.  As a patent practitioner, my work has primarily related to patents in the fields of chemistry, pharmaceuticals, and biochemistry.

6.      In 1979, I spent four months studying U.S. Patent Law in the in-house patent department of American Hoechst Corporation and at the Catholic University in Washington DC.

7.      I often provide lectures on introductory principles of patent law to patent prosecutors who are at the early stages of their careers, as well as to scientific researchers.

8.      I am the President of the Licensing Executives Society ("LES") Germany, and was formerly the chair of the Patent and Technology Licensing Committee and of the Small and Medium Size Enterprises ("SME") support group of LES International.

9.      In 2007, I began a Teaching Position at the "Master in IP Law and Management" Program at CEIPI (Centre for International Industrial Property Studies) of Robert Schuman University in Strasbourg.

10.     During the last four years, I have testified as a court expert at the Landgericht (county court) in Düsseldorf, Germany.  However, I am prohibited from disclosing the identity of the case in which I have testified.  I have not previously testified as an expert in the Untied States.

11.     My curriculum vitae is attached as Exhibit A.

12.     I am being compensated for my time at the rate of € 340 per hour.  My compensation is in no way dependent on the outcome of this case.

## II.    Mandate

13.    I have been asked to comment on and respond to issues raised in Mr. Walter

Holzer's expert report submitted by plaintiffs Boehringer Ingelheim International GmbH and

Boehringer Ingelheim Pharmaceuticals, Inc. (collectively, "Boehringer"). Specifically, I have

been asked to use my expertise and experience in German and European patent law, practice, and

procedures to testify regarding the understanding of European and German patent practitioners

with respect to certain filings submitted by Boehringer in connection with U.S. Application

Serial No. 256,671 ("the '671 application"), which I understand issued as U.S. Patent No.

4,886,812 ("the '812 patent").

14.    In addition to the specific opinions set forth in this report, I may respond to

additional testimony and information that becomes available during deposition, at trial, or

otherwise, including any opinions put forth by Boehringer's experts. I may also use charts,

graphs, or other demonstrative exhibits to support any potential testimony at trial, as well as

provide further background information on European and German patent law, practice, and

procedures.

15.    In forming my opinions, I have relied on the materials cited throughout this report

and listed in Exhibit B, as well as my training and experience.

## III.    Mr. Holzer's Report

16.    In his report, Mr. Holzer provides a review of Boehringer's "filing strategy" with

respect to the '812 patent, as well as two earlier-filed German applications, and explains how

they would be understood by a European patent practitioner. However, while Mr. Holzer

indicates in the beginning of his report that he will provide opinions concerning Barr's

inequitable conduct defense, and states that the defense "concerns certain statements to the

United States Patent and Trademark Office regarding the priorities claimed in US patent application Ser. No. 256,671," Holzer ¶ 11, his report does not include a discussion of how European and German patent practitioners would understand the statements at issue.[1]

17.     A European patent practitioner or a German patent practitioner familiar with European practice, and particularly one who prosecuted applications with counterpart applications pending in the United States, would be aware of the obligation to provide information about relevant prior art to the United States Patent and Trademark Office ("USPTO").  For this reason, any such person involved in the prosecution of a German or European patent application would inform the outside U.S. prosecuting attorney (or an in-house colleague) involved in the prosecution of a U.S. counterpart application about any relevant prior patent applications, publications, or patents.  Such a practitioner would also be familiar with the form used in the USPTO known as an Information Disclosure Statement ("IDS") and its role in disclosing information to the USPTO.

18.     I have reviewed an IDS submitted by Boehringer to the USPTO in connection with the '671 application, which discusses the Eli Lilly U.S. Application No. 747,748 and EP 0 207 696.  The IDS states:

> [The Eli Lilly U.S. Application] is not available as prior art because its filing date is later than the effective filing date of the above-captioned application. (The effective filing date of the above-captioned application is 22 December 1984, the date on which the German application for which Convention priority is claimed was filed).

---

[1] I will focus on the knowledge and understanding of European and German patent practitioners during the 1980s.

I understand that the date referenced in the above statement, 22 December 1984, is the filing date of German application DE 34 37 075, which is listed as one of two priority documents on the '812 patent.

19.    Mr. Holzer's report discusses the well-accepted and regular practice of indicating, at the time a patent application is filed, a claim to priority to (or the benefit of the filing date of) one or more earlier-filed patent applications. But a European patent practitioner or a German patent practitioner familiar with European practice would understand that such an initial claim to priority is different from making an affirmative representation to the patent examiner about a patent application's effective filing date during subsequent communications with the patent office regarding patentability—such as the statements made by Boehringer in the IDS discussed above. While an initial claim to priority consists essentially of identifying earlier, related applications that could potentially be used to establish an earlier filing date, an affirmative representation that an application has a particular effective filing date in correspondence such as an IDS would be understood to be a representation concerning a specific priority date for all of the then-pending claims of the application.

20.    Mr. Holzer's report also discusses that, under the European Patent Convention, a single claim can have multiple priority dates. This can occur where, for example, a European application contains a claim directed to a chemical genus and certain of the specified substituents were not disclosed in the original priority application filed in the originating country (for example Germany), but were first described in the European application. Mr. Holzer does not mention, however, that in such a circumstance a European patent practitioner or a German patent practitioner familiar with European practice would understand that it would not be correct to state that the European application as a whole has an effective filing that is identical to the filing

date of the earlier priority application. In the case, for example, where additional subject matter was included in a foreign counterpart application filed after the priority application, and such subject matter was not contained in the original priority application, it would be correct to state that certain portions of the counterpart application are entitled to one priority date, and that the remaining portions are entitled to a different priority date. A European patent practitioner or a German patent practitioner familiar with European practice would not assert that the counterpart application has an effective filing date that is identical to the filing date of the original priority application.

