IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BOEHRINGER INGELHEIM INTERNATIONAL GMBH and BOEHRINGER INGELHEIM PHARMACEUTICAL, INC. | ) ) ) ) | |
| Plaintiffs, | ) ) ) | C.A. No. 05-0700 (***) |
| v. | ) ) | |
| BARR LABORATORIES, INC., | ) ) | |
| Defendant, | ) ) | |
| BOEHRINGER INGELHEIM INTERNATIONAL GMBH and BOEHRINGER INGELHEIM PHARMACEUTICAL, INC. | ) ) ) ) | |
| Plaintiffs, | ) ) ) | C.A. No. 05-0854 (***) |
| v. | ) ) | **REDACTED** |
| MYLAN PHARMACEUTICALS, INC., | ) ) ) | |
| Defendant. | ) | |

**EXHIBITS F AND H TO
PLAINTIFFS' BRIEF IN SUPPORT OF THEIR
MOTION TO STRIKE PORTIONS OF BARR'S EXPERT REPLY REPORTS**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
1201 North Market Street
P. O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
   *Attorneys for Plaintiffs Boehringer
   Ingelheim International GmbH and
   Boehringer Ingelheim Pharmaceutical,
   Inc.*

Original Filing Date: August 14, 2007
Redacted Filing Date: August 16, 2007

# EXHIBIT F

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BOEHRINGER INGELHEIM INTERNATIONAL GMBH and BOEHRINGER INGELHEIM PHARMACEUTICAL, INC.<br><br>Plaintiffs,<br><br>v.<br><br>BARR LABORATORIES, INC.,<br><br>Defendant, | Civil Action No. 05-0700 (KAJ) |
| BOEHRINGER INGELHEIM INTERNATIONAL GMBH and BOEHRINGER INGELHEIM PHARMACEUTICAL, INC.<br><br>Plaintiffs,<br><br>v.<br><br>MYLAN PHARMACEUTICALS, INC.,<br><br>Defendant. | Civil Action No. 05-0854 (KAJ) |

## EXPERT REPORT OF WALTER HOLZER

### I. INTRODUCTION

1. I, Walter Holzer, have been an Austrian and European Patent Attorney for almost 30 years. As a result of my expertise and experience in Austrian and European patent law, I have rendered opinions as a Court expert for many years. In 2000 the national law on experts changed to provide for certain specific duties and obligations of experts in Austria. As a result, certain standards and requirements were promulgated for experts on patent matters, including the requirement to take and pass an examination. I passed this examination and am now registered

as a "generally sworn and court certified" expert on patent matters before the Austrian Patent Court. I first was entered on the official list of court certified experts in 2000. In order to remain on this list after my first five-year tenure, in 2005 I had to demonstrate the expert opinions I had offered during this time period. I continue to be qualified as a court-appointed expert until 2015.

2. I have acted in the capacity of an expert several times in the past before numerous courts, including Austrian Patent Courts and Labour courts, one time before a Swiss court and one time before the ICC Arbitration Tribunal. Pursuant to the Austrian professional codes of conduct, I am not permitted to disclose the identity of the cases in which I have provided expert opinions. In addition, even if I were permitted to disclose such information, the case records are not public. I have never acted as an expert in the United States up until now.

3. I graduated from the Technical University Vienna, where I obtained a degree in Mechanical Engineering. I was a Member of the Council of Professional Representatives before the EPO (EPI) and the Standing Advisory Committee of the EPO (SACEPO) from 1979 – 2005. I served as President of EPI from 1999 – 2005. I was also the President of the Austrian Chamber of Patent Attorneys from 1985-2000.

4. From 1984 – 1996 I served as a technical (lay) judge at the Austrian Patent Appeals Court and have served periodically as a lay judge at the Austrian Supreme Court in Labour and Social Matters.

