# EXHIBIT A

LAW OFFICES
## WILLIAMS & CONNOLLY LLP
725 TWELFTH STREET, N.W.

WASHINGTON, D. C. 20005-5901

DOV P. GROSSMAN
(202) 434-5812
dgrossman@wc.com

(202) 434-5000

FAX (202) 434-5029

EDWARD BENNETT WILLIAMS (1920-1988)
PAUL R. CONNOLLY (1922-1978)

August 29, 2007

**VIA FACSIMILE AND FIRST CLASS MAIL**
Amanda Hollis, Esq.
LATHAM & WATKINS LLP
Sears Tower, Suite 5800
Chicago, IL 60606

Re:  **Boehringer Ingelheim International GmbH, et al. v. Barr Laboratories, Inc., et al.**, No. 05-0700 (***) (D. Del.)

Dear Amanda:

I write in response to your letter dated August 27, 2007 regarding Boehringer's Motion to Strike. Because your letter contains several inaccurate statements, I would like to memorialize the following points from our conversations:

When Boehringer first contacted Barr about its motion to strike, Boehringer's position was that it intended to file the motion unless Barr withdrew specific portions of the reply reports proffered by Barr. Boehringer maintained that position in subsequent correspondence and during the parties' pre-filing meet-and-confer. Boehringer never suggested that any alternative resolution of the parties' disagreement would be satisfactory to Boehringer and it never requested Barr's agreement to serve additional expert reports.

In the motion, Boehringer proposed for the first time that it be permitted to file supplemental reports. While Barr believes and continues to believe that Boehringer's motion is frivolous, Barr contacted Boehringer as a result of its request for supplemental reports and stated that it would be willing to allow Boehringer to serve supplemental reports as long as it did not change the schedule for expert depositions. The parties have had difficultly scheduling a number of the expert depositions—including the deposition of Dr. Paul Bartlett, one of the experts you indicated would likely file a supplemental report—and have been forced to agree to extend the deadline for expert discovery as a result. I repeatedly emphasized during our conversations that Barr did not want to delay resolution of this case any further. I also noted that the majority of expert depositions had been scheduled either within or very close to the existing September 14, 2007 deadline for expert discovery, and that Barr wanted to avoid pushing back any depositions that had already been scheduled.

After Barr's initial proposal on August 16, 2007 of three weeks for filing Boehringer's supplemental reports, and Boehringer's counterproposal on August 20 of thirty days from the date of the parties' agreement, I stated during our conversation on August 21 that

**WILLIAMS & CONNOLLY LLP**

Amanda Hollis, Esq.
August 29, 2007
Page 2

Barr was willing to give Boehringer more than three weeks to serve supplemental reports, but that it wanted to receive the reports before the depositions as currently scheduled. Given that Boehringer had indicated that it wanted supplemental reports from Dr. Bartlett and Mr. Walter Holzer, Barr proposed that Boehringer be allowed until noon on Friday, September 14—over four weeks after Barr first contacted Boehringer about serving supplemental reports—to submit an additional report from Dr. Bartlett, whose deposition is scheduled for Tuesday, September 18. Boehringer would have had at least thirty days to prepare a report from Mr. Holzer, as you indicated during our conversations that, due to internal scheduling conflicts at Latham & Watkins, Mr. Holzer's deposition could not proceed on September 12, 2007 as originally proposed, and that it would need to be re-scheduled for October 16, 2007.

During our conversations, you initially indicated that Boehringer would only need supplemental reports from Dr. Bartlett and Mr. Holzer. However, you subsequently stated that Boehringer might also need to file a report from a new expert. I asked you why Boehringer believed it might need an additional expert, as well as what would be the general subject matter of the expert's opinions. You subsequently advised us that Boehringer did not know what additional subjects it might need an expert for, as Boehringer had not contacted its experts to discuss the allegedly improper opinions contained in Barr's reply reports.

Finally, on August 27, 2007, we advised you that, as a result of the documents first provided to us on August 24, 2007, Barr intended to withdraw the report submitted by Dr. Günter Isenbruck. You reiterated that such withdrawal did not change Boehringer's position regarding the motion to strike or the time needed for supplemental reports.

