IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BOEHRINGER INGELHEIM INTERNATIONAL GMBH and BOEHRINGER INGELHEIM PHARMACEUTICAL, INC. | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 05-700 (JJF) |
| v. | ) ) ) | |
| BARR LABORATORIES, INC., | ) ) | |
| Defendant, | ) ) | |
| BOEHRINGER INGELHEIM INTERNATIONAL GMBH and BOEHRINGER INGELHEIM PHARMACEUTICAL, INC. | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 05-854 (JJF) |
| v. | ) ) ) | |
| MYLAN PHARMACEUTICALS, INC., | ) ) | **REDACTED - PUBLIC VERSION** |
| Defendant. | ) | |

## PLAINTIFFS' PROPOSED
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
1201 North Market Street
P. O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
jblumenfeld@mnat.com
mnoreika@mnat.com

*Attorneys for Plaintiffs*
*Boehringer Ingelheim International GmbH and*
*Boehringer Ingelheim Pharmaceuticals, Inc.*

OF COUNSEL:

Steven C. Cherny
LATHAM & WATKINS LLP
885 Third Avenue, Suite 1000
New York, NY 10022-4834
(212) 906-1200

Kenneth G. Schuler
Amanda J. Hollis
Joel Neckers
LATHAM & WATKINS LLP
Sears Tower, Suite 5800
Chicago, IL 60606
(312) 876-7700

Original Filing Date: April 18, 2008

Redacted Filing Date: April 23, 2008
2299189

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

FINDINGS OF FACT ......................................................................................................... 1

I.     Background ............................................................................................................. 1

       A.    The Parties ................................................................................................... 1
       B.    MIRAPEX® and the Patent at Issue .......................................................... 2

II.    Procedural History ................................................................................................ 3

       A.    The Barr and Mylan ANDA Filings .......................................................... 3
       B.    The Instant Action ....................................................................................... 4

III.   Prosecution History of the Patent-in-Suit ........................................................... 5

       A.    The '374 Patent / '947 Application ............................................................ 5
       B.    The '086 Patent / '197 Application ............................................................ 7
       C.    The '812 Patent / '671 Application ............................................................ 9

IV.    Infringement ........................................................................................................... 11

       A.    Pramipexole ................................................................................................. 11
       B.    The Asserted Claims ................................................................................... 13
             1.   Infringement Of Claim 7 .................................................................. 14
             2.   Infringement of Claim 5 .................................................................. 14
             3.   Infringement of Claim 9 .................................................................. 15
             4.   Infringement of Claim 10 ................................................................ 16

V.     Obviousness-Type Double Patenting .................................................................. 16

       A.    Boehringer's Terminal Disclaimer ............................................................ 17
       B.    The Differences Between the Scope of the Claims of the '086 Patent and
             the Scope of the Asserted Claims .............................................................. 18
       C.    Materially Different Uses Pursuant to MPEP § 806.05(h) ..................... 20
       C.    Secondary Considerations of Non-obviousness ....................................... 24

CONCLUSIONS OF LAW ...........................................................................................26

I.      Infringement............................................................................................................26

        A.      Claim 7 .........................................................................................................27
        B.      Claims 5, 9, And 10 .....................................................................................27

II.     Double Patenting....................................................................................................28

        A.      Any Alleged Obviousness-type Double Patenting Was Cured by the
                Terminal Disclaimer ....................................................................................28
        B.      Defendants Failed to Meet Their Burden of Proof ..................................31
        C.      In Any Event, Defendants' Arguments Are Unavailing .......................32
        D.      Secondary Considerations Further Support the Conclusion That the
                Claims of the '812 Patent Are Patentably Distinct From Those of the '086
                Patent.............................................................................................................34
        E.      Section 121 Precludes the Use of the '086 Patent as a Reference ........36

III.    Boehringer Is Entitled To Injunctive Relief.......................................................40

# TABLE OF AUTHORITIES

**CASES**

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
  239 F.3d 1343 (Fed. Cir. 2001)......................................................................................31

*Am. Cyanamid Co. v. U.S. Surgical Corp.*,
  30 U.S.P.Q.2d 1561 (D. Conn. 1992) ............................................................................35

*Applied Materials, Inc. v. Advanced Semiconductor Material Am., Inc.*,
  98 F.3d 1563 (Fed. Cir. 1996)................................................................................... 35-37

*Astellas Pharma, Inc. v. Ranbaxy Inc.*,
  2007 WL 576341 (D.N.J. 2007) ..............................................................................32, 34

*Bott v. Four Star Corp.*,
  675 F. Supp. 1069 (E.D. Mich. 1987).............................................................................29

*Callicrate v. Wadsworth Mfg., Inc.*,
  427 F.3d 1361 (Fed. Cir. 2005).......................................................................................27

*Eli Lilly & Co. v. Medtronic, Inc.*,
  496 U.S. 661 (1990)..................................................................................................27, 32

*Eli Lilly & Co. v. Barr Labs.*,
  251 F.3d 955 (Fed. Cir. 2001)................................................................................... 31-32

*Gen. Foods Corp. v. Studiengesellschaft Kohle mbH*,
  972 F.2d. 1272 (Fed. Cir. 1992).....................................................................................34

*Geneva Pharmaceuticals, Inc. v. GlaxoSmithKline PLC*,
  349 F.3d 1373 (Fed. Cir. 2003).......................................................................................29

*Georgia-Pacific Corp. v. U.S. Gypsum Co.*,
  195 F.3d 1322 (Fed. Cir. 1999).......................................................................................31

*Gerber Garment Tech., Inc. v. Lectra Sys., Inc.*,
  916 F.2d 683 (Fed. Cir. 1990)................................................................................... 36-39

*Glaxo Group Ltd. v. Apotex, Inc.*,
  376 F.3d 1339 (Fed. Cir. 2004).......................................................................................27

*Glaxo, Inc. v. Novopharm Ltd.*,
  110 F.3d 1562 (Fed. Cir. 1997).................................................................................27, 40

*In re Breslow*,
  616 F.2d 516 (C.C.P.A. 1980) ........................................................................32

*In re Bronson*,
  168 F.2d 548 (C.C.P.A. 1948) ........................................................................32

*In re Cady*,
  22 C.C.P.A. 1190, 77 F.2d 106 (C.C.P.A. 1935) ....................................33

*In re Goodman*
  11 F.3d 1046 (Fed. Cir. 1993)........................................................................29

*In Re GPAC*,
  57 F.3d 1573 (Fed. Cir. 1995).......................................................................36

*In re Longi*,
  759 F.2d 887 (Fed. Cir. 1985).......................................................................29

*In re Metoprolol Succinate Patent Litig.*,
  494 F.3d 1011 (Fed. Cir. 2007)................................................................31-32

*In re Robeson*,
  331 F.2d 610 (C.C.P.A. 1964) ........................................................................29

*In re Schroeder*,
  1996 WL 297604 (Fed. Cir. Jun. 6, 1996) ................................................29

*J.T. Eaton & Co. v. Atl. Paste and Glue Co.*,
  106 F.3d 1563 (Fed. Cir. 1997).....................................................................35

*King Pharm., Inc. v. Teva Pharm. USA, Inc.*,
  409 F. Supp. 2d 609 (D.N.J. 2006) .............................................................29

*Lerner v. Ladd*,
  216 F. Supp. 81 (D. D.C. 1962) ...............................................................36-37

*Merck & Co. v. Hi-Tech Pharmacal Co.*,
  482 F.3d 1317 (Fed. Cir. 2007)................................................................29-30

*Michaels of Or. Co. v. Clean Gun, LLC*,
  2002 U.S. Dist. LEXIS 20371 (D. Or. 2002).........................................32

*Miles Lab., Inc. v. Shandon, Inc.*,
  997 F.2d 870 (Fed. Cir. 1993).......................................................................26

*Mirafi, Inc. v. Murphy*,
   14 U.S.P.Q.2d 1337 (W.D.N.C. 1989) ..................................................................35

*Ortho Pharm. Corp. v. Smith*,
   959 F.2d 936 (Fed. Cir. 1992)..........................................................................29

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*,
   348 F. Supp. 2d 713 (N.D. W. Va. 2004) ...........................................................35

*Panduit Corp. v. Dennison Mfg. Corp.*,
   836 F.2d 1329 (Fed. Cir. 1987).........................................................................26

*Perricone v. Medicis Pharm. Corp.*,
   432 F.3d 1368 (Fed. Cir. 2005).....................................................................28-29

*Pfizer Inc. v. Ranbaxy Labs., Ltd.*,
   405 F. Supp.2d 495 (D. Del. 2005)..........................................................31, 33-34

*Pfizer, Inc. v. Teva Pharm. USA, Inc.*,
   No. 2007-1271, 2008 U.S. App. LEXIS 4969 (Fed. Cir. March 7, 2008)..........................38-39

*PIN/NIP, Inc. v. Platte Chem. Co.*,
   304 F.3d 1235 (Fed. Cir. 2002).........................................................................32

*Rockwell Intern. Corp. v. U.S.*,
   37 Fed. Cl. 478 (Fed. Cl. 1997) ........................................................................36

*SRI Int'l v. Matsushita Elec. Corp. of Am.*,
   775 F.2d 1107 (Fed. Cir. 1985).........................................................................26

*Symbol Techs., Inc. v. Opticon, Inc.*,
   935 F.2d 1569 (Fed. Cir. 1991).................................................................31-32, 38-39

*Takeda Pharm. Co., Ltd. v. Dudas*,
   84 U.S.P.Q.2d 1365 (D.D.C. 2007) ...................................................................33

*Technicon Instruments Corp. v. Coleman Instruments Corp.*,
   225 F. Supp. 630 (N.D. Ill. 1966), *aff'd* 385 F.2d 391 (7th Cir. 1967) ...............................29

*Toro Co. v. Deere & Co.*,
   355 F.3d 1313 (Fed. Cir. 2004)..........................................................................27

*Union Carbide Corp. v. Dow Chem. Co.*,
   619 F. Supp. 1036 (D. Del. 1985)....................................................................36-37

*Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*.
    473 F.3d 1173 (Fed. Cir. 2006)...........................................................29

*Vulcan Eng'g Co. v. Fata Aluminum, Inc.,*
    278 F.3d 1366 (Fed. Cir. 2002)...........................................................36

*Warner-Lambert Co. v. Teva Pharms. USA, Inc.,*
    418 F.3d 1326 (Fed. Cir. 2005)....................................................26-28

*Yamanouchi Pharm. Co. v. Danbury Pharmacal, Inc.,*
    231 F.3d 1339 (Fed. Cir. 2000)...........................................................26

## STATUTES, RULES, AND REGULATIONS

37 C.F.R. § 1.321(C)..............................................................................29

21 U.S.C. § 355(j)(2)(A)(vii)(IV)..........................................................3-4

21 U.S.C. § 355.....................................................................................26

35 U.S.C. § 100(b)................................................................................32

35 U.S.C. § 101............................................................................18, 32

35 U.S.C. § 121...........................................................................36-39

35 U.S.C. § 121:....................................................................................36

35 U.S.C. § 156.....................................................................17, 30-31

35 U.S.C. § 156(b)................................................................................17

35 U.S.C. § 253.....................................................................................30

35 U.S.C. § 271(e)................................................................................26

35 U.S.C. § 271(e)(2)......................................................................26-27

35 U.S.C. § 271(e)(4)(A).......................................................................40

35 U.S.C. § 271(e)(4)(B).......................................................................40

35 U.S.C. § 282.....................................................................................31

## INTRODUCTION

Plaintiffs Boehringer Ingelheim International GmbH and Boehringer Ingelheim Pharmaceuticals, Inc. ("Boehringer" or "Plaintiffs') submit these Proposed Findings of Fact and Conclusions of Law.  To the extent that any issue of law is deemed to be an issue of fact, it should be so considered, and to the extent that any issue of fact is deemed to be one of law, it should be so considered.  Boehringer reserves its right to supplement its Proposed Findings of Fact and Conclusions of Law, as necessary.

