IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BOEHRINGER INGELHEIM INTERNATIONAL GMBH and BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 05-700 (JJF) |
| BARR LABORATORIES, INC., | ) | CONSOLIDATED |
| Defendant. | ) ) ) | **REDACTED – PUBLIC VERSION** |
| BOEHRINGER INGELHEIM INTERNATIONAL GMBH and BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 05-854 (JJF) |
| MYLAN PHARMACEUTICALS, INC., | ) ) | |
| Defendant. | ) ) ) | |

## DEFENDANTS' OPENING POST-TRIAL BRIEF

OF COUNSEL:
Glenn J. Pfadenhauer
Jessamyn S. Berniker
Dov P. Grossman
Brett R. Tobin
Kendra P. Robins
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000

YOUNG CONAWAY STARGATT &
TAYLOR, LLP
Karen Keller (#4489)
kkeller@ycst.com
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

*Attorneys for Defendant Barr
Laboratories, Inc.*

OF COUNSEL:
Kevin J. Culligan
Joy Arnold
HELLER EHRMAN LLP
Times Square Tower
7 Times Square
New York, NY 10036
(212) 832-8300

Shannon M. Bloodworth
HELLER EHRMAN LLP
171 Rhode Island Avenue, NW
Washington, DC 20036
(202) 912-2000

Dated: April 18, 2008

MORRIS JAMES LLP
Mary B. Matterer (#2696)
mmatterer@morrisjames.com
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, DE 19899-2306
(302) 888-6960

*Attorneys for Mylan*
*Pharmaceuticals, Inc.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ v

SUMMARY OF THE ARGUMENT ........................................................................... 1

NATURE AND STAGE OF THE PROCEEDINGS .................................................. 2

BRIEF TECHNICAL BACKGROUND ..................................................................... 2

ARGUMENT ............................................................................................................... 3

I.   CLAIMS 3, 4, 5, 7, 9, AND 10 OF THE '812 PATENT ARE INVALID FOR
     NONSTATUTORY DOUBLE PATENTING ...................................................... 3

     A.   The Person of Ordinary Skill in the Art................................................... 3

     B.   Nonstatutory Double Patenting Turns on Whether Later Claims Are
          Patentably Distinct from Earlier Claims ................................................. 4

     C.   The '812 Patent Claims Are Invalid Because a Claim to a Compound
          is Not Patentably Distinct from a Claim to a Method of Using the
          Compound.................................................................................................. 5

          1.   The *Geneva-Pfizer* Line of Cases .............................................. 5

          2.   The '812 Patent Claims Compounds That Were Already
               Claimed In the Earlier '086 Method Claims................................. 8

          3.   Claims 3, 4, 5, 7, 9, and 10 of the '812 Patent Are Not
               Patentably Distinct From Claims of the '086 Patent Under the
               *Geneva-Pfizer* Line of Cases .................................................... 10

     D.   The '812 Compound Claims Are Anticipated By—and Thus Not
          Patentably Distinct From—the '086 Method Claims ........................... 11

     E.   The '812 Compound Claims Are Obvious Over—and Thus Not
          Patentably Distinct From—the '086 Method Claims ........................... 13

     F.   Boehringer's Alternate Approaches To Double Patenting Are Not the
          Law ......................................................................................................... 13

          1.   "Materially Different Processes" Is Not and Cannot Be the
               Proper Standard........................................................................... 13

          2.   Double Patenting Is Not Limited to Claims of the Same
               Statutory Type............................................................................. 15

II.  BOEHRINGER'S RESPONSES DO NOT SAVE THE '812 CLAIMS ........................ 15

     A.   Boehringer's Untimely Disclaimer Did Not Resurrect the '812 Patent ............... 16

          1.   The Prohibition on Double Patenting Prevents Unjustified
               Extensions of a Patentee's Right to Exclude ............................. 16

          2.   Boehringer's Disclaimer Is Ineffective Because It Fails to
               Disclaim to the Expiration Date of the '086 Patent .................. 18

          3.   The Surrender of a Portion of Boehringer's Patent Term
               Extension Did Not Eliminate Double Patenting ........................ 20

   a. Boehringer's Term Extension Rises and Falls With the Validity of the '812 Patent ............................................................ 21

   b. Boehringer Did Not Disclaim the Same Rights It Unlawfully Enjoyed ...................................................................... 23

  4. Boehringer's Disclaimer Is Also Ineffective Because It Lacks A Required Provision to Cure Double Patenting ...................................... 25

  5. Boehringer's Disclaimer Comes Too Late to Affect This Case .............. 25

 B. Boehringer Cannot Rely on the Exception of Section 121 ................................... 26

  1. Section 121 Requires the Patent Application to Be Filed "As a Result of" a Restriction Requirement ......................................................... 27

  2. The '671 Application Was Filed to Address Issues Presented by the Lilly Application, Not as a Result of a Restriction Requirement ...................................................................................................... 28

  3. The Claims of the '812 Patent Are Not Consonant With Any Restriction Requirement .................................................................................. 31

  4. The '671 Application Was Filed After Issuance of the '374 Patent ................................................................................................................ 32

 C. Alleged Evidence of Objective Indicia Do Not Save the '812 Patent ................. 33

  1. Objective Indicia of Nonobviousness Are Legally Irrelevant ................. 33

  2. The Alleged Evidence of Nonobviousness Is Not Commensurate With the Scope of the Claims .......................................... 33

  3. Boehringer Has Not Demonstrated Any Objective Indicia of Nonobviousness ......................................................................................... 34

   a. None of the Claimed Compounds Have Been Shown to Have Unexpected Properties ......................................................... 34

    1) Pramipexole Does Not Possess Several of the Asserted Properties ......................................................... 34

    2) The Purported Properties Of Pramipexole Would Not Have Been Unexpected ............................. 35

   b. Pramipexole Did Not Satisfy Any Long-Felt But Unmet Need ..................................................................................................... 36

   c. Boehringer Has Not Demonstrated Any Relevant Commercial Success ...................................................................... 37

III. BOEHRINGER DID NOT PROVE INFRINGEMENT OF CLAIMS 5, 9, AND 10 ........................................................................................................................... 38

REQUESTED RELIEF ......................................................................................................... 40

CONCLUSION ...................................................................................................................... 40

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Agrizap, Inc. v. Woodstream Corp.,*
   Nos. 2007-1415, 2007-1421, 2008 WL 819757, *6 (Fed. Cir. 2008) ....................................34

*Applied Materials, Inc. v. Advanced Semiconductor Materials America, Inc.,*
   98 F.3d 1563, 1568 (Fed. Cir. 1996)................................................................................28, 31

*Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,*
   489 U.S. 141 (1989)..........................................................................................................16

*Bristol-Myers Squibb Co. v. Pharmachemie B.V.,*
   361 F.3d 1343 (Fed. Cir. 2004)........................................................................................27, 31

*Brown & Williamson Tobacco Corp. v. Philip Morris, Inc.,*
   229 F.3d 1120 (Fed. Cir. 2000)........................................................................................38

*CMI Corp. v. Lakeland Constr. Co.,*
   184 USPQ 721 (N.D. Ill. 1975) ........................................................................................26

*Eli Lilly & Co. v. Barr Labs., Inc.,*
   251 F.3d 955 (Fed. Cir. 2001)...................................................................................... passim

*Eli Lilly & Co. v. Zenith Goldline Pharms., Inc.,*
   364 F. Supp. 2d 820 (S.D. Ind. 2005) ..............................................................................33

*Envtl. Designs, Ltd. v. Union Oil Co.,*
   713 F.2d 693 (Fed. Cir. 1983)...........................................................................................4

*Geneva Pharms., Inc. v. GlaxoSmithKline PLC,*
   349 F.3d 1373 (Fed. Cir. 2003)................................................................................... passim

*Geneva Pharms., Inc. v. Glaxosmithkline PLC,*
   No. 2:01cv391 (E.D. Va Apr. 22, 2002)..........................................................................7

*Gerber Garment Tech., Inc. v. Lectra Sys., Inc.,*
   916 F.2d 683 (Fed. Cir. 1990)...........................................................................................28

*Graham v. John Deere,*
   383 U.S. 1 (1966)...............................................................................................................37

*Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.,*
   222 F.3d 951 (Fed. Cir. 2000)...........................................................................................39

*In re Baxter Travenol Labs,*
   952 F.2d 388 (Fed. Cir. 1991)...........................................................................................38

*In re Braithwaite,*
    379 F.2d 594 (CCPA 1967) ...................................................................17, 25

*In re Byck,*
    48 F.2d 665 (CCPA 1931) .......................................................................6, 33

*In re Christmann,*
    128 F.2d 596 (CCPA 1942) ...............................................................6, 7, 8, 33

*In re Eckel,*
    93 F.2d 848 (CCPA 1968) ..........................................................................20

*In re Goodman,*
    11 F.3d 1046 (Fed. Cir. 1993).................................................................11, 14

*In re Greenfield,*
    571 F.2d 1185 (CCPA 1978) .......................................................................34

*In re Huang,*
    100 F.3d 135 (Fed. Cir. 1996).....................................................................38

*In re Juillard,*
    476 F.2d 1380 (CCPA 1973) .......................................................................35

*In re Lonardo,*
    119 F.3d 960 (Fed. Cir. 1997).................................................................17, 25

*In re Longi,*
    759 F.2d 887 (Fed. Cir. 1985).................................................................11, 19

*In re Mayne,*
    104 F.3d 1339 (Fed. Cir. 1997)...............................................................34, 35

*In re Metoprolol Succinate Patent Litig.,*
    494 F.3d 1011 (Fed. Cir. 2007).........................................................4, 11, 13, 26

*In re Paulsen,*
    30 F.3d 1475 (Fed. Cir. 1994)......................................................................33

*In re Peterson,*
    315 F.3d 1325 (Fed. Cir. 2003).....................................................................33

*In re Robeson,*
    331 F.2d 610 (CCPA 1964) .....................................................................19, 25

*In re Soni,*
    54 F.3d 746 (Fed. Cir. 1995)...................................................................34, 35

*In re Tiffin*,
   448 F.2d 791 (CCPA 1971) ..............................................................................34

*In re Van Ornum*,
   686 F.2d 937 (CCPA 1982) .........................................................................18, 25

*In re Zickendraht*,
   319 F.2d 225 (CCPA 1963) .........................................................................28, 31

*J.T. Eaton & Co. v. Atl. Paste & Glue Co.*,
   106 F. 3d 1563, 1571 (Fed. Cir. 1997).............................................................37

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.*,
   175 F.3d 985 (Fed. Cir. 1999)..........................................................................39

*Kan. Jack, Inc. v. Kuhn*,
   719 F.2d 1144 (Fed. Cir. 1983).........................................................................38

*KSR Int'l Co. v. Teleflex Inc.*,
   550 U.S. __, 127 S. Ct. 1727 (2007)..................................................................13

*Medinol Ltd. v. Guidant Corp.*,
   341 F. Supp. 2d 301 (S.D.N.Y. 2004)..................................................................3

*Merck & Co. v. Hi-Tech Pharmacal Co.*,
   482 F.3d 1317 (Fed. Cir. 2007).....................................................................22, 25

