IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BOEHRINGER INGELHEIM INTERNATIONAL GMBH and BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 05-700 (JJF) |
| BARR LABORATORIES, INC., | ) ) | CONSOLIDATED |
| Defendant. | ) ) ) | **REDACTED - PUBLIC VERSION** |
| BOEHRINGER INGELHEIM INTERNATIONAL GMBH and BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 05-854 (JJF) |
| MYLAN PHARMACEUTICALS, INC., | ) ) | |
| Defendant. | ) ) | |

## DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

OF COUNSEL:
Glenn J. Pfadenhauer
Jessamyn S. Berniker
Dov P. Grossman
Brett R. Tobin
Kendra P. Robins
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000

YOUNG CONAWAY STARGATT &
TAYLOR, LLP
Karen E. Keller (#4489)
kkeller@ycst.com
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

*Attorneys for Defendant Barr
Laboratories, Inc.*

OF COUNSEL:
Kevin J. Culligan
Joy Arnold
HELLER EHRMAN LLP
Times Square Tower
7 Times Square
New York, NY 10036
(212) 832-8300

Shannon M. Bloodworth
HELLER EHRMAN LLP
171 Rhode Island Avenue, NW
Washington, DC 20036
(202) 912-2000

Dated: April 18, 2008

MORRIS JAMES LLP
Mary B. Matterer (#2696)
mmatterer@morrisjames.com
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, DE 19899-2306
(302) 888-6960

*Attorneys for Mylan
Pharmaceuticals, Inc.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iv

PROPOSED FINDINGS OF FACT .................................................................................. 1

I.      BACKGROUND ........................................................................................................ 1

II.     THE '812 PATENT IS INVALID FOR NONSTATUTORY DOUBLE
        PATENTING .............................................................................................................. 3

III.    BOEHRINGER'S PATENT TERM EXTENSION UNDER SECTION 156 ............... 8

IV.     BOEHRINGER'S BELATED AND INEFFECTIVE TERMINAL
        DISCLAIMER ............................................................................................................ 9

V.      ALLEGED "OTHER" USES OF PRAMIPEXOLE .................................................. 11

VI.     THE PROSECUTION HISTORIES FROM THE INSTANT PATENT
        FAMILY ................................................................................................................... 16

        A.      THE '947 APPLICATION AND THE '374 PATENT ................................... 16

        B.      THE '197 APPLICATION AND THE '086 PATENT ................................... 18

        C.      THE '671 APPLICATION AND THE '812 PATENT ................................... 21

VII.    NON-INFRINGEMENT OF CLAIMS 5, 9, AND 10 ................................................ 23

PROPOSED CONCLUSIONS OF LAW .......................................................................... 24

VIII.   THE '812 PATENT IS INVALID FOR NONSTATUTORY DOUBLE
        PATENTING ............................................................................................................ 24

IX.     A PATENT TERM EXTENSION ONLY EXTENDS A SUBSTANTIALLY
        NARROWER, PRE-EXISTING SET OF RIGHTS .................................................. 28

X.      THE BELATED TERMINAL DISCLAIMER DOES NOT CURE DOUBLE
        PATENTING ............................................................................................................ 29

XI.     SECTION 121 DOES NOT SAVE THE '812 PATENT ............................................ 32

XII.    THE ALLEGED OBJECTIVE INDICIA OF NONOBVIOUSNESS ARE
        IRRELEVANT AND DO NOT SUPPORT VALIDITY ............................................. 34

XIII.   CLAIM CONSTRUCTION ...................................................................................... 36

XIV.    NON-INFRINGEMENT OF CLAIMS 5, 9, AND 10 ................................................ 37

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Agrizap, Inc. v. Woodstream Corp.,*
  Nos. 2007-1415, 2007-1421, 2008 WL 819757, *6 (Fed. Cir. 2008) ....................................35

*Applied Materials, Inc. v. Advanced Semiconductor Materials America., Inc.,*
  98 F.3d 1563 (Fed. Cir. 1996)..........................................................................................34

*Bristol-Myers Squibb Co. v. Pharmachemie B.V.,*
  361 F.3d 1343 (Fed. Cir. 2004).............................................................................32, 33, 34

*Brown & Williamson Tobacco Corp. v. Philip Morris, Inc.,*
  229 F.3d 1120 (Fed. Cir. 2000)........................................................................................36

*Centricut, LLC v. Esab Group, Inc.,*
  390 F.3d 1361 (Fed. Cir. 2004)........................................................................................37

*CMI Corp. v. Lakeland Constr. Co.,*
  184 USPQ 721, 727 (N.D. Ill. 1975) ..........................................................................32, 36

*Eli Lilly & Co. v. Barr Labs., Inc.,*
  251 F.3d 955 (Fed. Cir. 2001) .................................................................................. passim

*Eli Lilly & Co. v. Zenith Goldline Pharms., Inc.,*
  364 F. Supp. 2d 820 (S.D. Ind. 2005) ..............................................................................34

*Endress + Hauser, Inc. v. Hawk Measurement Sys. Pty, Ltd.,*
  122 F.3d 1040 (Fed. Cir. 1997)........................................................................................24

*Envtl. Designs, Ltd. v. Union Oil Co.,*
  713 F.2d 693 (Fed. Cir. 1983)..........................................................................................25

*Geneva Pharms., Inc. v. GlaxoSmithKline PLC,*
  349 F.3d 1373 (Fed. Cir. 2003).................................................................................. passim

*Geneva Pharms., Inc. v. Glaxosmithkline PLC,*
  No. 2:01cv391..................................................................................................................26

*Gerber Garment Tech., Inc. v. Lectra Sys., Inc.,*
  916 F.2d 683 (Fed. Cir. 1990)..........................................................................................33

*Graham v. John Deere Co.,*
  383 U.S. 1 (1966).............................................................................................................36

*Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.,*
  222 F.3d 951 (Fed. Cir. 2000)..........................................................................................37

*In re Baxter Travenol Labs,*
    952 F.2d 388 (Fed. Cir. 1991)................................................................36

*In re Braithwaite,*
    379 F.2d 594 (CCPA 1967) ...................................................................30

*In re Byck,*
    48 F.2d 665 (CCPA 1931) ..........................................................25, 26, 34

*In re Christmann,*
    128 F.2d 596 (CCPA 1942) .........................................................25, 26, 34

*In re Goodman,*
    11 F.3d 1046 (Fed. Cir. 1993)...................................................26, 27

*In re Greenfield,*
    571 F.2d 1185 (CCPA 1978) ..................................................................35

*In re Huang,*
    100 F.3d 135 (Fed. Cir. 1996)................................................................36

*In re Juillard,*
    476 F.2d 1380 (CCPA 1973) ...........................................................35, 36

*In re Lintner,*
    458 F.2d 1013 (CCPA 1972) ..................................................................28

*In re Lonardo,*
    119 F.3d 960 (Fed. Cir. 1997)..........................................................29, 30

*In re Longi,*
    759 F.2d 887 (Fed. Cir. 1985)..........................................................28, 30

*In re Mayne,*
    104 F.3d 1339 (Fed. Cir. 1997)........................................................35, 35

*In re Metoprolol Succinate Patent Litig.,*
    494 F.3d 1011 (Fed. Cir. 2007)........................................25, 27, 28, 32

*In re Metz,*
    173 F.3d 433, 1998 WL 670185 (Fed. Cir. Sept. 22, 1998) ...................24

*In re Paulsen,*
    30 F.3d 1475 (Fed. Cir. 1994)................................................................34

*In re Peterson,*
    315 F.3d 1325 (Fed. Cir. 2003)..............................................................35

*In re Robeson,*
   331 F.2d 610 (CCPA 1964) ................................................................30

*In re Soni,*
   54 F.3d 746 (Fed. Cir. 1995) ........................................................35, 36

*In re Tiffin,*
   448 F.2d 791 (CCPA 1971) ............................................................35

*In re Van Ornum,*
   686 F.2d 937 (CCPA 1982) .........................................................29, 31

*In re Zickendraht,*
   319 F.2d 225 (CCPA 1963) .........................................................33, 34

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.,*
   175 F.3d 985 (Fed. Cir. 1999) ..........................................................36

*J.T. Eaton & Co. v. Atl. Paste & Glue Co.,*
   106 F. 3d 1563 (Fed. Cir. 1997) .......................................................36

*Kan. Jack, Inc. v. Kuhn,*
   719 F.2d 1144 (Fed. Cir. 1983) ........................................................36

*KSR Int'l Co. v. Teleflex Inc.,*
   550 U.S. __, 127, S. Ct. 1727 (2007) ................................................28

*Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.,*
   485 F.3d 1157 (Fed. Cir. 2007) ........................................................35

*Medinol Ltd. v. Guidant Corp.,*
   341 F. Supp. 2d 301 (S.D.N.Y. 2004) ...............................................24

*Merck & Co. v. Hi-Tech Pharmacal Co.,*
   482 F.3d 1317 (Fed. Cir. 2007) .....................................................31, 39

*Merck & Co. v. Kessler,*
   80 F.3d 1543 (Fed. Cir. 1996) .........................................................29

*Merck & Co. v. Teva Pharms. USA, Inc.,*
   228 F. Supp. 2d 480 (D. Del. 2002) ..................................................24

*Pfizer Inc. v. Dr. Reddy's Labs., Ltd.,*
   359 F.3d 1361 (Fed. Cir. 2004) ........................................................29

*Pfizer, Inc. v. Teva Pharms. USA, Inc.,*
   578 F.3d 1353 (Fed. Cir. 2008) ................................................. passim

*Pharmacia Corp. v. Par Pharm., Inc.*,
  417 F.3d 1369 (Fed. Cir. 2005)...................................................................31

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005)...................................................................24

*Proctor & Gamble Co. v. Teva Pharms. USA, Inc.*,
  536 F. Supp. 2d 476 (D. Del. 2008)...........................................................34

*Racing Strollers, Inc. v. TRI Indus., Inc.*,
  878 F.2d 1418 (Fed. Cir. 1989)...................................................................28

