# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BOEHRINGER INGELHEIM INTERNATIONAL GMBH and BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 05-700 (JJF) |
| v. | ) ) | **REDACTED -** |
| BARR LABORATORIES, INC., | ) ) | **PUBLIC VERSION** |
| Defendant, | ) ) ) | |
| BOEHRINGER INGELHEIM INTERNATIONAL GMBH and BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 05-854 (JJF) |
| v. | ) ) | |
| MYLAN PHARMACEUTICALS, INC., | ) ) | |
| Defendant. | ) ) | |

## PLAINTIFFS' POST-TRIAL ANSWERING BRIEF

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
1201 North Market Street
P. O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
mnoreika@mnat.com

*Attorneys for Plaintiffs*
*Boehringer Ingelheim International GmbH and*
*Boehringer Ingelheim Pharmaceuticals, Inc.*

*Of Counsel*:

Steven C. Cherny
LATHAM & WATKINS LLP
885 Third Avenue, Suite 1000
New York, NY  10022-4834
(212) 906-1200

Kenneth G. Schuler
Amanda J. Hollis
Joel Neckers
LATHAM & WATKINS LLP
Sears Tower, Suite 5800
Chicago, IL  60606
(312) 876-7700

Original Filing Date:  May 14, 2008
Redacted Filing Date:  May 21, 2008

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES. ................................................................................................. ii

I.    INTRODUCTION ........................................................................................................1

II.   ARGUMENT.................................................................................................................2

      A.   Defendants Do Not Seriously Dispute That They Infringe All Of The
           Asserted Claims ...................................................................................................2

      B.   Boehringer's Terminal Disclaimer Moots Defendants' Double Patenting
           Challenge ..............................................................................................................4

           1.   There Is No Requirement That A Terminal Disclaimer Must Be
                Filed Before The First Patent Expires.....................................................5

           2.   The Federal Circuit In Merck Rejected Defendants' Theory That A
                Terminal Disclaimer Is Not Effective Unless The Expiration Dates
                Are Linked ..................................................................................................6

           3.   Defendants' Argument That Boehringer's Patent Term Extension
                "Falls" Because It "Attached" To An Invalid Patent Is Wrong...................7

           4.   Boehringer's Terminal Disclaimer Cured Any Extension Of The
                '086 Patent Rights.......................................................................................9

                a.   Boehringer's Terminal Disclaimer Disclaimed Rights To
                     The Use Of Pramipexole To Treat Parkinson's Disease And
                     Parkinsonism.................................................................................11

                b.   Rights To Non-Pharmaceutical Uses And Pharmaceutical
                     Uses Other Than To Treat Schizophrenia Or Parkinson's
                     Disease, Or Lower Heart Rate Or Blood Pressure Do Not
                     Extend The '086 Patent.................................................................12

                c.   The '812 Patent Did Not Prevent Others From Practicing
                     Rights To Uses Covered By The '086 Patent ...............................12

                d.   Defendants' Theory Would Work An Unjust Forfeiture.............14

           5.   It Is Undisputed That The '086 And '812 Patents Are Commonly
                Owned ........................................................................................................15

           6.   The Terminal Disclaimer Is Not Late .....................................................15

      C.   Defendants Have Not Shown That The '812 Patent Claims Are Double
           Patented................................................................................................................17

           1.   The '812 Patent Claims Are Patentably Distinct Under MPEP §
                806.05(h) ...................................................................................................18

2.    There Is No Rule That Compounds And Their Methods Of Use Are Patentably Indistinct As A Matter of Law ...........................................22

3.    The '086 Patent Claims Cannot "Anticipate" The '812 Patent Claims ...........................................................................................................23

4.    Defendants Ignore That The PTO Explicitly Considered This Issue ........26

5.    Boehringer's Terminal Disclaimer Is Not An Admission of Obviousness ...................................................................................................27

D.    Defendants Continue To Misconstrue Section 121 And The Consonance Requirement Of Gerber Garment.........................................................................27

1.    There Is No Requirement That The '812 Patent Had To Be Filed As A Result Of A Restriction Requirement.................................................28

2.    The Applicants Maintained Consonance ...................................................29

3.    The '812 Patent Was Filed Before Issuance Of The '086 Patent .............31

E.    Defendants Have Not Refuted The Secondary Indicia Of Nonobviousness That Favor Patentability........................................................................................33

1.    Secondary Indicia May Be Considered......................................................33

2.    Secondary Indicia Of Nonobviousness Favor A Finding Of No Double Patenting.........................................................................................34

a.    Defendants Have No Response To Boehringer's Evidence Of Copying And Licensing.................................................................34

b.    Pramipexole Has Unexpected Properties......................................35

c.    Pramipexole's Other Uses Would Not Have Been Expected As Of December 1984 ...................................................................36

d.    Pramipexole Satisfied Several Long-Felt But Unmet Needs.........37

e.    Pramipexole Has Been Commercially Successful.........................38

III.    CONCLUSION...............................................................................................................39

## TABLE OF AUTHORITIES

CASES

*American Hoist & Derrick Co. v. Sowa & Sons, Inc.*,
  725 F.2d 1350 (Fed. Cir. 1984).................................................................26

*Applied Materials, Inc. v. Advanced Semiconductor Materials Am., Inc.*,
  98 F.3d 1563 (Fed. Cir. 1996).................................................................33

*Astellas Pharma, Inc. v. Ranbaxy Inc.*,
  2007 WL 576341 *8 (D.N.J. 2007) ................................................ 21, 25-26

*Bayer AG v. Barr Labs, Inc.*,
  798 F. Supp. 196 (S.D.N.Y. 1992)..........................................................16

*Bott v. Four Star Corp.*,
  675 F. Supp. 1069 (E.D. Mich. 1987)......................................................16

*Bristol-Myers Squibb Co. v. Pharmachemie B.V.*,
  361 F.3d 1343 (Fed. Cir. 2004)................................................................30

*Brown & Williamson Tobacco Corp. v. Philip Morris, Inc.*,
  229 F.3d 1120 (Fed. Cir. 2000)................................................................39

*C.R. Bard, Inc. v. M3 Sys., Inc.*,
  157 F.3d 1340 (Fed. Cir. 1998)................................................................14

*Corp. v. Lakeland Constr. Co.*,
  184 USPQ 721 (N.D. Ill. 1975) ...............................................................15

*E. I. Du Pont de Nemours & Co. v. Phillips Petroleum Co.*,
  656 F. Supp. 1343 (D. Del. 1987), *aff'd in part and rev'd in part on other grounds*,
  849 F.2d 1430 (Fed. Cir. 1988).............................................................34

*Ecolochem, Inc. v. Southern Cal. Edison, Co.*,
  227 F.3d 1361 (Fed. Cir. 2000)................................................................38

*Eli Lilly and Co. v. Barr Laboratories, Inc.*,
  251 F.3d 955 (Fed. Cir. 2001)..............................................................4, 17

*Eli Lilly and Co. v. Barr Labs.*,
  222 F.3d 973 (Fed. Cir. 2000)................................................................10

*General Foods Corp. v. Studiengasellshaft Kohle GmbH*,
  972 F.2d 1272 (Fed. Cir. 1992).......................................................... 24-26

*Geneva Pharm., Inc. v. GlaxoSmithKline PLC*,
  349 F.3d 1373 (Fed. Cir. 2003)........................................................ Passim

*Gerber Garment Technology, Inc. v. Lectra Systems, Inc.,*
    916 F.2d 683, 16 USPQ2d 1436 (Fed.Cir.1990) .........................................27

*In re Aldrich,*
    398 F.2d 855 (C.C.P.A. 1968) .................................................................24

*In re Bronson,*
    168 F.2d 548 (C.C.P.A. 1948) .................................................................23

*In re Byck,*
    48 F.2d 665 (C.C.P.A. 1931) .............................................................. 20-21

*In re Christmann,*
    128 F.2d 596 (C.C.P.A. 1942) ............................................................ 20-21

*In re Eckel,*
    393 F.2d 848 (C.C.P.A 1968) ...................................................................7

*In re GPAC,*
    57 F.3d 1573 (Fed. Cir. 1995)................................................................34

*In re Lonardo,*
    119 F.3d 960 (Fed. Cir. 1997)..................................................................4

*In re Robeson,*
    331 F.2d 610 (C.C.P.A 1964) ...................................................................7

*In re Sarett,*
    327 F.2d 1005 (C.C.P.A. 1964) ...............................................................24

*In re Sutherland,*
    347 F.2d 1009 (C.C.P.A. 1965) ...............................................................24

*In re Zicekndraht,*
    319 F.2d 225 (C.C.P.A 1963) (Rich, J., concurring) ...............................28

*J.T. Eaton & Co. v. Atlantic Paste and Glue Co.,*
    106 F.3d 1563 (Fed. Cir. 1997)...............................................................38

*King Pharm., Inc. v. Teva Pharm., Inc.,*
    409 F.Supp. 2d 609 (D. N.J. 2006) ....................................................... 6-7

*Merck & Co. v. Hi-Tech Pharmacal Co.,*
    482 F. 3d 1317 (Fed. Cir. 2007).................................................... 4, 6-8

*Molins PLC v. Textron, Inc.,*
    48 F.3d 1172 (Fed. Cir. 1995)................................................................19

*Motionless Keyboard Co. v. Microsoft Corp.,*
486 F.3d 1376 (Fed. Cir. 2007) ............................................................................................27

*Nippon Steel Corp. v. United States,*
458 F.3d 1345 (Fed. Cir. 2006) ............................................................................................24

*Perricone v. Medicis Pharm. Corp.*
432 F.3d 1368 (Fed. Cir. 2005) ............................................................................................16

*Pfizer Inc. v. Ranbaxy Labs. Ltd.,*
405 F. Supp. 2d 495 (D. Del. 2005) ................................................................................ Passim

*Pfizer, Inc. v. Teva Pharmaceuticals USA, Inc.,*
518 F.3d 1353 (Fed. Cir. 2008) ...............................................................................20, 22, 30

*Quad Environmental Technologies Corp. v. Union Sanitary Dist.,*
20 U.S.P.Q.2d 1392 (Fed. Cir. 1991) ....................................................................................27

*Regents of the Univ. of Cal. v. Dakocytomation California, Inc.,*
517 F.3d 1364 (Fed. Cir. 2008) ............................................................................................10

*Smietanka v. First Trust & Sav. Bank,*
257 U.S. 602 (1922) ........................................................................................................6, 38

*South Corp. v. United States,*
690 F.2d 1368 (Fed. Cir. 1982) (en banc) ...........................................................................23

*Studiengesellschaft Kohle, GmbH v. Northern Petrochemical Co.,*
784 F.2d 351 (Fed. Cir. 1986) ..............................................................................................19

*Symbol Tech., Inc. v. Opticon, Inc.,*
935 F.2d 1569 (Fed. Cir. 1991) ................................................................... 17, 28, 30-31

