## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| BOEHRINGER INGELHEIM INTERNATIONAL GMBH and BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Civil Action No. 05-700 (JJF) |
| BARR LABORATORIES, INC., | ) ) | **REDACTED - PUBLIC VERSION** |
| Defendant, | ) ) ) | |
| BOEHRINGER INGELHEIM INTERNATIONAL GMBH and BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) ) | Civil Action No. 05-854 (JJF) |
| v. | ) ) ) | |
| MYLAN PHARMACEUTICALS, INC., | ) ) ) | |
| Defendant. | ) ) | |

## PLAINTIFFS' PROPOSED SUPPLEMENTAL
## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
1201 North Market Street
P. O. Box 1347
Wilmington, DE  19899-1347
(302) 658-9200
jblumenfeld@mnat.com
mnoreika@mnat.com

*Attorneys for Plaintiffs*
*Boehringer Ingelheim International GmbH and*
*Boehringer Ingelheim Pharmaceuticals, Inc.*

OF COUNSEL:

Steven C. Cherny
LATHAM & WATKINS LLP
885 Third Avenue, Suite 1000
New York, NY  10022-4834
(212) 906-1200

Kenneth G. Schuler
Amanda J. Hollis
Joel Neckers
LATHAM & WATKINS LLP
Sears Tower, Suite 5800
Chicago, IL  60606
(312) 876-7700

Original Filing Date:  May 14, 2008
Redacted Filing Date:  May 21, 2008

**TABLE OF CONTENTS**

PAGE

TABLE OF AUTHORITIES ..................................................................................ii

INTRODUCTION ..............................................................................................41

SUPPLEMENTAL FINDINGS OF FACT ...........................................................42

    I.     BACKGROUND ....................................................................................42

    II.    PROSECUTION HISTORY OF THE PATENT-IN-SUIT ........................43

        A.    The '947 Application And The '374 Patent .........................43

        B.    The '086 Patent / '197 Application ....................................43

        C.    The '812 Patent / '671 Application ....................................46

    III.   INFRINGEMENT ...................................................................................48

        A.    Defendants Have Waived Their Right To Contest Infringement of Claims 5, 9, And 10 ...........................................................48

        B.    The Defendants Have Infringed Claim 5 .............................49

        C.    Defendants' Proposed Products Infringe Claims 9 And 10 Of The '812 Patent ........................................................................49

    IV.   OBVIOUSNESS-TYPE DOUBLE PATENTING ...................................50

        A.    Background ........................................................................50

        B.    Waiver ...............................................................................52

        C.    Substantive Defects In Defendants' Theory........................54

        D.    Boehringer's Patent Term Extension Under 35 U.S.C. § 156.................56

        E.    Boehringer's Terminal Disclaimer......................................58

        F.    Materially Different Uses Pursuant To MPEP § 806.05(h) .....................60

SUPPLEMENTAL CONCLUSIONS OF LAW........................................................67

    I.     INFRINGEMENT ...................................................................................67

    II.    DOUBLE PATENTING .........................................................................68

        A.    Any Alleged Obviousness-Type Double Patenting Was Cured By The Terminal Disclaimer........................................................68

        B.    Defendants Waived Their Right To Assert A Double Patenting Defense ..........................................................................70

        C.    Even Assuming They Were Not Waived, Defendants' Arguments Are Without Merit ..................................................................71

i

D.    Materially Different Uses Pursuant To MPEP § 806.05(h) ..................... 74

E.    Section 121 Precludes The Use Of The '086 Patent As A Reference........ 75

F.    Secondary Considerations Support The Conclusion That The Claims Of The '812 Patent Are Patentably Distinct From Those Of The '086 Patent................................................................................................................. 77

## TABLE OF AUTHORITIES

CASES                                                                                     PAGE

*Applied Materials, Inc. v. Advanced Semiconductor Materials America, Inc.*,
    98 F.3d 1563 (Fed. Cir. 1996) ................................................................75, 77, 79

*Astellas Pharma, Inc. v. Ranbaxy Inc.*,
    2007 WL 576341 (D.N.J. 2007)................................................................72-75

*Bayer AG v. Barr Labs, Inc.*,
    798 F. Supp. 196 (S.D.N.Y. 1992) ................................................................70

*Bayer AG v. Dr. Reddy's Labs.*,
    518 F. Supp. 2d 617 (D. Del. 2007) ................................................................74

*Bott v. Four Star Crop.*,
    675 F. Supp. 1069 (E.D. Mich. 1987) ................................................................70

*Bristol-Myers Squibb Co. v. Pharmachemie B.V.*,
    361 F.3d 1343 (Fed. Cir. 2004) ................................................................44, 47

*CMI Corp. v. Lakeland Constr. Co.*,
    184 USPQ 721 (N.D. Ill. 1975) ................................................................70

*Cordis Corp. v. Medtronic Ave. Inc.*,
    511 F.3d 1157 (Fed. Cir. 2008) ................................................................67

*E. I. Du Pont de Nemours & Co. v. Phillips Petroleum Co.*,
    656 F. Supp. 1343 (D. Del. 1987), *aff'd in part and rev'd in part on other grounds*, 849
    F.2d 1430 (Fed. Cir. 1988) ................................................................79

*Ecolochem, Inc. v. Southern Cal. Edison, Co.*,
    227 F.3d 1361 (Fed. Cir. 2000) ................................................................80

*Eli Lilly & Co. v. Barr Labs., Inc.*,
    251 F.3d 955 (Fed. Cir. 2001) ................................................................68

*General Foods Corp. v. Studiengesellschaft Kohle GmbH*,
    972 F.2d 1272 (Fed. Cir. 1992) ................................................................73-74

*Geneva Pharms., Inc. v. GlaxoSmithKline PLC*,
    349 F.3d 1373 (Fed. Cir. 2003) ................................................................Passim

*Glaxo Wellcome, Inc. v. Pharmadyne Corp.*,
    32 F. Supp. 2d 265 (D. Md. 1998) ................................................................80

iii

*In re Beasley,*
    117 Fed. Appx. 739 (Fed. Cir. 2004) ....................................................... 74

*In re Bronson,*
    168 F.2d 548 (C.C.P.A. 1948).................................................................. 73

*In re Byck,*
    18 C.C.P.A. at 1210, 1211..................................................................... 72

*In re Byck,*
    48 F.2d 665 (C.C.P.A 1931).................................................................. 78

*In re Christmann,*
    128 F.2d 596 (C.C.P.A. 1942 ................................................................ 78

*In re Christmann,*
    29 C.C.P.A. at 1038............................................................................. 72

*In re Emert,*
    124 F.3d 1458 (Fed. Cir. 1997) ............................................................. 77

*In re Lonardo,*
    119 F.3d 960 (Fed. Cir. 1997) ............................................................... 68

*In re Metoprolol Succinate Patent Litig.,*
    494 F.3d 1011 (Fed. Cir. 2007) ............................................................. 74

*J.T. Eaton & Co. v. Atlantic Paste and Glue Co.,*
    106 F.3d 1563 (Fed. Cir. 1997) ............................................................. 80

*King Pharmaceuticals v. Teva Pharms., Inc.,*
    409 F. Supp. 2d 609 (D. N.J. 2006) ....................................................... 59

*Kinney v. Trustees of Princeton Univ.,*
    2007 WL 700874 (D.N.J. 2007).............................................................. 54

*Merck & Co., Inc. v. Hi-Tech Pharmacal Co., Inc.,*
    482 F.3d (Fed. Cir. 2007) ......................................................... 56, 59, 69

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.,*
    348 F. Supp. 2d 713 (N.D. W. Va. 2004) ............................................... 80

*Perricone v. Medicis Pharma. Corp.,*
    432 F.3d 1368 (Fed. Cir. 2005) ............................................................. 70

*Pfizer, Inc. v. Teva Pharms. USA, Inc.,*
    518 F.3d 1353 (Fed. Cir. 2008) .................................................... 71-72, 78

*Procter & Gamble Co. v. Teva Pharm. USA, Inc.*,
  536 F. Supp. 2d 476 (D. Del. 2008) ......................................................................... 77-78

*Southwall Techs., Inc. v. Cardinal IG Co.*,
  54 F.3d 1570 (Fed. Cir. 1995) ...................................................................................... 68

*Studiengesellschaft Kohle mbH v. Northern Petrochemical Co.*,
  784 F.2d 351 (Fed. Cir. 1986) ...................................................................................... 71

*Takeda Pharma. Co. v. Dudas*,
  511 F. Supp. 2d 81 (D.D.C. 2007) ............................................................................... 75

*Technicon Instruments Corp. v. Coleman Instruments, Inc.*,
  255 F. Supp. 630 (N.D. Ill. 1966) ............................................................................... 70

*Transclean Corp. v. Bridgewood Servs., Inc.*,
  290 F.3d 1364 (Fed. Cir. 2002) .............................................................................. 68, 71

*Transclean Corp. v. Bridgewood Servs., Inc.*,
  777 F. Supp. 2d 1045 (D. Minn. 1999) ...................................................................... 70

*U.S. v. Sandini*,
  888 F.2d 300 (3rd Cir. 1989) ....................................................................................... 54

*Union Carbide Corp. v. Dow Chemical Co.*,
  619 F. Supp. 1036 (D. Del. 1985) ............................................................................... 76

**STATUTES**

21 U.S.C. § 301, et seq. .................................................................................................. 57

21 U.S.C. § 321(g)(1)(B) ................................................................................................ 57

21 U.S.C. § 321(p) .......................................................................................................... 57

21 U.S.C. §§ 331(d) and 355(a) ..................................................................................... 57

35 U.S.C. §§ 100 and 101 ............................................................................................... 55

35 U.S.C. § 100(b) .......................................................................................................... 71

35 U.S.C. § 101 .......................................................................................................... 55, 71

35 U.S.C. § 102, 103 ....................................................................................................... 74

35 U.S.C. §§ 120 and 121 ............................................................................................... 51

35 U.S.C. § 121 ....................................................................................................... Passim

35 U.S.C. § 156 ....................................................................................................... 56, 59, 69

35 U.S.C. § 156(b) ....................................................................................................... Passim

35 U.S.C. § 253 ....................................................................................................... 57, 70

**OTHER AUTHORITIES**

37 C.F.R. § 1.321(c)(3) ....................................................................................................... 70

Constitution of the United States ....................................................................................................... 78

**RULES**

FED. R. CIV. P. 26(e)(1) ....................................................................................................... 70

FED. R. CIV. P. 26(e) and 36(c) ....................................................................................................... 68

Fed. R. Civ. P. 37(c) ....................................................................................................... 56

FED. R. CIV. P. 37(c)(1) ....................................................................................................... 70-71

FRE 402 ....................................................................................................... 78

## INTRODUCTION

Plaintiffs Boehringer Ingelheim International GmbH and Boehringer Ingelheim Pharmaceuticals, Inc. ("Boehringer" or "Plaintiffs") submit these Supplemental Proposed Findings of Fact and Conclusions of Law in response to Defendants' proposed findings of fact and conclusions of law. Many of Defendants' proposed findings of fact and conclusions of law serve no useful purpose and are unsupported by the record. Thus, many of Defendants' proposed findings require no response. Moreover, certain of Defendants' proposed findings distort the record, taking testimony out of context and/or citing to a record that does not support Defendants' proposed finding(s).

