IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| BOEHRINGER INGELHEIM INTERNATIONAL GMBH and BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | C.A. No. 05-700 (JJF) |
| BARR LABORATORIES, INC., | ) ) | CONSOLIDATED |
| Defendant. | ) ) | **CONFIDENTIAL** |
| | ) ) | **FILED UNDER SEAL** |
| BOEHRINGER INGELHEIM INTERNATIONAL GMBH and BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 05-854 (JJF) |
| MYLAN PHARMACEUTICALS, INC., | ) ) | |
| Defendant. | ) ) | |

## DEFENDANTS' RESPONSIVE POST-TRIAL BRIEF

OF COUNSEL:
Glenn J. Pfadenhauer
Jessamyn S. Berniker
Dov P. Grossman
Brett R. Tobin
Kendra P. Robins
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000

YOUNG CONAWAY STARGATT & TAYLOR, LLP
Adam W. Poff (#3990)
apoff@ycst.com
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
(302) 571-6600

*Attorneys for Defendant Barr Laboratories, Inc.*

OF COUNSEL:
Kevin J. Culligan
Joy Arnold
HELLER EHRMAN LLP
Times Square Tower
7 Times Square
New York, NY 10036
(212) 832-8300

Shannon M. Bloodworth
HELLER EHRMAN LLP
171 Rhode Island Avenue, NW
Washington, DC 20036
(202) 912-2000

Dated: May 14, 2008

MORRIS JAMES LLP
Mary B. Matterer (#2696)
mmatterer@morrisjames.com
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, DE 19899-2306
(302) 888-6960
*Attorneys for Mylan
Pharmaceuticals Inc.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... v

SUMMARY OF ARGUMENT ...................................................................................... 1

ARGUMENT.................................................................................................................. 2

I.  BOEHRINGER MISCONCEIVES THE EFFECT OF ITS UNTIMELY
    DISCLAIMER ...................................................................................................... 2

    A.  Boehringer Ignores the Scope of Its Section 156 Extension................... 2

    B.  *Merck v. Hi-Tech* Does Nothing to Save the '812 Patent ..................... 3

    C.  Not Every Terminal Disclaimer Can Cure Double Patenting................... 5

    D.  Boehringer Was Not Entitled to Extend the Term of an Invalid Patent ................. 6

II. BOEHRINGER CANNOT UNDERMINE DEFENDANTS' CLEAR AND
    CONVINCING EVIDENCE OF DOUBLE PATENTING ................................. 7

    A.  Defendants' Proffered Evidence Establishes Double Patenting ............ 8

    B.  The '086 Patent Claims Are Not Directed Exclusively to Medical
        Doctors ................................................................................................. 10

    C.  Boehringer's Belated Speculation Regarding Alleged Differences
        Between the Claims of the '086 and '812 Patents Does Not Undermine
        the Evidence Offered by Defendants ..................................................... 12

    D.  Whether Method and Compound Claims Are in Different Statutory
        Categories Is Irrelevant........................................................................ 15

    E.  *General Foods* Does Not Change the Applicable Test......................... 16

    F.  MPEP Section 806.05(h) Does Not Set Forth the Test for Double
        Patenting ............................................................................................... 17

        1.  Section 806.05(h) Cannot Be the Test for Double Patenting
            Because It Is Fundamentally Inconsistent with Controlling
            Authority ....................................................................................... 17

        2.  Section 806.05(h) Does Not Address Whether Claims Are
            Patentably Distinct for Double Patenting Purposes ..................... 19

        3.  Boehringer Cannot Satisfy 806.05(h) ......................................... 21

        4.  Section 806.05(f) Is Irrelevant ................................................... 21

    G.  Evidence of Secondary Indicia of Nonobviousness Is Irrelevant .......... 23

III. BOEHRINGER HAS NOT SATISFIED ITS BURDEN OF
     DEMONSTRATING THAT SECTION 121 APPLIES......................................... 24

    A.  No Restriction Requirement Applied When the Application Resulting
        in the '812 Patent Was Filed.................................................................. 24

1. The Restriction Requirement Imposed During Prosecution of the Original '374 Patent Was Withdrawn During Prosecution of the Subsequent '086 Patent................................................................ 24

2. Boehringer's Self-Serving Snippets from the Prosecution Histories Are Irrelevant............................................................. 26

B. Boehringer Cannot Satisfy the Prerequisites for Application of Section 121......................................................................................................... 27

1. The '671 Application Was Not Filed "As a Result of" Any Restriction Requirement .................................................... 27

2. Boehringer Has Run Afoul of the Consonance Requirement.................. 30

IV. BOEHRINGER IMPROPERLY ATTEMPTS TO SHIFT THE BURDEN OF PROVING INFRINGEMENT TO DEFENDANTS ....................................... 31

V. THE COURT CAN AND SHOULD ADDRESS BOTH DOUBLE PATENTING AND BOEHRINGER'S TERMINAL DISCLAIMER ............................ 32

CONCLUSION.................................................................................................... 32

## TABLE OF AUTHORITIES

### FEDERAL CASES

*Applied Materials, Inc. v. Advanced Semiconductor Materials Am., Inc.,*
    98 F.3d 1563 (Fed. Cir. 1996)..................................................................................19, 30

*Astellas Pharma, Inc. & Boehringer Ingelheim Pharmaceuticals,*
*Inc. v. Ranbaxy, Inc., et al.,*
    2007 WL 576341 (D.N.J. Feb. 21, 2007) (vacated) ........................................................15, 22

*Avia Group Int'l, Inc. v. L.A. Gear Calif., Inc.,*
    853 F.2d 1557 (Fed. Cir. 1988)..................................................................................10

*Bristol-Myers Squibb Co. v. Pharmachemie B.V.,*
    361 F.3d 1343 (Fed. Cir. 2004)..................................................................................25, 28

*Bush Inds., Inc. v. O'Sullivan Inds., Inc.,*
    772 F. Supp. 1442 (D. Del. 1991)................................................................................10

*Callicrate v. Wadworth Mfg., Inc.,*
    427 F.3d 1361 (Fed. Cir. 2005)..................................................................................32

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.,*
    381 F.3d 1371 (Fed. Cir. 2004)..................................................................................7

*Daiichi Sankyo Co. v. Apotex, Ltd.,*
    501 F.3d 1254 (Fed. Cir. 2007)..................................................................................11

*Ecolochem, Inc. v. S. Cal. Edison Co.,*
    227 F.3d 1361 (Fed. Cir. 2000)..................................................................................23

*Eli Lilly & Co. v. Barr Laboratories,*
    251 F.3d 955 (Fed. Cir. 2001)..................................................................................4, 5, 6, 7

*Eli Lilly & Co. v. Zenith Goldline Pharms.,*
    2001 U.S. Dist. LEXIS 18361 (S.D. Ind. Oct. 12, 2001)..................................................23

*General Foods Corp. v. Studiengesellschaft Kohle mbH,*
    927 F.2d 1272 (Fed. Cir. 1992)..................................................................................16, 17

*Geneva Pharms., Inc. v. GlaxoSmithKline PLC,*
    349 F.3d 1373 (Fed. Cir. 2003)..................................................................................7, 23

*Gerber Garment Tech., Inc. v. Lectra Sys., Inc.,*
    916 F.2d 683 (Fed. Cir. 1990)..................................................................................28

*Graham v. John Deere Co.,*
   383 U.S. 1 (1966)...................................................................................................24

*In re Braithwaite,*
   379 F.2d 594 (CCPA 1967) ...................................................................................6

*In re Byck,*
   48 F.2d 665 (CCPA 1931) .............................................................................7, 19

*In re Cady,*
   77 F.2d 106 ............................................................................................................22

*In re Christmann,*
   128 F.2d 596 (CCPA 1942) ...........................................................7, 12, 13, 18

*In re Heyl,*
   379 F.2d 1018 (CCPA 1967) ...............................................................................20

*In re Kaplan,*
   789 F.2d 1574 (Fed. Cir. 1986).............................................................................14

*In re Lonardo,*
   119 F.3d 960 (Fed. Cir. 1997)..................................................................4, 5, 10

*In re Longi,*
   759 F.2d 887 (Fed. Cir. 1985)................................................................5, 20, 21

*In re Metoprolol Succinate Patent Litig.,*
   494 F.3d 1011 (Fed. Cir. 2007)............................................................................17

*In re Papesch,*
   315 F.2d 381 (CCPA 1963) ...............................................................................13

*In re Peterson,*
   315 F.3d 1325 (Fed. Cir. 2003)............................................................................23

*In re Thorington,*
   418 F.2d 528 (CCPA 1969) .............................................................................6, 13

*In re Translogic Tech., Inc.,*
   504 F.3d 1249 (Fed. Cir. 2007)............................................................................21

*In re Van Ornum,*
   686 F.2d 937 (CCPA 1982) .................................................................................6

*In re Ziegler,*
   443 F.2d 1211 (CCPA 1971) ..................................................................................25

*Jazz Photo Corp. v. International Trade Comm'n,*
   264 F.3d 1094 (Fed. Cir. 2001)..............................................................................32

*Merck & Co. v. Hi-Tech Pharmacal Co.,,*
   482 F.3d 1317 (Fed. Cir. 2007)..........................................................................3, 4

*Merck & Co. v. Kessler,*
   80 F.3d 1543 (Fed. Cir. 1996)..........................................................................3, 19

*Nutrition 21 v. United States,*
   930 F.2d 867 (Fed. Cir. 1991).................................................................................10

*Pfizer Inc. v. Dr. Reddy's Laboratories, Ltd.,*
   359 F.3d 1361 (Fed. Cir. 2004)..................................................................................3

