# EXHIBIT A

## KELLEY DRYE & WARREN LLP

A LIMITED LIABILITY PARTNERSHIP

333 WEST WACKER DRIVE

SUITE 2600

CHICAGO, ILLINOIS 60606

————

(312) 857-7070

NEW YORK, NY

WASHINGTON, DC

TYSONS CORNER, VA

STAMFORD, CT

PARSIPPANY, NJ

————

BRUSSELS, BELGIUM

————

AFFILIATE OFFICES

JAKARTA, INDONESIA

MUMBAI, INDIA

FACSIMILE

(312) 857-7095

www.kelleydrye.com

DIRECT LINE: (312) 857-2365

EMAIL: sszczepanski@kelleydrye.com

September 12, 2005

**BY CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Chief Executive Officer
Boehringer Ingelheim International GmbH
Corporate Headquarters
Binger Strasse 173
D-55216 Ingelheim
Germany

Chief Executive Officer
Boehringer Ingelheim GmbH
Corporate Headquarters
Binger Strasse 173
D-55216 Ingelheim
Germany

Chief Executive Officer
Boehringer Ingelheim Corporation
900 Ridgebury Road
Ridgefield, CT 06877

Chief Executive Officer
Boehringer Ingelheim Pharmaceuticals, Inc.
900 Ridgebury Road
Ridgefield, CT 06877

Re:    Updated Notice Pursuant to Section 505(j)(2)(B)(ii) of the Federal Food, Drug
and Cosmetic Act and 21 U.S.C. § 355(j)(2)(B)(ii) regarding United States Patent
Nos. 4,843,086 and 4,886,812

Dear Sirs:

This is an update to the Notice Letter I sent to you on August 10, 2005.

We represent Barr Laboratories, Inc. of Pomona, New York ("Barr"). On behalf of Barr,
we hereby provide notice of the following information to Boehringer Ingelheim International
GmbH, Boehringer Ingelheim GmbH, Boehringer Ingelheim Pharmaceuticals, Inc., and
Boehringer Ingelheim Corporation (collectively "Boehringer"), the holder of approved New
Drug Application ("NDA") No. 20-667 according to the records of the U.S. Food and Drug
Administration ("FDA") and the owner of United States Patent No. 4,843,086 ("the '086
Patent") entitled "Tetrahydro-benzthiazoles, The Preparation Thereof And Their Use As

CH01/SZCZS/200660.1

BARR000011

TX406



KELLEY DRYE & WARREN LLP

Chief Executive Officers
September 12, 2005
Page Two

Intermediate Products Or As Pharmaceuticals" and United States Patent No. 4,886,812 ("the '812 Patent") entitled "Tetrahydro-benzthiazoles, The Preparation Thereof And Their Use As Intermediate Products Or As Pharmaceuticals," according to the records of the U.S. Patent and Trademark Office.

Pursuant to Section 505(j)(2)(B)(ii) of the Federal Food, Drug and Cosmetic Act, 21 U.S.C. § 355(j)(2)(B) and 21 C.F.R. § 314.95(c)(1), we advise you that the FDA has received an Abbreviated New Drug Application ("ANDA") submitted by Barr pursuant to 21 U.S.C. § 355(j), which contains bioavailability or bioequivalence data from studies on (S)-2-Amino-6-n-propylamino-4,5,6,7-tetrahydrobenzthiazole dihydrochloride monohydrate tablets that are the subject of NDA No. 20-667. The ANDA was submitted with a certification pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV) ("Original Paragraph IV Patent Certification") to obtain approval to engage in the commercial manufacture, use and/or sale of (S)-2-Amino-6-n-propylamino-4,5,6,7-tetrahydrobenzthiazole dihydrochloride monohydrate drug product before the expiration of the '086 and '812 Patents, which are listed in *Approved Drug Products with Therapeutic Equivalence Evaluations* ("the Orange Book"). Barr's ANDA as originally submitted sought approval only for a dosage of 0.25 mg per tablet.

The Original Paragraph IV Patent Certification submitted with the ANDA pertained to the 0.25 mg per tablet strength. An amendment to the ANDA was subsequently submitted seeking additional approval for the 0.125 mg, 0.5 mg, 1.0 mg, and 1.5 mg per tablet strengths. That amendment was also submitted with a certification pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV) ("Second Paragraph IV Patent Certification") to obtain approval to engage in the commercial manufacture, use and/or sale of (S)-2-Amino-6-n-propylamino-4,5,6,7-tetrahydrobenzthiazole dihydrochloride monohydrate drug product before the expiration of the '086 and '812 Patents, which are listed in the Orange Book. The (S)-2-Amino-6-n-propylamino-4,5,6,7-tetrahydrobenzthiazole dihydrochloride monohydrate tablets described in and the subject of Barr's ANDA in the amounts of 0.125, 0.25 mg, 0.5 mg, 1.0 mg, and 1.5 mg per tablet are collectively referred to herein as "Barr's Product." Barr has been informed that the amendment to its ANDA was accepted for filing as of June 24, 2005.

Pursuant to 21 C.F.R. § 314.95(c)(2), we advise you that the ANDA submitted by Barr was assigned number 77-724 by the FDA.

Pursuant to 21 C.F.R. § 314.95(c)(3), we advise you that the established name of Barr's Product is pramipexole dihydrochloride tablets, 0.125 mg, 0.25 mg, 0.5 mg, 1.0 mg, and 1.5 mg strengths.

Pursuant to 21 C.F.R. § 314.95(c)(4), we advise you that the active ingredient of Barr's Product is (S)-2-Amino-6-n-propylamino-4,5,6,7-tetrahydrobenzthiazole dihydrochloride monohydrate; the strengths are 0.125 mg, 0.25 mg, 0.5 mg, 1.0 mg, and 1.5 mg; and the dosage form is a tablet.

CH01/SZCZS/200660.1

BARR000012

TX406_0002



Chief Executive Officers     KELLEY DRYE & WARREN LLP
September 12, 2005
Page Three

Pursuant to 21 C.F.R. § 314.95(c)(5), we advise you that the patents alleged in the Original Paragraph IV Patent Certification and in the Second Paragraph IV Patent Certification to be not infringed, invalid and/or unenforceable are the '086 and '812 Patents. The expiration date of the '086 Patent is represented in the Orange Book to be November 23, 2007; the expiration date of the '812 Patent is represented in the Orange Book to be March 25, 2011.

Barr alleges, and has certified to the FDA, that in Barr's opinion, and to the best of its knowledge, the '086 and '812 Patents are invalid, unenforceable and/or will not be infringed by the manufacture, use, sale, or offer for sale of Barr's Product described in the above-referenced ANDA. Pursuant to 21 U.S.C. § 355(j)(2)(B)(iv) and 21 C.F.R. § 314.95(c)(6), Barr's detailed statement of the factual and legal basis for the patent certification set forth in Barr's ANDA and for the patent certification set forth in the amendment to Barr's ANDA is attached hereto and made a part hereof.

Pursuant to 21 U.S.C. § 355(j)(5)(C), this notice letter includes an Offer of Confidential Access to Application. As required by § 355(j)(5)(C)(i), Barr offers to provide confidential access to certain information from its ANDA No. 77-724 for the sole and exclusive purpose of determining whether an infringement action referred to in § 355(j)(5)(B)(iii) can be brought.

Section 355(j)(5)(C)(i)(III) allows Barr to impose restrictions "as to persons entitled to access, and on the use and disposition of any information accessed, as would apply had a protective order been entered for purposes of protecting trade secrets and other confidential business information." That provision also grants Barr the right to redact its ANDA in response to a request for Confidential Access under this offer.

As permitted by statute, Barr imposes the following terms and restrictions on its Offer of Confidential Access:

(1)    Barr will permit confidential access to certain information from its proprietary ANDA No. 77-724 to attorneys from one outside law firm representing Boehringer, provided, however, that attorneys from such firm do not engage, formally or informally, in patent prosecution for Boehringer. Such information (hereinafter, "Confidential Barr Information") shall be marked with the legend "CONFIDENTIAL".

(2)    The attorneys from the outside law firm representing Boehringer shall not disclose any Confidential Barr Information to any other person or entity, including Boehringer employees, outside scientific consultants, and/or other outside counsel retained by Boehringer, without the prior written consent of Barr's outside counsel, Kelley Drye & Warren LLP.

(3)    As provided by § 355(j)(5)(C)(i)(III) Boehringer's outside law firm shall make use of the Confidential Barr Information for the sole and exclusive purpose of determining whether an action referred to in § 355(j)(5)(B)(iii) can be brought and for no other purpose. By way of example only, the Confidential Barr Information shall not be used to prepare or prosecute any future or pending patent application by Boehringer, or in connection with any filing to or

CH01/SZCZS/200660.1

BARR000013

TX406_0003



communication with the FDA relating to Barr's ANDA No. 77-724. Boehringer's outside firm agrees to take all measures necessary to prevent unauthorized disclosure or use of the Confidential Barr Information, and that all Confidential Barr Information shall be kept confidential and not disclosed in any manner inconsistent with this Offer of Confidential Access.

(4)    The Confidential Barr Information disclosed is, and remains, the property of Barr. By providing the Confidential Barr Information, Barr does not grant Boehringer and/or Boehringer's law firm any interest in or license to the Confidential Barr Information.

(5)    Boehringer's law firm shall, within thirty-five (35) days from the date that it first receives the Confidential Barr Information, return to Barr's outside counsel, Kelley Drye & Warren LLP, all Confidential Barr Information and any copies thereof. Boehringer's law firm shall return to Kelley Drye & Warren LLP all Confidential Barr Information before any infringement suit is filed by Boehringer, if suit is commenced before this 35-day period expires. In the event that Boehringer opts to file suit, none of the information contained in or obtained from any Confidential Barr Information that Barr provides will be included in any publicly-available complaint or other pleading.

(6)    Nothing in this Offer of Confidential Access shall be construed as an admission by Barr regarding the validity, enforceability, and/or infringement of any U.S. Patent. Further, nothing herein shall be construed as an agreement or admission by Barr with respect to the competency, relevance, or materiality of any such Confidential Barr Information, document, or thing. The fact that Barr provides Confidential Barr Information upon request of Boehringer shall not be construed as an admission by Barr that such Confidential Barr Information is relevant to the disposition of any issue relating to any alleged infringement of the '086 or '812 patents, or to the validity or enforceability of those patents.

(7)    The attorneys from Boehringer's outside law firm will acknowledge in writing their receipt of a copy of these terms and restrictions prior to production of any Confidential Barr Information. Such written acknowledgment shall be provided to Barr's outside counsel, Kelley Drye & Warren LLP.

(8)    This offer of Confidential Access shall be governed by the laws of the State of New York.

Section 355(j)(5)(C)(i)(III) provides that any request for access that Boehringer makes under this Offer of Confidential Access "shall be considered acceptance of the offer of confidential access with the restrictions as to persons entitled to access, and on the use and dispositions of any information accessed, contained in [this] offer of confidential access" and that the "restrictions and other terms of [this] offer of confidential access shall be considered terms of an enforceable contract." Thus, to the extent that Boehringer requests access to Confidential Barr Information, it necessarily accepts the terms and restrictions outlined above. Written notice requesting access under this Offer of Confidential Access should be made to:

CH01/SZCZS/200660.1

BARR000014

TX406_0004

Chief Executive Officers     KELLEY DRYE & WARREN LLP
September 12, 2005
Page Five

> Steve Szczepanski
> Kelley Drye & Warren LLP
> 333 West Wacker
> Suite 2600
> Chicago, Illinois 60606
> Telephone: (312) 857-2305
> Facsimile: (312) 857-7095

By providing this Offer of Confidential Access to Application, Barr maintains the right and ability to bring a Declaratory Judgment action under 28 U.S.C. §§ 2201 *et seq.*, pursuant to 21 U.S.C. § 355(j)(5)(C).

Very truly yours,

Steve Szczepanski

SZS/jda

Enclosure: Detailed Factual and Legal Basis for Barr's Paragraph IV Patent Certification Regarding United States Patent Nos. 4,843,086 and 4,886,812

CH01/SZCZS/200660.1



KELLEY DRYE & WARREN LLP

## DETAILED FACTUAL AND LEGAL BASIS FOR BARR'S PARAGRAPH IV PATENT CERTIFICATION REGARDING UNITED STATES PATENT NOS. 4,843,086 AND 4,886,812

A.    The Barr Product And Its Use For Treating Parkinson's Disease Do Not Literally Infringe Claims 1-20 And 29-40 Of The '086 Patent Or Claims 6 And 7 Of The '812 Patent

The Barr Product and its use for treating Parkinson's disease do not literally infringe Claims 1-20 and 29-40 of the '086 Patent or Claims 6 and 7 of the '812 Patent for at least the following reasons.

Claims 1-20 and 31-40 of the '086 Patent are not infringed because they are directed to methods of lowering the blood pressure, lowering the heart rate, and treating schizophrenia. The Barr Product is only for treatment of Parkinson's disease. Therefore, the Barr Product and/or its use do not literally infringe Claims 1-20 and 31-40 of the '086 Patent.

Claim 29 of the '086 Patent and Claim 7 of the '812 Patent are not literally infringed because they are directed to a racemate. The Barr Product is the (−) stereoisomer. The isomer is not identical to the claimed racemate compound; therefore, the Barr Product containing the (−) stereoisomer does not literally infringe Claim 29 of the '086 Patent or Claim 7 of the '812 Patent.

Claim 30 of the '086 Patent and Claim 6 of the '812 Patent are not literally infringed because they claim uses of compounds different from those of the Barr Products. Specifically, Claim 30 is directed to a use of 2-amino-6-dimethylamino-4,5,6,7-tetrahydrobenzthiazole or a pharmaceutically acceptable acid addition salt thereof. Similarly, Claim 6 of the '812 Patent is directed to 2-amino-6-dimethylamino-4,5,6,7-tetrahydrobenzthiazole or a pharmaceutically acceptable acid addition salt thereof. The Barr Product is (S)-2-amino-6-n-propylamino-4,5,6,7-tetrahydrobenzthiazole − a different compound. Therefore, the Barr Product does not literally infringe Claim 30 of the '086 Patent or Claim 6 of the '812 Patent.

B.    The Barr Product And Its Use For Treating Parkinson's Disease Do Not Infringe Claims 1-20 And 29-40 Of The '086 Patent Or Claims 6 And 7 Of The '812 Patent Under The Doctrine Of Equivalents

The Barr Product and its use for treating Parkinson's disease do not infringe Claims 1-20 and 29-40 of the '086 Patent or Claims 6 and 7 of the '812 Patent under the doctrine of equivalents for at least the following reasons.

First, the methods of Claims 1-20 and 31-40 are directed to the treatment of medical disorders (hypertension, tachycardia, and schizophrenia) that are dissimilar to Parkinson's disease. In other words, the function, operation, and result of the Barr Product to treat Parkinson's disease is not the same as the treatment of the medical disorders to which Claims 1-20 and 31-40 of the '086 Patent are directed. Therefore, the use of the Barr Product to treat Parkinson's disease would not infringe Claims 1-20 and 31-40 of the '086 Patent under the doctrine of equivalents.

BARR000016

TX406_0006

KELLEY DRYE & WARREN LLP

Claim 29 of the '086 Patent and Claim 7 of the '812 Patent are directed to a racemate. The Barr Product is the (−) stereoisomer. Differences between individual optical isomers and between a single optical isomer and a racemic mixture often cause substantial differences between the functions of each isomer or racemic mixture, the ways each isomer or racemic mixture operates, and the results from each isomer or racemic mixture. Therefore, the use of the Barr Product to treat Parkinson's disease would not infringe Claim 29 of the '086 Patent and Claim 7 of the '812 Patent under the doctrine of equivalents.

Claim 30 of the '086 Patent and Claim 6 of the '812 Patent specifically cover 2-amino-6-dimethylamino-4,5,6,7-tetrahydrobenzthiazole or its administration to treat Parkinson's disease. However, the use of the Barr Product involves administration of a drug containing (S)-2-amino-6-n-propylamino-4,5,6,7-tetrahydrobenzthiazole as an active ingredient. Thus, the method of Claim 30 of the '086 Patent and the compound of Claim 6 of the '812 Patent cover the treatment of Parkinson's disease in a substantially different way than the proposed use of the Barr Product. Furthermore, to extend the coverage of Claim 30 of the '086 Patent and Claim 6 of the '812 Patent beyond the stated chemical composition, 2-amino-6-dimethylamino-4,5,6,7-tetrahydrobenzthiazole, would serve to erase several meaningful structural limitations of the claim. Therefore, the Barr Product and its use to treat Parkinson's disease do not infringe Claim 30 of the '086 Patent and Claim 6 of the '812 Patent under the doctrine of equivalents.

C.    Claims 1-2, 11-12, 21-22 and 25 Of The '086 Patent And Claims 1-2 of The '812 Patent ("Non-Priority Claims") Are Invalid Under 35 U.S.C. § 102(g)

Certain new matter was added to the parent application in the U.S. which was not present in either of the two German patent applications to which the '086 Patent and the '812 Patent claim priority. Therefore, claims directed to this new matter, i.e., Claims 1-2, 11-12, 21-22 and 25 of the '086 Patent and Claims 1-2 of the '812 Patent, are not entitled to the benefit of the foreign priority date of the German applications. These "Non-Priority Claims" are invalid under 35 U.S.C. § 102(g) over the work carried out in the United States by Eli Lilly employees as evidenced by U.S. Patent Application Serial No. 06/747,748 (the "Lilly U.S. Application") which was filed in the United States Patent and Trademark Office on June 24, 1985. The Lilly U.S. Application's only inventors were two employees of Eli Lilly: Bennett Coleman Laguzza and William Wilson Turner, Jr. ("Laguzza and Turner"), residents of the United States. Such work was prior to the effective filing date of the Non-Priority Claims, and this work encompassed the claimed inventions. Accordingly, the Non-Priority Claims are anticipated.

Specifically, the Non-Priority Claims each contain the following limitation:

> wherein the above mentioned phenyl nucleus may be substituted
> by 1 or 2 halogen atoms

This limitation was included in the specifications of the U.S. applications that led to the '086 and '812 Patents, but was not present in either of the German priority applications. Since, in order to obtain a foreign priority date, all limitations of a claim must be present in a priority document, these claims are not entitled to priority of either German application.

BARR000017

TX406_0007



The Lilly U.S. Application discloses that Laguzza and Turner synthesized the compounds (±)-2-amino-6-di-n-propylamino-4,5,6,7-tetrahydrobenzothiazole dihydrobromide (Example 1) and (±)-2-amino-6-dimethylamino-4,5,6,7-tetrahydrobenzothiazole dihydrobromide (Example 2) in the United States. The Lilly U.S. Application shows that the compound (±)-2-amino-6-di-n-propylamino-4,5,6,7-tetrahydrobenzothiazole dihydrobromide was tested to determine its usefulness for the treatment of high blood pressure and Parkinsonism. The Lilly U.S. Application also shows that the compound (±)-2-amino-6-dimethylamino-4,5,6,7-tetrahydrobenzothiazole dihydrobromide was tested to determine its usefulness for the treatment of high blood pressure and heart rate lowering. A broader genus claim is anticipated under Section 102 by a prior art reference which only discloses a single species of the genus.

The dihydrobromide acid addition salts of (±)-2-amino-6-di-n-propylamino-4,5,6,7-tetrahydrobenzthiazole and (±)-2-amino-6-dimethylamino-4,5,6,7-tetrahydrobenzthiazole were synthesized by Laguzza and Turner in the United States prior to June 24, 1985. U.S. Patent Application Serial No. 06/747,748 ("the Lilly U.S. Application"). Both compounds are species of the genus covered by Claims 1 and 2 of the '812 Patent. Therefore, Claims 1 and 2 of the '812 Patent, which are not entitled to a priority date prior to December 19, 1985, the filing date of the first U.S. patent application, are invalid as anticipated by the Laguzza and Turner work under Section 102(g).

The dihydrobromide acid addition salt of (±)-2-amino-6-di-n-propylamino-4,5,6,7-tetrahydrobenzthiazole also was actually tested for the lowering of blood pressure and for treatment of Parkinsonism prior to June 24, 1985. Because a blood pressure lowering amount of the (±)-2-amino-6-di-n-propylamino-4,5,6,7-tetrahydrobenzthiazole dihydrobromide species of the generic compounds of Claims 1 and 2 was made and actually lowered blood pressure in a host in the United States by Laguzza and Turner prior to June 24, 1985, Claims 1 and 2 of the '086 Patent are invalid as anticipated under Section 102(g). Furthermore, because a therapeutically effective amount for treating Parkinsonism or Parkinson's disease of the (±)-2-amino-6-di-n-propylamino-4,5,6,7-tetrahydrobenzthiazole dihydrobromide species of the generic compounds of Claims 21-22 and 25 of the '086 Patent was made and showed therapeutic effectiveness in the United States by Laguzza and Turner prior to June 24, 1985, Claims 21-22 and 25 of the '086 Patent are invalid as anticipated under Section 102(g).

The dihydrobromide acid addition salt of (±)-2-amino-6-dimethylamino-4,5,6,7-tetrahydrobenzthiazole was actually tested for the lowering of blood pressure and the lowering of heart rate prior to June 24, 1985. Because a blood pressure lowering amount of the (±)-2-amino-6-dimethylamino-4,5,6,7-tetrahydrobenzthiazole dihydrobromide species of the generic compounds of Claims 1 and 2 of the '086 Patent was made and actually lowered blood pressure in a host in the United States by Laguzza and Turner prior to June 24, 1985, Claims 1 and 2 of the '086 Patent are invalid as anticipated under Section 102(g). Furthermore, because a heart rate lowering amount of the (±)-2-amino-6-dimethylamino-4,5,6,7-tetrahydrobenzthiazole dihydrobromide species of the generic compounds of Claims 11 and 12 of the '086 Patent was made and actually lowered the heart rate in a host in the United States by Laguzza and Turner prior to June 24, 1985, Claims 11 and 12 of the '086 Patent are invalid as anticipated under Section 102(g).

BARR000018

TX406_0008

KELLEY DRYE & WARREN LLP

D.    Claims 1-4, 6, 11-14, 16, 21-24, 26, 31-34, and 36 Of The '086 Patent And
Claims 1-4 and 9 Of The '812 Patent Are Invalid For Failure to Meet The
Requirement of 35 U.S.C. § 112, ¶ 1

The specifications of the '086 Patent and the '812 Patent do not provide sufficient
support as required by 35 U.S.C. § 112, ¶ 1 for Claims 1-4, 6, 11-14, 16, 21-24, 26, 31-34 and 36
of the '086 Patent and Claims 1-4 and 9 of the '812 Patent. Therefore, these claims are invalid
for failure to comply with the requirements of § 112, ¶ 1.

Specifically, the specification of the '086 and '812 Patents discloses a small number of
compounds which produced pharmacological effects and the testing of this small number of
compounds was very limited. Only six compounds, designated A-F, were subjected to efficacy
testing. The specification gives only four examples of the testing of Compounds A-F.
Compounds A-F were tested on mice for their effect on exploratory activity. Compounds A, B,
D, and E were tested on mice for their effect on inhibition of dopamine turnover. Compounds A
and C were tested on mice for their effect on the inhibition of dopamine synthesis. Finally,
Compound C was tested on monkeys to model its potential anti-Parkinsonism and anti-
Parkinson's disease activity.

