IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

BOEHRINGER INGELHEIM INTERNATIONAL )
GMBH and BOEHRINGER INGELHEIM )
PHARMACEUTICALS, INC., )
                 )
           Plaintiffs, )
                 )
           v. )     C.A. No. 05-700 (JJF)
                 )     CONSOLIDATED
BARR LABORATORIES, INC., )
                 )     **CONFIDENTIAL**
           Defendant. )     **FILED UNDER SEAL**
_____ )
                 )
BOEHRINGER INGELHEIM INTERNATIONAL )
GMBH and BOEHRINGER INGELHEIM )
PHARMACEUTICALS, INC., )
                 )
           Plaintiffs, )
                 )
           v. )     C.A. No. 05-854 (JJF)
                 )
MYLAN PHARMACEUTICALS, INC., )
                 )
           Defendant. )
_____ )

## DEFENDANTS' RESPONSIVE PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

OF COUNSEL:
Glenn J. Pfadenhauer
Jessamyn S. Berniker
Dov P. Grossman
Brett R. Tobin
Kendra P. Robins
WILLIAMS & CONNOLLY LLP
725 Twelfth Street, N.W.
Washington, DC 20005
(202) 434-5000

YOUNG CONAWAY STARGATT &
TAYLOR, LLP
Adam W. Poff (#3990)
apoff@ycst.com
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, DE 19801
(302) 571-6600

*Attorneys for Defendant Barr*
*Laboratories, Inc.*

OF COUNSEL:
Kevin J. Culligan
Joy Arnold
HELLER EHRMAN LLP
Times Square Tower
7 Times Square
New York, NY 10036
(212) 832-8300

Shannon M. Bloodworth
HELLER EHRMAN LLP
171 Rhode Island Avenue, NW
Washington, DC 20036
(202) 912-2000

Dated: May 14, 2008

MORRIS JAMES LLP
Mary B. Matterer (#2696)
mmatterer@morrisjames.com
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, DE 19899-2306
(302) 888-6960

*Attorneys for Mylan
Pharmaceuticals, Inc.*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iv

INTRODUCTION ............................................................................................................... 1

RESPONSIVE PROPOSED FINDINGS OF FACT ....................................................... 1

I.     BOEHRINGER'S TERMINAL DISCLAIMER IS INEFFECTIVE ................................ 1

II.    BOEHRINGER HAS NOT UNDERMINED THE CLEAR AND CONVINCING EVIDENCE OF DOUBLE PATENTING ................................................. 2

III.   BOEHRINGER HAS NOT SATISFIED ITS BURDEN THAT SECTION 121 APPLIES ................................................................................................................ 9

RESPONSIVE PROPOSED CONCLUSIONS OF LAW ........................................................ 13

I.     BOEHRINGER'S TERMINAL DISCLAIMER IS INEFFECTIVE ............................... 13

II.    BOEHRINGER HAS NOT UNDERMINED THE CLEAR AND CONVINCING EVIDENCE OF DOUBLE PATENTING ............................................. 14

III.   BOEHRINGER HAS NOT SATISFIED ITS BURDEN THAT SECTION 121 APPLIES ................................................................................................................ 20

IV.   BOEHRINGER IMPROPERLY ATTEMPTS TO SHIFT THE BURDEN REGARDING INFRINGEMENT TO DEFENDANTS ................................................. 22

### TABLE OF AUTHORITIES

### FEDERAL CASES

*Applied Materials, Inc. v. Advanced Semiconductor Materials Am., Inc.,*
    98 F.3d 1563 (Fed. Cir. 1996)...............................................................................18, 21

*Astellas Pharma, Inc. & Boehringer Ingelheim Pharms. Inc.*
*v. Ranbaxy Inc., et al.,*
    No. 05-2563 (MLC), 2007 WL 576341 (D.N.J. Feb. 21, 2007).........................5, 19

*Avia Group Int'l, Inc. v. L.A. Gear Calif., Inc.,*
    853 F.2d 1557 (Fed. Cir. 1988)......................................................................15

*Bristol-Myers Squibb Co. v. Pharmachemie B.V.,*
    361 F.3d 1343 (Fed. Cir. 2004).......................................................................21

*Bush Indus. Inc. v. O'Sullivan Indus., Inc.,*
    772 F. Supp. 1442 (D. Del. 1991).....................................................................15

*Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.,*
    381 F.3d 1371 (Fed. Cir. 2004)......................................................................13

*Centricut, LLC v. Esab Group, Inc.,*
    390 F.3d 1361 (Fed. Cir. 2004).......................................................................22

*Daiichi Sankyo Co. v. Apotex, Ltd.,*
    501 F.3d 1254 (Fed. Cir. 2007)......................................................................15

*Ecolochem, Inc. v. S. Cal. Edison Co.,*
    227 F.3d 1361 (Fed. Cir. 2000).......................................................................20

*Eli Lilly & Co. v. Barr Labs., Inc.,*
    251 F. 3d 955 (Fed. Cir. 2001).............................................................13, 14, 16

*Eli Lilly & Co. v. Zenith Goldline Pharms.,*
    2001 U.S. Dist. LEXIS 18361 (S.D. Ind. Oct. 12, 2001).....................................20

*Fisons plc v. Quigg,*
    876 F. 2d 99 (Fed. Cir. 1989)........................................................................13

*General Foods Corp. v. Studiengesellschaft Kohle mbH,*
    972 F.2d 1272 (Fed. Cir. 1992).......................................................................17

*Geneva Pharms., Inc. v. GlaxoSmithKline PLC,*
    349 F.3d 1373 (Fed. Cir. 2003).......................................................................16

*Gerber Garment Tech., Inc. v. Lectra Sys., Inc.,*
    916 F.2d 683 (Fed. Cir. 1990)...................................................................................21

*Imhaeuser v. Buerk,*
    101 U.S. 647 (1880)......................................................................................................22

*In re Braithwaite,*
    379 F.2d 594 (CCPA 1967) ........................................................................................14

*In re Byck,*
    48 F.2d 665 (CCPA 1931) ...............................................................................16, 18

*In re Cady,*
    77 F.2d 106 ......................................................................................................................20

*In re Christmann,*
    128 F.2d 596 (CCPA 1942) .............................................................................15, 16, 18

*In re Heyl,*
    379 F. 2d 1018 (CCPA 1967) ....................................................................................19