21.    I have compared German applications DE 34 37 075 and DE 35 08 947 to their European counterpart, EP 0 186 087. I note that the scope of the General Formulas I in the German applications is not as broad as the General Formula I set forth in the European application with respect to the definition of $R_1$, a difference that can also be found in the claims of the respective applications. To the extent the broader scope of $R_1$ in the European application is not supported by the German applications, any claims of the European application that incorporate both original matter from the German applications and additional subject matter added at the time of the filing of the European application would have multiple priority dates under European law. Under that circumstance, a European patent practitioner or a German patent practitioner familiar with European practice would understand that it is not correct to state that such claims or the European application itself have an effective filing date that is identical to the filing date of German application DE 34 37 075.

22.    A European or German practitioner would be aware that there are differences between U.S. law on the one hand, and European and German law on the other hand, with respect to priority of invention and what qualifies as prior art. In particular, he or she would be

aware that there exists a procedure in the U.S. known as an interference that does not exist under the European Patent Convention or under German law.  Furthermore, he would know that, under U.S. patent law, an unpublished patent application could become relevant to an application with a later U.S. filing date for both novelty and inventive step (obviousness) considerations.  In contrast, in Europe, an unpublished application with an earlier effective filing date could only be relevant for novelty, not inventive step.  In light of those differences, such a practitioner who was aware that multiple priority dates were involved in the European prosecution would, upon seeing a statement in connection with the prosecution of a U.S. counterpart application that the application had an "effective filing date" of the earlier priority document, alert his U.S. correspondence attorney or U.S. in-house colleagues who were involved in the U.S. prosecution that, at least under European law, not all of the claimed subject matter had a priority date of the earlier application.

23.     Mr. Holzer states that, with respect to prosecution of a European application, "[a]ny distribution of different priorities with respect to different claims would therefore only need to be done if there turned out to be intervening prior art that necessitated assessing entitlement to priority."  Holzer at p.9.  The discovery of the Eli Lilly U.S. application is precisely the kind of event that would cause a European or German patent practitioner to assess the distribution of different priorities with respect to different claims.

24.     On pages 13-14 of his report, Mr. Holzer discusses whether a claim with multiple priority dates "could be patentable notwithstanding the existence" of intervening prior art. However, whether or not such a claim could be patentable is a different issue from whether a

statement regarding the effective filing date of an application containing such a claim is an accurate statement.

_July 9, 2007_

Date

Günter Isenbruck

8

## EXHIBIT A

Dr. Guenter Isenbruck

**Patentanwalt, European Patent Attorney**

**Isenbruck Boesl Hoerschler Wichmann Huhn** - *Patentanwaelte*

**Theodor-Heuss-Anlage 12, D 68165 Mannheim**

**Tel. +49/621/ 42271 0**

**Fax +49/621/ 42271 31**

**isenbruck@ib-patent.de**

## CV -- Guenter Isenbruck

Dr. Guenter Isenbruck is a chemist and a national German as well as a European Patent Attorney and has been with the Hoechst group – finally as its General Intellectual Property Counsel – from 1975 to 1996. He used to be name partner with the internationally active law firm Bardehle et al. for about 6 years. He is now (since January 2003) senior partner of the patent attorney law firm Isenbruck - Boesl - Hoerschler - Wichmann - Huhn and is located in its Mannheim office with his majority of activities being in chemical, process engineering and biotech areas.

He has been involved in establishing patent and licensing strategies for the various nationally and globally active business units of former Hoechst AG together with its group companies e.g. in France, Japan and USA. Actually he is involved in patent litigation (infringement and revocation) activities for different clients in the LifeScience area.

Mr. Isenbruck is actually President of LES (Licensing Executives Society) Germany, and used to be chair of the Patent and Technology Licensing Committee and the SME task force of LES International. He is specialized - besides global patent filing and prosecuting - in technology transfer, opinion work (validity and FTO studies) and co-operations between industry or investors and universities or other non-profit R&D institutes (including start-ups and spin-offs).

A German national, Mr.Isenbruck obtained a diploma and a Ph.D. in Organic Chemistry from Johann Wolfgang Goethe University of Frankfurt and studied additionally Education at the university in Zuerich (Switzerland) – accompanied 1971 to 1975 by a four years' period as an instructor with a Swiss high school – and U.S Patent Law in 1979 at the Catholic University in Washington DC. He participated in many workshops, seminars and conferences on the teaching side on topics like IP in general, technology transfer, valuation of technology, or negotiation and formulation of technology oriented agreements. Beginning 2007 he holds a Teaching Position at the "Master in IP Law and Management" Program at CEIPI (Centre for International Industrial Property Studies) of Robert Schuman University in Strasbourg.

## EXHIBIT B

- U.S. Patent Nos. 4,731,374, 4,843,086, and 4,886,812, as well as their file histories

- EP 0 186 087 and its file history

- German applications 34 47 075 and 35 08 947, as well as English translations of those applications

- U.S. Application Serial No. 747,748 and EP Application 0 207 696