5. Throughout the years, I have been involved with extensive lecturing and publication activities. I am currently a Guest-Professor on Industrial Property at the University of Applied Arts in Vienna, where I teach courses on patent law and procedure. I am also a Director of the Diploma Course on Patent Litigation in Europe at the University of Robert Schuman, Strasbourg.

6.   I continue to practice as a patent attorney at Patentanwälte Schütz u. Partner, where I am a partner. A more detailed list of my accomplishments can be found in my CV, annexed to this report. (Ex. A)

## II.   SCOPE OF ASSIGNMENT

7.   I have been retained by Boehringer-Ingelheim International, GmbH, and Boehringer-Ingelheim Pharmaceuticals, Inc. (collectively "Boehringer") to use my experience and expertise in European patent law to assist Boehringer in determining whether adding certain information to a European patent application that claimed priority from two German patent applications was consistent with normal European patent practices and procedures at the relevant time.

8.   A list of the materials I reviewed in order to address this question is attached as Exhibit B to this report.

9.   I expect to testify as an expert witness in this case. This report describes my expected affirmative testimony. However, I reserve the right to supplement it as further relevant information becomes available to me.

10.   The facts, as I have been told by Boehringer's counsel and as I understand them, are as follows. Barr Laboratories and Mylan Pharmaceuticals have each filed Abbreviated New Drug Applications ("ANDA") with the Federal Food and Drug Administration ("FDA") seeking approval to market a generic version of pramipexole dihydrochloride tablets. Boehringer currently markets pramipexole dihydrochloride tablets under the trade name Mirapex® and has filed an action against Barr and Mylan asserting that their ANDAs infringe one or more claims of U.S. Pat. No. 4,886,812 ("the '812 patent"). In response, Barr has alleged several defenses, including that the '812 patent is unenforceable as a result of "inequitable conduct". According to my understanding, inequitable conduct involves the failure to disclose material information or

CH\939516.2                                                                                                                  3

the making of a material misstatement to the United States Patent and Trademark Office with the intent to deceive the U.S. PTO.

11.  I understand that Barr's inequitable conduct defence concerns certain statements to the United States Patent and Trademark Office regarding the priorities claimed in US patent application Ser. No. 256,671 which became the '812 patent. I have not been retained to express any opinions as to the merit of Barr's inequitable conduct defence. I have only been retained to provide opinions concerning standard European practices with regard to European filing procedures that may be relevant to such defence.

### III. FUNDAMENTAL DIFFERENCES BETWEEN EUROPEAN AND U.S. PATENT LAW

12.  At the outset, I think it might be helpful to explain certain basic differences between European and U.S. patent law that might shed light on certain filing activities which took place in this case.

13.  One fundamental difference between European and U.S. patent law is that all European countries and in particular the European Patent Office follow a first-to-file system of granting patents, whereas the U.S. grants patents according to the first-to-invent principle. This means that, in Europe, provided that the other requirements for grant have been met, the patent is granted to the applicant who first discloses the relevant subject matter[1] in a filed patent application. Unlike in the U.S., in general reference cannot be made in Europe to an earlier date of conception or reduction to practice, unless prior users rights are concerned, which however

---

[1] For purposes of this report, "subject matter" means possibly patentable subject matter contained in the specification and/or claims. Unless I say so otherwise, my use of this term should not imply that I have drawn any conclusions as to whether the information is entitled to a particular priority date.

CH\939516.2

4

play no role in the present context Hence, in order to establish an effective filing date for the subject matter of an invention, it is essential to file a patent application, and there will be an incentive to do this as soon as an effective disclosure can be made.

14. In order for foreign[2] patent applications to claim priority from an initial patent application for the same subject matter, they must be lodged within twelve months of the initial patent application. When the foreign patent application is prepared, one would wish to include any further subject matter or embodiments pertaining to the original invention that had materialised during the period between the priority application and the foreign application.