Sincerely,

*Dov P. Grossman*

Dov P. Grossman

cc:  Jack Blumenfeld, Esq. (by fax)
     Josy Ingersoll, Esq. (by fax)
     Mary Materer, Esq. (by fax)
     Shannon Bloodworth, Esq. (by fax)

# EXHIBIT B

9/11/2007 Anslyn, Eric (rough)

This transcript is a ROUGH DRAFT, UNEDITED, UNCERTIFIED TRANSCRIPT ONLY. It contains the raw output from the court reporter's stenotype machine, translated into English by the court reporter's computer, without the benefit of proofreading. It will contain untranslated steno strokes, mistranslations (wrong words), and misspellings. These and any other errors will be corrected in the final transcript. Since this rough draft transcript has not been proofread, the court reporter cannot assume responsibility for any errors.

This rough draft transcript is intended to assist attorneys in their case preparation and is not to be construed as the final transcript. It is not to be read by the witness or quoted in any pleading or for any other purpose and may not to be filed with any court.

---

9/11/2007 Anslyn, Eric (rough)

ROUGH DRAFT

(Exhibit Numbers 316 and 317 were marked for identification and attached to the deposition transcript.)

P R O C E E D I N G S

ERIC ANSLYN, Ph.D., having been duly sworn, testified as follows:

EXAMINATION BY COUNSEL FOR PLAINTIFF:

BY MR. SCHULER:

Q. Good morning, Doctor Anslyn Ken Schuler, on behalf of Boehringer have you ever had your deposition taken before?

A. I have not.

Q. Just a few ground rules. Feel free to tell me if you don't understand one of my questions, and I will be happy to try and rephrase it. The court reporter is going to try and take down all of your testimony and my questions and sometimes obviously we are going to talk about chemical terms with which she may not be all that familiar. So we may have to go slowly and spell some things out. Please answer audibly because the court reporter can only take down what you say.

If at any time you need a break for any reason, just let me know and we will go off the record. I had marked before we started two exhibits and I will hand

---

9/11/2007 Anslyn, Eric (rough)

ROUGH DRAFT

them to you. Could you identify each of those for me, the first one being Exhibit 316?

A. The first is the original expert report submitted in this case. And the second one is my supplemental report.

Q. Just so the record is clear Exhibit 316 is also your expert report, is that right?

MR. PHADENHAUER: Object to the form.

BY MR. SCHULER:

Q. I think you said the original report. You meant the expert report that you signed?

A. Yes, it is.

Q. If at any time today you need to refer to either one of those reports, just let me know. It is not a memory test here. Do you understand generally that your expert reports concern a patent, at least one patent called the 812 patent?

A. Certainly part of my expert report is concerned with the 812 patent.

Q. Generally speaking, can you tell me what the field of the invention is of the 812 patent?

A. May I see the 812 patent, please?

MR. SCHULER: Sure. Doctor Anslyn we have already previously in the case although it is not

---

9/11/2007 Anslyn, Eric (rough)

ROUGH DRAFT

reflected on the document, we have marked this as exhibit 3 you can either refer to it as the 812 patent or Exhibit 3.

A. The 812 patent is considered or focused on an invention that relates to new tetrahydrobenzthiazoles of the general formula and there is a structure, Formula 1 given, wherein a series of specific definitions are given to groups and part of that general formula.

Q. More generally speaking what is the field of the in vention of the 812 patent?

A. The field of the invention is in the general area of organic chemistry.

Q. What is your expertise that you believe that you bring to bear with regard to the issues you have commented on in your two expert reports?

A. My expertise is in the area of organic chemistry.

Q. Now, can you explain for me how you became an expert in the field of organic chemistry?

A. Through a history of obtaining degrees focused on organic chemistry and through my own research focused on organic chemistry and I would be delighted to go through each of those.