## FINDINGS OF FACT

**I.    BACKGROUND**

**A.    The Parties**

1.    Plaintiff Boehringer Ingelheim International GmbH is a corporation organized and existing under the laws of Germany, having an office and place of business at Binger Strasse 173, 55216 Ingelheim, Germany.  *See* D.I. 190, at Ex. 1, ¶ 1.

2.    Plaintiff Boehringer Ingelheim Pharmaceuticals, Inc. is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 900 Ridgebury Road, Ridgefield, Connecticut 06877.  *See* D.I. 190, at Ex. 1, ¶ 2.

3.    Barr Laboratories, Inc. ("Barr") is a corporation organized and existing under the laws of the State of Delaware, having a principal place of business at 2 Quaker Road, Pomona, New York 10970.  *See* D.I. 190, at Ex. 1, ¶ 3.

4.    Mylan Pharmaceuticals Inc. ("Mylan") is a corporation incorporated under the laws of the State of West Virginia, having a principal place of business at 781 Chestnut Ridge Road, Morgantown, West Virginia, 26504.  *See* D.I. 190, at Ex. 1, ¶ 4.

B.     **MIRAPEX® and the Patent at Issue**

5.     United States Patent No. 4,886,812 ("the '812 patent"), entitled "Tetrahydro-Benzthiazoles, The Preparation Thereof and Their Use as Intermediate Products or as Pharmaceuticals," issued on December 12, 1989 to Dr. Karl Thomae GmbH of Biberach an der Riss, Germany, the assignee of the named inventors, Gerhart Griss, Claus Schneider, Rudolf Hurnaus, Walter Kobinger, Ludwig Pichler, Rudolf Bauer, Joachim Mierau, Dieter Hinzen and Gunter Schingnitz. *See* D.I. 190, at Ex. 1, ¶ 5.

6.     Plaintiff Boehringer Ingelheim International GmbH is the assignee and record owner of the '812 patent. *See* TX 406; TX 426; TX 509; TX 546.

7.     United States Patent No. 4,843,086 ("the '086 patent"), entitled "Tetrahydro-Benzthiazoles, The Preparation Thereof and Their Use as Intermediate Products or as Pharmaceuticals," issued on June 27, 1989 to Dr. Karl Thomae GmbH of Biberach an der Riss, Germany, the assignee of the named inventors, Gerhart Griss, Claus Schneider, Rudolf Hurnaus, Walter Kobinger, Ludwig Pichler, Rudolf Bauer, Joachim Mierau, Dieter Hinzen and Gunter Schingnitz. *See* TX 2.

8.     Plaintiff Boehringer Ingelheim International GmbH is the assignee and record owner of the '086 patent. *See* TX 426; TX 546.

9.     MIRAPEX® is a trade name for a pharmaceutical product marketed by Boehringer that is covered by certain claims of the '812 patent. *See* TX 419; TX 99 at BARR909.

10.     MIRAPEX® was approved by the United States Food and Drug Administration ("FDA") for the treatment of the signs and symptoms of idiopathic Parkinson's disease on July 1, 1997. *See* D.I. 190, at Ex. 1, ¶ 7.

11.     In November 2006, MIRAPEX® also was approved for the treatment of moderate-to-severe Restless Leg Syndrome ("RLS"), an often disabling condition consisting of an urge to involuntarily move the legs.  *See* TX 419.

12.     Plaintiff Boehringer Ingelheim Pharmaceuticals, Inc. is the holder of NDA No. 020667 for MIRAPEX®.  *See* TX 406; TX 426; TX 509; TX 546.

13.     Boehringer manufactures and sells MIRAPEX® in the United States.  *See* TX 513 at 56; Trial Tr. (Vol. 2), D.I. 207, at 410:11-411:12.

## II.     PROCEDURAL HISTORY

### A.     <u>The Barr and Mylan ANDA Filings</u>

14.     Barr is the owner of Abbreviated New Drug Application ("ANDA") No. 77-724, which was submitted under section 505(j) of the Federal Food, Drug, and Cosmetic Act, and seeks approval to engage in the commercial manufacture, use and sale of generic pramipexole dihydrochloride tablets in 0.125, 0.25, 0.5, 1.0 and 1.5 mg strengths ("Barr's proposed product") prior to the expiration of the '812 patent.  *See* D.I. 190, at Ex. 1, ¶ 14; TX 406 at 2

15.     In its ANDA, Barr certified pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV) that the '812 patent is invalid and/or will not be infringed by Barr's proposed product.  *See* TX 406; TX 508.

16.     Mylan is the owner of ANDA No. 77-854, which was submitted under section 505(j) of the Federal Food, Drug and Cosmetic Act, and seeks approval to engage in the commercial manufacture, use and sale of generic pramipexole dihydrochloride tablets in 0.125, 0.25, 0.5, 1.0 and 1.5 mg strengths ("Mylan's proposed product") prior to the expiration of the '812 patent.  *See* D.I. 190, at Ex. 1, ¶ 11; TX 509 at 1.

17.     In its ANDA, Mylan certified pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV) that the '812 patent is invalid and/or will not be infringed by Mylan's proposed product.  *See* TX 509.

18.     Barr and Mylan are likely to market their proposed products prior to the expiration of the '812 patent.  *See* TX 406 at 2; TX 509 at 1; Trial Tr. (Vol. 2), D.I. 207, at 563:1-565:10; D.I. 192.

### B.     The Instant Action

19.     By letters dated August 10, 2005 and September 12, 2005 ("Barr's Notice Letter"), Barr advised Boehringer that Barr had submitted ANDA No. 77-724.  *See* TX 406.

20.     Boehringer brought C.A. No. 05-700 (JJF) on September 26, 2005, within 45 days of receiving Barr's August 10, 2005 letter, asserting infringement of both the '086 patent and the '812 patent.  *See* D.I. 190, at § I ¶ 1, 2.  The '086 patent has expired and only the '812 patent remains in suit.  *See* D.I. 190, at § I ¶ 1.

21.     In its Answer and Counterclaims to the Amended Complaint (D.I. 8) filed on October 28, 2005, Barr denied that its proposed product would infringe any valid claim of the '812 patent and alleged as a defense that the claims of the '812 patent are invalid.  Barr also asserted counterclaims seeking declarations of noninfringement and invalidity of the claims of the '812 patent.  *See* D.I. 190, at § I ¶ 5.

22.     On November 9, 2006, Barr filed an Amended Answer & Counterclaims asserting that the claims of the '812 patent were unenforceable due to inequitable conduct.  *See* D.I. 190 at § I ¶ 7; D.I. 177.  By Stipulation dated November 2, 2007, the Court dismissed Barr's inequitable conduct counterclaim with prejudice.  *See id*; D.I. 177.

23.     By letter dated October 26, 2005 ("Mylan's Notice Letter"), Mylan advised Boehringer that Mylan had submitted ANDA No. 77-854.  *See* D.I. 190, at § I ¶ 9.

24.     Boehringer brought C.A. No. 05-854 (JJF) on December 12, 2005, asserting infringement of the '812 patent based on Mylan's filing of ANDA No. 77-854.  *See* D.I. 190, at §

I ¶¶ 8, 10. The '086 patent has expired and only the '812 patent remains in suit. *See* D.I. 190, at § I ¶ 1.

25.    By order of January 31, 2006 (D.I. 33), the actions against Barr and Mylan were consolidated. *See* D.I. 190, at § I ¶ 16.

## III.    PROSECUTION HISTORY OF THE PATENT-IN-SUIT

### A.    The '374 Patent / '947 Application

26.    Pramipexole falls within a class of compounds known as "tetrahydrobenzthiazoles." *See* D.I. 190 at Ex. 1, ¶ 8. On December 15, 1985, Boehringer first applied for patent protection in the United States by filing a patent application relating to different classes of new tetrahydrobenzthiazole compounds invented by the applicants during the 1980s, including pramipexole. *See* TX 46 at 3.

27.    This first application—the grandparent of the '812 patent—was U.S. Patent Application No. 06/810,947 ("the '947 application"). *See* TX 46; D.I. 190, at Ex. 1, ¶ 17.

28.    As filed, the '947 application included 15 claims variously directed to compounds (including pramipexole), methods of use, and methods of preparation. *See* TX 46 at 48-52.

29.    Examiner Ceperley was the examiner of the '374 patent. *See* TX 46 at 201.

30.    On September 4, 1986, the United States Patent and Trademark Office ("PTO"), through Examiner Ceperley, imposed the following restriction requirement:

Restriction to one of the following inventions is required under 35 U.S.C. § 121:

I.    Claims 1-8 (at least part of each), drawn to benzothiazole compounds and a pharmaceutical composition, classified in Class 548, subclasses 161, 163 and 164.

II.    Claims 1-5 and 8-10 (at least part of each), drawn to pyrrolidinyl-substituted benzothiazole compounds and a pharmaceutical composition, classified in Class 514, subclass 367.

III.      Claims 1-4 and 8 (at least part of each), drawn to piperidinyl-substituted benzothiazole compounds and a pharmaceutical composition, classified in Class 546, subclass 192.

IV.      Claims 1-4 and 8 (at least part of each), drawn to hexamethylimino substituted benzothiazole compounds and a pharmaceutical composition, classified in Class 540, subclass 603.

V.      Claims 1-4 and 8 drawn (at least part of each) [to] morpholinyl-substituted benzothiazole compounds and a pharmaceutical composition classified in class 544, subclass 135.

VI.      Claim 14, drawn to a method of preparing benzothiazole compounds using a thiourea reactant.

VII.      Claim 15, drawn to a method of preparing benzothiazole compounds using a disulfide reactant classified based on type of compound formed.

VIII.      Claims 9 and 10, drawn to a method of lowering blood pressure or heart rate classified based on type of compound used.

IX.      Claims 11 and 12, drawn to a method of treating Parkinsonism, classified based on type of compound used.

X.      Claim 13, drawn to a method for treating schizophrenia, classified based on type of compound used.

*See* TX 46 at 198-99.