*Merck & Co. v. Kessler*,
   80 F.3d 1543 (Fed. Cir. 1996)...........................................................................23

*Merck & Co. v. Teva Pharms. USA, Inc.*,
   228 F. Supp. 2d 480 (D. Del. 2002)....................................................................3

*Monsanto Co. v. Scruggs*,
   459 F.3d 1328 (Fed. Cir. 2006).........................................................................39

*Pfizer Inc. v. Dr. Reddy's Laboratories, Ltd.*,
   359 F.3d 1361 (Fed. Cir. 2004).........................................................................23

*Pfizer, Inc. v. Teva Pharms. USA, Inc.*,
   518 F.3d 1353 (Fed. Cir. 2008)................................................................. passim

*Pharmacia Corp. v. Par Pharm., Inc.*,
   417 F.3d 1369 (Fed. Cir. 2005).........................................................................25

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005)...........................................................................3

*Proctor & Gamble Co. v. Teva Pharms. USA, Inc.,*
    536 F. Supp. 2d 476 (D. Del. 2008) ........................................................................33

*Racing Strollers, Inc. v. TRI Indus., Inc.,*
    878 F.2d 1418 (Fed. Cir. 1989) ...........................................................................14

*Regents of the Univ. of Cal. v. Dakocytomation Cal., Inc.,*
    2006 WL 1343950 (N.D. Cal. May 17, 2006) ......................................................27

*Schering Corp. v. Geneva Pharms., Inc.,*
    339 F.3d 1373 (Fed. Cir. 2003) ...........................................................................11

*SmithKline Beecham Corp. v. Apotex Corp.,*
    403 F.3d 1331 (Fed. Cir. 2005) ...........................................................................13

*South Corp. v. United States,*
    690 F.2d 1368 (Fed. Cir. 1982) .............................................................................6

*Southwall Techs., Inc. v. Cradinal IG Co.,*
    54 F. 3d 1570 (Fed. Cir. 1995) ...........................................................................39

*Symbol Techs., Inc. v. Lemelson Med.,*
    277 F.3d 1361 (Fed. Cir. 2002) ...........................................................................32

*Symbol Techs., Inc. v. Opticon, Inc.,*
    935 F.2d 1569 (Fed. Cir. 1991) ...............................................................10, 11, 31

*Union Carbide Corp. v. Dow Chem. Co.,*
    619 F. Supp. 1036 (D. Del. 1985) .......................................................................28

## FEDERAL STATUES, RULES AND REGULATIONS

37 C.F.R. § 1.321(c)(3) ........................................................................................25

35 U.S.C. § 121 ...........................................................................................passim

35 U.S.C. 154 ......................................................................................................18

35 U.S.C. § 156 ..............................................................................................21, 23

35 U.S.C. § 253 ...................................................................................................19

Fed R.Civ. P. 54(d)(1) .........................................................................................40

D. Del. R. 54.1(a)(1) ............................................................................................40

Manual of Patent Examining Procedure ....................................................13, 14, 15

## OTHER AUTHORITIES

75 J. Pat. & Trademark Off. Soc'y 161 (1993)
    [P.J. Federico, *Commentary on the New Patent Act* (1954)] ...........................................27, 32

## SUMMARY OF THE ARGUMENT

Clear and convincing evidence at trial demonstrated that Boehringer's '812 patent is invalid for double patenting. The relevant law is well-established and the relevant facts are not in dispute. Judgment should therefore be entered in favor of Defendants.

The '812 patent claims various compounds, including pramipexole. But before getting the '812 patent, Boehringer first obtained the '086 patent, which claims methods of using the same compounds. That is the epitome of nonstatutory double patenting. It has long been settled that claims to compounds and known methods of using them are not patentably distinct. Indeed, the notion that one could obtain a patent for methods of using a particular compound, and then get a second patent, with a later expiration date, claiming the compound itself, is contrary to both law and logic—since the earlier invention necessarily requires having and using the compound.

The compound claims of the '812 patent are not patentably distinct from the earlier method claims of the '086 patent, and Boehringer knows as much. That was amply demonstrated by Boehringer's own action, at the close of trial, in filing a terminal disclaimer to unilaterally give away five-and-a-half months of the '812 patent's term extension period. Although Boehringer portrays this as merely belt-and-suspenders caution, in reality, Boehringer's terminal disclaimer was a desperate Hail Mary pass—a tacit admission that the '812 patent is invalid. Unfortunately for Boehringer, its terminal disclaimer does not solve the double patenting problem. The only permissible cure for nonstatutory double patenting is to surrender all patent protection for that portion of the defective later patent that extends beyond the term of the earlier patent, and to do so before the earlier patent expires. The second patent otherwise is incurably invalid. Since Boehringer chose to wait until after the '086 patent expired and continued to maintain all of the claims of the '812 patent—and the corresponding rights to exclude—beyond that expiration, Boehringer's last-ditch effort to save the '812 patent fails.

## NATURE AND STAGE OF THE PROCEEDINGS

Defendants Barr Laboratories, Inc. ("Barr") and Mylan Pharmaceuticals, Inc. ("Mylan") (collectively "Defendants") filed Abbreviated New Drug Applications with the FDA to sell pramipexole dihydrochloride tablets, generic versions of Mirapex®, a drug sold by Plaintiffs Boehringer Ingelheim International GmbH and Boehringer Ingelheim Pharmaceuticals, Inc. (collectively "Boehringer"). Boehringer filed this suit in response. At the trial held from March 11-13, 2008, Boehringer alleged infringement of claims 5, 7, 9, and 10 of U.S. Patent No. 4,886,812 ("the '812 patent") and Defendants contested, *inter alia*, the validity of claims 3, 4, 5, 7, 9, and 10 of the '812 patent. Boehringer originally asserted U.S. Patent No. 4,843,086 ("the '086 patent"), but that patent expired on June 27, 2006.

## BRIEF TECHNICAL BACKGROUND

The patents in this case relate to a large group of compounds known as tetrahydrobenzthiazoles, one of which is pramipexole. The earlier '086 patent claims methods of using the compounds to treat various medical conditions. The later '812 patent claims the compounds themselves. The compounds in the '812 and '086 patents are described as free bases and as acid addition salts. The salts result when the free base is reacted with an acid. Tr. 229:23-230:12 (Klibanov); Tr. 467:11-469:15 (Anslyn). Therapeutic administration of the acid addition salt of a tetrahydrobenzthiazole will naturally and necessarily produce, *inter alia*, the free base of that compound. *See* Tr. 231:14-233:3, 246:10-247:13 (Klibanov); Tr. 489:17-23 (Anslyn).

## ARGUMENT

### I.    CLAIMS 3, 4, 5, 7, 9, AND 10 OF THE '812 PATENT ARE INVALID FOR NONSTATUTORY DOUBLE PATENTING

The testimony of Defendants' expert chemist, Dr. Eric Anslyn, was uncontroverted.  Dr. Anslyn compared the claims of the '812 and '086 patents, as understood by the person of ordinary skill, and clearly and convincingly demonstrated the existence of double patenting. Boehringer and its experts did not dispute Dr. Anslyn's testimony that the earlier '086 patent claimed methods of using compounds that Boehringer then claimed in the later '812 patent.  Nor did Boehringer dispute Dr. Anslyn's testimony that the natural result of practicing those earlier method claims is the possession or presence of one or more of the compounds claimed in the '812 patent.  The law could not be more clear that in such a situation—with claims directed to particular compounds on the one hand, and known methods of using those compounds on the other hand—the claims are not patentably distinct.  As a result, the claims of the '812 patent are invalid for nonstatutory double patenting.

### A.    The Person of Ordinary Skill in the Art

The claims of the '812 and '086 patents must be read through the eyes of the hypothetical person of ordinary skill in the art (the "POOS").  *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).  Since the POOS is a hypothetical person, such person may possess the skills and experience of multiple individuals.[1]  For the '086 and '812 patents, whose common specifications describe the invention as chemical compounds, processes for making them, and methods of using them, TX 1, 2, 3, the POOS would possess a combination of skills in

---

[1] *See, e.g., Medinol Ltd. v. Guidant Corp.*, 341 F. Supp. 2d 301, 321 (S.D.N.Y. 2004) (POOS could be multiple individuals working together or a team of scientists); *see also Merck & Co. v. Teva Pharms. USA, Inc.*, 228 F. Supp. 2d 480, 501 (D. Del. 2002) (POOS could have knowledge and experience from various disciplines), *aff'd*, 347 F.3d 1367 (Fed. Cir. 2003).

chemistry, pharmacology, and/or biological evaluation of pharmaceutical compounds. Tr.

460:12-461:10 (Anslyn); Tr. 684:17-685:22 (Mailman); *see also* Tr. 223:1-10 (Klibanov)

(training in chemistry, biochemistry, pharmacy, or related discipline). These credentials are

consistent with the educational background and work experience of the inventors, who were

knowledgeable in chemistry and biology.[2] These qualifications are also consistent with the

explanation of Defendants' expert neuropharmacologist Dr. Richard Mailman that chemists and

pharmacologists typically work together as a team to evaluate whether a compound provides a

particular therapeutic effect. Tr. 715:5-12 (Mailman).

### B.    Nonstatutory Double Patenting Turns on Whether Later Claims Are Patentably Distinct from Earlier Claims

The type of double patenting at issue here—"nonstatutory" double patenting—"is a

judicially created doctrine adopted to prevent claims in separate applications or patents" which

are "so alike that granting both exclusive rights would effectively extend the life of patent

protection." *In re Metoprolol Succinate Patent Litig.*, 494 F.3d 1011, 1016 (Fed. Cir. 2007).[3]

The touchstone for nonstatutory double patenting is patentable distinctness. In other words,

double patenting exists where "claims in a later patent . . . are not patentably distinct from claims

in a commonly owned earlier patent." *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 967

(Fed. Cir. 2001).

---

[2] *See* Tr. 566:15-568:4 (Kobinger Dep.); TX 787 (Hurnaus Dep.) 9:6-9:12, 13:4-18, 14:6-10, 15:22-16:6; TX 789 (Mierau Dep.) 10:23-11:5, 11:9-22, 22:4-11; TX 790 (Schingnitz Dep.) 12:12-14:5; TX 791 (Schneider Dep.) 8:16-8:25, 9:14-10:3, 10:20-11:2, 12:9-21; *see also Envtl. Designs, Ltd. v. Union Oil Co.*, 713 F.2d 693, 696 (Fed. Cir. 1983) (setting forth the factors for determining the POOS).

[3] Nonstatutory double patenting is sometimes referred to as "obviousness-type" double patenting, a label that is a misnomer to the extent it implies that nonstatutory double patenting only occurs where a later claim is obvious in view of an earlier claim.

The Federal Circuit, relying on longstanding precedent, recently reiterated the analytical framework for evaluating whether claims are patentably distinct:

> "A later patent claim is not patentably distinct from an earlier patent claim if the later claim is obvious over, or anticipated by, the earlier claim." [*Eli Lilly*, 251 F.3d at 968.] We have also held that a "claim to a method of using a composition is not patentably distinct from an earlier claim to the identical composition in a patent disclosing the identical use." [*Geneva Pharms., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1385-86 (Fed. Cir. 2003).]