*Regents of Univ. of Cal. v. Dakocytomation Cal., Inc.*,
  No. C 05-03955, 2006 WL 1343950 (N.D. Cal. May 17, 2006) ...............33

*Richardson-Vicks Inc. v. Upjohn Co.*,
  122 F.3d 1476 (Fed. Cir. 1997)...................................................................35

*Schering Corp. v. Geneva Pharms., Inc.*,
  339 F.3d 1373 (Fed. Cir. 2003)...................................................................27

*Southwall Techs., Inc. v. Cardinal IG Co.*,
  54 F. 3d 1570 (Fed. Cir. 1995)....................................................................37

*SmithKline Beecham Corp. v. Apotex Corp.*,
  403 F.3d 1331 (Fed. Cir. 2005)...................................................................27

*Symbol Techs., Inc. v. Lemelson Med., Inc.*,
  277 F.3d 1361 (Fed. Cir. 2002)...................................................................33

*Symbol Techs., Inc. v. Opticon, Inc.*,
  935 F.2d 1569 (Fed. Cir. 1991)..............................................................28, 34

*Union Carbide Corp. v. Dow Chem. Co.*,
  619 F. Supp. 1036 (D. Del. 1985)...............................................................33

## FEDERAL STATUTES, RULES AND REGULATIONS

37 C.F.R. § 1.321(c)(3).................................................................................31

35 U.S.C. § 121.............................................................................................32

35 U.S.C. § 156....................................................................................8, 28, 29

35 U.S.C. § 253.............................................................................................30

Manual of Patent Examining Procedure .......................................................28

## OTHER AUTHORITIES

J. Pat. & Trademark Off. Soc'y 161 (1993)
  [P.J. Federico, *Commentary on the New Patent Act* (1954)]...................................................32

## INTRODUCTION

Defendants Barr Laboratories, Inc. ("Barr") and Mylan Pharmaceuticals, Inc. ("Mylan") (collectively "Defendants") submit the following proposed findings of fact and conclusions of law.

## PROPOSED FINDINGS OF FACT[1]

### I.    BACKGROUND

1.    U.S. Patent No. 4,843,086 ("the '086 patent") issued on June 27, 1989.  TX 2; D.I. 190 at Ex. 1, ¶ 18.

2.    U.S. Patent No. 4,886,812 ("the '812 patent") issued on December 12, 1989.  TX 3; D.I. 190 at Ex. 1; ¶ 20.

3.    The '086 patent expired on June 27, 2006.  D.I. 190 at Ex. 1, ¶ 19.

4.    Boehringer Ingelheim International GmbH and Boehringer Ingelheim Pharmaceuticals, Inc. (collectively "Boehringer") asserts that it is the owner of both the '086 and '812 patents.  TX 701 at ¶¶ 6-7.

5.    The patents in this case relate to compounds known as tetrahydrobenzthiazoles.  TX 1; TX 2; TX 3; Tr. 462:3-9 (Anslyn).  The terms "tetrahydrobenzothiazole," "tetrahydrobenzthiazole," and "tetrahydro-benzthiazole" are interchangeable.  D.I. 190 (Pre-Trial Order) at Ex. 1, p. 8, ¶ 8.

6.    The compounds at issue possess the following generic structure:



---

[1] To the extent that any of the contentions of fact herein are deemed to be contentions of law, or vice versa, Defendants incorporate them by reference into the appropriate section herein.  The inclusion of proposed findings of fact or conclusions of law relating to evidence discussed in Defendants' Evidentiary Brief is not intended to waive the arguments therein.

TX 1; TX 2; TX 3; Tr. 225:1-227:3 (Klibanov). $R_1$ through $R_4$ each represent atoms or groups of atoms attached to the molecule at that position (substituents) as defined by the '086 and '812 patents. TX 2; TX 3; Tr. 464:8-17 (Anslyn). The numbers in the above drawing represent different positions around the tetrahydrobenzthiazole core where substituents may be attached. Tr. 225:1-227:3 (Klibanov); Tr. 464:1-7 (Anslyn).

      7.      According to the patents, the $R_3$ and $R_4$ substituents may connect to each other to form an additional ring. TX 1; TX 2; TX 3; Tr. 464:18-465:8 (Anslyn). The particular types of rings they can form are pyrrolidino, piperidino, hexamethyleneimino, or morpholino groups. TX 1; TX 2; TX 3; Tr. 464:18-465:8 (Anslyn). When $R_3$ and $R_4$ form a pyrrolidino group, it can be referred to as a pyrrolidinyl-substituted benzothiazole. TX 791 (Schneider Dep.) 162:14-164:6; TX 787 (Hurnaus Dep.) 196:19-197:10; 197:18-22, 198:3-7, 198:9-16, 198:20-199:2, 199:5-10, 199:13-17.

      8.      Pramipexole is the S-enantiomer of 2-amino-6-n-propylamino-4, 5, 6, 7-tetrahydrobenzthiazole. D.I. 190, Ex. 1 at ¶ 9.

      9.      Pramipexole dihydrochloride is the dihydrochloride salt of pramipexole. D.I. 190, Ex. 1 at ¶¶ 9-10; TX 724.

      10.      The compounds disclosed in the '812 patent family are free bases, and they can react with acids to form salts referred to as acid addition salts. Tr. 229:23-230:12 (Klibanov); Tr. 467:11-469:15 (Anslyn).

      11.      When acid addition salts of a tetrahydrobenzthiazole are administered, they produce, *inter alia*, the free base. *See* Tr. 231:14-233:3, 246:10-247:13 (Klibanov); Tr. 489:17-23 (Anslyn).

      12.      Claim 3 of the '812 patent claims more than 10,000 compounds. Tr. 479:6-22

(Anslyn).

  13. Claim 4 of the '812 patent claims more than 1,000 compounds. Tr. 479:23-480:3 (Anslyn).

  14. Claim 5 of the '812 patent claims dozens of compounds. Tr. 480:4-7 (Anslyn).

  15. Claim 7 of the '812 patent claims the S-enantiomer of 2-Amino-6-n-propylamino-4,5,6,7-tetrahydrobenzthiazole, the R-enantiomer of 2-Amino-6-n-propylamino-4,5,6,7-tetrahydrobenzthiazole, the racemic combination of the two enantiomers, and all other combinations of the two compounds. Tr. 252:6-253:22 (Klibanov); TX 787 (Hurnaus Dep.) 269:8-9, 269:14-15.

  16. Claim 9 of the '812 patent claims more than 100 compounds. Tr. 480:8-11 (Anslyn).

  17. Claim 10 of the '812 patent claims more than 100 compounds. Tr. 480:12-15 (Anslyn).

## II. THE '812 PATENT IS INVALID FOR NONSTATUTORY DOUBLE PATENTING

  18. The person of ordinary skill in the art for the '086 and '812 patents would possess a combination of skills in chemistry, pharmacology, and/or biological evaluation of pharmaceutical compounds. Tr. 460:12-461:10 (Anslyn); Tr. 684:17-685:22 (Mailman); *see also* Tr. 223:1-10 (Klibanov) (training in chemistry, biochemistry, pharmacy, or a related field).

  19. The inventors of the '086 and the '812 patents have educational backgrounds and work experience related to both the chemical and biological side of pharmacological development. Tr. 566:15-568:4 (Kobinger Dep.); TX 787 (Hurnaus Dep.) 9:6-9:12, 13:4-18, 14:6-10, 15:22-16:6; TX 789 (Mierau Dep.) 10:23-11:5, 11:9-22, 22:4-11; TX 790 (Schingnitz Dep.) 12:12-14:5; TX 791 (Schneider Dep.) 8:16-8:25, 9:14-10:3, 10:20-11:2, 12:9-21.

3

20.     The '086 and the '812 patents share a common specification, which describes the invention as chemical compounds, processes for making them, and methods of using them.  TX 2; TX 3.

21.     Chemists and pharmacologists typically work together as a team to evaluate whether a compound provides particular therapeutic effect.  Tr. 715:5-12 (Mailman).

22.     To further demonstrate that the claims of the '812 patent are invalid for double patenting, Defendants offered the testimony of Dr. Eric Anslyn, the Norman Hackerman Professor of Chemistry and Biochemistry and University Distinguished Teaching Professor at the University of Texas, Austin.  See TX 720; Tr. 444:6-496:14 (Anslyn).  The testimony of Dr. Anslyn was credible, and provided the factual underpinning for the legal conclusion that there is no patentable distinction between the claims of the '086 and '812 patents.

23.     Dr. Anslyn was well-qualified to comment on the claims of the two patents and the interrelationship between them.  Dr. Anslyn has been in the field of chemistry for approximately 30 years, and his research focuses on the interaction between small organic molecules and biological receptors.  TX 720; Tr. 451:3-24, 453:14-454:2 (Anslyn).  Dr. Anslyn has over 160 publications in highly regarded journals, including in the field of medicinal chemistry, is a regular reviewer for leading chemistry journals, including journals in the field of medicinal chemistry, and is an Associate Editor of the Journal of the American Chemical Society.  TX 720; Tr. 454:3-456:21 (Anslyn).  Dr. Anslyn also was a permanent member a National Institutes of Health Committee focused on grants for work in the field of medicinal chemistry, and is one of the founding members of the Texas Institute for Drugs and Diagnostics development—an organization devoted to the development of pharmaceuticals through collaboration between chemists, biochemists, pharmacists, and physicians.  See TX 720; Tr.

452:1-453:13 (Anslyn).

24.     The earlier-issued '086 patent is directed to methods of treatment using tetrahydrobenzthiazoles.  Tr. 471:20-472:21 (Anslyn).

25.     The methods claimed in the '086 patent use tetrahydrobenzthiazoles that are then claimed in the later-issued '812 patent.  Tr. 480:16-481:5 (Anslyn).

26.     The compounds claimed in claim 3 of the '812 patent are identical to the compounds used in the method of claim 23 of the '086 patent.  Tr. 483:8-484:14 (Anslyn).

27.     The compounds claimed in claim 7 of the '812 patent are identical to the compounds used in the methods of claim 9, 19, 29, and 39 of the '086 patent.  Tr. 481:11-482:18, 493:11-20 (Anslyn).