*Syntex (U.S.A.), Inc. v. U.S. Patent and Trademark Office,*
882 F.2d 1570 (Fed. Cir. 1989) ............................................................................................19

*Takeda Pharma. Co., Ltd. v. Dudas,*
511 F. Supp. 2d 81 (D. D.C. 2007) .......................................................................................21

*Technicon Instruments Corp. v. Coleman Instruments, Inc.,*
255 F. Supp. 630 (N.D. Ill. 1966) ..................................................................................16-17

*Transclean Corp. v. Bridgewood Services, Inc.,*
290 F.3d 1364 (Fed. Cir. 2002) ..............................................................................................3

*Union Carbide Corp. v. Dow Chemical Co.,*
619 F. Supp. 1036 (D. Del. 1985) ...................................................................................28-29

*Vandenberg v. Dairy Equip. Co.,*
   740 F.2d 1560 (Fed. Cir. 1984)..................................................................34

**STATUTES**

21 U.S.C. § 301, *et seq*...............................................................................13

21 U.S.C. § 321(g)(1)(B)..............................................................................13

21 U.S.C. § 321(p).......................................................................................13

21 U.S.C. §§ 331(d) and 355(a)....................................................................13

35 U.S.C. §§ 101, 102, 103 and 112..............................................................1

35 U.S.C. § 102, 103....................................................................................25

35 U.S.C. 111..............................................................................................27

35 U.S.C. § 121.....................................................................................Passim

35 U.S.C. § 156.....................................................................................Passim

35 U.S.C. § 156(b).......................................................................................13

35 U.S.C. § 156(d)(1).....................................................................................9

35 U.S.C. § 253..................................................................................6, 10, 16

35 U.S.C. § 271(e)(4)...................................................................................39

35 U.S.C. § 282.............................................................................................9

**OTHER AUTHORITIES**

37 C.F.R. pt. 1............................................................................................32

37 C.F.R. § 1.321(c)(3)................................................................................15

72 Fed. Reg. 46,716 (Aug. 21, 2007)............................................................32

## I.    INTRODUCTION

Defendants Barr Laboratories, Inc. ("Barr") and Mylan Pharmaceuticals, Inc. ("Mylan") (collectively "Defendants") seek FDA approval to sell a copy of MIRAPEX®, a blockbuster drug invented, patented, and sold by Plaintiffs Boehringer Ingelheim International GmbH and Boehringer Ingelheim Pharmaceuticals, Inc. ("Boehringer"). Barr and Mylan admit they infringe the '812 patent. They also concede that the invention they copied is valid under 35 U.S.C. §§ 101, 102, 103 and 112.

The compound claims of the '812 patent originally were presented to the PTO together with method claims found in the '086 patent. But for a restriction requirement those method and compound claims would have issued in the same patent. In deciding that the method and compound claims were patentably distinct, the PTO applied the standard set forth in MPEP § 806.05 – the same standard it has applied for decades in assessing when claims in different statutory subclasses are patentably distinct.

Boehringer relied on the PTO's analysis in splitting up its claims. Boehringer received the '812 patent in 1989, but could not practically benefit from that patent until the FDA approved pramipexole for sale as a Parkinson's Disease treatment in 1997. Some, but not all, of that lost time was restored when the PTO granted Boehringer a four-year extension of its patent term under 35 U.S.C. § 156.

Defendants now argue that it "shocks one's sense of justice" for the PTO to have issued method and compound claims in separate patents, even though Boehringer originally asked the PTO for only one patent. Defendants, however, have never disputed that the PTO correctly applied the test for patentable distinctness set forth in MPEP § 806.05 or that MPEP § 806.05 is the appropriate test by which the PTO assesses whether inventions in different statutory subclasses are patentably distinct from each other. Defendants argue instead, without any

1

support, that a different test should be applied now that the patent has issued. Defendants do not argue that the PTO made a mistake in issuing the '812 patent, but instead take the surprising position that in faithfully following its rules, the PTO issues invalid patents. Once a patent issues, however, it is presumptively valid. It would be inconsistent with that presumption to assume that the PTO repeatedly applies a test that leads to issuance of invalid patents.

Defendants also do not dispute that the 4-year patent term extension was properly granted. Even though Boehringer has disclaimed the 5½ months that supposedly shocked their sense of justice, Defendants say that is not enough. They assert that Boehringer caused the public tremendous "harm" during the 5½ month difference between those patents' original expiration dates—even though Boehringer never enforced the '812 patent against any party other than Barr and Mylan and even though no one could have used the inventions claimed in that patent for the purposes claimed in the '086 patent.

What "shocks one's sense of justice" is Defendants' assertion that Boehringer, having followed the PTO's direction, should forfeit not just the 5½ months it gave up when it filed a terminal disclaimer, but the entire 4-year extension period granted under an independent statutory provision intended to restore at least partial patent term to innovative pharmaceutical companies.

## II.    ARGUMENT

### A.    Defendants Do Not Seriously Dispute That They Infringe All Of The Asserted Claims

Defendants admit infringement of claim 7 of the '812 patent. Def. Br. at 38; PFF at ¶ 89. During discovery, Defendants did not contest infringement of the other asserted claims, in response to Boehringer's contention interrogatories seeking Defendants' noninfringement contentions. PFF at ¶ 86. In fact, Mylan affirmatively stated that it would not contest

2

infringement of the asserted claims. *Id.*; PSFF at ¶ 161. At trial, Defendants did not cross-examine Boehringer's expert Dr. Klibanov on his infringement analysis or ask their own expert anything about infringement. Defendants argue *for the first time*, post-trial, that their pramipexole products do not infringe asserted claims 5, 9 or 10. Def. Br. at 38; PSFF at ¶ 163. Defendants' new bases for contesting infringement of claims 5, 9 and 10 are disingenuous at best and certainly untimely. Although Boehringer has the burden of proving infringement, that is not a license for Defendants to ignore the discovery rules. Once Defendants declined to identify any basis for noninfringement, they waived the right affirmatively to urge noninfringement. *See Transclean Corp. v. Bridgewood Services, Inc.*, 290 F.3d 1364, 1374 (Fed. Cir. 2002) (affirming grant of summary judgment and decision to preclude party from presenting noninfringement evidence where party did not disclose such information in response to contention interrogatories).

Defendants do not identify any limitation of claim 5 missing from their products. *See* PSFF at ¶ 166. Instead, they contend that claim 5 is not infringed because anyone reading Boehringer's request for a patent term extension would understand that Boehringer clearly disavowed any claim scope that would cover pramipexole. Def. Br. at 39. But Defendants do not explain why, even though represented by sophisticated counsel, they never previously contested that they infringe claim 5. *See* PSFF at ¶ 163. Why are Boehringer and the Court hearing this contention for the first time in post-trial briefing? Allowing Defendants to identify noninfringement contentions for the first time after trial invites infringers to shirk their discovery responsibilities and then raise new arguments in the guise of arguing that patentees did not meet their burden of proof.

Similarly, Defendants' contention that they have not infringed claims 9 and 10 is a belatedly-disclosed claim construction argument. Defendants argue *for the first time* that claims 9 and 10 should be limited to the free base forms of the compounds. *See* Def. Br. at 39; PSFF at ¶¶ 163, 167. Had Defendants raised this claim construction argument earlier, the parties could have had a *Markman* hearing to resolve it. Defendants should not be permitted to introduce an entirely new noninfringement or claim construction theory post-trial. *See* Pl. Evid. Br. at 4; PSFF at ¶¶ 163, 167. Moreover, even if Defendants' new claim construction theory were adopted, the evidence shows that their accused products still would infringe. *See* PSFF at ¶ 168. Defendants themselves stated that "some amount of free base will . . . result from therapeutic administration of the salt." PFF ¶ 43. Defendants never rebutted Dr. Klibanov's testimony that Defendants' pramipexole products would infringe claims 9 and 10 even if those claims were limited to the free base forms. PSFF at ¶ 168; PSCOL at ¶ 6.

Defendants' noninfringement arguments come too late and are wrong. Boehringer is entitled to judgment of infringement of claims 5, 9 and 10, as well as stipulated claim 7.

**B.    Boehringer's Terminal Disclaimer Moots Defendants' Double Patenting Challenge**

Even though Boehringer's terminal disclaimer moots the assertion that Boehringer extended the term of the '086 patent, Defendants relegate discussion of that threshold issue to the back of their brief. Defendants understandably seek to downplay the terminal disclaimer issue.

Defendants do not cite a single case in which a disclaimer was found to be ineffective to cure an obviousness-type double patenting assertion.[1] Nor do any of Defendants' theories on the subject have merit. As the Federal Circuit held in *Merck & Co. v. Hi-Tech Pharmacal Co.*, 482

---

[1]    In the only cases Defendants cite concerning the effectiveness of a terminal disclaimer, no terminal disclaimer even had been filed. *See In re Lonardo*, 119 F.3d 960, 965 (Fed. Cir. 1997), and *Eli Lilly and Co. v. Barr Laboratories, Inc.*, 251 F.3d 955, 968 (Fed. Cir. 2001).

F.3d 1317 (Fed. Cir. 2007), the purpose of a terminal disclaimer – to obviate a double patenting challenge – is still served where the expiration dates of the terminally disclaimed patent and the reference patent are separated by an indisputably valid Section 156 extension, which is precisely the situation here. *See* PSFF at ¶ 202; PCOL at ¶ 21.

What Defendants seek to do is to eviscerate a wholly unrelated 4-year statutory patent term extension period because Boehringer allegedly "told the world" it had exclusive rights to non-pharmaceutical and unapproved uses of the '812 patent compounds for 5½ months during 2006. There is, however, no evidence that those compounds even have any non-pharmaceutical uses. Regardless, Defendants' defense rests squarely on an assertion that Boehringer illicitly extended the '086 patent term. The '086 patent only claims *pharmaceutical* methods of use. To the extent the '812 patent prevented any hypothetical, non-pharmaceutical uses, that did not extend the pharmaceutical methods claimed in the '086 patent.

Similarly, the "unapproved uses" identified by Defendants were, in fact, prohibited by the Federal Food Drug and Cosmetic Act and FDA regulations, not by the '812 patent. When all is said and done, the '812 patent term will end exactly when it would have – and everything is as it would have been – had Boehringer disclaimed before the '086 patent term expired. *See* PFF at ¶¶ 101-04. Defendants cannot avoid the fact that any allegation that Boehringer extended the '086 patent term died when Boehringer terminally disclaimed the 5½ months that Defendants wrongly contend extended that term.

### 1. There Is No Requirement That A Terminal Disclaimer Must Be Filed Before The First Patent Expires

Defendants initially assert that a terminal disclaimer "must be filed before the first patent expires." Def. Br. at 17. But there is no basis in the statute for that position:

> [A]ny patentee or applicant may disclaim or dedicate to the public the entire term, or *any terminal part of the term,* of the patent granted or to be granted.