Boehringer does not purport to respond to every irrelevancy, misstatement, and/or distortion contained in Defendants' proposed findings. Boehringer addresses only certain examples to establish that Defendants' "findings" and record citations cannot be taken at face value or trusted. As relevant, Boehringer's supplemental proposed findings set forth below will be cross-referenced in Boehringer's concurrently filed Answering brief and its supplemental proposed conclusions of law. These supplemental findings are numbered beginning with the last number and page of Boehringer's initial proposed findings of fact and conclusions of law (Nos. 137 and 63, respectively, and page 41).

Throughout, reference to the record for Boehringer's supplemental proposed findings will be as defined in Boehringer's opening brief, with the following additions: "DFF" and "DCOL" refer to Defendants' proposed findings of fact and proposed conclusions of law, respectively, while "PFF," "PCOL," "PSFF" and "PSCOL" refer to Plaintiffs' proposed findings of fact, proposed conclusions of law, supplemental proposed findings of fact and supplemental conclusions of law, respectively.

To the extent that any issue of law is deemed to be an issue of fact, it should be so considered, and to the extent that any issue of fact is deemed to be one of law, it should be so considered. Plaintiffs reserve their right to supplement their Supplemental Proposed Findings of Fact and Conclusions of Law, as necessary.

## SUPPLEMENTAL FINDINGS OF FACT

### I.    BACKGROUND

137.  At trial, Boehringer established that Boehringer Ingelheim International GmbH is the assignee and record owner of the '086 and '812 patents, as the Defendants themselves acknowledged in their Notice Letters. *See* TX 406; TX 426; TX 509; TX 546. Boehringer also established that Boehringer Ingelheim Pharmaceuticals, Inc. is the NDA holder for Mirapex® tablets. *See* PFF at ¶ 12. In the face of such evidence, Defendants' statement that Boehringer merely "asserts" such status, *see* DFF at ¶ 4, is insufficient to contest Boehringer's showing at trial.

138.  Even if DFF 12-14 and 16-17 were relevant to Defendants' double patenting defense, the Court finds that the Defendants did not disclose such evidence during discovery. The only alleged basis for the Defendants' double patenting defense that was disclosed during fact discovery was the suggestion that the compound claims of the '812 patent were "sub-genera" of the method of use claims of the '086 patent. *See* TX 406 at 10; TX 407 at 9-11. For his part, Dr. Anslyn first made such a statement in his Rebuttal Expert Report. *See* Anslyn Rebuttal Rept. (Ex. A) at 1-5. Thus, any attempt on the part of Defendants to use Dr. Anslyn's testimony as affirmative evidence with regard to an issue upon which they bear the burden of proof, as set forth in DFF 12-14 and 16-17, is barred.

## II.  PROSECUTION HISTORY OF THE PATENT-IN-SUIT

### A.  The '947 Application And The '374 Patent

139.  In DFF 107, Defendants contend that the restriction requirement, imposed during the prosecution of the '374 patent, required that Boehringer prosecute all of the compound/composition groups and the utility groups together. *See* DFF at ¶ 107. This mischaracterizes the nature of the restriction requirement.  Through the restriction requirement, Examiner Ceperley required the applicants to elect a subset of then-pending claims and permitted Boehringer *to combine* groups, indicating that "[a]pplicants must elect either (A) one of the compound groups I-V *and* one of the utility groups VIII-X (composition and utility to be limited to elected compound type for examination) or (B) one of the process groups VI and VII." TX 46 at 200.

140.  Moreover, Examiner Ceperley never suggested that Boehringer would not be able to pursue additional claims in divisional applications. *See id.* at *passim*.  In fact, in response to the restriction requirement, Boehringer elected to prosecute certain subject matter pending in the '947 application and explicitly "reserve[d] the right to prosecute claims to the unelected subject matter in divisional applications." *See* TX 46 at 202.

### B.  The '086 Patent / '197 Application

141.  In DFF at ¶¶ 109 and 110, Defendants assert that Boehringer re-submitted all the claims from the '947 application in the '197 application and then failed to file a preliminary amendment to remove the pyrrolidino limitation. *See* DFF at ¶¶ 109 and 110.  Defendants' contention is misleading, however, because the '197 application was filed as a divisional of the '947 application, and as such, it contained "a complete copy of the prior" '947 application, including the fifteen originally-filed claims. *See* PFF at ¶ 38. There is simply no requirement that Boehringer must have filed a preliminary amendment.  In any event, by way of a subsequent amendment, the

43

applicants submitted claims that omitted reference to pyrrolidino compounds with respect to methods of treating Parkinson's disease. *See* PFF at ¶ 44.

142.    Defendants also contend that the Examiner Gerstl did not refer to the prior restriction requirement or impose a new restriction requirement during the prosecution of the '086 patent. *See* DFF at ¶ 111.    That contention is misleading, however, because Boehringer advised Examiner Gerstl that it was filing the '197 application as a divisional application to the '947 application and that the parent '947 application was examined by Examiner Ceperley. *See* PFF at ¶¶ 38-39.

143.    Defendants also contend that the restriction requirement that issued during the '947 application did not "carry over" to the '197 application and the examiner "withdrew" the restriction requirement. *See* DFF at ¶ 115. Defendants' assertion is incorrect. First, the Defendants do not identify any office action in which the PTO "withdrew" the restriction requirement – in fact, no such document exists. *See* DFF at ¶ 115. Moreover, during the prosecution of the '086 patent, Boehringer argued that the parent '947 application "was made subject to a restriction requirement" such that "the '374 patent cannot be applied as a reference to support an obviousness-type double patenting rejection." *See* PFF at ¶ 48.    Following the applicants' invocation of the restriction requirement, Examiner Gerstl withdrew the double patenting rejection. *See id.* at ¶¶ 48-50.

144.    The invocation of the restriction requirement during the course of the prosecution of the '197 application indicates that the applicants "proceeded under the assumption that the [] restriction requirement continued in effect." *Bristol-Myers Squibb Co. v. Pharmachemie B.V.*, 361 F.3d 1343, 1349 (Fed. Cir. 2004).

145.    In DFF 112 and 113, Defendants contend that Examiner Gerstl allowed compound claims 6 and 7 during the prosecution of the '197 application, which are identical to claims 6 and 7 that issued in the '812 patent. *See* DFF at ¶¶ 112, 113. In fact, the examiner was plainly cognizant

of double patenting as a potential issue, and rejected claims in both the '197 and '671 applications on such grounds but, as noted, did not impose such a rejection with regard to claim 7. *See* PFF at ¶¶ 40, 61, 62. That circumstance logically requires and underscores the fact that claim 7 is patentably distinct from any claim of the '374 or '086 patents.

146. Defendants contend that the allowed claim pattern was "inconsistent" with the restriction requirement imposed during the prosecution of the '374 patent. *See* DFF at ¶ 114. But this is irrelevant because the Examiner later was alerted to the existence of the restriction requirement and the claims were amended to be consistent therewith. *See* PFF at ¶¶ 43, 47, 48.

147. Defendants contend that the newly submitted method claims "did not comply with (and therefore were not consonant with) the restriction requirement imposed in the earlier application because, using terminology from that restriction requirement, the claims encompassed multiple utility groups... for multiple compound groups...and a single process group...and because they did not include a single compound/composition group with a single utility group." *See* DFF at ¶ 120. Consonance, however, merely requires that "the claims do not cross the line of demarcation drawn around the invention elected in the restriction requirement." *See* PCOL at ¶ 53. Boehringer acted in a manner that was consonant with the election made in response to the restriction requirement. *See id.* at ¶ 55. Thus, the applicants never "crossed the line" of that election, deleting subject matter claimed in the '374 patent from both of the subsequent divisional applications and the resulting '086 and '812 patents. *See id.*

148. Boehringer acknowledged the separate and distinct nature of the inventions covered by the compound claims versus the method claims when it only cancelled compound claims 1-8 "[i]n view of the particular pertinence of U.S. Patent Application Serial No. 747,748" and stated that "these claims have been cancelled and will be reinstated in a divisional application under 37

45

CFR 1.60" so that "issues presented by this reference will be more easily dealt with in said divisional application." PFF at ¶ 46.

149.    The Examiner never objected to Boehringer's plan to pursue the compound claims in a divisional application, eventually issued a Notice of Allowability, and the '086 patent issued on June 27, 1989. *See* PFF at ¶¶ 49, 50.

**C.    The '812 Patent / '671 Application**

150.    Defendants' contention that Boehringer filed the '671 application after the issuance of the '374 patent (*see* DFF at ¶ 127), is irrelevant. Section 121 does not require that the '671 application be filed prior to the issuance of the '374 patent. *See* PCOL at ¶¶ 46, 47.

151.    In DFF 129-131, Defendants assert that Boehringer did not file the '671 application as a result of the restriction requirement. *See* DFF at ¶¶ 129-131. Defendants' assertion misses the mark for a number of reasons, however. Initially, it ignores the fact that, but for the restriction requirement imposed during the prosecution of the '971 application, all of the claims would have issued at the same time in the '374 patent. *See* PFF at ¶¶ 30-35.

152.    Second, Defendants' claim is irrelevant, as Section 121 does not require that the '812 patent have been filed as a result of a restriction requirement, but merely that *the '086 patent application* have resulted from a restriction requirement. *See* 35 U.S.C. § 121.

153.    Third, the applicants invoked the restriction requirement on two occasions during the course of the prosecution of the '671 application. At the outset, they filed a preliminary amendment which was "intended to exclude from the claims subject matter already patented in U.S. Patent 4,731,374 and that [is] pending in Serial No. 124,197 filed November 23, 1987." PFF at ¶ 56. They also invoked it in response to the initial double patenting rejection of certain claims in arguing that the Examiner could not take the position that the claims of the '812 patent were patentably indistinct from those of the '374 patent. *See id.* at ¶¶ 63-64.

154.   By referencing the restriction requirement (*see* PFF at ¶ 48), and amending the claims of the '197 application to be consonant with it (*see id.* at ¶ 44), the applicants' conduct indicates that they "proceeded under the assumption that the [] restriction requirement continued in effect." *Bristol-Myers Squibb*, 361 F.3d at 1349.

155.   Defendants assert, in DFF 133, that claims 16 and 17, which issued as claims 9 and 10 of the '812 patent were added to the '671 application in a preliminary amendment, and were not subject to the restriction requirement. *See* DFF at ¶ 133.   However, claims 9 and 10 were *sub genera* of claim 5 of the '374 patent, which was subject to the restriction requirement. *See* PFF at ¶ 58.

156.   Moreover, as a result of the applicants' preliminary amendments, the '671 application claimed a subset of the inventions originally claimed in the grandparent '947 application that did not overlap with the subject matter claimed in the '374 and '086 patents. *See id.* at ¶ 60.