*Pfizer Inc. v. Ranbaxy Labs., Ltd.,*
   405 F. Supp. 2d 495 (D. Del. 2005) ..................................................................13, 14

*Pfizer, Inc. v. Teva Pharms. USA, Inc.,*
   482 F. Supp. 2d 390 (D.N.J. 2007) ........................................................................18

*Pfizer, Inc. v. Teva Pharms. USA, Inc.,*
   518 F. Supp. 3d 1353 (Fed. Cir. 2008) ..................................................7, 18, 28, 30

*Pharmacia Corp. v. Par Pharm., Inc.,*
   417 F.3d 1369 (Fed. Cir. 2005)..................................................................................6

*Phillips v. AWH Corp.,*
   415 F.3d 1303 (Fed. Cir. 2005) (en banc)...........................................................10, 12

*Proctor & Gamble Co. v. Teva Pharms. USA, Inc.,*
   536 F. Supp. 2d 476 (D. Del. 2008)........................................................................23

*Research Corp. Techs. v. Gensia Labs, Inc.,*
   10 Fed. Appx. 856 (Fed. Cir. 2001) (nonprecedential)...........................................15

*SmithKline Beecham Corp. v. Apotex Corp.,*
   403 F.3d 1331 (Fed. Cir. 2005)................................................................................13

*Symbol Techs., Inc. v. Opticon, Inc.,*
   935 F.2d 1569 (Fed. Cir. 1991)....................................................................14, 30, 31

*Tafas v. Dudas,*
    2008 WL 859467, __ F. Supp. 2d __ (E.D. Va. April 1, 2008).............................................19

*Takeda Pharmaceutical Co. v. Dudas,*
    511 F. Supp. 2d 81 (D.D.C. 2007) .......................................................................................22

*Toro Co. v. Deere & Co.,*
    355 F.3d 1313 (Fed. Cir. 2004)...........................................................................................32

*Transclean Corp v. Bridgewood Services, Inc.,*
    290 F.3d 1364 (Fed. Cir. 2002)...........................................................................................32

*Union Carbide Corp. v. Dow Chemical Co.,*
    619 F. Supp. 1036 (D. Del. 1985) .......................................................................................28

## OTHER AUTHORITIES

37 C.F.R. § 1.142(a).........................................................................................................................30

37 C.F.R. § 1.321(c)...........................................................................................................................6

35 U.S.C. § 121 ...................................................................................................................... passim

35 U.S.C. § 156 ...................................................................................................................... passim

35 U.S.C. § 253 ...................................................................................................................................5

Fed. R. Evid. 702 ...........................................................................................................................10

## SUMMARY OF ARGUMENT

The positions advanced by Boehringer in its opening brief bear little resemblance to the

factual and legal realities that govern this case. Boehringer wishes that its last-minute terminal

disclaimer cured the '812 patent's clear, and dispositive, double patenting problem. Indeed, it

wants so much for that to be true that it asked the Court at the close of trial to rule only on that

single issue. And even after the Court rebuffed Boehringer's attempt to avoid the inevitable

finding that the claims of the '812 and '086 patents are not patentably distinct, Boehringer still

made its terminal disclaimer the centerpiece of its Opening Brief. But Boehringer has

completely ignored one fundamental point that is fatal to its "no harm, no foul" argument: the

rights that it disclaimed are not the same as the rights that it unlawfully maintained. There can

be no dispute that under the patent term extension statute, there is a world of difference between

the broad rights provided by an original patent term and the limited rights provided by a term

extension under Section 156. Since any term extension Boehringer obtained was statutorily

limited to approved uses of pramipexole, Boehringer did not, and cannot, "give back" the five-

and-a-half months of additional patent term that it unlawfully obtained and maintained.

It is easy to understand why Boehringer wants to focus on the terminal disclaimer issue,

as it has virtually no response on the substance of the double patenting analysis. Boehringer

never addresses the controlling authority from the Federal Circuit and the CCPA setting forth the

relevant standard for patentable distinctness, *i.e.*, the *Geneva-Pfizer* line of cases and *Eli Lilly*.

Nor does it address the proper legal standard for application of Section 121. Instead,

Boehringer's post-trial submissions constitute nothing more than repeated attempts to divert

attention from the relevant issues with a host of criticisms finding no support in the factual

record or the applicable law—including the startling assertion that decades of case law

1

addressing double patenting are irrelevant and that the real standard for patentable distinctness is set forth in a never-before-relied-upon provision of the Manual of Patent Examining Procedure.

Wishing that the law is something different than it is, and wishing that the facts supported Boehringer's terminal disclaimer or double patenting arguments, does not make it so. To the contrary, the evidence is clear and convincing that the claims of the '812 patent are invalid for double patenting and Boehringer's terminal disclaimer did nothing to change that. Judgment should therefore be entered in favor of Defendants.

## ARGUMENT

### I.    BOEHRINGER MISCONCEIVES THE EFFECT OF ITS UNTIMELY DISCLAIMER

Boehringer's disclaimer of five-and-a-half months of its term extension did nothing to cure the double patenting problem that invalidates the claims of the '812 patent. Boehringer's contrary arguments flout forty years of precedent and cannot be reconciled with the clear language of 35 U.S.C. § 156.

### A.    Boehringer Ignores the Scope of Its Section 156 Extension

Boehringer's terminal disclaimer defense fundamentally misjudges the nature of its patent term extension. Boehringer acts as if the five-and-a-half months of term extension it surrendered were the equivalent to the five-and-a-half-month enlargement of the '812 patent term beyond the expiration of the '086 patent that Boehringer already enjoyed. For example, Boehringer argues that it gave up "the exact same portion of the patent term" it unlawfully obtained beyond the expiration date of the '086 patent, D.I. 213 at 16 (emphasis added), and that "the result [is] precisely the same" as if it had first terminally disclaimed and then received an extension, D.I. 213 at 16 (emphasis omitted). As explained in Defendants' Opening Brief, that simply is not true. Section 156 is explicit: during the period of the term extension, Boehringer's

2

rights are limited to asserting the '812 patent only as to FDA-approved uses of pramipexole, whereas Boehringer maintained the full scope of the '812 patent for months after the '086 patent expired. *See* 35 U.S.C. § 156(b); D.I. 211 at 23-25; D.I. 216 at ¶¶ 55, 168-69. That principle was confirmed by the Federal Circuit in *Merck & Co. v. Kessler*, 80 F.3d 1543, 1547 (Fed. Cir. 1996), and *Pfizer Inc. v. Dr. Reddy's Laboratories, Ltd.*, 359 F.3d 1361, 1366 (Fed. Cir. 2004).

Boehringer never acknowledges this controlling authority. To the contrary, the whole premise for its terminal disclaimer is an entirely different (and clearly erroneous) view: that a Section 156 extension extends the full scope of a patent. But as Congress and the Federal Circuit have made plain, that is not the law.

### B.    *Merck v. Hi-Tech* Does Nothing to Save the '812 Patent

Boehringer portrays the decision in *Merck & Co. v. Hi-Tech Pharmacal Co.*, 482 F.3d 1317 (Fed. Cir. 2007), as a dispositive silver bullet that is fatal to Defendants' double patenting argument. According to Boehringer, *Merck* stands for the proposition that a patent term extension under Section 156 affords exclusionary rights that are completely separate from any rights stemming from the patent whose term is extended, such that even if the '812 patent were invalid, Defendants still have no basis to take away Boehringer's term extension period. Put another way, Boehringer's view is that, despite Section 156 conferring something called a "patent term extension," *Merck* actually creates an independent period of exclusivity that Boehringer gets whether or not the underlying patent which was "extended" is invalid. But, as explained in Defendants' Opening Brief, *Merck* says no such thing. *See* D.I. 211 at 22; D.I. 216 at ¶ 174.

In *Merck*, the Federal Circuit did not sanction the use of a terminal disclaimer filed after the earlier patent had expired as a cure for double patenting. And the court did not hold that a disclaimer of some portion of a term extension constitutes a cure for double patenting. Rather,

3

*Merck v. Hi-Tech* stands for the unremarkable proposition that a term extension under Section 156 may be added to a patent whose term has previously been shortened by a proper terminal disclaimer made to obviate double patenting. 482 F.3d at 1322-24. The Federal Circuit found that the purpose behind terminal disclaimers was served because the later patent was first disclaimed and then extended, *id.* at 1318-19, 1323, resulting in no extension of monopoly. But the Federal Circuit in no way suggested that a patentee could continue to assert a period of exclusivity—which would nonsensically be named a "term extension" under Boehringer's theory—after the underlying patent was found to be invalid.

In a vain attempt to elevate the importance of *Merck*, Boehringer argues that the Federal Circuit's double patenting decisions in *In re Lonardo*, 119 F.3d 960 (Fed. Cir. 1997), and *Eli Lilly & Co. v. Barr Laboratories, Inc.*, 251 F.3d 955 (Fed. Cir. 2001), are inapplicable here because neither case involved a patent term extension under Section 156. D.I. 213 at 21. That argument again presupposes that the rights a patentee has by virtue of a term extension are coextensive with the rights he holds during the original patent term. But, as Defendants explained previously, the presence of a term extension does nothing to undermine the relevance of those cases—which hold that a patentee cannot cure double patenting via a terminal disclaimer where the earlier patent is no longer in force—because the term extension only extends a narrow subset of rights. D.I. 211 at 23-25; D.I. 216 at ¶¶ 55-56, 168-69. And the existence of a term extension period does not and cannot avoid the well-established prohibition on allowing the original patent term of a second patent to extend beyond the expiration of the term of an earlier, patentably indistinct patent. Merely disclaiming the subset of rights extended by a term extension does not solve the problem.