The generic formula of Claims 1, 11, 21, and 31 of the '086 Patent and Claim 1 of the
'812 Patent covers a very large number of compounds which may or may not have therapeutic
effectiveness. For example, Claims 1, 11, 21 and 31 of the '086 cover over a million possible
compounds. On the other hand, the specifications of the '086 and '812 Patents disclose limited
testing of a few specific compounds, Compounds A-F, which may have some type of
pharmacological activity. Not one of these compounds is specifically mentioned as having a
blood pressure lowering effect, a heart rate lowering effect, or efficacy versus schizophrenia, and
none of the four examples of animal testing for pharmacological activity of the Compounds A-F
mention that these compounds have a blood pressure lowering effect a heart rate lowering effect,
or efficacy versus schizophrenia. Undue experimentation by one of ordinary skill in the art
would be required to determine which of the compounds of these claims would be effective for
lowering the blood pressure of a host, lowering the heart rate of a host, or treating schizophrenia
and which would have any therapeutic effect. Claims to a genus of compounds require
reasonably specific supporting disclosure. Accordingly, a patentee is not entitled to claim all
possible compounds of a group when only few are supported by the specification.

Claims 2-4, 6, 12-14, 16, 22-24, 26, 32-34, and 36 of the '086 Patent and Claims 2-4 and
9 of the '812 Patent somewhat narrow the scope of the broadest claims by restricting the possible
substituent positions and by limiting the number of permissible R-group substitutions. However,
in view of the unpredictability of this art, the number of examples provided, and the experiments
described in the specification, the specification does not enable these claims as well.

Accordingly, Claims 1-4, 6, 11-14, 16, 21-24, 26, 31-34 and 36 of the '086 Patent and
Claims 1-4 and 9 of the '812 Patent are invalid for lack of enablement.

BARR000019

TX406_0009

 

KELLEY DRYE & WARREN LLP

E.    Claims 1-10 Of The '812 Patent Are Invalid For Obviousness-Type Double
       Patenting

All claims of the '812 Patent are directed to subject matter which is not patentably
distinct from that claimed in the '086 Patent, and is therefore not properly the subject of an
additional patent. Moreover, the compounds of the '086 Patent method claims are sub-genera of
the compounds of the '812 Patent claims. As a result, the claims of the '812 Patent are invalid
over the claims of the '086 Patent under the doctrine of obviousness-type double patenting.

No restriction requirement was issued by the Examiner during the prosecution of the
applications that matured into the '086 Patent. Accordingly, the application which matured into
the '812 Patent was not a divisional; it was a continuation. Indeed, composition claims 6 and 7
were allowed during the prosecution of the '086 Patent, but the patentee chose to cancel those
allowed claims and instead reintroduce them in the application that matured into the '812 Patent.
The mere designation by an applicant of an application as being a "divisional" does not invoke
the protection of 35 U.S.C. § 121.

F.    Claims 26-28 of the '086 Patent and Claim 9 of the '812 Patent are Invalid Under
       35 U.S.C. § 132 Because They Include New Matter Introduced After Filing of the
       Applications

The general formula of Claims 26-28 of the '086 Patent and Claim 9 of the '812 Patent
covers a genus that was not specifically disclosed in the originally filed applications that matured
into the '086 and '812 Patents; rather the general formula was added during prosecution of the
applications. This addition of new matter violates 35 U.S.C. § 132 and, therefore, Claims 26-28
of the '086 Patent and Claim 9 of the '812 Patent are invalid.

BARR000020

TX406_0010

# EXHIBIT B

**Exhibit 3**

**Defendants' Statement Of Issues Of Fact That Remain To Be Litigated**

To the extent that Defendants' Statement of Issues of Law contains issues of fact, those issues are incorporated herein by reference. Should the Court determine that any issue identified in this list as an issue of fact is more properly considered an issue of law, Defendants incorporate such issues by reference into their Statement of Issues of Law.

Barr and Mylan's identification of issues of fact that remain to be litigated is based in part on their current understanding of the arguments Boehringer is likely to make in attempting to respond to Defendants' non-infringement and invalidity contentions, based upon the pleadings (including Boehringer's draft pre-trial order sections provided to Defendants on January 2, 2008) and discovery in the action to date. To the extent Boehringer attempts to introduce different or additional facts, Defendants reserve the right to object to and/or contest those facts, and to present any and all rebuttal evidence in response to those facts. Defendants also reserve the right to modify, supplement, or amend this Statement of Issue of Fact, including to respond to any issues, exhibits, or witnesses presented by Boehringer.

## I.    INFRINGEMENT

1.    Whether Boehringer has met its burden of proof that Barr's product literally infringes each of claims 5, 9, and 10 of the '812 patent.

2.    Whether the active ingredient in Barr's product is pramipexole dihydrochloride.

## II.    DOUBLE PATENTING

With respect to Defendants' defense that claims 3, 4, 5, 7, 9, and 10 of the '812 patent are invalid for double patenting, the issues of fact to be litigated are as follows:

1.    Whether claims 3, 4, 5, 7, 9, and 10 of the '812 patent are invalid for double patenting over claims of the '086 patent.

2.    Whether claims 3, 4, 5, 7, 9, and 10 of the '812 patent are not patentably distinct from claims of the '086 patent.

3.    Whether claims 3, 4, 5, 7, 9, and 10 of the '812 are anticipated by (literally and/or inherently), or obvious in light of, claims of the '086 patent.

4.    Whether, in order to practice the method of treatments in the claims of the '086 patent, one would be required to have the specified compound or compounds.

5.    Whether the earlier-issued '086 patent is directed to methods of treatment using tetrahydro-benzthiazoles that are then claimed in the later-issued '812 patent.  As an example, claim 29 of the '086 patent differs from claim 7 of the '812 patent only in that the earlier issued claim 29 of the '086 patent recites a method of using compounds to treat Parkinsonism or Parkinson's disease, while the later-issued claim 7 of '812 patent claims those compounds themselves:

| Claim 29 of the '086 Patent | Claim 7 of the '812 Patent |
| --- | --- |
| A method for treating Parkinsonism or Parkinson's disease which comprises administering a therapeutically effective amount of **2-Amino-6-n-propylamino-4,5,6,7-tetrahydro-benzthiazole, or a pharmaceutical acceptable acid addition thereof**. | **2-Amino-6-n-propylamino-4,5,6,7-tetrahydro-benzthiazole, or a pharmaceutical acceptable acid addition salt thereof.** |

Claims 9, 19, and 39 of the '086 patent similarly claim methods of using the same compounds for treating schizophrenia, lowering heart rate, and lowering blood pressure but are otherwise identical to claim 29 and bear the same relationship to claim 7.

6.    Whether the '086 patent claims methods of using either (a) the identical compounds claimed in the '812 patent, or (b) a sub-genus of the compounds claimed in the '812 patent, as set forth in the following chart:

| '086 Patent Claims | '812 Patent Claims |
|---|---|
| 7, 8, 9, 10, 17, 18, 19, 20, 23, 27, 28, 29, 30, 37, 38, 39, 40 | 3 |
| 7, 8, 9, 10, 17, 18, 19, 20, 27, 28, 29, 30, 37, 38, 39, 40 | 4 |
| 9, 10, 19, 20, 29, 30, 39, 40 | 5 |
| 9, 19, 29, 39 | 7 |
| 8, 9, 18, 19, 28, 29, 38, 39 | 9 |
| 8, 9, 18, 19, 28, 29, 38, 39 | 10 |

7.    Whether the following facts support Defendants' double patenting defense:

a.    The '374 patent contains compound and method of treatment claims, as well as one pharmaceutical composition claim, the '086 patent contains method of treatment claims, and the '812 patent contains compound claims as well as one pharmaceutical composition claim.

b.    The '086 patent contains claims to methods of using compounds for lowering blood pressure, lowering the heart rate, treatment of Parkinsonism or Parkinson's disease, and treatment of schizophrenia.  The '086 patent method claims recite treatment of these disorders by administering a therapeutically effective amount of a compound identified in the respective claims.

c.    Because the '086 patent is directed to methods of treatment using tetrahydro-benzthiazoles that are then claimed in the later-issued '812 patent, the '812 patent claims are not the product of innovation but, at best, of ordinary skill and common sense.

d.    Boehringer contends that the use of Barr's proposed ANDA product—pramipexole dihydrochloride tablets—to treat the signs and symptoms of

idiopathic Parkinson's disease literally infringes claims 3, 4, 5, 7, 9, and 10 of the '812 patent.

  e.  One cannot practice each of multiple claims of the '086 patent without also infringing the '812 patent.

  f.  One cannot use pramipexole for any of the uses disclosed in the '812 patent without also infringing the '086 patent.

  g.  Practicing the methods of at least claims 8, 9, 18, 19, 28, 29, 38, and 39 of the '086 patent, naturally and necessarily results in the formation of the claimed compounds in both protonated (acidic) and unprotonated (free base) form.

8.  Whether the '086 patent can be used as a reference against the '812 patent for purposes of double patenting.

9.  Whether a restriction requirement imposed during prosecution of the grandparent application to the '812 patent, Application Serial No. 6/810,947 ("the '947 application"), which matured as the '374 patent, did not carry over to Application Serial No. Application Serial No. 7/124,197 ("the '197 application"), which matured as the '086 patent.

10.  Whether the examiner in the '197 application, by his actions, withdrew the restriction requirement that was imposed in the '947 application.

11.  Whether the '812 patent was not filed as a result of a restriction requirement.

12.  Whether the claims of the '812 patent are not consonant with the restriction requirement imposed during the '947 application.

13.  Whether the application that matured into the '812 patent, Application Serial No. 07/256,671 ("the '671 application") was filed October 12, 1988, approximately seven months after issuance of the '374 patent.

14.     Whether Boehringer has met its burden of showing that the third sentence of 35 U.S.C. § 121 prevents a finding of double patenting.

15.     Whether the following additional facts support Defendants' position that the third sentence of 35 U.S.C. § 121 does not prevent the '086 patent from being used as a reference against the '812 patent for purposes of double patenting:

a)  The '947 application was filed December 19, 1985.  The claims as filed contained the following general subject matter:

Claims 1-5      Genus and subgenus tetrahydro-benzthiazoles

Claim 6         2-Amino-6-dimethylamino-4,5,6,7-tetrahydro-benzthiazole

Claim 7         2-Amino-6-n-propylamino-4,5,6,7-tetrahydro-benzthiazole

Claim 8         A pharmaceutical composition comprising a tetrahydro-benzthiazole of claim 3

Claim 9         A method of lowering the blood pressure with a compound of claims 3-7

Claim 10        A method for lowering the heart rate with a compound of claims 3-7

Claim 11        A method of treating Parkinsonism with a compound of claims 3-7

Claim 12        A method of treating Parkinson's disease with a compound of claims 3-7

Claim 13        A method of treating schizophrenia with a compound of claims 3-7

Claims 14-15  Methods for making a tetrahydro-benzthiazole of claim 1

b)  During prosecution of the '947 application, the patent examiner (Examiner Ceperley) imposed the following restriction requirement:

I.      Claims 1-8 (at least part of each), drawn to benzothiazole compounds and a pharmaceutical composition, classified in Class 548, subclasses 161, 163 and 164.

5

II.     Claims 1-5 and 8-10 (at least part of each), drawn to pyrrolidinyl-substituted benzothiazole compounds and a pharmaceutical composition, classified in Class 514, subclass 367.

III.    Claims 1-4 and 8 (at least part of each), drawn to piperidinyl-substituted benzothiazole compounds and a pharmaceutical composition, classified in Class 546, subclass 192.

IV.     Claims 1-4 and 8 (at least part of each), drawn to hexamethylimino substituted benzothiazole compounds and a pharmaceutical composition, classified in Class 540, subclass 603.

V.      Claims 1-4 and 8, drawn (at least part of each) morpholinyl-substituted benzothiazole compounds and a pharmaceutical composition, classified in Class 544, subclass 135.

VI.     Claim 14, drawn to a method of preparing benzothiazole compounds using a thiourea reactant.

VII.    Claim 15,  drawn to a method of preparing benzothiazole compounds using a disulfide reactant classified based on type of compounds formed.

VIII.   Claims 9 and 10, drawn to a method of lowering blood pressure or heart rate classified based on type of compound used.

IX.     Claims 11 and 12, drawn to a method for treating Parkinsonism, classified based on type of compound used.

X.      Claim 13, drawn to a method for treating schizophrenia, classified based on type of compound used.

c)  In the restriction requirement, the examiner used the term "benzothiazole" to refer to "tetrahydro-benzthiazole."

d)  The restriction requirement imposed during prosecution of the '947 application required compound/composition groups and utility (method of use) groups to be prosecuted together.  As part of the restriction requirement, the examiner stated that the applicants needed to "elect either (A) one of the compound groups I-V and one of the utility groups VIII-X (composition and utility to be limited to

6

elected compound type for examination) or (B) one of the process groups VI and VII."

e) During prosecution of the '947 application, Boehringer elected claims consistent with the restriction requirement, *i.e.*, one of the compound/composition groups— Group II, pyrrolidino substituted tetrahydro-benzthiazoles—and one of the utility groups—Group IX, a method of treating Parkinsonism—and those claims issued as the '374 patent on March 15, 1988.

f) The '197 application was filed November 23, 1987.

g) The restriction requirement imposed during prosecution of the '947 application did not carry over to the '197 application.

h) During prosecution of the '197 application, Boehringer re-submitted all of the claims from the parent application in the exact same form, including the subject matter of claims that had already issued in the '374 patent.  No preliminary amendment was filed to remove the pyrrolidino limitation.

i) During prosecution of the '197 application, a new patent examiner (Examiner Gerstl) stated that originally-filed claims 6 and 7 (compounds) and 9, 10, and 13 (three types of methods of treatment) were allowable in the same patent.  Claims 1-5, 8, 11, and 12, however, were rejected for double patenting over the '374 patent, because those claims still encompassed tetrahydro-benzthiazoles claimed in the '374 patent.   As the examiner stated, "Although the conflicting claims are not identical, they are not patentably distinct from each other because they overlap."

j)  While the claims of this '197 application were identical to the ones that were submitted during prosecution of the '947 application, the new examiner examined all of the claims together and neither referred to the prior restriction requirement nor imposed a new one.  Instead, the examiner allowed claims in a pattern inconsistent with the prior restriction requirement.

k)  In response to the examiner's rejection of some claims and allowance of others, Boehringer cancelled all of the pending claims, including the allowed claims, and submitted new claims that did not comply with the restriction requirement imposed during prosecution of the '947 application.

l)  Boehringer acknowledged that the '947 restriction requirement no longer applied when it voluntarily withdrew the allowed claims in the '197 application and re-submitted claims for multiple methods of treatment (*i.e.*, Groups VIII-X (if categorized according to the '947 restriction requirement)) employing compounds from multiple restriction groups (*i.e.*, Groups I-V (if categorized according to the '947 restriction requirement)).

m)  The claims of the '197 application which issued as the '086 patent were not consonant with the restriction requirement imposed during prosecution of the '947 application.  Using the terminology from the restriction requirement imposed during prosecution of the '947 application, the method of treatment claims that issued in the '086 patent include methods of using compounds of Groups I-V of the restriction requirement for the treatment of the disorders of Groups VIII-X of that restriction requirement.  In addition, the applicants did not "elect either (A) one of the compound groups I-V and one of the utility groups VIII-X

8

(composition and utility to be limited to elected compound type for examination) or (B) one of the process groups VI and VII."

n) On June 24, 1985, almost six months before Boehringer filed the '947 application, Eli Lilly Corporation filed U.S. Application Serial No. 747,748 ("the Eli Lilly '748 application"). The Eli Lilly '748 application disclosed compounds that overlapped with the compounds disclosed in Boehringer's tetrahydrobenzthiazole patent applications. Boehringer became aware of the Eli Lilly '748 application no later than February 2, 1987.

o) Boehringer was concerned that there may be an interference between the Eli Lilly '748 application and its U.S. applications.

p) During prosecution of the '197 application, Boehringer disclosed the Eli Lilly '748 application and explained to the examiner that it disclosed "a subgenus of the compounds disclosed and originally claimed in the above-captioned application." Boehringer represented that it contained potentially interfering subject matter with Boehringer's compound claims.

q) "In view of the particular pertinence of" the Eli Lilly '748 application to the compound/composition claims and given the apparent concern over a potential interference between those claims and the Lilly application, Boehringer stated that it would re-file the compound/composition claims in a separate application to "advance the prosecution of [the '086 patent] and [so] that issues presented by [the Eli Lilly '748 application] will be more easily dealt with."

r) Scientists at Eli Lilly synthesized compounds within the scope of the claims of the '812 patent in 1983 and 1984.

s)  The '086 patent expired on or about June 27, 2006.

t)  The restriction requirement imposed during prosecution of the '947 application did not carry over to the '671 application.

u)  The claims submitted by the applicants in the '671 application which issued in the '812 patent are from Groups I and III-V (if categorized according to the '947 application's restriction requirement).  The claims also do not include "(A) one of the compound groups I-V and one of the utility groups VIII-X (composition and utility to be limited to elected compound type for examination), or (B) one of the process groups VI and VII" as those categorizations were used during prosecution of the '947 application.

v)  The '671 application was filed for the reasons stated during prosecution of the '086 patent: "[i]n view of the particular pertinence of" the Eli Lilly '748 application to the compound/composition claims, the '671 application was filed to "advance the prosecution of [the '086 patent] and [so] that issues presented by [the Eli Lilly '748 application] will be more easily dealt with."

w)  No terminal disclaimer has been filed for the '812 patent.

16.    Whether Boehringer's proffered evidence of non-obviousness is relevant to Defendants' double patenting defense.

17.    Even if Boehringer's evidence of non-obviousness were relevant to Defendants' double patenting defense, whether Boehringer's proffered evidence of non-obviousness is limited to pramipexole, the S-enantiomer of 2-amino-6-n-propylamino-4,5,6,7-tetrahydrobenzthiazole, and therefore is not commensurate with the scope of claims 3, 4, 5, 7, 9, or 10 of the '812 patent.

18.     Whether each of claims 3, 4, 5, 7, 9, and 10 encompasses more compounds than just S-enantiomer of 2-amino-6-n-propylamino-4,5,6,7-tetrahydrobenzthiazole, and as many as thousands more.

19.     Whether Boehringer has demonstrated that pramipexole possesses unexpected properties as compared to the uses claimed in the '086 patent.

20.     Whether Boehringer has demonstrated that pramipexole actually treats fibromyalgia or depression, or acts as a neuroprotective agent.

21.     Whether Boehringer has demonstrated that pramipexole is a commercial success.

22.     Whether Boehringer has only provided evidence of what it refers to as "commercial significance," not commercial success.

23.     Whether Boehringer has proffered any evidence of nexus between the secondary indicia and the claims of the '812 patent.

24.     Whether Boehringer has demonstrated that pramipexole satisfied any long-felt but unmet need as compared to the uses claimed in the '086 patent.

25.     Whether Boehringer has demonstrated copying.

26.     Whether the inactive ingredients in MIRAPEX® are mannitol, corn starch, colloidal silicon dioxide, povidone, and magnesium stearate.

27.     Whether the inactive ingredients in Mylan's product are colloidal silicon dioxide, crospovidone, hydroxpropyl cellulose, magnesium stearate, mannitol, pregelatinized starch, and sodium citrate.

28.     Whether the inactive ingredients in Barr's product are corn starch, hydrogenated vegetable oil, mannitol, povidone, and pregelatinized corn starch.

26.     Whether Boehringer has proffered any evidence of failure of others.

11

27.     Whether Boehringer has proffered any evidence that treatment of restless legs syndrome, depression, or fibromyalgia or neuroprotective ability, if proven, constitute "materially different" methods of use from the methods claimed in the '086 patent.

28.     Whether Boehringer has proffered any evidence of other objective indicia of non-obviousness.

## III.    PRIOR INVENTION UNDER 35 U.S.C. § 102(g)

1.     Whether claims 3, 4, and 5 of the '812 patent are invalid under 35 U.S.C. § 102(g)(2) based on the prior invention of scientists at Eli Lilly.

2.     Whether, before the relevant priority dates for claims 3, 4, and 5 of the '812 patent, scientists at Eli Lilly invented compounds within the scope of those claims.

3.     Whether the priority date of claims 3 and 4 of the '812 patent is December 19, 1985.

4.     Whether Boehringer has met its burden of creating a genuine issue of material fact as to whether the Eli Lilly scientists abandoned their prior invention before the priority dates of claims 3, 4, and 5 of the '812 patent.

5.     Whether the following additional facts support Defendants' Section 102(g) defense:

    a.   During the 1983-84 timeframe, Bennett Laguzza was a scientist at Eli Lilly working in the area of central nervous system diseases, including dopamine agonists.  Prior to December 22, 1984, he synthesized 2-amino-6-di-n-propylamino-4,5,6,7-tetrahydrobenzothiazole dihydrobromide and submitted for testing to scientists working in the ergoline group.  The compound was shown to be active in those experiments, which were known for evaluating receptor agonist activity.

12

b. Prior to December 22, 1984, William Turner, a scientist at Eli Lilly, prepared 2-amino-6-dimethylamino-4,5,6,7-tetrahydrobenzothiazole dihydrobromide and 2-methylamino-6-dimethylamino-4,5,6,7-tetrahydrobenzothiazole dihydrobromide in connection with work being performed by the ergoline group. 2-amino-6-dimethylamino-4,5,6,7-tetrahydrobenzothiazole was subsequently submitted for biological testing and shown to be active.

c. On June 24, 1985, the Eli Lilly '748 application was filed listing Bennett Laguzza and William Turner as inventors.

d. The '748 patent discloses and claims 2-amino-6-di-n-propylamino-4,5,6,7-tetrahydrobenzothiazole dihydrobromide and 2-amino-6-dimethylamino-4,5,6,7-tetrahydrobenzothiazole dihydrobromide, and discloses test data for each of those compounds regarding their utility as receptor agonists.

e. In 1986, foreign counterpart applications to the '748 application were filed in South Africa, Europe, Australia, and Japan.

f. The '748 application was not abandoned until approximately February 17, 1987, after the priority dates of claims 3, 4, and 5 of the '812 patent.

g. The definition of $R_1$ in the '812 patent specification is as follows:

$R_1$ represents a hydrogen atom, an alkyl group having 1 to 6 carbon atoms, an alkenyl or alkynyl group each having 3 to 6 carbon atoms, an alkanoyl group having 1 to 6 carbon atoms, a phenyl alkyl or phenyl alkanoyl group having 1 to 3 carbon atoms in the alkyl part, whilst the above mentioned phenyl nuclei may be substituted by 1 or 2 halogen atoms.

13

h.  A compound where a phenyl group is substituted by one or more halogen atoms can be referred to as a "halogenated phenyl," "halogenated phenyl group," or "halogenated phenyl moiety."

i.  In addition to the above-referenced definition of $R_1$ for General Formula I, there are several references in the '812 patent to compounds where the $R_1$ substituent contains within it a halogenated phenyl group.

j.  The definition of $R_1$ in General Formula I of the '812 patent, however, is broader than the definition of $R_1$ set forth in the two German applications to which the '812 patent allegedly claims priority.  General Formula I of the '075 and '947 German applications reads:

> $R_1$ represents a hydrogen atom, an alkyl group having 1 to 6 carbon atoms, an alkenyl or alkynyl group each having 3 to 6 carbon atoms, an alkanoyl group having 1 to 6 carbon atoms, a phenyl alkyl or phenyl alkanoyl group having 1 to 3 carbon atoms in the alkyl part.

k.  There is nothing in either of the German applications that discloses implicitly or explicitly any starting material, intermediate, or final product in which $R_1$ contains or optionally contains a halogenated phenyl group.

l.  Claims 3 and 4 of the '812 patent encompass compounds with a halogenated phenyl group at the $R_1$ position.

m.  Synthetic methods (d) or (e) in the German applications do not disclose either compounds, or the synthesis of compounds, with a halogenated phenyl group at the $R_1$ position.

## IV.   **RELIEF**

1.  A judgment should be entered declaring that claims 3, 4, 5, 7, 9, and 10 of the '812 patent are invalid.

2.      A judgment should be entered declaring that the manufacture, use, offer to sell, sale and/or importation into the United States of Barr's product does not infringe claims 5, 9 and 10 of the '812 patent.