*In re Kaplan,*
    789 F.2d 1574 (Fed. Cir. 1986)..................................................................................16

*In re Lonardo,*
    119 F.3d ....................................................................................................................13, 14

*In re Longi,*
    759 F.2d 887 (Fed. Cir. 1985).........................................................................13, 19, 20

*In re Metoprolol Succinate Patent Litigation,*
    494 F.3d 1011 (Fed. Cir. 2007)...................................................................................17

*In re Papesch,*
    315 F.2d 381 (CCPA 1963) ........................................................................................15

*In re Thorington,*
    418 F.2d 528 (CCPA 1969) ...............................................................................14, 16

*In re Translogic Tech., Inc.,*
    504 F.3d 1249 (Fed. Cir. 2007)...................................................................................20

*In re Van Ornum,*
    686 F.2d 937 (CCPA 1982) ........................................................................................14

*In re Ziegler,*
    443 F.2d 1211 (CCPA 1971) ...........................................................................20

*Merck & Co. v. Hi-Tech Pharmacal Co.,*
    482 F.3d 1317 (Fed. Cir. 2007) .....................................................................13

*Merck & Co. v. Kessler,*
    80 F. 3d 1543 (Fed. Cir. 1996) ......................................................................18

*Nutrition 21 v. United States,*
    930 F.2d 867 (Fed. Cir. 1991) .......................................................................14

*Pfizer Inc. v. Ranbaxy Labs., Ltd.,*
    405 F. Supp. 2d 495 (D. Del. 2005) .........................................................15, 16

*Pfizer, Inc. v. Teva Pharms. USA, Inc.,*
    518 F.3d 1353 (Fed. Cir. 2008) ...........................................................16, 18, 21

*Pharmacia Corp. v. Par Pharm., Inc.,*
    417 F.3d 1369 (Fed. Cir. 2005) .....................................................................14

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005) (en banc) ....................................................15

*Plant Genetic Sys., N.V. v. DeKalb Genetics Corp.,*
    315 F.3d 1335 (Fed. Cir. 2003) .....................................................................20

*Research Corp. Techs. v. Gensia Labs, Inc.,*
    10 Fed. Appx. 856 (Fed. Cir. 2001) (nonprecedential) ...............................17

*Symbol Techs., Inc. v. Opticon, Inc.,*
    935 F.2d 1569 (Fed. Cir. 1991) .....................................................................16

*Tafas v. Dudas,*
    2008 WL 859467, --- F. Supp. 2d. --- (E.D. Va. 2008) .............................18

*Takeda Pharmaceutical Co. v. Dudas,*
    511 F. Supp. 2d 81 (D.D.C. 2007) ................................................................19

*Under Sea Indus., Inc. v. Dacor Corp.,*
    833 F.2d 1551 (Fed. Cir. 1987) .....................................................................22

*Union Carbide Corp. v. Dow Chemical Co.,*
    619 F. Supp. 1036 (D. Del. 1985) .................................................................21

REDACTED VERSION – PUBLICLY FILED

## OTHER AUTHORITIES

37 C.F.R. § 1.142(a) ..........................................................................................................21

37 C.F.R. § 1.321(c) ..........................................................................................................14

35 U.S.C. § 121 ........................................................................................................... passim

35 U.S.C. § 156 ..................................................................................................................13

35 U.S.C. § 253 ..................................................................................................................14

Fed. R. Evid. 702 ...............................................................................................................13

## INTRODUCTION

Defendants Barr Laboratories, Inc. ("Barr") and Mylan Pharmaceuticals, Inc. ("Mylan") (collectively "Defendants") submit the following responsive proposed findings of fact and conclusions of law. Defendants' proposed findings of fact and conclusions of law numbered 1 through 203 are set forth in D.I. 216.

## RESPONSIVE PROPOSED FINDINGS OF FACT[1]

### I. BOEHRINGER'S TERMINAL DISCLAIMER IS INEFFECTIVE

204. Boehringer is incorrect that, by filing its terminal disclaimer, it gave up the exact same portion of the patent term it unlawfully obtained beyond the expiration date of the '086 patent, and also is incorrect that the result is the same as if Boehringer had first terminally disclaimed and then received an extension. *See* D.I. 213 at 16. The five-and-a-half months of term extension Boehringer surrendered by filing its terminal disclaimer are not the equivalent of the five-and-a-half month enlargement of the '812 patent beyond the expiration of the '086 patent.

205. Boehringer's terminal disclaimer failed to ensure that the original term of the '812 patent would not extend beyond the expiration date of the '086 patent. *See* TX 548; TX 2; D.I. 190 at Ex. 1, ¶ 19.

206. Boehringer's terminal disclaimer was untimely filed, after the expiration of the '086 patent. *See* TX 548; TX 2; D.I. 190 at Ex. 1, ¶ 19.

207. Boehringer did not put an extension on the '086 patent, but instead chose to put the extension on the later-expiring '812 patent and to tie the extension to the original expiration date of the '812 patent. *See* TX 99 at BARR912.

---

[1] To the extent that any of the contentions of fact herein are deemed to be contentions of law, or vice versa, Defendants incorporate them by reference into the appropriate section herein.

208.    The existence Boehringer's term extension period does not and cannot avoid the well-established prohibition on allowing the original patent term of a second patent to extend beyond the expiration of the term of an earlier, patentably indistinct patent.

209.    Boehringer's terminal disclaimer of five-and-a-half months of its patent term extension did not cure the double patenting problem that invalidates the '812 patent. The '812 patent is incurably invalid.

210.    The '812 patent is invalid and thus there are no rights which are extended by the patent term extension.

## II.    BOEHRINGER HAS NOT UNDERMINED THE CLEAR AND CONVINCING EVIDENCE OF DOUBLE PATENTING

211.    Defendants presented the evidence and analysis required by law to establish double patenting.

212.    The testimony of Defendants' expert Dr. Eric Anslyn was directed to: (1) a construction of the claims in the earlier and later patents; and (2) a comparison of the differences between the claims. *See* Tr. 462:3-495:10 (Anslyn).

213.    Dr. Anslyn opined that the '086 patent claimed methods of treatment, and testified extensively concerning those methods and which compounds are used in them. Tr. 471:20-477:21 (Anslyn).

214.    Dr. Anslyn testified that the '086 patent claims require administration of an effective amount of the compounds described in those claims, and that the patents define what constitutes an effective dose. Tr. 472:15-21, 474:6-13, 475:3-12, 477:2-10, 497:19-498:7, 504:22-505:11 (Anslyn).