15. Another fundamental difference between European and U.S. practice is that in Europe it is possible for a single claim to have multiple priority dates. This is clear from Article 88 of the European Patent Convention, which states as follows:

"Claiming priority

(1) An applicant for a European patent desiring to take advantage of the priority of a previous application shall file a declaration of priority, a copy of the previous application and, if the language of the latter is not one of the official languages of the European Patent Office, a translation of it in one of such official languages. The procedure to be followed in carrying out these provisions is laid down in the Implementing Regulations.

(2) *Multiple priorities may be claimed in respect of a European patent application,* notwithstanding the fact that they originated in different countries. *Where appropriate, multiple priorities may be claimed for any one claim.* Where multiple priorities are claimed, time limits which run from the date of priority shall run from the earliest date of priority.

(3) If one or more priorities are claimed in respect of a European patent application, the right of priority shall cover only those elements of the European patent application which are included in the application or applications whose priority is claimed.

---

[2] The term "foreign" in the present context means applications filed in a country other than the country of the priority application, including international filings according to the PCT and so-called European second filings.

(4) If certain elements of the invention for which priority is claimed do not appear among the claims formulated in the previous application, priority may nonetheless be granted, provided that the documents of the previous application as a whole specifically disclose such elements." (emphasis added).

16. Article 88 EPC has not changed since the Convention was signed in 1973. This can be seen from the latest version of the authoritative text *"European Patent Convention"*, edited by Singer and Stauder[3], extracts of which are enclosed as Exhibit C. As a matter of comparison, in the case of Article 63 EPC, the fact of amendment is recorded in a footnote on the relevant page of the book. No such footnote is given on the pages that set out Article 88 EPC.

17. Furthermore, the *Guidelines for Examination in the EPO*, under Part C, Chapter V, Section 1.5 ("Multiple priorities"), state that "a European application may claim rights of priority based on more than one previous application" so long as "the earliest priority application [was] filed not more than 12 months before the date of filing of the European application." The *Guidelines* provide the following example of an instance in which multiple priorities may be claimed:

> "If, for instance, the European application describes and claims two embodiments (A and B) of an invention, A being disclosed in a French application and B in a German application, both filed within the preceding 12 months, the priority dates of both the French and German applications may be claimed for the appropriate parts of the European application; embodiment A will have the French priority date and embodiment B the German priority date as effective dates. *If embodiments A and B are claimed as alternatives in one claim, these alternatives will likewise have the different priority dates as effective dates.*"

(emphasis added).

---

[3] Third Edition, Volume 1

CH\939516.2                                                                 6

18. This text is taken from the 2005 edition of the *Guidelines* (Ex. D). It also appears in the 1994 edition of the *Guidelines*, which is the earliest edition that I have been able to find (Ex. E). It is entirely consistent, of course, with Article 88 EPC and, given that Article 88 has not changed since the EPC came into force in 1973, I believe that the quoted passage was applicable throughout the relevant period. As an example Decision T 0441/93 of the Boards of Appeal of the European Patent Office can be cited (Ex. F), which confirms that certain claims can be entitled to different priority dates.

19. One can also refer to the 'Convention of Paris for the Protection of Industrial Property (Stockholm Revision)', commonly referred to as simply the *Paris Convention*. This was first enacted in 1883 and established the basic principle of claiming priority from an earlier application, thus allowing applicants to defer for a year their foreign filings without being fully exposed to any intervening prior art. The Stockholm revision was made in 1967. I attach extracts of the Paris Convention, as reproduced in *The European Patents Handbook* (Ex. G). Article 4F states:

> "No country of the Union may refuse a priority for a patent application on the ground that the applicant claims multiple priorities, even originating in different countries, or on the ground that an application claiming one or more priorities contains one or more elements that were not included in the original application or applications whose priority is claimed, provided that, in both cases, there is unity of invention within the meaning of the law of the country.
>
> (...)"

20. According to information on the website of the World Intellectual Property Organisation (WIPO) (attached as Exhibit H) the USA ratified this Article of the Paris Convention in 1973.

21. Article 4F clearly envisages not only the claiming of multiple priorities in a single application but also the addition of subject matter to the foreign application that is not present in the application or applications from which priority is claimed.