Q. And we will go through each of those. Can you

9/11/2007 Anslyn, Eric (rough)

ROUGH DRAFT

2  A.   The chemists here are attempting to group all
3  synthetic methods together that can undergo the lithium
4  aluminum hydride reduction, and did not, therefore,
5  explicitly rule out, you know, whether this could be an
6  acyl group at R2 double prime in trier terminology, but
7  they knew that you would not be placing an acyl group at
8  R2 double prime. It is not one of the allowed
9  substituents there.
10 BY MR. SCHULER:
11 Q.   Okay. But by the plain language of Page 9, it
12 is one of the allowed substituents there, because we are
13 talking about R2 double prime not R2, correct?
14      MR. PHADENHAUER: Object to the form of the
15 question. Object, asked and answered.
16 A.   Ask me again.
17 Q.   Sure. Your answer was they knew you would not
18 be placing an acyl group at the R2 double prime, it is
19 not one of the allowed substituents there. But the plain
20 language on Page 9 does permit it to be one of the
21 substituents at R2 double prime, correct?
22      MR. PHADENHAUER: Object to the form of the
23 question, object asked and answered, object
24 mischaracterizes.
25 A.   Please draw my attention once more to where it

9/12/2007 6:47 PM                                         177

9/11/2007 Anslyn, Eric (rough)

ROUGH DRAFT

2  is you wanted me to focus.
3  BY MR. SCHULER:
4  Q.   Line 2 of Page 9, at least one of the groups,
5  R1 double prime, R2 double prime, R3 double prime or R4
6  double prime represent one of the acyl or phenylacyl
7  groups mentioned hereinbefore, correct?
8  A.   That is an accurate reading.
9  Q.   And you are saying a chemist would disregard
10 the possibility that R2 double prime would be an acyl or
11 phenylacyl group, correct?
12      MR. PHADENHAUER: Object to the form.
13 A.   A chemist, when considering the synthesis of
14 these structures as defined by General Formula 1, could
15 read the fact that in General Formula 1, R1 has acyl
16 groups that upon direct reduction give the alkyl groups
17 listed. It has phenylacyl groups that upon direct
18 reduction gives the phenylalkyl groups mentioned.
19      So the chemist understands that with R1, acyl
20 groups are listed as direct precursors to the alkyl
21 groups of R1, the same one-to-one correspondence occurs
22 wig the alkanoyl and phenylalkanoyl groups in the R3
23 position, and there are terminology within this document
24 where it says acyl groups at positions R1 and R3 are
25 valuable precursors towards the synthesis of alkyl groups

9/12/2007 6:47 PM                                         178

9/11/2007 Anslyn, Eric (rough)

ROUGH DRAFT

2  at those positions, also, R1 and R3.
3       So I believe a chemist skilled in the art when
4  reading this document would limit the synthesis of acyl
5  groups at positions R1 and R3 to giving those alkyl
6  groups as previously defined as R1 and R3.
7  Q.   I didn't ask you, with all due respect, I
8  didn't ask you about R1 I didn't ask you about R3. I
9  asked you about R2 double prime would a chemist disregard
10 the plain language at the top of page 9 with regard to R2
11 double prime being one of the acyl or phenylacyl groups
12 mentioned hereinbefore?
13      MR. PHADENHAUER: Object to the form of the
14 question. Objection asked and answered.
15 A.   I was citing the evidence for R1 and R3 as the
16 background and reason for why I am believing a chemist,
17 when reading this document, would not consider placing an
18 acyl group at those positions and undergoing this
19 reaction sequence.
20      MR. SCHULER: Let's take a break.
21      (Thereupon, there was a recess from 3:50 p.m.
22 to 4:02 p.m.)
23      (Exhibit Number [318] was marked for
24 identification and attached to the deposition
25 transcript.)

9/12/2007 6:47 PM                                         179

9/11/2007 Anslyn, Eric (rough)

ROUGH DRAFT

2  BY MR. SCHULER:
3  Q.   Now, Exhibit 318, we have marked, and it is the
4  expert report of Doctor Paul Bartlett. As I understand
5  it, you compiled Exhibit 317 in response to parts of
6  Doctor Bartlett's report, is that right?
7  A.   In part in response to Doctor Bartlett's
8  report.
9  Q.   Okay. Now, Paragraphs 5 through 10?
10 A.   I'm just checking over and making sure that
11 this is the report.
12 Q.   I apolize. I thought we established that
13 earlier -- oh, you are looking at Doctor Bartlett's
14 report?
15 A.   I was looking at Doctor Bartlett's report.
16      MR. SCHULER: I thought you were looking at
17 your Exhibit 317. I apologize.
18 A.   Should I continue?
19      MR. SCHULER: Sure.
20 A.   Okay.
21 Q.   Turning to Exhibit 317, Paragraph 5, is there
22 any reason you could not have included Paragraph 5 in
23 your original expert report?
24      MR. PHADENHAUER: Object to the form of the
25 question.