31.      The examiner concluded that each of the compound groups I-V were patentably distinct from (i) each other, (ii) each of the claimed methods of manufacture in groups VI-VII, and (iii) each of the claimed methods of use in groups VIII-X.  TX 46 at 198-201.

32.      Examiner Ceperley explained that her restriction requirement was based in part on Section 806.05(h) of the PTO's Manual of Patent Examining Procedure:

> The inventions are distinct if either (1) the process for using the product as claimed can be practiced with another and materially different product, or (2) the product as claimed can be used in a materially different process of using the product. MPEP 806.05(h).

> In this case, the compounds could be used in each of the materially different processes as set forth in VIII-X.

TX 46 at 199-200.

6

33.     Examiner Ceperley requested the applicants to elect a subset of then-pending claims and permitted Boehringer to combine some of the groups, indicating that "[a]pplicants must elect either (A) one of the compound groups I-V and one of the utility groups VIII-X (composition and utility to be limited to elected compound type for examination) or (B) one of the process groups VI and VII." *Id.* at 200.

34.     In response to the restriction requirement, Boehringer elected "to prosecute claims directed to the invention of Group II (pyrrolidinyl-substituted benzothiazoles) and to the invention of Group IX (a method for treating Parkinsonism)." TX 46 at 202.

35.     In their Response, the applicants explicitly "reserve[d] the right to prosecute claims to the unelected subject mater in divisional applications." TX 46 at 202.

36.     The elected claims ultimately issued as U.S. Patent No. 4,731,374 ("the '374 patent") on March 15, 1988. *See* TX 46; D.I. 190, at Ex. 1, ¶ 17.

###     B.     The '086 Patent / '197 Application

37.     On November 23, 1987, while the '974 application was still pending, Boehringer filed U.S. Application No. 07/124,197 ("the '197 application"), as a divisional application to the '947 application. *See* TX 2; TX 46; TX 286 at 73; D.I. 190, at Ex. 1, ¶ 18.

38.     Because the '197 application was a divisional of the '947 application, as required it contained "a complete copy of the prior" '974 application, including the fifteen originally-filed claims. *See* TX 46; TX 286 at 64-68.

39.     The '197 application was examined by Examiner Gerstl. *See* TX 46; TX 286 at 76-78. The applicants advised Examiner Gerstl that the parent '947 application was examined by Examiner Ceperley. *See* TX 46 at 72.

40.     In the first Office Action, Examiner Gerstl allowed claims 6, 7, 9, 10 and 13 but rejected claim 14 under § 103 and claims 1-5, 8, 11, 12 and 15 of the '197 application "under the

judicially created doctrine of obviousness-type double patenting as being unpatentable over the prior invention as set forth in claim 1 of U.S. patent no. 4731374." *See* TX 286 at BARR504.

41.    During the course of prosecution, Boehringer discovered European Patent Application No. 207,696, published July 1, 1987, filed by Eli Lilly ("the European Lilly application") that disclosed a subgenus of some the tetrahydrobenzthiazole compounds claimed in the '197 application (as originally filed). *See* TX 286 at BARR598-600. The European Lilly application did not constitute prior art to the '197 application because its publication date was later than Boehringer's effective filing date. *Id.*

42.    The European Lilly application claimed priority to an earlier U.S. Application, Serial No. 747,748 ("the Lilly '748 application"). TX 286 at BARR599. The filing date of the Lilly '748 application was after the effective filing date of the '197 application. *Id.*

43.    Boehringer responded to Examiner Gerstl's first office action in the '197 application with an amendment that cancelled all 15 claims (including those that had been allowed) and added "new claims 16-56." *See* TX 286 at BARR578-600.

44.    The new claims were directed to methods of using tetrahydrobenzthiazole compounds to treat various medical conditions (Groups VIII-X of the September 11, 1986 restriction requirement) and omitted reference to pyrrolidino compounds with respect to methods of treating Parkinson's disease. *See* TX 286 at BARR578-598.

45.    In its remarks, Boehringer explained that it had discovered the European Lilly application as well as the Lilly '748 application, which potentially could have led to the discovery of interfering subject matter. *See* TX 286 at BARR598-600.

46.    Boehringer went on to state that:

> In view of the particular pertinence of U.S. Patent Application Serial No.
> 747,748 to claims 1-8, these claims have been cancelled and will be

> reinstated in a divisional application under 37 CFR 1.60.  It is believed that so doing will advance the prosecution of the above-captioned application and that issues presented by this reference will be more easily dealt with in said divisional application.

*See* TX 286 at BARR600.

47.    Boehringer noted that "[n]one of the new claims are directed to the subject matter of former claims 1-8" (covering compounds), but that the applicants "reserve the right to present claims directed to the subject matter of these cancelled claims in a divisional application, under 37 CFR 1.60."  *See* TX 286 at BARR593.

48.    In its Response, Boehringer also responded to Examiner Gerstl's obviousness-type double patenting rejection of claims 11 and 12.  *See* TX 286 at BARR578-600.  Boehringer argued that the parent '947 application "was made subject to a restriction requirement" such that "the '374 patent cannot be applied as a reference to support an obviousness-type double patenting rejection."  *Id.* at BARR595.

49.    Examiner Gerstl asserted no objection to Boehringer's plan to pursue the compound claims in a divisional application.  *See* TX 286 *at passim*.

50.    Examiner Gerstl issued a Notice of Allowability, and the '086 patent issued on June 27, 1989.  *See* TX 2; TX 286 at BARR601; D.I. 190, at Ex. 1, ¶ 18.

**C.    The '812 Patent / '671 Application**

51.    The application that ultimately issued as the '812 patent ("the '671 application") was filed on October 12, 1988, as a divisional of the pending '197 application.  *See* TX 99 at BARR674; D.I. 190, at Ex. 1, ¶ 20.

52.    The '812 patent was examined by Examiner Gerstl, who at the time was also examining the '197 patent application.  *See* TX 2; TX 99.

9

53.     The '671 application was filed while the '197 patent application was still pending. *See* TX 46; TX 99; TX 286.

54.     Because the '671 application was a divisional of the pending '197 application, it contained a complete copy of the '197 application, including the fifteen originally set out in the '197 and '947 applications.  *See* TX 99 at BARR662-66.

55.     Shortly after filing the '671 application, the applicants filed a preliminary amendment cancelling all of the claims directed to methods of making and using tetrahydrobenzthiazoles (claims 9-15) and amending the remaining compound claims 1-8 to delete all references to "pyrrolidino" compounds.  *See* TX 99 at BARR677.

56.     The applicants explained that the preliminary amendment was "intended to exclude from the claims subject matter already patented in U.S. Patent 4,731,374 and that [is] pending in Serial No. 124,197 filed November 23, 1987."  TX 99 at BARR677.

57.     Claims 1-8 ultimately issued as claims 1-8 of the '812 patent.  *See* TX 3; TX 99.

58.     In a Second Preliminary Amendment, Boehringer added two additional compound claims designated "new claims 16 and 17," which were "directed to a subgeneric aspect of the invention not previously claimed."  TX 99 at BARR678-679.

59.     Claims 16 and 17 issued as claims 9 and 10 of the '812 patent.  *See* TX 3; TX 99.

60.     As a result of the applicants' preliminary amendments, the '671 application claimed a subset of the inventions originally claimed in the grandparent '947 application that did not overlap with the subject matter claimed in the '374 and '086 patents.  *See* TX 1; TX 2; TX 3.

61.     In the first Office Action, Examiner Gerstl rejected claims 1-5 and 8 of the '671 application under the judicially created doctrine of obviousness-type double patenting over claims 1-7 of the '374 patent.  *See* TX 99 at BARR776.

10

62.    Examiner Gerstl simultaneously allowed claim 7, which was directed to "2-Amino-6-n-propyl-amino-4,5,6,7 tetrahydrobenzothiazole, or a pharmaceutically acceptable acid addition salt thereof."  *See* TX 99 at BARR776-77.

63.    At a May 4, 1989 interview, the applicants reached agreement with the Examiner that the double patenting rejection would be withdrawn on the basis that the claims were not directed to "pyrrolidino" compounds and, accordingly, were "not directed to the same subject matter as those of the '374 patent."  *See* TX 99 at BARR786.

64.    The applicants further noted in the prosecution of the '671 application that "[i]mplicit in the above mentioned restriction requirement was a finding by the examiner in charge of the prior application that the ten inventions set forth in the requirement are not obvious, one over the other" such that the double patenting rejection was improper, and recited their "understanding . . . that the obviousness-type double patenting rejection will be withdrawn and that no terminal disclaimer need be filed."  TX 99 at BARR786.

65.    Soon thereafter, the Examiner allowed the claims of the '671 application, and the '812 patent issued on December 12, 1989.  *See* TX 3; TX 99 at BARR789.

66.    The claims of the '812 patent belong to no claim Groups identified by the PTO as directed to distinct inventions that were prosecuted to issuance in either the '086 or '374 patents. *See* TX 1; TX 2; TX 3.

## IV.    INFRINGEMENT

### A.    <u>Pramipexole</u>

67.    The active ingredient in MIRAPEX® is pramipexole dihydrochloride.  *See* D.I. 190, at Ex. 1, ¶ 8.

68.    Pramipexole is a member of a group of compounds generally referred to as "tetrahydro-benzthiazoles," or "tetrahydrobenzthiazoles."  *See* D.I. 190, at Ex. 1, ¶ 8.

11

69.    Pramipexole has the following structure:



pramipexole

*See* TX 419.

70.    The chemical name of pramipexole dihydrochloride is (S)-2-amino-4,5,6,7-tetrahydro-6-(propylamino)benzthiazole dihydrochloride monohydrate. *See* TX 419.

71.    Pramipexole dihydrochloride is a dihydrochloride salt of (S)2-Amino-6-n-propylamino-4,5,6,7-tetrahydrobenzthiazole. *See* D.I. 190, at Ex. 1, ¶ 10.

72.    There are two enantiomers of 2-Amino-6-n-propylamino-4,5,6,7-tetrahydro-benzthiazole. *See* D.I. 190, at Ex. 1, ¶ 9.

73.    Pramipexole is the S-enantiomer, which corresponds in this case to (-)2-Amino-6-n-propylamino-4,5,6,7-tetrahydrobenzthiazole. *See* D.I. 190, at Ex. 1, ¶ 9.

74.    The R-enantiomer corresponds in this case to (+)2-Amino-6-n-propylamino-4,5,6,7-tetrahydrobenzthiazole. *See* D.I. 190, at Ex. 1, ¶ 9.

75.    When MIRAPEX® or pramipexole is administered and ingested, it dissociates in the gastrointestinal system into a mixture of three forms of the free base which are in dynamic equilibrium with each other. *See* Trial Tr. (Vol. 1), D.I. 206, at 231:20-232:14.

76.    The three forms of the free base include an unprotonated free base, a monoprotonated free base, and a diprotonated free base. *See* Trial Tr. (Vol. 1), D.I. 206, at 232:2-14.