*Pfizer, Inc. v. Teva Pharms. USA, Inc.*, 518 F.3d 1353, 1363 (Fed. Cir. 2008). Accordingly, there are at least three ways to establish that claims are not patentably distinct. First, claims to a method of using a compound are not patentably distinct from claims to the compound itself where that method was disclosed by the earlier patent. Second, claims are not patentably distinct if the earlier claim anticipates the later claim. Third, claims are not patentably distinct if the earlier claim renders the later claim obvious. Boehringer's '812 patent claims are invalid under all three of these established rules.

### C. The '812 Patent Claims Are Invalid Because a Claim to a Compound is Not Patentably Distinct from a Claim to a Method of Using the Compound

#### 1. The *Geneva-Pfizer* Line of Cases

Decades of controlling precedent leave no doubt as to the law governing the issue before the Court: the comparison of compound and method of use claims in evaluating a defense of double patenting. In *Geneva Pharmaceuticals, Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373 (Fed. Cir. 2003), the Federal Circuit concluded that two sets of claims—one directed to a compound and one directed to a method of using it—just like the claims presented here, were not patentably distinct from one another as a matter of law. *Id.* at 1385-86. After remarking that the "court does not consider the [compound] claim in a vacuum, as a simple compound, without considering the compound's disclosed utility," *id.* at 1385, the Federal Circuit held that a claim

to the compound and a method of using it were not patentably distinct from one another where that method of using it had been described in the earlier patent. *Id.* at 1384-86. The court concluded that the compound and a previously disclosed method of using it constitute a single invention for which only one patent may be granted. *Id.*

In *Pfizer*, the Federal Circuit re-affirmed the test set forth in *Geneva*. *Pfizer* presented the court with a patent claiming the use of a composition that was itself claimed in an earlier patent, 518 F.3d at 1363, and the Federal Circuit again found the claims patentably indistinct. "Thus, we agree with the district court that the [later] patent merely claims a particular use described in the [earlier] patent of the claimed compositions of the [earlier] patent. The asserted claims of the patent [later] are therefore not patentably distinct over the claims of the [earlier] patent." *Id.*

The rule applied in *Geneva* and *Pfizer* was not a departure from the conventional view. Rather, in *Geneva*, the Court expressly relied on two earlier decisions of the Court of Customs and Patent Appeals ("CCPA")—*In re Byck*, 48 F.2d 665 (CCPA 1931) and *In re Christmann*, 128 F.2d 596 (CCPA 1942)[4]—which both stated:

> It would shock one's sense of justice if an inventor could receive a patent upon a composition of matter, setting out at length in the specification the useful purposes of said composition, manufacture and sell it to the public, and then prevent the public from making any beneficial use of such product by securing patents upon each of the uses to which it may be adapted.
>
> In the case at bar, appellant received a patent upon his composition of matter because he had invented something new and useful. He could not have received such patent unless he had disclosed its utility. Such disclosure of usefulness did not constitute separate inventions, but an essential part of a single invention.

---

[4] Decisions of the CCPA are binding on the Federal Circuit. *South Corp. v. United States*, 690 F.2d 1368, 1370-71 (Fed. Cir. 1982) (en banc).

48 F.2d at 666-67 (emphasis added); 128 F.2d at 600 (emphasis added); *see also Geneva*, 349 F.3d at 1386; *Pfizer*, 518 F.3d at 1363 n.8.  In other words, because a compound and a method of using it are part of a "single invention," it would "shock one's sense of justice" if a patentee were to take that single inventive concept and obtain separate patents, thereby extending the period of monopoly.  To do so would violate the very essence of the rule against double patenting.

This well established principle applies regardless of the order of the claims—*i.e.,* whether the compound claims come before the method claims or whether the method claims come before the compound claims.  In *Geneva,* the Federal Circuit expressly considered both factual scenarios and concluded that compound and method claims are not patentably distinct and the later claims are invalid either way.  The Court reached that result when the compound claims came first, finding the later method claims invalid.  *Geneva*, 349 F.3d at 1384-86.  And the Federal Circuit came to the same result when the method claims came first, which is the precise factual posture of this case, and found the later compound claims invalid.  *See id.* at 1375-82 (affirming finding of double patenting in *Geneva Pharms., Inc. v. Glaxosmithkline PLC*, No. 2:01cv391 (consolidated), slip op. (E.D. Va. Apr. 22, 2002), attached as Ex. 5A to D.I. 190).

*Christmann* also involved the order of claims at issue here: whether one could "claim broadly a new compound as a separate invention" in view of previously obtaining "a patent for the same compound as used in an insecticide."  128 F.2d at 599.  Not surprisingly, the court there too concluded that the later compound claims—which by their very nature provide broader patent protection than an earlier claim to a method of using the compound—were invalid for double patenting.  *Id.* at 599-600.

Boehringer may argue that the *Geneva-Pfizer* line of cases is limited to compounds having a single utility, so it does not apply to pramipexole which allegedly has multiple utilities.

Tr. 289:4-19 (Counsel for Boehringer). That is a textbook example of a distinction without a difference. Nothing in *Geneva* or *Pfizer* suggests that the rule they each applied is limited to instances where a compound has only one method of use. Moreover, prior decisions underlying the *Geneva-Pfizer* line of cases contemplated compounds or compositions with multiple utilities and nonetheless found double patenting.

For example, the decision in *Christmann* expressly rejected any distinction based on multiple uses. There the patent applicants first claimed the use of a composition for a particular utility (as an insecticide), and then filed an application on the composition itself. 128 F.2d at 597. In response to a rejection, the applicants submitted declarations showing additional utilities for the claimed composition. But the CCPA rejected the notion that the new uses could support a claim to the compound itself:

> The claims in the instant case are not directed to any particular use although . . . appellants rely in part upon the new use to justify their contention for allowance of the new claims. Unquestionably, under the stated circumstances the allowance of the appellants' claims would be an extension of the appellants' monopoly not warranted by law. If they were to obtain a patent including the instant claims, they would presumptively be given a monopoly for seventeen years on the exclusive use of the compound for any purpose.

*Id.* at 599-600 (emphasis added). In other words, whether a compound can be used for a single use or for multiple uses, the bottom line is the same. Once a use of a compound is claimed, a second, subsequent patent cannot be obtained on the compound itself.

### 2. The '812 Patent Claims Compounds That Were Already Claimed In the Earlier '086 Method Claims

As Dr. Anslyn explained, the earlier '086 patent claimed methods of using various compounds, and then the later '812 patent claims those very same compounds.

The compounds claimed in claim 3 of the '812 patent are <u>identical</u> to the compounds used in the method of claim 23 of the '086 patent, Tr. 483:8-484:14 (Anslyn), and the compounds claimed in claim 7 of the '812 patent are <u>identical</u> to the compounds used in the methods of claims 9, 19, 29, and 39 of the '086 patent, Tr. 481:11-482:18, 493:11-20 (Anslyn), as shown here:

| '812 Patent Compound Claims | '086 Patent Method Claims that Use the Identical Compounds Claimed in the '812 Patent Claim |
|---|---|
| 3 | 23 |
| 7 | 9, 19, 29, 39 |

Tr. 481:11-482:18, 483:8-484:14, 493:11-20 (Anslyn).

Similarly, at least one compound claimed in each of claims 4, 5, 9, and 10 of the '812 patent is always and necessarily used in the methods of each of claims 9, 19, 29, and 39 of the '086 patent, as shown here:

| '812 Patent Compound Claims | '086 Patent Method Claims that Always and Necessarily Use a Compound Claimed in the '812 Patent Claim |
|---|---|
| 4 | 9, 19, 29, 39 |
| 5 | 9, 19, 29, 39 |
| 9 | 9, 19, 29, 39 |
| 10 | 9, 19, 29, 39[5] |

Tr. 485:22-486:20, 487:4-491:1, 492:18-493:10, 493:21-495:10 (Anslyn).

---

[5] The evidence demonstrated that additional claims of the '086 patent always and necessarily use compounds claimed in claims 3, 4, 5, 9, and 10 of the '812 patent, but for simplicity, we have not listed all of those '086 patent claims here. *See* Proposed Findings of Fact ¶¶ 28-32.

Dr. Anslyn further explained that the person of ordinary skill would understand that it would be impossible for one to practice any of seventeen of the claims of the '086 patent[6] without necessarily using or forming compounds claimed in claims 3, 4, 5, 7, 9, and/or 10 of the '812 patent. Tr. 482:19-483:7, 484:15-485:1, 485:22-486:20, 487:4-491:1, 493:21-495:10 (Anslyn). Those '086 patent claims are each limited to the use of compounds that are claimed in the '812 patent.

> ### 3.    Claims 3, 4, 5, 7, 9, and 10 of the '812 Patent Are Not Patentably Distinct From Claims of the '086 Patent Under the *Geneva-Pfizer* Line of Cases

As discussed above, under the *Geneva-Pfizer* line of cases, claims directed to compounds (the '812 claims) are not patentably distinct from claims directed to methods of using the same compounds (the '086 claims) where those methods of use are disclosed in the earlier patent. Having already obtained patent protection for a method of using the compounds, a patentee cannot thereafter obtain additional patent protection on the compounds themselves. The underlying rationale for this rule is clear:  if such claims were allowed, the patentee would be able to preclude the public from practicing the earlier invention after the expiration of the first patent. That is precisely what Boehringer attempted here. As Dr. Anslyn explained, it would be impossible to practice various methods claimed in the now-expired '086 patent without using compounds claimed in (and thereby infringing) the later '812 patent. Boehringer attempted to use the compound claims in the '812 patent to unlawfully extend its monopoly over the invention claimed in the '086 patent, namely the use of those compounds in certain methods. It is not the case, therefore, that "the world [was] free to use" the invention claimed in the earlier patent as soon as it expired. *See Symbol Techs., Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1581 (Fed. Cir.

---

[6] Claims 7, 8, 9, 10, 17, 18, 19, 20, 23, 27, 28, 29, 30, 37, 38, 39 and 40.

1991); *see also In re Longi*, 759 F.2d 887, 894 (Fed. Cir. 1985). Boehringer attempted to use the '812 patent as a shield to "effectively extend the life of the" '086 patent, which demands the conclusion that the '812 patent is invalid for double patenting. *Symbol Techs.*, 935 F.2d at 1581.

## D.     The '812 Compound Claims Are Anticipated By—and Thus Not Patentably Distinct From—the '086 Method Claims

The claims of the '812 patent are invalid for a second reason: because the earlier method claims in the '086 patent anticipate—expressly and inherently—the subsequent compound claims. As the Federal Circuit has explained, "[a] patentable distinction does not lie where a later claim is anticipated by an earlier one." *Eli Lilly*, 251 F.3d at 970. A later claim is anticipated in the double patenting context when a claim of an earlier, commonly owned patent discloses, either expressly or inherently, each limitation of the later claim. *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d at 970; *Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003). For instance, a subsequent claim directed to a group of compounds is invalid for double patenting when a prior commonly owned patent claims one compound within that group, as the general rule that a species anticipates a genus applies equally in the double patenting context. *Eli Lilly*, 251 F.3d at 970-71; *In re Goodman*, 11 F.3d 1046, 1053 (Fed. Cir. 1993).