28.     At least one compound claimed in claim 3 of the '812 patent is always and necessarily used in the methods of each of claims 7, 8, 9, 10, 17, 18, 19, 20, 23, 27, 28, 29, 30, 37, 38, 39, 40 of the '086 patent.  Tr. 492:8-17 (Anslyn).

29.     At least one compound claimed in claim 4 of the '812 patent is always and necessarily used in the methods of each of claims 7, 8, 9, 10, 17, 18, 19, 20, 27, 28, 29, 30, 37, 38, 39, and 40 of the '086 patent.  Tr. 485:22-486:8, 492:18-493:2 (Anslyn).

30.     At least one compound claimed in claim 5 of the '812 patent is always and necessarily used in the methods of each of claims 9, 10, 19, 20, 29, 30, 39, and 40 of the '086 patent.  Tr. 486:9-486:20, 493:3-10 (Anslyn).

31.     At least one compound claimed in claim 9 of the '812 patent is always and necessarily used in the methods of each of claims 8, 9, 18, 19, 28, 29, 38, and 39 of the '086 patent.  Tr. 487:4-491:1, 493:21-495:10 (Anslyn).

32.     At least one compound claimed in claim 10 of the '812 patent is always and

necessarily used in the methods of each of claims 8, 9, 18, 19, 28, 29, 38, and 39 of the '086 patent. Tr. 487:4-491:1, 493:21-495:10 (Anslyn).

33.    It would be impossible for one to practice one or more of seventeen claims of the '086 patent[2] without necessarily using or forming compounds claimed in claims 3, 4, 5, 7, 9, and/or 10 of the '812 patent. Tr. 482:19-483:7, 484:15-485:1, 485:22-486:20, 487:4-491:1, 493:21-495:10 (Anslyn). Those '086 patent claims are limited to the use of compounds that are claimed in the '812 patent. *Id.*

34.    The earlier method claims in the '086 patent anticipate—expressly and inherently—the subsequent compound claims 3, 4, 5, 7, 9, and 10 of the '812 patent. TX 2 at cols. 24-30; TX 3 at cols. 24-26.

35.    The '812 patent contains compound claims as well as one pharmaceutical composition claim. TX 3 at Cols. 23-26; Tr. 479:6-16 (Anslyn).

36.    The '086 patent contains claims to methods of using compounds for lowering blood pressure, lowering the heart rate, treating Parkinsonism or Parkinson's disease, and treating schizophrenia. TX 2 at Cols. 24-30; Tr. 471:20-472:11 (Anslyn).

37.    The '086 patent method claims recite treatment of these disorders by administering a therapeutically effective amount of a compound identified in the respective claims. TX 2 at Cols. 24-30; Tr. 472:15-21, 474:6-13, 475:3-12, 477:2-10 (Anslyn).

38.    The '086 and '812 patents define "therapeutically effective amount" in the specification. *See, e.g.*, TX 2 at Col. 9, l. 66 – Col. 10, l. 5; TX 99 at BARR785 (defining "therapeutically effective amount" based on the above-referenced portion of the specification); Tr. 497:19-498:7 (Anslyn).

---

[2] Claims 7, 8, 9, 10, 17, 18, 19, 20, 23, 27, 28, 29, 30, 37, 38, 39, and 40.

39.    Claims 3, 4, 5, 7, 9, and 10 of the '812 patent each claim a genus of compounds which either (a) is identical to a genus of compounds used in a method claim of the '086 patent, or (b) includes every compound used in a method claim of the '086 patent.  Tr. 480:16-481:5, 481:11-482:18, 483:8-484:14, 492:8-495:10 (Anslyn).

40.    The earlier claims of the '086 patent expressly anticipate the claims of the '812 patent because the earlier claims disclose the identical genus of compounds, or at least a species or sub-genus within the genus of the compounds, claimed in the later patent.  Tr. 480:16-481:5, 481:11-482:18, 483:8-484:14, 492:8-495:10 (Anslyn).

41.    Claims 3, 4, 5, 7, 9, and 10 of the '812 patent are inherently anticipated by the earlier claims of the '086 patent, as the natural result of practicing methods claimed in the '086 patent would be the presence of one or more compounds claimed by claims 3, 4, 5, 7, 9, and 10 of the '812 patent.  Tr. 477:22-478:19, 482:19-483:7, 484:15-485:1, 485:22-486:20, 488:10-491:1, 493:21-495:10 (Anslyn); Tr. 570:1-571:6 (Kobinger Dep.); TX 789 (Mierau Dep.) 64:2-10, 65:9-13, 66:24-67:4, 67:7-14, 67:17-18; TX 790 (Schingnitz Dep.) 159:10-24.

42.    A person of ordinary skill would appreciate that in order to practice the method claims of the '086 patent—which recite methods of using a therapeutically effective amount of a compound—a skilled artisan must necessarily have the specified compound.  Tr. 477:22-478:19, 482:19-483:7, 484:15-485:1, 485:22-486:20, 488:10-491:1, 493:21-495:10 (Anslyn); Tr. 570:1-571:6 (Kobinger Dep.); TX 789 (Mierau Dep.) 64:2-10, 65:9-13, 66:24-67:4, 67:7-14, 67:17-18; TX 790 (Schingnitz Dep.) 159:10-24.

43.    Method claims 8, 9, 18, 19, 28, 29, 38, and 39 of the '086 patent anticipate claims 9 and 10 of the '812 patent even though claims 9 and 10 may be limited to free base compounds and the prior '086 patent methods optionally administer the acid addition salt, because some

amount of free base will naturally and necessarily result from therapeutic administration of the salt. *See* Tr. 488:23-491:1 (Anslyn); Tr. 231:14-233:3, 246:10-247:13 (Klibanov).

44.    Claims 3, 4, 5, 7, 9, and 10 of the '812 patent are not patentably distinct from multiple claims of the '086 patent. TX 2 at Cols. 24-30; TX 3 at Cols. 24-26.

45.    Claims 3, 4, 5, 7, 9 and 10 of the '812 patent are not the product of innovation but of ordinary skill and common sense. TX 2 at Cols. 24-30; TX 3 at Cols. 24-26.

46.    The '812 patent effectively extended the life of the '086 patent.

47.    The '812 patent purports to prevent the public from practicing the '086 patent after the claims of the '086 patent expired. TX 2; TX 3; TX 99 at BARR912.

48.    The public cannot practice multiple claims of the now-expired '086 patent without infringing the '812 patent. *See, e.g.*, TX 701; TX 702 (Boehringer's Response to Interrogatory No. 5); TX 704 (Boehringer's Responses to Interrogatory Nos. 27-28).

## III.    BOEHRINGER'S PATENT TERM EXTENSION UNDER SECTION 156

49.    On July 28, 1997, Boehringer applied for a patent term extension of the '812 patent under 35 U.S.C. § 156 based on the regulatory review period for its Mirapex® product. TX 99 at BARR814, BARR912.

50.    Boehringer received a patent term extension of the '812 patent under 35 U.S.C. § 156 for 1,564 days. TX 99 at BARR909-BARR12. The extension period of the '812 patent began on December 12, 2006 and was originally scheduled to expire on March 25, 2011. *Id.*

51.    On December 12, 2006, the original term of the '812 patent expired and the patent term extension period began to run. TX 99 at BARR912.

52.    Boehringer obtained five-and-a-half months of patent life for the '812 patent that extended beyond the expiration date of the '086 patent, *i.e.*, the timeframe between June 27, 2006 and December 12, 2006. TX 2; TX 3; TX 99 at BARR912. D.I. 190 at ¶ 19.

53.    The patent rights that Boehringer possessed during the period between June 27, 2006 and December 12, 2006 were the full scope of rights available to a patentee, including the right to exclude others from practicing any of the claims of the '812 patent, using any compound, for any purpose.

54.    Between June 27, 2006 and December 12, 2006, Boehringer's rights to exclude pursuant to the '812 patent extended to tens thousands of compounds.  TX 3 at Cols. 23-26; TX 99 at BARR912; Tr. 479:6-480:15 (Anslyn).

55.    The rights that Boehringer possessed as a result of, and during, the patent term extension period of the '812 patent, *i.e.*, as of December 12, 2006, were limited to enforcing the '812 patent to exclude others from using pramipexole for FDA approved uses.

56.    During the patent term extension period of the '812 patent, which began on December 12, 2006, Boehringer did not have the right to enforce the '812 patent to exclude others from making, using or selling any of the more than ten thousand compounds that are within the scope of the '812 patent other than pramipexole, and no longer had the right to enforce the '812 patent to exclude others from making, using or selling pramipexole for any use other than approved uses.

57.    The patent term extension does not entitle Boehringer to exclude the public from making, using, or selling pramipexole for any other use, such as to lower blood pressure, heart rate, or treat schizophrenia (as claimed in the '086 patent).

58.    The scope of rights that Boehringer obtained pursuant to its patent term extension is not equivalent in scope to Boehringer's rights during the five-and-a-half months of original patent life of the '812 patent that extended beyond the term of the '086 patent.

## IV.    BOEHRINGER'S BELATED AND INEFFECTIVE TERMINAL DISCLAIMER

59.    On March 13, 2008, after both Plaintiffs and Defendants had already rested their

cases at trial and evidence had closed, Boehringer offered into evidence a terminal disclaimer of the same date. TX 548; Tr. 275:2-3, 441:21-22, 718:14-719:7.

60.    Boehringer terminally disclaimed "only the terminal part of the statutory term of the '812 patent which would extend beyond the 1,564 days after the full statutory term of the '086 patent as that term is defined in 35 U.S.C. 154, so that by virtue of this disclaimer, the '812 patent will expire on October 8, 2010." TX 548.

61.    The terminal disclaimer does not cure the double patenting of the '812 patent because it was filed after the '086 patent expired. *See* TX 2; D.I. 190 at Ex. 1, ¶ 19.

62.    The terminal disclaimer only gives up five-and-a-half months of the patent term extension period of the '812 patent, which is a substantially narrower set of rights than if Boehringer had disclaimed five-and-a-half months of its original patent life. *See* TX 548; TX 99 at BARR912; TX 3 at Cols. 23-26.