35 U.S.C. § 253. Defendants ask the Court to graft onto the statute an exception that Congress did not include – that a terminal disclaimer cannot be effective if the disclaimed term is based on the term of an expired patent. This Court may not do so. *See, e.g., Smietanka v. First Trust & Sav. Bank,* 257 U.S. 602, 606 (1922) (rejecting effort "to graft something on the statute that is not there").

### 2.    The Federal Circuit In *Merck* Rejected Defendants' Theory That A Terminal Disclaimer Is Not Effective Unless The Expiration Dates Are Linked

Defendants next assert that "it is a fixed point of law that a terminal disclaimer must prevent the time-wise extension of the second patent beyond the life of the first patent, if it is to cure double patenting." Def. Br. at 17. Because Boehringer's terminal disclaimer did not disclaim "to the expiration date of the '086 patent, such that the two patents expired on the same day," Defendants contend that the terminal disclaimer was ineffective to cure double patenting. *Id.* at 19. The only law on point, however, shows that Defendants are wrong.

In *Merck,* the Federal Circuit held that "a patent term extension under Section 156 may be applied to a patent subject to a terminal disclaimer" even though the earlier patent expired on December 12, 2004 and the later patent-in-suit expired more than 4 years later. 482 F.3d at 1322-24. Despite their different expiration dates, the court held that "[t]he purpose of the terminal disclaimer—to prevent extension of patent term for subject matter that would have been obvious over an earlier filed patent—remains fulfilled." *Id.* at 1323; *see also King Pharm., Inc. v. Teva Pharm., Inc.,* 409 F.Supp. 2d 609, 618-19 (D. N.J. 2006). Therefore, the mere fact that

the '812 and '086 patents expire on different days does not mean that Boehringer's terminal disclaimer is ineffective.[2]

The cases cited by Defendants do not address this situation, in which at least two different statutory schemes intersect. None involve a Section 156 extension – the only period separating the '812 and '086 patent expiration dates – a period that the Federal Circuit has held legitimately may separate the expiration date of a terminally disclaimed patent from that of the reference patent. *See Merck*, 482 F.3d at 1323; *King Pharmaceuticals*, 409 F. Supp. 2d at 618. Indeed, Defendants cite no case even suggesting that a terminal disclaimer is ineffective to cure obviousness-type double patenting for *any* reason, much less because the later patent was not disclaimed to the exact date of the reference patent.[3]

### 3. Defendants' Argument That Boehringer's Patent Term Extension "Falls" Because It "Attached" To An Invalid Patent Is Wrong

Defendants argue that Boehringer's patent term extension is invalid because, in the absence of a terminal disclaimer, it attached to what they assert is an invalid patent. Def. Br. at 21-22. Defendants do not explain what relevance they believe this argument has to the question of whether Boehringer's terminal disclaimer was effective to obviate the basis for their claim of

---

[2]   *Merck* indicates that the only requirement for a terminal disclaimer with respect to an extended patent is that "the date from which any Hatch-Waxman extension is computed is the terminally disclaimed date." 482 F.3d at 1323. Boehringer's terminal disclaimer met that requirement – the 1,564-day extension was calculated from the expiration date of the '086 patent. *See* PFF at ¶ 104.

[3]   Additionally, with the exception of *In re Robeson*, 331 F.2d 610 (C.C.P.A 1964), and *In re Eckel*, 393 F.2d 848 (C.C.P.A 1968), no terminal disclaimer was filed in any of the cases cited by Defendants. Moreover, in both *Robeson* and *Eckel*, the courts held that the terminal disclaimers in fact cured the double-patenting issues. *See Robeson*, 331 F.2d at 615; *Eckel*, 393 F.2d at 857.

invalidity.  Regardless, Defendants' theory that a Section 156 extension cannot attach before a terminal disclaimer is filed has no support.

Section 156 mandates that a patent term *"shall be extended"*[4] if the specified requirements are met.  *See* 35 U.S.C. § 156.  There is no statutory requirement for a terminal disclaimer to be filed prior to the extension.  *Id.*  Section 253 similarly provides that *"any patentee* ...may disclaim...*any terminal part* of the term, of the patent granted."  There is no exception for patents whose terms previously have been extended.  *Id.*  Defendants do not point to any authority prohibiting a Section 156 extension from applying to a patent that is later terminally disclaimed.  *See* PSCOL at ¶ 68.

The only case Defendants cite—*Merck*—supports the view that Section 156 extensions and terminal disclaimers are separate, achieve different goals, and are not mutually exclusive. *Merck*, 483 F.3d at 1321-24.  Where a Section 156 extension was applied to a terminally disclaimed patent, the Federal Circuit found:

> The purpose of the terminal disclaimer—to prevent extension of patent term for subject matter that would have been obvious over an earlier filed patent—remains fulfilled by virtue of the fact that the date from which any Hatch-Waxman extension is computed is the terminally disclaimed date.  At the same time, the purpose of the patent term extension—to restore some of the patent term lost due to regulatory review—is also satisfied.

*Merck*, 482 F.3d at 1323.  The same purposes are fulfilled where the Section 156 extension is granted before a terminal disclaimer is filed.  There is nothing in *Merck* suggesting that the order in which the extension and the terminal disclaimer are applied matters.  In contrast, if the Court were to rule – as Defendants' request – that Boehringer's Section 156 extension somehow was invalid or did not "attach," the second of the two purposes that the Federal Circuit discussed in *Merck* would be eviscerated as the time Boehringer lost due to regulatory review would not be

---

[4]    All emphasis is added unless otherwise noted.

restored. In effect, this perverse rule would mean that the act of obtaining a Section 156 extension (which must be filed within 60 days after the drug is approved by the FDA) thereafter renders any allegation of double patenting incurable. *See* 35 U.S.C. § 156(d)(1).

Defendants' failure to raise an objection to the validity of the patent term extension prior to post-trial briefing is telling. The PTO extended the '812 patent on October 13, 1999, when it determined that "the requirements of the law have been met." PFF at ¶ 101. As this Court has noted, "[t]he presumption of validity applies to the PTO's determination to grant a patent term extension," such that the Defendants were obligated to "come forward with clear and convincing evidence that the extension is invalid." *Pfizer Inc. v. Ranbaxy Labs. Ltd.*, 405 F. Supp. 2d 495, 511 (D. Del. 2005). Defendants never before challenged the validity of this extension. *See* PSFF at ¶ 193. Had Defendants truly believed that the extension was invalid because Boehringer did not file an earlier terminal disclaimer, they were required to separately plead that under 35 U.S.C. § 282. *See Pfizer*, 405 F. Supp. 2d at 511.[5] But they waited until *after* Boehringer filed its disclaimer to allege that the extension was invalid.

### 4. Boehringer's Terminal Disclaimer Cured Any Extension Of The '086 Patent Rights

Defendants next argue that Boehringer's terminal disclaimer is ineffective because the rights Boehringer disclaimed during the extension period were not identical to the rights Boehringer possessed between the June 2006 and December 2006 expiration dates of the '086 and '812 patents. Def. Br. at 23. Defendants' theory is fundamentally wrong because (1) it lacks any basis in the applicable statutes and case law; and (2) it is based on Defendants' misperception that the rights a patentee terminally disclaims from the back end of a patent term

---

[5] Given the circumstances, the Defendants waived any such claim. *See* PSFF at ¶ 193.

must be the same as those that exist on the front end in order for the terminal disclaimer to cure double patenting.

Nothing in the language of Section 253 supports Defendants' proposed requirement that a terminal disclaimer be identical to the rights attendant to a patent term extension under § 156. Nor can Defendants point to any court decision that even remotely hints at any such requirement. *See* Def. Br. at 23-25.

Moreover, as Defendants acknowledge, obviousness-type double patenting is concerned with whether a second patent unlawfully extends the rights of the first patent. *See, e.g., Eli Lilly and Co. v. Barr Labs.*, 222 F.3d 973, 985 (Fed. Cir. 2000) (internal quotes omitted) ("As our predecessor court explained, [t]he fundamental reason for the rule [of obviousness-type double patenting] is to prevent unjustified time-wise extension of the right to exclude granted by a patent"); *see also* Def. Br. at 16-17 ("The Prohibition on Double Patenting Prevents Unjustified Extensions of a Patentee's Right to Exclude"). A terminal disclaimer cures double patenting not from a technical standpoint, but because it prevents the allegedly improper extension of the earlier patent's rights. *See Geneva Pharm., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1379 (Fed. Cir. 2003) (obviousness-type double patenting "prevents an applicant from extending patent protection for an invention beyond the statutory term by claiming a slight variant... With nonstatutory double patenting, *a terminal disclaimer may restrict the slight variation to the term of the original patent and cure the double patenting rejection*."); *see also Regents of the Univ. of Cal. v. Dakocytomation Cal., Inc.*, 517 F.3d 1364, 1372 (Fed. Cir. 2008). The reason double patenting is curable, unlike a statutory defect, is because the alleged harm can be mitigated by disclaimer of the period when the public allegedly would have been wrongfully excluded from the invention claimed in the earlier patent.

A terminal disclaimer accomplishes that result regardless of when it is filed. Whether the effective rights actually disclaimed at the terminal part of a patent term are the same as those enjoyed at some other point along the term is irrelevant to whether the terminal disclaimer cures double patenting. Often the rights disclaimed may not, for myriad reasons, be identical to those enjoyed throughout the patent term. This occurs, for example, when the marketplace changes during the patent term or where a patent is reissued and gives rise to new intervening rights before a terminal disclaimer is filed. In such instances, the patentee's right to exclude is different in the beginning as compared to what is disclaimed at the end of the term. Thus, "identity" of rights is not any part of a test for a curative terminal disclaimer. The question is instead whether the terminal disclaimer *cures any alleged extension of the earlier patent rights*.

To answer this question, the rights of the '086 patent first must be identified. All parties agree that the '086 patent covered methods of using compounds to treat Parkinson's Disease and Parkinsonism, schizophrenia and elevated blood pressure or heart rate. PFF at ¶ 106; DFF at ¶ 36. Next, it must be determined whether Boehringer's terminal disclaimer prevented any extension of the '086 patent rights that are alleged to have occurred as a result of the expiration date of the '812 patent. The facts show that the terminal disclaimer cured any alleged "harm" resulting from the supposed unlawful extension of the '086 patent by 5½ months.

        **a.**    **Boehringer's Terminal Disclaimer Disclaimed Rights To The Use Of Pramipexole To Treat Parkinson's Disease And Parkinsonism.**

During the 5½ month period identified by Defendants, the only parties against whom Boehringer asserted the '812 patent were Barr and Mylan. Notably, both sought to copy MIRAPEX® and asked for approval to sell their generic copies for an FDA-approved use – treatment of Parkinson's disease. *See* PFF at ¶¶ 14, 16, 131; TX 406 at 1-2; TX 509 at 1-2.