157.   Defendants repeatedly contend that the examiner did not refer to the restriction requirement imposed during the prosecution of the '374 patent, did not issue a new restriction requirement, and that the restriction requirement did not carry over to the '671 application. *See* DFF at ¶¶ 135-136.   This misstates the issue, as there is no such requirement in § 121, which merely requires that *the '086 patent application* have resulted from a restriction requirement. *See* PSCOL at ¶¶ 94-96.   Defendants' contention is also misleading because, as noted, the applicants repeatedly invoked the restriction requirement during the prosecution of the '671 application. *See* PFF at ¶ 64.

158.   Finally, the examiner of both the '086 and '812 patents was Examiner Gerstl, who was certainly cognizant of potential double patenting issues. *See id.* at ¶ 52.   Examiner Gerstl did not raise any concern that the claims of the '812 patent were not consonant with the election made

previously in response to the restriction requirement imposed during the course of the prosecution of the '374 patent. *See* PFF at ¶¶ 61-65.

## III.    INFRINGEMENT

### A.    Defendants Have Waived Their Right To Contest Infringement of Claims 5, 9, And 10

159.    Defendants claim that their proposed products do not infringe claims 5, 9, and 10 of the '812 patent. *See* DFF at ¶ 140. The arguments set forth by the Defendants were never disclosed to Boehringer in the course of discovery, however.

160.    By means of contention interrogatory, Boehringer asked Barr to "describe with particularity all facts referring or relating to" Barr's assertion of noninfringement. *See* TX 407 at 7. In response, Barr "incorporate[ed] by reference Sections A and B" of its Notice Letter. *See id.* at 8. Barr offered no further articulation of its theory of noninfringement and never disclosed to Boehringer that it intended to contest infringement with respect to any claims other than claims 6 and 7.

161.    Mylan had previously represented in an interrogatory response that it did "not contest infringement of [any of] the asserted claims." TX 413 at 3.

162.    On the date for initial expert disclosures, Boehringer proffered the expert report of Dr. Klibanov, who opined that Barr and Mylan had infringed claims 5, 7, 9, and 10. *See* Klibanov Expert Rpt. (Ex. B to Boehringer's Evidentiary Br.), at ¶¶ 45-72. Neither Defendant offered any rebuttal to Dr. Klibanov's opinions.

163.    The first suggestion by either Defendant that they contested infringement with regard to claims 5, 9, and 10 came in the context of the Pretrial Order, bare weeks before trial and well after the discovery deadlines. *See* Plaintiff's Evidentiary Brief (D.I. 215) at 3, 4.

**B.     The Defendants Have Infringed Claim 5**

164.  The Defendants note that Boehringer's application for patent term extension does not recite claim 5.  *See* DFF at ¶ 138.  However, the application indicates that "claim 3 is applicable because it reads on compounds of formula Ia." TX 99 at BARR818.

165.  Claim 5 of the '812 patent is directed to a "tetrahydro-benzthiazole of formula Ia, as claimed in claim 3, wherein $R_1$ and $R_2$ together with the nitrogen atom between them form an amino . . . group; and, $R_3$ and $R_4$ together with the nitrogen atom between them form a . . . n- propylamino [] group." PFF at ¶ 90.  In their statement to the PTO, Boehringer explained that pramipexole dihydrochloride falls within claim 3 because it "is the dihydrochloride salt of a compound of the formula Ia wherein $R_1$, $R_2$ and $R_3$ are all hydrogen and $R_4$ is n-propyl." TX 99 at BARR818.  Those same statements establish that pramipexole dihydrochloride falls within claim 5. *See* PFF at ¶¶ 90-93.

166.  Dr. Klibanov explained at trial why, as a matter of chemistry, the Barr and Mylan proposed generic pramipexole dihydrochloride products fall within the scope of claim 5.  *See* PFF at ¶ 94.  The Defendants presented no evidence rebutting that testimony.  The Defendants do not point to any element of claim 5 that they contend is missing from their proposed products. *See* DFF at ¶ 138.

**C.     Defendants' Proposed Products Infringe Claims 9 And 10 Of The '812 Patent**

167.  The Defendants assert that claims 9 and 10 of the '812 patent do not refer to acid addition salts.  *See* DFF at ¶ 137.  The Defendants, however, failed to raise this as a claim construction issue prior to their post-trial briefing.  *See* Joint Status Rept., D.I. 185, at ¶ 3. Moreover, the uncontroverted evidence at trial established that claims 9 and 10 of the '812 patent encompass salts because the specification of the '812 patent repeatedly states that the compounds of

the invention include acid addition salts, and in particular pharmaceutically acceptable acid addition salts. *See* Trial Tr. (Vol. 1), D.I. 206, at 242:21-243:24; TX 3 *at passim*.

168. In addition, the Court finds that even if claim 9 of the '812 patent was construed to cover only the free base form of the subject compounds (including (S)2-Amino-6-n-propylamino-4,5,6,7-tetrahydro benzthiazole), the administration of the Barr and Mylan proposed generic pramipexole dihydrochloride products to a human would generate a free base of that compound. Defendants essentially concede this point. *See* DFF at ¶ 11. Thus, the administration of either the salt or a free base ends up as a mixture of three different species, namely the unprotonated free base, the monoprotonated free base, and the diprotonated free base. *See* Trial Tr. (Vol. 1), D.I. 206, at 242:21-247:13.

169. Moreover, the Defendants invoke Boehringer's application for patent term extension with regard to claim 5, but omit to mention that it explicitly recites that pramipexole dihydrochloride falls within the scope of both claims 9 and 10. *See* TX 99 at BARR818-19 ("Claim 9 is applicable because . . . . [p]ramipexole dihydrochloride is the dihydrochloride salt of the compound of the above formula wherein R is n-propyl."); *id.* ("Claim 10 is applicable in that it is limited to those compounds embraced by claim 9 wherein R is an alkyl group of 1 to 7 carbon atoms.").

170. Accordingly, by filing ANDAs seeking approval to market pramipexole dihydrochloride tablets prior to the expiration of the '812 patent, the Defendants have infringed claims 9 and 10 of the '812 patent.

## IV.    OBVIOUSNESS-TYPE DOUBLE PATENTING

### A.    Background

171. The claims of the '812 patent contain subject matter directed to medicinal chemists. *See* PFF at ¶ 107; Trial Tr. (Vol. 1), D.I. 206, at 222:8-10. According to Defendants' experts, the

'086 patent claims contain subject matter directed to physicians. *See id.*; Trial Tr. (Vol. 3), D.I. 208, at 686:5-688:5.

172.   Defendants contend that the person of ordinary skill in the art for both "the '086 and '812 patents would possess a combination of skills in chemistry, pharmacology, and/or biological evaluation of pharmaceutical compounds." DFF at ¶ 18.  That contention contradicts the testimony of their expert witnesses, however.  Dr. Anslyn admitted that the person of skill in the art with respect to the method claims of the '086 patent would be a medical doctor.  *See* Trial Tr. (Vol. 2), D.I. 207, at 499:6-503:4.  On cross-examination, Dr. Mailman admitted that the only persons who could practice the methods of the '086 patent are those who are licensed to prescribe drugs.  *See* Trial Tr. (Vol. 3), D.I. 208, at 687:1-688:5.

173.   Defendants suggest that their definition of the person of ordinary skill in the art is defined, at least in part, by the named inventors' backgrounds. *See* DFF at ¶ 19.  But Dr. Kobinger, for instance, testified that as a pharmacologist, he could not recognize chemical names.  *See* Trial Tr. (Vol. 2), D.I. 207, at 568:5-7.

174.   Defendants' implicit suggestion in DFF 20 that the shared specification of the '086 and '812 patents is somehow evidence of double patenting is misguided.  Under 35 U.S.C. §§ 120 and 121, Applicants were required to file the '671 application with the identical specification contained in the '197 application by virtue of it being a divisional application.  *See* PFF at ¶ 54; TX 99 at BARR000662-66.

175.   The Defendants double patenting theory posits that the '812 patent "effectively extended the life of the '086 patent." DFF at ¶¶ 24-25, 46-48.  That theory is flawed on a number of levels.  Initially, the Defendants simply ignore the pertinent prosecution history.  The applicants initially submitted both method of use and compound claims together, in a single application.  *See*

51

PFF at ¶¶ 27-28, 33, 54; TX 99 at BARR000662. The claims presumably would have issued together as part of the '374 patent but for the determination by the PTO in the restriction requirement that those claims were separate and distinct inventions. *See* PFF at ¶¶ 27-33.

176. Moreover, the Defendants failed to deal with the differences between the claims of the '086 patent and the claims of the '812 patent, let alone to show that any particular claim is an obvious variant of a claim of the '086 patent in light of those myriad differences. *See* PCOL at ¶¶ 23-26; DFF at ¶¶ 22-48. Along those same lines, Dr. Anslyn conducted no analysis as to how the '812 patent claims are obvious in light of the differences between the claims in the '812 and '086 patents. *See* Trial Tr. (Vol. 2), D.I. 207, at 443:16-511:10

177. In DFF 38, Defendants rely on Dr. Anslyn's testimony to define a "therapeutically effective amount" as the phrase is used in the '086 patent. But Dr. Anslyn conceded that he is neither a medical doctor nor a pharmacologist and therefore "[does] not know at what level one would define therapeutically effective." Trial Tr. (Vol. 2), D.I. 207, at 499:2-500:15. Thus, Dr. Anslyn is not qualified to opine on the subject.

178. Similarly, Defendants' reliance on Dr. Anslyn's testimony as alleged support for their contention that the '086 patent claims anticipate the '812 patent claims is unwarranted. *See* DFF at ¶¶ 24-43. Not only is Defendants' "anticipation" theory legally flawed, but Dr. Anslyn admitted that he was "not trying to draw any legal conclusions" about the validity of the asserted claims. *See* Trial Tr. (Vol. 2), D.I. 207, at 508-09; *id.* at 507:22-24 ("I am not an attorney, and therefore, I was not making judgments related to those kinds of issues").

**B.     Waiver**

179. During fact discovery, Boehringer served a contention interrogatory asking Barr to "describe with particularity all facts referring or relating to the allegations ... that the claims of the '812 patent are invalid ... under the doctrine of double patenting." TX 407 at 9 (internal quotations

omitted). In response, Barr merely "incorporate[d] by reference Sections C, D, E and F of the ... updated Notice Letter sent to Plaintiffs on September 12, 2005." *Id.* at 10-11.

180. Barr's Notice Letter was short and conclusory – the only alleged basis for the claim of double patenting was the suggestion that the compound claims of the '812 patent were "sub-genera" of the method of use claims of the '086 patent. *See* TX 406 at 10.

181. Barr's only supplemental response to the subject interrogatory had nothing to do with double patenting. *See* TX 409 at 2-4.

182. Mylan's Notice Letter made no assertion of double patenting. *See* TX 509 at 12-27. During the course of discovery Mylan limited its invalidity defenses to those asserted by Barr. *See* TX 413 at 4; TX 536 at 2.