### C.    Not Every Terminal Disclaimer Can Cure Double Patenting

Boehringer claims that its terminal disclaimer is effective to moot any double patenting issue because the disclaimer satisfies the requirements set forth in 35 U.S.C. § 253, the statutory provision allowing for terminal disclaimers.  D.I. 213 at 16, 21.  Defendants do not dispute that Boehringer's disclaimer complied with the literal terms of Section 253 and effectively surrendered a portion of the term extension period for the '812 patent.  But as Defendants demonstrated in their Opening Brief, not all terminal disclaimers operate to cure double patenting.  For this reason, the various cases Boehringer cites on page 20 of its Brief that recognize that a terminal disclaimer may, in certain cases, resolve a double patenting problem, do not answer the relevant question, namely:  whether <u>Boehringer's</u> terminal disclaimer was sufficient.

The case law and federal regulations make clear that, in order to obviate double patenting, a terminal disclaimer <u>must</u> at least:

1.  Be timely filed, before the expiration of the earlier patent;[1]

2.  Ensure that the later patent does not extend beyond the expiration date of the earlier patent;[2]

3.  State that the later patent "shall be enforceable only for and during such period that said patent is commonly owned" with the patent that formed the basis for the double patenting;[3] and

---

[1] *In re Lonardo*, 119 F.3d at 965 ("[A] terminal disclaimer may overcome that [double patenting] basis for unpatentability, assuming that the first patent has not expired."); *see also Eli Lilly*, 251 F.3d at 967 n.5 (a terminal disclaimer cannot cure double patenting where earlier patent had no remaining patent term because it had already been disclaimed in its entirety).

[2] *See, e.g., Eli Lilly*, 251 F.3d at 967 n.5 ("double patenting precludes [the later claim] from extending beyond the termination date of the [earlier] patent"); *In re Longi*, 759 F.2d 887, 894 (Fed. Cir. 1985) (nonstatutory double patenting can be cured if the patentee files "a terminal disclaimer under 35 U.S.C. § 253, disclaiming 'any terminal part of the term . . . of the patent' thereby guaranteeing that the second patent would expire at the same time as the first patent").

    4. Prevent an extension of the monopoly.[4]

*See also* D.I. 211 at 17-20, 25; D.I. 216 at ¶¶ 170-72, 175. As Defendants' Opening Brief

demonstrated, Boehringer's terminal disclaimer does not meet any of these requirements. For

that reason, it does nothing to save the '812 patent, which became incurably invalid when the

'086 patent expired.[5]

**D.      Boehringer Was Not Entitled to Extend the Term of an Invalid Patent**

    Finally, Boehringer asserts that Defendants never "contested the validity of" its Section

156 extension. D.I. 213 at 19; D.I. 214 (FOF) at ¶ 103. That argument misses the mark.

Whether Boehringer theoretically was entitled to a term extension on a patent because

Boehringer satisfied the statutory prerequisites for such an extension makes no difference.

Boehringer chose to extend the later-expiring '812 patent and to tie the extension to the original

expiration date of that patent.[6] If the '812 patent is invalid for double patenting, then there is no

---

[3] 37 C.F.R. § 1.321(c)(3); *see also Pharmacia Corp. v. Par Pharm., Inc.*, 417 F.3d 1369, 1374 (Fed. Cir. 2005); *In re Van Ornum*, 686 F.2d 937, 948 (CCPA 1982) ("[W]e consider it desirable to tie both the termination and the ownership of the two patents together.").

[4] *See, e.g., Eli Lilly*, 251 F.3d at 967-68 ("The judicially-created doctrine of obviousness-type double patenting . . . prohibit[s] a party from obtaining an extension of the right to exclude through claims in a later patent that are not patentably distinct from claims in a commonly owned earlier patent."); *In re Thorington*, 418 F.2d 528, 537 (CCPA 1969) (double patenting is "grounded on the public policy that abhors improper extensions of monopoly"); *In re Braithwaite*, 379 F.2d 594, 601 (CCPA 1967) ("Double patenting is . . . primarily intended to prevent prolongation of monopoly.").

[5] Boehringer argues that 37 C.F.R. § 1.321(c)—which relates to filing a terminal disclaimer to overcome double patenting—does not require that the earlier patent must not have expired. D.I. 213 at 21. But there is no logical reason for the regulation to contain such a provision, as it is self-evident that disclaiming to an already-expired patent is a senseless exercise because it would leave the patentee without any remaining patent life after the disclaimer.

[6] Boehringer's implicit suggestion that it could have tacked the patent term extension onto the '086 patent instead of the '812 patent is irrelevant. Boehringer chose to put the extension on the '812 patent and cannot now put it on the expired '086 patent because, among other things, a term

patent term to be extended because, as Defendants previously explained, a patent term extension only extends existing rights—it does not create new ones. D.I. 211 at 21; D.I. 216 at ¶ 167. Therefore, if the claims of the '812 patent are invalid—and, indeed, they are incurably so—then there simply are no rights to be extended.

## II.    BOEHRINGER CANNOT UNDERMINE DEFENDANTS' CLEAR AND CONVINCING EVIDENCE OF DOUBLE PATENTING

In its 90-plus pages of post-trial briefing, Boehringer wholly ignores the relevant law on double patenting. It never mentions the controlling legal standard for determining whether compound and utility claims are patentably distinct. *See generally Pfizer, Inc. v. Teva Pharms. USA, Inc.*, 518 F.3d 1353 (Fed. Cir. 2008); *Geneva Pharms., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373 (Fed. Cir. 2003); *In re Christmann*, 128 F.2d 596 (CCPA 1942); *In re Byck*, 48 F.2d 665 (CCPA 1931). Nor does Boehringer recognize the clear Federal Circuit holding that later claims are patentably indistinct if they are, *inter alia*, anticipated by earlier claims. *See Eli Lilly*, 251 F.3d at 968.

The absence of any such discussion speaks volumes about the strength of Boehringer's case. Boehringer plainly was aware of this binding precedent—it was discussed extensively in the Pre-Trial Order. D.I. 190 at Ex. 5, pp. 3-5. But when the time came to put pen to paper, Boehringer apparently realized that it has nothing to say if the proper legal standard is applied, so it chose to sidestep the relevant issues and resort to diversionary tactics, raising a host of questions that scrupulously avoid the crux of the double patenting inquiry.

---

extension may not be placed on an expired patent. 35 U.S.C. § 156(a)(1); *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 381 F.3d 1371, 1385-86 (Fed. Cir. 2004).

### A.    Defendants' Proffered Evidence Establishes Double Patenting

Boehringer first asserts that Defendants cannot prevail because Defendants allegedly did "not even purport to 'construe[] the claims in the earlier patent and the later patent and determine the differences.'" D.I. 213 at 24; *see also* D.I. 214 (COL) at ¶ 26. That is nonsense. The evidence and analysis proffered by Defendants did precisely that.

As discussed in Defendants' Opening Brief, the testimony of Defendants' expert Dr. Eric Anslyn—the only witness to evaluate the claims of both the '086 and '812 patents—laid the groundwork for the conclusion of double patenting. D.I. 211 at 3, 8-13; D.I. 216 at ¶¶ 22-43. Dr. Anslyn's testimony was directed to the very inquiries that Boehringer says are needed, specifically: (1) a construction of the claims in the earlier and later patents; and (2) a comparison of the differences between the claims. For example, Dr. Anslyn opined that the '086 patent claims methods of treatment, and testified extensively about those methods and the compounds used in them. Tr. 471:20-477:21 (Anslyn). He testified that the '086 patent claims require administration of an effective amount of the compounds described in those claims, and made clear that the patents define what constitutes an effective dose. Tr. 472:15-21, 474:6-13, 475:3-12, 477:2-10, 497:19-498:7, 504:22-505:11 (Anslyn). Given those claim limitations, Dr. Anslyn explained that "one of ordinary skill in the art would appreciate that you cannot practice these method claims [of the '086 patent] without having the compounds" specified therein, testimony that Boehringer reluctantly acknowledges in its brief. Tr. 477:22-478:10 (Anslyn); *see also* D.I. 213 at 25.

Dr. Ansyln also testified about the scope of the '812 patent claims. He explained that those claims claim particular compounds, and he testified about how many compounds are covered by those claims. *See, e.g.,* Tr. 479:10-480:15 (Anslyn).

After construing the claims of the two patents, Dr. Anslyn discussed similarities and

differences between them. He compared the compounds used in the method claims of the '086 patent to the compounds claimed in the '812 patent, testifying that "[t]here is substantial overlap of the compounds described in the compound claims of the '812 patent with the compounds used in the method claims of the '086 patent, and in some cases there [sic] are actually identical." Tr. 480:16-481:5 (Anslyn). Dr. Anslyn opined that although one patent claims methods and the other claims compounds, the compounds used in those methods are either identical to, or a subset of, the compounds claimed in the later '812 patent. Tr. 481:11-482:18, 483:8-484:14, 485:22-486:20, 487:4-491:1, 492:18-495:10 (Anslyn); *see also* D.I. 211 at 8-9, 11-12; D.I. 216 at ¶¶ 26-27, 29-32. He further concluded that one could not practice one or more of seventeen claims of the '086 patent without necessarily using and/or forming compounds within the scope of the '812 patent claims. Tr. 482:19-483:7, 484:15-485:1, 485:22-486:20, 487:4-491:1, 493:21-495:10 (Anslyn); *see also* D.I. 211 at 10; D.I. 216 at ¶ 33. Thus, while acknowledging differences in claim scope between the two patents, Dr. Anslyn's testimony established, *inter alia*, that (1) the later claims claim the compounds used in the earlier method claims, rendering them patentably indistinct under the *Geneva-Pfizer* line of cases, and (2) the later claims are anticipated—expressly and inherently—by the earlier claims, which renders them patentably indistinct under *Eli Lilly.*

Boehringer did not produce <u>any</u> evidence to the contrary. It did not even bother to offer a witness to testify about the scope of the '086 claims, let alone their relationship to the '812 patent claims. Instead, Boehringer merely characterizes Dr. Anslyn's opinions as "irrelevant to the pertinent double patenting inquiry." D.I. 213 at 25. Dr. Anslyn's testimony undoubtedly is relevant—and, indeed, dispositive—when one applies the relevant standard for double patenting set forth in the Federal Circuit and CCPA cases that Boehringer refuses to acknowledge.