3.      A judgment should be entered declaring that the manufacture, use, offer to sell, sale and/or importation into the United States of Mylan's product does not infringe any valid claim of the '812 patent.

4.      An order should be entered that Boehringer has no good-faith basis to believe that the '812 patent is not invalid.

5.      An order should be entered that this is an "exceptional case" within the meaning of 35 U.S.C. § 285 warranting an award of reasonable attorney's fees to Barr and Mylan.

6.      An order should be entered awarding costs to Barr and Mylan.

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| BOEHRINGER INGELHEIM INTERNATIONAL GMBH and BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., | ) ) ) | C.A. No. 05-700 (***) CONSOLIDATED |
| Plaintiffs, | ) | |
| v. | ) ) | **CONTAINS** |
| BARR LABORATORIES, INC. | ) | **CONFIDENTIAL** |
| Defendant. | ) | **INFORMATION** |
| | ) ) | |
| _____ | ) ) | |
| BOEHRINGER INGELHEIM INTERNATIONAL GMBH and BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., | ) ) ) | |
| Plaintiffs, | ) | C.A. No. 05-854 (***) |
| v. | ) ) | |
| MYLAN PHARMACEUTICALS INC., | ) ) | |
| Defendant. | ) ) | |

**DEFENDANT BARR LABORATORIES, INC.'S RESPONSES TO PLAINTIFFS
BOEHRINGER INGELHEIM INTERNATIONAL GMBH AND BOEHRINGER
INGELHEIM PHARMACEUTICAL, INC.'S FOURTH SET OF INTERROGATORIES**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Defendant

Barr Laboratories, Inc. ("Barr Laboratories") hereby objects and responds as follows to the

Fourth Set of Interrogatories from Plaintiffs Boehringer Ingelheim International GmbH and

Boehringer Ingelheim Pharmaceutical, Inc. (collectively, "Plaintiffs" or "Boehringer").

**GENERAL OBJECTIONS**

Barr Laboratories incorporates by reference its General Objections to Plaintiffs'

First Set of Interrogatories.

## SPECIFIC OBJECTIONS AND RESPONSES

### INTERROGATORY NO. 15

Describe with particularity all facts referring or relating to your allegations in paragraph 36 of your Amended Answer that "claims in the '671 application were broader than the disclosure of German General Formula I and included new matter that was not supported by the two original German applications."

### Response:

Barr Laboratories objects to this interrogatory on the grounds that it is overly broad and unduly burdensome. Barr Laboratories further objects to this interrogatory to the extent it seeks information protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine, or any other applicable privilege. Barr Laboratories further objects to this interrogatory as calling for a legal conclusion. Barr Laboratories further objects to this interrogatory on the grounds that it seeks information which is in the possession of Plaintiffs. Barr Laboratories further objects to this interrogatory to the extent that it calls for an expert opinion. Defendant Barr Laboratories expressly reserves the right to address matters responsive to this interrogatory in its expert reports.

Subject to and without waiver of these foregoing specific objections and the General Objections, Barr Laboratories responds that, in General Formula I in the two German Applications to which Boehringer claimed priority for the '671 application (German Applications DE 3447075 or DE 3508947 (collectively "the Original German Applications")), the substituent $R_1$ was defined as follows:

> $R_1$ represents a hydrogen atom, an alkyl group having 1 to 6 carbon atoms, an alkenyl or alkynyl group each having 3 to 6 carbon atoms, an alkanoyl group having 1 to 6 carbon atoms, a phenyl alkyl or phenyl alkanoyl group having 1 to 3 carbon atoms in the alkyl part.

TX411_0002

See, e.g., Ex. 4; Ex. 5. However, in General Formula I of the '671 application, $R_1$ was defined as follows:

> $R_1$ represents a hydrogen atom, an alkyl group having 1 to 6 carbon atoms, an alkenyl or alkynyl group each having 3 to 6 carbon atoms, an alkanoyl group having 1 to 6 carbon atoms, a phenyl alkyl or phenyl alkanoyl group having 1 to 3 carbon atoms in the alkyl part, whilst the above mentioned phenyl nuclei may be substituted by 1 or 2 halogen atoms.

See, e.g., Exhibit 99 (emphasis added). The addition of the phrase "whilst the above mentioned phenyl nuclei may be substituted by 1 or 2 halogen atoms" to the definition of $R_1$ was not supported by the disclosure of the Original German Applications, and therefore constitutes new matter in the '671 application. See also, e.g., Fleischer Tr. at 201:22-206:7, 211:2-214:2, 251:7-253:10; Hurnaus Tr. at 204:19-206:2, 206:22-207-21, 209:8-210:3; Schneider Tr. at 152:16-154:8. Barr Laboratories further states that at least claims 1, 2, 3, 4, and 8 of the '671 application as originally filed include within their scope compounds, or compositions comprising compounds, in which the substituent $R_1$ can be a phenyl alkyl or phenyl alkanoyl group having 1 to 3 carbon atoms in the alkyl part, whilst the above mentioned phenyl nuclei may be substituted by 1 or 2 halogen atoms. Barr Laboratories further responds that consistent with Federal Rule 33(d) Boehringer has copies of the original German Applications and the '671 application and thus the burden of deriving the answer to this interrogatory is substantially the same for Plaintiffs as it is for Barr Laboratories.

## INTERROGATORY NO. 16

Describe with particularity all facts referring or relating to your allegations in paragraph 37 of your Amended Answer that "at least claims 1, 2, 3, 4 and 8 of the '812 patent cannot claim a priority date any earlier than December 19, 1985," and provide the full factual and legal basis for that contention.

3

**Response:**

Barr Laboratories objects to this interrogatory on the grounds that it is overly broad and unduly burdensome. Barr Laboratories further objects to this interrogatory to the extent it seeks information protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine, or any other applicable privilege. Barr Laboratories further objects to this interrogatory as calling for a legal conclusion. Barr Laboratories further objects to this interrogatory on the grounds that it seeks information which is in the possession of Plaintiffs. Barr Laboratories further objects to this interrogatory to the extent that it calls for an expert opinion. Defendant Barr Laboratories expressly reserves the right to address matters responsive to this interrogatory in its expert reports. Barr Laboratories further objects to the extent this interrogatory is duplicative of the information sought in Boehringer's Interrogatory No. 15.

Subject to and without waiver of these foregoing specific objections and the General Objections, Barr Laboratories refers to its response to Boehringer's Interrogatory No. 15, and further responds that at least claims 1, 2, 3, 4 and 8 of the '812 patent include within their scope compounds, or compositions comprising compounds, in which the substituent $R_1$ can be a phenyl alkyl or phenyl alkanoyl group having 1 to 3 carbon atoms in the alkyl part, whilst the above mentioned phenyl nuclei may be substituted by 1 or 2 halogen atoms. These claims of the '812 patent cannot claim a priority date any earlier than December 19, 1985, because the Original German Applications do not contain a sufficient disclosure or written description of such compounds, or compositions comprising such compounds.

**INTERROGATORY NO. 17**

Describe with particularity all facts referring or relating to your allegations in paragraph 38 of your answer that "one or more of the inventors' representatives and others working at Boehringer and its affiliates with the [sic] duty of disclosure to the United States Patent and Trademark Office ("USPTO"), including Dr. Dieter Laudien, Dr. Roger Milnes, and Dr. Rolf Fleisher [sic], became aware by at least February 2, 1987 that Eli Lilly & Company had

4

TX411_0004

CONFIDENTIAL

filed U.S. Application Serial No. 747,748 ("the Lilly application") with the USPTO on June 24, 1985."

**Response:**

       Barr Laboratories objects to this interrogatory on the grounds that it is overly broad and unduly burdensome. Barr Laboratories further objects to this interrogatory to the extent it seeks information protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine, or any other applicable privilege. Barr Laboratories further objects to this interrogatory as calling for a legal conclusion. Barr Laboratories further objects to this interrogatory on the grounds that it seeks information which is in the possession of Plaintiffs.

       Subject to and without waiver of these foregoing specific objections and the General Objections, Barr Laboratories responds that at some point no later than February 2, 1987 representatives of the inventors at Boehringer, including but not necessarily limited to Drs. Fleischer and Milnes, became aware of the patent application filed by Eli Lilly in the U.S. Patent Office (Application Serial No. 747,748, "Lilly U.S. Application") and the patent application filed by Eli Lilly in the European Patent Office (Application No. 86304754.4, the "Lilly European Application") (collectively "the Lilly Applications"). See, e.g., Ex. 92. On February 2, 1987 Drs. Fleischer and Milnes signed and submitted to the European Patent Office a letter about the Lilly European Application. The Lilly European Application claims priority to the Lilly U.S. Application on its face. See Ex. 22. Boehringer has also admitted that it was aware of the Lilly European Application no later than February 2, 1987. See Boehringer's Response to Barr Laboratories' Interrogatory No. 11. Furthermore, Dr. Fleischer testified that he was aware of the Lilly European Application before February 2, 1987. See, e.g., Fleischer Tr. at 299:12-19.

5

## INTERROGATORY NO. 18

Describe with particularity all facts referring or relating to the allegations in paragraph 38 of your Amended Answer that one or more of the inventors' representatives and others working at Boehringer and its affiliates, "including Drs. Laudien, Milnes, and Fleischer, also became aware in early 1987 that the Lilly Application contained overlapping subject matter with the '671 application."

## Response:

Barr Laboratories objects to this interrogatory on the grounds that it is overly broad and unduly burdensome. Barr Laboratories further objects to this interrogatory to the extent it seeks information protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine, or any other applicable privilege. Barr Laboratories further objects to this interrogatory as calling for a legal conclusion. Barr Laboratories further objects to this interrogatory on the grounds that it seeks information which is in the possession of Plaintiffs. Barr Laboratories further objects to this interrogatory to the extent that it calls for an expert opinion. Defendant Barr Laboratories expressly reserves the right to address matters responsive to this interrogatory in its expert reports.

Subject to and without waiver of these foregoing specific objections and the General Objections, Defendant Barr Laboratories refers to its response to Boehringer's Interrogatory No. 17, and further responds that at some point no later than February 2, 1987 representatives of the inventors at Boehringer, including but not necessarily limited to Drs. Fleischer and Milnes, became aware that the Lilly European Application had subject matter that overlapped with Boehringer's European Patent Application No. 85116016.8 ("the Boehringer European Patent Application"). See, e.g., Ex. 92; Ex. 95; Fleischer Tr. at 285:5-286:14; Milnes Tr. at 145:5-146:13. Through the letters of February 2, 1987 and May 10, 1988, Boehringer sought to have the Lilly European Application rejected because it overlapped with the

6

Boehringer European Patent Application. See, e.g., Ex. 92; Ex. 95; Fleischer Tr. at 291:21-293:22. The Boehringer European Patent Application was based on the same foreign filing text as the '947 application.

**INTERROGATORY NO. 19**

Describe with particularity all facts referring or relating to the allegations in paragraph 40 of your Amended Answer that "[i]n the course of disclosing the Lilly application to the USPTO during the [sic] prosecution of the '671 application, one or more of the inventors' representatives and others working at Boehringer and its affiliates with a duty of disclosure to the USPTO, including Drs. Laudien, Milnes, and Fleischer, caused or knowingly permitted material misstatements of fact to be made concerning the priority date of the '671 application."

**Response:**

Barr Laboratories objects to this interrogatory on the grounds that it is overly broad and unduly burdensome. Barr Laboratories further objects to this interrogatory to the extent it seeks information protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine, or any other applicable privilege. Barr Laboratories further objects to this interrogatory as calling for a legal conclusion. Barr Laboratories further objects to this interrogatory on the grounds that it seeks information which is in the possession of Plaintiffs. Barr Laboratories further objects to this interrogatory to the extent that it calls for an expert opinion. Defendant Barr Laboratories expressly reserves the right to address matters responsive to this interrogatory in its expert reports.

Subject to and without waiver of these foregoing specific objections and the General Objections, Defendant Barr Laboratories refers to its Responses to Boehringer's Interrogatory Nos. 15, 16, 17 and 18, and further responds that Boehringer submitted a Second Preliminary Amendment and Information Disclosure Statement ("the '671 IDS") representing to the United States Patent Office that the Lilly U.S. Application "is not available as prior art because its filing date is later than the effective filing date of the above-captioned application.

(The effective filing date of the above-captioned application is 22 December 1984, the date on

which the German application for which Convention priority is claimed was filed)." See, e.g.,

Ex. 99. Dr. Fleischer was consulted about and received copies of the '671 IDS and previous

filings making similar and/or identical representations to the USPTO and did not take any action

to correct such representations even though he knew they were incorrect. See, e.g., Ex. 88; Exs.

92-99; Fleischer Tr. at 43:8-19, 75:2-18, 135:7-136:16, 140:16-19, 151:2-153:9, 167:10-168:13,

170:12-15, 195:15-199:22, 201:22-206:7, 211:2-214:2, 236:14-237:8, 242:10-243:5, 251:7-

253:10, 283:10-284:2, 285:5-286:14, 290:8-21, 291:21-294:20, 295:12-297:2, 300:19-304:9,

307:6-308:7, 309:4-19, 311:11-312:16, 313:20-316:8, 320:22-322:3, 349:21-350:8; Stempel Tr.

at 133:10-133:19, 135:11-135:21, 211:24-212:13, 574:3-574:16; Milnes Tr. at 106:12-107:9,

137:25-138:15; Klaes Tr. at 180:10-181:8, 189:17-189:24.

   In the '671 IDS Boehringer also stated that the '671 application overlapped with

the Lilly U.S. Application because certain compounds of the Lilly Applications "represent a

subgenus of the compounds disclosed and originally claimed in the ['671] application." See,

e.g., Ex. 98. At least Dr. Fleischer, Dr. Milnes, and Mr. Stempel were aware that the '671

application and the Lilly Applications had overlapping and "possibly interfering" subject matter.

See, e.g., Ex. 92; Ex. 95; Ex. 98; Ex. 99; Fleischer Tr. at 285:21-286:14, 287:13-290:21, 291:21-

296:10; Klaes Tr. at 171:10-171:19; Milnes Tr. at 140:25-142:24.

   At the time Boehringer submitted the '671 IDS, at least then pending claims 1, 2,

3, 4, and 8 of the '671 application included within their scope compounds, or compositions

comprising compounds, in which the substituent $R_1$ can be a phenyl alkyl or phenyl alkanoyl

group having 1 to 3 carbon atoms in the alkyl part, whilst the above mentioned phenyl nuclei

may be substituted by 1 or 2 halogen atoms. Such claims encompassed subject matter that was

8

not sufficiently disclosed by or described in the Original German Applications. Because new

matter had been added to the '671 application which was not sufficiently disclosed by or

described in the original German applications, Boehringer's representations to the USPTO in the

'671 IDS were false. At least Dr. Fleischer was aware of this fact because, inter alia, he was

responsible for the prosecution of the first German Application, DE 3447075, he was responsible

for the worldwide prosecution of patent applications claiming priority to the Original German

Applications, and he drafted the foreign filing text upon which the '671 application was based

and which included the new matter. See, e.g., Ex. 88; Exs. 92-99; Fleischer Tr. at 43:8-19, 75:2-

18, 135:7-136:16, 140:16-19, 151:2-153:9, 167:10-168:13, 170:12-15, 195:15-199:22, 201:22-

206:7, 211:2-214:2, 236:14-237:8, 242:10-243:5, 251:7-253:10, 254:11-16, 283:10-284:2, 285:5-

286:14, 290:8-21, 291:21-294:20, 295:12-297:2, 300:19-304:9, 307:6-308:7, 309:4-19, 311:11-

312:16, 313:20-316:8, 320:22-322:3, 349:21-350:8; Stempel Tr. at 133:10-133:19, 135:11-

135:21, 211:24-212:13, 574:3-574:16; Milnes Tr. at 106:12-107:9, 137:25-138:15; Klaes Tr. at

180:10-181:8, 189:17-189:24. Dr. Fleischer therefore knew, or at least should have known in the

exercise of reasonable diligence, that the representations to the USPTO in the '671 IDS were

false and he never took any steps to correct such misrepresentations.

### INTERROGATORY NO. 20

Describe with particularity all facts referring or relating to the allegations in
paragraph 42 of your Amended Answer that "one or more of the inventors' representatives and
others working at Boehringer and its affiliates with a duty of disclosure to the USPTO, including
Drs. Laudien, Milnes, and Fleischer, knew that if they did not misrepresent the priority date to
the USPTO in order to overcome the Lilly application, they would not be able to obtain claims
covering some of their particularly preferred compounds."

### Response:

Barr Laboratories objects to this interrogatory on the grounds that it is overly

broad and unduly burdensome. Barr Laboratories further objects to this interrogatory to the

9

extent it seeks information protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine, or any other applicable privilege. Barr Laboratories further objects to this interrogatory as calling for a legal conclusion. Barr Laboratories further objects to this interrogatory on the grounds that it seeks information which is in the possession of Plaintiffs. Barr Laboratories further objects to this interrogatory to the extent that it calls for an expert opinion. Defendant Barr Laboratories expressly reserves the right to address matters responsive to this interrogatory in its expert reports.

Subject to and without waiver of these foregoing specific objections and the General Objections, Defendant Barr Laboratories refers to its Responses to Boehringer's Interrogatory Nos. 15, 16, 17, 18 and 19 and further responds that the preferred compounds described in the '671 application include compounds that were not disclosed in or described by the Original German Applications because they contain a halogenated phenyl substituent at the $R_1$ position. See, e.g., Ex. 4; Ex. 5; Ex. 99; Fleischer Tr. at 251:7-253:10. As a result, the claim(s) encompassing such compounds could not claim priority back to the original German applications. Without the effective filing date of the Original German Applications, such claims were anticipated by the Lilly U.S. Application.

**INTERROGATORY NO. 21**

Describe with particularity the facts and circumstances regarding Barr's decision to file Abbreviated New Drug Application No. 77-724 (Barr's ANDA).

**Response:**

Defendant Barr Laboratories objects to this interrogatory on the grounds that it is overly broad and unduly burdensome. Barr Laboratories further objects to this interrogatory to the extent it seeks information protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine, or any other applicable privilege. Barr Laboratories further

10

TX411_0010

objects to this interrogatory on the grounds that it is not relevant to the claims or defenses of any

party. Barr Laboratories further objects to the extent this interrogatory seeks discovery on Barr

Laboratories' legal basis for filing a Paragraph IV certification as such discovery has been

previously stayed by the Court. Barr Laboratories further objects to this interrogatory as

duplicative of Interrogatory Nos. 1, 9, and 10.

Subject to and without waiver of these foregoing specific objections and the

General Objections, and incorporating the specific objections and Responses to Interrogatory

Nos. 1, 9, and 10, Defendant Barr Laboratories responds that it has already provided a Rule

30(b)(6) witness on this topic. Barr Laboratories further responds that, consistent with Federal

Rule 33(d) Barr Laboratories has produced all non-privileged documents in its possession found

after a reasonable search, to the extent they exist, which reflect this information and thus the

burden of deriving the answer to this interrogatory is substantially the same for Plaintiffs as it is

for Barr Laboratories.

## INTERROGATORY NO. 22

Describe with particularity all facts referring or relating to the development of
Barr's proposed product, including, but not limited to, the reasons why Barr chose to attempt to
manufacture and market a generic pramipexole product instead of a product containing any other
dopamine agonist.

## Response:

Defendant Barr Laboratories objects to this interrogatory on the grounds that it is

overly broad and unduly burdensome. Barr Laboratories further objects to this interrogatory to

the extent it seeks information protected from disclosure by the attorney-client privilege and/or

the attorney work product doctrine, or any other applicable privilege. Barr Laboratories further

objects to the phrase "proposed product" as vague and ambiguous. Barr Laboratories further

objects to the characterization that it chose one dopamine agonist over another as that assumes –

11

without any foundational evidence – that such a choice was made. Barr Laboratories further

objects to this interrogatory on the grounds that, to the extent it seeks information about

dopamine agonists other than pramipexole, it is not relevant to the claims or defenses of any

party. Barr Laboratories further objects to this interrogatory as duplicative of Interrogatory Nos.

1, 9 and 11.

Subject to and without waiver of these foregoing specific objections and the

General Objections, and incorporating the specific objections and Responses to Interrogatory

Nos. 1, 9 and 11, Defendant Barr Laboratories responds that it has already provided a Rule

30(b)(6) witness on the development of Barr Laboratories' proposed product. In addition, Barr

Laboratories has already produced a copy of the product development report for Barr

Laboratories' Proposed Pramipexole Product which has been marked as Exhibit 140, along with

numerous other documents describing the development process, and that Boehringer has

questioned Barr Laboratories witnesses about that document. Barr Laboratories further responds

that, consistent with Federal Rule 33(d), Barr Laboratories has produced all non-privileged

documents in its possession found after a reasonable search which reflect this information and

thus the burden of deriving the answer to this interrogatory is substantially the same for Plaintiffs

as it is for Barr Laboratories.

## INTERROGATORY NO. 23

Describe with particularity Barr's market projections for Barr's proposed product,
including but not limited to projected net sales, net costs, pricing, and net profits for each of the
years 2008, 2009, 2010, and 2011.

## Response:

Defendant Barr Laboratories objects to this interrogatory on the grounds that it is

overly broad and unduly burdensome. Barr Laboratories further objects to this interrogatory to

12

the extent it seeks information protected from disclosure by the attorney-client privilege and/or

the attorney work product doctrine, or any other applicable privilege. Barr Laboratories further

objects to this interrogatory on the grounds that projected or potential sales are not relevant to the

claims or defenses of any party.

Subject to and without waiver of these foregoing specific objections and the

General Objections, Defendant Barr Laboratories responds that, pursuant to Federal Rule 33(d)

Barr Laboratories has produced all non-privileged documents in its possession found after a

reasonable search, to the extent they exist, which reflect any such information, and thus the

burden of deriving the answer to this interrogatory is substantially the same for Plaintiffs as it is

for Barr Laboratories. Barr Laboratories further refers Plaintiffs to, for example,

BARR021828-37, BARR021854-59, BARR060049-72, BARR060076-80, BARR060144-158,

BARR064420-54, BARR160507-12.

**INTERROGATORY NO. 24**

Describe with particularity Barr's projected consumer or customer profiles
concerning Barr's proposed product.

**Response:**

Defendant Barr Laboratories objects to this interrogatory on the grounds that it is

overly broad and unduly burdensome. Barr Laboratories further objects to this interrogatory to

the extent it seeks information protected from disclosure by the attorney-client privilege and/or

the attorney work product doctrine, or any other applicable privilege. Barr Laboratories further

objects to this interrogatory on the grounds that it is not relevant to the claims or defenses of any

party.

13

Subject to and without waiver of these foregoing specific objections and the

General Objections, Defendant Barr Laboratories responds that it does not possess, and has never

possessed, any such consumer or customer profiles.

## INTERROGATORY NO. 25

Describe with particularity the potential and/or expected market size for Barr's
proposed product for each of the years 2008, 2009, 2010 and 2011.

## Response:

Defendant Barr Laboratories objects to this interrogatory on the grounds that it is

overly broad and unduly burdensome.  Barr Laboratories further objects to this interrogatory to

the extent it seeks information protected from disclosure by the attorney-client privilege and/or

the attorney work product doctrine, or any other applicable privilege.  Barr Laboratories further

objects to this interrogatory on the grounds that projected or potential sales are not relevant to the

claims or defenses of any party.  Barr Laboratories further objects that this interrogatory is

duplicative of Interrogatory No. 23.  Barr Laboratories further objects that the phrase "market

size for Barr Laboratories' proposed product" is vague and ambiguous because it is impossible to

determine whether it seeks information regarding the market in which Barr Laboratories'

proposed product will compete or the expected sales of Barr Laboratories' proposed product.