215.    Dr. Anslyn explained that "one of ordinary skill in the art would appreciate that you cannot practice these method claims [of the '086 patent] without having the compounds"

2

specified therein. Tr. 477:22-478:10 (Anslyn).

216.    Dr. Ansyln testified regarding the scope of the '812 patent claims. He explained that those claims claim particular compounds and testified as to how many compounds were covered by those claims. *See, e.g.*, Tr. 479:10-480:15 (Anslyn).

217.    Dr. Anslyn discussed similarities and differences between the claims of the '812 and '086 patents. He compared the compounds used in the method claims of the '086 patent to the compounds claimed in the '812 patent, testifying that "[t]here is substantial overlap of the compounds described in the compound claims of the '812 patent with the compounds used in the method claims of the '086 patent, and in some cases there [sic] are actually identical." Tr. 480:16-481:5 (Anslyn).

218.    Dr. Anslyn opined that while the '086 patent claims methods and the '812 patent claims compounds, the compounds used in the '086 method claims are either identical to, or a subset of, the compounds claimed in the later '812 patent. Tr. 481:11-482:18, 483:8-484:14, 485:22-486:20, 487:4-491:1, 492:18-495:10 (Anslyn).

219.    Dr. Anslyn testified that he did not "just compare the compound names," but "read all of the specifications and all of the claims, and came to the kinds of conclusions that" were discussed in his testimony. Tr. 502:10-17 (Anslyn).

220.    Dr. Anslyn explained that his analysis was "more than just [whether the claims were] using the same words," and also stated that "anyone skilled in the art would understand that in order to practice this method claim, you would actually physically have to have that compound." Tr. 509:16-24 (Anslyn).

221.    Dr. Anslyn's testimony established, *inter alia*, that (1) the later claims claim the compounds used in the earlier method claims, and (2) the later claims are anticipated—expressly

3

and inherently—by the earlier claims.

222. Boehringer did not produce any evidence contrary to Dr. Anslyn's testimony.

223. Boehringer did not offer a witness to testify about the scope of the '086 claims or about their relationship to the '812 patent claims.

224. The common specification of the '086 and '812 patents is directed to, *inter alia*, chemists. TX 2; TX 3; Tr. 222:8-11 (Klibanov); Tr. 460:12-462:2 (Anslyn); Tr. 686:5-20, 711:18-712:2 (Mailman).

225. The '086 and '812 patents have the same inventors, including some chemists. TX 2; TX 3; TX 787 (Hurnaus Dep.) 9:6-12, 13:4-18, 14:6-10, 15:22-16:6; TX 791 (Schneider Dep.) 8:16-25, 9:14-10:3, 10:20-11:2, 12:9-21.

226. The '086 patent is not directed to medical doctors to the exclusion of chemists, and the record contains no evidence that the '086 patent is directed to medical doctors to the exclusion of chemists.

227. Defendants' experts Dr. Anslyn and Dr. Richard Mailman were the only witnesses to address the qualifications of the hypothetical person of ordinary skill to which the '086 patent is directed, and they both indicated that such a person would have a background in, *inter alia*, chemistry. Tr. 460:12-462:2 (Anslyn); Tr. 684:21-686:20, 711:18-712:2 (Mailman).

228. Boehringer's expert Dr. Warren Olanow, who is himself a medical doctor, never testified that the '086 patent is directed solely to medical doctors.

229. Boehringer did not offer any evidence about how a hypothetical person of skill in the art would understand the claims of the '086 patent.

230. Dr. Anslyn is qualified to testify about the '086 and '812 patent claims from the perspective of a person of ordinary skill in the art.

4

231.    Boehringer's internal documents show that the R-enantiomer of pramipexole possesses dopaminergic activity. *See* TX 496 & 497 (SND 919 CL2 X—the R-enantiomer of pramipexole dihydrochloride—possesses activity in "dopamine synthesis inhibition and dopamine utilization"); *see also* D.I. 190 at Ex. 1 ¶ 9 (SND 919X is the R-enantiomer).

232.    Boehringer did not offer any evidence that the use of the R-enantiomer is not part of claims 9, 19, and 39 of the '086 patent.

233.    In the appeal from the district court decision in *Astellas Pharma, Inc. & Boehringer Ingelheim Pharms. Inc. v. Ranbaxy Inc., et al.,* Boehringer argued that claims which are not in the same statutory category generally cannot be found invalid for double patenting (a premise Defendants dispute), but even Boehringer admitted that "[t]here is one notable exception to these general principles—a small subset of decisions that involve a claim to a compound compared to a claim to the method of using the compound." Brief for Plaintiffs-Appellees Astellas Pharma, Inc. & Boehringer Ingelheim Pharms., Inc., No. 2007-1199, 2007 WL 1362598 at *29 (Fed. Cir. Apr. 25, 2007) (emphasis in original).

234.    During prosecution of the '086 patent, the examiner rejected pending claims 11 and 12 (method of use claims) for double patenting over claim 1 of the '374 patent (a compound claim). TX 286 at BARR504; TX 1 at Col. 24.

235.    Boehringer is incorrect that Defendants' double patenting theory focuses on whether the '086 method claims are "sub-genera" of the '812 compound claims. *See* D.I. 213 at 27-28. Defendants' analysis focuses on whether "the compounds of the '086 Patent method claims are sub-genera of the compounds of the '812 Patent claims." TX 406 at BARR20 (emphasis added).

236.    Pramipexole's alleged ability to serve as a neuroprotective agent or to treat

Restless Legs Syndrome ("RLS"), depression, or fibromyalgia was not known as of the priority date.

237.    Defendants did not copy the Mirapex® product.  For example, the inactive ingredients in Defendants' products are different from those in Mirapex®.  TX 419 (Boehringer's revised product label for Mirapex®) at BOE881432; TX 422 (Barr's revised product label for pramipexole dihydrochloride tablets) at BARR208788; TX 755 at MYL2179R (Mylan's product label for pramipexole dihydrochloride tablets).