22. It would not be uncommon to file intervening patent applications between the first priority-establishing application and the foreign application in order, for example, to provide further support for and/or embodiments of the invention that was initially disclosed. In some situations, the scope of the claims of the initial priority application would already cover the additional matter. In other situations, it would be possible that a later, intervening priority application would add subject matter related to the initial invention which might later on be included in an independent claim or in certain instances would have to be divided out if the initial claims are amended in such a manner that unity of invention is no longer given. This would depend on a number of factors, including the scope of the claims as amended during prosecution, and the practice of the jurisdiction in question.

23. A patent attorney might also wish to make one or more intervening filings to provide for additional subject matter in a more explicit manner in the context of the inventive concept contained in the first application. Priority may then either be derived from the initial priority application, and the filing dates of one or more intermediate applications, which however would still precede the foreign filing date.

24. At the end of the twelve-month period that starts with the first patent application for the subject matter in question, one would prepare the specification for foreign filing in the countries or regions of interest, such as the EPO, USPTO, etc., or, more commonly these days, a single PCT (Patent Cooperation Treaty) patent application designating numerous countries and regions. This application could include still further support for and developments of the original

CH\939516.2                                                                 8

inventive idea and would almost invariably claim priority from the initial application and from any intervening applications that had been filed on the same invention.

25.  It is important to claim priority on filing (or within any grace period for doing so that the patent office in question permits) and this is done simply by identifying the country, application number and filing date of all of the potentially relevant priority-establishing applications.

The priority claim enables one potentially to assert in the future that particular defined subject matter is entitled to a priority date earlier than the filing date of the foreign application. If the claim to priority is not made on filing, then this possibility is lost. However, the mere act of identifying an earlier application and claiming priority from it does not mean that any and all potential claims or parts of claims that might be drafted on that application will necessarily be entitled to the priority date derived from that earlier application. Such an assertion could only be made in relation to a particular identified claim (or part thereof), whereas in all likelihood the claims will have to be amended after filing in response to some objection from the examiner. Any distribution of different priorities with respect to different claims would therefore only need to be done if there turned out to be intervening prior art that necessitated assessing entitlement to priority.



CH\939516.2

9

# REMAINDER OF EXHIBIT F
# FULLY REDACTED

# EXHIBIT H

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BOEHRINGER INGELHEIM INTERNATIONAL GMBH and BOEHRINGER INGELHEIM PHARMACEUTICAL, INC.<br><br>    Plaintiffs,<br><br>    v.<br><br>BARR LABORATORIES, INC.,<br><br>    Defendant, | Civil Action No. 05-0700 (***) |
| BOEHRINGER INGELHEIM INTERNATIONAL GMBH and BOEHRINGER INGELHEIM PHARMACEUTICAL, INC.<br><br>    Plaintiffs,<br><br>    v.<br><br>MYLAN PHARMACEUTICALS, INC.,<br><br>    Defendant. | Civil Action No. 05-0854 (***) |

## EXPERT REPORT OF DR. C. WARREN OLANOW

1. I, Dr. C. Warren Olanow, expect to testify as an expert witness in this case on behalf of Boehringer Ingelheim International GMBH and Boehringer Ingelheim Pharmaceuticals, Inc. (collectively "Boehringer"). This report describes my expected affirmative testimony. I reserve the right to supplement it in response to the Defendants' expert reports and as additional relevant information becomes available to me.

### I.   PROFESSIONAL AND EDUCATIONAL BACKGROUND

2. I received an M.D. degree from the University of Toronto, trained in Neurology at the Neurological Institute at Columbia University, and did post graduate studies in neuroanatomy

at Columbia University. I am currently the Henry P. and Georgette Goldschmidt Professor and Chairman of the Department of Neurology, Professor in the Department of Neuroscience at the Mount Sinai School of Medicine in New York and Chief of the Neurology Service at Mount Sinai Medical Center (collectively known as "Mount Sinai").