9/12/2007 6:47 PM                                         180

9/11/2007 Anslyn, Eric (rough)

ROUGH DRAFT

2  A.  This paragraph was put in here to further
3  clarify the position or the facts and opinions I put
4  forth in my original report with regards to what General
5  Formula 1 of the German applications describes.
6  BY MR. SCHULER:
7  Q.  I understand. Is there any reason you couldn't
8  have put forth that same language and substance in your
9  original expert report?
10      MR. PHADENHAUER: Object to the form of the
11  question.
12  A.  I believe it is a further elaboration and
13  discussion of what were the opinions put forth in the
14  beginning, and, you know, without definitively reading
15  every word here and every word there, I'm not sure I can
16  say whether I could have put this paragraph in the
17  beginning. I might have been able to.
18  BY MR. SCHULER:
19  Q.  Well, it relies on the same documents that you
20  relied on for your original report, correct?
21  A.  It relies on these same documents, but it
22  appears that I'm calling out some very explicit
23  information that I would like it known.
24  Q.  And the same is true of Paragraph 9, correct,
25  you could have included that information in your original

9/12/2007 6:47 PM                                               181

9/11/2007 Anslyn, Eric (rough)

ROUGH DRAFT

2  expert report, correct?
3      MR. PHADENHAUER: Object to the form of the
4  question.
5  A.  I don't think we 100 percent established that I
6  could have put that paragraph, as I said, that I needed
7  to read the entire original expert report and then the
8  opinions set forth here, but they are, indeed, based and
9  we are using the same documents to remember high on. So
10  with that please ask me the question for 9.
11  BY MR. SCHULER:
12  Q.  Paragraph 9 relies on Exhibit 53 and you could
13  have included that information from Exhibit 53 in your
14  original report, correct?
15      MR. PHADENHAUER: Object to the form.
16  A.  This paragraph is there to make a difference
17  with respect to how synthetic Method D is being
18  interpreted, I believe, by Doctor Bartlett and myself.
19  So, you know, without the context under which Doctor
20  Bartlett was interpreting this synthetic method, I'm --
21  BY MR. SCHULER:
22  Q.  Let me ask you this?
23  A.  Please go ahead.
24  Q.  Did you determine at the time you signed your
25  first expert report, that a skilled artisan would

9/12/2007 6:47 PM                                               182

9/11/2007 Anslyn, Eric (rough)

ROUGH DRAFT

2  understand synthetic Method D to describe synthesis of
3  compounds within General Formula 1?
4  A.  Yes.
5  Q.  And you chose not to include the substance of
6  Paragraph 9 despite having come to that conclusion, is
7  that right?
8      MR. PHADENHAUER: Object to the form of the
9  question.
10  A.  Okay. I was looking for Paragraph 45 where I
11  set forth what the conditions of R1 are in General
12  Formula 1, and continue with the description of General
13  Formula 1 here.
14      MR. PHADENHAUER: By Paragraph 45, you are
15  referring to your opening report, Doctor?
16  A.  My opening report. Okay. In formulating the
17  opinion set forth therein, other opinions put in the
18  original document, I certainly knew what was being
19  described in synthetic Method D.
20  BY MR. SCHULER:
21  Q.  Did you also come to the conclusion as of the
22  time you signed Exhibit 316 that a skilled artisan would
23  understand synthetic Method E to describe the synthesis
24  of compounds within General Formula 1?
25  A.  Because I read the German applications quite

9/12/2007 6:47 PM                                               183

9/11/2007 Anslyn, Eric (rough)