77.    Only the unprotonated free base is able to effectively cross biological barriers such as intestinal mucosa and the blood-brain barrier, which is essential for the ability of pramipexole to exert its therapeutic effect.  *See* Trial Tr. (Vol. 1), D.I. 206, at 232:15-233:3.

78.    The active ingredient in each of the Barr and Mylan proposed products is pramipexole dihydrochloride.  *See* D.I. 190, at Ex. 1, ¶ 12, 15.

79.    Barr makes explicit in its Notice Letter, ANDA, and proposed labeling that the active ingredient in Barr's proposed product is the S-enantiomer of 2-Amino-6-n-propylamino-4,5,6,7-tetrahydrobenzthiazole.  *See* TX 277; TX 406.

80.    The chemical structure of the pramipexole dihydrochloride in Barr and Mylan's proposed products is the same as the chemical structure of the active ingredient in MIRAPEX®.  *See* Trial Tr. (Vol. 1), D.I. 206, at 233:18-24.

81.    Barr's ANDA discloses that its pramipexole dihydrochloride tablets "contain pramipexole."  *See* Trial Tr. (Vol. 1), D.I. 206, at 248:2-11; TX 277 at 11.

82.    Mylan makes explicit in its ANDA, Notice Letter, and proposed labeling that the active ingredient in its proposed product is the S-enantiomer of 2-Amino-6-n-propylamino-4,5,6,7-tetrahydrobenzthiazole.  *See* TX 752, TX 755; TX 509.

83.    Mylan's ANDA discloses that its pramipexole dihydrochloride tablets "contain pramipexole."  *See* Trial Tr. (Vol. 1), D.I. 206, at 248:12-249:3; TX 752 at MYL3933; TX 755 at MYL2179R.

### B.    The Asserted Claims

84.    The '812 patent contains ten claims, nine of which are directed to compounds, while claim 8 is directed to a "pharmaceutical composition."  *See* TX 3 at claims 1-10.

85.    Boehringer is asserting Claims 5, 7, 9 and 10 of the '812 patent against Barr and Mylan in this action.  *See* D.I. 190, at § I ¶ 14.

86.     In response to Boehringer's contention interrogatories seeking their bases for asserting noninfringement, Mylan did not contest infringement of any asserted claim and Barr only contested infringement of claim 7, the claim it now admits infringing.  *See* TX 406; TX 407 at 8; TX 509; TX 413 at 3; TX 536 at 2.

87.     Neither Barr nor Mylan submitted any expert report disputing infringement, nor did they put on any evidence at trial in response to Boehringer's evidence of infringement.

### 1.     Infringement Of Claim 7

88.     Claim 7 of the '812 patent is directed to "2-Amino-6-n-propylamino-4,5,6,7-tetrahydrobenzthiazole, or a pharmaceutically acceptable addition salt thereof."  *See* TX 3 at 15.

89.     Both Barr and Mylan have stipulated that by filing ANDAs seeking approval to engage in the commercial manufacture, use, and sale of their proposed products prior to the expiration of the '812 patent, they have infringed claim 7 of the '812 patent.  *See* D.I. 190, at Ex. 1, ¶¶ 13-16

### 2.     Infringement of Claim 5

90.     Claim 5 of the '812 patent is directed to a "tetrahydro-benzthiazole of formula Ia, as claimed in claim 3, wherein $R_1$ and $R_2$ together with the nitrogen atom between them form an amino or allylamino group; and, $R_3$ and $R_4$ together with the nitrogen atom between them form a dimethylamino, diethylamino, N-allyl-N-(4-chloro-benzyl)-amino, n- propylamino or group."  *See* TX 3 at Claim 5.

91.     Claim 3 of the '812 patent is directed to a "tetrahydro-benzthiazole of the formula:



(Ia)

Wherein $R_1$ is a hydrogen atom, an alkyl group having 1 to 3 carbon atoms, an allyl, benzyl, 2-chloro-benzyl, 4-chloro-benzyl, 3,4-dichloro-benzyl or phenyl-ethyl group; $R_2$ is a hydrogen atom, a methyl or ethyl group; $R_3$ is a hydrogen atom, an alkyl group with 1 to 6 carbon atoms, an allyl, propargyl, benzyl, chlorobenzyl, phenylethyl, cyclopentyl or cyclohexyl group; and $R_4$ is a hydrogen atom, an alkyl group having 1 to 3 carbon atoms or an alkyl group; or $R_3$ and $R_4$ together with the nitrogen atom between them form a piperidino, hexamethyleneimino or morpholino group; or, a pharmaceutically acceptable acid addition salt thereof." TX 3 at claim 3.

92.     Claim 5 of the '812 patent references and is dependent from claim 3 of the '812 patent. *See* Trial Tr. (Vol. 1), D.I. 206, at 235:1-236:4, 239:13-240:23; TX 3.

93.     Dependent claim 5 of the '812 patent specifies that $R_1$ and $R_2$ together with the nitrogen atom between them form an amino or allylamino group, and $R_3$ and $R_4$ together with the nitrogen atom between them form a dimethylamino, diethylamino, N-allyl-N-(4-chloro-benzyl)-amino, or an n-propylamino group. *See* TX 3; Trial Tr. (Vol. 1), D.I. 206, at 239-40.

94.     The pramipexole dihydrochloride in the Barr and Mylan proposed products is a tetrahydrobenzthiazole of formula Ia of claim 3 wherein $R_1$ and $R_2$ together with the nitrogen atom between them form an amino group and $R_3$ and $R_4$ together with the nitrogen atom between them form an n-propylamino group. *See* Trial Tr. (Vol. 1), D.I. 206, at 236:2-4. Additionally, dihydrochoride is widely known to be a pharmaceutically acceptable salt. *See, e.g.,* TX 3 at 6:57-62. Accordingly, both the Barr and Mylan proposed products contain a compound that falls within the scope of Claim 5 of the '812 patent. *See* Trial Tr. (Vol. 1), D.I. 206, at 239-41.

### 3.     Infringement of Claim 9

95.     Claim 9 of the '812 patent is directed to a "tetrahydrobenzthiazole of the formula

wherein R is an alkyl group with 1 to 7 carbon atoms, a cycloalkyl group having 3 to 7 carbon atoms, an alkenyl or alkynyl group having 3 to 6 carbon atoms, an alkanoyl group having 1 to 7 carbon atoms or a phenyl alkyl or phenyl alkanoyl group having 1 to 3 carbon atoms in the alkyl moiets, wherein the phenyl nucleus may be substituted by fluorine, chlorine or bromine atoms." TX 3 at claim 9.

96.     The pramipexole dihydrochloride contained in the Barr and Mylan proposed products falls within claim 9 of the '812 patent because pramipexole is a tetrahydrobenzothiazole of the formula depicted in claim 9 wherein R is an alkyl group having 3 carbon atoms.  The Barr and Mylan proposed products therefore contain a compound that falls within the scope of claim 9 of the '812 patent.  *See* Trial Tr. (Vol. 1), D.I. 206, at 241:1-3.

### 4.     Infringement of Claim 10

97.     Claim 10 of the '812 patent is directed to "[t]he compound of claim 9 wherein R is an alkyl group having 1 to 7 carbon atoms."  *See* TX 3 at 15.  Pramipexole is such a compound, having an alkyl group with three carbon atoms.  *See* Trial Tr. (Vol. 1), D.I. 206, at 242:7-20.

98.     The Barr and Mylan proposed products fall within the scope of Claim 10 of the '812 patent.  *See* Trial Tr. (Vol. 1), D.I. 206, at 242:7-243:10.

## V.     OBVIOUSNESS-TYPE DOUBLE PATENTING

99.     The Defendants assert that each of claims 3, 4, 5, 7, 9, and 10 of the '812 patent is invalid under the doctrine of obviousness-type double patenting over the claims of the '086

16

patent. *See* D.I. 190, at Ex. 3, § II ¶ 2. The Defendants' theory focuses primarily on claims 9, 19, 29, and 39 of the '086 patent.

### A. Boehringer's Terminal Disclaimer

100. Under the Hatch-Waxman Act, the term of a patent covering a new drug can be extended for up to five years to compensate for any time taken by the regulatory approval process that deprives a patent holder of the full benefit of a patent. *See* 35 U.S.C. § 156.

101. The '812 patent was initially scheduled to expire on December 12, 2006. *See* TX 99 at BARR000909. Boehringer applied for a patent term extension for the '812 patent term pursuant to 35 U.S.C. § 156. *See* TX 99 at BARR000909-912. On October 13, 1999, the PTO determined that, "[s]ince it appears that the requirements of the law have been met, this certificate extends the term of the ['812] patent for the period of 1,564 days from December 12, 2006, the original expiration date of the patent . . . with all rights pertaining thereto as provided by 35 U.S.C. § 156(b)." *Id.* at BARR000912.

102. The 1,564-day extension resulted in a March 25, 2011 expiration date for the '812 patent. *See* TX 458. The '086 patent expired on June 27, 2006. *See* TX 2.

103. Defendants have never contested the validity of the 1,564-day extension Boehringer received pursuant to Section 156. *See* TX 406; TX 407; TX 409; TX 412; TX 413; TX 509.

104. During the course of trial, on March 13, 2008, Boehringer filed a Terminal Disclaimer with the PTO which provides, in pertinent part:

> Pursuant to 35 U.S.C. § 253 and the Federal Circuit's decision in *Merck & Co. v. Hi-Tech Pharmacal Co.,* 482 F.3d 1317, 1324 (Fed. Cir. 2007) that a patent term extension under § 156 may be applied to a patent subject to a terminal disclaimer, Boehringer hereby disclaims, except as provided below, only the terminal part of the statutory term of the '812 patent which would extend beyond 1,564 days after the full statutory term of the '086

17

patent as that term is defined in 35 U.S.C. § 154, so that, by virtue of this disclaimer, the '812 patent will expire on October 8, 2010.

TX 548 at 1.

### B. The Differences Between the Scope of the Claims of the '086 Patent and the Scope of the Asserted Claims

105.    The claims of the '086 patent and the '812 patent are directed to different statutory subject matter under 35 U.S.C. § 101.  Each of the claims of the '086 patent is directed to a method of use, while the claims of the '812 patent are directed to compositions of matter, specifically pharmaceutical compounds.  *See* TX 2 at claims 1-40; TX 3 at claims 1-10; Trial Tr. (D.I. 207), at 504:22-505:11.

106.    The '086 patent claims are directed to four specific methods of using certain tetrahydrobenzthiazoles – a method of lowering blood pressure, a method of lowering heart rate, a method of treating Parkinson's disease or Parkinsonism, and a method of treating schizophrenia.  *See* TX 2 at claims 1-40.  They do not claim any compounds and particularly do not claim any compound encompassed within the claims of the '812 patent.  *See id.*

107.    Accordingly, the subject matter of the '086 patent is addressed to physicians, particularly those involved in treating the specific enumerated disorders, *i.e.*, Parkinson's disease, Parkinsonism, schizophrenia, elevated heart rate, or high blood pressure.  *See* TX 2 at 29-32; Trial Tr. (Vol. 3), D.I. 208, at 686:5-688:5.  By way of contrast, the '812 patent, which claims only compounds, is directed to medicinal chemists.  *See* Trial Tr. (Vol. 1), D.I. 206, at 222:8-10.