In undertaking the double patenting anticipation analysis, it is proper to inquire whether an earlier claim discloses a particular compound or composition. *See, e.g., Metoprolol*, 494 F.3d at 1019 (looking to whether the earlier patent in double patenting case "discloses" a particular composition); *Geneva*, 349 F.3d at 1385 (In assessing double patenting, "this court examines the disclosure of the [earlier] claim."). 

The undisputed evidence at trial established that the earlier '086 patent claims explicitly disclose the compounds later claimed in the '812 patent. As Dr. Anslyn's testimony established,

claims 3, 4, 5, 7, 9, and 10 of the '812 patent each claim a genus of compounds which either (a) is identical to a genus of compounds used in a method claim of the '086 patent, or (b) includes every compound used in a method claim of the '086 patent. *See supra* at 8-9. The earlier claims in the '086 patent therefore expressly anticipate the claims of the '812 patent because the earlier claims disclose the identical genus of compounds, or at least a species or sub-genus of the compounds, claimed in the later patent.

A prior patent claim may also inherently anticipate a later commonly owned claim and thereby result in double patenting. *See Eli Lilly*, 251 F.3d at 970. A reference inherently anticipates a claim if the claim is the natural result of practicing the reference's explicit limitations. *Id.*

The evidence at trial clearly and convincingly demonstrated that claims 3, 4, 5, 7, 9, and 10 of the '812 patent are inherently anticipated by the earlier claims of the '086 patent, as the natural result of practicing methods claimed in the '086 patent would be the presence of one or more compounds claimed by claims 3, 4, 5, 7, 9, and 10 of the '812 patent. *See supra* at 10. The rationale for Dr. Anslyn's testimony is indisputable. A person of ordinary skill in the art would appreciate that in order to practice the method claims of the '086 patent—which recite methods of using a therapeutically effective amount of a compound—the skilled artisan must necessarily have the specified compound. Tr. 477:22-478:10, 482:19-483:7, 484:15-485:1, 485:22-486:20, 488:10-491:1, 493:21-495:10 (Anslyn). Several inventors of the '086 and '812 patents confirmed this self-evident proposition. Tr. 570:1-571:6 (Kobinger Dep.); TX 789 (Mierau Dep.) 64:2-10, 65:9-13, 66:24-67:4, 67:7-67:14, 67:17-18; TX 790 (Schingnitz Dep.) 159:10-24.

This principle applies with equal force to claims 9 and 10 of the '812 patent, even though such claims may be limited to free base compounds and the prior '086 patent methods optionally

administer the acid addition salt, because some amount of free base naturally and necessarily results from therapeutic administration of the salt. *See* Tr. 488:23-491:1 (Anslyn); Tr. 231:14-233:3, 246:10-247:13 (Klibanov); *see also SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1345 (Fed. Cir. 2005) (formation of a compound, even in trace amounts, is sufficient to anticipate).

**E.    The '812 Compound Claims Are Obvious Over—and Thus Not Patentably Distinct From—the '086 Method Claims**

Finally, the earlier '086 patent claims render obvious the later '812 patent claims. As discussed above, the person of ordinary skill practicing the method claims of the '086 patent would naturally and necessarily have the compounds claimed in the '812 patent. Accordingly, the compounds themselves, as claimed in the later '812 patent, are certainly "'the product not of innovation but of ordinary skill and common sense'" based on the prior '086 patent claims. *See Metoprolol*, 494 F.3d at 1017 n.2 (*quoting KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. __, 127 S. Ct. 1727, 1742 (2007)).

**F.    Boehringer's Alternate Approaches To Double Patenting Are Not the Law**

Because it cannot prevail under the proper legal tests set forth above, Boehringer may ask the Court to ignore the well-settled law on double patenting and instead apply new tests created by Boehringer for purposes of saving the '812 patent. Any such arguments should be summarily rejected.

**1.    "Materially Different Processes" Is Not and Cannot Be the Proper Standard**

Relying solely on a never-before-relied-upon section of the Manual of Patent Examining Procedure ("MPEP"), which does not have the force of law in any event, Boehringer suggests that there exists an alternate test for double patenting. Boehringer invites this Court to be the first to adopt this brand-new standard for deciding whether claims are patentably distinct, even

though it is inconsistent with controlling Federal Circuit precedent. Specifically, Boehringer contends that Section 806.05(h) of the MPEP provides an additional test for patentable distinctness, namely, whether compounds claimed in a later patent may be used in "materially different processes" than methods claimed in an earlier patent. It does not.

Boehringer points to no case, and Defendants are aware of none, that has adopted Boehringer's "materially different processes" test to decide whether claims to methods and compounds are invalid for nonstatutory double patenting. To the contrary, the standards for patentable distinctness set forth in the binding Federal Circuit precedent are fundamentally inconsistent with such a test. As discussed above, additional uses for a compound do not alter the double patenting analysis. *See supra* at 7-8. For example, both *Byck* and *Christmann* specifically addressed situations in which more than one use was contemplated for a particular compound, but still concluded that compound and method claims are not patentably distinct from one another where the method is disclosed in the earlier patent. Moreover, the test for patentable distinctness set forth in *Eli Lilly* demands a conclusion of double patenting if the later claims are anticipated by the earlier ones. *See supra* at 11. As applied to this case, that analysis examines whether a later claimed compound is expressly or inherently present in the prior method of use claim. *Eli Lilly*, 251 F.3d at 970; *In re Goodman*, 11 F.3d at 1053. Whether that compound can be used in "materially different processes" has absolutely nothing to do with that inquiry.

The fact that Section 806.05(h) exists in the MPEP is of no moment for this Court, as the MPEP does not bind the Federal Circuit or this Court and does not have the force of law. *See, e.g.*, *Racing Strollers, Inc. v. TRI Indus., Inc.*, 878 F.2d 1418, 1422 (Fed. Cir. 1989); Foreword, MPEP. In other words, although the PTO may use the "materially different processes" test set

forth in Section 806.05(h) of the MPEP to facilitate examination of a patent application in certain cases, it does not set forth the relevant legal test for double patenting.

### 2.    Double Patenting Is Not Limited to Claims of the Same Statutory Type

Boehringer has also suggested that the '812 patent cannot be invalid for double patenting because the claims of the two patents are of different statutory types—*i.e.,* the '812 claims are directed to compounds, while the '086 patent claims methods. But any such bright line test clearly cannot withstand scrutiny in light of the *Geneva-Pfizer* line of cases, which all found a lack of patentable distinction between claims in one patent claiming compounds and claims in a second patent claiming methods of use.

## II.    BOEHRINGER'S RESPONSES DO NOT SAVE THE '812 CLAIMS

At trial, Boehringer clearly recognized the futility of trying to assert that the claims of the '812 patent and '086 patent are patentably distinct under the relevant standards. Indeed, it did not offer any testimony comparing the claims, nor did it meaningfully cross examine Dr. Anslyn on his comparison. Instead, Boehringer's response to this undeniable showing of double patenting is to try to convince the Court that: (1) Boehringer's last-minute disclaimer of five-and-a-half months of the '812 patent's term extension somehow operates as a magical, retroactive cure-all for double patenting; (2) Boehringer is entitled to the benefit of the limited exception of 35 U.S.C. § 121, even though the application that led to the '812 patent admittedly was not filed as the result of a restriction requirement as the law requires; and (3) objective indicia of non-obviousness—which the Federal Circuit and this Court have already held are irrelevant to double patenting—save the '812 patent. Each of these arguments is meritless.

A.    **Boehringer's Untimely Disclaimer Did Not Resurrect the '812 Patent**

After both sides rested at trial, Boehringer announced that it had, that very day, filed a terminal disclaimer, and sought to rely on that disclaimer in a futile attempt to bring the clearly invalid '812 patent claims back to life. Whatever Boehringer hoped this gesture would achieve, it did nothing to solve the '812 patent's double patenting problem. First, the disclaimer is ineffective to remedy the double patenting because the '812 patent became incurably invalid when the '086 patent expired and Boehringer continued to prevent the public from freely practicing that invention by virtue of maintaining the '812 patent, which claims a patentably indistinct invention with a longer patent term. A terminal disclaimer years later cannot retroactively restore rights that Boehringer unlawfully withheld from the public starting when the '086 patent expired. Second, the disclaimer Boehringer offered—five-and-a-half months off the end of its patent term extension period—did not solve the double patenting issue because it <u>failed to restore to the public the same rights Boehringer's double patenting withheld from the public</u>. Both the patent term extension statute and Federal Circuit case law make clear that a patentee's rights under a patent term extension are substantially narrower than the full rights under a patent's original term. Finally, Boehringer's terminal disclaimer is of no moment because it fails to satisfy several prerequisites for a disclaimer to eliminate double patenting.

1.    **The Prohibition on Double Patenting Prevents Unjustified Extensions of a Patentee's Right to Exclude**

The crux of our patent system is a bargain: a patentee discloses an invention in a public patent, so that others can improve on the invention and practice it after the patent expires, in exchange for the patentee receiving a 20-year monopoly on the invention. *See Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 150-51 (1989). Double patenting—a patentee having a second patent that claims an invention that is not patentably distinct from its earlier patent—

upsets this balance and results in the patentee not keeping its end of the bargain. To ensure that the public gets the benefit of its bargain, the prohibition on double patenting "prevent[s] a patentee from obtaining a time-wise extension of [a] patent for the same invention or an obvious modification thereof." *See, e.g., In re Lonardo*, 119 F.3d 960, 965 (Fed. Cir. 1997); *see also Eli Lilly*, 251 F.3d at 967-68 ("The judicially-created doctrine of obviousness-type double patenting . . . prohibit[s] a party from obtaining an extension of the right to exclude through claims in a later patent that are not patentably distinct from claims in a commonly owned earlier patent."); *In re Braithwaite*, 379 F.2d 594, 601 (CCPA 1967) ("Double patenting is . . . primarily intended to prevent prolongation of monopoly.").

A terminal disclaimer is allowed to solve some double patenting problems precisely because it can eliminate the extra patent term that the second patent otherwise would have provided to the patentee beyond the term of the first patent, thereby avoiding the harm to the public that results from successive patents directed to the same, or indistinct, inventions. To effectuate that public protection function, however, the disclaimer must be filed before the first patent expires and must tie the expiration of the two patents to the same date. Otherwise, the result is an extension of the monopoly—in contravention of the public's interest in practicing the invention. Consistent with that strong public policy, the Federal Circuit has held that a terminal disclaimer must be filed before the first patent expires in order to cure double patenting. "[A] terminal disclaimer may overcome that [double patenting] basis for unpatentability, <u>assuming that the first patent has not expired</u>." *Lonardo*, 119 F.3d at 965 (emphasis added); *see also Eli Lilly*, 251 F.3d at 968 n.5. Based on the same policy, it is a fixed point of law that a terminal disclaimer must prevent the time-wise extension of the second patent beyond the life of the first patent, if it is to cure double patenting. *See, e.g., Eli Lilly*, 251 F.3d at 967-68; *Lonardo*, 119

F.3d at 965; *In re Van Ornum*, 686 F.2d 937, 943-44 (CCPA 1982). Once the earlier patent has expired without the longer portion of the later patent having been disclaimed, a subsequent terminal disclaimer can no longer prevent some time-wise extension of the monopoly on the invention—from the moment the first patent expired, the unlawful extension occurred. In such a case, the doctrine of double patenting renders the later patent claims incurably invalid. That is what happened here.