63.    Boehringer enlarged the scope of patent protection available to the patentee by not terminally disclaiming the '812 patent over the '086 patent before the '086 patent had expired.

64.    Boehringer obtained a 24-week time-wise extension of patent life of the '812 patent beyond the '086 patent, which is an unlawful time-wise extension of patent protection.

65.    Once the '086 patent expired, the '812 patent became incurably invalid.

66.    Boehringer obtained a prolonged monopoly of the invention in the '086 patent.

67.    Boehringer's '812 patent purported to prevent the public from practicing the '086 and '812 patents as to the tens of thousands of compounds other than pramipexole until five-and-a-half months after the expiration of the '086 patent.

68.    Boehringer's terminal disclaimer does not couple the expiration date of the '812 patent to the expiration date of the '086 patent. The terminal disclaimer does not cause the '812

patent to expire on the same day as the '086 patent; it merely offers to give up five-and-a-half

months of Boehringer's patent term extension period.  TX 548.

69.    Boehringer's terminal disclaimer did not state that the later '812 patent "shall be

enforceable only for and during such period that said patent is commonly owned" with the patent

which formed the basis for the double patenting.  *See* TX 548.

## V.    ALLEGED "OTHER" USES OF PRAMIPEXOLE

70.    In response to Boehringer's expert Dr. Olanow, Barr offered the testimony of Dr.

Richard Mailman, a Professor of Psychiatry, Pharmacology, Neurology, and Medicinal

Chemistry at the University of North Carolina School of Medicine.  *See* TX 717; Tr. 613:18-

653:12 (Mailman).  The testimony of Dr. Mailman was credible, and refutes Dr. Olanow's

opinions concerning alleged evidence of nonobviousness with respect to pramipexole, as well as

his testimony comparing the uses claimed in the '086 patent to the alleged new uses of

pramipexole.

71.    Dr. Mailman is eminently qualified to comment on these issues.  He has devoted

approximately 40 years to the study of pharmacology and neuropharmacology, and has published

over 170 articles and 50 book chapters in the field.  *See* TX 717; Tr. 613:22-616:15 (Mailman).

Dr. Mailman's research focuses specifically on the design of drugs for dopamine receptors, work

which has led him to being named as an inventor on six patents for new drugs that work on

dopamine receptors.  Tr. 617:4-22 (Mailman).

72.    Pramipexole has not been proven or established to be neuroprotective.  Tr.

124:21-125:3 (Olanow); Tr. 629:15-20 (Mailman); TX 458 ("No treatment has been shown to be

neuroprotective"); TX 783 at 1018; ("The search for a neuroprotective treatment in Parkinson's

disease has been unsuccessful.").

73.    There remains an unmet need for a neuroprotective agent in treating

neurodegenerative diseases.  Tr. 84:24-85:17, 111:2-8; 124:16-20 (Olanow); TX 783 ("There is an important unmet medical need in Parkinson's disease for a neuroprotective treatment that slows or stops disease progression.").

74.    Pramipexole has not been proven or established to be effective in treating fibromyalgia.  Tr. 145:14-20 (Olanow); Tr. 630:17-631:1 (Mailman).

75.    Pramipexole has not solved any long-felt need for a drug to treat fibromyalgia. Tr. 145:14-20 (Olanow).

76.    Pramipexole has not been proven or established to be effective in treating endogenous depression.  Tr. 158:10-15 (Olanow); Tr. 631:2-12 (Mailman).

77.    Several studies published before the 1984 priority date indicated that dopamine agonists could be used to treat depression.  *See, e.g.*, TX 734 at BARR 209489 (study demonstrating that a dopamine agonist had the same antidepressant effects as a known antidepressant and explaining that "[r]ecently attention has turned to dopamine's role in depression"); TX 322 at BARR 209483 (study demonstrating that a dopamine agonist had the same antidepressant effects as a known antidepressant, and stating that "there have also been suggestions that the dopamine receptor stimulation could produce beneficial effects in depressed patients with Parkinson's disease"); Tr. 632:20-641:11 (Mailman).

78.    Even if pramipexole could be used in the treatment of depression—which has not been established—it would not have been unexpected that pramipexole had anti-depressant activity.  Tr. 631:13-632:19 (Mailman).

79.    A person of skill in the art in December 1984 would conclude from the claims of the '086 patent that pramipexole is a dopamine agonist.  Tr. 619:5-16 (Mailman); *see generally* Tr. 619:13-622:7 (Mailman).

80.     In December 1984, the drugs known to be effective in treating Parkinson's disease were dopamine agonists. Tr. 619:22-620:13 (Mailman).

81.     The structure of pramipexole possesses pharmacophoric elements—such as an aromatic moiety and a nitrogen located two carbons away from the aromatic moiety—that are consistent with dopamine agonism. Tr. 620:18-621:4 (Mailman).

82.     In December 1984, and still today, there was a widely-held view that dopamine agonists could also be used to treat schizophrenia. Tr. 621:9-24 (Mailman); *see also* Tr. 200:19-201:13 (Olanow).

83.     In December 1984 dopamine agonists were also known to potentially lower heart rate and blood pressure. Tr. 621:23-622:3 (Mailman); TX 2 at BOE30-31.

84.     Multiple studies published before December 1984 indicated that dopamine agonists could be used to treat depression. *See, e.g.,* TX 734 at BARR209489; TX 322 at BARR209483; TX 486 at 7; *see generally* Tr. 632:20-641:11 (Mailman).

85.     Several studies published before the 1984 priority date indicated that dopamine agonists could also potentially be used to treat depression. *See, e.g.,* TX 734 at BARR209489 (study demonstrating that a dopamine agonist had the same antidepressant effects as a known antidepressant and explaining that "[r]ecently attention has turned to dopamine's role in depression"); TX 322 at BARR209483 (study demonstrating that a dopamine agonist had the same antidepressant effects as a known antidepressant, and stating that "there have also been suggestions that the dopamine receptor stimulation could produce beneficial effects in depressed patients with Parkinson's disease"); Tr. 632:20-641:11 (Mailman).

86.     The idea that pramipexole could be used to treat depression would not have been unexpected to the person of ordinary skill as of December 1984. Tr. 631:13-632:19 (Mailman).

87.     There remains an unmet need for a drug to treat depression.  Tr. 84:24-85:17 (Olanow).

88.     In November 1982, a study was published by Dr. Sevket Akpinar in Archives of Neurology, stating that "levodopa plus benserazide (or a dopamine agonist) can be used successfully in the treatment of restless legs syndrome."  TX 320 at BARR209416; Tr. 648:14-21 (Mailman); Tr. 171:22-172:13 (Olanow).

89.     The Akpinar study tested the effects of both a dopamine agonist (bromocriptine) and a dopamine antagonist (pimozide) in patients with RLS and found that the dopamine agonist relieved the symptoms while the dopamine antagonist worsened them.  TX 320 at BARR209416; Tr. 643:14-646:1 (Mailman).

90.     The 1982 Akpinar study has been cited in the literature nearly 100 times, and was cited in a press release by Boehringer as first reporting the beneficial effects of dopaminergic stimulation in the treatment of RLS.  Tr. 648:24-649:5 (Mailman); TX 470 at 2;  TX 263 at BARR014162; TX 738 at 2.

91.     The idea that pramipexole could be used to treat Restless Legs Syndrome (RLS) would not have been unexpected to the person of ordinary skill as of December 1984.  Tr. 650:15-651:23 (Mailman).

92.     Neurontin (Gabapentin) and Klonopin (Clonazepam) were both available on the market before pramipexole and were used to treat RLS.  Tr. 652:20-653:11 (Mailman).

93.     In response to the testimony of Boehringer's expert Dr. Mohan Rao, Barr offered the testimony of its expert economist Roy Weinstein.  Tr. 513:3-547:22 (Weinstein).  Mr. Weinstein has been in the field of economics for over 40 years, and is currently the president of Micronomics, an economic research consulting firm.  *See* TX 773; Tr. 513:5-19, 514:4-11

(Weinstein). Mr. Weinstein has been engaged in economic research and analysis related to intellectual property for 20 years, including in the pharmaceutical field, and has published his work in, *inter alia*, the Journal of the Patent and Trademark Office Society, the Journal of Law and Technology, and The Licensing Journal. TX 773; Tr. 515:11-24 (Weinstein). Mr. Weinstein's testimony was credible, and refuted Dr. Rao's opinions regarding the commercial success of pramipexole for certain uses not referred to in the claims of the '086 patent.



99.    Boehringer presented inconsistent data relating to the sales and use of Mirapex® for different indications. Tr. 414:6-416:18, 419:23-427:14 (Rao); 530:23-532:16, 551:24-552:15, 553:17-554:19 (Weinstein).

100.    Boehringer's own 30(b)(6) witness on commercial success, Elizabeth Keating, testified that there are not accurate ways of determining what percentage of Mirapex's sales goes

to a particular indication. Tr. 514:6-575:6-576:5 (Keating)

101.    Dr. Rao only considered three years of data regarding Mirapex's® sales, and did not consider Mirapex's® market share in his analysis at that time. Tr. 389:21-390:10, 394:16-395:7 (Rao).

102.    The alleged evidence of nonobviousness, if relevant, is not adequate to overcome the evidence of invalidity of claims 3, 4, 5, 7, 9, and 10 .

103.    Boehringer did not present any evidence of the uses of any compound within the '812 patent other than pramipexole ((-) 2-Amino-6-n-propylamino-4,5,6,7-tetrahydrobenzthiazole).

## VI.    THE PROSECUTION HISTORIES FROM THE INSTANT PATENT FAMILY

### A.    THE '947 APPLICATION AND THE '374 PATENT

104.    Boehringer filed U.S. Patent Application No. 06/810,947 ("the '947 application") on December 19, 1985, which issued as U.S. Patent No. 4,731,374 ("the '374 patent") on March 15, 1988.  TX 1; TX 46; D.I. 190 at Ex. 1, ¶ 17; TX 786 (Stempel Dep.) 462:2-5, 462:13.