Defendants' ANDA filings fall squarely within the ambit of what they *concede* Boehringer had a legitimate right to exclude under the terms of the patent term extension. *See* Def. Br. at 23. Thus, with regard to FDA-approved uses, Boehringer's terminal disclaimer during the extension period cured any alleged unlawful extension of the '086 patent and the timing of the terminal disclaimer did not extend any rights in the '812 patent for the 5½ month period beyond those indisputably conferred by the patent term extension.

> **b.** **Rights To Non-Pharmaceutical Uses And Pharmaceutical Uses Other Than To Treat Schizophrenia Or Parkinson's Disease, Or Lower Heart Rate Or Blood Pressure Do Not Extend The '086 Patent**

Defendants assert that the '812 patent covered rights to non-pharmaceutical uses that could not be disclaimed during the extension period. *See* Def. Br. at 23. That assertion is irrelevant to the curative effect of the terminal disclaimer. Such non-pharmaceutical uses have nothing to do with the '086 patent rights, which cover methods of treating diseases. Any rights in the claims of the '812 patent to non-pharmaceutical uses cannot have extended the '086 patent. PSFF at ¶ 205.

The same is true for any pharmaceutical uses that are not covered by the '086 patent. To the extent those uses were covered by the '812 patent and not disclaimed during the 5½ month period, that is of no consequence to the effectiveness of the terminal disclaimer because those rights by definition could not extend the '086 patent rights. *See* PSFF at ¶ 205.

> **c.** **The '812 Patent Did Not Prevent Others From Practicing Rights To Uses Covered By The '086 Patent**

That leaves the remaining pharmaceutical uses claimed by the '086 patent—treatment of schizophrenia and elevated blood pressure or heart rate—and the use of compounds other than pramipexole to treat Parkinson's Disease. Defendants argue that, with respect to these rights,

"Boehringer withheld from the public in 2006 more than it purports to give back now." Def. Br. at 23. But it was the implementing regulations of the Federal Food, Drug and Cosmetic Act ("FFDCA"), 21 U.S.C. § 301, *et seq.*—not Boehringer's patent rights—that prevented access to pramipexole or the other patented compounds for these unapproved indications. The FFDCA regulates products based upon their intended uses. Under the FFDCA, any product that is intended for the "diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals" is a drug. *See* 21 U.S.C. § 321(g)(1)(B). Any "drug" that is not generally recognized as safe and effective for its intended uses is considered to be a "new drug." *See* 21 U.S.C. § 321(p). Sections 301(d) and 505(a) of the FFDCA prohibit anyone from introducing or delivering a new drug into interstate commerce unless the drug has been approved by the FDA by a new drug application ("NDA"). *See* 21 U.S.C. §§ 331(d) and 355(a). Obtaining such approval is a time consuming and expensive process, typically requiring extensive clinical trials and several years and millions of dollars to complete. There is no evidence that anyone sought – let alone obtained – an NDA for such uses. *See* PSFF at ¶ 197.

Regardless, had anyone obtained FDA approval of any of the compounds covered by the '812 patent for treatment of schizophrenia or to lower heart rate or blood pressure, those approved products and uses would have been covered by the patent term extension. Section 156(b) provides that the rights during the extension period for a product patent shall "be limited to *any use approved for the product*...before expiration of the term of the patent [and under specified regulatory review provisions]...and...on or after the expiration of the regulatory review period upon which the extension of the patent was based." 35 U.S.C. § 156(b). There is no limit on when that use or product is approved or who must obtain approval. As a result, had any

person received FDA approval for the other uses covered by the '086 patent, those uses would have been included in Boehringer's extension rights under 35 U.S.C. § 156.

Defendants' assertion that Boehringer's terminal disclaimer failed to cure an alleged extension in the '086 patent "monopoly" falls apart. The only approved use for any compound discussed in the '086 patent was covered by the terminal disclaimer. Thus, the '812 patent did not deprive the public of anything covered by the '086 patent except the very approved use subject to the terminal disclaimer. *See* SPCOL at ¶ 203.

### d.     Defendants' Theory Would Work An Unjust Forfeiture

Defendants' theory regarding identity of rights would also work a severe forfeiture without reason. To be sure, Boehringer believes that no double patenting occurred and that 35 U.S.C. § 121 bars the use of the '086 patent as a reference in any event. Regardless, there is no basis for Boehringer to lose 4 years of patent term extension where it never even attempted to enforce the rights it supposedly had. Such an extreme sanction is not supported by any case law and does not conform to the approach taken in analogous circumstances. For example, if a patentee misuses a patent by extending the term through a license agreement or collecting royalties twice on the same device, it does not lose the entirety of its patent rights forever. The patent is only unenforceable until the misuse is fixed. *See C.R. Bard, Inc. v. M3 Sys., Inc.,* 157 F.3d 1340, 1372-73 (Fed. Cir. 1998) (misuse "does not, of itself, invalidate the patent."). If there was any theoretical "misuse" here, it has been fixed in the fashion recognized by courts and the PTO alike. The notion that Boehringer forfeited the entirety of its patent term extension, in addition to the 5½ months it disclaimed, by the timing of the disclaimer would turn the entire concept of a terminal disclaimer on its head.

14

5.     **It Is Undisputed That The '086 And '812 Patents Are Commonly Owned**

Defendants next allege that Boehringer's terminal disclaimer is ineffective because it "fails to satisfy several prerequisites." Def. Br. at 16.   The only alleged "prerequisite" Defendants actually identify, however, is a regulation governing the form of terminal disclaimers "when filed to obviate judicially created double patenting in a patent application or in a reexamination proceeding" which provides that written disclaimers shall include a statement that "any patent granted on that application or any patent subject to the reexamination proceeding" shall be enforceable only while the application and the reference that is the subject of the double patenting rejection are commonly owned. *See* 37 C.F.R. § 1.321(c)(3). The '812 patent is an issued patent and was not in reexamination proceedings when Boehringer filed its terminal disclaimer.  Accordingly, there is no basis for Defendants' assertion that the requirements of 37 C.F.R. § 1.321(c)(3) apply.

Regardless, there is no case where a terminal disclaimer has been held to be ineffective merely because it did not include an express statement in conformance with this regulation. Moreover, this is a non-issue because *Defendants admit that Boehringer Ingelheim International GmbH is the assignee and record owner of both the '812 and '086 patents. See* PSFF at ¶ 137. The terminal disclaimer clearly indicates that they are commonly owned as well. *See id.* at ¶ 204.

6.     **The Terminal Disclaimer Is Not Late**

Defendants also argue that Boehringer's terminal disclaimer comes "too late in the litigation." Def. Br. at 26. They rely on a single case, *CMI Corp. v. Lakeland Constr. Co.*, 184 USPQ 721, 727 (N.D. Ill. 1975), to argue that the "Court should refuse to allow" Boehringer's disclaimer merely because of the time it was filed. Def. Br. at 26. The court in *CMI*, however,

did not hold that the terminal disclaimer was ineffective because it was late. It merely held "that the filing of [] a terminal disclaimer was ineffective since disclaiming the terminal portion of the life of a later issued patent *in this case* cannot avoid the invalidity of the later filed patent to *the same subject matter*." *CMI*, 184 U.S.P.Q. at 727. Thus, although "concerned" with the patentee's delay, the court rested its decision on the well-known rule that a terminal disclaimer cannot obviate same invention–type double patenting. *Id.*; *see Bayer AG v. Barr Labs, Inc.*, 798 F. Supp. 196, 200 (S.D.N.Y. 1992) ("In this respect, we decline to follow the holding in *CMI Corp. v. Lakeland Construction Co., Inc.* (N.D. Ill. 1975) insofar as the court can be said to have there found the filing of a terminal disclaimer ineffective on the ground of unreasonable delay....*[T]he double patenting at issue appears to have been of the 'same invention' type, upon which a terminal disclaimer has no effect, and not of the obviousness type, which such a disclaimer cures.*").

Contrary to Defendants' contentions, neither Congress nor the courts have fashioned any temporal limit on a patentee's ability to file a terminal disclaimer. The statute permitting terminal disclaimers contains no time limit. *See* 35 U.S.C. § 253. In *Perricone v. Medicis Pharm. Corp.* 432 F.3d 1368, 1375 (Fed. Cir. 2005), the Federal Circuit noted that "the Patent Act and PTO rules support the filing of a terminal disclaimer even after issuance of the second patent" (citing 35 U.S.C. § 253 (2000) and 37 CFR § 1.321(a)), and that "[a] terminal disclaimer can indeed supplant a finding of invalidity for double patenting." *Id. See also Bott v. Four Star Corp.*, 675 F. Supp. 1069, 1074 (E.D. Mich. 1987) (permitting filing of terminal disclaimer in response to a motion for summary judgment to obviate obviousness-type double patenting defense). Similarly, as the only court to consider the precise issue at hand, the court in *Technicon Instruments Corp. v. Coleman Instruments, Inc.*, 255 F. Supp. 630 (N.D. Ill. 1966)

found a terminal disclaimer cured a double patenting issue where, as here, it was filed after the commencement of trial. *See id.* at 636, 641. Accordingly, all authority on point contradicts Defendants' view that Boehringer's terminal disclaimer is too late to be effective.

\*　　　\*　　　\*

Thus, it is clear that the Boehringer's terminal disclaimer cured any double patenting issue. In any event, as set forth below, Defendants have not proved that there was any double patenting in the first instance.

### C.    Defendants Have Not Shown That The '812 Patent Claims Are Double Patented

Defendants have not met their "heavy and unshifting" burden of proving obviousness-type double patenting. *Symbol Tech., Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1580 (Fed. Cir. 1991). In analyzing double patenting, the Court determines (1) the differences between the claims of the earlier and later patent, and (2) whether the differences render the claims patentably indistinct. *See Eli Lilly & Co. v. Barr Labs, Inc.*, 251 F.3d at 955, 967 (Fed. Cir. 2001). Even in their post-trial brief, Defendants do not attempt to identify the differences between the claims. *See* PSFF at ¶ 176. As Boehringer pointed out in its opening brief, there are several. *See* PSFF at ¶¶ 105-116; PCOL at ¶ 33. Nor have Defendants offered any analysis as to how the '812 patent claims are obvious in light of those myriad differences. *See* PSFF at ¶ 176. Although Defendants' brief reads as if their expert Dr. Anslyn conducted such an analysis, he did not. *See* PCOL at ¶¶ 23-28; PSFF at ¶ 176. Defendants' defense fails for this reason alone. *See* PSFF at ¶ 176; PCOL at ¶¶ 23-28.

Nor do Defendants take issue with MPEP § 806.05(h), the test the PTO explicitly applied during prosecution of the patent-in-suit and has been using for years to determine when claims falling into separate statutory classes are patentably distinct. Defendants argue that the MPEP is

17

not law and is not binding but ignore that courts have adopted tests substantively identical to MPEP § 806.05(h) and do not explain why that test is wrong, much less address the consequences if the Court were to reject it. *See* PCOL at ¶ 30; PSCOL at ¶ 95.