183. Defendants have proffered at least 30 Proposed Findings of Fact on the issue of obviousness-type double patenting. *See* DFF at ¶¶ 18-48. None of these contentions were disclosed during discovery in response to Boehringer's interrogatory concerning double patenting. *See* D.I. 215; TX 407; TX 409; TX 410.

184. Boehringer has been prejudiced by the Defendants' belated disclosures. The earliest that certain of the facts and contentions set forth in DFF at ¶¶ 18-48 were disclosed to the Plaintiffs was in the Pretrial Order, on the eve of trial. *See* D.I. 190, Ex. 3, at § II. Those facts certainly were not disclosed during the course of fact discovery even though all of the facts and contentions set forth in DFF ¶¶ 18-48 are responsive to Boehringer's interrogatories. Because the Defendants failed to make those disclosures during discovery, Boehringer was unable to explore these topics with Barr and Mylan deponents and did not have an adequate opportunity to develop expert opinion testimony regarding those theories.

185. The Defendants' failure to disclose those facts and contentions until trial was not substantially justified. *See Kinney v. Trustees of Princeton Univ.*, 2007 WL 700874, *5 (D.N.J. 2007) (finding no substantial justification where the party "had a duty to produce [certain] documents at issue and failed to do so until the eve of the final pretrial conference."). Indeed, in the face of ample opportunity to have made those disclosures in a timely fashion, the Defendants' conduct "demonstrates willfulness at minimum." *Mercedes-Benz Antitrust Litig.*, 225 F.R.D. 498, 507 (D.N.J. 2005) (concluding that failure to disclose was willful given that "[plaintiff] has had several opportunities to disclose the identity of [the witness] and the subject matter of his knowledge"). There was no change in circumstance regarding the scope of the respective claims of the '086 and '812 patents during that time, and the facts and contentions set forth in DFF ¶¶ 18-48 were equally available to the Defendants during the period for fact discovery.

### C. Substantive Defects In Defendants' Theory

186. Defendants' factual contentions in DFF 44-48 are not supported by the citations they provide. In these five paragraphs, Defendants cite only to the patents (TX 2 and TX 3), the prosecution history for the '812 patent (TX 99), and several of Boehringer's Interrogatory Responses (TX 702 and TX 704). None of these citations support the contention that "[c]laims 3, 4, 5, 7, 9, and 10 of the '812 patent are not the product of innovation," for example. *See* DFF at ¶ 45 (citing TX 2 at cols. 24-30 and TX 3 at cols. 24-26). In addition, the Defendants provide no citation for the assertion that "[t]he '812 patent effectively extended the life of the '086 patent." *See* DFF at ¶ 46. It is purely attorney argument, which is not evidence. *See, e.g. U.S. v. Sandini*, 888 F.2d 300, 311 (3rd Cir. 1989) ("attorney's argument [is] not evidence").

187. Defendants cite no other evidence in support of their contention that the claims of the '812 patent are not patentably distinct from the claims of the '086 patent. *See* DFF at *passim*.

188.　In DFF 46-48, Defendants suggest that the claims of the '812 patent somehow extend the life of the '086 patent. *See* DFF at ¶¶ 46-48. However, Boehringer terminally disclaimed the difference between the '086 and '812 patent terms. *See* PFF at ¶ 104. Additionally, the '812 patent claims are directed to different statutory subject matter than those of the '086 patent pursuant to 35 U.S.C. § 101. *See* PFF at ¶ 105; PCOL at ¶ 29; 35 U.S.C. §§ 100 and 101. Moreover, one can practice the claims of the '812 patent without infringing the claims of the '086 patent. *See id.* at ¶ 114. Further, the claims of the two patents are distinct pursuant to MPEP § 806.05(h), the test applied by the PTO in deciding whether to issue restriction requirements. *See* PFF at ¶ 32; PCOL ¶ 30. Given those circumstances, Boehringer cannot have extended the patent term of the '086 patent by virtue of the '812 patent claims.

189.　There are myriad differences between what is claimed in the '086 patent and what is claimed in the '812 patent – the "therapeutically effective amount" limitation in the '086 patent claims being one of many such differences. *See* PFF at ¶¶ 105-130.

190.　Dr. Anslyn is not qualified to testify as an expert regarding the meaning of the claims of the '812 patent. The claims of the '812 patent are directed to medicinal chemists (*see* Trial Tr. (Vol. 1), D.I. 206, at 222:8-11; TX 3), and Dr. Anslyn is not a medicinal chemist. *See* Trial Tr. (Vol. 2), D.I. 207, at 444:9-447:24.

191.　Dr. Anslyn also is not qualified to testify as an expert regarding the meaning of the claims of the '086 patent. Defendants' expert, Dr. Mailman, admitted that the claims of the '086 patent are directed to physicians who can prescribe drugs. *See* Trial Tr. (Vol. 3), D.I. 208, at 687:1-688:5. Dr. Anslyn is not a physician and he is not certified to prescribe drugs. *See* Trial Tr. (Vol. 2), D.I. 207, at 499:6-503:4. Nor is Dr. Mailman. *See* Trial Tr. (Vol. 3), D.I. 208, at 613:22-614:20.

192.  Neither the Defendants nor Dr. Anslyn has ever even attempted to identify the differences between the claims. *See* PSFF at ¶¶ 176.  Nor has Barr or its expert offered any analysis as to how the '812 patent claims are obvious in light of those myriad differences. *See id.* at 176-178.  Barr's defense fails for this reason alone. *See id.*

### D.    Boehringer's Patent Term Extension Under 35 U.S.C. § 156

193.  During the course of litigation, the Defendants never challenged the patent term extension awarded to Boehringer pursuant to 35 U.S.C. § 156. *See, e.g.,* TX 406 at 10; TX 407; TX 409 at 2-4; TX 412; TX 413; TX 509.  In post-trial briefing, Defendants for the first time purport to make such an argument. *See* Def. Br. at 21.  But any such contention has been waived by virtue of the fact that the Defendants raised it for the first time in the context of post-trial briefing. *See* Fed. R. Civ. P. 37(c).  Putting that defect aside, their argument is contrary to the Federal Circuit's rationale in *Merck* that patent term extensions are solely governed by the criteria set forth in § 156 and serve a distinct purpose from that underlying the regular patent term – "to restore some of the patent term lost due to regulatory review." *Merck & Co., Inc. v. Hi-Tech Pharmacal Co., Inc.,* 482 F.3d at 1322-23 (Fed. Cir. 2007).

194.  There is no dispute that Boehringer's rights under the '812 patent during the Section 156 extension period include the right to exclude others with regard to FDA-approved uses. *See* 35 U.S.C. § 156(b); Def. Br. at 23 ("Pursuant to 35 U.S.C. § 156, any term extension that Boehringer obtained of the '812 patent allowed Boehringer to assert the '812 patent only to the extent that it covered pramipexole used for FDA approved uses.").

195.  Had anyone obtained FDA approval of any of the compounds covered by the '812 patent for any other pharmaceutical use (including schizophrenia, lowering heart rate, or lowering blood pressure,) the right to exclude others from using such compounds for such uses also would have been included among Boehringer's rights under the '812 patent during the Section 156

56

extension period. *See* 35 U.S.C. § 156(b) (rights during the extension period for a product patent shall "be limited to *any use approved for the product*...before expiration of the term of the patent [and under specified regulatory review provisions]...and...on or after the expiration of the regulatory review period upon which the extension of the patent was based."); § 156(f) (defining "product" to include any active ingredient of a drug).

196.    To the extent that any person was precluded from marketing any compound (other than pramipexole) encompassed by an asserted claim of the '812 patent, it was the implementing regulations of the Federal Food, Drug and Cosmetic Act ("FFDCA"), 21 U.S.C. § 301, et seq., and the FDA—not the '812 patent—that prevented such access for indications that were not FDA-approved.   Under the FFDCA, any product that is intended for the "diagnosis, cure, mitigation, treatment, or prevention of disease in man or other animals" is a drug.  21 U.S.C. § 321(g)(1)(B). Any "drug" that is not generally recognized as safe and effective for its intended uses, is considered to be a "new drug." 21 U.S.C. § 321(p).  Sections 301(d) and 505(a) of the FFDCA prohibit anyone from introducing or delivering a new drug into interstate commerce unless it has obtained FDA approval. 21 U.S.C. §§ 331(d) and 355(a).

197.    There is no evidence that anyone sought – let alone obtained – an NDA for any uses for pramipexole or other compounds covered by the '812 patent during the 5½ month period between the original expiration dates of the '812 and '086 patents.

198.    A terminal disclaimer accomplishes its statutorily-prescribed role regardless of when it is filed.  *See* 35 U.S.C. § 253.  Whether the effective rights actually disclaimed at the terminal part of a patent term are the same as those enjoyed at some other point along the term is irrelevant to whether the terminal disclaimer cures double patenting. That is because the curative effect of a terminal disclaimer depends on whether the terminal disclaimer prevents extension of any rights

granted in the original patent. *See Geneva Pharms., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1379 (Fed. Cir. 2003) (The doctrine of obviousness-type double patenting "prevents an applicant from extending patent protection for an invention beyond the statutory term by claiming a slight variant. *See id*. With nonstatutory double patenting, *a terminal disclaimer may restrict the slight variation to the term of the original patent and cure the double patenting rejection*").

199. Had Boehringer filed a terminal disclaimer on or before December 11, 2006, the expiration date for the '812 patent would have been October 8, 2010. *See* TX 2; TX 3; TX 99 at BARR909. Had Boehringer filed a terminal disclaimer during the prosecution of the '671 application, the expiration date also would have been October 8, 2010 (*see id.*); however, examiner Gerstl agreed that "no terminal disclaimer need be filed." TX 99 at BARR786. The terminal disclaimer Boehringer filed on March 13, 2008 results in precisely the same expiration date – October 8, 2010. *See* TX 548 at 1; PFF at ¶ 104.

200. During the five and a half month period identified by the Defendants, the only parties excluded from exceeding the scope of § 271(e)(1) were Barr and Mylan. Notably, Both defendants seek to market their generic pramipexole product to treat Parkinson's disease – an FDA-approved use. *See* TX 752 at MYL3935; TX 754 at BARR208788. Thus, on the Defendants' proposed labeling for their generic pramipexole products, the indicated use is for the treatment of Parkinson's disease. *See id.*

**E.    Boehringer's Terminal Disclaimer**

201. Plaintiffs offered the Terminal Disclaimer (TX 548) as evidence in their rebuttal case after Defendants rested their case. *See* Trial Tr. (Vol. 3), D.I. 208, at 718:22-721:24.

202. Upon filing with the PTO, the Terminal Disclaimer became a part of the prosecution history for the '812 patent which was an exhibit disclosed in the Pretrial Order (*see* D.I. 190, Ex. 7,

at 3) and introduced into evidence during trial. *See* TX 99; Trial Tr. (Vol. 3), D.I. 208, at 719:17-720:7.

203. Defendants argue that "the terminal disclaimer does not cure double patenting of the '812 patent because it was filed after the '086 patent expired" and that "[o]nce the '086 patent expired, the '812 patent became incurably invalid." DFF at ¶¶ 61, 65. But they cite no support for this contention; they only cite the '086 patent and the Pre-Trial Order. *Id.* Defendants cannot point to a single case in which a court found a terminal disclaimer that was filed to obviate an obviousness-type double patenting issue to be ineffective.