Boehringer next argues that even if Dr. Anslyn did provide an extensive analysis of the two sets of claims, he never actually opined on their "distinctiveness." D.I. 213 at 25; *see also* D.I. 214 (COL) at ¶ 27. The ultimate conclusion as to whether claims are patentably distinct, however, is a legal issue for the Court. *Lonardo*, 119 F.3d at 965. Dr. Anslyn's role as an expert witness is to provide testimony that will assist the Court, not to opine about ultimate legal conclusions. *See, e.g., Nutrition 21 v. United States*, 930 F.2d 867, 871 n.2 (Fed. Cir. 1991) ("An expert's opinion on the ultimate legal conclusion is neither required nor indeed 'evidence' at all.") (*citing Avia Group Int'l, Inc. v. L.A. Gear Calif., Inc.*, 853 F.2d 1557, 1564 (Fed. Cir. 1988)); *Bush Indus., Inc. v. O'Sullivan Indus., Inc.*, 772 F. Supp. 1442, 1455 (D. Del. 1991) (*citing Avia*); Fed. R. Evid. 702.

**B.    The '086 Patent Claims Are Not Directed Exclusively to Medical Doctors**

Boehringer next contends that Dr. Anslyn is not qualified to testify about the '086 patent claims because he is a chemist as opposed to a medical doctor. D.I. 213 at 26 & n.4; D.I. 214 (FOF) at ¶ 107, (COL) at ¶ 33. That assertion is wrong as a matter of law and fact. First, as to the law, the lynchpin of Boehringer's argument is that the claims of the '812 and '086 patents are directed to two different, mutually exclusive audiences, even though the specifications are virtually identical. D.I. 213 at 25; D.I. 214 (FOF) at ¶ 107, (COL) at ¶ 33; *see also* TX 2; TX 3. Specifically, Boehringer asserts that the method of treatment claims in the '086 patent are directed solely to physicians, while the compound claims in the '812 patent are meant solely for chemists. D.I. 213 at 25; D.I. 214 (FOF) at ¶¶ 105-07; *see also* TX 2; TX 3. But the claims of the patents "do not stand alone"; rather, they are to be interpreted by "the person of ordinary skill in the art" to whom the patent is directed "in the context of the entire patent, including the specification." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313, 1315 (Fed. Cir. 2005) (en banc) (emphasis added). One cannot divorce the person of ordinary skill's understanding of claim

terms from the specification, and it is undisputed by experts on both sides that the specification

that is shared by the two patents is directed to, *inter alia*, chemists.  TX 2; TX 3; Tr. 222:8-11

(Klibanov); Tr. 460:12-462:2 (Anslyn); Tr. 686:5-20, 711:18-712:2 (Mailman); *see also* D.I. 214

(FOF) at ¶ 107; D.I. 211 at 3-4; D.I. 216 at ¶¶ 18, 20.

     In addition, the educational background of the inventors is a critical factor in determining

the qualifications of the person of ordinary skill, *see, e.g., Daiichi Sankyo Co. v. Apotex, Inc.*,

501 F.3d 1254, 1256-57 (Fed. Cir. 2007), and it is undisputed that the two patents have the same

inventors, including chemists, TX 2; TX 3; TX 787 (Hurnaus Dep.) 9:6-12, 13:4-18, 14:6-10,

15:22-16:6; TX 791 (Schneider Dep.) 8:16-25, 9:14-10:3, 10:20-11:2, 12:9-21.  It simply is not

credible for Boehringer to suggest that although the inventors of the '086 patent include

chemists, a chemist like Dr. Anslyn is not qualified to comment on the claims of the patent.  In

fact, the Federal Circuit has specifically rejected the argument that a method of treatment claim

is directed only to medical doctors where, as here, the inventors had backgrounds in subjects

other than medicine.  *Daiichi*, 501 F.3d at 1257.

     Boehringer's position is also wrong as a factual matter because the record contains no

evidence that the '086 patent is directed to medical doctors to the exclusion of chemists.  To the

contrary, Defendants' experts Dr. Anslyn and Dr. Richard Mailman—the only witnesses to

address the qualifications of the hypothetical person of ordinary skill for the '086 patent—both

indicated that such a person would have a background in, *inter alia*, chemistry.  Tr. 460:12-462:2

(Anslyn); Tr. 684:21-686:20, 711:18-712:2 (Mailman).  By contrast, Boehringer's expert Dr.

Olanow, who is himself a medical doctor, never testified about the qualifications of the person of

ordinary skill, let alone that the '086 patent is directed solely to medical doctors.

**C.    Boehringer's Belated Speculation Regarding Alleged Differences Between the Claims of the '086 and '812 Patents Does Not Undermine the Evidence Offered by Defendants**

Although Boehringer never offered any testimony comparing the claims of the two patents, and although it did not meaningfully cross-examine Dr. Anslyn about his testimony on the issue, Boehringer now conjures up in post-trial briefing a host of alleged differences between the two sets of claims that it asserts are "material." D.I. 213 at 25.  But Boehringer cannot rely on lawyers' speculation to demonstrate that claims are patentably distinct.  A comparison of claims requires the input of the person of ordinary skill, and Boehringer never offered <u>any</u> evidence as to how that hypothetical person would understand the claims of the '086 patent. Indeed, it is a basic principle of patent law that claims are to be read through the eyes of the person of ordinary skill in the art, not through the lens of lawyers trying a case or laypersons with no background in the relevant technology. *Phillips*, 415 F.3d at 1313.  And even taking Boehringer's arguments at face value, they do not undermine the inevitable conclusion that the '812 patent is invalid for double patenting.

<u>First</u>, Boehringer argues that the fact that method claims in the '086 patent are limited to certain utilities while the compound claims in the '812 patent are not means the claims are patentably distinct. D.I. 213 at 25; D.I. 214 (FOF) at ¶¶ 109-10, (COL) at ¶ 33. But, in fact, that is one reason why the claims are <u>not</u> patentably distinct as a matter of law.  As the CCPA pointed out in *In re Christmann*, 128 F.2d 596 (CCPA 1942), the fact that earlier claims have a specific utility, while the later claims can be used for <u>any</u> purpose, is precisely why the later claims are invalid:

> The claims in the instant case are not directed to any particular use although . . . appellants rely in part upon the new use to justify their contention for allowance of the new claims.  Unquestionably, under the stated circumstances the allowance of the appellants' claims would be an extension of the appellants' monopoly not warranted by law.  If they were to obtain a patent including the

> instant claims, they would presumptively be given a monopoly for seventeen
> years on the exclusive use of the compound for <u>any</u> purpose.

*Id.* at 599-600 (emphasis added); *see also In re Papesch*, 315 F.2d 381, 391 (CCPA 1963)

("[f]rom the standpoint of patent law, a compound and all of its properties are inseparable");

*Pfizer Inc. v. Ranbaxy Labs., Ltd.*, 405 F. Supp. 2d 495, 513 (D. Del. 2005) (compound claim

includes "both the chemical structure and the properties of" the compound), *aff'd in part, rev'd*

*in part on other grounds*, 457 F.3d 1284 (Fed. Cir. 2006). Put differently, the fact that the later

claims are not limited to a given utility points toward invalidity—not away from it—because it

means that the monopoly obtained through the '086 patent has been extended beyond the term of

that patent. *See, e.g., Thorington*, 418 F.2d at 537 (double patenting is "grounded on the public

policy that abhors improper extensions of monopoly").

    <u>Second</u>, Boehringer points to the fact that the method claims in the '086 patent require

the use of an effective amount of the specified compounds, whereas the compounds of the '812

patent claims can be used in any amount. D.I. 213 at 25; D.I. 214 (FOF) at ¶ 108, (COL) at ¶ 33.

This makes no difference. The person of ordinary skill would appreciate—as undisputed

testimony established—that one cannot practice the method claims of the '086 patent without

having <u>some</u> amount of the compounds claimed in the '812 patent, Tr. 477:22-478:10, 482:19-

483:7, 484:15-485:1, 485:22-486:20, 487:4-491:1, 493:21-495:10 (Anslyn), and it is black-letter

law that the presence of <u>any</u> amount of a later-claimed compound is enough to render the claim

anticipated, *see, e.g., SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1345 (Fed. Cir.

2005).

    <u>Third</u>, Boehringer buries in its findings of fact (but does not mention in its Brief) that

claim 7 of the '812 patent includes the R-enantiomer of pramipexole, whereas claim 29 of the

'086 patent allegedly does not cover the R-enantiomer (since the claim is limited to "effective"

amounts and the R-enantiomer supposedly has no activity). D.I. 214 (FOF) at ¶¶ 112-13, (COL) at ¶ 33. That argument is undermined by Boehringer's own documents, which establish that the R-enantiomer does indeed possess dopaminergic activity. *See* TX 496 & 497 (SND 919 CL2 X—the R-enantiomer of pramipexole dihydrochloride—possesses activity in "dopamine synthesis inhibition and dopamine utilization"); *see also* D.I. 190 at Ex. 1 ¶ 9 (SND 919X is the R-enantiomer). Perhaps that is why Boehringer's expert Dr. Olanow never addressed this issue. Even if Boehringer were correct that the R-enantiomer is not encompassed by claim 29, that would have no impact on the conclusion of double patenting. The only consequence of such a construction of claim 29 would be that the compounds used in that (earlier) method claim would be <u>narrower</u> than the set of compounds claimed in (later) compound claim 7 of the '812 patent. Thus claim 7 (as well as claims 3, 4, 5, 9, and 10) of the '812 patent still would be anticipated, both literally and inherently, by the earlier claim, and still would be invalid under the *Geneva-Pfizer* line of cases. In addition, Boehringer did not proffer any evidence that the use of the R-enantiomer is not part of claims 9, 19, and 39 of the '086 patent, each of which independently invalidates the later compound claims in the '812 patent. *See* D.I. 211 at 8-13; D.I. 216 at ¶¶ 27-34, 141-44.