Subject to and without waiver of these foregoing specific objections and the

General Objections, and incorporating the specific objections and responses to Interrogatory No.

23, Defendant Barr Laboratories responds that consistent with Federal Rule 33(d) Barr

Laboratories has produced all documents in its possession found after a reasonable search, to the

extent they exist, which reflect information regarding the projected size of the market in which

Barr Laboratories' proposed product will compete and thus the burden of deriving the answer to

this interrogatory is substantially the same for Plaintiffs as it is for Barr Laboratories.

14

## INTERROGATORY NO. 26

Describe with particularity any actual or proposed assignments, licenses, or other transfers of any rights to Barr's ANDA and any negotiations in connection therewith, including but not limited to any such assignments, licenses, transfers, or negotiations to which Barr was a party.

### Response:

Defendant Barr Laboratories objects to this interrogatory on the grounds that it is vague and ambiguous. Barr Laboratories further objects to this interrogatory to the extent it seeks information protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine, or any other applicable privilege. Barr Laboratories further objects to this interrogatory on the grounds that it is not relevant to the claims or defenses of any party.

Subject to and without waiver of these foregoing specific objections and the General Objections, Defendant Barr Laboratories responds that there are no such actual or proposed assignments, licenses, or transfers of rights to Barr Laboratories' ANDA nor have any negotiations related to those issues taken place.

## INTERROGATORY NO. 27

Describe with particularity the chemical structure of Barr's proposed product, including but not limited to actual and potential impurities, and the performance and activity of the API in Barr's proposed product.

### Response:

Defendant Barr Laboratories objects to this interrogatory on the grounds that it is overly broad and unduly burdensome. Barr Laboratories further objects to this interrogatory to the extent it seeks information protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine, or any other applicable privilege. Barr Laboratories further objects to this interrogatory on the grounds that it calls for information not relevant to the claims or defenses of any party. Barr Laboratories further objects to the term "chemical structure of

15

Barr's proposed product" as ambiguous and unintelligible as Barr Laboratories' proposed

product does not have a single chemical structure. Barr Laboratories further objects to the term

"performance and activity" as vague and ambiguous. Barr Laboratories further objects to this

interrogatory on the grounds that, to the extent Barr Laboratories understands it, the interrogatory

seeks information which appears in documents already produced to Boehringer and is thus

already in the possession of Plaintiffs. Barr Laboratories further objects to this interrogatory to

the extent that it calls for an expert opinion. Defendant Barr Laboratories expressly reserves the

right to address matters responsive to this interrogatory in its expert reports.

Subject to and without waiver of these foregoing specific objections and the

General Objections, Defendant Barr Laboratories responds that the structure of the API in Barr

Laboratories' Proposed Product is shown on Barr Laboratories' proposed product label. Barr

Laboratories further states that information concerning any alleged impurities in the API in Barr

Laboratories' proposed product may be found in Barr Laboratories' ANDA No. 77-724. In

addition, consistent with Federal Rule 33(d) Barr Laboratories has produced all non-privileged

documents in its possession found after a reasonable search which reflect this information and

thus the burden of deriving the answer to this interrogatory is substantially the same for Plaintiffs

as it is for Barr Laboratories.

**INTERROGATORY NO. 28**

Identify the concentration of all impurities in the pramipexole used to
manufacture the registration batch associated with Abbreviated New Drug Application No. 77-
724 including but not limited to (R)-N-Propyl-4,5,6,7-tetrahydro-benzothiazole-2,6-diamine
dihydrochloride monohydrate.

**Response:**

Defendant Barr Laboratories objects to this interrogatory on the grounds that it is

overly broad and unduly burdensome. Barr Laboratories further objects to this interrogatory to

16

the extent it seeks information protected from disclosure by the attorney-client privilege and/or

the attorney work product doctrine, or any other applicable privilege. Barr Laboratories further

objects to this interrogatory on the grounds that it calls for information not relevant to the claims

or defenses of any party. Barr Laboratories further objects to the characterization of the

R-enantiomer as an impurity. Barr Laboratories further objects to this interrogatory on the

grounds that, to the extent Barr Laboratories understands it, the interrogatory seeks information

which appears in documents already produced to Boehringer and is thus already in the

possession of Plaintiffs. See, e.g., Barr Laboratories' ANDA No. 77-724 and Certificates of

Analysis for the API. Barr Laboratories further objects to this interrogatory to the extent it seeks

information in the possession of any third parties.

Subject to and without waiver of these foregoing specific objections and the

General Objections, Defendant Barr Laboratories responds that consistent with Federal Rule

33(d) Barr Laboratories has produced all non-privileged documents in its possession found after

a reasonable search which reflect this information and thus the burden of deriving the answer to

this interrogatory is substantially the same for Plaintiffs as it is for Barr Laboratories.

**INTERROGATORY NO. 29**

To the extent that you disagree that 35 U.S.C. § 121 precludes the use of the '086
patent as a reference against the claims of the '812 patent, describe with particularity the facts
referring or relating to your disagreement.

**Response:**

Defendant Barr Laboratories objects to this interrogatory on the grounds that it is

overly broad and unduly burdensome. Barr Laboratories further objects to this interrogatory to

the extent it seeks information protected from disclosure by the attorney-client privilege and/or

the attorney work product doctrine, or any other applicable privilege. Barr Laboratories further

17

objects to this interrogatory as calling for a legal conclusion. Barr Laboratories further objects to this interrogatory to the extent that it calls for an expert opinion. Defendant Barr Laboratories expressly reserves the right to address matters responsive to this interrogatory in its expert reports.

Subject to and without waiver of these foregoing specific objections and the General Objections, Defendant Barr Laboratories responds that Boehringer has the burden of showing that 35 U.S.C. § 121 applies to this case. Boehringer's objections and responses to Barr Laboratories' Interrogatory No. 8 are wholly inadequate and do not satisfy this burden. In addition, Barr Laboratories states that, in accordance with applicable law, Section 121 does not apply to the use of the '086 patent as a reference against the '812 patent because the '671 application that led to the '812 patent was not filed as a result of a restriction requirement, nor is it consonant with any restriction requirement contained in any related file history, including the restriction requirement imposed in the application that led to the '374 patent. Barr Laboratories further states that the '671 application was filed after the issuance of the application that matured into the '374 patent. Barr Laboratories further responds that consistent with Federal Rule 33(d) Boehringer has copies of the '374, '086, and '812 patents and their prosecution histories and thus the burden of deriving the answer to this interrogatory is substantially the same for Plaintiffs as it is for Barr Laboratories.

## INTERROGATORY NO. 30

Identify all persons providing information with regard to Interrogatory Nos. 1 to 29.

## Response:

Defendant Barr Laboratories objects to this interrogatory on the grounds that it is overly broad and unduly burdensome. Barr Laboratories further objects to this interrogatory to

18

CONFIDENTIAL

the extent it seeks information protected from disclosure by the attorney-client privilege and/or the attorney work product doctrine, or any other applicable privilege.

Subject to and without waiver of these foregoing specific objections and the General Objections, Defendant Barr Laboratories responds that Salah Ahmed, Paul Bisaro and Nicholas Tantillo provided certain information with regard to certain of Interrogatory Nos. 1 to 29 which assisted counsel in the preparation of these responses.

As to Objections:

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

_____
Josy W. Ingersoll (#1088)
John W. Shaw (#3362)
Karen L. Pascale (#2903)
Adam W. Poff (#3990)
Karen E. Keller  (#4489)
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, Delaware 19899-0391
(302) 571-6600
apoff@ycst.com
*Attorneys for Defendant Barr Laboratories,
Inc.*

OF COUNSEL:

Glenn J. Pfadenhauer
Jessamyn S. Berniker
Dov P. Grossman
Brett R. Tobin
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, NW
Washington, D.C.  20005
(202) 434-5000

Dated: January 30, 2007

19

TX411_0019

## CERTIFICATE OF SERVICE

I, Adam W. Poff, Esquire hereby certify that on January 30, 2007, copies of the foregoing document were served on the following counsel of record in the manner indicated:

### BY HAND DELIVERY

Jack B. Blumenfeld, Esquire
Morris Nichols Arsht & Tunnell
1201 North Market Street
PO Box 1347
Wilmington, DE 19899-1347

Mary B. Matterer, Esquire
Morris, James, Hitchens & Williams LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE 19801

### BY E-MAIL ON JANUARY 30, 2007 AND
### FEDERAL EXPRESS ON JANUARY 31, 2007

Steven C. Cherny, Esquire
Latham & Watkins LLP
885 Third Avenue, Suite 1000
New York, NY 10022-4834

Kenneth G. Schuler, Esquire
Latham & Watkins LLP
Sears Tower, Suite 5800
Chicago, IL 60606

Shannon M. Bloodworth, Esquire
Heller Ehrman LLP
1717 Rhode Island Ave., N.W.
Washington, DC 20036

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Adam W. Poff (No. 3990)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware 19801
(302) 571-6600
apoff@ycst.com

*Attorneys for Barr Laboratories, Inc.*

TX411_0020

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BOEHRINGER INGELHEIM               )
INTERNATIONAL GMBH and BOEHRINGER  )     C.A. No. 05-700 (***)
INGELHEIM PHARMACEUTICALS, INC.,   )
                    Plaintiffs,    )
        v.                         )
                                   )
BARR LABORATORIES, INC.            )
                    Defendant.     )

## EXPERT REPORT OF ERIC V. ANSLYN, Ph.D.

### I.      Background and Qualifications

1.      I am the Norman Hackerman Professor of Chemistry and a University Distinguished Teaching Professor at the University of Texas, Austin.

2.      I graduated with a doctorate in chemistry in 1987 (and formally received my Ph.D. in 1988) from the California Institute of Technology. The focus of my Ph.D. studies was organic chemistry.

3.      Following completion of my doctorate, I spent two years performing post-doctoral work in the field of bioorganic chemistry at Columbia University.

4.      For approximately the last 20 years, the focus of my work has been in the area of bioorganic chemistry, with an emphasis on using synthetic organic compounds to mimic biologically active moieties.

5.      I teach the introductory organic chemistry class at the University of Texas, a course I have frequently taught for over 17 years. This course covers topics such as organic structures, nomenclature, chirality, and synthesis of organic compounds, including biologically active molecules. During my career, I have also taught courses in bioorganic chemistry, physical organic chemistry, organometallic chemistry, and supramolecular chemistry.

6.      I am a co-author of *Modern Physical Organic Chemistry*, a graduate level textbook that covers, among other topics, organic structures, nomenclature, and chirality. I also am in the process of co-writing an undergraduate level organic chemistry textbook, entitled *Organic Chemistry*, which is scheduled to be published toward the end of 2007.

7.      For approximately the last seven years, I have been an Associate Editor of the *Journal of the American Chemical Society*.

8.      I am a founding member of the Texas Institute of Drug and Diagnostics Development. The primary goal of this institute is the creation of small molecule therapeutics for targets identified by Texas-based medical schools.

9.      I have recently been honored with the Arthur C. Cope Scholar Award from the American Chemical Society, which was established to recognize and encourage excellence in organic chemistry.

10.     My curriculum vitae is attached as Exhibit A.

## II.      Mandate

11.     I will testify as an expert in the area of organic chemistry.

12.     I have been asked by Barr's counsel to comment on certain aspects of three United States patents – U.S. Patent Nos. 4,731,374 ("the '374 patent"), 4,843,086 ("the '086 patent"), and 4,886,812 ("the '812 patent") – including a discussion of what is disclosed by these patents to the person of ordinary skill in the art, how the claims would be understood by the person of ordinary skill in the art, and the relationship between claims of the '086 patent and the '812 patent. I have also been asked to compare these U.S. patents to two earlier German patent applications, and to evaluate whether certain aspects of the general formula disclosed in the U.S. patents would be understood by a skilled artisan to be disclosed by those German applications. I

have also been asked to comment on certain compounds prepared at Eli Lilly & Company, and to analyze whether they are encompassed by the claims of the '812 patent as understood by a skilled artisan.

### III.   Definition of One of Ordinary Skill in the Art

13.     I have been asked by counsel for Barr to provide opinions about the qualifications of the person of ordinary skill in the art ("skilled artisan") who would have understood and appreciated the disclosure and teachings of the '812 patent as of December 22, 1984, the date German application DE 3447075 ("the '075 German application") was filed.[1]  In my opinion, the skilled artisan would have had one of the following: (1) a bachelor's degree with an emphasis on organic chemistry, about two years of experience in that field, and a general understanding of medicinal chemistry or bioorganic chemistry; (2) a bachelor's degree with an emphasis on bioorganic chemistry or medicinal chemistry and about two years of experience in one of those fields; (3) a master's degree with an emphasis on organic chemistry, and a general understanding of medicinal chemistry or bioorganic chemistry; (4) a master's degree with an emphasis on bioorganic chemistry, or medicinal chemistry; or (5) comparable education, training, and/or experience.

### IV. Materials Relied Upon

14.     In addition to my training and experience, I have relied upon the following materials in forming the opinions set forth herein:

- the '374, '086, and '812 patents;

---

[1]     None of the opinions expressed in this Report would change if December 19, 1985, the filing date of the first U.S. application (the application that led to the '374 patent), were used as the date instead.

3

- BARR000662-666;

- English translations of the '075 German application (Exhibit 53 in this matter) and DE 3508947 ("the '947 German application") (BARR209351-403);

- Eli Lilly U.S. Application Serial No. 747,748 ("the '748 application") (Exhibit 18 in this matter);

- Exhibits 11, 12, 13, 14, 15, 16, 19, 21, 22, 23, 26, 27, 30, 31, and 32 in this matter; and

- the deposition testimony of Bennett Laguzza, William Turner, Richard Hahn, and Barry Smalstig in this matter.

## V.    Cases in Last Four Years

15.    I have not testified as an expert during the last four years.

## VI.    Compensation

16.    I am being compensated for my time at the rate of $350 per hour.  My compensation is in no way dependent on the outcome of this case.

## VII.    Summary of Opinions

17.    As understood by the skilled artisan, the compounds in claims 3-5 and 7-10 of the '812 patent[2] are identical to or completely encompass the compounds used in method claims of the '086 patent.

18.    While the specification and claims of the '812 patent define $R_1$ in General Formula I to optionally contain what I will refer to as a "halogenated phenyl," there is nothing in either of the two German applications that describes either implicitly or explicitly to the skilled

---

[2]    I have been advised by counsel for Barr that the Plaintiffs are suing Barr on claims 3-5 and 7-10 of the '812 patent.

artisan, any starting material, intermediate, or final product in which $R_1$ contains or optionally contains a halogenated phenyl.

19.     Individuals at Eli Lilly & Co. successfully prepared the following three compounds prior to December 22, 1984:  2-amino-6-di-n-propylamino-4,5,6,7-tetrahydrobenzothiazole dihydrobromide; 2-amino-6-dimethylamino-4,5,6,7-tetrahydrobenzothiazole dihydrobromide; and 2-methylamino-6-dimethylamino-4,5,6,7-tetrahydrobenzothiazole dihydrobromide.  In addition, Eli Lilly & Co. patent applications were filed in at least the United States, the European Patent Office, Australia, and South Africa, that disclose and contain claims that the skilled artisan would understand encompass the three aforementioned compounds, disclose methods of synthesizing them, and specifically describe the biological activity of at least the first two of these compounds.

20.     In addition to the specific opinions set forth in this Report, I may respond to additional testimony and information that becomes available during deposition, at trial, or otherwise, including any opinions put forth by Boehringer's experts.  I may also use charts, graphs, or other demonstrative exhibits to support any potential testimony at trial.

21.     I may also provide the Court with general background on relevant principles of organic chemistry.

## VIII.   General Background

22.     In order to provide background for my opinions, it is useful to review a few principles of organic chemistry.

23.     Each carbon atom typically forms 4 bonds.  Lines are often used to designate bonds between atoms:

24.     When two atoms are bonded to each other with one bond, it is called a "single bond"; when two atoms are bonded to each other with two bonds, it is called a "double bond"; when two atoms are bonded to each other with three bonds, it is called a "triple bond."

25.     In drawings of organic compounds, carbon (C) atoms, hydrogen (H) atoms bonded to carbon atoms, and bonds between carbon and hydrogen atoms are often assumed and therefore not specified.  Atoms other than carbon or hydrogen, as well as carbon-carbon bonds and bonds between carbon and atoms other than hydrogen, are usually specified.  For example:

 is the same as 

26.     Carbon atoms can be arranged in rings.  One example of this is benzene:

 or 

27.     Atoms other than carbon can also bond with carbon to form a ring.  One class of such ring structures is a group known as heterocycles.  One example of a heterocycle is a thiazole ring, which is a five-membered ring with 1 sulfur (S) atom and 1 nitrogen (N) atom positioned in the ring as follows:

 or 

6

28.    The following structure is a tetrahydrobenzothiazole[3]:



or

The name derives from the fact that the structure has a thiazole ring fused to a benzene ring in which four of the carbon atoms have been substituted with four extra hydrogen atoms.

29.    There is a conventional numbering system for the tetrahydrobenzothiazole skeleton that assigns numbers to the atoms in the rings. This allows the skilled artisan to identify the placement of other atoms or groups (often referred to as "substituents") bonded to the ring system. That numbering convention is as follows:



30.    An "amino group" generally refers to a substituent that, among other things, contains at least one nitrogen atom with only single bonds to that nitrogen.

31.    The compounds disclosed in the '374, '086, and '812 patents are based on a general chemical structure which has two amino groups, shown in grey, bound to a tetrahydrobenzothiazole core:

_____

[3]    The skilled artisan would understand that the terms "tetrahydrobenzothiazole," "tetrahydrobenzthiazole," and "tetrahydro-benzthiazole" are interchangeable.

As shown in this drawing, one of these amino groups is in the 2-position of the tetrahydrobenzothiazole core. The other amino group must be placed in either the 4, 5, 6, or 7 positions.

32.    As shown in the above drawing, both of the amino groups have two substituents. The substituents attached to the 2-position amino group are designated as $R_1$ and $R_2$, and the substituents attached to the other amino group are designated as $R_3$ and $R_4$.

### IX.    Background Information Regarding the '374, '086, and '812 Patents

33.    The '374, '086, and '812 patents disclose compounds of the following general formula, which is referred to as General Formula I in their specifications:



$R_1$ represents a hydrogen atom, an alkyl group having 1 to 6 carbon atoms, an alkenyl or alkynyl group each having 3 to 6 carbon atoms, an alkanoyl group having 1 to 6 carbon atoms, a phenyl alkyl or phenyl alkanoyl group having 1 to 3 carbon atoms in the alkyl part, whilst the above mentioned phenyl nuclei may be substituted by 1 or 2 halogen atoms,

$R_2$ represents a hydrogen atom or an alkyl group with 1 to 4 carbon atoms,

$R_3$ represents a hydrogen atom, an alkyl group with 1 to 7 carbon atoms, a cycloalkyl group having 3 to 7 carbon atoms, an alkenyl or alkynyl group having 3 to 6 carbon atoms, an alkanoyl group having 1 to 7 carbon atoms, a phenyl alkyl or phenyl alkanoyl

group having 1 to 3 carbon atoms in the alkyl part, whilst the phenyl nucleus may be substituted by fluorine, chlorine or bromine atoms,

$R_4$ represents a hydrogen atom, an alkyl group with 1 to 4 carbon atoms, an alkenyl or alkynyl group having 3 to 6 carbon atoms or

$R_3$ and $R_4$ together with the nitrogen atom between them represent a pyrrolidino, piperidino, hexamethyleneimino or morpholino group.

Exhibit 1, Col. 1; Exhibit 2, Col. 1; Exhibit 3, Col. 1.

34.    The three patents further identify that the compounds of General Formula I can be used to lower blood pressure, lower heart rate, treat Parkinsonism or Parkinson's disease, or treat schizophrenia. *See, for example,* '812 patent (Exhibit 3), Cols. 7, 10.

35.    With regard to the claims of these patents, the skilled artisan would understand that the '374 patent contains compound and method of treatment claims, as well as one pharmaceutical composition claim, the '086 patent contains method of treatment claims, and the '812 patent contains compound claims as well as one pharmaceutical composition claim.

36.    The skilled artisan would understand that the '086 patent contains claims to methods of using compounds for lowering blood pressure, lowering the heart rate, treatment of Parkinsonism or Parkinson's disease, or treatment of schizophrenia. The skilled artisan also would understand that the '086 patent has claims to methods of treating each of these disorders by administering a therapeutically effective amount of a compound identified in the particular claim. The skilled artisan would appreciate that, in order to perform the method of treatment in these claims, one would be required to have the specified compound or compounds.

## X.    Relationship Between Claims of the '086 and '812 Patents

37.    The skilled artisan would understand that the compounds in claims of the '812 patent are identical to or completely encompass the compounds used in method claims in the

9

'086 patent.[4]  The following chart shows which claims of the '086 patent: (1) use compound(s) that are identical to the compound(s) in the specified claim of the '812 patent; or (2) use compound(s) that are encompassed within a group of compounds in the specified claim of the '812 patent:

| '812 Patent Claim | '086 Patent Claims |
| --- | --- |
| 3 | 7, 8, 9, 10, 17, 18, 19, 20, 23, 27, 28, 29, 30, 37, 38, 39, 40 |
| 4 | 7, 8, 9, 10, 17, 18, 19, 20, 27, 28, 29, 30, 37, 38, 39, 40 |
| 5 | 9, 10, 19, 20, 29, 30, 39, 40 |
| 7 | 9, 19, 29, 39 |
| 9[5] | 8, 9, 18, 19, 28, 29, 38, 39 |
| 10 | 8, 9, 18, 19, 28, 29, 38, 39 |

38.     In addition, the skilled artisan would understand that claim 3 of the '812 patent is to a group of compounds that is identical to the group of compounds used in claims 3, 13, and

---

[4]     I understand that there is a disagreement among the parties as to whether the phrase "2-amino-6-n-propylamino-4,5,6,7-tetrahydrobenzothiazole" as used in the claims of the patents is limited to the racemic mixture.  However, the opinions expressed in this section of my Report are not dependent upon the outcome of that dispute.

[5]     I have been advised that Boehringer contends that claims 9 and 10 encompass a dihydrochloride form of the compounds claimed in those claims – *i.e.*, a pharmaceutically acceptable acid addition salt form thereof.

33 of the '086 patent, except that the '086 patent claims also permit $R_3$ and $R_4$ together with the nitrogen atom between them to form a pyrrolidino group.

39.    The skilled artisan would understand that claim 8 of the '812 patent is to pharmaceutical compositions and is dependent upon claim 3 of the '812 patent. The skilled artisan would further understand that the compounds of the pharmaceutical compositions encompassed by claim 8 of the '812 patent are identical to, or completely encompass, the compounds used in the methods of claims 7, 8, 9, 10, 17, 18, 19, 20, 23, 27, 28, 29, 30, 37, 38, 39, and 40 of the '086 patent.

## XI.    Disclosure of Halogenated Phenyl Groups

40.    As discussed above, the definition of $R_1$ in the '812 patent specification is as follows:

> $R_1$ represents a hydrogen atom, an alkyl group having 1 to 6 carbon atoms, an alkenyl or alkynyl group each having 3 to 6 carbon atoms, an alkanoyl group having 1 to 6 carbon atoms, a phenyl alkyl or phenyl alkanoyl group having 1 to 3 carbon atoms in the alkyl part, *whilst the above mentioned phenyl nuclei may be substituted by 1 or 2 halogen atoms.*

Exhibit 3, Col. 1 (emphasis supplied).

41.    A "phenyl group" (or "phenyl nuclei" as used in the '812 patent) can be depicted as follows:



The squiggly line means that the ring acts as a group that can be attached to another atom.

11

42.     A compound where a phenyl group is substituted by one or more halogen atoms can be referred to as a "halogenated phenyl," "halogenated phenyl group," or "halogenated phenyl moiety."