238.    Prior to getting FDA approval for the use of Mirapex® in the treatment of RLS, Boehringer publicized reports indicating efficacy, thus promoting its off-label use.  *See* TX 264, TX 265; Tr. 392:2-394:15 (Rao).  In addition, sales of a product can be increased by factors other than advertising but which are still unrelated to the invention.  These factors include brand name awareness, existing market share, and physician familiarity, all of which were operative before Mirapex® received approval for RLS.  *See* Tr. 533:17-534:16 (Weinstein).  These facts undercut any nexus between the sales of Mirapex® and the claimed invention.

239.    Boehringer's own testimony and documents significantly undercut any value of its alleged evidence of commercial success of Mirapex® for its purported "other uses," because they confirm that:  (1) there is no accurate way of determining what conditions Mirapex® is being prescribed for, *see* Tr. 575:6-576:5 (Keating); Tr. 532:6-16 (Weinstein);



240.    Dr. Rao's assessment of profitability was flawed because he did not benchmark against the profitability of other products in the market and he did not consider the potential returns on alternative investments by Boehringer, clinical costs incurred by Boehringer overseas, or Boehringer's research and development costs. Tr. 408:5-413:11 (Rao); Tr. 537:4-541:10 (Weinstein).

241.    The evidence is insufficient to show the existence of any long-felt unmet need as of December 1984 that was satisfied by Mirapex®.

242.    Boehringer did not elicit any testimony or present any evidence of objective indicia of nonobviousness with respect to any compound claimed in the '812 patent other than pramipexole.

243.    Pramipexole is a dopamine agonist, and its use in the treatment of Parkinson's disease is a function of the compound's dopaminergic qualities. Tr. 49:13-50:3 (Olanow); Tr. 622:8-624:18 (Mailman).

244.    Consistent with the notion that pramipexole has not been shown to be neuroprotective, the mechanism of action by which it might work has likewise not been established. Tr. 97:12-99:13 (Olanow).

245.    *In vitro* and *in vivo* data regarding potential neuroprotective activity are not reliable predictors of actual neuroprotective activity. Tr. 126:10-128:3 (Olanow); TX 783 at 1013, 1018-19.

246.    Consistent with the notion that pramipexole has not been established as a treatment for fibromyalgia, the mechanism of action by which it might work has likewise not been established because the mechanism of fibromyalgia itself is not known. Tr. 92:10-93:2 (Olanow).

247.    The population of individuals with fibromyalgia is unknowable. Tr. 154:16-156:6 (Olanow); TX 732 at 1.

248.    Consistent with the notion that pramipexole has not been established as a treatment for endogenous depression, the mechanism of action by which it might work has likewise not been established. Tr. 82:1-19 (Olanow).

249.    To the extent tests have shown that dopamine agonists like pramipexole can be used to treat endogenous depression, it is those compounds' dopaminergic properties which are driving the results. Tr. 631:20-641:9 (Mailman).

250.    The populations of individuals with depression and Parkinson's disease substantially overlap. Tr. 78:20-22 (Olanow); TX 486 at 2; TX 487 at 1; TX 488 at 1.

251.    The exact mechanism by which pramipexole is used to treat RLS has not been established, but two mechanisms have been theorized, both dopaminergic. Tr. 68:1-6 (Olanow); Tr. 651:24-652:12 (Mailman); see also TX 263 at BARR014162.

252.    One theorized mechanism by which pramipexole might be treating RLS is by activating only pre-synaptic dopamine receptors at low doses, which is the same mechanism by which dopamine agonists could be used to treat schizophrenia. Tr. 68:1-69:1, 200:19-201:13 (Olanow); Tr. 622:8-629:14 (Mailman); TX 723; TX 725.

253.    The other theorized mechanism by which pramipexole might be treating RLS is by activating post-synaptic receptors, which is the same mechanism by which dopamine agonists are used to treat Parkinson's disease. Tr. 651:24-652:19 (Mailman); see also Tr. 49:10-50:3 (Olanow).

254.    The population of individuals with Parkinson's disease and RLS noticeably overlap. See TX 726.

255.    Boehringer did not present any evidence establishing that pramipexole is effective in treating ADHD.

256.    Boehringer did not elicit any testimony or present any evidence of the uses of any compound claimed in the '812 patent other than pramipexole.

257.    Boehringer did not elicit any testimony or present any evidence of the mechanism of action or patient population of any compound claimed in the '812 patent other than pramipexole.

258.    Boehringer did not elicit any testimony or present any evidence of whether any compound claimed in the '812 patent "can be used in a materially different process."

259.    In the restriction requirement imposed during prosecution of the '947 application, the examiner determined that methods of lowering blood pressure and methods of lowering heart rate were not materially different from one another despite the fact that they deal with different disease states. TX 46 at BARR275-76.

260.    Boehringer has not satisfied the standard set forth in MPEP 806.05(h).

261.    Defendants complied with Rule 26 and Boehringer was placed on notice of all of the facts that Defendants rely upon to prove their double patenting defense both "during the discovery process" and "in writing." *See* Defendants' Brief in Opposition to Plaintiffs' Evidentiary Objections (filed simultaneously herewith).

## III.    BOEHRINGER HAS NOT SATISFIED ITS BURDEN THAT SECTION 121 APPLIES

262.    Boehringer acknowledged that the restriction requirement imposed during prosecution of the '947 application had been removed by the PTO when, during prosecution of the '197 application, Boehringer withdrew the previously allowed claims and submitted new claims containing subject matter from multiple restriction groups of the '947 restriction

9

requirement including claims to multiple utility groups (Groups VIII, IX, and X) for multiple compound groups (Groups I-V), and a process group (Group VI). TX 286 at BARR578-600.

263.    Whether the '374 patent can be used as a reference against the '812 patent is not relevant to the issues presented here.

264.    Whether the '812 patent is invalid for double patenting over the '374 patent is not relevant to the issues presented here. The subject matter of the '374 patent claims is different than the subject matter of the '086 patent claims. TX 1; TX 2.

265.    Boehringer prosecuted subject matter from Group IX (treatment of parkinsonism/Parkinson's disease) of the restriction requirement in both the '374 and the '086 patents. TX 1 at Claims 8-9; TX 2 at Claims 21-30; *see also* TX 46 at BARR276.

266.    Claim 7 of the '812 patent was originally submitted during prosecution of the '197 application. TX 286 at BARR493; TX 3 at Col. 25. The examiner allowed the claim, but Boehringer voluntary cancelled it and then re-submitted it during prosecution of the '812 patent. TX 286 at BARR503, BARR578; TX 99 at BARR664.