3. I am responsible for all neurological care, neurological research and neurological education at Mount Sinai.

4. Prior to my present position I was on the faculty of McGill University, Duke University and the University of Southern Florida where I saw patients, did research, and taught undergraduate and graduate students.

5. My research and clinical interests have primarily focused on the cause and development of new therapies for Parkinson's disease and other movement disorders. I have published more than 270 peer reviewed articles, 65 book chapters, and served as editor for more than 20 books/monographs in this field.

6. I have been President of the Movement Disorder Society, the largest international organization for physicians and scientists who study and treat Parkinson's disease and other movement disorders. I have also been President of the International Society of Motor Disturbances, and Treasurer of the American Neurological Association. I currently serve on the scientific boards of numerous organizations including the Michael J. Fox Foundation, the World Federation of Neurology Research Committee on parkinsonism and related disorders, and the National Space Biomedical Research Institute.

7. I have been appointed to the medical/scientific advisory boards of dozens of pharmaceutical and biotech companies. I have served as a consultant to the National Institutes of

Health ("NIH") and the Food and Drug Administration ("FDA"), and testified before congress on issues related to Parkinson's disease.

8. I have served on the editorial boards of several professional journals including *Movement Disorders* and *Parkinsonism and related disorders*, the two largest journals in the field of Parkinson's disease and movement disorders.

9. I have received numerous professional honors and awards for my work, including having served as guest professor and delivering named lectureships at many universities throughout the United States and the world. I have been named in Best Doctors in America and Best Doctors in New York, am an honorary member of the French Neurological Society, and an honorary Professor at the University of London (Royal Free Hospital). I was recently named the most cited Parkinson's disease researcher in the United States in the past decade.

10. My curriculum vitae, which sets forth my professional activities, publications, and invited presentations and awards is provided as Exhibit A to this report.

11. A list of cases in which I have testified over the last five years by deposition or in trial is included in Exhibit B to this report. I am being compensated for my work in connection with this case at my standard consulting rate of $750 per hour. My compensation is in no way dependent on the outcome of the case or any opinions expressed in the case.

## II. BACKGROUND OF THE CASE

12. I understand that Boehringer is the owner of U.S. Patent No. 4,866,812 (which I will refer to as "the '812 Patent" or "the patent-in-suit") and U.S. Patent No. 4,843,086 (which I will refer to as "the '086 Patent"), and that the FDA approved a new drug application for pramipexole (MIRAPEX®) in 1997 for the treatment of the signs and symptoms of idiopathic Parkinson's disease.

# REMAINDER OF EXHIBIT H
# FULLY REDACTED

Case 1:05-cv-00700-JJF   Document 171   Filed 08/16/2007   Page 17 of 18

## CERTIFICATE OF SERVICE

I, Maryellen Noreika, hereby certify that on August 16, 2007, 2006, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will send notification of such filing to the following:

>Mary B. Matterer
>Morris James LLP
>
>Adam Wyatt Poff
>Young, Conaway, Stargatt & Taylor LLP

I further certify that copies of the foregoing document were also served upon the following in the manner indicated:

**BY HAND DELIVERY**

Mary B. Matterer, Esquire
Morris James LLP
500 Delaware Avenue
Wilmington, DE 19801

Adam Wyatt Poff, Esquire
Young, Conaway, Stargatt & Taylor LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801

**BY FEDERAL EXPRESS**

Glenn J. Pfadenhauer, Esquire
Jessamyn S. Berniker, Esquire
Dov P. Grossman, Esquire
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, DC 20005-5901

Shannon M. Bloodworth, Esquire
Heller Ehrman LLP
1717 Rhode Island Ave., NW
Washington, DC 20036

David J. Harth, Esquire
Heller Ehrman LLP
One East Main Street, Suite 201
Madison, WI 53703

>*/s/ Maryellen Noreika (#3208)*
>Maryellen Noreika (#3208)