ROUGH DRAFT

2  thoroughly, I knew what the synthetic methods disclosed
3  therein were meant to lead to and those are compounds of
4  General Formula 1.
5  Q.  And yet you didn't include the substance of
6  Paragraph 10 in your original report, is that right?
7      MR. PHADENHAUER: Object to the form. Object
8  mischaracterizes, object lack of foundation.
9  A.  In herent in understanding the complete
10  documents of the German applications, I had to read
11  synthetic Methods D and E and I knew what those synthetic
12  methods were oriented towards the synthesis of, General
13  Formula 1 with the described R groups. So this is an
14  example of a conclusion I was able to draw in reading the
15  original documents, the German documents, prior to the
16  original expert report.
17  Q.  Well, I guess what I -- never mind. How many
18  halogen atoms are there that are possible? Let me
19  rephrase that. How many elements fall within the ambit
20  of those containing halogens?
21      MR. PHADENHAUER: Object to the form of the
22  question.
23  A.  You are seeking the names of the -- no, you
24  just asked how many elements are halogens. Five.
25  BY MR. SCHULER:

9/12/2007 6:47 PM                                               184

9/11/2007 Anslyn, Eric (rough)

ROUGH DRAFT

2  Q.  One of them is?
3  A.  Chlorine.
4  Q.  The second one?
5  A.  Oh, fluorine, chlorine, bromine, iodine,
6  astatine.
7  Q.  Astatine has that ever been used in any
8  pharmaceutical compound to your knowledge?
9  A.  I'm not knowledgeable of astatine being used.
10 Q.  Is it radioactive?
11 A.  As as is radioactive.
12 Q.  Does it have a half life is is incredibly
13 short. It has a very short life?
14 Q.  It is not stable?
15 A.  Astatine is only stable for the time period of
16 its half life.
17 Q.  In every day normal parlance a chemist would
18 say I'm working with stable compounds you would not
19 characterize astatine as stable, correct?
20 A.  Okay. Radioactive, chemists who study radio
21 chemistry, I don't know whether they think of astatine as
22 stable relative to some other radioactive element.
23 Q.  Now, the description with regard to phenyl
24 nucleus being substituted in Exhibit 53 refers to three
25 of the five halogen atoms, is that right?

9/12/2007 6:47 PM    185

9/11/2007 Anslyn, Eric (rough)

ROUGH DRAFT

2  A.  Please show me where you are looking.
3  Q.  I don't know. You just quote it. You don't
4  say where it is from?
5  A.  Please show me where you are quoting from.
6  Q.  Paragraph 13 of your supplemental report?
7  A.  Please ask me your question.
8  Q.  Your quotation of the general, the German
9  applications indicates that the inventors disclosed with
10 regard to phenyl nucleus substitution they of the five
11 halogen atoms?
12 A.  I'm discussing that skilled artisan would have
13 the understanding because there are halogen atoms other
14 than fluorine, chlorine and bromine, for example, iodine,
15 that sentence is meant to further elaborate on the prior
16 sentence.
17 Q.  Well, is it an accurate statement to say that
18 Exhibit 53 describes with regard to phenyl nucleus
19 substitution three of the four halogen at operates that
20 potentially could be used in a pharmaceutical compound?
21     MR. PHADENHAUER: Object to form.
22 A.  Specifically at position R3 of General Formula
23 1.
24 BY MR. SCHULER:
25 Q.  But they disclose three of the four that could

9/12/2007 6:47 PM    186

9/11/2007 Anslyn, Eric (rough)

ROUGH DRAFT

2  potentially be used, is that right?
3     MR. PHADENHAUER: Object to the form.
4  A.  Well, it discloses fluorine, chlorine and
5  bromine, and there is a fourth being iodine.
6  Q.  When you hear phenyl subcity tugs of fluorine,
7  chlorine and bromine, do you immediately think those are
8  halogen atoms?
9     MR. PHADENHAUER: Object to the form of the
10 question.
11 A.  A chemist skilled in the art would realize
12 those are halogens.
13 Q.  Would the chemist also know that iodine is also
14 a halogen?
15 A.  A chemist would know that iodine is a halogen.
16 Q.  I have handed you, obviously, Doctor Bartlett's
17 report. Then you have Section B at Page 5 and it
18 continues on to Page 6 of your supplemental report. Can
19 you tell me which paragraphs or which sections of Doctor
20 Bartlett's report Paragraphs 14, 15 and 16 respond to?
21 A.  So Part A of this supplemental report is the
22 focus of the response to Doctor Bartlett's report P. Part
23 B has opinions and facts related to the 086 and 812
24 patents.
25 Q.  Am I to infer from that that Section B is not

9/12/2007 6:47 PM    187

9/11/2007 Anslyn, Eric (rough)