108.    Each of the claims identified by the Defendants as a predicate for the double patenting defense contains the limitation that the method utilizes "a therapeutically effective amount."  *See* TX 2 at claims 7-10, 17-20, 23, 27-30, 37-40.  The asserted claims of the '812 patent contain no such limitation.  *See* TX 3 at claims 5, 7, 9 & 10.

109.    The utility of the claims of the '086 patent is limited to for the enumerated methods of use – the treatment of Parkinson's disease, Parkinsonism, schizophrenia, elevated heart rate, or high blood pressure. *See* TX 2 at claims 1-40.

110.    By way of contrast, the utility of the compounds claimed in the '812 patent lies with the properties of the claimed compounds, including pramipexole itself. *See* TX 3, at claims 1-10. Pramipexole can be used to treat a number of medical conditions other than those claimed in the '086 patent. *See* TX 3 at 14-15; Trial Tr. (Vol. 1), D.I. 206, at 54:21-55:12; Trial Tr. (Vol. 2), D.I. 207 at 363:7-364:3; TX 302; TX 460; TX 461; TX 465; TX 467; TX 469; TX 471; TX 472; TX 480; TX 483; TX 485; TX 486. Thus, the claims of the '086 patent and the '812 patent have different utilities. *Compare* TX 2 *with* TX 3.

111.    With respect to claim 7 of the '812 patent, the Defendants' double patenting defense centers on claim 29 of the '086 patent. *See* Trial Tr. (Vol. 2), D.I. 207, at 481:11-483:7, 485:2-486:20, 487:18-489:16; TX 190, at Ex. 3, § II ¶¶ 5-6 The latter claims a method of administering "a therapeutically effective amount of 2-Amino-6-n-propylamino-4,5,6,7-tetrahydro-benzthiazole, or a pharmaceutically acceptable acid addition salt thereof," in the treatment of Parkinson's disease. *See* TX 2 at claim 29.

112.    The (+) or R enantiomer of pramipexole has not been shown to be therapeutically effective in any amount to treat Parkinsonism or Parkinson's disease. *See* Trial Tr. (Vol. 3), D.I. 208, at 662:17-20; TX 462. Therefore, claim 29 of the '086 patent does not encompass a method of using (R)/(+) 2-Amino-6-n-propylamino-4,5,6,7-tetrahydro-benzthiazole for such a purpose.

113.    By contrast, the parties have stipulated that claim 7 of the '812 patent encompasses (R)/(+) enantiomer in addition to pramipexole. *See* D.I. 190, at Ex. I, ¶ 16; Trial Tr. (Vol. 3), D.I. 208, at 664:16-665:24; D.I. 190, at Ex. 12, 13.

114.    The claims of the '812 patent can be practiced without infringing the claims of the '086 patent.  For instance, one can make pramipexole without infringing any of the claims of the '086 patent.  *Compare* TX 2 *with* TX 3.

115.    In addition, one can sell pramipexole without infringing any of the claims of the '086 patent.  *Compare* TX 2 *with* TX 3.

116.    One also can use pramipexole without infringing any claim of the '086 patent by using it as part of a method of treating a medical condition other than the four specific methods claimed in the '086 patent.  *Compare* TX 2 *with* TX 3; *see also* Trial Tr. (Vol. 1), D.I. 206, at 54:21-55:12; Trial Tr. (Vol. 2), D.I. 207 at 363:7-364:3; TX 302; TX 460; TX 461; TX 465; TX 467; TX 469; TX 471; TX 472; TX 480; TX 483; TX 485; TX 486.

**C.    Materially Different Uses Pursuant to MPEP § 806.05(h)**

117.    The test applied by the examiner of the grandparent '947 application in issuing a restriction requirement is set forth in MPEP § 806.05(h).  Pursuant to that test, methods of using a product are distinct from the product itself if, *inter alia*, "the product as claimed can be used in a materially different process of using the product."  TX 46 at 199.

118.    Pramipexole can be, and has been, used in materially different processes from those claimed in the '086 patent.  *See* Trial Tr. (Vol. 1), D.I. 206, at 54:21-55:12 (pramipexole is used to treat RLS, depression, fibromyalgia, and for neuroprotection); Trial Tr. (Vol. 2), D.I. 207 at 363:7-364:3 (same); TX 302; TX 433; TX 460; TX 461; TX 465; TX 467; TX 469; TX 471; TX 472; TX 480; TX 483; TX 485; TX 486.

119.    Pramipexole is effective for the treatment of RLS, a condition characterized by an urge to move the legs, and a burning or discomfort in the legs, particularly at night and when the person is laying down.  *See* Trial Tr. (Vol. 1), D.I. 206, at 58:16-59:5, 61:12-69:13; 75:22-76:9; Trial Tr. (Vol. 3), D.I. 208, at 655:7-16; TX 469; TX 471; TX 472.    Pramipexole was

demonstrated to be effective in the treatment of RLS in multiple, double-blind and placebo-controlled clinical studies. *See* Trial Tr. (Vol. 1), D.I. 206, at 61:22-64:21; TX 471; TX 472. Based upon such evidence of efficacy, the FDA approved pramipexole as being safe and effective for the treatment of moderate-to-severe RLS in 2006. *See id.* at 69:14-17; Trial Tr. (Vol. 3), D.I. 208, at 655:10-16. ████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████

120.    RLS affects a fundamentally different patient population and is symptomatically distinct from the medical conditions identified in the claims of the '086 patent. Whereas RLS tends to impact a broad spectrum of people, Parkinson's disease is a neurodegenerative disorder that tends occur in the elderly. *See* Trial Tr. (Vol. 1), D.I. 206, at 60:10-61:11; 74:12-75:21; 79:3-6.

121.    The accepted mechanism of action for pramipexole in the treatment of the signs and symptoms of Parkinson's disease involves the thrice-daily administration of relatively high doses of pramipexole to stimulate post-synaptic dopamine receptors. *See* Trial Tr. (Vol. 1), D.I. 206, at 67:20-69:13; Trial Tr. (Vol. 2), D.I. 207, at 377:18-378:15; TX 480. In this way, pramipexole mimics naturally-occurring dopamine in patients who are suffering from dopamine deficiency. *See* Trial Tr. (Vol. 1), D.I. 206, at 67:20-69:13. This fundamentally differs from the likely mechanism of action of the drug for the treatment of RLS, which utilizes a once-daily, small dose of pramipexole to bind to dopamine autoreceptors (or presynaptic receptors), thereby decreasing dopamine output. *See* Trial Tr. (Vol. 1) (D.I. 206) at 67:20-69:17.

122.    RLS is a distinct medical condition from those identified in the '086 patent claims.  *Id.* at 60:10-61:11.  Pramipexole's usefulness to treat RLS could not have been predicted from its usefulness in treating the conditions contained in the claims of the '086 patent (*Id.* at 75:22-77:18), nor could it have been predicted by one of skill in the art in 1984 (as of the filing date of the '947 application).  *See id.* at 112:4-18.

123.    Pramipexole also is effective in treating depression.  *See* Trial Tr. (Vol. 1), D.I. 206, at 54:21-55:12, 79:13-80:10; Trial Tr. (Vol. 3), D.I. 208, at 655:17-656:10.  A double-blind trial in patients suffering from depression showed that pramipexole is effective to treat endogenous depression.  *See id.* at 79:13-81:12; Trial Tr. (Vol. 3), D.I. 208, at 655:23-656:10; *see also* TX 486.  ███████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████████████████████

124.    Although some patients who suffer from Parkinson's disease also suffer from depression, endogenous depression affects a fundamentally different patient population and is symptomatically distinct from the medical conditions identified in the claims of the '086 patent.  Whereas Parkinson's disease tends to impact the elderly and is neurodegenerative, depression occurs amongst all age groups and is not neurodegenerative.  *See* Trial Tr. (Vol. 1), D.I. 206, at 78:7-79:6.

125.    Pramipexole's efficacy in treating depression would not be expected from its usefulness in treating the conditions contained in the claims of the '086 patent, (Trial Tr. (Vol. 1), D.I. 206, at 78:7-79:12), nor would it have been predictable to those in the field in 1984.  *See id.* at 85:18-87:16; 112:4-18.

126.    Pramipexole also has been shown to be effective to treat a condition known as fibromyalgia.  *See* Trial Tr. (Vol. 1), D.I. 206, at 54:21-55:12; TX 485; TX 484.  Fibromyalgia is primarily characterized by debilitating pain or tenderness in the extremities, typically in multiple sites.  *See* Trial Tr. (Vol. 1), D.I. 206, at 87:17-88:1; TX 483.   A prospective, randomized placebo-controlled trial has indicated that pramipexole is effective in the treatment of fibromyalgia.  *See id.* at 88:22-89:11, 89:22-91:17; TX 485. ███████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████

127.    The use of pramipexole in the treatment of fibromyalgia is a materially different use than those claimed in the '086 patent.  *See* Trial Tr. (Vol. 1), D.I. 206, at 89:12-21.  Fibromyalgia impacts a different patient population and the potential mechanism of action is different as well.  *See* Trial Tr. (Vol. 1), D.I. 206, at 89:12-21.  Furthermore, in 1984, one in the field could not have predicted pramipexole's usefulness to treat fibromyalgia.  *See id.* at 95:6-11; 112:4-18.

128.    *In vitro* data, *in vivo* data, and the results of major clinical trials are indicative that pramipexole has neuroprotective properties.  *See* Trial Tr. (Vol. 1), D.I. 206, at 54:21-55:12; 96:21-111:21; TX 460; TX 465; TX 461; TX 467; TX 547.   Neuroprotection – the delay or reversal of neurodegenerative conditions – is fundamentally different than the treatment of the signs and symptoms of such a neurodegenerative condition like Parkinson's disease.  *See* Trial Tr. (Vol. 1), D.I. 206, at 96:5-97:11; Trial Tr. (Vol. 3), D.I. 208, at 669:4-9; TX 547 at 345 & 348; TX 460 at 2; TX 462 at 4.

129.    The mechanism by which pramipexole acts as a neuroprotective agent is different than the mechanism by which it treats the symptoms of Parkinson's disease – in Parkinson's, pramipexole activates post-synaptic dopamine receptors, while its neuroprotective effects do not appear to be dopamine-receptor mediated. *See* Trial Tr. (Vol. 1), D.I. 206, at 96:5-99:20; TX 457; TX 458; TX 459; TX 460; TX 461; TX462; TX 463; TX 464; TX 465; TX 466; TX 467; TX 547 at 348. One in the field in 1984 could not have predicted that pramipexole would be a neuroprotective agent from the claims of the '086 patent. *See* Trial Tr. (Vol. 1), D.I. 206, at 111:22-112:18.