### 2.    Boehringer's Disclaimer Is Ineffective Because It Fails to Disclaim to the Expiration Date of the '086 Patent

The harm caused by Boehringer's '812 patent claims is that, by virtue of their later expiration, they extended Boehringer's effective monopoly over the invention claimed in the '086 patent. The '086 patent expired on June 27, 2006, D.I. 190 at Ex. 1, ¶ 19, and the '812 patent's original term expired nearly six months later on December 12, 2006, TX 99 at BARR912. For a terminal disclaimer to cure this problem, the term of the '812 patent would need to have been disclaimed to the expiration date of the '086 patent, such that the two patents expired on the same day. That did not happen here, for two separate but related reasons. First, Boehringer waited until well after the '086 patent expired to file its disclaimer. By the time it did so, the horse had already left the barn—it was no longer possible to disclaim the term of the '812 patent back to the expiration date of the '086 patent since the '086 patent's expiration date had already come and gone. Second, Boehringer's disclaimer does not even purport to give the '812 patent the same expiration date as the '086 patent, as is required to cure the harm caused by the double patenting. Instead, it disclaimed "only the terminal part of the statutory term of the '812 patent which would extend beyond 1,564 days after the full statutory term of the '086 patent as that term is defined in 35 U.S.C. 154, so that, by virtue of this disclaimer, the '812 patent will expire on October 8, 2010." TX 548; Tr. 718:14-719:7 (Counsel for Boehringer).

As discussed above, claims 3, 4, 5, 7, 9 and 10 of the '812 patent are not patentably distinct from multiple claims of the '086 patent. *See supra* at 5-13. Accordingly, those claims have been invalid from the day they were issued. They then became <u>incurably</u> invalid on June 27, 2006—the day the '086 patent expired. At the moment the '086 patent expired, the public should have had the right to practice the invention claimed in the '086 patent. Instead, as Dr. Anslyn explained, it is impossible to practice those methods without using compounds claimed in the '812 patent. In other words, allowing the '812 patent term to survive the expiration of the '086 patent prevents the public from practicing the earlier-claimed invention.

That is precisely why the law provides that the <u>only</u> terminal disclaimer that can cure a double patenting problem is one that ties the expiration dates of the two patents. In *In re Robeson*, 331 F.2d 610 (CCPA 1964), the CCPA explained that if "the second patent expires simultaneously with the first, the right to fully utilize the patented discovery at the expiration date remains unimpaired. Thus the terminal disclaimer here precludes any extension of monopoly." *Id.* at 614.

This basic, unchanging principle has been recognized repeatedly. In *In re Longi*, the Federal Circuit explained that nonstatutory double patenting can be cured if the patentee files

> a terminal disclaimer under 35 U.S.C. § 253, disclaiming "any terminal part of the term . . . of the patent," <u>thereby guaranteeing that the second patent would expire at the same time as the first patent.</u> . . . <u>Since the second patent would expire simultaneously with the first</u>, this use of a terminal disclaimer is consistent with the policy that the public should be free to use the invention as well as any obvious modifications at the end of the patent's term.

759 F.2d 887, 894 (Fed. Cir. 1985) (emphases added); *see also Eli Lilly,* 251 F.3d at 968 n.5 ("double patenting <u>precludes</u> the [later claim] from extending beyond the termination date of the [earlier patent]" (emphasis added)); A-9 Chisum on Patents § 9.04 ("In a line of decisions

beginning in 1964, the [CCPA] adopted the position that a terminal disclaimer that causes a

second patent to the same inventor to expire on the same date as the first will cure the double

patenting problem in all situations except when two patents are for identical subject matter.").

This precedent is consistent with the premise underlying terminal disclaimers:  by allowing an

inventor to avoid double patenting with a terminal disclaimer, the courts have "in no way

enlarged the scope of patent protection available to the inventor." *In re Eckel*, 393 F.2d 848, 857

(CCPA 1968).

The terminal disclaimer at issue here was filed long after the expiration date of the '086

patent and is, therefore, incapable of tying the expiration of the '812 patent to that date.

Boehringer asks this Court to take the unprecedented step of giving curative effect to a

retroactive terminal disclaimer that does not couple the expiration of the second patent to the

expiration of the first, and thereby does not avoid the harm that the prohibition on double

patenting is intended to prevent.  The Court should decline this invitation.

### 3.    The Surrender of a Portion of Boehringer's Patent Term Extension Did Not Eliminate Double Patenting

Recognizing that it did not file its disclaimer before the expiration of the '086 patent, and

did not make the two patents expire on the same date, Boehringer essentially seeks to argue no

harm, no foul.  The lynchpin of this argument is the patent term extension pursuant to 35 U.S.C.

§ 156 that Boehringer obtained for the '812 patent.  Boehringer's theory is that by disclaiming

five-and-a-half months at the end of its term extension period, it has achieved substantively the

same result as if it had properly terminally disclaimed (and thereby shortened the term of) the

'812 patent before the '086 patent expired and then put the patent term extension on that shorter

'812 patent.  Thus, Boehringer's position is that, irrespective of whether it complied with the law

regarding terminal disclaimers, so long as the ultimate expiration date of the term extension for

the '812 patent ends up being no later than what it would have been had Boehringer acted as the law requires, any double patenting problem vanishes.

That is simply wrong. Boehringer's patent term extension in no way changes the legal analysis. As an initial matter, it is self-evident that the patent term extension on the '812 patent cannot be any more valid than the patent itself because the term extension is just that—an extension of existing patent rights, not the creation of new rights. Although a patentee may extend the term of a patent, an invalid patent is invalid, with or without an extension. More importantly, Boehringer's argument is premised on the notion that the rights it disclaimed by giving up the end of its extension are identical to the rights it had under the '812 patent in the summer and fall of 2006 after the '086 patent expired. In fact, those rights are very different. Boehringer had the benefit (and deprived the public) of more rights in the second half of 2006 as a result of the '812 patent's later expiration date, than it surrendered by giving back five-and-a-half months from the end of its term extension in 2011.

### a. Boehringer's Term Extension Rises and Falls With the Validity of the '812 Patent

A patent term extension is just that—an extension of pre-existing rights held by the patentee. Section 156 itself is explicit that it only serves to extend existing patent rights—it does not grant any new rights to a patentee. *See, e.g.*, 35 U.S.C. § 156(a)(1) (extension not permissible if the patent has already expired). Section 156, entitled "Extension of patent term," is unambiguous—it extends (in part) the patent term of an existing patent. It does not create patent rights unconnected to the original patent. *See* 35 U.S.C. § 156 (repeatedly referring to the extension of "the term of a patent"). For this reason, it is self-evident that if the '812 patent is invalid, it remains invalid during any purported term as well.

The decision in *Merck & Co. v. Hi-Tech Pharmacal Co.*, 482 F.3d 1317 (Fed. Cir. 2007), did not change this established law. That case stands for the modest proposition that a patentee may place a term extension on a terminally disclaimed patent where the invalid patent is <u>first</u> made valid by terminally disclaiming any period of protection beyond the first patent <u>and then</u> the extension is added to the resulting shortened term. 482 F.3d at 1318-19. In other words, the disclaimer in *Merck v. Hi-Tech* did precisely what the law allows: it made the expiration dates of the two patents the same <u>prior</u> to the extension under Section 156. The Federal Circuit pointed to that very fact in explaining why the policy underlying the doctrine of double patenting was served notwithstanding the subsequent term extension:

> The computation of a Hatch-Waxman patent term extension is from the expiration date resulting from the terminal disclaimer <u>and not from the date the patent would have expired in the absence of the terminal disclaimer</u>. Any waiver of the term is thus not ignored or nullified because the terminal disclaimer provides the date from which the patent term extension begins. <u>The purpose of the terminal disclaimer</u>—to prevent extension of patent term for subject matter that would have been obvious over an earlier filed patent—<u>remains fulfilled by virtue of the fact that the date from which any Hatch-Waxman extension is computed is the terminally disclaimed date</u>. At the same time, the purpose of the patent term extension—to restore some of the patent term lost due to regulatory review—is also satisfied.

*Id.* at 1322-23 (emphases added). Thus the decision demonstrates that merely because a patent may be eligible for a term extension, that does not necessarily cure any double patenting problem. The double patenting problem was <u>first</u> solved by the filing of a terminal disclaimer before the expiration of the first patent, and <u>then</u> the extension was put on the valid, disclaimed patent.

**b.      Boehringer Did Not Disclaim the Same Rights It Unlawfully Enjoyed**

Boehringer asks the Court to give it a free pass for any technical violation of the prohibition on double patenting on the apparent theory that there was no resulting harm from Boehringer's retroactive disclaimer since it later gave up the same period of time (from its term extension) as it would have given up (from the '812 patent term) had it terminally disclaimed prior to the expiration of the '086 patent. The idea that giving up five-and-a-half months of patent term extension is the same as giving up five-and-a-half months of patent term has some superficial appeal. But once the facts are examined, Boehringer's position has no merit.

Boehringer withheld from the public in 2006 more than it purports to give back now, as Boehringer's rights during the term extension period are <u>substantially narrower</u> than they were during the original term of a patent. Pursuant to 35 U.S.C. § 156, any term extension that Boehringer obtained of the '812 patent allowed Boehringer to assert the '812 patent <u>only</u> to the extent that it covered pramipexole used for FDA approved uses. In *Merck & Co. v. Kessler*, 80 F.3d 1543 (Fed. Cir. 1996), the Federal Circuit explicitly held that, with respect to patent term extensions under Section 156, "the restoration period of the patent does not extend to all products protected by the patent but only to the product on which the extension was based." 80 F.3d at 1547 (*citing* 35 U.S.C. § 156(b)(1)). The Federal Circuit re-affirmed that holding in *Pfizer Inc. v. Dr. Reddy's Laboratories, Ltd.*, 359 F.3d 1361 (Fed. Cir. 2004), where it stated that Section 156 extensions cover only the active compound (in that case, amlodipine) or any of its salts or esters. 359 F.3d at 1367. Indeed, *Pfizer* further explained that the extension does not extend to the full array of uses for the active compound, stating that, "[t]he 'rights derived' provision of § 156(b) specifically limits the extension to '<u>any use approved for the product,' which means that other, *e.g.*, non-pharmaceutical uses, are not subject to the extension.</u>" *Pfizer*, 359 F.3d at 1366

(emphasis added). Such an interpretation of Section 156 is mandated by the statutory language, which states that the rights of the patentee during the period of the extension "shall. . . in the case of a patent which claims a product, be limited to any use approved for the product." 35 U.S.C. § 156(b) (emphasis added).