105.    The claims of the '947 application as filed contained the following subject matter:

| | |
|---|---|
| Claims 1-5 | Genus and subgenus tetrahydro-benzthiazoles |
| Claim 6 | 2-Amino-6-dimethylamino-4,5,6,7-tetrahydro-benzthiazole |
| Claim 7 | 2-Amino-6-n-propylamino-4,5,6,7-tetrahydro-benzthiazole |
| Claim 8 | A pharmaceutical composition comprising a tetrahydro-benzthiazole of claim 3 |
| Claim 9 | A method of lowering the blood pressure with a compound of claims 3-7 |
| Claim 10 | A method for lowering the heart rate with a compound of claims 3-7 |
| Claim 11 | A method of treating Parkinsonism with a compound of claims 3-7 |

16

Claim 12     A method of treating Parkinson's disease with a compound of claims 3-7

Claim 13     A method of treating schizophrenia with a compound of claims 3-7

Claims 14-15  Methods for making a tetrahydro-benzthiazole of claim 1

TX 46 at BARR114-18.

106.    During prosecution of the '947 application, the patent examiner (Examiner Ceperley) imposed the following restriction requirement:

I.      Claims 1-8 (at least part of each), drawn to benzothiazole compounds and a pharmaceutical composition, classified in Class 548, subclasses 161, 163 and 164.

II.     Claims 1-5 and 8-10 (at least part of each), drawn to pyrrolidinyl-substituted benzothiazole compounds and a pharmaceutical composition, classified in Class 514, subclass 367.

III.    Claims 1-4 and 8 (at least part of each), drawn to piperidinyl-substituted benzothiazole compounds and a pharmaceutical composition, classified in Class 546, subclass 192.

IV.    Claims 1-4 and 8 (at least part of each), drawn to hexamethylimino substituted benzothiazole compounds and a pharmaceutical composition, classified in Class 540, subclass 603.

V.     Claims 1-4 and 8, drawn (at least part of each) morpholinyl-substituted benzothiazole compounds and a pharmaceutical composition, classified in Class 544, subclass 135.

VI.    Claim 14, drawn to a method of preparing benzothiazole compounds using a thiourea reactant.

VII.   Claim 15, drawn to a method of preparing benzothiazole compounds using a disulfide reactant classified based on type of compounds formed.

VIII.  Claims 9 and 10, drawn to a method of lowering blood pressure or heart rate classified based on type of compound used.

IX.    Claims 11 and 12, drawn to a method for treating Parkinsonism, classified based on type of compound used.

X.     Claim 13, drawn to a method for treating schizophrenia, classified based

on type of compound used.

TX 46 at BARR275-76; TX 786 (Stempel Dep.) 260:23-24, 261:6-:25.

107.    The restriction requirement required compound/composition groups and utility (method of use) groups to be prosecuted together.  As part of the restriction requirement, the examiner stated that the applicants needed to "elect either (A) one of the compound groups I-V and one of the utility groups VIII-X (composition and utility to be limited to elected compound type for examination) or (B) one of the process groups VI and VII."  TX 46 at BARR277; TX 786 (Stempel Dep.) 263:4-10, 263:21-264:10.

### B.    THE '197 APPLICATION AND THE '086 PATENT

108.    On November 23, 1987, Boehringer filed U.S. Application No. 07/124,197 ("the '197 application"), which issued as the as the '086 patent on June 27, 1989.  TX 2; TX 286. .

109.    Boehringer re-submitted all of the claims from the parent application in the same form, including the subject matter of claims that had already issued in the '374 patent.  TX 286 at BARR491-95; TX 786 (Stempel Dep.) 474:24-475:6, 476:5-14, 477:14-22, 484:14-17, 484:23-485:11.

110.    No preliminary amendment was filed to remove the pyrrolidino limitation.  TX 286 at BARR500-02; TX 786 (Stempel Dep.) 476:5-14; *compare* TX 99 at BARR677.

111.    A new examiner (Examiner Gerstl), who had not examined the '374 patent, re-examined all of the claims and neither referred to the prior restriction requirement nor imposed a new one.  TX 286 at BARR503; TX 786 (Stempel Dep.) 470:5-8.

112.    The new examiner allowed in the same patent claims 6, 7 (compounds) as well as claims 9, 10, and 13 (three types of methods of treatment), and rejected the remaining claims. TX 286 at BARR503; TX 786 (Stempel Dep.) 470:5-8.

113.    Claims 6 and 7 that were allowed during prosecution of the '086 patent are

18

identical to claims 6 and 7 that issued in the '812 patent. TX 286 at BARR493, 503; TX 3.

114.    The allowed claim pattern was inconsistent with the restriction requirement imposed during the prosecution of the '374 patent. Using the terminology from the '374 patent restriction requirement, the allowed claims fell into a compound group (I) and multiple utility groups (VIII and X) for use of multiple compound groups (I-V). *See* TX 46 at BARR275-76; TX 286 at BARR 503; TX 786 (Stempel Dep.) 489:24-490:15, 492:4-493:18.

115.    The restriction requirement that issued in the '947 application did not carry over into the '197 application; the examiner effectively withdrew any restriction requirement from the '947 application. *See* TX 286 at BARR503; TX 46 at BARR275-76; TX 786 (Stempel Dep.) 298:18-21; 470:5-8, 487:11-22, 489:24-490:15, 492:4-493:18.

116.    The other claims (1-5, 8, and 11-12) were rejected for, *inter alia*, double patenting on the basis that they "overlap[ed]" with the '374 patent claims—*i.e.*, because the pyrrolidino limitation remained in those claims. *See* TX 286 at BARR504.

117.    The double patenting rejection "could easily have been obviated by amending" the claims "so as to remove pyrrolidino compounds from their scope." TX 286 at BARR595-96.

118.    In response to the examiner's rejection of some claims and allowance of others, Boehringer cancelled all of the pending claims, including the allowed claims. TX 286 at BARR592; TX 786 (Stempel Dep.) 503:7-11, 508:20-509:2, 509:10-510:4, 510:9-13.

119.    Boehringer then submitted new claims that were exclusively method and process claims and which encompassed all four methods of treatment disclosed in the patent. TX 286 at BARR578-93; TX 786 (Stempel Dep.) 511:13-511:24, 512:9-17, 512:20-513:3, 513:10-18, 513:21-514:7, 514:17-514:22, 515:2-8, 515:13-23.

120.    The new claims did not comply with (and therefore were not consonant with) the

restriction requirement imposed in the earlier application because, using the terminology from

that restriction requirement, the claims encompassed multiple utility groups (VIII, IX, and X),

for multiple compound groups (I-V) and a single process group (VI), and because they did not

include a single compound/composition group with a single utility group. *See* TX 46 at

BARR275-76; TX 286 at BARR592-600.

121.    The lone process claim (claim 56), which corresponded to rejected claim 14, was

later cancelled.  TX 286 at BARR602.

122.    In the same filing, Boehringer disclosed Eli Lilly U.S. Application Serial No.

747,748 ("the Lilly application"), filed June 24, 1985 and represented that it contained

potentially interfering subject matter with Boehringer's compound claims.  TX 286 at

BARR598-600; TX 786 (Stempel Dep.) 527:12-528:3.  *See also* TX 18 (Lilly Application).

123.    "In view of the particular pertinence of" the Lilly application to the

compound/composition claims and given the apparent concern over a potential interference

between those claims and the Lilly application, Boehringer stated that it would re-file the

compound/composition claims in a separate application to "advance the prosecution of [the '086

patent] and [so] that issues presented by [the Lilly application] will be more easily dealt with."

TX 286 at BARR600; TX 704 (Response to Interrogatory No. 36); TX 786 (Stempel Dep.)

542:5-543:5, 544:12-16, 544:19-545:6, 558:21-561:7, 574:17-575:6.

124.    Boehringer's internal documents show that it was concerned about a potential

interference with Eli Lilly.  *See* TX 127 ("It cannot be ruled out that Eli Lilly gets patent rights in

the USA which would dominate us."); TX 133 at BOE131840 ("potential interference with Eli

Lilly in USA").

125.    The new method of treatment claims issued as the '086 patent on June 27, 1989,

and included claims that covered uses of genuses and sub-genuses of tetrahydrobenzthiazoles for methods of lowering blood pressure (claims 1-10); lowering heart rate (claims 11-20); treating Parkinsonism or Parkinson's disease (claims 21-30); and treating schizophrenia (claims 31-40). TX 2; Tr. 472:15-21, 474:6-13, 475:3-12, 477:2-10 (Anslyn).

### C.    THE '671 APPLICATION AND THE '812 PATENT

126.    On October 12, 1988, Boehringer filed U.S. Application No. 07/256,671 ("the '671 application"), which issued as the '812 patent on December 12, 1989. TX 1; TX 3; TX 99; TX 786 (Stempel Dep.) 557:8-15, 558:12-17, 558:20.

127.    The '671 application was filed approximately seven months after issuance of the '374 patent. TX 1, 3; TX 786 (Stempel Dep.) 557:8-15, 558:12-17.

128.    The '671 application was filed as a division of the '197 application (which matured as the '086 patent); it was not filed as a division of the '947 application (which matured as the '374 patent). TX 1, 2, 3.

129.    The '671 application was not filed as a result of the restriction requirement imposed during prosecution of the '374 patent; instead, the '671 application was filed to "advance the prosecution of [the '086 patent] and [so] that issues presented by [the Lilly application] will be more easily dealt with." TX 704 (Response to Interrogatory No. 36); TX 786 (Stempel Dep.) at 542:5-543:5, 544:12-16, 544:19-545:6, 558:21-561:7, 574:17-575:6; *see also* TX 286 at BARR600.

130.    Boehringer was not forced by any restriction requirement to make the claims of the '812 patent in a separate application from the '086 patent. *See* TX 286 at BARR503, BARR592, BARR600; TX 704 (Response to Interrogatory No. 36); TX 786 (Stempel Dep.) 298:18-21, 470:5-8, 503:7-11, 508:20-509:2, 509:10-14, 510:9-13; 542:5-543:5, 544:12-16, 544:19-545:6, 558:21-561:7, 574:17-575:6.