Instead of conducting the proper analysis, Defendants create new *per se* rules that claims to compounds and claims to methods of using those compounds are *never* patentably distinct and that, even though method and compound claims cover separate classes of statutory subject matter and it is impossible for such claims to be subgenuses or species of each other, a claim to a method of using a compound can "anticipate" a later compound claim because it is proper to look at what is *disclosed* in an earlier claim. As discussed below, each of these "rules" misstates the law. The choice between rules formulated and applied by the PTO and those formulated, without support, by an interested party is clear.

### 1.   The '812 Patent Claims Are Patentably Distinct Under MPEP § 806.05(h)

Notably, Defendants do not disagree that, under either of the tests set forth in MPEP § 806.05(h), each of the challenged '812 patent claims is patentably distinct from the '086 patent claims. Def. Br. at 13-15; PCOL at ¶¶ 30, 31. In light of all the evidence at trial showing that pramipexole can be used to treat several medical conditions that are not mentioned in the '086 patent claims and that several different classes of compounds can be used to treat the diseases that are, Defendants can not dispute that

> "(A) the process[es] of using as claimed" in the '086 patent "can be practiced with []other materially different product[s];" *and*

> "(B) the product[s] as claimed" in the '812 patent "can be used in...materially different process[es]."

MPEP § 806.05(h). In fact, Defendants concede that the second test for patentable distinctiveness set forth in MPEP § 806.05(h)(B) is satisfied by making their new argument that

18

Boehringer's terminal disclaimer is ineffective because the '812 patent claims have a far different scope "than the use of pramipexole for FDA approved uses" (Def. Br. at 24), including "non-pharmaceutical uses." *Id.* at 23. Thus, if MPEP § 806.05(h) applies, there is no question that Boehringer wins.

Defendants offer no substantive reason why the tests set forth in MPEP § 806.05 should not be applied. Their brief includes only a two-sentence conclusion that double patenting can be found between claims of two patents even if they are of different statutory types, pointing to the *Geneva* and *Pfizer* cases as examples. Def. Br. at 15. That is a straw man. There is no dispute that *sometimes* claims drawn to different statutory subclasses can be double patented.[6] The question, however, is *when* double patenting can occur between claims of different statutory subcategories and what is the appropriate test for assessing that specific situation. The PTO has, for years, applied the tests set forth in MPEP § 806.05 to analyze this specific situation of claims of different statutory classes, which differs from the common cases of comparing composition claim to composition claim or method claim to method claim. *See* PCOL at ¶ 30; PSCOL at ¶¶ 91, 92.

Defendants do not criticize or find anything wrong with the PTO's test. They only submit that the MPEP § 806.05(h) test is not binding. But that undisputed conclusion ignores the many cases where courts have found persuasive guidance in the MPEP. "While the MPEP does not have the force of law, it is entitled to judicial notice as an official interpretation of statutes or regulations as long as it is not in conflict therewith." *Molins PLC v. Textron, Inc.,* 48 F.3d 1172,

---

[6]    Claims directed to the same statutory subject matter are different than claims directed to different statutory subclasses, however, in that the former may be same invention-type double patented while the latter can not. *Studiengesellschaft Kohle, GmbH v. Northern Petrochemical Co.,* 784 F.2d 351, 354-55 (Fed. Cir. 1986).

1180 n.10 (Fed. Cir. 1995); *see, e.g., Syntex (U.S.A.), Inc. v. U.S. Patent and Trademark Office,* 882 F.2d 1570, 1571 n.3 (Fed. Cir. 1989).

Defendants argue that MPEP § 806.05(h) conflicts with the *Geneva-Pfizer* cases and two older cases, *In re Byck* and *In re Christmann*. To the contrary, the rule and the cases are entirely consistent. In *Geneva* and *Pfizer*, the courts considered whether claims to methods of using compositions were patentably distinct from claims to the compositions themselves. The only evidence showed that the claimed compositions *had only one use*, which was the subject of the method claims. *See Geneva*, 349 F.3d at 1386 ("The Fleming patent's claim describes a compound, *and Fleming's written description discloses a single utility of that compound* as administration to a human in amounts effective for inhibiting ß-lactamase. The '720 patent claims nothing more than Fleming's disclosed utility as a method of using the Fleming compound."); *Pfizer,* 518 F.3d at 1363 ("Thus, we agree with the district court that *the '068 patent merely claims a particular use* described in the '165 patent of the claimed compositions of the '165 patent."). Far from contradicting MPEP § 806.05(h), these cases are absolutely consistent with that test. Where, as in *Geneva*, there is only one use for a composition then a claim to that use is not patentably distinct from the claim to the composition. But where (as here) there are materially different uses for a composition, then the uses and the compound **are** patentably distinct. *See* PCOL at ¶ 1. Thus, although MPEP § 806.05(h) was not raised in either *Geneva* or *Pfizer,* had it been applied, it would have resulted in the same outcomes.

MPEP § 806.05(h) also is consistent with *Byck* and *Christmann* because these cases are not directed to the situation addressed by 806.05 – comparison of claims drawn to different statutory subclasses. Contrary to Defendants' characterizations, each of those cases considered the more common question whether claims directed to *products* were double-patented over

claims to other *products*. *See In re Christmann*, 128 F.2d 596, 597 (C.C.P.A. 1942) (comparing later claims directed to "[a] reaction product of hydrofluosilicic acid and a guanidine" with earlier claim to "[a]n insecticidal composition including a reaction product of hydrofluosilicic acid and a guanidine"); *In re Byck*, 48 F.2d 665, 665 (C.C.P.A. 1931) (comparing later claims directed to "[a]n insulated coil comprising a conductive winding" with earlier claim to same "composition"). *See also Geneva*, 349 F.3d at 1379 ("In *Christmann*, our predecessor court affirmed the PTO's nonstatutory double patenting rejection of claims to an insecticidal composition over a prior patent claiming the composition's active component.").

Defendants say that "Boehringer [has] point[ed] to no case, and Defendants are aware of none, that has adopted [the] 'materially different processes' test" set forth in the MPEP. Defendants simply ignore *Astellas Pharma, Inc. v. Ranbaxy Inc.*, 2007 WL 576341, *8 (D.N.J. Feb. 21, 2007),[7] and *Takeda Pharma. Co., v. Dudas*, 511 F. Supp. 2d 81, 96 (D. D.C. 2007), that Boehringer discussed extensively at trial. *Astellas* found MPEP § 806.05(f)—which outlines the same test for process of manufacture and product claims—supported its decision that the claims at issue were not double patented. *See*, 2007 WL 576341, at *8. *Takeda* also found MPEP § 806.05(f) informative in arriving at the same conclusion. *Takeda Pharma.*, 511 F. Supp. 2d at 96. It is no surprise Defendants turn a blind eye to these cases, both of which were previously brought to their attention, and pretend that Boehringer's suggestion to apply the MPEP tests is "brand new." Def. Br. at 14. In fact, courts have found the guidance in the MPEP to be persuasive in situations like those presented here.

---

[7]    Defendants' failure to mention this case in their brief is curious, given the Defendants' argument at trial based on the uncontroversial fact that it had been vacated. As Boehringer pointed out at trial and in its opening brief, the only reason the decision was vacated was because of a settlement between the parties. That does not change or make less persuasive the reasoning of the District Court in *Astellas*.

Finally, Defendants ignore the problems that would be created if the Court found that faithful application of MPEP § 806.05(h) leads to invalid patents. The PTO invoked that section in this case (and many others) in finding that compound and method claims originally combined in one application were patentably distinct and therefore subject to a restriction requirement. Boehringer and other patentees have relied on the PTO and the rules set forth in MPEP § 806.05. Were the Court now to find that obedience to the PTO's rule actually results in invalid patents, an unidentified number of presumably valid patents would anomalously be rendered invalid. Especially where the rule affects matters of restriction that are squarely within the PTO's expertise, that would be an extremely harsh result. Defendants brush off the MPEP as merely "facilitat[ing] examination of a patent application," and contend that once the claims have been examined and allowed, the test is of no effect in later proceedings involving the patent. *See* Def. Br. at 15. Thus, as Defendants would have it, one branch of the government can apply a certain test to issue a patent, and then another branch can say that the test does not apply. Such a result gives no deference to the PTO and certainly would "shock one's sense of justice."

### 2.    There Is No Rule That Compounds And Their Methods Of Use Are Patentably Indistinct As A Matter of Law

Defendants contend that claims to methods of using compounds cannot be patentably distinct from claims to the compounds themselves "as a matter of law." Def. Br. at 6. They say this "principle applies regardless of the order of the claims—i.e., whether the compound claims come before the method claims or whether the method claims come before the compound claims." *Id.* at 7. As their only support, Defendants rely on the so-called "*Geneva-Pfizer*" line of cases. Those cases do not help Defendants.

As discussed earlier, in both *Geneva* and *Pfizer*, the claimed compounds had a single use, which was the subject of the method claims. There was no evidence that the claimed methods

could be practiced with materially different compounds. It was expressly on this basis that the Federal Circuit held the claims to be patentably indistinct. *Geneva*, 349 F.3d at 1386; *Pfizer*, 518 F.3d at 1367. These cases set forth no *per se* rule that compound and method claims were patentably indistinct. Indeed, the opinions suggest the opposite because the courts' analyses did not stop after they had determined that the method claimed the only use for the claimed compounds. Instead, in both cases, the court went on to identify and then rely upon additional connections between the claims, including the fact that there was only one use for the claimed compounds.

### 3. The '086 Patent Claims Cannot "Anticipate" The '812 Patent Claims

Defendants next argue that the '812 patent's compound claims are anticipated by the '086 patent's method claims. Def. Br. at 11. This argument merely restates the "sub-genera" theory that Barr relied upon throughout discovery. Although a species-genus or an "anticipation" analysis may apply to claims directed to the same statutory subclass, it does not apply when the claims to be compared come from different subclasses. That is because, as the Federal Circuit's predecessor court held:

> *[I]n patent law it is axiomatic if claims are to be considered as being in the same genus and species relationship, they must fall into the same statutory class....* Clearly the apparatus claims of appellants can not be considered to be species of any method claims, because the inventions defined by the claims are in different statutory classes. Each method claim herein includes the limitation of 'discontinuing' the energy applied to the heating element, and no such limitation appears in the apparatus. Therefore, it is not possible to designate the apparatus claims as species of any allowed method claim.

*In re Bronson*, 168 F.2d 548, 550-551 (C.C.P.A. 1948) (affirming decision that claims to an apparatus should be prosecuted in a separate application from the claims directed to methods of using the same apparatus); *see also South Corp. v. United States*, 690 F.2d 1368 (Fed. Cir. 1982) (en banc) (adopting the precedent of its predecessor court).