204. Defendants argue that "Boehringer's terminal disclaimer does not couple the expiration date of the '812 patent to the expiration date of the '086 patent," and that Boehringer allegedly "obtained a 24-week time-wise extension of patent life of the '812 patent beyond the '086 patent." DFF at ¶¶ 62, 68. The only period separating the expiration dates of the '086 and '812 patents, however, is the 1,564-day term extension Boehringer obtained under Section 156. *See* PFF at ¶¶ 101-104. Defendants have never contested that Boehringer rightfully obtained such extension. In *Merck*, 482 F.3d at 1323, the Federal Circuit confirmed that the mere fact that the expiration dates of a terminally disclaimed patent and the original patent were separated by an extension granted under Section 156 did not change the fact that "[t]he purpose of the terminal disclaimer—to prevent extension of patent term for subject matter that would have been obvious over an earlier filed patent—remains fulfilled." *Id.*; *see also King Pharmaceuticals v. Teva Pharms., Inc.*, 409 F. Supp. 2d 609 (D. N.J. 2006).

205. Defendants argue that "[t]he terminal disclaimer only gives up ... a substantially narrower set of rights than if Boehringer had disclaimed five-and-a-half months of its original patent life." DFF at ¶ 62. Defendants ignore the fact that the only rights covered by the '086 patent

were either (1) included within the set of rights Boehringer disclaimed, (2) or could not have been practiced under FDA regulations. *See* 35 U.S.C. § 156(b); PSFF at ¶ 199.

206.    Defendants argue that "Boehringer's terminal disclaimer did not state that the later '812 patent 'shall be enforceable only for and during such period that said patent is commonly owned' with the patent which formed the basis for the double patenting." DFF at ¶ 69. The terminal disclaimer clearly indicates that the '086 and '812 patents are commonly owned, however, and the PTO has accepted the disclaimer. *See* TX 548 at 1. Moreover co-ownership is undisputed as Defendants admit that Boehringer Ingelheim International GmbH is the assignee and record owner of both the '812 and '086 patents. *See* PFF at ¶¶ 8, 12. Finally, no court ever has held that the mere fact that a terminal disclaimer does not contain the statement Defendants recite renders the disclaimer ineffective for any purpose.

**F.    Materially Different Uses Pursuant To MPEP § 806.05(h)**

207.    The uncontested evidence at trial established that MIRAPEX® is effective in the treatment of RLS. *See* PFF at ¶ 119. Defendants' suggestion that other drugs may be as good as MIRAPEX® simply does not address the fact that MIRAPEX® is indisputably effective in treating RLS, which is a materially different use than those claimed in the '086 patent. *See* DFF at ¶¶ 94-97.

208.    Defendants offered no response to Boehringer's evidence that pramipexole is effective in the treatment of RLS. In fact, both Barr's expert Dr. Mailman and Dr. Olanow confirmed that placebo-controlled, clinical studies have shown that pramipexole is effective in treating RLS, and that the FDA approved pramipexole as being safe and effective for the treatment of moderate-to-severe RLS based upon such studies. *See* Trial Tr. (Vol. 3), D.I. 208, at 655:7-16; *see also* Trial Tr. (Vol. 1), D.I. 206, at 69:14-17. Furthermore, even prior to FDA approval, pramipexole was a leading therapy in the treatment of RLS. *See* TX 469; Trial Tr. (Vol. 1), D.I. 206, at 66:6-67:13.

209.  Defendants had no response to the evidence Boehringer elicited at trial indicating that RLS affects a fundamentally different patient population and is symptomatically distinct from the medical conditions identified in the claims of the '086 patent; that the mechanism of action of pramipexole for the treatment of RLS differs from the mechanism of action used to treat Parkinson's disease; and that pramipexole satisfied a long-felt need in the treatment of RLS. *See* Trial Tr. (Vol. 1), D.I. 206, at 60:10-61:11; 67:20-69:17; 74:12-75:21; 79:3-6.

210.  Instead, Defendants contend, in DFF 88-91, that one skilled in the art as of December 1984, would have expected that pramipexole could be used to treat RLS. *See* DFF at ¶¶ 88-91. Defendants' contention is based solely on the testimony of Dr. Mailman and is not supported by the record. *See id.*

211.  The '086 patent, which claims methods of using pramipexole to treat various diseases (including Parkinson's disease, schizophrenia, lowering blood pressure and lowering heart rate), does not mention RLS. *See* TX 286. According to Dr. Mailman, only a physician or person with a legally mandated power to prescribe drugs could practice the methods of treatment listed in the '086 patent. *See* Trial Tr. (Vol. 3), D.I. 208, at 686:21-687:6. Dr. Mailman is not a medical doctor and is not legally allowed to prescribe medicine to patients. *See id.* at 654:12-20.

212.  Even though he is not able to prescribe medication, Dr. Mailman testified that the idea that pramipexole could be used to treat RLS would have been expected to one skilled in the art in December 1984. *See* DFF at ¶ 91. Initially, while relevant to secondary indicia of non-obviousness with regard to unexpected results, the question of whether or not pramipexole's usefulness to treat RLS could have been expected in 1984 is irrelevant to the primary question at hand – whether there are multiple, materially different uses for pramipexole within the meaning of MPEP § 806.05(h).

213. In addition, Dr. Mailman's opinion is premised on a single letter to the editor reporting anecdotal observations – not results from a clinical study – involving bromocriptine. *See* Trial Tr. (Vol. 3), D.I. 208, at 679:16-680:17. The letter to the editor reported on the administration of bromocriptine to 3 people, but the course of treatment was not blinded, the sample size was de minimis, and no placebo control was used. *See id.* at 679:16-681:19. Those missing attributes are the hallmarks of appropriate clinical trials with regard to clinical efficacy. *See* Trial Tr. (Vol. 1), D.I. 206, at 64:5-66:5.

214. Moreover, Dr. Mailman's testimony relies solely on a letter to the editor – a publication that the FDA has determined is not appropriate for drawing conclusions about efficacy. The FDA's draft guidance on the subject indicates that pharmaceutical companies may not distribute to physicians letters to the editor for purposes of educating them on unapproved uses for approved drugs. *See* Trial Tr. (Vol. 3), D.I. 208, at 682:9-684:2.

215. The Court instead credits Dr. Olanow's testimony that pramipexole's usefulness to treat RLS could not have been predicted from its usefulness in treating the conditions contained in the claims of the '086 patent (Trial Tr. (Vol. 1), D.I. 206, at 75:22-77:18), nor could it have been predicted by one of skill in the art in December 1984. *See id.* at 112:4-18.

216. In DFF 72 and 73, relying on Drs. Mailman and Olanow, Defendants assert that pramipexole has not been proven to be neuroprotective. *See* DFF at ¶¶ 72, 73. That contention is inconsistent with statements Dr. Mailman made prior to trial and outside the context of this lawsuit. Thus, in a peer-reviewed article published in a leading journal in 2006, Dr. Mailman indicated that pramipexole has neuroprotective properties. *See, e.g.,* TX 547; Trial Tr. (Vol. 3), D.I. 208, at 674:19-675:14. According to Dr. Mailman, "recent imaging data demonstrated that PD patients treated with ropinirole or pramipexole may demonstrate more residual presynaptic dopamine

62

transporter binding compared to patients treated with levodopa only, suggestive of a neuroprotective

effect…" TX 547 at 346; Trial Tr. (Vol. 3), D.I. 208, at 674:19-675:14. In addition, according to

Dr. Mailman:

> [a]lthough pramipexole alleviates parkinsonian symptoms by directly acting
> on dopamine receptors, *its neuroprotective effects do not appear to be*
> *mediated by dopamine receptors* […] These results suggest that pramipexole
> exhibits additional activities (e.g., antioxidant effects) in addition to its
> receptor-mediated antiparkinson effects.

TX 547 at 348 (emphasis supplied).

217. Thus, both Drs. Mailman and Olanow agree that the available evidence indicates that

pramipexole is neuroprotective. *See* Trial Tr. (Vol. 1), D.I. 206, at 54:21-55:12; 96:21-111:21; Trial

Tr. (Vol. 3), D.I. 208, at 674:19-675:14; TX 460; TX 465; TX 461; TX 467; TX 547. Irrespective

of whether there is definitive evidence of pramipexole's usefulness as a neuroprotective agent, the

unrebutted evidence at trial established that the notion that pramipexole might be neuroprotective

has influenced physicians' prescribing behavior. *See* Trial Tr. (Vol. 1), D.I. 206, at 104:10-105:13.

218. Drs. Olanow and Mailman agree that one in the field in 1984 could not have predicted

that pramipexole would be a neuroprotective agent from the claims of the '086 patent. *See* Trial Tr.

(Vol. 1), D.I. 206, at 111:22-112:18; Trial Tr. (Vol. 3), D.I. 208, at 677:13-17 (Dr. Mailman

testifying that "[f]rank neuroprotection which is a complete arresting or reversal of the disease

process would not have been expected from just the symptomatic treatment [of Parkinson's

disease]").

219. In DFF 74 and 75, Defendants assert that pramipexole is not effective in treating

fibromyalgia and it has not satisfied any long-felt need to treat fibromyalgia. *See* DFF at ¶¶ 74, 75.

Defendants' assertion is contrary to the evidence presented at trial.

220. Pramipexole has been shown to be effective in treating fibromyalgia and Defendants

offered no evidence to the contrary. *See* Trial Tr. (Vol. 1), D.I. 206, at 54:21-55:12; TX 485; TX

63

484. Thus, Dr. Mailman offered no testimony on the subject. *See* Trial Tr. (Vol. 3), D.I. 208, at 613:2-715:14. It was uncontested at trial that a prospective, randomized placebo-controlled trial indicated that pramipexole is effective in the treatment of fibromyalgia. *See* Trial Tr. (Vol. 1), D.I. 206, at 88:22-89:11, 89:22-91:17; TX 485. █████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████ Furthermore, in 1984, one in the field could not have predicted pramipexole's usefulness to treat fibromyalgia, and Defendants offered no evidence to the contrary. *See* Trial Tr. (Vol. 1), D.I. 206, at 95:6-11; 112:4-18; Trial Tr. (Vol. 3), D.I. 208, at 613:19-715:19.

221. In DFF 76-78 and 84-86, Defendants assert that pramipexole has not been proven to be effective in treating depression and that it would not have been unexpected that pramipexole had anti-depressant activity as of December 1984. *See* DFF at ¶¶ 76-78, 84-86. Defendants' assertions are contrary to the record.

222. At trial, Drs. Olanow and Mailman both testified that pramipexole is effective in treating depression. *See* Trial Tr. (Vol. 1), D.I. 206, at 54:21-55:12, 79:13-80:10; Trial Tr. (Vol. 3), D.I. 208, at 655:17-656:10. Likewise, Drs. Olanow and Mailman both testified that double-blind trial in patients suffering from depression showed that pramipexole is effective to treat endogenous depression. *See* Trial Tr. (Vol. 1), D.I. 206, at 79:13-81:12; Trial Tr. (Vol. 3), D.I. 208, at 655:23-656:10; *see also* TX 486.