<u>Finally</u>, Boehringer attempts a sleight of hand, positing that one can practice claims of the '812 patent without infringing the '086 patent. D.I. 213 at 25; D.I. 214 (FOF) at ¶¶ 114-16, (COL) at ¶ 33. That, however, is not the relevant question. Rather, the case law focuses on whether one can practice the <u>earlier</u> patent without infringing the <u>later</u> patent, not whether one can practice the later patent without infringing the earlier patent. *See Symbol Techs., Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1581 (Fed. Cir. 1991); *In re Kaplan*, 789 F.2d 1574, 1578 (Fed. Cir. 1986); *Pfizer v. Ranbaxy*, 405 F. Supp. 2d at 514-15. And, to that end, the uncontroverted

evidence is that one cannot practice a number of the claims of the '086 patent without infringing

claims in the '812 patent.   D.I. 211 at 10; D.I. 216 at ¶ 33.[7]

> **D.    Whether Method and Compound Claims Are in Different Statutory Categories Is Irrelevant**

Boehringer also contends that the claims of the '812 patent necessarily are patentably

distinct from the claims of the '086 patent because the claims of the two patents are in different

statutory categories.  D.I. 213 at 24, 28.  Boehringer can only make this argument by

disregarding the proper test for double patenting.  As explained in Defendants' Opening Brief,

the Federal Circuit and the CCPA have expressly held in the *Geneva-Pfizer* line of cases that

claims to a compound and claims to a method of using the compound—claims undeniably in two

different statutory classes—are not patentably distinct. D.I. 211 at 5-7.  So the law cannot be

that claims in different statutory classes are per se patentably distinct. *See Research Corp.*

*Techs. v. Gensia Labs, Inc.*, 10 Fed. Appx. 856, 863-64 (Fed. Cir. 2001) (nonprecedential)

(rejecting argument that being in different statutory classes is determinative for nonstatutory

double patenting).  In fact, Boehringer itself knows that is not the law because it previously

admitted as much.  In the appeal from the district court decision in *Astellas Pharma, Inc. &*

*Boehringer Ingelheim Pharms. Inc. v. Ranbaxy Inc., et al.,* Boehringer argued that claims which

---

[7] Boehringer also argues that Defendants' double patenting theory is limited to whether the '086 method claims are "sub-genera" of the '812 compound claims.  D.I. 213 at 27-28.  That mischaracterization of Defendants' defense is premised on Boehringer's baseless contention that Plaintiffs were unaware of the details of Defendants' double patenting defense before receiving Defendants' Pre-Trial Order sections—an issue addressed in Defendants' Brief in Opposition to Plaintiffs' Evidentiary Objections (filed simultaneously herewith).  In any event, Boehringer's criticism is a straw-man.  Whether the method claims technically are "sub-genera" of the compound claims is not the issue here.  Rather, as Boehringer concedes, Defendants' analysis actually focuses on whether "the compounds of the '086 Patent method claims are sub-genera of the compounds of the '812 patent claims."  D.I. 213 at 28.  That is precisely the inquiry called for by the standard for patentable distinctness set forth in *Eli Lilly* and the *Geneva-Pfizer* line of cases, as it establishes that (1) the later claims claim the compounds used in the earlier method claims, and (2) the '812 patent claims are anticipated by and obvious over the '086 patent claims.

are not in the same statutory category generally cannot be found invalid for double patenting (a premise Defendants dispute) but even Boehringer was forced to admit that "[t]here is one notable exception to these general principles—a small subset of decisions that involve <u>a claim to a compound compared to a claim to the method of using the compound</u>." Brief for Plaintiffs-Appellees Astellas Pharma, Inc. & Boehringer Ingelheim Pharms., Inc., No. 2007-1199, 2007 WL 1362598 at *29 (Fed. Cir. Apr. 25, 2007). Boehringer cannot credibly take a different position here.

### E.    *General Foods* Does Not Change the Applicable Test

Boehringer also suggests that the Federal Circuit's decision in *General Foods Corp. v. Studiengesellschaft Kohle mbH*, 972 F.2d 1272 (Fed. Cir. 1992), precludes a finding of double patenting here because it purportedly precludes a rote comparison of chemical names and formulas identified in the claims of one patent with those recited in a later patent without considering the claimed inventions as a whole. D.I. 214 (COL) at ¶ 35; *see also* D.I. 213 at 26. Boehringer is wrong for at least two reasons. First, Defendants' double patenting analysis was not premised solely on a comparison of chemical names and formulas. Dr. Anslyn clearly testified that he did not "just compare the compound names," but "read all of the specifications and all of the claims, and came to the kinds of conclusions that" were discussed in his testimony. Tr. 502:10-17 (Anslyn). He further explained that his analysis was "more than just [whether the claims were] using the same words"—*i.e.*, the same chemical names—but included the opinion that "anyone skilled in the art would understand that in order to practice this method claim, you would actually physically have to have that compound." Tr. 509:16-24 (Anslyn). That is precisely the analysis mandated by *Eli Lilly* and the *Geneva-Pfizer* line of cases.

Second, the holding in *General Foods* recently was recognized by the Federal Circuit as limited to the comparison of two processes that only partially overlapped. *In re Metoprolol*

16

*Succinate Patent Litigation,* 494 F.3d 1011, 1019 (Fed. Cir. 2007). In *Metoprolol,* the Federal Circuit distinguished such a case from cases like this one, involving claims relating to compounds, and found no patentable distinction between an earlier pharmaceutical composition claim containing a particular compound, and a later claim to the compound itself. *Id.* at 1017. In so doing, the Federal Circuit expressly rejected the argument that *General Foods* precluded the court from focusing on whether the same compound was part of both claims, stating that "in this case, the composition of the earlier patent claim includes the compound of the later patent claim in its entirety. Specifically, the earlier patent not only <u>discloses</u> but also <u>claims</u> a composition comprised-in-part of" the compound. *Id.* at 1019 (emphases in original). In other words, where an earlier claim discloses a chemical compound as part of a claimed invention—which the '086 method claims clearly do—and a later claim is directed to the compound itself, it <u>is</u> proper to compare the chemical compounds described in both sets of claims. Thus, the Federal Circuit already has considered, and rejected, the very argument Boehringer advances here.

### F.    MPEP Section 806.05(h) Does Not Set Forth the Test for Double Patenting

Left without any real response to Defendants' double patenting charge, Boehringer resorts to making up new law by arguing that a section of the Manual of Patent Examining Procedure ("MPEP") contains the relevant standard for patentable distinctness. D.I. 213 at 28; D.I. 214 (FOF) at ¶ 117. Nothing in Boehringer's post-trial submissions, however, explains how the "materially different" test contained in that MPEP provision could be the proper standard for double patenting, given that it is directly contrary to the controlling case law cited in Defendants' Opening Brief.

#### 1.    Section 806.05(h) Cannot Be the Test for Double Patenting Because It Is Fundamentally Inconsistent with Controlling Authority

It is plain that Section 806.05(h) cannot be the relevant test for double patenting because

17

the provision is wholly inconsistent with controlling Federal Circuit and CCPA authority. For example, applying the test under Section 806.05(h) subsection A, namely, whether "the process of using as claimed" in the earlier patent "can be practiced with another materially different product," Boehringer argues that a patentable distinction must exist between the '086 patent claims directed to treatment of Parkinson's disease with certain compounds and the '812 patent claims to those very compounds, because other drugs not used in the claims of the '086 patent, such as Requip® and Levodopa, can also be used in the treatment of Parkinson's disease. D.I. 213 at 28-29; D.I. 214 (COL) at ¶ 31. Even assuming that were a correct interpretation of the MPEP provision, such a conclusion runs directly contrary to the *Geneva-Pfizer* line of cases. For instance, *Pfizer* dealt with an earlier claim to a pharmaceutical compound and a later claim to the use of that compound to treat inflammation. *See Pfizer, Inc. v. Teva Pharms. USA, Inc.*, 482 F. Supp. 2d 390, 476 (D.N.J. 2007), *aff'd in relevant part*, 518 F.3d at 1363. The Federal Circuit recognized that the compound was just one of many different anti-inflammatory drugs that had been used over the years, *Pfizer*, 518 F.3d at 1356, but concluded nevertheless that the claims were patentably indistinct, *id.* at 1363.

Subsection B—which examines whether "the product as claimed can be used in a materially different process"—also is inconsistent with Federal Circuit and CCPA authority. *Christmann*, for example, concluded that where the earlier claim recites a composition with a specific utility and the later claim is directed to the composition itself, the later claim is invalid, irrespective of whether the composition could be used in methods other than the one claimed in the earlier patent. 128 F.2d at 599-600.[8] However, application of Boehringer's reading of

---

[8] Similarly, in *Byck*, the court held that the rule against double patenting is violated where a patentee obtains a patent on a compound that describes "useful purposes" of the compound, and

Section 806.05(h)(B) to the facts of *Christmann* would lead to the opposite result, as the very

fact that the composition had other utilities would mean that it is patentably distinct from a claim

to the composition limited to a particular utility.