43.     An example of a substituent at the $R_1$ position containing a halogenated phenyl group is 4-chloro-benzyl, which can be depicted as follows:



44.     In addition to the above-referenced definition of $R_1$ for General Formula I, there are several references in the '812 patent to compounds where the $R_1$ substituent contains within it a halogenated phenyl group:

•       the specification states that examples of $-NR_1R_2$ include 2-chloro-benzylamino, 4-chloro-benzylamino, 2-fluoro-benzylamino, and 3,4-dichloro-benzylamino, each of which contains a halogenated phenyl group at $R_1$, *see* Exhibit 3, Col. 2;

•       the specification of the '812 patent further states that particularly preferred compounds of General Formula I include those in which $R_1$ is 2-chloro-benzyl, 4-chloro-benzyl, or 3,4-dichloro-benzyl, each of which contains a halogenated phenyl group, *see* Exhibit 3 at Col. 3;

•       example 10 of the '812 patent contains examples in which $R_1$ is a 2-chloro-benzyl, 4-chloro-benzyl, or a 3,4-dichloro-benzyl – *i.e.*, where $R_1$ contains a halogenated phenyl moiety, *see* Exhibit 3 at Cols. 19-20;

•       claim 1 of the '812 patent states that $R_1$ can be "a phenyl alkyl or phenyl alkanoyl group having 1 to 3 carbon atoms in the alkyl part, wherein the above mentioned phenyl nuclei

12

may be substituted by 1 or 2 halogen atoms" and claim 2 also includes that description, *see* Exhibit 3 at Col. 23-24;

- claim 3 of the '812 patent states that $R_1$ can be a 2-chloro-benzyl, 4-chloro-benzyl, or a 3,4-dichloro-benzyl, each of which contains a halogenated phenyl group, and claim 4 also includes that description, *see* Exhibit 3 at Cols. 24-25; and

- claim 8 of the '812 patent is to pharmaceutical compositions of compounds of claim 3, and therefore, as referenced above, those compositions include compounds where $R_1$ contains a halogenated phenyl group, *see* Exhibit 3 at Cols. 24-26.

45.    The definition of $R_1$ in General Formula I of the '812 patent, however, is broader than the definition of $R_1$ set forth in the '075 and '947 German applications. General Formula I of the '075 and '947 German applications reads:

> $R_1$ represents a hydrogen atom, an alkyl group having 1 to 6
> carbon atoms, an alkenyl or alkynyl group each having 3 to 6
> carbon atoms, an alkanoyl group having 1 to 6 carbon atoms, a
> phenyl alkyl or phenyl alkanoyl group having 1 to 3 carbon atoms
> in the alkyl part.

Exhibit 53 at BARR028270-271. The skilled artisan would not understand this definition to encompass an $R_1$ substituent containing a halogenated phenyl group, unlike the definition for General Formula I in the '812 patent, which expressly includes such a group.

46.    In addition, there is nothing in either of the German applications that discloses implicitly or explicitly to the skilled artisan, any starting material, intermediate, or final product in which $R_1$ contains or optionally contains a halogenated phenyl group. Unlike the '812 patent, there are no examples in either of the German applications of compounds that contain a halogenated phenyl group as part of the $R_1$ substituent.

13

47.    As stated above, the skilled artisan would understand that claims 1-4 and 8 of the '812 patent include compounds in which $R_1$ contains a halogenated phenyl moiety.

## XII.    Eli Lilly

48.    I have reviewed documents from Eli Lilly & Co. related to the synthesis and biological evaluation of tetrahydrobenzothiazoles, as well as testimony from individuals at Eli Lilly about those experiments.  Based on that review, it is my opinion that the following compounds were synthesized at Eli Lilly prior to December 22, 1984: (1) 2-amino-6-di-n-propylamino-4,5,6,7-tetrahydrobenzothiazole dihydrobromide, (2) 2-amino-6-dimethylamino-4,5,6,7-tetrahydrobenzothiazole dihydrobromide, and (3) 2-methylamino-6-dimethylamino-4,5,6,7-tetrahydrobenzothiazole dihydrobromide.

49.    These materials also reflect that 2-amino-6-di-n-propylamino-4,5,6,7-tetrahydrobenzothiazole dihydrobromide and 2-amino-6-dimethylamino-4,5,6,7-tetrahydrobenzothiazole dihydrobromide were evaluated in biological experiments and shown to be active.

50.    Following preparation and biological testing of these compounds, the Eli Lilly '748 application was filed, listing Bennett Laguzza and William Turner as inventors.  This application discloses the following group of compounds, described as General Formula XX:[6]

---

[6]    For clarity purposes, I have used the picture for General Formula XX from Exhibit 22, but the formula is the same one disclosed in the '748 application.

14

XX

Wherein Y is S or O, $R^1$ and $R^2$ are independently H, methyl, ethyl or n-propyl, and $R^3$ and $R^4$ are independently H, methyl, ethyl, n-propyl or allyl; and pharmaceutically-acceptable acid addition salts thereof formed with non-toxic acids.

Exhibit 18 at BARR027393-394.  The application also states that, for General Formula XX, "Compounds wherein Y is S are substituted 4,5,6,7-tetrahydrobenzothiazoles . . . ."  Exhibit 18 at BARR027393-394.

51.    The skilled artisan would understand that the three compounds discussed in paragraph 48 above (2-amino-6-di-n-propylamino-4,5,6,7-tetrahydrobenzothiazole dihydrobromide, 2-amino-6-dimethylamino-4,5,6,7-tetrahydrobenzothiazole dihydrobromide, and 2-methylamino-6-dimethylamino-4,5,6,7-tetrahydrobenzothiazole dihydrobromide) are all disclosed by the '748 application:

•    The skilled artisan would understand that General Formula XX of the '748 application encompasses each of these three compounds;

•    The skilled artisan would understand that 2-amino-6-di-n-propylamino-4,5,6,7-tetrahydrobenzothiazole dihydrobromide is disclosed in Example 1 of the '748 application, and

15

the description of the synthetic process, including the yields, reflects the process described in

Bennett Laguzza's laboratory notebook (Exhibit 11);[7]

- The skilled artisan would understand that 2-amino-6-dimethylamino-4,5,6,7-tetrahydrobenzothiazole dihydrobromide is disclosed in Example 2 of the '748 application, and the description of the synthetic process, including the yields, reflects the process described in William Turner's laboratory notebook (Exhibit 30);

- The skilled artisan would understand that claims 1-6 and 9-10 of the '748 application include 2-amino-6-di-n-propylamino-4,5,6,7-tetrahydrobenzothiazole dihydrobromide;

- The skilled artisan would understand that claims 1-5, 9, and 11 of the '748 application include 2-amino-6-dimethylamino-4,5,6,7-tetrahydrobenzothiazole dihydrobromide; and

- The skilled artisan would understand that claims 1-2, 4-5, and 9 of the '748 application include 2-methylamino-6-dimethylamino-4,5,6,7-tetrahydrobenzothiazole dihydrobromide.

52.     In addition, the skilled artisan would understand claims 1-4 of the '812 patent to encompass 2-amino-6-di-n-propylamino-4,5,6,7-tetrahydrobenzothiazole dihydrobromide and 2-methylamino-6-dimethylamino-4,5,6,7-tetrahydrobenzothiazole dihydrobromide. Similarly, the skilled artisan would understand claims 1-6 of the '812 patent to encompass 2-amino-6-dimethylamino-4,5,6,7-tetrahydrobenzothiazole dihydrobromide. Because the skilled artisan

---

[7]     While the examples and claims of the '748 application refer to "5,6,7,8-tetrahydrobenzothiazoles," the skilled artisan would understand from, for example, the remainder of the specification and the synthetic methods described that this was a typographical error, and that the compounds are in fact "4,5,6,7-tetrahydrobenzothiazoles."

would understand that claim 8 of the '812 patent relies on claim 3 of the '812 patent, the skilled artisan would further understand that each of these three compounds falls within the group of compounds of the pharmaceutical compositions encompassed by claim 8.

53.     The person of ordinary skill would understand that there is overlap between the compounds in the claims of the '748 application and the compounds in the claims of the '812 patent. The skilled artisan would also understand that there is overlap between the therapeutic uses identified in the '748 application and the therapeutic uses identified in the '812 patent.

54.     I have reviewed BARR000662-666, which I have been informed contains the originally filed claims of the application that became the '812 patent. The skilled artisan would understand that there is overlap between the compounds in these originally filed claims and the claims of the '748 application.

55.     The skilled artisan would understand that claims 1-4 and 8 in BARR000662-666 include compounds in which $R_1$ contains a halogenated phenyl moiety.

56.     I have reviewed Exhibits 21, 22, and 23, which I understand to be Eli Lilly applications filed in South Africa, the European Patent Office, and Australia. These applications include the same General Formula XX and preparative examples for the same compounds as the '748 application.

57.     I have also reviewed Exhibit 26, a Chemical Abstract from April 27, 1987. This abstract, number 131726w, discloses, among other things, the same groups of compounds as General Formula XX and 2-amino-6-di-n-propylamino-4,5,6,7-tetrahydrobenzothiazole dihydrobromide.

3/28/07
_____
Date

_____
Eric V. Anslyn, Ph.D.

17

**Tab A**

# Eric V. Anslyn
## Norman Hackerman Professor of Chemistry

Home Address:
8323 Young Lane
Austin, TX 78737

Business Address:
The University of Texas at Austin
Department of Chemistry and Biochemistry
Austin, TX. 78712

**Education:**

    Postdoctoral Work: [12/87-9/89]
        Columbia University, New York, New York
        Research Advisor: Professor Ronald Breslow
        Research: Mechanistic studies of Ribonuclease A mimics. Detailed kinetics analyses of imidazole catalyzed 3'-5' UpU hydrolysis and isomerization. Synthesis and kinetics studies of bis-imidazole β-cyclodextrin catalyzed phosphodiester hydrolyses.

    Ph.D., Chemistry: [11/87]
        California Institute of Technology, Pasadena, California
        Research Advisor: Professor Robert Grubbs
        Research: Mechanistic and theoretical studies of olefin metathesis and ring opening metathesis polymerizations catalyzed by group IV and VI metals.

    B.S., Chemistry: [5/82]
        California State University, Northridge; GPA= 3.97/4.00
        Research Advisor: Professor Edward Rosenberg
        Research: Mechanistic studies of ligand fluxuations on clusters.

**Awards, Honors, and Fellowships:**

    American Associate for Advancement of Science, Election as a Fellow, 2006
    Hamilton Textbook Award, from the University Coop. 2006
    Cope Scholar Award. To be granted from the ACS in Spring of 2006.
    Named the Norman Hackerman Professor of Chemistry: 2004-Present
    Graduate Teaching Award, UT Austin: 2003
    Election to Academy of Distinguished Teachers, UT Austin: 2000
    Outstanding Faculty Award, UT Continuing Education: 1999
    Jean Holloway Award for Excellence in Teaching: 1999
    College of Natural Sciences Teaching Excellence Award: 1995
    Dreyfus Teacher-Scholar Award: 1994-1996
    Alfred P. Sloan Research Fellow: 1994-1996
    Proctor and Gamble University Research Initiative: 1993-1996
    Searle Scholar: 1991-1994
    Presidential Young Investigator: 1990-1995
    Camille and Henry Dreyfus Young Faculty Award: 1989
    National Science Foundation Post-Doctoral Fellowship: 1988
    Union Carbide Fellow in Catalysis: Academic Year 86-87
    Graduated with B.S. Summa Cum Laude: 1982
    Analytical Chemistry Award, C.S.U., Northridge: 1980

**Employment:**

    University Distinguished Teaching Professor, University of Texas at Austin, 2000-present, teaching and independent research.
    Professor, University of Texas at Austin, 1999-2000
    Associate Professor, University of Texas at Austin, 1995-1999
    Assistant Professor, University of Texas at Austin, 1989-1995
    Head of Synthetic Organic NMR Facility: Cal. Instit. of Tech. 1984-1987
        Responsible for all training, maintenance and special experiment design on a JEOL FX-90 and JEOL GX-400. Extensive experience with 2D NMR, polarization transfer, magnitization transfer and NMR of heavy metals.

Teaching Assistant, Cal. State Univ. Northridge, 1983
    Introductory Chemistry Laboratory, both first and second semester.

**University of Texas Departmental and University Service:**
    Hamilton Book Award Committee, 2006
    Dean's Committee for Analysis the Space for ESB, 2006
    Upon invitation, Voltaire's Coffee Discussion Group, "The Mists of Avalon" 2006
    Participant, Academy of Distinguished Teachers Reading Roundup Discussion,
        "The Mists of Avalon", 2003, 2004, 2005, 2006.
    Academy of Distinguished Teachers Sub-Committee on "Special Courses", 2005
    Departmental Awards Committee, 2004-present.
    Instructor, Texas Teachers as Scholars, Course on Enzymes, Receptors, and
        Sensing, Spring 2005.
    College of Natural Sciences Tenure and Promotion Committee, 2004-present
    Departmental Tenure and Promotion Committee, 2004-Present
    SPAC Committee Member, 2003-present
    Assistant Graduate Student Advisor 1995-present.
    Chairman, Graduate Student Recruiting Committee for the Chemistry and
        Biochemistry Department, 1995-1999.
    Chairman, Department of Chemistry Safety Committee, 1993-1999.
    College of Natural Sciences Safety Committee, 1995-1999.
    Undergraduate Chemistry Student Advising, 1990-1995.
    Chairman: Organic Chemistry Seminar Series from 1992-1995.
    Lecture to the ACS Student Affiliates, Spring 1999.
    Lecture to the ACS Student Affiliates, Fall 1998.
    Lecture to the ACS Student Affiliates, Fall 1996.
    Lecture to the 1994 Honors Colloquium.
    Lecture to The Young Chemists Society, 1993.
    Departmental Fellowship Committee, 1992-1995.
    Graduate Student Recruitment Committee, 1991.

**Professional Service:**
    Organizer, Supramolecular Chemistry Conference, Hawaii, 2008.
    Pacific Chem. Symposium Co-Organizer, Dec. 2005.
    Pacific Chem. Symposium Co-Organizer, Dec. 2000.
    *J. Am. Chem. Soc.,* Manuscript Associate Editor, Oct. 1st 1999 - present.
    NIH Medicinal Chemistry A, Study Section Member, 1999-2003.
    *Supramolecular Chemistry,* Editorial Advisory Board, 1999-2004.
    *J. Supramolecular Chemistry,* Editorial Advisory Board, 1999-present.
    *J. Am. Chem. Soc.* Book and Software Associate Editor, 1998-Oct. 1st 1999.
    Symposium Co-Organizer: Southwest Regional ACS Meeting 1993.
    23rd Macrocycle Conference Co-Organizer: Oahu Hawaii 1998.
    1999 NSF Workshop on Physical Organic Chemistry, Co-organizer.
    1998 NSF Workshop on Physical Organic Chemistry, Co-organizer.
    1997 NSF Workshop on Physical Organic Chemistry, Co-organizer.
    Reviewer of Batelle National Laboratory project on Anion Recognition.
    *Ad Hoc* Member, Bioorganic and Natural Products Study Section, NIH, 1996.
    *Ad Hoc* Member, Medicinal Chemistry A, Study Section, NIH, 1997.

**Patents:**
1. "A Receptor and Method for Citrate Determination, The University of Texas at Austin," Patent filed Oct. 15th 1998, First Office Action Dec. 7th 1998. Axel Metzger, Eric V. Anslyn. Issued.

2. "Detection System Based on An Analyte Reactive Particle," J. T. McDevitt, E. V. Anslyn, J. B. Shear, D. P. Neikirk, University of Texas at Austin, United States Patent application (09/616,355), PCT application (PCT/US00/19302), filed 7/14/00. Issued 9/5/2003, #6,602,702.

2

3. "General Signaling Protocols For Chemical Receptors In Immobilized Matrices," John T. McDevitt, Eric. V. Anslyn, Jason B. Shear, Dean P. Neikirk, United States Patentapplication, PCT application (PCT/US00/19351) filed 7/14/00. Issued. #6,589,779.

4. "Fluid-Based Analysis of Mulitple Analytes by a Sensor Array," J. T. McDevitt, E. V. Anslyn, J. B. Shear, D. B. Neikirk, United States application (09/287,248), filed 4/7/99.

5. "Method and System for In Vivo Measurement of Multiple Analytes by a Sensor Array," J. McDevitt, E. Anslyn, J. Shear, D. Neikirk, J. Scott, M. O'Hare, M. Otworth, J. Douglas, J. McMorris, United States application, filed 5/8/00.

6. "Sensor Arrays for the Measurement and Identification of Multiple Analytes in Solution," J. T. McDevitt, E. V. Anslyn, J. B. Shear, D. P. Neikirk, United States Patent application (09/354,882), PCT application (PCT/US99/16162) filed 7/16/99. Australian application (53165/99) filed 1/10/01; Canadian application filed 1/15/01; European application (99938752.5), filed 1/16/01.

7. "Method and Apparatus for the Delivery of Samples to a Chemical Sensor Array," J. T. McDevitt, E. V.Anslyn, J. B. Shear, D. P. Neikirk, D. Borich, United States Patent application (09/616,731), PCT application (PCT/US00/19351), Taiwanese application (89114103), Philippine application (1-2000-001896), filed 7/14/00.

8. "Magnetic-Based Placement and Retention of Sensor Elements in an 'Electronic Tongue' Sensor Array," J. T. McDevitt, E. V. Anslyn, J. B. Shear, D. P. Neikirk, United States Patent application (09/775,342), filed 1/31/01.

9. "Method and System for Collecting and Transmitting Chemical Information," J. T. McDevitt, E. V. Anslyn, J. B. Shear, D. P. Neikirk, United States Patent application (09/775,340), PCT application (PCT/US01/03141), filed 1/31/01.

10. "System and Method for the Analysis of Bodily Fluids," J. T. McDevitt, E. V. Anslyn, J. B. Shear, D. P.Neikirk, United States Patent application (09/775,344), PCT application (PCT/US01/03139), filed 1/31/01.

11. "Method of Preparing a Sensor Array," J. T. McDevitt, E. V. Anslyn, J. B. Shear, D. P. Neikirk, United States Patent application (09/775,353), PCT application (PCT/US01/03241), filed 1/31/01.

12. "System for Transferring Fluid Samples Through a Sensor Array," J. T. McDevitt, E. V. Anslyn, J. B. Shear, D. P. Neikirk, Y.-S. Sohn, United States Patent application (09/775,048), PCT application (PCT/US01/03316), filed 1/31/01.

13. "Portable Sensor Array System," J. T. McDevitt, E. V. Anslyn, J. B. Shear, D. P. Neikirk, United States Patent application (09/775,343), PCT application (PCT/US01/03240), filed 1/31/01.

14. "Method and Apparatus for the Confinement of Materials in a Micromachined Chemical Sensor Array," J. T. McDevitt, E. V. Anslyn, J. B. Shear, D. P. Neikirk, provisional United States Patent application 60/265,776). filed 1/31/01.

15. "Multimodal Miniature Microscope" M. Descour, R. Dupuis, E. Anslyn, R. Richard-Kortum, Provisional United States Patent application, filed 09/07/01.

**Research Publications:**
152) "Micromachined microfluidic chemiluminescent system for explosives detection," Y. S. Park, H. S. Hewage, D. P. Neikirk, E. V. Anslyn, SPIE Defense and Security Symposium **2007**, Conference 6554, *Chemical and Biological Sensing VIII*, April 11-12, 2007, paper [6554-02].

151) "Smart microplates: integrated photodiodes for detecting bead-based chemiluminescent reactions," Yoon S. Park, Matthew M. Andringa, Dean P. Neikirk, Himali S. Hewage, and Eric V. Anslyn, 5th IEEE International Conference on Sensors, paper # B1L-E-4, Daegu, Korea, October 22 - 25, 2006.

150) "Differential Receptor Arrays and Assays for Solution-Based Molecular Recognition," Aaron T. Wright; Eric V. Anslyn, *Chem. Soc. Rev.*, **2006**, 35, 14-28.

3

149) "A Colorimetric Boronic Acid Based Sensing Ensemble for Carboxy and Phospho Sugars," Tianzhi Zhang; Eric V. Anslyn, *Org. Lett.,* **2006** 8(8), 1649 -1652.

148) "Rational Design, Synthesis, and Application of a New Receptor for the Molecular Recognition of Tricarboxylate Salts in Aqueous Media," Antonio Frontera; Jeroni Morey; Antnia Oliver; M. Neus Piña; David Quiñonero; Antoni Costa; Pablo Ballester; Pere M. Deyà; Eric V. Anslyn. *J. Org. Chem.,* **2006** 71 (19), 7185 -7195.

147) "Carbonyl Coordination Chemistry from a New Angle: A Computational Study of -Carbon Acidity Based on Electrophile Coordination Geometry," Ronald J. T. Houk; Eric V. Anslyn; John F. Stanton *Org. Lett.,* **2006** 8(16), 3461 -3463.

146) "Detection of chemical warfare simulants by phosphorylation of a coumarin oximate," Karl J. Wallace; Ruth I. Fagbemi; Frantz J. Folmer-Andersen; Jeroni Morey; Vincent M. Lynth; Eric V. Anslyn, *Chem. Communications,* **2006**, 37, 3886-3888.

145) "Micromachined chemiluminescent system for explosives detection," Yoon Park, Dean P. Neikirk, and Eric V. Anslyn, in *Proceedings of SPIE,*Volume 6398 Optically Based Biological and Chemical Detection for Defence III, John C. Carrano, Arturas Zukauskas, Eds., 63980R (Oct. 13, 2006)

144) "Indicator-displacement assays" Binh T. Nguyen, Eric V. Anslyn, *Coor. Chem. Rev.* **2006**, *250*, 3118-3127.

143) "A Structural Investigation of the N-B Interaction in an o-(N,N-Dialkylaminomethyl)arylboronate System" Zhu, Lei; Shabbir, Shagufta H.; Gray, Mark; Lynch, Vincent M.; Sorey, Steven; Anslyn, Eric V *J. Am. Chem. Soc.* **2006**, *128*, 1222-1232.

142) "Signal amplification by allosteric catalysis" Zhu, Lei; Anslyn, Eric V*Angew. Chem., Int. Ed,* **2006**, *45*, 1190-1196.

141) "Pattern-Based Discrimination of Enantiomeric and Structurally Similar Amino Acids: An Optical Mimic of the Mammalian Taste Response" Folmer-Andersen, J. Frantz Kitamura, Masanori; Anslyn, Eric V. *J. Am. Chem. Soc.* **2006**, *128*, 5652-5653.

140) "Modern Physical Organic Chemistry", a textbook, Eric Anslyn and Dennis Dougherty, University Science Books, 2005.

139) "A Functional Assay for Herapin in Serum Using a Designed Synthetic Receptor, "Aaron T. Wright; Zhenlin Zhong; Eric V. Anslyn, *Angew. Chem.* 2005, 44(35), 5679-5682.

138) "A Differential Array of Metalated Synthetic Receptors for the Analysis of Tripeptide Mixtures," Aaron T. Wright; Eric V. Anslyn; John T. McDevit, *J Am Chem Soc.* 2005,127(49):17405-11.

137) "Differential Receptors Create Patterns That Distinguish Various Proteins" Aaron Wright, M. Griffin, Z. Zhong, S.McCleskey, E.V. Anslyn, J.T. McDevitt, *Angew. Chem.* 2005, *117*, 6533-6536.

136) "Colorimetric Detection of Chemical Warfare Simulants" *New J. Chem.,* Karl Wallace, Jeroni Morey, Eric V. Anslyn, 2005, *29*, 1469-1474.