267.    During prosecution of the '671 application, the examiner initially rejected claims 1-5 and 8 for double patenting over the '374 patent. TX 99 at BARR777. Boehringer did not argue that Section 121 prevented the examiner from imposing the rejection. *See* TX 99 at BARR786. By contrast, Boehringer did argue during prosecution of the '197 application that Section 121 prevented the '947 application from being used as a reference for double patenting. TX 286 at BARR595.

268.    Boehringer's statement during prosecution of the '671 application that "no terminal disclaimer need be filed" was in reference to a double patenting rejection over the '374 patent, not the '086 patent. TX 99 at BARR776-77, BARR785-86.

269.    When Boehringer filed the '671 application, Boehringer only cancelled some of the claims by preliminary amendment; it did not cancel the claims in toto. TX 99 at BARR662-66, BARR677.

270.    Boehringer never told the examiner for the '671 application that it was filing a preliminary amendment "as a result of" a restriction requirement, and there is nothing in the record to reflect that the amendment was filed "as a result of" a restriction requirement. The evidence actually shows that Boehringer filed the preliminary amendment for the very same reason Boehringer admits it filed the '671 application in the first place—to address issues presented by the Lilly application. Boehringer explicitly stated during the prosecution of the '086 patent that: "In view of the particular pertinence of [the Lilly application] to claims 1-8, these claims have been cancelled and will be reinstated in a divisional application . . . ." TX 286 at BARR600 (emphasis added). Boehringer's preliminary amendment did precisely that. It narrowed the application to claims 1-8. TX 99 at BARR677. Thus, there simply is no basis to distinguish between the reason the '671 application was filed (which Boehringer admits was due to the Lilly reference) and the reason behind the simultaneously-filed preliminary amendment.

271.    The evidence also shows that Boehringer removed the pyrrolidino compounds from the '671 application claims to avoid overlapping with the '374 patent so they would not be subject to the same kind of double patenting rejection that Boehringer received during prosecution of the '197 application. *See* TX 286 at BARR504 (pending claims "overlap[ped]" with claims of the '374 patent).

272.    In the restriction requirement in the '947 application, Examiner Ceperley did not simply define ten groups, but also mandated that those groups be presented in a particular fashion, *i.e.*, by electing one compound group and one utility group or one process group. TX 46

at BARR 277.

273.    In order to comply with the restriction requirement in the grandparent '947

application, Boehringer was obligated to do, *inter alia*, two things.  First, Boehringer was

obligated not to combine claims falling within certain restriction groups in one application and

not to claim the same group in multiple applications.  Second, if Boehringer wanted to prosecute

utility claims, it was obligated to prosecute compound claims at the same time and vice versa.

Alternately, if Boehringer wanted to prosecute process claims, it had to prosecute such claims

alone.  That reflects the examiner's determination, as part and parcel of the restriction

requirement, that such grouping of the claims would result in claims to a single invention being

included in a single patent.  *See* TX 46 at BARR275-77.

274.    Boehringer separated compound and method groups from each other and put them

in different patents, thereby crossing the line of demarcation set by the examiner because it

prosecuted subject matter in two separate applications that should have been in a single

application.  TX 2; TX 3; TX 46 at BARR 275-77.

275.    Boehringer also included multiple compound groups together in the '812 patent,

which further crossed the line of demarcation set forth in the restriction requirement.  *See* TX 3;

TX 46 at BARR275-76; TX 786 (Stempel Dep.) 616:4-617:2, 617:10-12; TX 787 (Hurnaus

Dep.) at 196:19-197:10, 197:18-22, 198:3-7, 198:9-16, 198:20-199:2, 199:5-199:10, 199:13-

199:17 (discussing claim 3 of the '812 patent); *see also* TX 791 (Schneider Dep.) at 162:14-

164:6.

## RESPONSIVE PROPOSED CONCLUSIONS OF LAW

### I.   BOEHRINGER'S TERMINAL DISCLAIMER IS INEFFECTIVE

276.   A patent term extension may not be put on an expired patent. 35 U.S.C.

§ 156(a)(1); *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 381 F.3d 1371, 1385-86 (Fed. Cir.

2004).

277.   Section 156 of Title 35 only permits one application for a patent term extension.

35 U.S.C. § 156(a)(2); *Fisons plc v. Quigg*, 876 F.2d 99, 100-02 (Fed. Cir. 1989).

278.   *Merck & Co. v. Hi-Tech Pharmacal Co.*, 482 F.3d 1317 (Fed. Cir. 2007), stands

for the proposition that a term extension under Section 156 may be added to a patent whose term

has previously been shortened by a proper terminal disclaimer made to obviate double patenting.

482 F.3d at 1322-24. The Federal Circuit did not sanction the use of a terminal disclaimer filed

after the earlier patent had expired as a cure for double patenting, nor did the court hold that a

disclaimer of some portion of a term extension constitutes a cure for double patenting.

279.   *Merck v. Hi-Tech* does not suggest that a patentee may continue to assert a period

of term extension after the underlying patent has been held invalid.

280.   Not every terminal disclaimer can cure double patenting. To do so, a terminal

disclaimer must at least:

    a)   Be timely filed, before the expiration of the earlier patent, *see In re Lonardo*, 119
F.3d 960, 965 (Fed. Cir. 1997) ("[A] terminal disclaimer may overcome that
[double patenting] basis for unpatentability, assuming that the first patent has not
expired."); *Eli Lilly & Co. v. Barr Labs., Inc.*, 251 F.3d 955, 967 n.5 (Fed. Cir.
2001) (a terminal disclaimer cannot cure double patenting where earlier patent
had no remaining patent term because it had already been disclaimed in its
entirety);

    b)   Ensure that the later patent does not extend beyond the expiration date of the
earlier patent, *see, e.g., Eli Lilly,* 251 F.3d at 967 n.5 ("double patenting precludes
[the later claim] from extending beyond the termination date of the [earlier]
patent"); *In re Longi,* 759 F.2d 887, 894 (Fed. Cir. 1985) (nonstatutory double
patenting can be cured if the patentee files "a terminal disclaimer under 35 U.S.C.