ROUGH DRAFT

2  designed to respond to anything in Doctor Bartlett's
3  report?
4     MR. PHADENHAUER: Object to the form.
5  A.  No, I wouldn't infer that. It is possible that
6  there are opinions set forth in these three paragraphs
7  that have some bearing on opinions that Doctor Bartlett
8  has given.
9  Q.  I began this discussion asking you which part
10 of Doctor Bartlett's report that this Section B responds
11 to and you said Part A focuses on Doctor Bartlett's
12 report Part B has facts and opinions related to the 086
13 and 812 patents I infer the that that Part B has nothing
14 to do with Doctor Bartlett's report if you can tell me
15 which sections of his report that Section B responds to?
16     MR. PHADENHAUER: Object to form.
17 A.  I phrased that Part B has its focus on the 086
18 and 812 patents, supplementing opinions that were given
19 in the original report. But that does not mean that
20 facts and opinions given in these three paragraphs might
21 not have some bearing on opinions that doctor will
22 Bartlett has given.
23 Q.  Well, was this Section B designed to respond to
24 anything that Doctor Bartlett said that made you say I
25 want to respond to that, I'm going to include Paragraphs

9/12/2007 6:47 PM    188

# EXHIBIT C

# LATHAM&WATKINS LLP

Sears Tower, Suite 5800
233 S. Wacker Dr.
Chicago, Illinois 60606
Tel: +312.876.7700  Fax: +312.993.9767
www.lw.com

FIRM / AFFILIATE OFFICES

| | |
|---|---|
| Barcelona | New Jersey |
| Brussels | New York |
| Chicago | Northern Virginia |
| Frankfurt | Orange County |
| Hamburg | Paris |
| Hong Kong | San Diego |
| London | San Francisco |
| Los Angeles | Shanghai |
| Madrid | Silicon Valley |
| Milan | Singapore |
| Moscow | Tokyo |
| Munich | Washington, D.C. |

August 27, 2007

**VIA E-MAIL AND U.S. MAIL**
Dov Grossman, Esq.
Williams & Connolly LLP
725 Twelfth Street, N.W.
Washington, D.C. 20005-5901

Re: *Boehringer Ingelheim International GmbH et al. v. Barr Laboratories, Inc.*, No. 05-0700 (KAJ) (D. Del.)

Dear Dov:

  I write to confirm the results of the parties' recent discussions concerning Boehringer's Motion to Strike Portions of Barr's Expert Reply Reports. On August 16, 2007, you contacted Ken Schuler and proposed a compromise to Boehringer's motion. According to this proposal, Barr would not object to Boehringer's service of expert reports that responded to the new issues raised in Barr's reply reports by September 6, 2007 if Boehringer would agree to withdraw its motion. We understand that the purpose of Barr's offer was to alleviate the prejudice to which Boehringer referred in its motion.

  We subsequently informed you that three weeks was an insufficient amount of time to prepare a series of expert reports and that your offer therefore would not alleviate the prejudice created by Barr's supplemental reports. As a counterproposal, however, we said Boehringer would be willing to withdraw its motion if Barr would not object to the service of responsive expert reports within 30 days of Barr's agreement. We explained that, given that Barr had already scheduled one of its experts' depositions for mid-October, there would still be plenty of time to complete this round of reports and all necessary depositions without extending the schedule for expert discovery more than it had already been extended.

  To date Barr has not agreed to Boehringer's counterproposal. During our last conversation on August 23, 2007 you asked whether Boehringer would submit reports on behalf of any experts who had not submitted a report in this case already. I explained that, because no expert reports are currently due from Boehringer, it has not had any need to confer with its experts or decide who would be able to prepare responsive reports. You ended the call by stating that Boehringer should assume Barr did not agree to its counterproposal if Barr files a response to Boehringer's Motion to Strike.

CH\967063.1

August 27, 2007
Page 2

**LATHAM&WATKINS**LLP

                                      Very truly yours,

                                      Amanda Hollis
                                      of LATHAM & WATKINS LLP

cc:    Jack Blumenfeld, Esq. (by e-mail)
        Mary Matterer, Esq. (by e-mail)
        Josy Ingersoll, Esq. (by e-mail)
        Shannon Bloodworth, Esq. (by e-mail)

CH\967063.1