130.    The use of pramipexole in treating RLS, depression, fibromyalgia, and as a neuroprotective therapy could not have been predicted in 1984. *See* Trial Tr. (Vol. 1), D.I. 206, at 57:15-58:15, 112:4-18. In fact, someone of ordinary skill in the field in 1984 would not have been able to predict that pramipexole was a dopamine agonist based on its efficacy in treating the conditions listed in the '086 patent claims. *See id.* at 112:19-113:13. Furthermore, even assuming that one of ordinary skill in the field knew that pramipexole was a dopamine agonist, they could not have predicted that it would be effective to treat RLS, depression, fibromyalgia or as a neuroprotective therapy. *See id.* at 113:14-115:15.

C.    **Secondary Considerations of Non-obviousness**

131.    Barr and Mylan both have elected to copy MIRAPEX[®], which is a commercial embodiment of at least claims 5, 7, 9 and 10 of the '812 patent. *See* Trial Tr. (Vol. 2), D.I. 207, at 564:1-565:10; TX 406; TX 509. Barr has gone so far as to copy the formulation for MIRAPEX[®] tablets, as well as their shape. *See* Tantillo Tr. at 70:2-18, 70:23-71:7, 71:11, 71:12-72:23, 73:19-77:10, 97:9-18, 97:23-98:4, 99:23-100:19, 100:22-101:7.

132.    There have been commercially significant sales of MIRAPEX[®] for uses other than those claimed in the '086 patent, *e.g.* RLS, depression, fibromyalgia, and ADHD. ████



133.    The sales of MIRAPEX® for uses other than those claimed in the '086 patent also generated commercially significant profits for Boehringer in 2005.  *See* Trial Tr. (Vol. 2), D.I. 207, at 379:5-383:15; TX 527.

134.    Notably, prior to November 2006, the sales of MIRAPEX® for uses other than those claimed in the '086 patent were "off label," and thereby driven by physicians' views regarding the efficacy of pramipexole to treat those medical conditions.  *See* Trial Tr. (Vol. 2), D.I. 207, at 372:23-373:13.  Because there was no advertising or promotion associated with those off-label sales, there is a clear nexus between the foregoing sales and profits and the features of pramipexole as an embodiment of claims 5, 7, 9 and 10 of the '812 patent.  *See id.*

135.    In 1992, the Upjohn Company took a license to develop, manufacture, use and sell certain compounds developed by Boehringer, including pramipexole.  *See* TX 426.

136.    Barr's pramipexole supplier, Amino Chemicals Ltd., provided Barr with a "Technical Package" that includes a discussion of patents relating to pramipexole, including the '812 patent.  *See* TX 145 at 5-10.  Amino notes that the '812 patent's "expiry date of December

12, 2006 has been extended by 1564 days up to March 25, 2011." *Id.* at 5.  Amino indicates that it will not import pramipexole into the United States until "after the expiration date of the '812 patent, i.e. March 25, 2011." *Id.* at 10.

## CONCLUSIONS OF LAW

### I.    INFRINGEMENT

1.    Boehringer bears the burden of proving infringement of one or more claims of the '812 patent by Barr and Mylan by a preponderance of the evidence.  35 U.S.C. § 271(e)(2); *Warner-Lambert Co. v. Teva Pharms. USA, Inc.*, 418 F.3d 1326, 1341 (Fed. Cir. 2005).

2.    A patent owner may establish infringement under either of two theories: literal infringement or the doctrine of equivalents.  Literal infringement occurs where each element of at least one claim of the patent is found in the alleged infringer's product.  *See Panduit Corp. v. Dennison Mfg. Corp.*, 836 F.2d 1329, 1330 n.1 (Fed. Cir. 1987).

3.    For purposes of evaluating infringement, the Court must undertake a two-step process.  First, it must interpret the claims at issue by evaluating the language of the claims. *Miles Lab., Inc. v. Shandon, Inc.*, 997 F.2d 870, 876 (Fed. Cir. 1993).  Here, the parties do not dispute the meaning of any of the asserted claims of the '812 patent.

4.    The second step in determining infringement requires the Court to compare the accused product with the properly construed claims of the patent at issue to determine whether the accused product infringes the claim.  *See Miles Lab.*, 997 F.2d at 876; *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985).

5.    The Hatch-Waxman Act, 21 U.S.C. § 355 and 35 U.S.C. § 271(e), permits would-be manufacturers of generic versions of a previously-approved, patented drug to seek expedited approval from the FDA before expiration of the patent, by means of an ANDA.  *See Yamanouchi Pharm. Co. v. Danbury Pharmacal, Inc.*, 231 F.3d 1339, 1342 (Fed. Cir. 2000).

6.    The filing of an ANDA for a drug claimed in a patent constitutes a legally cognizable act of infringement for which the owner of the patent may bring suit under 35 U.S.C. § 271(e)(2).  *See Glaxo Group Ltd. v. Apotex, Inc.*, 376 F.3d 1339, 1344 (Fed. Cir. 2004); *Eli Lilly & Co. v. Medtronic, Inc.*, 496 U.S. 661, 678 (1990).

7.    Although this act of infringement is described as "artificial," 35 U.S.C. § 271(e)(2) gives patentees a jurisdictional basis to bring a lawsuit even though the ANDA applicant is not making using or selling the patented product, which are the traditional acts of infringement.  *See Glaxo, Inc. v. Novopharm Ltd.*, 110 F.3d 1562, 1569 (Fed. Cir. 1997).

8.    ███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████

9.    Where the accused infringers do not dispute infringement, the patentee is entitled to judgment of infringement.  *See, e.g.*, *Callicrate v. Wadsworth Mfg., Inc.*, 427 F.3d 1361, 1372 (Fed. Cir. 2005); *Toro Co. v. Deere & Co.*, 355 F.3d 1313, 1322 (Fed. Cir. 2004).

**A.    Claim 7**

10.    The parties stipulated that by submitting ANDA Nos. 77-724 and 77-854 seeking approval to engage in the commercial manufacture, use, and sale of Barr and Mylan's products prior to the expiration of the '812 patent, Barr and Mylan have infringed claim 7 of the '812 patent.  *See supra* at ¶ 89; *Warner-Lambert*, 418 F.3d at 1341.

**B.    Claims 5, 9, And 10**

11.    Boehringer established that Barr and Mylan's proposed products contain a compound that satisfies each of the elements of claim 5 of the '812 patent.  *See supra* at ¶¶ 94, 96, 98.

12. Boehringer proved, by a preponderance of the evidence, that by filing ANDAs seeking approval to market their proposed products prior to the expiration of the '812 patent, Barr and Mylan have infringed claim 5 of the '812 patent. *See Warner-Lambert,* 418 F.3d at 1341; *see also* Trial Tr. (Vol. 1), D.I. 206, 240:24-241:3, 250:12-16.

13. Boehringer established that Barr and Mylan's proposed products contain a compound that satisfies each of the elements of claim 9 of the '812 patent. *See supra* at ¶¶ 95, 96.

14. Boehringer proved, by a preponderance of the evidence, that by filing ANDAs seeking approval to market their proposed products prior to the expiration of the '812 patent, Barr and Mylan have infringed claim 9 of the '812 patent. *See Warner-Lambert,* 418 F.3d at 1341; *see also* Trial Tr. (Vol. 1), D.I. 206, at 250:12-16.

15. Boehringer established that Barr and Mylan's proposed products contain a compound that satisfies each of the elements of claim 10 of the '812 patent. *See supra* at ¶¶ 97, 98.

16. Boehringer proved, by a preponderance of the evidence, that by filing ANDAs seeking approval to market their proposed products prior to the expiration of the '812 patent, Barr and Mylan have infringed claim 10 of the '812 patent. *See Warner-Lambert,* 418 F.3d at 1341; *see also* Trial Tr. (Vol. 1), D.I. 206, at 250:12-16.

## II.  DOUBLE PATENTING

### A.  Any Alleged Obviousness-type Double Patenting Was Cured by the Terminal Disclaimer

17. It is well-established that the filing of a terminal disclaimer removes any obviousness-type double patenting issue. *See, e.g.*, *Perricone v. Medicis Pharm. Corp.*, 432 F.3d 1368, 1375 (Fed. Cir. 2005) ("A terminal disclaimer can indeed supplant a finding of

invalidity for double patenting."); *Ventana Med. Sys., Inc. v. Biogenex Labs., Inc.*. 473 F.3d 1173, 1184 n. 4 (Fed. Cir. 2006) ("[T]he filing of a terminal disclaimer … serves the statutory function of removing the rejection of double patenting…."); *Geneva Pharmaceuticals, Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1378 (Fed. Cir. 2003) ("With nonstatutory double patenting, a terminal disclaimer may restrict the slight variation to the term of the original patent and cure the double patenting rejection."); *In re Goodman* 11 F.3d 1046, 1052 (Fed. Cir. 1993) ("the patentee may overcome the double patenting rejection by filing a terminal disclaimer").

18.     By filing a terminal disclaimer, Boehringer obviated the harm that the Defendants allege existed due to the purported double patenting issue—the allegedly unwarranted "exten[sion of] the life of patent protection." *See Perricone*, 432 F.3d at 1373. In short, the filing of the terminal disclaimer renders the Defendants' double patenting defense moot. *See In re Schroeder*, 1996 WL 297604, at *1 n.1 (Fed. Cir. Jun. 6, 1996) ("Claims 1-6 were also rejected under the doctrine of obviousness-type double patenting. At oral argument, counsel for the Schroeders informed this court that a terminal disclaimer had been filed which rendered this rejection moot.").

19.     Thus, even were the Court to conclude that a double patenting issue existed, it was cured by the terminal disclaimer filed by Boehringer on March 13, 2008. *See, e.g.*, 37 C.F.R. § 1.321(C); *Merck & Co., Inc. v. Hi-Tech Phamacal Co., Inc.*, 482 F.3d 1317, 1321-24 (Fed. Cir. 2007); *Ortho Pharm. Corp. v. Smith*, 959 F.2d 936, 941-42 (Fed. Cir. 1992); *In re Longi*, 759 F.2d 887, 894 (Fed. Cir. 1985); *In re Robeson*, 331 F.2d 610, 614-615 (C.C.P.A. 1964); *King Pharm., Inc. v. Teva Pharm. USA, Inc.*, 409 F. Supp. 2d 609 (D.N.J. 2006); *Bott v. Four Star Corp.*, 675 F. Supp. 1069, 1072 (E.D. Mich. 1987); *Technicon Instruments Corp. v.*

*Coleman Instruments Corp.*, 225 F. Supp. 630, 641 (N.D. Ill. 1966), *aff'd* 385 F.2d 391 (7th Cir. 1967).

20.    The Court rejects Defendants' suggestion that Boehringer could not cure the alleged double patenting defect by way of a terminal disclaimer because the '086 patent had already expired.  Initially, the only cases cited by the Defendants did not involve instances in which there would have been any patent term extension left following a potential terminal disclaimer.  Here, because of the Section 156 patent term extension, the '812 patent will not expire until October 8, 2010, even after the filing of the terminal disclaimer.  *See supra* at ¶¶ 100-104.