Boehringer's surrender of a portion of its term extension did not prevent the public harm that the prohibition on double patenting is designed to prevent. Had Boehringer done what it should have done—cured the double patenting problem by terminally disclaiming the '812 patent to the expiration date of the '086 patent and then added the patent term extension onto the shorter '812 patent—Boehringer would have been entitled in the summer and fall of 2006 to exclude others only from practicing a portion of the claims of the '812 patent—the use of pramipexole for FDA approved uses. But instead, by doing what it actually did in attaching its patent term extension to "December 12, 2006, the original expiration of the ['812] patent," TX 99 at BARR823, BARR912, the term extension began in December. As a result, during the summer and fall of 2006, Boehringer told the world that it could prevent others from practicing any of the '812 patent claims because the full patent scope remained in effect until December.

The full scope of those '812 claims encompass much more than pramipexole, indeed sometimes more than ten thousand compounds. Tr. 479:6-480:15 (Anslyn). And they encompass much more than the use of pramipexole for FDA approved uses, such as using pramipexole for the non-approved uses of lowering blood pressure or heart rate or treating schizophrenia (as claimed in the '086 patent). By placing its patent term extension on top of the December 2006 expiration date of the invalid '812 patent, rather than on the June 2006 expiration date of the '086 patent (or of the '812 patent had a proper disclaimer been filed), Boehringer unlawfully deprived the public of the ability to freely practice portions of the '086

patent that it had no lawful right to exclude others from practicing. For five-and-a-half months, Boehringer maintained the right to exclude others from making, using, selling, or offering for sale any of the compounds within the scope of the '812 patent claims, and for any purpose. Such broad patent protection was not—and could not have been—restored to the public through Boehringer's terminal disclaimer of its patent term extension, because it never was part of that extension. Accordingly, Boehringer's terminal disclaimer has done nothing to remedy the very harm that timely-filed terminal disclaimers are designed to prevent. *See, e.g., Lonardo*, 119 F.3d at 965; *Braithwaite*, 379 F.2d at 601; *Robeson*, 331 F.2d at 614. Boehringer's terminal disclaimer of its extension period is therefore not only too late, it is also too little.[7]

### 4. Boehringer's Disclaimer Is Also Ineffective Because It Lacks A Required Provision to Cure Double Patenting

Boehringer's terminal disclaimer also is defective for failing to comply with the well-settled requirement that a terminal disclaimer must state that the later patent "shall be enforceable only for and during such period that said patent is commonly owned" with the patent which formed the basis for the double patenting. 37 C.F.R. § 1.321(c)(3); *see also Pharmacia Corp. v. Par Pharm., Inc.*, 417 F.3d 1369, 1374 (Fed. Cir. 2005); *Van Ornum*, 686 F.2d at 948 ("[W]e consider it desirable to tie both the termination and the ownership of the two patents together."). Boehringer's terminal disclaimer did not do that, and therefore is legally inoperative to the cure double patenting problem. *See* TX 548.

### 5. Boehringer's Disclaimer Comes Too Late to Affect This Case

Finally, the Court should reject Boehringer's last minute terminal disclaimer because it

---

[7] The decision in *Merck & Co. v. Hi-Tech Pharmacal Co.* is consistent with the limitations in Section 156 and related Federal Circuit case law, since, as discussed above, the fact that the later patent was first disclaimed and then extended meant that there was no risk that the patentee would have any broader patent coverage than it would be permitted under Section 156—a rule Boehringer has run afoul of here. 482 F.3d 1317, 1323 (Fed. Cir. 2007).

simply comes too late in the litigation. While the Federal Circuit has not decided the question of whether a terminal disclaimer filed during litigation can ever cure double patenting, *see Metoprolol*, 494 F.3d at 1020 n.4 ("This court has not decided the issue"), the Court should refuse to allow Boehringer's last minute disclaimer to do so in the circumstances of this case. The decision in *CMI Corp. v. Lakeland Constr. Co.*, 184 USPQ 721, 727 (N.D. Ill. 1975), *aff'd mem.*, 532 F. 2d 757 (7th Cir. 1976), supports such a determination. In *CMI*, the court, explaining that it was "concerned with the timing of the disclaimer, coming at such a late date, especially since defendants' answer had raised the issue several years earlier," found that a terminal disclaimer filed on the eve of trial, over seven years after the allowance of the patent and almost two years since the filing of the litigation, was ineffective to cure double patenting. 184 USPQ at 727. Here, Boehringer's decision to wait until the last possible moment to file a terminal disclaimer should not be rewarded.[8]

### B.    Boehringer Cannot Rely on the Exception of Section 121

Finally, Boehringer posits that it can escape a finding of double patenting because the conditions for an exception under 35 U.S.C. § 121 have been met. That is just wrong. Both the facts (from the prosecution histories) and the law (from the Federal Circuit) demonstrate that Section 121 is inapplicable here for the simple reason that the application that issued as the '812 patent has nothing to do with any restriction requirement imposed by the PTO. Rather, it was Boehringer who decided—voluntarily—to place the subject matter of the '086 and '812 patents in separate patents, and it was Boehringer who decided, unprompted, to file the separate

---

[8] As discussed in detail in Defendants' Opening Evidentiary Brief, filed simultaneously herewith, Boehringer's extreme delay in the filing of the terminal disclaimer—as well as the fact that it was not offered until after the parties had rested and after the close of evidence—also means that it is not properly part of the record and Boehringer cannot rely on it as a defense to double patenting.

application that led to the '812 patent in order to deal with a potentially interfering reference from Eli Lilly.

The third sentence of 35 U.S.C. § 121 provides a safe harbor from a charge of double patenting if, and only if, particular conditions are satisfied. *Bristol-Myers Squibb Co. v. Pharmachemie B.V.* ("*BMS*"), 361 F.3d 1343, 1347-48 (Fed. Cir. 2004). A patentee must demonstrate three things to obtain the benefit of Section 121. First, the patentee must show that the subsequent application was filed "as a result of a restriction requirement." *Id.* at 1347-48. Second, the subsequent application must be "consonant with" said restriction requirement. *Id.* Third, the subsequent application must be filed before the issuance of the patent from the earlier application during which the restriction requirement was made. *See* P.J. Federico, *Commentary on the New Patent Act*, at 35 (1954), *reprinted in* 75 J. Pat. & Trademark Off. Soc'y 161, 196 (1993).

Boehringer bears the burden of demonstrating that the Section 121 exception applies. *Geneva Pharms, Inc. v. GlaxSmithKline PLC*, 349 F.3d 1373, 1381 (Fed. Cir. 2003); *see also Regents of the Univ. of Cal. v. Dakocytomation Cal., Inc.*, No. C 05-03955, 2006 WL 1343950, at *2 (N.D. Cal. May 17, 2006). Boehringer has failed to carry that burden.

### 1.    Section 121 Requires the Patent Application to Be Filed "As a Result of" a Restriction Requirement

As an initial matter, Boehringer cannot satisfy the requirement that the application which issued as the '812 patent was filed "as a result of" a restriction requirement. In *BMS*, the Federal Circuit expressly held that: a patentee "is entitled to invoke the statutory prohibition against the use of the [earlier] patent 'as a reference' against the divisional application that resulted in the [later] patent only if the divisional application <u>was filed as a result of</u> a restriction requirement." 361 F.3d at 1347-48 (emphasis added). Other cases reflect the same conclusion,

including cases relied upon by Boehringer. *See, e.g., Pfizer Inc. v. Teva Pharms. USA, Inc.*, 518 F. 3d 1353, 1359 (Fed. Cir. 2008) ("[S]ection 121 provides a safe harbor to patents that issue on applications filed as a result of a restriction requirement." (emphasis added)); *Gerber Garment Tech., Inc. v. Lectra Sys., Inc.*, 916 F.2d 683, 687 (Fed. Cir. 1990) ("The prohibition against use of a parent application 'as a reference' against a divisional application applies only to the divisional applications that are 'filed as a result of' a restriction requirement." (emphasis added)); *Union Carbide Corp. v. Dow Chem. Co.*, 619 F. Supp. 1036, 1059 (D. Del. 1985).

The "as a result of" requirement is logical. The purpose of Section 121 is to prevent a patentee that has been forced by the PTO to divide up an application into several different patents from being penalized for complying with the PTO's directives. As the court explained in *Applied Materials, Inc. v. Advanced Semiconductor Materials America, Inc.*, "when the existence of multiple patents is due to the administrative requirements imposed by the Patent and Trademark Office, 35 U.S.C. § 121 provides that the inventor shall not be prejudiced by having complied with those requirements." 98 F.3d 1563, 1568 (Fed. Cir. 1996). Put differently, the applicant must be "forced to make [the claims of the later patent] in a separate application [from the earlier patent] by a requirement of restriction" for Section 121 to apply. *In re Zickendraht*, 319 F.2d 225, 232 (CCPA 1963) (Rich, J., concurring) (emphasis added). A contrary rule would give a patentee free license to file as many overlapping or related subsequent applications as it wished with impunity, as long as a restriction requirement had been issued earlier.

### 2. The '671 Application Was Filed to Address Issues Presented by the Lilly Application, Not as a Result of a Restriction Requirement

The evidence is undisputed that patent application No. 256,671 ("the '671 application"), which matured into the '812 patent, was not filed "as a result of" a restriction requirement.

Rather, as Boehringer admits and the file histories clearly demonstrate, the '671 application was filed voluntarily because of concern over potentially interfering matter between Boehringer's compound claims and a patent application filed by Eli Lilly, No. 747,748. TX 286 at BARR600; TX 786 (Stempel Dep.) 542:5-543:5, 544:12-16, 544:19-545:6, 558:21-561:7, 574:17-575:6; TX 704 (Boehringer's Response to Interrogatory No. 36) at pp. 24-25[9].

The first application that Boehringer filed was No. 810,947 ("the '947 application"), which ultimately issued as U.S. Patent No. 4,731,374 ("the '374 patent"). TX 1; TX 46. During prosecution, the examiner imposed a restriction requirement that divided the compound claims into five groups (I-V), the process claims into two groups (VI-VII), and the utility claims into three groups (VIII-X). TX 46 at BARR275-76; TX 786 (Stempel Dep.) 260:23-24, 261:6-25. The restriction requirement required Boehringer to elect either (1) **one** of the compound/composition groups **and one** of the utility groups, **or** (2) **one** of the process groups. TX 46 at BARR277 (emphasis added); TX 786 (Stempel Dep.) 263:4-10, 263:21-264:10. In other words, the examiner required compound and method claims to be prosecuted together. No other restriction requirement was imposed during prosecution of the Boehringer applications.