131.    The claims of the '812 patent are not consonant with the restriction requirement imposed during prosecution of the '374 patent. TX 3; TX 46 at BARR275-76.

132.    Claims 1-8 of the '671 application corresponded to original claims 1-8 presented during prosecution of the '374 and '086 patents, except that "pyrrolidino," the subject of the '374 patent claims, and claims to methods of use, the subject of the '086 patent, were deleted by preliminary amendment. TX 99 at BARR662-66, BARR677; TX 786 (Stempel Dep.) 569:3-16.

133.    New compound claims 16 and 17, which issued as claims 9 and 10 of the '812 patent were added to the '671 application as well. TX 99 at BARR677-79; TX 3.  The claims "[we]re directed to a subgeneric aspect of the invention not previously claimed," TX 99 at BARR 678-79, and therefore not subject to the restriction requirement, see also TX 46 at BARR275-76 (no mention of claims 16-17).

134.    The issued claims of the '812 patent encompass four different restriction groups (I and III-V) using the framework from the restriction requirement imposed during prosecution of the '374 patent. See TX 786 (Stempel Dep.) 616:4-617:2, 617:10-12; TX 787 (Hurnaus Dep.) at 196:19-197:10, 197:18-22, 198:3-7, 198:9-16, 198:20-199:2, 199:5-199:10, 199:13-199:17 (discussing claim 3 of the '812 patent); see also TX 791 (Schneider Dep.) at 162:14-164:6; TX 46 at BARR275-76.

135.    During prosecution of the '671 application, the examiner did not refer to the restriction requirement imposed in the earlier application, nor did he impose a new one. TX 99.

136.    The restriction requirement that issued in the '947 application did not carry over into the '671 application. See TX 99; TX 286 at BARR503; TX 46 at BARR275-76; TX 786 (Stempel Dep.) 298:18-21, 470:5-8, 487:11-22, 489:24-490:15, 492:4-493:18, 616:4-617:2, 617:10-12; TX 787 (Hurnaus Dep.) at 196:19-197:10, 197:18-22, 198:3-7, 198:9-16, 198:20-

199:2, 199:5-199:10, 199:13-199:17 (discussing claim 3 of the '812 patent); *see also* TX 791 (Schneider Dep.) at 162:14-164:6.

**VII.    NON-INFRINGEMENT OF CLAIMS 5, 9, AND 10**

137.    Independent claims 1, 3, 6, and 7 of the '812 patent explicitly refer to acid addition salts; claim 9 does not, nor does dependent claim 10.  TX 3 at Cols. 23-26.

138.    In its application for a Patent Term Extension, Boehringer did not list claim 5 as a claim that covered pramipexole dihydrochloride.  TX 99 at BARR817-19.

139.    The active ingredient in Defendants' proposed products is pramipexole dihydrochloride, which is an acid addition salt.  D.I. 190, Ex. 1 at ¶¶ 10, 12, 15.

140.    Defendants' proposed pramipexole products do not infringe claims 5, 9 and 10 of the '812 patent.

## PROPOSED CONCLUSIONS OF LAW

### VIII.  THE '812 PATENT IS INVALID FOR NONSTATUTORY DOUBLE PATENTING

141.   Claims 3, 4, 5, 7, 9, and 10 of the '812 patent are invalid for double patenting over claims of the '086 patent.

142.   Claims 3, 4, 5, 7, 9, and 10 of the '812 patent are not patentably distinct from multiple claims of the '086 patent.

143.   The earlier '086 patent claims anticipate '812 patent claims 3, 4, 5, 7, 9, and 10, both expressly and inherently.

144.   The earlier '086 patent claims render obvious the later '812 patent claims 3, 4, 5, 7, 9, and 10.

145.   The claims of the '812 and '086 patents must be read through the eyes of the hypothetical person of ordinary skill in the art. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc).

146.   "The hypothetical person of ordinary skill in the art represents an ideal." *In re Metz*, 173 F.3d 433, 1998 WL 670185, at *4 (Fed. Cir. Sept. 22, 1998) (table opinion); *see also Endress + Hauser, Inc. v. Hawk Measurement Sys. Pty, Ltd.*, 122 F.3d 1040, 1042 (Fed. Cir. 1997) (person of ordinary skill is a "theoretical construct" that "is not descriptive of some particular individual").

147.   As a hypothetical person, the person of ordinary skill can possess the skills and experience of multiple individuals. *See, e.g., Medinol Ltd. v. Guidant Corp.*, 341 F. Supp. 2d 301, 321 (S.D.N.Y. 2004) (person of ordinary skill could be multiple individuals working together or a team of scientists); *see also Merck & Co. v. Teva Pharms. USA, Inc.*, 228 F. Supp. 2d 480, 501 (D. Del. 2002) (POOS could have knowledge and experience from various

24

disciplines), *aff'd*, 347 F.3d 1367 (Fed. Cir. 2003).

148.    "Factors that may be considered in determining level of ordinary skill in the art

include: (1) the educational level of the inventor; (2) type of problems encountered in the art; (3)

prior art solutions to those problems; (4) rapidity with which innovations are made; (5)

sophistication of the technology; and (6) educational level of active workers in the field. Not all

such factors may be present in every case, and one or more of these or other factors may

predominate in a particular case." *Envtl. Designs, Ltd. v. Union Oil Co.*, 713 F.2d 693, 696 (Fed.

Cir. 1983) (internal citation omitted).

149.    Nonstatutory double patenting, also referred to as "obviousness-type" double

patenting, "is a judicially created doctrine adopted to prevent claims in separate applications or

patents" which are "so alike that granting both exclusive rights would effective extend the life of

patent protection." *In re Metoprolol Succinate Patent Litig.*, 494 F.3d 1011, 1016 (Fed. Cir.

2007) (internal quotation omitted).

150.    Double patenting exists where "claims in a later patent . . . are not patentably

distinct from claims in a commonly earlier owned patent." *Eli Lilly & Co. v. Barr Labs., Inc.*,

251 F.3d 955, 967 (Fed. Cir. 2001).

151.    "A later patent claim is not patentably distinct from an earlier patent claim if the

later claim is obvious over, or anticipated by, the earlier claim." *Pfizer, Inc. v. Teva Pharms.

USA, Inc.*, 518 F.3d 1353, 1363 (Fed. Cir. 2008) (*quoting Eli Lilly*, 251 F.3d at 968).

152.    A claim to a compound is not patentably distinct from a claim to a method of

using the compound where that method was disclosed by the earlier patent. *Pfizer*, 518 F.3d at

1363, n.8; *Geneva Pharms., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1385-86 (Fed. Cir.

2003); *In re Christmann*, 128 F.2d 596, 599-600 (CCPA 1942); *In re Byck*, 48 F.2d 665, 666-67

(C.C.P.A. 1931).

153.    A later patent to a compound is not patentably distinct from an earlier method claim that recited a method of using the same compound. *Geneva*, 349 F.3d at 1375-82; *Geneva Pharms., Inc. v. GlaxoSmithKline PLC*, No. 2:01cv391 (consolidated), slip op. (E.D. Va. Apr. 22, 2002) (attached as Ex. 5A to D.I. 190); *Christmann*, 128 F.2d at 599-600.

154.    The legal principle articulated in the *Geneva-Pfizer* line of precedent is not limited to situations having a single utility. *Pfizer*, 518 F.3d at 1363, n.8; *Geneva*, 349 F.3d at 1385-86; *Christmann*, 128 F.2d at 599-600; *Byck*, 48 F.2d at 666-67. Allowance of claims to a product "not directed to any particular use" after a claim to a specific use of the product is "an extension of the [patentee's] monopoly not warranted by law," even if the product also has a new "use." *Christmann*, 128 F. 2d at 599-600. "If [the patentee] were to obtain a patent including [such] claims, they would presumptively be given a monopoly for seventeen years on the exclusive use of the compound for any purpose." *Id.*

155.    "It would shock one's sense of justice if an inventor could receive a patent upon a composition of matter, setting out at length in the specification the useful purposes of such composition, manufacture and sell it to the public, and then prevent the public from making any beneficial use of such product by securing patents upon each of the uses to which it may be adapted." *Byck*, 48 F.2d at 666-67; *Christmann*, 128 F.2d at 600; *see also Geneva*, 349 F.3d at 1386; *Pfizer*, 518 F.3d at 1363, n.8.

156.    Nonstatutory double patenting can be based on anticipation. *See, e.g., Eli Lilly*, 251 F.3d at 968; *In re Goodman*, 11 F.3d 1046, 1053 (Fed. Cir. 1993). "A patentable distinction does not lie where a later claim is anticipated by an earlier one." *Eli Lilly*, 251 F.3d at 970. A later claim is anticipated in the double patenting context when a claim of an earlier, commonly

owned patent discloses, either expressly or inherently, each limitation of the later claim. *Eli Lilly*, 251 F.3d at 970; *Schering Corp. v. Geneva Pharms., Inc.*, 339 F.3d 1373, 1377 (Fed. Cir. 2003).

157.    A subsequent claim directed to a group of compounds is invalid for double patenting when a prior commonly owned patent claims one compound within that group. The general rule that a species anticipates a genus applies in the double patenting context. *Eli Lilly*, 251 F.3d at 970-71; *Goodman*, 11 F.3d at 1046, 1053.

158.    The claim of an earlier commonly owned patent expressly anticipates a later claim when the prior claim expressly discloses all of the limitations of the later claim. *Eli Lilly*, 251 F.3d at 970; *Schering Corp.* 339 F.3d at 1377.

159.    In the double patenting context, the court may consider whether an earlier claim discloses a particular compound or composition. *See, e.g., Metoprolol*, 494 F.3d at 1019 (looking to whether the earlier patent in a double patenting case "discloses" a particular composition); *Geneva*, 349 F.3d at 1385 (in assessing double patenting, "this court examines the disclosure of the [earlier] claim").