23

Defendants attempt to get around this problem (while at the same time implicitly admitting its existence) by arguing that the Court should look to what is *disclosed* in the '086 patent to determine whether the '812 claims are anticipated:

> In undertaking the double patenting anticipation analysis, *it is proper to inquire whether an earlier claim discloses a particular compound or composition*.

Def. Br. at 11 (emphasis supplied). To the contrary, "[Federal Circuit] precedent makes clear that the *disclosure* of a patent cited in support of a double patenting rejection cannot be used as though it were prior art, *even where the disclosure is found in the claims*." *General Foods Corp. v. Studiengasellshaft Kohle GmbH*, 972 F.2d 1272, 1281 (Fed. Cir. 1992) (emphasis in original). "Claims relied on in [double patenting] rejections often disclose or name the *very thing* being claimed [in the challenged claims].... [T]he words of such claims cannot be treated as 'prior art' ... but are looked to solely for the purpose of determining *what has already been patented*." *In re Sutherland*, 347 F.2d 1009, 1015 (C.C.P.A. 1965) (emphasis in original); *see also In re Aldrich*, 398 F.2d 855, 859 (C.C.P.A. 1968) ("double patenting rejections *cannot* be based on ... the disclosures of the patents whose claims are relied on to demonstrate double patenting or on the 'disclosures' of their claims ...." (emphasis in original); *In re Sarett*, 327 F.2d 1005, 1013 (C.C.P.A. 1964) ("[w]e are not concerned with what one skilled in the art would be aware [of] from *reading* the claims but with *what inventions the claims define*.").

Neither *Metoprolol Succinate Patent Litig.*, 494 F.3d 1011 (Fed. Cir. 2007), nor *Geneva* have overruled or modified this well-settled canon of double patenting jurisprudence.[8]   In *Metoprolol*, AstraZeneca argued that "[Federal Circuit] precedent makes clear that the *disclosure*

---

[8]   In any event, the court sitting as a 3-person panel in *Metoprolol* and *Geneva* could not overrule the *stare decisis* effect of *General Foods*. *See, e.g. Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 n.3 (Fed. Cir. 2006) ("only the court *en banc* may overrule precedent") (*citing George E. Warren Corp. v. United States*, 341 F.3d 1348, 1351-52 (Fed. Cir. 2003).

of a patent cited in support of a double patenting rejection cannot be used as though it were prior art, *even where the disclosure is found in the claims*." 494 F.3d at 1018 (citing *General Foods*, 972 F.2d at 1281). The Federal Circuit agreed, emphasizing that "[t]he disclosure of the claims forming the basis of a double patenting rejection cannot be used as 'prior art' for a rejection under 35 U.S.C. § 102, 103. The language of *General Foods* and of the precedents cited in the decision explain...that what is *claimed*, as opposed to what is *disclosed* to one skilled in the art, remains critical." *Metoprolol*, 972 F.3d at 1019 (citing *General Foods*, 972 F.2d at 1281-82 (emphasis in original). Thus, contrary to what Defendants would have the Court believe, the Federal Circuit in *Metoprolol* explicitly looked to what was *claimed* in each of the patents, not merely "whether the earlier patent ... 'discloses' a particular composition." *See* Def. Br. at 11.

Defendants characterize the Federal Circuit's statement in *Geneva* that "this court examines the disclosure of the [earlier] claim" as permitting the use of what is disclosed in an earlier claim to invalidate a later claim on the basis of double patenting. Def. Br. at 11 (citing *Geneva*, 349 F.3d at 1385). But Defendants omit the Federal Circuit's clarification in the very same paragraph that "[b]ecause nonstatutory double patenting compares earlier and later claims, an earlier patent's disclosure *is not available* to show nonstatutory double patenting." *Geneva*, 349 F.3d at 1385. The Federal Circuit then determined "the scope of the compared claims." *See id.* By so doing, the Federal Circuit was not using the earlier claims as prior art based on what they "disclose" but by what they claimed, in a manner consistent with the court's decision in *General Foods*.

Accordingly, Defendants cannot base their double patenting analysis upon the fact that the compounds claimed in the '812 patent are also mentioned in the '086 patent. As *Astellas* explained:

> In order to reach the conclusion that defendants desire, the Court would have to go beyond what is claimed by the two patents and compare the [challenged] claims with the compounds merely named and not claimed in the [earlier] patent, contrary to the law of obviousness-type double patenting. Defendants' arguments do nothing more than show how the two patents are related, and do not meet the burden of showing by clear and convincing evidence that the [challenged] patent is invalid for obviousness-type double patenting.

*Astellas*, 2007 WL 576341, at *5 (citing *Gen. Foods*, 972 F.2d at 1274). Indeed, the Federal Circuit has called the Defendants' theory a "distressing failure to adhere to firmly established and universally understood rules of claim interpretation" by "using nothing but the *disclosure* of" a single element in the '086 patent claims "as though it were prior art, and not reading" such claims "to determine what invention [they] *define*[] – like the metes and bounds of a deed." *General Foods*, 972 F.2d at 1280-81; *see also Metoprolol*, 494 F.3d at 1019 (same). Accordingly, it would be error for the Court to follow Defendants' "anticipation-based" double patenting analysis.

### 4. Defendants Ignore That The PTO Explicitly Considered This Issue

Defendants ignore that the PTO expressly considered whether the very compound and method claims at issue here are patentably distinct when it issued the restriction requirement. PFF at ¶ 31. It then considered the issue again when the it addressed the issue of double patenting but ultimately allowed the '086 and '812 patents to issue. *Id.* at ¶¶ 52, 61, 65. Defendants' only answer to these facts is to ignore or discount the PTO's analysis. But the Federal Circuit has found that deference to the PTO is especially appropriate when the PTO considered the only issue presented. *American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1359 (Fed. Cir. 1984). Defendants' burden is heightened because the same PTO Examiner examined both the '086 and '812 patent applications and found no double patenting problem between these applications. *See* PFF at ¶ 52. Defendants' view that there is a *per se*

rule also is totally undercut by the fact that the PTO does not seem to know about this rule and has been issuing hundreds of presumptively valid patents based on the more nuanced rule tailored to this specific situation – MPEP § 806.05, entitled "Product and Process of Using—800 Restriction in Applications Filed Under 35 U.S.C. 111—Double Patenting."

### 5.    Boehringer's Terminal Disclaimer Is Not An Admission of Obviousness

Defendants argue in the introduction of their brief that Boehringer's terminal disclaimer was "a tacit admission that the '812 patent is invalid." Def. Br. at 1. Notably Defendants do not cite any authority for this proposition and do not discuss it further. *That is because it is a clearly incorrect statement of the law.* The Federal Circuit repeatedly has explained that "the filing of a terminal disclaimer simply serves the statutory function of removing the rejection of double patenting, and raises neither presumption nor estoppel on the merits of the rejection. It is improper to convert this simple expedient of 'obviation' into an admission or acquiescence or estoppel on the merits." *E.g., Quad Environmental Technologies Corp. v. Union Sanitary Dist.,* 20 U.S.P.Q.2d 1392, 1394-1395 (Fed. Cir. 1991). For this reason, "*[a] terminal disclaimer simply is not an admission that a later-filed invention is obvious*." *Motionless Keyboard Co. v. Microsoft Corp.,* 486 F.3d 1376, 1385 (Fed. Cir. 2007).

### D.    Defendants Continue To Misconstrue Section 121 And The Consonance Requirement Of *Gerber Garment*

Whether Section 121 applies to prevent the use of the '086 patent as a reference against the '812 patent is a matter of statutory interpretation. Defendants, however, never address what the statute actually says. Instead they propose requirements that do not exist from isolated language they have found in concurring opinions and journal articles. As discussed below, none of these alleged requirements withstand scrutiny. Indeed, Defendants offer no rebuttal to

27

Boehringer's showing that it complied with the plain language of § 121. Their double patenting defense fails for this reason alone. *See* PSCOL at ¶¶ 93-102.

### 1.    There Is No Requirement That The '812 Patent Had To Be Filed As A Result Of A Restriction Requirement

Defendants continue to assert there is some requirement that to be afforded the protective benefits of Section 121, *the '812 patent* had to be filed "a result of" a restriction requirement. Def. Br. at 27-28.  The court will look in vain for anything in the statute that supports Defendants' position.  Instead, as Boehringer pointed out in its opening brief, Section 121 only says that *the application being used as a reference* need be filed "as a result of a [restriction] requirement." 35 U.S.C. § 121 ("A patent issuing on an application with respect to which a requirement for restriction under this section has been made, or on an application filed as a result of such a requirement, *shall not be used as a reference*....").  Consistent with this interpretation, the Federal Circuit held has held that "[t]he safeguard of § 121...applied" such that the original application in which a restriction requirement was entered could not be used against a *continuation* of a divisional of the original application. *Symbol Techs. v. Opticon Inc.*, 935 F.2d 1569, 1580 (Fed. Cir. 1991). *See also Geneva*, 349 F.3d at 1378. ("Thus, if the 2000/01 patents and the '720 patent *trace their lineage back to a common parent which was subject to a restriction requirement,* then § 121 intervenes to prevent a nonstatutory double patenting rejection.").

Defendants do not rely on the language of Section 121.  Instead, they seek to impose a requirement from a concurring opinion in *In re Zickendraht*, 319 F.2d 225, 232 (C.C.P.A 1963) (Rich, J., concurring). Def. Br. at 28.  There was no contention in *Zickendraht* that Section 121 applied, however, and Judge Rich's passing reference to that Section in a concurring opinion cannot change the plain language of the statute.

Moreover, this Court previously considered and rejected the standard proposed by Defendants. Thus, in *Union Carbide Corp. v. Dow Chemical Co.*, 619 F. Supp. 1036 (D. Del. 1985), the Court quoted the very sentence from Judge Rich's opinion in *Zickendraht* upon which Defendants now rely, *id.* at 1056, but concluded that Section 121 contained no "formalistic rule" requiring an application be filed for the first time as a result of a restriction requirement, *id.* at 1060. This Court instead held that Section 121 protected the use of a first patent as a reference against a second even though the application for the second patent had been filed *before the restriction requirement had even been entered,* so long as the second application's claims were amended to reflect the division of a copending application:

> Where, as here, the claims of an application are amended in toto to reflect the division of a copending application, I conclude that the amended application is one "filed as a result of such a requirement" as set forth in section 121. *No practical distinction exists between an application filed for the first time as a result of a restriction requirement, and an application which is amended in full to comport with that requirement. I am therefore not convinced that section 121 was intended to include only the former and decline to limit the statute's application based on a formalistic rule.*

*See id.* at 1060.

Finally, even if there were a requirement that the '812 patent result from a restriction requirement, it would qualify. The applicants' Preliminary Amendment in the '671 application deleted all references to "pyrrolidino" compounds and was "intended to exclude from the claims subject matter already patented in U.S. Patent 4,731,374 and that [is] pending in Serial No. 124,197 filed November 23, 1987." *See* PFF at ¶ 55, 56. Therefore, the '671 application also was filed "as a result of" the restriction requirement. *See* PCOL at ¶¶ 49-50.