223. Relying on Dr. Mailman, Defendants assert that several studies published before December 1984 indicate that bromocriptine had been tested as a potential treatment for depression. *See* DFF at ¶ 84. Defendants then conclude that the notion that pramipexole could be used to treat

depression would have been expected to one of skill in the art as of December 1984. *See id.* at ¶¶ 85-86.

224. Defendants' assertions are not supported by the evidence. The Defendants ignore the fact that the studies on which Dr. Mailman relies involved one compound (bromocriptine), and that there was certainly no indication that all dopamine agonists could effectively treat depression as of December 1984. *See* Trial Tr. (Vol. 1), D.I. 206, at 86:11-87:16. Moreover, bromocriptine is an ergot dopamine agonist, as opposed to pramipexole, which is a non-ergot dopamine agonist. *See id.* Thus, even if bromocriptine had been established to treat depression effectively as of December 1984, there was not sufficient evidence for a person skilled in the art to know that pramipexole could be used to treat depression. *See id.*

225. In DFF 79, relying on Dr. Mailman, Defendants contend that a person skilled in the art in December 1984 would conclude that pramipexole is a dopamine agonist based on the conditions (Parkinson's disease, schizophrenia, lowering heart rate and lowering blood pressure) listed in the '086 patent. *See* DFF at ¶ 79. Defendants further contend that in December 1984, the drugs known to be effective in treating Parkinson's disease were dopamine agonists and that as of December 1984, dopamine agonists were thought to potentially treat schizophrenia and lower heart rate and blood pressure. *See id.* at ¶¶ 80-83.

226. The Court finds that Dr. Mailman's opinions on that subject are not credible. Dr. Mailman admitted that in the 1980s, the most widely used class of compounds to lower heart rate and blood pressure were beta-blockers, not dopamine agonists. *See* Trial Tr. (Vol. 3), D.I. 208, at 688:7-22. Dr. Mailman also admitted that "very well-known scientists" theorized in the 1980's that beta-blockers could be used to treat schizophrenia. *See id.* at 688:23-689:6. Dr. Mailman further

testified that he was not aware of a dopamine agonist that was approved for treating hypertension or lowering heart rate as of the mid-1980's. *See id.* at 692:21-693:13.

227. Dr. Mailman's opinions also conflict with those expressed by Dr. Olanow, who is a leading neurologist, and who testified that one skilled in the art as of 1984 could not predict that pramipexole was a dopamine agonist based on the medical conditions listed in the '086 patent. *See* Trial Tr. (Vol. 1), D.I. 206, at 112:4-115:15. Dr. Mailman's opinions also conflict with Dr. Olanow's testimony that even if one of skill in the art knew that pramipexole was a dopamine agonist, they could not predict that it would be effective in treating the conditions listed in the '086 patent. *See id.* at 113:14-115:16.

228. Defendants contend that scientists in the mid-1980's theorized that dopamine agonists could be used to treat schizophrenia. *See* DFF at ¶ 82. Defendants' contention is based on Dr. Mailman's testimony regarding studies involving apomorphine (a dopamine agonist) and pergolide (another dopamine agonist), that were completed in 1978 and 1982 and involved the treatment of schizophrenia. *See* Trial Tr. (Vol. 3), D.I. 208, at 626:5-629:14. The theory that dopamine agonists could treat schizophrenia, however, had been disproven by 1984. *See id.* at 702:22-706:21. Thus, a study published in May 1984 concluded that there was "no antipsychotic potential for [apomorphine.]" *See id.* at 706:7-21.

229. Accordingly, the Court finds that one skilled in the art in December 1984 would not conclude that pramipexole is a dopamine agonist based on the conditions listed in the '086 patent. *See supra* at ¶¶ 225-228.

230. In DFF 81, Defendants suggest that one skilled in the art in 1984 likely would have concluded that pramipexole was a dopamine agonist simply by looking at its chemical structure. *See* DFF at ¶ 81. The Court also finds that this contention is not credible.

66

231. Dr. Mailman admitted on cross-examination that dopamine agonists pramipexole, apomorphine, and bromocriptine have substantially different chemical structures and sizes. *See* Tr. (Vol. 3), D.I. 208, at 708:14-709:17.

232. Dr. Mailman also provided sworn testimony in another patent case involving a pharmaceutical product with dopaminergic properties to the effect that "[e]ven [today], we know that these types of molecules act on multiple receptor sites in the central nervous system, and even today, we cannot yet predict how a molecule will act on each of these other receptors when simple atomic substitutions are made." *See* Tr. (Vol. 3), D.I. 208, at 710:1-16. Dr. Mailman also attested that as "a researcher working in the field of dopamine receptor research today, my view is that one still cannot predict whether a variation in the structure of a compound will alter its interaction with a receptor site until one conducts the appropriate testing." *See id.* at 710:17-711:1. Finally, Dr. Mailman admitted that "even though researchers are getting better at predicting behavior of compounds at various central nervous receptor sites, one still cannot predict what new compounds will have desired properties at each receptor of interest." *See id.* at 711:2-11.

233. Accordingly, the Court finds that one skilled in the art in December 1984 would not conclude that pramipexole is a dopamine agonist based on its chemical structure.

## SUPPLEMENTAL CONCLUSIONS OF LAW

**I.    INFRINGEMENT**

63. In DCOL 200-203, Defendants contend that Boehringer is estopped from asserting that claim 5 encompasses pramipexole merely because it did not include claim 5 in the application for patent term extension. *See* DCOL at ¶¶ 200-203 (citing *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995)). But "for prosecution disclaimer to attach [the Federal Circuit's] precedent requires that the alleged disavowing actions or statements made during prosecution be both clear and unmistakeable." *Cordis Corp. v. Medtronic Ave. Inc.*, 511 F.3d 1157,

1177 (Fed. Cir. 2008). As Defendants' failure to allege noninfringement of claim 5 until post-trial demonstrates, the mere omission of claim 5 from the application for extension is not a clear or unmistakable disclaimer.

64.    The Court finds that the Defendants did not timely disclose their assertion that they contest infringement with respect to claims 5, 9, and 10. *See* FED. R. CIV. P. 26(e) and 36(c); *see also* PSFF at ¶¶ 159-163. Accordingly, Defendants have waived their right to contest infringement of claims 5, 9, and 10 of the '812 patent. *See id.*; *see also Transclean Corp. v. Bridgewood Servs., Inc.*, 290 F.3d 1364, 1374 (Fed. Cir. 2002).

65.    The Court further finds that the unrebutted testimony at trial established that pramipexole falls within claim 5, and therefore, Defendants' reliance on *Southwall Techs.* is misplaced. *See* PFF at ¶¶ 90-93; PSFF at ¶¶ 164-166.

66.    The Court finds that a mere failure to include claim 5 in the application for patent term extension is not an estoppel that would preclude Boehringer from asserting infringement with regard to claim 5. Indeed, the rationale for including claim 3 as encompassing pramipexole also applies to claim 5. *See* PSFF at ¶ 164. In addition, the Court finds that Defendants never rebutted Dr. Klibanov's testimony that Defendants' pramipexole products would infringe claims 9 and 10 even if those claims were limited to the free base forms. *See* PSFF at ¶ 168.

## II.    DOUBLE PATENTING

### A.    Any Alleged Obviousness-Type Double Patenting Was Cured By The Terminal Disclaimer

67.    Defendants argue that the Terminal Disclaimer is invalid because it was filed after the expiration of the '086 patent, but cite no case in which any court reached such a result. Indeed, in the cases cited by Defendants, there was no patent term extension at issue. *See In re Lonardo*, 119 F.3d 960 (Fed. Cir. 1997); *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955 (Fed. Cir. 2001).

68.    Defendants' argument is foreclosed by the Federal Court's decision in. *Merck*, 482 F.3d at 1324, where the Federal Circuit held that "a patent term extension under Section 156 may be applied to a terminally disclaimed patent."

69.    Section 156 mandates that a patent term "shall be extended" if the specified requirements are met. 35 U.S.C. § 156. The statute does not include any requirement that the patent be terminally disclaimed prior to the patent term extension, if at all. *See id.*

70.    Contrary to Defendants' contention, "identity" of rights is not the test for whether a terminal disclaimer is able to cure double patenting – in the context of a patent term extension, the only criterion articulated by the Federal Circuit with respect to a terminal disclaimer for an extended patent is that "the date from which any Hatch-Waxman extension is computed is the terminally disclaimed date." *Merck*, 482 F.3d at 1323. Boehringer's terminal disclaimer indisputably satisfied that criteria – the 1,564-day extension is now calculated from "the terminally disclaimed date," here the expiration date "of the '086 patent." PFF at ¶ 104.

71.    Boehringer's patent term extension on the '812 patent confers upon Boehringer the right to exclude others from making, using, or selling pramipexole for any FDA-approved use. *See* 35 U.S.C. § 156(b). Both Barr and Mylan have attempted to copy MIRAPEX® and seek approval to sell their generic copies for an FDA-approved use. *See* PFF at ¶¶ 14, 16, 131; TX 406 at 1-2; TX 509 at 1-2. The Defendants' ANDA filings accordingly fall squarely within the ambit of what they concede Boehringer had a legitimate right to exclude under the terms of the patent term extension. *See* Def. Br. at 23.

72.    Defendants do not cite to any case, nor is there a case that has found a terminal disclaimer to be ineffective merely because it did not include an express statement that the terminally disclaimed and the reference patents are commonly owned.

73.     At any rate, Defendants admit that Boehringer Ingelheim International GmbH is the assignee and record owner of both the '812 and '086 patents. *See* D.I. 190, at Ex. 1, ¶ 5; TX 426; TX 546. Thus any alleged requirement of common ownership under 37 C.F.R. § 1.321(c)(3) would be met in this instance.

74.     Contrary to Defendants' contentions, neither Congress nor the courts have fashioned any temporal limit on a patentee's ability to file a terminal disclaimer. *See* 35 U.S.C. § 253; *Perricone v. Medicis Pharma. Corp.*, 432 F.3d 1368, 1375 (Fed. Cir. 2005); *Bayer AG v. Barr Labs, Inc.*, 798 F. Supp. 196, 197-98 (S.D.N.Y. 1992); *Bott v. Four Star Crop.*, 675 F. Supp. 1069 (E.D. Mich. 1987); *Technicon Instruments Corp. v. Coleman Instruments, Inc.*, 255 F. Supp. 630, 636, 641 (N.D. Ill. 1966).

75.     In *CMI Corp. v. Lakeland Constr. Co.*, 184 USPQ 721, 727 (N.D. Ill. 1975), although the district court was "concerned" with the patentee's delay in filing the terminal disclaimer, the court rested its decision on the rule that a terminal disclaimer cannot obviate same invention-type double patenting – not at issue here. It did not find that the terminal disclaimer was ineffective because of the timing of its execution. *Id.*

76.     In *Technicon*, 255 F. Supp. 630, the patentee filed a terminal disclaimer after a bench trial. *See* 255 F. Supp. at 636. The district court concluded that the post-trial terminal disclaimer "eliminates any extension of monopoly," and that "the second issued patent is not invalid." *Id.* at 641.