### 2. Section 806.05(h) Does Not Address Whether Claims Are Patentably Distinct for Double Patenting Purposes

The foregoing inconsistencies between the MPEP and controlling double patenting

authority show that Boehringer fundamentally misperceives the purpose of Section 806.05(h).

The "materially different" standard is not a substantive test for double patenting, but instead, that

provision of the Patent Office's handbook for examiners is actually a means of separating claims

based on their subject matter to accommodate administrative convenience and facilitate

examination of the application by the PTO.[9] *See, e.g., Applied Materials, Inc. v. Advanced*

*Semiconductor Materials Am., Inc.*, 98 F.3d 1563, 1568 (Fed. Cir. 1996) (purpose of restriction

requirement under Section 121 is to "accommodate administrative convenience"); *see also* TX

46 at BARR277 (Examiner: "restriction for <u>examination purposes</u> is proper" (emphasis added)).

In other words, the provision simply addresses whether inventions are "distinct," such that it

would be more convenient to examine them in separate patent applications as a matter of PTO

practice.[10]

_____

then attempts to secure patents upon "each of the uses to which it may be adapted." 48 F.2d at
666 (emphasis added).

[9] The PTO does not even have the authority to issue substantive rules, and it does not have the
authority to make substantive declarations interpreting the Patent Act. *See, e.g., Merck & Co. v.*
*Kessler*, 80 F.3d 1543, 1549-50 (Fed. Cir. 1996); *Tafas v. Dudas*, --- F. Supp. 2d. ----, 2008 WL
859467, at *5-6 (E.D. Va. April 1, 2008).

[10] Section 806.05(h) provides (emphasis added):

    A product and a process of using the product can be shown to be <u>distinct</u>
    <u>inventions</u> if either or both of the following can be shown: (A) the process of

That is a different inquiry than what is at issue here. Both the Federal Circuit and the CCPA have held that later claims may be invalid for double patenting over earlier claims, even if the claims involve "clearly distinct inventions" for purposes of placing them in different applications. *See In re Longi*, 759 F.2d 887, 893 (Fed. Cir. 1985) (double patenting can apply to "clearly distinct inventions"); *In re Heyl*, 379 F.2d 1018, 1021-22 (CCPA 1967) ("separate inventions" are not necessarily patentably distinct). In other words, claims directed to two inventions that qualify as "distinct" under Section 806.05(h) and may be properly placed in separate patent applications, may nonetheless not be "patentably distinct" for purposes of deciding whether the doctrine of double patenting requires that the later patent not extend longer than the first.[11]

Indeed, if the test that the PTO applies to divide up claimed subject matter pursuant to Section 806.05(h) actually governed whether claims are patentably distinct for double patenting purposes, then there would have been no reason to provide the safe harbor provision of Section 121. Put differently, if every restriction requirement divides up the pending claims into patentably distinct groups, none of the patents on any of the restriction groups could ever render a patent directed to another group invalid for double patenting—the inventions would by definition be patentably distinct—and a safe harbor provision would not be necessary. Instead, there is a safe harbor provision precisely because the test for patentable distinctness under *Eli*

---

using as claimed can be practiced with another materially different product; or (B) the product as claimed can be used in a materially different process.

[11] Boehringer creates a straw man by claiming that "[w]ere the Court now to hold that MPEP 806.05 is inapplicable, then innumerable patentees—including Boehringer—would be unjustly punished for having obeyed the PTO." D.I. 213 at 31. That is not true. If a patentee actually obeys the PTO in placing different claims in different patent applications as a result of a restriction requirement—which Boehringer did not do—then it would be protected from double patenting by the safe harbor contained in the third sentence of 35 U.S.C. § 121.

*Lilly* and the *Geneva-Pfizer* line of cases on the one hand and the test for distinctness under

MPEP Section 806.05(h) can in reality lead to drastically different conclusions. Whatever

administrative function Section 806.05(h) is intended to accomplish, it does not and cannot

supplant controlling Federal Circuit and CCPA law on double patenting.[12]

### 3.    Boehringer Cannot Satisfy 806.05(h)

Even if Section 806.05(h) were relevant to the double patenting inquiry, Boehringer

cannot satisfy the standard it sets forth.  The '812 patent claims are directed to more than ten

thousand compounds, while Boehringer only points to evidence regarding a single compound—

pramipexole.  *See* D.I. 216 at ¶ 103.  Evidence as to this solitary compound is not commensurate

with the scope of the '812 patent claims and therefore cannot support a conclusion that "the

product <u>as claimed</u> can be used in a materially different process." (emphasis added).[13]

### 4.    Section 806.05(f) Is Irrelevant

Because (not surprisingly) there are no cases under Section 806.05(h) that actually help

Boehringer's cause, Boehringer relies on a different MPEP provision, Section 806.05(f), in

---

[12] Boehringer's Section 806.05(h) arguments fail for yet another reason:  they are improperly premised on post-priority date evidence.  For example, in attempting to show materially different processes, Boehringer relies on pramipexole's alleged ability to treat RLS, depression, and fibromyalgia and to act as a neuroprotective agent.  However, those uses were not known as of the priority date.  And since patentability must be assessed as of the priority date, *see, e.g., In re Translogic Tech., Inc.*, 504 F.3d 1249, 1258 (Fed. Cir. 2007) (obviousness judged as of "the time of the invention"), a principle that applies with equal force to nonstatutory double patenting, *see, e.g., Longi*, 759 F.2d 893 (*quoting In re Zickendraht*, 319 F.2d 225, 232 (CCPA 1963) (Rich, J., concurring)) (double patenting evaluated as of "the time the invention was made"), such after-discovered uses are of no assistance to Boehringer.

[13] Even as to pramipexole the evidence does not support a conclusion that it can be used in a materially different process from that claimed in the '086 patent.  It has not been established to treat fibromyalgia or depression, or to be neuroprotective, *see* D.I. 211 at 35; D.I. 216 at ¶¶ 72-74, 76, and its mechanism of action for treating RLS is the same as that for treating Parkinson's disease and/or schizophrenia, as claimed in the '086 patent, *see* Tr. 68:1-69:1, 200:19-201:13 (Olanow); Tr. 622:8-629:14, 651:24-652:19 (Mailman).

attempting to convince the Court to apply Section 806.05(h) as a test for double patenting. But Section 806.05(f) employs the "materially different" standard in a much different context—a comparison involving claims directed to processes of <u>making</u> compounds. D.I. 213 at 31-32. Indeed, the primary decision on which Boehringer relies—the district court's decision in *Astellas Pharma, Inc. & Boehringer Ingelheim Pharmaceuticals, Inc. v. Ranbaxy, Inc., et al.*, 2007 WL 576341 (D.N.J. Feb. 21, 2007)[14]—makes that very distinction. In *Astellas*, the defendant argued that a claim to a compound and a claim to a process for <u>making</u> the compound were not patentably distinct, based on the rule established in *Geneva* that a claim to a compound and a claim to a method of <u>using</u> the compound are not patentably distinct. 2007 WL 576341, at *5-6. The district court rejected that argument, holding that there is a clear difference between compounds and methods of <u>using</u> them on the one hand (at issue in *Geneva*) and compounds and processes of <u>making</u> them on the other hand (at issue in *Astellas*). *Id.* at *6.

The other decision that Boehringer relies on, *Takeda Pharmaceutical Co. v. Dudas*, 511 F. Supp. 2d 81 (D.D.C. 2007), is also readily distinguishable, as it dealt with a situation in which the compound claims came first (in the earlier patent), and the claims to processes of making the compounds came second (in the later patent). *Id.* at 84. That is a very different factual posture than the instant case, as such an interrelationship would not necessarily anticipate or render obvious the later process claims.[15]

---

[14] The *Astellas* decision was vacated at Boehringer's request and therefore is not citable as precedent. *See* Docket for Civil Action No. 05-CV-2563 (MLC) (D.N.J), *Astellas Pharma, Inc. & Boehringer Ingelheim Pharms. Inc. v. Ranbaxy Inc., et al.*, Entry Nos. 50-51.

[15] Boehringer slips a fleeting reference to *In re Cady*, 77 F.2d 106 (CCPA 1935), into its proposed conclusions of law, though it never mentions the decision in its Opening Brief. *See* D.I. 214 (COL) at ¶ 30. *Cady*, however, does not bear on the issues here, as it, like the other cases cited by Boehringer, addressed the relationship between compounds and processes for making them, not the relationship between compounds and methods of using them. 77 F.2d at 106-07.

G.      **Evidence of Secondary Indicia of Nonobviousness Is Irrelevant**

Next, Boehringer half-heartedly contends that courts "may" consider evidence of secondary indicia of nonobviousness in conducting a double-patenting analysis. D.I. 213 at 32; D.I. 214 (COL) at ¶ 37. The "authority" on which Boehringer relies consists of:

- A footnote in a sixteen-year-old district court decision from outside this District; and

- A nineteen-year-old district court decision that was reversed by the Federal Circuit.

No mention is made of this Court's contrary decision just weeks ago or of the Federal Circuit's contrary decision in *Geneva*. As set forth in Defendants' Opening Brief and Opening Evidentiary Brief, evidence of secondary indicia of nonobviousness is completely irrelevant here and should not be considered. *See, e.g., Proctor & Gamble Co. v. Teva Pharms. USA, Inc.*, 536 F. Supp. 2d 476, 497-98 (D. Del. 2008); *Geneva*, 349 F.3d at 1377 n.1 (Fed. Cir. 2003); *see also* D.I. 211 at 33; D.I. 212 at 1-2.