135) "Preparation of 1,3,5-Tris(aminomethyl)-2,4,6-triethylbenzene from Two Versatile 1,3,5-Tri(halosubstituted) 2,4,6-Triethylbenzene Derivatives" Karl Wallace, Robert Hanes, Eric Anslyn, Jeroni Morey, Kathleen Kilway, Jay Siegel, *Synthesis,* 2005, *12*, 2080-2083.

134) "Heavy metal analysis using a Heck-catalyzed cyclization to create coumarin" Q. Wu., E.V. Anslyn *J. Mat. Chem.* 2005, *15*, 2815-2819.

133) "An Artificial Siderophore for the Detection of Iron(III)" K. J. Wallace, M.Gray, Z. Zhong, V. Lynch, E.V. Anslyn, *Dalton Trans.* 2005, *14*, 2436-2441.

4

132) "Naked-Eye Detection of Histidine by Regulation of Cu(II) Coordination Modes" J. Frantz Folmer-Andersen, Vince Lynch, E.V. Anslyn, Chem. Eur. J. 2005,*11*, 0000.

131) "Colorimetric Enantiodiscrimination of .alpha.-Amino Acids in Protic Media "Folmer-Andersen, J. Frantz ; Lynch, Vincent M. ; Anslyn, Eric V.
*J. Am. Chem. Soc.,* 2005, *127*, 7987-7988.

130) "Guidelines in implementing enantioselective indicator-displacement assays for .alpha.-hydroxycarboxylates and diols" Zhu, Lei; Zhong, Zhenlin; Anslyn, Eric V. *J. Am. Chem. Soc.* 2005, *127*, 4260.

129) Abiotic Guanidinium Receptors for Anion Molecular Recognition and Sensing, R.J.T. Houk, S.L. Tobey, E.V. Anslyn, Topics Curr. Chem. 2005, Springer-Verlag, Vol. 255, p 199.

128) "Guanidinium-Based Anion Receptors" In Encyclopedia of Supramolecular Chemistry, 1st Ed. , Tobey, S.L.; Anslyn, E.: Eds. Atwood, J.L.; Steed, J.W. Marcel-Dekker, 2004.

127) "Thermodynamic Analysis of Receptors Based on Guanidinium/Boronic Acid Groups for the Complexation of Carboxylates, a-Hydroxycarboxylates, and Diols: Driving Force for Binding and Cooperativity" Wiskur, S.L.; Lavigne, J.J.; Metzger, A.; Tobey, S.L.; Lynch, V.; Anslyn, E.V. *Chem. Eur. J.* 2004, *10*, 3792-3804.

126) "Self-Assembling dimeric and trimeric aggregates based on solvophobic and charge-pairing interactions" *Supramolecular Chemistry*, 2004, *16*, 521-528.

125) "Tuning the Specificity of a Synthetic Receptor Using a Selected Nucleic Acid Receptor" Manimala, Joseph C.; Wiskur, Sheryl L.; Ellington, Andrew D.; Anslyn, Eric V. *J. Am. Chem. Soc.* 2004, *126*, 16515-16519.

124) "Synthetic receptors for Anion Recognition" In *Fundamentals of Anion Separations*: Moyer, B.A.; Singh, R.P., Eds. Plenum Pub. Corp. 2004, 59-69.

123) "Catalytic Signal Amplification Using a Heck Reaction. An Example in the Fluorescence Sensing of Cu(II)" Wu, Qiaoyin ; Anslyn, Eric V.
*J. Am. Chem. Soc.* 2004, *126*, 14682-14683.

122) "Using Indicator-Displacement Assays in Test Strips and To Follow Reaction Kinetics" Nguyen, Binh T.; Wiskur, Sheryl L.; Anslyn, Eric V.
Organic Letters 2004 *6*, 2499-2501.

121) "Guanidinium Groups Act as General-Acid Catalysts in Phosphoryl Transfer Reactions: A Two-Proton Inventory on a Model System" Piatek, Anna M.; Gray, Mark; Anslyn, Eric V. *J. Am. Chem. Soc.* 2004, *126*, 9878-9879.

120) Molecular recognition and indicator-displacement assays for phosphoesters, *Tetrahedron*, T. Zhang, E.V. Anslyn 2004, *60*, 11117-11124.

119) Synthetic Receptors as Sensors, E.V. Anslyn, *Tetrahedron*, 2004, *60*, 11055-11056.

118) FRET induced by an 'allosteric' cycloaddition reaction regulated with exogenous inhibitor and effectors, L. Zhu, V.M. Lynch, E.V. Anslyn, *Tetrahedron*, 2004, *60*, 7267-7275.

117) Cooperative Metal Coordination and Ion-Pairing in Tripeptide Recognition, A.T. Wright, E.V. Anslyn, *Org. Lett.* 2004, *9*, 1341-1344.

116) Threshold Detection Using Indicator-Displacement Assays: An Application in the Analysis of Malate in Pinot Noir Grapes, Piatek, A.; Bobbick, Y.; Anslyn, E.V. *J. Am. Chem. Soc.* 2004, *126*, 6072-6077.

115) Facile Quantification of Enantiomeric Excess and Concentration with Indicator-Displacement Assays: An Example in the Analysis of Alpha-Hydroxy Acids, L. Zhu, E.V. Anslyn, *J. Am. Chem. Soc.* **2004**, *126*, 3676-3677.

114) "Rate of Enolate Formation is Not very Sensitive to the Hydrogen Bonding Ability of Donors to Carbonyl Oxygen Lone Pair Acceptors; A Ramification of the Principle of Non-Perfect Synchronization for General-Acid-Catalyzed Enolate Formation" Z. Zhenlin, T. S. Snowden, M.D. Best, E.V. Anslyn, *J. Am. Chem. Soc.* **2004**, *126*, 3488-3495.

113) "A far-red fluorescent contrast agent to image epidermal growth factor receptor expression." Hsu, E.R. Anslyn, E.V.; Dharmawardhane, S.; Alizadeh-Naderi, R.; Aaron, J.S.; Sokolov, K.V.; El-Naggar, A.K.; Gillenwater, A.M.; Richards-Kortum, R.R. *Photochem. Photobiol.* **2004**, *79*, 272-279.

112) "Asymmetric Enolate Alkylation via Templation with Chiral Synthetic Receptors" **2004**, *45*, 501-504.

111) "Towards nanoscale three-dimensional fabrication using two-photon initiated polymerization and near-field excitation" B.J. Postinikova, J. Currie, T. Doyle, R.E. Hanes, E.V. Anslyn, J.B. Shear, and D.E. Vanden Bout, *Microelec. Eng.* **2003**, *69*, 459-465.

110) "Citrate and calcium determination in flavored vodkas using artificial neural networks" McCleskey, Shawn C.; Floriano, Pierre N.; Wiskur, Sheryl L., and others, Tetrahedron, Elsevier Science B.V., **2003**, 50, 10089.

109) "2,6-Di(pyrimidin-4-yl)pyridine Ligands with Nitrogen-Containing Auxiliaries: The Formation of Functionalized Molecular Clefts upon Metal Coordination" Folmer-Andersen, J. Frantz; Aiet-Haddou, Hassan; Lynch, Vincent M., and others, *Inorg. Chem.* , **2003**, 42, 8674.

108) "Energetics of Phosphate Binding to Ammonium and Guanidinium Containing Metallo-Receptors in Water"S.L. Tobey, E.V.Anslyn, *J. Am. Chem.Soc.* **2003**, 125, 14807.

107) "Triton X-100 Enhances Ion-Pairing Molecular Recognition in Water. Further Development of an IP3 Chemosensor" K. Niikura, E.V. Anslyn *J. Org. Chem.* **2003**, *68*, 10156.

106) "Studies into the Thermodynamic Origin of Negative Cooperativity in Ion-Pairing Molecular Recognition" S.L. Tobey, E.V. Anslyn, *J. Am. Chem. Soc.* **2003**, *125*, 10963.

105) "Determination of Inorganic Phosphate in Serum and Saliva using a Synthetic Receptor" S.L. Tobey, E.V. Anslyn, *Org. Lett.* **2003**, *5*, 2029.

104) "Controlling the Oxygenation Level of Hemoglobin by Using a Synthetic Receptor for 2,3-Bisphosphoglycerate" *Angew. Chem. Int. Ed. Eng.* **2003**, *42*, 3005.

103) "A Multicomponent Sensing Ensemble in Solution: Differentiation Between Structurally Similar Analytes" S.L. Wiskur, P.N. Floriano, E.V. Anslyn, J.T. McDevitt, *Angew. Chem. Int. Ed. Eng.* **2003**, *42*, 2070.

102) "C3V Symmetric Receptors Show High Selectivity and High Affinity for Phosphate" S.L. Tobey, B.D. Jones, E.V. Anslyn, *J. Am. Chem. Soc.* **2003**, *125*, 4026.

101) "Differential Receptors Create Patterns Diagnostic for ATP and GTP" *J. Am. Chem. Soc.* **2003**, *125*, 1114.

100) "Preorganized Bis-Zinc Phosphodiester Cleavage Catalysts Possessing Natural Ligands: A Lesson Pertinent to Bimetallic Artificial Enzymes" Karin Worm, E.V. Anslyn, *Chem. Eur. J.* **2003**, *9*, 741-747.

99) "Guanidinium Containing Receptors for Anions" Best, M.D.; Tobey, S.L.; Anslyn, E.V. *Coordination Chemistry Reviews*, **2002**, 3-15.

98) "Mimicking the Mammalian Sense of Taste through Single-Component and Multicomponent Analyte Sensors" ACS Symposium Series 825, **2002**, 276.

97) "Remarkable Cooperativity Between a Zn(II) Ion and Guanidinium/Ammonium Groups in the Hydrolysis of RNA" H. Ait-Haddou, J. Sumaoka, S.L. Wiskur, F.J. Folmer-Andersen, E.V. Anslyn, *Angew. Chem. Int. Ed. Eng.* **2002**, *41*, 4014.

96) "Ion-Pairing Molecular Recognition in Water: Aggregation at Low Concentrations that is Entropy-Driven" R. Mikhail, Y. Ionue, S. Tobey, A. Metzger, E. Anslyn, *J. Am. Chem. Soc.* **2002**, *124*, 14959.

95) "Trinuclear Copper(II) Complex Showing High Selectivity for the Hydrolysis of 2'-5' over 3'-5' for UpU and 3'-5' over 2'-5' for ApA Ribonucleotides" M.Komiyama, S. Kina, Z. Matsumura, J. Sumoaka, S. Tobey, V.M. Lynch, E.V. Anslyn, *J. Am. Chem. Soc.* **2002**, *124*, 13731.

94) "Synthesis and Uses of PS-Thiourea", J.C. Manimala, E.V. Anslyn, J. Manimala, E.V. Anslyn, Eur. *J. Org. Chem.* **2002**, *23*, 3893.

93) "A Molecular Receptor for Carboxylic Acids. Selectivity Achieving by Steric Constraints", M. Hashizumi, S. Tobey, E.V. Anslyn, *Supramolecular Chemistry.* **2002**, 14, 511.

92) "Stochastic Sensing of IP$_3$ Has Far-Reaching Consequences," E.V. Anslyn, J.B. Shear, *Chemistry & Biology*, **2002**, 9(7), 779-780.

91) "Novel C3-Symmetric Molecular Scaffolds with Potential Facial Differentiation," G. Hennrich, V.M. Lynch, E.V. Anslyn, *Chemistry-A European Journal,* **2002**, 8(10), 2274-2278.

90) "1,3,5-2,4,6-Functionalized, Facially Segregated Benzenes-Exploitation of Sterically Prediposed Systems in Supramolecular Chemistry," G. Hennrich, E.V. Anslyn, *Chemistry-A European Journal,* **2002**, 8 (10), 2218-2224.

89) "Toward the Development of Miniaturized Imaging Systems for Detection of Pre-Cancer," M.R. Descour, A-H. O. Karkkainen, J.D. Rogers, C. Liang, R.S. Weinstein, J.T. Rantala, B, Kilic, E. Madenci, R.R. Richards-Kortum, E.V. Anslyn, R.D. Dupuis, R.J. Schul, C.G. Willison, C.P. Tigges, *IEEE Journal of Quantum Electronics,* **2002**, 38(2), 122-130.

88) "Toward a Stable Hydroxyphosphorane," R. E. Hanes, Jr., V. M. Lynch, E. V. Anslyn and K. N. Dalby, *Org. Lett.,* **2002**, 4 (2), 201-203.

87) "A Colorimetric Sensing Ensemble for Heparin," Z. Zhong, E.V. Anslyn,, *J. Am. Chem. Soc.,* **2002**, *124* (31); 9014-9015.

86) "Competitive Indicator Methods for the Analysis of Citrate Using Colorimetric Assays," S.C. McCleskey, A. Metzger, C.S. Simmons, E.V. Anslyn, *Tetrahedron,* **2002**, 58, 621-628.

85) "A Highly Efficient Method for the Synthesis of Guanidinium Derivatives," J.C. Manimala, E.V. Anslyn, *Tetrahedron,* **2002**, 43, 565-567.

84) "Using a Synthetic Receptor to Create an Optical-Sensing Ensemble for a Class of Analytes: A Colorimetric Assay for the Aging of Scotch," S. L.Wiskur; E.V. Anslyn, *J. Am. Chem. Soc.,* **2001**,41, 10109-10110.

83) "Development of a Micromachined Fluidic Structure for a Biological and Chemical Sensor Array," Y-S. Sohn, A.P. Goodey, E.V. Anslyn, J.T. McDevitt, J.B. Shear, D.P. Neikirk, *Kluwer Academic Publisher,* **2001**, 177-178.

82) "Teaching Old Indicators New Tricks," S.L. Wiskur, H. Ait-Haddou, J.J. Lavigne, E.V. Anslyn, *Accounts of Chemical Research,* **2001**, 34, 963-972.

81) "Artificial Receptors for Enolizations and pKa Shifts," T.S. Snowden, E.V. Anslyn, *Bioorg. Med. Chem.* **2001**, 9, 2467-2478.

80) "Achieving Large Color Changes in Response to the Presence of Amino Acids: A Molecular Sensing Ensemble with Selectivity for Aspartate," H. Ait-Haddou, S.L. Wiskur, V.M. Lynch, E.V. Anslyn, *J. Am. Chem. Soc.*, **2001**, 45, 11296-11297.

79) "Using a Synthetic Receptor to Create an Optional-Sensing Ensemble for a Class of Analytes: A Colorimetric Assay for the Aging of Scotch," S.L. Wiskur, E.V. Anslyn, *J. Am. Chem. Soc.*, **2001**, 41, 10109-10110.

78) "Sensing a Paradigm Shift in the Field of Molecular Recognition: From Selective to Differential Receptors," J.J. Lavigne, E.V. Anslyn, *Angew. Chemie.*, **2001**, 40, 3118-3130.

77) "A Cascade of Reactions involving Anchimeric Assistance Leads to a Highly "Crowded," Hexakis [(Acyloxy) Methyl] Benzene" G. Hennrich, V.M. Lynch, E.V. Anslyn *Chemical Communications* **2001**, 23, 2436-2437.

76) "pKa Values and Geometries of Secondary and Tertiary Amines Complexed to Boronic Acids – Implications for Sensor Design," S. Wiskur, J.J. Lavigne, H. Ait Haddou, V. Lynch, Y.U. Chiu, J.W. Canary, E.V. Anslyn, *Org. Lett.* **2001**, *3*, 1311-1314.

75) "Characterization of Multicomponent Monosaccharide Solutions Using an Enzyme-Based Sensor Array" T. E. Curey, A. Goodey, A. Tsao, J. Lavigne, Y. Sohn, J. T. McDevitt, E. V. Anslyn, D. Neikirk, and J. B. Shear, *Bioanal. Chem.* **2001**, 293, 178-184.

74) "Development of Multi-analyte Sensor Arrays Composed of Chemically Derivatized Polymeric Microspheres Localized in Micromachined Cavities," A. Goodey, J. J. Lavigne, S. M. Savoy, M. Rodriguez, T. Curey, A. Tsao, G. Simmons, J. Wright , S.-J. Yoo, Y. Sohn, E. V. Anslyn, J. B. Shear, D. P. Neikirk, J. T. McDevitt, *J. Am. Chem. Soc.* **2001**, 123, 2559-2570.

73) "A Triggering Method for the Sensing of Citrate," L. Cabell, M.D. Best, J.J. Lavigne, S.E. Schneider, D.M. Perreault, M.-K. Monahan, E.V. Anslyn, *J. Chem. Soc. Perkins Trans II.* **2001**, 315-323.

72) "Liquid Flow Through an Array-Based Chemical Sensing System," Sohn, Y.-S.; Tsao, A.; Anslyn, E. V. ; McDevitt, J. T.; Shear, J. B.; Neikirk, D. P. SPIE-Int. Soc. Opt. Eng. 4177, Microfluidic Devices and Systems III, **2000**, 212-219.

71) "Azacalixarene: Synthesis, Conformational Analysis and Recognition Behavior Toward Anions," K. Niikura, E.V. Anslyn, *J. Chem. Soc., Perkins Trans. 2.* **2000**, 2769.

70) "Coupling Rational Design with Libraries Leads to an ATP Selective Chemosensor," S.S. Schneider, E.V. Anslyn, *J. Am. Chem. Soc.* **2000**, *122*, 3666.

69) "Teaching Old Indicators New Tricks: A Colorimetric Chemosensing Ensemble for Tartrate/Malate in Beverages," J.J. Lavigne, E.V. Anslyn, *Angew. Chemie*, **1999**, 38, 3666-3669.

68) "The Mammalian Sense of Taste and Multi-Component Sensor Arrays Mimics," J. J. Lavigne, A.L. Meyer, J.M. Vann, C.A. Lavigne, E.V. Anslyn, *Leatherhead Food RA, Food Industry Journal.* **1999**, 23, 458-461.

67) "Single-Analyte to Multianalyte Fluorescence Sensors," J.J. Lavigne, A. Metzger, K. Niikura, L.A. Cabell, S.M. Savoy, J.S.-J. Yoo, J.T. McDevitt, D.P. Neikirk, J.B. Shear, E.V. Anslyn, *Proc. SPIE-Int. Soc. Opt. Eng.*, **1999**, *3602* , 220-231.

66) "Anion Recognition: (Synthetic receptors for anions, application in sensors)," T.S. Snowden, E.V. Anslyn, *Curr. Opin. in Chem. Biol.* **1999**, *3*, 740-746.

65) "A Competition Assay for Determining Glucose-6-phosphate Concentration with a Tris-Boronic Acid Receptor," L. A. Cabell, E. V. Anslyn, *Tet. Lett.* **1999**, *40*, 7753-7756.

64) "A Comparison of NH-π versus Lone Pair Hydrogen Bonding Effects Carbon Acid p$K_a$ Shifts," T. Snowden, E.V. Anslyn, *J. Am. Chem. Soc.* **1999**, *121*, 6324-6325.

63) "Optical Sensing of Inorganic Anions Employing a Synthetic Receptor and Ionic Colorimetric Dyes," K. Niikura, A. Bisson, and E.V. Anslyn, *J. Chem. Soc., Perkin Trans. 2*, (6), **1999**, 1111-1114.

62) "Single Analyte to Multi-Analyte Fluorescence Sensors," J.J. Lavigne, A. Metzger, K. Niikura, L.A. Cabell, S.M. Savoy, J.S-J. Yoo, McDevitt, J.T., D. Neikirk, J.B. Shear, E.V. Anslyn, *Proc. SPIE*, **1999**, 220.

61) Book review of Ligand-Receptor Energetics: A Guide for the Perplexed. By Irving M. Klotz. E.V. Anslyn, *J. Am. Chem. Soc.*, **1998**, 120, 1348.

60) "Solution-Based Analysis of Multiple Analytes by a Sensor Array: Toward the Development of an Electronic Tongue," D.P. Neikirk, S.M. Savoy, J.J. Lavigne, S.J. Yoo, E.V. Anslyn, J.T. McDevitt, J.B. Shear, *Proc. SPIE*, **1998**, 3539.

59) "Molecular Recognition and Solid Phase Organic Synthesis: Synthesis of Unnatural Oligomers, Techniques for Monitoring Reactions, and the Analysis of Combinatorial Libraries," S. Schneider, E.V. Anslyn, "Advances in Supramolecular Chemistry", 1998, Vol. 5, 55-120.

58) "Solid Phase Synthesis Method for Oligoguanidiniums,," S. S. Schneider, P. Bishop, O. Bishop, E.V. Anslyn, *Tetrahedron.* **1998**, 54,15063-15086.

57) "Chemosensor with Selectivity for Inositol-trisphosphate," K. Niikura, A. Metzger, and E.V. Anslyn. *J. Am. Chem. Soc.* **1998**, *120*, 8533-8534.

56) "Solution-Based Analysis of Multiple Analyte by a Sensor Array: Toward the Development of an "Electronic Tongue," J. L. Lavigne, S. Savoy, M.B. Clevenger, J.E. Ritchie, B. McDoniel, S.-J. Yoo, E.V. Anslyn, J.T. McDevitt, J.B. Shear, D. Neikirk, *J. Am. Chem. Soc.* **1998**, *120*, 6429-6430.

55) "A Chemosensor for Citrate in Beverages," A. Metzger, E.V. Anslyn, *Angew.  Chem., Int. Ed. Eng.* **1998**, 37, 649-652.

54) "Micromachined Storage Wells for Chemical Sensing Beads in an 'Artificial Tongue' ," S.J. Yoo, J. Lavigne, S. Savoy, J.B. McDoniel, E.V. Anslyn, J.T. McDevitt, J.B. Shear, *Proc. SPIE*, **1997**, 322.

53) "Recognition of Anions through NH-π-Hydrogen Bonds in a Bicyclic Cyclophane. Selectivity for Nitrate," A. Bisson, V. Lynch, E.V. Anslyn, *Angew. Chemie. Int. Ed. Eng.* **1997**, 36, 2340-2342.

52) "The Ratio Between Endocyclic and Exocyclic Cleavage of Pyranoside Acetals is Dependent Upon the Anomer, the Temperature, the Aglycon Group, and the Solvent," J. L. Liras, V. Lynch, E.V. Anslyn, *J. Am. Chem. Soc.* **1997**, *119*, 8191-8200.

51) "In Vitro Selection Without Intervening Amplification," J. Smith, E.V. Anslyn, *Angew. Chemie.* **1997**, *36*, 1879.

50) "Non-Aqueous Titrations as a Tool in the Study of Molecular Recognition Phenomena. Uses in Distinquishing Hydrogen Bonding From Proton Transfer, the Measurement of Complex Induced pKa Shifts, and The Ability to Distinguish the Catalytic Roles of General Acids and Bases," C.L. Hannon, D.A. Bell, A.M. Kelly-Rowley, L.A. Cabell. E.V. Anslyn, *J. Phys. Org. Chem.* **1997**, 10, 396-404.

49) "Guanidinium Functional Groups for the Recognition of RNA, and as Catalysts for the Hydrolysis of RNA," L.A. Cabell, D. Perreault, E.V. Anslyn, *Bioorg. Med. Chem.* **1997**, 5, 1209-1220.

48) "A Synthetic Receptor Selective for Citrate," A. Metzger, E.V. Anslyn, *Angew. Chem., Int. Ed. Eng.* **1997**, 36, 862-865.

47) "Unifying the Current Data on the Mechanism of Cleavage/Tranesterification of RNA," D. M. Perreault, E.V. Anslyn, *Angew. Chem.* **1997**, *36*, 433 -450.

46) "Solid and Solution Phase Organic Syntheses of Oligomeric Thioureas," J. Smith, J.L. Liras, S.F. Schneider, E.V. Anslyn, *J. Org. Chem.* **1996**, *61*, 8811-8818.

45) "Hydrogen Bonding Receptors: Open-Chain Catalytic Systems,"D. W. Bell, E. V. Anslyn, <u>Supramolecular Chemistry</u> Vol. II, 1996, Chapter 13.