§ 253, disclaiming 'any terminal part of the term . . . of the patent' thereby guaranteeing that the second patent would expire at the same time as the first patent");

c) State that the later patent "shall be enforceable only for and during such period that said patent is commonly owned" with the patent which formed the basis for the double patenting, 37 C.F.R. § 1.321(c)(3); *see also Pharmacia Corp. v. Par Pharm., Inc.*, 417 F.3d 1369, 1374 (Fed. Cir. 2005); *In re Van Ornum*, 686 F.2d 937, 948 (CCPA 1982) ("[W]e consider it desirable to tie both the termination and the ownership of the two patents together."); and

d) Prevent an extension of the monopoly, *See, e.g., Eli Lilly,* 251 F.3d at 967-68 ("The judicially-created doctrine of obviousness-type double patenting . . . prohibit[s] a party from obtaining an extension of the right to exclude through claims in a later patent that are not patentably distinct from claims in a commonly owned earlier patent."); *In re Thorington*, 418 F.2d 528, 537 (CCPA 1969) (double patenting is "grounded on the public policy that abhors improper extensions of monopoly"); *In re Braithwaite*, 379 F.2d 594, 601 (CCPA 1967) ("Double patenting is . . . primarily intended to prevent prolongation of monopoly.").

281.    There is no logical reason for 37 C.F.R. § 1.321(c)—which relates to filing a terminal disclaimer to overcome double patenting—to state that the earlier patent must not have expired.  It is self-evident that disclaiming to an already-expired patent is a senseless exercise because it leaves the patentee without any remaining patent life after the disclaimer.

## II.    BOEHRINGER HAS NOT UNDERMINED THE CLEAR AND CONVINCING EVIDENCE OF DOUBLE PATENTING

282.    The ultimate conclusion as to whether claims are patentably distinct is a legal issue for the Court. *Lonardo*, 119 F.3d at 965.

283.    The inquiry for nonstatutory double patenting is not whether there are differences between the claims, but whether the differences render the later claims patentably indistinct from the earlier claims. *Eli Lilly*, 251 F.3d at 968.

284.    The role of an expert witness is to provide testimony that will assist the Court, not to opine on ultimate legal conclusions.  "An expert's opinion on the ultimate legal conclusion is neither required nor indeed 'evidence' at all." *Nutrition 21 v. United States*, 930 F.2d 867, 871

n.2 (Fed. Cir. 1991) (*citing Avia Group Int'l, Inc. v. L.A. Gear Calif., Inc.*, 853 F.2d 1557, 1564

(Fed. Cir. 1988)); *Bush Indus., Inc. v. O'Sullivan Indus., Inc.*, 772 F. Supp. 1442, 1455 (D. Del.

1991) (*citing Avia*); Fed. R. Evid. 702.

285.    The claims of patents "do not stand alone;" rather, they are to be interpreted by

"the person of ordinary skill in the art" to whom the patent is directed "in the context of the

entire patent, including the specification." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313, 1315

(Fed. Cir. 2005) (en banc).

286.    The educational background of the inventors is a critical factor in determining the

qualifications of the person of ordinary skill. *See, e.g., Daiichi Sankyo Co. v. Apotex, Inc.*, 501

F.3d 1254, 1256-57 (Fed. Cir. 2007).

287.    The Federal Circuit has rejected the argument that a method of treatment claim is

directed only to medical doctors where the inventors had backgrounds in subjects other than

medicine. *See, e.g., Daiichi*, 501 F.3d at 1257.

288.    *In re Christmann* held that where earlier claims have a specific utility and the later

claims can be used for any purpose, the later claims are invalid for double patenting:

> The claims in the instant case are not directed to any particular use
> although . . . appellants rely in part upon the new use to justify their contention for
> allowance of the new claims.  Unquestionably, under the stated circumstances the
> allowance of the appellants' claims would be an extension of the appellants'
> monopoly not warranted by law.  If they were to obtain a patent including the
> instant claims, they would presumptively be given a monopoly for seventeen
> years on the exclusive use of the compound for any purpose.

*Id.* at 599-600; *see also In re Papesch*, 315 F.2d 381, 391 (CCPA 1963) ("[f]rom the standpoint

of patent law, a compound and all of its properties are inseparable"); *Pfizer Inc. v. Ranbaxy

Labs., Ltd.*, 405 F. Supp. 2d 495, 513 (D. Del. 2005) (compound claim includes "both the

chemical structure and the properties of" the compound), *aff'd in part, rev'd in part on other*

*grounds*, 457 F.3d 1284 (Fed. Cir. 2006). Where the later claims are not limited to a given

utility, it extends the monopoly obtained through the earlier claims beyond the term of the earlier

patent, and therefore the later claims are invalid. *See, e.g., Thorington*, 418 F.2d at 537 (double

patenting is "grounded on the public policy that abhors improper extensions of monopoly").

289.    If the R-enantiomer is not encompassed by claim 29, the compounds used in that

(earlier) method claim would be narrower than the set of compounds claimed in (later)

compound claim 7 of the '812 patent. Thus claim 7 (as well as claims 3, 4, 5, 9, and 10) of the

'812 patent would still be anticipated, both literally and inherently, by the earlier claim, and

would still be invalid under the *Geneva-Pfizer* line of cases. *See Pfizer, Inc. v. Teva Pharms.*

*USA, Inc.*, 518 F.3d 1353, 1363 (Fed. Cir. 2008); *Geneva Pharms., Inc. v. GlaxoSmithKline PLC*,

349 F.3d 1373, 1384-86 (Fed. Cir. 2003); *Christmann*, 128 F.2d at 599-600; *In re Byck*, 48 F.2d

665, 666-67 (CCPA 1931); *Eli Lilly*, 251 F.3d at 968.

290.    Each of claims 9, 19, and 39 of the '086 patent independently invalidates the later

compound claims in the '812 patent. Tr. 492:8-495:10 (Anslyn).

291.    Double patenting case law focuses on whether one can practice the earlier patent

without infringing the later patent, not whether one can practice the later patent without

infringing the earlier patent. *See Symbol Techs., Inc. v. Opticon, Inc.*, 935 F.2d 1569, 1581 (Fed.

Cir. 1991); *In re Kaplan*, 789 F.2d 1574, 1578 (Fed. Cir. 1986); *Pfizer v. Ranbaxy*, 405 F. Supp.

2d at 514-15.

292.    The Federal Circuit and the CCPA have held in the *Geneva-Pfizer* line of cases

that claims to a compound and claims to a method of using the compound—claims in two

different statutory classes—are not patentably distinct. *See Pfizer*, 518 F.3d at 1363; *Geneva*,

349 F.3d at 1384-86; *Christmann*, 128 F.2d at 599-600; *Byck*, 48 F.2d at 666-67; *see also*

16

*Research Corp. Techs. v. Gensia Labs, Inc.*, 10 Fed. Appx. 856, 863-64 (Fed. Cir. 2001) (nonprecedential) (rejecting argument that being in different statutory classes is determinative for nonstatutory double patenting).