21.    Moreover, the Defendants' argument is inconsistent with the Federal Circuit's determination that a Section 156 patent term extension may be applied to a patent that is the subject of a terminal disclaimer.  *See Merck & Co.*, 482 F.3d at 1324 ("we hold that a patent term extension under § 156 may be applied to a patent subject to a terminal disclaimer.").  The court explained that "the language of § 156 is unambiguous and fulfills a purpose unrelated to and not in conflict with that of § 253."  *Id.* at 1322.  In short, the Court's determination in this case harmonizes the purposes underlying the applicable statutes in the same fashion as did the decision in *Merck*:

> [t]he purpose of the terminal disclaimer—to prevent extension of patent term for subject matter that would have been obvious over an earlier filed patent—remains fulfilled by virtue of the fact that the date from which any Hatch-Waxman extension is computed is the terminally disclaimed date. At the same time, the purpose of the patent term extension—to restore some of the patent term lost due to regulatory review—is also satisfied.

*Merck & Co.*, 482 F.3d at 1323.

22.    Accordingly, the terminal disclaimer Boehringer filed on March 13, 2008, obviates the Defendants' double patenting defense, leaving intact the 1,564 day extension on the term of the '812 patent that Boehringer received under 35 U.S.C. § 156.

**B.    Defendants Failed to Meet Their Burden of Proof**

23.    A patent is presumed valid.  *See* 35 U.S.C. § 282.  A validity analysis must be performed on a claim-by-claim basis.  *See id.* ("[e]ach claim of a patent … shall be presumed valid independently of the validity of other claims"); *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001).

24.    Defendants bear a "heavy and unshifting" burden of establishing invalidity by clear and convincing evidence.  *See Symbol Techs., Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1580 (Fed. Cir. 1991).

25.    An "obvious[ness]-type double patenting analysis involves two steps: (1) the court must construe the claim in the earlier patent and the later patent and determine the differences between the two patents, and (2) the court must determine whether the differences in the subject matter between the two claims render the claims patentably distinct."  *Pfizer Inc. v. Ranbaxy Labs., Ltd.*, 405 F. Supp.2d 495, 512 (D. Del. 2005).

26.    To satisfy this burden, Defendants must, at minimum, (1) set forth the differences between the '086 patent claims and '812 patent claims and (2) establish that the '812 patent claims are obvious even accounting for those differences.  *See Eli Lilly & Co. v. Barr Labs.*, 251 F.3d 955, 967 (Fed. Cir. 2001); *In re Metoprolol Succinate Patent Litig.*, 494 F.3d 1011, 1016 (Fed. Cir. 2007); *Georgia-Pacific Corp. v. U.S. Gypsum Co.*, 195 F.3d 1322, 1326 (Fed. Cir. 1999).

27.    The Defendants failed to identify the differences between claims 3, 4, 5, 7, 9 and 10 of the '812 patent and the claims of the '086 patent.  The Defendants also failed to offer any

analysis of how the asserted claims of the '812 patent are obvious in light of the myriad differences between those claims and the claims of the '086 patent. The Defendants offered no expert testimony opining that any claim of the '812 patent is anticipated by, or obvious in light of, any claim of the '086 patent. *See* Trial Tr. at *passim.*

28.    Accordingly, Defendants failed to establish a prima facie case of invalidity due to double patenting over the claims of the '086 patent. *See Symbol Techs.,* 935 F.2d at 1580; *Eli Lilly*, 251 F.3d at 968; *Metoprolol Succinate Patent Litig.*, 494 F.3d at 1016; *Georgia-Pacific Corp.*, 195 F.3d at 1327.

### C.    In Any Event, Defendants' Arguments Are Unavailing

29.    Processes are distinct, patentable subject matter from compositions of matter. *See* 35 U.S.C. § 101. A "process" under § 101 includes a method of use. *See* 35 U.S.C. § 100(b). A chemical compound is considered a composition of matter under § 101. *See PIN/NIP, Inc. v. Platte Chem. Co.*, 304 F.3d 1235, 1244 (Fed. Cir. 2002); *In re Breslow*, 616 F.2d 516, 520 (C.C.P.A. 1980). Accordingly, the claims of the '812 patent cannot, as a matter of law, be "subgenera" of the claims of the '086 patent. *See In re Bronson*, 168 F.2d 548, 550 (C.C.P.A. 1948); *Michaels of Or. Co. v. Clean Gun, LLC,* 2002 U.S. Dist. LEXIS 20371, at *27-28 (D. Or. 2002). Because the "subgenera" argument was the lone contention espoused by the Defendants during the course of discovery, the Defendants failed to satisfy their burden of proof for this independent reason.

30.    The relevant test for distinctness that is applied for products vis-à-vis processes of using a product is whether "the process of using as claimed can be practiced with another materially different product" or "the product as claimed can be used in materially a different process." MPEP § 806.05(h). *See, e.g., Astellas Pharma, Inc. v. Ranbaxy Inc.*, 2007 WL 576341, at *5 (D.N.J. 2007) (deciding that, pursuant to MPEP § 806.05(f), a nearly identical test

to that in MPEP § 806.05(f), later-claimed compounds were not invalid for obvious-type double patenting over earlier claims directed to processes for their manufacture); *Takeda Pharm. Co., Ltd. v. Dudas*,  84 U.S.P.Q.2d 1365, 1376 -1377 (D.D.C. 2007) (accepting and applying the test from MPEP § 806.05(f)); *In re Cady*,  22 C.C.P.A. 1190, 1194, 77 F.2d 106, 109 (C.C.P.A. 1935).

31.    The processes claimed by the '086 patent can be practiced with products materially different from those claimed by the '812 patent.  *See* Trial Tr. (Vol. 1), D.I. 207, at 44:3-45:16, 51:24-52:13; Trial Tr. (Vol. 3), D.I. 207, at 688:7-689:6.

32.    Pramipexole can be utilized in methods of treatment that are materially different than the methods of use claimed in the '086 patent.  Those materially different uses include the conditions set forth in the '086 patent claims, as well as the treatment of RLS, depression, fibromyalgia, and neuroprotection.  *See supra* FOF ¶¶ 119-28.  Accordingly, the asserted claims are patentably distinct from the claims of the '086 patent for this independent reason.

33.    In addition, a variety of differences exist between the scope of the claims of the '086 patent and the asserted claims of the '812 patent.  Those differences include:

- The '086 claims involve methods of use; they do not claim compounds – let alone any compounds falling within the scope of the asserted claims of the '812 patent (*see Ranbaxy,* 405 F. Supp.2d at 514-515);

- The '086 patent is directed to physicians, while the claims of the '812 patent are directed to medicinal chemists (*see supra* ¶¶ 106-07);

- The claims of the '086 patent contain a limitation that the method utilizes "a therapeutically effective amount," while the compound claims of the '812 patent do not (*see id.* at ¶108);

- The utility of the '086 patent claims centers on the specified methods of use, while the utility of the asserted claims of the '812 patent encompasses the properties of the claimed compounds, including pramipexole and all of its medicinal properties (*see id.* at ¶¶109-10; *Ranbaxy.* 405 F. Supp.2d at 515);

33

- Claim 29 of the '086 patent does not include a method of using the (R)/(+) enantiomer corresponding to pramipexole, while claim 7 of the '812 patent encompasses that enantiomer (*see supra* ¶¶112-13);

- The claims of the '812 patent can be practiced without infringing any claim of the '086 patent (*see supra* ¶ 114; *Ranbaxy*, 405 F. Supp.2d at 515).

34.    The foregoing differences render the asserted claims patentably distinct from the '086 patent claims relied upon by the Defendants.  *See Ranbaxy*, 405 F. Supp. 2d at 514-516.

35.    The Defendants' arguments disclosed for the first time in the Pretrial Order essentially assert that since the method of use claims of the '086 patent mention compound names like "2-Amino-6-n-propylamino-4,5,6,7-tetrahydro-benzthiazole," they anticipate the compound claims of the '812 patent.  But for the purpose of obviousness-type double patenting analysis, it is not proper to simply compare chemical names and formulas identified in the claims of one patent with those recited in the later patent's claims.  *See Astellas Pharma, Inc. v. Ranbaxy Inc.*, 2007 WL 576341, at *4; *Gen. Foods Corp. v. Studiengesellschaft Kohle mbH*, 972 F.2d. 1272, 1280-81 (Fed. Cir. 1992).

36.    Even were the Court to address the arguments first advanced by Defendants in the Pretrial Order, those arguments fail to establish double patenting.  "In assessing the differences between the claims, the Court may not treat the earlier claim as prior art.  Rather specific attention must be given to what is claimed in the earlier patent."  *Ranbaxy*, 405 F. Supp. 2d at 512.

## D.    Secondary Considerations Further Support the Conclusion That the Claims of the '812 Patent Are Patentably Distinct From Those of the '086 Patent

37.    Courts may, but are not required to, consider secondary indicia of non-obviousness, including commercial success, long felt but unsolved needs, failure of others and licensing, for the purposes of obviousness-type double patenting analysis.  *See, e.g., Astellas*

*Pharma*, 2007 WL 576341, at *4; *Am. Cyanamid Co. v. U.S. Surgical Corp.*, 30 U.S.P.Q.2d 1561, 1569, n. 22 (D. Conn. 1992); *Mirafi, Inc. v. Murphy*, 14 U.S.P.Q.2d 1337, 1340 (W.D.N.C. 1989).

38.    "When a patentee can demonstrate commercial success, usually shown by significant sales in a relevant market, and the successful product is the invention disclosed and claimed in the patent, it is presumed that the commercial success is due to the patented invention … [and] the burden shifts to the challenger to prove that the commercial success is instead due to other factors extraneous to the patented invention, such as advertising or superior workmanship." *J.T. Eaton & Co. v. Atl. Paste and Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997). *See Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 348 F. Supp. 2d. 713, 756 (N.D. W. Va. 2004) ("[as] the successful product is the invention disclosed and claimed in the patent, [defendant] bears the burden of showing that [the product's] commercial success is due to extraneous factors.").

39.    Boehringer need not show that every possible embodiment within the scope of the claims has achieved commercial success – it is enough that an embodiment of the challenged claims of the '812 patent has achieved such success. *See Applied Materials*, 98 F.3d at 1570 ("a patentee need not show that all possible embodiments within the claims were successfully commercialized in order to rely on success in the marketplace of the embodiment that was commercialized.").

40.    There have been commercially significant sales of MIRAPEX® for uses other than those claimed in the '086 patent, resulting in a presumption of commercial success. *See supra* at ¶¶ 132-134.  The Defendants have not provided any evidence that would rebut the presumption that the commercial success of MIRAPEX® is due to extraneous factors such as advertising.