Boehringer then submitted application No. 124,197 ("the '197 application"), which ultimately issued as the '086 patent. In that application, Boehringer initially resubmitted all of the claims from the '947 application, including the subject matter of claims that had already issued in the '374 patent. TX 286 at BARR491-95; TX 786 (Stempel Dep.) 474:24-475:6, 476:5-14; 477:14-22, 484:14-17, 484:23-485:11. The new examiner rejected most of the

---

[9] Boehringer's internal documents reflect this concern. *See* TX 127 ("It cannot be ruled out that Eli Lilly gets patent rights in the USA which would dominate us."); TX 133 at BOE131840 ("Potential interference with Eli Lilly in USA."); *see also* TX 18 (Lilly Application); TX95/TX721 (applications interfere).

claims, but did deem allowable in the same patent compound claims 6 and 7 and method claims 9, 10, and 13.  TX 286 at BARR503; TX 786 (Stempel Dep.) 470:5-8.

In response, however, Boehringer cancelled <u>all</u> of the pending claims, including the allowed claims, TX 286 at BARR 592, TX 786 (Stempel Dep.) 503:7-11, 508:20-509:2, 509:10-14, 510:9-13, and then submitted new claims directed exclusively to methods of using compounds and processes for making compounds.  TX 286 at BARR578-93; TX 786 (Stempel Dep.) 511:13-511:24, 512:9-17, 512:20-513:3, 513:10-18, 513:21-514:7, 514:17-514:22, 515:2-8, 515:13-23.

Boehringer explained that the reason it took those actions was to address issues presented by the Lilly application.  It told the Patent Office that "[i]n view of the particular pertinence of" the Lilly application, and given the apparent concern over a potential interference with its compound claims, it would re-file those claims in a separate application to "advance the prosecution of [the '086 patent] and [so] that issues presented by [the Lilly application] will be more easily dealt with."  TX 286 at BARR600; TX 786 (Stempel Dep.) 542:5-543:5, 544:12-16, 544:19-545:6.  Thus, the reason the application that issued as the '812 patent was filed had absolutely nothing to do with a restriction requirement—it was a voluntary choice made by Boehringer to preserve as much patent protection as it could in light of the Lilly application. Boehringer has admitted that fact.  TX 704 (Boehringer's Response to Interrogatory No. 36) at pp. 24-25.

Boehringer has also acknowledged that the restriction requirement that had been issued during the prosecution of the '947 application was no longer applicable during prosecution of the '671 application that led to the '812 patent.  The Boehringer attorney responsible for

prosecuting the application, Mr. Alan Stempel, testified that "the restriction requirement only applied to the '947 application." TX 786 (Stempel Dep.) 298:18-21.

In sum, the prosecution history of the '812 patent provides unequivocal evidence that the '671 application was not filed as a result of a restriction requirement. The only reason for that application was a wholly voluntary action taken by Boehringer. The earlier restriction requirement had nothing to do with it. There is simply no basis to conclude here that Boehringer was "forced" to put the claims of the '812 patent in a separate application from the '086 patent, *see Zickendraht*, 319 F.2d at 232, or did so in order to "comply" with "administrative requirements," *see Applied Materials,* 98 F.3d at 1568.

### 3.    The Claims of the '812 Patent Are Not Consonant With Any Restriction Requirement

Boehringer also cannot obtain the benefit of Section 121 because it cannot show that the '671 application was "consonant with" a restriction requirement. Consonance requires that an applicant divide up the claimed subject matter according to the examiner's instructions. *Symbol Techs.*, 935 F.2d at 1579; *see also Pfizer*, 518 F.3d at 1359. The purpose of the requirement is simple: in order to receive the benefit of Section 121, you have to act consistently with what the PTO tells you to do. *See BMS*, 361 F.3d at 1348; *see also Applied Materials*, 98 F.3d at 1568; *Zickendraht*, 319 F.2d at 232 (Rich, J., concurring).

The evidence with respect to consonance is uncontroverted. The examiner for the '947 application stated that Boehringer <u>must</u> elect either (1) one of the compound/compositions groups <u>and</u> one of the utility groups, or (2) one of the process groups. TX 46 at BARR277; TX 786 (Stempel Dep.) 263:4-10, 263:21-264:10. At no point during the prosecution of the subsequent '197 or '671 applications did Boehringer ever limit its claims accordingly. Instead, Boehringer ignored the restriction requirement and re-submitted all of the claims for re-

examination. The result was that the '812 patent claims multiple groups of compounds and the '086 patent claims multiple utility groups—neither of which is consonant with the restriction requirement. Mr. Stempel admitted as much, testifying that submission of multiple compound groups or multiple utility groups would be inconsistent with the restriction requirement. *See, e.g.*, TX 786 (Stempel Dep.) 266:21-267:17, 267:22-269:25, 270:3-9; *see also* TX 786 (Stempel Dep.) 301:15-302:2, 302:5-7, 305:23-306:11 (claim 1 of '812 patent not consistent with restriction requirement); TX 786 (Stempel Dep.) 263:4-10, 263:21-264:10, 265:15-24 (cannot have claims covering, for example, compound Groups I and II).

### 4.     The '671 Application Was Filed After Issuance of the '374 Patent

Finally, Boehringer also cannot rely on Section 121 because the '671 application was filed too late. As explained in P.J. Federico's *Commentary on the New Patent Act*—a reference frequently relied on by the Federal Circuit as a valuable resource for understanding Title 35[10]— Section 121 requires that "if two or more divisional applications are filed as a result of a multiple requirement for restriction, they each must be filed <u>before the original application is patented</u> in order to obtain the benefit of this provision." Federico, at 35, 75 J. Pat. & Trademark Off. Soc'y 196 (emphasis added). Put simply, there is a limit on how long a patentee has to file divisional applications that fall within the safe harbor. Because the '671 application was not filed until October 12, 1988—almost seven months after the '374 patent issued on the application where the only restriction requirement was imposed—Section 121 does not apply.

---

[10] *See, e.g.*, *Symbol Techs., Inc. v. Lemelson Med.*, 277 F.3d 1361, 1366 (Fed. Cir. 2002) ("Federico's commentary is an invaluable insight into the intentions of the drafters of the [1952 Patent] Act.").

### C. Alleged Evidence of Objective Indicia Do Not Save the '812 Patent

#### 1. Objective Indicia of Nonobviousness Are Legally Irrelevant

Despite the fact that both the Federal Circuit and this Court have clearly established that evidence of objective indicia of nonobviousness is wholly irrelevant to the double patenting analysis in this case, *see Geneva*, 349 F.3d at 1377 n.1; *Proctor & Gamble Co. v. Teva Pharms. USA, Inc.*, 536 F. Supp. 2d 476, 497-98 (D. Del. 2008), Boehringer insisted on spending much of its trial time presenting testimony on such issues. None of the *Geneva, Pfizer, Byck*, or *Christmann* double patenting decisions involving compounds and methods of using them considered such evidence pertinent to their analyses. *Pfizer*, 518 F.3d at 1563 & n.8; *Geneva*, 349 F.3d at 1377 n.1; *Christmann*, 128 F.2d at 599; *Byck*, 48 F.2d at 666-67. Moreover, Defendants have demonstrated that the '812 patent claims are anticipated by claims of the '086 patent, and it is black-letter patent law that evidence of nonobviousness is irrelevant to anticipation. *See, e.g., In re Paulsen*, 30 F.3d 1475, 1482 n.11 (Fed. Cir. 1994); *Eli Lilly & Co. v. Zenith Goldline Pharms., Inc.*, 364 F. Supp. 2d 820, 911 (S.D. Ind. 2005); *see also* Defendants' Opening Evidentiary Brief.

#### 2. The Alleged Evidence of Nonobviousness Is Not Commensurate With the Scope of the Claims

Even if objective indicia were relevant here, Boehringer's evidence suffers from another fatal flaw: the evidence is limited to pramipexole, but every disputed claim encompasses compounds in addition to pramipexole, and in some cases more than ten thousand additional compounds. Tr. 479:17-480:15 (Anslyn); Tr. 252:6-253:22 (Klibanov); Tr. 571:18-572:3 (Kobinger). Established precedent dictates that secondary indicia can save a claim that would otherwise be invalid only if such indicia are present for more than a portion of the claim. *See, e.g., In re Peterson*, 315 F.3d 1325, 1330-31 (Fed. Cir. 2003) (evidence must be commensurate

with the scope of the claim); *In re Greenfield*, 571 F.2d 1185, 1189 (CCPA 1978) (same); *In re Tiffin*, 448 F.2d 791, 792 (CCPA 1971) (same). The evidence of alleged nonobviousness that Boehringer proffered falls well short of the requisite showing, and therefore is insufficient to overcome a finding of invalidity.

### 3.    Boehringer Has Not Demonstrated Any Objective Indicia of Nonobviousness

Beyond those insurmountable problems, the evidence Boehringer cites fails to actually suggest non-obviousness, and, in any event, cannot overcome the strong showing of invalidity. *See, e.g., Agrizap, Inc. v. Woodstream Corp.*, Nos. 2007-1415, 2007-1421, __ F. 3d __, 2008 WL 819757, at *6 (Fed. Cir. Mar. 28, 2008) (holding that the objective evidence of nonobviousness, including commercial success, copying, and long-felt need, could not overcome "such a strong prima facie case of obviousness").

### a.    None of the Claimed Compounds Have Been Shown to Have Unexpected Properties

At trial, Boehringer attempted to argue that pramipexole possesses a number of properties that were not predictable in light of the uses claimed in the '086 patent. However, the evidence fails to demonstrate that pramipexole possesses some of the properties Boehringer attempts to attribute to it, and does demonstrate that any properties it may have were not unexpected.

### 1)    Pramipexole Does Not Possess Several of the Asserted Properties

It is axiomatic that for evidence of unexpected properties to have any bearing on a finding of invalidity, the product must actually possess the asserted properties. *In re Mayne*, 104 F.3d 1339, 1343 (Fed. Cir. 1997). In other words, the patentee must produce evidence that the claimed invention actually "exhibits some superior property or advantage." *Id.* (*citing In re Soni*,

54 F.3d 746, 750 (Fed. Cir. 1995)).  The evidence at trial, however, unequivocally showed that

pramipexole does not possess several of the properties that Boehringer posits are "unexpected:"

- <u>Neuroprotection</u>: Dr. Warren Olanow, Boehringer's expert neurologist, testified that "we have not been able to define or establish that <u>any</u> agent is neuroprotective," including pramipexole. Tr. 124:21-125:3 (Olanow) (emphasis added). Dr. Mailman, concurred with that view. Tr. 629:15-20 (Mailman). *See also* TX 458 ("No treatment has been shown to be neuroprotective"); TX 783 at 1018 ("The search for a neuroprotective treatment in Parkinson's disease has been unsuccessful.").

- <u>Fibromyalgia</u>: Dr. Olanow admitted that pramipexole has not been proven or established as an effective treatment for fibromyalgia. Tr. 145:14-20 (Olanow). Again, Dr. Mailman concurred. Tr. 630:17-631:1 (Mailman).

- <u>Depression:</u> Both Dr. Olanow and Dr. Mailman agreed that pramipexole has not been established to be useful for treating depression that is unrelated to Parkinson's disease. Tr. 158:10-15 (Olanow); Tr. 631:2-12 (Mailman).

Boehringer cannot rely on non-existent properties to demonstrate the presence of unexpected

properties.