160.    A prior patent claim may also inherently anticipate a later commonly owned claim and thereby result in double patenting. *See Eli Lilly*, 251 F.3d at 970. A reference inherently anticipates a claim if the claim is the natural result of practicing the reference's explicit limitations. *Id.*

161.    The production or formation of a compound, even in trace amounts, is sufficient to invalidate a compound claim for anticipation. *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1345 (Fed. Cir. 2005).

162.    An earlier patent renders obvious a later, commonly owned patent where the

second patent is "'the product not of innovation but of ordinary skill and common sense.'"

*Metoprolol*, 494 F.3d at 1017 n.2 (finding double patenting when elements were omitted from

the later patent but disclosed in the earlier patent (*quoting KSR Int'l Co. v. Teleflex Inc.*, 550 U.S.

__, 127 S. Ct. 1727, 1742 (2007)).

163.    "Claims which are broad enough to read on obvious subject matter are

unpatentable even though they also read on nonobvious subject matter." *In re Lintner*, 458 F.2d

1013, 1015 (CCPA 1972).

164.    The policy rationale underlying the doctrine of double patenting is that the "the

world [should] be free to use" the invention claimed in the earlier patent once it expires. *Symbol*

*Techs., Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1581 (Fed. Cir. 1991); *see also In re Longi*, 759

F.2d 887, 894 (Fed. Cir. 1985). The later patent should not "effectively extend the life of the"

earlier patent. *Symbol Techs.*, 935 F.2d at 1580-81.

165.    Section 806.05(h) of the Manual of Patent Examining Procedure ("MPEP") does

not supply the substantive test for double-patenting and is fundamentally inconsistent with the

standards for patentable distinctness set forth by the CCPA and the Federal Circuit. *Compare*

*Pfizer*, 518 F.3d at 1363 n.8; *Geneva*, 349 F.3d at 1385-86; *Eli Lilly*, 251 F.3d at 968 *with* MPEP

§ 806.05(h).

166.    The MPEP does not bind the Federal Circuit and does not have the force of law.

*See, e.g., Racing Strollers, Inc. v. TRI Indus., Inc.*, 878 F.2d 1418, 1422 (Fed. Cir. 1989);

Foreward, MPEP.

## IX.    A PATENT TERM EXTENSION ONLY EXTENDS A SUBSTANTIALLY NARROWER, PRE-EXISTING SET OF RIGHTS

167.    Section 156 only serves to extend (in part) existing rights, it does not grant any

new rights to a patentee. *See, e.g.*, 35 U.S.C. § 156(a)(1) (extension not permissible if the patent

has already expired); 35 U.S.C. § 156 (repeatedly referring to the extension of "the term of a patent").

168.    During the period of a patent term extension, the rights held by the patentee are substantially narrower than during the original term of a patent.  35 U.S.C. § 156; *see, e.g.,* *Pfizer Inc. v. Dr. Reddy's Labs., Ltd.*, 359 F.3d 1361, 1366 (Fed. Cir. 2004) ("[t]he 'rights derived' provision of § 156(b) specifically limits the extension to 'any use approved for the product,' which means that other, e.g., non-pharmaceutical uses, are not subject to the extension"); *Merck & Co. v. Kessler*, 80 F.3d 1543, 1547 (Fed. Cir. 1996) ("the restoration period of the patent does not extend to all products protected by the patent but only to the product on which the extension was based." (*citing* 35 U.S.C. § 156(b)(1))).

169.    "[T]he rights derived from any patent the term of which is extended under [Section 156] shall during the period during which the term of the patent is extended shall during the period during which the term of the patent is extend . . . in the case of a patent which claims a product, be limited to any use approved for the product."  35 U.S.C. § 156(b)(1) (emphasis added).

## X.    THE BELATED TERMINAL DISCLAIMER DOES NOT CURE DOUBLE PATENTING

170.    The Federal Circuit has held that a terminal disclaimer must be filed before the first patent expires in order to cure double patenting.  "[A] terminal disclaimer may overcome that [double patenting] basis for unpatentability, assuming that the first patent has not expired." *In re Lonardo*, 119 F.3d 960, 965 (Fed. Cir. 1997); *see also Eli Lilly*, 251 F.3d at 968 n.5.

171.    In order to cure double patenting, a terminal disclaimer must prevent the time-wise extension of the second patent beyond the life of the first patent.  *See, e.g., Eli Lilly,* 251 F.3d at 967-68 & n.5; *Lonardo*, 119 F.3d at 965; *In re Van Ornum*, 686 F.2d 937, 943-44 (CCPA

1982). Once the earlier patent has expired, therefore, double patenting can no longer be cured.

172.    Timely-filed terminal disclaimers are designed to prevent patentees from obtaining a time-wise extension of patent protection. *See, e.g., Lonardo*, 119 F.3d at 965 ("The doctrine of double patenting is intended to prevent a patentee from obtaining a time-wise extension of patent for the same invention or an obvious modification thereof."); *see also Eli Lilly,* 251 F.3d at 967-68 ("The judicially-created doctrine of obviousness-type double patenting . . . prohibit[s] a party from obtaining an extension of the right to exclude through claims in a later patent that are not patentably distinct from claims in a commonly owned earlier patent."); *In re Braithwaite*, 379 F.2d 594, 601 (CCPA 1967) ("Double patenting is . . . primarily intended to prevent prolongation of monopoly."); *In re Robeson*, 331 F.2d 610, 614 (CCPA 1964) ("If . . . the second patent expires simultaneous with the first, the right to fully utilize the patented discovery at the expiration date remains unimpaired. Thus the terminal disclaimer here precludes any extension of monopoly.").

173.    The only terminal disclaimer that can cure a double patenting problem is one that ties the expiration date of the two patents. *See, e.g., Eli Lilly,* 251 F.3d at 968 n.5 ("double patenting <u>precludes</u> the [later claim] from extending beyond the termination date of the [earlier patent]" (emphasis added)); *In re Longi*, 759 F.2d at 894 (emphasis added) (nonstatutory double patenting can be cured if the patentee files "a terminal disclaimer under 35 U.S.C. § 253, disclaiming 'any terminal part of the term . . . of the patent,' thereby guaranteeing that the second patent would expire at the same time as the first patent. . . . Since the second patent would expire simultaneously with the first, this use of a terminal disclaimer is consistent with the policy that the public should be free to use the invention as well as any obvious modifications at the end of the patent's term."); *Robeson*, 331 F.3d at 614.

174.    In *Merck & Co. v. Hi-Tech Pharmacal Co.*, 482 F.3d 1317 (Fed. Cir. 2007), the patent was first terminally disclaimed and then the extension was put on the terminal disclaimer's expiration date. *Id.* at 1318-19. The expiration dates of the two patents were the same prior to the extension under Section 156. The Federal Circuit pointed to the coupling of the expiration dates to explain why the policy underlying the doctrine of double patenting was served notwithstanding the extension:

> The computation of a Hatch-Waxman patent term extension is from the expiration date resulting from the terminal disclaimer and not from the date the patent would have expired in the absence of the terminal disclaimer. Any waiver of the term is thus not ignored or nullified because the terminal disclaimer provides the date from which the patent term extension begins. The purpose of the terminal disclaimer—to prevent extension of patent term for subject matter that would have been obvious over an earlier filed patent—remains fulfilled by virtue of the fact that the date from which any Hatch-Waxman extension is computed is the terminally disclaimed date. At the same time, the purpose of the patent term extension—to restore some of the patent term lost due to regulatory review—is also satisfied.

*Id.* at 1322-23.

175.    It is well-settled that a terminal disclaimer must state that the later patent "shall be enforceable only for and during such period that said patent is commonly owned" with the patent which formed the basis for the double patenting. 37 C.F.R. § 1.321(c)(3); *see also Pharmacia Corp. v. Par Pharm., Inc.*, 417 F.3d 1369, 1374 (Fed. Cir. 2005); *Van Ornum*, 686 F.2d at 948 ("[W]e consider it desirable to tie both the termination and the ownership of the two patents together.").

176.    Boehringer's terminal disclaimer did not state that the '812 patent "shall be enforceable only for and during such period that said patent is commonly owned" with the '086

patent. As a result, Boehringer's terminal disclaimer is legally incapable of curing double patenting.

177. The Federal Circuit has not decided the question of whether a terminal disclaimer filed during litigation can ever cure double patenting, see *Metoprolol*, 494 F.3d at 1020 n.4 ("This court has not decided the issue"). However, in *CMI Corp. v. Lakeland Constr. Co.*, 184 USPQ 721, 727 (N.D. Ill. 1975), *aff'd mem.*, 532 F. 2d 757 (7th Cir. 1976), the court, found that a terminal disclaimer filed on the eve of trial, over seven years after the allowance of the patent and almost two years since the filing of the litigation, was ineffective to cure double patenting. The court explained that it was "concerned with the timing of the disclaimer, coming at such a late date, especially since defendants' answer had raised the issue several years earlier." *Id.* at 727.

## XI.    SECTION 121 DOES NOT SAVE THE '812 PATENT

178. The third sentence of 35 U.S.C. § 121 provides an exception from a charge of double patenting if, and only if, particular conditions are satisfied. *Bristol-Myers Squibb Co. v. Pharmachemie B.V.* ("*BMS*"), 361 F.3d 1343, 1347-48 (Fed. Cir. 2004). A patentee must demonstrate three things to obtain the benefit of Section 121. First, the patentee must show that the later-filed application was filed "as a result of a restriction requirement." *Id.* at 1347-48. Second, the subsequent application must be "consonant with" said restriction requirement. *Id.* Third, the subsequent application must be filed before the issuance of the patent from the earlier application during which the restriction requirement was made. *See P.J. Federico, Commentary on the New Patent Act*, at 35 (1954), *reprinted in* 75 J. Pat. & Trademark Off. Soc'y 161, 196 (1993) (statute requires that "if two or more divisional applications are filed as a result of a multiple requirement for restriction, they each must be filed before the original application is patented in order to obtain the benefit of this provision"); *see also Symbol Techs., Inc. v.*

*Lemelson Med., Inc.*, 277 F.3d 1361, 1366 (Fed. Cir. 2002) ("Federico's commentary is an invaluable insight into the intentions of the drafters of the [1952 Patent] Act.").