## 2.    The Applicants Maintained Consonance

Defendants further allege that that "Boehringer cannot show that the '671 application was 'consonant with' a restriction requirement." Def. Br. at 31.    According to Defendants,

"[c]onsonance requires that an applicant divide up the claimed subject matter according to the examiner's instructions," *id.*, and was lost because the '812 patent claims include multiple groups of compounds, while the '086 patent claims include multiple utility groups. *See id.* at 32. Defendants' view of consonance is simply not the law. As the Federal Circuit has explained, including in the cases Defendants cite, consonance only requires that the applicant not reach back and claim something in one of the invention groups it elected before:

> Consonance requires that the line of demarcation between the "independent and distinct inventions" that prompted the restriction requirement be maintained. Though the claims may be amended, they must not be so amended as to bring them back over the line imposed in the restriction requirement. Where that line is crossed the prohibition of the third sentence of Section 121 does not apply. *Gerber Garment Technology, Inc. v. Lectra Systems, Inc.*, 916 F.2d 683, 688, 16 USPQ2d 1436, 1440 (Fed.Cir.1990). *The corollary to this Court's statement in Gerber Garment is that new or amended claims in a divisional application are entitled to the benefit of § 121 if the claims do not cross the line of demarcation drawn around the invention elected in the restriction requirement.*

*Symbol Techs.*, 935 F.2d at 1579 (cited by Defendants) (holding consonance was maintained).[9] *See also Pfizer*, 518 F.3d at 1359 (the "consonance requirement prevents an applicant from amending the claims in the divisional application in a way that would violate the originally imposed restriction requirement and thereby impermissibly extend the patent term *as to that subject matter*"). Applying the correct standard, consonance was maintained. *See* PFF at ¶ 66. Indeed, the Preliminary Amendment was filed contemporaneously with the filing of the '671 application in order to "exclude from the claims subject matter already patented in U.S. Patent 4,731,374 and that now pending in Serial No. 124,197 filed November 23, 1987." *See* PFF at ¶¶

---

[9]    Neither *Pfizer, Inc. v. Teva Pharmaceuticals USA, Inc.*, 518 F.3d 1353 (Fed. Cir. 2008), nor *Bristol-Myers Squibb Co. v. Pharmachemie B.V.*, 361 F.3d 1343, 1350 (Fed. Cir. 2004), addressed the issue of consonance. *See Pfizer*, 518 F.3d at 1362 ("Given our conclusion, we do not consider Teva's alternative argument that section 121 does not apply because the 165 patent is not consonant with the restriction requirement made in the parent application."); *Bristol-Myers Squibb*, 361 F.3d at 1350 ("In light of the complexity of the factual record in this case, we go no further than to address the ground on which the district court ruled.").

55, 56. Therefore, the '812 patent maintains consonance with the restriction requirement and, pursuant to Section 121, the '086 patent "shall not be used as a reference" against the '812 patent claims. *See Symbol Techs.*, 935 F.2d at 1579.

### 3.    The '812 Patent Was Filed Before Issuance Of The '086 Patent

Section 121 discusses three applications, "original," "divisional," and "other":

> A patent issuing on an application with respect to which a requirement for restriction under this section has been made, or on an application filed as a result of such a requirement, shall not be used as a reference either in the Patent and Trademark Office or in the courts *against a divisional application* or against *the original application* or any patent issued on either of them, if the divisional application is filed before the issuance of the patent on *the other application*.

35 U.S.C. § 121. The "original" application is the application in which a restriction requirement was entered, the "other application" is the application that was filed as a result of such the restriction requirement, and the "divisional" application is a divisional of either. With respect to timing, the only requirement in Section 121 is that the relevant divisional application be filed "before the issuance of the patent on the *other* application," meaning the application from which the divisional arises. That requirement is satisfied here, as the '671 application was filed on October 12, 1988, as a divisional of the pending '197 application, and before the June 27, 1989 issue date of the '086 patent. *See* PFF at ¶¶ 51, 53.

Relying exclusively on P.J. Federico's article, *Commentary on the New Patent Act*, 75 J. Pat. & Trademark Off. Soc'y 196 (originally published in 1954), Defendants instead contend that "Section 121 requires that 'if two or more divisional applications are filed as a result of a multiple requirement for restriction, they each must be filed before the original application is patented in order to obtain the benefit of this provision." Def. Br. at 32. Given that it conflicts

31

with the plain language of Section 121, is not precedent and has not been adopted by any court, the article has no bearing on the issue.[10]

Had the drafters intended the result Defendants seek, Section 121 would say "if the divisional application is filed before the issuance of the patent on the *original* application." But it does not. Such a requirement would have been extremely burdensome and impractical, especially in cases such as this one where the PTO drew so many lines in its restriction requirement that the applicants would have had to file and prosecute many separate applications before issuance of the '374 application in order to preserve the protective benefits of Section 121. *See* PFF at ¶¶ 30-31. There is nothing to suggest that Congress intended such a result. Indeed, the PTO recently considered a proposed rule that would require all divisional applications to be filed while the original case is still pending in connection with its continuation practice reform and rejected it. *See* U.S. Patent and Trademark Office, Final Rule: Changes to Practice for Continued Examination Filings, Patent Applications Containing Patentably Indistinct Claims, and Examination of Claims in Patent Applications (2007). http://www.uspto.gov/web/offices/pac/dapp/opla/presentation/ccfrchanges.pdf; *see also,* Changes to Practice for Continued Examination Filings, Patent Applications Containing Patentably Indistinct Claims, and Examination of Claims in Patent Applications, 72 Fed. Reg. 46,716 (Aug. 21, 2007) (to be codified at 37 C.F.R. pt. 1).

---

[10]    Moreover, in the same passage Defendants quote, Mr. Federico indicated that the third sentence of Section 121 is "rather awkwardly worded" and that a requirement that multiple divisional applications need to be filed before issuance of the original application only "appear[s]" to be the case. P.J. Federico's *Commentary on the New Patent Act*, 75 J. Pat. & Trademark Off. Soc'y 196.

   **E.**    **Defendants Have Not Refuted The Secondary Indicia Of Nonobviousness That Favor Patentability**

      **1.**    **Secondary Indicia May Be Considered**

Defendants contend that none of Defendants' evidence of secondary indicia is relevant to the question of obviousness-type double patenting.[11]  Def. Br. at 33-34.  Citing *Geneva*, 349 F.3d at 1377 n.1 and *Procter & Gamble Co. v. Teva Pharms. USA*, Inc., 536 F. Supp. 2d 476, 497-98 (D. Del. 2008), Defendants first argue that "the Federal Circuit and this Court have clearly established that evidence of objective indicia of nonobviousness is wholly irrelevant to the double patenting analysis."  Def. Br. at 33.  Neither *Geneva* nor *Pfizer*, however, forbids an inquiry into objective indicia of nonobviousness for double patenting.  They only found that such an inquiry is not required.  *Geneva*, 349 F.3d at 1378  ("Obviousness requires inquiry into objective criteria suggesting non-obviousness; nonstatutory double patenting does not."); *Procter & Gamble*, 536 F. Supp. 2d at 497  (same).

Defendants next argue that Boehringer's evidence of secondary indicia of nonobviousness is irrelevant because such indicia are only present for a "portion" of the claims.  Def. Br. at 33.  This argument also is inaccurate.  According to the Federal Circuit, "a patentee need not show that all possible embodiments within the claims were successfully commercialized in order to rely on success in the marketplace of the embodiment that was commercialized." *Applied Materials, Inc. v. Advanced Semiconductor Materials Am., Inc.*, 98 F.3d 1563, 1570 (Fed. Cir. 1996).  In addition, this Court has distinguished the cases upon which Defendants rely on this very basis:

---

[11]    As for Defendants' argument that secondary indicia are irrelevant because this is an "anticipation" case, that argument is based on Defendants' misperception that the infringement / anticipation test for obviousness-type double patenting applies to claims that fall within different statutory subclasses.  But that is not the case.  *See* Sec. II.C.3, *supra*.

> Phillips, relying on *In re Tiffin*, 58 C.C.P.A. 1420, 448 F.2d 791 (1971), argues that the commercial sales data in evidence is "inadequate" and does not support a finding of nonobviousness because it is "not commensurate with the scope of the claims." ...[Secondary indicia] may be the most pertinent, probative, and revealing evidence available to aid in reaching a conclusion on the obvious/non-obvious issue. It should when present always be considered as an integral part of the analysis. *W. L. Gore & Associates, Inc. v. Garlock, Inc.*, 721 F.2d 1540, 1555 (Fed. Cir. 1983). ...Thus, the question is not whether the evidence of commercial success is "commensurate in scope with the claims," but rather whether the evidence is relevant to the question of nonobviousness.

*E. I. Du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 656 F. Supp. 1343, 1371 (D. Del. 1987), *aff'd in part and rev'd in part on other grounds*, 849 F.2d 1430, 1431 (Fed. Cir. 1988). This result is sensible given that factors totally unrelated to the obviousness of an invention go in to a patentee's decision whether to commercially develop or test a particular embodiment of a claimed invention including, for example, availability of necessary supplies, cost of development and availability of funds, availability of funds, time constraints, and other competing business interests.

> ### 2.    Secondary Indicia Of Nonobviousness Favor A Finding Of No Double Patenting

Defendants lastly deny that Boehringer has demonstrated "any objective indicia of nonobviousness." Def. Br. at 34. Defendants' characterization distorts the record and Federal Circuit case law.

> #### a.    Defendants Have No Response To Boehringer's Evidence Of Copying And Licensing

Defendants do not deny that copying and licensing of an invention are indicative of nonobviousness. *See Vandenberg v. Dairy Equip. Co.*, 740 F.2d 1560, 1567 (Fed. Cir. 1984) (copying); *In re GPAC*, 57 F.3d 1573, 1580 (Fed. Cir. 1995) (licensing). Nor do they even address (let alone refute) that they have copied MIRAPEX® or that others have obtained licenses

regarding certain compounds developed by Boehringer, including pramipexole. *See* PFF at ¶¶

131, 135. Accordingly, these factors are indicative of nonobviousness.

b.   <b>Pramipexole Has Unexpected Properties</b>

Defendants assert that the evidence at trial "unequivocally" showed that pramipexole

lacks "*some* of the properties" Boehringer attributed to it at trial. Def. Br. at 35. Although

Defendants contend that pramipexole is not neuroprotective and cannot be used to treat

fibromyalgia or depression, they concede that pramipexole is useful as a treatment for RLS.