**B.     Defendants Waived Their Right To Assert A Double Patenting Defense**

77.     Defendants did not timely disclose the facts and arguments relied upon in their Findings of Fact and Opening Post Trial Brief and thus are precluded from relying on them. *See* FED. R. CIV. P. 26(e)(1); FED. R. CIV. P. 37(c)(1); *Transclean Corp. v. Bridgewood Servs., Inc.*, 777 F. Supp. 2d 1045 (D. Minn. 1999).

78.    Preclusion of Defendants' double patenting arguments is automatic unless Defendants can show either substantial justification or harmlessness. *See American Stock Exchange, LLC v. Mopex, Inc.*, 2002 US DIST LEXIS 25085, *15 (S.D.N.Y. 2002) ("absent a determination of either substantial justification or harmlessness, the pertinent provision [of Rule 37(c)(1)] is described as taking 'automatic' effect."). The Defendants have shown neither harmlessness nor a substantial justification for their failure to disclose these arguments within the required time frame. *See* D.I. 215, at 8-10. Nor could their failure be deemed harmless or justified. *See id.* Boehringer was unable to conduct discovery relevant to these belatedly-disclosed arguments. *See Transclean*, 290 F.3d at 1374 ("The court found clear prejudice to Transclean, as it was precluded from conducting discovery on the infringement issues.").

**C.    Even Assuming They Were Not Waived, Defendants' Arguments Are Without Merit**

79.    Under the plain language of 35 U.S.C. Section 101, "[w]hoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor . . . ." 35 U.S.C. § 101. Notably, Congress defined the term "process" to mean a "process, art or method, and [it] includes a new use of a known . . . composition of matter, or material." 35 U.S.C. § 100(b). Thus, Congress long ago determined that a compound and a method of using it are *not* a single invention. *See id.*; *see also Studiengesellschaft Kohle mbH v. Northern Petrochemical Co.*, 784 F.2d 351, 354 (Fed. Cir. 1986) ("because the two patents claim different statutory classes of subject matter, composition and process, they are not the same invention").

80.    Defendants contend that the claims in the '086 and '812 patents are not patentably distinct. *See* DCOL at ¶¶ 152-155. Defendants' contention is based entirely on their claim that the Federal Circuit, in *Geneva*, 349 F.3d 1373 and *Pfizer, Inc. v. Teva Pharms. USA, Inc.*, 518 F.3d

71

1353 (Fed. Cir. 2008), broadly held that compounds and methods of use constitute a single invention for which only one patent may be granted. *See id.* Defendants further rely on *In re Byck*, 18 C.C.P.A. at 1210, 1211 and *In re Christmann*, 29 C.C.P.A. at 1038. *See id.* Defendants' reliance on this line of cases is misplaced.

81.     Each of the cases on which Defendants rely involved compounds with only a single utility; none held that a compound and a method of use could never constitute separate inventions. *See* DCOL at ¶¶ 152-155; *see also Geneva Pharms. v. GlaxoSmithKline PLC*, 349 F.3d 1373 (Fed. Cir. 2003) ("Fleming's written description discloses a single utility of that compound as administration to a human in amounts effective for inhibiting beta-lactamase. The '720 patent claims nothing more than Fleming's disclosed utility as a method of using the Fleming compound"); *Teva Pharms. USA, Inc.*, 518 F.3d at 1363 ("we agree with the district court that the '068 patent merely claims a particular use described in the '165 patent of the claimed compositions of the '165 patent"); *In re Byck*, 18 C.C.P.A. at 1210, 1211 ("Of course he might have disclosed a use of the invention which, together with other elements might have constituted a separate invention for which he would be entitled to a patent"); *In re Christmann*, 29 C.C.P.A. at 1038 ("The only utility shown in the record was as an insecticide").

82.     The compounds disclosed in the '812 patent have multiple medical uses, including for the treatment of conditions beyond those set forth in the '086 patent claims. *See* PFF at ¶¶ 108, 110.

83.     Defendants' theory fails for other reasons as well. In *Astellas Pharma, Inc. v. Ranbaxy Inc.*, 2007 WL 576341, *5 (D.N.J. 2007) (vacated pursuant to settlement agreement) the court explained that it was "contrary to the law of obviousness-type double patenting" to compare the later compound claims "with the compounds merely named as part of the [earlier] claimed

process." Thus, Defendants' theory "violates the fundamental rule of claim construction, that what is claimed is what is defined by the claim *taken as a whole*, every claim limitation (here each step) being material." *General Foods Corp. v. Studiengesellschaft Kohle GmbH*, 972 F.2d 1272, 1280 (Fed. Cir. 1992); *see also Ranbaxy*, 405 F. Supp. 2d at 512 ("specific attention must be given to what is claimed in the earlier patent").

84.     Defendants' theory that "claims directed to compounds (the '812 claims) are not patentably distinct from claims directed to methods of using the same compounds (the '086 claims)" because they allegedly "are disclosed in the earlier patent" is equally misplaced. As the Federal Circuit has emphasized, such a hindsight analysis is impermissible:

> [o]ur precedent makes clear that the disclosure of a patent cited in support of a double patenting rejection cannot be used as though it were prior art, even where the disclosure is found in the claims.

*General Foods*, 972 F.2d at 1281.

85.     Claims directed to different statutory subclasses cannot anticipate one another because, as the Federal Circuit's predecessor held, the four statutory categories of statutory subject matter cannot be species or genera of each other:

> [I]n patent law it is axiomatic if claims are to be considered as being in the same genus and species relationship, they must fall into the same statutory class.... Clearly the apparatus claims of appellants can not be considered to be species of any method claims, because the invention defined by the claims are in different statutory classes. Each method claim herein includes the limitation of 'discontinuing' the energy applied to the heating element, and no such limitation appears in the apparatus. Therefore, it is not possible to designate the apparatus claims as species of any allowed method claim.

*In re Bronson*, 168 F.2d 548, 550-551 (C.C.P.A. 1948) (affirming decision that claims to an apparatus should be prosecuted in a separate application from the claims directed to methods of using the same apparatus).

86.    Moreover, "the *disclosure* of a patent cited in support of a double patenting rejection cannot be used as though it were prior art, *even where the disclosure is found in the claims*." *General Foods*, 972 F.2d at 1281 (emphasis in original).

87.    Neither *Metoprolol* nor *Geneva* have overruled or modified this canon of double patenting jurisprudence. *See In re Metoprolol Succinate Patent Litig.*, 494 F.3d 1011, 1019 (Fed. Cir. 2007) ("[t]he disclosure of the claims forming the basis of a double patenting rejection cannot be used as 'prior art' for a rejection under 35 U.S.C. § 102, 103."); *Geneva*, 349 F.3d at 1385 ("[b]ecause nonstatutory double patenting compares earlier and later claims, an earlier patent's disclosure is not available for nonstatutory double patenting").

88.    Thus, the Court cannot find double patenting on the basis that the compounds claimed in the '812 patent are mentioned in certain claims of the '086 patent. *See Metoprolol*, 494 F.3d. at 1019; *Geneva*, 348 F.3d at 1385; *General Foods*, 972 F.2d at 1280-81; *Astellas*, 2007 WL 576341, at *5.

89.    Defendants' assertion that the '812 patent allegedly extends the term of the '086 patent claims – while legally incorrect – is also not evidence of double patenting. Thus, the fact that a later patent allegedly dominates a prior patent is not indicative of double patenting. *See Studiengasellschaft*, 972 F.2d at 1279 ("as a matter of law the extension of protection objection is not necessarily controlling [in a double patenting analysis]"); *Bayer AG v. Dr. Reddy's Labs.*, 518 F. Supp. 2d 617, 639 (D. Del. 2007) ("domination is not *per se* double patenting").

**D.    Materially Different Uses Pursuant To MPEP § 806.05(h)**

90.    "While the MPEP does not have the force of law, it is entitled to judicial notice as an official interpretation of statutes or regulations as long as it is not in conflict therewith." *In re Beasley*, 117 Fed. Appx. 739, 744 n. 7 (Fed. Cir. 2004).

91.     Federal Circuit precedent regarding the applicable standard for determining whether claims to compounds are patentably distinct from claims to methods of use does not conflict with the standard applied by the USPTO as set forth in MPEP § 806.05(h). *See supra* at ¶¶ 79-89.

92.     Courts have adopted the nearly identical standards for distinctness set forth in MPEP §§ 806.05(e) and (f) in evaluating claims of double patenting. *See, e.g. Astellas*, 2007 WL 576341, at *8 (adopting the standard set forth in MPEP § 806.05(f) applicable to the determination of whether compound claims are patentably distinct from claims to processes of making the compounds); *Applied Materials, Inc. v. Advanced Semiconductor Materials America, Inc.*, 98 F.3d 1563, 1577-78 (Fed. Cir. 1996) (applying the test set forth in MPEP § 806.05(e) for the patentablity of an apparatus over a method of using the apparatus); *Takeda Pharma. Co. v. Dudas*, 511 F. Supp. 2d 81, 96 (D.D.C. 2007) (acknowledging and finding support for its holding in the test set forth in MPEP § 806.05(f) for double patenting of process claims over product claims).

E.     **Section 121 Precludes The Use Of The '086 Patent As A Reference**

93.     In DCOL 178-182, Defendants imply that the '812 patent was not filed as a result of a restriction requirement and that the '812 patent was not filed before the issuance of the '374 patent. *See* DCOL at ¶¶ 178-182. Defendants have misstated the law as it relates to restriction requirements.

94.     Pursuant to 35 U.S.C. § 121 "an application filed as a result of such a requirement, shall not be used as a reference" against a divisional of that application. *See* 35 U.S.C. § 121; *Geneva*, 349 F.3d at 1378 ("Thus, if the 2000/01 patents and the '720 patent trace their lineage back to a common parent which was subject to a restriction requirement, then § 121 intervenes to prevent a nonstatutory double patenting rejection").

95.     Thus, § 121 focuses on the patent that is purportedly being used "as a reference," not the patent to which it is being used as a reference against. *See* 35 U.S.C. § 121. Had Congress

75

intended the statute to operate in the manner Defendants suggest, it would have required the divisional application to be filed before the issuance of the patent on the "*original* application." *See id.* It instead chose to merely require that the divisional be filed before a patent issues on the "*other* application." *See id.*

96.    Here, the "reference" cited by the Defendants is the '086 patent, which was filed "as a result" of the restriction requirement imposed during the prosecution of the '947 application. *See* PCOL at ¶¶ 47-48.

97.    The '671 application and the resulting '812 patent, along with the '197 application and the resulting '086 patent, "trace their lineage back to a common parent [the '374 patent] which was subject to a restriction requirement," such that Section 121 "intervenes to prevent a nonstatutory double patenting rejection." *Geneva*, 349 F.3d at 1378; PFF at ¶¶ 37, 51, 54.