Even if the Court were to receive and consider such evidence, Boehringer's substantive arguments fare no better. First and foremost, Boehringer cannot proffer any evidence of secondary considerations beyond a single compound—pramipexole. As such, the evidence is not commensurate with the scope of the claims and thus is legally insufficient. *See, e.g., In re Peterson*, 315 F.3d 1325, 1330-31 (Fed. Cir. 2003); *see also* D.I. 211 at 33-34.

Furthermore, the objective evidence of nonobviousness proffered by Boehringer is weak at best. Boehringer's allegations of copying are at most only "equivocal evidence of non-obviousness," *Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1380 (Fed. Cir. 2000), particularly in the Hatch-Waxman context, *Eli Lilly & Co. v. Zenith Goldline Pharms. Inc.*, 2001 U.S. Dist. LEXIS 18361, *42 (S.D. Ind. Oct. 12, 2001) (evidence of copying in the context of the Hatch Waxman Act adds "relatively little weight" to any proof of nonobviousness).

Regarding the alleged commercial success of Mirapex® for its purported "other uses," D.I. 213 at 33-34; D.I. 214 (FOF) at ¶¶ 132-34, Boehringer's own testimony and documents significantly undercut any value of such evidence because they confirm that: (1) there is no accurate way of determining what conditions Mirapex® is being prescribed for, *see* Tr. 575:6-576:5 (Keating); Tr. 532:6-16 (Weinstein);



Boehringer seeks to establish long-felt need by equating it to commercial success, asserting that because physicians prescribe Mirapex® for other uses—a disputed allegation in any event—it must be satisfying a long felt, but unmet, need. D.I. 213 at 34; D.I. 214 (COL) at ¶ 41. That is improper bootstrapping. In order to demonstrate a long-felt but unmet need, Boehringer first must identify such a need, and then demonstrate that it was satisfied by Mirapex®. *See Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966). Boehringer has done neither.

## III.   BOEHRINGER HAS NOT SATISFIED ITS BURDEN OF DEMONSTRATING THAT SECTION 121 APPLIES

Boehringer has not come close to satisfying its burden of demonstrating that the double patenting exception of Section 121 is applicable here. D.I. 211 at 26-32; D.I. 216 at ¶¶ 178-84.

### A.   No Restriction Requirement Applied When the Application Resulting in the '812 Patent Was Filed

#### 1.   The Restriction Requirement Imposed During Prosecution of the Original '374 Patent Was Withdrawn During Prosecution of the Subsequent '086 Patent

Boehringer's Section 121 argument is premised on the incorrect notion that the restriction

24

requirement imposed during prosecution of the original '947 application (which became the '374 patent) remained in effect during the prosecution of subsequent applications, including the '197 application (which became the '086 patent). The record shows otherwise. The law is clear that a patent examiner, through his actions, can "ma[k]e clear that the previous restriction requirements did not carry over" into a subsequent application because he can "re-examine an application and withdraw the restriction requirement." *Bristol-Myers Squibb Co. v. Pharmachemie B.V.*, 361 F.3d 1343, 1349 (Fed. Cir. 2004)[16]; *In re Ziegler,* 443 F.2d 1211, 1215 (CCPA 1971). That is exactly what happened here. The restriction requirement that had been imposed during prosecution of the original application was unquestionably no longer operative by the time Boehringer filed the third application (the '671), which became the '812 patent at issue here.

During prosecution of the second application in the series (the '197), Boehringer filed the identical claims that had been subjected to the restriction requirement during the prosecution of the original '947 application. *Compare* TX 46 at BARR114-18 *with* TX 286 at BARR491-95. When presented with these identical claims, the (new) examiner did <u>not</u> impose a restriction requirement or make any reference to the restriction requirement imposed during the prosecution of the earlier application. Instead, he actually allowed claims from several different restriction groups that had been established by the prior examiner, thereby acting inconsistently with the restriction requirement and effectively withdrawing it.[17]

---

[16] "By imposition of a new and different restriction requirement and failing to make any reference to the restriction requirements imposed in connection with the parent application, the examiner made clear that the previous restriction requirements did not carry over to the [subsequent] application." *Bristol-Myers*, 361 F.3d at 1349.

[17] Viewed in terms of the restriction groups set forth in the restriction requirement imposed during prosecution of the '947 application, the examiner allowed compound claims from Group I (claims 6 and 7) and utility claims from Groups VIII and X (claims 9, 10, and 13). The utility claims were not limited to the use of compounds from Group I. TX 286 at BARR503; TX 46 at BARR275-76; TX 786 (Stempel Dep.) 489:24-490:15, 492:4-494:2.

Indeed, Boehringer acknowledged that the restriction requirement was no longer in effect when, after the initial allowance of claims in the '197 application, it withdrew the allowed claims, cancelled the rejected claims, and re-submitted for examination in the same application claims again directed to multiple restriction groups from the '947 restriction requirement.[18] That action was inconsistent with the restriction requirement, both because Boehringer pursued claims from multiple utility restriction groups, and because Boehringer did not follow the examiner's requirement that claims be restricted to either: (1) one compound group plus one utility group; or (2) one process group. *See* TX 46 at BARR275-76; *see also* D.I. 211 at 30.

### 2. Boehringer's Self-Serving Snippets from the Prosecution Histories Are Irrelevant

Lacking any statement by the patent examiner anywhere in the file histories that the restriction requirement imposed during prosecution of the original '947 application carried over to subsequent applications, Boehringer resorts to relying on two self-serving statements by Boehringer's attorney. But even those comments Boehringer must take out of context to help its cause.

First, Boehringer points to a statement from the prosecution of the '197 application (which issued as the '086 patent) in which Mr. Alan Stempel contended that Section 121 prohibited the '374 patent from being used as a reference for double patenting. TX 286 at BARR595; *see also* D.I. 214 (FOF) at ¶ 48. Of course, whether the original '374 patent can be used as a reference for double patenting is of no moment here, as Defendants rely on the '086 patent in support of their defense, not the '374 patent.

Second, Boehringer points to a statement from the prosecution of the '671 application

---

[18] Boehringer submitted claims from multiple utility Groups (VIII, IX and X) for multiple compound Groups (I-V), as well as a process Group (VI). TX 286 at BARR578-600.

(which issued as the '812 patent) in which Mr. Stempel set forth his self-serving view that the restriction requirement imposed in the original '197 application constituted a finding that the ten restriction groups were not obvious, one over the other, and therefore the '812 patent is not invalid for double patenting over the '374 patent.[19]  D.I. 214 (FOF) at ¶ 64; *see also* TX 99 at BARR786.  Once again, Defendants do not assert double patenting based on the '374 patent, and the claims in the '374 patent are not directed to the same subject matter as the claims of the '086 patent on which Defendants do rely.  Moreover, noticeably absent from Mr. Stempel's view of the prior prosecution is any reference to Section 121 as the basis for his conclusion that the '812 patent was not invalid for double patenting.[20]

**B.     Boehringer Cannot Satisfy the Prerequisites for Application of Section 121**

Even assuming the restriction requirement from the original '947 application somehow carried over to subsequent applications, Boehringer still would not be entitled to the benefit of Section 121.

**1.     The '671 Application Was Not Filed "As a Result of" Any Restriction Requirement**

To avoid its repeated admissions that the '812 patent was not filed as a result of a restriction requirement, *see* D.I. 211 at 28-29; D.I. 216 at ¶¶ 122-24, 129-30, Boehringer advances the novel proposition that Section 121 does not require that the application which results in the later patent to have been filed as a result of a restriction requirement, D.I. 213 at 36;

---

[19] This argument is and was wrong, as explained throughout Defendants' briefs.

[20] Boehringer refers to this same statement from Mr. Stempel for the proposition that "Boehringer accordingly confirmed with the examiner that 'no terminal disclaimer need be filed.'"  D.I. 213 at 9; D.I. 214 (FOF) at ¶ 64.  However, that statement was made in the specific context of the rejection over the '374 patent.  The issue of whether Boehringer needed to file a terminal disclaimer over the '086 patent was never addressed by the examiner during prosecution of the '812 patent.

D.I. 214 (COL) at ¶¶ 47-50.  The problem with Boehringer's argument is that it has been squarely rejected by the Federal Circuit: "As section 121 has been interpreted by this court, [a patentee] is entitled to invoke the statutory prohibition against the use of [an earlier patent] 'as a reference' against the divisional application that resulted in the [later] patent only if the divisional application was filed as a result of a restriction requirement." *Bristol-Myers*, 361 F.3d at 1347-48 (emphasis added); *see also* D.I. 211 at 27-28; D.I. 216 at ¶ 180.

Ignoring this recent controlling authority on the question, Boehringer offers up a contrary district court decision from a decade earlier, *Union Carbide Corp. v. Dow Chemical Co.*, 619 F. Supp. 1036 (D. Del. 1985).  D.I. 213 at 36; D.I. 214 (COL) at ¶ 49.  In *Union Carbide*, the court allowed the patentee to invoke Section 121, even though the application at issue was admittedly not filed as a result of a restriction requirement.  That decision is entitled to little, if any, weight here.

First, both Federal Circuit case law and the language of Section 121 require that the application seeking the benefit of the safe harbor actually have been filed as a result of a restriction requirement.  35 U.S.C. § 121; *Bristol-Myers*, 361 F.3d at 1349; *Pfizer*, 518 F. 3d at 1359; *Gerber Garment Tech., Inc. v. Lectra Sys., Inc.*, 916 F.2d 683, 687 (Fed. Cir. 1990). Second, this holding of *Union Carbide* effectively has been overruled because the court there applied Section 121 in a case involving two continuation-in-part applications, and the Federal Circuit has subsequently determined that only divisional, not continuation-in-part, applications are entitled to the safe harbor benefit of Section 121.  *Pfizer*, 518 F.3d at 1362.