44) "On the Site of Cleavage of Pyranoside Acetals. Endo versus Exocyclic Cleavage," J. L. Liras, E.V. Anslyn, <u>Molecular Design and Bioorganic Catalysis.</u> Wilcox, C.S.; Hamilton, A.D.Eds. NATO SAI Series,Vol.478, Kluwer Acad. Pub., Boston, 1996. pp 1-15.

43) "Dimerization Constants for Phosphoric Acid Diesters," J. DeFord, F. Chu, E.V. Anslyn, *Tetrahedron Lett.* **1996**, 37, 1925-1928.

42) Book review: The Lock and Key Principle. The state of the Art - 100 E.V. Edited by J.-P. Behr, *Angew. Chem., Int. Ed. Engl.*, **1995**, *34*, 1995, 2293.

41) "Imidazole-Zinc Complexes for RNA Hydrolysis," F. Chu, J. Smith, V. M. Lynch, E.V. Anslyn. *Inorg. Chem.* **1995**, *34*, 5689-5690.

40) "Establishing a Cationic AAA-DDD Hydrogen Bonding Complex," D. W. Bell, E. V. Anslyn, *Tetrahedron*, **1995**, *51*, 7161-7172.

39) "An Alcohol Recognition Motif: Clear Evidence of Binding Site Cooperativity in the Complexation of Cyclohexanediols by Neutral Polyaza-Clefts," D. A. Bell, S. G. Diaz, V. M. Lynch, E. V. Anslyn, *Tetrahedron Lett.* **1995**, *36*, 4155-4158.

38) "Molecular Recognition of Enolates with a Neutral Polyaza-Cleft:  Complementarity versus Basicity, and the Potential to Shift Guest pKa's," A.M. Kelly-Rowley, E.V. Anslyn, *J. Am. Chem. Soc.* **1995**, *117*, 3438-3447.

37) "The Advantages of Using Rigid Polyaza-Clefts for Molecular Recognition," D. M. Perreault, X. Chen, E.V. Anslyn, *Tetrahedron.* **1995**, *51*, 353-362.

36) "Radioactive End Labeling to Determine Hydrolytic Rates of Nuclease Mimics,"J. Smith, E.V. Anslyn, *Anal. Biochem.* **1994**, *220*, 53-57.

35) "Facile Stereospecific Syntheses of Four of the Six 1,2,3,4-Cyclohexanetetrols: Increasing the Accessibility of Cyclitols for Probing Molecular Recognition of Saccharides," C.-Y Huang, E.V. Anslyn, C.-Y. Huang, L.A. Cabell, E.V. Anslyn. *Syn. Comm.* **1994**, *24*, 2757.

34) "Complexation of Phosphoric Acid Diesters in Lipophilic Solvents: The Effects of Receptor Cavity Size, Preorganizing Amine Recognition Units, and Phosphodiester Dimerization," F. Chu, L. S. Flatt, E.V. Anslyn, *J. Am Chem. Soc.* **1994**, 116, 4194-4204.

33) "Molecular Recognition of Cyclitols by Neutral Polyaza-Receptors: The Strength and Influence of Intramolecular Hydrogen Bonds Between Vicinal Alcohols," C.-Y. Huang, E.V. Anslyn, *J. Am. Chem. Soc.* **1994**, *116*, 2778-2792.

32) "Endocyclic and Exocyclic Cleavage of Pyranoside Acetals Detected by a Novel Probe in Both Methanol and Water," J. L. Liras, E.V. Anslyn, *J. Am. Chem. Soc.* **1994**, *116*, 2645-2646.

31) "Complexation of Carbonyl Compounds with an Organic Salt Dominated by Acid-Base Interactions," D. Bell, E.V. Anslyn, *J. Org. Chem.* **1994**, *59*, 512-514.

30) "Bis-Alkylguanidinium Receptors for Phosphodiesters, Effects of Counter Ions, Solvent Systems, and Cavity Flexibility Upon Complexation," D. Kneeland, K. Ariga, E.V. Anslyn, *J. Am. Chem. Soc.* **1993**, *115*, 10042-10055.

29) "The Guanidinium Group: Its Biological Role and Synthetic Analogs," C. L. Hannon, E.V. Anslyn <u>Bioorganic Chemistry Frontiers</u>, Volume III, Ed. H. Dugas, Springer-Verlag, 1993, pp193-256.

10

28) "Strategies for Phosphodiester Complexation and Catalysis," D. Kneeland, K. Ariga, F.Y. Chu, E.V. Anslyn, *Supramolecular Chemistry*, **1993**, *1*, 201-208.

27) "Enhanced Imidazole Catalyzed RNA Hydrolysis Induced by a Bis-Alkyl Guanidinium Receptor" J. Smith, K. Ariga, E.V. Anslyn, *J. Am. Chem. Soc.*, **1993**, *1*, 362-363.

26) "Artificial Enzyme Design Concepts, and Applications to Phosphoryl Transfer Reactions," Anslyn, E.V., <u>1993 McGraw-Hill Yearbook of Science and Technology</u>, McGraw-Hill, New York, 1993.

25) "A Columnar Scaffold Formed from Twisted Monomers," C.-Y. Huang, V. Lynch, E.V. Anslyn, *Angew. Chem.*, **1992**, *104*, 1259, *Angew. Chem., Int. Ed. Engl.*, **1992**, *31*, 1244-1246.

24) Book Review of - Jeffrey, G.A.; Saenger, W., <u>Hydrogen Bonding in Biological Structures</u>, Springer-Verlag, New York, 1991, E.V. Anslyn *J. Am. Chem. Soc.* **1992**, *114*, 4446.

23) "A Polyazacleft for Binding Multiple Phosphodiesters," L.S. Flatt, E.V. Anslyn, *Tetrahedron Lett.*, **1992**, *33*, 2785-2788.

22) "Intermolecular Versus Intramolecular Hydrogen Bonding Competition in the Complexation of Cyclitols by a Twisted Polyaza Cleft,"C.-Y. Huang, L.A. Cabell., V. Lynch, E.V. Anslyn, *J. Am. Chem. Soc.*, **1992**, *114*, 1900-1901.

21) "Manipulating the Stoichiometry and Strength of Phosphodiester Binding to a Bisguanidine Cleft in DMSO/Water Solutions," K. Ariga, E.V. Anslyn, Accepted for Publication in *J. Org. Chem.* **1992**, *57*, 417-419.

20) "Enolate Complexation in Acetonitrile with a Neutral Polyazacleft," A.M. Kelly-Rowley, L.A. Cabell, E.V. Anslyn, *J. Am. Chem. Soc.*, **1991**, *113*, 9687-9688.

19) "Twisted Polyaza Clefts for the Complexation of Cyclohexane-Polyols," C-Y. Huang, L.A. Cabell, E.V. Anslyn, *Tetrahedron Lett.*, **1990**, 7411-7414.

18) "Dichlorobis ($\eta$–5-chlorocyclopentadienyl)titanium, $(ClC_5H_4)_2TiCl_2$," E.V. Anslyn, R.H. Grubbs, C. Felten, D. Rehder, *Inorg. Syn.* **1992**, *29*, 198-201.

17) "Ribonuclease Mimics," *Tetrahedron*, **1991**, *47*, 2365-2376.

16) "Mechanistic Studies on Metal to Ligand Hydrogen Transfer in the Thermal Reactions of $H(\mu$-$H)Os_3(CO)_{10}(CNR)$: Evidence for Proton Barrier Tunneling in a Metal to Ligand Hydrogen Transfer," E.V. Anslyn., M. Green., G. Nicola., E. Rosenberg., *Organometallics* **1991**, *10*, 2600-2605.

15) "Proton Inventory of a Bifunctional Ribonuclease Model.," E.V. Anslyn, R. Breslow, *J. Am. Chem. Soc.*, **1989**, *111*, 8931.

14) "Geometric Evidence on the Ribonuclease Model Mechanism.," E.V. Anslyn, R. Breslow, *J. Am. Chem. Soc.*, **1989**, *111*, 5972.

13) "On the Mechanism of Catalysis by Ribonuclease: Cleavage and Isomerization of the Dinucleotide UpU Catalyzed by Imidazole Buffers," E.V. Anslyn, R. Breslow, *J. Am. Chem. Soc.*, **1989**, *111*, 4473.

12) "On the Mechanism of Action of Ribonucleases: Dinucleotide Cleavage Catalyzed by Imidazole and $Zn^{+2}$," R. Breslow, D.L. Huang, E.V. Anslyn, *Proc. Natl. Acad. Sci. USA*, **1989**, *86*, 1746.

11) "Synthesis, Reactivity and Kinetic Studies of Bis($\eta$ cyclo-pentadienyl) Titanium Methylidene Phosphine Complexes," J.D. Meinhart, E.V. Anslyn, R.H. Grubbs, *Organometallics*, **1989**, *8*, 583.

10) "Structures and Reactivity of Neutral and Cationic Molybdenum Methylene Complexes," E.V. Anslyn, W.A. Goddard III, *Organometallics*, **1989**, *8*, 1550.

9) "Synthesis and Structures of Titanium and Chromium Bimetallic Complexes of the Type $Cp_2Ti(Cl)O(CH_3)CCr(CO)_5$," E.V. Anslyn, R.H. Grubbs, *Organometallics*, **1988**, *7*, 2137.

8) "Substituent Effects on the Cleavage Rates of Titanocene Metallacyclo-butanes," W.C. Finch, E.V. Anslyn, R.H. Grubbs, *J. Am. Chem. Soc.*, **1988**, *110*, 2406.

7) "Metallacyclobutadiene vs. Metallatetrahedran Structures for $Cl_3MoC_3H_3$ Complexes," E.V. Anslyn, M.J. Brusich, W.A. Goddard III, *Organometallics*, **1988**, *7*, 98.

6) "A Mechanistic Study of the Reaction of $H_2Os_3(CO)_{10}$ with Terminal Alkynes," E. Rosenberg, E.V. Anslyn, L. Milone, S. Aime, R. Gobetto, D. Osella, *Gaz. Chim. Ital.*, **1988**, *118*, 299.

5) "On the mechanism of action of ribonucleases: dinucleotide cleavage catalyzed by imidazole and zinc(2+)," R. Breslow, D.L. Huang, E.V. Anslyn, *Proc. Natl. Acad. Sci. U. S. A.*, **1989**, *86*, 1989, 1746-50.

4) "The Mechanism of Titanocene Metallacyclobutane Cleavage and the Nature of the Reactive Intermediate," E.V. Anslyn, R.H. Grubbs, *J. Am. Chem. Soc.*, **1987**, *109*, 4926.

3) "Solution Structures and Dynamics of $[H_2Os_3(CO)_{10}(\sigma,\pi-vinyl)]$  Complexes," S. Aime, R. Gobetto, D. Osella, L. Milone, E. Rosenberg, E.V. Anslyn, *Inorganica Chimica Acta*, **1986**, *111*, 95.

2) "Reaction of $Cp_2Ti=CH_2$ with Organic Halides; Evidence for a Radical Mechanism.," S.L. Buchwald, E.V. Anslyn, R.H. Grubbs, *J. Am. Chem. Soc.*, **1985**, *107*, 1766.

1) "Kinetic Deuterium Isotope Effects on $\mu$-Hydride and Carbonyl Ligand Migrations," E. Rosenberg, E.V. Anslyn, C. Barner-Thorsen, S. Aime, D. Osella, R. Gobetto, L. Milone, *Organometallics*, **1984**, *3*, 1790.

**Invited Lectures:**
166) "The Power of Differential Receptors Rather Than Selective Receptors" University of Basel, Oct. 30th 2006
165) "Supramolecular Chemistry and Pattern Recognition: A Complementary Match" University of Berne, Oct. 31st, 2006
164) "Supramolecular Analytical Chemistry" University of Neuchatel, Nov. 1st, 2006.
163) "Combining Supramolecular Chemistry with Chemometrics" University of Fribourg, Nov. 2nd 2006.
162) "Teaching Supramolecular Chemistry  New Tricks" University of Lausanne, EPFL, Nov. 3rd 2006
161) "A Marriage of Supramolecular Chemistry with Pattern Recognition" ACS Meeting, Fall 2006, San Francisco, Cope Scholar Award Presentation
160) "Practical Sensing Applications" Merck Pharmaceuticals, August 17th, 2006. Rahway NJ
159) "A Marriage of Supramolecular Chemistry with Pattern Recognition" June 26th, 2nd ISMSC, Victoria Canada.
158) "Supramolecular Chemistry and Pattern Recognition: A Complementary Match", June 16th. 2006, Oviedo Universitad. Oviedo, Spain.
157) "Supramolecular Chemistry and Pattern Recognition: A Complementary Match", June 14th, 2006 Autonomica Quimica. Madrid, Spain.
156) "Supramolecular Chemistry and Pattern Recognition: A Complementary Match", June 12th, 2006, Institute Catala d'Investigacio Quimica, Tarragona, Spain..
155) "Supramolecular Chemistry and Pattern Recognition: A Complementary Match" June 9th, 2006, Valencia Universitad, Valencia Spain.
154) "Supramolecular Chemistry and Pattern Recognition: A Complementary Match", June 7[th], 2006, Universitad de Illes Balears, Mallorca Spain.
153) "Supramolecular Chemistry and Pattern Recognition: A Complementary Match", Apr.. 13th 2006, Northeastern Univ. Boston, MA.
152) "Supramolecular Chemistry and Pattern Recognition: A Complementary Match", Mar. 10th 2006, Iowa State Univ., Ames, IO.

151) "Supramolecular Chemistry and Pattern Recognition: A Complementary Match", Feb. 9th 2006, Univ. Arizona, Tuscon, AZ.

150) "Supramolecular Chemistry and Pattern Recognition: A Complementary Match", Jan. 12th 2006, Univ. Tennessee, Knoxville TN.

149) "A Marriage of Supramolecular Chemistry and Pattern Recognition", Jan. 9th 2006, Structural and Functional Organic Chemistry GRC, Santa Ynez CA.

148) "Physical Organic Chemistry of Molecular Recognition Processes", Dec. 18th, Pacific Chem, Honolulu , HI.

147) "A Marriage of Supramolecular Chemistry and Pattern Recognition", Dec. 17th, Pacific Chem, Honolulu , HI.

146) "Structural and Functional Assays for Boronic Acids", Dec. 15th, Pacific Chem, Honolulu , HI.

145) "Supramolecular Chemistry and Pattern Recognition: A Complementary Match, Nov. 14th, Univ. of Toledo, Toledo Ohio.

144) "Supramolecular Chemistry and Pattern Recognition: A Complementary Match", Oct. 10th, Wuhan University, Wuhan, China.

143) "Supramolecular Chemistry and Pattern Recognition: A Complementary Match", Sept. 15th, Washington University, St. Louis MO.

142) "Organic Chemistry Approaches to Single and Multi Analyte Sensing" June 16th, University of Turku, Finland.

141) "Organic Chemistry Approaches to Single and Multi Analyte Sensing" June 13th, Symposium on Synthetic Receptors, Lund Sweden.

140) "Organic Chemistry Approaches to Single and Multi Analyte Sensing" May 28th, Merck Pharmaceuticals, Rahway NJ.

139) "Organic Chemistry Approaches to Single and Multi Analyte Sensing" April 15[h], University of Zurich.

138) "Organic Chemistry Approaches to Single and Multi Analyte Sensing" April 14th, University of Geneva.

137) "Organic Chemistry Approaches to Single and Multi Analyte Sensing" April 12th, Swiss School on Supramolecular Chemistry.

136) "Organic Chemistry Approaches to Single and Multi Analyte Sensing" March 9th, Univ. Mass. Amherst.

135) "Organic Chemistry Approaches to Single and Multi Analyte Sensing" March 88th 2005, Brown University.

134) "Organic Chemistry Approaches to Single and Multi Analyte Sensing" Nov. 17th, Cal. State Univ. Northridge.

133) "A Marriage of Supramolecular Chemistry and Pattern Recognition" Nov. 4th, Brauman-Bell Lecture, Baylor College of Dentistry, Dallas TX.

132) "A Marriage of Supramolecular Chemistry and Pattern Recognition" Oct. 8th, Marquette University.

131) "A Marriage of Supramolecular Chemistry and Pattern Recognition" Sept. 8th 2004, SCT meeting, Prague, Czech Rep..

130) "A Marriage of Supramolecular Chemistry and Pattern Recognition" July 27th, XII ISSC, Notre Dame University.

129) "Organic and Organometallic Approaches to Molecular Sensing" July 12th, University of Bristol, England.

128) "Organic and Organometallic Approaches to Molecular Sensing" July. 8[nd], Bioanalytical Gordon Conference, Queen's College Oxford England.

127) "Organic and Organometallic Approaches to Molecular Sensing" July. 5th, Organic Mechanisms Conference, University College Dublin Ireland.

126) "Organic and Organometallic Approaches to Molecular Sensing" July. 2nd, Trinity College Dublin Ireland.

125) "Organic and Organometallic Approaches to Molecular Sensing" July. 1st, Queen's College Belfast Ireland.

124) "Organic and Organometallic Approaches to Molecular Sensing" June. 14th, Bioorganic Gordon Conference, Protor Academy.

123) "Organic and Organometallic Approaches to Molecular Sensing" June. 1st, London Ontario Canada, Canadian Chemical Society Meeting.

122) "Organic and Organometallic Approaches to Molecular Sensing" Mar. 31st, Simon Fraser Univ.

121) "Organic and Organometallic Approaches to Molecular Sensing" Mar. 30th, Univ. British Columbia.

120) "Organic and Organometallic Approaches to Molecular Sensing" Mar. 29th, Univ. of Victoria.

119) "Organic and Organometallic Approaches to Molecular Sensing" Mar. 28th, Anaheim ACS meeting.

118) "Organic and Organometallic Approaches to Molecular Sensing" Mar. 19th, University of Houston.

117) "Organic and Organometallic Approaches to Molecular Sensing" Jan. 27th, Laval University.

116) "RNA Hydrolysis and Catalysis of Cleavage" Jan. 26th, Laval University.

115) "Uses of Indicator-Displacement Assays", Jan. 15th, 2004, Sundial Beach Resort, NSF Young Supramolecular Chemist Conferece.

114) "Organic Chemistry Approaches to Single and Multi-Analyte Sensing" Dec. 8th, U.C.S.D.

113) "Organic Chemistry Approaches to Single and Multi-Analyte Sensing" Nov. 3rd, <u>Halliburton Corporation.</u>
112) "Organic Chemistry Approaches to Single and Multi-Analyte Sensing" <u>University of Montana</u>, Oct. 20th
111) "Organic Chemistry Approaches to Single and Multi-Analyte Sensing" Oct. 17th. <u>Montana State University</u>
110) "Organic Chemistry Approaches to Molecular Sensing", Sept. 18th, <u>Georgia Tech.</u>
109) "Organic Chemistry Approaches to Molecular Sensing" Sept. 8th, <u>NYC ACS</u> Meeting Symposium on Supramolecular Chemistry.
108) "Organic Chemistry Approaches to Molecular Sensing" April 28th, <u>Astra Zeneca.</u>
107) "Organic Chemistry Approaches to Molecular Sensing" April 28th, <u>U. Alberta.</u>
106) "The Power of Supramolecular Chemistry in Sensing" Jan. 30th, <u>New Mexico State Univ.</u>
105) "Organic Structures for Chemical Sensing" Dec. 4th, <u>Texas Tech University</u>
104) "Artificial Phosphodiesterases", Dec. 3rd, <u>Texas Tech University</u>
103) "Organic Structures for Chemical Sensing" Sept. 23rd, <u>University of Pennsylvania.</u>
102) "Organic Structures for Chemical Sensing" Sept. 6th UT Arlington 2002 Boston ACS Meeting.
101) "Organic Structures for Chemical Sensing" Aug. 18th 2002 Boston ACS Meeting.
100) "Organic Chemistry Approaches to Single and Multi-Analyte Sensing" May 23rd, 2002 <u>North Dakota State University</u>
99) "Organic Chemistry Approaches to Single and Multi-Analyte Sensing" April 11th, 2002 <u>Notre Dame University.</u>
98) "The Impact of Array Sensors on Supramolecular Chemistry" Symposium Honoring Roger Tsien, ACS Meeting, April 9th, 2002. Orlando Fl.
97) "Organic Chemistry Approaches to Single and Multi-Analyte Sensing" Jan. 24th, 2002 <u>Clemson University.</u>
96) "Organic Chemistry Approaches to Single and Multi-Analyte Sensing" Dec. 7th, 2001 <u>University of Reno.</u>
95) "Organic Chemistry Approaches to Single and Multi-Analyte Sensing" Nov. 8th, 2001 <u>University of Utah.</u>
94) "Organic Approaches to Sensor Development" <u>NATO Conference on Sensing</u>, Prague, Czech Rep. Sept 1st 2001.
93) "Anion Receptors", Chicago ACS meeting, Anion recognition symposium, Aug. 27th 2001.
92) "Organic Chemistry Approaches to Single and Multi Analyte Sensing", LSU, May 4th, 2001.
91) "Organic Chemistry Approaches to Single and Multi Analyte Sensing", <u>Pharmacopeia</u>, Mar. 22nd, 2001.
90) "Sensing in the Anslyn Group", <u>Breslow Birthday Symposium</u>, Mar. 23rd, New York.
89) "Application of Nano Technology to Diagnostics", <u>AADR Conference</u>, Chicago, Mar. 9th 2001.
88) "Organic Chemistry Approaches to Single and Multi Analyte Sensing", <u>Colorado St. Univ.,</u> Jan. 23rd, 2001.
87) "Organic Chemistry Approaches to Single Analyte and Multianalyte Sensing", <u>Pacific Chem,</u> Honolulu Hawaii, Dec, 12th 2000
86) "Differential vs Selective Sensing, a Furtile Ground for Combinatorial Chemistry", Conference on Combinatorial Chemistry in Molecular Recognition, Saarbrucken Germany, Dec. 9th 2000.
85) "Organic Chemistry Approaches to Single Analyte and Multianalyte Sensing", <u>Rochester University</u>, Sept. 30th 2000
84) "Single and Multi Analyte Sensing", ISSC 2000, Aug. 2nd, Fukuoka Japan
83) "Organic Chemistry Approaches to Single Analyte and Multianalyte Sensing", <u>Rochester University</u>, Sept. 29th 2000.
82) "Organic Chemistry Approaches to Single Analyte and Multianalyte Sensing", UT Southwestern Medical School
81) "Designed and Combinatorial Receptors", <u>University of Pavia</u>, Italy, April 18th, 2000.
80) "Designed and Combinatorial Receptors", <u>University of Parma</u>, Italy, April 17th, 2000.
79) "The Mammalian Sense of Taste, and Mimics Thereof" Germany Agricultural Society Conference, April 13th, 2000, Cologne.
78) "Designed and Combinatorial Receptors", <u>University of Bonn</u>, Germany, April 10th, 2000.
77) "Designed and Combinatorial Receptors", <u>University of Munich</u>, Germany, April 14th, 2000.
76) "Mimicking the Mammalian Sense of Taste", <u>Spring ACS Meeting</u>, San Francisco, ACS Symposium on Taste and Smell.
75) "Organic Chemistry Approaches to Single Analyte and Multianalyte Sensing", <u>Penn. State University</u>, Mar. 13th, 2000.
74) "Designed and Combinatorial Receptors", <u>Gordon Research Conference</u> on Sensors, Jan. 25th 2000, Ventura Ca.
73) "Organic Chemistry Approaches to Single Analyte and Multianalyte Sensing", <u>University of North Carolina, Chapel Hill,</u> Dec. 2nd 1999
72) "Organic Chemistry Approaches to Single Analyte and Multianalyte Sensing", <u>North Carolina State University, Dec. 1st</u> 1999
71) "Organic Chemistry Approaches to Single Analyte and Multianalyte Sensing", <u>Arizona State University</u>, Feb. 3rd 2000.
70) "Organic Chemistry Approaches to Single Analyte and Multianalyte Sensing", <u>University Miss. St. Louis</u>, Nov. 8th 1999.
69) "Organic Chemistry Approaches to Single Analyte and Multianalyte Sensing", <u>Washington University</u>, Nov. 8th 1999.
68) "Organic Chemistry Approaches to Single Analyte and Multianalyte Sensing", <u>Texas A&M University</u>, Sept. 10th 1999.
67) "Organic Chemistry Approaches to Single Analyte and Multianalyte Sensing", <u>University of Texas at Austin</u>, Oct. 14th 1999.