293.    The holding in *General Foods* recently was recognized by the Federal Circuit as limited to the comparison of two processes that only partially overlapped. *In re Metoprolol Succinate Patent Litigation*, 494 F.3d 1011, 1019 (Fed. Cir. 2007). In *Metoprolol,* the Federal Circuit distinguished such a case from cases like this one, involving claims relating to compounds, and found no patentable distinction between an earlier pharmaceutical composition claim containing a particular compound, and a later claim to the compound itself. *Id.* at 1017. The Federal Circuit expressly rejected the argument that *General Foods* precluded the court from focusing on whether the same compound was part of both claims, stating that "in this case, the composition of the earlier patent claim includes the compound of the later patent claim in its entirety. Specifically, the earlier patent not only <u>discloses</u> but also <u>claims</u> a composition comprised-in-part of" the compound. *Id.* at 1019 (emphases in original).

294.    Where an earlier claim discloses a chemical compound as part of a claimed invention and a later claim is directed to the compound itself, it is proper to compare the chemical compounds described in both sets of claims. *See Metoprolol*, 494 F.3d at 1019.

295.    MPEP Section 806.05(h) does not set forth the substantive test for double patenting applicable here.

296.    MPEP Section 806.05(h) is inconsistent with binding Federal Circuit and CCPA precedent on the standard for determining patentable distinctness, including the *Geneva-Pfizer* line of cases and *Eli Lilly*. The test for patentable distinctness under *Eli Lilly* and the *Geneva-Pfizer* line of cases can lead to different conclusions from MPEP 805.06(h).

17

297.    *Pfizer* dealt with an earlier claim to a pharmaceutical compound and a later claim to use of that compound to treat inflammation. *See Pfizer, Inc. v. Teva Pharms. USA, Inc.*, 482 F. Supp. 2d 390, 476 (D.N.J. 2007), *aff'd in relevant part*, 518 F.3d at 1363. The Federal Circuit recognized that the compound was just one of many different anti-inflammatory drugs which had been used over the years, 518 F.3d at 1356, but nonetheless concluded that the claims were patentably indistinct, *id.* at 1363.

298.    Where the earlier claim recites a composition with a specific utility and the later claim is the composition itself, the later claim is invalid, irrespective of whether the composition could be used in methods other than the one claimed in the earlier patent. *Christmann*, 128 F.2d at 599-600.

299.    In *Byck*, the court held that the rule against double patenting is violated where a patentee obtains a patent on a compound that describes "useful purposes" of the compound, and then attempts to secure patents upon "each of the uses to which it may be adapted." 48 F.2d at 666.

300.    MPEP 806.05(h) is not a substantive test for double patenting, but instead is a means of separating claims based on their subject matter to accommodate administrative convenience and facilitate examination of the application by the PTO. *See Applied Materials, Inc. v. Advanced Semiconductor Materials Am., Inc.*, 98 F.3d 1563, 1568 (Fed. Cir. 1996) (purpose of restriction requirements under Section 121 is to "accommodate administrative convenience").

301.    The PTO does not have the authority to issue substantive rules, and it does not have the authority to make substantive declarations interpreting the Patent Act. *See, e.g., Merck & Co. v. Kessler*, 80 F.3d 1543, 1549-50 (Fed. Cir. 1996); *Tafas v. Dudas*, --- F. Supp. 2d. -----,

2008 WL 859467, at *5-6 (E.D. Va. April 1, 2008).

302.    Later claims can be invalid for double patenting even if the claims involve

"distinct inventions" for purposes of placing them in separate applications. *See Longi*, 759 F.2d

at 893; *In re Heyl*, 379 F.2d 1018, 1021-22 (CCPA 1967).

303.    If the test that the PTO applies to divide up claimed subject matter pursuant to

Section 806.05(h) governed whether claims are patentably distinct for double patenting purposes,

then there would have been no reason to provide the safe harbor provision of 35 U.S.C. § 121.

304.    The decision in *Astellas Pharma, Inc. & Boehringer Ingelheim Pharms. Inc. v.*

*Ranbaxy Inc., et al.*, No. 05-2563 (MLC), 2007 WL 576341 at *5-6 (D.N.J. Feb. 21, 2007), was

vacated at Boehringer's request and is not citeable as precedent. *See* Docket for Civil Action No.

05-CV-2563 (MLC) (D.N.J), *Astellas Pharma, Inc. & Boehringer Ingelheim Pharms. Inc. v.*

*Ranbaxy Inc., et al.*, Entry Nos. 50-51.

305.    The vacated decision in *Astellas* involved the relationship between claims directed

to compounds and claims directed to processes of making them.  It did not involve the

relationship between compound claims and method of use claims.  The court in *Astellas* held that

there is a clear difference between compounds and methods of <u>using</u> them on the one hand (at

issue in *Geneva*) and compounds and processes of <u>making</u> them on the other hand (at issue in

*Astellas*).  2007 WL 576341, at *6.

306.    *Takeda Pharmaceutical Co. v. Dudas*, 511 F. Supp. 2d 81 (D.D.C. 2007), dealt

with a situation in which the compound claims came first (in the earlier patent), and the claims to

processes of making the compounds came second (in the later patent). *Id.* at 84.  That is a very

different factual posture than the instant case, as such an interrelationship would not necessarily

anticipate or render obvious the later process claims.

19

307.    *In re Cady*, 77 F.2d 106 (CCPA 1935), does not bear on the issues here, as, *inter alia*, it addressed the relationship between compounds and processes for making them, not compounds and methods of using them. *Id.* at 106-07.

308.    Patentability must be assessed as of the priority date. *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1258 (Fed. Cir. 2007); *Plant Genetic Sys., N.V. v. DeKalb Genetics Corp.*, 315 F.3d 1335, 1339 (Fed. Cir. 2003).  This principle applies to nonstatutory double patenting as well. *Longi*, 759 F.2d at 893 (*quoting In re Zickendraht*, 319 F.2d 225, 232 (CCPA 1963) (Rich, J., concurring)).  One therefore cannot overcome double patenting by relying on developments in the art subsequent to the date of invention.