41.     Boehringer also has demonstrated that pramipexole as a compound has satisfied long-felt but unsatisfied needs in connection with its use to treat RLS, as well as depression and fibromyalgia. *See supra* at ¶¶ 119-134. That need necessarily cannot have been satisfied by any invention contained in the '086 patent.

42.     Upjohn's decision to take a license to the '812 patent is another indicia of non-obviousness. *See supra* at ¶ 135; *Rockwell Intern. Corp. v. U.S.*, 37 Fed. Cl. 478, 499-501 (Fed. Cl. 1997); *In Re GPAC*, 57 F.3d 1573, 1580 (Fed. Cir. 1995).

43.     The fact that at least one prospective supplier of generic pramipexole has indicated that it will stay out of the market until the expiration of the '812 patent in 2011 is indicative that others have acceded to the validity of the claims of the patent. *See supra* at ¶ 136; *Vulcan Eng'g Co. v. Fata Aluminum, Inc.,* 278 F.3d 1366, 1378 (Fed. Cir. 2002).

44.     The foregoing factors further weigh in favor of a finding that the asserted claims of the '812 patent are not invalid for obviousness-type double patenting.

**E.     Section 121 Precludes the Use of the '086 Patent as a Reference**

45.     Under 35 U.S.C. § 121, the Court is precluded from using the '086 patent as a reference against the claims of the '812 patent. *Union Carbide Corp. v. Dow Chem. Co.*, 619 F. Supp. 1036, 1059 (D. Del. 1985); *Lerner v. Ladd*, 216 F. Supp. 81, 84 (D. D.C. 1962); *Applied Materials, Inc. v. Advanced Semiconductor Material Am., Inc.*, 98 F.3d 1563, 1577 (Fed. Cir. 1996); *Gerber Garment Tech., Inc. v. Lectra Sys., Inc.*, 916 F.2d 683, 687-88 (Fed. Cir. 1990).

46.     Pursuant to 35 U.S.C. § 121:

> A patent issuing on an application with respect to which a requirement for restriction under this section has been made, or on an application filed as a result of such a requirement, shall not be used as a reference either in the Patent and Trademark Office or in the courts against a divisional application or against the original application or any patent issued on either of them, if the divisional application is filed before the issuance of the patent on the other application.

35 U.S.C. § 121.

47.    Here, the "reference" cited by the Defendants is the '086 patent.  That patent may not be used as a reference against the claims of the '812 patent if (a) the '086 patent qualifies as "[a] patent issuing . . . on an application filed as a result of such a [restriction] requirement"; (b) "the divisional application [was] filed before the issuance of the patent on the other application"; and (c) the applicants maintained consonance.  *See generally* 35 U.S.C. § 121; *see Union Carbide*, 619 F. Supp. at 1059; *Lerner*, 216 F. Supp. at 84; *Applied Materials*, 98 F.3d at 1577; *Gerber Garment*, 916 F.2d at 687-88.

48.    The patent application that issued as the '086 patent was filed "as a result of" the restriction requirement imposed during the course of the prosecution of the '947 application.  *See* TX 46; TX 286.

49.    An application also is "filed as a result of" a restriction requirement where, *inter alia*, its claims are amended for the purpose of conforming to the restriction requirement.  *See Union Carbide*, 619 F. Supp. at 1060.  In *Union Carbide*, this Court considered whether Section 121 precluded the use of a parent application as a reference against the claims of a co-pending divisional application where the co-pending divisional had been filed before a restriction requirement had been imposed in the parent, but was amended to conform to the restriction requirement.  *See id.*  The Court found that:

> With the filing of the … amendment, the PTO was apprised that such action was taken pursuant to the office's requirement for restriction. Where, as here, the claims of an application are amended in toto to reflect the division of a copending application, I conclude that the amended application is one "filed as a result of such a requirement" as set forth in section 121.

*Id.*

50.     Although not required by the terms of § 121, the record also shows that the '671 application and the resulting '812 patent were also filed as a result of the restriction requirement given that amendments were made to conform to the restriction requirement.  *See supra* at ¶¶ 51-66.  Thus, the applicants amended the claims pending in that application "to exclude from the claims subject matter already patented in U.S. Patent 4,731,374 and that [is] pending in Serial No. 124,197 filed November 23, 1987."  *See* TX 99 at BARR000677.

51.     A divisional application is one that claims subject matter that has been carved out of a prior application.  *See Pfizer, Inc. v. Teva Pharm. USA, Inc.*, No. 2007-1271, 2008 U.S. App. LEXIS 4969, at *14 (Fed. Cir. March 7, 2008).  There is no dispute that the '671 application was a divisional of the application that resulted in the '086 patent.  The applicants indicated that they intended to file such a divisional application, *see supra* at ¶¶ 51, the '671 application is designated as such, *see id.*, and the claims of the '812 patent claim subject matter that was carved out of the '197 application.  *See id.* at ¶¶ 55-66.

52.     The divisional '671 application was filed on October 12, 1988, before the issuance of the '086 patent.  *See* TX 99; TX 286; D.I. 190, at Ex. 1, ¶¶ 18, 20.

53.     For purposes of evaluating consonance, claims in divisional applications "are entitled to the benefit of § 121 if the claims do not cross the line of demarcation drawn around the invention elected in the restriction requirement."  *See Symbol Techs.*, 935 F.2d at 1579.  Thus, "[t]o gain the benefits of Section 121 there outlined, [an applicant] must have brought its case within the purview of the statute, i.e., it must have limited the claims in its divisional application to the non-elected invention or inventions."  *Gerber Garment*, 916 F.2d at 688.

54.     The "consonance requirement prevents an applicant from amending the claims in the divisional application in a way that would violate the originally imposed restriction

requirement and thereby impermissibly extend the patent term as to that subject matter." *See Pfizer*, 2008 U.S. App. LEXIS 4969 at *14. Here, the "subject matter" associated with "the originally imposed restriction requirement" is that elected to issuance in the '374 patent – the pyrrolidino-substituted tetrahydro-benzthiazoles and a method of using them to treat Parkinson's disease. *See supra* at ¶¶ 33, 34, 55, 56.

55.    The applicants acted in a manner that was consonant with the election made in response to the restriction requirement. The applicants never "crossed the line" of that election, deleting subject matter claimed in the '374 patent from both of the subsequent divisional applications and the resulting '086 and '812 patents. *See supra* at ¶¶ 43, 44, 55, 56.

56.    The "lines of demarcation" imposed by the PTO's September 11, 1986 restriction requirement are maintained between the '086 and '812 patents. *See* TX 46; TX 99; TX 286; *see also Symbol Techs.*, 935 F.2d at 1579; *Gerber Garment*, 916 F.2d at 688.

57.    The Preliminary Amendment was filed contemporaneously with the filing of the '671 application and "exclude[d] from the claims subject matter already patented in U.S. Patent 4,731,374 and that [] pending in Serial No. 124,197 filed November 23, 1987." *See* TX 99 at BARR000677. Therefore, the '812 patent maintains consonance with the restriction requirement and, pursuant to Section 121, the '086 patent "shall not be used as a reference" against the '812 patent claims. *See Symbol Techs.*, 935 F.2d at 1579.

58.    As noted by the Federal Circuit, "[n]oncompliance with the consonance requirement is normally detected by the PTO examiner. *See* Manual of Patent Examining Procedure (MPEP) § 804.01 (double patenting protection of Section 121 does not apply where the claims are not consonant with, *i.e.* 'have been changed in material respects from', the claims subject to the restriction requirement)." *Gerber Garment*, 916 F.2d at 685-86. Notably, the

examiner of both the '086 and '812 patents was Examiner Gerstl, who was certainly cognizant of potential double patenting issues. *See supra* at ¶¶ 39, 52. Examiner Gerstl did not raise any concern that the claims of the '812 patent were not consonant with the election made previously in response to the restriction requirement imposed during the course of the prosecution of the '374 patent. *See supra* at ¶¶ 61-65.

59.    In addition, Examiner Gerstl implicitly agreed that the applicants were acting in a fashion that was consonant when he withdrew the double patenting rejection without requiring a terminal disclaimer. *See* TX 99; TX 286.

## III.    BOEHRINGER IS ENTITLED TO INJUNCTIVE RELIEF

60.    When the Court determines that the relevant patent has been infringed, and the defendant has not proved invalidity, the patent owner is entitled to an order that FDA approval of the ANDA not be effective until the expiration of the patent. *See* 35 U.S.C. § 271(e)(4)(A); *Glaxo*, 110 F.3d at 1569.

61.    Having satisfied its burden of proof, Boehringer is entitled, under 35 U.S.C. § 271(e)(4)(A), to an Order that the effective date of any approval of the Barr and Mylan proposed pramipexole dihydrochloride tablets that are the subject of ANDA Nos. 77-724 and 77-854 be a date not earlier than the expiration date of the '812 patent or any later date of exclusivity to which Boehringer is or becomes entitled.

62.    Having met its burden of proof, Boehringer is entitled, under 35 U.S.C. § 271(e)(4)(B), to a permanent injunction, restraining and enjoining Barr and Mylan from engaging in the commercial manufacture, use, offer for sale, or sale of its proposed pramipexole dihydrochloride tablets within the United States, or importation into the United States.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jack B. Blumenfeld*

Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
1201 North Market Street
P. O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
mnoreika@mnat.com

*Attorneys for Plaintiffs*
*Boehringer Ingelheim International GmbH and*
*Boehringer Ingelheim Pharmaceuticals, Inc.*

OF COUNSEL:

Steven C. Cherny
LATHAM & WATKINS LLP
885 Third Avenue, Suite 1000
New York, NY  10022-4834
(212) 906-1200

Kenneth G. Schuler
Amanda J. Hollis
Joel Neckers
LATHAM & WATKINS LLP
Sears Tower, Suite 5800
Chicago, IL  60606
(312) 876-7700

April 18, 2008
2299189

## CERTIFICATE OF SERVICE

I, Jack Blumenfeld, hereby certify that on April 23, 2008, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will send notification of such filing to the following:

> Mary B. Matterer
> MORRIS JAMES LLP
>
> Adam Wyatt Poff
> YOUNG, CONAWAY, STARGATT & TAYLOR LLP

I further certify that copies of the foregoing document were also served upon the following in the manner indicated:

## BY ELECTRONIC MAIL AND HAND DELIVERY

Mary B. Matterer, Esquire
MORRIS JAMES LLP
500 Delaware Avenue
Wilmington, DE 19801

Adam Wyatt Poff, Esquire
YOUNG, CONAWAY, STARGATT & TAYLOR LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801

## BY ELECTRONIC MAIL

Glenn J. Pfadenhauer, Esquire
Jessamyn S. Berniker, Esquire
Dov P. Grossman, Esquire
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005-5901

Kevin J. Culligan, Esquire
HELLER EHRMAN LLP
Times Square Tower
7 Times Square
New York, NY 100306-6524

Shannon M. Bloodworth, Esquire
HELLER EHRMAN LLP
1717 Rhode Island Ave., NW
Washington, DC 20036

*/s/ Jack B. Blumenfeld*

Jack B. Blumenfeld (#1014)