### 2)    The Purported Properties Of Pramipexole Would Not Have Been Unexpected

Any showing of unexpected properties requires evidence that the properties would not

have been expected by a person of ordinary skill in the art at the time of the invention. *Mayne*,

104 F.3d at 1343 (*citing Soni*, 54 F.3d at 750); *In re Juillard*, 476 F.2d 1380, 1382 (CCPA 1973).

The evidence at trial clearly demonstrated that the ability of pramipexole to treat restless leg

syndrome, and any ability it might have to treat neuroprotection or depression would not have

been unexpected as of the December 1984 priority date.

<u>Restless Leg Syndrome</u>:  A seminal study published in the Archives of Neurology in

1982 by Dr. Sevket Akpinar concluded unequivocally that "levodopa plus benserazide (<u>or a</u>

<u>dopamine agonist</u>) can be used successfully in the treatment of restless legs syndrome." TX 320

at BARR209416 (emphasis added).  The person of ordinary skill would have understood from

the '086 patent claims that pramipexole was a dopamine agonist. Tr. 619:13-622:7 (Mailman).

The Akpinar study has been cited nearly 100 times since its publication, Tr. 648:24-649:5

(Mailman)—including in at least one article cited by Dr. Olanow in his expert report, Tr. 185:18-

186:2 (Olanow). Several of those publications have credited the 1982 Akpinar study for the

discovery that dopamine agonists can be used to treat RLS. *See, e.g.*, TX 738 at 2; TX 470 at 2.

Notably, even Boehringer has publicly recognized that "[t]he beneficial effects of dopaminergic

stimulation were first reported in 1982 in a case narrative by Akpinar." *See* TX 263 at

BARR014162; Tr. 189:20-190:14 (Olanow). In light of this evidence, as Dr. Mailman testified,

the person of ordinary skill would not find it unexpected that pramipexole treats RLS, Tr.

650:15-651:23 (Mailman).

Depression: Several studies published before the 1984 priority date indicated that

dopamine agonists could also potentially be used to treat depression. *See, e.g.*, TX 734 at

BARR209489 (study demonstrating that a dopamine agonist had the same antidepressant effects

as a known antidepressant and explaining that "[r]ecently attention has turned to dopamine's role

in depression"); TX 322 at BARR209483 (study demonstrating that a dopamine agonist had the

same antidepressant effects as a known antidepressant, and stating that "there have also been

suggestions that the dopamine receptor stimulation could produce beneficial effects in depressed

patients with Parkinson's disease"); Tr. 632:20-641:11 (Mailman). Based on that information,

Dr. Mailman explained that even if pramipexole could be used in the treatment of depression—

which has not been established—it would not have been unexpected. Tr. 631:13-632:19

(Mailman).

>            **b.        Pramipexole Did Not Satisfy Any Long-Felt But Unmet Need**

Boehringer also fails to establish that pramipexole met any long-felt but unmet need with

respect to fibromyalgia, depression, RLS, or neuroprotection. A need must not only be long-felt

but also unsolved. *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966). The inquiry thus

centers on whether the evidence shows that a need existed <u>as of the priority date</u> and that the

claimed invention solved it. Boehringer failed to establish either point. As illustrated above in

the discussion of unexpected properties, Boehringer cannot establish that pramipexole is

neuroprotective or that it treats fibromyalgia or depression. It follows necessarily, then, that

pramipexole has not met any need in those areas. In fact, Dr. Olanow acknowledged that the

needs for neuroprotective agents and effective anti-depressants <u>remain</u> <u>unmet</u>. Tr. 84:24-85:17,

111:2-8, 124:16-20 (Olanow); *see also* TX 783 ("There is an important unmet medical need in

Parkinson's disease for a neuroprotective treatment that stops or slows disease progression.").

Regarding RLS, both experts agreed that drugs to treat RLS were available before pramipexole,

including dopaminergic drugs. Tr. 66:19-67:7 (Olanow); Tr. 652:20-653:11 (Mailman).

### c.    Boehringer Has Not Demonstrated Any Relevant Commercial Success

To the extent that there is any relevant inquiry, it is whether Mirapex® has been shown to

be a commercial success for uses <u>other than</u> those claimed in the '086 patent. *See J.T. Eaton &*

*Co. v. Atl. Paste & Glue Co.*, 106 F. 3d 1563, 1571 (Fed. Cir. 1997) (Commercial success "must

be due to the merits of the claimed invention beyond what was readily available in" the prior

art.). Boehringer's proffered evidence of commercial success here is insufficient. First,

Boehringer once again only discusses commercial success with respect to pramipexole; that

simply does not provide evidence commensurate with the scope of the claims at issue. That is

particularly devastating in the commercial success context, because the patentee is required to

prove a nexus between the claimed sales and the patented features of the invention—which

Boehringer did not establish—and a nexus is only presumed where the evidence of commercial

success is in fact coextensive with the scope of the claims, which Boehringer also did not

establish. *See Brown & Williamson Tobacco Corp. v. Philip Morris, Inc.*, 229 F.3d 1120, 1130 (Fed. Cir. 2000).

In addition, Boehringer cannot make the requisite showing of commercial success in connection with the other uses. First, it undisputed that there is no accurate way of determining which sales of Mirapex® are for which indications. Tr. 575:6-576:5 (Keating); Tr. 414:6-416:18, 419:23-427:14 (Rao); Tr. 530:23-532:16, 531:24-552:15, 553:17-554:19 (Weinstein). Second, the analysis set forth by Boehringer's expert, Dr. Mohan Rao, is flawed. Dr. Rao only considered three years of data regarding Mirapex's sales, and wholly failed to consider the share of Mirapex® in the relevant markets at that time. Tr. 389:21-390:10, 394:16-395:7 (Rao). ███

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████ By failing to account for market share data, Dr. Rao's testimony provides weak, if any, evidence of commercial success. *See Kan. Jack, Inc. v. Kuhn*, 719 F.2d 1144, 1150-51 (Fed. Cir. 1983); *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996); *In re Baxter Travenol Labs*, 952 F.2d 388, 392 (Fed. Cir. 1991); Tr. 520:17-521:6 (Weinstein). Based on these deficiencies, Defendants' expert, Roy Weinstein, testified that it was "impossible" to conclude that Mirapex® was a commercial success for uses other than those described in the '086 patent. Tr. 517:12-518:17 (Weinstein).

## III.    BOEHRINGER DID NOT PROVE INFRINGEMENT OF CLAIMS 5, 9, AND 10

Although Defendants have stipulated to infringement of claim 7, Boehringer overreaches in its contention that claims 5, 9, and 10 also are infringed by Defendants' products.

There is no dispute that independent claims 1, 3, 6, and 7 of the '812 patent expressly recite that they each encompass acid addition salts in addition to the free bases. TX 3 at Col. 23-

26; Tr. 255:17-256:23 (Klibanov). There likewise is no dispute that claims 9 and 10 do not

mention or refer to salts. TX 3 at Col. 26; Tr. 256:24-257:5, 257:22-24 (Klibanov). In view of

the plain language of the claims, claims 9 and 10 should be limited to the free bases of the

specified compounds, and not include acid addition salts. *See, e.g., Johnson Worldwide Assocs.,*

*Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999) (a court must presume that the terms in

the claim mean what they say). Given that the parties have stipulated that the active ingredient in

Defendants' proposed products is pramipexole dihydrochloride, D.I 190 at Ex. 1, ¶¶ 12, 15—*i.e.,*

an acid addition salt of pramipexole—those products do not infringe claims 9 and 10.

       1.       In its request for a patent term extension, Boehringer was required to make

a showing "in which <u>each applicable patent claim</u> reads on the approved product," pramipexole

dihydrochloride. TX 99 at BARR817 (emphasis supplied). That analysis is identical to an

assessment of infringement. *Monsanto Co. v. Scruggs*, 459 F.3d 1328, 1334 (Fed. Cir. 2006)

("Infringement occurs when a properly construed claim reads on the accused product."). 

However, Boehringer did <u>not</u> list claim 5 among the claims that "reads on" pramipexole

dihydrochloride, the approved product. TX 99 at BARR817-18. In view of the public notice

function of the file history, which contains the application for the patent term extension,

Boehringer should be estopped from now asserting that claim 5 encompasses pramipexole. *See*

*Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*, 222 F.3d 951, 957 (Fed. Cir. 2000) ("The

prosecution history constitutes a public record of the patentee's representations concerning the

scope and meaning of the claims, and competitors are entitled to rely on those representations

when ascertaining the degree of lawful conduct."); *Southwall Techs., Inc. v. Cardinal IG Co.*, 54

F.3d 1570, 1576 (Fed. Cir. 1995) ("The prosecution history limits the interpretation of claim

terms so as to exclude any interpretation that was disclaimed during prosecution.").

## REQUESTED RELIEF

In light of the evidence of double patenting, Defendants respectfully request that the Court enter judgment that claims 3, 4, 5, 7, 9, and 10 of the '812 patent are invalid for double patenting. Defendants further request that the Court order that the terminal disclaimer has not cured that basis for invalidity. Defendants further request that a judgment be entered declaring that the manufacture, use, offer to sell, sale and/or importation into the United States of Defendants' proposed products will not infringe any valid claim of the '812 patent. Defendants also seek their costs. Fed. R. Civ. P. 54(d)(1); D. Del. R. 54.1(a)(1).

## CONCLUSION

For the foregoing reasons, judgment should be entered in favor of Defendants, and the remedies Defendants seek should be ordered.

Respectfully submitted,

YOUNG CONAWAY STARGATT &
    TAYLOR, LLP

MORRIS JAMES LLP

*/s/ Karen E. Keller*
Karen E. Keller (#4489)
kkeller@ycst.com
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
(302) 571-6600
*Attorney for Barr Laboratories, Inc.*

*/s/ Mary B. Matterer*
Mary B. Matterer (#2696)
MMatterer@morrisjames.com
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, DE 19899-2306
(302) 888-6960
*Attorney for Mylan Pharmaceuticals Inc.*

Dated: April 18, 2008

## CERTIFICATE OF SERVICE

I, Karen E. Keller, Esquire, hereby certify that on April 25, 2008, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

Jack B. Blumenfeld, Esquire
Morris Nichols Arsht & Tunnell
1201 North Market Street
PO Box 1347
Wilmington, DE 19899-1347

Mary B. Matterer, Esquire
Morris James LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801

I further certify that on April 25, 2008, I caused a copy of the foregoing document to be served by e-mail on the above-listed counsel of record and on the following non-registered participants in the manner indicated:

### BY E-MAIL

Steven C. Cherny, Esquire
Latham & Watkins LLP
885 Third Avenue, Suite 1000
New York, NY 10022-4834

Kenneth G. Schuler, Esquire
Latham & Watkins LLP
Sears Tower, Suite 5800
Chicago, IL 60606

Shannon M. Bloodworth, Esquire
Heller Ehrman LLP
1717 Rhode Island Ave., N.W.
Washington, DC 20036

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ *Karen E. Keller*
Karen E. Keller (No. 4489)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600
kkeller@ycst.com

*Attorneys for Barr Laboratories, Inc.*