179.    The patentee has the burden of showing that Section 121 applies.  *Geneva*, 349 F.3d at 1381; *Regents of Univ. of Cal. v. Dakocytomation Cal., Inc.*, No. C 05-03955 MHP, 2006 WL 1343950, at *2 (N.D. Cal. May 17, 2006).

180.    In order to obtain the benefit of Section 121 to protect a divisional application, a patentee must demonstrate that the divisional application was filed "as a result of a restriction requirement." *BMS*, 361 F.3d at 1347-48; *Pfizer,* 518 F.3d at 1359 ("[S]ection 121 provides a safe harbor to patents that issue on applications filed as a result of a restriction requirement" (emphasis added)); *Gerber Garment Tech., Inc. v. Lectra Sys., Inc.*, 916 F.2d 683, 687 (Fed. Cir. 1990) ("The prohibition against use of a parent application 'as a reference' against a divisional application applies only to the divisional applications that are 'filed as a result of' a restriction requirement."); *Union Carbide Corp. v. Dow Chem. Co.*, 619 F. Supp. 1036, 1059 (D. Del. 1985).

181.    For section 121 to apply the applicant must be "forced to make [the claims of the later patent] in a separate application [from the earlier patent] by a requirement of restriction." *In re Zickendraht*, 319 F.2d 225, 232 (CCPA 1963) (Rich, J., concurring).

182.    The purpose of Section 121 is to prevent a patentee that has been forced by the PTO to divide up an application into several different patents from being penalized for complying with the PTO's directives.  *Applied Materials, Inc. v. Advanced Semiconductor Materials America., Inc.*, 98 F.3d 1563, 1568 (Fed. Cir. 1996) ("when the existence of multiple patents is due to the administrative requirements imposed by the Patent and Trademark Office,

35 U.S.C. § 121 provides that the inventor shall not be prejudiced by having complied with those requirements"); *see also Zickendraht*, 319 F.2d at 232 (Rich, J., concurring).

183.    In addition, for Section 121 to apply, the subsequent application must be "consonant with," said restriction requirement. *BMS*, 361 F.3d at 1347-48; *see also Symbol Techs.*, 935 F.2d at 1579; *Pfizer*, 518 F. 3d at 1359. Consonance requires that an applicant divide up the claimed subject matter according to the examiner's instructions. *Symbol Techs., Inc.*; *Pfizer*, 518 F. 3d at 1359.

184.    Boehringer cannot rely on the exception of Section 121 to escape a finding of double patenting.

## XII.    THE ALLEGED OBJECTIVE INDICIA OF NONOBVIOUSNESS ARE IRRELEVANT AND DO NOT SUPPORT VALIDITY

185.    Evidence of nonobviousness is irrelevant to the double patenting analysis in this case. *See Geneva*, 349 F.3d at 1378 n.1; *Proctor & Gamble Co. v. Teva Pharms. USA, Inc.*, 536 F. Supp. 2d 476, 497-98 (D. Del. 2008).

186.    None of the *Geneva, Pfizer, Byck*, or *Christmann* double patenting decisions involving compounds and methods of using them considered such evidence pertinent to their analyses. *See Pfizer*, 518 F.3d at 1563 & n.8; *Geneva*, 349 F.3d at 1377 n.1; *Christmann*, 128 F.2d at 599; *Byck*, 48 F.2d at 666-67.

187.    Evidence of nonobviousness is irrelevant to anticipation. *See, e.g., In re Paulsen*, 30 F.3d 1475, 1482 n.11 (Fed. Cir. 1994); *Eli Lilly & Co. v. Zenith Goldline Pharms., Inc.*, 364 F. Supp. 2d 820, 911 (S.D. Ind. 2005).

188.    Objective indicia of nonobviousness can save a claim that would otherwise be invalid only if such indicia are present for more than a portion of—or commensurate with the scope of—the claim. *In re Peterson*, 315 F.3d 1325, 1330-31 (Fed. Cir. 2003) (evidence must be

commensurate with the scope of the claim); *In re Greenfield*, 571 F.2d 1185, 1189 (CCPA 1978) (same); *In re Tiffin*, 448 F.2d 791, 792 (CCPA 1971) (same).

189.    "Evidence of secondary considerations, including evidence of unexpected results and commercial success, are but a part of the 'totality of the evidence' that is used to reach the ultimate conclusion of obviousness." *Richardson-Vicks Inc. v. Upjohn Co.*, 122 F.3d 1476, 1483 (Fed. Cir. 1997); *see also Agrizap, Inc. v. Woodstream Corp.*, Case Nos. 2007-1415, 2007-1421, --- F.3d ---, 2008 WL 819757, *6 (Fed. Cir. 2008) (holding that the objective evidence of nonobviousness, including commercial success, copying, and long-felt need, could not overcome "such a strong prima facie case of obviousness"); *Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007) (holding that substantial evidence of commercial success, praise, and long-felt need were inadequate to overcome the strong prima facie obviousness showing).

190.    In order for evidence of unexpected properties to have any bearing on a finding of invalidity, the product must actually possess the asserted properties. *In re Mayne*, 104 F.3d 1339, 1343 (Fed. Cir. 1997).

191.    The burden is on the party alleging the unexpected property to demonstrate that the property actually exists and this requires evidence that the claimed invention actually "exhibits some superior property or advantage." *Mayne*, 104 F.3d at 1343; *In re Soni*, 54 F.3d 746, 750 (Fed. Cir. 1995).

192.    Any showing of unexpected properties requires evidence that the properties would not have been expected by a person of ordinary skill in the art at the time of the invention. *Mayne*, 104 F.3d at 1343 (*citing Soni*, 54 F.3d at 750); *In re Juillard*, 476 F.2d 1380, 1382 (CCPA 1973).

193.    For objective indicia of nonobviousness, a need must not only be long-felt but also unsolved. *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966). The inquiry thus centers on whether the evidence shows that a need existed as of the priority date and that the claimed invention solved it.

194.    Commercial success "must be due to the merits of the claimed invention beyond what was readily available in" the prior art. *See J.T. Eaton & Co. v. Atl. Paste & Glue Co.*, 106 F. 3d 1563, 1571 (Fed. Cir. 1997).

195.    Evidence consisting solely of sales data is weak, if any, evidence of commercial success. *See Kan. Jack, Inc. v. Kuhn*, 719 F.2d 1144, 1150-51 (Fed. Cir. 1983); *In re Huang*, 100 F.3d 135, 140 (Fed. Cir. 1996); *In re Baxter Travenol Labs*, 952 F.2d 388, 392 (Fed. Cir. 1991).

196.    A nexus is required to establish commercial success, and a nexus is only presumed where the evidence of commercial success is coextensive with the scope of the claims. *See Brown & Williamson Tobacco Corp. v. Philip Morris, Inc.*, 229 F.3d 1120, 1130 (Fed. Cir. 2000).

## XIII.   CLAIM CONSTRUCTION

197.    A court must presume that the terms in the claim mean what they say. *See, e.g.*, *Johnson Worldwide Assocs., Inc. v. Zebco Corp.*, 175 F.3d 985, 989 (Fed. Cir. 1999).

198.    The claim term "2-Amino-6-n-propylamino-4,5,6,7-tetrahydrobenzthiazole" should be construed as "(+)2-Amino-6-n-propylamino-4,5,6,7-tetrahydrobenzthiazole; (-)2-Amino-6-n-propylamino-4,5,6,7-tetrahydrobenzthiazole; or any mixture thereof." *See, e.g.*, Tr. 254:22-255:16 (Klibanov).

199.    Claims 9 and 10 are construed as limited to the free bases of the specified compounds. *See* TX 3 at Cols. 23-26.

## XIV.  NON-INFRINGEMENT OF CLAIMS 5, 9, AND 10

200.    "The patentee has the burden of proving infringement by a preponderance of the evidence." *Centricut, LLC v. Esab Group, Inc.*, 390 F.3d 1361, 1367 (Fed. Cir. 2004).

201.    "The prosecution history constitutes a public record of the patentee's representations concerning the scope and meaning of the claims, and competitors are entitled to rely on those representations when ascertaining the degree of lawful conduct." *Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*, 222 F.3d 951, 957 (Fed. Cir. 2000).

202.    "The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution." *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995).

203.    Boehringer is effectively estopped from now asserting that claim 5 encompasses pramipexole.

Respectfully submitted,

YOUNG CONAWAY STARGATT &
    TAYLOR, LLP

MORRIS JAMES LLP

/s/ Karen E. Keller
Karen E. Keller (#4489)
kkeller@ycst.com
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
(302) 571-6600
*Attorney for Barr Laboratories, Inc.*

/s/ Mary B. Matterer
Mary B. Matterer (#2696)
MMatterer@morrisjames.com
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, DE 19899-2306
(302) 888-6960
*Attorney for Mylan Pharmaceuticals Inc.*

Date: April 18, 2008

## <u>CERTIFICATE OF SERVICE</u>

I, Karen E. Keller, Esquire, hereby certify that on April 25, 2008, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

Jack B. Blumenfeld, Esquire
Morris Nichols Arsht & Tunnell
1201 North Market Street
PO Box 1347
Wilmington, DE 19899-1347

Mary B. Matterer, Esquire
Morris James LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE 19801

I further certify that on April 25, 2008**,** I caused a copy of the foregoing document to be served by e-mail on the above-listed counsel of record and on the following non-registered participants in the manner indicated:

### <u>BY E-MAIL</u>

Steven C. Cherny, Esquire
Latham & Watkins LLP
885 Third Avenue, Suite 1000
New York, NY 10022-4834

Kenneth G. Schuler, Esquire
Latham & Watkins LLP
Sears Tower, Suite 5800
Chicago, IL 60606

Shannon M. Bloodworth, Esquire
Heller Ehrman LLP
1717 Rhode Island Ave., N.W.
Washington, DC 20036

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ *Karen E. Keller*
Karen E. Keller (No. 4489)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600
kkeller@ycst.com

*Attorneys for Barr Laboratories, Inc.*