In any case, Defendants' assertions misconstrue the record. First, Defendants' own

expert Dr. Mailman, has publicly opined that pramipexole has neuroprotective properties. *See*

Supp. PSFF at ¶ 214. Indeed, according to Dr. Mailman:

> [a]lthough pramipexole alleviates parkinosian symptoms by directly acting on
> dopamine receptors, *its neuroprotective effects* do not appear to be mediated by
> dopamine receptors [...] These results suggest that pramipexole exhibits
> additional activities (e.g., *antioxidant effects*) in addition to its receptor-mediated
> antiparkinson effects.

*See id.* at ¶¶ 216, 217. Dr. Mailman's writings are consistent with Dr. Olanow's opinions that

the available evidence indicates that pramipexole is neuroprotective. *See id.*

Defendants further assert that Drs. Mailman and Olanow testified that pramipexole has

not been proven as an effective treatment for fibromyalgia. That is misleading, however,

because a prospective, randomized placebo-controlled trial indicated that pramipexole is

effective in the treatment of fibromyalgia. *See* Supp. PSFF at ¶ 220. Defendants did not contest

this showing at trial. *See id.*

Defendants also assert that Drs. Olanow and Mailman agreed that pramipexole has not

been established to be useful in treating depression. Both Drs. Olanow and Mailman, however,

testified that pramipexole is effective in treating depression. *See* Supp. PSFF at ¶ 227.

35

Moreover, they both testified that their conclusion is supported by a double-blind trial that showed that pramipexole is effective in treating endogenous depression. *See id.*

Accordingly, Defendants' suggestion that pramipexole does not possess unexpected properties as it relates to the treatment of fibromyalgia and depression and its use as a neuroprotective agent, is without merit.

### c. Pramipexole's Other Uses Would Not Have Been Expected As Of December 1984

Defendants next suggest that the ability of pramipexole to treat RLS and depression would have been expected as of December 1984. *See* Def. Br. at 35, 36. Defendants, however, say nothing about its usefulness 1) as a treatment for fibromyalgia, and 2) as a neuroprotective agent. Def. Br. at 35-36. Boehringer's showing that those uses are unexpected is unrebutted. *See* PFF at ¶¶ 117-130.

With respect to RLS and depression, Defendants again mischaracterize the record. Dr. Mailman's testimony that one skilled in the art in December 1984 would expect pramipexole could be used to treat RLS and depression is not credible. Dr. Mailman has no experience with treating medical diseases and cannot practice any of the methods of treatment listed in the '086 patent (or otherwise). *See* PSFF at ¶ 211. His testimony is particularly weak in light of the testimony of Dr. Olanow, a world-renowned neurologist, who opined that pramipexole's usefulness in treating RLS could not have been predicted from its usefulness in treating the conditions listed in the claims of the '086 patent. *See id.* at ¶ 215. In addition, Defendants' argument is premised on a single letter to the editor that reported anecdotal results implying the administration of bromocriptine to 3 patients in a non-blinded, non-placebo controlled fashion. *See id.* at ¶ 213. Moreover, that letter was not peer reviewed, did not lead to any sort of consensus that dopaminergic agents could be used to treat RLS in the 1980s and certainly would

not lead one skilled in the art in 1984 to expect that pramipexole could be used to treat RLS. *See id.* According to the FDA, such evidence is inconsistent with the good reprint practices outlined in its draft guidance for industry materials that pharmaceutical companies may distribute to physicians. *See id.* at ¶ 214.

With respect to depression, Defendants ignore the fact that the studies on which Dr. Mailman relies involved a single compound (bromocriptine), and there was no indication that all dopamine agonists could effectively treat depression as of December 1984. *See* PSFF at ¶¶ 224. Further, bromocriptine is an ergot dopamine agonist, as opposed to pramipexole, which is a non-ergot dopamine agonist. *See id.* Thus, even if bromocriptine had been established as an effective treatment for depression as of December 1984, there was insufficient evidence for a person skilled in the art to know that pramipexole could be used to treat depression. *See id.*

### d.     Pramipexole Satisfied Several Long-Felt But Unmet Needs

Defendants also argue that there was no long-felt but unmet need as of December 1984 in the treatment of depression, fibromyalgia, RLS or neuroprotection, and that even if there was, pramipexole did not solve it. *See* Def. Br. at 36, 37. Defendants are incorrect.

Physicians extensively prescribe pramipexole off-label for use in the treatment of RLS, fibromyalgia, and depression. This evidence indicates that pramipexole has satisfied unmet needs associated with those medical conditions. *See* PFF at ¶ 132. Furthermore, Defendants' assertion that other dopaminergic drugs could be used to treat RLS as of December 1984 is irrelevant. The inquiry is not whether other drugs satisfied a long-felt but unmet need, but whether pramipexole did. *See* PFF at ¶¶ 119-134; PCOL at ¶ 41. It was unrebutted that pramipexole has satisfied an unmet need in the treatment of RLS. *See* Trial Tr. (Vol. 1), D.I. 206, at 74:12-75:2.

37

### e.    Pramipexole Has Been Commercially Successful

Finally, Defendants assert that MIRAPEX® is not commercially successful. Defendants are incorrect for three primary reasons.

First, Defendants' contention that the evidence of pramipexole's commercial success is not commensurate with the scope of the claims misstates the law. *See supra* at 33.

Second, Defendants' assertion that there is no nexus between the sales of MIRAPEX® and the patented features of the invention is without merit. Under settled Federal Circuit law, when "a patentee can demonstrate commercial success, usually shown by significant sales in a relevant market, and that the successful product is the invention disclosed and claimed in the patent, it is presumed that the commercial success is due to the patented invention." *J.T. Eaton & Co. v. Atlantic Paste and Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997). Boehringer unquestionably did so. *See* PSCOL at ¶¶ 112-114.

"Once [a patentee makes] the requisite showing of nexus between commercial success and the patented invention, the burden shift[s] to [the defendant] to prove that the commercial success was instead due to other factors extraneous to the patented invention." *Ecolochem, Inc. v. Southern Cal. Edison, Co.*, 227 F.3d 1361, 1377 (Fed. Cir. 2000). Not only did Defendants fail to satisfy their burden, *see* PSFF at ¶ 114, the evidence at trial established that there is a nexus between the commercial success of MIRAPEX® and the claimed features of the '812 patent. Thus, Dr. Rao testified that there was a nexus between the claimed features and the commercial success of MIRAPEX®. *See* Trial Tr. (Vol. 2), D.I. 207, at 370:5-373:13; 391:15:20. He controlled for such nexus by looking at sales of MIRAPEX® for the treatment of RLS, fibromyalgia, and depression, during a period (2003-2005) when Boehringer did not advertise, market, or promote MIRAPEX® for the treatment of any such conditions. *See id.* The

"off label" sales for such uses axiomatically were due to the therapeutic benefits of the compound. *See* PFF at ¶ 34.

Defendants did not rebut Dr. Rao's trial testimony and now offer only argument that there is no nexus. That argument, however, is insufficient to rebut Boehringer's evidence. As the Federal Circuit noted (in a case relied upon by Defendants) the "presumed nexus cannot be rebutted with mere argument; evidence must be put forth." *Brown & Williamson Tobacco Corp. v. Philip Morris, Inc.*, 229 F.3d 1120, 1130 (Fed. Cir. 2000).

<u>Finally,</u> Defendants attempt to suggest that Boehringer did not establish that MIRAPEX® is commercially successful, relying primarily on the testimony of Dr. Weinstein. ███████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████    *See id.* at 560:14-22. By any measure, that evidence shows "commercially significant sales." *See* PFF at ¶¶ 132-33.

## III.    CONCLUSION

For the reasons set forth in Boehringer's Opening Brief and herein, the Court should enter judgment for Boehringer, and against Barr and Mylan, that the asserted claims of the '812 patent are infringed and valid and should grant Boehringer the relief provided by 35 U.S.C. § 271(e)(4).

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jack B. Blumenfeld*

Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
1201 North Market Street
P. O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
mnoreika@mnat.com

*Attorneys for Plaintiffs*
*Boehringer Ingelheim International GmbH and*
*Boehringer Ingelheim Pharmaceuticals, Inc.*

*Of Counsel:*

Steven C. Cherny
LATHAM & WATKINS LLP
885 Third Avenue, Suite 1000
New York, NY  10022-4834
(212) 906-1200

Kenneth G. Schuler
Amanda J. Hollis
Joel Neckers
LATHAM & WATKINS LLP
Sears Tower, Suite 5800
Chicago, IL  60606
(312) 876-7700

May 14, 2008
2327876

40

## CERTIFICATE OF SERVICE

I, Jack B. Blumenfeld, hereby certify that on May 14, 2008, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will send notification of such filing to the following:

Mary B. Matterer
MORRIS JAMES LLP

Adam Wyatt Poff
YOUNG, CONAWAY, STARGATT & TAYLOR LLP

I further certify that copies of the foregoing document were also served upon the following in the manner indicated:

### BY ELECTRONIC MAIL and HAND DELIVERY

Mary B. Matterer, Esquire
MORRIS JAMES LLP
500 Delaware Avenue
Wilmington, DE 19801

Adam Wyatt Poff, Esquire
YOUNG, CONAWAY, STARGATT & TAYLOR LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801

### BY ELECTRONIC MAIL and FEDERAL EXPRESS

Glenn J. Pfadenhauer, Esquire
Jessamyn S. Berniker, Esquire
Dov P. Grossman, Esquire
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005-5901

Shannon M. Bloodworth, Esquire
HELLER EHRMAN LLP
1717 Rhode Island Avenue, NW
Washington, DC 20036

Kevin J. Culligan, Esquire
HELLER EHRMAN LLP
Times Square Tower
7 Times Square
New York, NY 10036-6524

/s/ Jack B. Blumenfeld
_____
Jack B. Blumenfeld (#1014)

## CERTIFICATE OF SERVICE

I, Jack B. Blumenfeld, hereby certify that on May 21, 2008, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will send notification of such filing to the following:

> Mary B. Matterer
> MORRIS JAMES LLP
>
> Adam Wyatt Poff
> YOUNG, CONAWAY, STARGATT & TAYLOR LLP

I further certify that copies of the foregoing document were also served upon the following in the manner indicated:

### BY ELECTRONIC MAIL and HAND DELIVERY

Mary B. Matterer, Esquire
MORRIS JAMES LLP
500 Delaware Avenue
Wilmington, DE 19801

Adam Wyatt Poff, Esquire
YOUNG, CONAWAY, STARGATT & TAYLOR LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801

### BY ELECTRONIC MAIL and FEDERAL EXPRESS

Glenn J. Pfadenhauer, Esquire
Jessamyn S. Berniker, Esquire
Dov P. Grossman, Esquire
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005-5901

Shannon M. Bloodworth, Esquire
HELLER EHRMAN LLP
1717 Rhode Island Avenue, NW
Washington, DC 20036

Kevin J. Culligan, Esquire
HELLER EHRMAN LLP
Times Square Tower
7 Times Square
New York, NY 10036-6524

/s/ Jack B. Blumenfeld

Jack B. Blumenfeld (#1014)