98.    The record establishes that the '671 application and the resulting '812 patent were also filed "as a result of" the restriction requirement given that the amendments to the '671 application were made to conform to the restriction requirement. *See* PCOL at ¶¶ 49, 50. By amending the claims of the '671 application for the purpose of conforming to the restriction requirement, the '671 application itself was filed "as a result of" a restriction requirement. *See Union Carbide Corp. v. Dow Chemical Co.*, 619 F. Supp. 1036, 1060 (D. Del. 1985); PCOL at ¶¶ 49, 50.

99.    For purposes of evaluating consonance, claims are entitled to the benefit of § 121 if they do not cross the line of demarcation drawn around the invention elected in the restriction requirement. PCOL at ¶¶ 53-54.

100.    The applicants acted in a manner that was consonant with the election made in response to the restriction requirement. The applicants never "crossed the line" of that election,

deleting subject matter claimed in the '374 patent from both of the subsequent divisional applications and the resulting '086 and '812 patents. *See* PCOL at ¶¶ 55-57.

101.    Furthermore, while claims 9 and 10 were added in the course of prosecution, that circumstance does not impact the applicability of § 121. *See Applied Materials*, 98 F.3d at 1568 ("In this case, consonance was not violated, for the process claims remained in separate patents from the apparatus claims *although the scope of the process claims was modified*.") (emphasis supplied); *Opticon*, 935 F.2d at 1579 ("new or amended claims in a divisional application are entitled to the benefit of § 121 if the claims do not cross the line of demarcation drawn around the invention elected in the restriction requirement").

102.    "Noncompliance with [a] consonance requirement is normally detected by the PTO examiner." *Gerber Garment*, 916 F.2d at 685-86. The Court finds that in this case,  Examiner Gerstl never suggested that any action taken by the applicants in the course of the prosecution of the '197 and '671 applications was not consonant with the restriction requirement. *See* PFF at ¶¶ 37-66; PCOL at ¶ 58.

**F.    Secondary Considerations Support The Conclusion That The Claims Of The '812 Patent Are Patentably Distinct From Those Of The '086 Patent**

103.    Federal Circuit case law allows, but does not require, consideration of objective indicia of non-obviousness to rebut a double patenting claim. *See, e.g. Geneva*, 349 F.3d at 1378 n.1; *In re Emert*, 124 F.3d 1458, 1462 (Fed. Cir. 1997).

104.    In DCOL ¶ 185, Defendants incorrectly suggest that the Federal Circuit's decisions in *Geneva* and *Procter & Gamble Co. v. Teva Pharm. USA, Inc.*, 536 F. Supp. 2d 476 (D. Del. 2008), somehow preclude the Court from considering secondary indicia. In *Geneva*, the Federal Circuit observed "[o]bviousness *requires* an inquiry into objective criteria suggesting non-obviousness; nonstatutory double patenting does not." *See* 349 F.3d at 1377 n.1 (emphasis

77

supplied); *see also* Def. Evid. Brief, at 2.  Thus, under *Geneva*, evaluation of secondary indicia is not required in a double patenting analysis; nor is it prohibited.

105.    Defendants misstate the holding by this Court in *Procter & Gamble*, 536 F. Supp. 2d 476.  In that case, this Court held that "Teva [had] not established by clear and convincing evidence that the relevant claims of the [challenged] patent are patentably indistinct from [the] claim [] of the [prior patent], and therefore the [challenged patent] is not invalid under the doctrine of obviousness-type double patenting." *Id.* at 498.  Because Teva failed to meet its burden, it was unnecessary to consider or evaluate the secondary indicia. *See id.*

106.    The cases Defendants cite, in support of their contention are inapposite to the consideration of secondary indicia in this case.  *See In re Christmann*, 128 F.2d 596, at *passim* (C.C.P.A 1942) ("[t]he situation here presented is not one in which a substance which is known to be useful for some purposes is found to be unexpectedly useful for another, unrelated purpose.") (internal citation omitted); *In re Byck*, 48 F.2d 665, 666-67 (C.C.P.A 1931) (secondary indicia were not raised and not addressed); *Teva Pharms. USA, Inc.*, 518 F.3d at 1363, n.8  (same).

107.    Boehringer's evidence showing secondary indicia is legally relevant to the double patenting inquiry and, at minimum, admissible under FRE 402.  *See* FED. R. EVID. 402 ("All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, or by other rules prescribed by the Supreme Court pursuant to statutory authority.").

108.    Defendants imply that Boehringer's evidence of nonobviousness is not commensurate with the scope of the claims of the '812 patent.  *See* DCOL at ¶ 188.  The Court finds Defendants' suggestion to be misplaced.

109.    First, this Court has distinguished the cases upon which Defendants rely in finding that "the question is not whether the evidence of commercial success is 'commensurate in scope with the claims,' but rather whether the evidence is relevant to the question of nonobviousness." *E.I. DuPont de Nemours & Co. v. Phillips Petroleum Co.*, 656 F. Supp. 1343, 1371 (D. Del. 1987), *aff'd in part and rev'd in part on other grounds*, 849 F.2d 1430, 1431 (Fed. Cir. 1988).

110.    Second, under *Applied Materials*, 98 F.3d at 1570, "a patentee need not show that all possible embodiments within the claims were successfully commercialized in order to rely on success in the marketplace of the embodiment that was commercialized." Thus, contrary to Defendants' assertion, the Federal Circuit has held that it is not necessary for a patentee to establish that every theoretical embodiment of the claims must have been commercialized successfully. *See, e.g., id.*; *see also Gillette Co. v. S.C. Johnson & Son, Inc.*, CA Nos. 83-2657-N, 83-3201-N, 1989 U.S. Dist. LEXIS 8880, *135 (D. Mass. July 31, 1989) ("the question before me is not whether the improved results are commensurate with the scope of the claims; it is to determine how the evidence effects the question of whether the claimed subject matter as a whole was obvious. The evidence is not to be discounted or ignored or disregarded because it is not commensurate with the scope of the claims").

111.    The Court concludes that the evidence at trial established that one of skill in the art, as of December 1984, would not have expected that pramipexole could be used to treat RLS, fibromyalgia, depression, or that it could be used as a neuroprotective agent. *See* PSFF at ¶¶ 229-230.

112.    Under settled Federal Circuit law, when "a patentee can demonstrate commercial success, usually shown by significant sales in a relevant market, and that the successful product is the invention disclosed and claimed in the patent, it is presumed that the commercial success is due

to the patented invention." *J.T. Eaton & Co. v. Atlantic Paste and Glue Co.*, 106 F.3d 1563, 1571 (Fed. Cir. 1997). "Once [a patentee makes] the requisite showing of nexus between commercial success and the patented invention, the burden shift[s] to [the defendant] to prove that the commercial success was instead due to other factors extraneous to the patented invention." *Ecolochem, Inc. v. Southern Cal. Edison, Co.*, 227 F.3d 1361, 1377 (Fed. Cir. 2000).

113.    Evidence of significant sales and sales growth constitutes evidence of commercial success. *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 348 F. Supp. 2d 713 (N.D. W. Va. 2004); *Glaxo Wellcome, Inc. v. Pharmadyne Corp.*, 32 F. Supp. 2d 265, 302, 303 (D. Md. 1998).

114.    The Court concludes that Boehringer has established that MIRAPEX® has been commercially successful. *See* PFF ¶¶ at 132-134. Moreover, the Court concludes that Defendants have offered only argument, and not evidence, in support of their contention that there is no nexus between the commercial success of MIRAPEX® and the claimed features of the '812 patent. Therefore, the Court concludes that the undisputed evidence at trial established that there is a nexus between the commercial success of MIRAPEX® and the claimed features of the '812 patent. *See id.* at ¶ 134.

<div style="margin-left:40%">

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Jack B. Blumenfeld*

---

Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
1201 North Market Street
P. O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
jblumenfeld@mnat.com
mnoreika@mnat.com

*Attorneys for Plaintiffs*
*Boehringer Ingelheim International GmbH and*
*Boehringer Ingelheim Pharmaceuticals, Inc.*

</div>

80

*Of Counsel*:

Steven C. Cherny
LATHAM & WATKINS LLP
885 Third Avenue, Suite 1000
New York, NY 10022-4834
(212) 906-1200

Kenneth G. Schuler
Amanda J. Hollis
Joel Neckers
LATHAM & WATKINS LLP
Sears Tower, Suite 5800
Chicago, IL 60606
(312) 876-7700

May 14, 2008
2330000

## CERTIFICATE OF SERVICE

I, Jack B. Blumenfeld, hereby certify that on May 14, 2008, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will send notification of such filing to the following:

Mary B. Matterer
MORRIS JAMES LLP

Adam Wyatt Poff
YOUNG, CONAWAY, STARGATT & TAYLOR LLP

I further certify that copies of the foregoing document were also served upon the following in the manner indicated:

### BY ELECTRONIC MAIL and HAND DELIVERY

Mary B. Matterer, Esquire
MORRIS JAMES LLP
500 Delaware Avenue
Wilmington, DE 19801

Adam Wyatt Poff, Esquire
YOUNG, CONAWAY, STARGATT & TAYLOR LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801

### BY ELECTRONIC MAIL and FEDERAL EXPRESS

Glenn J. Pfadenhauer, Esquire
Jessamyn S. Berniker, Esquire
Dov P. Grossman, Esquire
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005-5901

Shannon M. Bloodworth, Esquire
HELLER EHRMAN LLP
1717 Rhode Island Avenue, NW
Washington, DC 20036

Kevin J. Culligan, Esquire
HELLER EHRMAN LLP
Times Square Tower
7 Times Square
New York, NY 10036-6524

*/s/ Jack B. Blumenfeld*

Jack B. Blumenfeld (#1014)

## CERTIFICATE OF SERVICE

I, Jack B. Blumenfeld, hereby certify that on May 21, 2008, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will send notification of such filing to the following:

> Mary B. Matterer
> MORRIS JAMES LLP
>
> Adam Wyatt Poff
> YOUNG, CONAWAY, STARGATT & TAYLOR LLP

I further certify that copies of the foregoing document were also served upon the following in the manner indicated:

### BY ELECTRONIC MAIL and HAND DELIVERY

Mary B. Matterer, Esquire
MORRIS JAMES LLP
500 Delaware Avenue
Wilmington, DE 19801

Adam Wyatt Poff, Esquire
YOUNG, CONAWAY, STARGATT & TAYLOR LLP
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801

### BY ELECTRONIC MAIL and FEDERAL EXPRESS

Glenn J. Pfadenhauer, Esquire
Jessamyn S. Berniker, Esquire
Dov P. Grossman, Esquire
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005-5901

Shannon M. Bloodworth, Esquire
HELLER EHRMAN LLP
1717 Rhode Island Avenue, NW
Washington, DC 20036

Kevin J. Culligan, Esquire
HELLER EHRMAN LLP
Times Square Tower
7 Times Square
New York, NY 10036-6524

/s/ Jack B. Blumenfeld

_____

Jack B. Blumenfeld (#1014)