Finally, although the application at issue in *Union Carbide* was not filed initially as a result of a restriction requirement, the claims of that application were cancelled in toto, and the examiner was apprised that the new claims were being added to the application "as a result of,"

and to comply with, the requirement for restriction and election in the co-pending application. 619 F. Supp. at 1044, 1060. The record here, however, is unambiguous: Boehringer filed the '671 application "[so] that issues presented by [the Lilly application] will be more easily dealt with." TX 286 at BARR600; TX 786 (Stempel Dep.) 542:5-543:5, 544:12-16, 544:19-545:6; TX 704 (Boehringer's Response to Interrogatory No. 36) at pp. 24-25.

Boehringer now argues that it amended the claims of the '671 application "as a result of" the earlier restriction requirement when it filed a preliminary amendment excluding some subject matter from the claims. D.I. 214 (FOF) at ¶ 56, (COL) at ¶ 50. However, apart from Boehringer's post-hoc explanation, there is nothing in the record to reflect that the amendment was filed "as a result of" the restriction requirement. The evidence actually shows that Boehringer filed the preliminary amendment for the very same reason Boehringer admits it filed the '671 application in the first place—to address issues presented by the Lilly application. Boehringer explicitly stated during the prosecution of the '086 patent that: "In view of the particular pertinence of [the Lilly application] to claims 1-8, these claims have been cancelled and will be reinstated in a divisional application . . . ." TX 286 at BARR600 (emphasis added). Boehringer's preliminary amendment did precisely that. It narrowed the application to claims 1-8. TX 99 at BARR677. Thus, there simply is no basis to distinguish between the reason the '671 application was filed (which Boehringer admits was due to the Lilly reference) and the reason behind the simultaneously-filed preliminary amendment. *Union Carbide* does not help Boehringer, as neither the '671 application, nor the claims that ultimately issued, were filed as a result of a restriction requirement.

Because the exception to double patenting contained in Section 121 applies here only if the '671 application (which became the '812 patent) was filed "as a result of" a restriction

requirement, and because it is clear that the application was actually filed to address the Lilly application (*see* D.I. 211 at 28-31), Boehringer cannot rely on the statutory safe harbor.

### 2.    Boehringer Has Run Afoul of the Consonance Requirement

Boehringer's attempt to show compliance with the consonance requirement ignores what the examiner told Boehringer it had to do to comply with her restriction requirement, and thereby be eligible to rely on Section 121. Boehringer pretends that consonance just requires that the divisional application not overlap with anything claimed in the earlier patent. D.I. 213 at 37-38. That is simply wrong.

Consonance requires that the applicant comply with the restriction requirement imposed by the patent examiner. *Symbol Techs.*, 935 F.2d at 1579; *see also Pfizer*, 518 F.3d at 1359. The purpose of imposing a restriction requirement in the first place is to have the applicant elect a single invention for prosecution. *See, e.g., Applied Materials*, 98 F.3d at 1576 ("A restriction requirement is made during the prosecution of a patent application at the discretion of the Commissioner to avoid granting a patent for more than one invention." (*citing* 35 U.S.C. § 121)); 37 C.F.R. § 1.142(a) (where a restriction requirement is imposed, "the examiner in an Office action will require the applicant in the reply to that action to elect an invention to which the claims will be restricted"). An applicant who does not follow the examiner's directions is not entitled to the benefit of Section 121.

Here, Examiner Ceperley (the examiner for the original '947 application) did not simply define ten groups, but also mandated that those groups be presented in a particular fashion, *i.e.*, by electing one compound group <u>and</u> one utility group <u>or</u> one process group. TX 46 at BARR 277. Accordingly, compliance with the restriction requirement would obligate Boehringer to do, *inter alia*, two things. First, Boehringer was obligated not to combine claims falling within certain restriction groups in one application. Second, if Boehringer wanted to prosecute utility

claims, it was obligated to prosecute compound claims at the same time and vice versa.

Alternately, if Boehringer wanted to prosecute process claims, it had to prosecute such claims

alone. That reflects the examiner's determination, as part and parcel of the restriction

requirement, that such grouping of the claims would result in claims to a single invention being

included in a single patent.

Instead, Boehringer separated compound and method groups from each other and put

them in different patents, thereby crossing the "line of demarcation" set by the examiner because

it prosecuted subject matter in two separate applications that should have been in a single

application. *See Symbol Techs.*, 935 F.2d at 1579. Although Boehringer may be literally correct

that it separated compound claims in the '812 patent from method claims in the '086 patent,

because Boehringer ignored the examiner's mandate that methods and compounds be prosecuted

together as part of a single application, consonance was not maintained.[21]

## IV.    BOEHRINGER IMPROPERLY ATTEMPTS TO SHIFT THE BURDEN OF PROVING INFRINGEMENT TO DEFENDANTS

Although Boehringer acknowledges that it bears the burden of proving infringement, it

improperly attempts to shift this burden to Defendants by arguing that Defendants did not contest

infringement. D.I. 213 at 11, 13-15; D.I. 214 (COL) at ¶ 9; (FOF) at ¶¶ 86-87. However, the

cases on which Boehringer relies do <u>not</u> stand for the proposition that a defendant's failure to

respond to a charge of infringement eliminates the need for a plaintiff to make out its *prima facie*

case, let alone that a plaintiff automatically is entitled to a judgment of infringement. In three of

those cases, the court required the patentee to put forth affirmative evidence of infringement in

---

[21] Boehringer also violated the consonance requirement by including multiple compound groups
together in the '812 patent, which further crossed the line of demarcation set forth in the
restriction requirement. D.I. 216 at ¶ 131, 134.

order to meet its burden of proof.[22]  In the fourth, *Callicrate v. Wadworth Mfg., Inc.*, the

defendant had admitted before trial that the accused devices included all claim elements, and the

Federal Circuit reversed the jury verdict of non-infringement on that basis.  427 F.3d 1361, 1372

(Fed. Cir. 2005).  Boehringer must be held to its burden here.

## V.     THE COURT CAN AND SHOULD ADDRESS BOTH DOUBLE PATENTING AND BOEHRINGER'S TERMINAL DISCLAIMER

Finally, Defendants agree that the Court can and should decide the issue of double

patenting even if it determines that Boehringer's terminal disclaimer is effective.  *See* D.I. 213 at

38-39.

## CONCLUSION

For the foregoing reasons, judgment should be entered in favor of Defendants, and the

remedies set forth in Defendants' Opening Post-Trial Brief should be ordered.

---

[22] *Toro Co. v. Deere & Co.*, 355 F.3d 1313, 1322 (Fed. Cir. 2004) (affirming the district court's grant of summary judgment because the record, which was undisputed, indicated infringement and because the defendant's employees and counsel had acknowledged infringement); *Transclean Corp. v. Bridgewood Srvcs., Inc.*, 290 F.3d 1364, 1373-74 (Fed. Cir. 2002) (affirming the district court's grant of summary judgment of infringement because plaintiff's motion for summary judgment of infringement presented evidence sufficient to show infringement that was uncontroverted in light of defendant's non-response); *Jazz Photo Corp. v. Int'l Trade Comm'n*, 264 F.3d 1094, 1102 (Fed. Cir. 2001) (explaining, *inter alia*, that "the patentee must present evidence sufficient to establish that one or more patent claims are infringed").

Date: May 14, 2008                                    Respectfully submitted,


YOUNG CONAWAY STARGATT &                MORRIS JAMES LLP
    TAYLOR, LLP

*/s/ Adam W. Poff*_____        */s/ Mary B. Matterer*_____
Adam W. Poff (#3990)                     Mary B. Matterer (#2696)
apoff@ycst.com                           MMatterer@morrisjames.com
The Brandywine Building                  500 Delaware Avenue, Suite 1500
1000 West Street, 17th Floor             P.O. Box 2306
P.O. Box 391                             Times Square Tower
Wilmington, DE 19899-0391                Wilmington, DE 19899-2306
(302) 571-6600                           (302) 888-6960
*Attorney for Barr Laboratories, Inc.*   *Attorney for Mylan Pharmaceuticals Inc.*

## CERTIFICATE OF SERVICE

I, Adam W. Poff, Esquire, hereby certify that on May 22, 2008, I caused to be

electronically filed a true and correct copy of the foregoing document with the Clerk of the Court

using CM/ECF, which will send notification that such filing is available for viewing and

downloading to the following counsel of record:

Jack B. Blumenfeld, Esquire
Morris Nichols Arsht & Tunnell
1201 North Market Street
PO Box 1347
Wilmington, DE 19899-1347

Mary B. Matterer, Esquire
Morris, James, Hitchens & Williams LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE 19801

I further certify that on May 22, 2008, I caused a copy of the foregoing document

to be served on the above-listed counsel by e-mail and on the following non-registered

participants in the manner indicated:

### BY E-MAIL

Steven C. Cherny, Esquire
Latham & Watkins LLP
885 Third Avenue, Suite 1000
New York, NY 10022-4834

Kenneth G. Schuler, Esquire
Latham & Watkins LLP
Sears Tower, Suite 5800
Chicago, IL 60606

Shannon M. Bloodworth, Esquire
Heller Ehrman LLP
1717 Rhode Island Ave., N.W.
Washington, DC 20036

REDACTED VERSION – PUBLICLY FILED

YOUNG CONAWAY STARGATT & TAYLOR, LLP


/s/ *Adam W. Poff*
Adam W. Poff (No. 3990)
Karen E. Keller (No. 4489)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
(302) 571-6600
Email:  apoff@ycst.com

*Attorneys for Barr Laboratories, Inc.*