66) "Organic Chemistry Approaches to Single Analyte and Multianalyte Sensing", Carnegie Mellon University, Apr. 19th, 1999.

65) "Organic Approaches to Single Analyte and Multianalyte Sensing," University of Missouri, Kansas City, Feb. 24th, 1999

64) "From Single Analyte to Multi-Analyte Sensing Methodologies, Synthetic Receptors put to a Practical Use," ISPE Conference, Jan. 26th    1999

63) "From Single Analyte to Multi-Analyte Sensing Methodologies, Synthetic Receptors Put to a Practical Use," Virginia Commonwealth University, Nov. 10th, 1998

62) "From Single Analyte to Multi-Analyte Sensing Methodologies, Synthetic Receptors put to a Practical Use," University of Delaware, Oct. 27th, 1998

61) "From Single Analyte to Multi-Analyte Sensing Methodologies, Synthetic Receptors put to a Practical Use," Montana State University, Oct. 19th, 1998

60) "From Single Analyte to Multi-Analyte Sensing Methodologies, Synthetic Receptors put to a Practical Use", University of Montana, Oct. 16th, 1998

59) "From Single Analyte to Multi-Analyte Sensing Methodologies, Synthetic Receptors put to a Practical Use", NSF Workshop on Physical    Organic Chemistry, June 1998

58) "The Site of Cleavage of Pyranosides, and New Sensing    Methodologies" Wichita State University. Feb. 4th 1997.

57) "Supramolecular Catalysis: Reaction Mechanisms," Fifth Chemical Congress of North America, Cancun Mexico, Nov. 1997.

56) "Physical Organic Chemistry of Catalysis and Sensing," Scripps Institute for Chemical Sciences, La Jolla, CA, Oct. 24th 1997

55) "Sensor Based upon Synthetic Receptors," NSF Workshop on Physical Organic Chemistry, June 1997, Gold Lake Colorado

54) "Artificial Receptors as Catalysis and Sensors," Procter and Gamble Corp. May 1997

53) "Catalysts, Sensors, Mechanistic Probes: Molecular Recognition in Action.," University of Oita, Oita Japan, Jan. 1997

52) "Catalysts, Sensors, Mechanistic Probes: Molecular Recognition in Zction.," University of Kyushu, Kyushu Japan, 1997

51) "Catalysts, Sensors, Mechanistic Probes: Molecular Recognition in Action.," Kurume Research Center, Kurume Japan, Jan. 1997

50) "Catalysts, Sensors, Mechanistic Probes: Molecular Recognition in Action.," University of Hiroshima, Hiroshima Japan, Jan. 1997

49) "Catalysts, Sensors, Mechanistic Probes: Molecular Recognition in Action.," Ministry of Science and Education, Tsukuba Japan, Jan. 1997

48) "Enzymatic and Solution Acetal Hydrolysis Mechanisms," NSF Workshop, Squam Lake, NH. July 1996.

47) "Supramolecular Catalysis of Phosphoryl and Glycosyl Transfers," University of Arkansas, Fayetteville, Ark. Jan. 15th 1996

46) "Guanidinium Catalyzed Phosphoryl Transfers," Pacific Chemistry Conference, Dec. Honolulu, HA. 18th 1995.

45) "Methods in Combinatorial Libraries of RNA and Oligomeric Guanidiniums," Southwest Regional ACS Meeting Memphis Nov. 1995.

44) "Methods in Combinatorial Libraries of RNA and Oligomeric Guanidiniums," Proctor and Gamble Corp. Cincinnati OH Sept. 25th 1995.

43) "Endocyclic vs. Exocyclic Cleavage of Pyranosides," NATO Conference on Bioorganic Chemistry, Johnstown, PA. May 18th 1995.

42) "Catalysis of Glycosyl and Phosphoryl Transfers," Purdue University, May 1st 1995.

41) "A Phosphorane p$K_a$ Determined via Pulse Radiolysis," ACS Meeting, Anaheim CA, April 1995.

40) "Mechanistic Aspects of Supramolecular Catalysis," Syracuse University, Syracuse, NY, Jan. 24th 1995.

39) "Mechanistic Aspects of Supramolecular Catalysis," Clinical Diagnostic Systems Incorporated, Rochester N.Y. Jan. 26th 1995.

38) "Mechanistic Aspects of Supramolecular Catalysis," Rochester University, Rochester, NY, Jan. 27th 1995.

37) "Mechanistic Aspects of Supramolecular Catalysis," McGill University, Montreal, Quebec, Canada, Oct. 4th 1994.

36) "Mechanistic Aspects of Supramolecular Catalysis," University of Montreal, Montreal, Quebec, Canada, Oct. 5th 1994.

35) "Mechanistic Aspects of Supramolecular Catalysis," Sherbrooke University, Sherbrooke, Quebec, Canada, Oct. 3rd 1994.

34) "Mechanistic Aspects of Supramolecular Catalysis," Eli Lilly Corp. Indianapolis, IN, June 30th 1994.

33) "Mechanistic Aspects of Supramolecular Catalysis," University of Wisconsin, Madison, May 19th 1994.

32) "Artificial Restriction Endonucleases," Searle Scholars Conference, Chicago, May 16th 1994.

31) "Mechanistic Aspects of Supramolecular Catalysis," Massachusetts Institute of Technology, Boston MA. May 9th 1994.

30) "Mechanistic Aspects of Supramolecular Catalysis," Polaroid Corporation, Boston MA. May 6th 1994.

29) "Mechanistic Aspects of Supramolecular Catalysis," University ofIllinois, Urbana-Champagne, IL. May 4th 1994.

28) "Mechanistic Aspects of Supramolecular Catalysis," University of Pennsylvania, Philadelphia Penn. May 2nd 1994.
27) "Mechanistic Aspects of Supramolecular Catalysis" Smith-Kline, Beecham, Philadelphia Penn. April 29th 1994.
26) "Mechanistic Aspects of Supramolecular Catalysis Stanford University," Palo Alto, CA. April 20th 1994.
25) MARION MERRILL DOW LECTURE, "Mechanistic Aspects of   Supramolecular Catalysis"," University of California , Berkeley CA. April 19th 1994.
24) "Mechanistic Aspects of Supramolecular Catalysis," University of California, Los Angeles CA. April 14th 1994.
23) "Mechanistic Aspects of Supramolecular Catalysis," California Institute of Technology, Pasadena CA. April 13th 1994.
22) "Mechanistic Aspects of Supramolecular Catalysis," Texas A & M University, Dec. 9th 1993.
21) "Mechanistic Aspects of Supramolecular Catalysis," Alcon Corp. Dec. 8th, 1993.
20) "Organic Catalysts for RNA Hydrolysis," Genta Incorporation, San Diego, CA August 10th 1993.
19) "Catalysis of Phosphodiester Hydrolysis by Bis-GuanidiniumReceptors," XVIII International Symposium on Macrocyclic Chemistry, Univerisity of Twente, Netherlands, July 1993.
18) "Polyazaclefts for Molecular Recognition and Catalysis," Strasbourg University, France, July 1993.
17) "Polyazaclefts for Molecular Recognition and Catalysis," University of Munich, July 1993.
16) "Phosphodiester Hydrolysis Catalysts," 76th Canadian ChemicalConference, Sherbrooke, Quebec, June 1993.
15) "Physical Organic Studies of Biological Relevance," NSF Reactive Intermediates Conference, Lake Tahoe, June 1993.
14) "Polyaza Clefts for Molecular Recognition and Catalysis," New York University, March 5th 1993.
13) "Phosphodiester Hydrolysis Catalysts," ICI Pharmaceuticals, March 8th 1993.
12) "Polyaza Clefts for Molecular Recognition and Catalysis," SUNY Stoney Brook, March 4th 1993.
11) "Polyaza Clefts for Molecular Recognition and Catalysis,"Columbia University, March 3rd 1993.
10) "Molecular Recognition of Carbohydrates, Enolates, and   Phosphodiesters," U.T. Arlington, Nov. 1992.
9) "Molecular Recognition of Carbohydrates, Enolates, and Phosphodiesters," Carnegie Mellon University, Nov. 1992.
8) "Complexation of Reactive Intermediates," XVII International Symposium Macrocyclic Chemistry, Provo, UT August 1992.
7) "Molecular Recognition of Carbohydrates, Enolates, and Phosphodiester," Hiroshima University, July 1992.
6) "Molecular Recognition of Carbohydrates, Enolates, and Phosphodiesters", Tokyo Institute of Technology, July 1992.
5) "General Acid Catalysts for Phosphodiester Cleavage", XIII International Symposium of Molecular Recognition and Inclusion, July    26th 1992, Kyoto Japan.
4) "Phosphodiester Receptors for a Variety of Solvents," Short Talk, Biooorganic Gordon Conference, Plymouth State College, June 1992.
3) "Polyaza Clefts for Molecular Recognition Purposes," University of Houston, April 3rd 1992.
2) "Synthesis of Polyazaclefts for Bioorganic Studies," Princeton University, April 26th 1991.
1) "Ribonuclease A Mimics," The University of Texas at Dallas, Nov. 31st 1990.


**Research Support:**

**PAST SUPPORT**
1. National Science Foundation, High Risk Research Program, "Mixed Valent Molecular Ferromagnets," 1990-1991, $50,000.
2. National Science Foundation, Post-Doctoral Research Supplement, "Carbohydrate Complexing Agents," 1989-1990, $32,000.
3. Texas Advanced Technology Program "Degradation of Aromatic Pollutants by an Artificial Oxidase," 1989-1991, $105,000.
4. Texas Advanced Technology Program "Molecular Recognition Driven Co-Facial Assembly of Metallomacrocycles," 1989-1991, $125,000.
5. The Robert A. Welch Foundation (F-1151) "Selective and Asymmetric Catalytic Olefin Hydrogenation," June 1st 1989-May 31st 1992; $75,000.
6. Searle Foundation "Artificial Restriction Endonucleases," March 1st 1991-Feb. 28th 1994  $162,000. One year extension granted.
7. Camille and Henry Dreyfus Foundation (NF-89-35) "Bioorganic Catalyst Development," Sept. 1st 1989-Aug. 31 1994, $25,000.
8. Monsanto Corporation "Research Support Donation as Part of Presidential Young Investigator Program," $10,000 1990.
9. Texas Advanced Technology Program, "Rationally Designed Degradation Enzymes for Aromatic Pollutants", 1992-1994, $160,409 (Co-PI with Jon Robertus).
10. North Atlantic Treaty Organization "Receptors for Co-Factor Hydrolysis," 1993-1994, $12,000 (Co-PI with Franz Schmitdchen in Munich, Germany).

16

11. National Science Foundation, Presidential Young Investigator Award (CHE-9057208) "Development of Artificial Enzymes," Nov. 1st 1990-Oct. 31st 1995, $125,000 (base), $375,000 (with matching funds).

12. National Institutes of Health "Carbohydrate Artificial Receptors and Mechanistic Probes," 1994-1997, $270,000.

13. National Institutes of Health "Artificial Metallonucleases,"1994-1997, $270,000

14. Texas Advanced Technology, "On-Line Sensors for the Analysis of Common Beverage Additives," 1998-2000, $150,000.

15. National Institutes of Health "The Development of an Electronic Tongue," (E. Anslyn, PI: total for four groups) 1998-2001, $783,008.

16. National Science Foundation – NER Program "Molecular Duplex Formation," (M. Krische P.I., total for two groups), 2002-2004, $100,000.

17. Army Research Office, MURI, "Texas Consortium for the Development of Biological Sensors," $2,999,000 (A. Ellington, PI; total for 10 groups) 05/01/1999-04/30/2004.

18. Beckman Foundation Technologies Initiative "Center for the Design and Fabrication of Sensor Arrays," $2,500,000 (J. Shear, PI; total for 8 groups) 7/99 - 6/04.

19. National Science Foundation "Artificial Metalloenzymes for RNA Hydrolysis," $310,000, 9/01/00-8/30/03.

20. Department of Defense "Anion Receptors and Selectors," PI with Co-PI Jonathan Sessler, $350,000, 2000-2003.

21. National Science Foundation, "Multi-Modal Miniature Microscopes," Rebecca Richard-Kortum, PI, with three Co-PIs, 303,000, 2000-2003.

22. National Institutes of Health "Further Development of the UT Electronic Tongue," (E. Anslyn, PI: total for four groups) 2002-2006, $900,000.

23. National Institutes of Health "Model Studies of Low Barrier Hydrogen Bonds in Catalysis," 2002-2006, $750,000.

24. National Institutes of Health "Micro-Array Analysis of Saliva," (PI with 7 other co-PI's), 2002-2006, $4,000,000.

25. National Institutes of Health "The Molecular Recognition of Urine" 2005-2006, $100,000.

**CURRENT SUPPORT**

Welch Foundation "Characterizing Phosphoranes with Pulse Radiolysis," 2003-2006, $96,000.

National Institutes of Health "Colorimetric Methods for the Determination of Enantiomeric Excess" $876,000 direct, 2006-2010.

National Science Foundation "Enantiomeric Excess Assays for Carboxylic Acids" $346,000 direct for 2006 – 2009.

# EXHIBIT E

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BOEHRINGER INGELHEIM                    )
INTERNATIONAL GMBH and BOEHRINGER       )    C.A. No. 05-700 (***)
INGELHEIM PHARMACEUTICALS, INC.,        )
                            Plaintiffs, )
          v.                            )
                                        )
BARR LABORATORIES, INC.                 )
                            Defendant.  )

### SUPPLEMENTAL EXPERT REPORT OF ERIC V. ANSLYN, Ph.D.

**A.    Dr. Bartlett's Report**

1.      I have reviewed the expert report of Paul A. Bartlett and been asked to respond to some of the opinions therein.

2.      While I disagree that, in order to be a person of ordinary skill in the art, an individual must have the level of education and/or experience that Dr. Bartlett describes, the opinions expressed in my reports would not change if I applied his definition instead of the definition contained in my initial report.

3.      Nothing in Dr. Bartlett's report changes my opinions set forth in my March 28, 2007 report.

**1.    The German Applications Do Not Disclose Halogen-Substituted Phenyl Moities at the $R_1$ Position.**

4.      Dr. Bartlett incorrectly suggests several times that my March 28 report focused on the fact that claim 1 in the first German application does not include halogen-substituted phenyl rings at the $R_1$ position while claim 1 of the '812 patent does. While it is correct that the skilled artisan would understand that claim 1 of the first German application does not include such substituents, but claim 1 of the '812 patent does, my analysis was broader. I pointed out that the skilled artisan would understand that General Formula I of both German Applications

does not include halogen-substituted phenyl rings at the $R_1$ position while General Formula I of

the '812 patent does. *See, e.g.,* Anslyn March 28 Rep. ¶ 45.

    5.    General Formula I is set forth at the very beginning of the German Applications,

and both defines the scope of the invention of the German Applications and establishes the

context for reading the entire disclosure of those applications. A skilled artisan would possess

this understanding because, among other things, the very first sentence of the disclosure of the

first German application reads:

> This invention relates to new tetrahydro-benzthiazoles of general formula



(I)

> the enantiomers and acid addition salts thereof, particularly the physiologically
> acceptable acid addition salts thereof with inorganic or organic acids, and processes for
> preparing them.

Exh. 53 at BARR28270. The second German application refers back to the first German

application, stating "German Patent Application No. 34 47 075.1 describes tetrahydro-

benzthiazoles of general formula [structure] (I)" and then completes the sentence in identical

fashion. BARR209357. Explicit definitions of the $R_1$, $R_2$, $R_3$, and $R_4$ substituents of General

Formula I follow in both applications. *See* Ex. 53 at BARR028270-71; BARR209358.

    6.    Dr. Bartlett agrees that claim 1 of the first German application does not disclose

halogen-substituted phenyl rings at the $R_1$ position. *See* Bartlett ¶ 52. However, the definitions

of $R_1$-$R_4$ of claim 1 of the first German application are identical to the definitions of $R_1$-$R_4$ of

General Formula I of both German applications. Ex. 53 at BARR028270-71, BARR028314;

BARR209357-58. Accordingly, under Dr. Bartlett's analysis, General Formula I of the German

applications does not disclose halogen-substituted phenyl rings at the $R_1$ position.

7.    I disagree with Dr. Bartlett's opinion to the extent he asserts that the skilled artisan reading the methods of synthesis (d) and (e) of the German applications would understand them to disclose the <u>synthesis</u> of compounds with halogen-substituted phenyl moieties at the $R_1$ position.  In addition, I disagree with Dr. Bartlett's opinion to the extent he asserts that the skilled artisan reading the synthetic methods (d) and (e) of the German applications would understand them to disclose <u>compounds</u> which have a halogen-substituted phenyl group at the $R_1$ position as starting materials, intermediates, or final products.

8.    As I explained in my original report and above, the skilled artisan would understand that General Formula I of the German applications does not include halogen-substituted phenyl rings in the definition of the possible substituents at the $R_1$ position.

9.    A skilled artisan would understand synthetic method (d) to describe the synthesis of compounds within General Formula I.  Synthetic method (d) begins with the phrase "In order to prepare compounds of general formula I . . . ", and a skilled artisan would read the description that follows in (d) in the context of that language.  A skilled artisan therefore would not understand synthetic method (d) to disclose compounds or the synthesis of compounds with a halogen-substituted phenyl ring at the $R_1$ position, because those compounds are not encompassed by the group of compounds in General Formula I.  The "wherein at least one of the groups $R_1$, $R_2$, $R_3$ or $R_4$ . . ." clause in the first sentence would be understood by a skilled artisan to indicate that the method is directed to making compounds defined by General Formula I, not a broad group of compounds unlimited by the bounds of General Formula I.

10.    The same is true with respect to section (e).  A skilled artisan would understand synthetic method (e) to describe the synthesis of compounds within General Formula I.  Synthetic method (e) begins with the phrase "In order to prepare compounds of general formula I

3

. . . ", and a skilled artisan would read the description that follows in (e) in the context of that language. A skilled artisan therefore would not understand synthetic method (e) to disclose compounds or the synthesis of compounds with a halogen-substituted phenyl ring at the $R_1$ position, because those compounds are not encompassed by the group of compounds in General Formula I. The "wherein at least one of the groups $R_1$, $R_2$, $R_3$ or $R_4$ . . ." clause in the first sentence would be understood by a skilled artisan to indicate that the method is directed to making compounds defined by General Formula I, not a broad group of compounds unlimited by the bounds of General Formula I.

11.     Dr. Bartlett relies on the German applications' use of the term "hereinbefore" for his opinions regarding the disclosures of synthetic methods (d) and (e) in the German applications. *See* Bartlett ¶¶ 59-66. I do not believe the skilled artisan would interpret the word "hereinbefore" in those synthetic methods to change the fact that the methods are defined as making compounds of General Formula I.

12.     Dr. Bartlett states that "inherently, the synthetic routes disclosed in the German priority applications would reasonably enable one of ordinary skill to make diaminotetrahydrobenzthiazoles with halogenated benzyl or other phenylalkyl groups as $R_1$ substituents." Bartlett ¶ 57. Regardless of the accuracy of Dr. Bartlett's assertion, as discussed above, the skilled artisan would not understand synthetic methods (d) or (e) to disclose either compounds, or the synthesis of compounds, with a halogenated phenyl group at the $R_1$ position. The skilled artisan would also not understand from either synthetic method (d) or (e)—or anything else in the German applications—that the inventors had made, or had contemplated making, compounds with a halogenated phenyl group at the $R_1$ position.

13.     The skilled artisan would understand that the phrase "wherein the above mentioned phenyl nuclei may be substituted by 1 or 2 halogen atoms" of $R_1$ of claim 1 of the '812 patent is broader than the phrase "whilst the phenyl nucleus may be substituted by fluorine, chlorine or bromine atoms" of $R_3$ of General Formula I of the German applications.  The skilled artisan would have that understanding because there are halogen atoms other than fluorine, chlorine and bromine: for example, iodine.  Therefore, Dr. Bartlett's opinion does not explain how all of the compounds encompassed by claims 1 and 2 of the '812 patent as understood by the skilled artisan are disclosed in the German applications.

**B.     The '086 and '812 Patents**

14.     The skilled artisan would understand that each of claims 3-5 and 9-10 of the '812 patent encompasses multiple different compounds—from dozens to thousands of compounds.  The skilled artisan would also understand that the phrase "2-Amino-6-n-propylamino-4,5,6,7-tetrahydro-benzthiazole" has the same meaning in claim 7 of the '812 patent and claims 9, 19, 29, and 39 of the '086 patent.

15.     Because claim 8 of the '812 patent is dependent upon claim 3 of the '812 patent, the skilled artisan would understand that claim 8 encompasses at least thousands of pharmaceutical compositions.

16.     The skilled artisan would understand that a natural result flowing from practicing the methods of at least claims 8, 9, 18, 19, 28, 29, 38, and 39 of the '086 patent would be the formation of the claimed compounds in both protonated (acidic) and unprotonated (free base) form.  He/she would hold that understanding based on, among other things, the principle that weakly acidic and basic forms of amines are in equilibrium in the body.  That principle is reflected in the Henderson-Hasselbalch equation and analogous equations for diprotic acids,

which can be utilized to calculate the respective amounts of protonated and free base forms based on the dissociation constants $(pK_as)$[1] for the compounds and the pH.

7/9/07

Date

Eric V. Anslyn, Ph.D.

---

[1] See page BOE00075146 of BOE00075129-62 for information about the dissociation constants for the protonated forms of pramipexole.

# EXHIBIT F

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF DELAWARE

3    --------------------------------------------X

4    BOEHRINGER INGELHEIM,

5    INTERNATIONAL GMBH and

6    BOEHRINGER INGELHEIM

7    PHARMACEUTICALS, INC.,

8         Plaintiffs              C.A. No.

9         vs                     05-700

10   BARR LABORATORIES, INC.,

11        Defendant

12   --------------------------------------------X

13          Deposition of ERIC ANSLYN, Ph.D.

14                Washington, D.C.

15          Tuesday, September 11, 2007

16                 9:10 a.m.

17

18

19

20

21

22   Job No.: 1-111766

23   Pages 1 - 245

24   Reported by:  Dianna C. Kilgalen, Notary Public.

25               - - - - - -

Page 93

1                       ERIC ANSLYN, Ph.D.

2   attached to other groups, and those groups could be

3   single atoms.

4        Q.    Now, turning your attention to Paragraph 36,

5   that paragraph concerns the claims of the 086 patent,

6   correct?

7             MR. PFADENHAUER:  Object to the form.

8        A.    So I'm saying that the skilled artisan would

9   understand that the 086 patent contains claims to

10  methods of using compounds, and then I list four to

11  five conditions.

12  BY MR. SCHULER:

13       Q.    In the last sentence of Paragraph 36, you say

14  the skilled artisan would appreciate that in order to

15  perform the method of treatment in these claims, one

16  would be required to have the specified compound or

17  compounds.  Do you see that?

18       A.    That is what the sentence says, yes.

19       Q.    And what is the basis of your opinion in that

20  regard?

21       A.    It is common knowledge that to perform a

22  method of treatment, one needs the compounds to perform

23  that method.

24       Q.    Well, you would agree that that statement

25  would only be pertinent for the period after the patent