309.    Boehringer cannot even satisfy the standard set forth in Section 806.05(h) because (1) its evidence is not commensurate with the scope of the '812 patent claims, and (2) even as to pramipexole, the evidence does not support a conclusion that it can be used in a materially different process from that claimed in the '086 patent.

310.    Copying is only "equivocal evidence of non-obviousness," *Ecolochem, Inc. v. S. Cal. Edison Co.*, 227 F.3d 1361, 1380 (Fed. Cir. 2000), particularly in the Hatch-Waxman context, *Eli Lilly & Co. v. Zenith Goldline Pharms., Inc.*, 2001 U.S. Dist. LEXIS 18361, at *42 (S.D. Ind. Oct. 12, 2001) (evidence of copying in the context of the Hatch-Waxman Act adds "relatively little weight" to any proof of nonobviousness).

## III.    BOEHRINGER HAS NOT SATISFIED ITS BURDEN THAT SECTION 121 APPLIES

311.    A patent examiner, through his actions, can "re-examine an application and withdraw the restriction requirement." *In re Ziegler*, 443 F.2d 1211, 1215 (CCPA 1971).

312.    "By imposition of a new and different restriction requirement and failing to make any reference to the restriction requirements imposed in connection with the parent application,

[an] examiner [can] ma[k]e clear that the previous restriction requirements did not carry over to [a subsequent] application." *Bristol-Myers Squibb Co. v. Pharmachemie B.V.*, 361 F.3d 1343, 1349 (Fed. Cir. 2004).

313.   *Union Carbide v. Dow Chemical Co.*, 619 F. Supp. 1036 (D. Del. 1985) is inconsistent with Federal Circuit case law and the language of Section 121, both of which require that the application sought to be protected actually have been filed as a result of a restriction requirement. 35 U.S.C. § 121; *Bristol-Myers*, 361 F.3d at 1349; *Pfizer*, 518 F. 3d at 1359; *Gerber Garment Tech., Inc. v. Lectra Sys., Inc.*, 916 F.2d 683, 687 (Fed. Cir. 1990).

314.   The holding of *Union Carbide* has been effectively overruled because the court applied Section 121 in a case involving two continuation-in-part applications, and the Federal Circuit has subsequently determined that only divisional, not continuation-in-part, applications are entitled to the safe harbor benefit of Section 121. *Pfizer*, 518 F.3d at 1362.

315.   In *Union Carbide*, although the application at issue was not filed initially as a result of a restriction requirement, the claims of that application were cancelled in toto, and the examiner was apprised that the new claims were being added to the application "as a result of," and to comply with, the requirement for restriction and election in the co-pending application. 619 F. Supp. at 1044, 1060.  Boehringer did not do the same here.

316.   The purpose of imposing a restriction requirement is to have the applicant elect a single invention for prosecution. *See, e.g., Applied Materials*, 98 F.3d at 1576 ("A restriction requirement is made during the prosecution of a patent application at the discretion of the Commissioner to avoid granting a patent for more than one invention." (*citing* 35 U.S.C. § 121)); 37 C.F.R. § 1.142(a) (where a restriction requirement is imposed, "the examiner in an Office action will require the applicant in the reply to that action to elect an invention to which the

claims will be restricted").

## IV. BOEHRINGER IMPROPERLY ATTEMPTS TO SHIFT THE BURDEN REGARDING INFRINGEMENT TO DEFENDANTS

317.   "The patentee has the burden of proving infringement by a preponderance of the evidence." *Centricut, LLC v. Esab Group, Inc.*, 390 F.3d 1361, 1367 (Fed. Cir. 2004).

318.   Defendants were not required to prove—or even raise evidence of—non-infringement. *See Under Sea Indus., Inc. v. Dacor Corp.*, 833 F.2d 1551, 1557 (Fed. Cir. 1987) (finding that the district court erred to the extent it placed the burden on the defendant to show non-infringement); *see also Imhaeuser v. Buerk*, 101 U.S. 647, 662 (1880) (stating that "the burden to prove infringement never shifts if the charge is denied in the plea or answer").

319.   Boehringer has the burden of proving infringement of the '812 patent and nothing relieved Boehringer of this obligation.

Respectfully submitted,

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Adam W. Poff*
Adam W. Poff (#3990)
apoff@ycst.com
The Brandywine Building
1000 West Street, 17th Floor
P.O. Box 391
Wilmington, DE 19899-0391
(302) 571-6600
*Attorney for Barr Laboratories, Inc.*

Date: May 14, 2008

MORRIS JAMES LLP

*/s/ Mary B. Matterer*
Mary B. Matterer (#2696)
MMatterer@morrisjames.com
500 Delaware Avenue, Suite 1500
P.O. Box 2306
Wilmington, DE 19899-2306
(302) 888-6960
*Attorney for Mylan Pharmaceuticals Inc.*

22

## <u>CERTIFICATE OF SERVICE</u>

I, Adam W. Poff, Esquire, hereby certify that on May 22, 2008, I caused to be

electronically filed a true and correct copy of the foregoing document with the Clerk of the Court

using CM/ECF, which will send notification that such filing is available for viewing and

downloading to the following counsel of record:

Jack B. Blumenfeld, Esquire
Morris Nichols Arsht & Tunnell
1201 North Market Street
PO Box 1347
Wilmington, DE 19899-1347

Mary B. Matterer, Esquire
Morris, James, Hitchens & Williams LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE 19801

I further certify that on May 22, 2008, I caused a copy of the foregoing document

to be served on the above-listed counsel by e-mail and on the following non-registered

participants in the manner indicated:

### <u>BY E-MAIL</u>

Steven C. Cherny, Esquire
Latham & Watkins LLP
885 Third Avenue, Suite 1000
New York, NY 10022-4834

Kenneth G. Schuler, Esquire
Latham & Watkins LLP
Sears Tower, Suite 5800
Chicago, IL 60606

Shannon M. Bloodworth, Esquire
Heller Ehrman LLP
1717 Rhode Island Ave., N.W.
Washington, DC 20036

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/s/ *Adam W. Poff*

Adam W. Poff (No. 3990)
Karen E. Keller (No. 4489)
The Brandywine Building
1000 West Street, 17th Floor
Wilmington, Delaware  19801
(302) 571-6600
Email:  apoff@ycst.com

*Attorneys for Barr Laboratories, Inc.*